# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
       :

In re                        :   Chapter 11
       :

DALLAS STARS, L.P., *et al.*,[1]    :   Case No. 11-_____ (___)
       :

        Debtors.       :   Joint Administration Requested
       :
       :   Proposed Bid Proc. Hearing Date: TBD
       :   Proposed Bid Proc. Obj. Deadline: TBD
       :

---------------------------------------------------------x

## DEBTORS' MOTION:

**(I)**       **FOR AN ORDER SCHEDULING A HEARING ON SHORTENED NOTICE (A) TO CONSIDER BIDDING PROCEDURES AND RELATED MATTERS AND (B) TO DETERMINE CONFIRMATION-RELATED DEADLINES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND**

**(II)**     **FOR AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING THE PROPOSED BUYERS' ASSET PURCHASE AGREEMENT AS A STALKING HORSE ASSET PURCHASE AGREEMENT; (C) APPROVING BID PROTECTIONS; (D) SCHEDULING A COMBINED HEARING TO CONSIDER (1) APPROVAL OF THE DISCLOSURE STATEMENT, (2) APPROVAL OF SOLICITATION PROCEDURES AND FORMS OF BALLOTS, (3) CONFIRMATION OF THE PREPACKAGED PLAN, AND (4) APPROVAL OF THE SALE; (E) ESTABLISHING A DEADLINE TO OBJECT TO THE DISCLOSURE STATEMENT, SALE AND THE PREPACKAGED PLAN; (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (G) <u>GRANTING ANY RELATED RELIEF</u>**

        Dallas Stars, L.P. ("<u>Dallas Stars</u>"), Dallas Arena LLC ("<u>Dallas Arena</u>"), Dallas

Stars U.S. Holdings Corp. ("<u>U.S. Holdings</u>"), and StarCenters LLC ("<u>StarCenters</u>"), as debtors

and debtors in possession (collectively, the "<u>Debtors</u>" or "<u>Sellers</u>"), hereby file this motion (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485); and StarCenters LLC (4430).

"Motion") (I) For an Order Scheduling a Hearing on Shortened Notice to Consider Bidding Procedures and to Determine Confirmation-Related Deadlines and Approving the Form and Manner of Notice Thereof; and (II) For an Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement, (c) Approving Bid Protections (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing an Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief, and respectfully represent as follows:

## Procedural Background

1.      On September 15, 2011 (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Further, a motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") is pending before this Court.

## Jurisdiction

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Factual Background**

1.      The Debtors have filed these Chapter 11 Cases to effectuate a sale (the "Sale"), through a competitive auction process (the "Bidding Process"), of substantially all of the assets of the Debtors (the "Purchased Assets"), including (i) the professional ice hockey team that is a member of the National Hockey League (the "NHL") and is known as "the Dallas Stars" (the "NHL Stars"); (ii) their interests in ice arenas and related assets located in the Dallas-Fort Worth metroplex known as the "Dr Pepper StarCenters"; and (iii) all of the ownership interests held by Dallas Arena in and to Center Operating Company, L.P. and Center GP, LLC, which own the leases and agreements related to the American Airlines Center ("AAC"), the arena where the NHL Stars play their home games.  The purpose of the Sale is to allow for a transition in ownership of the NHL Stars, while ensuring that the team continues to play professional ice hockey at the AAC in Dallas.

2.      After a lengthy marketing process and substantial discussions involving input from the NHL and certain of the Debtors' senior secured lenders, prior to the Commencement Date, the Debtors finalized an asset purchase agreement (the "Stalking Horse Asset Purchase Agreement") with Dallas Sports & Entertainment, LP and certain of its affiliates (the "Stalking Horse" or the "Proposed Buyers") providing for the Sale to the Stalking Horse, subject in all respects to NHL approval, of the Purchased Assets under a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, and subject to higher or better offers in the Bidding Process and to NHL approval of both any bid and any bidder.  The ultimate successful bidder that achieves all requisite Bankruptcy Court and NHL approvals will be the "Purchaser" under the Prepackaged Plan.

3.      Prior to the Commencement Date, the Debtors solicited votes (the "Solicitation")

on the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11

of the Bankruptcy Code (the "Prepackaged Plan") through a disclosure statement distributed in

accordance with sections 1125 and 1126(b) of the Bankruptcy Code (the "Disclosure

Statement").  The Debtors believe that the votes obtained during the Solicitation are sufficient

to satisfy the requirements for confirmation of the Prepackaged Plan under the Bankruptcy

Code.

3.      Additional information regarding the Debtors' businesses, the Stalking

Horse Asset Purchase Agreement, the Prepackaged Plan (including the treatment of all claims),

the Bidding Process, and the events leading to these Chapter 11 Cases is contained in the

Declaration of Robert L. Hutson in Support of the Debtors' Chapter 11 Petitions and Request

for First Day Relief (the "Hutson Declaration") and the Disclosure Statement, each filed

contemporaneously herewith.

## Relief Requested

4.      By this Motion, the Debtors seek entry of two orders (the "Orders"),

forms of which are attached hereto as **Exhibits A and B**.   By the first Order, attached hereto as

**Exhibit A** (the "Shortened Notice Order"), which the Debtors are seeking to have entered at the

"first day hearing," the Debtors request the scheduling of a hearing on shortened notice (the

"Bidding Procedures/Scheduling Hearing") to consider approval of the relief requested in the

Bidding Procedures and Confirmation Scheduling Order (as defined below) and approval of the

notice relating thereto.  At the Bidding Procedures/Scheduling Hearing, the Debtors will seek

entry of a second Order, attached hereto as **Exhibit B** (the "Bidding Procedures and

Confirmation Scheduling Order")[2]:

(a)  approving procedures (the "<u>Bidding Procedures</u>", the form of which is attached as **<u>Exhibit 1</u>** to the Bidding Procedures and Confirmation Scheduling Order) for (i) submitting bids for the Purchased Assets (as defined below), (ii) conducting an auction (the "<u>Auction</u>") with respect to the Purchased Assets if the Debtors receive more than one bid on the Purchased Assets;

(b)  approving the Stalking Horse Asset Purchase Agreement between the Debtors and Proposed Buyers, in the form attached to the Bidding Procedures and Confirmation Scheduling Order as **<u>Exhibit 2</u>**, for the purpose of establishing a minimum acceptable bid at which to begin the Auction;

(c)  providing the Proposed Buyers with a break-up fee of US $4,000,000 (the "<u>Break-Up Fee</u>") (representing approximately 1.5% of the transaction value under the Stalking Horse Asset Purchase Agreement) and an Expense Reimbursement in an amount not to exceed US $500,000 (the "<u>Expense Reimbursement</u>" and together with the Break-Up Fee, the "<u>Stalking Horse Protections</u>"), payable under certain circumstances upon the closing of a sale to a successful alternative bidder other than the Proposed Buyer;

