# Exhibit B

## Bidding Procedures and Confirmation Scheduling Order

---------------------------------------------------------------------- x
               :

In re                           :    **Chapter 11**
               :

**DALLAS STARS, L.P.,** *et al.*[1]    :    **Case No. 11 -_____ (___)**
               :

        **Debtors.**           :    **Joint Administration**
               :    **Requested**

---------------------------------------------------------------------- x

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, AND 503 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, AND 9014 (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING THE DALLAS SPORTS AND ENTERTAINMENT, L.P. ASSET PURCHASE AGREEMENT AS A STALKING HORSE AGREEMENT, (C) APPROVING BID PROTECTIONS, (D) SCHEDULING A COMBINED HEARING TO CONSIDER (1) APPROVAL OF THE DISCLOSURE STATEMENT, (2) APPROVAL OF SOLICITATION PROCEDURES AND FORMS OF BALLOTS, (3) CONFIRMATION OF THE PREPACKAGED PLAN, AND (4) APPROVAL OF THE SALE; (E) ESTABLISHING A DEADLINE TO OBJECT TO THE SALE, THE DISCLOSURE STATEMENT, AND THE PREPACKAGED PLAN; (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND OF THE CHAPTER 11 CASES; AND (G) GRANTING ANY RELATED RELIEF**

Upon the motion (the "Motion") of Dallas Stars, L.P. ("Dallas Stars"), Dallas Arena LLC

("Dallas Arena"), Dallas Stars U.S. Holdings Corporation ("U.S. Holdings"), and StarCenters

LLC ("StarCenters"), as debtors and debtors in possession (collectively, the "Debtors"), pursuant

to sections 105, 363, 365, and 503 of the Bankruptcy Code,[2] and sections 2002, 4001, 6004,

6006, 9008, and 9014 of the Bankruptcy Rules for an order (I) For an Order Scheduling a

Hearing on Shortened Notice to Consider Bidding Procedures and to Determine Confirmation-

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485); and StarCenters LLC (4430).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Related Deadlines and Approving the Form and Manner of Notice Thereof; and (II) For an Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement; (c) Approving Bid Protections; (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing an Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief all as more fully described in the Motion; and upon the Hutson Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the hearing to consider the relief requested therein (the "<u>Hearing</u>") having been given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty largest unsecured creditors (on a consolidated basis); (iii) counsel to National Hockey League, (iv) counsel to agent under the First Lien Credit Agreement, (v) counsel to agent under the Second Lien Credit Agreement, (vi) those parties that have requested notice pursuant to Bankruptcy Rule 2002, (vii) counsel to the Purchaser, (viii) any party that may hold a lien on the Debtors properties; (ix) any party that has signed a non-disclosure agreement with the NHL in connection with a potential purchase of the Purchased Assets; and (x) all parties required by Local Rule 9013-1(m) in compliance with the Bankruptcy Code, the Bankruptcy Rules and the Shorten Notice Order, dated [_____, 2011] [Docket No. ___] , authorizing and approving the form and manner of notice of the Hearing, as established by the Affidavit of Service of [_____] of the Bid Procedures/Scheduling Hearing

Notice, dated [_____, 2011] [Docket No. __]; and the legal and factual bases set forth in the Motion establishing just and sufficient cause to grant the relief requested therein; and the relief granted herein being in the best interests of the Debtors, their estates, creditors, and all parties in interest; and the Court having held the Hearing with the appearances of interested parties noted in the record of the Hearing; and upon the entire record and all of the proceedings before the Court, it is hereby further FOUND AND DETERMINED THAT:

A.      The proposed Summary and Notice will constitute due, adequate, and timely notice of the commencement of the Debtors' Chapter 11 Cases, the Bidding Procedures, the Auction, the Combined Hearing, the Objection Deadline, the procedures for objecting to the adequacy of the Disclosure Statement and to confirmation of the Prepackaged Plan, and the procedures for objecting to the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith in accordance with Bankruptcy Rule 2002.

B.      The Debtors have articulated good and sufficient reasons for approving the Bidding Procedures.

C.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the return for the Purchased Assets.  The Bidding Procedures were negotiated in good faith between the Debtors and Dallas Sports & Entertainment L.P. and certain of its affiliates (the "Proposed Buyers").

D.      The Proposed Buyers have expended, and likely will continue to expend, considerable time, money, and energy pursuing the purchase of the Purchased Assets and have engaged in extended arm's-length and good faith negotiations. The Stalking Horse Asset Purchase Agreement is the culmination of these efforts.

E.     The Debtors have demonstrated a compelling and sound business justification for authorization to (i) enter into the Stalking Horse Asset Purchase Agreement to establish the minimum bidding purchase price for the Business and (ii) pay the Break-Up Fee and Expense Reimbursement under the terms and conditions set forth in the Stalking Horse Asset Purchase Agreement.  The Break-Up Fee and Expense Reimbursement are material inducements for, and condition of, the Proposed Buyers' entry into the Stalking Horse Asset Purchase Agreement. The Proposed Buyers are unwilling to commit to purchase the Purchased Assets under the terms of the Stalking Horse Asset Purchase Agreement unless the Proposed Buyers are assured the Expense Reimbursement and Break-Up Fee.

F.     Recognizing this expenditure of time, energy, and resources, the Debtors have agreed to pay the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers under certain terms and conditions.  The Break-Up Fee and the Expense Reimbursement are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Proposed Buyers; (iii) reasonable and appropriate in light of the size and nature of the proposed sale, comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Proposed Buyers; and (iv) necessary to induce the Proposed Buyers to continue to pursue the purchase of the Business and to be bound by the Stalking Horse Asset Purchase Agreement.

G.     The assurance of the payment in cash of the Break-Up Fee and Expense Reimbursement (i) will promote more competitive bidding by inducing the Proposed Buyers' bid, which otherwise would not have been made and which may be the highest or best available offer for the Purchased Assets, (ii) has induced the Proposed Buyers to research the value of the Purchased Assets, conduct extensive due diligence and propose the transaction, including, among

other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely, and (iii) will provide a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth.

H.     No other party to date has entered into an asset purchase agreement for the Purchased Assets on terms acceptable to the Debtors.  The Stalking Horse Asset Purchase Agreement provides the Debtors with the opportunity to sell their business on a "going concern" basis for the benefit of all parties.  The execution of the Stalking Horse Asset Purchase Agreement is a necessary prerequisite to determining whether any party other than the Proposed Buyers are willing to enter into a definitive agreement for the Purchased Assets on terms acceptable to the Debtors and their creditor constituencies.

I.     The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers.  The Break-Up Fee and the Expense Reimbursement have been negotiated at arm's-length and are reasonable under the circumstances; and therefore,

IT IS HEREBY ORDERED THAT:

1.     The Motion is granted to the extent set forth herein.

2.     The objections, if any, to entry of this Order are overruled in their entirety.

3.     The Bidding Procedures attached hereto as Exhibit 1 are hereby authorized and approved in all respects.

4.     The sale transaction contemplated by the purchase agreement annexed hereto as Exhibit 2 is designated as the "Stalking Horse Asset Purchase Agreement."

5.     Immediately upon entry of this Order, the Stalking Horse Asset Purchase Agreement shall be binding upon the parties thereto in accordance with its terms.

6. The Break-Up Fee and the Expense Reimbursement are approved in their entirety. The Debtors shall pay the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers out of the purchase price paid by the Successful Bidder pursuant to the terms and conditions set forth in the Stalking Horse Asset Purchase Agreement without need for further order of the Court.

7. To constitute a "Qualified Bid", a bid must be received by the Bid Deadline (as defined in the Bidding Procedures) and otherwise comply with all of the applicable provisions of the Bidding Procedures.

8. The failure specifically to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision. The Bidding Procedures are hereby authorized and approved in their entirety.

9. The Debtors shall file a Notice of Successful Bidder identifying the Successful Bidder and the terms of the Successful Bid within one business day following the completion of the Auction.

10. A hearing to consider the adequacy of the Disclosure Statement, approval of the Solicitation Procedures, approval of the Sale, and confirmation of the Debtors' Prepackaged Plan (the "Combined Hearing") is hereby scheduled to be held before this Court on _____, 2011 at __:__ Eastern Time or as soon thereafter as counsel may be heard.

11. Objections, if any, to the Disclosure Statement, the Solicitation Procedures, the Prepackaged Plan, any filed supplements thereto, the Sale, or the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith shall: (i) be in writing; (ii) set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estates or properties of the Debtors, (iii) specify

with particularity the legal and factual basis of the objection, (iv) if the objection relates to the assumption and assignment of an executory contract or unexpired leases, including the cure amount relating thereto or the adequate assurance of future performance provided in connection therewith, include a copy of such contract or lease or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates; and (v) be filed with the Court together with proof of service thereof and simultaneously served on: (a) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin Sosland and Weil, Gotshal & Manges LLP, 767 Fifth Ave., New York, New York, 10153, attn: Ronit J. Berkovich); (b) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan and J. Gregory Milmoe); (d) counsel to JP Morgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006-5417, attn: Andrew LeBlanc); and (f) counsel to the Committee, if one shall be appointed, so as to be actually received by __:00 p.m. (Eastern Time) on _____, 2011 (the "Objection Deadline").

12.     Any objections not timely filed and served in the manner set forth in this Order may, in the Court's discretion not be considered and may be overruled.

13.     The form and sufficiency of the Summary and Notice attached hereto as Exhibit 3 are hereby approved.

14.     The Debtors shall serve the Summary and Notice on all parties in interest on a date no greater than __ business days after entry of this Order.

15. Service of the Summary and Notice in the manner set forth herein constitutes good and sufficient notice of the commencement of the Debtors' Chapter 11 Cases, the Bidding Procedures, the Auction, the Combined Hearing, the Objection Deadline, the procedures for objecting to the adequacy of the Disclosure Statement, to the Solicitation Procedures, and to confirmation of the Plan, and the procedures for objecting to the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith, and the applicable provisions of the Bankruptcy Code and any requirements for other notice are hereby waived and dispensed with pursuant to Rules 2002, 6006, 9006, and 9007 of the Bankruptcy Rules and section 105(a) of the Bankruptcy Code; provided, however, that any provision of Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Disclosure Statement and Prepackaged Plan to parties not entitled to vote, whether because they are unimpaired or because they are deemed to reject the Prepackaged Plan, or any parties in interest other than as prescribed in this Order, shall be waived; provided further, however, the Disclosure Statement and Prepackaged Plan shall remain posted to the following page on the World Wide Web at http://www.dslp.com and shall be provided in either electronic or paper form to any parties in interest upon written request to the Debtors.

16. The Debtors are authorized, pursuant to Bankruptcy Rule 2002(*l*), to give supplemental publication notice of the Auction and Combined Hearing by publication in the *Wall Street Journal*, national edition, the *Dallas Morning News*, or any other newspaper in their discretion and on a date no greater than __ business days after entry of this Order.

17. The meeting pursuant to section 341(a) of the Bankruptcy Code shall not be convened and is hereby cancelled unless the Prepackaged Plan is not confirmed by this Court within ninety days after the Commencement Date.

18.     The Debtors shall not be required to file reports pursuant to Bankruptcy Rule 2015.3 unless the U.S. Trustee convenes a meeting under section 341 of the Bankruptcy Code; *provided that*, nothing herein shall affect the Debtors' rights to request an extension of time to comply with, or modification of the requirements of Bankruptcy Rule 2015.3.

19.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

20.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order, including any matter or dispute relating to the Sale of the Purchased Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, or the Backup Bid.


Dated: _____, 2011
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

# **Exhibit 1**

## **Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with an auction (the "Auction") for the sale (the "Sale") of certain assets and equity interests (the "Purchased Assets") of Dallas Stars, L.P., Dallas Arena LLC, StarCenters LLC and Dallas Stars U.S. Holdings Corp. (the "Debtors") and the rights necessary to operate the Dallas Stars National Hockey League hockey franchise (the "Team") as a National Hockey League ("NHL") franchise in the Team's current Home Territory, as defined in the NHL Constitution (as defined below). At a hearing following the Auction (the "Combined Hearing"), the Debtors will seek entry of an order (the "Confirmation Order") from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") authorizing and approving the Sale to the Qualified Bidder (as defined below) that the Debtors determine to have made the highest or otherwise best bid.

## I.    Assets to Be Sold

All of the Debtors' right, title and interest in, to the following assets:[1]

(a)    the Purchased Contracts;

(b)    all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Debtors, other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on Schedule 2.1(b) to the Stalking Horse Asset Purchase Agreement (as defined below);

(c)    all inventory and supplies of Debtors;

(d)    all rights of Debtors with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)    all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Debtors, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)    all rights of Debtors under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such term in the Stalking Horse Asset Purchase Agreement.

(g) all rights and privileges held by Debtors associated with the NHL, including rights to membership and franchise of the Team in the NHL and all ownership interests of Debtors in any NHL Entity;

(h) the Furniture and Equipment;

(i) the Transferred Equity Interests (subject to the election of Sellers pursuant to Section 9.17 of the Stalking Horse Asset Purchase Agreement (as defined below) to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j) the Sellers' Intellectual Property;

(k) all Documents of Debtors used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Debtors (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Debtor shall be permitted to retain copies of any or all Documents;

(l) all Permits of Debtors, but only to the extent such Permits are assignable or otherwise transferable;

(m) all rights of Debtors under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Debtor or to the extent affecting the Business or any Purchased Assets;

(n) all rights of Debtors under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o) to the extent assignable, all Insurance Policies issued to any Debtor and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p) to the extent assignable, all of Debtors' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q) all rights of Debtors to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings,

team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, Reunion Arena or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r) all goodwill owned by Debtors associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s) all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t) any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.


## II.    <u>Application Submissions and Due Diligence</u>

### A.    **Submission of Background Information**

Any person or entity that is interested in becoming a potential purchaser or holder of a direct or indirect interest in the Purchased Assets, including, without limitation, each direct or indirect equity holder of such prospective purchaser or holder and each trustee and beneficiary of any trust included therein (each a "<u>Potential Bidder</u>")[2] shall notify the Debtors and the NHL and shall submit the following information:

1.    Submission of Background Information

A Potential Bidder who has not previously done so in connection with the Sale shall complete, execute and submit to the NHL no later than seven (7) days after entry of the Bidding Procedures and Confirmation Scheduling Order (as defined below) that portion of the Application to Acquire NHL Membership, or an Ownership Interest in an NHL Member Club (in the form annexed hereto as Exhibit A) (the "<u>NHL Application</u>") labeled "Background Information – Application for Membership – Individual" or "Background Information – Application for Membership – Corporate/Partnership/Trust", whichever is applicable (the "<u>Background Portion</u>") and shall notify the Debtors of such submission. The Background Portion, including the Representations and Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

---

[2] If two or more Potential Bidders are part of a single group, such group of Potential Bidders shall be referred to herein as a "Potential Bidders Group."

## 2. No Transaction or Operations Information

None of the information that would otherwise be required by the NHL Application with respect to the proposed transaction or the post-acquisition operations or management of the Team (the "Transaction Portion") shall be required as a condition for the NHL to begin its review of the Background Portion. Potential Bidders may, but are not required to, provide the Transaction Portion of the NHL Application to the NHL prior to the Bid Deadline (as defined below).

## 3. Confidentiality Agreement

In addition, if not previously executed and delivered in connection with the Sale, each Potential Bidder shall provide an executed confidentiality agreement substantially in the form annexed hereto as Exhibit B with such changes as are reasonably acceptable to the NHL and Debtors (the "Confidentiality Agreement").

In the event that any of the background information contained in any NHL Application or Background Portion with regard to a Potential Bidder differs from information previously provided to the NHL by such Potential Bidder, such changes shall be highlighted in the completed Background Portion.

The NHL shall treat the information in the NHL Application and Background Portion confidentially in accordance with the NHL's existing procedures. To the extent disclosure of any such information is required in connection with the chapter 11 cases, the NHL Application and Background Portion shall be deemed to have been filed under seal.

## B. Due Diligence

The NHL shall review any submitted Background Portion in accordance with its normal procedures as promptly as practicable following receipt by the NHL and shall notify the Debtors that it has commenced such review. Promptly after the NHL determines that a Potential Bidder does not appear to be approved for purposes of conducting due diligence with respect to the Purchased Assets, the NHL shall so notify the Potential Bidder and, not acting in bad faith, seek to resolve any such impediment if the NHL determines in its sole discretion such action is possible.

A Potential Bidder or Potential Bidder Group, as the case may be, who is approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets shall be given access to a data room for such purpose; provided, that, prior to being allowed access to the data room, such Potential Bidder or Potential Bidder Group, as the case may be, shall have submitted to the Debtors the executed Confidentiality Agreement.

To the extent practicable, the Debtors shall provide each Potential Bidder or Potential Bidder Group, as the case may be, who has been approved for such purpose by the NHL with access to (i) the same confidential evaluation materials and information provided by

the Debtors to each other Potential Bidder and the Proposed Buyers (as defined below) and (ii) such other financial information and other data related to the Debtors as the Potential Bidder may reasonably request, which requests may include reasonable access to the Debtors' senior management and advisors and shall be deemed to include, in any event, the Debtors' good faith estimate of the potential cure costs and rejection damages associated with each material contract and lease subject to assumption in conjunction with the Sale.

## III.     Submission of Bids

Each offer, solicitation or proposal (a "Bid") from a Potential Bidder or Potential Bidders Group, as the case may be, must be in writing and must be received by the Debtors, the NHL and the Notice Parties[3] on or before thirty (30) days after entry of the Bid Procedures Order, at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline").   As detailed in subparagraphs A through C below, a Potential Bidder or Potential Bidders Group, as the case may be, that submits a Bid on or before the Bid Deadline that includes: (i) to the NHL, a fully completed and executed NHL Application, (ii) to the Notice Parties, an executed mark-up of the Stalking Horse Asset Purchase Agreement (as defined below), and (iii) to the Debtors, the Good Faith Deposit (as defined below), shall be deemed an "Acceptable Potential Bidder."

A Potential Bidder or a Potential Bidders Group, as the case may be, that submits a Bid after the Bid Deadline shall not constitute an Acceptable Potential Bidder.  Each Bid must be accompanied by:

### A.     The Completed NHL Application

On or before the Bid Deadline, each Potential Bidder shall submit to the NHL a fully completed and executed NHL Application, including (to the extent not previously submitted) both the Background and Transaction Portions, and all required schedules, exhibits, financial information, tax returns, etc.  A Potential Bidder shall also notify the Debtors of such submission.  The NHL Application, including the Representations and

---

[3] The "Notice Parties" shall include: (a) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (b) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin A. Sosland and Glenn D. West); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan and J. Gregory Milmoe); (d) counsel to JPMorgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC  20006-5417, attn: Andrew M. LeBlanc); (f) the Collateral Trustee for the benefit and security of the holders from time to time of the notes associated with that certain Note Purchase Agreement, dated as of April 23, 1999 (the "Note Purchase Agreement") by and among Center Operating Company, L.P. and several institutional investors named therein (the "Collateral Trustee") (The Bank of New York Mellon, 10161 Centurion Parkway, Jacksonville, Florida 32256, attn: Geri Creswell); and (g) counsel to the noteholders of the Note Purchase Agreement (the "Noteholders") (Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, attn: Allen G. Kalish).

Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

### B.      Mark-Up of Stalking Horse Asset Purchase Agreement

To facilitate the Auction and to assist the Debtors and other interested parties in assessing the terms of each Bid, each Potential Bidder or Potential Bidders Group, as the case may be, must work from the Asset Purchase Agreement (the "Stalking Horse Asset Purchase Agreement") between the Debtors and Dallas Sports & Entertainment L.P., and certain of its affiliates (collectively, the "Proposed Buyers" or the "Stalking Horse") to prepare its bid and shall submit as part of its Bid, a fully executed asset purchase agreement, marked to show all proposed changes to such Stalking Horse Asset Purchase Agreement. Each Bid shall include a summary term sheet including a summary of the material terms proposed to be included in the Bid.  The Stalking Horse Asset Purchase Agreement is attached to the Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement, (c) Approving Bid Protections, (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing an Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief (the "Bidding Procedures and Confirmation Scheduling Order")[4] as Exhibit B, and is also available on the main docket of these cases.

Each Bid must include as a condition of the Debtors' obligation to consummate the sale of the Purchased Assets, approval by the NHL under the Constitution of the NHL (the "NHL Constitution"), the By-Laws of the NHL (the "NHL By-Laws") and all other applicable requirements of the NHL.

To the extent practicable, the Debtors will make members of senior management and advisors available to discuss the terms of a Bid and seek to provide to each Acceptable Potential Bidder, who has been approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets, the disclosure schedules to the Acceptable Potential Bidder's Bid in connection with the preparation of such Bid.

### C.      Good Faith Deposit

Potential Bidders will be required to submit to the Debtors, in immediately available funds, letter of credit or other form of security reasonably acceptable to Debtors, a good faith deposit in an amount equal to US $15,000,000.00 (the "Good Faith Deposit") at the time the Potential Bidder submits a Bid.  The Good Faith Deposit shall be returned to the respective Potential Bidder if such bidder is determined not to be a Qualified Bidder, or following the Auction if the Acceptable Potential Bidder is a Qualified Bidder but not the

---

[4] The Bidding Procedures and Confirmation Scheduling Order is defined as the Bidding Procedures Order in the Stalking Horse Asset Purchase Agreement.

Backup Bidder (as defined below) or the Successful Bidder (as defined below), except that the return of the Good Faith Deposit of the Proposed Buyers shall be governed by the terms of the Stalking Horse Asset Purchase Agreement. The Good Faith Deposit shall be returned to the Backup Bidder on the earlier of: (i) the closing of the Sale to the Successful Bidder (as defined below) and (ii) 45 days after the close of the Auction.

## IV. Determining Qualified Bids and Qualified Bidders

### A. Terms and Conditions of a Qualified Bid

In addition to the requirements for an Acceptable Potential Bidder, in order for a Bid from an Acceptable Potential Bidder to be deemed a "Qualified Bid" and for the Acceptable Potential Bidder to be deemed a "Qualified Bidder", the Bid must: (i) satisfy each of the conditions listed below in paragraphs 1 through 8 and (ii) be submitted on or before the Bid Deadline. A Bid submitted after the Bid Deadline shall not constitute a Qualified Bid. The Stalking Horse Bid (as defined below) satisfies each of the conditions of a Qualified Bid listed below other than the condition set forth in paragraph 8 below.

The Debtors may determine in their reasonable discretion, after consultation with JPMorgan Chase Bank, N.A. and Monarch Alternative Capital LLC (the "Senior Lenders") and the NHL, whether an Acceptable Potential Bidder's Bid is a Qualified Bid, except that the Senior Lenders and the Debtors shall have no right to be consulted with regard to Sections IV.A.4 and IV.A.8 of these Bidding Procedures.

Promptly after determining that any Acceptable Potential Bidder does not appear to be a Qualified Bidder, the Debtors and the NHL shall notify each other and such Bidder of this determination and, not acting in bad faith, shall seek to resolve any impediment to the Acceptable Potential Bidder's becoming a Qualified Bidder if possible.

#### 1. Financial Capability

To the extent not previously provided, a Bid shall contain evidence (in the form of binding commitment letters, guarantees or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions including, but not limited to, paying liquidated damages, if any.

#### 2. Corporate Authority

A Bid shall contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies) approval of the contemplated transaction.

3.      Nature of Bids for Purchased Assets and Minimum Overbid

The Bid must be for all of the Purchased Assets, including substantially all of the assets of the Debtors necessary to conduct the Purchased Assets as an NHL team in the Team's current Home Territory (as defined in the NHL Constitution).

The Bid must also be at least US $10,000,000 greater than the total value of the Bid as evidenced by the Stalking Horse Asset Purchase Agreement (the "Stalking Horse Bid") (inclusive of any amounts to be paid by such bidder for the Break-Up Fee (as defined in the Bidding Procedures and Confirmation Scheduling Order) and the Expense Reimbursement (as defined in the Bidding Procedures and Confirmation Scheduling Order)).   For purposes of calculating the value of the Stalking Horse Bid, the debt component of the Stalking Horse Bid shall be 100% of the face amount of the notes provided for in the Stalking Horse Bid, taking into account the anticipated net effect of the working capital adjustment.

4.      NHL Consent

The Bid must provide that (i) the Acceptable Potential Bidder will be, and the transactions contemplated therein will comply with and be, subject to NHL approval, pursuant to all of the NHL's applicable ownership transfer requirements, including, without limitation, as set forth in Articles 3.5 and 3.6 of the NHL Constitution, By-Law 35 of the NHL By-Laws, and the applicable procedural guidelines (collectively, the "NHL Rules"); (ii) the Acceptable Potential Bidder will cooperate with the review process of the NHL, including, providing promptly information requested by the NHL and meeting with the NHL Executive Committee and NHL officials in connection with such review, (iii) if successful, the Acceptable Potential Bidder will execute a standard form of Consent Agreement, a standard form of NHL Guaranty and a standard form of NHL Proxy with the NHL (in substantially the forms annexed hereto as Exhibits C, D, and E) with such changes as are reasonably acceptable to the NHL; and (iv) the Acceptable Potential Bidder will deliver or cause to be delivered, as a condition to closing, any agreements or other documents that the NHL requires with respect to the financing of the acquisition, including, if applicable, from lenders or other financing sources.

5.      No Break-Up Fee, Etc. for Qualified Bidders

A Bid, other than a Qualified Bid submitted by the Proposed Buyers, may not request any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, neither the tendering of a Bid nor the determination that a Bid is a Qualified Bid shall entitle the Acceptable Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

6. Other Bid Requirements

A Bid must: (i) not be conditioned on the outcome of unperformed due diligence, board approval or a financing contingency; (ii) provide that the bidder's offer is irrevocable until the earlier of (x) consummation of the Sale of the Purchased Assets, (y) the close of the Auction unless the Potential Bidder is selected as the Successful Bidder or the Backup Bidder and (z) 45 days after the close of the Auction if the Potential Bidder is selected as the Backup Bidder; (iii) contain the form of Confirmation Order the bidder would request the Debtors to seek court approval of at the Combined Hearing; (iv) include evidence of the bidder's ability to provide adequate assurance of future performance of such contracts, permits and licenses it would require the Debtors to assume and assign; (v) assume that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time) under the Prepackaged Plan; and (vi) provide that the Potential Bidder will enter into an Assumption Agreement (as defined in that certain consent agreement dated September 14, 2011 by and among the Collateral Trustee, the Noteholders, and certain of the Debtors (the "COC Consent Agreement")), substantially in the form attached to the COC Consent Agreement as Exhibit F (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), and a Pledge and Assumption Agreement (as defined in the COC Consent Agreement), substantially in the form attached to the COC Consent Agreement as Exhibit G (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), with the Collateral Trustee.[5]

7. Asset Purchase Agreement and Ancillary Agreements

As stated above in Section III.B, a Bid must include a fully executed form of asset purchase agreement and must also include any agreements ancillary to the Sale, each executed by an Acceptable Potential Bidder.

8. Approval of the NHL

Each Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby must be approved for ownership transfer by the NHL under the NHL Rules. Two (2) days before the commencement of the Auction (the "NHL Determination Date"), each Acceptable Potential Bidder, the Debtors and the Notice Parties shall have been notified by the NHL whether the Acceptable Potential Bidder or the Acceptable Potential Bidder Group, the Bid and the transactions contemplated thereby have been approved for ownership transfer by the NHL under the NHL Rules.

B. Qualified Bidders

Only the Acceptable Potential Bidders who have satisfied the foregoing requirements, and whose applications for the transfer of ownership have been approved by the NHL, shall be Qualified Bidders. If one or no Qualified Bid is timely received, the Debtors will

---

[5] The Debtors will include this requirement if COC and the Debtors have entered into the COC Consent Agreement at the time of the Bidding Procedures and Scheduling Hearing.

not conduct an Auction. If only one Qualified Bid from a Qualified Bidder is timely received, the Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Combined Hearing.

### C. Notification by the Debtors of the Best Qualified Bid

On or prior to 5:00 p.m. (prevailing Eastern time) on the NHL Determination Date, the Debtors shall provide each Qualified Bidder that has submitted a Qualified Bid: (i) written notice of the Auction and (ii) notice of the Qualified Bid with which the Debtors intend to commence the Auction (the "Best Qualified Bid") and (iii) copies of all Qualified Bids.

