**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                 :

**In re**                              :    **Chapter 11**
                                   :

**DALLAS STARS, L.P., _et al.,_[1]**       :    **Case No. 11-_____ (___)**
                                   :

      **Debtors.**                    :    **Joint Administration**
                                   :    **Requested**
---------------------------------------------------------------- x

### DECLARATION OF ROBERT L. HUTSON IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

       I, Robert L. Hutson, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

       1.     I am the Chief Financial Officer of Dallas Stars, L.P. ("Dallas Stars"), Dallas Arena LLC ("Dallas Arena"), and StarCenters LLC ("StarCenters"), and Treasurer of Dallas Stars U.S. Holdings Corp. ("Holdings"), as debtors and debtors in possession, in the above-referenced chapter 11 cases (collectively, the "Debtors"). I have served in each such capacity for each such Debtor since November 2002, and, as such, I am familiar with the day-to-day operations, business, and financial affairs of each of the Debtors.

       2.     I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases (the "Chapter 11 Cases") and in support of (i) the Debtors' voluntary petitions

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corp. (0485); and StarCenters LLC (4430).

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Commencement Date") and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "First Day Pleadings").

3. The First Day Pleadings seek relief aimed at preserving the value of the Debtors and maintaining the continuity of their operations by, among other things, (a) continuing the operations of the Debtors, including professional ice hockey play, and continuing the operations of ice rinks and team stores that are also assets of the Debtors; (b) preserving the Debtors' relationships with their fans, players and other employees, customers, vendors, and suppliers; (c) ensuring continued employee morale; (d) maintaining the Debtors' cash management systems and other business operations without interruption; and (e) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

# I.

# INTRODUCTION

5. Crushing debt and a protracted out-of-court sale process have marked the last few years of the Debtors' history and the Debtors have calculated that as of approximately November 30, 2011, they will no longer be able to meet their current operating expenses,

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

including player and coach salaries and other employee wage obligations, absent additional sources of funding. The Debtors have filed these Chapter 11 Cases to effectuate a sale (the "Sale"), through a competitive auction process, of substantially all of the assets of the Debtors (the "Purchased Assets"), including (i) the professional ice hockey team that is a member of the National Hockey League ("NHL" or the "League") and is known as "the Dallas Stars" (the "NHL Stars"); (ii) their interests in four ice arenas and related assets located in the Dallas-Fort Worth metroplex known as the "Dr Pepper StarCenters";[2] and (iii) all of the ownership interests held by Dallas Arena in and to Center Operating Company, L.P. ("COC") and Center GP, LLC ("Center GP"), which own the leases and agreements related to the American Airlines Center ("AAC"), the arena where the NHL Stars play their home games. The purpose of the Sale is to allow for a transition in ownership of the NHL Stars, while ensuring that the team continues to play professional ice hockey at the AAC in Dallas. As described in greater detail in the Disclosure Statement at Section I.A.3, the Debtors are contractually bound by a number of agreements that require that the team remains in Dallas and plays its home games at the AAC. The Debtors are unequivocally committed to a long future of the NHL Stars playing hockey in Dallas. To that end, no bid submitted during the bidding process will be considered that contemplates moving the team from the AAC in Dallas. I have been advised that the Sale will be consummated on the effective date of the Prepackaged Plan (the "Effective Date").

---

[2] The Sale may include a fifth Dr Pepper StarCenter located in Plano, Texas that is owned by a non-debtor entity, Plano StarCenter LLC. That facility is currently being closed for repairs and will be non-operational for a significant period of time. As described in the Disclosure Statement (defined herein) at Section I.C.8, whether that facility is included in the Sale depends, among other things, on whether the Debtors obtain consent from an entity that holds a security interest in substantially all of the assets of Plano StarCenter LLC, including the ice arena. Notwithstanding the foregoing, as described in the Disclosure Statement at Section I.C.8, the purchase price under the Stalking Horse Asset Purchase Agreement will not be adjusted if the Debtors' interest in the Plano StarCenter LLC ice arena is not transferred in connection with the Sale.

6.	After a lengthy marketing process and substantial discussions involving input from the NHL and certain of the Debtors' senior secured lenders, prior to the Commencement Date, the Debtors finalized an asset purchase agreement (the "Stalking Horse Asset Purchase Agreement") with Dallas Sports & Entertainment, LP and certain of its affiliates (the "Stalking Horse" or the "Proposed Buyers") providing for the Sale to the Stalking Horse, subject in all respects to NHL approval, of the Purchased Assets under a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, and subject to higher or better offers in the bidding process and to NHL approval of both any bid and any bidder.

7.	Prior to the Commencement Date, the Debtors prepared the *Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al. Under Chapter 11 of the Bankruptcy Code* (the "Prepackaged Plan") and the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al. Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"),[3] each of which was filed concurrently herewith, and conducted a prepetition solicitation of the holders of impaired claims entitled to vote on the Prepackaged Plan under the Bankruptcy Code (the "Solicitation").

8.	I understand that there were two classes of impaired claims that were entitled to vote on the Prepackaged Plan. The class consisting of the Debtors' first lien lenders in Class 2 voted to accept the Prepackaged Plan by 100% in amount and 100% in number of those voting.[4] The class consisting of the Debtors' second lien lenders in Class 3 voted to accept the

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Prepackaged Plan, as the case may be.

[4] Of the total number of holders of First Lien Secured Claims, 79.3% cast a Ballot, representing 93.5% of the outstanding amount of the First Lien Secured Claims.

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

Prepackaged Plan by 89.6% in amount and 85.7% in number of those voting.[5]  I am advised that subject to Bankruptcy Court approval, the votes obtained are sufficient to obtain confirmation of the Prepackaged Plan under the Bankruptcy Code.

        9.      Contemporaneous with the filing of these Chapter 11 Cases, the Debtors have filed a motion seeking Bankruptcy Court (I) approval of (a) the Stalking Horse Asset Purchase Agreement, including certain protections for the Stalking Horse, (b) bidding procedures (the "Bidding Procedures"), and (c) the Disclosure Statement and related solicitation procedures, and (II) the scheduling of hearings to consider the foregoing and confirmation of the Prepackaged Plan (the "Bidding Procedures and Confirmation Scheduling Motion").  The Bidding Procedures contemplate that the Debtors will market the Purchased Assets further postpetition, potential purchasers will be provided the opportunity to submit bids for the Purchased Assets that are higher or better than the Stalking Horse's bid, an auction (the "Auction") will be held if more than one qualified bid is received, and the Debtors will sell the Purchased Assets either to the successful bidder at the Auction (the "Successful Bidder"), or if there is only one qualified bidder, to that qualified bidder.  Importantly, the Bidding Procedures also provide that all bids and all bidders are subject to approval of the NHL and the Bankruptcy Court.  The term "Asset Purchase Agreement" as used in the Prepackaged Plan, the Disclosure Statement, and herein, refers to the purchase agreement submitted by the ultimate "Purchaser."  If the only bid to receive NHL approval is the Stalking Horse Asset Purchase Agreement and as a result there is no Auction, then the Stalking Horse Asset Purchase

---

[5] Of the total number of holders of Second Lien Secured Claims, 77.8% cast a Ballot, representing 92.2% of the outstanding amount of the Second Lien Secured Claims, and those voting in favor constitute 66.7% in number and 82.6% in amount of 100% of the Second Lien Secured Claims.

Agreement will be the Asset Purchase Agreement and the Stalking Horse will be the Purchaser under the Prepackaged Plan.

10. I am further advised that the consideration that will be paid under the Asset Purchase Agreement will be available for distribution to the holders of certain Claims under the Prepackaged Plan. Under the Stalking Horse Asset Purchase Agreement (if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement), the Stalking Horse will pay the Claims (the "CFV Claim") of CFV I LLC, an affiliate of the NHL (the "Prepetition CFV Lender"), in full in Cash upon consummation of the Sale. I am advised that under the Stalking Horse Purchase Agreement, the Stalking Horse has agreed to assume all liabilities other than a limited number of specified liabilities expressly excluded (generally obligations owed to affiliates of the Debtors, as described below and in the Disclosure Statement in more detail). As such, trade creditors of the Debtors are intended to be unaffected by the Prepackaged Plan, and the Debtors have filed a motion concurrently herewith to seek Bankruptcy Court approval to be able to continue to pay all trade creditors of the Debtors that continue to provide normal trade credit terms in the ordinary course of business during the pendency of these Chapter 11 Cases.

11. I have been told by my advisors that the consideration distributable to holders of First Lien Secured Claims under the Prepackaged Plan would, pursuant to the Stalking Horse Asset Purchase Agreement if the Stalking Horse is the Successful Bidder, consist of obligations of the Stalking Horse pursuant to a senior secured term loan facility in an aggregate original principal amount equal to $100,000,000, as adjusted by the Purchase Price Adjustment (as defined below), plus an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount, plus any cash or non-cash assets required to be paid

to holders of First Lien Secured Claims as a result of the Purchase Price Adjustment, plus any cash left over in the Debtors' estates upon dissolution.

12.     I also understand that competing bidders may provide different forms of consideration to the holders of First Lien Secured Claims, as long as the aggregate value of such consideration satisfies the value requirements set forth in the Bidding Procedures.  However, no competing bidder (other than the Stalking Horse) may bid with consideration in the form of indebtedness to the holders of First Lien Secured Claims unless agreed to in writing by the First Lien Administrative Agent with the consent of the holders of a majority of the First Lien Secured Claims.

13.     Because the Prepackaged Plan provides for an Auction and a competitive bidding process for the Debtors' assets, the Debtors do not believe that there is an alternative to the Prepackaged Plan that would provide holders of Claims, including holders of Second Lien Secured Claims, with a greater realization on the Debtors' assets.  In light of the fact that the proceeds of the Sale under the Stalking Horse Asset Purchase Agreement would not be sufficient to pay the holders of the First Lien Secured Claims in full, the holders of Second Lien Secured Claims are not entitled to receive a distribution under the Prepackaged Plan unless the Auction yields Qualified Bids (as defined in the Bidding Procedures) and such bids provide for the satisfaction in full, in cash, and complete discharge of the obligations under the First Lien Credit Agreement.

14.     Notwithstanding the foregoing, as inducement to holders of Second Lien Secured Claims to vote in favor of the Prepackaged Plan, the holders of First Lien Secured Claims have agreed to share $500,000 of the consideration they would otherwise receive under the Prepackaged Plan—either in secured notes or cash, as the case may be—if the holders of

Second Lien Secured Claims vote to accept the Prepackaged Plan. Specifically, I understand that the Prepackaged Plan provides that if each of Classes 3A through 3D votes to accept the Prepackaged Plan, then notwithstanding the Intercreditor Agreement that governs the rights between the holders of First Lien Secured Claims and the holders of Second Lien Secured Claims, the Second Lien Administrative Agent shall receive $500,000 of the consideration that would otherwise have been distributed to holders of First Lien Secured Claims, which shall be in the form of secured notes (such as the Stalking Horse Senior Secured Obligations) with a principal amount of $500,000 if the consideration being provided under the Asset Purchase Agreement to holders of First Lien Secured Claims consists of at least $500,000 in secured notes and shall otherwise be in cash. In addition, whether or not the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan, the holders of First Lien Secured Claims have agreed that the holders of Second Lien Secured Claims will receive, on the Effective Date, the Second Lien Expense Reimbursement, as defined in Section 1.92 of the Prepackaged Plan, that generally includes the fees of the Second Lien Administrative Agent's attorneys and accounting advisors, up to $25,000, to review the documents relating to the consideration to be provided to the holders of Second Lien Secured Claims under the Prepackaged Plan.

15. The Prepackaged Plan is the result of months of discussions among the Debtors, the NHL, the Stalking Horse, and certain of the Debtors' lenders, and the Sale will be the product of a lengthy marketing process that yields the highest or best value for the Debtors' assets. After an extensive analysis of their options, the Debtors believe that confirmation of the Prepackaged Plan, including consummation of the Sale, is in the best interest of all creditors and equity holders, and is in the best interest of the NHL Stars and the NHL. Therefore, in light of the Debtors' impending inability to continue to fund operations and debt service and the support

obtained for the Prepackaged Plan and the Sale contemplated therein, it is imperative that these Chapter 11 Cases proceed expeditiously to confirmation of the Prepackaged Plan and the closing of the Sale.

16.     This Declaration is intended to provide a summary overview of the Debtors' businesses and these Chapter 11 Cases. Parts II through VI of this Declaration provide a description of the Debtors' organizational structure and businesses, capital structure, the circumstances giving rise to the commencement of these Chapter 11 Cases, the Sale, and the Prepackaged Plan. Part VII summarizes the First Day Pleadings and the relief they seek, which the Debtors believe is crucial to the effective administration of these Chapter 11 Cases.

## II.

## THE DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES

### A.     The Company

17.     Dallas Stars, a Delaware limited partnership and a wholly-owned subsidiary of HSG (as defined below), owns and operates the NHL Stars. Dallas Stars owns 100% of the equity interests of StarCenters, U.S. Holdings, and Plano StarCenter LLC, a Texas limited liability company ("Plano StarCenter") and directly owns a 99% equity interest in Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company ("Hockey Enterprises").[6] As described in greater detail herein, Dallas Stars also leases (i) the Dr Pepper Arena in Frisco, which is the practice facility home to the NHL Stars and home arena for the Texas Tornado of the North American Hockey League and the Texas Legends of the NBA

---

[6] Hockey Enterprises holds a limited partnership interest in NHL Enterprises Canada, L.P. and is a stockholder of National Hockey League Enterprises Canada, Inc., the general partner of NHL Enterprises Canada, L.P.

Development League, (ii) the Dr Pepper StarCenter in Euless, (iii) the Dr Pepper StarCenter in Farmers Branch, and (iv) the Dr Pepper StarCenter in McKinney at Craig Ranch.

18.     Dallas Arena, a Texas limited liability company and a wholly-owned subsidiary of HSG, was formed for the purpose of holding HSG's ownership interest in COC, which is described below.  Specifically, Dallas Arena directly owns a 50% member interest in Center GP, a Texas limited liability company, and a 49.95% limited partnership interest in COC. Center GP owns a 0.1% interest in, and is the general partner of, COC.

19.     U.S. Holdings, a Delaware corporation and a direct, wholly-owned subsidiary of Dallas Stars, owns a 1% equity interest in Hockey Enterprises.

20.     StarCenters, a Texas limited liability company and a direct, wholly-owned subsidiary of Dallas Stars, is the employer of personnel of the Dr Pepper StarCenters, which are described below.

21.     Below is a current organizational chart for the Debtors and certain non-debtor related entities:

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

The Debtors and Certain Non-Debtor Affiliates and Related Entities as of September 2011



## B.    The National Hockey League.

22.    The NHL was founded in Montreal, Canada, in 1917 and is considered the premier professional ice hockey league in the world.  The NHL expanded into the U.S. in 1924 and currently has 30 teams across North America (the "NHL Member Clubs").  The NHL divides teams into two conferences, the Eastern Conference and the Western Conference.  Each conference has three divisions and each division has five teams.  The NHL regular season generally begins in October and runs through the middle of April with the playoffs continuing

into early June.  Each team plays an 82 game schedule, consisting of 41 games at home and 41 games on the road.

23.     The NHL is a joint venture organized as an unincorporated not-for-profit association.  Some of the NHL's primary responsibilities include:  regulating the conduct of its member franchises; negotiating League-wide agreements on behalf of its member franchises; and establishing the teams' regular season and playoff schedules.

24.     The NHL is governed according to the NHL Rules (as defined in the Disclosure Statement).  The current commissioner of the NHL (the "NHL Commissioner"), Gary Bettman, has served in that capacity since 1993.  The governing body of the NHL is the Board of Governors of the NHL, as established under the NHL Constitution ("BOG"), which includes one member from each NHL Member Club.  The NHL Commissioner is selected by the BOG. Among other things, the BOG is responsible for approving certain critical League actions, including the sale or relocation of a franchise.

**C.     The NHL Stars.**

25.     The NHL Stars are an exceptional professional hockey team, located in the fourth largest metropolitan area and one of the largest high-growth markets in the U.S.  The NHL Stars are the only NHL team in Texas or any of its bordering states, giving it a truly regional fan base that extends across a five-state region.  Founded in 1966 in Minneapolis, Minnesota as the North Stars, the team relocated to Dallas-Fort Worth in 1993 and was renamed "the Dallas Stars."  The NHL Stars currently compete in the NHL's Pacific Division, together with the Anaheim Ducks, the Los Angeles Kings, the Phoenix Coyotes, and the San Jose Sharks.

26.     The NHL Stars' 2011/2012 roster is expected to include core players Brenden Morrow, Mike Ribeiro, Steve Ott, Loui Eriksson, Alex Goligoski, Stephane Robidas,

Jamie Benn, and Kari Lehtonen.  The NHL Stars' hockey operations and coaching staff include six key members that collectively have over 100 years of experience with professional ice hockey.  The Debtors employ approximately 57 players, 154 full-time employees, and 284 part-time employees.

**D.  COC Operations and the American Airlines Center.**

27.  COC, a Texas limited partnership, is a joint venture between Dallas Arena and certain entities controlled by Mark Cuban, the owner of the Dallas Mavericks (the "Mavericks"), a professional basketball team and a member of the National Basketball Association.  COC leases and operates the AAC, the home arena for the NHL Stars and the Mavericks.

28.  The AAC is an award-winning, state-of-the-art entertainment facility near downtown Dallas with a total hockey seating capacity of approximately 18,500, including luxury seats and suites.  The AAC hosts many other premier sporting events, concerts, family shows, and business and special events.  COC, as lessee, has a 30-year lease agreement for the AAC with the City of Dallas, as lessor, pursuant to the transactions described below.

29.  In 1998, certain entities related to the NHL Stars and the Mavericks entered into a 30-year lease (beginning September 2001) for the AAC with the City of Dallas, pursuant to that certain Lease Agreement, dated as of July 28, 1998 (the "Original AAC Lease"), by and between City of Dallas (the "AAC Lessor") and Arena/Dallas Stars, Inc. (predecessor in interest to Dallas Arena), Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc. (collectively, the "Original Arena Group"), and that certain Option Contract, dated as of July 28, 1998 (the "Arena Option Contract"), by and between City of Dallas and the Original Arena Group.