(d)  scheduling the Auction for November 21, 2011 at 10 a.m. (Central Time) and providing the procedures governing any auction, as incorporated in the Bidding Procedures;

(e)  scheduling a combined hearing (the "<u>Combined Hearing</u>") to consider (a) approval of the Disclosure Statement; (b) approval of the procedures employed to solicit votes to accept or reject the Prepackaged Plan pursuant to Bankruptcy Rule 3017(a) (the "<u>Solicitation Procedures</u>") and the forms of Ballots (defined below); and (c) the confirmation of the Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c);

(f)  establishing an objection deadline to object to the adequacy of the Disclosure Statement, the Solicitation Procedures, or confirmation of the Prepackaged Plan (the "<u>Objection Deadline</u>");

---

[2] The Bidding Procedures and Confirmation Scheduling Order is defined as the Bidding Procedures Order in the Stalking Horse Asset Purchase Agreement.

(g)     authorizing and approving the form and manner of notice of the Bidding Procedures, the Auction, the Combined Hearing, related deadlines, and the commencement of the Chapter 11 Cases (the <u>Summary and Notice</u>"); and

(h)     granting any related relief.

5.     Below is a table highlighting the dates relevant to the Solicitation Procedures and setting forth the Debtors' proposed dates for the mailing of the Bidding Procedures/Scheduling Hearing Notice (as defined below), the Combined Hearing, and the Objection Deadline:

| Proposed Timetable | |
|---|---|
| Commencement of Solicitation | September 1, 2011 |
| Voting Deadline | September 13, 2011 |
| Commencement Date | September 15, 2011 |
| Mailing of Bidding Procedures/Scheduling Hearing Notice | September 16, 2011[3] |
| Hearing to Consider Bidding Procedures and to Determine Confirmation Schedule | September 22, 2011 |
| Mailing of Summary and Notice | September 26, 2011 |
| Bid Deadline | October 22, 2011 |
| Objection Deadline | October 25, 2011 |
| Reply Date (if any) | October 31, 2011 |
| Auction Date | November 21, 2011 |
| Combined Hearing | November 23, 2011 |

<u>**Relief Requested by the Shortened Notice Order**</u>

6.     By this Motion, the Debtors request the entry of the Shortened Notice Order shortening the applicable notice period for the Bidding Procedures, pursuant to Rule 9006-1(e) of the Local Rules of Bankruptcy Practice and Procedure of the United States

---

[3] This assumes a first day hearing of September 16, 2011.

Bankruptcy Court for the District of Delaware (the "Local Rules") and section 105(a) of the Bankruptcy Code. The Debtors propose that the Bidding Procedures/Scheduling Hearing to consider the relief requested by the Bidding Procedures and Confirmation Scheduling Order be conducted on September 22, 2011 at 10 a.m. (Eastern Time). The Debtors propose that parties may raise objections, if any, to the Bidding Procedures or the confirmation-related deadlines orally at the Bidding Procedures/Scheduling Hearing.

7. The Debtors also request by this Motion approval of the form of notice of the Bidding Procedures/Scheduling Hearing (the "Bidding Procedures/Scheduling Hearing Notice") attached to the Shortened Notice Order as **Exhibit 1**.

### Bidding Procedures-Related Relief

**A.      Approval of the Bidding Procedures**

*Assets to be Sold*

8. The Debtors seek authority to auction and sell substantially all assets of the Debtors (other than the Excluded Assets, as defined in the Stalking Horse Asset Purchase Agreement), including the assets set forth below (collectively, the "Purchased Assets,") free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against, except as assumed under the Stalking Horse Asset Purchase Agreement, under the Prepackaged Plan in accordance with section 1123(b)(4) of the Bankruptcy Code: [4]

       (a)      the Purchased Contracts;

       (b)      all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Sellers (other than any accounts receivable arising out of or in connection with any Excluded

---

[4] Unless otherwise indicated, all capitalized terms herein shall have ascribed to them the definition ascribed to them in the Stalking Horse Asset Purchase Agreement.

US_ACTIVE:\43703938\23\40036.0005
RLF1 5345287v. 1

Contract as identified in Schedule 2.1(b) of the Stalking Horse Asset Purchase Agreement);

(c) all inventory and supplies of Sellers;

(d) all rights of Sellers with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e) all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Sellers, including any prepaid Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date and ending prior to, on, or after the Closing Date;

(f) all rights of Sellers under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(g) all rights and privileges held by Sellers associated with the NHL, including rights to membership and franchise of the Stars in the NHL and all ownership interests of Sellers in any NHL Entity;

(h) the Furniture and Equipment;

(i) the Transferred Equity Interests (subject to the election of Sellers pursuant to section 9.17 of the Stalking Horse Asset Purchase Agreement to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j) Sellers' Intellectual Property;

(k) all Documents of Sellers used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Sellers (other than Continuing

Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Sellers shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Sellers, but only to the extent such Permits are assignable or otherwise transferable;

(m)    all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Seller and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Sellers' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Sellers to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings, team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, the Reunion Arena (the former home ice arena for the Stars), or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Sellers associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any

Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

***The Bidding Procedures***[5]

9.      Although the Debtors engaged in an extensive marketing process prepetition to maximize the value of the Purchased Assets, which resulted in the selection of the Proposed Buyers as the staking horse, through the Bidding Procedures, the Debtors seek to implement a competitive bidding process in these chapter 11 cases for the sale of the Purchased Assets to ensure that they receive the highest or best value for their assets.  To accomplish such a process and expedite approval of the Prepackaged Plan, the Proposed Buyers have agreed to become the "Stalking Horse Bidders" upon entry by this Court of the Bidding Procedures and Confirmation Scheduling Order.

10.      The Debtors believe that the Bidding Procedures provide an appropriate framework for selling the Purchased Assets in a uniform fashion and will enable the Debtors to review, analyze, and compare all bids received to determine which bid(s) are in the best interests of the Debtors and their estates and creditors.  **THE BID OF ANY BIDDER FAILING TO COMPLY WITH THE BIDDING PROCEDURES MAY NOT BE CONSIDERED.**

***Required Approvals by the National Hockey League***

11.      Information Provided to Potential Bidders:  Any person or entity that is interested in becoming a potential purchaser or holder of a direct or indirect interest in the

---

[5] Any summary of the Bidding Procedures set forth in this Motion is qualified in its entirety by the Bidding Procedures attached as **Exhibit A** to the Bidding Procedures and Confirmation Scheduling Order.