## V.     The Auction

If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 commencing sixty (60) days following the entry of the Bidding Procedures and Confirmation Scheduling Order at 10:00 a.m. (CT) to determine the highest or otherwise best bid with respect to the Purchased Assets.

### A. Participation in the Auction

Only Qualified Bidders who have submitted a Qualified Bid shall be eligible to participate in the Auction.

### B. The Auction Process

All Bids made at the Auction after the commencement thereof (each, an "Overbid") shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Overbids made and announced at the Auction, including the Successful Bid (as defined below). The Debtors, in their reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale of the Purchased Assets for any reason, including to seek further clarification from the Bankruptcy Court regarding any issues, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

The Debtors shall announce at the Auction the material terms of each Overbid, and in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, the total consideration offered in each such Overbid to provide a floor for further bidding. The current highest or best offer for the Purchased Assets, as determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, shall represent the new Best Qualified Bid. A Qualified Bidder

need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

Any Overbid shall be made in overbid increments of at least US $5,000,000 greater than the Best Qualified Bid. For the avoidance of doubt, US $4,500,000 (the Break-Up Fee and Expense Reimbursement) shall be deducted from each Qualified Bid and Overbid submitted by a Qualified Bidder (including the initial Qualified Bid) other than the Proposed Buyers in determining the value of each such Qualified Bid or Overbid.

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid as set forth above.

To the extent not previously provided (which shall be determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee) demonstrating such Qualified Bidder's ability to close the proposed transaction.

Except as expressly provided herein, the procedures set forth herein cannot be amended or modified without the approval of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to construe these Bidding Procedures and determine any disputes arising under them.

## VI.    Identification of the Successful Bidder and Acceptance of Successful Bid

### A.    Identification of the Successful Bidder

At the close of the Auction, the Debtors, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). The Debtors reserve the right to determine, in their reasonable business judgment and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia* the Break-Up Fee and the Expense Reimbursement, if any).

After the Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, so determine the Successful Bid, the Auction will be closed. The Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, will then determine and announce which bid has been determined to be the second highest or otherwise best bid (the "Backup Bid" and such bidder being the "Backup Bidder"). In determining which bid is the Backup Bid, the Debtors, in

consultation with the NHL, the Senior Lenders, and representatives of any statutory committee will use their reasonable business judgment.

Notwithstanding anything herein to the contrary, the Debtors, in their reasonable discretion and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, reserve the right to reject at any time prior to entry of a court order approving an offer, without liability, any offer (other than the offer submitted by the Proposed Buyers) that the Debtors deem to be: (x) inadequate or insufficient, (y) contrary to the best interests of the Debtors and their estates, or (z) with the advice of counsel, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein.

The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted the Bid only when the Bid has been approved by the Bankruptcy Court at the Combined Hearing.

## B. Acceptance of Bid From Successful Bidder

The Debtors presently intend to sell the Purchased Assets to the Successful Bidder, pursuant to the terms of the Successful Bid. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Combined Hearing.

Except as otherwise provided in the Successful Bid agreed to by the Debtors, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, encumbrances, and interests thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens attaching to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

## VII. The Combined Hearing

The Combined Hearing shall be held in the Bankruptcy Court two (2) days following the completion of the Auction, and may be adjourned from time to time without further notice to creditors or parties in interest other than an announcement in open court at the Combined Hearing. Any objections to the approval of the sale of the Purchased Assets shall be argued at the Combined Hearing.

## VIII. Closing with the Backup Bidder(s)

Without any further order of the Bankruptcy Court after Confirmation, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Backup Bidder will be deemed to have submitted the highest or best

bid and the Debtors and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Debtors and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

Following the Combined Hearing, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder, the Debtors reserve the right to seek all available damages from the defaulting Successful Bidder as modified by the applicable purchase agreement, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtors, the Successful Bidder shall have no recourse against the Debtors other than for recovery of its deposit or against the NHL, provided that if the Successful Bidder is the Proposed Buyers, the Proposed Buyers shall have such rights as are provided for in the Stalking Horse Asset Purchase Agreement.


Dated: _____

# Exhibit 2

**Stalking Horse Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

among

DALLAS STARS, L.P.,

DALLAS ARENA LLC,

STARCENTERS LLC and

DALLAS STARS U.S. HOLDINGS CORP.

as Sellers,

and

DALLAS SPORTS & ENTERTAINMENT, L.P.,

DSE HOCKEY CLUB, L.P.,

DSE HOCKEY CENTERS, L.P., and

DSE PLANO GP, INC.

as Purchasers

Dated as of September 15, 2011

# TABLE OF CONTENTS

Article I    DEFINITIONS ................................................................................................ 2

    1.1    Certain Definitions ......................................................................................... 2

    1.2    Other Definitional and Interpretive Matters ...................................................... 20

Article II    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
    LIABILITIES .................................................................................................. 22

    2.1    Purchase and Sale of Assets ............................................................................ 22

    2.2    Excluded Assets ............................................................................................. 23

    2.3    Assumption of Liabilities ................................................................................ 24

    2.4    Excluded Liabilities ........................................................................................ 26

    2.5    Cure Amounts ................................................................................................ 27

    2.6    Further Conveyances and Assumptions; Consent of Third Parties ...................... 27

    2.7    Bulk Sales Laws ............................................................................................. 28

Article III    CONSIDERATION ......................................................................................... 28

    3.1    Consideration ................................................................................................. 28

    3.2    Purchase Price Deposit ................................................................................... 29

    3.3    Payment of Purchase Price .............................................................................. 30

    3.4    Purchase Price Adjustment .............................................................................. 31

Article IV    CLOSING AND TERMINATION ................................................................... 33

    4.1    Closing Date .................................................................................................. 33

    4.2    Termination of Agreement ............................................................................... 33

    4.3    Procedure Upon Termination ........................................................................... 35

    4.4    Effect of Termination ...................................................................................... 35

Article V    REPRESENTATIONS AND WARRANTIES OF DALLAS STARS .............. 37

    5.1    Organization and Good Standing ..................................................................... 37

    5.2    Authorization of Agreement ............................................................................ 37

    5.3    Conflicts; Consents of Third Parties ................................................................. 38

    5.4    Capitalization ................................................................................................. 38

    5.5    Financial Statements ....................................................................................... 39

    5.6    Accounts Receivable ...................................................................................... 40

    5.7    Title to Purchased Assets; Sufficiency ............................................................. 40

    5.8    Absence of Certain Developments .................................................................... 41

| | | |
|---|---|---|
| 5.9 | Taxes | 41 |
| 5.10 | Real Property | 42 |
| 5.11 | Tangible Personal Property | 43 |
| 5.12 | Intellectual Property | 43 |
| 5.13 | Stars Material Contracts | 44 |
| 5.14 | Employee Benefits | 46 |
| 5.15 | Labor | 48 |
| 5.16 | Litigation | 48 |
| 5.17 | Compliance with Laws; Permits | 48 |
| 5.18 | Environmental Matters | 48 |
| 5.19 | Insurance | 49 |
| 5.20 | NHL Matters | 50 |
| 5.21 | Player Matters | 50 |
| 5.22 | Deferred Compensation Liability | 50 |
| 5.23 | No Guarantees | 50 |
| 5.24 | Indebtedness for Borrowed Money | 50 |
| 5.25 | Financial Advisors | 50 |
| 5.26 | Related Party Transactions | 50 |
| 5.27 | Non-reliance of Dallas Stars | 51 |
| Article VI | REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA | 52 |
| 6.1 | Organization and Good Standing | 52 |
| 6.2 | Authorization of Agreement | 52 |
| 6.3 | Conflicts; Consents of Third Parties | 52 |
| 6.4 | Capitalization | 53 |
| 6.5 | Financial Statements | 54 |
| 6.6 | Absence of Certain Developments | 54 |
| 6.7 | Taxes | 54 |
| 6.8 | Real Property | 55 |
| 6.9 | Tangible Personal Property | 56 |
| 6.10 | Intellectual Property | 56 |
| 6.11 | Arena Material Contracts | 57 |
| 6.12 | Employee Benefits | 59 |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 6.13 | Labor | 59 |
| 6.14 | Litigation | 60 |
| 6.15 | Compliance with Laws; Permits | 60 |
| 6.16 | Environmental Matters | 60 |
| 6.17 | Insurance | 61 |
| 6.18 | Financial Advisors | 61 |
| 6.19 | Related Party Transactions | 61 |
| 6.20 | Non-reliance of Dallas Arena | 61 |
| Article VII | REPRESENTATIONS AND WARRANTIES OF PURCHASERS | 62 |
| 7.1 | Organization and Good Standing | 62 |
| 7.2 | Authorization of Agreement | 62 |
| 7.3 | Conflicts; Consents of Third Parties | 63 |
| 7.4 | Litigation | 63 |
| 7.5 | Financial Advisors | 63 |
| 7.6 | Investment Intention | 63 |
| 7.7 | Financial Capability | 64 |
| 7.8 | NHL Information Requirements | 64 |
| 7.9 | Non-reliance of Purchasers | 64 |
| Article VIII | BANKRUPTCY COURT MATTERS | 65 |
| 8.1 | Competing Transaction | 65 |
| 8.2 | Sellers' Chapter 11 Bankruptcy Cases | 65 |
| 8.3 | Confirmation Order | 66 |
| 8.4 | Cooperation in Bankruptcy Court Matters | 66 |
| 8.5 | Break Up Fee and Expense Reimbursement | 67 |
| 8.6 | Leases and Contracts | 67 |
| 8.7 | Notice to Parties-in-Interest | 67 |
| Article IX | COVENANTS | 68 |
| 9.1 | Access to Information | 68 |
| 9.2 | Conduct of the Business Pending the Closing | 69 |
| 9.3 | Consents | 71 |
| 9.4 | Regulatory Approvals | 71 |
| 9.5 | Further Assurances | 73 |

# TABLE OF CONTENTS

9.6 Confidentiality ............................................................................................ 73

9.7 Preservation of Records ............................................................................ 73

9.8 Publicity .................................................................................................... 74

9.9 NHL Approvals .......................................................................................... 74

9.10 Stars Foundation ....................................................................................... 74

9.11 Senior Secured Loan ................................................................................. 74

9.12 Guarantee .................................................................................................. 75

9.13 Disclosure Schedules; Supplementation and Amendment of Schedules ............. 75

9.14 Insurance ................................................................................................... 76

9.15 Change of Name ........................................................................................ 77

9.16 Bankruptcy Compliance ............................................................................ 77

9.17 Plano StarCenter ....................................................................................... 77

Article X EMPLOYEES AND EMPLOYEE BENEFITS ............................................ 78

10.1 Employment .............................................................................................. 78

10.2 Employee Benefits .................................................................................... 79

Article XI CONDITIONS TO CLOSING .................................................................... 80

11.1 Conditions Precedent to Obligations of Purchasers .................................. 80

11.2 Conditions Precedent to Obligations of Sellers ........................................ 81

11.3 Conditions Precedent to Obligations of Sellers and Purchasers .............. 81

11.4 Frustration of Closing Conditions ............................................................. 82

Article XII SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES ............ 82

12.1 Survival ..................................................................................................... 82

12.2 Indemnification by Sellers ........................................................................ 83

12.3 Indemnification by Purchasers .................................................................. 83

12.4 Indemnification Procedures ....................................................................... 84

12.5 Certain Limitations on Indemnification ..................................................... 85

12.6 Calculation of Losses ................................................................................ 86

12.7 Tax Treatment of Indemnity Payments ..................................................... 86

12.8 Specific Performance ................................................................................ 87

12.9 Exclusive Remedy ..................................................................................... 87

12.10 Nature of Representations and Warranties; Schedules .............................. 88

12.11 DTPA WAIVER ......................................................................................... 88

# TABLE OF CONTENTS

12.12    Limitation of Lender Liability ........................................................................... 89

12.13    Purchasers' Rights ........................................................................................... 89

Article XIII    MISCELLANEOUS ...................................................................................... 89

13.1    Tax Matters ...................................................................................................... 89

13.2    Expenses ........................................................................................................... 90

13.3    Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury ......................................................................................... 90

13.4    Entire Agreement ............................................................................................. 91

13.5    Amendments and Waivers ............................................................................... 91

13.6    Governing Law ................................................................................................. 92

13.7    Notices .............................................................................................................. 92

13.8    Severability ...................................................................................................... 93

13.9    Binding Effect; Third Party Beneficiaries; Assignment .................................. 93

13.10    Non-Recourse .................................................................................................. 94

13.11    Legal Representation ........................................................................................ 94

13.12    General Releases .............................................................................................. 94

13.13    Counterparts ..................................................................................................... 96

13.14    Sellers' Representative ..................................................................................... 96

Exhibits

| | |
|---|---|
| A | Plan of Reorganization |
| B | Disclosure Statement |
| C | Bidding Procedures Order |
| D | Confirmation Order |
| E | Escrow Agreement |
| F | NHL Owner Consent |
| G | NHL/Lender Cooperation Agreement |
| H | NHL Guaranty |
| I | Purchaser/NHL Proxy |
| J | Senior Secured Loan |
| K | Bill of Sale |
| L | Assignment and Assumption Agreement |

Schedules

| | |
|---|---|
| A | Pro Forma Balance Sheet |
| B | Pro Forma NWC |
| C | Pro Forma Purchase Price |
| 1.1(a)(i) | Non-Excluded Affiliate Contracts |
| 1.1(a)(ii) | Excluded Contracts |
| 1.1(b) | NHL Documents |
| 1.1(c) | Permitted Exceptions |
| 2.1(b) | Excluded Contracts—Accounts Receivable |
| 2.2(e) | Excluded Assets—Deposits, Prepaid Charges and Prepaid Expenses |
| 2.3(h) | Beneficiary Contracts |
| 2.3(i) | Affiliate Guarantees |
| 5.3(a) | Dallas Stars Conflicts |
| 5.3(b) | Dallas Stars Consents of Third Parties |
| 5.4(a) | Dallas Stars Capitalization |
| 5.4(f)(i) | Dallas Stars Required Equity Issuances |
| 5.4(f)(ii) | Dallas Stars Voting Trusts |
| 5.4(g) | Dallas Stars Entity Information |
| 5.5 | Dallas Stars Financial Statements |
| 5.6 | Dallas Stars Accounts Receivable |
| 5.7(a) | Dallas Stars Condition of Purchased Assets |
| 5.7(b) | Dallas Stars Continued Ownership of Purchased Assets |
| 5.7(c)(i) | Dallas Stars Title to Purchased Assets |
| 5.7(c)(ii) | Dallas Stars Sufficiency of Purchased Assets |
| 5.8 | Dallas Stars Absence of Certain Developments |
| 5.9 | Dallas Stars Taxes |
| 5.10(a)(i) | Dallas Stars Owned Property |
| 5.10(a)(ii) | Dallas Stars Owned Property Liens |
| 5.10(b) | Dallas Stars Real Property Leases |

| | |
|---|---|
| 5.10(c)(i) | Dallas Stars Real Property Insurance Claims |
| 5.10(c)(ii) | Dallas Stars Structural Matters |
| 5.11 | Dallas Stars Personal Property Leases |
| 5.12(a) | Dallas Stars Registered Intellectual Property |
| 5.12(b) | Dallas Stars – Purchased Intellectual Property – Ownership or Valid Licenses |
| 5.12(c) | Dallas Stars – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property |
| 5.12(d) | Dallas Stars – Purchased Intellectual Property – Violations and Infringements by Third Parties |
| 5.13(a) | Dallas Stars Material Contracts |
| 5.13(b) | Dallas Stars Material Contract Defaults |
| 5.14(a) | Dallas Stars Employee Benefit Plans |
| 5.14(d) | Dallas Stars Benefit Plan Actions, Suits or Claims |
| 5.14(e) | Dallas Stars Transaction Effects on Benefits |
| 5.15(a) | Dallas Stars Labor or Collective Bargaining Agreements |
| 5.15(b) | Dallas Stars Labor Strikes, Grievances, and Related Matters |
| 5.16 | Dallas Stars Litigation |
| 5.18 | Dallas Stars Environmental Matters |
| 5.19 | Dallas Stars Insurance |
| 5.20(b) | CFV Debt Amount |
| 5.21 | Player Matters |
| 5.22 | Deferred Compensation Liability |
| 5.23 | Dallas Stars Guarantees |
| 5.24 | Dallas Stars Indebtedness |
| 5.25 | Financial Advisors of Dallas Stars |
| 5.26 | Dallas Stars Related Party Transactions |
| 6.3(a) | Dallas Arena Conflicts |
| 6.3(b) | Dallas Arena Consents of Third Parties |
| 6.4(d)(i) | Dallas Arena Required Equity Issuances |
| 6.4(d)(ii) | Dallas Arena Voting Trusts |
| 6.5 | COC Financial Statements |
| 6.6 | Dallas Arena Absence of Certain Developments |
| 6.7 | Dallas Arena Taxes |
| 6.8(b) | Dallas Arena Real Property Leases |
| 6.8(c) | Dallas Arena Real Property Insurance Claims |
| 6.9 | COC Personal Property Lease Defaults |
| 6.10(a) | Dallas Arena Registered Intellectual Property |
| 6.10(b) | Dallas Arena – Purchased Intellectual Property – Ownership or Valid Licenses |
| 6.10(c) | Dallas Arena – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property |
| 6.10(d) | Dallas Arena – Purchased Intellectual Property – Violations and Infringement by Third Parties |
| 6.11(a) | Dallas Arena Material Contracts |
| 6.11(b) | COC Material Contracts |
| 6.11(c) | Dallas Arena Material Contract Defaults |

| 6.11(d) | COC Material Contract Defaults |
| 6.13(a) | Dallas Arena Labor or Collective Bargaining Agreements |
| 6.13(b) | Dallas Arena Labor Strikes, Grievances, and Related Matters |
| 6.14 | Dallas Arena Litigation |
| 6.16 | Dallas Arena Environmental Matters |
| 6.17 | Dallas Arena Insurance |
| 6.18 | Financial Advisors of Dallas Arena |
| 6.19 | Dallas Arena Related Party Transactions |
| 7.3 | Purchaser Conflicts |
| 7.5 | Financial Advisors of Purchaser |
| 9.2(a) | Conduct of the Business – Required Conduct |
| 9.2(b) | Conduct of the Business – Prohibited Conduct |
| 10.1(a) | Employees of Dallas Stars |
| 10.1(d) | Severance |
| 11.3(d) | Required Consents |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 15, 2011, among Dallas Stars, L.P., a Delaware limited partnership ("Dallas Stars"), Dallas Arena LLC, a Texas limited liability company ("Dallas Arena"), StarCenters LLC, a Texas limited liability company ("StarCenters"), Dallas Stars U.S. Holdings Corp., a Delaware corporation ("U.S. Holdings" and collectively with Dallas Stars, Dallas Arena and StarCenters, "Sellers" and each, a "Seller"), and Dallas Sports & Entertainment, L.P., a Delaware limited partnership ("DSE"), DSE Hockey Club, L.P., a Delaware limited partnership ("Hockey Club"), DSE Hockey Centers, L.P., a Delaware limited partnership ("Hockey Centers"), DSE Plano GP, Inc., a Delaware corporation ("DSE Plano" and collectively with DSE, Hockey Club and Hockey Centers, "Purchasers" and each, a "Purchaser"), and, solely with respect to Sections 9.12 and 12.8 and Article XIII of this Agreement, Tom Gaglardi, an individual resident of Vancouver, British Columbia ("Guarantor").

## RECITALS:

1.	Dallas Stars owns and operates a professional hockey team that is a member of the National Hockey League (the "NHL") and is known as the Dallas Stars (the "Stars"), and leases and operates (i) the Dr Pepper Arena in Frisco, which is the practice facility home to the Stars and home arena for the Texas Tornado of the North American Hockey League and the Texas Legends of the NBA Development League, (ii) the Dr Pepper StarCenter in Euless, (iii) the Dr Pepper StarCenter in Farmers Branch, and (iv) the Dr Pepper StarCenter in McKinney at Craig Ranch (collectively, the "Leased StarCenters");

2.	Dallas Stars subleases the arena located at 2500 Victory Avenue, Dallas, Texas and known as the American Airlines Center ("AAC") as the home ice arena for the Stars;

3.	Each of StarCenters, Plano StarCenter, LLC, a Texas limited liability company ("Plano StarCenter"), and U.S. Holdings, is a direct wholly-owned Subsidiary of Dallas Stars;

4.	StarCenters is the employer of all personnel of the Dr Pepper StarCenters (as defined below);

5.	Plano StarCenter owns the Dr Pepper StarCenter located in Plano, Texas (collectively with the Leased StarCenters, the "Dr Pepper StarCenters");

6.	U.S. Holdings owns a 1% equity interest in Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company ("Hockey Enterprises"). Dallas Stars owns a 99% equity interest in Hockey Enterprises. Hockey Enterprises holds a limited partnership interest in NHL Enterprises Canada, L.P. and is a stockholder of National Hockey League Enterprises Canada, Inc., which is the general partner of NHL Enterprises Canada, L.P.;

7.	Dallas Arena owns a 50% member interest in Center GP, LLC, a Texas limited liability company ("Center GP"), and a 49.95% limited partner interest in Center Operating Company, L.P., a Texas limited partnership ("COC"). Center GP owns a 0.1% general partner

interest in COC. COC leases and operates the AAC and owns the issued and outstanding stock of Arena Operating Company, Inc., a Texas corporation;

8.       Each of StarCenters, Plano StarCenter, U.S. Holdings and Hockey Enterprises (collectively, the "Stars Subsidiaries"), Dallas Arena and Dallas Stars is a direct or indirect, wholly-owned Subsidiary of HSG Sports Group LLC, a Texas limited liability company ("HSG"), which is ultimately majority-owned by Hicks;

9.       Sellers have solicited the Lenders (as defined in Section 1.1), and have obtained approval of the Requisite Lenders, for acceptance of a plan of reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the terms set forth on Exhibit A (as it may be amended from time to time consistent with this Agreement, the "Plan") pursuant to a Disclosure Statement in substantially the form attached as Exhibit B hereto (the "Disclosure Statement") and in accordance with section 1126(b) of the Bankruptcy Code and Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

10.       Within two (2) Business Days after the execution of this Agreement, Sellers propose to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such proceedings, collectively, the "Bankruptcy Case") and, simultaneously therewith, file motions seeking (i) approval of the Disclosure Statement and confirmation of the Plan; and (ii) Bankruptcy Court approval of the Bidding Procedures Order (as defined in Section 1.1); and

11.       Sellers intend, pursuant to the terms of the final form of the Bidding Procedures Order approved by the Bankruptcy Court and the Plan, to conduct a sales process to sell all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

In consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1       Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"AAC" has the meaning given in the Recitals.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding the fact that HSG no longer

controls Sellers or the Stars Subsidiaries by virtue of the NHL Proxy, for purposes of this Agreement, a Hicks Affiliate shall nevertheless be considered an Affiliate of Sellers. For the avoidance of doubt, neither COC, any Subsidiary of COC, Center GP, the NHL nor any NHL Entity or other NHL Affiliated Party shall be considered an Affiliate of any Seller or any of the Transferred Subsidiaries.

"Aggregate Purchaser Termination Amount" has the meaning given in Section 4.4(d).

"Aggregate Seller Termination Amount" has the meaning given in Section 4.4(d).

"Agreement" has the meaning given in the Preamble.

"Antitrust Fees" has the meaning given in Section 9.4(b).

"Antitrust Laws" has the meaning given in Section 9.4(b).

"Arena Associate" has the meaning given in Section 6.19.

"Arena Material Contract" has the meaning given in Section 6.11(a).

"Associate" has the meaning given in Section 5.26.

"Assumed Liabilities" has the meaning given in Section 2.3.

"Auction" has the meaning given in the Bidding Procedures Order.

"Back-Up Bidder" has the meaning given in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning given in the Recitals.

"Bankruptcy Code" has the meaning given in the Recitals.

"Bankruptcy Court" has the meaning given in the Recitals.

"Bankruptcy Petitions" has the meaning given in the Recitals.

"Bankruptcy Rules" has the meaning given in the Recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in substantially the form attached as Exhibit C hereto, with such changes as may be required by the Bankruptcy Court that are not materially adverse to Purchasers or Sellers, that, among other things, (i) approves the payment of the Break-Up Fee on the terms and conditions set forth in Section 8.5 hereof and (ii) establishes a date by which Competing Bids must be submitted by bidders and establishes procedures for the Auction process.

"Break-Up Fee" has the meaning given in Section 8.5(a).

"Broker" has the meaning given in Section 5.25.

"Business" means the business  comprised of the Purchased Assets as currently owned and operated by Sellers and the Transferred Subsidiaries, including, without limitation, the business of operating the Stars.

"Business Day" means any day of the year on which national banking institutions in Texas are open to the public for conducting business and are not required or authorized to close.

"Center GP" has the meaning given in the Recitals.

"CFV Debt Agreement" means that certain promissory note dated January 14, 2011, in the stated principal amount of $45,000,000, made by Dallas Stars and payable to CFV I LLC, an Affiliate of the NHL, as amended from time to time.

"CFV Debt Amount" means the amount owed by Dallas Stars to CFV I LLC, an Affiliate of the NHL, pursuant to the CFV Debt Agreement.

"Clayton Act" means the Clayton Antitrust Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"Closing" has the meaning given in Section 4.1.

"Closing Balance Sheet" has the meaning given in Section 3.4(b).

"Closing Date" has the meaning given in Section 4.1.

"Closing Documents" has the meaning given in Section 3.4(b).

"Closing NWC" has the meaning given in Section 3.4(b).

"COC" has the meaning given in the Recitals.

"COC Entities" means, collectively, (i) COC and (ii) Center GP.

"COC Equity Interests" means (i) the 50% member interest in Center GP held by Dallas Arena; and (ii) the 49.95% limited partnership interest in COC held by Dallas Arena.

"COC Interim Balance Sheet" has the meaning given in Section 6.5.

"COC Interim Balance Sheet Date" has the meaning given in Section 6.5.

"COC Financial Statements" has the meaning given in Section 6.5.

"COC Material Contract" has the meaning given in Section 6.11(b).

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Collective Bargaining Agreement" means the Collective Bargaining Agreement, dated as of July 22, 2005, by and between the NHL and the NHLPA.

"Commitment Termination Date" has the meaning given in the Senior Secured Loan.

"Competing Bid" means a Qualified Bid other than a Qualified Bid of the Purchasers.

"Confidentiality Agreement" has the meaning given in Section 9.6(a).

"Confirmation Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes as may be required by the Bankruptcy Court; provided, however, if Purchasers are deemed to have the highest or best bid by Sellers, any changes to the form of the Confirmation Order affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion.

"Continuing Employees" has the meaning given in Section 10.1(c).

"Contract" means any written contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license.

"control" (including the terms "controlled by" and "under common control with") has the meaning given in Section 1.1 (in the definition of "Affiliate").

"Copyrights" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Cumulative Budgeted Loss" means the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries as at the end of each of (i) September 2011 of $0, (ii) October 2011 (cumulative of September and October 2011) of ($4,866,731), (iii) November 2011 (cumulative of September, October and November 2011) of ($11,123,247), and (iv) December 2011 (cumulative of September, October, November and December 2011) of ($15,058,541); provided that for August 2011 and any month prior to August 2011, the amount of the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries shall be deemed to be zero.

"Currency Agreement" means, with respect to any Person, any foreign exchange Contract, currency swap agreement, futures Contract, option Contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"Dallas Arena" has the meaning given in the Preamble.

"Dallas Arena Documents" has the meaning given in Section 6.2.

"Dallas Stars" has the meaning given in the Preamble.

"Dallas Stars Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Documents" has the meaning given in Section 5.2.

"Dallas Stars Financial Statements" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet Date" has the meaning given in Section 5.5.

"Disclosure Statement" has the meaning given in the Recitals.

"Dispute Notice" has the meaning given in Section 3.4(c)(ii).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related exclusively to, or necessary for the operation of, the Business and the Purchased Assets in each case whether or not in electronic form.

"Domain Names" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Dr Pepper StarCenters" has the meaning given in the Recitals.

"DSE" has the meaning given in the Preamble.

"DSE Plano" has the meaning given in the Preamble.

"Employee" means all employees, as of the date hereof, whether or not actively at work as of the date hereof, of Dallas Stars or any of the Stars Subsidiaries, together with individuals who are hired by Dallas Stars or any Stars Subsidiary after the date hereof and prior to the Closing.