30.     Subsequently, COC assumed the obligations of the Original Arena Group on the Original AAC Lease, pursuant to that certain Assignment and Assumption Agreement, dated as of September 30, 1999, by and among the Original Arena Group and COC (the "COC AAC Assignment").  In connection with the COC AAC Assignment, COC also assumed the rights of the Original Arena Group under the Arena Option Contract.

31.     Dallas Stars uses the AAC as its home arena for the NHL Stars' NHL hockey games under a 30-year sublease between COC and Dallas Stars, as sublessee, pursuant to (i) that certain Second Amended and Restated Arena Lease—Dallas Stars, dated as of May 22, 2002 but effective as of July 28, 1998, by and between COC and Dallas Stars, as amended by that certain First Amendment to Second Amended and Restated Arena Lease—Dallas Stars, dated as of November 16, 2005 but effective as of July 1, 2003, by and between COC and Dallas Stars, as further amended by that certain Second Amendment to Amended and Restated Arena Lease—Dallas Stars, dated as of November 29, 2005, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease—Dallas Stars, dated as of May 12, 2010, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease—Dallas Stars, dated as of March 23, 2011, by and between COC and Dallas Stars and (ii) the Arena Option Contract (as amended and restated, the "COC Sublease").

E.     **The Dr Pepper StarCenters.**

32.     Historically, to support and nurture the popularity of ice hockey in the Dallas-Fort Worth area, Dallas Stars partnered with the Texas cities of Euless, Farmers Branch, Frisco, and McKinney to build ice skating/hockey facilities, and Dallas Stars also acquired an ice skating/hockey facility in Plano, Texas.  Dallas Stars leases and operates the arena facilities in

Euless, Farmers Branch, Frisco, and McKinney. Plano StarCenter owns and Dallas Stars operates the facility in Plano. Pursuant to a naming rights agreement with Dr Pepper, the facilities are named "Dr Pepper StarCenters."[7]

33. Today there are four Dr Pepper StarCenters available for use by youth and adult hockey players and ice skaters in the Dallas-Fort Worth metroplex. Dr Pepper StarCenters are an important integrated marketing tool for building the NHL Stars' brand. From time to time, the NHL Stars hold public practices in the various Dr Pepper StarCenters, to provide fans an opportunity to interact directly with the team.

**F. Corporate Structure and Current Officers.**

<u>**The Debtors' Parent Companies.**</u>

34. HSG Sports Group LLC, a Texas limited liability company ("<u>HSG</u>"), holds a direct 99% limited partnership interest in Dallas Stars and 100% of the member interests of Dallas Arena. HSG Partnership Holdings LLC, a Texas limited liability company ("<u>HSG Partnership</u>"), holds a direct 1% general partnership interest in Dallas Stars. HSG Partnership is a direct wholly-owned subsidiary of HSG. HSG and HSG Partnership are direct and indirect, respectively, wholly-owned subsidiaries of HSG Sports Group Holdings LLC, a Texas limited liability company ("<u>HSGH</u>").

35. HSGH is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks. In addition to indirectly owning the NHL Stars and a 50% interest in the AAC, HSGH previously indirectly owned the Texas Rangers Major League Baseball Club (the "<u>Texas Rangers</u>"). The Texas Rangers were directly

---

[7] The facility in Frisco is named "Dr Pepper Arena."

owned and operated by Texas Rangers Baseball Partners, a Texas general partnership ("TRBP"), an indirect subsidiary of HSGH. TRBP subsequently sold the Texas Rangers franchise to Rangers Baseball Express, LLC and certain of its related entities ("RBE") in August 2010.

**Current Principal Executive Officers.**

36.     The current principal executive officers of Dallas Stars are as follows:

- *Tony Tavares*. Tony Tavares was named interim president of Dallas Stars in January 2011. Mr. Tavares has had a wealth of past experience leading NHL franchises. Prior to joining Dallas Stars, Mr. Tavares helped The Walt Disney Company build the Mighty Ducks of Anaheim expansion team from the ground-up, serving as president of Disney Sports Enterprises from January 1993 to January 2002. During his time with Disney Sports, he also oversaw the acquisition of the California Angels Baseball Club in 1996 and served as president of the Angels until January 2002. From January 2002 until October 2006, Mr. Tavares served as president and chief executive officer of the Baseball Expos Limited Partnership, the professional baseball team that operated as the Montreal Expos, where he helped the franchise relocate to Washington, D.C. as the Washington Nationals, and eventually assisted the team through an ownership change. Mr. Tavares went on to become president and CEO of Sports Properties Acquisition Corporation, a publicly-traded limited-life company focused on buying a professional sports team, in July 2007. Mr. Tavares currently owns ProEminent Sports LLC, a sports and entertainment consulting firm.

- *Robert L. Hutson*. I was named Chief Financial Officer of Dallas Stars in November 2002 and I oversee all financial matters related to the team. Prior to joining Dallas Stars, I was a senior manager in the audit division of Arthur Andersen LLP. At Arthur Andersen, I provided audit and business advisory services to publicly traded and private companies. I also assisted clients during initial and secondary public offerings of equity and debt as well as mergers and acquisitions.

# III.

## PREPETITION INDEBTEDNESS AND OTHER MATERIAL ARRANGEMENTS

### A.    Debtor Guarantees Under HSG Credit Agreements.

37.    Each Debtor is a guarantor under (i) that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), by and among HSGH, HSG, certain subsidiaries of HSG (including the Debtors), as guarantors, the lenders party thereto from time to time (the "Prepetition First Lien Lenders"), JP Morgan Securities Inc., as joint lead arranger and joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, Barclays Bank PLC, as co-syndication agent, and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent (the "First Lien Administrative Agent") and (ii) that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, collectively, the "HSG Credit Agreements"), by and among HSGH, HSG, certain subsidiaries of HSG (including the Debtors), as guarantors, the lenders party thereto from time to time (the "Prepetition Second Lien Lenders," and together with the Prepetition First Lien Lenders, collectively, the "HSG Credit Agreement Lenders"), JP Morgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger and joint bookrunner, and GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent, collateral agent, and co-syndication agent (the "Second Lien Administrative Agent" and, collectively with the First Lien Administrative Agent and the HSG Credit Agreement Lenders, the "Prepetition HSG Lenders").  On March 31, 2009,

HSG failed to make a scheduled interest payment under the HSG Credit Agreements, and on April 7, 2009, the lenders to the HSG Credit Agreements accelerated the entire amount of indebtedness thereunder. As of July 31, 2011, approximately $250,889,000 in principal, interest, and expenses were owing under the First Lien Credit Agreement and approximately $146,232,000 in principal, interest, and expenses were owing under the Second Lien Credit Agreement.[8]

38.     The Debtors' guaranty obligations under the HSG Credit Agreements are secured by (i) a first priority lien in favor of the First Lien Administrative Agent for the benefit of the Prepetition First Lien Lenders (the "Prepetition First Lien") and (ii) a second priority lien in favor of the Second Lien Administrative Agent for the benefit of the Prepetition Second Lien Lenders (the "Prepetition Second Lien" and, together with the Prepetition First Lien, collectively, the "Prepetition HSG Credit Facility Liens") on substantially all of the Debtors' assets (the "Prepetition Collateral") pursuant to the following security agreements entered into in connection with the HSG Credit Agreements: (i) the Amended and Restated Pledge and Security Agreement, dated as of December 19, 2006 (the "First Lien Security Agreement"), by and among HSGH, HSG, and certain subsidiaries of HSG (including the Debtors), as grantors, and the First Lien Administrative Agent and (ii) the Second Lien Pledge and Security Agreement, dated as of December 19, 2006 (the "Second Lien Security Agreement" and together with the First Lien Security Agreement, the "HSG Security Agreements"), by and among HSGH, HSG, and certain subsidiaries of HSG (including the Debtors), as grantors, and the Second Lien Administrative Agent. The priority of the security interests and relative creditor rights between

---

[8] These amounts do not include First Lien Secured Claims that are based on Swap Agreements (as described below).

First Lien Administrative Agent, Prepetition First Lien Lenders, and the other "Secured Parties" (as defined in the First Lien Security Agreement), on the one hand, and the Second Lien Administrative Agent, Prepetition Second Lien Lenders and the other "Secured Parties" (as defined in the Second Lien Security Agreement) are set forth in that certain Intercreditor Agreement, dated as of December 19, 2006 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), pursuant to which the Prepetition Second Liens are made subject and subordinate to the Prepetition First Liens on all Prepetition Collateral.

39.     In connection with the execution of the HSG Credit Agreements, HSG was required to enter into interest rate agreements ("Swap Agreements") to protect against fluctuations in interest rates with a notional amount of at least 50% of the aggregate principal amount of the term loans made under the First Lien Credit Agreement and the Second Lien Credit Agreement. Each counterparty to a Swap Agreement was required to be an original lender under the First Lien Credit Agreement or an affiliate thereof. The amounts owing under the Swap Agreements are included as "Obligations" under the First Lien Credit Agreement,[9] and Claims based on Swap Agreements are treated as First Lien Secured Claims under the Prepackaged Plan.[10] In total, HSG entered into nine Swap Agreements, each of which was terminated by the counterparty as a result of the acceleration of the obligations under the HSG Credit Agreements. Neither the Debtors nor, to the knowledge of the Debtors, any of the other

---

[9] The First Lien Credit Agreement also provides that certain other types of hedge agreements also constitute "Obligations" as defined therein; however, as described below, the Debtors believe that the Swap Agreements are the only hedge agreements giving rise to Claims under the definition of "Obligations" in the First Lien Credit Agreement.

[10] A Claim arising under the Swap Agreements (the "Determined Hedge Claim") is defined in the Prepackaged Plan at Section 1.32.

"Loan Parties" under the HSG Credit Agreements have entered into any subsequent interest rate agreements or other hedge agreements. As of August 12, 2011, the aggregate amount of the obligations owing under the Swap Agreements, as a result of the early termination thereof, is estimated to be $16,665,498.[11]

**B.      NHL Consent Letter.**

         40.      Each Debtor is also a party to that certain letter agreement, dated as of December 19, 2006, among HSGH, HSG, the Debtors, certain other subsidiaries of HSG, the First Lien Prepetition Agent, the Second Lien Prepetition Agent, and the NHL (as amended, the "NHL Consent Letter"), pursuant to which the NHL authorized the incurrence of the obligations under the HSG Credit Agreements. In addition to providing the requisite NHL consent to the HSG Credit Agreements, the NHL Consent Letter prescribes a framework that governs the lending relationship among the Prepetition HSG Lenders, the Debtors, the NHL, and the other parties party thereto. For example, the NHL Consent Letter circumscribes the enforcement rights and remedies which the Prepetition HSG Lenders would otherwise have against Dallas Stars and the hockey-related assets. The NHL Consent Letter also imposes the guaranty limitations described in Section I.C.2 of the Disclosure Statement. Further, the NHL Consent

---

[11] This amount is based upon information obtained from the First Lien Administrative Agent based on stipulations to resolve proofs of claims publicly filed by swap counterparties during the jointly administered chapter 11 bankruptcy cases of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC in the U.S. Bankruptcy Court for the Northern District of Texas (Case Numbers 10-43624 and 10-43625, respectively). The claims of swap counterparties in the Chapter 11 Cases will be determined in accordance with the formula set forth in Section 1.32 of the Prepackaged Plan: (i) the allowed amount of such holder's Claim as stipulated by such holder and the debtors in *In re Rangers Equity Holdings, L.P., et al.*, Case No. 10-43624 (Bankr. N.D. Tex. 2010) on or about December 21, 2010, pursuant to docket entries No. 140, 143, 146, 155, and 159 in such case, *minus* (ii) the aggregate amount of any distributions on account of such Claims received by such holder from the First Lien Administrative Agent or First Lien Collateral Agent following December 21, 2010, *plus* (iii) interest accrued on such Claim following the date of such stipulation, calculated in a manner consistent with the calculation of post-termination interest utilized by the debtors in *In re Rangers Equity Holdings, L.P. et al.* in stipulating to such allowed Claim amounts on or about December 21, 2010.

Letter stipulates that the Debtors' guaranty obligations under the HSG Credit Agreements and HSG Security Agreements, as limited by the guaranty limitations described in Section I.C.2 of the Disclosure Statement (the "Prepetition First and Second Lien Obligations"), are subject to and subordinate to the NHL Constitution and Agreements (as defined in the NHL Consent Letter).

## C. Prepetition CFV Financing.

41. On January 14, 2011, Dallas Stars executed that certain Promissory Note (as amended and otherwise modified from time to time, together with the other agreements and instruments related thereto, the "CFV Debt Agreement") in favor of the Prepetition CFV Lender, pursuant to which the Prepetition CFV Lender agreed to make advances to Dallas Stars from time to time on an unsecured basis in an aggregate principal amount of up to $45,000,000 (the loans and other amounts outstanding under the CFV Debt Agreement are collectively referred to herein as the "CFV Debt Amount" and together with the Prepetition First and Second Lien Obligations, the "Prepetition Obligations").  Funds advanced under the CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders.  Substantially all available amounts have been advanced under the CFV Debt Agreement and the CFV Debt Amount has become due and payable as of June 30, 2011 subject to a grace period running through October 31, 2011.  As of August 31, 2011, the amount of CFV Debt Amount outstanding is approximately $51,384,000, inclusive of principal, interest and fees due in respect thereof.

42. Pursuant to the terms of the NHL Consent Letter, in the event that any of the Club Collateral (as defined in the NHL Consent Letter) or other Dallas Stars assets are sold, the proceeds shall be used first to pay all amounts due and owing by Dallas Stars, HSGH, HSG

Partnership, HSG, U.S. Holdings, and StarCenters or any of their respective affiliates to the

NHL, the Enterprise Entities (as defined in the NHL Consent Letter), any other entity formed

generally by the NHL member clubs after the date thereof, or any other member club, whether in

accordance with the terms of the NHL Constitution and Agreements (as defined in the NHL

Consent Letter), applicable law or otherwise (including, without limitation all amounts due and

owing by Dallas Stars with respect to the CFV Club Loan Documents (as defined in the NHL

Consent Letter)); second, to the extent permitted by law, to pay all amounts due and owing under

the First Lien Credit Agreement; third, to the extent permitted by law, to pay all amounts due and

owing under the Second Lien Credit Agreement; and then, as required by law, including, without

limitation to pay any amounts due and owing by Dallas Stars, HSGH, HSG Partnership, HSG,

U.S. Holdings and StarCenters or any of their respective affiliates to any of their respective

lenders or other creditors; provided, that the maximum aggregate amount of any such proceeds

applied pursuant to second and third above to pay or repay principal (including, without

limitation, the stated amount of any letters of credit), interest, expenses, indemnities, other

reimbursement obligations set forth in any Operative Document (as defined in the NHL Consent

Letter), or any other Obligations (as defined in the NHL Consent Letter) shall not exceed

$125 million plus the aggregate amount of funds disbursed to Dallas Stars pursuant to the CFV

Club Loan Documents on or after January 14, 2011 (minus the amount of disbursed funds the

proceeds of which are used by Dallas Stars to repay its obligations under the Existing Parallel

Facility Note (as defined in the NHL Consent Letter)).

**D.      Dallas Stars' Obligations Under Center Operating Company Debt.**

43.     In connection with the construction of the AAC, COC entered into that

certain Note Purchase Agreement, dated as of April 23, 1999 (as amended and otherwise

modified from time to time, the "COC Note Purchase Agreement"), by and among COC, as assignee of Arena/Dallas Stars, Inc. (predecessor in interest to Dallas Arena), Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., and the certain institutional investors named therein, providing for the issuance and sale by COC of (i) the Series A Senior Secured Notes due 2023 in an aggregate principal amount of $115,000,000, (ii) the Series B Senior Secured Notes due 2023 in an aggregate principal amount of $68,129,142, (iii) the Series C Senior Secured Notes due 2012 in an aggregate principal amount of $20,899,469, and (iv) the Series E Senior Secured Notes due 2011 in an aggregate principal amount of $10,000,000[12] (collectively, the "COC Notes").

44. Except with respect to the Arena Pledge Agreement (as defined below), neither Dallas Stars nor Dallas Arena is directly or indirectly liable under the COC Note Purchase Agreement. As a condition precedent to the COC Note Purchase Agreement, however, Dallas Stars entered into that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time, the "Team Agreement"), pursuant to which Dallas Stars agreed that, upon the occurrence of certain "Trigger Events" (as defined therein), including the filing of a bankruptcy case by Dallas Stars, and after the delivery of a Trigger Event Put Notice (as defined therein) by the Required Holders (as defined therein) to Dallas Stars, Dallas Stars would be required to purchase 50% of the outstanding principal amount of the COC Notes under certain specified terms and procedures (the "Required COC Note Purchase Obligation"). Furthermore, it is an event of default under the COC Note Purchase Agreement if the Required COC Note Purchase Obligation is triggered and Dallas Stars does not purchase the

---

[12] The Series E notes are no longer outstanding.

COC Notes as required under the Team Agreement, unless certain conditions are satisfied by COC.

45.    I have been advised by counsel that because the delivery of a Trigger Event Put Notice postpetition would constitute a violation of the automatic stay under section 362 of the Bankruptcy Code, the Required COC Note Purchase Obligation will not arise postpetition. Therefore, the potential cross-default under the COC Note Purchase Agreement will not be triggered. Furthermore, I understand that although the filing of the Chapter 11 Cases by the Debtors would constitute a Trigger Event under the Team Agreement, the Debtors believe that any Trigger Event that may arise as a result of the filing of Chapter 11 Cases constitutes an invalid ipso facto provision under section 365(e)(1)(B) of the Bankruptcy Code, and thus is unenforceable in its entirety upon the filing of these Chapter 11 Cases.