Purchased Assets, including, without limitation, each direct or indirect equity holder of such prospective purchaser or holder and each trustee and beneficiary of any trust included therein (each a "Potential Bidder")[6] shall notify the Debtors and the NHL and shall submit certain background information (the "Background Information") no later than seven days after entry of the Bidding Procedures and Confirmation Scheduling Order, and enter into a confidentiality agreement (the "Confidentiality Agreement") satisfactory to the Debtors and the NHL, as further described in section II.A of the Bidding Procedures. Upon submission of the Background Information and the Confidentiality Agreement, a Potential Bidder that is approved for data room access by the NHL shall be given access to a data room for purposes of performing due diligence with respect to the Purchased Assets.

12.     A Potential Bidder or Potential Bidders Group, as the case may be, that submits an offer, solicitation, or proposal (a "Bid") on or before the Bid Deadline that includes: (i) to the NHL, a completed NHL Application, (ii) to the Notice Parties (as defined in the Bidding Procedures), an executed mark-up of the Stalking Horse Asset Purchase Agreement, and (iii) to the Debtors, a good faith deposit (the "Good Faith Deposit") in the amount of US $15,000,000.00, shall be deemed an "Acceptable Potential Bidder." Good Faith Deposits of all Potential Bidders shall be held in a separate interest-bearing account for the Debtors' benefit until consummation of a transaction involving any other bidder for the Purchased Assets.

13.     For an Acceptable Potential Bidder to be deemed a "Qualified Bidder" and its Bid a "Qualified Bid," the Bid must satisfy each of the conditions listed in sections IV.A.1-8 of the Bidding Procedures. Only a bidder who submits a Qualified Bid on or before

---

[6] If two or more Potential Bidders are part of a single group, such group of Potential Bidders shall be referred to herein as a "Potential Bidders Group."

thirty days after entry of the Bidding Procedures and Confirmation Scheduling Order, at 4:00

p.m. (Eastern Time) (the "Bid Deadline") may participate in the Auction.

14.     NHL Approval Required: Each Bid must include as a condition of the

Debtors' obligation to consummate the sale of the Purchased Assets, approval by the NHL

under the NHL Rules.

15.     Two days before the commencement of the Auction (the "NHL

Determination Date"), the NHL shall notify each Acceptable Potential Bidder, the Debtors, and

the Notice Parties to the Bidding Procedures (as defined in the Bidding Procedures) whether the

Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby have been

approved for ownership transfer by the NHL under the NHL Rules.

### *The Auction*

16.     If only one Qualified Bid from a Qualified Bidder is timely received, the

Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court

for approval at the Confirmation Hearing.

17.     If there is more than one Qualified Bidder, the Debtors propose that on

**November 21, 2011 at 10 a.m. (Central Time)**, they will commence the Auction to sell the

Purchased Assets, subject to the Bidding Procedures.  The Debtors further propose that the

Auction be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite

300, Dallas, Texas 75201.  Only Qualified Bidders that have submitted a Qualified Bid shall be

eligible to participate in the Auction.

18.     At the Auction, should one be held, the Debtors will accept additional

bids from Qualified Bidders on account of the Purchased Assets, subject to section V.B of the

Bidding Procedures.  Bidding will continue until the Debtors; in consultation with the NHL;

JPMorgan Chase Bank, N.A. and Monarch Alternative Capital LLC (together, the "Senior Lenders"); and representatives of any statutory committee, determine that the Debtors have received the highest or otherwise best bid for the Purchased Assets. The Debtors, in consultation with the NHL, the Senior Lenders, and representative of any statutory committee, will then determine and announce at the Auction which bid they have determined to be the highest or best bid (the "Successful Bid") and will announce as the backup bid the bid they have determined to be the second highest or otherwise best bid (the "Backup Bid"). The Qualified Bidder that submitted the Successful Bid (the "Successful Bidder") will be required to enter into a definitive agreement, which shall be subject to the approval of the Bankruptcy Court at the Combined Hearing. The Qualified Bidder that submitted the Backup Bid will be required to enter into a contingent definitive agreement, which shall be subject to approval of the Bankruptcy Court if the Successful Bidder does not close.

**B.      Approval of the Proposed Buyers' Asset Purchase Agreement as the Stalking Horse Asset Purchase Agreement**

19.      Pursuant to the Prepackaged Plan, the Debtors are seeking approval of the Proposed Buyers' asset purchase agreement as the Stalking Horse Asset Purchase Agreement, attached hereto as **Exhibit 2.** The Stalking Horse Asset Purchase Agreement represents the bid of the Proposed Buyers and, subject to Court approval, is protected by the Stalking Horse Protections. The Stalking Horse Asset Purchase Agreement is subject to: (1) being determined by the NHL to be a Qualified Bid; (2) the Stalking Horse being determined by the NHL to be a Qualified Bidder; and (3) higher or better offers as part of the Auction process. In connection with the Stalking Horse Asset Purchase Agreement, and in connection with the Sale, the Debtors also seek authority to assume and assign the Purchased Contracts (as

defined in section 1.1 of the Stalking Horse Asset Purchase Agreement) to the Proposed Buyers or ultimate purchaser.

### C. Break-Up Fee and Expense Reimbursement

20. As a condition to the Proposed Buyers entering into the Stalking Horse Asset Purchase Agreement to establish a floor price for the Purchased Assets, the Proposed Buyers required that the Debtors agree to pay a Break-Up Fee and Expense Reimbursement in the event that the Proposed Buyers are ultimately outbid at the Auction or if the Debtors determine not to proceed with the Stalking Horse Asset Purchase Agreement under certain circumstances described in the Bidding Procedures and Confirmation Scheduling Order and in the Stalking Horse Asset Purchase Agreement. Specifically, pursuant to the Stalking Horse Asset Purchase Agreement, if (i) the Stalking Horse Asset Purchase Agreement is terminated pursuant to section 4.2(h) thereof, by Debtors pursuant to section 4.2(a) or section 4.2(d)(i) thereof or by Proposed Buyers pursuant to section 4.2(e) thereof, and (ii) a Competing Bid closes within 180 days of such termination, the Debtors shall cause the Proposed Buyers to be paid out of the proceeds of a Competing Bid an amount equal to $4,000,000 as a Break-Up Fee and shall reimburse the Proposed Buyers an Expense Reimbursement in an amount not to exceed $500,000 in immediately available funds; provided that the Break-Up Fee and Expense Reimbursement shall not be payable if the Stalking Horse Asset Purchase Agreement is terminated by the Debtors pursuant to section 4.2(a) or section 4.2(d)(i) thereof or by Proposed Buyers pursuant to section 4.2(e) thereof, in the event that Proposed Buyers' or any of their affiliates' failure to perform any of their obligations under the Stalking Horse Asset Purchase Agreement (including, without limitation, their obligations under section 9.9 of the Stalking Horse Asset Purchase Agreement) could reasonably be considered to have resulted in the

failure to obtain all required NHL Approvals (as defined in the Stalking Horse Asset Purchase Agreement).