"Employee Benefit Plans" means all material "employee benefit plans," as defined in Section 3(3) of ERISA, all individual consulting, employment or compensation agreements, and all other material plans or agreements providing for bonus, incentive, equity or equity-based compensation, stock purchase, pension, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, life insurance or scholarship maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or is obligated to contribute thereunder for current or former employees of Sellers and their respective Subsidiaries primarily in respect of the Business.

"Environmental Law" means any applicable Law currently in effect relating to the protection of the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and

the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"Environmental Permits" has the meaning given in Section 5.18(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning given in Section 3.2.

"Escrow Agreement" has the meaning given in Section 3.2.

"Escrowed Funds" has the meaning given in Section 3.2.

"Estimated Closing Balance Sheet" has the meaning given in Section 3.4(a).

"Excess Cash Payment" has the meaning given in Section 3.1(d).

"Excluded Assets" has the meaning given in Section 2.2.

"Excluded Contracts" means the following Contracts: (i) this Agreement and the other documents related to this Agreement or the transactions contemplated hereby, (ii) all Contracts between any Seller and any broker, investment banker or similar advisor relating to this Agreement or the transactions contemplated hereby (other than GSP), (iii) all Contracts between any Seller and any Affiliate of Sellers or any other Hicks Affiliate (other than Contracts to which the only parties that are Affiliates of any Seller or any other Hicks Affiliate consist of (A) any Seller and any other Seller or (B) any Seller and any Transferred Subsidiary), except as set forth in Schedule 1.1(a)(i), (iv) the Contracts listed on Schedule 1.1(a)(ii) and (v) all Contracts relating to the Senior Indebtedness.

"Excluded Equity Interests" means the StarCenters Equity Interests and the U.S. Holdings Shares.

"Excluded Insurance Claim" has the meaning given in Section 9.14(b).

"Excluded Insurance Policy" has the meaning given in Section 9.14(b).

"Excluded Liabilities" has the meaning given in Section 2.4.

"Excluded Matter" has the meaning given in Section 1.1 (in the definition of "Material Adverse Effect").

"Excluded NWC Amounts" means each of the following:

(i)     all Liabilities, including any reserve or accrual for Liability, of Dallas Arena and the COC Entities, including, but not limited to, those set forth on, reserved for or accrued for on the COC Financial Statements;

(ii)     all Liabilities, including any reserve or accrual for Liability, for Texas franchise or margin Tax in excess of Tax accruals calculated in accordance with the past

practices of Dallas Stars, including (i) Liabilities as a result of any Sellers' joint and several liability and (ii) Liabilities relating to or resulting from the consummation of the transactions contemplated by the Agreement;

(iii)    all Liabilities, including any reserve or accrual for Liability, for Liability for sales Taxes, in excess of Tax accruals for the then current and following month periods calculated in accordance with the past practices of Dallas Stars;

(iv)    all Liabilities, including any reserve or accrual for Liability, for the non-current portion of any unearned revenue or deferred expense; and

(v)    all Liabilities, including any reserve or accrual for Liability, related to the Plano StarCenter property damage.

"Expense Reimbursement" has the meaning given in Section 8.5(a).

"Family" means, with respect to any natural person, such person's spouse and children (including adopted and step children).

"Federal Trade Commission Act" means the Federal Trade Commission Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"Final NWC" has the meaning given in Section 3.4(c)(i), Section 3.4(d) or Section 3.4(e), as applicable.

"First Lien Agent" means JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent under the First Lien Credit Agreement.

"First Lien Cash Payment" has the meaning set forth in Section 3.1(e).

"First Lien Credit Agreement" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, Barclays Bank PLC, as Co-Syndication Agent and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, as amended from time to time.

"First Lien Lender" means any Lender under the First Lien Credit Agreement.

"Former Employee" means all individuals (including common law employees, individual independent contractors and individual consultants) who were employed or engaged by or on behalf of Dallas Stars or any of the Stars Subsidiaries (it being understood that prior to January 1, 2011, all employees employed or engaged on behalf of Dallas Stars or any of the Stars Subsidiaries were employed by HSG on behalf of Dallas Stars and the Stars Subsidiaries), but who are no longer so employed or engaged as of the Closing Date.

"FTC" means the Federal Trade Commission.

"<u>Furniture and Equipment</u>" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property, including all artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, that are owned by Dallas Stars.

"<u>GAAP</u>" means generally accepted accounting principles in the United States as of the date hereof.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"<u>GSP</u>" means GSP Securities LLC.

"<u>Guarantor</u>" has the meaning given in the Preamble.

"<u>Hardware</u>" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"<u>Hedge Agreement</u>" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender counterparty in connection with or to satisfy the requirements of the First Lien Credit Agreement or the Second Lien Credit Agreement, including the (i) ISDA Master Agreement, dated as of December 5, 2001, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, (ii) ISDA Master Agreement, dated as of February 9, 2006, as amended and supplemented from time to time, between Wachovia Bank, National Association and HSG, (iii) ISDA Master Agreement, dated as of March 9, 2006, as amended and supplemented from time to time, between Goldman Sachs Capital Markets, L.P. and HSG, (iv) ISDA Master Agreement, dated as of June 26, 2006, as amended and supplemented from time to time, between Sovereign Bank and HSG, (v) ISDA Master Agreement, dated as of June 28, 2006, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, and (vi) ISDA Master Agreement, dated as of September 15, 2006, as amended and supplemented from time to time, between Barclays Bank Plc and HSG.

"<u>Hicks</u>" means Thomas O. Hicks, in his individual capacity.

"<u>Hicks Affiliate</u>" means Hicks, his Family or any trust for the benefit of him or his Family or any Person (other than Sellers or any Transferred Subsidiary) controlled by Hicks, his Family, or any trust for the benefit of him or his Family.

"<u>Hockey Centers</u>" has the meaning given in the Preamble.

"<u>Hockey Club</u>" has the meaning given in the Preamble.

"<u>Hockey Enterprises</u>" has the meaning given in the Recitals.

"Hockey Enterprises Equity Interest" has the meaning given in Section 5.4(c).

"Hockey Enterprises Shares" has the meaning given in Section 5.4(c).

"Hockey Player Employee" means each hockey player party to a contract with Dallas Stars or any of its Subsidiaries, as entered into or assumed by Dallas Stars or entered into by or on behalf of Dallas Stars pursuant to any minor league affiliation agreement.

"HSG" has the meaning given in the Recitals.

"HSGH" means HSG Sports Group Holdings LLC, a Texas limited liability company, which wholly-owns HSG as its direct Subsidiary.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules and regulations promulgated thereunder.

"Inactive Employee" has the meaning given in Section 10.1(b).

"Intercompany Amounts" means all accounts receivable or accounts payable of (i) any Seller payable to or owed by (A) any other Seller, (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17)  or (C) Hockey Enterprises, (ii) to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17, Plano StarCenter payable to or owed by (A) any Seller or (B) Hockey Enterprises or (iii) Hockey Enterprises payable to or owed by (A) any Seller or (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17).

"Indebtedness" of any Person means, without duplication, (i) the principal and accreted value and accrued and unpaid interest, fees, expenses, penalties and other amounts payable in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current Liabilities); (iii) all obligations of the type referred to in clauses (i) and (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indemnification Claim" has the meaning given in Section 12.4(b).

"Independent Accounting Firm" has the meaning given in Section 3.4(e).

"Insurance Policies" has the meaning given in Section 5.19(a).

"Intellectual Property" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, reexaminations and reissues of any of the foregoing (collectively, "Patents"); (ii) all trademarks, service marks, trade names, service names, brand names, trade dress, logos, corporate names and other source or business identifiers, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) copyrights and works of authorship, and all registrations, applications, renewals and extensions and reversions of any of the foregoing (collectively, "Copyrights"); (iv) all trade secrets (collectively, "Trade Secrets"); and (v) all internet domain names, and all registrations, applications, renewals and extensions of any of the foregoing (collectively, "Domain Names").

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Dallas Arena" means the actual knowledge of Tony Tavares or Robert Hutson.

"Knowledge of Dallas Stars" means the actual knowledge of Tony Tavares or Robert Hutson.

"Law" means any foreign, federal, state or local law, statute, code, ordinance, Order, rule or regulation.

"Leased Real Property" means any real property subject to a Real Property Lease.

"Leased StarCenters" has the meaning given in the Recitals.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"Lender" means, with respect to the Senior Indebtedness, each financial institution listed on the signature pages thereto as a lender, and any other Person that becomes a lender pursuant to an assignment agreement in accordance therewith.

"Lender Related Parties" has the meaning given in Section 12.12.

"Liability" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs and expenses relating thereto.

"Liens" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, charge, option, right of first refusal, interests (as such term is used in section 363(f) of the Bankruptcy Code), easement or servitude.

"Loss(es)" has the meaning given in <u>Section 12.2(a)(i)</u>.

"Marks" has the meaning given in <u>Section 1.1</u> (in the definition of "Intellectual Property").

"Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon the business, assets, liabilities, properties, prospects, results of operations or financial condition of Sellers and the Transferred Subsidiaries (taken as a whole), (ii) a material adverse effect upon the legality, validity, binding effect or enforceability against Sellers of this Agreement or any Seller Document or Purchaser Document to which it is a party, or (iii) a material adverse effect upon the ability of Sellers to consummate the transactions contemplated by this Agreement, and in respect of the foregoing subsections (i), (ii) and (iii), other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Sellers and the Transferred Subsidiaries operate; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in applicable Laws or accounting rules; (v) the failure of Sellers to meet any of their internal projections; (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; (vii) actions taken by the NHL affecting all NHL member teams; (viii) the physical condition of any player under contract to Dallas Stars; (ix) changes in GAAP; (x) any act, omission or event occurring in accordance with the terms and conditions of this Agreement or to which any Purchaser consents in writing; (xi) transactions or other circumstances involving players, coaches or executives under contract to Dallas Stars, including, but not limited to, trade, injury, death, disability, retirement, termination, suspension or contract extension; (xii) the on-ice performance of the Stars; (xiii) any sale, or announced or pending sale, of a member team of the NHL; (xiv) the number of games won or lost by the Stars or attendance at Stars games; or (xv) the filing of, and the continued pendency of, the Bankruptcy Case.

"Material Contracts" means, collectively, the Stars Material Contracts and the Arena Material Contracts.

"Monarch" means Monarch Master Funding Ltd., as a First Lien Lender.

"NHL" has the meaning given in the Recitals.

"NHL Affiliated Party" means each of the NHL Entities and each of the NHL Member Clubs (except Dallas Stars, but including future NHL Member Clubs) and each of their respective Subsidiaries and other Affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors.

"NHL Approvals" means such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings as are required under applicable NHL Rules and other rules and regulations of the NHL or any NHL Document.

"NHL Benefit Plans" has the meaning given in Section 5.14(a).

"NHL Board of Governors" means the Board of Governors of the NHL, as established under the NHL Constitution, and any successor chief governing body of the NHL that may be later established.

"NHL By-Laws" means the By-Laws of the NHL, as adopted under the NHL Constitution, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions and decisions issued by the NHL Commissioner or his designee.

"NHL Commissioner" means the person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

"NHL Constitution" means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings and decisions issued by the NHL Commissioner or his designee.

"NHL Documents" means all documents and agreements between Sellers or their Subsidiaries and the NHL relating to the Business, including the documents and agreements listed in Schedule 1.1(b), together with any of the foregoing which are entered into after the effective date of this Agreement in the Ordinary Course of Business in connection with the Business.

"NHL Entities" means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the NHL Member Clubs generally after the date of this Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective Affiliates and subsidiaries; provided that the "NHL Entities" shall not include the NHL Member Clubs.

"NHL Guaranty" has the meaning given in Section 9.9.

"NHL/Lender Cooperation Agreement" has the meaning given in Section 9.9.

"NHL Member Clubs" means the hockey clubs set forth in Article III of the NHL Constitution, as amended.

"NHL Owner Consent" has the meaning given in Section 9.9.

"<u>NHLPA</u>" means the National Hockey League Players' Association.

"<u>NHL Proxy</u>" means (i) the Irrevocable Proxy, dated January 14, 2010, by HSG to the NHL Commissioner; (ii) the Irrevocable Proxy, dated January 14, 2010, by HSGH to the NHL Commissioner; (iii) the Irrevocable Proxy, dated January 14, 2010, by HSG Partnership Holdings LLC to the NHL Commissioner; and (iv) the Irrevocable Proxy, dated January 14, 2010, by Dallas Arena to the NHL Commissioner.

"<u>NHL Rules</u>" means (i) the NHL Constitution, (ii) the NHL By-Laws, (iii) the governing documents of each of the NHL Entities, (iv) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities and the NHL Board of Governors, (v) the current and future collective bargaining agreements between the NHL and the NHLPA and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other persons, on the other hand, in furtherance of the NHL's (or any NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-Laws, and (vi) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time.

"<u>Nonassignable Assets</u>" has the meaning given in <u>Section 2.6(b)</u>.

"<u>Notice Deadline</u>" has the meaning given in <u>Section 8.7</u>.

"<u>NWC</u>" means the consolidated net working capital (defined as current assets less current liabilities) of Dallas Stars and its Subsidiaries calculated in a manner consistent with the Pro Forma NWC in accordance with <u>Section 3.4(g)</u>. For the avoidance of doubt, (i) NWC may be a positive or a negative number (*i.e.*, a deficit), (ii) current liabilities shall exclude all Excluded Liabilities, the CFV Debt Amount, all net Intercompany Amounts and all Excluded NWC Amounts and (iii) current liabilities shall include Specified Expenses.

"<u>Officer Indemnification Agreements</u>" means (i) the Letter Agreement, dated December 29, 2010, by Dallas Stars and Dallas Arena for the benefit of Robert Hutson, and (ii) the Employment Agreement, dated December 14, 2010, by and between Dallas Stars and Tony Tavares, as the same may be amended or extended.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business, including the ordinary and usual course of normal day-to-day operations of the Business during the Bankruptcy Case which, for the avoidance of doubt, may deviate from the ordinary and usual course of normal day-to-day operations prior to filing the Bankruptcy Case.

"Owned Property" or "Owned Properties" has the meaning given in Section 5.10(a).

"Parking Easement" means the Parking Agreement and Easement, dated as of April 16, 2008, by and among Dallas Stars, SSR and SSR GP Interests, L.P.

"Patents" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Permit" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in existing policies of title insurance (including any mortgagee, owner or lessee policy) to the extent copies of which have been provided to Purchasers; (ii) Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body; (v) title of a lessor under a capital or operating lease or other personal property; (vi) rights of subtenants, landlords, licensees, sponsors and concessionaires; (vii) the terms and conditions of the Real Property Leases; (viii) the Shared Parking Letter; (ix) the Parking Easement; (x) all Liens that will be extinguished by the Confirmation Order; (xi) other imperfections in title, charges, easements, restrictions and encumbrances which do not materially detract from the value of or materially interfere with the Business or the property subject thereto; and (xii) all matters listed on Schedule 1.1(c).

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" means any lease of personal property by Dallas Stars or any Stars Subsidiary.

"Petition Date" means the date on which the Bankruptcy Petitions are duly filed with the Bankruptcy Court.

"Plan" has the meaning given in the Recitals.

"Plano StarCenter" has the meaning given in the Recitals.

"Post-Closing Covenants" has the meaning given in Section 12.1(b).

"Post-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Post-Closing Expense Amount" means $750,000.

"Pre-Closing Covenants" has the meaning given in Section 12.1(b).

"Pre-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Pro Forma Balance Sheet" means the pro forma consolidated balance sheet of Dallas Stars and its Subsidiaries as of June 30, 2011, attached hereto as Schedule A.

"Pro Forma NWC" means the pro forma calculation of NWC as of June 30, 2011, attached hereto as Schedule B.

"Pro Forma Purchase Price" means the pro forma calculation of the Purchase Price as of June 30, 2011, attached hereto as Schedule C.

"Proposed NHL Approval Requirements" means the proposed substantive terms of the NHL Owner Consent, the NHL Guaranty, the Purchaser/NHL Proxy, and the NHL/Lender Cooperation Agreement.

"Prorated Budgeted Loss" means an amount equal to (i) a fraction, the numerator of which shall be the number of days that elapsed in the month of Closing through and including the Closing Date and the denominator of which shall be the total number of days in the month of Closing, *multiplied* by (ii) the Cumulative Budgeted Loss for the month of Closing *less* the Cumulative Budgeted Loss as of the end of the immediately preceding month.

"Purchase Price" has the meaning given in Section 3.1(e).

"Purchased Assets" has the meaning given in Section 2.1.

"Purchased Contracts" means all Contracts (other than Excluded Contracts) to which any Seller is a party, including all Ticket Contracts.

"Purchased Intellectual Property" means all Intellectual Property (i) owned by Sellers (the "Sellers' Intellectual Property") or (ii) owned by any of the Transferred Subsidiaries, including, in each case (i) and (ii), the Registered Intellectual Property.

"Purchaser(s)" has the meaning given in the Preamble.

"Purchaser Documents" has the meaning given in Section 7.2.

"Purchaser Indemnified Parties" has the meaning given in Section 12.2(a).

"Purchaser/NHL Proxy" has the meaning given in Section 9.9.

"Purchaser Plans" has the meaning given in Section 10.2(b).

"Qualified Bid" has the meaning given to such term in the Bidding Procedures Order.

"Qualified Bidder" has the meaning given to such term in the Bidding Procedures Order.

"Real Property Lease" means any lease of real property to which Dallas Stars or any Stars Subsidiary is party as lessor or lessee.

"Registered Intellectual Property" means all issued Patents, pending Patent applications, registered Marks, pending applications for registration of Marks, registered Copyrights and Domain Name registrations, in each case, owned, filed or applied for by (i) any Seller or (ii) any Transferred Subsidiary.

"Requisite Lenders" means the Lenders under the First Lien Credit Agreement and the Second Lien Credit Agreement (i) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement and (ii) representing at least fifty percent (50%) of the Lenders under the First Lien Credit Agreement and Second Lien Credit Agreement; provided, however, that at the option of Sellers with the approval of the NHL, the definition of Requisite Lenders shall mean the First Lien Lenders (x) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and (y) representing at least fifty percent (50%) of the First Lien Lenders.

"RLF" means Richards, Layton & Finger, a Professional Association.

"Second Lien Credit Agreement" means that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, and GSP Finance LLC (as successor to Barclays Bank PLC) as Administrative Agent, Collateral Agent and Co-Syndication Agent, as amended from time to time.

"Second Lien Expense Reimbursement" has the meaning given in the Plan.

"Securities Act" has the meaning given in Section 7.6.

"Seller(s)" has the meaning given in the Preamble.

"Seller Benefit Plan" has the meaning given in Section 5.14(a).

"Seller Documents" means the Dallas Stars Documents and the Dallas Arena Documents.

"Seller Indemnified Parties" has the meaning given in Section 12.3(a).

"Seller Released Parties" has the meaning given in Section 13.12(a).

"Seller Releasing Parties" has the meaning given in Section 13.12(b).

"Sellers' Intellectual Property" has the meaning given in Section 1.1 (in the definition of "Purchased Intellectual Property").

"Sellers' Representative" has the meaning given in Section 13.14.

"Senior Indebtedness" means the obligations arising under, in connection with or in respect of (i) the First Lien Credit Agreement, (ii) the Second Lien Credit Agreement, (iii) the

amounts due under, or otherwise due in connection with the termination of, the Hedge Agreements, and (iv) any other agreement entered into in connection with the foregoing.

"<u>Senior Secured Loan</u>" has the meaning given in <u>Section 9.11</u>.

"<u>Shared Parking Letter</u>" means the Letter Agreement, dated September 12, 2003, between SSR GP Interests, L.P., Dallas Stars, SSG/Mandalay Baseball Partners, L.P. and SSR, regarding the shared-parking arrangement at the Frisco sports complex.

"<u>Shared Services Agreement</u>" means the Shared Services Agreement, dated as of October 3, 2008, by and among HSG and certain of its affiliated entities signatory thereto, pursuant to which HSG provides certain shared services to each of Dallas Stars, the Stars Subsidiaries and other Affiliates of HSG.

"<u>Sherman Act</u>" means the Sherman Antitrust Act of 1890, as amended, and the rules and regulations promulgated thereunder.

"<u>Specified Expenses</u>" means those unpaid fees and expenses relating to the sale process and the related matters contemplated by this Agreement as and in the amount submitted in final form in writing by Sellers to Purchasers at least three (3) Business Days prior to the Closing Date, and not subject to review or approval by Purchasers but only by Sellers in advance of Closing (and which may include estimates thereof through the Closing Date), including (i) amounts due to GSP (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by <u>Section 7.8</u>), (iii) fees of Sellers' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) the Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement, including, without limitation, any Antitrust Fees and any fees resulting from the filings contemplated under <u>Section 9.15</u>.

"<u>SSR</u>" means SSR Collin Land, L.P., a Texas limited partnership.

"<u>StarCenters</u>" has the meaning given in the Preamble.

"<u>StarCenters Equity Interests</u>" means the limited liability company membership interests in and to StarCenters.

"<u>Stars</u>" has the meaning given in the Recitals.

"<u>Stars Benefit Plan</u>" has the meaning given in <u>Section 5.14(a)</u>.

"<u>Stars Entities</u>" means each of Dallas Stars and the Stars Subsidiaries.

"<u>Stars Foundation</u>" means Dallas Stars Foundation, Inc., a Texas non-profit corporation.

"<u>Stars Material Contract</u>" has the meaning given in <u>Section 5.13(a)</u>.

"<u>Stars Pension Plan</u>" has the meaning given in <u>Section 5.14(b)</u>.

"<u>Stars Subsidiaries</u>" has the meaning given in the Recitals.

"<u>Subsidiary</u>" means, with respect to a Person, any Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person.

"<u>Subsidiary Released Parties</u>" has the meaning given in <u>Section 13.12(b)</u>.

"<u>Subsidiary Releasing Parties</u>" has the meaning given in <u>Section 13.12(a)</u>.

"<u>Successful Bidder</u>" has the meaning given in the Bidding Procedures Order.

"<u>Suite Contract</u>" means a Contract to which any Seller is a party that gives another party thereto the right to use a suite at the AAC or any Dr Pepper StarCenter for more than one game in any season, other than sponsorship or advertising and promotional agreements.

"<u>Target NWC</u>" means $7,750,000.

"<u>Tax(es)</u>" means (i) all federal, state, local or foreign taxes, charges, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any Liability in respect of any items described in clauses (i) or (ii) payable by reason of Treasury Regulation Section 1.1502-6 or any analogous or similar provision under federal, state, local or foreign Law.

"<u>Tax Benefit</u>" has the meaning given in <u>Section 12.6(b)</u>.

"<u>Tax Return</u>" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes a Seller, any of its Subsidiaries, or any of their Affiliates.

"<u>Taxing Authority</u>" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"<u>Termination Date</u>" means the later of (i) December 31, 2011 and (ii) in the event the Auction has occurred and Purchasers are not the Successful Bidder, the earlier of (A) the closing of the Competing Bid and (B) forty-five (45) days after the close of the Auction.

"<u>Ticket Contracts</u>" means all Contracts, licenses and subscriptions to which any Seller is a party relating to attendance at any event at the AAC or any Dr Pepper StarCenter including, without limitation, season ticket subscriptions and Suite Contracts.

"Trade Secrets" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Transaction Expenses" means all fees, charges, disbursements and expenses, paid out-of-pocket to third parties incurred in contemplation of or in connection with the transactions contemplated hereby, including fees, expenses and costs of legal counsel, accountants, financial advisors, consultants, agents and other representatives, incurred in connection with the transactions contemplated hereby.

"Transfer Taxes" has the meaning given in Section 13.1(a).

"Transferred Equity Interests" means (i) the 100% member interest in Plano StarCenter held by Dallas Stars, but only to the extent Sellers do not elect to treat such member interests as an Excluded Asset pursuant to Section 9.17 , (ii) 99% of the issued and outstanding capital stock of Hockey Enterprises held by Dallas Stars, (iii) the Hockey Enterprises Equity Interest and (iv) the COC Equity Interests.

"Transferred Subsidiaries" means (i) Hockey Enterprises and, (ii) to the extent Sellers do not elect to treat the member interests of the same as an Excluded Asset pursuant to Section 9.17, Plano StarCenter.

"U.S. Holdings" has the meaning given in the Preamble.

"U.S. Holdings Shares" has the meaning given in Section 5.4(c).

"Weil" has the meaning given in Section 4.1.

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or

indication that breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)     <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statements, or (c) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)     <u>Recitals</u>. The Recitals to this Agreement are incorporated by reference herein and made a part hereof.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Further, prior drafts of this Agreement or any ancillary agreements hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

## ARTICLE II

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchasers all of Sellers' right, title and interest in, to and under the Purchased Assets.  "<u>Purchased Assets</u>" shall mean all assets of Sellers (other than the Excluded Assets), including the following assets:

(a)     the Purchased Contracts;

(b)     all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Sellers (other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on <u>Schedule 2.1(b)</u>);

(c)     all inventory and supplies of Sellers;

(d)     all rights of Sellers with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)     all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Sellers, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)     all rights of Sellers under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(g)     all rights and privileges held by Sellers associated with the NHL, including rights to membership and franchise of the Stars in the NHL and all ownership interests of Sellers in any NHL Entity;

(h)     the Furniture and Equipment;

(i)     the Transferred Equity Interests (subject to the election of Sellers pursuant to <u>Section 9.17</u> to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j)     Sellers' Intellectual Property;

(k)     all Documents of Sellers used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the

Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Sellers (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Sellers shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Sellers, but only to the extent such Permits are assignable or otherwise transferable;

(m)     all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Seller and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Sellers' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Sellers to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings, team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, the Reunion Arena (the former home ice arena for the Stars), or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Sellers associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

2.2     Excluded Assets.  Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchasers, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets of Sellers:

(a)     the Excluded Contracts, including those accounts receivable identified on Schedule 2.1(b);

(b)     all minute books, organizational documents, stock or other equity registers and such other books and records and corporate or other entity filings of Sellers as pertain to ownership, organization or existence of each Seller and duplicate copies of such Documents as are necessary to enable Sellers to file Tax Returns and reports and comply with any applicable Laws or internal policies regarding document retention;

(c)     any personnel files pertaining to any individuals (including common law employees and independent contractors), other than the personnel files of any Continuing Employee and any independent contractors who are a party to a Purchased Contract;

(d)     any (i) other Documents or other books and records that any Seller is required by Law to retain or that any Seller determines are necessary or advisable to retain; provided, however, that Purchasers shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (ii) documents relating to proposals to acquire the Business by Persons other than Purchasers;

(e)     all of Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets as identified on Schedule 2.2(e);

(f)     the Excluded Equity Interests;

(g)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Excluded Asset;

(h)     any claim, right or interest of Sellers with respect to any Excluded Liability; and

(i)     to the extent Sellers so elect pursuant to Section 9.17, the 100% membership interests in Plano StarCenter held by Dallas Stars.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall assume, effective as of the Closing, and shall timely perform, pay and discharge in accordance with their respective terms, all Liabilities of Sellers (collectively, the "Assumed Liabilities") other than Excluded Liabilities.  The Assumed Liabilities include, but are not limited to, the following Liabilities of the Sellers:

(a)     except to the extent specifically provided in Article X, all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services of any individual by or on behalf of any Seller or any of the Transferred Subsidiaries on or before the Closing Date, (ii) workers' compensation claims against any Seller or any of the Transferred Subsidiaries, or any other entity with respect to the employment of any Former Employee on behalf of any Seller or any Transferred Subsidiary, that relate to the period ending on the Closing Date, irrespective of whether such claims are made prior to, on or after the Closing, or (iii) any Employee Benefit Plan;

(b)     all Liabilities arising from the sale of products sold or services provided in the Ordinary Course of Business pursuant to product or service warranties, returns and rebates;

(c)     all Liabilities constituting, or arising in connection with, accounts payable existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(d)     all Liabilities for Taxes;

(e)     all Liabilities for Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)     all Liabilities with respect to the Business, the Purchased Assets or the Continuing Employees arising after the Closing;

(g)     all Liabilities for the CFV Debt Amount;

(h)     all Liabilities of Dallas Stars for benefits received as a third party beneficiary under or otherwise received as a result of the Contracts listed on Schedule 2.3(h);

(i)     all Liabilities of Dallas Stars for contribution and indemnity at law to HSG or HSGH arising out of HSG's or HSGH's guaranty obligations under the Contracts set forth on Schedule 2.3(i), but only to the extent that HSG or HSGH actually makes any payments thereunder as a result of Dallas Stars' or its Subsidiaries' default of their obligations;

(j)     all Liabilities for the Specified Expenses;

(k)     all Liabilities and obligations of Sellers for the aggregate amount of gross deferred compensation as set forth on the schedule provided pursuant to Section 5.22, including for Hockey Player Employees and coaches;

(l)     all Liabilities of Sellers arising under the Purchased Contracts, including any cure amounts as set forth in Section 2.5;

(m)     all Liabilities of Sellers to the extent covered by Insurance Policies or benefits of Insurance Policies that are assigned to and assumed by Purchasers;

(n)     all Liabilities of Sellers under the Officer Indemnification Agreements;

(o)     all Liabilities constituting, or arising in connection with, trade payables; and

(p)     all Liabilities of Sellers to the NHL, any NHL Affiliated Party, any other entity formed generally by the NHL Member Clubs after the date hereof, or any other NHL Member Club, whether in accordance with the terms of the NHL Constitution and Agreements (as defined in that certain letter agreement, dated December 19, 2006, as has been or may be further amended, restated, supplemented or otherwise modified from time to time, by and among the NHL, the First Lien Agent, the Administrative Agent under the Second Lien Credit

Agreement, HSG, HSGH, Dallas Stars, Dallas Arena, U.S. Holdings, StarCenters, and certain other subsidiaries of HSG), applicable Law or otherwise.