46.    Under the Team Agreement, Dallas Stars can sell its assets to a purchaser if certain conditions are met, including such purchaser's assumption of Dallas Stars' obligations under the Team Agreement. The Debtors believe all such conditions have been or will be satisfied at the time the Sale is consummated. In connection with the consummation of the Prepackaged Plan, Dallas Stars will assume the Team Agreement and assign it to the Purchaser, and Purchaser will assume all of Dallas Stars' obligations under the Team Agreement and the agreements related thereto. Because the Trigger Event is a prohibited ipso facto provision, and there will be no events of default under the Team Agreement, I have been advised that no cure is required for the assumption and assignment of the Team Agreement. As a result of the foregoing, the Debtors believe that neither consent to the Sale nor waiver of the Trigger Events by the holders of COC Notes is necessary for the consummation of the Sale.

47.	Notwithstanding the foregoing, pursuant to an agreement dated as of September 14, 2011, among certain of the Debtors, the COC Noteholders, and the Collateral Trustee (the "COC Waiver Agreement"), in exchange for the waiver by the COC Noteholders and the Collateral Agent (as defined in the COC Note Purchase Agreement) of the Required COC Note Purchase Obligation (notwithstanding the applicability of the automatic stay), the Debtors have agreed to obtain an order expressly authorizing the continued performance by the Debtors of all obligations under the COC Sublease pursuant to section 365(d)(3) of the Bankruptcy Code until such time as the COC Sublease is assumed. Pursuant to the Prepackaged Plan, on the Effective Date, the Debtor will assume and assign the COC Sublease in its entirety to the Successful Bidder at the Auction.

**E.	Dallas Arena's Obligations Under Center Operating Company Debt.**

48.	As a condition precedent to the COC Note Purchase Agreement, Dallas Arena entered into that certain Pledge Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time, the "Arena Pledge Agreement"), pursuant to which Dallas Arena pledged all of its interests in COC to The Bank of New York Mellon (f/k/a The Bank of New York), a New York banking corporation, as collateral trustee under the Arena Pledge Agreement ("BoNY"), as security for the payment and performance of COC's obligations under the COC Note Purchase Agreement.[13] In connection with the consummation of the Prepackaged Plan, the Purchaser will assume the obligations of Dallas Arena including all obligations under the Arena Pledge Agreement and the agreements related thereto, which will be evidenced by an assumption agreement executed by the Purchaser, and the Purchaser will enter into a pledge

---

[13] Separately, Center GP, a non-debtor, executed a pledge agreement with the collateral trustee to pledge its interest in COC in connection with the Note Purchase Agreement.

agreement to replace the Arena Pledge Agreement. Except with respect to the Arena Pledge Agreement, neither Dallas Stars nor Dallas Arena is directly or indirectly liable under the COC Note Purchase Agreement.

**F.  Additional Agreements Relating to the AAC.**

49.  In addition to the COC Note Purchase Agreement and the Team Agreement, Dallas Stars is a party to various other agreements related to the NHL Stars' use of the AAC. In particular, Dallas Stars is a party to: (a) the Second Amended and Restated Arena Lease -- Dallas Stars, dated as of May 22, 2002 but effective as of July 28, 1999 (as supplemented, amended and otherwise modified, the "Sublease"), by and between COC and Dallas Stars, pursuant to which COC leased to Dallas Stars the right to use the AAC for the NHL Stars' NHL-sanctioned ice hockey games; (b) the Stars Non-Relocation Agreement, dated as of April 23, 1999 (as supplemented, amended and otherwise modified), by and between Dallas Stars and BoNY, pursuant to which Dallas Stars agreed, among other things, to cause the NHL Stars to play their home games in the AAC; (c) the Assignment of Leases and Rents and Agreement, dated as of December 10, 1999 (as supplemented, amended and otherwise modified), made by COC to BoNY and agreed and consented to by Dallas Stars and Dallas Basketball Limited, pursuant to which COC collaterally assigned, among other things, the Sublease and all rents relating thereto; (d) the Subordination, Nondisturbance and Attornment Agreement (Stars), dated as of December 10, 1999 (as supplemented, amended and otherwise modified), by and between Dallas Stars and BoNY, pursuant to which Dallas Stars and BoNY agreed upon the relative priorities of their interests and their rights and obligations if certain events occur; (e) Stars Franchise Agreement, dated as of July 28, 1998 (as supplemented, amended and otherwise modified), by and between City of Dallas and Dallas Stars, pursuant to which Dallas

Stars agreed, among other things, to cause the NHL Stars to play its home games in Dallas, Texas; and (f) Dallas Sports and Entertainment Center Naming Rights and Sponsorship Agreement, dated as of December 13, 1999 (as supplemented, amended and otherwise modified), by and among COC, Dallas Stars, Dallas Basketball Limited, and American Airlines, Inc., pursuant to which Dallas Stars agreed, among other things, that during the term of such agreement, that the COC arena would be named the "American Airlines Center."

**G.      Transactions with Related Entities.**

50.      Dallas Stars (or HSG on behalf of Dallas Stars) is party to a number of agreements (as described below, the "Related Entities Agreements") between or among Dallas Stars or HSG and certain affiliates of and entities related to Dallas Stars, including HSGH; SSR Collin Land, L.P. ("SSR Collin"); SSR GP Interests, L.P. ("SSR GP"); SSG Realty Partners, L.P. ("SSG Realty"); RoughRiders Baseball Partners, L.P. ("RoughRiders Baseball"); Southwest Sports Group Baseball, L.P. ("SSG Baseball"); Hicks Holdings LLC ("HH"); Hicks Cedar Park LLC ("HCP"); and Southwest Sports Realty Partners, L.P. ("SSR Realty" and collectively with Dallas Stars, HSG, HH, HCP, HSGH, SSR Collin, SSR GP, SSG Baseball, SSG Realty, and RoughRiders Baseball, the "Related Entities").  Each of the Related Entities is ultimately controlled by Mr. Hicks, with the exception of RoughRiders Baseball, of which the majority of HSG's interest was sold as described herein.[14]

51.      The Related Entities Agreements include, among other things, transactions relating to the development and use of the Dr Pepper StarCenter in Frisco and related parking facilities; HSGH's guaranty of certain obligations under an indebtedness agreement with respect

_____

[14] For clarification, HCP is owned by certain trusts established for the benefit of the children of Mr. Hicks and is indirectly controlled by Mr. Hicks.

to the Plano Dr Pepper StarCenter; and an affiliation agreement with HCP, which owns and operates the minor league hockey team in Cedar Park, Texas called "the Texas Stars" (the "Texas Stars"), all of which are described in more detail in Section I.C.9 of the Disclosure Statement.

**H.  Prepetition Advisory Agreements.**

### KPMG Agreement.

52.  From time to time, Dallas Stars has entered into certain engagement agreements with KPMG LLP ("KPMG") for a variety of audit, tax, and advisory services, of which some agreements relate to current engagements, and others that relate to completed engagements but may have certain ongoing obligations and liabilities, including indemnification and contribution obligations.  The Debtors also intend to file a motion to retain KPMG to perform audit, tax consultant, tax compliance, and bankruptcy administration services for the Debtors during these Chapter 11 Cases.  Under the Stalking Horse Asset Purchase Agreement, the Stalking Horse will assume payment obligations associated with any engagement agreements with KPMG, but will not assume any indemnification or contribution obligations thereunder.

### GSP Agreement.

53.  On February 4, 2010, HSG, Dallas Stars, and Dallas Arena entered into an engagement agreement with GSP (the "GSP Engagement Letter") for GSP to provide financial advice and assistance in connection with opportunities relating to a sale of Dallas Stars and its subsidiaries, Dallas Arena, and the related hockey assets.  The GSP Engagement Letter was amended on January 14, 2011 and again on September 2, 2011 to extend the expiration date of the agreement to January 31, 2012.  Under the Stalking Horse Asset Purchase Agreement, the Stalking Horse will assume the payment obligations under the GSP Engagement Letter, except

that the Stalking Horse will not assume any indemnification or contribution obligations thereunder. Any such indemnification or contributions obligations terminate upon the closing of the sale when fees owing to GSP under the GSP Engagement Letter are paid. Although the Debtors do not intend to seek to retain GSP to perform services to the Debtors during the pendency of these Chapter 11 Cases, GSP has agreed to provide, at the request of the Debtors or the Court, financial advisory services to the Debtors until the expiration of the GSP Engagement Letter, including assisting with the evaluation of bids received during the auction process and providing testimony in support of the confirmation of the Prepackaged Plan, including providing testimony regarding the prepetition marketing process conducted by the Debtors.

**I.      Material Prepetition Transactions Ancillary to Sale.**

54.      To memorialize accurately the historic operations of Dallas Stars' organization, including properly documenting the use and ownership of certain assets and equipment in accordance with past operational practices, and to facilitate the Sale, prior to the Solicitation, Dallas Arena, Dallas Stars, and certain of their affiliates and other related entities memorialized such historical relationships and operations in a series of agreements to appropriately reflect the ownership and use of certain assets historically utilized by Dallas Stars to assist in the orderly disposition of the assets being sold to the Purchaser. The material agreements entered into by Dallas Stars and Dallas Arena immediately prior to the Solicitation are described more fully in Section I.C.11 of the Disclosure Statement.

# IV.

## KEY EVENTS LEADING TO THE CHAPTER 11 CASES

**A.      Dallas Stars' Financial Position Declines.**

55.      Since 2004, Dallas Stars has experienced, and continues to experience, cash flow deficiencies.  In 2005, Dallas Stars lost over $70,000,000 in anticipated revenue when the NHL season was cancelled as a result of a work stoppage with its players.  During Mr. Hicks' tenure as owner of Dallas Stars, he has provided financial support to the team through capital contributions and loans from HSG in excess of $150,000,000.  Due to the unprecedented downturn in the U.S. economy and the housing industry, as well as the global economic recession and other commitments and contractual restraints, Mr. Hicks ceased funding additional amounts that benefited the NHL Stars some time after April 2009.

56.      Although Dallas Arena has been cash flow positive as a result of the equity distributions from COC, these funds were historically distributed to HSG by Dallas Arena as intercompany loans; HSG used such distributions by Dallas Arena to fund cash flow deficiencies of HSG, Dallas Stars, and TRBP.  In addition, Thomas O. Hicks made certain loans and capital contributions to HSGH and HSG—HSG, in turn, used such distributions to fund cash flow deficiencies of HSG, Dallas Stars, and TRBP.  These intercompany deficiencies were reflected in the books and records of each entity as a payable owed to the entity that funded the deficiency (each an "Intercompany Debt").  HSG loans were reflected in the books and records of HSG as a receivable owed by the specific entity, either Dallas Stars or TRBP.  As of July 30, 2011, Dallas Stars owed HSG approximately $154,000,000 on account of Intercompany Debts to fund operations and HSG owed Dallas Arena approximately $46,634,223 on account of

Intercompany Debts to HSG from Dallas Arena that were used to fund operations of the corporate family, including Dallas Stars.

57.     In early 2009, HSG began evaluating Dallas Stars' financial position relative to projections for 2010, 2011, and beyond and determined that reductions in all expense categories were required to compensate for current and projected shortfalls. Despite the cost reduction initiatives over the last three years, the cash deficiencies have continued. Further, although Dallas Stars receives cash flow from Dallas Arena, such cash flows have not been sufficient to cover the cash deficiencies of Dallas Stars.

58.     As a result of the cash flow deficiencies suffered by Dallas Stars and the concurrent cash flow deficiencies suffered by TRBP, HSG was unable to service its long-term debt obligations under the HSG Credit Agreements. On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreements, and on April 7, 2009, the Prepetition HSG Lenders accelerated the entire amount of indebtedness thereunder (the "HSG Loan Acceleration"). Pursuant to the terms of the HSG Credit Agreements, the Prepetition HSG Lenders under the HSG Credit Agreements have claims against the Debtors in respect of the Prepetition First and Second Lien Obligations. Ultimately, Dallas Stars and Dallas Arena, together with the other stakeholders, concluded that a sale of the NHL Stars franchise and related assets of Dallas Stars and its subsidiaries and Dallas Arena was the only viable course of action.

**B.     HSG Interest Reserve Accounts Transfers.**

59.     Subsequent to the HSG Loan Acceleration, and in accordance with the terms of the NHL Consent Letter, Dallas Stars began receiving funds from the interest reserve accounts that had been established in December 2006 pursuant to the requirements of the HSG Credit Agreements. Beginning May 12, 2009, the First Lien Administrative Agent from time to

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

time transferred cash to Dallas Stars, upon the concurrent request of Dallas Stars and the NHL, and such cash transfers were used to fund the team's operating shortfalls during the period between May 2009 and January 2010. During such period, approximately $19,000,000 was transferred to Dallas Stars to fund operations (the "Interest Reserve Account").

**C.     NHL Monitoring and Original Prepetition CFV Financing Assistance.**

60.     After months of discussions among HSG, Dallas Stars, the NHL, and the Prepetition HSG Lenders concerning a possible sale of Dallas Stars, on November 9, 2009, the NHL, Mr. Hicks, and Dallas Stars entered into a letter agreement (the "NHL Framework Agreement"), pursuant to which the parties agreed to a framework by which the NHL would oversee a sale process involving Dallas Stars and Dallas Arena. The NHL Framework Agreement provided for the appointment of an NHL Monitor (as defined therein) to oversee the operations of Dallas Stars as well as the ensuing sale process. The NHL Framework Agreement also prescribed limitations on the activities of Dallas Stars and the other Debtors and called for the weekly delivery of certain financial information to the NHL, the First Lien Administrative Agent, and Second Lien Administrative Agent.

61.     In January 2010, Dallas Stars again faced cash flow deficiencies once the Interest Reserve Account had been fully depleted. HSG and Dallas Stars began discussions with the NHL and the Prepetition HSG Lenders with respect to securing additional funds to meet its cash flow needs for the remainder of the 2009-2010 NHL season. On February 1, 2010, after weeks of discussions, Dallas Stars executed a Promissory Note with the Prepetition CFV Lender (together with the other agreements and instruments related thereto, the "Original CFV Debt Agreement"), pursuant to which the Prepetition CFV Lender agreed to make available to Dallas Stars advances in an aggregate principal amount of up to $19,000,000 (the "Original CFV Debt

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

Amount"). Funds advanced under the Original CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders.

62. As a condition precedent to entering into the Original CFV Debt Agreement, HSGH, HSG, HSG Partnership, and Dallas Arena delivered certain Irrevocable Proxies to the Commissioner, each dated as of January 14, 2010 (the "NHL Proxies"), pursuant to which the Commissioner (as defined in the NHL Proxies) obtained the exclusive right to control the operations of Dallas Stars and Dallas Arena, including authority to cause a sale of Dallas Stars and Dallas Arena. Since the execution of the NHL Proxies, HSG has had no ability to control the Debtors or their respective operations.

**D.     Additional Prepetition CFV Financial Assistance.**

63. When borrowing capacity under the Original CFV Debt Agreement was exhausted, Dallas Stars sought additional financial assistance for its cash flow needs for the remainder of the 2010-2011 NHL season. Dallas Stars, the NHL and the senior prepetition lenders again worked together to arrange financial assistance, and on January 14, 2011, the Original CFV Debt Amount was refinanced into the CFV Debt Agreement. The CFV Debt Agreement provided an additional $24,600,000 of borrowing capacity for an aggregate principal amount of CFV Debt Amount of up to $45,000,000. Funds advanced under the CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders. In separate draw-downs, substantially all available amounts have been advanced under the CFV Debt Agreement and the CFV Debt Amount has become due and payable as of June 30, 2011 subject to a grace period running through October 31, 2011. As of August 31, 2011, the amount of CFV Debt

Amount outstanding is approximately $51,384,000, inclusive of principal, interest and fees due in respect thereof.

**E.      Financial Advisors are Retained.**

64.      On February 4, 2010, HSG, Dallas Stars and Dallas Arena retained GSP Securities LLC ("GSP") to provide financial advice and assistance in connection with opportunities relating to a sale of (i) Dallas Stars and its subsidiaries, (ii) Dallas Arena, and (iii) the related hockey assets.

**F.      Marketing Process.**

65.      By the spring of 2010, HSG and Dallas Stars, in conjunction with their advisors, had canvassed a broad group of over 30 prospective buyers and investors. HSG and Dallas Stars directed their advisors to oversee the creation of an electronic dataroom and actively solicited parties interested in buying the NHL Stars to perform due diligence. During the course of the marketing process, at least eight of the prospective buyers executed confidentiality agreements and were granted access to the dataroom. Beginning in April 2010, confidential information memoranda were distributed to six of the prospective buyers that had executed confidentiality agreements and received NHL approval to participate in the marketing process. By mid-November 2010, five of the prospective buyers had participated in diligence meetings with the Dallas Stars management team. After well over a year of marketing the NHL Stars and its related assets to potential bidders with the financial wherewithal to purchase an NHL franchise, a bid from Tom Gaglardi, a Vancouver businessman, emerged as the highest or best offer. Even after Mr. Gaglardi's bid materially exceeded those of other interested buyers, Dallas Stars negotiated Mr. Gaglardi's bid for several months to maximize the consideration and other relevant terms of the bid, including, at the Debtors' insistence, the ability to solicit higher or

better bids in connection with postpetition bidding procedures. In the spring of 2011, Dallas Stars and Mr. Gaglardi began negotiations to memorialize Mr. Gaglardi's bid.

**G.     Memorandum of Understanding.**

66.     On April 13, 2011, Dallas Stars, Dallas Arena, and Tom Gaglardi entered into that certain Memorandum of Understanding ("MOU"), which set forth certain understandings and intentions of the parties with respect to the proposed sale of the NHL Stars franchise and related assets of Dallas Stars and Dallas Arena. Pursuant to the terms of the MOU, Dallas Stars and Dallas Arena granted certain limited exclusivity rights to Tom Gaglardi with respect to the proposed sale, which exclusivity rights expired in May 2011. The parties negotiated and drafted definitive documents in preparation for the sale of the NHL Stars franchise and related assets of Dallas Stars and Dallas Arena in accordance with the terms of the MOU starting in mid-April 2011.