<b><u>Applicable Authority for the Bidding Procedures</u></b>

**A.      Shortening the Time to Consider the Bidding Procedures is Appropriate**

21.      Local Rule 9006-1(c) requires that all motion papers shall be filed and served at least fourteen days prior to a hearing date scheduled for such motion, and seventeen days if notice is given by mail, unless the Bankruptcy Rules state otherwise.  Bankruptcy Rule 2002(a) requires a notice period of at least twenty-one days prior to the scheduled time for a hearing on a motion for the proposed use, sale, or lease of property of the estate outside the ordinary course of business.  Pursuant to Local Rule 9006-1(e) and Bankruptcy Rule 9006, however, the twenty-one day notice period may be shortened by order of the Court upon written motion specifying the exigencies supporting shortened notice.  The Debtors hereby request an expedited notice period for this Motion so that the Bidding Procedures/Scheduling Hearing can be held within seven days of the Commencement Date.

22.      As set forth above, the Debtors believe, upon consultation with the NHL and certain First Lien Lenders (as defined below), that the bid submitted by the Proposed Buyers is worth pursuing as the Stalking Horse Bid in connection with the sale of the Purchased Assets.  The Debtors have widely marketed the Purchased Assets prepetition for years, and have been unable to obtain a higher or better offer for the Purchased Assets than the offer tendered by the Proposed Buyers in the Stalking Horse Asset Purchase Agreement.  In addition, the Bidding Procedures and a form of Bidding Procedures and Confirmation Scheduling Order were included in the solicitation materials sent to all classes entitled to vote on the Debtors' Prepackaged Plan, and thus have been reviewed by interested parties long before the

Commencement Date.

23.     If the Proposed Buyers are appointed as a "stalking horse," the Proposed Buyers' bid will generate competitive bidding at the Auction and will ensure that the Debtors' estates receive the maximum value for the Purchased Assets.  The Stalking Horse Asset Purchase Agreement, however, requires that the Debtors use commercially reasonable efforts to obtain entry of the Bidding Procedures and Confirmation Scheduling Order no later than seven days after the Commencement Date.  *See* Stalking Horse Asset Purchase Agreement at § 8.2. Because all of the dates in the Bidding Procedures are tied to the entry of the Bidding Procedures and Confirmation Scheduling Order, the earlier the Court holds the Bidding Procedures/Scheduling Hearing, the earlier the Purchased Assets can be sold and the Debtors can emerge from chapter 11.  The Debtors' financial situation will become more precarious as time continues to pass without the Purchased Assets being sold, especially once the NHL season begins and the Debtors' payroll increases dramatically.  Accordingly, the Debtors seek expedited consideration of the Bidding Procedures.

24.     Moreover, delaying the Bidding Procedures/Scheduling Hearing will only increase the length of time before the Debtors will be able to consummate the Sale of the Purchased Assets, increasing the cost to the estates for professional fees, and the amount due on the CFV Debt (as described in the Disclosure Statement).

25.     Courts in this District have found it appropriate to shorten the notice period for a hearing on a motion that seeks entry of an order approving bidding procedures in connection with the sale of substantially all of the debtors' assets where denying such relief would, among other things, result in jeopardizing the value of the debtors' assets and threaten the consummation of a proposed sale.  *See, e.g., CB Holding Corp.*, No. 10-13683 (Bankr. D.

Del. Dec. 28, 2010) (order granting motion to shorten notice on bidding procedures where, among other things, such relief would allow debtors to obtain the maximum value for their assets); *In re Urban Brands, Inc.*, No. 10-13005 (Bankr. D. Del. Sept. 23, 2010) (order granting relief so that debtors can consummate a going concern sale of assets and not liquidate); *In re RathGibson, Inc.*, No. 09-12452 (Bankr. D. Del. Mar. 23, 2010) (order granting requested relief so that sale marketing process will result in the highest or best possible bid, and thus maximize the value, for debtors' assets); *In re Abitibibowater, Inc.*, No. 09-11296 (Bankr. D. Del. Nov. 10, 2009) (same).[7]

26.     Upon entry of the Proposed Order, the Debtors will serve it upon (i) the U.S. Trustee, (ii) all entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in or on the Purchased Assets, (iii) the attorneys for the Debtors' prepetition secured lenders, (iv) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002, and (v) all persons who have expressed an interest in acquiring the Purchased Assets within the last year.  Parties in interest will be able to submit objections up until and at the Bidding Procedures/Scheduling Hearing.  Furthermore, failure to object to the Bidding Procedures will not preclude any party in interest from objecting to the Sale of the Purchased Assets at the Combined Hearing.

27.     Accordingly, the Debtors submit that all parties will be provided with sufficient notice of the relief requested in the Shortened Notice Order despite an abbreviated notice period.

---

[7] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon request of Debtors' counsel.

**B.     The Bidding Procedures Should be Approved**

28.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be undertaken by private sale or by public auction.  The Debtors believe that the Bidding Procedures that would control the Auction are fair and appropriate and will maximize the recovery for the Debtors and their estates in connection with the sale of the Purchased Assets.  The Bidding Procedures provide for an open auction process with minimum barriers to entry and the proposed deadlines provide interested parties with sufficient time to perform due diligence on the Purchased Assets.

29.     The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets.  Bidding procedures should be approved when they provide a benefit to the estate, maximize the value of the Purchased Assets, and enhance competitive bidding.  *In re Dura Automotive Sys., Inc.*, 2007 Bankr. LEXIS 2764, No. 06-11202, *253 (Bankr. D. Del. Aug. 15, 2007)  Further, bidding procedures should be approved when they are determined using good business judgment.  *See In re Holley Performance Prods.*, 2009 Bankr. LEXIS 4683, No. 09-1333 at *5 (Bankr. D. Del. Dec. 9, 2009) (bidding procedures approved because they were in the debtors' reasonable business judgment); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2nd Cir. 1992) (holding that the procedures governing sales outside of the ordinary course of business should be properly calculated to obtain a fair and reasonable recovery and determined by the debtors' good business judgment); *In re The Bombay Co., Inc.*, Case No. 07-44084-DML-11, 2007 Bankr. LEXIS 3218, at *12 (Bankr. N.D. Tex. Sept. 26, 2007) ("The principal question the court thus

faces is whether management of the Debtors in fact exercised good business judgment [by proposing the bidding procedures].").; *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (same). The Debtors believe that the Bid Procedures satisfy these standards and are consistent with other procedures previously approved in this district and in other bankruptcy courts.