2.4    Excluded Liabilities.  Purchasers will not assume or be liable for any Liabilities of Sellers other than the Assumed Liabilities.  "Excluded Liabilities" shall consist of the following Liabilities of Sellers:

(a)    all Liabilities of Sellers arising out of the Excluded Assets, including the Excluded Contracts, except as otherwise provided in Section 2.3(d);

(b)    all Liabilities of HSG or any Hicks Affiliates, except as otherwise provided (i) in Section 2.3(d) or 2.3(e), in each case, solely to the extent that Sellers are jointly and severally liable with HSG or any Hicks Affiliates with respect thereto pursuant to applicable Law and (ii) in Section 2.3(a), 2.3(h), 2.3(i) or 2.3(p);

(c)    all Liabilities arising out of or relating to the Senior Indebtedness (including any and all Liabilities of or to GSP in its capacity as Lender and agent under the Second Lien Credit Agreement), except as otherwise provided in Section 2.3(p);

(d)    all Liabilities of Sellers owed to any of their Affiliates or any Hicks Affiliate (but, for the avoidance of doubt, (i) such Affiliates or Hicks Affiliate shall not include any other Seller or any Transferred Subsidiary, and (ii) such Liabilities shall not include any Liabilities owed pursuant to any Contract set forth on Schedule 1.1(a)(i) hereto);

(e)    all Liabilities, if any, to proposed purchasers or bidders not party hereto and who are unaffiliated with any Purchaser arising from the negotiations of or on behalf of Sellers or HSG with such Persons;

(f)    any Liabilities to the extent covered by any Insurance Policies (including any extension of any "claims made" liability insurance policies effected pursuant to Sellers' obligations under Section 9.14 and any renewals of any Insurance Policies), to the extent such Insurance Policies and the benefits of such Insurance Policies are not assigned to and assumed by Purchasers, and only to the extent that Sellers, after fulfilling all obligations set forth in Section 9.14, actually recover the amount of such Liabilities under the applicable policies;

(g)    all Liabilities based upon or resulting from any employee pension benefit plan that is subject to Section 302 or Title IV of ERISA (other than a Seller Benefit Plan or NHL Benefit Plan) directly maintained or contributed to by any member (other than Sellers or any of their Subsidiaries) of a group under common control (under Section 414(b) or (c) of the Code) with Sellers or any of their Subsidiaries prior to the Closing Date;

(h)    all Liabilities of Sellers under this Agreement, including any indemnification obligations under Article XII;

(i)    except as provided in Section 2.3(g), any Liabilities under the CFV Debt Agreement; and

(j)    any Liabilities to a Broker (other than to GSP).

2.5    Cure Amounts.  At Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assign to Purchasers and Purchasers shall assume from Sellers, the Purchased Contracts.  The cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts, Personal Property Leases and Real Property Leases, shall be paid by Purchasers, on or before Closing, and not by Sellers, and Sellers shall have no liability therefor.

2.6    Further Conveyances and Assumptions; Consent of Third Parties.

(a)    From time to time following the Closing, Sellers and Purchasers shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to fully convey, transfer and assign to Purchasers and their successors or assigns, all of the rights, titles and interests in the Purchased Assets and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)    Nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which by its terms or by Law is nonassignable without the consent of a third party or a Governmental Body or is cancelable by a third party in the event of an assignment ("Nonassignable Assets") unless and until such consent shall have been obtained or the Bankruptcy Court shall have authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals).  With respect to Material Contracts or Permits that are material for the Business as a going concern after the Closing Date, Sellers shall use their commercially reasonable efforts to promptly obtain such consents prior to the Closing and, if the Closing occurs, after the Closing Date; provided, however, that such efforts shall not require any Seller or any of its Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily or contingently liable for any Assumed Liability to obtain any such consent.  Purchasers and Sellers shall use their respective commercially reasonable efforts to obtain, or cause to be obtained, any consent, substitution, approval or amendment required to novate all Liabilities under any and all Purchased Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of Sellers and their Affiliates so that, in any such case, Purchasers shall be solely responsible for such Liabilities.  To the extent permitted by applicable Law and the terms of the Nonassignable Assets, in the event consents to the assignment thereof cannot be obtained or the Bankruptcy Court has not authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals), such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchasers and the covenants and obligations thereunder shall be performed by Purchasers in such Seller's name and all benefits and obligations existing thereunder shall be for Purchasers' account.  Sellers shall take or cause to be taken at Purchasers' expense such actions in their name or otherwise as Purchasers may reasonably request so as to provide Purchasers with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and

Sellers shall promptly pay over to Purchasers all money or other consideration received by it in respect of all Nonassignable Assets. As of and from the Closing Date, each Seller authorizes each Purchaser, to the extent permitted by applicable Law and the terms of the Nonassignable Assets, at Purchasers' expense, to perform all the obligations and receive all the benefits of such Seller under the Nonassignable Assets and appoints each Purchaser its attorney-in-fact to act in its name on its behalf, and Purchasers agree to indemnify and hold such Seller and its Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchasers' performance of, or failure to perform, such obligations under the Nonassignable Assets and any actions taken upon exercise of such power of attorney. Following the Closing, Sellers shall not terminate, modify or amend any Nonassignable Asset without Purchasers' prior written consent.

2.7 <u>Bulk Sales Laws</u>. Except as may otherwise be required by the Bankruptcy Court, Purchasers hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchasers.

## ARTICLE III

## CONSIDERATION

3.1 <u>Consideration</u>. The aggregate consideration for the Purchased Assets (which, for the avoidance of doubt, shall be a joint and several obligation of Purchasers) shall be:

(a) an amount in cash equal to the CFV Debt Amount;

(b) an amount in cash as necessary to pay in full the Specified Expenses;

(c) the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 in partial satisfaction of the Senior Indebtedness; <u>provided</u> that the original principal amount of the Senior Secured Loan and the indebtedness of DSE to be incurred in connection therewith shall be adjusted:

(i) by deducting the amount, if any, by which the CFV Debt Amount exceeds $50,000,000;

(ii) by (A) deducting the amount, if any, by which the Target NWC exceeds the Final NWC (for the avoidance of doubt, if the Final NWC is a deficit number, the amount deducted shall be equal to the aggregate of (x) the full amount of the deficit, and (y) the Target NWC) or (B) adding the amount if any by which the Final NWC exceeds the Target NWC; and

(iii) (A) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on the last day of a month, by adding an amount equal to the absolute value of the Cumulative Budgeted Loss for such month, (B) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on a date other than the last day of a month (and, for greater certainty, no amount has been added under <u>Section 3.1(c)(iii)(A)</u>), by adding an amount equal to (x) the absolute value of the

Cumulative Budgeted Loss for the immediately preceding calendar month *plus* (y) the absolute value of the Prorated Budgeted Loss for the month in which Closing occurs, or (C) if the Closing Date occurs on or after January 1, 2012, by adding an amount equal to the absolute value of ($15,058,541);

further, provided that, the final principal amount of the Senior Secured Loan, as may be adjusted under Section 3.1(c) hereinabove, shall not exceed $100,000,000;

(d)     if the aggregate principal amount of the Senior Secured Loan as adjusted under Section 3.1(c) would exceed $100,000,000 but for the last proviso of Section 3.1(c), an amount in cash equal to the excess amount thereof, if any, in excess of $100,000,000 (the "Excess Cash Payment");

(e)     an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount (the "First Lien Cash Payment") (collectively, the sum of the amounts determined pursuant to the foregoing subsections (a), (b), (c), (d) and (e), the "Purchase Price", which shall be calculated pursuant to this Section 3.1 in a manner consistent with the preparation of the Pro Forma Purchase Price); and

(f)     the assumption of the Assumed Liabilities.

3.2     Purchase Price Deposit.  Upon the execution of this Agreement, Purchasers shall immediately deposit with Citibank, N.A., in its capacity as escrow agent (the "Escrow Agent"), the sum of Fifteen Million U.S. Dollars ($15,000,000) by wire transfer of immediately available funds (the "Escrowed Funds"), to be released by the Escrow Agent and delivered to either Purchasers or to or on behalf of Sellers, in accordance with the provisions of the Escrow Agreement, which will be entered into by Purchasers, Sellers and the Escrow Agent immediately upon execution of this Agreement in substantially the form attached as Exhibit E (the "Escrow Agreement").  The Escrow Agreement shall provide, among other things, that the Escrow Agent shall provide Sellers and Purchasers with written notice immediately upon receipt of the Escrowed Funds.  Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(a)     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied towards the Purchase Price payable by Purchasers to Sellers under Section 3.3 hereof;

(b)     the Escrowed Funds, together with all accrued investment income thereon, shall be promptly returned to Purchasers, if this Agreement is terminated:

(i)     pursuant to Section 4.2(a);

(ii)     by Purchasers or Sellers pursuant to Section 4.2(c), but not in the event that the Order contemplated by Section 4.2(c) was due to the failure of Purchasers to perform any of their obligations under this Agreement;

(iii)     by Sellers pursuant to Section 4.2(d)(i), but not in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under

this Agreement (including, without limitation, their obligations under <u>Section 9.9</u>) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

        (iv)      by Purchasers pursuant to <u>Section 4.2(e)</u>;

        (v)      pursuant to <u>Section 4.2(h)</u>; or

        (vi)      by Purchasers pursuant to <u>Section 4.2(i)</u>; and

(c)      if this Agreement is terminated for any reason other than as set forth in <u>Section 3.2(b)</u>, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be delivered to Sellers.

3.3      <u>Payment of Purchase Price</u>.

(a)      On the Closing Date, (i) the Escrow Agent shall pay the Escrowed Funds and all accrued investment income thereon by wire transfer of immediately available United States funds to an account designated by CFV I LLC, and (ii) Purchasers shall pay the Purchase Price (less the Escrowed Funds and all accrued investment income thereon) to Sellers, which shall be paid (A) by wire transfer of immediately available United States funds in an amount equal to the CFV Debt Amount (less the Escrowed Funds and all accrued investment income thereon) to an account designated by CFV I LLC; (B) by wire transfer of immediately available United States funds in an amount equal to the Specified Expenses to accounts and in the amounts designated by Sellers and the NHL, respectively, and to the extent direct payment of Specified Expenses owed to RLF, Weil and GSP, respectively, is permitted by the Bankruptcy Court at Closing, to the accounts and in the amounts designated by RLF, Weil and GSP, respectively; (C) by wire transfer of immediately available United States funds in an amount equal to the First Lien Cash Payment to an account designated by the First Lien Agent; and (D) by the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 (subject to adjustment as provided in <u>Sections 3.1(c)</u> and <u>3.4</u> hereof).

(b)      Within three (3) Business Days following the determination of the Final NWC pursuant to <u>Section 3.4</u>, (i) the aggregate principal amount of the Senior Secured Loan shall be adjusted as calculated pursuant to <u>Sections 3.1(c)</u> and <u>3.4</u> hereof and the principal amount of the Senior Secured Loan shall automatically be adjusted pursuant to its terms; and (ii) Purchasers shall pay by wire transfer of immediately available United States funds an amount equal to the Excess Cash Payment, if any, to an account designated by the First Lien Agent.

(c)      Sellers shall cause all wire transfer instructions needed for payment of the Purchase Price under this <u>Section 3.3</u> to be delivered to Purchasers at least three (3) Business Days prior to Closing. At the Closing, and upon the payment of the Excess Cash Payment, if any, Purchasers shall deliver, or cause to be delivered, to Sellers evidence of the wire transfers referred to in this <u>Section 3.3</u>.

3.4    Purchase Price Adjustment.

(a)    No later than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchasers the following: (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries prepared on an estimated basis as of the close of business on the Closing Date (the "Estimated Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, and (ii) Sellers' calculation of the NWC as of the close of business on the Closing Date based on the Estimated Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g).

(b)    Within thirty (30) days after the Closing Date, Purchasers shall prepare and deliver to Sellers' Representative the following (collectively, the "Closing Documents"): (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries as of the close of business on the Closing Date (the "Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, (ii) Purchasers' calculation of the NWC as of the close of business on the Closing Date (the "Closing NWC") based on the Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g), and (iii) a certificate of the chief financial officer of Purchasers verifying that the Closing Balance Sheet and Closing NWC have been prepared in the manner required by this Agreement.

(c)    Within twenty (20) Business Days after delivery of the Closing Documents, Sellers' Representative will deliver to Purchasers a written response in which Sellers' Representative will either:

(i)    agree in writing with the Closing NWC, in which case the Closing NWC will be final and binding (herein the "Final NWC"); or

(ii)    dispute the Closing NWC by delivering to Purchasers a written notice (a "Dispute Notice") setting forth in reasonable detail the basis for each such disputed item.

For purposes of this Section 3.4(c), Sellers' Representative may only deliver a Dispute Notice if the aggregate value of all disputed items is in excess of $100,000.  For purposes of Sections 3.4(b) and 3.4(c), Purchasers will promptly furnish to Sellers' Representative such work papers and other documents and information that Sellers' Representative may request to the extent the same are available to Purchasers (or their independent public accountants).  Purchasers shall also permit such reasonable access to their businesses and their officers and that of their Subsidiaries as may be required by the Sellers' Representative to permit it to complete its review of the Closing NWC and to do so in a timely manner.

(d)    If Sellers' Representative fails to take either of the actions specified in Section 3.4(c) within twenty (20) Business Days after delivery of the Closing Documents, then

Sellers' Representative will be deemed to have irrevocably accepted the Closing NWC, in which case, the Closing NWC will be final and binding (herein also the "<u>Final NWC</u>").

(e)     If Sellers' Representative timely delivers a Dispute Notice to Purchasers, then Purchasers and Sellers' Representative will attempt in good faith, for a period of ten (10) Business Days, to agree on the Closing NWC for purposes of this Agreement. Any resolution agreed in writing by Purchasers and Sellers' Representative during such ten (10)-Business Day period as to any disputed items will be final and binding on the parties. If Purchasers and Sellers' Representative do not resolve all disputed items by the end of ten (10) Business Days after the date of delivery of the Dispute Notice, then Purchasers and Sellers' Representative will engage a mutually agreeable independent accounting firm to determine the remaining disputed items provided that the aggregate value of the remaining disputed items is in excess of $100,000 and if the aggregate value of the remaining disputed items is $100,000 or less, then the parties shall each be deemed to prevail on their position regarding an amount equal to 50% of such remaining disputed amount. If Purchasers and Sellers' Representative are unable to jointly select such independent accounting firm within five (5) Business Days after such ten (10) Business Day period, Sellers' Representative may, upon notice to Purchasers, apply to any court of competent jurisdiction for the court to select an independent accounting firm for such purpose (such selected independent accounting firm, whether pursuant to this sentence or the preceding sentence, the "<u>Independent Accounting Firm</u>"). The Independent Accounting Firm shall render its determination with respect to the matters in dispute in a written report that specifies the conclusions of the Independent Accounting Firm as to each item in dispute and provide a revised Closing NWC consistent with all prior agreements of the parties and its determination of the matters in dispute (herein also the "<u>Final NWC</u>"). The Independent Accounting Firm's determination as set forth in its report will be final and binding on the parties for all purposes of this Agreement.

(f)     Purchasers and Sellers' Representative will each use their commercially reasonable efforts to cause the Independent Accounting Firm to render its determination within twenty (20) days after referral of the items to such firm or as soon thereafter as reasonably practicable. Purchasers and Sellers' Representative will furnish to each other and to the Independent Accounting Firm such work papers and other documents and information relating to the disputed items as the Independent Accounting Firm may request and are available to that party (or its independent public accountants) and will be afforded the opportunity to present to the Independent Accounting Firm any material related to the disputed items and to discuss the items with the Independent Accounting Firm. Purchasers may require that the Independent Accounting Firm enter into a customary form of confidentiality agreement with respect to the work papers and other documents and information provided to the Independent Accounting Firm. Purchasers shall also permit such reasonable access to their business and their officers and that of their Subsidiaries as may be required by the Independent Accounting Firm to permit them to complete their work and to do so in a timely manner. The Independent Accounting Firm will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the items in dispute as originally submitted to the Independent Accounting Firm; <u>provided</u> <u>that</u> any such costs borne by Sellers shall be paid in cash by Purchasers and shall be added to the Specified Expenses for purposes of the calculation of the Final NWC. For example, should the items in dispute total in amount to $1,000 and the Independent Accounting Firm awards $600 in favor of Sellers'

Representative's (on behalf of Sellers) position, 60% of the costs of its review would be borne by Purchasers and 40% of the costs would be borne by Sellers.

(g) Notwithstanding anything herein or in any Schedule hereto to the contrary, the calculation of NWC (including the calculation of the Pro Forma NWC, the Closing NWC and the Final NWC) shall not include, or make any adjustments for, any Excluded NWC Amounts. For the avoidance of doubt, an agreed upon amount reflecting an adjustment for all Excluded NWC Amounts is reflected in the calculation of the Target NWC.

ARTICLE IV

CLOSING AND TERMINATION

4.1     Closing Date.  The consummation of the transactions contemplated by this Agreement provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP ("Weil") located at 200 Crescent Court, Suite 300, Dallas, TX 75201 (or at such other place as the parties may designate in writing) at 10:00 am CDT time on a date to be specified by the parties (the "Closing Date"), which date shall be the third Business Day after the satisfaction or waiver of the conditions set forth in Article XI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), unless another time, date or place is agreed to in writing by the parties hereto.

4.2     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a) at the election of Sellers or Purchasers at any time on or after the Termination Date if the Closing shall not have occurred by the close of business on such date, provided that the terminating party is not in breach of any of its obligations hereunder that would prevent the Closing conditions in Article XI, as applicable, from being satisfied;

(b) by mutual written consent of Sellers and Purchasers;

(c) by Sellers or Purchasers, upon written notice to the other, if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that subject to Section 9.4(b) hereof, the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); provided, however, that the right to terminate this Agreement under this Section 4.2(c) shall not be available to a party if such Order was due to the failure of such party to perform any of its obligations under this Agreement;

(d) by written notice from Sellers to Purchasers in the event that (i) either party has received a formal notification from the NHL stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; provided that the right of Sellers to terminate this Agreement under this Section 4.2(d)(i) shall not be available to Sellers if such failure to obtain consent or formal notification from the NHL was due to the failure of Sellers to perform any of their obligations under this Agreement, or (ii) Purchasers are (A) in breach of

their representations and warranties set forth in <u>Section 7.7</u>, (B) in breach of their covenants set forth in <u>Section 9.11</u> or (C) have not reasonably satisfied the condition set forth in <u>Section 11.2(c)</u> and all other conditions precedent in <u>Section 11.1</u> and <u>Section 11.3</u> have been satisfied or waived, other than the failure to satisfy any such condition precedent that could reasonably be considered to have resulted from Purchasers' or any of their Affiliates' failure to perform any of their obligations or breach of any of their representations and warranties under this Agreement; <u>provided</u>, <u>however</u>, that with respect to this <u>Section 4.2(d)(ii)</u>, such breach has not been cured within three (3) Business Days after written notice of such breach has been delivered to Purchasers;

(e)     by written notice from Purchasers to Sellers in the event that either party has received a formal notification stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; <u>provided</u>, <u>however</u>, that the right of Purchasers to terminate this Agreement under this <u>Section 4.2(e)</u> shall not be available to Purchasers if Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under <u>Section 9.9</u>) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

(f)     by written notice from Purchasers to Sellers in the event that Sellers are in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13</u>, except for those updates that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect); <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Sellers; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(f)</u> shall not be available to Purchasers if any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement;

(g)     by written notice from Sellers to Purchasers in the event that any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement; <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Purchasers; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(g)</u> shall not be available to Sellers if any Seller is in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13</u>);

(h)     immediately (i) upon the closing of a Competing Bid in accordance with the Bidding Procedures Order or (ii) on the Commitment Termination Date, in each case, subject to Purchasers' right to payment of the Break-Up Fee in accordance with the provisions of <u>Section 8.5</u>;

(i)     by Purchasers, upon written notice to Sellers after entry of an Order (i) dismissing the Bankruptcy Case, (ii) rendering it impossible to obtain confirmation of the Plan prior to the Termination Date, or (iii) denying confirmation of the Plan, <u>provided that</u>, in each case, the same has not been cured within fourteen (14) days after the entry of such Order.

(j)     by Sellers, upon written notice to Purchasers, if (i) Sellers have obtained all consents set forth on Schedule 11.3(d) (including NHL Approvals) and court orders required to close the transaction on the terms and conditions set forth in this Agreement, (ii) all other conditions to Purchasers' obligation to close the transaction contemplated by this Agreement have been satisfied, (iii) Sellers are not in breach of any representation, warranty or covenant in any provision of this Agreement, (iv) Sellers are ready, willing and able to close the transaction on the terms and conditions set forth in this Agreement, (v) Purchasers are not otherwise entitled to terminate this Agreement pursuant to Section 4.2, and, (vi) notwithstanding (i) through (v) above, Purchasers fail or refuse to close the transaction on the terms and conditions set forth in this Agreement, then Sellers may provide Purchasers with a written demand to close the transaction on the terms and conditions set forth in this Agreement within five (5) Business Days following the receipt of such demand and, if Purchasers fail or refuse to close the transaction during such five (5) Business-Day period, Sellers may terminate this Agreement by written notice to Purchasers; or

(k)     by written notice from Purchasers to Sellers, if as of the Closing, Sellers are unable to assume and assign to Purchasers any Purchased Contract and such failure results, or could reasonably be expected to result, in a Material Adverse Effect within the meaning of clause (i) of the definition of Material Adverse Effect, but not in the event that the inability to assume and assign any such Purchased Contract is due to Purchasers' failure to demonstrate adequate assurance of future performance of any such Purchased Contract.

4.3     Procedure Upon Termination.  In the event of termination and abandonment by Purchasers or Sellers, or both, pursuant to Section 4.2 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchasers or Sellers, other than refunding, release or payment of the Aggregate Seller Termination Amount or the Aggregate Purchaser Termination Amount, if applicable, in accordance with Section 4.4.

4.4     Effect of Termination.

(a)     In the event that this Agreement is validly terminated in accordance with Sections 4.2 and 4.3, then each of the parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any Purchaser or any Seller; provided that the obligations of the parties set forth in Section 3.2, this Section 4.4 and Articles XII and XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     Nothing in this Section 4.4 shall relieve any Seller or any Purchaser of any Liability for a deliberate breach of any of its covenants or agreements or deliberate breach of its representations and warranties contained in this Agreement prior to the date of termination, provided that Sellers' liability hereunder for any and all such breaches shall be capped at an amount equal to the Expense Reimbursement and/or the Break-Up Fee, as applicable. Purchasers shall only be entitled to payment of the Expense Reimbursement from Sellers in the following circumstances: (i) if Sellers are unable to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities) by

the Termination Date, (ii) if the Lenders do not consent (to the extent necessary) to the transactions contemplated by this Agreement on or prior to the Termination Date based on the failure of Sellers to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), or (iii) as contemplated by Section 8.5; provided that, in connection with subsections (i) and (ii) above, Purchasers are ready, willing and able to consummate the transactions contemplated by this Agreement and are not in breach of any representation, warranty or covenant in any provision of this Agreement.  Purchasers shall only be entitled to payment of the Break-Up Fee on the terms and conditions contemplated by Section 8.5.  For the avoidance of doubt, (x) the payment of reasonable out-of-pocket expenses pursuant to this Section 4.4(b) shall not be paid in duplication of any of Purchasers' expenses to be reimbursed by Sellers under Section 8.5 and (y) in the event that the Closing occurs subsequent to any payment to Purchasers of the Expense Reimbursement, Purchasers shall be required to refund such payment to Sellers.  For the avoidance of doubt, prior to Closing, in no event shall Sellers be liable to Purchasers for any amount in excess of the Break-Up Fee plus the Expense Reimbursement.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.4 shall relieve Purchasers or Sellers of their obligations under the Confidentiality Agreement.  If this Agreement is terminated in accordance with Sections 4.2 and 4.3, Purchasers agree that the prohibition in the Confidentiality Agreement restricting each Purchaser's ability to solicit any employee of Sellers or their Affiliates to join the employ of Purchasers or any of their Affiliates shall be extended to a period of two years from the date of this Agreement.

(d)     Each Seller and each Purchaser acknowledges and agrees that (i) Sellers' receipt, and Purchasers' forfeiture, of the Escrowed Funds pursuant to Section 3.2(c), or (ii) Purchasers' receipt of the Break-Up Fee and/or the Expense Reimbursement, shall constitute a payment of liquidated damages and not a penalty and that the amount of the Escrowed Funds or the Break-Up Fee and/or the Expense Reimbursement, as applicable, is reasonable in light of the substantial but indeterminate harm anticipated to be caused if the transactions contemplated by this Agreement are not consummated, the difficulty of proof of loss and damages, the inconvenience or non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder. Further, each Seller and each Purchaser acknowledges and agrees that the agreements contained in this Section 4.4 are an integral part of the transactions contemplated by this Agreement.  In the event that Purchasers or Sellers shall fail to pay or release the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, when due, the parties responsible for payment or release of such amount shall reimburse the parties entitled to receive such amount for all reasonable costs and expenses actually incurred or accrued by such entitled parties in connection with the collection under and enforcement of this Section 4.4, but in the case of Purchasers, in the aggregate all of Purchasers' Transaction Expenses paid by Sellers shall not exceed the amount of the Expense Reimbursement.  Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated and Sellers or Purchasers have a right to receive payment of the Escrowed Funds and all accrued investment income thereon or Break-Up Fee and/or the Expense Reimbursement, as applicable, pursuant to this Section 4.4 and Section 8.5 (subject to the satisfaction of the conditions precedent to the payment of the Break-Up Fee and Expense Reimbursement set forth in Section 8.5), together with any costs or

expenses to be reimbursed in accordance with the foregoing sentence or any other provision of this Agreement (collectively, with the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, the "Aggregate Purchaser Termination Amount" or the "Aggregate Seller Termination Amount," respectively), prior to Closing such right shall be the sole and exclusive remedy of the parties receiving such amount against the parties paying such amount, for any and all Losses or claims arising under, out of, or related to this Agreement, including the termination of this Agreement, or the sale or purchase of the Purchased Assets, including the failure to consummate such sale or purchase. Nothing in this Agreement shall prevent the enforcement of the remedy of specific performance set forth in Section 12.8 in lieu of termination of this Agreement.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF DALLAS STARS

Dallas Stars hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

5.1     Organization and Good Standing.  Dallas Stars is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of Delaware. StarCenters is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  Plano StarCenter is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  U.S. Holdings is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Hockey Enterprises is an unlimited liability company duly organized, validly existing and in good standing under the Laws of the Province of Nova Scotia.  Each of the Stars Entities has all requisite power and authority to own, lease and operate its properties and to carry on its businesses as now conducted.  Each of the Stars Entities is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2     Authorization of Agreement.  Each of the Stars Entities has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party, if any, or to be executed by such Stars Entity in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Stars Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and each of the Dallas Stars Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of the Stars Entities party thereto.  This Agreement has been, and each of the Dallas Stars Documents will be at or prior to the Closing, duly and validly executed and delivered by Stars Entities party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the

Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Stars Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Stars Entities enforceable against the Stars Entities party thereto in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 5.3(a), none of the execution and delivery by any Stars Entity of this Agreement or the Dallas Stars Documents to which it is party, if any, the consummation of the transactions contemplated hereby or thereby, or compliance by the Stars Entities with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of the Stars Entities; (ii) subject to entry of the Confirmation Order, any Contract or Permit to which any Stars Entity is a party or by which any of the properties or assets of the Stars Entities are bound; (iii) subject to entry of the Confirmation Order, any Order of any Governmental Body applicable to the Stars Entities or by which any of the properties or assets of the Stars Entities are bound; or (iv) subject to entry of the Confirmation Order, any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 5.3(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Stars Entities in connection with the execution and delivery of this Agreement or the Dallas Stars Documents, the compliance by the Stars Entities party hereto and thereto with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.4     Capitalization.