67.     The marketing process has continued with Dallas Stars, in conjunction with their advisors and GSP, engaging in negotiations with potential buyers through the date of the execution of the MOU and after the expiration of exclusivity under the MOU.

**H.     NHL Approval.**

68.     Dallas Stars, as a member of the NHL, is subject to the rules and regulations of the NHL. In particular, the NHL Rules provide that (i) any sale of a NHL franchise cannot be consummated without first obtaining the requisite approval from a three-fourths majority vote of the BOG and (ii) the sale of any NHL Member Club must comply with the process set forth in the NHL Rules. Accordingly, Dallas Stars has worked closely with the NHL throughout the negotiation of the Stalking Horse Asset Purchase Agreement and all related

events leading to the Solicitation of votes on the Prepackaged Plan and in preparation for the filing of these prepackaged Chapter 11 Cases.

69.    Further, pursuant to the NHL Proxies, the Commissioner holds the exclusive right to authorize a sale of Dallas Stars and Dallas Arena and the exclusive authority to direct the filing of the prepackaged Chapter 11 Cases by the Debtors to effectuate the Sale.

**I.    The Debtors' Current Financial Picture.**

70.    As discussed above, due to cash flow shortfalls, Mr. Hicks has had to contribute and loan $150,000,000 to the Debtors over the past 10 years to fund, among other things, player salaries and other operating expenses.  Moreover, in the most recently completed fiscal year, the Debtors lost $37,900,000, and over the past three seasons, the Debtors lost $91,500,000.  The Debtors are projected to lose in excess of $31,000,000 this season, before interest expense, legal, and professional costs related to the Sale and restructuring process, and taxes.  Consequently, the Sale proposed herein is critical to the Debtors' future ability to meet their payroll and other operating expenses and to satisfy their debt repayment obligations.

**V.**

**THE SALE**

**A.    The Proposed Stalking Horse.**

71.    The proposed Stalking Horse is Tom Gaglardi.  Mr. Gaglardi is the President of Northland Properties Corporation ("Northland"), which he and his family own. Northland's principal business activities are the ownership and operation of Sandman Hotels, Inns and Suites, Denny's Restaurants, Moxie's Restaurants, Shark Club Bar and Grills, Chop Restaurants, Rockford Restaurants, and the Kamloops Blazers Hockey Team, and the leasing of

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

residential and commercial real estate in Canada.  Northland owns 45 hotels with 6,400 rooms, owns over 100 restaurants, and employs more than 10,000 employees.

**B.      Stalking Horse Asset Purchase Agreement.**

72.     On September 1, 2011, the Debtors and the Stalking Horse completed negotiations on the Stalking Horse Asset Purchase Agreement, for the sale of substantially all the assets of the Debtors, including the NHL Stars franchise, Dallas Arena's ownership interest in COC and Center GP, and other hockey-related assets of the Debtors.  A copy of the Stalking Horse Asset Purchase Agreement is attached to the Disclosure Statement as Exhibit C.  Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, (i) the Debtors agreed to file the Chapter 11 Cases and the Prepackaged Plan and (ii) the Stalking Horse agreed to purchase substantially all the assets of the Debtors to be consummated in connection with the Prepackaged Plan.

73.     As described below, under the Stalking Horse Asset Purchase Agreement, substantially all of assets of the Debtors, including the NHL Stars franchise, Dallas Arena's ownership interest in COC and Center GP, and substantially all contractual rights related to the operation of the NHL Stars will be sold to the Stalking Horse.  In turn, the Stalking Horse will also assume all of the ordinary course obligations of Dallas Stars, including deferred compensation obligations, sponsorship, ticketholder, certain employee and specified tax obligations, with the exception of certain excluded liabilities (including the obligations of the HSG Credit Agreements).

74.     The Debtors intend to assign to the Purchaser all of their contractual rights relating to COC and the NHL Stars franchise, including all marketing, media, advertising, and merchandising contracts, and all NHL player contracts.  Subject to Bankruptcy Court approval,

the Sale is anticipated to complete an orderly transition of the operations of Dallas Stars and Dallas Arena.  As described in greater detail herein, the Debtors have filed a motion concurrently herewith to seek relief from the Bankruptcy Court to honor all tickets to games and continue other valued customer programs and all employees will keep their jobs pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

75.    I understand the material terms of the Stalking Horse Asset Purchase Agreement are as follows (defined terms used in this section and not otherwise defined herein have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement):[15]

**Description of Purchased Assets.**  Upon the Closing (as defined below), the assets sold to the Stalking Horse include the Debtors' right, title, and interest in the Purchased Assets, including all rights and privileges held by Dallas Stars associated with the NHL (which includes rights to membership in NHL and the NHL Stars franchise), all assets and interests (tangible and intangible) related to the Dr Pepper StarsCenters and sublease of the AAC, and Dallas Arena's interests in COC and Center GP.

**Assumed Obligations/Liabilities.**  As part of the sale of the Purchased Assets, the Stalking Horse will assume, and agree to pay and perform, all liabilities and obligations of the Debtors, other than the following expressly excluded liabilities that are more specifically described in the Stalking Horse Asset Purchase Agreement (the "Excluded Liabilities"):  (i) any liabilities arising out of assets that are being retained by the Debtors after the Closing, except that the Stalking Horse is assuming all liabilities related to taxes; (ii) all liabilities of HSG and certain other affiliates of Mr. Hicks except for liabilities related to taxes to which Debtors are jointly and severally liable, and certain other liabilities specifically assumed by the Stalking Horse under the Stalking Horse Asset Purchase Agreement; (iii) liabilities related to the HSG Credit Agreements; (iv) liabilities of Debtors owed to their affiliates (other than to another Debtor or their subsidiaries) or any affiliates of Mr. Hicks, except liabilities related to certain affiliate contracts that are specifically assumed by the Stalking Horse; (v) liabilities to other potential purchasers or bidders who are not affiliated with the Stalking Horse; (vi) liabilities covered by insurance policies that are not assigned to the Stalking Horse to the extent that the Debtors recover the amount

---

[15] This summary is for informational purposes only and is qualified in its entirety by the terms of the Stalking Horse Asset Purchase Agreement.

of such liabilities under the applicable insurance policies; (vii) certain liabilities related to employee pension plans that are maintained by an entity under common control with Debtors or their subsidiaries prior to the Closing; (viii) any liabilities of Debtors arising under the Stalking Horse Asset Purchase Agreement, such as indemnification obligations; (ix) any liabilities under the CFV Debt Agreement, except for the CFV Debt Amount which is specifically assumed by the Stalking Horse; and (x) any liabilities of Debtors to a broker other than GSP.

**Total Consideration; Purchase Price.** Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, at Closing the aggregate consideration paid and obligations assumed by the Stalking Horse will consist of (a) an amount in cash equal to the CFV Debt Amount, which will be paid to CFV; (b) an amount in cash as necessary to pay in full the Specified Expenses,[16] comprising fees and expenses relating to the sale process including, but not limited to, (i) amounts owed to the Debtors' sell-side advisor, GSP; (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisors; and (iii) fees of the Debtors' legal and accounting advisors; (c) the incurrence of indebtedness under the Stalking Horse Senior Secured Obligation in an aggregate principal amount not to exceed $100,000,000 in partial satisfaction of the First Lien Secured Claims, provided, however, the principal amount of the Stalking Horse Senior Secured Obligation shall be increased or decreased subject to the Purchase Price Adjustment described below; (d) an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount, which will be paid to the holders of the First Lien Secured Claims; and (e) the assumption of certain Assumed Liabilities (as defined in the Stalking Horse Asset Purchase Agreement).

**Purchase Price Deposit.** The Stalking Horse will deposit $15,000,000 of the purchase price into an escrow account prior to the filing of the Chapter 11 Cases that shall be distributed or applied as described in the Stalking Horse Asset Purchase Agreement at the Closing (as defined below).

---

[16] The Specified Expenses represent the fees and expenses for the Sale and Auction and the Chapter 11 Cases, including fees and expenses of the NHL and its attorneys and other advisors and the Debtors and their attorneys and other advisors and professionals. "Specified Expenses" is defined in the Prepackaged Plan to mean "those unpaid fees and expenses relating to the sale process and the related matters contemplated by the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) as set forth therein, including (i) amounts due to GSP Finance LLC (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by section 7.8 of the Stalking Horse Asset Purchase Agreement), (iii) fees of Debtors' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement (including, without limitation, any antitrust fees and any fees resulting from the filings contemplated under section 9.15 of the Stalking Horse Asset Purchase Agreement)." Prepackaged Plan at Section 1.98.

**Purchase Price Adjustment.**  As indicated above, at Closing the principal amount of the Stalking Horse Senior Secured Obligation shall be (x) decreased by the amount, if any, by which the CFV Debt Amount exceeds $50,000,000, (y) increased or decreased by the amount, if any, by which the final net working capital is greater than or less than, respectively, $7,750,000 and (z) (i) if the Closing Date occurs on or after September 1, 2011 but before January 1, 2012 and falls on the last day of the month, increased by the absolute value of the cumulative budgeted loss of Dallas Stars and its subsidiaries for such month, or (ii) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on a date other than the last day of the month, increased by an amount equal to (x) the absolute value of the cumulative budgeted loss for the immediately preceding calendar month *plus* (y) the absolute value of the prorated budgeted loss for the month in which Closing occurs, or (iii) if the Closing Date occurs on or after January 1, 2012, increased by an amount equal to $15,058,541. At Closing, an estimated adjustment shall be made to the principal amount of the Stalking Horse Senior Secured Obligation, and then post-closing, a final adjustment shall be made.  The post-closing calculation of the final net working capital is subject to a dispute resolution mechanism for any disagreements between the Stalking Horse and the holders of the First Lien Secured Claims. Within three Business Days following the determination of the final net working capital (pursuant to the terms of the Stalking Horse Asset Purchase Agreement), a final adjustment to increase or decrease the Stalking Horse Senior Obligation shall be automatically made pursuant to its terms.  In addition, at the time of such adjustment, the Purchaser shall pay to the First Lien Administrative Agent on behalf of the holders of the First Lien Secured Claims an amount in cash equal to the positive difference, if any, by which the adjusted amount of the Stalking Horse Senior Secured Obligation exceeds $100,000,000.  The foregoing paragraph is collectively referred to herein as the "Purchase Price Adjustment."

**Closing Date.**  The consummation of the transactions contemplated by the Stalking Horse Asset Purchase Agreement (the "Closing"), including the sale of the NHL Stars franchise to the Stalking Horse, will occur not later than the third Business Day after the satisfaction or waiver by the applicable party of the following conditions, among others:

(1) each of the Debtors and the Stalking Horse have performed or complied with all covenants, obligations and agreements required of such party under the Stalking Horse Asset Purchase Agreement;

(2) all applicable approvals of the Bankruptcy Court and NHL shall have been received;

(3) the waiting period applicable to the transactions contemplated by the Stalking Horse Asset Purchase

Agreement under the HSR Act shall have expired or early termination shall have been granted;

(4)     Debtors shall have delivered, or caused to be delivered, to the Stalking Horse stock certificates (or affidavits of lost stock certificates) representing the Hockey Enterprises shares that are owned by Dallas Stars and U.S. Holdings, duly endorsed in blank or accompanied by stock transfer powers;

(5)     Debtors and the Stalking Horse shall have obtained a release of all Liens held pursuant to the Prepetition Obligations pursuant to the Confirmation Order;[17]

(6)     there shall not have been or occurred since May 31, 2011, any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Material Adverse Effect;

(7)     the Bankruptcy Court shall have entered the Bidding Procedures and Confirmation Scheduling Order;

(8)     the Bankruptcy Court shall have entered the Confirmation Order and any stay period applicable to the Confirmation Order shall have expired or shall have been waived by the Bankruptcy Court; and

(9)     the Closing Date (as defined in the Stalking Horse Senior Secured Credit Agreement) shall have occurred and the Term Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) shall have been deemed made pursuant to the terms of the Stalking Horse Senior Secured Credit Agreement. Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, certain conditions precedent may not be waived by the Stalking Horse or the Debtors without the consent of the Senior Lenders pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

---

[17] The proposed Confirmation Order is attached as Exhibit D to the Stalking Horse Asset Purchase Agreement, which is attached as Exhibit C to the Disclosure Statement.

**Termination Rights.**  The Stalking Horse Asset Purchase Agreement provides termination rights to each of the parties thereto upon the occurrence of certain specified events or the failure to occur of certain other specified events.  Such termination rights include, among others, that either Debtors or the Stalking Horse may terminate if the Closing does not occur prior to the later of (i) December 31, 2011 and (ii) in the event the Stalking Horse is not the Successful Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order), the earlier of (A) the closing of the Sale to a Competing Bid (as such term is defined in the Stalking Horse Asset Purchase Agreement) and (B) forty-five (45) day after the close of the Auction if the Closing shall not have occurred by the close of business on such date, provided that the terminating party is not in breach of any of its obligations under the Stalking Horse Asset Purchase Agreement that would prevent the closing conditions in Article XI of the Stalking Horse Asset Purchase Agreement, as applicable, from being satisfied.

**Break-Up Fee.**  Under certain circumstances, if a Competing Bid closes, Debtors shall pay the Stalking Horse an amount equal to $4,000,000 as a break-up fee (the "Break-Up Fee") and shall reimburse the Stalking Horse for any transaction expenses in an amount not to exceed $500,000 (the "Expense Reimbursement") in accordance with the terms of the Bidding Procedures and Confirmation Scheduling Order.

**Representations, Warranties and Covenants.**  The Stalking Horse Asset Purchase Agreement contains standard and customary representations, warranties and covenants.

**Dallas Stars Employees.**  Prior to the Closing, the Stalking Horse will offer employment to each non-player Employee (as such term is defined in the Stalking Horse Asset Purchase Agreement), who is not a party to a purchased contract, to commence employment with the Stalking Horse immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment with Dallas Stars or any of its subsidiaries.  In addition, with respect to all non-player Employees who actually commence employment with the Stalking Horse, the Stalking Horse will provide (subject to certain limitations) severance benefits and payments no less favorable than the severance benefits and payments that would have been provided immediately prior to Closing.  The contracts of all current Employees are included as part of the Purchased Assets and each Employee will remain under the employment of the Stalking Horse on and after the Closing pursuant to the terms of his or her contract.  The Stalking Horse Asset Purchase Agreement also provides for the Stalking Horse's assumption of liabilities related to the employment or termination of employment by the Debtors of any individual before, on or after the Closing Date (including liabilities relating to workers compensation claims that relate to the period ending on the Closing Date).  In addition, the Stalking Horse Asset Purchase Agreement also contains certain other standard and customary provisions related to employee benefits.

**Indemnification.**  The Stalking Horse Asset Purchase Agreement includes customary provisions obligating each of the Debtors and the Stalking Horse to indemnify

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

the other party and their affiliates for losses caused by a breach of the indemnifying party's representations, warranties, covenants, or losses resulting from certain excluded and assumed liabilities. The indemnification obligations of each party survive as to covenants of such party for up to one year after the last date upon which a covenant is required to be performed by such party, and as to representations and warranties, do not survive Closing.

**C.     The Stalking Horse Senior Secured Obligation.**

76.     I have been told by my advisors that if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the Stalking Horse Senior Secured Obligation will be incurred pursuant to the terms of the Stalking Horse Senior Secured Credit Agreement among the Stalking Horse, as borrower, certain subsidiaries of the Stalking Horse, as guarantors, each lender from time to time party thereto (which, on the Effective Date, will be the holders of the First Lien Secured Claims and Second Lien Secured Claims), and JPMorgan Chase Bank, N.A., as administrative agent for the lenders. Under the Stalking Horse Senior Secured Credit Agreement, each Prepetition First Lien Lender and each Prepetition Second Lien Lender will be deemed to have issued a term loan to the Stalking Horse on the Effective Date (with such term loans to be extended on a non-cash basis) in the aggregate principal amount of $100,000,000 to partially satisfy the First Lien Secured Claims and Second Lien Secured Claims under the terms of the Prepackaged Plan.

77.     The Stalking Horse Senior Secured Obligation will have a five-year maturity and will bear interest at the Eurodollar Rate (as defined in the Stalking Horse Senior Secured Credit Agreement) plus 3.25% per annum (or at the Base Rate (as defined in the Stalking Horse Senior Secured Credit Agreement) plus 2.25% per annum) until the first anniversary thereof and at the Eurodollar Rate plus 4.25% per annum (or at the Base Rate plus 3.25% per annum) thereafter. The Stalking Horse Senior Secured Obligation can be prepaid in whole or in part at any time and from time to time without premium or penalty. In addition,

unless a default or event of default has occurred and is continuing thereunder, the Stalking Horse Senior Secured Obligation can be prepaid at a discount of 2% of principal if repaid in full within six months of issuance, and at a discount of 1% of principal if repaid in full after six months but prior to 12 months after issuance.

78.     I have been advised that the Stalking Horse Senior Secured Credit Agreement contains representations, warranties, affirmative covenants, and negative covenants, and in addition, contains the following covenants and defaults: fixed charged coverage ratio, tested quarterly, to be not less than 1.00:1.00 for the trailing 12 month period (subject to equity cure); minimum adjusted EBITDA, tested quarterly, to be not less than $3,000,000 for the trailing 12 month period (subject to equity cure); minimum franchise valuation requirement of two times the outstanding principal amount of the Stalking Horse Senior Secured Obligation; pre-funding of annual budgeted losses; and maintenance of an interest reserve account. The Stalking Horse Senior Secured Obligation would be secured by a pledge of substantially all assets of the Stalking Horse and each of the guarantors under the Stalking Horse Senior Secured Credit Agreement, subject to such limitations as are required by the NHL.