30.  The Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the consideration that should be received for the Purchased Assets. Accordingly, approval of the Bid Procedures, including the dates established thereby for the Auction and the Combined Hearing, is warranted.

**C.  The Approval of the Stalking Horse Protections Are Appropriate**

31.  In connection with the Sale, the Debtors are seeking authorization to pay the Stalking Horse Protections described herein if either: (i) the Stalking Horse Asset Purchase Agreement is terminated pursuant to section 4.2(h) thereof, by Debtors pursuant to section 4.2(a) or section 4.2(d)(i) thereof or by Proposed Buyers pursuant to section 4.2(e) thereof, and (ii) a Competing Bid closes within 180 days of such termination, the Debtors shall cause the Proposed Buyers to be paid out of the proceeds of a Competing Bid an amount equal to $4,000,000 as a Break-Up Fee and shall reimburse the Proposed Buyers an Expense Reimbursement in an amount not to exceed $500,000 in immediately available funds; provided that the Break-Up Fee and Expense Reimbursement shall not be payable if the Stalking Horse Asset Purchase Agreement is terminated by the Debtors pursuant to section 4.2(a) or section 4.2(d)(i) thereof or by Proposed Buyers pursuant to section 4.2(e) thereof, in the event that Proposed Buyers' or any of their affiliates' failure to perform any of their obligations under the

Stalking Horse Asset Purchase Agreement (including, without limitation, their obligations under section 9.9 of the Stalking Horse Asset Purchase Agreement) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals (as defined in the Stalking Horse Asset Purchase Agreement).

32.     Under controlling Third Circuit precedent, approval of a break-up fee is appropriate if it is shown to be necessary to preserve the value of the estate. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-07 (3d Cir. 2010) (noting that the Third Circuit "recognize[d] that the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time, money and energy needed to produce its bid" and thus a break-up fee is permissible and sometimes necessary to preserve the value of the estate).

33.     In *Reliant*, a bidder entered into an asset purchase agreement with the debtors for one of the debtors' assets.  The asset purchase agreement provided that should the bankruptcy court want an auction to seek higher or otherwise better offers for the asset, that the bidder's bid become a stalking horse bid and the bidder be afforded bidding protections in the form of a break-up fee and expense reimbursement.  The bankruptcy court ordered that the asset be put up for auction, but did not grant the bidder its break-up fee as a bid protection (though it did grant the expense reimbursement).  The District Court and Third Circuit affirmed the bankruptcy court's holding that the break-up fee had neither induced the bidder to sign the asset purchase agreement, nor was it necessary to cause the bidder to adhere to its bid.  The Third Circuit held that for a break-up fee to be approved, it must either provide a benefit to the estate by inducing the bidder to bid or by preventing the bidder from withdrawing its bid. *Id.* at 206-08.  Further, the Third Circuit held that break-up fees are normal, appropriate, and in some cases necessary components of sales outside the ordinary course of business under section 363

of the Bankruptcy Code.  *Id.* at 206-07 (noting that "the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time, money and energy needed to produce its bid" and thus a break-up fee is permissible and sometimes necessary to preserve the value of the estate); *see also In re Integrated Res., Inc.,* 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a single "white-knight" to enter the bidding by providing some form of compensation for the risk it is undertaking). Break-up fees encourage bidding by "establish[ing] a bid standard or minimum for other bidders to follow. . . .or attract[ing] additional bidders."  *Id.* at 662.

34.     Here, the Proposed Buyers have agreed to enter into the Stalking Horse Asset Purchase Agreement only if they receive the Stalking Horse Protections.  Without these protections, the Proposed Buyers could walk away from the Stalking Horse Asset Purchase Agreement.  *See* Stalking Horse Asset Purchase Agreement § 11.3(e).  Thus the Stalking Horse Protections not only induced the Proposed Buyers to make their initial bid, but the granting of the Stalking Horse Protections is necessary to prevent the Proposed Buyers from being able to withdraw their Stalking Horse Bid.  Given the time the Debtors have spent unsuccessfully seeking a bidder for these assets, such a withdrawal would be devastating for the Debtors' ability to emerge from chapter 11.  In addition, not only will the existence of the Stalking Horse Asset Purchase Agreement increase the likelihood of competitive bidding at the Auction, it will also establish a floor bid, ensuring that other bids provide for more than is contemplated in the Stalking Horse Asset Purchase Agreement.

35.     In addition, the Expense Reimbursement of up to $500,000 is appropriate.  Without the assurance of the Expense Reimbursement, it is unlikely that the Proposed Buyers would have entered into the Stalking Horse Asset Purchase Agreement,

because the Proposed Buyers performed extensive due diligence on the value of the Purchased

Assets and invested time and money to prepare an offer.  Indeed, the Expense Reimbursement

served as an inducement for the Proposed Buyers to allow the Purchased Assets to become

subject to the Bidding Procedures and encouraged the Proposed Buyers to enter into an

agreement it otherwise would not have.  Further, the Expense Reimbursement ensured the

Proposed Buyers would spend the resources required to craft an appropriate offer for the

Purchased Asset, which can now serve as the base price in the event of an Auction.

36.     Because the Stalking Horse Protections provide the types of benefits to

the Debtors' estates as identified by the Third Circuit in *Reliant*, they should be approved.

Without the assurance of the Break-Up Fee and Expense Reimbursement, it is unlikely that the

Proposed Buyers would have entered into the Stalking Horse Asset Purchase Agreement.

37.     Further, the Break-Up Fee is fair and reasonable in amount and is within

the range of Break-Up Fees approved in this jurisdiction.  The Break-Up Fee represents

approximately 1.5% of the transaction value under the Stalking Horse Asset Purchase

Agreement.  Bankruptcy courts in this District have approved protections similar to the

proposed protections requested herein as reasonable and consistent with the type and range of

bidding protection typically approved.  *See, e.g.*, In re *Allen Family Foods, Inc.*, Case No. 11-

11764 (KJC) (Bankr. D. Del. June 24, 2011) ($2.1 million break-up fee and $600k expense

reimbursement in connection with $86 million dollar sale, or 3.1% ); *In re TW Liquidation

Corp.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 28, 2011) ($1.25 million break-up fee in

connection with a $44.677 million sale, or 2.8% ); *In re PCAA Parent LLC*, Case No. 10-10250

(MFW) (Bankr. D. Del  Feb. 17, 2010) (approving $3.066 million break-up fee and $750k

expense reimbursement in connection with $111.5 million sale, or 3.4%); *In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650k break-up fee and $400k expense reimbursement in connection with $17.65 million sale, or 5.9%); *In re Tallygenicom, L.P.*, Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $750k break-up fee and $750k expense reimbursement in connection with $36.6275 million sale, or 4.1%); *In re Sharper Image Corp.*, Ch. 11 Case No. 08-10322 (KGG) (Bankr. D. Del. May 14, 2008) (authorizing a break-up fee of $1,025,000 and reimbursement of expenses of up to $500,000, or 2.9%); *In re Women's First Healthcare, Inc.*, 332 B.R. 115, 122 (Bankr. D. Del. 2005) (approving break-up fee of $50,000 or approximately 3% of purchase price); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2000) [Dkt. No. 1700] (approving a $25 million or 3% of purchase price break-up fee).[8]  Accordingly, the Debtors should be authorized to offer the Break-Up Fee in the amount required by the Proposed Buyers as the Debtors deem necessary in their business judgment.