(a)     Schedule 5.4(a) sets forth the name of each Stars Entity and, with respect to each such Stars Entity, the jurisdiction in which it is organized, the jurisdictions, if any, in which it is qualified to do business, the names of all equity owners and the amount of equity owned by each such owner.

(b)     Dallas Stars owns (i) a 100% limited liability company interest in StarCenters and (ii) a 100% limited liability company interest in Plano StarCenter.

(c)     Dallas Stars owns (i) all of the issued and outstanding capital stock of U.S. Holdings and (ii) 99 shares of common stock of Hockey Enterprises.  U.S. Holdings owns one share of common stock of Hockey Enterprises (the "Hockey Enterprises Equity Interest").  The authorized capital stock of U.S. Holdings consists of 1,000 shares of common stock, $.01 par value per share (the "U.S. Holdings Shares"), and as of the date hereof, all 1,000 shares of such stock are issued and outstanding.  The authorized capital stock of Hockey Enterprises consists of 40,000 common shares, without par value, and as of the date hereof, there are 100 shares of such stock issued and outstanding (the "Hockey Enterprises Shares").

(d)     None of the 100% limited liability company interests in StarCenters and Plano StarCenter held by Dallas Stars is certificated.  None of the Transferred Equity Interests has been registered under the Securities Act or any applicable state securities Laws.

(e)     All of the equity interests referred to in Sections 5.4(a), 5.4(b), 5.4(c) and 5.4(d) were duly authorized for issuance and are validly issued, and those referred to in Sections 5.4(b), 5.4(c) and 5.4(d) are fully paid and non-assessable.

(f)     Except as set forth on Schedule 5.4(f)(i), there exists no existing option, warrant, call, right, or Contract to which Dallas Stars is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the Stars Subsidiaries or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the Stars Subsidiaries.  Except as set forth on Schedule 5.4(f)(ii), none of the Stars Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the Transferred Equity Interests.

(g)     Schedule 5.4(g) identifies the name and jurisdiction of incorporation or organization of each Person (other than a Subsidiary or NHL Entity) in which any Stars Entity holds an equity interest, the nature and class of such interest, and the number of shares or other equity interests of such class held by such Stars Entity.

5.5     Financial Statements.  Dallas Stars has made available to Purchasers copies of (i) the audited consolidated balance sheets of Dallas Stars and its Subsidiaries as at June 30, 2008, 2009 and 2010 (the most recent of which, the "Dallas Stars Balance Sheet") and the related audited consolidated statements of income and of cash flows of Dallas Stars and its Subsidiaries for the years then ended, and (ii) the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011, and the related unaudited consolidated statement of income of Dallas Stars and its Subsidiaries for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Dallas Stars Financial Statements").  Except as set forth in the notes thereto and as disclosed in Schedule 5.5, each of the Dallas Stars Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of Dallas Stars and its Subsidiaries as at the dates and for the periods indicated therein.  For the purposes hereof, the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011 are

collectively referred to as the "Dallas Stars Interim Balance Sheet" and May 31, 2011 is referred to as the "Dallas Stars Interim Balance Sheet Date." Dallas Stars and the Stars Subsidiaries have no Liabilities except for (a) Liabilities accrued or reserved for on the Dallas Stars Interim Balance Sheet; (b) Liabilities incurred in the Ordinary Course of Business or any other Liabilities not incurred in the Ordinary Course of Business that do not exceed $5,000,000 in the aggregate; (c) Liabilities incurred in connection with the transactions contemplated herein; (d) Excluded Liabilities; (e) any Liabilities which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and (f) as set forth on Schedule 5.5.

5.6     Accounts Receivable.  In all material respects, all accounts receivable of Dallas Stars and the Stars Subsidiaries are reflected properly on the Dallas Stars Balance Sheet, the Dallas Stars Interim Balance Sheet and the accounting records of Dallas Stars as of the Closing Date and represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business.  Except as set forth on Schedule 5.6 or reserved for in the Dallas Stars Financial Statements, there is no contest, claim, defense or right of setoff, other than returns in the Ordinary Course of Business, relating to the amount or validity of such notes or accounts receivable, except for any such contests, claims, defenses or rights of setoff which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.6 sets forth an accurate and complete list and the aging of all notes and accounts receivable as of the Dallas Stars Interim Balance Sheet Date.

5.7     Title to Purchased Assets; Sufficiency.

(a)     Except as set forth on Schedule 5.7(a), to the Knowledge of Dallas Stars, the Purchased Assets that are tangible assets of any kind or description taken as a whole are in good operating condition and repair, ordinary wear and tear excepted, except where the failure to be in such condition and repair, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 5.7(b) and except for Excluded Assets, all of the assets reflected on the Dallas Stars Interim Balance Sheet are included in the Purchased Assets or in the assets of the Stars Subsidiaries unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.  Except as set forth on Schedule 5.7(b), all Purchased Assets and assets of the Stars Entities reflected on the Dallas Stars Interim Balance Sheet are owned by the Stars Entities, unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.

(c)     Except as set forth in Schedule 5.7(c)(i) and other than the real property subject to the Real Property Leases, intellectual property licensed to any Seller, and personal property subject to the Personal Property Leases, Dallas Stars or one of the Stars Subsidiaries owns and has good title to each of the Purchased Assets (other than Purchased Assets owned by Dallas Arena), free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets constitute all of the assets used in the Business as currently conducted or

necessary together with Sellers' agreements hereunder and under the Seller Documents for Purchasers to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business, except insurance, management, legal, corporate, administrative and other services provided by HSG pursuant to the Shared Services Agreement, the Excluded Assets and as set forth in Schedule 5.7(c)(ii).

5.8     Absence of Certain Developments.  Except as contemplated by this Agreement or as set forth on Schedule 5.8, since the Dallas Stars Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as contemplated by this Agreement or as set forth on Schedule 5.8, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the Dallas Stars Interim Balance Sheet Date, Dallas Stars and the Stars Subsidiaries have conducted the Business relating to Dallas Stars and the Stars Subsidiaries only in the Ordinary Course of Business and there has been no:

(a)     commitments for capital expenditures (to the extent unpaid) with respect to the Business, other than commitments for capital expenditures that do not exceed $100,000 individually or $400,000 in the aggregate;

(b)     material increases in the base salary of, or payment of any material bonus to, any Employee, other than (i) in the Ordinary Course of Business, (ii) with respect to any Hockey Player Employee, coach or general manager, or (iii) pursuant to a Contract with any Employee;

(c)     change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(d)     authorization, approval, agreement or commitment to do any of the foregoing; or

(e)     distribution in cash or property in respect of the equity interest of any Stars Entity (other than distributions solely among any Stars Entity (other than distributions made by Dallas Stars) and/or any COC Entity); provided, that distributions by Dallas Stars shall not include any amounts paid to Dallas Arena.

5.9     Taxes.  To the Knowledge of Dallas Stars, except as set forth on Schedule 5.9, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)     Each Stars Entity has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns.  All such Tax Returns are correct and complete in all material respects;

(b)     Each Stars Entity has complied in all material respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c)     There are no Liens for Taxes upon any of the Purchased Assets, the assets of Plano StarCenter and the assets of Hockey Enterprises, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d)     No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against any Stars Entity that are still pending.  No requests for waivers of the time to assess any such Taxes have been made that are still pending.  No Tax Return of any Stars Entity is under current examination by the IRS or by any state, local, or foreign Taxing Authority and no such Tax audit is threatened in writing.  All assessments for Taxes due from any Stars Entity with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e)     None of the Stars Entities is liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f)     Since February 27, 2004, each of Dallas Stars, StarCenters and Plano StarCenter has been properly treated as a disregarded entity for U.S. federal income tax purposes;

(g)     Since its formation, Hockey Enterprises has been treated as a partnership for U.S. federal income tax purposes;

(h)     HSGH is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(i)     None of the Stars Entities has entered into any "reportable transactions" within the meaning of Treasury Regulation Section 1.6011-4, other than any "loss transaction" described in Treasury Regulations Section 1.6011-4(b)(5).

5.10     Real Property.

(a)     Schedule 5.10(a)(i) sets forth a complete list of all real property and interests in real property owned in fee by Dallas Stars and the Stars Subsidiaries (individually, an "Owned Property" and collectively, the "Owned Properties").  Plano StarCenter has fee title to all Owned Property, free and clear of all Liens of any nature whatsoever except (A) Liens set forth on Schedule 5.10(a)(ii), (B) Permitted Exceptions and (C) Assumed Liabilities.

(b)     Schedule 5.10(b) sets forth (i) a complete list of all Real Property Leases under which any Stars Entity is a lessee and (ii) a complete list of all Real Property Leases by any Stars Entity as lessor, except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Stars Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any Stars Entity under any of the Real Property Leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Stars Entities are current in their rental payments under

all Real Property Leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 5.10(c)(i), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any of its Owned Property or its Leased Real Property, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 5.10(c)(ii), and except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, all Owned Properties and Leased Real Properties are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed.  To the Knowledge of Dallas Stars, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such Owned Property and Leased Real Property, and neither Dallas Stars nor any Stars Subsidiary has received within the prior year written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.11     Tangible Personal Property.  Schedule 5.11 sets forth all Personal Property Leases of Dallas Stars and the Stars Subsidiaries involving annual payments in excess of $100,000 except for such omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 5.11, and except for such notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Dallas Stars has not received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by Dallas Stars under any such Personal Property Leases.

5.12     Intellectual Property.

(a)     Schedule 5.12(a) sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property.  Except as could not, individually or in the aggregate, have a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries in full force and effect.

(b)     Except as set forth on Schedule 5.12(b), Dallas Stars and the Stars Subsidiaries own or have valid licenses to use all material Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries as the same are used by Dallas Stars or the applicable Stars Subsidiary in the Ordinary Course of Business as of the date hereof, except to

the extent the failure to be the owner or a valid licensee thereof could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 5.12(c) and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, (i) none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) none of Dallas Stars or the Stars Subsidiaries has received any written notice alleging that any such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries.

(d)     Except as set forth on Schedule 5.12(d) and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries is being infringed, misappropriated or violated by any Person.

5.13    Stars Material Contracts.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect,  Schedule 5.13(a) sets forth the following material, written Contracts to which any Stars Entity is bound, each of which is a Purchased Contract (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on Schedule 5.13(a), collectively, the "Stars Material Contracts"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)     Contracts with any labor union or association representing any Employees of Dallas Stars;

(iii)     Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)     Contracts under which (A) Dallas Stars or any of the Stars Subsidiaries grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Stars a license under any material Intellectual Property used or held for use exclusively in the Business or grants to any of the Stars Subsidiaries a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)      Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)      Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)      Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)      Suite Contracts to which Dallas Stars or any Stars Subsidiary is a party;

(ix)      Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)      Contracts containing or providing for any Tax sharing, Tax allocation or Tax indemnification (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes);

(xi)      Contracts for a partnership, joint venture or similar agreement;

(xii)      Contracts relating to any acquisition to be made by any Stars Entity of any operating business or the capital stock of any other Person;

(xiii)      Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiv)      Contracts, other than Contracts with Employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xv)      marketing or advertising Contracts with anticipated revenue to Dallas Stars or any Stars Subsidiary in any 12-month period reasonably expected to be greater than $100,000;

(xvi)      Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvii)      other than league-wide broadcast Contracts entered into by any NHL Entity or pursuant to the NHL Documents, Contracts granting any rights to

broadcasts, whether radio, television or otherwise, of NHL games in which the Stars are a participant.

(b)     With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except for NHL Documents and any Contract currently in effect between Dallas Stars and the NHL, including those listed on Schedule 1.1(b) (as applicable), or as a result of the Bankruptcy Case or as otherwise set forth on Schedule 5.13(b): (i) all of the Stars Material Contracts are in full force and effect and are valid and binding on and enforceable against the Stars Entities party thereto, and, to the Knowledge of Dallas Stars, the other parties thereto in accordance with their terms; (ii) no Stars Entity is in payment default under or monetary breach of, or to the Knowledge of Dallas Stars, otherwise in default under or in breach of, any Stars Material Contract to which it is a party; (iii) no Stars Entity has waived any material future right under any Stars Material Contract to which it is a party; (iv) to the Knowledge of Dallas Stars, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Stars Material Contract; and (v) to the Knowledge of Dallas Stars, no Stars Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Stars Material Contract that has not been resolved.

(c)     Dallas Stars has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Stars Material Contract.

5.14     Employee Benefits.

(a)     Schedule 5.14(a) lists each material "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material employee benefit plan or agreement maintained by Dallas Stars or any of the Stars Subsidiaries (each, a "Stars Benefit Plan") or on behalf of Dallas Stars for the benefit of any Employee or Former Employee (each, a "Seller Benefit Plan"), but does not list any such plans and agreements that are maintained or administered by or on behalf of the NHL for the benefit of the professional hockey players, minor league hockey players and certain coaches employed by Dallas Stars or any of the Stars Subsidiaries, and current or former general managers, trainers and certain other hockey operations personnel (the "NHL Benefit Plans").  Dallas Stars has made available to Purchasers correct and complete copies of each Stars Benefit Plan (or, in the case of any such Stars Benefit Plan that is unwritten, descriptions thereof), and if applicable, as to each such plan: (i) the most recent annual report on Form 5500 required to be filed with the IRS (if any such report was required), (ii) the most recent summary plan description, and (iii) the most recent trust agreement or insurance Contract. Each Stars Benefit Plan has been administered in accordance with its terms and the applicable provisions of ERISA, the Code and all other applicable Laws, except for any non-compliance that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Seller Benefit Plans will cease to produce active coverage after Closing for any Continuing Employee or Former Employee.

(b)     To the Knowledge of Dallas Stars, (i) the 401(k) plan in which Employees participate (the "Stars Pension Plan") qualifies under Section 401(a) of the Code and (ii) no

event has occurred since the date of the most recent determination letter or application therefor relating to such Stars Pension Plan that would adversely affect the qualification of such Stars Pension Plan. Dallas Stars has made available to Purchasers a correct and complete copy of the most recent determination letter received with respect to the Stars Pension Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)     All contributions, premiums and benefit payments under or in connection with the Stars Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Stars Benefit Plans have been timely made. All contributions and premium payments to the NHL Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the NHL Benefit Plans have been timely made. No Stars Benefit Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(d)     Except as set forth on Schedule 5.14(d), there are no actions (other than an audit or investigation), suits or claims (other than routine claims for benefits) with respect to any Stars Benefit Plan pending or, to the Knowledge of Dallas Stars, threatened, which could give rise to a material liability of Dallas Stars or the Stars Subsidiaries, and to the Knowledge of Dallas Stars, there are no facts that are reasonably likely to give rise to any such actions (other than an audit or investigation), suits or claims (other than routine claims for benefits). There is currently no audit or investigation by any Governmental Body against or involving any Stars Benefit Plan pending, and to the Knowledge of Dallas Stars, there is no such audit or investigation threatened by any such Governmental Body.

(e)     Except as set forth on Schedule 5.14(e), neither the execution or delivery of this Agreement, nor the consummation of the transactions contemplated herein, will, with respect to any Employee and solely as a result of the consummation of such transactions: (i) increase any benefits otherwise payable under any Stars Benefit Plan or Seller Benefit Plan; (ii) result in any acceleration of the time of payment or vesting of any such benefits; (iii) result in the payment of any retention, stay bonus, change of control, enhanced severance, or similar payments or (iv) require the funding of any trust or other funding vehicle.

(f)     Except for any representations and warranties in this Article V regarding Contracts with Employees or compensation payable to Employees, this Section 5.14 represents the sole and exclusive representation and warranty of Dallas Stars regarding employee benefit matters. Dallas Stars makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or other employee benefit plans that are not maintained by Dallas Stars or any of the Stars Subsidiaries except as expressly set forth herein.

(g)     Schedule 10.1(a) lists all non-player Employees, as of the date hereof, including, for each such Employee, his or her (i) name, (ii) job title, (iii) department, (iv) base salary or wage rate, (v) date of hire, (vi) status as a full-time or part-time employee, (vii) location, (viii) exempt or non-exempt status, and (ix) calendar year 2010 bonus or commission with respect to non-exempt clerical personnel. Schedule 10.1(a) also lists (x) the name of each non-player Employee who is on a leave of absence as of such date, as well as the names of all Hockey Player Employees as of such date and (y) the bonus pool for non-executive Employees

with respect to fiscal year 2010 and the bonus pool for executive Employees with respect to fiscal year 2010.

5.15    Labor.

(a)    Except as set forth on Schedule 5.15(a), Dallas Stars is not a party to any labor or collective bargaining agreement.

(b)    Except as set forth on Schedule 5.15(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Stars, threatened against or involving Dallas Stars, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Stars, threatened by or on behalf of any Employee, Former Employee or group of Employees or Former Employees of Dallas Stars, except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.16    Litigation.  Except as set forth on Schedule 5.16 there are no Legal Proceedings pending or threatened in writing against Dallas Stars or the Stars Subsidiaries, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 5.16, neither Dallas Stars nor the Stars Subsidiaries is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

5.17    Compliance with Laws; Permits.

(a)    Dallas Stars is in compliance with all Laws applicable to the Purchased Assets of Dallas Stars or the Business, except where the failure to be in compliance could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Stars currently has all Permits which are required for the operation of the Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Stars is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.18    Environmental Matters.  The representations and warranties contained in this Section 5.18 are the sole and exclusive representations and warranties of Dallas Stars pertaining or relating to any Environmental Laws or any matter arising under or associated with any Environmental Laws.  Except as set forth on Schedule 5.18 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)     the operations of Dallas Stars and the Stars Subsidiaries are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Permits required under all applicable Environmental Laws necessary to operate its Business ("Environmental Permits");

(b)     none of Dallas Stars or the Stars Subsidiaries is subject to any pending, or to the Knowledge of Dallas Stars, threatened claim alleging that Dallas Stars may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law;

(c)     to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars incurring any liability pursuant to any Environmental Law;

(d)     to the Knowledge of Dallas Stars, there is no current condition at any of the real property owned or leased by Dallas Stars or any Stars Subsidiary (including the Dr Pepper StarCenters), or relating to the operations of the Business or the Purchased Assets or relating to the operations of the Stars Entities, that would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring Liabilities under Environmental Laws; and

(e)     to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring any material Liability pursuant to any Environmental Law.

5.19     Insurance.

(a)     Schedule 5.19 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and: (i) that are owned or held by Dallas Stars or any Stars Subsidiary, (ii) under which Dallas Stars or Stars Subsidiary is insured, or (iii) that cover the Business, any Employees or any Purchased Assets (collectively, the "Insurance Policies").  For the avoidance of doubt, "Insurance Policies" shall not include any Stars Benefit Plan, Seller Benefit Plan or NHL Benefit Plan.  Additionally, for each of the Insurance Policies, Schedule 5.19 indicates whether such policy was purchased under an insurance program offered by an NHL Entity or was separately purchased by Dallas Stars or any of its Affiliates.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Stars or any Stars Subsidiary with respect to any such policy.

(b)     Dallas Stars, the Stars Subsidiaries, and the Business have complied in all material respects with the provisions of each of the Insurance Policies under which they and the Purchased Assets are insured, and all material claims under the Insurance Policies have been filed in a timely fashion.

5.20    NHL Matters.

(a)    Dallas Stars is the owner, holder and operator of a valid, subsisting and effective NHL franchise, which permits and authorizes Dallas Stars to operate a professional NHL team currently known as the "Dallas Stars."

(b)    Schedule 5.20(b) sets forth as of the date hereof a true and complete calculation of the CFV Debt Amount (as may be updated for the Closing pursuant to Section 9.13).

5.21    Player Matters.  To the Knowledge of Dallas Stars, except as disclosed on Schedule 5.21 and except for matters that are required to be kept confidential and for such omissions which could not reasonably be expected to have a Material Adverse Effect, no Hockey Player Employee is subject to suspension by Dallas Stars, and no Hockey Player Employee is subject to any investigation by Dallas Stars that may result in suspension, expulsion or material fines.  Schedule 5.21 sets forth a list of each Hockey Player Employee and his service time under the NHL Rules.

5.22    Deferred Compensation Liability.  Schedule 5.22 (current as of the date specified therein) sets forth all deferred compensation (other than by or under any NHL Benefit Plan) payable by Dallas Stars to any current or former NHL player, coach, or general manager relating to such current or former NHL player's, coach's, or general manager's service as an NHL player, coach, or general manager.  Prior to Closing, Sellers shall update Schedule 5.22 and deliver such updated Schedule to Purchasers.

5.23    No Guarantees.  Except as set forth on Schedule 5.23, none of the Liabilities of the Stars Subsidiaries is guaranteed by or subject to a similar contingent obligation of any other Person.  Except as set forth on Schedule 5.23, none of the Stars Subsidiaries has guaranteed or become subject to a similar contingent obligation in respect of the Liabilities of any other Person.  Except as set forth on Schedule 5.23, there are no outstanding letters of credit, surety bonds or similar instruments of any Stars Subsidiary in connection with or relating to the Business or the Purchased Assets.

5.24    Indebtedness for Borrowed Money. Except for Sellers' Liabilities as guarantors of the Senior Indebtedness and except as provided on Schedule 5.24, no Stars Subsidiary has any Liabilities relating to Indebtedness for borrowed money (other than purchase money Indebtedness for personal property included in the Purchased Assets), whether as a borrower, guarantor or otherwise.

5.25    Financial Advisors.  Except as set forth on Schedule 5.25, no Person has acted, directly or indirectly, as a broker, finder or financial advisor (a "Broker") for Dallas Stars in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

5.26    Related Party Transactions.  Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii), Schedule 5.26 or Schedule 5.7(c)(ii), to the Knowledge of Dallas Stars, no Hicks Affiliates, director, manager, partner or officer of Dallas Stars or the Stars Subsidiaries, or Affiliate of any such director or officer (each, an "Associate") (i) owns, directly or indirectly,

and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) in the case of Dallas Stars' or the Stars Subsidiaries' officers and directors, salaries and employee benefits and other transactions pursuant to any Seller Benefit Plan in the Ordinary Course of Business, (y) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars and (z) such transactions that will be terminated or unwound prior to the Closing.

5.27    <u>Non-reliance of Dallas Stars</u>.  Except for the specific representations and warranties expressly made by Purchasers in <u>Article VII</u> of this Agreement, Dallas Stars (1) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchasers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Stars or its representatives or made available to Dallas Stars and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (2) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (3) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement or by applicable Law; and (4) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article XII</u>.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA

Dallas Arena hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

6.1     Organization and Good Standing.  Dallas Arena is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Center GP is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  COC is a limited partnership duly organized and validly existing and in good standing under the Laws of the State of Texas.  Each of Dallas Arena, COC and Center GP has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each of Dallas Arena, COC and Center GP is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2     Authorization of Agreement.  Dallas Arena has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Dallas Arena in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Arena Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and each of the Dallas Arena Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of Dallas Arena.  This Agreement has been, and each of the Dallas Arena Documents will be at or prior to the Closing, duly and validly executed and delivered by Dallas Arena, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Arena Documents when so executed and delivered will constitute, legal, valid and binding obligations of Dallas Arena, enforceable against Dallas Arena in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 6.3(a), none of the execution and delivery by Dallas Arena of this Agreement or the Dallas Arena Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Dallas Arena with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or

cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of Dallas Arena or, as applicable, COC or Center GP; (ii) any Contract or Permit to which Dallas Arena or, as applicable, COC or Center GP, is a party or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; (iii) any Order of any Governmental Body applicable to Dallas Arena or, as applicable, COC or Center GP, or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; or (iv) any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 6.3(b)</u>, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Dallas Arena, COC or Center GP in connection with Dallas Arena's execution and delivery of this Agreement or the Dallas Arena Documents, the compliance by Dallas Arena with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under <u>Section 8.2</u>, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.4     <u>Capitalization</u>.

(a)     Dallas Arena owns a 50% limited liability company interest in Center GP and a 49.95% limited partnership interest of COC.  Center GP holds a 0.1% general partner interest of COC and is the sole general partner of COC.

(b)     The COC Equity Interests are not certificated.  The COC Equity Interests have not been registered under the Securities Act or any applicable state securities Laws.

(c)     All of the equity interests referenced in <u>Section 6.4(a)</u> and <u>6.4(b)</u> above were duly authorized for issuance and are validly issued.

(d)     Except as set forth on <u>Schedule 6.4(d)(i)</u>, there exists no existing option, warrant, call, right, or Contract to which Dallas Arena or, to the Knowledge of Dallas Arena, any COC Entity is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the COC Entities or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the COC Entities.  Except as set forth on <u>Schedule 6.4(d)(ii)</u>, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the COC Equity Interests.

6.5     Financial Statements.  Dallas Arena has made available to Purchasers copies of (i) the audited consolidated balance sheets of COC and its Subsidiary as at December 31, 2008, 2009 and 2010, and the related audited consolidated statements of income and cash flows of COC and its Subsidiary for the years then ended, and (ii) the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011, and the related unaudited consolidated statement of income of COC and its Subsidiary for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "COC Financial Statements").  Except as set forth in the notes thereto and as disclosed in Schedule 6.5, to the Knowledge of Dallas Arena, each of the COC Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of COC and its Subsidiary as at the dates and for the periods indicated therein.  For the purposes hereof, the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011 are collectively referred to as the "COC Interim Balance Sheet" and May 31, 2011 is referred to as the "COC Interim Balance Sheet Date."

6.6     Absence of Certain Developments.  Except as contemplated by this Agreement or as set forth on Schedule 6.6, since the COC Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as contemplated by this Agreement or as set forth on Schedule 6.6, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the COC Interim Balance Sheet Date, Dallas Arena has conducted the Business relating to the COC Equity Interests only in the Ordinary Course of Business, and to the Knowledge of Dallas Arena, there has been no:

(a)     change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(b)     distribution in cash or property in respect of the equity interest of Dallas Arena (other than distributions by any COC Entity); provided, that distributions by Dallas Arena shall not include any amounts paid to Dallas Stars; or

(c)     authorization, approval, agreement or commitment to do any of the foregoing.

6.7     Taxes.  To the Knowledge of Dallas Arena, except as set forth on Schedule 6.7, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)     Dallas Arena has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns.  All such Tax Returns are correct and complete in all material respects;

(b)     Dallas Arena has complied in all respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c)     There are no Liens for Taxes upon any of the Purchased Assets, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d)     No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against Dallas Arena that are still pending.  No requests for waivers of the time to assess any such Taxes have been made that are still pending.  No Tax Return of Dallas Arena is under current examination by the IRS or by any state, local, or foreign Taxing Authority, and there is no threat of a Tax audit with respect to any Tax Return of Dallas Arena.  All assessments for Taxes due from Dallas Arena with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e)     Dallas Arena is not liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f)     Since its formation, Dallas Arena has been properly treated as a disregarded entity for U.S. federal income tax purposes; and

(g)     Dallas Arena has not entered into any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, other than any "loss transactions" described in Treasury Regulation Section 1.6011-4(b)(5).

6.8     Real Property.

(a)     Dallas Arena does not own or lease any real property.

(b)     To the Knowledge of Dallas Arena, Schedule 6.8(b) sets forth (i) a complete list of all real property leases by any COC Entity as lessee and (ii) a complete list of all real property leases by any COC Entity as lessor except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  To the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any COC Entity under any of its real property leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Dallas Arena, each COC Entity is current in its rental payments under all of its real property leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     To the Knowledge of Dallas Arena, except as set forth on Schedule 6.8(c), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any leased real property of any COC Entity, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse

Effect. To the Knowledge of Dallas Arena, except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, all leased real properties of each COC Entity are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Dallas Arena, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such leased real property of the COC Entities, and neither Dallas Arena nor any of its Affiliates has received within the prior three (3) years written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

6.9    Tangible Personal Property. Dallas Arena does not own or lease any personal property. Except as set forth on Schedule 6.9, and except for notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by such COC Entity under any of its personal property leases to which it is a party.