**D.     Owner Support Agreement.**

79.     As a condition precedent to the Stalking Horse Senior Secured Credit Agreement, if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then Mr. Gaglardi and Northland Properties Corporation, a Canadian Corporation ("NPC" and, together with Mr. Gaglardi, the "Owner Support Parties") are required to enter into an Owner Support Agreement (the "OSA"), with the Administrative Agent, pursuant to which the Owner Support Parties would agree with and guarantee to the Administrative Agent to, directly or indirectly, fund the Stalking Horse through cash common equity contributions or Owner Support

Party Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) in such amounts necessary (A) to maintain the continuing operation of the NHL Stars in good standing under the NHL Rules, (B) to pay the operating expenses of the NHL Stars including, without limitation, Interest Expense (as defined in the Stalking Horse Senior Secured Credit Agreement), and (C) to cause the Stalking Horse to pre-fund annual budgeted losses and maintain the interest reserve account as required under Sections 6.12 and 6.15, respectively, of the Stalking Horse Senior Secured Credit Agreement.

80.     The OSA would include certain financial covenants: (1) Liquid Net Worth (as defined in the OSA) of at least $20 million at the closing of the Sale (exclusive of any amount being paid, contributed or applied for any purpose at or connection with the closing of the Sale as required under the Stalking Horse Asset Purchase Agreement, the Stalking Horse Credit Agreement, or the NHL/Lender Cooperation Agreement) and $30 million tested quarterly for periods thereafter (exclusive of assets in the Stalking Horse, the subsidiaries of the Stalking Horse and Center Operating Company and its subsidiaries); and (2) Net Worth (as defined in the OSA) of at least $500,000,000 tested annually. Additionally, a condition precedent to the closing under the Stalking Horse Senior Secured Credit Agreement is the delivery of the Accountant's Letters (as defined in the OSA) in accordance with the OSA.

E.     **NHL/Lender Cooperation Agreement.**

I understand that if a portion of the consideration the Purchaser provides under the Asset Purchase Agreement is in the form of a secured debt obligation to the holders of First Lien Secured Claims (or, if applicable, the holders of Second Lien Secured Claims), then a condition precedent to the Closing of the Asset Purchase Agreement will be that the Purchaser and other parties thereto execute the NHL/Lender Cooperation Agreement. If the Stalking Horse Asset

Purchase Agreement is the Asset Purchase Agreement, then the NHL/Lender Cooperation

Agreement shall be substantially in the form of Exhibit G to the Stalking Horse Asset Purchase

Agreement.  The Debtors will not be a party to such agreement.  The NHL/Lender Cooperation

Agreement is described in detail in Section I.E.5 of the Disclosure Statement.

**F.      Bidding Procedures.**

81.      As noted, although the Debtors engaged in a substantial prepetition

marketing process before selecting the Stalking Horse as the stalking horse bidder, the Debtors

propose to implement a postpetition bidding process to ensure that they receive the highest or

otherwise best value for their assets for the benefit of their creditors.  To that end,

contemporaneously herewith, the Debtors have filed a motion, seeking:

(a)      entry of an order (the "Shortened Notice Order") at the "First Day

Hearing" setting a date for a hearing to (i) approve the Bidding Procedures and (ii) schedule

other dates relevant to Confirmation of the Prepackaged Plan (the "Bidding

Procedures/Scheduling Hearing"); and

(b)      entry of an order at the Bidding Procedures/Scheduling Hearing,

which order (the "Bidding Procedures and Confirmation Scheduling Order")[18] shall (i) approve

the Stalking Horse Asset Purchase Agreement, including the Stalking Horse bid protections,

(ii) approve the Bidding Procedures, and (iii) schedule dates for filing objections to the

Prepackaged Plan, the Disclosure Statement, and the related solicitation procedures and

scheduling the date for the hearing on confirmation of the Prepackaged Plan (the "Confirmation

Hearing" or the "Combined Hearing").

---

[18] The Bidding Procedures and Confirmation Scheduling Order is attached as Exhibit C to the Stalking Horse Asset Purchase Agreement, which is attached as Exhibit C to the Disclosure Statement.

82.     I have been advised that at the Confirmation Hearing, the Debtors will seek confirmation of the Prepackaged Plan authorizing the Sale to the Successful Bidder under the Asset Purchase Agreement or the Stalking Horse Asset Purchase Agreement, as the case may be, and approving all of the Disclosure Statement and related solicitation procedures. The proposed Bidding Procedures are summarized below.[19]

**G.     Due Diligence, Bid Requirements, and NHL Approval.**

83.     Within seven days after entry of the Bidding Procedures and Confirmation Scheduling Order, any party interested in becoming a potential purchaser of the Purchased Assets (a "Potential Bidder") is required to notify the Debtors and the NHL and submit the background information in that certain "Application to Acquire NHL Membership, or Ownership in an NHL Member Club" (the "NHL Application"). A Potential Bidder that is approved for such purpose by the NHL[20] and executes a confidentiality agreement as set forth in the Bidding Procedures will be given access to a dataroom for purposes of performing due diligence with respect to the Purchased Assets.

84.     For an offer, solicitation, or proposal (a "Bid") to constitute an "Acceptable Potential Bid" and the Potential Bidder an "Acceptable Potential Bidder," each Bid must:  (i) be in writing from a Potential Bidder and must be received by the Debtors, the NHL, and the notice parties listed in the Bidding Procedures on or before 30 days after entry of the Bidding Procedures and Confirmation Scheduling Order at 4:00 p.m. (ET) (the "Bid Deadline"), (ii) include a fully completed and executed NHL Application provided to the NHL, and

---

[19] Any summary of the Bidding Procedures set forth in this Declaration is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures and Confirmation Scheduling Order.

[20] Any bid ultimately submitted by a Potential Bidder remains subject to further NHL Approval (as defined and described below).

(iii) include an executed mark-up of the Stalking Horse Asset Purchase Agreement provided to the notice parties as defined in the Bidding Procedures, and (iv) include a good faith deposit in an amount equal to US $15,000,000 to the Debtors.

85.    For an Acceptable Potential Bid to constitute a "Qualified Bid," and the Acceptable Potential Bidder a "Qualified Bidder," the Acceptable Potential Bid must be submitted by the Bid Deadline, be for all the Purchased Assets, including substantially all of the assets of the Debtors necessary to conduct the Purchased Assets as an NHL team in the NHL Stars' current Home Territory (as defined in the NHL Constitution), and: (i) contain evidence (in the form of binding commitment letters, guarantees, or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions; (ii) contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies') approval of the contemplated transaction; (iii) be for all the Purchased Assets and be at least US $10,000,000 greater than the total value of the Bid as evidenced by the Stalking Horse Asset Purchase Agreement (the "Stalking Horse Bid"); (iv) provide that the Acceptable Potential Bidder and Bid will be subject to NHL approval, will cooperate with the review process of the NHL, will execute certain agreements with the NHL (as fully set forth in Section IV.A.4 of the Bidding Procedures) and will, as a condition to closing, deliver any agreements or other documents that the NHL requires; (v) other than the Stalking Horse Bid, not request a break-up fee, termination fee, expense reimbursement or similar type of payment; (vi) not be conditioned on the outcome of unperformed due diligence, board approval or a financing contingency; provide that the bidder's offer is irrevocable for a period of time designated by the Bidding Procedures; contain a form of confirmation order; include evidence of the Acceptable Potential Bidder's ability to provide adequate assurance of future performance of

such contracts, permits and licenses it would require the Debtors to assume and assign; assume that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time) under the Prepackaged Plan; and provide that the Potential Bidder will enter into an Assumption Agreement (as defined in that certain consent agreement dated September 14, 2011 by and among the Collateral Trustee, the Noteholders, and certain of the Debtors (the "COC Consent Agreement")), substantially in the form attached to the COC Consent Agreement as Exhibit F (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), and a Pledge and Assumption Agreement (as defined in the COC Consent Agreement), substantially in the form attached to the COC Consent Agreement as Exhibit G (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), with the Collateral Trustee; and (vii) provide that the Potential Bidder will enter into an assumption agreement to assume all obligations of Dallas Stars under the various COC transaction documents related to the COC Note Purchase Agreement, and a pledge and assumption agreement by which the Purchaser will pledge its interest in COC and Center GP to the holders of COC Notes; (viii) include a fully executed form of asset purchase agreement and any agreements ancillary to the Sale, each executed by the Acceptable Potential Bidder; and (ix) receive approval for ownership transfer by the NHL under the NHL's applicable ownership transfer requirements ("NHL Final Approval"). The Stalking Horse Bid and Stalking Horse satisfies each of the conditions of a Qualified Bid and Qualified Bidder other than NHL Final Approval.

86.     Two days before the commencement of the Auction (the "NHL Determination Date"), the NHL shall notify each Acceptable Potential Bidder, the Debtors, and

the notice parties to the Bidding Procedures whether the Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby have received NHL Final Approval.

87.     On or prior to 5:00 p.m. (ET) on the NHL Determination Date, if more than one Qualified Bid is timely received, the Debtors shall provide each Qualified Bidder that has submitted a Qualified Bid:  (i) written notice of the Auction, (ii) notice of the Qualified Bid with which the Debtors intend to commence the Auction, and (iii) copies of all Qualified Bids. If one or no Qualified Bid is timely received, the Debtors will not conduct an Auction.  If only one Qualified Bid from a Qualified Bidder is timely received, the Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Confirmation Hearing.

**H.      The Auction.**

88.     If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 commencing 60 days following the entry of the Bidding Procedures and Confirmation Scheduling Order at 10:00 a.m. (CT).  Only Qualified Bidders shall be eligible to participate in the Auction.  The Debtors, in their reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale for any reason by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

89.     All Bids made at the Auction after the commencement thereof (each, an "Overbid") shall be made in overbid increments of at least US $5,000,000 greater than the current highest or best offer for the Purchased Assets.  For the avoidance of doubt, US $4,500,000 (representing the US $4,000,000 Break-Up Fee and the US $500,000 Expense

Reimbursement) shall be deducted from each Qualified Bid and Overbid submitted by a Qualified Bidder (including the initial Qualified Bid), other than a Bid of the Stalking Horse, in determining the value of each Qualified Bid or Overbid. An Overbid must comply with the conditions for a Qualified Bid. A Qualified Bidder need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

**I.      Identification of the Successful Bidder and Acceptance of Successful Bid.**

90.     At the close of the Auction, the Debtors, in consultation with the NHL; JPMorgan Chase Bank, N.A. and Monarch Master Funding Ltd. (together, the "Senior Lenders"); and representatives of any statutory committee shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). After the Successful Bid is so determined, the Auction will be closed.

91.     The Debtors will then determine, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which bid has been determined to be the second highest or otherwise best bid (the "Backup Bid" and such bidder being the "Backup Bidder"). The Debtors reserve the right to determine, in their reasonable business judgment and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which Bid is the Successful Bid and which Bid is the Backup Bid.

92.     The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtors' acceptance of the Bid. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Confirmation Hearing.

93.     Except as otherwise provided in the Successful Bid agreed to by the Debtors, all of the Debtors' right, title, and interest in and to the Purchased Assets shall be sold

free and clear of all liens, claims, encumbrances, and interests thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens attaching to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

**J.      Closing with the Backup Bidder(s).**

94.      If for any reason the Successful Bidder fails to consummate the Sale, the Backup Bidder will be deemed to have submitted the highest or otherwise best bid and the Debtors and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable.  If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Debtors and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

**VI.**

**<u>THE PREPACKAGED PLAN</u>**

**A.      General Summary of the Prepackaged Plan**

95.      As stated above, concurrently herewith, the Debtors have filed their Prepackaged Plan.  The primary purpose of the Prepackaged Plan is to consummate the Sale.  I am advised that the Prepackaged Plan consists of four separate chapter 11 plans, one for each Debtor.  Each plan for each respective debtor provides for a class of Priority Non-Tax Claims (Class 1); First Lien Secured Claims (Class 2); Second Lien Secured Claims (Class 3); Secured Tax Claims (Class 5); Other Secured Claims (Class 6); Assumed General Unsecured Claims

(Class 7); Non-Assumed General Unsecured Claims (Class 8); and Equity Interests (Class 9). Class 4 comprises the CFV Claim.

96.     Under the Prepackaged Plan, the Purchaser will assume or pay substantially all of the Claims of the Debtors, including the costs and expenses of the transaction (the "Specified Expenses" discussed above), and will assume substantially all of the Debtors' executory contracts and unexpired leases.  The Purchaser is paying or assuming all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  In addition, the Purchaser will be paying the CFV Claim and assuming all general unsecured claims (the "Assumed General Unsecured Claims"), other than a limited number of claims specifically listed as "Excluded Liabilities" under the Stalking Horse Asset Purchase Agreement (the "Non-Assumed General Unsecured Claims"), as described in Section I.E.1 of the Disclosure Statement.  The Debtors are not aware of any Non-Assumed General Unsecured Claims other than Intercompany Claims and certain claims of affiliates.

97.     With respect to First Lien Secured Claims, the Prepackaged Plan provides for a distribution in the form of "Secured Creditor Consideration."  The form of such consideration and the amount of such consideration will depend on the results of the competitive bidding process set forth in the Bidding Procedures.  If the Stalking Horse Purchase Agreement is the Asset Purchase Agreement, such consideration will consist of:  (i) the Stalking Horse entering into the Stalking Horse Senior Secured Obligation in an aggregate original principal amount not to exceed $100,000,000 (as adjusted pursuant to the terms of the Stalking Horse Asset Purchase Agreement); (ii) cash distributed by the Stalking Horse equal to the positive difference, if any, between $50,000,000 and the amount payable to the Prepetition CFV Lender to satisfy its claims; (iii) cash distributed in respect of any positive net working capital and

cumulative losses purchase price adjustment under the Stalking Horse Asset Purchase Agreement; and (iv) any cash remaining in the estates, after closing expenses are paid, as provided in Sections 6.3 and 11.1 of the Prepackaged Plan (other than cash set aside to pay certain professional fees). If the Stalking Horse Purchase Agreement is not the Asset Purchase Agreement, then the consideration provided to each holder of First Lien Secured Claims and (if the Discharge of First Lien Obligations has occurred) Second Lien Secured Claims shall consist of: (i) the aggregate consideration (other than the liabilities assumed under the Asset Purchase Agreement) provided under the Asset Purchase Agreement, plus (ii) any cash remaining in the estates of the Debtors after the Effective Date, after closing expenses are paid, as provided in Sections 6.3 and 11.1 of the Prepackaged Plan (other than cash set aside to pay certain professional fees), minus (iii) the aggregate amount of cash necessary to satisfy (x) the CFV Claim and the Specified Expenses and (y) the Stalking Horse Protection Claim (as defined in the Stalking Horse Asset Purchase Agreement), if such claim is payable pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

98.     I have been advised that with respect to Second Lien Secured Claims, the value received under the Stalking Horse Asset Purchase Agreement is not sufficient to pay the holders of First Lien Secured Claims in full and thus the holders of Second Lien Secured Claims are not entitled to a recovery on account of their Claims. As such, the holders of Second Lien Secured Claims would not otherwise receive a recovery unless the bidding process yields additional bids that would provide sufficient value to first pay in full all obligations under the First Lien Credit Agreement such that all obligations thereunder were satisfied in full in cash and completely discharged (such event being referred to in the Prepackaged Plan as "Discharge of First Lien Obligations"). To induce the holders of Second Lien Secured Claims to vote in favor

of the Prepackaged Plan, the holders of First Lien Secured Claims have agreed (i) that the holders of Second Lien Secured Claims will receive the Second Lien Expense Reimbursement, whether or not the holders of Second Lien Secured Claims vote to accept that Prepackaged Plan, and (ii) to share $500,000 of the consideration they will receive under the Prepackaged Plan— either in cash or in secured notes, as the case may be—if the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan.

99.     I have been advised that the Prepackaged Plan does not provide for a recovery to holders of Class 8 Non-Assumed General Unsecured Claims and Class 9 Equity Interests in the Debtors.  As such, I have been advised that Classes 8 and 9 are deemed to reject the Prepackaged Plan and are not entitled to vote thereon.  I have been further advised that the Prepackaged Plan also provides that if sufficient consideration is received in the bidding process to pay holders of First Lien Secured Claims and Second Lien Secured Claims in full, the Debtors will amend the Plan to provide a recovery to Class 8 Non-Assumed General Unsecured Claims and possibly to holders of Class 9 Equity Interests.

100.     In light of the fact that substantially all of the Debtors' assets are being sold to the Purchaser on the Effective Date and substantially all Claims to be paid under the Prepackaged Plan are being paid or assumed by the Purchaser on the Effective Date, the Post-Effective Date Debtors (as defined in the Prepackaged Plan) will have minimal responsibilities following the Effective Date, other than ensuring that professionals are paid after approval of final fee applications and abiding by the post-Closing covenants under the Asset Purchase Agreement.  The Prepackaged Plan provides for the appointment of an Officer to replace the existing management of the Debtors on the Effective Date, and the Purchaser will provide

$750,000 to cover the wind-down costs of the Post-Effective Date Debtors.[21]  The Prepackaged Plan further provides that the Chapter 11 Cases will be closed following completion of the fee application process and the Post-Effective Debtors will be dissolved or consolidated with related entities, without the need for further action by the Post-Effective Date Debtors, upon the completion of all of the Post-Effective Date Debtors' responsibilities.

101.    The Prepackaged Plan further provides that, given the unique nature of the Chapter 11 Cases, there is no need for creditors to file proofs of claim.  As such, all filed proofs of claim will be deemed withdrawn.  Any dispute as to the amount of any Claim to be assumed by Purchaser is to be resolved in the ordinary course as it would if the Chapter 11 Cases had not been filed.  This process will protect all parties' rights while avoiding the administratively burdensome process of having to object specifically to each protective proof of claim that is filed.

102.    Because the Prepackaged Plan is supported by the Debtors' senior secured lenders and the NHL, and will lead to the least disruption in the NHL Stars' business of playing professional hockey by providing for the expeditious Sale under the Bankruptcy Court-supervised Auction, I believe the Prepackaged Plan is in the best interests of the Debtors, the NHL Stars franchise, and all parties in interest.

---

[21] Because all unsecured claims will be assumed by the Purchaser and thus satisfied under the Prepackaged Plan, the Debtors do not believe that appointment of a statutory creditors' committee is necessary or appropriate in these Chapter 11 Cases.  If, however, a statutory creditors' committee is appointed, then the fees and expenses of any such committee will be paid out of the $750,000 set aside to cover the wind-down costs of the Post-Effective Date Debtors.