38.     This Court has also approved protections similar to the proposed Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved.  *See, e.g., In re Magic Brands, LLC*, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); *In re Spheris, Inc.*, Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 23, 2010) (authorizing stalking horse expense reimbursement); *In re Anchor Blue Retail Group, Inc.*, Case No. 09-11770 (PJW) (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to $1,000,000.00); *In re Sharper Image Corp.*, Case No. 08-10322 (KG) (Bankr. D. Del. Mar. 12, 2008)

---

[8] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon request of Debtors' counsel.

(authorizing reimbursement of expenses for initial bidder in Store Closing Sales auction); *In re Earthshell Corp.*, Case No. 07-10086 (KG) (Bankr. D. Del. Feb. 12, 2007) (authorizing stalking horse expense reimbursement up to $300,000.00); *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination payment); *In re Radnor Holdings Corp.*, Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) (authorizing expense reimbursement).[9]

39.     For the foregoing reasons, the Debtors submit that the proposed Stalking Horse Protections provide an actual benefit to the Debtors' estates and are appropriate as contemplated by the Stalking Horse Asset Purchase Agreement. Accordingly, the Stalking Horse Protections should be approved.

**D.     The Proposed Notice Procedures Are Adequate**

40.     As described below in more detail, the Debtors will be providing notice of the Bidding Procedures, as well as notice of the confirmation-related deadlines and a summary of the plan, through the Summary and Notice. The Debtors request that the Court approve the Summary and Notice because it satisfies the requirements of Bankruptcy Rule 2002. Bankruptcy Rule 6004 provides that notice of a proposed sale of property outside the ordinary course of business must satisfy the requirements of Bankruptcy Rule 2002. Pursuant to Bankruptcy Rule 2002, the Debtors are required to notify their creditors of the sale of the Purchased Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. In accordance with such rules, the Debtors propose to serve copies of the Bidding Procedures and Confirmation Scheduling

---

[9] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon request of Debtors' counsel.

Order and the Summary and Notice no later than three business days after entry of the Bidding Procedures and Confirmation Scheduling Order, by first class mail, postage prepaid, or other method reasonably calculated to provide notice of the sale and the Auction, upon by first-class mail upon the Noticed Parties.

41.     The Debtors submit that such notice shall constitute good and sufficient notice of the Bidding Procedures, the Auction, and the sale of the Purchased Assets and that no other or further notice need be given.  Accordingly, the Debtors request that the Court approve the form and manner of the Summary and Notice.

**Relief Relating to Solicitation Procedures
and Confirmation and Applicable Authority**

**A.     Scheduling a Combined Hearing**

42.     Bankruptcy Rule 3017(a) provides that "the court shall hold a hearing on at least 28 days' notice … to consider the disclosure statement and any objections or modifications thereto."  Section 1128(a) of the Bankruptcy Code provides that "[a]fter notice, the court shall hold a hearing on confirmation of a plan."  In addition, Bankruptcy Rule 3017(c) provides that "[o]n or before approval of the disclosure statement, the court … may fix a date for the hearing on confirmation."  Section 105(d)(2)(B)(vi) of the Bankruptcy Code provides that the Court may combine the hearing on approval of the disclosure statement with the hearing on confirmation of the plan.

43.     The most sensitive and difficult task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies – has already been accomplished in advance of the Commencement Date.  As set forth above and in greater detail in the Hutson Declaration, the Debtors solicited votes on the Prepackaged Plan

from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plan. The votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished. Thus, the Debtors respectfully submit that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan once an Auction, should one be necessary, is conducted. It is in the best interests of the Debtors' estates and their creditors to proceed with the confirmation process as expeditiously thereafter as possible.

44.     In accordance with the schedule outlined above, the Debtors respectfully request that the Court schedule the Combined Hearing for November 23, 2011, well in excess of the required 28 days notice and two days after the proposed Auction. The proposed schedule is in the interests of all parties in interest in the Debtors' reorganization cases. The relief sought herein is necessary to the efficient prosecution of these chapter 11 cases and will assist in the expeditious confirmation of the Prepackaged Plan while providing adequate notice to, and protecting the rights of creditors. Such relief allows for more than ample time for parties to evaluate the Disclosure Statement and Prepackaged Plan prior to the Combined Hearing.

**B.**     **Approval of Solicitation Procedures and Forms of Ballots**

45.     The Debtors request that at the Combined Hearing the Court consider approval of the Solicitation Procedures, all of which were undertaken and substantially completed prior to the Commencement Date.

**1. Classes Presumed to Accept the Prepackaged Plan and Classes Deemed to Reject the Prepackaged Plan**

46.     Because each of the holders in Classes 1A-1D (Priority Non-Tax Claims); Class 4A (the CFV Claim); Class 5A-5D (Secured Tax Claims); Classes 6A-6D (Other Secured Claims); and Classes 7A-7D (Assumed General Unsecured Claims) are unimpaired by the Prepackaged Plan, the holders of claims in each of these classes are conclusively presumed to have accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.  The Debtors submit that the Bankruptcy Code does not require the solicitation of votes from such holders.  Specifically, section 1126(f) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, the holders of claims in each of these unimpaired classes are conclusively presumed to accept the Prepackaged Plan and have not been solicited.

47.     Similarly, because each of the holders in Classes 8A-8D (Non-Assumed General Unsecured Claims) and Classes 9A-9D (Equity Interests in Debtors) are not entitled to any distribution or to retain any property pursuant to the Prepackaged Plan, the holders of claims in that class are presumed to have rejected the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.  The Debtors submit that the Bankruptcy Code does not require the solicitation of votes from such holders.  Specifically, section 1126(g) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, the holders of claims or equity interests in each of the impaired classes mentioned above are conclusively deemed to reject the Prepackaged Plan and have not been solicited.