6.10    Intellectual Property.

(a)    Schedule 6.10(a) sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Arena, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property. Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Arena have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Arena in full force and effect.

(b)    Except as set forth on Schedule 6.10(b), Dallas Arena owns or has valid licenses to use all Purchased Intellectual Property owned by Dallas Arena as the same is used by Dallas Arena in the Ordinary Course of Business as of the date hereof, except to the extent the failure to be the owner or a valid licensee thereof could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as set forth on Schedule 6.10(c) and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, (i) none of the Purchased Intellectual Property owned by Dallas Arena nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) Dallas Arena has not received any written notice alleging that such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Arena.

(d)     Except as set forth on <u>Schedule 6.10(d)</u> and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, none of the Purchased Intellectual Property owned by Dallas Arena is being infringed, misappropriated or violated by any Person.

6.11    <u>Arena Material Contracts</u>.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, <u>Schedule 6.11(a)</u> sets forth the following material, written Contracts to which Dallas Arena is bound (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on <u>Schedule 6.11(a)</u>, collectively, the "<u>Arena Material Contracts</u>"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)     Contracts with any labor union or association representing any employees of Dallas Arena;

(iii)     Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)     Contracts under which (A) Dallas Arena grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Arena a license under any material Intellectual Property used or held for use exclusively in the Business or grants to Dallas Arena a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)     Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)     Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)     Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)     the Suite Contracts to which Dallas Arena is a party;

(ix)    Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)    Contracts for a partnership, joint venture or similar agreement;

(xi)    Contracts relating to any acquisition to be made by Dallas Arena of any operating business or the capital stock of any other Person;

(xii)    Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiii)    Contracts, other than Contracts with employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xiv)    marketing or advertising Contracts (A) with anticipated revenue to Dallas Arena in any 12-month period reasonably expected to be greater than $100,000 or (B) granting any material exclusive rights;

(xv)    Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvi)    Contracts granting any rights to broadcasts, whether radio, television or otherwise, games or events.

(b)    Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, Schedule 6.11(b) sets forth the following material, written Contracts to which any COC Entity is bound  (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on Schedule 6.11(b), collectively, the "COC Material Contracts"):

(i)    Contracts for a partnership, joint venture or similar agreement;

(ii)    Contracts relating to any acquisition to be made by any of the COC Entities of any operating business or the capital stock of any other Person; and

(iii)    Contracts relating to the incurrence of Indebtedness, or the making of any loans.

(c)    With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(c): (i) all of the Arena Material Contracts are in full force and effect and are valid and binding on and enforceable against Dallas Arena, and, to the Knowledge of Dallas Arena, the other parties thereto in accordance with their

terms; (ii) Dallas Arena is not in payment default under or monetary breach of, or to the Knowledge of Dallas Arena, otherwise in default under or in breach of, any Arena Material Contract to which it is a party; (iii) Dallas Arena has not waived any material future right under any Arena Material Contract to which it is a party; (iv) to the Knowledge of Dallas Arena, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Arena Material Contract; and (v) to the Knowledge of Dallas Arena, Dallas Arena has not given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Arena Material Contract that has not been resolved.

(d)     To the Knowledge of Dallas Arena and with such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(d): (i) all of the COC Material Contracts are in full force and effect and are valid and binding on and enforceable against the COC Entity party thereto and the other parties thereto in accordance with their terms; (ii) no COC Entity is in payment default under or monetary breach of, or otherwise in default under or in breach of, any COC Material Contract to which it is a party; (iii) no COC Entity has waived any material future right under any COC Material Contract to which it is a party; (iv) no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any COC Material Contract; and (v) no COC Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any COC Material Contract that has not been resolved.

(e)     Dallas Arena has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Arena Material Contract.

6.12    Employee Benefits.

(a)     Dallas Arena does not maintain any material "employee benefit plan" (as defined by ERISA) or any other material employee benefit plan or agreement.

(b)     Except for any representations and warranties in this Article VI regarding Contracts with Employees or compensation payable to Employees, this Section 6.12 represents the sole and exclusive representation and warranty of Dallas Arena regarding employee benefit matters.  Dallas Arena makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or any other plans that are not maintained by Dallas Arena.

6.13    Labor.

(a)     Except as set forth on Schedule 6.13(a), Dallas Arena is not a party to any labor or collective bargaining agreement.

(b)     Except as set forth on Schedule 6.13(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Arena, threatened against or involving Dallas Arena, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Arena, threatened by or on behalf of any

employee or group of employees or former employees of Dallas Arena, except in each case as could not reasonably be expect to have, individually or in the aggregate, a Material Adverse Effect.

6.14    Litigation.  Except as set forth on Schedule 6.14, there are no Legal Proceedings pending or threatened in writing against Dallas Arena, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.14, to the Knowledge of Dallas Arena, there are no material Legal Proceedings pending or threatened in writing against the COC Entities.  Except as set forth on Schedule 6.14, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

6.15    Compliance with Laws; Permits.

(a)    Dallas Arena is in compliance with all Laws applicable to the COC Equity Interests held by Dallas Arena and its Business, except where the failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.  Dallas Arena has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Arena has all Permits which are required for the operation of its Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Arena is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Arena is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.16    Environmental Matters. The representations and warranties contained in this Section 6.16 are the sole and exclusive representations and warranties of Dallas Arena pertaining or relating to any Environmental Laws or any matter arising under or associated with Environmental Laws.  Except as set forth on Schedule 6.16 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    the operations of Dallas Arena related to its ownership of the COC Equity Interests and, to the Knowledge of Dallas Arena, the operations of the COC Entities are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Environmental Permits;

(b)    none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any pending, or to the Knowledge of Dallas Arena, threatened claim alleging that Dallas Arena or such COC Entity may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law; and

(c)     to the Knowledge of Dallas Arena, there are no pending or threatened investigations of the Business or the AAC under Environmental Laws, which could reasonably be expected to result in Dallas Arena or any COC Entity incurring any material liability pursuant to any Environmental Law.

6.17     Insurance.  Schedule 6.17 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and: (i) that are owned or held by Dallas Arena or (ii) under which Dallas Arena is insured.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Arena with respect to any such policy.  Dallas Arena has complied in all material respects with the provisions of each such insurance policy under which they are insured, and all material claims under such insurance policies have been filed in a timely fashion.

6.18     Financial Advisors.  Except as set forth on Schedule 6.18, no Person has acted, directly or indirectly, as Broker for Dallas Arena in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

6.19     Related Party Transactions.  Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii) or Schedule 6.19, to the Knowledge of Dallas Arena, no Hicks Affiliates, director, manager, partner or officer of Dallas Arena or Affiliate of any such director or officer (each, an "Arena Associate") (i) owns, directly or indirectly, and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena and (y) such transactions that will be terminated or unwound prior to the Closing.

6.20     Non-reliance of Dallas Arena.  Except for the specific representations and warranties expressly made by Purchasers in Article VII of this Agreement, Dallas Arena (a) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations,

investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Arena or its representatives or made available to Dallas Arena and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (b) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (c) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article VII of this Agreement or by applicable Law; and (d) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in Article VII of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article XII.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby jointly and severally represent and warrant to Sellers as of the date of this Agreement and as of the Closing Date that:

7.1     Organization and Good Standing.  Each Purchaser is a limited partnership or corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited partnership or corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Purchaser is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization.

7.2     Authorization of Agreement.  Each Purchaser has full limited partnership or corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by such Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by each Purchaser of this Agreement and each Purchaser Document, to which such Purchaser is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all necessary limited partnership or corporate action on behalf of such Purchaser.  This Agreement has been, and each Purchaser Document to which such Purchaser is a party will be at or prior to the Closing, duly and validly executed and delivered by each such Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the Bidding Procedures Order) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights

and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

7.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 7.3 hereto, none of the execution and delivery by any Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by any Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of limited partnership, certificate of incorporation, limited partnership agreement, bylaws (or other organizational and governing documents) of any Purchaser, (ii) any Contract or Permit to which any Purchaser is a party or by which any Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to any Purchaser or by which any of the properties or assets of any Purchaser are bound, or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by any Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, the taking by any Purchaser of any other action contemplated hereby or for such Purchaser to conduct the Business, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, and (iv) the NHL Approvals.

7.4     Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchasers, threatened against any Purchaser, or to which any Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would be reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.  No Purchaser is subject to any Order of any Governmental Body except to the extent the same could not reasonably be expected to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.

7.5     Financial Advisors.  Except as set forth on Schedule 7.5, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

7.6     Investment Intention.  Each Purchaser is an accredited investor as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act").  Each applicable Purchaser is acquiring the Transferred Equity Interests for its own account, for investment purposes only and not with a view to the distribution thereof (as such term is used in

Section 2(11) of the Securities Act). Each Purchaser understands that the Transferred Equity Interests have not been registered under the Securities Act or any applicable state securities Laws, and that the Transferred Equity Interests cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

7.7 <u>Financial Capability</u>. As of the Closing Date, Purchasers will have sufficient cash to pay the consideration contemplated by <u>Sections 3.1(a)</u>, <u>(b)</u>, <u>(d)</u> and <u>(e)</u> to consummate the transactions contemplated by this Agreement.

7.8 <u>NHL Information Requirements</u>. As of the date hereof and as of the Closing Date, each Purchaser has provided all information to the NHL concerning itself and its Affiliates and its equity and debt financing sources (including the executed organizational documents of Purchasers, and personal background and financial information of all of the direct and indirect owners of Purchasers) required by the NHL to obtain the NHL Approvals, which information is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading, including completing and filing any and all necessary applications, background information forms, and any other documents and information required of them by the NHL to obtain the NHL Approvals in connection herewith. Purchasers and their Affiliates do not own, directly or indirectly, any interest in any NHL franchise. Purchasers agree to pay any and all fees and expenses owed to the NHL in connection with the transactions contemplated by this Agreement that are not otherwise paid, provided that the same shall be deemed to constitute Specified Expenses to the extent paid by Purchasers pursuant to <u>Section 3.1(b)</u> or otherwise. Purchasers have no reasonable basis to believe that Purchasers will fail to obtain any NHL Approvals necessary in connection with the transactions contemplated by this Agreement as a result of any facts known to Purchasers that have not otherwise been disclosed to the NHL, including any failure that is related to any of their debt or equity financing sources.

7.9 <u>Non-reliance of Purchasers</u>. Except for the specific representations and warranties expressly made by the respective Sellers in <u>Articles V</u> and <u>VI</u> of this Agreement:

(a) each Purchaser acknowledges and agrees that (i) no Seller or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets including any Purchased Assets, the nature or extent of any Liabilities including the Assumed Liabilities, the prospects of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information including any Documents, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Sellers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise) furnished to Purchasers or its representatives or made available to Purchasers and their representatives in any "data rooms," "virtual data rooms," management

presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever, and (ii) no officer, agent, representative or employee of any Seller or any other Person has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided;

(b)     each Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Sellers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person;

(c)     each Purchaser specifically disclaims any obligation or duty by any Seller to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Articles V and VI of this Agreement or by applicable Law; and

(d)     each Purchaser acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including acquiring the Purchased Assets and assuming the Assumed Liabilities, subject only to the specific representations and warranties set forth in Articles V and VI of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article XII.

ARTICLE VIII

BANKRUPTCY COURT MATTERS

8.1     Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of Competing Bids.  Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchasers and their Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to Sellers, the Purchased Assets and the Business and the assets of Sellers to Qualified Bidders.

8.2     Sellers' Chapter 11 Bankruptcy Cases.  Sellers and Purchasers acknowledge and agree that this Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court.  Sellers hereby agree to file the Bankruptcy Petitions and a motion seeking approval of the Bidding Procedures Order within two (2) Business Days of the execution of this Agreement, and to use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order no later than seven (7) days after the Petition Date.  On the Petition Date, Sellers shall file with the Bankruptcy Court the Plan, which shall include a request for Bankruptcy Court approval of this Agreement and the transactions contemplated hereby, subject to higher or better offers received by Sellers in accordance with the Bidding Procedures Order.  Sellers shall promptly advise Purchasers of any

written objection(s) filed with the Bankruptcy Court or otherwise served on Sellers either to this Agreement, the Plan or the Bidding Procedures Order.

8.3     Confirmation Order.  Sellers shall use their commercially reasonable efforts to promptly obtain the entry of the Confirmation Order and to perform such other acts as may be necessary to permit Sellers and their Subsidiaries to convey any interests they have in the Purchased Assets to Purchasers in accordance with the terms and conditions of this Agreement. Any changes to the form of the Confirmation Order or Plan affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion.  Upon entry of the Confirmation Order, and provided that no stay of the Confirmation Order is in effect, Sellers and Purchasers shall proceed to Closing so long as the Confirmation Order contains findings that Purchasers and Sellers are each acting in good faith and that Purchasers are acquiring rights in the Purchased Assets in good faith reliance on the Confirmation Order.  Sellers shall give Purchasers reasonable advance written notice of any hearings regarding the motions required to obtain the issuance of the Confirmation Order.

8.4     Cooperation in Bankruptcy Court Matters.

(a)     To the extent reasonably practicable, Sellers shall provide Purchasers, and Purchasers shall provide Sellers, with the opportunity to review and provide comments on any other filings and presentations of evidence with respect to any court proceeding related to the transactions contemplated hereunder, the Confirmation Order or the Bidding Procedures Order, and Sellers and Purchasers shall each use their commercially reasonable efforts (and Sellers and Purchasers shall cooperate, assist and consult with each other in connection with such efforts) to secure the entry of (i) the Confirmation Order and (ii) the Bidding Procedures Order.

(b)     Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchasers under the Purchased Contracts as required by section 365(b)(1)(C) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by such Purchaser under this Agreement and the Purchased Contracts and demonstrating that such Purchaser is purchasing the Purchased Assets in good faith and in good faith reliance on the Confirmation Order.  Purchasers agree that they will promptly take all actions reasonably required by Sellers or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of an order approving this Agreement, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its employees and representatives available to be interviewed by Sellers' attorneys and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Purchasers under the Purchased Contracts.  If a written objection is filed to the motion seeking approval of this Agreement, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Sellers and Purchasers shall use commercially reasonable efforts to have such objection overruled.  In the event the entry of the Confirmation

Order or the Bidding Procedures Order shall be appealed, Sellers and Purchasers shall use their respective commercially reasonable efforts to defend such appeal.

8.5     Break Up Fee and Expense Reimbursement.

(a)     Each party agrees and acknowledges that the parties' negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by the parties, and that the negotiation and execution of this Agreement have provided value to the parties.  Therefore, if (x) this Agreement is terminated pursuant to Section 4.2(h), by Sellers pursuant to Section 4.2(a) or Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e), and (y) a Competing Bid closes within 180 days of such termination, then Sellers shall cause Purchasers to be paid out of the proceeds of such Competing Bid an amount equal to $4,000,000 as a break-up fee (the "Break-Up Fee") and shall reimburse Purchasers for the Transaction Expenses of Purchasers in an amount not to exceed $500,000 (the "Expense Reimbursement") in immediately available funds and without need for further Order of or from the Bankruptcy Court (other than the Bidding Procedures Order); provided, that the Break-Up Fee and Expense Reimbursement shall not be payable if this Agreement is terminated by Sellers pursuant to Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e) in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under Section 9.9) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals.

(b)     Any Break-Up Fee payable pursuant to Section 8.5(a) shall be paid directly to Purchasers out of the purchase price paid by the Successful Bidder contemporaneously with the closing of a Competing Bid along with the payment of any obligations still outstanding under the Expense Reimbursement if not yet satisfied, and Sellers shall cause such payment(s) to be made as a condition to the closing of a Competing Bid.  The Expense Reimbursement payable pursuant to Section 8.5(a) shall be paid by Sellers within three (3) Business Days of receipt of reasonable evidence of the amounts constituting Purchasers' Transaction Expenses, in the form of a summary invoice, redacted to preserve attorney-client privilege and attorney work product.

(c)     Sellers hereby acknowledge that their obligations to pay the Break-Up Fee and Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.  Such obligations of Sellers shall have administrative superpriority status against Sellers and their Subsidiaries and their respective estates under Section 503(b) and 507(a) of the Bankruptcy Code, and with priority over all other expenses of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code.

8.6     Leases and Contracts.  Pursuant to Section 365 of the Bankruptcy Code, all of Sellers' right, title and interest in and to the Purchased Contracts shall be assumed by Sellers and assigned to Purchasers pursuant to the assignment and assumption agreement described in Exhibit L.

8.7     Notice to Parties-in-Interest.  Not later than three (3) Business Days following entry of the Bidding Procedures Order, or by such other date as ordered by the Bankruptcy Court

(the "Notice Deadline"), (a) the Office of the United States Trustee for the District of Delaware; (b) the parties included on the Master Service List filed with the Bankruptcy Court in connection with the Bankruptcy Cases; (c) all counterparties to the Purchased Contracts; (d) all parties with Liens on or against the Purchased Assets; and (e) all affected federal, state and local Governmental Bodies and Taxing Authorities, including the IRS, and any federal, state or local Governmental Body with regulatory or tax jurisdiction with respect to the Purchased Assets or the Assumed Liabilities, shall, in each case, be duly notified by Sellers of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein. On or before the Notice Deadline, Sellers shall use commercially reasonable efforts to duly notify the foregoing and such other Persons reasonably requested and identified by Purchasers, in each case, of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein. Not later than three (3) Business Days following the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall also publish notice of the Auction in the *Wall Street Journal* and *Dallas Morning News*.

## ARTICLE IX

## COVENANTS

9.1     Access to Information. From and after the date of this Agreement and until the Closing, Sellers shall, and shall use commercially reasonable efforts to cause the COC Entities and their respective Subsidiaries to, permit Purchasers, through their officers, employees and representatives (including their legal advisors and accountants), to make such investigation of the properties, businesses and operations of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business and such examination of the books and records of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances. Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers to cooperate with Purchasers and Purchasers' representatives in connection with such investigation and examination, and Purchasers and their representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to the business of Sellers and their Subsidiaries. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Seller is bound. Notwithstanding anything to the contrary contained herein, prior to the Closing, without the prior written consent of Sellers, which may be withheld for any reason, Purchasers shall not contact any suppliers to, or customers of, any Seller or, except as permitted by Section 9.6 hereof, any lenders to any Seller. Purchasers shall have no right to perform invasive or subsurface investigations of the properties or facilities of Sellers or any of their Subsidiaries without the prior written consent of Sellers in their sole and absolute discretion.

9.2    <u>Conduct of the Business Pending the Closing</u>.

(a)    Prior to the Closing, except (I) as set forth on <u>Schedule 9.2(a)</u>, (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement, (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall and shall cause the Transferred Subsidiaries and (to the extent feasible under governing documents of the COC Entities) the COC Entities to:

(i)    conduct the Business only in the Ordinary Course of Business;

(ii)    use their commercially reasonable efforts to preserve the present business operations, organization and goodwill of Dallas Stars, Dallas Arena, the Stars Subsidiaries and the Business, which will not require any Seller to renew any Contracts or exercise any rights under any Contracts outside of the Ordinary Course of Business;

(iii)    promptly deliver notice to Purchasers in writing of any specific event or circumstance of which any Seller receives notice that: (A) has resulted or could reasonably be expected to result in any of the conditions set forth in <u>Section 11.1</u> or <u>11.2</u> not being satisfied; (B) any Legal Proceeding (other than the Bankruptcy Case contemplated by this Agreement) is pending or threatened that relates to the transactions contemplated by this Agreement; or (C) any of the covenants or agreements of any Seller contained in this Agreement is breached in any material respect; and

(iv)    continue in full force and effect all Insurance Policies or renewal of Insurance Policies on equivalent terms with the same or different insurance carriers.

(b)    Prior to the Closing, except (I) as set forth on <u>Schedule 9.2(b)</u>, (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement (including in connection with any Competing Bid), (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall not and shall cause the Transferred Subsidiaries not to:

(i)    other than in the Ordinary Course of Business (A) materially increase the annual level of compensation of any executive officer of Dallas Stars or any other Continuing Employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any executive officer of Dallas Stars or any other Continuing Employee, (C) adopt, or materially increase the coverage or benefits available under, any Stars Benefit Plan or, solely with regard to the Continuing Employees, any Seller Benefit Plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any executive officer of Dallas Stars or any other Continuing Employee, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Benefit Plans (except with respect to new hires) and except with respect to any Hockey Player Employee, coach, or general manager;

(ii)	subject any of the Purchased Assets to any Lien, except for Permitted Exceptions and Assumed Liabilities;

(iii)	acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of a material portion of the Purchased Assets (except pursuant to an existing Contract set forth on Schedule 5.13(a), 6.11(a) or 6.11(b), Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory, otherwise in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets or as required by NHL);

(iv)	cancel or compromise any material debt or claim or waive or release any material right of Sellers that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)	enter into any commitment for capital expenditures of the Business in excess of $400,000 in the aggregate, except as approved by the NHL or reasonably necessary to address a public safety issue or to continue the current level of operations of the Business;

(vi)	enter into, modify or terminate any labor or collective bargaining agreement related to the Business, except as approved by the NHL;

(vii)	enter into or agree to enter into any merger or consolidation with any Person;

(viii)	other than in the Ordinary Course of Business or as required by applicable Law or the NHL, enter into any agreement that would amend any Real Property Lease, or otherwise affect the operation of any real property subject to a Real Property Lease or any real property set forth on Schedule 5.10(a)(i) or 5.10(b);

(ix)	make any distribution in cash or property in respect of the equity interest of Sellers or the Transferred Subsidiaries (other than solely between any Seller and/or any Transferred Subsidiary);

(x)	(A) sell, assign, transfer, issue or otherwise dispose of any interest in the Stars Subsidiaries, or any securities or obligations convertible into or exchangeable for any such interests, or any options, warrants or conversion or other rights to acquire any such interests, or any such securities or obligations; (B) effect any reorganization or recapitalization; or (C) split, combine or reclassify any interest of the Stars Subsidiary, or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for any interest of the Stars Subsidiaries;

(xi)	propose or adopt any amendments to the governance documents of the Stars Subsidiaries;

(xii)	incur any Indebtedness for borrowed money (other than pursuant to the CFV Debt Agreement);

(xiii)   make any contribution, loan or other payment, or enter into any agreement with, any Hicks Affiliate (other than Sellers, the Transferred Subsidiaries, or the COC Entities); or

(xiv)   agree to do anything prohibited by this <u>Section 9.2(b)</u>.

Notwithstanding the foregoing, nothing herein shall limit or otherwise impair Dallas Stars' unfettered right to operate the Stars as it deems fit in its sole and absolute discretion, or give Purchasers, directly or indirectly, any right to control or direct (including by way of any veto right) the operations of the Stars, including without limitation with respect to (i) the making or not making of any player personnel decisions, including assignments, trades, acquisitions, dispositions, waivers, drafts, or the like, (ii) hiring or firing (or changing or eliminating the responsibilities of) of any hockey operations personnel, including any general manager, coach, assistant coach, scout, trainer, team medical and athletic training personnel, and (iii) the conduct, performance or management of any hockey activities; <u>provided</u>, <u>however</u>, that prior to: (A) entering into any standard player's contract, or extending any existing standard player's contract, with any Hockey Player Employee that would provide for: (I) potential payments during any season in an amount greater than $2,000,000 or a signing bonus in an amount greater than $750,000, or (II) a term of three (3) years or more, (B) the hiring or firing of the general manager or head coach of the Stars, or (C) trading any Hockey Player Employee who had been on the Stars' active roster for at least 43 NHL games during the 2010-2011 season, Dallas Stars shall give reasonable notice thereof to Tom Gaglardi, on behalf of Purchasers and shall consult with Tom Gaglardi on behalf of Purchasers with respect thereto if and to the extent such notice and consultation is, in Dallas Stars' sole discretion, reasonable and appropriate under the circumstances and otherwise in compliance with NHL Rules, <u>provided</u>, <u>further</u> that for the avoidance of doubt, failing to so consult for whatever reason and/or the taking of any action set forth in clauses (A)-(C) above without notice or consultation following any notice and consultation shall not be a breach of this Agreement.

9.3      <u>Consents</u>.  Subject to the respective specific obligations of the parties under this Agreement to obtain certain consents and approvals, Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in <u>Section 5.3(b)</u>, <u>Section 6.3(b)</u> and <u>Section 7.3(b)</u> hereof; <u>provided</u> <u>however</u>, that no party shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or initiate any litigation or Legal Proceedings to obtain any such consent or approval, in each case except as otherwise specifically contemplated by this Agreement.

9.4      <u>Regulatory Approvals</u>.

(a)      If necessary, Purchasers and Sellers shall (i) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 15 Business Days after the date of this Agreement in the case of all filings required under the HSR Act and within four weeks in the

case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or Affiliates from the FTC or the U.S. Department of Justice or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of the FTC or the U.S. Department of Justice or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use its commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers, on the one hand, or Purchasers, on the other hand, may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 9.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(b)     Each Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any Antitrust Law, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and, at Purchasers' option and at Purchasers' sole cost and expense, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by reasonably pursuing available avenues of administrative and judicial appeal. Each Purchaser and Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such

transactions as promptly as possible after the date of this Agreement.  All fees associated with filings required by the HSR Act or any other Antitrust Laws shall be paid by Sellers (the "Antitrust Fees").

9.5 Further Assurances.  Subject to, and not in limitation of, Sections 9.3 and 9.4, each Seller and each Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

9.6 Confidentiality.

(a) Subject to Section 9.6(b) below, each Purchaser acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of the confidentiality agreement between HSG and Tom Gaglardi dated as of March 31, 2010 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference and remain in full force and effect after the execution of this Agreement, and which shall be binding on each Purchaser as if such Purchaser were Tom Gaglardi and shall be binding on Purchasers for the benefit of Sellers as if Sellers were HSG under the Confidentiality Agreement, subject to the following modifications: Purchasers and their Representatives (as defined in the Confidentiality Agreement) are permitted to (i) communicate with the Lenders regarding the transactions contemplated by this Agreement and (ii) communicate with the NHL.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information to the extent relating to the Business, the Assumed Liabilities and the Purchased Assets; provided, however, that each Purchaser acknowledges that any and all other Confidential Information (as defined in the Confidentiality Agreement) provided to it by any Seller or its representatives concerning any Seller or its Affiliates (other than any Transferred Subsidiary), any Excluded Liability or any Excluded Asset shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b) Notwithstanding anything in this Agreement or the Confidentiality Agreement to the contrary, Purchasers and Sellers acknowledge and agree that in connection with filing the Bankruptcy Case, this Agreement will be filed with the Bankruptcy Court and made publicly available.

9.7 Preservation of Records.  Purchasers agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business for a period of seven years from the Closing Date, and each Seller shall, and shall use commercially reasonably efforts to cause their Affiliates to, preserve and keep records held by them relating to the Business until the earlier of such Seller's dissolution or the expiration of a period of seven years from the Closing Date, and each party shall provide reasonable access to and make such records and personnel available to the other as may be reasonably required by such party and its Affiliates during regular business hours and upon reasonable advance notice in connection with, among other things, preparation of regulatory filings, Tax Returns, any insurance claims, Legal Proceedings or Tax audits or examination against or governmental investigations of Sellers or Purchasers or any of their Affiliates or in order to enable Sellers or Purchasers to comply with

their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. Sellers or Purchasers, as applicable, at their sole cost and expense may make copies of the books and records to which they are entitled to access pursuant to this <u>Section 9.7</u>.

9.8     <u>Publicity</u>.  Prior to Closing, except as required by applicable Law, NHL Rules, or the NHL Documents, neither Sellers nor Purchasers shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the judgment of Purchasers or Sellers, as applicable, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, <u>provided</u> <u>that</u>, the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the timing and content thereof.