# VII.

## SUMMARY OF FIRST DAY PLEADINGS

103.    Concurrently herewith, the Debtors have filed, for the Court's approval, a number of First Day Pleadings, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity.  It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Commencement Date.  Certain of the First Day Pleadings filed by the Debtors request that the Court authorize the Debtors to immediately pay all or part of a claim that arose prior to the Commencement Date.  As set forth in more detail below, in such instances, the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in each such First Day Pleading.

**A.**    **Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 Requesting Joint Administration of Chapter 11 Cases**

### Relief Requested

104.    By the above-captioned motion, the Debtors seek the joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Code for the District of Delaware (the "Local Rules").  Each of the Debtors face identical issues in these Chapter 11 Cases and joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby save considerable time and expense for the Debtors and their estates.

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

**Basis for Relief Requested**

105.     The rights of respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases, and, in fact, the rights of all creditors will be enhanced by the reduction in costs resulting from the joint administration.  The Court also will be relieved of the burden of entering duplicative orders and maintaining redundant files.  Finally, supervision of the of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee") will be simplified.

106.     I believe that the joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted in all respects.

**B.     Debtors' Motion (I) For an Order Scheduling a Hearing on Shortened Notice (a) to Consider Bidding Procedures and Related Matters and (b) to Determine Confirmation-Related Deadlines and Approving the Form and Manner of Notice Thereof; and (II) for an Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement; (c) Approving Bid Protections; (d) Scheduling a Combined Hearing to Consider (1) Approval of the Disclosure Statement, (2) Approval of Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing a Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief**

**Relief Requested**

107.     By the above-captioned motion (the "Bidding Procedures/Scheduling Motion"), the Debtors request entry of the Shortened Notice Order, which the Debtors are seeking to have entered at the "First Day Hearing," the Debtors request the scheduling of the Bidding Procedures/Scheduling Hearing to consider approval of the relief requested in the

Bidding Procedures and Confirmation Scheduling Order and approval of the notice relating

thereto.

### Basis for Relief Requested

108.    At the Bidding Procedures/Scheduling Hearing, the Debtors will seek

entry of Bidding Procedures and Confirmation Scheduling Order, attached to the Bidding

Procedures/Scheduling Motion as Exhibit B:

(a)    approving the Bidding Procedures, described *supra*, and the form
of which is attached as Exhibit 1 to the Bidding Procedures and Confirmation Scheduling Order
for (i) submitting bids for the Purchased Assets, (ii) conducting the Auction with respect to the
Purchased Assets if the Debtors receive more than one bid on the Purchased Assets;

(b)    approving the Stalking Horse Asset Purchase Agreement, in the
form attached to the Bidding Procedures and Confirmation Scheduling Order as Exhibit 2, for
the purpose of establishing a minimum acceptable bid at which to begin the Auction;

(c)    providing the Proposed Buyers with the Break-Up Fee and
Expense Reimbursement, payable under certain circumstances and upon the closing of a sale to a
successful alternative bidder other than the Proposed Buyer;

(d)    scheduling the Auction for November 21, 2011 at 10:00 a.m.
(Central Time) and providing the procedures governing any auction, as incorporated in the
Bidding Procedures;

(e)    scheduling the Combined Hearing to consider (a) approval of the
Disclosure Statement; (b) approval of the Solicitation Procedures (as defined in the Bidding
Procedures/Scheduling Motion) and the forms of Ballots (as defined in the Bidding
Procedures/Scheduling Motion); and (c) the confirmation of the Prepackaged Plan pursuant to
section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c);

(f)    establishing the objection deadline to object to the adequacy of the
Disclosure Statement, the Solicitation Procedures, or confirmation of the Prepackaged Plan;

(g)    authorizing and approving the form and manner of notice of the
Bidding Procedures, the Auction, the Combined Hearing, related deadlines, and the
commencement of the Chapter 11 Cases (the "Summary and Notice"); and

(h)    granting any related relief.

109.    By the Bidding Procedures/Scheduling Motion, the Debtors request the

entry of the Shortened Notice Order shortening the applicable notice period for the Bidding

Procedures. The Debtors propose that the Bidding Procedures/Scheduling Hearing to consider the relief requested by the Bidding Procedures/Scheduling Motion be conducted on September 22, 2011 at 10:00 a.m. (Eastern Time). The Debtors propose that parties may raise objections, if any, to the Bidding Procedures or the confirmation-related deadlines orally at the Bidding Procedures/Scheduling Hearing.

110.     The Debtors also request by Bidding Procedures/Scheduling Motion approval of the form of notice of the Bidding Procedures/Scheduling Hearing (the "Bidding Procedures/Scheduling Hearing Notice") attached to the Shortened Notice Order as Exhibit 1.

111.     The Debtors believe, upon consultation with the NHL and Prepetition First Lien Lenders, that the Bid submitted by the Proposed Buyers is worth pursuing as the Stalking Horse Bid in connection with the sale of the Purchased Assets. The Debtors have widely marketed the Purchased Assets prepetition for years, and have been unable to obtain a higher or better offer for the Purchased Assets than the offer tendered by the Proposed Buyers in the Stalking Horse Asset Purchase Agreement. In addition, the Bidding Procedures and a form of Bidding Procedures and Confirmation Scheduling Order were included in the solicitation materials sent to all classes entitled to vote on the Debtors' Prepackaged Plan, and thus have been reviewed by interested parties long before the Commencement Date.

112.     If the Proposed Buyers are appointed as a "stalking horse," I believe the Proposed Buyers' Bid will generate competitive bidding at the Auction and will ensure that the Debtors' estates receive the maximum value for the Purchased Assets. The Stalking Horse Asset Purchase Agreement, however, requires that the Debtors use commercially reasonable efforts to obtain entry of the Bidding Procedures and Confirmation Scheduling Order no later than seven days after the Commencement Date. Because all of the dates in the Bidding Procedures are tied

to the entry of the Bidding Procedures and Confirmation Scheduling Order, the earlier the Court holds the Bidding Procedures/Scheduling Hearing, the earlier the Purchased Assets can be sold and the Debtors can emerge from chapter 11. The Debtors' financial situation will become more precarious as time continues to pass without the Purchased Assets being sold, especially once the NHL season begins and the Debtors' payroll increases dramatically. Accordingly, the Debtors seek expedited consideration of the Bidding Procedures.

113. Moreover, delaying the Bidding Procedures/Scheduling Hearing will only increase the length of time before the Debtors will be able to consummate the Sale of the Purchased Assets, increasing the cost to the estates for professional fees, and the amount due on the CFV Debt Agreement.

114. The Debtors also request by Bidding Procedures/Scheduling Motion approval of the Bidding Procedures, as described in greater detail *supra*. The Debtors believe that the Bidding Procedures are fair and appropriate and will maximize the recovery for the Debtors and their estates in connection with the sale of the Purchased Assets. The Bidding Procedures provide for an open auction process with minimum barriers to entry and the proposed deadlines provide interested parties with sufficient time to perform due diligence on the Purchased Assets.

115. The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets.

116. The Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market

to test the consideration that should be received for the Purchased Assets. Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Combined Hearing, is warranted.

117. In connection with the Sale, the Debtors are seeking authorization to pay the "Stalking Horse Protections" (as defined in the Bidding Procedures/Scheduling Motion and described herein) if either: (i) the Stalking Horse Asset Purchase Agreement is terminated pursuant to section 4.2(h), by the Debtors pursuant to section 4.2(a) or section 4.2(d)(i) or by the Proposed Buyers pursuant to section 4.2(e), and (ii) a Competing Bid closes within 180 days of such termination, contemporaneously with or prior to the closing of a Competing Bid, the Debtors shall cause Purchasers to be paid out of the proceeds of a Competing Bid an amount equal to $4,000,000 as a Break-Up Fee and shall reimburse the Proposed Buyers as an Expense Reimbursement in an amount not to exceed $500,000 in immediately available funds; provided that the Break-Up Fee and Expense Reimbursement shall not be payable if the Stalking Horse Asset Purchase Agreement is terminated by the Debtors pursuant to section 4.2(a) or section 4.2(d)(i) or by the Proposed Buyers pursuant to section 4.2(e), in the event that Proposed Buyers' or any of its affiliates failure to perform any of their obligations under the Stalking Horse Asset Purchase Agreement (including, without limitation, their obligations under section 9.9 of the Stalking Horse Asset Purchase Agreement) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals.

118. I believe the Proposed Buyers have agreed to enter into the Stalking Horse Asset Purchase Agreement only if they receive the Stalking Horse Protections. Without these protections, the Proposed Buyers could walk away from the Stalking Horse Asset Purchase Agreement. Thus, I believe the Stalking Horse Protections not only induced the Proposed

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

Buyers to make their initial bid, but the granting of the Stalking Horse Protections is necessary to prevent the Proposed Buyers from being able to withdraw their Stalking Horse Bid. Given the time spent seeking a bidder for these assets, such a withdrawal would be devastating for the Debtors' ability to emerge from chapter 11. In addition, not only will the existence of the Stalking Horse Asset Purchase Agreement increase the likelihood of competitive bidding at the Auction, it will also establish a floor bid, ensuring that other bids provide for more than is contemplated in the Stalking Horse Asset Purchase Agreement. There is no doubt that the existence of the Expense Reimbursement encouraged the Proposed Buyers to invest their resources in valuing the Purchased Assets, which, as a result of such valuation, I believe will provide that the Debtors' estates are more likely to receive the true value of the Purchased Assets.

119.     Further, without the assurance of the Expense Reimbursement, I believe it is unlikely that the Proposed Buyers would have entered into the Stalking Horse Asset Purchase Agreement because the Proposed Buyers performed considerable due diligence on the value of the Purchased Assets and invested time and money in crafting an initial offer. Indeed, the Expense Reimbursement served as an inducement, encouraging the Proposed Buyers to enter into an agreement it otherwise would not have, and I believe the Stalking Horse Asset Purchase Agreement will encourage competitive bidding at the Auction.

120.     By the Bidding Procedures/Scheduling Motion, the Debtors are also asking the Court to schedule the Combined Hearing. The most sensitive and difficult task required to effectuate a successful reorganization—the negotiation of consensual agreements with critical creditor constituencies—has already been accomplished in advance of the Commencement Date. The Debtors solicited votes on the Prepackaged Plan from all classes of

holders of claims entitled to vote to accept or reject the Prepackaged Plan. I understand from my counsel that the votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. Thus, the Debtors respectfully submit that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan. It is in the best interests of the Debtors' estates and their creditors to proceed with the confirmation process as expeditiously as possible.

121. Accordingly, by the Bidding Procedures/Scheduling Motion, the Debtors respectfully request that the Court schedule the Combined Hearing to be held as soon as practicable but on not less than 28 days' notice. The Debtors respectfully request the Court schedule the Combined Hearing for November 23, 2011. The proposed schedule is in the interests of all parties in interest in the Debtors' reorganization cases. The relief sought herein is necessary to the efficient prosecution of these Chapter 11 Cases and will assist in the expeditious confirmation of the Prepackaged Plan while providing adequate notice to, and protecting the rights of creditors. In addition to the reasons set forth above, it is appropriate that a scheduling order be entered at the same time the Bidding Procedures are approved so that creditors may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Prepackaged Plan. The proposed schedule affords creditors and all other parties in interest ample notice of the proceedings. Because the solicitation period was completed prior to the Commencement Date, and the proposed schedule affords an additional 13 days in which parties may evaluate the Prepackaged Plan prior to the proposed Objection Deadline—no party in interest will be prejudiced by the relief requested hereby. Such relief allows for more than ample time for parties to evaluate the Disclosure Statement and Prepackaged Plan prior to the Combined Hearing.

122.     The Debtors request that at the Combined Hearing the Court consider approval of the Solicitation Procedures, all of which were undertaken and substantially completed prior to the Commencement Date.

123.     The Debtors submit that, with respect to the specific classes of claims against and equity interests in the Debtors that were presumed to accept or deemed to reject the Prepackaged Plan, the Solicitation Procedures undertaken by the Debtors and described herein comply with the Bankruptcy Code and should be approved. The Debtors respectfully request that the Court consider approval of the Solicitation Procedures with respect to these classes at the Combined Hearing.

124.     Based on conversations with my counsel, I believe:  (i) the Disclosure Statement and the Solicitation Procedures instituted in connection therewith, including the form of Ballots, are in full compliance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules as well as any applicable nonbankruptcy laws, rules, or regulations governing the adequacy of disclosure in connection with such solicitation; (ii) the Disclosure Statement contains adequate information to permit holders of impaired claims against and interests in the Debtors to make an informed judgment about the Prepackaged Plan pursuant to sections 1125(a) and 1126(b)(2) of the Bankruptcy Code; and (iii) the Debtors' Solicitation Procedures complied with all the requirements of Bankruptcy Rule 3018.  Accordingly, at the Combined Hearing, the Debtors will respectfully request that this Court enter an order (i) finding that the information contained in the Disclosure Statement is "adequate information" as such term is defined in section 1125(a) of the Bankruptcy Code, (ii) approving the Solicitation Procedures and form of Ballots, and (iii) granting such other and further relief as the Court may deem just and proper.

125.     The Debtors respectfully request that the Court set a date that is at least 28 calendar days after the mailing of the Summary and Notice as the Objection Deadline—the last date to file objections to approval of the Disclosure Statement or confirmation of the Prepackaged Plan.  This date will provide creditors and holders of equity interests 28 days' notice of the deadline for filing objections to the Disclosure Statement and the Prepackaged Plan, while still affording the Debtors and other parties in interest time to file a responsive brief and, if possible, resolve any objections received.  The Debtors also request that the Court set any reply deadline at least four business days after the Objection Deadline.

126.     The Debtors commenced solicitation prior to the Commencement Date and obtained the requisite amount of acceptances of the Prepackaged Plan prior to the Commencement Date.  Based on the advice of my counsel, I believe the classes consisting of holders of claims and equity interests materially affected by the Prepackaged Plan have already accepted the Prepackaged Plan in excess of the statutory thresholds specified in section 1126(c) and 1126(d) of the Bankruptcy Code.  The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtors intend to proceed accordingly.  The Debtors submit that cause exists for this Court to direct the United States Trustee not to convene a meeting of creditors or equity security holders unless the Prepackaged Plan is not confirmed within ninety days after the Commencement Date, and the Debtors request such related relief by the Bidding Procedures/Scheduling Motion.

127.     Based on the foregoing, the relief requested in the Bidding Procedures/Scheduling Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors.  Accordingly, I believe the relief requested in the Bidding Procedures/Scheduling Motion should be granted.

**C.** **Motion of Debtors Pursuant to Sections 105, 361, 362, 363, and 507 of the Bankruptcy Code for Entry of an Order (I) Authorizing the use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing**

<u>Relief Requested</u>

128. By the above-captioned motion (the "<u>Cash Collateral Motion</u>"), the Debtors request, pursuant to sections 105, 361,362, 363, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 of the Bankruptcy Rules, entry of the proposed interim order, (i) authorizing the Debtors to use Cash Collateral; (ii) authorizing the Debtors to provide adequate protection to the Prepetition First Lien Secured Parties (as defined in the Cash Collateral Motion) and, if applicable, Prepetition Second Lien Secured Parties (as defined in the Cash Collateral Motion) for any diminution in value of their respective interests in the Prepetition Collateral (as defined in the Cash Collateral Motion), including the Cash Collateral; (iii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the interim order; and (iv) scheduling a final hearing to consider the relief requested in the Motion and the entry of a final order.

<u>Basis for Relief Requested</u>

129. Absent the use of the Cash Collateral, the Debtors will not have sufficient working capital and financing to carry on the operation of their businesses as going concerns. Indeed, without the use of Cash Collateral, the continued operation of the Debtors' businesses may not be possible, and serious and irreparable harm to the Debtors and their estates may occur. This result would be in diametrical opposition to the rehabilitative purpose of chapter 11. Consequently, the use of Cash Collateral is critical to preserve and maintain the value of the Debtors' businesses. This in turn will extract the maximum value from the Debtors' assets. On

an interim basis, the Debtors seek authority to use Cash Collateral pending a final hearing in the amounts reflected in the thirteen-week projections, in an aggregate amount up to $26,000,000.

130.    The Prepetition First Lien Secured Parties have agreed to the Debtors' use of Cash Collateral.  The Prepetition Second Lien Secured Parties, pursuant to the terms of the Intercreditor Agreement, have prenegotiated certain aspects of the Debtors' use of Cash Collateral.  The adequate protection described herein is being provided in accordance with the Debtors' agreement with the Prepetition First Lien Secured Parties, and the prenegotiated rights of the Prepetition Second Lien Secured Parties.  Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and administration of these Chapter 11 Cases should be approved.

131.    Without access to the use of the Cash Collateral, the Debtors' liquidity will quickly dry up and the Debtors could be forced to cease operations in a non-orderly manner. In contrast, the value of the Prepetition Collateral is preserved by allowing the Debtors access to Cash Collateral because it ensures the uninterrupted continuance of the Debtors' operations. Accordingly, the adequate protection proposed herein is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

132.    Absent authorization from the Court to use Cash Collateral on an interim basis pending a Final Hearing, the Debtors will be immediately and irreparably harmed.  As set forth above, the Debtors' ability to use Cash Collateral on the terms described herein is critical to their ability to operate their businesses in the ordinary course.  Without the liquidity provided by the use of Cash Collateral, the Debtors will simply be unable to conduct normal business operations, will be unable to pay basic expenses, such as payroll, utilities, and supplier payments, and will suffer a precipitous loss of value to the detriment of all parties in interest.  Indeed,

absent the interim use of Cash Collateral, the Debtors' businesses will be brought to an immediate halt and one of the principal objectives of the Debtors' Prepackaged Plan—to protect the value of the franchise and successfully complete the sale of the Debtors' assets to the Purchaser contemplated by the Prepackaged Plan under an orderly and expedited chapter 11 case—would be frustrated. Serious and irreparable harm to the Debtors and their estates would occur, with disastrous consequences for the Debtors, their estates and creditors, if the Debtors do not obtain entry of the Interim Order.