48.    The Debtors submit that, with respect to the specific classes of claims against and equity interests in the Debtors that were presumed to accept or deemed to reject the Prepackaged Plan, the Solicitation Procedures undertaken by the Debtors and described herein comply with the Bankruptcy Code and should be approved.  The Debtors respectfully request that the Court consider approval of the Solicitation Procedures with respect to these classes at the Combined Hearing.

**2.    Solicitation of Classes Entitled to Vote to Accept or Reject the Prepackaged Plan**

49.    Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from a holder of a claim or interest without an approved disclosure statement when there is no nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, if such holder was solicited prior to the commencement of the bankruptcy case and such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of the Bankruptcy Code.  Further Bankruptcy Rule 3018(b) provides, in relevant part, as follows:

> A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to

substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code.

50.     On September 1, 2011, the Disclosure Statement, the Prepackaged Plan, the Stalking Horse Asset Purchase Agreement, the proposed Confirmation Order, the proposed Bidding Procedures and Confirmation Scheduling Order, the Senior Secured Loan (as defined in the Stalking Horse Asset Purchase Agreement), and one or more of the forms of ballots (the "Ballots"), attached to the Bidding Procedures and Confirmation Scheduling Order as **Exhibit 4**, were overnight mailed to all holders of impaired claims entitled to vote on the Prepackaged Plan, including holders of claims in Classes 2A-2D (First Lien Holder Claims) and Classes 3A-3D (Second Lien Holder Claims).  The Debtors established August 19, 2011, as the record date (the "Record Date") for determining which creditors were entitled to vote on the Prepackaged Plan.  The voting period ended at 4 p.m. Eastern Time on September 13, 2011 (the "Voting Deadline").

51.     Bankruptcy Rule 3017(d) requires a form of ballot substantially conforming to Official Form No. 14.  The Ballots are based on Official Form No. 14, but were modified to address the particular aspects of these chapter 11 cases and to be relevant and appropriate for each class of impaired claims and interests entitled to vote on the Prepackaged Plan.  To be counted as votes to accept or reject the Prepackaged Plan, the Ballots stated that all Ballots must be properly executed, completed and delivered to The Garden City Group, Inc. so that they are received no later than the Voting Deadline.  In addition, each of the Ballots was specifically designed to conform to the Prepackaged Plan.

52.     The restructuring proposed in the Prepackaged Plan is the product of

negotiations over several months between the Debtors, the Proposed Buyer, the NHL, and the Debtors' secured creditors, including certain lenders party to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (the "First Lien Lenders"); and the agent to the lenders party to that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (the "Second Lien Lenders").  The solicitation process only required the balloting of 50 parties, each of which was a sophisticated lender in the nature of a bank, asset management fund, or other investment firm. Given these circumstances and the fact that the Voting Deadline was 13 days after the commencement of solicitation, the Debtors believe that the solicitation period was a sufficient period within which such creditors could make an informed decision to accept or reject the Prepackaged Plan.  This is further supported by the fact that the class consisting of the First Lien Lenders voted to accept the Prepackaged Plan by 100% in amount and 100% in number of those voting,[10] and that the class consisting of the Second Lien Lenders voted to accept the Prepackaged Plan by 89.6% in amount and 85.7% in number of those voting.[11]

53.     The Debtors respectfully submit that: (i) the Disclosure Statement and the Solicitation Procedures instituted in connection therewith, including the form of Ballots, are in full compliance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules as well as any applicable nonbankruptcy laws, rules, or regulations governing the adequacy of disclosure in connection with such solicitation; (ii) the Disclosure Statement

---

[10] Of the total number of First Lien Lenders, 79.3% cast a Ballot, representing 93.5% of the outstanding amount of the First Lien Holder Claims.

[11] Of the total number of Second Lien Lenders, 77.8% cast a Ballot, representing 92.2% of the outstanding amount of the Second Lien Holder Claims, and those voting in favor constitute 66.7% in number and 82.6% in amount of 100% of the Second Lien Holder Claims.

contains adequate information to permit holders of impaired claims against and interests in the

Debtors to make an informed judgment about the Prepackaged Plan pursuant to sections

1125(a) and 1126(b)(2) of the Bankruptcy Code; and (iii) the Debtors' Solicitation Procedures

complied with all the requirements of Bankruptcy Rule 3018. Accordingly, at the Combined

Hearing, the Debtors will respectfully request that this Court enter an order (i) finding that the

information contained in the Disclosure Statement is "adequate information" as such term is

defined in section 1125(a) of the Bankruptcy Code, (ii) approving the Solicitation Procedures

and form of Ballots, and (iii) granting such other and further relief as the Court may deem just

and proper.

### C. Deadline and Procedures for Objections to the Sale, Disclosure Statement and the Prepackaged Plan

54. Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing

objections to a plan of reorganization, whereas Bankruptcy Rule 3017(a) authorizes the Court to

fix a time for filing objections to the adequacy of a disclosure statement. Further, Bankruptcy

Rule 2002(b) requires at least twenty-eight days' notice be given by mail to all creditors of the

time fixed for filing objections to approval of a disclosure statement and confirmation of a plan

of reorganization.

55. The Debtors respectfully request that the Court set a date that is at least

twenty-eight calendar days after the mailing of the Summary and Notice as the Objection

Deadline—the last date to file objections to approval of the Disclosure Statement or

confirmation of the Prepackaged Plan. This date will provide creditors and holders of equity

interests twenty-eight days' notice of the deadline for filing objections to the Disclosure

Statement and the Prepackaged Plan, while still affording the Debtors and other parties in

interest time to file a responsive brief and, if possible, resolve any objections received.  The Debtors also request that the Court set any reply deadline at least four business days after the Objection Deadline.

56.     The Debtors further request that the Court direct that any objections to the Disclosure Statement and/or Prepackaged Plan be in writing, filed with the Clerk of the United States Bankruptcy for the District of Delaware together with proof of service thereof, set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estates or properties of the Debtors, and state the legal and factual basis for such objection.  Any such objections should be served upon the following so as to be received no later than 5 p.m. Eastern Time on October 25, 2011: (a) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin Sosland and Weil, Gotshal & Manges LLP, 767 Fifth Ave., New York, New York, 10153, attn Ronit J. Berkovich); (b) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan and J. Gregory Milmoe); (d) counsel to JP Morgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC  20006-5417, attn: Andrew LeBlanc); and (f) counsel to a committee, if one shall be appointed.