9.9     <u>NHL Approvals</u>.  Prior to or on the date hereof, Purchasers shall have, and shall have caused all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to have, completed and filed with the NHL all necessary applications, background information forms, and any other documents and information required of them under the NHL Constitution and NHL By-Laws to obtain the NHL Approvals.  Upon Closing, Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries (as required by the NHL) to, execute the NHL owner's consent in substantially the form attached hereto as <u>Exhibit F</u> (the "<u>NHL Owner Consent</u>"), the NHL/lender cooperation letter agreement in substantially the form attached hereto as <u>Exhibit G</u> (the "<u>NHL/Lender Cooperation Agreement</u>"), the NHL guaranty in substantially the form attached hereto as <u>Exhibit H</u> (the "<u>NHL Guaranty</u>"), and one or more NHL proxies in substantially the forms attached hereto as <u>Exhibit I</u> (the "<u>Purchaser/NHL Proxy</u>").  Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to, use commercially reasonable efforts to obtain receipt of NHL Approvals at the earliest practicable date; <u>provided</u> <u>that</u> Purchasers shall not be required to enter into any additional material obligations to the extent such obligations are not provided for in the NHL Owner Consent, NHL/Lender Cooperation Agreement, NHL Guaranty or Purchaser/NHL Proxy in the forms attached hereto as <u>Exhibits F</u> through <u>H</u>, respectively, other than any additional obligations required by the NHL as a result of any information provided to the NHL after the date hereof or any other action, requirement or request from Purchasers.

9.10     <u>Stars Foundation</u>.  Effective as of the Closing, Sellers shall use their commercially reasonable efforts to secure resignations of current officers and directors of the Stars Foundation as of the Closing and to cause the Stars Foundation to elect such replacement officers and directors as directed by Purchasers or their designated Affiliates.

9.11     <u>Senior Secured Loan</u>.  Prior to or contemporaneously with the Closing, Purchasers shall execute a credit agreement dated as of the Closing Date in substantially the form attached hereto as <u>Exhibit J</u> (the "<u>Senior Secured Loan</u>"), subject to such changes that are not materially adverse to Purchasers or the transactions contemplated by this Agreement, and deliver executed copies of the Senior Secured Loan to the lenders thereunder.  Additionally, prior to or

contemporaneously with the Closing, Purchasers shall satisfy all of the conditions precedent to funding under the Senior Secured Loan and all other documents related thereto, save and except for (i) execution and delivery of the NHL/Lender Cooperation Agreement by parties other than the Purchasers and their Affiliates or (ii) satisfaction of the conditions set forth in Article IV(c) of the Senior Secured Loan, provided that the failure to satisfy Article IV(c) of the Senior Secured Loan is not the result of any breach by the Purchasers or their Affiliates of any provision of this Agreement or any other provision of the Senior Secured Loan. Purchasers shall perform their obligations, and cause any of their Affiliates party thereto to perform their obligations, under the Senior Secured Loan as of and on the Closing Date. Purchasers shall take all action necessary to cause all other parties to the Senior Secured Loan to perform such party's obligations under the Senior Secured Loan as of and on the Closing Date. Purchasers shall cause the First Lien Lenders to enter into the Senior Secured Loan and the NHL/Lender Cooperation Agreement in substantially the forms attached hereto as Exhibit J and Exhibit G, respectively.

9.12    Guarantee. Guarantor hereby fully and irrevocably guarantees the payment and performance of Purchasers' obligations under this Agreement, including payment of the Purchase Price at Closing. Guarantor is hereby made fully responsible for the acts and omissions of Purchasers pursuant to the terms of this Agreement. This guarantee shall be a full, unconditional, irrevocable, absolute and continuing guarantee of payment and performance and not a guarantee of collection, and Guarantor shall remain liable for the Purchase Price hereunder until its payment in full. Guarantor hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against any Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 9.12.

9.13    Disclosure Schedules; Supplementation and Amendment of Schedules. Sellers may, in their reasonable discretion, include in the Schedules items that are not material in order reasonably to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other applicable Schedule if the applicability of such information to such other Schedules is reasonably apparent on its face. From time to time prior to the Closing, Sellers shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement to have been omitted in error (including by creating new schedules where none are currently referenced herein); provided that, such supplement or amendment shall thereafter be deemed to modify the applicable Schedule or Schedules and this Agreement and the representations and warranties contained herein (both as of the date hereof and as of the Closing Date) for all purposes under this Agreement (except to the extent limited under Section 4.2(f) and 4.2(g)), including for the purpose of determining whether the conditions to Closing set forth in Section 11.1(a) have been satisfied. For purposes of this Section 9.13, any items included or described in the Schedules that are based on documents that have not been made available to Purchasers at any time prior to the date hereof shall be deemed to have been provided in a supplement to the Schedules delivered by Sellers on the date hereof. No supplement or amendment to a Schedule pursuant to this Section 9.13 shall be deemed to be an amendment to this Agreement for purposes of Section 13.5. In conjunction with Sellers' delivery to Purchasers

of any supplement or amendment to a Schedule pursuant to this <u>Section 9.13</u>, Sellers shall also deliver to Purchasers such underlying documentation and information as reasonably necessary for Purchasers to be able to understand and analyze the matter(s) reflected in such supplement or amendment.

9.14    <u>Insurance</u>.

(a)    To the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "occurrence based" liability insurance, Sellers shall use their commercially reasonable efforts, prior to the Closing, to cause, or cause any applicable Affiliate of Sellers to cause, Purchasers to be added as an additional insured, on a primary and noncontributory basis, under such Insurance Policy for the current policy year and the preceding six (6) policy years solely with respect to pre-Closing occurrences, injury and/or damage. Additionally, to the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "claims made" liability insurance coverage, Sellers shall use their commercially reasonable efforts, prior to Closing, to ensure that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Business or the Purchased Assets for a period of not less than six (6) years following the Closing.  Notwithstanding the foregoing, no Seller shall be required to make any payment to any insurance provider in order to secure coverage for Purchasers under any Insurance Policy prior to or after Closing, nor will any Seller have any obligation to continue to make any premium payments or to take any other affirmative actions with respect to the Insurance Policies from and after the Closing Date; <u>provided</u>, <u>however</u>, that if prior to or after Closing, if Purchasers determine that any payments are necessary to secure coverage for Purchasers under any Insurance Policy, as provided in this <u>Section 9.14(a)</u>, then to the extent permitted by applicable Law and the terms of such Insurance Policy, Purchasers shall have the option to make such payment on behalf of Sellers to effectuate such continued coverage.

(b)    If Purchasers provide a written notice to Sellers after the Closing that any claim has arisen, or otherwise exists, that is covered under any Insurance Policy that is not assigned to Purchasers under <u>Section 2.1(o)</u> (an "<u>Excluded Insurance Policy</u>") and under which Purchasers have not then been added as an additional insured as provided in <u>Section 9.14(a)</u> relating to a matter that would be an Assumed Liability if not covered by such Excluded Insurance Policy (such claim, an "<u>Excluded Insurance Claim</u>"), and if such notice is accompanied by instructions regarding the process for reporting and pursuing recovery on such Excluded Insurance Claim under the relevant Insurance Policies, then promptly following receipt of such written notice from Purchasers, Sellers shall use their commercially reasonable efforts to report such Excluded Insurance Claim within such time and in such manner as required under such Excluded Insurance Policy (to the extent such time period has not expired) and shall further use their commercially reasonable efforts to pursue recovery on such Excluded Insurance Claim, all in accordance with Purchasers' instructions, and upon the receipt by Sellers of any insurance proceeds, Sellers shall promptly pay Purchasers such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any losses, damages or other amounts borne by Purchasers arising from such Excluded Insurance Claim).  However, Purchasers shall be responsible for and reimburse Sellers for any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses

associated with Sellers' own employees) incurred by any Seller in pursuing any Excluded Insurance Claim for the benefit of any Purchaser pursuant to its obligations under this <u>Section 9.14(b)</u>, along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses that would otherwise be borne by Sellers as a result of any such Excluded Insurance Claim.  At the reasonable request of any Seller, Purchasers shall advance such out-of-pocket costs to Sellers.  Sellers (in their sole discretion) may elect to authorize any Purchaser, to the extent permitted by applicable Law and the terms of such Excluded Insurance Policies, at Purchasers' expense, to perform all the obligations and receive all the benefits of Sellers under such Excluded Insurance Policies relating to any Excluded Insurance Claim and appoint any Purchaser as their attorney-in-fact to act in their name on their behalf, in which case, (i) Purchasers agree to indemnify and hold Sellers and their Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to any Purchaser's performance of, or failure to perform, such obligations under such Excluded Insurance Policies and (ii) Sellers shall be relieved of their obligations under this <u>Section 9.14(b)</u> with respect to such Excluded Insurance Claim, but only to the extent Purchasers are allowed to perform such obligations under Applicable Law and the terms of such Excluded Insurance Policies.  Nothing herein shall be deemed to require any Seller to maintain its existence for any period of time following the Closing.

9.15    <u>Change of Name</u>.  Within five (5) Business Days after the Closing Date, Sellers shall discontinue the use of the "Dallas Stars" and "StarCenter" name in any manner and shall change their limited partnership, corporate or limited liability company name to a name that does not include "Dallas Stars" or "StarCenter" or any confusingly similar variations thereof; <u>provided</u>, <u>however</u>, that each Seller may continue to use the "Dallas Stars" and "StarCenter" names in connection with identifying itself as a former owner of the Stars, the Dr Pepper StarCenters or any of the Stars Entities or COC Entities.  Upon the written request of Purchasers, Sellers shall execute such consents, to be delivered at Closing, as any Purchaser may reasonably require in connection with the Delaware or Texas Secretaries of State, as applicable, to change its corporate, limited partnership or limited liability company name at Closing to a name containing "Dallas Stars" or "StarCenter".

9.16    <u>Bankruptcy Compliance</u>.  Prior to the entry of the Confirmation Order, Sellers and Purchasers that are corporations (as defined by the Bankruptcy Code) shall take such actions as are necessary for those corporations to comply with the requirements of Section 1123(a)(6) of the Bankruptcy Code.

9.17    <u>Plano StarCenter</u>.  Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all necessary consents and approvals of General Electric Capital Corporation, as lender under that certain Loan Agreement, dated as of September 1998, by and between General Electric Capital Corporation and Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), as amended, required to consummate the transactions contemplated by this Agreement.  In the event that General Electric Capital Corporation fails or refuses to provide such necessary consents and approvals on terms and conditions reasonably satisfactory to Sellers, then Sellers in their sole and absolute discretion may elect, by delivering written notice to Purchasers on or before the Closing Date, that the 100% membership interests in Plano StarCenter held by Dallas Stars shall not be deemed a Transferred Equity Interest or a Purchased Asset and shall instead be

an Excluded Asset hereunder which will not be transferred to Purchasers at the Closing. Notwithstanding anything to the contrary set forth in this Agreement, if General Electric Capital Corporation shall fail or refuse to grant its consent or approval and the Sellers elect to treat the membership interests in Plano StarCenter as an Excluded Asset pursuant to this Section 9.17, (i) Purchasers shall have no right to terminate this Agreement as a result thereof and (ii) such consent of General Electric Capital Corporation shall in no event constitute a condition precedent to Closing, and (iii) the parties agree that there shall be no adjustment to the Purchase Price as a result thereof.

## ARTICLE X

## EMPLOYEES AND EMPLOYEE BENEFITS

10.1    Employment.

(a)    Employees. Sellers shall update Schedule 10.1(a) within three (3) Business Days prior to the Closing for any changes thereto and shall deliver the updated Schedule 10.1(a) to Purchasers at the Closing.

(b)    Offer of Employment.  Prior to the Closing, Purchasers shall offer employment to each non-player Employee who is not a party to a Purchased Contract, to commence employment with Purchasers immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment.  Notwithstanding the foregoing, any such offer of employment to a non-player Employee who is not a participant in an NHL Benefit Plan as of the Closing and who is on a leave of absence on the Closing Date by reason of military leave or long-term disability, whether such leave is paid, unpaid or otherwise (an "Inactive Employee"), may be conditioned upon: (i) the Closing occurring, and (ii) such Inactive Employee commencing active employment with Purchasers on a date that is the later of (A) nine months after the Closing Date (or the next applicable work-day to the extent such date does not fall on a work-day) or (B) such longer period of time as required by Law.

(c)    Continuing Employees.  All non-player Employees who actually commence employment with Purchasers (including all Inactive Employees who commence employment with Purchasers as described in Section 10.1(b)), as well as all Hockey Player Employees, are referred to as "Continuing Employees."

(d)    Severance.  Notwithstanding anything to the contrary contained in Section 10.1(b), Purchasers shall provide each Continuing Employee who incurs a termination of employment on or before the first anniversary of the Closing Date with severance payments and severance benefits that are no less favorable than the severance payments and severance benefits to which such individual would have been entitled with respect to such termination under the severance policies (including any applicable Contracts with such Continuing Employee) in place immediately prior to the Closing, as described in any such applicable Contracts and in Sellers' guidelines for severance pay as set forth in Schedule 10.1(d); provided, however, Purchasers shall not be obligated to provide to any Continuing Employee who is not a party to a written employment, collective bargaining, severance or similar agreement with cash severance

payments in excess of eight (8) weeks of such Continuing Employee's base salary as in effect immediately prior to the Closing Date.

(e)     Standard Procedure.  Pursuant to the "Standard Procedure" provided in section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Purchasers and Sellers shall report on a predecessor/successor basis as set forth therein, (ii) Sellers will not be relieved from filing a Form W-2 with respect to any Continuing Employees, and (iii) Purchasers will undertake to file (or cause to be filed) a Form W-2 for each such Continuing Employee with respect to the portion of the year during which such Continuing Employees are employed by Purchasers that includes the Closing Date, excluding the portion of such year that such Continuing Employee was employed by Sellers.

(f)     Sellers and Purchasers hereby agree that the "Asset Purchase Transaction Exception" set forth in Section 1.409A-1(h)(4) of the Treasury Regulations shall apply to the transactions contemplated under this Agreement so that each Continuing Employee will not be treated as having experienced a separation from service for purposes of applying the provisions of any nonqualified deferred compensation plan maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or are obligated to contribute for such Continuing Employee.

10.2    Employee Benefits.

(a)     Benefits.  Purchasers shall provide, or cause to be provided, from the Closing Date through December 31, 2011 or such longer period of time required by applicable Law, to each of the Continuing Employees, compensation (including salary, wages and opportunities for commissions, bonuses, incentive pay, overtime and premium pay), employee benefits, location of employment and a position of employment that are, in the aggregate, substantially comparable to those provided to such Continuing Employee immediately prior to the Closing; provided that Purchasers shall not have any obligation to issue, or adopt any plans or arrangements providing for the issuance of, equity, warrants, options or other rights in respect of any equity of any entity or any securities convertible or exchangeable into such shares pursuant to any such plans or arrangements; provided further, that no plans or arrangements of Sellers providing for such issuance shall be taken into account in determining whether employee benefits are substantially comparable in the aggregate.  Purchasers hereby acknowledge that the Seller Benefit Plans will not be available for the benefit of, and will cease to produce active coverage for, any Continuing Employee after the Closing.  Purchasers acknowledge and agree that Sellers make no representations or warranties to Purchasers regarding the NHL Benefit Plans.

(b)     Purchaser Plans.  For purposes of eligibility, vesting and levels of benefits under the employee benefit plans of Purchasers providing benefits to Continuing Employees (the "Purchaser Plans"), Purchasers shall credit each Continuing Employee with his or her years of service with Sellers, to the same extent as such Continuing Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. The Purchaser Plans shall not deny Continuing Employees coverage on the basis of pre-existing conditions and shall credit such Continuing Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in the Purchaser Plans.

(c)     No Employee Restrictions.  Nothing contained in this Section 10.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Continuing Employee or any change in the employee benefits available to any individual Continuing Employee.

(d)     Accrued Vacation.  Except as required by applicable Law, Purchasers shall be responsible for all Liabilities with respect to Continuing Employees attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.

(e)     Worker's Compensation.  Purchasers hereby agree to assume, as of the Closing, all Liabilities, if any, of Dallas Stars and the Stars Subsidiaries with respect to worker's compensation relating to Employees and Former Employees, if applicable, but only to the extent that (i) such Liabilities, if any, are not covered by the Insurance Policies or (ii) such Liabilities, if any, are covered by any Insurance Policies and such Insurance Policies or the benefits thereof are assigned to Purchaser pursuant to the terms hereof.

ARTICLE XI

CONDITIONS TO CLOSING

11.1     Conditions Precedent to Obligations of Purchasers.  The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since the Dallas Stars Interim Balance Sheet Date or the COC Interim Balance Sheet Date, respectively;

(d)     Sellers shall have delivered, or caused to be delivered, to Purchasers stock certificates (or affidavits of lost stock certificates) representing the Hockey Enterprises Shares that are owned by Sellers, duly endorsed in blank or accompanied by stock transfer powers;

(e)     Dallas Stars shall have delivered, or caused to be delivered, to Purchasers a duly executed bill of sale in the form of Exhibit K hereto;

(f)     Sellers shall have delivered, or caused to be delivered, to Purchasers a duly executed assignment and assumption agreement in the form of Exhibit L hereto;

(g)     Sellers shall have delivered, or caused to be delivered, to Purchasers the applicable Seller Documents;

(h)     Sellers shall have delivered, or caused to be delivered, to Purchasers an updated calculation of the CFV Debt Amount as of the Closing Date; and

(i)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9.

11.2     <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchasers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date;

(c)     Purchasers shall have delivered, or caused to be delivered, to Sellers evidence of the wire transfers referred to in Section 3.3(a);

(d)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9; and

(e)     Purchasers shall have delivered, or caused to be delivered, to Sellers a duly executed assignment and assumption agreement in the form of Exhibit L hereto and executed versions of the applicable Purchaser Documents.

11.3     <u>Conditions Precedent to Obligations of Sellers and Purchasers</u>.  The obligations of either Sellers or Purchasers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers or Purchasers (except as provided in Section 11.3(g)) in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(c)     Sellers and Purchasers shall have obtained a release of all Liens held pursuant to the Senior Indebtedness against the Purchased Assets pursuant to the Confirmation Order;

(d)     Sellers shall have obtained those consents listed on <u>Schedule 11.3(d)</u> in a form reasonably satisfactory to Purchasers and copies thereof shall have been delivered to Purchasers;

(e)     the Bankruptcy Court shall have entered the Bidding Procedures Order;

(f)     the Bankruptcy Court shall have entered the Confirmation Order and any stay period applicable to the Confirmation Order shall have expired or shall have been waived by the Bankruptcy Court; and

(g)     the Closing Date (as defined in the Senior Secured Loan) shall have occurred and the Term Loans (as defined in the Senior Secured Loan) shall have been deemed made pursuant to the terms of the Senior Secured Loan; for the avoidance of doubt, the condition precedent provided in this <u>Section 11.3(g)</u> may not be waived by Purchasers or Sellers without the consent of the First Lien Agent and Monarch as provided in <u>Section 13.5</u>.

11.4     <u>Frustration of Closing Conditions</u>.  No Seller or Purchaser may rely on the failure of any condition set forth in <u>Section 11.1</u>, <u>11.2</u> or <u>11.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XII

SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES

12.1     <u>Survival</u>.

(a)     The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

(b)     All of the covenants or other agreements of the parties contained in this Agreement shall survive until the earlier of such covenant or agreement being fully performed or fulfilled or until the termination of the applicable survival period referenced in the next sentence, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance. No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed at or prior to Closing (the "<u>Pre-Closing Covenants</u>") may be made or brought by any party hereto more than

180 days following the Closing Date (the "Pre-Closing Covenant Survival Period") and (ii) by their nature are required to be performed after Closing (the "Post-Closing Covenants") may be made or brought by any party hereto after the one (1)-year anniversary of the last date on which each such Post-Closing Covenant was required to be performed (in each case, a "Post-Closing Covenant Survival Period"); provided, however, that any obligation under Sections 12.2(a)(i), 12.2(a)(iii), 12.3(a)(i), and 12.3(a)(iv) shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor in reasonable detail to the indemnifying party in accordance with Section 12.4 before the termination of the Pre-Closing Covenant Survival Period or Post-Closing Covenant Survival Period, as applicable.

12.2    Indemnification by Sellers.

(a)    Subject to this Article XII, each Seller hereby agrees from and after the Closing to, severally and not jointly, indemnify and hold Purchasers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Purchaser Indemnified Parties") harmless from and against:

(i)    any and all losses, Liabilities, claims, demands, assessments, judgments, notices, suits, actions, proceedings, obligations, damages, fines, penalties, costs and expenses, including attorneys' and other professionals' fees and disbursements (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Sellers;

(ii)    any and all Losses based upon or arising directly from any Excluded Asset or any Excluded Liability; and

(iii)    any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of Sellers.

(b)    Purchasers acknowledge and agree that Sellers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Purchasers after the Closing Date in breach of this Agreement.  Purchasers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.3    Indemnification by Purchasers.

(a)    Subject to this Article XII, each Purchaser hereby agrees from and after the Closing to, jointly and severally, indemnify and hold Sellers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Seller Indemnified Parties") harmless from and against:

(i)    any and all Losses based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Purchasers;

(ii)     any and all Losses based upon or arising directly out of any Assumed Liability;

(iii)     any and all Losses based upon or arising directly out of any Purchased Asset or Purchasers' operation of the Business after the Closing Date; and

(iv)     any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of any Purchaser.

(b)     Sellers acknowledge and agree that Purchasers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Sellers after the Closing Date in breach of this Agreement.  Sellers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.4     Indemnification Procedures.

(a)     A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

(b)     In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought under Sections 12.2 and 12.3 hereof (regardless of the limitations set forth in Section 12.5) (an "Indemnification Claim"), the indemnified party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party.  The failure of the indemnified party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is prejudiced as a result of such failure.  The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with such Indemnification Claim, which relates to any Losses indemnified against by it hereunder.  If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party of its intent to do so.  If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel)

for all indemnified parties in connection with any Indemnification Claim. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 12.4 to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all Liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of Sections 12.5 and 12.6, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate Liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim. If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such Indemnification Claim.

(c)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

12.5    Certain Limitations on Indemnification.

(a)     Notwithstanding anything herein to the contrary, Sellers shall not be jointly and severally liable for any Losses.

(b)     Sellers shall not be required to indemnify any Purchaser Indemnified Party and Purchasers shall not be required to indemnify any Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the party seeking indemnification.

(c)     Nothing in this Article XII shall reduce the aggregate consideration for the Purchased Assets set forth in Section 3.1 (including, without limitation, by reducing the principal amount of the Senior Secured Loan pursuant to Section 3.1(c)).

12.6    Calculation of Losses.

(a)    The amount of any Losses for which indemnification is provided under this Article XII shall be net of any amounts actually recovered or recoverable by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).  Purchasers shall use their commercially reasonable efforts to recover under insurance policies for any Losses prior to seeking indemnification under this Agreement.

(b)    The amount of the Indemnification Claim shall be (i) increased to take account of any net Tax cost incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase, if any) in the event that the Tax treatment of such indemnity payment prescribed by Section 12.7 is not permitted by applicable Law and (ii) reduced to take account of any net Tax Benefit currently realizable by the indemnified party arising from the incurrence or payment of any such Loss.  To the extent such Indemnification Claim does not give rise to a currently realizable Tax Benefit, if the amount with respect to which any Indemnification Claim is made gives rise to a subsequently realized Tax Benefit to the indemnified party that made the Indemnification Claim, such indemnified party shall refund to the indemnifying party the amount of such Tax Benefit (grossed-up to reflect any Tax Benefit currently realized by the indemnified party as a result of making such refund payment) when, as and if realized (it being understood that such indemnified party shall use its reasonable efforts to realize such Tax Benefit).  For purposes of this Section 12.6, a "Tax Benefit" means an amount by which the Tax Liability of the party (or the consolidated, combined, unitary or similar Tax group including the party) or, if the party is a pass-through entity for Tax purposes, the members of the party, is actually reduced (including by deduction, reduction of income by virtue of increased Tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant Taxing Authority.  In computing the amount of any such Tax cost or Tax Benefit, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified Loss.  For purposes of this Section 12.6, a Tax Benefit is "currently realizable" to the extent that such Tax Benefit can be realized in the current taxable period or year or in any Tax Return with respect thereto (including through a carryback to a prior taxable period) or in any taxable period or year prior to the date of the Indemnification Claim.  The amount of any increase, reduction or payment hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD or a successor form) with respect to the indemnified party's Liability for Taxes, and payments between the parties to this Agreement to reflect such adjustment shall be made if necessary.

(c)    Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any Losses that are not legally recoverable under applicable Law as actual breach of contract damages of such other Person.

12.7    Tax Treatment of Indemnity Payments.  Sellers and Purchasers agree to treat any indemnity payment made pursuant to this Article XII as an adjustment to the Purchase Price for federal, state, local and foreign income Tax purposes, except as required by applicable Law.

12.8    <u>Specific Performance</u>.  Sellers, on the one hand, and Purchasers and Guarantor, on the other hand, acknowledge and agree that a breach of this Agreement would cause irreparable damage to the other party and such other party will not have an adequate remedy at law.  Therefore, prior to the termination of this Agreement, all obligations of Sellers, on the one hand, and all obligations of Purchasers or Guarantor, on the other hand, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, including, without limitation, the obligation of Purchasers to pay the Purchase Price and/or enforcement of the terms of the Senior Secured Loan against the lenders thereunder in accordance with the terms thereof, and appropriate injunctive relief may be applied for and granted in connection therewith; <u>provided</u>, <u>however</u>, that (i) any election by Purchasers or Sellers, as the case may be, to pursue specific performance under this <u>Section 12.8</u> shall be in lieu of and not in addition to Purchasers' or Sellers' right to receive the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, respectively, in accordance with <u>Section 4.4(d)</u> hereof, except that in the event specific performance is not granted, Purchasers or Sellers as the case may be, may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of <u>Section 4.4(d)</u> and (ii) in order to be entitled to the remedy of specific performance under this <u>Section 12.8</u>, the party instituting Legal Proceedings for specific performance must not be in breach (which breach is incapable of being cured) of any of its obligations hereunder that would prevent the Closing conditions in <u>Article XI</u> from being satisfied.  Notwithstanding anything to the contrary set forth in <u>Section 4.4(d)</u>, if Purchasers or Sellers, as the case may be, shall elect to pursue specific performance pursuant to this <u>Section 12.8</u> by instituting a Legal Proceeding as contemplated hereby, (A) such election shall thereupon become the sole and exclusive remedy of Purchaser or Seller, as the case may be, for such breach and (B) the party instituting such Legal Proceedings shall thereby waive any right to seek money damages or any other remedy available in law or in equity against the other party in connection with such breach.  Each of the parties hereto hereby agrees that specific performance is an agreed upon contractual remedy of the parties and waives any defense in respect of an action of specific performance that would be available to the parties in the absence of this provision, except that in the event specific performance is not granted, either party may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of <u>Section 4.4(d)</u>.  Each of the parties hereto waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.  If, prior to the Termination Date, any party brings any Legal Proceeding to enforce specifically the performance of the terms and provisions hereof by any other party, the Termination Date shall automatically be extended by (x) the amount of time during which such Legal Proceeding is pending, plus 20 Business Days or (y) such other time period established by the Bankruptcy Court.

12.9    <u>Exclusive Remedy</u>.  Following the Closing, the sole and exclusive remedy for any and all claims arising under, out of, or related to this Agreement, or the sale and purchase of the Purchased Assets, shall be the rights of indemnification and specific performance set forth in this <u>Article XII</u> and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise; it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties hereto to the fullest extent permitted by Law.  The provisions of this <u>Section 12.9</u> and the limited remedies provided in <u>Section 3.2</u>, <u>Section 4.4</u>, <u>Article XII</u> and <u>Section 13.10</u>, were specifically bargained-for between Purchasers

and Sellers and were taken into account by Purchasers and Sellers in arriving at the Purchase Price. Sellers have specifically relied upon the provisions of <u>Section 3.2</u>, <u>Section 4.4</u> and this <u>Section 12.9</u> and the limited remedies provided in <u>Section 3.2</u>, <u>Section 4.4</u>, <u>Article XII</u> and <u>Section 13.10</u>, in agreeing to the Purchase Price and in agreeing to provide the specific representations and warranties set forth herein.

12.10   <u>Nature of Representations and Warranties; Schedules</u>.  Except for the representations and warranties contained in <u>Articles V</u> and <u>VI</u> (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their respective Affiliates, officers, managers, partners, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in <u>Articles V</u> and <u>VI</u> hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Sellers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchasers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchasers by any manager, partner, officer, equityholder, employee, agent, consultant, or representative of Sellers or any of their respective Affiliates).  Sellers make no representations or warranties to Purchasers regarding the probable success or profitability of the Business.  Except for the representations and warranties contained in <u>Article VII</u> (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Purchasers nor any other Person makes any other express or implied representation or warranty with respect to Purchasers or the transactions contemplated by this Agreement, and Purchasers disclaim any other representations or warranties, whether made by Purchasers or any of their respective Affiliates, officers, managers, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in <u>Article VII</u> hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Purchasers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any partner, officer, member, employee, agent, consultant, or representative of Purchasers or any of their respective Affiliates).  The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed.  All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.  The sole purpose of the representations and warranties set forth in this Agreement is to allocate financial responsibility pursuant to the express provisions of this Agreement should the representations and warranties prove to have been inaccurate; and no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort) are permitted to any party hereto as a result of the untruth of any such representation and warranty.