**D.      Motion of Debtors Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code Authorizing the Debtors to Pay Wages, Salaries, Compensation, and Employee Benefits**

<u>Relief Requested</u>

133.     By the above-captioned motion (the "<u>Employee Wage and Benefits Motion</u>"), the Debtors seek entry of an order authorizing, but not requiring, the Debtors to (a) pay, in their sole discretion, wages, salaries, commissions, payroll taxes, garnishments, expense reimbursements, bonuses, and certain other compensation (collectively, the "<u>Compensation Obligations</u>") and certain employee benefits, which include, among other things, the PTO Plans, the Health and Welfare Plans, the 401(k) Plan, the Severance Plan, the Discount Program, the Relocation Benefits, the NHL Plans, and the Minor League Health and Welfare Plan (each as defined below and collectively, the "<u>Employee Benefits</u>" and together with the Compensation Obligations, the "<u>Employee Obligations</u>") and (b) maintain and continue to honor their practices, programs, and policies for their employees as they were in effect on the Commencement Date, and as they may be modified, amended, or supplemented from time to time in the ordinary course of business.

**Basis for Relief Requested**

134.    The continued operation of the Debtors' businesses and the successful consummation of the sale of the Debtors' assets to the Purchaser pursuant to the Prepackaged Plan depends on the retention and cooperation of the Debtors' Employees.

**A.      Obligations to Non-Player Employees**

135.    With respect to Non-Player Employees (as defined in the Employee Wages and Benefits Motion), any delay or failure to pay any of the Employee Compensation Obligations or amounts due under the Employee Benefits could irreparably impair the Non-Player Employees' morale, dedication, confidence, and cooperation, and could severely disrupt the Debtors' relationship with their Non-Player Employees and irreparably impair Non-Player Employee morale at the very time that such Non-Player Employee dedication, confidence, retention, and cooperation are most crucial.  The Debtors cannot run a professional hockey team without the support of coaches, trainers, and hockey staff who work directly with the players and the Non-Player Employees who oversee the administration, financial management, and back-office functions of the Debtors' business operations.  At this critical stage, the Debtors simply cannot risk the substantial disruption to their business operations that would be attendant to any decline in workforce morale or composition attributable to the Debtors' failure to pay the Employee Compensation Obligations and obligations arising under the Employee Benefits.  As of the Commencement Date, the Debtors estimate that approximately $373,178 is due and owing to the Employees on account of Employee Obligations incurred prior to the Commencement Date.

136.    Moreover, because the Debtors expect the prepackaged cases to be concluded in a short period of time and because assumed general unsecured claims are

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

unimpaired under the Prepackaged Plan, paying the Non-Player Employees in the ordinary course of business will enable the Debtors to operate smoothly during these cases. Such relief would allow the Debtors to focus on consummating the Prepackaged Plan for the benefit of their estates and creditors. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Non-Player Employees will seek other employment alternatives. In addition, with respect to Non-Player Employees who have incurred expenses in connection with the performance of their duties, it would be inequitable to require these Non-Player Employees to bear personally the cost of any business expenses they incurred prepetition on behalf of the Debtors with the understanding that they would be reimbursed.

137. Similarly, the Debtors believe it is necessary and equitable to continue to pay the compensation obligations owed to two former Non-Player Employees pursuant to their respective employment contracts (the "Contract Termination Obligations") in the ordinary course because (i) all assumed general unsecured claims are being paid in full by the Purchaser under the Prepackaged Plan, (ii) the Debtors have requested the payment in full of all of their vendors in the ordinary course during the Chapter 11 Cases, and (iii) the Purchaser has agreed to assume the Contract Termination Obligations pursuant to the Asset Purchase Agreement. Moreover, failure to pay the Contract Termination Obligations could cause potential business disruptions and affect the morale of current Non-Player Employees—many of whom have developed strong and lasting relationships with the former Non-Player Employees who were terminated—and cause those remaining Non-Player Employees to perform their duties at less than optimal levels, or lead them to seek other employment.

## B. Obligations to the Players

138.     As noted, the 2011-2012 NHL hockey season does not commence until October 6, 2011, and, as of the Commencement Date, the Debtors have not incurred substantial salary and benefit obligations to players.  Continuing the Employee Obligations to the Debtors' players in the ordinary course, including the Deferred Compensation and Re-Entry Waiver Obligations, is critical to protect the value of the franchise and successfully complete the sale of the Debtors' assets contemplated by the Prepackaged Plan.  Failure to honor Employee Obligations to the Debtors' players would have substantial public relations repercussions for the Debtors, as such Employees are public figures.  In addition, the value of the Debtors is enhanced by strong performance for the NHL Stars, and lessened by weak performance.  As such, it is crucial to the value of the Debtors and their estates that the players be focused on winning hockey games, not on the bankruptcy proceedings.

139.     With respect to the deferred compensation obligations to one former NHL Player of the Debtors (the "Deferred Compensation Obligation") and reimbursement obligation to an NHL Club for a transferred Player (the "Re-Entry Waiver Obligation"), the Debtors are bound by the terms of a collective bargaining agreement (the "CBA") that governs the contractual relationship between the Clubs and the hockey players, including the Deferred Compensation Obligation and the Re-Entry Waiver Obligation.  Pursuant to section 1113(f) of the Bankruptcy Code, debtors in possession may not unilaterally terminate or alter any provisions of a collective bargaining agreement without first complying with the procedures contemplated by section 1113.  The Debtors do not seek to reject the CBA under section 1113 of the Bankruptcy Code and therefore must honor the Employee Obligations to the Debtors' players, including the Deferred Compensation Obligation and the Re-Entry Waiver Obligation.

In addition, failure to honor certain Player obligations, including the Deferred Compensation Obligation and the Re-Entry Waiver Obligation could constitute a default under the CBA. The next payment on account of the Deferred Compensation Obligation and the Re-Entry Waiver Obligation does not become due and payable until January 1, 2012 and October 15, 2011, respectively, and no amounts are currently outstanding as of the Commencement Date. Furthermore, the Deferred Compensation Obligation and the Re-Entry Waiver Obligation will be assumed by the Debtors and assigned to the Purchaser pursuant to the Asset Purchase Agreement.

140.    Based on the foregoing, I believe that the relief requested is in the best interests of the Debtors and their respective estates and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption and should be granted.

**E.    Motion of Debtors for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing the Payment of Prepetition Claims of Certain Creditors in the Ordinary Course of Business**

### Relief Requested

141.    By the above-captioned motion (the "Payable Claims Motion"), the Debtors request entry of an order authorizing but not directing the Debtors, subject to the procedures set forth in the Payable Claims Motion, to pay, in the ordinary course of business, the liquidated, noncontingent, and undisputed prepetition claims (the "Payable Claims") of holders of General Unsecured Claims and Other Secured Claims[22] (each as defined in the Prepackaged

---

[22] Certain of the Debtors' prepetition trade creditors, such as shippers and mechanics, may be secured creditors because of their capacity to assert liens on the Debtors' property.

Plan) (collectively the "Prepetition Creditors").  In addition, the Debtors request the authority to continue to perform all obligations under the COC Sublease.

**Basis for Relief Requested**

142.    These Chapter 11 Cases are the culmination of a lengthy process designed to sell the Purchased Assets while at the same time providing an appropriate treatment for the Debtors' creditors.  The Debtors believe that a seamless transition through bankruptcy and to the Auction will preserve the value upon which the Prepackaged Plan is based.  A fundamental aspect of the Debtors' efforts to minimize disruption during their Chapter 11 Cases is the Debtors' ability to maintain and develop their relationships with important vendors with whom the Debtors conduct business.  The perception and understanding of these Chapter 11 Cases by such parties is vital to the success of the Debtors' reorganization.

143.    Indeed, the relief requested in the Payable Claims Motion is designed to create certainty in the Debtors' relationships with such parties.  These relationships will contribute to the continued operation of the business of the Debtors during and after these Chapter 11 Cases.  The Debtors are not seeking to pay these amounts immediately, but only such portions thereof as they become due in the ordinary course of the Debtors' businesses and consistent with the Debtors' prepetition business practices.

144.    Further, the Debtors anticipate emerging from chapter 11 within a very short time period and concurrently herewith the Debtors have filed the Prepackaged Plan and Disclosure Statement.  The Debtors are seeking approval of the Disclosure Statement and confirmation of the Prepackaged Plan as soon as possible.  The Prepackaged Plan provides, *inter alia*, that the Payable Claims will be paid in full and thus be unimpaired.  As a result, assuming confirmation of the Prepackaged Plan within 60–75 days, granting the relief requested in the

Payable Claims Motion may accelerate in certain circumstances, and then only slightly, the timing of payments to the Debtors' vendors and other holders of unimpaired General Unsecured Claims or Other Secured Claims and will not affect or impair the rights of other creditors in these Chapter 11 Cases.

145.    Absent continuity of payment of the Payable Claims in the ordinary course of business, the Debtors' businesses will be disrupted.  The adverse consequences of not being able to maintain existing terms with vendors could damage, perhaps irreparably, the Debtors' operations and potentially imperil their restructuring efforts if such Prepetition Creditors cease providing goods and services even for a short period of time.  The Debtors rely on the Prepetition Creditors to operate their businesses, and many of the Prepetition Creditors are the only qualified source for the specific supplies the Debtors require.  Refusal by the Prepetition Creditors to continue to supply the Debtors would be devastating to their businesses.

146.    The Debtors estimate that, as of the Commencement Date, they owe a total of approximately $1,100,000 on account of undisputed Payable Claims.[23]  Of those claims, the Debtors estimate that approximately $400,000 would also be entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors in the ordinary course of business within 20 days of the Commencement Date.  Furthermore, $95,400 of the Payable Claims may be secured.  The Debtors estimate that approximately $560,000 of Payable Claims will become due and payable within the first 20 days of these Chapter 11 Cases.  These amounts of Payable Claims are typical for the Debtors in the

---

[23] This figure does not include the value of goods in transit and not received by the Debtors as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims.

ordinary course of their business. Further, the Debtors are current with virtually all of their payments to Prepetition Creditors as of the Commencement Date. Many of Payable Claims are on rolling, 30 or 45-day terms, and Debtors do not intend to pay the Payable Claims until they would come due in the ordinary course of their business.

147. In light of the prepackaged nature of these cases, the short duration of time which the Debtors expect to be in bankruptcy, and the fact that the Prepackaged Plan provides that General Unsecured Creditors and Other Secured Creditors will be unimpaired and that administrative and priority claims will be paid in full, I believe the relief requested in the Payable Claims Motion is in the best interests of the Debtors, their creditors, and all parties in interest and, therefore, the Payable Claims Motion should be granted.

**F.      Motion of Debtors Pursuant to Sections 105(a), 363, and 503(b)(1) of the Bankruptcy Code for Authorization to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business**

### Relief Requested

148. By the above-captioned motion (the "Customer Programs Motion"), the Debtors seek entry of an order authorizing the Debtors to honor all tickets purchased and otherwise continue the customer programs in the ordinary course of business, and to perform and honor, at the Debtors' sole discretion, their prepetition obligations thereunder. The relief requested is critical for the Debtors to be able to retain their valuable and loyal fans and customers, to the benefit of all parties in interest. Any interruption or discontinuation of the Customer Programs risks alienating fans and customers, which could have devastating effects on the Debtors' business and the sale to be effectuated by the Prepackaged Plan. Thus, it is vital that the Debtors be able to honor all tickets purchased and otherwise continue the Customer Programs, and to satisfy all prepetition obligations thereunder.

**Basis for Relief Requested**

149.     Prior to the Commencement Date, in the ordinary course of business, the Debtors implemented certain customer programs and policies (collectively, the "Customer Programs") designed to attract and retain fans of the NHL Stars and customers of the Dr Pepper StarCenters.  More specifically, these Customer Programs aim to develop and sustain fan relationships and loyalty, increase ticket and merchandise sales, attract and sustain patronage of the Dr Pepper StarCenters, increase the number of amateur hockey players and the popularity of hockey in the Dallas-Fort Worth metroplex, and generate goodwill for the Debtors amongst their fans and customers.  These Customer Programs include various ticket packages to NHL Stars home games, certain programs for NHL Stars fans paid for by third parties, programs at the Dr Pepper StarCenters including youth and adult hockey leagues, hockey and figure skating lessons, general skating, and birthday parties (collectively the "StarCenters Programs"), and certain benefits for participants in the StarCenters Programs, including VIP cards, free or discounted NHL Stars tickets, discounts on StarCenters Programs, and free or discounted NHL Stars merchandise.

150.     The Debtors submit that the resulting benefits of continued fan and customer satisfaction and loyalty during these Chapter 11 Cases will far exceed any costs associated with the Customer Programs.  Considering the potential for loss of fan loyalty, goodwill, and revenue absent the relief requested herein, I submit that authorization to continue the Customer Programs in the ordinary course of business and to perform and honor the prepetition obligations thereunder, as the Debtors deem appropriate in their sole business judgment, is essential to preserving the viability of the Debtors' business.  Based on the

foregoing, I believe that the relief requested in the Customer Programs Motion is in the best

interest of the Debtors, their estates, and their creditors and should be approved in all respects.

**G.** **Motion of Debtors for an Order Pursuant to Sections 105(a), 363(c), 365, and 345(b) of the Bankruptcy Code (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms, (II) Granting an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code, and (III) Perform Obligations Under the Ticketmaster Agreements**

<u>Relief Requested</u>

151.    To manage their businesses efficiently and seamlessly, the Debtors use a

cash management system (the "<u>Cash Management System</u>") to collect and transfer the funds

generated by their operations and to disburse funds to satisfy their financial obligations.  The

Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting,

and enables the Debtors to maintain control over the administration of their bank accounts

(the "<u>Bank Accounts</u>"), which are located at JPMorgan Chase ("<u>JPMorgan</u>") and are listed on

Exhibit 1 of the proposed order annexed to the motion (the "<u>Cash Management Motion</u>").[24]  By

the Cash Management Motion, the Debtors seek entry of an order, pursuant to sections 105(a),

363(c), 365 and 345(b) of the Bankruptcy Code, granting them (i) authorization to continue to

use the Cash Management System, including to fund their operations in the ordinary course of

business, consistent with their prepetition practices, (ii) authorization to maintain the Debtors'

existing Bank Accounts, (iii) authorization to perform their obligations under the Ticketmaster

Agreements (as defined herein), and (iv) an extension of time to comply with section 345(b) of

the Bankruptcy Code.  Without the requested relief, the Debtors will be unable to maintain their

---

[24] The Debtors have provided a chart depicting the Cash Management System, attached to the proposed Cash Management Order as Exhibit 2.

financial operations effectively and efficiently, which would cause significant harm to the Debtors and their estates and creditors.

**Basis for Relief Requested**

152. To manage their businesses efficiently and seamlessly, the Debtors use the Cash Management System to collect and transfer the funds generated by their operations and to disburse funds to satisfy their financial obligations. The Debtors record such collections, transfers, and disbursements as they are made. For demonstrative purposes, a diagram generally illustrating the Cash Management System is annexed as Exhibit 2 to the Cash Management Motion.

153. The Cash Management System can be broken down into several distinct segments: cash collection, concentration, and disbursements. In addition, the Debtors' purchase card program is an important component of the Cash Management System.

154. The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Based upon the foregoing, maintenance of the existing Cash Management System is in the best interest of the Debtors and their estates.

155. JPMorgan charges certain fees (the "Service Fees") to maintain the various Bank Accounts in the Cash Management System. The Service Fees are paid directly to JPMorgan monthly from the Stars Operating Account (as defined in the Cash Management Motion). The Service Fees vary based on the amount of activity in the Bank Accounts, but are

approximately $5,000 per month. The Debtors seek to continue to pay the Service Fees in the ordinary course throughout the chapter 11 proceedings. As of the filing, the Debtors believe that approximately $2,750 of Service Fees are outstanding. Failure to pay the prepetition Services Fees could result in the disruption of the Cash Management System, which would severely hinder the Debtors' ability to do business throughout these Chapter 11 Cases. Therefore, the Debtors are seeking authority of the Court to pay the outstanding balance of the Service Fees in the ordinary course of business.

156. Additionally, many of the Debtors' employees have a corporate purchase card issued by JPMorgan that they are authorized to use for business-related expenses. The majority of the purchase card expenses are related to travel and lodging expenses of the Debtors' employees, including expenses related to travel and lodging of the Dallas Stars' hockey players. The Debtors have placed a security deposit of $285,300 into a control account maintained by HSG and controlled by JPMorgan for purposes of securing their credit card obligations.[25] All right, title, and interest in the funds held in the control account belonging to HSG were assigned to Dallas Stars pursuant to that certain letter agreement, dated September 1, 2011, by and among the Dallas Stars, Dallas Arena, Plano StarCenter, HSG, HSG Sports Group Holdings LLC, and Hicks Holdings LCC. The average monthly purchase card expenses of the Debtors varies greatly, depending on whether the team is the off-season or in-season, and depending on the number of road games the team may play in a given month; however, purchase card expenses for May 2011 through August 2011 have averaged totaled approximately $195,000 per month.

---

[25] All corporate credit cards in the program are used by Debtors' employees. No HSG or other non-debtor employees have access to the Debtors' corporate credit cards.

157.     As of the Commencement Date, the Debtors estimate that $131,000 in purchase card expenses have been incurred but not paid for by the Debtors.  The Debtors are seeking authority of the Court to pay the outstanding balance of the credit cards in the ordinary course of business.  The purchase card payments are necessary for the continued use of the credit cards, which are critical for funding the day-to-day operations of the Debtors.  The Debtors expect to discontinue the use of these purchase cards after the Sale of the Debtors' businesses, as contemplated by the Prepackaged Plan, is completed.