**D.** **Form and Manner of Notice of the Commencement and the Combined Hearing of These Chapter 11 Cases**

57.     Not later than three Business Days following the entry of the Bidding Procedures and Confirmation Scheduling Order, the Debtors propose to serve a notice and summary of the Prepackaged Plan in the form of the Summary and Notice, substantially in the form annexed as **Exhibit 3** to the Bidding Procedures and Confirmation Scheduling Order, by first-class mail on: (a) the Office of the United States Trustee for the District of Delaware; (b) creditors listed on the creditor matrix; (c) all counterparties to the Purchased Contracts; (d) all parties with liens on or against the Purchased Assets; and (e) all affected federal, state and local governmental bodies and taxing authorities, including the IRS, and any federal, state or local governmental body with regulatory or tax jurisdiction with respect to the Purchased Assets or the Assumed Liabilities (the "Noticed Parties").

58.     The Summary and Notice contains, *inter alia*: (i) notice of commencement of these chapter 11 cases (ii) the date, time, and place of the Combined Hearing; (iii) instructions for obtaining copies of the Disclosure Statement and Prepackaged Plan; (iv) the Objection Deadline and the procedures for filing objections to the Disclosure Statement and the confirmation of the Prepackaged Plan. The Debtors believe that sending notice of the Commencement and notice of the Combined Hearing after the Bidding Procedures/Scheduling Hearing is the most efficient, as the same creditors that would be entitled to notice of the Commencement would be entitled to receive notice of the Combined Hearing and these creditors would not be prejudiced by the minimal time period that will have elapsed between the Commencement Date and the Bidding Procedures/Scheduling Hearing.

59.     In addition, Bankruptcy Rule 2002(*l*) permits a court to "order notice by

publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice." The Debtors request that this Court authorize the Debtors, in their discretion, to give supplemental publication notice of the Auction and Combined Hearing in the *Wall Street Journal*, national edition, the *Dallas Morning News*, or any other newspaper in their discretion on a date no less than twenty-eight days prior to the Objection Deadline. The proposed notice schedule, as described above, affords parties in interest ample notice of these proceedings.

60.     The Debtors request that the Court determine that they are not required to distribute copies of the Prepackaged Plan or the Disclosure Statement to any holder of a claim against or equity interest in the Debtors within a class under the Prepackaged Plan that is deemed to accept or is deemed to reject the Prepackaged Plan, unless such party makes a specific request in writing for the same. Bankruptcy Rule 3017(d) provides, in relevant part, as follows:

> If the court orders that the disclosure statement and the plan or a summary of the plan shall not be mailed to any unimpaired class, notice that the class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan or summary of the plan and disclosure statement may be obtained upon request and at the plan proponent's expense, shall be mailed to members of the unimpaired class together with the notice of the time fixed for filing objections to and the hearing on confirmation.

The Debtors request that the Court apply the same rationale to classes that are deemed to reject the Prepackaged Plan and waive the requirement that the Debtors send a copy of the Prepackaged Plan and Disclosure Statement to members of these classes. In lieu of furnishing each such holder of a claim against or equity interest in the Debtors that is either deemed to accept or is deemed to reject the Prepackaged Plan with a copy of the Prepackaged Plan and the Disclosure Statement, the Debtors propose to send to such parties the Summary and Notice,

which sets forth the manner in which a copy of the Prepackaged Plan and the Disclosure Statement may be obtained.  Accordingly, the Debtors submit that such notice satisfies the requirements of Bankruptcy Rule 3017(d).

### E. Related Relief

61.     Section 341(a) of the Bankruptcy Code requires the United States Trustee to convene and preside at a meeting of creditors, and section 341(b) authorizes the United States Trustee to convene a meeting of equity security holders.  However, section 341(e) of the Bankruptcy Code provides for the following exception:

> Notwithstanding subsections (a) and (b), the court, on the request of a party in interest and after notice and a hearing, for cause may order that the United States Trustee not convene a meeting of creditors or equity security holders if the debtor has filed a plan as to which the debtor solicited acceptances prior to the commencement of the case.

62.     As noted above, the Debtors commenced solicitation prior to the Commencement Date and obtained the requisite amount of acceptances of the Prepackaged Plan prior to the Commencement Date.  The classes consisting of holders of claims materially affected by the Prepackaged Plan have already accepted the Prepackaged Plan in excess of the statutory thresholds specified in section 1126(c) and 1126(d) of the Bankruptcy Code.  The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtors intend to proceed accordingly.  The Debtors submit that cause exists for this Court to direct the United States Trustee not to convene a meeting of creditors or equity security holders unless the Prepackaged Plan is not confirmed within ninety days after the Commencement Date.

### The Relief Requested is Appropriate

63.     The requested relief is further supported by the prepackaged nature of

these cases.  As set forth above and in greater detail in the Hutson Declaration, the Debtors

solicited votes on the Prepackaged Plan from all classes entitled to vote to accept or reject the

Prepackaged Plan.  The votes tabulated and received from these classes demonstrate acceptance

of the Prepackaged Plan.  The most critical and complex task required to effectuate a successful

reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has

already been accomplished.  Thus, the Debtors respectfully submit that given the backdrop of

these cases, the relief requested herein is appropriate inasmuch as such relief will assist the

Debtors to move towards expeditious confirmation of the Prepackaged Plan with the least

possible disruption or harm to their businesses.  Based on the foregoing, the Debtors submit that

the relief requested is necessary and appropriate, is in the best interests of their estates and

creditors, and should be granted in all respects.

### Notice

64.     No trustee, examiner or statutory creditors' committee has been

appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (i) the Office

of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty largest

unsecured creditors (on a consolidated basis); (iii) counsel to National Hockey League, (iv)

counsel to agent under the First Lien Credit Agreement, (v) counsel to agent under the Second

Lien Credit Agreement, (vi) counsel to the Stalking Horse, (vii) any party that may hold a lien

on the Debtors properties; and (viii) any party that has signed a non-disclosure agreement with

the NHL in connection with a potential purchase of the Purchased Assets.  As this Motion is

seeking first-day relief, notice of this Motion and any order entered hereon will be served on all

parties required by Del. Bankr. L.R. 9013-1(m).  The Debtors respectfully submit that no

further notice of this Motion is required.

## **No Previous Request**

65.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

US_ACTIVE:\43703938\23\40036.0005
RLF1 5345287v. 1

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: September 15, 2011
      Wilmington, Delaware

/s/ *John H. Knight*
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Zachary I. Shapiro (No. 5103)
Julie A. Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

– and –

Martin A. Sosland (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Facsimile:   (214) 746-7777

Ronit J. Berkovich (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Proposed Attorneys for Debtors and
Debtors in Possession

US_ACTIVE:\43703938\23\40036.0005
RLF1 5345287v. 1