12.11   <u>DTPA WAIVER</u>.  TO THE GREATEST EXTENT ALLOWED BY LAW, PURCHASERS HEREBY WAIVE AND RELINQUISH ALL PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT (CHAPTER 17, SUBCHAPTER E, OF THE TEXAS BUSINESS AND COMMERCE CODE) IN

CONNECTION WITH THE SALES TRANSACTION CONTEMPLATED BY THIS AGREEMENT.  PURCHASERS REPRESENT AND WARRANT TO SELLERS THAT: (A) PURCHASERS ARE NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION; (B) PURCHASERS ARE REPRESENTED BY EXPERIENCED AND KNOWLEDGEABLE LEGAL COUNSEL OF THEIR OWN CHOOSING WHO HAVE FULLY NEGOTIATED THE TERMS OF THIS AGREEMENT (INCLUDING THE FORM OF ALL CONVEYANCE DOCUMENTS ATTACHED TO OR ENTERED INTO IN CONNECTION WITH THE EXECUTION OR CONSUMMATION OF THIS AGREEMENT); AND (C) PURCHASERS ARE KNOWLEDGEABLE AND EXPERIENCED IN THE PURCHASE AND SALE OF SPORTS TEAMS, AND ARE FULLY ABLE TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION.

12.12    Limitation of Lender Liability.  Purchasers acknowledge and agree that the terms and conditions of this Agreement (including, without limitation, Article XII hereof) shall not give Purchasers or any of their Affiliates any right of recovery against, or shall cause any Liability to attach to, any of the NHL Affiliated Parties, the First Lien Lenders, the First Lien Agent or any of their respective Affiliates (the "Lender Related Parties"), by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, or otherwise, and Purchasers acknowledge and agree on their behalf and on behalf of their Affiliates not to make any claims against any of the Lender Related Parties in connection therewith.  The Lender Related Parties shall be third party beneficiaries of this Section 12.12.

12.13    Purchasers' Rights.  Sellers acknowledge that nothing in Section 12.12 limits or otherwise affects Purchasers' rights to enforce the terms of this Agreement against Sellers.

ARTICLE XIII

MISCELLANEOUS

13.1    Tax Matters.

(a)    Payment of Sales, Use or Similar Taxes.  Purchasers shall be responsible for (and shall indemnify and hold harmless Sellers and their managers, directors, members, partners, officers, employees, equityholders, Affiliates, agents, successors and permitted assigns against) any sales Taxes applicable to the Purchased Assets and for all other applicable sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges (including real property transfer Taxes, UCC-3 filing fees, real estate, aircraft and motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings) in connection with the transactions contemplated by this Agreement including any interest and penalty thereon (other than Taxes measured by or with respect to income imposed on Sellers or their Affiliates) ("Transfer Taxes").  Sellers shall, however, seek to include in the Confirmation Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(a).  To the extent that any Transfer Taxes are required to be paid by any Seller (or such Transfer Taxes are assessed against any Seller), Purchasers shall promptly reimburse Sellers, as applicable, for such Transfer Taxes.  Sellers and Purchasers shall cooperate and consult with each other prior to filing

any Tax Returns in respect of Transfer Taxes. Sellers and Purchasers shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(b)     Disputes. Notwithstanding anything to the contrary in this Agreement, if a Legal Proceeding, controversy, audit, or other dispute shall arise between one or more Sellers and any Taxing Authority concerning Taxes for which Purchasers are responsible under this Agreement, Purchasers (and at the direction of Purchasers, Purchasers' counsel) shall have the sole right, but not obligation, to represent such Seller(s) in resolving such Legal Proceeding, controversy, audit, or other dispute, provided that this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute with respect to which Seller would not have had the right to represent itself absent the transaction which is the subject of this Agreement. For purposes of clarification and without limitation, this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute relating to Taxes which is subject to the control of a Person that owns an interest in the applicable Seller.

13.2     Expenses. Except as otherwise provided in this Agreement, Sellers, on the one hand, and Purchasers, on the other hand, shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, Purchasers shall be responsible for, and shall pay directly or promptly reimburse Sellers and the Transferred Subsidiaries for amounts paid by or on behalf of Sellers, all filing fees lawfully payable to or at the request of any Governmental Body in connection with this Agreement, the Seller Documents, the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby.

13.3     Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury.

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of the State of Texas (or, if such court does not have sufficient jurisdiction, the Texas state courts located in Dallas County, Texas) and any appellate court from any thereof, for the resolution of any such claim or dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection, which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum

for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

(c)     Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.4     Entire Agreement. This Agreement (including the Schedules and Exhibits hereto) contains the entire agreement of the parties respecting the transactions contemplated by this Agreement and supersedes all prior agreements among the parties respecting the transactions contemplated by this Agreement, including that certain Memorandum of Understanding, effective as of April 13, 2011, by and among Dallas Stars, Dallas Arena, and Tom Gaglardi. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the transactions contemplated by this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's length transaction. The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the transactions contemplated by this Agreement shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and the parties hereby agree that neither party hereto shall have any remedies or causes of action (whether in contract or in tort) for any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

13.5     Amendments and Waivers. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by all of the parties hereto; provided that no amendment, supplement, change or waiver (i) to Section 11.3(g) or Section 12.12 hereof, (ii) that would have the effect of reducing the Excess Cash Payment, the First Lien Cash Payment or the principal amount of the Senior Secured Loan in a manner not otherwise contemplated by this Agreement or (iii) that would otherwise materially adversely effect the Excess Cash Payment, the First Lien Cash Payment or the terms and conditions of the Senior Secured Loan shall be effective, in each case, without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement. Purchasers agree not to consent to any amendment to the Confirmation Order or Plan that Purchasers are permitted to consent to pursuant to Section 8.3 hereof that would adversely effect the terms and

conditions of the Senior Secured Loan without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement, which consent shall not be unreasonably withheld or delayed. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The First Lien Agent and Monarch shall be third party beneficiaries of this Section 13.5.

13.6    Governing Law.  Unless any Exhibit or Schedule to this Agreement specifies a different choice of law, this Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, its Exhibits and Schedules, the negotiation, execution, performance, validity, interpretation, construction and enforcement of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the State of Texas (without giving effect to any choice or conflict of Law provision or rules (whether of the State of Texas or otherwise) that would cause the application of Laws of any other jurisdiction).

13.7    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission), or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to any Seller, to:

Dallas Stars, L.P.
2601 Avenue of the Stars
Frisco, TX 75034
Facsimile:  (214) 387-5610
Attention:  Robert Hutson

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201

Facsimile: (214) 746-7777
Attention: Glenn D. West

If to any Purchaser, to:

Dallas Sports & Entertainment, L.P.
c/o Northland Properties Corporation
310 - 1755 W Broadway
Vancouver, British Columbia V6J 4S5
CANADA
Facsimile: (604) 730-4645
Attention: Tom Gaglardi

With a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
Brookfield Place
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario M5J 2T3
CANADA
Facsimile: (416) 863-6275
Attention: Jim Rossiter

13.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    <u>Binding Effect; Third Party Beneficiaries; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement except (a) as provided in this <u>Section 13.9</u> and <u>Sections 12.12</u>, <u>13.5</u>, <u>13.10</u>, <u>13.11</u> and <u>13.12</u> herein and (b) only after the Closing has occurred, the rights of the NHL, the First Lien Lenders, Weil and GSP to receive the payments pursuant to <u>Section 3.3</u> only.  No assignment of this Agreement or of any rights, interests or obligations hereunder may be made by either Sellers or Purchasers, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other parties hereto and the NHL and any attempted assignment without the required consents shall be void.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

13.10   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, manager, partner, equityholder, employee, Affiliate, agent, attorney or representative of Sellers, the Transferred Subsidiaries, Purchasers, or any of their respective Affiliates shall have any Liability (whether in contract or in tort) for any obligations or Liabilities of Sellers, the Transferred Subsidiaries or Purchasers arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement, including, without limitation, any alleged non-disclosure or misrepresentation made by any such Persons; provided, however, that nothing in this Section 13.10 shall prohibit any legal action against or enforcement of or recovery for any Liability (whether in contract or in tort) against Guarantor for, or be deemed to waive or release any obligations of Guarantor under this Agreement or any party to the Senior Secured Loan for any obligations or Liabilities of Purchasers as a result of the failure of such party to the Senior Secured Loan to provide financing to Purchasers pursuant to the Senior Secured Loan.

13.11   Legal Representation.  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, managers, members, partners, shareholders, officers, employees and Affiliates, that Weil serves as counsel to Sellers and their Affiliates (other than the Transferred Subsidiaries and their respective Subsidiaries), on the one hand, and to the Transferred Subsidiaries and their respective Subsidiaries, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transaction contemplated hereby.  Sellers, Purchasers, and the Transferred Subsidiaries hereby agree that, in the event that a dispute arises after the Closing between Sellers or any of their respective Affiliates (other than the Transferred Subsidiaries) and Purchasers or the Transferred Subsidiaries, Weil may represent Sellers and any of their Affiliates (other than the Transferred Subsidiaries) in such dispute even though the interests of Sellers or their Affiliates (other than the Transferred Subsidiaries) may be directly adverse to the Transferred Subsidiaries and Purchasers, and even though Weil has previously represented the Transferred Subsidiaries. The Transferred Subsidiaries and Purchasers further agree that, as to all communications among Weil, the Transferred Subsidiaries and Sellers or their Affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney or solicitor-client privilege and the expectation of client confidence belongs to each Seller and may be controlled by such Seller and shall not pass to or be claimed by the Transferred Subsidiaries or any Purchaser. Notwithstanding the foregoing, in the event that a dispute arises between the Transferred Subsidiaries and a third party other than a party to this Agreement after the Closing, the Transferred Subsidiaries may assert the attorney or solicitor-client privilege to prevent disclosure of confidential communications by Weil to such third party; provided, however, that none of the Transferred Subsidiaries may waive such privilege without the prior written consent of Sellers.

13.12   General Releases.

(a)      Effective as of the Closing Date, the Transferred Subsidiaries (collectively, the "Subsidiary Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge Sellers and any and all of their Affiliates, Subsidiaries (whether or not such entities are wholly owned), parent entities, and other direct or indirect related entities (as well as each of their respective predecessors, successors, and assigns) and the

NHL Affiliated Parties and each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Affiliates, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Seller Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Seller Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Transferred Subsidiaries, breach of any other duty, appropriation of any business opportunity of the Transferred Subsidiaries, dealing with the Transferred Subsidiaries in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Subsidiary Releasing Parties, or that any of the Subsidiary Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(b)     Effective as of the Closing Date, Sellers (collectively, the "Seller Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge the Transferred Subsidiaries and any and all of their Subsidiaries (whether or not such entities are wholly owned), and the NHL Affiliated Parties and, other than the Hicks Affiliates, each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Subsidiary Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Subsidiary Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or*

*negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Sellers, breach of any other duty, appropriation of any business opportunity of the Sellers, dealing with the Sellers in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Seller Releasing Parties, or that any of the Seller Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(c)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 13.12</u> shall not release, acquit or discharge any rights, actions, causes of action, claims or demands that now exist or that may hereafter accrue by and among any Seller, any Transferred Subsidiary and/or any Purchaser relating to or arising in connection with this Agreement or any agreement or document executed pursuant hereto, including those arising under <u>Article XII</u> of this Agreement.  The releases provided in this <u>Section 13.12</u> are intended to survive indefinitely and shall remain enforceable after the Closing of the transaction contemplated by this Agreement.

13.13   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.14   <u>Sellers' Representative</u>.  Prior to the Closing, Sellers shall appoint, in consultation with the First Lien Agent, a representative (such representative, or any successor thereto, the "<u>Sellers' Representative</u>") as the Sellers' sole and exclusive representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of the Sellers solely with respect to the determination of the Final NWC pursuant to <u>Section 3.4</u> hereof, and in accordance with the terms and provisions of this Agreement and to act on behalf of such Sellers in any Legal Proceeding involving the determination of the Final NWC.  If the Sellers' Representative otherwise appointed is unwilling or becomes unable to serve as Sellers' Representative, such other Person or Persons as may be designated by the First Lien Agent in accordance with this <u>Section 13.14</u> shall succeed as the Sellers' Representative.

** REMAINDER OF PAGE INTENTIONALLY LEFT BLANK **

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

DALLAS STARS, L.P.

By: _____
    Name:  Robert Hutson
    Title:   Chief Financial Officer


DALLAS ARENA LLC

By: _____
    Name:  Robert Hutson
    Title:   Chief Financial Officer


STARCENTERS LLC

By: _____
    Name:  Robert Hutson
    Title:   Chief Financial Officer


DALLAS STARS U.S. HOLDINGS CORP.

By: _____
    Name:  Robert Hutson
    Title:   Treasurer

DALLAS SPORTS & ENTERTAINMENT, L.P.

By: DSE GP, Inc., its General Partner

By: _____
    Name: Tom Gaglardi
    Title: President


DSE HOCKEY CLUB, L.P.

By: DSE Hockey Club GP, Inc., its General Partner

By: _____
    Name: Tom Gaglardi
    Title: President


DSE HOCKEY CENTERS, L.P.

By: DSE Hockey Center GP, Inc., its General Partner

By: _____
    Name: Tom Gaglardi
    Title: President


DSE PLANO GP, INC.

By: _____
    Name: Tom Gaglardi
    Title: President


Tom Gaglardi, in his individual capacity, solely with respect to Sections 9.12, 12.8 and Article XIII of this Agreement

_____

# Exhibit 3

## Summary and Notice

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

```
------------------------------------------------------------------  x
                                                                    :
In re                                                               :    Chapter 11
                                                                    :
DALLAS STARS, L.P., et al.[1]                                       :    Case No. 11 -_____ (___)
                                                                    :
          Debtors.                                                  :    Joint Administration
                                                                    :    Requested
------------------------------------------------------------------  x
```

### NOTICE OF (A) COMMENCEMENT OF CHAPTER 11 CASES, (B) BIDDING PROCEDURES, (C) COMBINED HEARING TO APPROVE DISCLOSURE STATEMENT, PREPETITION SOLICITATION PROCEDURES, AND SALE AND TO CONFIRM PREPACKAGED PLAN, (D) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND (E) ESTABLISHMENT OF OBJECTION DEADLINE -AND- <u>SUMMARY OF PREPACKAGED PLAN OF REORGANIZATION</u>

**NOTICE IS HEREBY GIVEN** as follows:

**A.**     <u>**Commencement of Chapter 11 Cases**</u>

1.      On September 15, 2011, (the "<u>Commencement Date</u>") Dallas Stars, L.P. ("<u>Dallas Stars</u>") Dallas Arena LLC ("<u>Dallas Arena</u>"), Dallas Stars U.S. Holdings Corp. ("<u>U.S. Holdings</u>"), and StarCenters LLC ("<u>StarCenters</u>") as debtors and debtors in possession (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

2.      On the Commencement Date, the Debtors filed the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code (the "<u>Prepackaged Plan</u>") and the proposed Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P. *et al.* Under Chapter 11 of the Bankruptcy Code (the "<u>Disclosure Statement</u>") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.  Copies of the Prepackaged Plan and the Disclosure Statement may be obtained upon request of the Debtors' counsel at the addresses specified below and are on file with the Clerk of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485); and StarCenters LLC (4430).

Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours of 8:00 a.m.– 4:00 p.m. Eastern Time.  The Prepackaged Plan and the Disclosure Statement also are available for inspection on the Bankruptcy Court's internet site at www.deb.uscourts.gov and the internet site of the Debtors' solicitation agent, The Garden City Group at www.dslpinfo.com.

3.	Also on the Commencement Date, the Debtors filed a motion (the "Bidding Procedures Motion") for entry of an order (the "Bidding Procedures/Confirmation Scheduling Order") (i) approving the Bidding Procedures (as set forth in the Bidding Procedures/Confirmation Scheduling Order, the "Bidding Procedures") for a Sale (the "Sale") of substantially all of the assets of the Debtors (the "Purchased Assets") pursuant to the Prepackaged Plan; (ii) scheduling an auction (the "Auction"); (iii) scheduling a combined hearing to approve the Disclosure Statement, Prepetition Solicitation Procedures, and Sale and to confirm the Prepackaged Plan (the "Combined Hearing"); and (iv) approving this Notice.

4.	The primary purpose of the Prepackaged Plan is to effectuate the sale of the NHL Stars franchise and certain related assets.

**B.	Bidding Procedures**

5.	The Bidding Procedures shall govern the submission and acceptance of all bids.

6.	On _____, 2011, the United States Bankruptcy Court for the District of Delaware entered the Bidding Procedures/Confirmation Scheduling Order, approving the Bidding Procedures.

**7.	Copies of the Stalking Horse Asset Purchase Agreement, the Bidding Procedures/Confirmation Scheduling Order, the Bidding Procedures, and the proposed Confirmation Order[2] are available upon request to the Debtors' noticing agent at (888) 579-1198 or www.dslpinfo.com.  Parties interested in receiving more information regarding the Purchased Assets and/or copies of any related document may make a written request to: (i) Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas  75201 (Attn: Martin A. Sosland, Esq. and Charles M. Persons, Esq.), co-counsel for the Debtors, and/or (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware  19801 (Attn: John H. Knight, Esq. and Zachary I. Shapiro, Esq.), co-counsel for the Debtors.**

**PLEASE CONSULT THE BIDDING PROCEDURES IF YOU ARE INTERESTED IN SUBMITTING A BID.  THE BIDDING PROCEDURES CONTAIN THE FOLLOWING IMPORTANT DEADLINES:**

_____

[2] Capitalized terms used and not otherwise defined shall have the meanings ascribed to them in the Prepackaged Plan.

US_ACTIVE\43802348\04\40036.0005
RLF1 5345297v. 1

8. The deadline to submit the Background Portion of the NHL Application (each as defined in the Bidding Procedures), if potential bidder has not already done so in connection with the Sale, is on _____, 2011.

9. The deadline to submit a Qualified Bid (as defined in the Bidding Procedures) is on _____, 2011, at 4:00 p.m. (Eastern Time) (the "<u>Bid Deadline</u>").

10. An Auction for the Sale of the Purchased Assets, if one is needed, has been scheduled for _____, 2011, at 10:00 a.m. (Central Time) at the offices of Weil, Gotshal & Manges LLP located at 200 Crescent Court, Suite 300, Dallas, Texas 75201.

## C. Combined Hearing to Approve Disclosure Statement, Prepetition Solicitation Procedures, and Sale and to Confirm Prepackaged Plan

11. The Combined Hearing to consider the adequacy of the Disclosure Statement, approval of the Prepetition Solicitation Procedures, approval of the Sale, and confirmation of the Debtors' Prepackaged Plan and any objections thereto and to consider any other matter that may properly come before the Bankruptcy Court will be held before the Honorable _____, United States Bankruptcy Judge, in Room _____ of the United States Bankruptcy Court, 824 Market Street, _____ Floor, Wilmington, Delaware 19801, on , _____, 2011 at __:__ _.m. (Eastern Time) or as soon thereafter as counsel may be heard. The hearing to consider the confirmation of the Debtors' Prepackaged Plan and any objections thereto is scheduled to commence immediately following the Bankruptcy Court's approval of the adequacy of the Disclosure Statement, approval of the Prepetition Solicitation Procedures, and approval of the Sale. The Combined Hearing may be adjourned from time to time without further notice other than an announcement of the adjourned date or dates at the Combined Hearing or at an adjourned Combined Hearing and will be available on the electronic case filing docket. The time scheduled at the Combined Hearing for the confirmation of the Debtors' Prepackaged Plan may be rescheduled by the Bankruptcy Court in the event that the Bankruptcy Court does not find compliance with the disclosure requirements or the Bidding Procedures or for any other reason. Notice of the rescheduled date or dates, if any, will be provided by an announcement at the Combined Hearing or at an adjourned Combined Hearing and will be available on the electronic case filing docket.

## D. Assumption and Assignment of Certain Executory Contracts

12. Pursuant to section 9.1 of the Prepackaged Plan, as of the Effective Date, the Debtors shall assume and assign to the Purchaser, pursuant to sections 365(a) and (f) of the Bankruptcy Code, each executory contract and unexpired lease to which it is a party other than the Excluded Contracts. Excluded Contracts generally include (i) the Asset Purchase Agreement and all documents related thereto, (ii) all contracts between the Debtors and any broker or investment banker related to the Asset Purchase Agreement, other than GSP Securities LLC, (iii) except as set forth on <u>Schedule 1.1(a)(i)</u> of the Asset Purchase Agreement, all contracts between the Debtors and any Affiliate of the Debtors or any other Hicks Affiliate (other than contracts to which the only parties that are Affiliates of the Debtors or any other Hicks Affiliate consist of

(A) any Debtor and any other Debtor or (B) any Debtor and any Transferred Subsidiary), (iv) the contracts listed on Schedule 1.1(a)(ii) of the Asset Purchase Agreement, and (v) the First Lien Credit Agreement and Second Lien Credit Agreement, and all contracts related thereto. Unless an executory contract or unexpired lease is an Excluded Contract, it will be assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code and the Asset Purchase Agreement. On the Effective Date, each Excluded Contract that is an executory contract or unexpired lease shall either be terminated by its terms or assumed by the Debtors. Pursuant to section 9.3 of the Prepackaged Plan, all claims related to the rejection of executory contracts and unexpired leases are classified as Non-Assumed General Unsecured Claims and not entitled to a distribution. Please refer to sections 9.1, 9.2 and 9.3 of the Prepackaged Plan for more information on the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases.

13. Because the Debtors received authority from the Bankruptcy Court to pay the prepetition claims of certain trade and other unsecured creditors consistent with the terms of such obligations existing on the Commencement Date, or with past practice, the Debtors do not believe they owe any monetary amounts under any executory contract or unexpired lease to be assumed and assigned to the Purchaser under section 365(b)(1) of the Bankruptcy Code ("Cure Amount").

14. Any party wishing to object to such assumption or assumption and assignment, or to assert that a Cure Amount is owed must follow the instructions described herein for filing objections to the Prepackaged Plan and, with any objection, include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates. Any counterparty that does not object to the assumption or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, shall be deemed to have consented to such assumption or assumption and assignment. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the executory contract or unexpired lease assumption or assumption and assignment as of the Effective Date and, for all assumed contracts and leases, shall constitute an adjudication of the accuracy of the Debtors' proposed Cure Amounts. A failure to contest such accuracy through an objection to confirmation of the Prepackaged Plan will waive a counterparty's right to any other or additional Cure Amount, including the payment of any unpaid claims on the assumed contract or lease.

15. If there is a dispute regarding (i) the nature and amount of any Cure Amount; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed as assigned; or (iii) any other matter pertaining to assumption and assignment that is unresolved as of the Effective Date, cure shall occur within seven days following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

US_ACTIVE:\43802348\04\40036.0005
RLF1 5345297v. 1

## E.     **Establishment of Objection Deadline**

16.     Objections, if any, to the adequacy of the Disclosure Statement, approval of the Prepetition Solicitation Procedures, the Sale of the Purchased Assets, the Assumption and Assignment of Certain Executory Contracts, or the confirmation of the Prepackaged Plan must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before on or before ___ p.m. (Eastern Time) on _____ 2011 (the "Objection Deadline"); and (d) be served upon: (i) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin A. Sosland and Weil Gotshal & Manges LLP, 767 Fifth Ave., New York, New York 10153 attn: Ronit J. Berkovich); (ii) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (iii) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan and J. Gregory Milmoe); (iv) counsel to JPMorgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: Mitchell A. Seider and Joseph S. Fabiani); and (v) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006-5417, attn: Andrew M. LeBlanc); (vi) counsel to the Stalking Horse (Baker & McKenzie LLP, 181 Bay Street, Suite 2100, Toronto, Ontario, Canada M5J2T3, attn: Jim Rossiter). **UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE BIDDING PROCEDURES MOTION WITHOUT FURTHER HEARING AND NOTICE.**

## Summary of Prepackaged Plan of Reorganization[3]

17.     The Prepackaged Plan provides for the following distributions on the Effective Date, except to the extent any claimholder agrees to less favorable treatment:

(i)     except as otherwise described in sub-paragraph (iii) below, holders of First Lien Secured Claims will receive their pro rata share (in accordance with the First Lien Security Agreement) of the Secured Creditor Consideration up to the full Allowed amount of such Claim, including accrued interest under the First Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of First Lien Secured Claims is in the form of secured debt obligations to the holders of First Lien Secured Claims payable by the Purchaser,

---

[3] The statements contained herein are summaries of the provisions contained in the Disclosure Statement and the Prepackaged Plan and do not purport to be precise or complete statements of all the terms and provisions of the Prepackaged Plan or documents referred therein. For a more detailed description of the Prepackaged Plan, please refer to the Disclosure Statement.

such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement;

(ii) holders of Second Lien Secured Claims will receive their pro rata share of the Secured Creditor Consideration remaining after the Discharge of First Lien Obligations (including payment of accrued interest under the First Lien Credit Agreement through the Effective Date), up to the full Allowed amount of the Second Lien Secured Claim, including accrued interest under the Second Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement;

(iii) <u>if each of Classes 3A through 3D votes to accept the Prepackaged Plan</u>, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; *provided, however*, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent hereunder shall be in the form of a secured debt obligation in the original principal amount of $500,000; *provided further, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement;

(iv) holders of any Non-Assumed General Unsecured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Non-Assumed General Unsecured Claim; and

(v) holders of existing Equity Interests in Debtors shall be maintained; *provided, however,* the holders of the Allowed Equity Interests in Debtors shall not be entitled to transfer such Allowed Equity Interests in Debtors to any party, and shall not receive or retain any property or interest in property on account of such Allowed Equity Interests in Debtors.

Further, the Prepackaged Plan does not impair tax claims, priority claims, administrative expense claims, or assumed general unsecured claims. **HOLDERS OF ASSUMED GENERAL UNSECURED CLAIMS WILL BE PAID IN FULL UNDER THE**

**PREPACKAGED PLAN, AND TRADE VENDORS WILL BE PAID IN THE ORDINARY COURSE OF BUSINESS THROUGHOUT THE PENDENCY OF THE CHAPTER 11 PROCEEDINGS.**

18. The Prepackaged Plan provides for the classification and treatment of holders of Claims and interests allowed under section 502 of the Bankruptcy Code. Only the holder of an Allowed Claim is entitled to receive a distribution under the Prepackaged Plan. The following chart summarizes the treatment provided by the Prepackaged Plan to each class of claims and interests and indicates the acceptance or rejection of the Prepackaged Plan by each class:

| Class | Designation | Impairment | Entitled to Vote | Acceptance Percentage |
|-------|-------------|------------|------------------|-----------------------|
| Classes 1A-1D | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) | N/A |
| Classes 2A-2D | First Lien Secured Claims | Impaired | Yes | |
| Classes 3A-3D | Second Lien Secured Claims | Impaired | Yes | |
| Class 4A | CFV Claim | Unimpaired | No (deemed to accept) | N/A |
| Classes 5A-5D | Secured Tax Claims | Unimpaired | No (deemed to accept) | N/A |
| Classes 6A-6D | Other Secured Claims | Unimpaired | No (deemed to accept) | N/A |
| Classes 7A-7D | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) | N/A |
| Classes 8A-8D | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) | N/A |
| Classes 9A-9D | Equity Interests in Debtors | Impaired | No (deemed to reject) | N/A |

**If you have questions about this Notice or the Prepackaged Plan, please contact the Debtors' claims and noticing agent at (888) 579-1198. If you wish to object to the Prepackaged Plan, you must follow the instructions above for filing a formal objection.**

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

Dated: Wilmington, Delaware
_____, 2011

_____

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Zachary I. Shapiro (No. 5103)
Julie A. Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
      – and –

Martin A. Sosland
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Facsimile:    (214) 746-7777

Ronit J. Berkovich
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for Debtors and
Debtors in Possession*