158.     The Debtors are parties to three separate agreements with Ticketmaster, L.L.C. ("Ticketmaster").  Ticketmaster processes certain single game individual Ticket Sales for NHL Stars home games and any season ticket, partial season ticket and group ticket Ticket Sales for NHL Stars home games and certain Foundation events for the Debtors through its Archtics system pursuant to a prepetition contract, dated July 1, 2010, between the Dallas Stars and Ticketmaster (the "Ticketmaster Stars Game Ticketing Agreement").  Further, pursuant to a prepetition contract, dated July 1, 2010, between the Dallas Stars and Ticketmaster (together, the "Ticketmaster Dr Pepper Arena Ticketing Agreement" and together with the Ticketmaster Stars Game Ticketing Agreement, the "Ticketmaster Ticketing Agreements"), Ticketmaster processes single event tickets for events held at the Dr Pepper Arena for the Debtors.  The two Ticketmaster Ticketing Agreements, which have terms of five years each, are identical except that one governs the Ticket Sales at the American Airlines Center while the other governs sales of tickets at the Dr Pepper Arena.  By these agreements, the Debtors use the Archtics revenue processing system to keep track of their season, partial season and group ticket sales, and Ticketmaster processes Visa and MasterCard payments associated with these transactions.

159.     Under the Ticketmaster Ticketing Agreements, Ticketmaster is granted the authority to make Ticket Sales on behalf of the team on its website, via telephone, and through other means.  In exchange for the ticket selling and credit card processing it provides, Ticketmaster is entitled to compensation, which is takes by adding a special service charge to the face value of every ticket purchased by consumers through Ticketmaster.  The amount of such compensation varies based on the face value of the ticket.  An additional fee is charged for every ticket sold through Ticketmaster's website or by telephone.  Ticketmaster provides the Debtors with a portion of the additional fees and charges collected in exchange for the right to process such ticket sales.  Ticketmaster also charges the Debtors an annual fee for continued use of its proprietary Archtics software.

160.     In connection with the Ticketmaster Ticketing Agreements, Ticketmaster provides a weekly accounting to the Debtors and remits payment to one of the Collection Accounts each week for the face value of tickets purchased by customers and the Debtors' portion of the additional fees/charges relating to Ticket Sales processed for the Debtors during the prior week.  There are currently no defaults under the Ticketmaster Ticketing Agreements.

161.     Ticketmaster also operates a ticket exchange program (the "Ticket Exchange Program") on behalf of the Debtors under that certain NHL Secondary Interface Opt-In Agreement, dated August 23, 2010 (the "Ticketmaster Exchange Agreement" and together with the Ticketmaster Ticketing Agreements, the "Ticketmaster Agreements").  The Ticketmaster Exchange Agreement was effective as of July 1, 2010 and has a term of two years to July 1, 2012.  Under the Ticketmaster Exchange Agreement, customers may re-sell tickets to NHL Stars home games to other patrons through NHL.com for prices either above or below the ticket's face value.  Ticketmaster charges customers for the use of such services.  In exchange for

US_ACTIVE\43722024\12\40036.0005

RLF1 5345386v. 1

allowing Ticketmaster the exclusive right to conduct the resale of tickets under the Ticketmaster Exchange Agreement, the Debtors receive base fees (determined based on a formula relating to how many seats are available to each game) paid twice annually, as well as a percentage of the revenues Ticketmaster earns through the Ticket Exchange Program.

162.    Pursuant to the terms of the Ticketmaster Exchange Agreement, Ticketmaster operates an online site whereby holders of tickets to Dallas Stars home games may sell their tickets to other individuals seeking tickets to Dallas Stars home games, without regard to the face value of the tickets being sold. Ticketmaster charges sellers of tickets a fee based on the amount the seller is seeking, and the Debtors are entitled to a percentage of those fees collected by Ticketmaster when tickets are resold. The Debtors are also entitled to an annual fee. In exchange, the Debtors grant to Ticketmaster the exclusive rights to run the Ticket Exchange Program, including links to the Ticket Exchange Program on the NHL Stars website, provide Ticketmaster with various advertising benefits, and provide Ticketmaster with tickets to all Dallas Stars home games.

163.    By this Motion, the Debtors are specifically requesting authority to continue to perform their obligations under the Ticketmaster Ticketing Agreements, subject to Ticketmaster's continuing performance of its obligations, including weekly remittance of proceeds from Ticket Sales, in the same manner as Ticketmaster and the Debtors performed their obligations immediately prior to the Commencement Date. The Ticketmaster Ticketing Agreements represent an enormous benefit to the estates, because all ticket sales online and through the telephone are processed by Ticketmaster under the terms of the Ticketmaster Ticketing Agreements, and these sales represent a significant portion of the total overall Ticket Sales and sales of Tickets to Dr Pepper Center events. Without the benefits of the Ticketmaster

Agreements, the Debtors would be unable to process internet ticket or phone sales or any sale of season tickets or group tickets via Visa or MasterCard throughout the pendency of these Chapter 11 Cases. During the pendency of these Chapter 11 Cases, the Ticket Sales for NHL Stars games is one of the primary sources of revenue for the Debtors. At a time when the NHL season is about to begin and will be underway, an inability to use Ticketmaster's services would result in lost revenue that is vital to the Debtors' continued operations during the pendency of these Chapter 11 Cases, and vital to ensure the continued support of the local fan base. Without this source of revenue, the Debtors operations could be severely hampered, and the sale contemplated under the Prepackaged Plan would be jeopardized. Moreover, I believe the damage to the Debtors' business will likely go beyond lost revenue from ticket sales. Any difficulty purchasing tickets would likely lead to widespread dissatisfaction among the NHL Stars fan base, potentially costing the Debtors thousands of customers and impacting all sources of NHL Stars-related revenue for years to come.

164. Additionally, the Debtors are specifically requesting authority to continue to perform their obligations under the Ticketmaster Exchange Agreement. The Ticketmaster Exchange Agreement provides the Debtors with a source of income associated with the re-sale of tickets to NHL Stars games that would otherwise go untapped. In exchange for a percentage of the profits and minimal fees, Ticketmaster, through the Ticketmaster Exchange Agreement, provides the Debtors with a way to tap this source of revenue that would otherwise not be accessible. In addition, the Ticketmaster Exchange Agreement provides Dallas Stars ticket holders an opportunity to sell tickets that might otherwise go unused to patrons who will attend Dallas Stars home games. Parties that purchase tickets through the Ticket Exchange Program potentially use Concessions and purchase Merchandise during Dallas Stars home games, which

is an additional revenue source for the Debtors that benefits the estates. These additional sources of revenue will help ensure the viability of the Debtors as they move towards the Sale.

165.     I am informed by counsel that the Office of the United States Trustee's *Operating Guidelines For Chapter 11 Cases* (the "U.S. Trustee Guidelines") mandate the closure of the Debtors' prepetition bank accounts, the opening of new accounts, including special accounts for the payment of taxes and segregation of cash collateral, and the immediate printing of new checks with "Debtor in Possession" and other information printed on them. If the Debtors were required to comply with these guidelines, their operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of their existing Bank Accounts, the opening of new accounts, and the immediate printing of new checks.

166.     The Debtors believe, therefore, that their transition to chapter 11 will be smoother and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts are continued following the Commencement Date with the same account numbers; provided, however, that checks issued or dated prior to the Commencement Date will not be honored, absent a prior order of this Court. By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served. Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts prior to or following the Commencement Date.

167.     In addition to mandating the closure of all bank accounts, I am informed by counsel that the U.S. Trustee Guidelines require the immediate printing of new checks with the label "Debtor in Possession," and other information related to the Debtors' cases.  Similarly, Local Rule 2015-2(a) of the Local Rules mandate that the Debtors, upon exhausting their existing check stock, order new checks with the "Debtor in Possession" label.  The Debtors issue a large number of checks, and use a large volume of purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), in the ordinary course of business.  In light of the expedited nature of these prepackaged cases and to minimize expenses, the Debtors request that they be authorized to continue using their existing Business Forms, including electronically generated forms, substantially in the form existing immediately before the Commencement Date, without reference to their status as debtors in possession, and without adding the other related information required by the Guidelines.

168.     The Debtors further request (i) a 90-day extension of the time to comply with Local Rule 2015-2(a)'s requirement that any newly ordered check stock bear the debtor in possession legend and the bankruptcy case number and (ii) a waiver of this requirement upon confirmation of the Prepackaged Plan.  The Debtors intend to remain in chapter 11 only as long as it takes to confirm the Prepackaged Plan and close the Sale.  Obtaining new Business Forms (including new check stock) and implementing new electronic check forms across all of their businesses would create significant expense and logistical difficulties.  Once such a transition is accomplished, the process would have to be started again almost immediately to obtain Business Forms upon the Sale and emergence from chapter 11 protection.  Furthermore, as a major league sports team, the Debtors' chapter 11 filing will likely be widely publicized, and the Debtors will further publicize the chapter 11 cases through a press release and sending a notice of

commencement to all known creditors. Given such wide publication of the Debtors' status as debtors in possession, publication on checks and other business forms will add little additional notice or protections. Accordingly, the Debtors request a waiver of the requirement to mark new check stock with the debtor in possession status unless the Debtors remain in bankruptcy for longer than expected.

169. By the Cash Management Motion, the Debtors also seek a 60-day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the United States Trustee in discussions to determine what modification to their investment guidelines, if any, would be appropriate under the circumstances. The Debtors believe that the benefits of the requested extensions far outweigh any harm to the estates.

170. The majority of the Debtors' Bank Accounts are maintained at JPMorgan, which I have been informed by counsel is a bank that has been approved by the United States Trustee as an authorized bank depository (an "Authorized Bank Depository"). The Debtors believe that any funds that are deposited in these accounts are secure and, thus, the Debtors are in compliance with section 345 of the Bankruptcy Code.

171. Based on the foregoing, the relief requested in the Cash Management Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

**H.    Motion of Debtors for an Interim and Final Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; and (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance**

<u>**Relief Requested**</u>

172.    By the above-captioned motion (the "<u>Utilities Motion</u>"), the Debtors request entry of (a) an interim order (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a final order, (ii) approving the Debtors' Proposed Adequate Assurance (as defined in the Utilities Motion), (iii) approving the Debtors' proposed procedures for resolving any Additional Assurance Requests (as defined in the Utilities Motion), and (iv) scheduling a hearing on the Utilities Motion to consider granting the relief requested herein on a final basis; and (b) a final order granting the relief requested in the Utilities Motion on a final basis.

<u>**Basis for Relief Requested**</u>

173.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telephone services, garbage disposal, water, sewage disposal, and/or other similar services (collectively, the "<u>Utility Services</u>") from a number of utility companies or their brokers (collectively, the "<u>Utility Companies</u>").  Annexed to both the Proposed Interim Order and Proposed Final Order to the Utilities Motion as Exhibit 1 is a non-exclusive list of Utility Companies that provide Utility Services to the Debtors (the "<u>Utility Services List</u>"), a description of those Utility Services, and an estimate of the average monthly expenditure on Utility Services with each of the Utility Companies, and an

estimate of the amount of Adequate Assurance Deposit (as defined below) that is equal to the cost of two weeks of Utility Services for each of the Utility Companies. The relief requested in the Utilities Motion applies to all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Service List.

174. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, irreparably damaging the Debtors' relationships with customers and vendors to the detriment of all parties in interest. Such a disruption could potentially delay the Debtors' successful sale process. The Debtors propose to place a cash deposit equal to two weeks of Utility Services, calculated as a historical average over the past twelve months (the "Adequate Assurance Deposit") into a newly-created, interest-bearing segregated account maintained at JPMorgan within twenty days after the Commencement Date for the benefit of each Utility Company on a pro rata basis, unless such Utility Company agrees to a lesser amount or already holds a deposit equal to or greater than the cost of two weeks of Utility Service. Based on historical usage of Utility Services, the Debtors estimate that the Adequate Assurance Deposit will be approximately $90,500.

175. Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Utilities Motion should be granted.

**I.** **Motion of the Debtors for an Order Pursuant to Sections 105(a), 362(d), 363 (b), 503(b), and 1107(a) of the Bankruptcy Code for Authorization to (A) Continue Their Workers' Compensation, Liability, Property, and Other Insurance Programs and (B) Pay all Obligations in Respect Thereof**

### Relief Requested

176.   By the above-captioned motion, the Debtors request that the Court authorize the Debtors to continue their workers' compensation programs (the "Workers' Compensation Programs") and various liability, property, and other insurance programs (the "General Insurance Programs," and, together with the Workers' Compensation Programs, the "Insurance Programs") on an uninterrupted basis, and to honor all undisputed prepetition and postpetition obligations thereunder, including the payment of all claims, administrative expenses, brokers' fees, charges, premiums, and deductibles (the "Insurance Obligations").  In addition, to the extent any of the Debtors' employees hold valid claims under the Workers' Compensation Programs, the Debtors also seek authorization to modify the automatic stay imposed by section 362 of the Bankruptcy Code to permit these employees to proceed with their claims under the Workers' Compensation Programs, at the Debtors' discretion.  Furthermore, to the extent required by law or under a Workers' Compensation Program, the Debtors request authority to pay all or part of a claim related thereto directly to an employee, her medical providers, her heirs, or her legal representatives, as set forth in the applicable policy.  In furtherance of these requests, the Debtors request that the Court authorize and direct the Debtors' banks and any other applicable financial institutions to receive, honor, process, and pay any and all checks drawn, or electronic funds transferred, to pay the Insurance Obligations, whether such checks were presented prior to or after the Commencement Date.  The Debtors believe that any prepetition amounts owed on account of the Insurance Obligations will not exceed $621,165.

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1

**Basis for Relief Requested**

177.     The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the insurance carriers terminating their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future.  If the Insurance Programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to administer these Chapter 11 Cases successfully and complete the proposed Sale.  Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what they expect to be a significantly higher cost to their estates.  Accordingly, the Debtors must make all payments with respect to the Insurance Programs.

178.     In addition, the risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being and morale of the Debtors' current employees—perhaps going as far as resulting in employee departures.  Employee departures at this critical time may result in a severe disruption of the Debtors' businesses with a substantially adverse impact on the Debtors, the value of their assets and businesses, and consequently the Sale and the administration of these Chapter 11 Cases.

179.     Based on the foregoing, I believe that the authority to pay the Insurance Obligations in accordance with the Debtors' prepetition practices is in the best interests of the

Debtors and their estates and is essential to enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**J.     Motion of Debtors for an Order Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Sales Taxes, Use Taxes, Property Taxes, and Certain Other Governmental Assessments**

### Relief Requested

180.     The Debtors seek an order authorizing, but not directing, the Debtors to pay all prepetition sales taxes, use taxes, personal property taxes, and other governmental assessments (collectively, the "Tax Obligations") to various state and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit to be owed for periods prior to the Commencement date. The Debtors believe that the total amount of such Tax Obligations will not be greater than approximately $691,130. In furtherance of this request, the Debtors request that the Court authorize and direct the Debtors' banks and any other applicable financial institutions to receive, honor, process, and pay any and all checks drawn, or electronic funds transferred, that relate to any of the Tax Obligations, whether such checks were presented prior to or after the Commencement Date.

### Basis for Relief Requested

181.     To the extent the Debtors have collected sales taxes from third parties, such funds must be held in trust by the Debtors for the benefit of the applicable Taxing Authorities and do not constitute property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code. Furthermore, most, if not all, of the Tax Obligations described herein are afforded priority status pursuant to section 507(a)(8) of the Bankruptcy Code. As priority claims, the Tax Obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Under the Prepackaged Plan, the Taxing Authorities will be paid in

full.  Consequently, the requested relief merely affects the timing of the Debtors' payment of the Tax Obligations, not the amount paid in respect thereof.

182.    Moreover, many federal and state statutes hold officers of collecting entities personally liable or criminally responsible for certain taxes owed by those entities.  To the extent that any such taxes remain unpaid by the Debtors, the Debtors' officers may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their personnel from important tasks, to the detriment of all parties in interest.  The dedicated and active participation of the Debtors' officers and other employees is not only integral to the Debtors' continued, uninterrupted operations, but also essential to the orderly administration of these Chapter 11 Cases.  Accordingly, the Debtors submit that the proposed relief is in the best interests of the Debtors' estates.

183.    Payment of the prepetition Tax Obligations is critical to the Debtors' continued and uninterrupted operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, or seeking to lift the automatic stay, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

K.    **Motion of Debtors Pursuant to 28 U.S.C. § 156(c) for Authorization to Employ and Retain GCG, Inc. as Notice, Claims, and Solicitation Agent**

**Relief Requested**

184.    The Debtors request authorization to the employ and retain GCG, Inc. ("GCG") as the official notice, claims, and solicitation agent (the "Claims Agent") in these

Chapter 11 Cases in accordance with the terms and conditions of that certain bankruptcy administration agreement (the "GCG Agreement") by and between the Debtors and GCG, dated August 11, 2011.

**Basis for Relief Requested**

185. After a thorough review and competitive comparison of no fewer than three proposals from reputable claims agents, the Debtors selected GCG based on, among other things, its expertise in noticing, claims processing, balloting administration and distribution. Thus, the Debtors propose to compensate and reimburse GCG in accordance with the terms and conditions set forth in the GCG Agreement for all services rendered and expenses incurred in connections with these Chapter 11 Cases. The Debtors believe that the proposed rates to be charged by GCG are reasonable, appropriate, and competitive for services of this nature. The Debtors also believe GCG's rates are competitive and reasonable given the quality of GCG's services and GCG's prior bankruptcy expertise.

186. The Debtors estimate that they have well in excess of 200 creditors in these Chapter 11 Cases, and GCG is fully equipped to handle the volume of mailing involved in properly sending the notices to and processing the claims of these creditors and other interested parties. Based on the foregoing, I believe the retention of GCG as the Claims Agent is in the best interests of the Debtors, their estates, and all parties in interest.

187. Based on the foregoing, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such and other further relief as may be just.

Dated: September 15, 2011
Dallas, Texas

By: /s/ Robert L. Hutson
Robert L. Hutson
Chief Financial Officer of Dallas Stars,
Dallas Arena, and StarCenters, and
Treasurer of U.S. Holdings

US_ACTIVE:\43722024\12\40036.0005

RLF1 5345386v. 1