# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------------- x

: **Chapter 11**

**In re**  :

: **Case No. 11-_____ (___)**

**DALLAS STARS, L.P.,** *et al.*,  :

: **Joint Administration**

**Debtors.**  : **Requested**

------------------------------------------------------------------- x

## DISCLOSURE STATEMENT RELATING TO
## THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF
## <u>DALLAS STARS, L.P., *ET AL.* UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
    Debtors in Possession
200 Crescent Court, Suite 300
Dallas, Texas  75201
Telephone:  (214) 746-7700
— and —
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New  York 10153
Telephone:  (212) 310-8000

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and
    Debtors in Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19889
Telephone:  (302) 651-7700

Dated:  September 1, 2011

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 PLAN OF REORGANIZATION PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, DALLAS STARS, L.P., DALLAS ARENA LLC, DALLAS STARS U.S. HOLDINGS CORP., AND STARCENTERS LLC (COLLECTIVELY, THE "COMPANY" OR THE "DEBTORS") EXPECT PROMPTLY TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES AND CONFIRMING THE JOINT PREPACKAGED REORGANIZATION PLAN DESCRIBED HEREIN.



# DISCLOSURE STATEMENT

**DATED SEPTEMBER 1, 2011**

PREPETITION SOLICITATION OF VOTES
WITH RESPECT TO THE JOINT PREPACKAGED PLAN OF REORGANIZATION

OF

## DALLAS STARS, L.P.

## DALLAS ARENA LLC

## DALLAS STARS U.S. HOLDINGS CORP.

AND

## STARCENTERS LLC

FROM THE HOLDERS OF

**FIRST LIEN SECURED CLAIMS**

AND

**SECOND LIEN SECURED CLAIMS**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED REORGANIZATION PLAN IS 4:00 P.M. EASTERN TIME, ON SEPTEMBER 13, 2011, UNLESS EXTENDED BY THE COMPANY. TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.**

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF DALLAS STARS, L.P., ET AL. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u> (THE "<u>PREPACKAGED PLAN</u>"). ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE COMPANY IS SOLICITING ACCEPTANCES OF THE PREPACKAGED PLAN FROM HOLDERS OF FIRST LIEN SECURED CLAIMS IN CLASSES 2A, 2B, 2C, AND 2D AND FROM HOLDERS OF SECOND LIEN SECURED CLAIMS IN CLASSES 3A, 3B, 3C, AND 3D.

THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER OF CLAIMS SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PREPACKAGED PLAN; USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY.

ALTHOUGH THE COMPANY HAS NO OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT, IT RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THIS DISCLOSURE STATEMENT AT ANY TIME PRIOR TO THE VOTING DEADLINE.

\* \* \* \* \*

THE CONFIRMATION AND EFFECTIVENESS OF THE PREPACKAGED PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED. MOREOVER, THERE CAN BE NO ASSURANCE AS TO WHEN AND WHETHER CONFIRMATION OF THE PREPACKAGED PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PREPACKAGED PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES, ARE DESCRIBED IN SECTION IV.H—"THE PREPACKAGED PLAN— PROVISIONS GOVERNING DISTRIBUTIONS."

\* \* \* \* \*

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PREPACKAGED PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PREPACKAGED PLAN, ANTICIPATED EVENTS IN THE COMPANY'S CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE COMPANY BELIEVES THAT THE SUMMARIES OF THE PREPACKAGED PLAN, RELATED DOCUMENTS, AND STATUTORY PROVISIONS ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE COMPANY IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY OR OMISSION.

HOLDERS OF CLAIMS AND EQUITY INTERESTS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE PREPACKAGED PLAN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PREPACKAGED PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT RELY UPON ANY RECOMMENDATION, PROMISE, REPRESENTATION OR WARRANTY OF OR VIEW EXPRESSED BY OR ON BEHALF OF ANY PARTY, OTHER THAN THOSE EXPRESSLY SET FORTH IN THE PREPACKAGED PLAN OR THE RELATED DOCUMENTS.

CERTAIN OTHER FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND, TO THE EXTENT APPLICABLE, SECTION 1125(e) OF THE BANKRUPTCY CODE, AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. **PARTIES SHOULD CONSULT ARTICLE VII—"CERTAIN FACTORS TO BE CONSIDERED" FOR A DESCRIPTION OF SOME OF THE RISKS INVOLVED IN THIS CHAPTER 11 CASE.**

WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE COMPANY BELIEVES THAT ITS PLANS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, IT CANNOT BE SURE THAT THEY WILL BE ACHIEVED. THESE FACTORS ARE NOT INTENDED TO REPRESENT A COMPLETE LIST OF THE GENERAL OR SPECIFIC FACTORS THAT MAY AFFECT THE COMPANY. IT SHOULD BE RECOGNIZED THAT OTHER FACTORS, INCLUDING GENERAL ECONOMIC FACTORS AND BUSINESS STRATEGIES, MAY BE SIGNIFICANT, PRESENTLY OR IN THE FUTURE, AND THE FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT MAY AFFECT THE COMPANY TO A GREATER EXTENT THAN INDICATED. ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE COMPANY OR PERSONS ACTING ON ITS BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT. EXCEPT AS REQUIRED BY LAW, THE COMPANY UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE

AMOUNTS OF CLAIMS OR EQUITY INTERESTS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARIES PROVIDED HEREIN AND THE TERMS OF THE PREPACKAGED PLAN OR RELATED DOCUMENTS, THE TERMS OF THE PREPACKAGED PLAN SHALL GOVERN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE INFORMATION REGARDING THE HISTORY, BUSINESSES, AND OPERATIONS OF THE COMPANY, ARE INCLUDED HEREIN FOR PURPOSES OF DISCLOSURE AND CONFIRMATION OF THE PREPACKAGED PLAN. AS TO ANY JUDICIAL PROCEEDINGS IN ANY COURT, INCLUDING ANY ADVERSARY PROCEEDINGS OR CONTESTED MATTERS THAT MAY BE FILED IN THE BANKRUPTCY COURT, SUCH INFORMATION IS NOT TO BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE COMPANY.

* * * * *

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE COMPANY OF THE TRANSACTION OR MATTER ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

* * * * *

# SUMMARY OF THE PREPACKAGED PLAN[1]

   This section of the Disclosure Statement is intended to provide a high-level summary of the proposed transactions to be implemented in connection with the Prepackaged Plan. Each of the elements referenced below is described in more detail in other parts of this Disclosure Statement.

   The Prepackaged Plan, attached hereto as <u>Exhibit A</u>, submitted by Dallas Stars, L.P. ("<u>Dallas Stars</u>"); Dallas Arena LLC ("<u>Dallas Arena</u>"); Dallas Stars U.S. Holdings Corp. ("<u>U.S. Holdings</u>"); and StarCenters LLC ("<u>StarCenters</u>" and collectively, the "<u>Debtors</u>") provides for the sale (the "<u>Sale</u>"), through a competitive auction process, of substantially all of the assets of the Debtors (the "<u>Purchased Assets</u>"), including (i) the professional ice hockey team that is a member of the National Hockey League ("<u>NHL</u>" or the "<u>League</u>") and is known as "the Dallas Stars" (the "<u>NHL Stars</u>"); (ii) their interests in four ice arenas and related assets located in the Dallas-Fort Worth metroplex known as the "Dr Pepper StarCenters";[2] and (iii) all of the ownership interests held by Dallas Arena in and to Center Operating Company, L.P. ("<u>COC</u>") and Center GP, LLC ("<u>Center GP</u>"), which own the leases and agreements related to the American Airlines Center ("<u>AAC</u>"), the arena where the NHL Stars play their home games. The purpose of the Sale is to allow for a transition in ownership of the NHL Stars, while ensuring that the team continues to play professional ice hockey at the AAC in Dallas. As described herein at Section I.A.3, the Debtors are contractually bound by a number of agreements that require that the team remains in Dallas and plays its home games at the AAC. The Debtors are unequivocally committed to a long future of the NHL Stars playing hockey in Dallas. To that end, no bid submitted during the bidding process will be considered that contemplates moving the team from the AAC in Dallas. The Sale will be consummated on the effective date of the Prepackaged Plan (the "<u>Effective Date</u>").

   After a lengthy marketing process and substantial discussions involving input from the NHL and certain of the Debtors' senior secured lenders, the Debtors finalized an asset purchase agreement (the "<u>Stalking Horse Asset Purchase Agreement</u>") with Dallas Sports & Entertainment, LP and certain of its affiliates (the "<u>Stalking Horse</u>"), attached hereto as <u>Exhibit C</u>, providing for the Sale to the Stalking Horse of the Purchased Assets under the Prepackaged Plan, subject to higher or better offers in the bidding process and to NHL approval of both any bid and any bidder. If the Debtors obtain sufficient acceptances of the Prepackaged Plan from the holders of First Lien Secured Claims entitled to vote, they intend to execute the Stalking Horse Asset Purchase Agreement and file chapter 11 petitions in the Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") for the purpose of implementing the Sale and the Prepackaged Plan.

---

[1] All capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed to them in this Disclosure Statement or the Prepackaged Plan, as the case may be.

[2] The Sale contemplated herein may include a fifth Dr Pepper StarCenter located in Plano, Texas that is owned by a non-debtor entity, Plano StarCenter LLC. That facility is currently being closed for repairs and will be non-operational for a significant period of time. As described herein at Section I.C.8, whether that facility is included in the Sale depends, among other things, on whether the Debtors obtain consent from an entity that holds a security interest in substantially all of the assets of Plano StarCenter LLC, including the ice arena. Notwithstanding the foregoing, as described herein at Section I.C.8, the purchase price under the Stalking Horse Asset Purchase Agreement will not be adjusted if the Debtors' interest in the Plano StarCenter LLC ice arena is not transferred in connection with the Sale.

Contemporaneous with the filing of the Chapter 11 Cases, the Debtors expect to file a motion seeking (I) approval of (a) the Stalking Horse Asset Purchase Agreement, including certain protections for the Stalking Horse, (b) bidding procedures (the "Bidding Procedures"),[3] and (c) this Disclosure Statement and related solicitation procedures and (II) the scheduling of hearings to consider the foregoing and confirmation of the Prepackaged Plan. The Bidding Procedures contemplate that the Debtors will market the Purchased Assets further postpetition, potential purchasers that meet certain requirements will be provided the opportunity to submit bids for the Purchased Assets that are higher or better than the Stalking Horse's bid, an auction (the "Auction") will be held if more than one qualified bid is received, and the Debtors will sell the Purchased Assets either to the successful bidder at the Auction or, if there is only one qualified bidder, to that qualified bidder. Importantly, the Bidding Procedures also provide that all bids and all bidders are subject to approval of the NHL and the Bankruptcy Court. The term "Asset Purchase Agreement" as used in the Prepackaged Plan and herein refers to the purchase agreement submitted by the ultimate Purchaser. If the only qualified bid to receive NHL approval is the Stalking Horse Asset Purchase Agreement and as a result there is no Auction, then the Stalking Horse Asset Purchase Agreement will be the Asset Purchase Agreement and the Stalking Horse will be the Purchaser under the Prepackaged Plan.

The consideration that will be paid under the Asset Purchase Agreement will be available for distribution to the holders of certain Claims under the Prepackaged Plan. Under the Stalking Horse Asset Purchase Agreement (if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement), the Stalking Horse will pay the Claims (the "CFV Claim") of CFV I LLC, an affiliate of the NHL (the "Prepetition CFV Lender"), in full in Cash upon consummation of the Sale. In addition, the Stalking Horse has agreed to assume all liabilities other than a limited number of specified liabilities expressly excluded (generally obligations owed to affiliates, as described below in more detail). As such, trade creditors of the Debtors are intended to be unaffected by the Prepackaged Plan, and the Debtors plan to seek Bankruptcy Court approval to be able to continue to pay all trade creditors of the Debtors that continue to provide normal trade credit terms in the ordinary course of business during the pendency of their Chapter 11 Cases.

As more fully described in Section I.E.1 herein, if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, the consideration distributable to holders of First Lien Secured Claims under the Prepackaged Plan would consist of obligations of the Stalking Horse pursuant to a senior secured term loan facility in an aggregate original principal amount equal to $100,000,000, as adjusted by the Purchase Price Adjustment (as defined below), plus an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount, plus any cash or non-cash assets required to be paid to holders of First Lien Secured Claims as a result of the Purchase Price Adjustment, plus any cash left over in the Debtors' estates upon dissolution. Competing bidders may provide different forms of consideration to the holders of First Lien Secured Claims, as long as the aggregate value of such consideration satisfies the value requirements set forth in the Bidding Procedures. However, no competing bidder (other than the Stalking Horse) may bid with consideration in the form of indebtedness to the holders of First Lien Secured Claims unless agreed to in writing by the First Lien Administrative Agent with the consent of the holders of a majority of the First Lien Secured Claims.

---

[3] The Bidding Procedures are discussed herein at Section I.E.6 and are attached as Exhibit 1 to the Bidding Procedures and Confirmation Scheduling Order (as defined herein), which is attached as Exhibit C to the Stalking Horse Asset Purchase Agreement, which is in turn attached as Exhibit C to this Disclosure Statement.

Because the Prepackaged Plan provides for an Auction and a competitive bidding process for the Debtors' assets, the Debtors do not believe that there is an alternative to the Prepackaged Plan that would provide holders of Claims, including holders of Second Lien Secured Claims, with a greater realization on the Debtors' assets. In light of the fact that the proceeds of the Sale under the Stalking Horse Asset Purchase Agreement would not be sufficient to pay the holders of the First Lien Secured Claims in full, the holders of Second Lien Secured Claims are not entitled to receive a distribution under the Prepackaged Plan unless the Auction yields Qualified Bids (as defined in the Bidding Procedures) and such bids provide for the satisfaction in full, in cash, and complete discharge of the obligations under the First Lien Credit Agreement.

Notwithstanding the foregoing, as further inducement to holders of Second Lien Secured Claims to vote in favor of the Prepackaged Plan, the holders of First Lien Secured Claims have agreed to share $500,000 of the consideration they would otherwise receive under the Prepackaged Plan—either in secured notes or cash, as the case may be—if the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan. Specifically, the Prepackaged Plan provides that if each of Classes 3A through 3D votes to accept the Prepackaged Plan, then notwithstanding the Intercreditor Agreement that governs the rights between the holders of First Lien Secured Claims and the holders of Second Lien Secured Claims, the Second Lien Administrative Agent shall receive $500,000 of the consideration that would otherwise have been distributed to holders of First Lien Secured Claims, which shall be in the form of secured notes (such as the Stalking Horse Senior Secured Obligations) with a principal amount of $500,000 if the consideration being provided under the Asset Purchase Agreement to holders of First Lien Secured Claims consists of at least $500,000 in secured notes and shall otherwise be in cash. In addition, whether or not the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan, the holders of First Lien Secured Claims have agreed to provide the holders of Second Lien Secured Claims the Second Lien Expense Reimbursement, as defined in Section 1.92 of the Prepackaged Plan, that generally includes the fees of the Second Lien Administrative Agent's attorneys and accounting advisors, up to $25,000, to review the documents relating to the consideration to be provided to the holders of Second Lien Secured Claims under the Prepackaged Plan.

The Prepackaged Plan is the result of months of discussions among the NHL, the Stalking Horse, and certain of the Debtors' lenders, and the Sale will be the product of a lengthy marketing process that yields the highest value for the Debtors' assets. After an extensive analysis of their options, the Debtors believe that confirmation of the Prepackaged Plan, including consummation of the Sale, is in the best interest of all creditors and equity holders, and is in the best interest of the NHL Stars and the NHL.

**THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PREPACKAGED PLAN AND BELIEVE THAT THE PREPACKAGED PLAN PROVIDES THE BEST RECOVERY FOR THE DEBTORS' CREDITORS.**

# INTRODUCTION

## IMPORTANT—PLEASE READ

The Debtors submit this disclosure statement (the "Disclosure Statement") in connection with the solicitation of acceptances from holders of Claims entitled to vote on the Prepackaged Plan (the "Solicitation") and will seek Bankruptcy Court approval of the Disclosure Statement at the hearing to consider confirmation of the Prepackaged Plan (the "Confirmation Hearing"), which will be scheduled by the Bankruptcy Court after the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases").

This Solicitation is being conducted at this time to obtain sufficient votes to enable the Prepackaged Plan to be confirmed by the Bankruptcy Court. Capitalized terms used in this Disclosure Statement but not defined herein shall have the meanings ascribed to them in the Prepackaged Plan. Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan will govern.

The Debtors are commencing this Solicitation after extensive discussions among the Debtors, the Stalking Horse, the NHL, and certain of the Debtors' lenders. The discussions have resulted in the support of the Sale by the Debtors' key constituencies, including the NHL and the holders of First Lien Secured Claims, subject to, and in accordance with, the terms of the Prepackaged Plan.

The Prepackaged Plan consists of four separate chapter 11 plans, one for each Debtor.

## A.      HOLDERS OF CLAIMS ENTITLED TO VOTE

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a chapter 11 plan (unless such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be impaired under the Prepackaged Plan unless (i) the Prepackaged Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Prepackaged Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. Classes of Claims and Equity Interests that are unimpaired under the Prepackaged Plan are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

As described in greater detail herein, the holders of claims in Classes 2A, 2B, 2C, and 2D and Classes 3A, 3B, 3C, and 3D are impaired and entitled to vote on the Prepackaged Plan. No other holders of claims or equity interests are entitled to vote on the Prepackaged Plan because they are either unimpaired by the Prepackaged Plan and deemed to accept the Prepackaged Plan or are otherwise deemed to reject the Prepackaged Plan. Please consult the detailed summary of the Prepackaged Plan in Section IV of this Disclosure Statement for a discussion of the treatment afforded by the Prepackaged Plan to each class of Claims and Equity Interests.

If a Class of Claims entitled to vote on the Prepackaged Plan rejects the Prepackaged Plan, the Debtors reserve the right to amend the Prepackaged Plan or request confirmation of the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan of reorganization by one or more impaired classes of claims or equity interests. Under that section, a plan of reorganization may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable"

with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual chapter 11 plan of reorganization, see Section VI.C of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT NO ALTERNATIVE TO THE PREPACKAGED PLAN AFFORDS THE HOLDERS OF IMPAIRED CLAIMS THE POTENTIAL FOR A GREATER REALIZATION ON THE DEBTORS' ASSETS AND, THEREFORE, THE PREPACKAGED PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2A, 2B, 2C, AND 2D AND CLASSES 3A, 3B, 3C, AND 3D VOTE TO ACCEPT THE PREPACKAGED PLAN.**

**B.      SUMMARY OF VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Prepackaged Plan, a ballot will be sent with this Disclosure Statement for the purpose of voting on the Prepackaged Plan (a "Ballot"). If you hold Claims in more than one potentially impaired Class, you will receive separate ballots, which must be used for each separate Class of Claims. Ballots should be returned to The Garden City Group, Inc. ("GCG" or the "Solicitation Agent") as follows:

**In the pre-paid envelope provided, or by hand delivery, or overnight courier to:**

Dallas Stars Ballot Processing
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

**By mail to:**

Dallas Stars Ballot Processing
c/o GCG
P.O. Box 9807
Dublin, Ohio 43017-5707

**By facsimile to:**

(888) 584-7628

**By email to:**

dlsballoting@gcginc.com

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PREPACKAGED PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 4:00 P.M. (EASTERN TIME) ON SEPTEMBER 13, 2011 (THE "VOTING DEADLINE"). ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PREPACKAGED PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PREPACKAGED PLAN SHALL NOT BE COUNTED.

If you are a holder of a Claim entitled to vote on the Prepackaged Plan and you did not receive a ballot, you received a damaged ballot, you lost your ballot, or if you have any questions concerning the Disclosure Statement, the Prepackaged Plan, or the procedures for voting on the Prepackaged Plan, or to request a hard copy of the solicitation materials, please contact the Solicitation Agent by telephone at (888) 579-1198.

C.     **OVERVIEW OF THE PREPACKAGED PLAN**

The following table summarizes the treatment and estimated recovery for creditors and equity holders under the Prepackaged Plan that hold Allowed Claims and Equity Interests.  For a further explanation, please refer to the discussion in Section IV below—"The Prepackaged Plan"—and the Prepackaged Plan itself.

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| Classes 1A–1D<br><br>Priority Non-Tax Claims | Allowed Priority Non-Tax Claims, if any, will be assumed by Purchaser and paid in Cash on the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a different treatment.<br><br>Classes 1A–1D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Classes 2A–2D<br><br>First Lien Secured Claims | The First Lien Secured Claims shall be Allowed Claims and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, impairment, objection, or any other challenge under any applicable law or regulation by any person or entity. On the Effective Date (or, as expressly contemplated by Sections 6.3 and 11.1 of the Prepackaged Plan, after the Effective Date), each holder of a First Lien Secured Claim shall be issued (on behalf of the Debtors) its *pro rata* share (in accordance with the First Lien Security Agreement) of the Secured Creditor Consideration[4] up to the | Yes | Approximately 66.827%,[6] but potentially more depending on results of Auction. |

<hr>

[4] As defined in the Prepackaged Plan and as described in greater detail herein at Section IV.A, "Secured Creditor Consideration" means (i) the consideration provided under the Asset Purchase Agreement to the holders of First Lien Secured Claims and, if the Discharge of First Lien Obligations has occurred, the holders of Second Lien Secured Claims, plus (ii) property distributed to the First Lien Administrative Agent pursuant to Section 6.3 and 11.1 of the Prepackaged Plan. If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the consideration provided to the holders of First Lien Secured Claims shall be (i) the Stalking Horse Senior Secured Obligation, (ii) any Cash payments made under the Stalking Horse Asset Purchase Agreement to the First Lien Administrative Agent for the benefit of the holders of First Lien Secured Claims, and (iii) any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 of the Prepackaged Plan. If the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, then the consideration provided to each holder of First Lien Secured Claims, and if the Discharge of First Lien Obligations

has occurred, to the holders of Second Lien Secured Claims, shall be (i) (a) the aggregate consideration (other than liabilities assumed under the Asset Purchase Agreement) provided under the Asset Purchase Agreement (which, pursuant to the Bidding Procedures and Confirmation Scheduling Order, shall be of a higher or better value than the consideration provided to holders of First Lien Lender Claims and (if the Discharge of First Lien Obligations has occurred) Second Lien Lender Claims under the Stalking Horse Asset Purchase Agreement), plus any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 of the Prepackaged Plan, minus the sum of (x) the aggregate amount of Cash necessary to satisfy the CFV Claim and the Specified Expenses plus (y) the Stalking Horse Protection Claim, if such claim is payable pursuant to the terms of the Stalking Horse Asset Purchase Agreement; provided, that, unless otherwise expressly agreed in writing by the First Lien Administrative Agent with the consent of the holders of a majority in amount of the First Lien Secured Claims, the consideration set forth in the Asset Purchase Agreement may be in the form of a debt obligation to the holders of First Lien Secured Claims only if the Stalking Horse is the Purchaser and such debt is in the amount and on the terms set forth in the Stalking Horse Senior Secured Credit Agreement. Prepackaged Plan at Section 1.96.

As defined in the Prepackaged Plan, "Stalking Horse Senior Secured Obligation" means the obligation to be owed by the Stalking Horse to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) as of the Effective Date pursuant to the Stalking Horse Asset Purchase Agreement, the terms of which shall be set forth in the Stalking Horse Senior Secured Credit Agreement whether or not the holder of a First Lien Secured Claim (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) executes the Stalking Horse Senior Secured Credit Agreement, which if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement shall be in the original principal of $100,000,000 (as may be adjusted downwards by the Purchase Price Adjustment) in partial satisfaction of the First Lien Secured Claims, and, if applicable, Second Lien Secured Claims. Prepackaged Plan at Section 1.103.

[5] As defined in the Prepackaged Plan, "NHL/Lender Cooperation Agreement" means (i) if the Stalking Horse is the Purchaser, the NHL/Lender Cooperation Agreement shall have the meaning given in section 9.9 of the Stalking Horse Asset Purchase Agreement, with such modifications as may be acceptable to the NHL and the First Lien Administrative Agent, or (ii) if the Stalking Horse is not the Purchaser and the Purchaser provides consideration in the form of a secured debt obligation to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if applicable), that letter agreement to be entered into among the NHL, the Purchaser, any of its owner-support parties, any guarantors, pledgors, or similar parties, and the administrative agent with respect to such debt obligation, in form and substance reasonably satisfactory to the NHL and the First Lien Administrative Agent. Prepackaged Plan at Section 1.69. The NHL/Lender Cooperation Agreement is discussed in greater detail herein at Section I.E.5.

[6] In light of the nature of the distribution to holders of First Lien Secured Claims, including that the consideration provided under the Stalking Horse Asset Purchase Agreement is subject to adjustments and that the Prepackaged Plan contemplates a bidding process, it is not possible to determine the estimated distribution with precision. As such, the figures stated herein are estimates and are based on a number of assumptions. The methodology the Debtors employed to approximate the First Lien Secured Claims recovery is as follows: Assuming the First Lien Secured Claims against the Debtors are capped at $149,640,000 in the aggregate, as set forth in the Guaranty Cap and Lien Cap (as described below in more detail), and assuming the distribution to the holders of First Lien Secured Claims consists solely of the Stalking Horse Senior Secured Obligation in a principal amount of $100,000,000, with an agreed-upon value of $100,000,000, then the estimated recovery to holders of First Lien Secured Claims would be approximately 66.827%. As explained below in more detail, the amount ultimately distributable to holders of First Lien Secured Claims is subject to various adjustments, including, for example, the Final Net Working Capital Adjustment (as defined in the Stalking Horse Asset Purchase Agreement) which will not be determined until after the closing of the Sale, which will impact the ultimate recovery for the holders of First Lien Secured Claims, and the holders of First Lien Secured Claims are entitled to any cash remaining in the Debtors' estates upon dissolution, pursuant to Sections 6.3 and 11.1 of the Prepackaged Plan, which means the actual distribution could be more than or less than $100,000,000. In addition, if the Stalking Horse Asset Purchase Agreement is not the Asset Purchase

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| | full Allowed amount of such Claim, including accrued interest under the First Lien Credit Agreement through the Effective Date; provided, however, that if all or a portion of the distribution to the holders of First Lien Secured Claims is in the form of secured debt obligations to the holders of First Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.[5]  In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.*, Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims.  Notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which | | |

Agreement because the Auction yields additional bids that are higher or better than the bid submitted by the Stalking Horse, the recovery for the holders of First Lien Secured Claims may be greater than what is set forth in the Stalking Horse Asset Purchase Agreement.  For every million dollars greater than or less than $100,000,000 that the holders of First Lien Secured Claims receive in an actual distribution, the percentage recovery (from 66.827% on $100,000,000 distribution) will increase or decrease, as the case may be, by approximately 0.6685%.  For example: if the ultimate distribution is $99,000,000, the holders of First Lien Secured Claims would receive a recovery of approximately 66.159%, while if the ultimate distribution is $102,000,000 the holders of First Lien Secured Claims would receive a recovery of approximately 68.164%.  It is important to note that the information set forth herein for Estimated Recovery is an estimate and that each holder should review the information provided in this Disclosure Statement and confer if necessary with its legal and financial advisors to discuss the assumptions made.  The information set forth in this Estimated Recovery description does not take into account the $500,000 in consideration the holders of First Lien Secured Claims will provide to the holders of Second Lien Secured Claims if the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan.

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| | consideration shall be distributed *pro rata* to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; <u>provided</u>, <u>however</u>, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent under the Prepackaged Plan shall be in the form of a secured debt obligation in the original principal amount of $500,000; <u>provided further</u>, <u>however</u>, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  Except as provided in Section 4.3 of the Prepackaged Plan, the holders of Second Lien Secured Claims shall neither receive nor retain any distribution under the Prepackaged Plan unless and until the Discharge of First Lien Obligations has occurred.<br><br>Classes 2A–2D are impaired by the Prepackaged Plan.  Each holder of a First Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan. | | |

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| Classes 3A–3D<br><br>Second Lien Secured Claims | The Second Lien Secured Claims shall be Allowed Claims. In full satisfaction, settlement, release, and discharge of, and in exchange for, each Second Lien Secured Claim, in the event that the Discharge of First Lien Obligations has occurred, each holder of a Second Lien Secured Claim, on account of its Second Lien Secured Claim, on the Effective Date shall be issued (on behalf of the Debtors) its *pro rata* share of the Secured Creditor Consideration remaining after the Discharge of First Lien Obligations (including payment of accrued interest under the First Lien Credit Agreement through the Effective Date), up to the full Allowed amount of the Second Lien Secured Claim, including accrued interest under the Second Lien Credit Agreement through the Effective Date; provided, however, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations to the holders of Second Lien Secured Claims shall be subject to that certain NHL/Lender Cooperation Agreement. In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase | Yes | The greater of:<br><br>Approximately 0.342%[7] if each of Classes 3A–3D votes to accept the Prepackaged Plan<br><br>*or*<br><br>.017%[8] if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement but potentially more depending on results of Auction. |

---

[7] The methodology the Debtors employed to approximate the Second Lien Secured Claims recovery is as follows: If each of Classes 3A–3D votes to accept the Prepackaged Plan, then the holders of First Lien Secured Claims have agreed to provide to the holders of Second Lien Secured Claims $500,000 of the consideration the holders of First Lien Secured Claims will receive under the Prepackaged Plan, in notes or in cash, as the case may be. Assuming that as of July 31, 2011, as described herein at Section I.C.1, the holders of Second Lien Secured Claims hold an aggregated claim of $146,232,000, then the estimated recovery to the holders of Second Lien Secured Claims in Classes 3A–3D (on account of the consideration provided to the holders of Second Lien Secured Claims in Classes 3A–3D by the holders of First Lien Secured Claims if each of Classes 3A–3D votes to accept the Prepackaged Plan) would be approximately 0.342%. If one takes into account the Second Lien Expense Reimbursement, the total recovery to the holders of Second Lien Secured Claims is 0.359%.

[8] The estimated recovery to holders of Second Lien Secured Claims will be, at a minimum, approximately .017% on account of the Second Lien Expense Reimbursement.

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| | Agreement is provided in consideration of different forms (*e.g.*, Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims. Other than as set forth in the Prepackaged Plan, on the Effective Date, any Second Lien Secured Claim shall be extinguished and the holders of any Second Lien Secured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Second Lien Secured Claim; provided, however, and notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, on the Effective Date, the Second Lien Administrative Agent shall receive the Second Lien Expense Reimbursement.<br><br>Notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed *pro rata* to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; provided, however, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent under the Prepackaged Plan shall be in the form of a secured debt obligation in the original principal amount of $500,000; provided further, however, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims | | |

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| | payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as set forth in Section 4.3 of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by the Prepackaged Plan.<br><br>Classes 3A–3D are impaired by the Prepackaged Plan. Each holder of a Second Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan. | | |
| Class 4A<br><br>CFV Claim | The CFV Claim shall be an Allowed Claim. On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the CFV Claim shall be paid in full in Cash by the Purchaser under the Asset Purchase Agreement, as provided therein.<br><br>Class 4A is unimpaired by the Prepackaged Plan. Each holder of an Allowed CFV Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Classes 5A–5D<br><br>Secured Tax Claims | Each holder of an Allowed Secured Tax Claim that is assumed by the Purchaser under the Asset Purchase Agreement shall retain its existing lien, if any, in the Purchased Assets and any rights associated therewith pursuant to applicable non-bankruptcy law, and shall be paid in Cash by the Purchaser when such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business.<br><br>Classes 5A–5D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | No (deemed to accept) | 100% |

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| Classes 6A–6D<br><br>Other Secured Claims | Allowed Other Secured Claims will be assumed by the Purchaser on the Effective Date under the Asset Purchase Agreement. Each holder of an Allowed Other Secured Claim shall, on the Effective Date, either (i) retain its existing lien in the Purchased Assets and be paid by the Purchaser when such Allowed Other Secured Claim becomes due and owing in the ordinary course of business, or (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.<br><br>Classes 6A–6D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Classes 7A–7D<br><br>Assumed General Unsecured Claims | Each holder of an Allowed Assumed General Unsecured Claim will be paid by the Purchaser on the Effective Date or when and as such Allowed Assumed General Unsecured Claim becomes due and owing in the ordinary course of business.<br><br>Classes 7A–7D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to accept the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Classes 8A–8D<br><br>Non-Assumed General Unsecured Claims | On the Effective Date, any Non-Assumed General Unsecured Claim shall be extinguished and the holders of any Non-Assumed General Unsecured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Non-Assumed General Unsecured Claim. In the event the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to | No (deemed to reject) | 0% if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement but if the Auction yields sufficient |

| Class and Designation | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|
| | receive payment in full, the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests. Except for Intercompany Claims and claims arising out of executory contracts that are being rejected under the Prepackaged Plan—the Debtors are not aware of any Non-Assumed General Unsecured Claim.<br><br>Classes 8A–8D is impaired by the Prepackaged Plan. To the extent there are any claims in Class 8A, each holder of an Allowed Non-Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to reject the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. | | proceeds to provide a recovery to this Class, the Debtors will amend the Plan. |
| Classes 9A–9D<br><br>Equity Interests in Debtors | On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Debtors shall be maintained; provided, however, the holders of the Allowed Equity Interests in Debtors shall not be entitled to transfer such Allowed Equity Interests in Debtors to any party, and shall not receive or retain any property or interest in property on account of such Allowed Equity Interests in Debtors unless the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, in which case the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.<br><br>Classes 9A–9D are impaired by the Prepackaged Plan. Each holder of an Allowed Equity Interest in Debtors is deemed to reject the Prepackaged Plan. | No (deemed to reject) | 0% if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement but if the Auction yields sufficient proceeds to provide a recovery to this Class, the Debtors will amend the Plan. |

The primary purpose of the Prepackaged Plan is to effectuate the sale of the NHL Stars franchise and certain related assets to the Purchaser. If the Sale is not consummated, the Debtors do not

believe that the funds from current and future operations will be sufficient to meet their payroll and other operating expenses, including their debt service requirements, or satisfy their debt repayment obligations.

The Debtors' legal advisors are Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A.  They can be contacted at:

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Attn:  Martin A. Sosland, Esq.
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Ronit J. Berkovich, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19889
Attn:  John H. Knight, Esq.
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

* * *

# TABLE OF CONTENTS

I.     GENERAL INFORMATION ................................................................................ 1

    A.     The Company ...................................................................................... 1

          1.     The National Hockey League ................................................. 1

          2.     The NHL Stars ...................................................................... 2

          3.     COC Operations and the American Airlines Center ................ 2

          4.     The Dr Pepper StarCenters ................................................... 3

    B.     Corporate Structure and Current Officers ............................................ 4

          1.     The Debtors' Parent Companies ............................................ 4

          2.     Current Principal Executive Officers ..................................... 4

    C.     Prepetition Indebtedness and Other Material Arrangements ................ 5

          1.     Debtor Guarantees Under HSG Credit Agreements ............... 5

          2.     Dallas Stars' Guaranty and Lien Caps ................................... 6

          3.     NHL Consent Letter .............................................................. 7

          4.     Prepetition CFV Financing .................................................... 7

          5.     Dallas Stars' Obligations Related to Center Operating Company Debt .............. 8

          6.     Dallas Arena's Obligations Related to Center Operating Company Debt ........... 9

          7.     Additional Agreements Relating to the AAC ......................... 9

          8.     Plano StarCenter's Obligations Under Mortgage ................. 10

          9.     Transactions with Related Entities ....................................... 11

                   a.     Shared Services Agreement ....................................... 11

                   b.     The Frisco Facilities Agreements .............................. 12

                   c.     HCP Affiliation Agreement ....................................... 13

                   d.     HSGH and Dallas Stars Guaranty and Indemnity Agreement Related to the Plano StarCenter Loan ................... 13

                   e.     Lone Star Mobile Agreement ................................... 14

                   f.     Ownership of Victory Property .................................. 14

                   g.     VRH License Agreement .......................................... 14

                   h.     Miscellaneous Affiliate Transactions ....................... 15

         10.     Prepetition Advisory Agreements ........................................ 15

                   a.     KPMG Agreement .................................................... 15

                   b.     GSP Agreement ....................................................... 15

         11.     Material Prepetition Transactions Ancillary to Sale ............ 16

                   a.     Affiliate Agreement ................................................. 16

|  |  | b. | New Stars Transition Services Agreement | 18 |
| D. |  | Key Events Leading to the Chapter 11 Cases | | 18 |
|  | 1. | Dallas Stars' Financial Position Declines | | 18 |
|  | 2. | HSG Interest Reserve Accounts Transfers | | 19 |
|  | 3. | NHL Monitoring and Original Prepetition CFV Financial Assistance | | 19 |
|  | 4. | Additional Prepetition CFV Financial Assistance | | 20 |
|  | 5. | Financial Advisors are Retained | | 20 |
|  | 6. | TRBP Chapter 11 Cases and Sale | | 20 |
|  | 7. | Marketing Process | | 20 |
|  | 8. | Memorandum of Understanding | | 21 |
|  | 9. | NHL Approval | | 21 |
|  | 10. | The Debtors' Current Financial Picture | | 21 |
| E. |  | The Sale | | 22 |
|  | 1. | The Proposed Stalking Horse | | 22 |
|  | 2. | Stalking Horse Asset Purchase Agreement | | 22 |
|  | 3. | The Stalking Horse Senior Secured Obligation | | 27 |
|  | 4. | Owner Support Agreement | | 27 |
|  | 5. | NHL/Lender Cooperation Agreement | | 28 |
|  | 6. | Bidding Procedures | | 30 |
|  |  | a. | Due Diligence, Bid Requirements and NHL Approval | 31 |
|  |  | b. | The Auction | 32 |
|  |  | c. | Identification of the Successful Bidder and Acceptance of Successful Bid | 32 |
|  |  | d. | Closing with the Backup Bidder(s) | 33 |
| II. | THE SOLICITATION; VOTING PROCEDURES | | | 33 |
| A. | Voting Deadline | | | 33 |
| B. | Voting Procedures | | | 34 |
| C. | Fiduciaries and Other Representatives | | | 34 |
| D. | Parties Entitled to Vote | | | 35 |
| E. | Agreements upon Furnishing Ballots | | | 35 |
| F. | Releases Received and Granted by the Holders of First Lien Secured Claims and Second Lien Secured Claims that Elect to "Opt In" | | | 36 |
|  | 1. | Releases Received by the Holders of First Lien Secured Claims and Second Lien Secured Claims that Elect to "Opt In." | | 36 |

|   |   | 2. | Releases Granted by the Holders of First Lien Secured Claims and Second Lien Secured Claims that Elect to "Opt In." | 37 |
|---|---|---|---|---|
|   | G. | Waivers of Defects, Irregularities, Etc. | | 37 |
|   | H. | Withdrawal of Ballots; Revocation | | 38 |
|   | I. | Further Information; Additional Copies | | 38 |
| III. | | ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES | | 39 |
|   | A. | Administration of the Prepackaged Plan | | 39 |
|   | B. | Commencement of the Chapter 11 Cases | | 39 |
|   |   | 1. | First Day Relief and Other Pleadings to be Filed on the Petition Date | 39 |
|   |   |   | a. Joint Administration | 39 |
|   |   |   | b. Bidding Procedures and Scheduling | 39 |
|   |   |   | c. Utilities | 39 |
|   |   |   | d. Cash Collateral | 39 |
|   |   |   | e. Cash Management System | 40 |
|   |   |   | f. Payment of Prepetition Trade Claims | 40 |
|   |   |   | g. Retention of Professionals | 40 |
|   |   |   | h. Payment of Ordinary Course Professionals | 40 |
|   |   |   | i. Payment of Prepetition Employee Wages and Benefits | 40 |
|   |   |   | j. Customer Programs | 41 |
|   |   | 2. | Expected Timetable of the Chapter 11 Cases | 41 |
| IV. | | THE PREPACKAGED PLAN | | 41 |
|   | A. | General Summary of the Prepackaged Plan | | 41 |
|   | B. | Introduction to Chapter 11 Plans | | 43 |
|   | C. | Classification and Treatment of Claims and Equity Interests Under the Prepackaged Plan | | 44 |
|   | D. | Provisions for Payment of Unclassified Administrative, Professional, and Tax Claims | | 47 |
|   |   | 1. | Administrative Expense Claims | 47 |
|   |   | 2. | Professional Compensation and Reimbursement Claims | 47 |
|   |   | 3. | Priority Tax Claims | 47 |
|   | E. | Treatment of Claims and Equity Interests | | 48 |
|   |   | 1. | Classes 1A through 1D—Priority Non-Tax Claims | 48 |
|   |   |   | a. Impairment and Voting | 48 |
|   |   |   | b. Distributions | 48 |

2. Classes 2A through 2D—First Lien Secured Claims ..........................48

    a. Impairment and Voting ..........................48

    b. Distributions ..........................48

3. Classes 3A through 3D—Second Lien Secured Claims ..........................49

    a. Impairment and Voting ..........................49

    b. Distributions ..........................49

    c. Distributions if Classes 3A through 3D Accepts the Prepackaged Plan ..........................50

4. Class 4A—CFV Claim ..........................50

    a. Impairment and Voting ..........................50

    b. Distributions ..........................50

5. Classes 5A through 5D—Secured Tax Claims ..........................51

    a. Impairment and Voting ..........................51

    b. Distributions ..........................51

6. Classes 6A through 6D—Other Secured Claims ..........................51

    a. Impairment and Voting ..........................51

    b. Distributions ..........................51

7. Classes 7A through 7D—Assumed General Unsecured Claims ..........................51

    a. Impairment and Voting ..........................51

    b. Distributions ..........................51

8. Classes 8A through 8D—Non-Assumed General Unsecured Claims ..........................51

    a. Impairment and Voting ..........................51

    b. Distributions ..........................52

9. Classes 9A through 9D—Equity Interests in Debtors ..........................52

    a. Impairment and Voting ..........................52

    b. Distribution ..........................52

F. Identification of Classes of Claims and Equity Interests Impaired; Acceptance or Rejection of the Plan of Reorganization ..........................52

1. Holders of Claims and Equity Interests Entitled to Vote ..........................52

2. Holders of Claims and Equity Interests Not Entitled to Vote ..........................52

3. Nonconsensual Confirmation ..........................53

G. Means of Implementation and Post-Effective Date Governance ..........................53

1. Asset Purchase Agreement and Related Documents ..........................53

|  |  |  |  |
|---|---|---|---|
|  | a. | General | 53 |
|  | b. | Amendments | 53 |
|  | 2. | General Corporate Actions | 53 |
|  | a. | General | 53 |
|  | b. | Continued Legal Existence | 54 |
|  | c. | Officers of the Post-Effective Date Debtor | 54 |
|  | 3. | Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases | 54 |
|  | 4. | Cancellation of Liens | 55 |
| H. | | Provisions Governing Distributions | 55 |
|  | 1. | Date of Distributions on Account of Allowed Claims | 55 |
|  | 2. | Sources of Cash for the Prepackaged Plan Distribution | 56 |
|  | 3. | Disbursing Agent | 56 |
|  | 4. | Rights and Powers of Disbursing Agent | 56 |
|  | 5. | Expenses of the Disbursing Agent | 56 |
|  | 6. | Record Date for Distribution | 56 |
|  | 7. | Delivery of Distributions | 56 |
|  | a. | Last Known Address | 56 |
|  | b. | Distributions by First Lien Administrative Agent | 57 |
|  | c. | Distributions by the Second Lien Administrative Agent | 57 |
|  | 8. | Manner of Payment Under Prepackaged Plan | 58 |
|  | 9. | Setoffs and Recoupment | 58 |
|  | 10. | Distributions After Effective Date | 58 |
|  | 11. | Allocation of Payments under the Prepackaged Plan | 58 |
| I. | | Procedures for Treating Claims Under the Prepackaged Plan | 58 |
|  | 1. | Disputed Claims/Process | 58 |
|  | 2. | No Postpetition Interest on Claims | 59 |
| J. | | Treatment of Executory Contracts and Unexpired Leases | 59 |
|  | 1. | Assumption of Contracts and Leases | 59 |
|  | a. | General | 59 |
|  | b. | Objections to Rejection, Assumption, or Assumption and Assignment | 60 |
|  | 2. | Payments Related to Assumption of Contracts and Leases | 60 |

| | | | |
|---|---|---|---|
| | 3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 60 |
| | 4. | Compensation and Benefit Plans and Treatment of Retirement Plan | 60 |
| | 5. | Insurance Policies | 61 |
| K. | | Conditions Precedent to Effective Date | 61 |
| | 1. | Conditions Precedent to Effective Date of Prepackaged Plan | 61 |
| | | a. Confirmation Order | 61 |
| | | b. Execution and Delivery of Other Documents | 61 |
| | | c. Regulatory Approvals | 61 |
| | | d. NHL Approvals | 61 |
| | | e. NHL Consent | 61 |
| | | f. Consents | 62 |
| | 2. | Effect of Failure of Conditions | 62 |
| | 3. | Reservation of Rights | 62 |
| | 4. | Substantial Consummation | 62 |
| L. | | Effect of Confirmation | 62 |
| | 1. | Vesting of Assets | 62 |
| | 2. | Binding Effect | 63 |
| | 3. | Discharge of the Debtors | 63 |
| | 4. | Exculpation | 63 |
| | 5. | Releases by the Debtors and Stalking Horse | 64 |
| | 6. | Releases by Holders of Claims | 64 |
| | 7. | Waiver of Avoidance Actions | 66 |
| | 8. | Term of Injunctions or Stays | 66 |
| | 9. | Indemnification Obligations of the Debtors and Stalking Horse | 66 |
| M. | | Retention of Jurisdiction | 67 |
| N. | | Miscellaneous | 68 |
| | 1. | Payment of Statutory Fees | 68 |
| | 2. | Filing of Additional Documents | 68 |
| | 3. | Schedules and Exhibits Incorporated | 68 |
| | 4. | Amendment or Modification of the Prepackaged Plan | 68 |
| | 5. | Inconsistency | 69 |
| | 6. | Section 1125(e) of the Bankruptcy Code | 70 |
| | 7. | Preservation of Rights of Action; Settlement of Litigation Claims | 70 |

8. Compromise of Controversies ............................................................... 70

9. Exemption from Certain Transfer Taxes ............................................... 70

10. Compliance with Tax Requirements ..................................................... 71

11. Determination of Tax Filings and Taxes .............................................. 71

12. Severability of Provisions in the Prepackaged Plan ............................ 71

13. Governing Law .................................................................................... 72

14. Notices .................................................................................................. 72

15. Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment ................................................................................ 73

V. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN .................................................................................... 73

    A. Consequences to the Debtors ...................................................................... 74

        1. Consequences to Dallas Stars, Dallas Arena, and StarCenters ........... 74

        2. Consequences to U.S. Holdings ........................................................... 74

    B. Consequences to Holders of Allowed Claims ............................................ 75

        1. Exchanges of Claims Under the Prepackaged Plan ............................. 75

        2. Fully Taxable Exchange ....................................................................... 75

        3. Character of Gain or Loss ..................................................................... 76

        4. Distributions With Respect to Accrued But Unpaid Interest ............... 76

        5. Ownership and Disposition of the Stalking Horse Senior Secured Obligation ............................................................................................ 77

        6. Information Reporting and Backup Withholding ................................. 79

VI. CONFIRMATION OF THE PREPACKAGED PLAN ............................................ 79

    A. Confirmation Hearing .................................................................................. 79

    B. Requirements for Confirmation of the Prepackaged Plan—Consensual Confirmation ................................................................................................ 80

        1. General Requirements ........................................................................... 80

        2. Best Interests Test ................................................................................ 81

        3. Feasibility Analysis .............................................................................. 82

    C. Requirements for Confirmation of the Prepackaged Plan—Non-Consensual Confirmation ................................................................................................ 82

        1. No Unfair Discrimination ..................................................................... 82

        2. Fair and Equitable Test ......................................................................... 83

# TABLE OF CONTENTS

## (continued)

**Page**

VII.    CERTAIN FACTORS TO BE CONSIDERED ............................................................................ 83

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PREPACKAGED PLAN ............................................................................................................ 84

      A.    Commencement of "Traditional" Chapter 11 Cases ...................................................... 85

      B.    Alternative Plans ................................................................................................................. 85

      C.    Liquidation Under Chapter 7 or Chapter 11 .................................................................... 85

IX.    MISCELLANEOUS ................................................................................................................... 86

X.     RECOMMENDATION AND CONCLUSION .......................................................................... 87

# TABLE OF EXHIBITS[9]

A.   **Prepackaged Plan**

B.   **Organizational Chart**

C.   **Stalking Horse Asset Purchase Agreement**

<u>Exhibits to Stalking Horse Asset Purchase Agreement</u>

A – Plan of Reorganization [Attached as Exhibit A to the Disclosure Statement.]

B – Disclosure Statement [Not attached.]

C – Bidding Procedures Order/ Bidding Procedures and Confirmation Scheduling Order

<u>Exhibits to Bidding Procedures Order/ Bidding Procedures and Confirmation Scheduling Order</u>

Exhibit 1:  Bidding Procedures

Exhibit 2:  Stalking Horse Asset Purchase Agreement [Attached as Exhibit C to the Disclosure Statement.]

Exhibit 3:  Summary and Notice [Not attached.]

D – Confirmation Order

<u>Exhibits to the Confirmation Order</u>

Exhibit A:  The Prepackaged Plan [Attached as Exhibit A to the Disclosure Statement.]

Exhibit B:  Notice of Entry of the Order

E – Escrow Agreement [Not attached.]

F – NHL Owner Consent [Not attached.]

G – NHL/Lender Cooperation Agreement [Not attached.]

H – NHL Guaranty [Not attached.]

I – Purchaser/NHL Proxy [Not attached.]

J – Stalking Horse Senior Secured Credit Agreement/Senior Secured Loan [Without Schedules or Exhibits.]

K – Bill of Sale [Not attached.]

L –Assignment and Assumption Agreement [Not attached.]

---

[9] **<u>Some exhibits to the relevant transaction documents have not been attached to this Disclosure Statement because they are confidential and/or voluminous.  Holders of First Lien Secured Claims and Second Lien Secured Claims wishing to review such documents for the purpose of determining whether to vote to accept the Prepackaged Plan may obtain access to such documents as follows:  holders of First Lien Secured Claims may obtain such documents from the First Lien Administrative Agent through its internal password-protected Intralinks website; holders of Second Lien Secured Claims may obtain such documents from the Second Lien Administrative Agent.</u>**

# I.

## GENERAL INFORMATION

### A. THE COMPANY

Attached hereto as <u>Exhibit B</u> is a current organizational chart for the Debtors and certain non-debtor affiliates and related entities. Below is a short description of each of the Debtors:

Dallas Stars, a Delaware limited partnership and a wholly-owned subsidiary of HSG, owns and operates the NHL Stars. Dallas Stars directly owns 100% of the equity interests of StarCenters, U.S. Holdings, and Plano StarCenter LLC, a Texas limited liability company ("<u>Plano StarCenter</u>") and directly owns a 99% equity interest in Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company ("<u>Hockey Enterprises</u>").[10] As described in greater detail herein, Dallas Stars also leases (i) the Dr Pepper Arena in Frisco, which is the practice facility home to the NHL Stars and home arena for the Texas Tornado of the North American Hockey League and the Texas Legends of the NBA Development League, (ii) the Dr Pepper StarCenter in Euless, (iii) the Dr Pepper StarCenter in Farmers Branch, and (iv) the Dr Pepper StarCenter in McKinney at Craig Ranch.

Dallas Arena, a Texas limited liability company and a wholly-owned subsidiary of HSG, was formed for the purpose of holding HSG's ownership interest in COC, which is described below. Specifically, Dallas Arena directly owns a 50% member interest in Center GP, a Texas limited liability company, and a 49.95% limited partnership interest in COC. Center GP owns a 0.1% interest in, and is the general partner of, COC.

U.S. Holdings, a Delaware corporation and a direct, wholly-owned subsidiary of Dallas Stars, directly owns a 1% equity interest in Hockey Enterprises.

StarCenters, a Texas limited liability company and a direct, wholly-owned subsidiary of Dallas Stars, is the employer of personnel of the Dr Pepper StarCenters, which are described below.

#### 1. The National Hockey League.

The NHL was founded in Montreal, Canada, in 1917 and is considered the premier professional ice hockey league in the world. The NHL expanded into the U.S. in 1924 and currently has 30 teams across North America (the "<u>NHL Member Clubs</u>"). The NHL divides teams into two conferences, the Eastern Conference and the Western Conference. Each conference has three divisions and each division has five teams. The NHL regular season generally begins in October and runs through the middle of April with the playoffs continuing into early June. Each team plays an 82 game schedule, consisting of 41 games at home and 41 games on the road.

The NHL is a joint venture organized as an unincorporated not-for-profit association and is headquartered in New York City. Some of the NHL's primary responsibilities include: regulating the conduct of its member franchises; negotiating League-wide agreements on behalf of its member franchises; and establishing the teams' regular season and playoff schedules.

---

[10] Hockey Enterprises holds a limited partnership interest in NHL Enterprises Canada, L.P. and is a stockholder of National Hockey League Enterprises Canada, Inc., the general partner of NHL Enterprises Canada, L.P.

The NHL is governed according to the NHL Rules.[11]  The current commissioner of the NHL (the "NHL Commissioner"), Gary Bettman, has served in that capacity since 1993.  The governing body of the NHL is the Board of Governors of the NHL, as established under the NHL Constitution ("BOG"), which includes one member from each NHL Member Club.  The NHL Commissioner is selected by the BOG.  Among other things, the BOG is responsible for approving certain critical League actions, including the sale or relocation of a franchise.

### 2.    The NHL Stars.

The NHL Stars are an exceptional professional hockey team, located in the fourth largest metropolitan area and one of the largest high-growth markets in the U.S.  The NHL Stars are the only NHL team in Texas or any of its bordering states, giving it a truly regional fan base that extends across a five-state region.  Founded in 1966 in Minneapolis, Minnesota as the North Stars, the team relocated to Dallas-Fort Worth in 1993 and was renamed "the Dallas Stars."  The NHL Stars currently compete in the NHL's Pacific Division, together with the Anaheim Ducks, the Los Angeles Kings, the Phoenix Coyotes, and the San Jose Sharks.

The NHL Stars' 2011/2012 roster includes core players Brenden Morrow, Mike Ribeiro, Steve Ott, Loui Eriksson, Alex Goligoski, Stephane Robidas, Jamie Benn, and Kari Lehtonen.  The NHL Stars' hockey operations and coaching staff include six key members that collectively have over 100 years of experience with professional ice hockey.  The Debtors employ approximately 57 players, 154 full-time employees, and 284 part-time employees.

### 3.    COC Operations and the American Airlines Center.

COC, a Texas limited partnership, is a joint venture between Dallas Arena and certain entities controlled by Mark Cuban, the owner of the Dallas Mavericks (the "Mavericks"), a professional basketball team and a member of the National Basketball Association.  COC leases and operates the AAC, the home arena for the NHL Stars and the Mavericks.

The AAC is an award-winning, state-of-the-art entertainment facility near downtown Dallas with a total hockey seating capacity of approximately 18,500, including luxury seats and suites.  The AAC hosts many other premier sporting events, concerts, family shows, and business and special

---

[11] "NHL Rules" is defined under the Stalking Horse Asset Purchase Agreement to mean (i) the NHL Constitution, (ii) the NHL By-Laws, (iii) the governing documents of each of the NHL Entities, (iv) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities and the NHL Board of Governors, (v) the current and future collective bargaining agreements between the NHL and the NHLPA and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other persons, on the other hand, in furtherance of the NHL's (or any NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-Laws, and (vi) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time."  The capitalized terms used in this definition but not otherwise defined in this Disclosure Statement or in the Prepackaged Plan shall have the meanings ascribed to them in the Stalking Horse Asset Purchase Agreement.  *See* Stalking Horse Asset Purchase Agreement at section 1.1 (definition of "NHL Rules").

events. COC, as lessee, has a 30-year lease agreement for the AAC with the City of Dallas, as lessor, pursuant to the transactions described below.

In 1998, certain entities related to the NHL Stars and the Mavericks entered into a 30-year lease (beginning September 2001) for the AAC with the City of Dallas, pursuant to that certain Lease Agreement, dated as of July 28, 1998 (the "Original AAC Lease"), by and between City of Dallas (the "AAC Lessor") and Arena/Dallas Stars, Inc., Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc. (collectively, the "Original Arena Group"), and that certain Option Contract, dated as of July 28, 1998 (the "Arena Option Contract"), by and between City of Dallas and the Original Arena Group.

Subsequently, COC assumed the obligations of the Original Arena Group on the Original AAC Lease, pursuant to that certain Assignment and Assumption Agreement, dated as of September 30, 1999, by and among the Original Arena Group and COC (the "COC AAC Assignment"). In connection with the COC AAC Assignment, COC also assumed the rights of the Original Arena Group under the Arena Option Contract.

Dallas Stars uses the AAC as its home arena for the NHL Stars' NHL hockey games under a 30-year sublease between COC and Dallas Stars, as sublessee, pursuant to (i) that certain Second Amended and Restated Arena Lease—Dallas Stars, dated as of May 22, 2002 but effective as of July 28, 1998, by and between COC and Dallas Stars, as amended by that certain First Amendment to Second Amended and Restated Arena Lease—Dallas Stars, dated as of November 16, 2005 but effective as of July 1, 2003, by and between COC and Dallas Stars, as further amended by that certain Second Amendment to Amended and Restated Arena Lease—Dallas Stars, dated as of November 29, 2005, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease—Dallas Stars, dated as of May 12, 2010, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease— Dallas Stars, dated as of March 23, 2011, by and between COC and Dallas Stars and (ii) the Arena Option Contract.

## 4.     The Dr Pepper StarCenters.

Historically, to support and nurture the popularity of ice hockey in the Dallas-Fort Worth area, Dallas Stars partnered with the Texas cities of Euless, Farmers Branch, Frisco, and McKinney to build ice skating/hockey facilities and Dallas Stars also acquired an ice skating/hockey facility in Plano, Texas. Dallas Stars leases and operates the arena facilities in Euless, Farmers Branch, Frisco, and McKinney. Plano StarCenter owns and Dallas Stars operates the facility in Plano. Pursuant to a naming rights agreement with Dr Pepper, the facilities are named "Dr Pepper StarCenters."[12]

Today there are four Dr Pepper StarCenters available for use by youth and adult hockey players and ice skaters in the Dallas-Fort Worth metroplex. Dr Pepper StarCenters are an important integrated marketing tool for building the NHL Stars' brand. From time to time, the NHL Stars hold public practices in the various Dr Pepper StarCenters, to provide fans an opportunity to interact directly with the team.

---

[12] The facility in Frisco is named "Dr Pepper Arena."

**B.      CORPORATE STRUCTURE AND CURRENT OFFICERS**

### 1.      The Debtors' Parent Companies.

HSG Sports Group LLC, a Texas limited liability company ("HSG"), holds a direct 99% limited partnership interest in Dallas Stars and 100% of the member interests of Dallas Arena. HSG Partnership Holdings LLC, a Texas limited liability company ("HSG Partnership"), holds a direct 1% general partnership interest in Dallas Stars. HSG Partnership is a direct wholly-owned subsidiary of HSG. HSG and HSG Partnership are direct and indirect, respectively, wholly-owned subsidiaries of HSG Sports Group Holdings LLC, a Texas limited liability company ("HSGH").

HSGH is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks. In addition to indirectly owning the NHL Stars and a 50% interest in the AAC, HSGH previously indirectly owned the Texas Rangers Major League Baseball Club (the "Texas Rangers"). The Texas Rangers were directly owned and operated by Texas Rangers Baseball Partners, a Texas general partnership ("TRBP"), an indirect subsidiary of HSGH. TRBP subsequently sold the Texas Rangers franchise to Rangers Baseball Express, LLC and certain of its related entities ("RBE") in August 2010.

### 2.      Current Principal Executive Officers.

The current principal executive officers of Dallas Stars are as follows:

- *Tony Tavares*. Tony Tavares was named interim president of Dallas Stars in January 2011. Mr. Tavares has had a wealth of past experience leading NHL franchises. Prior to joining Dallas Stars, Mr. Tavares helped The Walt Disney Company build the Mighty Ducks of Anaheim expansion team from the ground-up, serving as president of Disney Sports Enterprises from January 1993 to January 2002. During his time with Disney Sports, he also oversaw the acquisition of the California Angels Baseball Club in 1996 and served as president of the Angels until January 2002. From January 2002 until October 2006, Mr. Tavares served as president and chief executive officer of the Baseball Expos Limited Partnership, the professional baseball team that operated as the Montreal Expos, where he helped the franchise relocate to Washington, D.C. as the Washington Nationals, and eventually assisted the team through an ownership change. Mr. Tavares went on to become president and CEO of Sports Properties Acquisition Corporation, a publicly-traded limited-life company focused on buying a professional sports team, in July 2007. Mr. Tavares currently owns ProEminent Sports LLC, a sports and entertainment consulting firm.

- *Robert Hutson*. Robert Hutson was named Chief Financial Officer of Dallas Stars in November 2002 and oversees all financial matters related to the team. Prior to joining Dallas Stars, Mr. Hutson was a senior manager in the audit division of Arthur Andersen LLP. At Arthur Andersen, Mr. Hutson provided audit and business advisory services to publicly traded and private companies. Mr. Hutson also assisted clients during initial and secondary public offerings of equity and debt as well as mergers and acquisitions.

C.      **PREPETITION INDEBTEDNESS AND OTHER MATERIAL ARRANGEMENTS**

    1.      <u>Debtor Guarantees Under HSG Credit Agreements.</u>

      Each Debtor is a guarantor under (i) that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>"), by and among HSGH, HSG, certain subsidiaries of HSG (including the Debtors), as guarantors, the lenders party thereto from time to time (the "<u>Prepetition First Lien Lenders</u>"), JP Morgan Securities Inc., as joint lead arranger and joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, Barclays Bank PLC, as co-syndication agent, and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent (the "<u>First Lien Administrative Agent</u>") and (ii) that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>" and together with the First Lien Credit Agreement, collectively, the "<u>HSG Credit Agreements</u>"), by and among HSGH, HSG, certain subsidiaries of HSG (including the Debtors), as guarantors, the lenders party thereto from time to time (the "<u>Prepetition Second Lien Lenders</u>", and together with the Prepetition First Lien Lenders, collectively, the "<u>HSG Credit Agreement Lenders</u>"), JP Morgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger and joint bookrunner, and GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent, collateral agent, and co-syndication agent (the "<u>Second Lien Administrative Agent</u>" and, collectively with the First Lien Administrative Agent and the HSG Credit Agreement Lenders, the "<u>Prepetition HSG Lenders</u>").  On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreements, and on April 7, 2009, the lenders to the HSG Credit Agreements accelerated the entire amount of indebtedness thereunder.  As of July 31, 2011, approximately $250,889,000 in principal, interest, and expenses were owing under the First Lien Credit Agreement and approximately $146,232,000 in principal, interest, and expenses were owing under the Second Lien Credit Agreement.[13]

      The Debtors' guaranty obligations under the HSG Credit Agreements are secured by (i) a first priority lien in favor of the First Lien Administrative Agent for the benefit of the Prepetition First Lien Lenders (the "<u>Prepetition First Lien</u>") and (ii) a second priority lien in favor of the Second Lien Administrative Agent for the benefit of the Prepetition Second Lien Lenders (the "<u>Prepetition Second Lien</u>" and, together with the Prepetition First Lien, collectively, the "<u>Prepetition HSG Credit Facility Liens</u>") on substantially all of the Debtors' assets (the "<u>Prepetition Collateral</u>") pursuant to the following security agreements entered into in connection with the HSG Credit Agreements:  (i) the Amended and Restated Pledge and Security Agreement, dated as of December 19, 2006 (the "<u>First Lien Security Agreement</u>"), by and among HSGH, HSG, and certain subsidiaries of HSG (including the Debtors), as grantors, and the First Lien Administrative Agent and (ii) the Second Lien Pledge and Security Agreement, dated as of December 19, 2006 (the "<u>Second Lien Security Agreement</u>" and together with the First Lien Security Agreement, the "<u>HSG Security Agreements</u>"), by and among HSGH, HSG, and certain subsidiaries of HSG (including the Debtors), as grantors, and the Second Lien Administrative Agent.  The priority of the security interests and relative creditor rights between First Lien Administrative Agent, Prepetition First Lien Lenders, and the other "Secured Parties" (as defined in the First Lien Security Agreement), on the one hand, and the Second Lien Administrative Agent, Prepetition Second Lien Lenders and the other "Secured Parties" (as defined in the Second Lien Security Agreement) are set

---

[13] These amounts do not include First Lien Secured Claims that are based on Swap Agreements (as described below).

forth in that certain Intercreditor Agreement, dated as of December 19, 2006 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), pursuant to which the Prepetition Second Liens are made subject and subordinate to the Prepetition First Liens on all Prepetition Collateral.

   In connection with the execution of the HSG Credit Agreements, HSG was required to enter into interest rate agreements ("Swap Agreements") to protect against fluctuations in interest rates with a notional amount of at least 50% of the aggregate principal amount of the term loans made under the First Lien Credit Agreement and the Second Lien Credit Agreement. Each counterparty to a Swap Agreement was required to be an original lender under the First Lien Credit Agreement or an affiliate thereof. The amounts owing under the Swap Agreements are included as "Obligations" under the First Lien Credit Agreement,[14] and Claims based on Swap Agreements are treated as First Lien Secured Claims under the Prepackaged Plan.[15] In total, HSG entered into nine Swap Agreements, each of which was terminated by the counterparty as a result of the acceleration of the obligations under the HSG Credit Agreements. Neither the Debtors nor, to the knowledge of the Debtors, any of the other "Loan Parties" under the HSG Credit Agreements have entered into any subsequent interest rate agreements or other hedge agreements. As of August 12, 2011, the aggregate amount of the obligations owing under the Swap Agreements, as a result of the early termination thereof, is estimated to be $16,665,498.[16]

### 2.  Dallas Stars' Guaranty and Lien Caps.

   The guaranty obligations of Dallas Stars, and each of its direct and indirect subsidiaries that is a guarantor under the HSG Credit Agreements (including U.S. Holdings and StarCenters), are subject to limitations with respect to the amount guaranteed under both the HSG Credit Agreements and the NHL Consent Letter (as defined below). Under the HSG Credit Agreements, the guaranty in respect of the principal amount of obligations thereunder is capped at $140,000,000; under the NHL Consent Letter, the capped principal amount is $139,640,000 as calculated pursuant to a formula therein (the "Guaranty Cap"). In addition, both the HSG Security Agreements and the NHL Consent Letter have

---

[14] The First Lien Credit Agreement also provides that certain other types of hedge agreements also constitute "Obligations" as defined therein; however, as described below, the Debtors believe that the Swap Agreements are the only hedge agreements giving rise to Claims under the definition of "Obligations" in the First Lien Credit Agreement.

[15] A Claim arising under the Swap Agreements (the "Determined Hedge Claim") is defined in the Prepackaged Plan at Section 1.32.

[16] This amount is based upon information obtained from the First Lien Administrative Agent based on stipulations to resolve proofs of claims publicly filed by swap counterparties during the jointly administered chapter 11 bankruptcy cases of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC in the U.S. Bankruptcy Court for the Northern District of Texas (Case Numbers 10-43624 and 10-43625, respectively). The claims of swap counterparties in the Chapter 11 Cases will be determined in accordance with the formula set forth in Section 1.32 of the Prepackaged Plan: (i) the allowed amount of such holder's Claim as stipulated by such holder and the debtors in *In re Rangers Equity Holdings, L.P., et al.*, Case No. 10-43624 (Bankr. N.D. Tex. 2010) on or about December 21, 2010, pursuant to docket entries No. 140, 143, 146, 155, and 159 in such case, *minus* (ii) the aggregate amount of any distributions on account of such Claims received by such holder from the First Lien Administrative Agent or First Lien Collateral Agent following December 21, 2010, *plus* (iii) interest accrued on such Claim following the date of such stipulation, calculated in a manner consistent with the calculation of post-termination interest utilized by the debtors in *In re Rangers Equity Holdings, L.P. et al.* in stipulating to such allowed Claim amounts on or about December 21, 2010.

limitations on the amount of all obligations secured by the Prepetition HSG Credit Facility Liens granted by Dallas Stars, and each of its direct and indirect subsidiaries that is a grantor under the HSG Security Agreements. Under the HSG Security Agreements, the principal amount of obligations secured thereby is capped at $140,000,000 and the amount secured in respect of principal and all other obligations is capped at $150,000,000; under the NHL Consent Letter, the amount secured in respect of principal and all other obligations is capped at $149,640,000 as calculated pursuant to a formula therein (the "Lien Cap"). Dallas Arena's guaranty of the obligations under the HSG Credit Agreements is not expressly capped under either the HSG Credit Agreements or the NHL Consent Letter; the Debtors and the NHL believe that Dallas Arena may be covered by the cap amounts under the NHL Consent Letter because the cap amounts apply with respect to all Hockey-Related Assets (as defined in the NHL Consent Letter), while the First Lien Administrative Agent and certain Prepetition First Lien Lenders assert that the assets of Dallas Arena are not covered by such cap amounts and that such assets are not "Hockey-Related Assets" as that term is used in the NHL Consent Letter. The Debtors' guaranty obligations under the HSG Credit Agreements and the HSG Security Agreements, as limited by the Guaranty Cap and the Lien Cap, are referred to herein as the "Prepetition First and Second Lien Obligations."

### 3. NHL Consent Letter.

Each Debtor is also a party to that certain letter agreement, dated as of December 19, 2006, among HSGH, HSG, the Debtors, certain other subsidiaries of HSG, the First Lien Prepetition Agent, the Second Lien Prepetition Agent, and the NHL (as amended, the "NHL Consent Letter"), pursuant to which the NHL authorized the incurrence of the obligations under the HSG Credit Agreements. In addition to providing the requisite NHL consent to the HSG Credit Agreements, the NHL Consent Letter prescribes a framework that governs the lending relationship among the Prepetition HSG Lenders, the Debtors, the NHL, and the other parties party thereto. For example, the NHL Consent Letter circumscribes the enforcement rights and remedies which the Prepetition HSG Lenders would otherwise have against Dallas Stars and the hockey-related assets. The NHL Consent Letter also imposes the guaranty limitations described above. Further, the NHL Consent Letter stipulates that the Prepetition First and Second Lien Obligations are subject to and subordinate to the NHL Constitution and Agreements (as defined therein).

### 4. Prepetition CFV Financing.

On January 14, 2011, Dallas Stars executed that certain Promissory Note (as amended and otherwise modified from time to time, together with the other agreements and instruments related thereto, the "CFV Debt Agreement") in favor of CFV I LLC, an affiliate of the NHL (the "Prepetition CFV Lender"), pursuant to which the Prepetition CFV Lender agreed to make advances to Dallas Stars from time to time on an unsecured basis in an aggregate principal amount of up to $45,000,000 (the loans and other amounts outstanding under the CFV Debt Agreement are collectively referred to herein as the "CFV Debt Amount" and together with the Prepetition First and Second Lien Obligations, the "Prepetition Obligations"). Funds advanced under the CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders. Substantially all available amounts have been advanced under the CFV Debt Agreement and the CFV Debt Amount has become due and payable as of June 30, 2011 subject to a grace period running through October 31, 2011. As of August 31, 2011, the amount of CFV Debt Amount outstanding is approximately $51,384,000, inclusive of principal, interest and fees due in respect thereof.

Pursuant to the terms of the NHL Consent Letter, in the event that any of the Club Collateral (as defined in the NHL Consent Letter) or other Dallas Stars assets are sold, the proceeds shall be used first to pay all amounts due and owing by Dallas Stars, HSGH, HSG Partnership, HSG, U.S. Holdings, and StarCenters or any of their respective affiliates to the NHL, the Enterprise Entities

(as defined in the NHL Consent Letter), any other entity formed generally by the NHL member clubs after the date thereof, or any other member club, whether in accordance with the terms of the NHL Constitution and Agreements (as defined in the NHL Consent Letter), applicable law or otherwise (including, without limitation all amounts due and owing by Dallas Stars with respect to the CFV Club Loan Documents (as defined in the NHL Consent Letter)); second, to the extent permitted by law, to pay all amounts due and owing under the First Lien Credit Agreement; third, to the extent permitted by law, to pay all amounts due and owing under the Second Lien Credit Agreement; and then, as required by law, including, without limitation to pay any amounts due and owing by Dallas Stars, HSGH, HSG Partnership, HSG, U.S. Holdings and StarCenters or any of their respective affiliates to any of their respective lenders or other creditors; provided, that the maximum aggregate amount of any such proceeds applied pursuant to second and third above to pay or repay principal (including, without limitation, the stated amount of any letters of credit), interest, expenses, indemnities, other reimbursement obligations set forth in any Operative Document (as defined in the NHL Consent Letter), or any other Obligations (as defined in the NHL Consent Letter) shall not exceed $125 million plus the aggregate amount of funds disbursed to Dallas Stars pursuant to the CFV Club Loan Documents on or after January 14, 2011 (minus the amount of disbursed funds the proceeds of which are used by Dallas Stars to repay its obligations under the Existing Parallel Facility Note (as defined in the NHL Consent Letter)).

## 5.       Dallas Stars' Obligations Related to Center Operating Company Debt.

In connection with the construction of the AAC, COC entered into that certain Note Purchase Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time, the "COC Note Purchase Agreement"), by and among COC, as assignee of Arena/Dallas Stars, Inc., Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., and the certain institutional investors named therein, providing for the issuance and sale by COC of (i) the Series A Senior Secured Notes due 2023 in an aggregate principal amount of $115,000,000, (ii) the Series B Senior Secured Notes due 2023 in an aggregate principal amount of $68,129,142, (iii) the Series C Senior Secured Notes due 2012 in an aggregate principal amount of $20,899,469, and (iv) the Series E Senior Secured Notes due 2011 in an aggregate principal amount of $10,000,000[17] (collectively, the "COC Notes").

Except with respect to the Arena Pledge Agreement (as defined below), neither Dallas Stars nor Dallas Arena is directly or indirectly liable under the COC Note Purchase Agreement. As a condition precedent to the COC Note Purchase Agreement, however, Dallas Stars entered into that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time, the "Team Agreement"), pursuant to which Dallas Stars agreed that, upon the occurrence of certain "Trigger Events" (as defined therein), including the filing of a bankruptcy case by Dallas Stars, and after the delivery of a Trigger Event Put Notice (as defined therein) by the Required Holders (as defined therein) to Dallas Stars, Dallas Stars would be required to purchase 50% of the outstanding principal amount of the COC Notes under certain specified terms and procedures (the "Required COC Note Purchase Obligation"). Furthermore, it is an event of default under the COC Note Purchase Agreement if the Required COC Note Purchase Obligation is triggered and Dallas Stars does not purchase the COC Notes as required under the Team Agreement, unless certain conditions are satisfied by COC.

The Debtors believe that because the delivery of a Trigger Event Put Notice postpetition would constitute a violation of the automatic stay under section 362 of the Bankruptcy Code, the

---

[17] The Series E notes are no longer outstanding.

Required COC Note Purchase Obligation will not arise postpetition. Therefore, the potential cross-default under the COC Note Purchase Agreement will not be triggered. Furthermore, although the filing of the Chapter 11 Cases by the Debtors would constitute a Trigger Event under the Team Agreement, the Debtors believe that any Trigger Event that may arise as a result of the filing of Chapter 11 Cases constitutes an invalid ipso facto provision under section 365(e)(1)(B) of the Bankruptcy Code, and thus is unenforceable in its entirety upon a filing of the Chapter 11 Cases.

Under the Team Agreement, Dallas Stars can sell its assets to a purchaser if certain conditions are met, including such purchaser's assumption of Dallas Stars' obligations under the Team Agreement. The Debtors believe all such conditions have been or will be satisfied at the time the Sale is consummated. In connection with the consummation of the Prepackaged Plan, Dallas Stars will assume the Team Agreement and assign it to the Purchaser, and Purchaser will assume all of Dallas Stars' obligations under the Team Agreement and the agreements related thereto. Because the Trigger Event is a prohibited ipso facto provision, and there will be no events of default under the Team Agreement, no cure is required for the assumption and assignment of the Team Agreement.

As a result of the foregoing, the Debtors believe that neither consent to the Sale nor waiver of the Trigger Events by the holders of COC Notes is necessary for the consummation of the Sale. If the holders of COC Notes contest the Debtors' position with respect to the matters described herein, and a court agrees with the position of the holders of COC Notes, then a waiver and/or consent from holders of COC Notes to consummate the Sale may be necessary. The Debtors have sought and will continue to seek a waiver from the holders of COC Notes out of an abundance of caution and to prevent any delay in the administration of the Chapter 11 Cases attendant to any potential disputes with the holders of COC Notes.

6. **Dallas Arena's Obligations Related to Center Operating Company Debt.**

As a condition precedent to the COC Note Purchase Agreement, Dallas Arena entered into that certain Pledge Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time, the "Arena Pledge Agreement"), pursuant to which Dallas Arena pledged all of its interests in COC to The Bank of New York Mellon (f/k/a The Bank of New York), a New York banking corporation, as collateral trustee under the Arena Pledge Agreement ("BoNY"), as security for the payment and performance of COC's obligations under the COC Note Purchase Agreement.[18] In connection with the consummation of the Prepackaged Plan, the Purchaser will assume the obligations of Dallas Arena including all obligations under the Arena Pledge Agreement and the agreements related thereto, which will be evidenced by an assumption agreement executed by the Purchaser, and the Purchaser will enter into a pledge agreement to replace the Arena Pledge Agreement. Except with respect to the Arena Pledge Agreement, neither Dallas Stars nor Dallas Arena is directly or indirectly liable under the COC Note Purchase Agreement.

7. **Additional Agreements Relating to the AAC.**

In addition to the COC Note Purchase Agreement and the Team Agreement, Dallas Stars is a party to various other agreements related to the NHL Stars' use of the AAC. In particular, Dallas Stars is a party to: (a) the Second Amended and Restated Arena Lease -- Dallas Stars, dated as of

---

[18] Separately, Center GP, a non-debtor, executed a pledge agreement with the collateral trustee to pledge its interest in COC in connection with the Note Purchase Agreement.

May 22, 2002 but effective as of July 28, 1999 (as supplemented, amended and otherwise modified, the "Sublease"), by and between COC and Dallas Stars, pursuant to which COC leased to Dallas Stars the right to use the AAC for the NHL Stars' NHL-sanctioned ice hockey games; (b) the Stars Non-Relocation Agreement, dated as of April 23, 1999 (as supplemented, amended and otherwise modified), by and between Dallas Stars and BoNY, pursuant to which Dallas Stars agreed, among other things, to cause the NHL Stars to play their home games in the AAC; (c) the Assignment of Leases and Rents and Agreement, dated as of December 10, 1999 (as supplemented, amended and otherwise modified), made by COC to BoNY and agreed and consented to by Dallas Stars and Dallas Basketball Limited, pursuant to which COC collaterally assigned, among other things, the Sublease and all rents relating thereto; (d) the Subordination, Nondisturbance and Attornment Agreement (Stars), dated as of December 10, 1999 (as supplemented, amended and otherwise modified), by and between Dallas Stars and BoNY, pursuant to which Dallas Stars and BoNY agreed upon the relative priorities of their interests and their rights and obligations if certain events occur; (e) Stars Franchise Agreement, dated as of July 28, 1998 (as supplemented, amended and otherwise modified), by and between City of Dallas and Dallas Stars, pursuant to which Dallas Stars agreed, among other things, to cause the NHL Stars to play its home games in Dallas, Texas; and (f) Dallas Sports and Entertainment Center Naming Rights and Sponsorship Agreement, dated as of December 13, 1999 (as supplemented, amended and otherwise modified), by and among COC, Dallas Stars, Dallas Basketball Limited, and American Airlines, Inc., pursuant to which Dallas Stars agreed, among other things, that during the term of such agreement, that the COC arena would be named the "American Airlines Center."

## 8.     Plano StarCenter's Obligations Under Mortgage.

In connection with Dallas Stars' purchase of the Plano StarCenter ice skating/hockey facility in 2001, Dallas Stars purchased all of the membership interests of Plano StarCenter, which was a party to that certain Loan Agreement, dated as of September 1998, by and between General Electric Capital Corporation ("GECC") and Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), as amended by that certain Consent to Transfer of Membership Interests, Amendment of Loan Agreement and Deed of Trust and Release, dated as of January 24, 2001, by and among Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), Dallas Stars, David M. Crawford, Jr., and GECC (as successor-in-interest to Lasalle National Bank), in the original principal amount of $6,800,000 ("Plano StarCenter Loan Agreement"). In connection with such loan, GECC holds a mortgage on the Plano StarCenter property, pursuant to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of September 11, 1998, by Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.) to Charles T. Marshall for the benefit of GECC, as amended by that certain Consent to Transfer of Membership Interests, Amendment of Loan Agreement and Deed of Trust and Release, dated as of January 24, 2001, by and among Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), Dallas Stars, David M. Crawford, Jr., and GECC (as successor-in-interest to LaSalle National Bank). The terms of the Plano StarCenter Loan Agreement provide for repayment by Plano StarCenter of principal and interest over a 30-year period, with an accelerated amortization schedule that began in 2010. During the accelerated amortization, Plano StarCenter is required to pay an increased interest rate. Profits generated from the facility must also be used to repay the loan.

In connection with the proposed Sale and the negotiation of the Prepackaged Plan, the Debtors are seeking consent from GECC to the sale and transfer under the Asset Purchase Agreement of the equity interests in Plano StarCenter, as well as a waiver of the event of default under the Plano StarCenter Loan Agreement arising as a result of the filing of the chapter 11 case of Dallas Stars. Under the Plano StarCenter Loan Agreement and related documents, Dallas Stars may not transfer its equity interests in Plano StarCenter without the consent of GECC. Such a transfer without the consent of GECC would also trigger liabilities to HSGH and Dallas Stars under each of their respective Guaranty of Recourse Obligations of Borrower, made as of January 24, 2001, which guarantees are discussed further

in Section I.C.9.d of this Disclosure Statement.  As of the date of this Disclosure Statement, GECC has not yet consented to the sale of the equity interests of Plano StarCenter to the Purchaser or any other successful bidder or waived the potential default.  Under the Stalking Horse Asset Purchase Agreement, in the event that GECC consents to the sale prior to the Effective Date, the equity interests of Plano StarCenter will be included among the assets sold to the Purchaser.  Under the Stalking Horse Asset Purchase Agreement, if, however, GECC does not consent to the sale of the Plano StarCenter equity interests to the Purchaser or forecloses on the Plano StarCenter Loan Agreement and seizes the collateral thereunder, including the Plano StarCenter, the Plano StarCenter equity interests will not be included in the Sale at the election of the Debtors, there will be no adjustment to the purchase price under the Stalking Horse Asset Purchase Agreement, and GECC will retain whatever rights and remedies it may have under the Plano StarCenter Loan Agreement and mortgage.  For the avoidance of doubt, there will be no adjustment to the purchase price under the Stalking Horse Asset Purchase Agreement whether or not the equity interests in Plano StarCenters are sold and transferred thereunder.

### 9.  Transactions with Related Entities.

Dallas Stars (or HSG on behalf of Dallas Stars) is party to a number of agreements (as described below, the "Related Entities Agreements") between or among Dallas Stars or HSG and certain affiliates of and entities related to Dallas Stars, including HSGH; SSR Collin Land, L.P. ("SSR Collin"); SSR GP Interests, L.P. ("SSR GP"); SSG Realty Partners, L.P. ("SSG Realty"); RoughRiders Baseball Partners, L.P. ("RoughRiders Baseball"); Southwest Sports Group Baseball, L.P. ("SSG Baseball"); Hicks Holdings LLC ("HH"); Hicks Cedar Park LLC ("HCP"); and Southwest Sports Realty Partners, L.P. ("SSR Realty" and collectively with Dallas Stars, HSG, HH, HCP, HSGH, SSR Collin, SSR GP, SSG Baseball, SSG Realty, and RoughRiders Baseball, the "Related Entities").  Each of the Related Entities is ultimately controlled by Mr. Hicks, with the exception of RoughRiders Baseball, of which the majority of HSG's interest was sold as described herein.  For clarification, HCP is owned by certain trusts established for the benefit of the children of Mr. Hicks and is indirectly controlled by Mr. Hicks.

The Related Entities Agreements include, among other things, transactions relating to the development and use of the Dr Pepper StarCenter in Frisco and related parking facilities; HSGH's guaranty of certain obligations under an indebtedness agreement with respect to the Plano Dr Pepper StarCenter; and an affiliation agreement with HCP, which owns and operates the minor league hockey team in Cedar Park, Texas called "the Texas Stars" (the "Texas Stars"), all of which are described in more detail below.

### a.  Shared Services Agreement.

HSG was formed in 1999, in part, to take advantage of certain operational efficiencies that existed between TRBP and Dallas Stars.  In connection therewith, Dallas Stars and Dallas Arena were parties to that certain Shared Services Agreement, dated as of October 3, 2008, by and among HSG and certain of its affiliated entities signatory thereto (the "Shared Services Agreement").  In the ordinary course of business, pursuant to the Shared Services Agreement, HSG provided certain business and administrative services (including, but not limited to, services of certain employees, insurance and benefit plans) to its subsidiaries and certain affiliates and related entities and has entered into various contracts on behalf of and for the benefit of its subsidiaries including Dallas Stars, Dallas Arena, and Dallas Stars' subsidiaries.  Under the Shared Services Agreement, HSG allocated a portion of the cost of such services to Dallas Stars and its subsidiaries and Dallas Arena commensurate with the benefit received by such entity.  Dallas Stars relied on a number of such services, including software and computer hardware used in connection with its accounting and financial operations.  Prior to the sale of the Texas Rangers, HSG entered into an interim transition services agreement to provide the ongoing provision of these services

for the benefit of Dallas Stars during the pendency of the TRBP bankruptcy, and Dallas Stars was removed as a party to and beneficiary of the Shared Services Agreement on May 20, 2010. HSG continues, however, to provide limited transition services still requested by Dallas Stars and its subsidiaries and Dallas Arena under the New Stars Transition Services Agreement and the Affiliate Agreement, each as described below.

b.    The Frisco Facilities Agreements.

Beginning in 2001, the Debtors, HSG, and certain non-Debtor affiliates of HSG that are ultimately controlled by Mr. Hicks, entered into several agreements (the "Frisco Facilities Agreements") to develop land in the City of Frisco, Texas ("City of Frisco") for the construction of, among other things, an ice skating and hockey facility, parking facilities, and certain other related infrastructure improvements (the "Frisco Facilities"). In October 2001, the City of Frisco, HSG, SSR Collin, and SSG Realty entered into a Master Agreement (the "Frisco Master Agreement") that sets forth terms and conditions with respect to the financing of and operating of the Frisco Facilities.

(1)    Agreements Related to the Development and Operation of the Frisco StarCenter.

Pursuant to the Frisco Master Agreement, the City of Frisco purchased land located in the City of Frisco from SSR Collin for the construction and development of an ice-skating and hockey facility. The ice-skating and hockey facility contemplated by the Frisco Master Agreement is now known as the Dr Pepper Arena in Frisco (the "Frisco StarCenter").

In accordance with the terms of the Frisco Master Agreement, Dallas Stars and the City of Frisco entered into that certain Stars Center Lease Agreement, dated as of October 8, 2001, by and between the City of Frisco and Dallas Stars, as amended (the "Frisco StarCenter Lease") pursuant to which Dallas Stars leased the Frisco StarCenter from the City of Frisco. The Frisco StarCenter Lease governs the use and operation of the Frisco StarCenter. HSG guarantees the obligations of Dallas Stars under the Frisco StarCenter Lease pursuant to that certain Guarantee Agreement, dated as of October 8, 2001, by and between HSG and the City of Frisco.

Dallas Stars subleases a portion of the Frisco StarCenter to CSH Texas, Inc. for home games of the Texas Tornado, a North American Hockey League junior hockey team. In addition, Dallas Stars subleases a portion of the Frisco StarCenter to Texas D League Management LLC for use by the Texas Legends, an NBA Development League franchise.

(2)    Agreements Related to the Development, Use, and Management of the Parking Facilities.

The parking facility constructed pursuant to the terms of the Frisco Master Agreement consists of a garage parking structure adjacent to the Frisco StarCenter (the "First Parking Facility") that is used by patrons attending events at the Frisco Facilities. The City of Frisco leases the First Parking Facility to Dallas Stars and the Frisco RoughRiders, a minor league baseball team ("Frisco RoughRiders"), pursuant to the Frisco StarCenter Lease and a separate lease with the Frisco RoughRiders, respectively.

The shared use of the First Parking Facility is currently governed by the terms of that certain Letter Agreement, dated as of September 12, 2003, among RoughRiders Baseball (the entity that controls the Frisco RoughRiders), Dallas Stars, SSR Collin, and SSR GP (as amended, the "Parking Agreement"). Pursuant to the Parking Agreement, Dallas Stars and RoughRiders Baseball appointed SSR

GP as the manager of the First Parking Facility. As manager, SSR GP is responsible for operating the First Parking Facility, including arranging for the maintenance, utilities, and insurance, and submitting an annual expense budget to Dallas Stars and RoughRiders Baseball. SSR GP allocates the cost of operating the First Parking Facility between Dallas Stars, RoughRiders Baseball, and other users of the First Parking Facility as designated by SSR GP and in accordance with the Parking Agreement.

Pursuant to the terms of that certain Parking Agreement and Easement, dated as of April 15, 2008, by and among Dallas Stars, SSR Collin and SSR GP, Dallas Stars granted SSR Collin an easement to and through the First Parking Facility for access to and from an adjacent office building constructed by an entity related to SSR Collin. In addition, Dallas Stars granted to SSR Collin the use of certain parking spaces within the First Parking Facility.

On February 5, 2008, the City of Frisco, SSR Collin, HSG, and SSR Realty entered into a Supplemental Master Agreement Regarding Expansion of StarsCenter, Development of Second Parking Structure and Related Improvements (as amended, the "Frisco Supplemental Agreement"). The Frisco Supplemental Agreement sets forth terms and conditions with respect to the upgrading, renovation, and expansion of the Frisco StarCenter and the development of a second garage parking structure (the "Second Parking Facility") adjacent to the Frisco StarCenter. Pursuant to the terms of the Frisco Supplemental Agreement, SSR Collin conveyed land to the City of Frisco for the expansion of the Frisco StarCenter and the development of the Second Parking Facility. Dallas Stars has the right to use and sublease the Second Parking Facility, pursuant to the terms of the Frisco Supplemental Agreement and the Frisco StarCenter Lease. Furthermore, if no event of default has occurred and is continuing under the Frisco StarCenter Lease, Dallas Stars is entitled to all revenues from the Second Parking Facility for the term of the Frisco StarCenter Lease.

c.      HCP Affiliation Agreement.

HCP owns and operates the Texas Stars, which is a member of the American Hockey League and is located in Cedar Park, Texas. The Texas Stars' home arena is the Cedar Park Center which HCP leases from the City of Cedar Park.

To facilitate and promote player development for the NHL Stars and the Texas Stars, Dallas Stars and HCP entered into that certain Amended and Restated Affiliation Agreement, dated as of April 13, 2010 (the "HCP Affiliation Agreement"). The HCP Affiliation Agreement sets forth terms pursuant to which Dallas Stars provides certain players and other hockey staff to the Texas Stars minor league hockey team and HCP pays Dallas Stars certain fees in connection therewith.

d.      HSGH and Dallas Stars Guaranty and Indemnity Agreement Related to the Plano StarCenter Loan.

In connection with the Plano StarCenter Loan Agreement, HSGH provided a guaranty for the benefit of LaSalle National Bank, as trustee for the note holders under the loan. Under this Guaranty of Recourse Obligations of Borrower, made as of January 24, 2001, HSGH guaranteed the prompt and unconditional payment of certain recourse obligations and liabilities of Plano StarCenter under the Plano StarCenter Loan Agreement. Also in connection with the Plano StarCenter Loan Agreement, HSGH executed the Hazardous Materials Indemnity Agreement, dated January 24, 2001, by Plano StarCenter and HSGH for the benefit of LaSalle National Bank (as trustee), whereby HSGH agreed to provide indemnification for certain environmental liabilities related to the Plano StarCenter mortgaged property, if any such liabilities were to arise in the future. Dallas Stars also executed a Guaranty of Recourse Obligations of Borrower and a Hazardous Materials Indemnity Agreement in connection with the Plano StarCenter Loan Agreement. Under the Guaranty of Recourse Obligations of Borrower, the guaranty

obligations of HSGH and Dallas Stars are limited certain to matters that include Plano StarCenter's criminal acts, misapplication of funds derived from the property, acts of fraud or misrepresentation, failure to maintain insurance, and damage to the property caused by intentional acts of Plano StarCenter or its agents, among other things. Under the Plano StarCenter Loan Agreement and related documents, Dallas Stars also may not transfer its equity interests in Plano StarCenter without the consent of GECC. Such a transfer without the consent of GECC would also trigger liabilities to HSGH and Dallas Stars under the Guaranty of Recourse Obligations of Borrower.

e.     Lone Star Mobile Agreement.

HSG indirectly owns an interest in Lone Star Mobile, L.P. ("Lone Star Mobile"), which is a mobile, truck-based sports broadcasting company that, among other things, broadcasts sporting events for television and other medium from the parking lots of sporting events. Dallas Stars also has a production agreement with Lone Star Mobile, whereby Lone Star Mobile is granted the right to provide certain mobile television production services to Dallas Stars for approximately 15 NHL Stars games. This production agreement between Dallas Stars and Lone Star Mobile will be assumed by the Stalking Horse under the Stalking Horse Asset Purchase Agreement.

f.     Ownership of Victory Property.

Dallas Arena and Dallas Stars understand that Mr. Hicks, directly or indirectly, owns equity interests in certain investment entities (or entity) that own real property interests in or rights to real property surrounding the AAC and that such investment entities or other related entities may have contracts with COC regarding the use, including parking rights with respect to, such real property.

g.     VRH License Agreement.

In 2004, VRH Partners ("VRH") purchased from Dallas Stars an ice rink facility in Irving, Texas, known as Dr Pepper StarCenter in Valley Ranch (the "Valley Ranch StarCenter"). Randy Locey, an Executive Vice President of Business Operations for Dallas Stars, currently holds an ownership interest in VRH.

Following the sale of the Valley Ranch StarCenter, VRH and Dallas Stars entered into that certain License Agreement, effective as of December 1, 2004 (the "VRH License") that sets forth terms regarding the shared use of certain services and the licensing terms with respect to the name "Dr Pepper StarCenter." Pursuant to the VRH License, for as long as Dallas Stars has a licensing agreement with Dr Pepper Bottling Company of Texas, Dallas Stars will license its rights to use the name "Dr Pepper StarCenter" to VRH. After Dallas Stars' licensing agreement with Dr Pepper expires or terminates, VRH will have a revocable license to use the name "StarCenter," subject to such terms and conditions imposed by Dallas Stars. In addition, pursuant to the terms of the VRH License, for a monthly fee paid by VRH to Dallas Stars, Dallas Stars provides certain administrative services to VRH, including payroll services, ice booking services, and maintenance assistance. Dallas Stars also contracts with a third-party provider for certain electricity needs of VRH and VRH pays its portion of the electricity bills directly. Certain hockey directors and executives of Dallas Stars provide services to VRH as independent contractors and are paid for such services directly by VRH. In addition, one hockey director employed by Dallas Stars provides services to VRH for which VRH reimburses Dallas Stars. The VRH License will terminate on the earliest to occur of (a) the date that VRH no longer holds fee simple title to the Valley Ranch StarCenter; (b) the date that Dallas Stars no longer owns the right to the name "StarCenter" or the name "Dallas Stars"; or (c) 30 years from the date of the VRH License.

h.   Miscellaneous Affiliate Transactions.

Mr. Hicks has historically personally licensed and paid for a suite at the AAC from COC and in connection therewith has been provided preferential parking. Mr. Hicks' suite license is an agreement with COC and will be unaffected by the Debtors' Chapter 11 Cases.

Dallas Stars, on behalf of itself and its subsidiaries, and Dallas Arena have entered into indemnification agreements with their officers, Tony Tavares and Robert Hutson, in consideration for such officers continuing to serve in management positions, which agreements provide indemnification for actions taken in the course of their service as officers and employees. These indemnification agreements will be assumed by the Stalking Horse under the Stalking Horse Asset Purchase Agreement.

**10.   Prepetition Advisory Agreements.**

a.   KPMG Agreement.

From time to time, Dallas Stars has entered into certain engagement agreements with KPMG LLP ("KPMG") for a variety of audit, tax, and advisory services, of which some agreements relate to current engagements, and others that relate to completed engagements but may have certain ongoing obligations and liabilities, including indemnification and contribution obligations. Under the Stalking Horse Asset Purchase Agreement, the Stalking Horse will assume payment obligations associated with any engagement agreements with KPMG, but will not assume any indemnification or contribution obligations thereunder.

b.   GSP Agreement.

On February 4, 2010, HSG, Dallas Stars, and Dallas Arena entered into an engagement agreement with GSP (the "GSP Engagement Letter") for GSP to provide financial advice and assistance in connection with opportunities relating to a sale of Dallas Stars and its subsidiaries, Dallas Arena, and the related hockey assets. On January 14, 2011, the GSP Engagement Letter was amended to extend the expiration date of the agreement from December 31, 2010 to July 31, 2011. While the parties are currently negotiating to further extend the GSP Engagement Letter, it has not yet been extended and it expired by its terms on July 31, 2011. The GSP Engagement Letter provides, however, that certain provisions shall survive after its termination or expiration, including obligations related to the payment of GSP's fees and expenses, indemnification, and confidentiality, among other provisions.

One such continuing obligation is the requirement that, if a Sale occurs within twelve months after the termination or expiration of the GSP Engagement Letter, Dallas Stars, Dallas Arena, and HSG must pay to GSP a "Success Fee" (as defined in the GSP Engagement Letter) out of the cash proceeds of a Sale. GSP and the Debtors disagree regarding the amount of the Success Fee to be paid to GSP pursuant to the GSP Engagement Letter if the Stalking Horse is the Successful Bidder (as defined herein). The Debtors believe that the Success Fee that will be owed to GSP if the Stalking Horse is the Successful Bidder will total $2,500,000, while GSP believes that the amount that would be owed is higher.

Under the Stalking Horse Asset Purchase Agreement, the Stalking Horse will assume the payment obligations under the GSP Engagement Letter, including the requirement to pay the Success Fee, except that the Stalking Horse will not assume any surviving indemnification or contribution obligations under the GSP Engagement Letter. To the extent any dispute regarding GSP's Success Fee has not been resolved prior to the Effective Date, the Bankruptcy Court will determine the amount of the Success Fee owed to GSP.

11. **Material Prepetition Transactions Ancillary to Sale**.

To memorialize accurately the historic operations of Dallas Stars' organization, including properly documenting the use and ownership of certain assets and equipment in accordance with past operational practices, and to facilitate the Sale, prior to the Solicitation, Dallas Arena, Dallas Stars, and certain of their affiliates and other related entities memorialized such historical relationships and operations in a series of agreements to appropriately reflect the ownership and use of certain assets historically utilized by Dallas Stars to assist in the orderly disposition of the assets being sold to the Purchaser. The material agreements entered into by Dallas Stars and Dallas Arena immediately prior to the Solicitation include the following:

a. Affiliate Agreement.

Dallas Stars, Plano StarCenter, and Dallas Arena entered into that certain letter agreement with related entities HSG, HSGH, and HH, dated as of September 1, 2011 (the "Affiliate Agreement"). As a result of the Debtors' longstanding relationship with HSG and in connection with the Sale, Dallas Stars, Plano StarCenter, and Dallas Arena entered into the Affiliate Agreement with HSG, HSGH, and HH to terminate and provide a transition of the services which were provided by such entities as a result of Dallas Stars, Plano StarCenter, and Dallas Arena being members of the HSG corporate structure. In the ordinary course of business, HSG and certain of its related entities (on behalf of HSG) have provided certain business and administrative services (including, but not limited to, coordinating insurance and benefit plans) to HSG's subsidiaries and affiliates and entered into various contracts on behalf of and for the benefit of its subsidiaries, including the Debtors. In connection therewith, Dallas Stars and Dallas Arena were party to the Shared Services Agreement discussed above. Although the formal Shared Services Agreement was terminated as to Dallas Stars on May 20, 2010, certain shared services arrangements and shared use of certain assets continued on an informal basis with respect to certain employee benefits and other matters.

To document the ownership and use of these shared assets and services of Dallas Arena, Dallas Stars and its subsidiaries, at the request of Dallas Stars and Dallas Arena and as an accommodation to Dallas Stars and Dallas Arena to facilitate the Sale, HSG, HSGH, and HH agreed to enter into the Affiliate Agreement with Dallas Stars, Plano StarCenter, and Dallas Arena. Among other things, the Affiliate Agreement sets forth agreements of the parties regarding the following matters:

- A purchase card collateral deposit account in HSG's name currently is used exclusively for the benefit of Dallas Stars, and Dallas Stars employees are the sole authorized users of credit cards secured by this account and Dallas Stars is responsible for the charges incurred by Dallas Stars employees on such credit cards. The Affiliate Agreement provides for the assignment of HSG's right, title, and interest in the funds held in the purchase card collateral deposit account to Dallas Stars, and for Dallas Stars to pay $60,000 to HSG in consideration of HSG's claims in respect of the purchase card collateral deposit account, including the funds originally contributed by HSG to such account, as set forth in the Affiliate Agreement. The Affiliate Agreement also provides for HSG's continued cooperation in allowing employees of Dallas Stars to use the credit cards secured by the purchase card collateral deposit account until the consummation of a Sale.

- When HSG owned the Texas Rangers, to take advantage of operational efficiencies, HSG entered into various contracts on behalf of both Dallas Stars and TRBP, which contracts were for the benefit of both TRBP and Dallas Stars. In connection with the sale of the Texas Rangers, the obligations, benefits and liabilities of the Office

Building Lease, dated as of June 14, 2007, between HSG and 2811 McKinney, Ltd., as amended pursuant to that certain First Amendment to Office Lease Agreement, dated March 17, 2011 and that certain Second Amendment to Office Lease Agreement, dated May 24, 2011 (as amended, the "2811 McKinney Lease"), which was further modified by that certain Sublease Agreement, dated as of July 11, 2011, by and between HSG and Radiant Outdoor, LLC, were allocated between HSG, on behalf of Dallas Stars, and the Texas Rangers. With respect to the 2811 McKinney Lease, the Affiliate Agreement provides that Dallas Stars shall continue to pay its allocable portion of rent and other obligations under this agreement for a period of time specified in the Affiliate Agreement.

- The Affiliate Agreement clarifies that certain agreements entered into by "HSMG/Dallas Stars" are agreements of Dallas Stars as the party thereto.

- Historically, HSG and HH maintained certain insurance policies for the benefit of various of their related entities. The Affiliate Agreement provides that an executive risk policy and an employment practices liability policy maintained by HSG that benefit certain of the Debtors and their subsidiaries shall be maintained by HSG until (i) Dallas Stars obtains a replacement policy or (ii) the expiration of such policy; HH shall cooperate in resolving a property insurance claim that Plano StarCenter has under a now-expired property insurance policy that was previously maintained by HH; and generally that HSG and HH shall cooperate (with Dallas Stars or Dallas Arena reimbursing HSG or HH for reasonable costs or expenses incurred in providing any requested cooperation) regarding any other claims under insurance policies maintained by HH or HSG for the benefit of Dallas Arena and/or Dallas Stars and its subsidiaries and shall pay any insurance proceeds recovered under such policies to Dallas Arena or Dallas Stars, as applicable.

- HSG maintains a 401(k) savings plan that includes participants who are employees of each of HSG and Dallas Stars. Under the Affiliate Agreement, HSG agrees to cooperate with Dallas Stars to roll over funds attributable to Dallas Stars employees to a new 401(k) savings plan, as requested by such Dallas Stars employees.

- HSG also has maintained a healthcare flexible spending plan, which most recently included participants who were employees of Dallas Stars but not employees of HSG. The Affiliate Agreement provides that after the consummation of the Sale, HSG shall terminate the flexible spending plan and Dallas Stars will reimburse HSG for certain amounts as set forth in the Affiliate Agreement.

- The Affiliate Agreement also provides for the offsetting contribution and distribution of the Intercompany Debt, described herein at Section D.1. Immediately prior to the closing of a Sale, (i) certain Intercompany Debt payable by Dallas Stars to HSG will be contributed by HSG to Dallas Stars and (ii) certain other Intercompany Debt payable by HSG to Dallas Arena will be distributed by Dallas Arena to HSG.

- Pursuant to the terms of the Affiliate Agreement, Dallas Stars has agreed to cooperate with HSGH and HSG in connection with the State of Texas' margin tax audit, and to promptly pay when due its allocable share of any amounts determined to be owing to the State of Texas as a result of the margin tax audit, together with its allocable share of any professional fees incurred in connection therewith. Dallas Stars further agreed to provide information requested by HSGH and HSG that is reasonably necessary to

prepare and file HSGH's 2011 IRS Form 1065, and Dallas Stars shall pay its allocable share of any professional fees incurred in connection therewith.

- As an accommodation to facilitate the Sale, HSGH agreed in the Affiliate Agreement to provide a certificate of non-foreign status under Section 1145 of the Internal Revenue Code of 1986, as amended, referred to as a FIRPTA certificate, that Dallas Stars and Dallas Arena may provide to the Purchaser upon the closing of the Sale.

       b.      New Stars Transition Services Agreement.

At the request of Dallas Stars and Dallas Arena and as a further accommodation to Dallas Stars and Dallas Arena to facilitate the Sale, HSG also agreed to enter into a transition services agreement with Dallas Stars, dated as of September 1, 2011 (the "New Stars Transition Services Agreement"), that (once the agreement is assigned to Purchaser upon the closing of the Sale) allows for the Purchaser's continued use, for six months following the closing of a Sale, of certain technology assets owned solely by HSG that are currently physically located at the offices of Dallas Stars and that HSG currently permits Dallas Stars to use. The New Stars Transition Services Agreement also provides for, among other things, the removal of these technology assets from the offices of Dallas Stars to the offices of HSG following the expiration of this six-month period (or earlier as provided in the agreement).

Each of the Affiliate Agreement and the New Stars Transition Services Agreement was entered into by HSG at the request of Dallas Stars and Dallas Arena and as an accommodation to Dallas Stars and Dallas Arena to facilitate the Sale. At all times during the negotiation of the Affiliate Agreement and the New Stars Transition Services Agreement, HSG was represented by separate counsel.

### D.      KEY EVENTS LEADING TO THE CHAPTER 11 CASES

#### 1.      Dallas Stars' Financial Position Declines.

Since 2004, Dallas Stars has experienced, and continues to experience, cash flow deficiencies. In 2005, Dallas Stars lost over $70,000,000 in anticipated revenue when the NHL season was cancelled as a result of a work stoppage with its players. During Mr. Hicks' tenure as owner of Dallas Stars, he has provided financial support to the team through capital contributions and loans from HSG in excess of $150,000,000. Due to the unprecedented downturn in the U.S. economy and the housing industry, as well as the global economic recession and other commitments and contractual restraints, Mr. Hicks ceased funding additional amounts that benefited the NHL Stars some time after April 2009.

Although Dallas Arena has been cash flow positive as a result of the equity distributions from COC, these funds were historically distributed to HSG by Dallas Arena as intercompany loans; HSG used such distributions by Dallas Arena to fund cash flow deficiencies of HSG, Dallas Stars, and TRBP. In addition, Thomas O. Hicks made certain loans and capital contributions to HSGH and HSG—HSG, in turn, used such distributions to fund cash flow deficiencies of HSG, Dallas Stars, and TRBP. These intercompany deficiencies were reflected in the books and records of each entity as a payable owed to the entity that funded the deficiency (each an "Intercompany Debt"). HSG loans were reflected in the books and records of HSG as a receivable owed by the specific entity, either Dallas Stars or TRBP. As of July 30, 2011, Dallas Stars owed HSG approximately $154,000,000 on account of Intercompany Debts to fund operations and HSG owed Dallas Arena approximately $46,634,223 on account of Intercompany Debts to HSG from Dallas Arena that were used to fund operations of the corporate family, including Dallas Stars.

In early 2009, HSG began evaluating Dallas Stars' financial position relative to projections for 2010, 2011, and beyond and determined that reductions in all expense categories were required to compensate for current and projected shortfalls. Despite the cost reduction initiatives over the last three years, the cash deficiencies have continued. Further, although Dallas Stars receives cash flow from Dallas Arena, such cash flows have not been sufficient to cover the cash deficiencies of Dallas Stars.

As a result of the cash flow deficiencies suffered by Dallas Stars and the concurrent cash flow deficiencies suffered by TRBP, HSG was unable to service its long-term debt obligations under the HSG Credit Agreements in excess of $525,000,000. On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreements, and on April 7, 2009, the Prepetition HSG Lenders accelerated the entire amount of indebtedness thereunder (the "HSG Loan Acceleration"). Pursuant to the terms of the HSG Credit Agreements, the Prepetition HSG Lenders under the HSG Credit Agreements have claims against the Debtors in respect of the Prepetition First and Second Lien Obligations. Ultimately, Dallas Stars and Dallas Arena, together with the other stakeholders, concluded that a sale of the NHL Stars franchise and related assets of Dallas Stars and its subsidiaries and Dallas Arena was the only viable course of action.

### 2. HSG Interest Reserve Accounts Transfers.

Subsequent to the HSG Loan Acceleration, and in accordance with the terms of the NHL Consent Letter, Dallas Stars began receiving funds from the interest reserve accounts that had been established in December 2006 pursuant to the requirements of the HSG Credit Agreements. Beginning May 12, 2009, the First Lien Administrative Agent from time to time transferred cash to Dallas Stars, upon the concurrent request of Dallas Stars and the NHL, and such cash transfers were used to fund the team's operating shortfalls during the period between May 2009 and January 2010. During such period, approximately $19,000,000 was transferred to Dallas Stars to fund operations (the "Interest Reserve Account").

### 3. NHL Monitoring and Original Prepetition CFV Financial Assistance.

After months of discussions among HSG, Dallas Stars, the NHL, and the Prepetition HSG Lenders concerning a possible sale of Dallas Stars, on November 9, 2009, the NHL, Mr. Hicks, and Dallas Stars entered into a letter agreement (the "NHL Framework Agreement"), pursuant to which the parties agreed to a framework by which the NHL would oversee a sale process involving Dallas Stars and Dallas Arena. The NHL Framework Agreement provided for the appointment of an NHL Monitor (as defined therein) to oversee the operations of Dallas Stars as well as the ensuing sale process. The NHL Framework Agreement also prescribed limitations on the activities of Dallas Stars and the other Debtors and called for the weekly delivery of certain financial information to the NHL, the First Lien Administrative Agent, and Second Lien Administrative Agent.

In January 2010, Dallas Stars again faced cash flow deficiencies once the Interest Reserve Account had been fully depleted. HSG and Dallas Stars began discussions with the NHL and the Prepetition HSG Lenders with respect to securing additional funds to meet its cash flow needs for the remainder of the 2009-2010 NHL season. On February 1, 2010, after weeks of discussions, Dallas Stars executed a Promissory Note with the Prepetition CFV Lender (together with the other agreements and instruments related thereto, the "Original CFV Debt Agreement"), pursuant to which the Prepetition CFV Lender agreed to make available to Dallas Stars advances in an aggregate principal amount of up to $19,000,000 (the "Original CFV Debt Amount"). Funds advanced under the Original CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders.

As a condition precedent to entering into the Original CFV Debt Agreement, HSGH, HSG, HSG Partnership, and Dallas Arena delivered certain Irrevocable Proxies to the Commissioner, each dated as of January 14, 2010 (the "NHL Proxies"), pursuant to which the Commissioner obtained the exclusive right to control the operations of Dallas Stars and Dallas Arena, including authority to cause a sale of Dallas Stars and Dallas Arena. Since the execution of the NHL Proxies, HSG has had no ability to control the Debtors or their respective operations.

### 4. Additional Prepetition CFV Financial Assistance.

When borrowing capacity under the Original CFV Debt Agreement was exhausted, Dallas Stars sought additional financial assistance for its cash flow needs for the remainder of the 2010-2011 NHL season. Dallas Stars, the NHL and the Senior Prepetition Creditors again worked together to arrange financial assistance, and on January 14, 2011, the Original CFV Debt Amount was refinanced into the CFV Debt Agreement. The CFV Debt Agreement provided an additional $24,600,000 of borrowing capacity for an aggregate principal amount of CFV Debt Amount of up to $45,000,000. Funds advanced under the CFV Debt Agreement were made available to the Prepetition CFV Lender pursuant to a non-recourse secured loan facility provided by a subset of the Prepetition HSG Lenders. In separate draw-downs, substantially all available amounts have been advanced under the CFV Debt Agreement and the CFV Debt Amount has become due and payable as of June 30, 2011 subject to a grace period running through October 31, 2011. As of August 31, 2011, the amount of CFV Debt Amount outstanding is approximately $51,384,000, inclusive of principal, interest and fees due in respect thereof.

### 5. Financial Advisors are Retained.

On February 4, 2010, HSG, Dallas Stars and Dallas Arena retained GSP Securities LLC ("GSP") to provide financial advice and assistance in connection with opportunities relating to a sale of (i) Dallas Stars and its subsidiaries, (ii) Dallas Arena, and (iii) the related hockey assets.

### 6. TRBP Chapter 11 Cases and Sale.

Concurrent with the marketing of the NHL Stars-related assets, in the spring of 2010, TRBP completed negotiations on an asset purchase agreement with a local investor group led by Chuck Greenberg and Texas Rangers President Nolan Ryan. On May 24, 2010, TRBP initiated a voluntary prepackaged chapter 11 case in the U.S. Bankruptcy Court for the Northern District of Texas styled *In re Texas Rangers Baseball Partners* under case number 10-43400. Certain of the Prepetition HSG Lenders initially opposed the sale to the Greenberg-Ryan group under the prepackaged plan. Ultimately, the court approved an auction for TRBP's assets, and a new higher and better bid by the Greenberg-Ryan group prevailed over a competing bid by an investor group led by Mark Cuban. The court later confirmed the *Fourth Amended Plan of Reorganization of TRBP Under Chapter 11 of the Bankruptcy Code* [Docket No. 532] (the "TRBP Plan"). The TRBP Plan provided for, among other things, distributions to the Prepetition HSG Lenders in respect of claims arising under the HSG Credit Agreements. On August 12, 2010, TRBP consummated the TRBP Plan and closed the sale to the Greenberg-Ryan group.

### 7. Marketing Process.

By the spring of 2010, HSG and Dallas Stars, in conjunction with their advisors, had canvassed a broad group of over 30 prospective buyers and investors. HSG and Dallas Stars directed their advisors to oversee the creation of an electronic dataroom and actively solicited parties interested in buying the NHL Stars to perform due diligence. During the course of the marketing process, at least eight of the prospective buyers executed confidentiality agreements and were granted access to the dataroom. Beginning in April 2010, confidential information memoranda were distributed to six of the prospective

buyers that had executed confidentiality agreements and received NHL approval to participate in the marketing process. By mid-November 2010, five of the prospective buyers had participated in diligence meetings with the Dallas Stars management team. After well over a year of marketing the NHL Stars and its related assets to potential bidders with the financial wherewithal to purchase an NHL franchise, a bid from Tom Gaglardi, a Vancouver businessman, emerged as the highest or best offer. Even after Mr. Gaglardi's bid materially exceeded those of other interested buyers, Dallas Stars negotiated Mr. Gaglardi's bid for several months to maximize the consideration and other relevant terms of the bid, including, at the Debtors' insistence, the ability to solicit higher or better bids in connection with postpetition bidding procedures. In the spring of 2011, Dallas Stars and Mr. Gaglardi began negotiations to memorialize Mr. Gaglardi's bid.

### 8. Memorandum of Understanding.

On April 13, 2011, Dallas Stars, Dallas Arena, and Tom Gaglardi entered into that certain Memorandum of Understanding ("MOU"), which set forth certain understandings and intentions of the parties with respect to the proposed sale of the NHL Stars franchise and related assets of Dallas Stars and Dallas Arena. Pursuant to the terms of the MOU, Dallas Stars and Dallas Arena granted certain limited exclusivity rights to Tom Gaglardi with respect to the proposed sale, which exclusivity rights expired in May 2011. The parties negotiated and drafted definitive documents in preparation for the sale of the NHL Stars franchise and related assets of Dallas Stars and Dallas Arena in accordance with the terms of the MOU starting in mid-April 2011.

The marketing process has continued with Dallas Stars, in conjunction with their advisors and GSP, engaging in negotiations with potential buyers through the date of the execution of the MOU and after the expiration of exclusivity under the MOU.

### 9. NHL Approval.

Dallas Stars, as a member of the NHL, is subject to the rules and regulations of the NHL. In particular, the NHL Rules provide that (i) any sale of a NHL franchise cannot be consummated without first obtaining the requisite approval from a three-fourths majority vote of the BOG and (ii) the sale of any NHL Member Club must comply with the process set forth in the NHL Rules. Accordingly, Dallas Stars has worked closely with the NHL throughout the negotiation of the Stalking Horse Asset Purchase Agreement and all related events leading to the Solicitation of votes on the Prepackaged Plan and in preparation for the filing of these prepackaged Chapter 11 Cases.

Further, pursuant to the NHL Proxies, the Commissioner holds the exclusive right to authorize a sale of Dallas Stars and Dallas Arena and the exclusive authority to direct the filing of the prepackaged Chapter 11 Cases by the Debtors to effectuate the Sale.

### 10. The Debtors' Current Financial Picture.

As discussed above, due to cash flow shortfalls, Mr. Hicks has had to contribute and loan $150,000,000 to the Debtors over the past 10 years to fund, among other things, player salaries and other operating expenses. Moreover, in the most recently completed fiscal year, the Debtors lost $37,900,000, and over the past three seasons, the Debtors lost $91,500,000. The Debtors are projected to lose in excess of $31,000,000 this season, before interest expense, legal and professional costs related to the Sale and restructuring process, and taxes. Consequently, the Sale proposed herein is critical to the Debtors' future ability to meet their payroll and other operating expenses and to satisfy their debt repayment obligations.

E.    THE SALE

1.    The Proposed Stalking Horse.

The proposed Stalking Horse is Tom Gaglardi.  Mr. Gaglardi is the President of Northland Properties Corporation ("Northland"), which he and his family own.  Northland's principal business activities are the ownership and operation of Sandman Hotels, Inns and Suites, Denny's Restaurants, Moxie's Restaurants, Shark Club Bar and Grills, Chop Restaurants, Rockford Restaurants, and the Kamloops Blazers Hockey Team, and the leasing of residential and commercial real estate in Canada.  Northland owns 45 hotels with 6,400 rooms, owns over 100 restaurants, and employs more than 10,000 employees.

Mr. Gaglardi is a life-long hockey fan with Texas roots.  His mother is from Longview, Texas and much of his family lives in the Dallas/Fort Worth area.  The acquisition includes the Debtors' 50% interest in the American Airlines Center, and Mr. Gaglardi is committed to keeping the Stars in Dallas and rebuilding the franchise both in terms of on-ice success and the fan experience.

2.    Stalking Horse Asset Purchase Agreement.

On September 1, 2011, the Debtors and the Stalking Horse completed negotiations on the Stalking Horse Asset Purchase Agreement, for the sale of substantially all the assets of the Debtors, including the NHL Stars franchise, Dallas Arena's ownership interest in COC and Center GP, and other hockey-related assets of the Debtors.  A copy of the Stalking Horse Asset Purchase Agreement is attached hereto as Exhibit C.  Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, (i) the Debtors agreed to file the Chapter 11 Cases and the Prepackaged Plan and (ii) the Stalking Horse agreed to purchase substantially all the assets of the Debtors to be consummated in connection with the Prepackaged Plan.

As described below, under the Stalking Horse Asset Purchase Agreement, substantially all of assets of the Debtors, including the NHL Stars franchise, Dallas Arena's ownership interest in COC and Center GP, and substantially all contractual rights related to the operation of the NHL Stars will be sold to the Stalking Horse.  In turn, the Stalking Horse will also assume all of the ordinary course obligations of Dallas Stars, including deferred compensation obligations, sponsorship, ticketholder, certain employee and specified tax obligations, with the exception of certain excluded liabilities (including the obligations of the HSG Credit Agreements).

The Debtors intend to assign to the Purchaser all of their contractual rights relating to COC and the NHL Stars franchise, including all marketing, media, advertising, and merchandising contracts, and all NHL player contracts.  Subject to Bankruptcy Court approval, the Sale is anticipated to complete an orderly transition of the operations of Dallas Stars and Dallas Arena.  As described in greater detail herein, the Debtors intend to seek relief from the Bankruptcy Court to honor all tickets to games and continue other valued customer programs and all employees will keep their jobs pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

The material terms of the Stalking Horse Asset Purchase Agreement are as follows (defined terms used in this Section and not otherwise defined herein have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement):[19]

**Description of Purchased Assets.**  Upon the Closing, the assets sold to the Stalking Horse include the Debtors' right, title, and interest in the Purchased Assets, including all rights and privileges held by Dallas Stars associated with the NHL (which includes rights to membership in NHL and the NHL Stars franchise), all assets and interests (tangible and intangible) related to the Dr Pepper StarsCenters and sublease of the AAC, and Dallas Arena's interests in COC and Center GP.

**Assumed Obligations/Liabilities.**  As part of the sale of the Purchased Assets, the Stalking Horse will assume, and agree to pay and perform, all liabilities and obligations of the Debtors, other than the following expressly excluded liabilities that are more specifically described in the Stalking Horse Asset Purchase Agreement (the "Excluded Liabilities"):  (i) any liabilities arising out of assets that are being retained by the Debtors after the Closing, except that the Stalking Horse is assuming all liabilities related to taxes; (ii) all liabilities of HSG and certain other affiliates of Mr. Hicks except for liabilities related to taxes to which Debtors are jointly and severally liable, and certain other liabilities specifically assumed by the Stalking Horse under the Stalking Horse Asset Purchase Agreement; (iii) liabilities related to the HSG Credit Agreements; (iv) liabilities of Debtors owed to their affiliates (other than to another Debtor or their subsidiaries) or any affiliates of Mr. Hicks, except liabilities related to certain affiliate contracts that are specifically assumed by the Stalking Horse; (v) liabilities to other potential purchasers or bidders who are not affiliated with the Stalking Horse; (vi) liabilities covered by insurance policies that are not assigned to the Stalking Horse to the extent that the Debtors recover the amount of such liabilities under the applicable insurance policies; (vii) certain liabilities related to employee pension plans that are maintained by an entity under common control with Debtors or their subsidiaries prior to the Closing; (viii) any liabilities of Debtors arising under the Stalking Horse Asset Purchase Agreement, such as indemnification obligations; (ix) any liabilities under the CFV Debt Agreement, except for the CFV Debt Amount which is specifically assumed by the Stalking Horse; and (x) any liabilities of Debtors to a broker other than GSP.

**Total Consideration; Purchase Price.**  Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, at Closing the aggregate consideration paid and obligations assumed by the Stalking Horse will consist of (a) an amount in cash equal to the CFV Debt Amount, which will be paid to CFV; (b) an amount in cash as necessary to pay in full the Specified Expenses,[20]

---

[19] This summary is for informational purposes only and is qualified in its entirety by the terms of the Stalking Horse Asset Purchase Agreement.

[20] The Specified Expenses represent the fees and expenses for the Sale and Auction and the Chapter 11 Cases, including fees and expenses of the NHL and its attorneys and other advisors and the Debtors and their attorneys and other advisors and professionals.  "Specified Expenses" is defined in the Prepackaged Plan to mean "those unpaid fees and expenses relating to the sale process and the related matters contemplated by the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) as set forth therein, including (i) amounts due to GSP Finance LLC (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by section 7.8 of the Stalking Horse Asset Purchase Agreement), (iii) fees of Debtors' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters

comprising fees and expenses relating to the sale process including, but not limited to, (i) amounts owed to the Debtors' sell-side advisor, GSP; (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisors; and (iii) fees of the Debtors' legal and accounting advisors; (c) the incurrence of indebtedness under the Stalking Horse Senior Secured Obligation in an aggregate principal amount not to exceed $100,000,000 in partial satisfaction of the First Lien Secured Claims, provided, however, the principal amount of the Stalking Horse Senior Secured Obligation shall be increased or decreased subject to the Purchase Price Adjustment described below; (d) an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount, which will be paid to the holders of the First Lien Secured Claims; and (e) the assumption of certain Assumed Liabilities (as defined in the Stalking Horse Asset Purchase Agreement).

      **Purchase Price Deposit.** The Stalking Horse will deposit $15,000,000 of the purchase price into an escrow account prior to the filing of the Chapter 11 Cases that shall be distributed or applied as described in the Stalking Horse Asset Purchase Agreement at the Closing.

      **Purchase Price Adjustment.** As indicated above, at Closing the principal amount of the Stalking Horse Senior Secured Obligation shall be (x) decreased by the amount, if any, by which the CFV Debt Amount exceeds $50,000,000, (y) increased or decreased by the amount, if any, by which the final net working capital is greater than or less than, respectively, $7,750,000 and (z) (i) if the Closing Date occurs on or after September 1, 2011 but before January 1, 2012 and falls on the last day of the month, increased by the absolute value of the cumulative budgeted loss of Dallas Stars and its subsidiaries for such month, or (ii) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on a date other than the last day of the month, increased by an amount equal to (x) the absolute value of the cumulative budgeted loss for the immediately preceding calendar month *plus* (y) the absolute value of the prorated budgeted loss for the month in which Closing occurs, or (iii) if the Closing Date occurs on or after January 1, 2012, increased by an amount equal to $15,058,541. At Closing, an estimated adjustment shall be made to the principal amount of the Stalking Horse Senior Secured Obligation, and then post-closing, a final adjustment shall be made. The post-closing calculation of the final net working capital is subject to a dispute resolution mechanism for any disagreements between the Stalking Horse and the holders of the First Lien Secured Claims. Within three Business Days following the determination of the final net working capital (pursuant to the terms of the Stalking Horse Asset Purchase Agreement), a final adjustment to increase or decrease the Stalking Horse Senior Secured Obligation shall be automatically made pursuant to its terms. In addition, at the time of such adjustment, the Purchaser shall pay to the First Lien Administrative Agent on behalf of the holders of the First Lien Secured Claims an amount in cash equal to the positive difference, if any, by which the adjusted amount of the Stalking Horse Senior Secured Obligation exceeds $100,000,000. The foregoing paragraph is collectively referred to herein as the "Purchase Price Adjustment."

      **Closing Date.** The consummation of the transactions contemplated by the Stalking Horse Asset Purchase Agreement (the "Closing"), including the sale of the NHL Stars franchise to the

---

contemplated by this Agreement (including, without limitation, any antitrust fees and any fees resulting from the filings contemplated under section 9.15 of the Stalking Horse Asset Purchase Agreement)." Prepackaged Plan at Section 1.98.

Stalking Horse, will occur not later than the third Business Day after the satisfaction or waiver by the applicable party of the following conditions, among others:

(1)     each of the Debtors and the Stalking Horse have performed or complied with all covenants, obligations and agreements required of such party under the Stalking Horse Asset Purchase Agreement;

(2)     all applicable approvals of the Bankruptcy Court and NHL shall have been received;

(3)     the waiting period applicable to the transactions contemplated by the Stalking Horse Asset Purchase Agreement under the HSR Act shall have expired or early termination shall have been granted;

(4)     Debtors shall have delivered, or caused to be delivered, to the Stalking Horse stock certificates (or affidavits of lost stock certificates) representing the Hockey Enterprises shares that are owned by Dallas Stars and U.S. Holdings, duly endorsed in blank or accompanied by stock transfer powers;

(5)     Debtors and the Stalking Horse shall have obtained a release of all Liens held pursuant to the Prepetition Obligations pursuant to the Confirmation Order;[21]

(6)     there shall not have been or occurred since May 31, 2011, any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Material Adverse Effect;

(7)     the Bankruptcy Court shall have entered the Bidding Procedures and Confirmation Scheduling Order (as defined herein);

(8)     the Bankruptcy Court shall have entered the Confirmation Order and any stay period applicable to the Confirmation Order shall have expired or shall have been waived by the Bankruptcy Court; and

(9)     the Closing Date (as defined in the Stalking Horse Senior Secured Credit Agreement) shall have occurred and the Term Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) shall have been deemed made pursuant to the terms of the Stalking Horse Senior Secured Credit Agreement. Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, certain conditions precedent may not be waived by

---

[21] The Confirmation Order is attached as Exhibit D to the Stalking Horse Asset Purchase Agreement, which is attached as Exhibit C to this Disclosure Statement.

the Stalking Horse or the Debtors without the consent of the Senior Lenders pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

**Termination Rights.**  The Stalking Horse Asset Purchase Agreement provides termination rights to each of the parties thereto upon the occurrence of certain specified events or the failure to occur of certain other specified events.  Such termination rights include, among others, that either Debtors or the Stalking Horse may terminate if the Closing does not occur prior to the later of (i) December 31, 2011 and (ii) in the event the Stalking Horse is not the Successful Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order), the earlier of (A) the closing of the Sale to a Competing Bid and (B) forty-five (45) day after the close of the Auction if the Closing shall not have occurred by the close of business on such date, provided that the terminating party is not in breach of any of its obligations under the Stalking Horse Asset Purchase Agreement that would prevent the closing conditions in Article XI of the Stalking Horse Asset Purchase Agreement, as applicable, from being satisfied.

**Break-Up Fee.**  Under certain circumstances, if a Competing Bid (as such term is defined in the Stalking Horse Asset Purchase Agreement) closes, Debtors shall pay the Stalking Horse an amount equal to $4,000,000 as a break-up fee and shall reimburse the Stalking Horse for any transaction expenses in an amount not to exceed $500,000 in accordance with the terms of the Bidding Procedures and Confirmation Scheduling Order.

**Representations, Warranties and Covenants.**  The Stalking Horse Asset Purchase Agreement contains standard and customary representations, warranties and covenants.

**Dallas Stars Employees.**  Prior to the Closing, the Stalking Horse will offer employment to each non-player Employee (as such term is defined in the Stalking Horse Asset Purchase Agreement), who is not a party to a purchased contract, to commence employment with the Stalking Horse immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment with Dallas Stars or any of its subsidiaries.  In addition, with respect to all non-player Employees who actually commence employment with the Stalking Horse, the Stalking Horse will provide (subject to certain limitations) severance benefits and payments no less favorable than the severance benefits and payments that would have been provided immediately prior to Closing. The contracts of all current Employees are included as part of the Purchased Assets and each Employee will remain under the employment of the Stalking Horse on and after the Closing pursuant to the terms of his or her contract.  The Stalking Horse Asset Purchase Agreement also provides for the Stalking Horse's assumption of liabilities related to the employment or termination of employment by the Debtors of any individual before, on or after the Closing Date (including liabilities relating to workers compensation claims that relate to the period ending on the Closing Date).  In addition, the Stalking Horse Asset Purchase Agreement also contains certain other standard and customary provisions related to employee benefits.

**Indemnification.**  The Stalking Horse Asset Purchase Agreement includes customary provisions obligating each of the Debtors and the Stalking Horse to indemnify the other party and their affiliates for losses caused by a breach of the indemnifying party's representations, warranties, covenants, or losses resulting from certain excluded and assumed liabilities.  The indemnification obligations of each party survive as to covenants of such party for up to one year after the last date upon which a covenant is required to be performed by such party, and as to representations and warranties, do not survive Closing.

### 3. The Stalking Horse Senior Secured Obligation.

If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the Stalking Horse Senior Secured Obligation will be incurred pursuant to the terms of the Stalking Horse Senior Secured Credit Agreement among the Stalking Horse, as borrower, certain subsidiaries of the Stalking Horse, as guarantors, each lender from time to time party thereto (which, on the Effective Date, will be the holders of the First Lien Secured Claims), and JPMorgan Chase Bank, N.A., as administrative agent for the lenders. Under the Stalking Horse Senior Secured Credit Agreement, each Prepetition First Lien Lender will be deemed to have issued a term loan to the Stalking Horse on the Effective Date (with such term loans to be extended on a non-cash basis) in the aggregate principal amount of $100,000,000 to partially satisfy the First Lien Secured Claims. The Stalking Horse Senior Secured Obligation will have a five-year maturity and will bear interest at the Eurodollar Rate (as defined in the Stalking Horse Senior Secured Credit Agreement) plus 3.25% per annum (or at the Base Rate (as defined in the Stalking Horse Senior Secured Credit Agreement) plus 2.25% per annum) until the first anniversary thereof and at the Eurodollar Rate plus 4.25% per annum (or at the Base Rate plus 3.25% per annum) thereafter. The Stalking Horse Senior Secured Obligation can be prepaid in whole or in part at any time and from time to time without premium or penalty. In addition, unless a default or event of default has occurred and is continuing thereunder, the Stalking Horse Senior Secured Obligation can be prepaid at a discount of 2% of principal if repaid in full within six months of issuance, and at a discount of 1% of principal if prepaid in full after six months but prior to 12 months after issuance.

The Stalking Horse Senior Secured Credit Agreement contains representations, warranties, affirmative covenants, and negative covenants, and in addition, contains the following covenants and defaults: fixed charged coverage ratio, tested quarterly, to be not less than 1.00:1.00 for the trailing 12 month period (subject to equity cure); minimum adjusted EBITDA, tested quarterly, to be not less than $3,000,000 for the trailing 12 month period (subject to equity cure); minimum franchise valuation requirement of two times the outstanding principal amount of the Stalking Horse Senior Secured Obligation; pre-funding of annual budgeted losses; and maintenance of an interest reserve account. The Stalking Horse Senior Secured Obligation would be secured by a pledge of substantially all assets of the Stalking Horse and each of the guarantors under the Stalking Horse Senior Secured Credit Agreement, subject to such limitations as are required by the NHL.

### 4. Owner Support Agreement.

As a condition precedent to the Stalking Horse Senior Secured Credit Agreement, if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then Mr. Gaglardi and Northland Properties Corporation, a Canadian Corporation ("NPC" and, together with Mr. Gaglardi, the "Owner Support Parties") are required to enter into an Owner Support Agreement (the "OSA"), with the Administrative Agent, pursuant to which the Owner Support Parties would agree with and guarantee to the Administrative Agent to, directly or indirectly, fund the Stalking Horse through cash common equity contributions or Owner Support Party Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) in such amounts necessary (A) to maintain the continuing operation of the NHL Stars in good standing under the NHL Rules, (B) to pay the operating expenses of the NHL Stars including, without limitation, Interest Expense (as defined in the Stalking Horse Senior Secured Credit Agreement), and (C) to cause the Stalking Horse to pre-fund annual budgeted losses and maintain the interest reserve account as required under Sections 6.12 and 6.15, respectively, of the Stalking Horse Senior Secured Credit Agreement.

The OSA would include certain financial covenants: (1) Liquid Net Worth (as defined in the OSA) of at least $20 million at the closing of the Sale (exclusive of any amount being paid, contributed or applied for any purpose at or connection with the closing of the Sale as required under the

Stalking Horse Asset Purchase Agreement, the Stalking Horse Credit Agreement, or the NHL/Lender Cooperation Agreement) and $30 million tested quarterly for periods thereafter (exclusive of assets in the Stalking Horse, the subsidiaries of the Stalking Horse and Center Operating Company and its subsidiaries); and (2) Net Worth (as defined in the OSA) of at least $500,000,000 tested annually. Additionally, a condition precedent to the closing under the Stalking Horse Senior Secured Credit Agreement is the delivery of the Accountant's Letters (as defined in the OSA) in accordance with the OSA.

## 5. NHL/Lender Cooperation Agreement.

If a portion of the consideration the Purchaser provides under the Asset Purchase Agreement is in the form of a secured debt obligation to the holders of First Lien Secured Claims (or, if applicable, the holders of Second Lien Secured Claims), then a condition precedent to the Closing of the Asset Purchase Agreement will be that the Purchaser and other parties thereto execute the NHL/Lender Cooperation Agreement.[22]  If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the NHL/Lender Cooperation Agreement shall be substantially in the form of Exhibit G to the Stalking Horse Asset Purchase Agreement.  The Debtors will not be a party to such agreement.

The NHL/Lender Cooperation Agreement will impose certain restrictions and obligations on the Requesting Parties[23] (which includes the Agent and Lenders, among others) in connection with, among other things, exercise of their rights and remedies with respect to the Collateral.  Among other restrictions, the NHL/Lender Cooperation Agreement provides that:

(i) during the period beginning on the date that any Lender has a right to commence Foreclosure (regardless of whether any Lender has then issued a Default Notice) and continuing for 180 days after such Lender delivers a Default Notice to the NHL (or in the event any Club Party or any other person or entity contests the right of such Lender to commence Foreclosure, then continuing for one hundred and eighty (180) days after the Lender gives a subsequent written notice to the NHL that the court or other entity having jurisdiction over the matter has made a final non-appealable determination of the right of such Lender to commence Foreclosure), provided that, in either such event, if the last day of such applicable 180-day period is prior to the final game of the Stanley Cup Finals for the NHL season in which such last day would otherwise occur, then such period shall be extended to the date 60 days after the date on which the Stanley Cup Playoffs for such season have been completed (the "Voluntary Sale Period"), the Lenders will not take certain enforcement actions, including Foreclosure, and the NHL will have the exclusive right to attempt to arrange a sale of such Collateral,

(ii) the Lenders will not, whether during or after the Voluntary Sale Period, exercise certain Indicia of Ownership with respect to such Collateral,

---

[22] This description of the NHL/Lender Cooperation Agreement is with respect to the Stalking Horse Asset Purchase Agreement.  If the Purchaser is not the Stalking Horse and the Asset Purchase Agreement provides for secured debt consideration, the agreement will be in the form and substance reasonably satisfactory to the NHL and the First Lien Administrative Agent.

[23] The capitalized terms used in this Section and not otherwise defined in the Disclosure Statement shall have the meanings ascribed to them in the NHL/Lender Cooperation Agreement.

(iii) the Lenders will, whether during or after the Voluntary Sale Period, release their liens on such Collateral if the NHL arranges and approves a sale of such Collateral and the price paid for such Collateral is (a) equal to the lesser of NHL-Approved Secured Loan Amount (as defined below) or the amount of all outstanding Obligations secured by the Collateral or (b) commercially reasonable in light of the fair market value of such Collateral and all other circumstances existing at such time, including the NHL Constitution and Agreements and the interests of the NHL and its member clubs in protecting and enhancing the reputation and integrity of hockey and in preserving and enhancing the value of other member clubs, and the Lenders shall be paid, in accordance with Section 7(d) thereof,[24] the lesser of: (1) all of the outstanding Obligations secured by the Collateral being sold and (2) the amount of such proceeds, if any, remaining after giving effect to such Section 7(d),

(iv) the maximum principal amount permitted to be outstanding at any time pursuant to the Operative Documents shall not at any time exceed $100,000,000 and the maximum amount of all Obligations secured by Collateral, at any time, under the Operative Documents or otherwise, shall not at any time exceed $110,000,000 (or, if the NHL has denied the Lenders' request to seek an enforcement action against the Owner Guarantors in accordance with Section 4(c) of the NHL/Lender Cooperation Agreement, $115,000,000 (it being understood, for the avoidance of doubt, that, for purposes of this parenthetical, any withholding by the NHL of its consent with respect to any request that does not comply with the requirements of the second proviso of Section 4(c) of the NHL/Lender Cooperation Agreement shall not be a request that the NHL has denied)) (the "NHL-Approved Secured Loan Amount") in the aggregate,

(v) in the event that any of the Collateral is sold, the proceeds shall be used (i) first to pay and/or satisfy all amounts and obligations due and owing by the Club, any other Club Party or any of their respective affiliates to the NHL, the other NHL Entities, any other entity formed generally by the NHL or its member clubs or the other NHL Entities after the date hereof, or any other member club, whether in accordance with the terms of the NHL Constitution and Agreements, applicable law or otherwise, and (ii) then as required by law including, without limitation, to pay any amounts due and owing by the Club, the other Club Parties or any of their respective affiliates to the Lenders or other creditors, and

(vi) any exercise by the Lenders of remedies under the Owner Support Agreement against the Owner Guarantors shall constitute a Foreclosure and be subject to the restrictions contained in the NHL/Lender Cooperation Agreement; provided that during the Voluntary Sale Period, the Lenders may, with the prior written consent of the NHL, seek to enforce against the Owner Guarantors only their obligations to pay the operating expenses of the Club pursuant to clauses (B) and (C) of Section 3 of the Owner Support Agreement so long as the proceeds received from any such enforcement shall be deposited into the Interest Reserve Account, the Stars Prefunding Interest Account or the Stars Prefunding Account, as applicable, for application in accordance with the NHL/Lender Cooperation Agreement.

---

[24] Section 7(d) of the NHL/Lender Cooperation Agreement is summarized in subsection (v) below.

The Lenders will have the right to assign and grant participations in their interests under the Operative Documents; provided, that, the NHL's consent to such assignment or participation will be required unless the following conditions are satisfied: (i) the assignment or participation is to a financial institution regularly engaged in the business of commercial lending and which has a combined capital and surplus and undivided profits of at least $250,000,000 and (ii) JPMorgan remains as Agent under the Credit Agreement (so long as the NHL shall have been provided copies of the relevant documentation governing such assignment or participation at least 5 business days prior to such assignment or participation).

The Lenders will agree that there shall be no Adverse Modification to any provision of any of the Operative Documents without the prior written approval of the NHL, which approval may be withheld in the NHL's sole and absolute discretion.

The foregoing description of the NHL/Lender Cooperation Agreement is for summary purposes only, and the holders of First Lien Secured Claims are encouraged to review the NHL/Lender Cooperation Agreement in its entirety, as it provides for other material obligations on, and material restrictions on the rights of, such parties under the Credit Agreement and related documents. Holders of First Lien Secured Claims may obtain a copy of the NHL/Lender Cooperation Agreement from the First Lien Administrative Agent through its internal password-protected Intralinks website; holders of Second Lien Secured Claims may obtain a copy from the Second Lien Administrative Agent.

## 6. Bidding Procedures.

As noted, although the Debtors engaged in a substantial prepetition marketing process before selecting the Stalking Horse as the stalking horse bidder, the Debtors propose to implement a postpetition bidding process to ensure that they receive the highest or best offer for their assets for the benefit of their creditors. To that end, contemporaneously with the filing of the Chapter 11 Cases, the Debtors will file a motion seeking:

(a) entry of an order at the "First Day Hearing" setting a date for a hearing to (i) approve the Bidding Procedures and (ii) schedule other dates relevant to confirmation of the Prepackaged Plan (the "Bidding Procedures/Scheduling Hearing");

(b) entry of an order at the Bidding Procedures/Scheduling Hearing, which order shall (i) approve the Stalking Horse Asset Purchase Agreement, including the bid protections, (ii) approve the Bidding Procedures, and (iii) schedule dates for filing objections to the Prepackaged Plan, the Disclosure Statement, and the related solicitation procedures and scheduling the date for the Confirmation Hearing (the "Bidding Procedures and Confirmation Scheduling Order");[25] and

At the Confirmation Hearing, the Debtors will seek confirmation of the Prepackaged Plan authorizing the Sale to the Purchaser under the Asset Purchase Agreement and approval of the Disclosure Statement and related solicitation procedures.

---

[25] The Bidding Procedures and Confirmation Scheduling Order is attached as Exhibit C to the Stalking Horse Asset Purchase Agreement, which is attached as Exhibit C to this Disclosure Statement.

The proposed Bidding Procedures are:[26]

a.    Due Diligence, Bid Requirements and NHL Approval.

Within seven days after entry of the Bidding Procedures and Confirmation Scheduling Order, any party interested in becoming a potential purchaser of the Purchased Assets (a "Potential Bidder") is required to notify the Debtors and the NHL and submit the background information in that certain "Application to Acquire NHL Membership, or Ownership in an NHL Member Club" (the "NHL Application").  A Potential Bidder that is approved for such purpose by the NHL[27] and executes a confidentiality agreement as set forth in the Bidding Procedures will be given access to a dataroom for purposes of performing due diligence with respect to the Purchased Assets.

For an offer, solicitation, or proposal (a "Bid") to constitute an "Acceptable Potential Bid" and the Potential Bidder an "Acceptable Potential Bidder," each Bid must:  (i) be in writing from a Potential Bidder and must be received by the Debtors, the NHL, and the notice parties listed in the Bidding Procedures on or before 30 days after entry of the Bidding Procedures and Confirmation Scheduling Order at 4:00 p.m. (ET) (the "Bid Deadline"), (ii) include a fully completed and executed NHL Application provided to the NHL, and (iii) include an executed mark-up of the Stalking Horse Asset Purchase Agreement provided to the notice parties as defined in the Bidding Procedures, and (iv) include a good faith deposit in an amount equal to US $15,000,000.00 to the Debtors.

For an Acceptable Potential Bid to constitute a "Qualified Bid," and the Acceptable Potential Bidder a "Qualified Bidder," the Acceptable Potential Bid must be submitted by the Bid Deadline, be for all the Purchased Assets, including substantially all of the assets of the Debtors necessary to conduct the Purchased Assets as an NHL team in the NHL Stars' current Home Territory (as defined in the NHL Constitution), and:  (i) contain evidence (in the form of binding commitment letters, guarantees or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions; (ii) contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies') approval of the contemplated transaction; (iii) be for all the Purchased Assets and be at least US $10,000,000 greater than the total value of the Bid as evidenced by the Stalking Horse Asset Purchase Agreement (the "Stalking Horse Bid"); (iv) provide that the Acceptable Potential Bidder and Bid will be subject to NHL approval, will cooperate with the review process of the NHL, will execute certain agreements with the NHL (as fully set forth in Section IV.A.4 of the Bidding Procedures) and will, as a condition to closing, deliver any agreements or other documents that the NHL requires; (v) other than the Stalking Horse Bid, not request a break-up fee, termination fee, expense reimbursement or similar type of payment; (vi) not be conditioned on the outcome of unperformed due diligence, board approval or a financing contingency; provide that the bidder's offer is irrevocable for a period of time designated by the Bidding Procedures; contain a form of confirmation order; include evidence of the Acceptable Potential Bidder's ability to provide adequate assurance of future performance of such contracts, permits and licenses it would require the Debtors to assume and assign; assume the Team Agreement under the Prepackaged Plan; and (vii) provide that the Potential Bidder will enter into an assumption agreement to assume all obligations of Dallas Stars under the various

---

[26] Any summary of the Bidding Procedures set forth in this Disclosure Statement is qualified in its entirety by the Bidding Procedures attached as Exhibit A to the Bidding Procedures and Confirmation Scheduling Order.

[27] Any bid ultimately submitted by a Potential Bidder remains subject to further NHL Approval (as defined and described below).

COC transaction documents related to the COC Note Purchase Agreement, and a pledge and assumption agreement by which the Purchaser will pledge its interest in COC and Center GP to the holders of COC Notes; (viii) include a fully executed form of asset purchase agreement and any agreements ancillary to the Sale, each executed by the Acceptable Potential Bidder; and (ix) receive approval for ownership transfer by the NHL under the NHL's applicable ownership transfer requirements ("NHL Final Approval"). The Stalking Horse Bid satisfies each of the conditions of a Qualified Bid other than NHL Final Approval.

Two days before the commencement of the Auction (the "NHL Determination Date"), the NHL shall notify each Acceptable Potential Bidder, the Debtors, and the notice parties to the Bidding Procedures whether the Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby have received NHL Final Approval.

On or prior to 5:00 p.m. (ET) on the NHL Determination Date, if more than one Qualified Bid is timely received, the Debtors shall provide each Qualified Bidder that has submitted a Qualified Bid: (i) written notice of the Auction, (ii) notice of the Qualified Bid with which the Debtors intend to commence the Auction, and (iii) copies of all Qualified Bids. If one or no Qualified Bid is timely received, the Debtors will not conduct an Auction. If only one Qualified Bid from a Qualified Bidder is timely received, the Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Confirmation Hearing.

b.     The Auction.

If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 commencing 60 days following the entry of the Bidding Procedures and Confirmation Scheduling Order at 10:00 a.m. (CT). Only Qualified Bidders shall be eligible to participate in the Auction. The Debtors, in their reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale for any reason by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

All Bids made at the Auction after the commencement thereof (each, an "Overbid") shall be made in overbid increments of at least US $5,000,000 greater than the current highest or best offer for the Purchased Assets. For the avoidance of doubt, US $4,500,000 (representing the US $4,000,000 Break-Up Fee (as defined in the Bidding Procedures and Confirmation Scheduling Order) and the US $500,000 Expense Reimbursement (as defined in the Bidding Procedures and Confirmation Scheduling Order)) shall be deducted from each Qualified Bid and Overbid submitted by a Qualified Bidder (including the initial Qualified Bid), other than a Bid of the Stalking Horse, in determining the value of each Qualified Bid or Overbid. An Overbid must comply with the conditions for a Qualified Bid. A Qualified Bidder need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

c.     Identification of the Successful Bidder and Acceptance of Successful Bid.

At the close of the Auction, the Debtors, in consultation with the NHL; JPMorgan Chase Bank, N.A. and Monarch Master Funding Ltd. (together, the "Senior Lenders"); and representatives of any statutory committee shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). After the Successful Bid is so determined, the Auction will be closed.

The Debtors will then determine, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which bid has been determined to be the second highest or otherwise best bid (the "<u>Backup Bid</u>" and such bidder being the "<u>Backup Bidder</u>"). The Debtors reserve the right to determine, in their reasonable business judgment and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which Bid is the Successful Bid and which Bid is the Backup Bid.

The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtors' acceptance of the Bid. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Confirmation Hearing.

Except as otherwise provided in the Successful Bid agreed to by the Debtors, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, encumbrances, and interests thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens attaching to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

d.      Closing with the Backup Bidder(s).

If for any reason the Successful Bidder fails to consummate the Sale, the Backup Bidder will automatically be deemed to have submitted the highest or best bid and the Debtors and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable.

## II.

## THE SOLICITATION; VOTING PROCEDURES

Before voting to accept or reject the Prepackaged Plan, each holder of a Claim entitled to vote should carefully review the Prepackaged Plan attached as <u>Exhibit A</u>, and described herein above under "Summary of the Prepackaged Plan." All descriptions of the Prepackaged Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Prepackaged Plan.

**IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASSES 2A–2D AND 3A– 3D EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN.**

A.      **VOTING DEADLINE**

As noted, the Voting Deadline is 4:00 p.m. Eastern Time on September 13, 2011.

All known holders of the foregoing Claims in the foregoing Classes entitled to vote on the Prepackaged Plan have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged The Garden City Group, Inc. as their Solicitation Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Prepackaged Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.** The Debtors reserve the absolute right, at any time or from time to time, to extend by the collective agreement of the Debtors, by oral or written notice to the Solicitation Agent, the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason including, but not

limited to, determining whether or not requisite acceptances of the Prepackaged Plan have been received, by making a public announcement of such extension no later than 9:00 a.m. (Eastern Time) on the first business day next succeeding the previously announced Voting Deadline. Without limiting the manner in which the Debtors may choose to make any public announcement, the Debtors will not have any obligation to publish, advertise, or otherwise communicate any such public announcement. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PREPACKAGED PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PREPACKAGED PLAN WILL NOT BE COUNTED.

TO REQUEST A HARD COPY OF THIS DISCLOSURE STATEMENT OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE SOLICITATION AGENT AT:

(i) BY TELEPHONE AT (888) 579-1198;

(ii) BY EMAIL AT DLSBALLOTING@GCGINC.COM; OR

(iii) BY WRITING TO: DALLAS STARS BALLOT PROCESSING, C/O GCG, P.O. BOX 9807, DUBLIN, OHIO 43017-5707.

Additional copies of this Disclosure Statement are available upon request made to the Solicitation Agent, at the telephone number set forth immediately above.

## B. VOTING PROCEDURES

For purposes of determining whether the number and amount of Claims required to constitute an accepting class of Claims under section 1126 of the Bankruptcy Code (the "Requisite Acceptances") have been received, only Ballots voted in respect of impaired Claims under the procedures described herein will be counted. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Prepackaged Plan and such abstentions will not be counted as votes for or against the Prepackaged Plan.

The Debtors are providing the solicitation materials to holders of Claims whose names appear as of August 19, 2011 (the "Voting Record Date") in the records maintained by the First Lien Administrative Agent or the Second Lien Administrative Agent, as applicable.

You should provide all of the information requested by the Ballots you receive. You should complete and return all Ballots that you receive either (i) in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Solicitation Agent; (ii) by email at dlsballoting@gcginc.com; or (iii) by facsimile at (888) 584-7628.

## C. FIDUCIARIES AND OTHER REPRESENTATIVES

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should

indicate such capacity when signing. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PREPACKAGED PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT BE COUNTED. **IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE SOLICITATION AGENT.**

### D. PARTIES ENTITLED TO VOTE

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party-in-interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the Prepackaged Plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the Prepackaged Plan. If a claim or interest is not impaired by the Prepackaged Plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Prepackaged Plan.

Classes 1A–1D, 4A, 5A–5D, 6A–6D, and 7A–7D of the Prepackaged Plan are not impaired, and holders of Claims in such Classes are conclusively presumed to have accepted the Prepackaged Plan. Classes 8A–8D and 9A–9D are impaired and, upon entry of the Bidding Procedures and Confirmation Scheduling Order, holders of Claims and Equity Interests in such Classes shall be conclusively presumed to have rejected the Prepackaged Plan.

Therefore, in accordance with sections 1126 and 1129 of the Bankruptcy Code, the Debtors are soliciting acceptances only from holders of Claims in Classes 2A–2D and 3A–3D.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

### E. AGREEMENTS UPON FURNISHING BALLOTS

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and

conditions to, this Solicitation and (ii) the terms of the Prepackaged Plan. Unless otherwise provided in the Prepackaged Plan, all parties in interest retain their right to object to confirmation of the Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code.

Notwithstanding the foregoing, holders of First Lien Secured Claims and Second Lien Secured Claims will be entitled to make an election to "opt in" on the Ballot to receive certain releases by granting certain other releases set forth in the Prepackaged Plan.[28]

**F.  RELEASES RECEIVED AND GRANTED BY THE HOLDERS OF FIRST LIEN SECURED CLAIMS AND SECOND LIEN SECURED CLAIMS THAT ELECT TO "OPT IN"**

### 1.  Releases Received by the Holders of First Lien Secured Claims and Second Lien Secured Claims that Elect to "Opt In."

Pursuant to the Prepackaged Plan, only those holders of First Lien Secured Claims and Second Lien Secured Claims that elect to "opt in" on the Ballot will be included in the definition of First Lien Released Parties[29] and Second Lien Released Parties,[30] as the case may be, and be entitled to receive the applicable releases set forth in Sections 11.5 and 11.6 of the Prepackaged Plan.

The releases to be received by those holders that opt in are set forth in Sections 11.5 and 11.6 of the Prepackaged Plan.[31] Section 11.5 of the Prepackaged Plan provides broad releases by the Debtors and the Stalking Horse, specifically:

(i) a broad release by the Debtors, subject to the limitations provided therein, to the First Lien Released Parties and Second Lien Released Parties; and

---

[28] This summary of the release provisions contained in Sections 11.5 and 11.6 of the Prepackaged Plan is provided for informational purposes only and is qualified in its entirety by the applicable provisions in the Prepackaged Plan.

[29] "First Lien Released Parties" include (i) the holders of First Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) the First Lien Administrative Parties, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate. Prepackaged Plan at Section 1.50.

[30] "Second Lien Released Parties" includes (i) the holders of Second Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) any Second Lien Administrative Party that submits to the Debtors by the deadline for the solicitation of votes on the Prepackaged Plan, in accordance with the notice requirements set forth in Section 13.14 of the Prepackaged Plan, a fully executed copy of the Consent to Release Form by Second Lien Administrative Party, a copy of which is attached to the Prepackaged Plan as Exhibit A, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate. Prepackaged Plan at Section 1.93.

[31] This summary of the release provisions contained in Sections 11.5 and 11.6 of the Prepackaged Plan is provided for informational purposes only and is qualified in its entirety by the applicable provisions in the Prepackaged Plan.

(ii) if the Stalking Horse is the Purchaser, a broad release by the Purchaser and the Owner Support Parties (as defined in Section 1.76 of the Prepackaged Plan), subject to the limitations provided therein, to the First Lien Released Parties and Second Lien Released Parties.

Section 11.6 of the Prepackaged Plan provides the following additional releases:

(i) a broad release by each First Lien Administrative Party (as defined in Section 1.47 of the Prepackaged Plan) and each holder of a First Lien Secured Claim and Second Lien Secured Claim that opts in to the release contained in Section 11.6, subject to the limitations provided therein, to the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties (as defined in Section 1.31 of the Prepackaged Plan), if the Stalking Horse is the Purchaser, the Purchaser Released Parties (as defined in Section 1.87 of the Prepackaged Plan), and the NHL Released Parties (as defined in Section 1.71 of the Prepackaged Plan); and

(ii) a broad release by the NHL only (excluding the NHL Affiliated Parties, as defined in Section 1.64 of the Prepackaged Plan), subject to the limitations provided therein, to the First Lien Administrative Party and each holder of a First Lien Secured Claim or each holder of a Second Lien Secured Claim that opts in to the releases contained in Section 11.6 of the Prepackaged Plan.

## 2. Releases Granted by the Holders of First Lien Secured Claims and Second Lien Secured Claims that Elect to "Opt In."

To receive the applicable releases under Sections 11.5 and 11.6 of the Prepackaged Plan, holders of First Lien Secured Claims or Second Lien Secured Claims must agree, by affirmatively "opting in" on the Ballot, to grant the releases set forth in Section 11.6 of the Prepackaged Plan, including releasing, subject to the limitations provided therein, the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the Purchaser Released Parties (if the Stalking Horse is the Purchaser), and the NHL Released Parties.

**The release provisions in Sections 11.5 and 11.6 of the Prepackaged Plan may affect your rights upon the effectiveness of the Prepackaged Plan. You should consult with an attorney if you have any questions regarding the scope of the release provisions contained in the Prepackaged Plan.**

**To be granted and receive the releases contained in Sections 11.5 and 11.6 of the Prepackaged Plan, each holder of a First Lien Secured Claim or Second Lien Secured Claim must affirmatively indicate on the Ballot by checking the appropriate box. The failure of a holder of First Lien Secured Claims or Second Lien Secured Claims to indicate affirmatively an election to opt in to the releases set forth in Sections 11.5 and 11.6 of the Prepackaged Plan will mean that the holder shall be deemed to not consent to the releases set forth in Section 11.6 of the Prepackaged Plan and will not receive the releases set forth in Sections 11.5 and 11.6 of the Prepackaged Plan. Election to withhold consent is at the option of the party entitled to vote.**

## G. WAIVERS OF DEFECTS, IRREGULARITIES, ETC.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtors in their sole discretion, which determination will be final and binding. As indicated in Section II.H—"THE SOLICITATION; VOTING PROCEDURES—Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any

such withdrawal.  The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be improper.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

<h2>H.    WITHDRAWAL OF BALLOTS; REVOCATION</h2>

Any party that has delivered a valid Ballot for the acceptance or rejection of the Prepackaged Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Solicitation Agent in a timely manner at the address set forth in Section II.I—"THE SOLICITATION; VOTING PROCEDURES—Further Information; Additional Copies."  Prior to the filing of the Prepackaged Plan, the Debtors intend to consult with the Solicitation Agent to determine whether any withdrawals of Ballots were received and whether the Requisite Acceptances have been received.  As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots that is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot.

Any party that has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his/her or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Prepackaged Plan.  In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received.

<h2>I.    FURTHER INFORMATION; ADDITIONAL COPIES</h2>

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain a hard copy of this Disclosure Statement or an additional copy of the Prepackaged Plan, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Solicitation Agent:

(i) by telephone at (888) 579-1198;

(ii) by email at dlsballoting@gcginc.com; or

(iii) by writing to:  Dallas Stars Ballot Processing, c/o GCG, P.O. Box 9807, Dublin, Ohio  43017-5707.

Please note that the Solicitation Agent is not authorized to, and will not, provide legal advice.

**III.**

**ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES**

A.      ADMINISTRATION OF THE PREPACKAGED PLAN

The Debtors intend to continue to operate their business in the ordinary course throughout the Chapter 11 Cases as they had prior to the Commencement Date.

B.      COMMENCEMENT OF THE CHAPTER 11 CASES

Contemporaneously with the filing of the Prepackaged Plan and the Disclosure Statement on the Commencement Date, the Debtors will file a series of "first day motions" seeking orders from the Bankruptcy Court to minimize any disruption of its business operations and to facilitate its reorganization. These requests include, but are not limited to, those described below.  Bankruptcy courts customarily provide various other forms of administrative and other relief in the early stages of chapter 11 cases.  The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court to facilitate its reorganization goals, including the matters described below.

1.      **First Day Relief and Other Pleadings to be Filed on the Petition Date.**

a.      **Joint Administration.**  The Debtors will seek authority to consolidate all filings under a single case name, in a single docket, for convenience and administrative purposes and to reduce costs for the Bankruptcy Court, the United States Trustee, and all parties in interest.

b.      **Bidding Procedures and Scheduling.**  The Debtors will seek entry of: (i) an order of the Bankruptcy Court scheduling the hearing to consider the relief requested in the Bidding Procedures and Confirmation Scheduling Order and (ii) the Bidding Procedures/Confirmation Scheduling Order.  *See* Section VI.A—"CONFIRMATION OF THE PREPACKAGED PLAN—Confirmation Hearing."

c.      **Utilities.**  The Debtors intend to seek an order from the Bankruptcy Court to restrain utilities from discontinuing, altering or refusing services, and to establish appropriate procedures for the determination of requests by utilities for postpetition deposits as adequate assurance for future performance.

d.      **Cash Collateral.**  The Debtors will seek an order of the Bankruptcy Court allowing the continued use of cash collateral in accordance with the provisions of section 363 of the Bankruptcy Code.  The Debtors have agreed to provide the prepetition first lien secured parties with senior replacement liens and a first lien administrative claim as adequate protection for any diminution in the value of their interests in the prepetition collateral.  In the event that the Bankruptcy Court enters a

final order finding that the value of the prepetition collateral is sufficient to satisfy all outstanding obligations to the prepetition first lien secured parties in full in cash, then the Debtors have also agreed to provide the prepetition second lien secured parties with junior replacement liens as adequate protection for any diminution in the value of their interests in the prepetition collateral.

e.   **Cash Management System.**  Because the Debtors expect the Chapter 11 Cases to last for less than three months, and because of the administrative hardship that any operating changes would impose on the Debtors, the Debtors intend to seek Bankruptcy Court authority to continue using their existing cash management system, bank accounts, and business forms.

f.   **Payment of Prepetition Trade Claims.**  The Debtors' trade claims are among the Claims included in the Class of Claims denominated Classes 7A–7D (Assumed General Unsecured Claims).  Because the Prepackaged Plan does not impair such Claims, the Debtors' trade claims will be paid in full.  Notwithstanding provisions of the Bankruptcy Code that would otherwise require the Debtors to defer payment of their trade claims, the Debtors intend to seek authority from the Bankruptcy Court to pay, in the ordinary course of business, the Debtors' trade claims of those providers of goods and services that agree, in a manner satisfactory to the Debtors, to continue to provide the Debtors with customary trade terms on an ongoing basis.  Because certain goods and services are essential to the Debtors' businesses, the relief sought in this motion is critical to the Debtors' uninterrupted operations during the Chapter 11 Cases.

g.   **Retention of Professionals.**  The Debtors will seek Bankruptcy Court authority to retain and employ certain professionals to represent them and assist them in connection with the Chapter 11 Cases.  Some of these professionals have been intimately involved with the negotiation and development of the Prepackaged Plan, and include, among others, (i) Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A., as counsel for the Debtors; and (ii) Garden City Group, Inc., as notice and Solicitation Agent for the Debtors, to provide the Debtors with case management services.

h.   **Payment of Ordinary Course Professionals.**  The Debtors will also seek authority to retain certain professionals to assist with the operation of their businesses in the ordinary course.  These "ordinary course professionals" will not be involved in the administration of the Chapter 11 Cases.

i.   **Payment of Prepetition Employee Wages and Benefits.**  The Debtors believe that any delay in paying prepetition compensation or benefits would destroy their relationship with employees and irreparably harm employee morale at a time when the dedication, confidence, and cooperation of the Debtors' employees are most critical.  Accordingly, the Debtors will seek authority to pay, in the ordinary course of business,

compensation and benefits, if any, that had accrued but remained unpaid as of the Commencement Date, including amounts owed to the NHL Stars hockey players.

j.      **Customer Programs.**  Prior to the Commencement Date, in the ordinary course of business and as is customary in professional sports, the Debtors instituted and engaged in certain activities, programs, and promotions to develop and sustain a positive reputation and relationship with their fans, who are their customers.  To that end, the Debtors implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, drive ticket and merchandise sales, meet competitive pressures, develop and sustain fan relationships and loyalty, improve profitability, attract and enhance patronage of the StarCenters facilities, and generate goodwill for the Debtors among their fans and the community at large.  While the Debtors do not believe that they need Court approval to continue these Customer Programs in the ordinary course of business, out of an abundance of caution, and to provide fans and customers with comfort, the Debtors will seek Bankruptcy Court approval to continue the Customer Programs in the ordinary course of business, and to perform and honor, at the Debtors' sole discretion, any prepetition obligations thereunder.

### 2.      Expected Timetable of the Chapter 11 Cases.

Assuming that the Bankruptcy Court enters an order scheduling the Bidding Procedures/Scheduling Hearing as requested by the Debtors, the Debtors anticipate that the Confirmation will occur within approximately 70 days of the Commencement Date.  The Debtors do not currently anticipate any significant objections to Confirmation.  If such objections were to be raised, the anticipated timing for Confirmation could be delayed, perhaps substantially.

**IV.**

**THE PREPACKAGED PLAN**

**A.      GENERAL SUMMARY OF THE PREPACKAGED PLAN**

The Sale is to be consummated through the Prepackaged Plan, which consists of four separate chapter 11 plans, one for each Debtor.  Under the Prepackaged Plan, the Purchaser will assume or pay substantially all of the Claims of the Debtors, including the costs and expenses of the transaction (the "Specified Expenses" discussed above), and will assume substantially all of the Debtors' executory contracts and unexpired leases.

The Purchaser is paying or assuming all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  In addition, the Purchaser will be paying the CFV Claim and assuming all general unsecured claims (the "Assumed General Unsecured Claims"), other than a limited number of claims specifically listed as "Excluded Liabilities" under the Stalking Horse Asset Purchase Agreement (the "Non-Assumed General Unsecured Claims"), as described above in Section I.E.1 of this Disclosure Statement.  The Debtors are not aware of any Non-Assumed General Unsecured Claims other than Intercompany Claims and certain claims of affiliates.

With respect to First Lien Secured Claims, the Prepackaged Plan provides for a distribution in the form of "Secured Creditor Consideration." The form of such consideration and the amount of such consideration will depend on the results of the competitive bidding process set forth in the Bidding Procedures. If the Stalking Horse Purchase Agreement is the Asset Purchase Agreement, such consideration will consist of: (i) the Stalking Horse entering into the Stalking Horse Senior Secured Obligation in an aggregate original principal amount not to exceed $100,000,000 (as adjusted pursuant to the terms of the Stalking Horse Asset Purchase Agreement); (ii) cash distributed by the Stalking Horse equal to the positive difference, if any, between $50,000,000 and the amount payable to the Prepetition CFV Lender to satisfy its claims; (iii) cash distributed in respect of any positive net working capital and cumulative losses purchase price adjustment under the Stalking Horse Asset Purchase Agreement; and (iv) any cash remaining in the estates, after closing expenses are paid, as provided in Sections 6.3 and 11.1 of the Prepackaged Plan (other than cash set aside to pay certain professional fees). If the Stalking Horse Purchase Agreement is not the Asset Purchase Agreement, then the consideration provided to each holder of First Lien Secured Claims and (if the Discharge of First Lien Obligations has occurred) Second Lien Secured Claims shall consist of: (i) the aggregate consideration (other than the liabilities assumed under the Asset Purchase Agreement) provided under the Asset Purchase Agreement, plus (ii) any cash remaining in the estates of the Debtors after the Effective Date, after closing expenses are paid, as provided in Sections 6.3 and 11.1 of the Prepackaged Plan (other than cash set aside to pay certain professional fees), minus (iii) the aggregate amount of cash necessary to satisfy (x) the CFV Claim and the Specified Expenses and (y) the Stalking Horse Protection Claim, if such claim is payable pursuant to the terms of the Stalking Horse Asset Purchase Agreement.

With respect to Second Lien Secured Claims, the value received under the Stalking Horse Asset Purchase Agreement is not sufficient to pay the holders of First Lien Secured Claims in full and thus the holders of Second Lien Secured Claims are not entitled to a recovery on account of their Claims. As such, the holders of Second Lien Secured Claims would not otherwise receive a recovery unless the bidding process yields additional bids that would provide sufficient value to first pay in full all obligations under the First Lien Credit Agreement such that all obligations thereunder were satisfied in full in cash and completely discharged (such event being referred to in the Prepackaged Plan as "Discharge of First Lien Obligations"). To induce the holders of Second Lien Secured Claims to vote in favor of the Prepackaged Plan, the holders of First Lien Secured Claims have agreed (i) to pay the Second Lien Expense Reimbursement, whether or not the holders of Second Lien Secured Claims vote to accept that Prepackaged Plan, and (ii) to share $500,000 of the consideration they will receive under the Prepackaged Plan—either in cash or in secured notes, as the case may be—if the holders of Second Lien Secured Claims vote to accept the Prepackaged Plan.

The Prepackaged Plan also provides that if sufficient consideration is received in the bidding process to pay holders of First Lien Secured Claims and Second Lien Secured Claims in full, the Debtors will amend the Plan to provide a recovery to Non-Assumed General Unsecured Claims and possibly to holders of Equity Interests.

In light of the fact that substantially all of the Debtors' assets are being sold to the Purchaser on the Effective Date and substantially all Claims to be paid under the Prepackaged Plan are being paid or assumed by the Purchaser on the Effective Date, the Post-Effective Date Debtors will have minimal responsibilities following the Effective Date, other than ensuring that professionals are paid after approval of final fee applications and abiding by the post-Closing covenants under the Asset Purchase Agreement. The Prepackaged Plan provides for the appointment of an Officer to replace the existing management of the Debtors on the Effective Date, and the Purchaser will provide $750,000 to cover the

wind-down costs of the Post-Effective Date Debtors.[32]  The Prepackaged Plan further provides that the Chapter 11 Cases will be closed following completion of the fee application process and the Post-Effective Debtors will be dissolved or consolidated with related entities, without the need for further action by the Post-Effective Date Debtors, upon the completion of all of the Post-Effective Date Debtors' responsibilities.

The Prepackaged Plan further provides that, given the unique nature of the Chapter 11 Cases, there is no need for creditors to file proofs of claim.  As such, all filed proofs of claim will be deemed withdrawn.  Any dispute as to the amount of any Claim to be assumed by Purchaser is to be resolved in the ordinary course as it would if the Chapter 11 Cases had not been filed.  This process will protect all parties' rights while avoiding the administratively burdensome process of having to object specifically to each protective proof of claim that is filed.

### B.    INTRODUCTION TO CHAPTER 11 PLANS

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business or sell substantially all of its assets for the benefit of itself and its creditors and equity holders.  In furtherance of the goals of chapter 11, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person or entity acquiring property under the plan, and any creditor of or equity holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PREPACKAGED PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PREPACKAGED PLAN OR THE DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PREPACKAGED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PREPACKAGED PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PREPACKAGED PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THEIR ESTATES, THE POST-EFFECTIVE DATE DEBTORS, ALL

---

[32] Because all unsecured claims will be assumed by the Purchaser and thus satisfied under the Prepackaged Plan, the Debtors do not believe that appointment of a statutory creditors' committee is necessary or appropriate in the Chapter 11 Cases.  If, however, a statutory creditors' committee is appointed, then the fees and expenses of any such committee will be paid out of the $750,000 set aside to cover the wind-down costs of the Post-Effective Date Debtors.

PARTIES RECEIVING PROPERTY UNDER THE PREPACKAGED PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PREPACKAGED PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PREPACKAGED PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### C. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PREPACKAGED PLAN

Section 1123 of the Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because a person or an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified. Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on a plan of reorganization (unless the class is deemed to reject) and the right to receive thereunder no less value than the holder would receive if the debtor were liquidated in a case filed under chapter 7 of the Bankruptcy Code. A chapter 11 plan cannot be confirmed if it is found to have provided improper classification of claims and interests.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the Effective Date or the date on which amounts owing are actually due and payable, payment in full, in Cash, and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain any property under the plan of reorganization on account of their claims or equity interests. For a more detailed description of the requirements for confirmation, *see* Section VI.C, titled "CONFIRMATION OF THE PREPACKAGED PLAN—Requirements for Confirmation of the Prepackaged Plan—Non-Consensual Confirmation."

The Prepackaged Plan provides for the classification and treatment of holders of Claims and interests allowed under section 502 of the Bankruptcy Code. Only the holder of an Allowed Claim or an Allowed Equity Interest is entitled to receive a distribution under the Prepackaged Plan.

Consistent with these requirements, the Prepackaged Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following classes:

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| Class 1A | Dallas Stars | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1B | Dallas Arena | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1C | U.S. Holdings | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1D | StarCenters | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2A | Dallas Stars | First Lien Secured Claims | Impaired | Yes |
| Class 2B | Dallas Arena | First Lien Secured Claims | Impaired | Yes |
| Class 2C | U.S. Holdings | First Lien Secured Claims | Impaired | Yes |
| Class 2D | StarCenters | First Lien Secured Claims | Impaired | Yes |
| Class 3A | Dallas Stars | Second Lien Secured Claims | Impaired | Yes |
| Class 3B | Dallas Arena | Second Lien Secured Claims | Impaired | Yes |
| Class 3C | U.S. Holdings | Second Lien Secured Claims | Impaired | Yes |
| Class 3D | StarCenters | Second Lien Secured Claims | Impaired | Yes |
| Class 4A | Dallas Stars | CFV Claim | Unimpaired | No (deemed to accept) |
| Class 5A | Dallas Stars | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5B | Dallas Arena | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5C | U.S. Holdings | Secured Tax Claims | Unimpaired | No (deemed to |

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| | | | | accept) |
| Class 5D | StarCenters | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 6A | Dallas Stars | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6B | Dallas Arena | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6C | U.S. Holdings | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6D | StarCenters | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 7A | Dallas Stars | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7B | Dallas Arena | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7C | U.S. Holdings | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7D | StarCenters | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 8A | Dallas Stars | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8B | Dallas Arena | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8C | U.S. Holdings | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8D | StarCenters | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 9A | Dallas Stars | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9B | Dallas Arena | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9C | U.S. Holdings | Equity Interests in | Impaired | No (deemed to |

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| | | Debtors | | reject) |
| Class 9D | StarCenters | Equity Interests in Debtors | Impaired | No (deemed to reject) |

### D. PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL, AND TAX CLAIMS

#### 1. Administrative Expense Claims.

Except as set forth in Section 2.2 of the Prepackaged Plan, to the extent an Allowed Administrative Claim is assumed by the Purchaser under the Asset Purchase Agreement, that Claim shall be paid by the Purchaser in the ordinary course of business as and when due. The Debtors are not aware of any Administrative Claim that will not be assumed and paid by the Purchaser.

#### 2. Professional Compensation and Reimbursement Claims.

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, other than professionals retained in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses, shall (a) file, on or before the date that is ninety days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses in the ordinary course and without the need for Bankruptcy Court approval. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred by professionals after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

The Asset Purchase Agreement shall provide that the portion of Specified Expenses that covers compensation for professional services or reimbursement of expenses incurred by professionals for which Bankruptcy Court approval is required shall be provided by Purchaser to the Post-Effective Date Debtors in Cash. On the Effective Date, the Post-Effective Date Debtors shall set aside such Cash in a separate, interest-bearing escrow account pending final allowance by the Bankruptcy Court of all professional fee applications. To the extent any Cash remains in the escrow account after the payment of all compensation for professional services or reimbursement of expenses incurred by professionals following the entry of Final Orders with respect to all professionals, the Post-Effective Date Debtors shall authorize the release of such Cash from the escrow account to the Purchaser.

#### 3. Priority Tax Claims.

Under the Asset Purchase Agreement, the Purchaser shall assume all of the Debtors' tax obligations for all taxable periods. With respect to any Priority Tax Claims not paid as of the Effective

Date, except to the extent that a holder of an Allowed Priority Tax Claim against the Debtors agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date by the Purchaser; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business, by the Purchaser; or (c) be treated on such other terms and conditions as are acceptable to the Purchaser and the holder of such Claim.

E.    TREATMENT OF CLAIMS AND EQUITY INTERESTS

    1.    **Classes 1A through 1D—Priority Non-Tax Claims.**

        a.    <u>Impairment and Voting</u>.  Classes 1A through 1D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

        b.    <u>Distributions</u>.  Allowed Priority Non-Tax Claims, if any, will be assumed by Purchaser and paid in Cash on the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a different treatment.

    2.    **Classes 2A through 2D—First Lien Secured Claims.**

        a.    <u>Impairment and Voting</u>.  Classes 2A through 2D are impaired by the Prepackaged Plan.  Each holder of a First Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

        b.    <u>Distributions</u>.  The First Lien Secured Claims shall be Allowed Claims and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, impairment, objection, or any other challenge under any applicable law or regulation by any person or entity.  On the Effective Date (or, as expressly contemplated by Sections 6.3 and 11.1 of the Prepackaged Plan, after the Effective Date), each holder of a First Lien Secured Claim shall be issued (on behalf of the Debtors) its *pro rata* share (in accordance with the First Lien Security Agreement) of the Secured Creditor Consideration up to the full Allowed amount of such Claim, including accrued interest under the First Lien Credit Agreement through the Effective Date; <u>provided</u>, <u>however</u>, that if all or a portion of the distribution to the holders of First Lien Secured Claims is in the form of secured debt obligations to the holders of First Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.*, Stalking Horse Senior

Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims. Notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; provided, however, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent under the Prepackaged Plan shall be in the form of a secured debt obligation in the original principal amount of $500,000; provided further, however, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as provided in Section 4.3 of the Prepackaged Plan, the holders of Second Lien Secured Claims shall neither receive nor retain any distribution under the Prepackaged Plan unless and until the Discharge of First Lien Obligations has occurred.

3. **Classes 3A through 3D—Second Lien Secured Claims.**

   a. Impairment and Voting. Classes 3A through 3D are impaired by the Prepackaged Plan. Each holder of a Second Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

   b. Distributions. The Second Lien Secured Claims shall be Allowed Claims. In full satisfaction, settlement, release, and discharge of, and in exchange for, each Second Lien Secured Claim, in the event that the Discharge of First Lien Obligations has occurred, each holder of a Second Lien Secured Claim, on account of its Second Lien Secured Claim, on the Effective Date shall be issued (on behalf of the Debtors) its *pro rata* share of the Secured Creditor Consideration remaining after the Discharge of First Lien Obligations (including payment of accrued interest under the First Lien Credit Agreement through the Effective Date), up to the full Allowed amount of the Second Lien Secured Claim, including accrued interest under the Second Lien Credit Agreement through the Effective Date; provided, however, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is

provided in consideration of different forms (*e.g.*, Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims. Other than as set forth in the Prepackaged Plan, on the Effective Date, any Second Lien Secured Claim shall be extinguished and the holders of any Second Lien Secured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Second Lien Secured Claim; provided, however, and notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, on the Effective Date, the Second Lien Administrative Agent shall receive the Second Lien Expense Reimbursement.

c.  Distributions if Classes 3A through 3D Accepts the Prepackaged Plan. Notwithstanding anything to the contrary in the Prepackaged Plan or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed *pro rata* to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; provided, however, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent under the Prepackaged Plan shall be in the form of a secured debt obligation in the original principal amount of $500,000; provided further, however, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as set forth in Section 4.3 of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by the Prepackaged Plan.

**4.  Class 4A—CFV Claim.**

a.  Impairment and Voting. Class 4A is unimpaired by the Prepackaged Plan. Each holder of an Allowed CFV Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

b.  Distributions. The CFV Claim shall be an Allowed Claim. The CFV Claim is not secured by any assets of the Debtors, but is subject to the NHL Consent Letter, as described herein. On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the CFV Claim shall be paid in full in Cash by the Purchaser under the Asset Purchase Agreement, as provided therein.

5. **Classes 5A through 5D—Secured Tax Claims.**

   a. <u>Impairment and Voting</u>. Classes 5A through 5D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

   b. <u>Distributions</u>. Each holder of an Allowed Secured Tax Claim that is assumed by the Purchaser under the Asset Purchase Agreement shall retain its existing lien, if any, in the Purchased Assets and any rights associated therewith pursuant to applicable non-bankruptcy law, and shall be paid in Cash by the Purchaser when such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business.

6. **Classes 6A through 6D—Other Secured Claims.**

   a. <u>Impairment and Voting</u>. Classes 6A through 6D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

   b. <u>Distributions</u>. Allowed Other Secured Claims will be assumed by the Purchaser on the Effective Date under the Asset Purchase Agreement. Each holder of an Allowed Other Secured Claim shall, on the Effective Date, either (i) retain its existing lien in the Purchased Assets and be paid by the Purchaser when such Allowed Other Secured Claim becomes due and owing in the ordinary course of business, or (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

7. **Classes 7A through 7D—Assumed General Unsecured Claims.**

   a. <u>Impairment and Voting</u>. Classes 7A through 7D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to accept the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

   b. <u>Distributions</u>. Each holder of an Allowed Assumed General Unsecured Claim will be paid by the Purchaser on the Effective Date or when and as such Allowed Assumed General Unsecured Claim becomes due and owing in the ordinary course of business.

8. **Classes 8A through 8D—Non-Assumed General Unsecured Claims.**

   a. <u>Impairment and Voting</u>. Classes 8A through 8D are impaired by the Prepackaged Plan. To the extent there are any claims in Classes 8A through 8D, each holder of an Allowed Non-Assumed General

Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to reject the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

b.  <u>Distributions</u>.  On the Effective Date, any Non-Assumed General Unsecured Claim shall be extinguished and the holders of any Non-Assumed General Unsecured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Non-Assumed General Unsecured Claim.  In the event the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.  Except for Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, the Debtors are not aware of any Non-Assumed General Unsecured Claim.

9.  <u>Classes 9A through 9D—Equity Interests in Debtors.</u>

a.  <u>Impairment and Voting</u>.  Classes 9A through 9D are impaired by the Prepackaged Plan.  Each holder of an Allowed Equity Interest in Debtors is deemed to reject the Prepackaged Plan.

b.  <u>Distribution</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Debtors shall be maintained; <u>provided</u>, <u>however</u>, the holders of the Allowed Equity Interests in Debtors shall not be entitled to transfer such Allowed Equity Interests in Debtors to any party, and shall not receive or retain any property or interest in property on account of such Allowed Equity Interests in Debtors unless the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, in which case the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.

F.  **IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION**

1.  <u>Holders of Claims and Equity Interests Entitled to Vote.</u>

Each of Classes 2A through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) is entitled to vote to accept or reject the Prepackaged Plan.

2.  <u>Holders of Claims and Equity Interests Not Entitled to Vote.</u>

Each of Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) is unimpaired by the Prepackaged Plan and the holders of Allowed Claims in Classes 1A through 1D, 4A, 5A through 5D, 6A through 6D, and 7A through 7D are conclusively deemed to have accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.

Each of Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) is impaired by the Prepackaged Plan and will receive no distribution under the Prepackaged Plan. The holders of claims in Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) are conclusively deemed to have rejected the Prepackaged Plan.

### 3. Nonconsensual Confirmation.

If any impaired Class of Claims or Interests entitled to vote shall not accept the Prepackaged Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Prepackaged Plan in accordance with Section 13.4 of the Prepackaged Plan or to undertake to have the Bankruptcy Court confirm the Prepackaged Plan under section 1129(b) of the Bankruptcy Code or both.

### G. MEANS OF IMPLEMENTATION AND POST-EFFECTIVE DATE GOVERNANCE

### 1. Asset Purchase Agreement and Related Documents.

a. General. On the Effective Date, the transactions contemplated by the Asset Purchase Agreement and any documents in connection therewith, including the Affiliate Agreement, shall be consummated. Except as otherwise explicitly provided in the Prepackaged Plan or in the Asset Purchase Agreement, on the Effective Date, substantially all of the Debtors' property shall be sold and transferred to the Purchaser in accordance with the terms of the Asset Purchase Agreement and the Prepackaged Plan in exchange for the consideration set forth in the Asset Purchase Agreement. Any property comprising the Estates that is not transferred under the Asset Purchase Agreement shall revest in the Post-Effective Date Debtors.

b. Amendments. To the extent there are material amendments to the Stalking Horse Asset Purchase Agreement or if the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, the Debtors shall file the Asset Purchase Agreement (and any related documents) prior to the Confirmation Hearing. After the Confirmation Date, the Debtors are authorized to enter into non-material amendments to the Asset Purchase Agreement or any other documents in accordance with the terms of the Asset Purchase Agreement in furtherance of the transactions contemplated thereby without the need for further notice or Court approval.

### 2. General Corporate Actions.

a. General. Upon the Effective Date, all actions contemplated by the Prepackaged Plan will be deemed authorized and approved in all respects, including (i) the consummation of the Asset Purchase Agreement and (ii) all other actions contemplated by the Asset Purchase Agreement and the Prepackaged Plan (whether to occur before, on or after the Effective Date). All matters and transactions provided for in the Asset Purchase Agreement and the Prepackaged Plan concerning the structure of the Debtors or the Post-Effective Date Debtors, and any

partnership, membership, or shareholder action required by the Debtors or the Post-Effective Date Debtors in connection with the Asset Purchase Agreement and the Prepackaged Plan will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the Debtors or the Post-Effective Date Debtors. On or (as applicable) prior to the Effective Date, the general partner or the appropriate officers of each Debtor or Post-Effective Date Debtor, as applicable, shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by the Asset Purchase Agreement and the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Asset Purchase Agreement and the Prepackaged Plan), including the Amended Corporate Organizational Documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan and the Asset Purchase Agreement, in each case in the name of and on behalf of such Debtor or Post-Effective Date Debtor. Such authorizations and approvals will be effective notwithstanding any requirements under non-bankruptcy law.

b.  Continued Legal Existence. Except as otherwise provided in the Prepackaged Plan, each Debtor will continue to exist after the Effective Date as a separate legal entity with all the powers of such entity under applicable law pursuant to the Debtor's corporate organizational document(s), as may be amended, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law, including as set forth in the Prepackaged Plan.

c.  Officers of the Post-Effective Date Debtor. On the Effective Date, all existing officers of the Debtors shall resign or be deemed to have resigned. Under the Prepackaged Plan, at or prior to the Confirmation Hearing, the Debtors will identify an officer that will be appointed as of the Effective Date to be the sole officer of each of the Post-Effective Date Debtors to wind up the affairs of the Post-Effective Date Debtors (the "Officer").[33]

3.  **Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases.**

Upon (i) the adjudication by the Bankruptcy Court of all applications by professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder and (ii) the completion of all other matters necessary to occur in the Chapter 11 Cases, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. Upon the closing of the Chapter 11 Cases and the completion of all

---

[33] Under the Stalking Horse Asset Purchase Agreement, the post-Effective Date Officers will be appointed by the Debtors in consultation with the First Lien Administrative Agent.

matters required to be performed by the Post-Effective Date Debtors under the Prepackaged Plan, the Asset Purchase Agreement, and applicable law other than dissolution, the Post-Effective Date Debtors shall be dissolved or otherwise consolidated without the need for further action (*i.e.*, without the need to file a certificate of dissolution or merger with or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of, or consolidate, the Post-Effective Date Debtors); provided, however, that the Post-Effective Date Debtors shall be required to provide notice to the Bankruptcy Court of Dissolution; and provided further, however, that notwithstanding the foregoing, the Officer or other authorized person of Dallas Stars shall file a certificate of cancellation of Dallas Stars' certificate of limited partnership with the Secretary of State of the State of Delaware in accordance with the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* and that the Officer shall file a certificate of dissolution of U.S. Holdings with the Secretary of State of the State of Delaware in accordance with the General Corporation Law of the State of Delaware, 8 Del. C. § 101, *et seq.* In the event the Post-Effective Date Debtors remain in possession of any Cash immediately prior to Dissolution, except as otherwise provided in Section 2.2 of the Prepackaged Plan, such Cash shall revert to the First Lien Collateral Agent, as contemplated by Section 11.1 of the Prepackaged Plan; provided, however, that if the Discharge of First Lien Obligations has occurred, such Cash shall revert to the Second Lien Administrative Agent, for the benefit of the holders of Second Lien Secured Claims.

## 4. <u>Cancellation of Liens.</u>

Except as otherwise specifically provided in the Prepackaged Plan and in accordance with the Asset Purchase Agreement, upon the occurrence of the Effective Date, any Lien encumbering the Purchased Assets shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors constituting Purchased Assets (including any Cash collateral) held by such holder and to take such actions as may be requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets), to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets); provided, however, that such Liens shall be released regardless of whether any such filing or recordings are made. Any valid, perfected prepetition liens against the Debtors' assets shall remain in force against such assets to the extent such assets remain in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets. Upon the occurrence of the Effective Date, the Purchaser may file or record a certified copy of the Prepackaged Plan and any order confirming same, as well as any other documents evidencing the release of a Lien, in any state or county office to evidence the release of any Lien encumbering the Purchased Assets.

## H. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. <u>Date of Distributions on Account of Allowed Claims.</u>

Except as otherwise specifically provided in the Prepackaged Plan or in the Asset Purchase Agreement, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter, provided that any Cash distributions to the holders of (i) CFV Claims, (ii) First Lien Secured Claims (except as expressly contemplated by Sections 6.3 and 11.1 of the Prepackaged Plan), and (iii) Second Lien Secured Claims (if each of Classes 3A through 3D votes to accept the Prepackaged Plan) shall be made on the Effective Date. In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is

not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 2. Sources of Cash for the Prepackaged Plan Distribution.

Except as otherwise specifically provided in the Prepackaged Plan or in the Confirmation Order, all Cash required for the payments to be made under the Prepackaged Plan shall be obtained from the Debtors' cash on hand or the Purchaser.

### 3. Disbursing Agent.

All distributions under the Prepackaged Plan shall be made by the Purchaser as set forth in the Asset Purchase Agreement, by the Officer as the Disbursing Agent, or by such other Person designated as a Disbursing Agent pursuant to the Prepackaged Plan or by the Post-Effective Date Debtors. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 4. Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Prepackaged Plan, (b) make all distributions contemplated by the Prepackaged Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Prepackaged Plan.

### 5. Expenses of the Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Post-Closing Expense Amount in the ordinary course of business.

### 6. Record Date for Distribution.

The record date for distribution shall be the Distribution Record Date, which is three Business Days prior to the Effective Date. Prepackaged Plan at Sections 1.39, 7.6.

### 7. Delivery of Distributions.

    a.    <u>Last Known Address</u>. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Debtors, unless the applicable Debtor has been notified in writing of a change of address. In the event that any distribution to any holder is returned as undeliverable, the Purchaser or Disbursing Agent, as applicable, shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Purchaser or Disbursing Agent, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions

shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Purchaser or Post-Effective Date Debtors, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

b.  <u>Distributions by First Lien Administrative Agent</u>.  The First Lien Administrative Agent shall be the Disbursing Agent for the Allowed First Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed First Lien Secured Claims shall be made by the First Lien Administrative Agent to the holders of such Allowed First Lien Secured Claims.  In connection therewith, the First Lien Administrative Agent shall distribute to each holder of a First Lien Secured Claim under a Hedge Agreement (as defined in the First Lien Credit Agreement) its *pro rata* share of the Secured Creditor Consideration, with such *pro rata* share calculated as such holder's Determined Hedge Claim divided by the aggregate amount of all First Lien Secured Claims (which, for the avoidance of doubt, includes the aggregate amount of Determined Hedge Claims).  The First Lien Administrative Agent shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of distributions.  If this Court or any other court of competent jurisdiction orders disgorgement of the payments made by the First Lien Administrative Agent pursuant to this Section, then (i) each holder of a First Lien Secured Claim shall only be required to disgorge its *pro rata* share of such payments and the holders of First Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the First Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a First Lien Secured Claim and which are no longer in the First Lien Administrative Agent's possession.

c.  <u>Distributions by the Second Lien Administrative Agent</u>.  The Second Lien Administrative Agent shall be the Disbursing Agent for the Allowed Second Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed Second Lien Secured Claims, if any, shall be made by the Second Lien Administrative Agent to the holders of such Allowed Second Lien Secured Claims.  The Second Lien Administrative Agent shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of any distributions.  If the Bankruptcy Court or any other court of competent jurisdiction orders disgorgement of the payments made by the Second Lien Administrative Agent pursuant to Section 7.7 of the Prepackaged Plan, then (i) each holder of a Second Lien Secured Claim shall only be required to disgorge its *pro rata* share of such payments and the holders of Second Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the Second Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a Second Lien Secured

Claim and which are no longer in the Second Lien Administrative
Agent's possession.

### 8. **Manner of Payment Under Prepackaged Plan.**

At the option of the Purchaser or the Disbursing Agent, as applicable, any Cash payment
to be made under the Prepackaged Plan may be made by check or wire transfer or as otherwise required
or provided in applicable agreements; provided that any Cash payment to be made to the holders of the
CFV Claim, the First Lien Administrative Agent (as disbursing agent for the holders of First Lien Secured
Claims), or the Second Lien Administrative Agent (as disbursing agent for the holders of Second Lien
Secured Claims) shall be made by wire transfer.

### 9. **Setoffs and Recoupment.**

Except as otherwise specifically provided for in the Prepackaged Plan (including, without
limitation, as provided for in Section 4.2(b) of the Prepackaged Plan), the Debtors may, but shall not be
required to, setoff against or recoup from any Claim any claims of any nature whatsoever that the Debtors
may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the
Prepackaged Plan shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors of
any such claim they may have against such claimant.

### 10. **Distributions After Effective Date.**

Distributions made after the Effective Date to holders of Disputed Claims that are not
Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have
been made on the Effective Date.

### 11. **Allocation of Payments under the Prepackaged Plan.**

In the case of distributions with respect to holders of Claims pursuant to the Prepackaged
Plan, such distributions shall, for tax purposes only, be allocable first to the principal amount of any such
Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the
remainder of the Claim. The aggregate original principal amount of the indebtedness incurred by the
Stalking Horse under the Stalking Horse Senior Secured Obligations (if applicable) shall reduce, on a
dollar-for-dollar basis, the outstanding amount of the obligations under the First Lien Credit Agreement
and, if applicable, the Second Lien Credit Agreement.

### I. PROCEDURES FOR TREATING CLAIMS UNDER THE PREPACKAGED PLAN

### 1. **Disputed Claims/Process.**

On and after the Effective Date, except as otherwise provided in the Prepackaged Plan,
all Claims shall be paid in the ordinary course of business of the Purchaser if assumed under the Asset
Purchase Agreement. If the Debtors, the Purchaser or any other party in interest disputes any Claim, such
dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11
Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not
been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the
unimpaired treatment of all holders of Assumed General Unsecured Claims under the Prepackaged Plan,
all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without
further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors,
regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed

withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under Section 8.1 of the Prepackaged Plan to assert their claims against the Purchaser, solely to the extent the Claim was assumed by the Purchaser under the Asset Purchase Agreement, or against the Post-Effective Date Debtors solely to the extent the Claim was not assumed by the Purchaser and is entitled to a distribution under the Prepackaged Plan, in any forum as though the Debtors' Chapter 11 Cases had not been commenced. Notwithstanding anything to the contrary in the Prepackaged Plan, the Purchaser or any holder of a Disputed Claim shall be entitled to file a motion in the Bankruptcy Court to determine whether any Claim was assumed by the Purchaser under the Asset Purchase Agreement. Nothing contained in Section 8.1 of the Prepackaged Plan shall affect the allowance of Claims pursuant to Section 4.2 or 4.3 of the Prepackaged Plan.

### 2. No Postpetition Interest on Claims.

Except as otherwise specifically provided for in the Prepackaged Plan, in the Confirmation Order or in any other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.

### J. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption of Contracts and Leases.

a. <u>General</u>. Except as otherwise specifically provided in the Prepackaged Plan and the Asset Purchase Agreement, as of the Effective Date, the Debtors shall be deemed to have assumed and assigned to the Purchaser each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is an Excluded Contract. All executory contracts and unexpired leases included in Subsections (iii) and (iv) of the definition "Excluded Contracts" in the Prepackaged Plan shall be deemed rejected as of the Effective Date, unless such contract has been previously rejected by the Debtors. Other than certain executory contracts with Affiliates (as such term is defined in the Asset Purchase Agreement), the Debtors are not aware of any executory contracts or unexpired leases that will be rejected by the Debtors on the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions, assumptions and assignments, or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on any schedule.

       b.      **Objections to Rejection, Assumption, or Assumption and Assignment**. Any party wishing to object to the rejection, assumption, or assumption and assignment of any executory contract or unexpired lease under the Prepackaged Plan or the Cure amount payable with respect to any assumed contract or unexpired lease must follow the instructions described in the notice of the Confirmation Hearing for filing objections to the Prepackaged Plan and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates. Any counterparty that does not object to the rejection, assumption, or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, and the Cure amount payable upon assumption, shall be deemed to have consented to such rejection, assumption, or assumption and assignment, and the Cure amount payable upon assumption.

### 2.      Payments Related to Assumption of Contracts and Leases.

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Prepackaged are in default shall be satisfied promptly, under section 365(b)(1) of the Bankruptcy Code, by the Purchaser upon assumption and assignment thereof. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption and assignment, Cure shall occur within seven days following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Claims arising out of the rejection of executory contracts and unexpired leases shall be Non-Assumed General Unsecured Claims and are not entitled to a distribution under the Prepackaged Plan. As of the date hereof, the Debtors do not expect to reject any unexpired leases.

### 4.      Compensation and Benefit Plans and Treatment of Retirement Plan.

Except to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and employee benefit plans directly sponsored by the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan and assigned to the Purchaser under the Asset Purchase Agreement. Accordingly, the obligations under such plans and programs shall survive confirmation of the Prepackaged Plan, except for (i) executory contracts or benefit plans specifically rejected pursuant to the Prepackaged Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the

Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

## 5. Insurance Policies.

Notwithstanding anything contained in the Prepackaged Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, shall be assumed by the Debtors and assigned to Purchaser and continued in accordance with the terms of the Asset Purchase Agreement. Nothing contained in Section 9.5 of the Prepackaged Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

## K. CONDITIONS PRECEDENT TO EFFECTIVE DATE

### 1. Conditions Precedent to Effective Date of Prepackaged Plan.

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

a. Confirmation Order. The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

b. Execution and Delivery of Other Documents. All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Asset Purchase Agreement and Prepackaged Plan shall have been effectuated, including the documents comprising the Prepackaged Plan Supplement and, in each case, (i) shall have been approved by the Bankruptcy Court and (ii) all conditions to their effectiveness shall have been satisfied or waived pursuant to the terms thereof.

c. Regulatory Approvals. The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Prepackaged Plan and that are required by law, regulations, or order.

d. NHL Approvals. The Debtors and the Purchaser (and all Persons and entities related thereto) shall have received all consents and approvals required by NHL to implement the Asset Purchase Agreement and the Prepackaged Plan.

e. NHL Consent. Any amendments to or waivers of the Prepackaged Plan, the Confirmation Order, or any provision thereof in a manner (i) materially adverse to the NHL or any NHL Affiliated Party or (ii) inconsistent with the NHL Rules, has been consented to by the NHL.

f.    <u>Consents</u>. All other authorizations, consents, and approvals determined by the Debtors to be necessary to implement the terms of the Asset Purchase Agreement and Prepackaged Plan shall have been obtained.

## 2.    **Effect of Failure of Conditions.**

If the conditions specified in Section 10.1 of the Prepackaged Plan have not been satisfied by the date of termination set forth in the Asset Purchase Agreement and the First Lien Administrative Agent (acting on behalf of the holders of First Lien Secured Claims), the NHL, the Debtors, and the Purchaser have not mutually agreed to extend such date of termination, then: (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Prepackaged Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Prepackaged Plan and nothing contained in the Prepackaged Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors and the Prepackaged Plan shall be deemed withdrawn.

## 3.    **Reservation of Rights.**

The Prepackaged Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or action taken by the Debtors with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtors or any other party with respect to any Claims or Equity Interests or any other matter.

## 4.    **Substantial Consummation.**

Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## L.    EFFECT OF CONFIRMATION

## 1.    **Vesting of Assets.**

The property of the Debtors' Estates that is not specifically disposed of pursuant to the Prepackaged Plan or purchased by Purchaser under the Asset Purchase Agreement, if any, shall vest in the Post-Effective Date Debtors on the Effective Date to be distributed in accordance with the terms of the Prepackaged Plan. All property sold, conveyed, or transferred to the Purchaser is and shall be free and clear of all Liens, Claims, and interests of any kind in accordance with section 363(f) of the Bankruptcy Code, except to the extent the Purchaser has assumed such Liens, Claims, or interests under the Asset Purchase Agreement. Thereafter, the Post-Effective Date Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Post-Effective Date Debtors not sold to the Purchaser shall be free and clear of all Claims, encumbrances, charges, and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order. Following the Effective Date, unless the Discharge of First Lien Obligations has occurred, (i) the First Lien Collateral Agent shall have the right, at its sole discretion at any time prior to, or upon, dissolution of the Debtors' Estates, to accept an in-kind distribution of any non-Cash assets remaining in the Debtors' Estates and (ii) upon dissolution of the Debtors' Estates, the Post-Effective Date Debtors shall distribute any

remaining Cash in the Estates to the First Lien Collateral Agent, in each case to be applied by the First Lien Collateral Agent in accordance with the First Lien Security Agreement.

## 2. Binding Effect.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder has accepted the Prepackaged Plan.

## 3. Discharge of the Debtors.

Except as otherwise specifically provided in the Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, the treatment of all Claims against or Equity Interests in the Debtors under the Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge, and release of, all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, from and after the Commencement Date, or against their Estates or properties or interests in property. Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged, and released in full in exchange for the consideration provided under the Prepackaged Plan. Except as otherwise provided in the Prepackaged Plan, all Persons shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. For the avoidance of doubt, as of the Effective Date, the Post-Effective Date Debtors shall have no liability with respect to any Assumed General Unsecured Claims or other Claims assumed under the Asset Purchase Agreement.

## 4. Exculpation.

*Notwithstanding anything in the Prepackaged Plan to the contrary (but subject to the following proviso), to the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, neither the Debtors, the Post-Effective Date Debtors, the Officer, the Stalking Horse, the Owner Support Parties, the Purchasers, the NHL Affiliated Parties, the Committee, the First Lien Released Parties, the Second Lien Released Parties nor their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any current or former attorneys, financial advisors, investment bankers (specifically including GSP Securities LLC in its capacity as investment banker and financial advisor to the Debtors), accountants, and other professionals retained by such persons), but in each case excluding any Hicks Affiliate, shall have or incur any liability to any holder of a Claim or Equity Interest for any Claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the marketing of the Debtors' assets, the Chapter 11 Cases, the negotiation, pursuit of approval and execution of the Asset Purchase Agreement and any related document, the Stalking Horse Senior Secured Credit Agreement and related documents, the Disclosure Statement, the Prepackaged Plan, the Prepackaged Plan Supplement, or any related document, or the solicitation of votes for, or confirmation of, the Prepackaged Plan or the funding of the Prepackaged Plan, the consummation of the Prepackaged Plan, the administration of the Prepackaged Plan, or the property to be distributed under the Prepackaged Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the*

*Prepackaged Plan; provided, however, this Exculpation shall not operate as a release, waiver of discharge of any party in respect of any contractual obligations of such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Purchasers pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court.*

### 5. Releases by the Debtors and Stalking Horse.

*Except as otherwise specifically provided in the Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, effective immediately prior to the occurrence of the Effective Date (provided the Effective Date occurs), the releases set forth in section 13.12 of the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) and in the NHL Owner Consent (as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) shall be effective and, except for the right to enforce the Prepackaged Plan, (i) the Debtors and (ii) if the Stalking Horse is the Purchaser, the Purchaser and the Owner Support Parties shall be deemed to forever release, waive and discharge the First Lien Released Parties and the Second Lien Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any First Lien Released Party or Second Lien Released Party in respect of any contractual obligations of any such First Lien Released Party or Second Lien Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors and assigned to the Purchaser pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court or (ii) any causes of action unknown to the Debtors, the Purchasers, or the Owner Support Parties, respectively, as of the Commencement Date arising out of willful misconduct or gross negligence of any such First Lien Released Party or Second Lien Released Party as determined by a Final Order of the Bankruptcy Court.*

### 6. Releases by Holders of Claims.

*Except as otherwise specifically provided in the Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, other than the right to enforce the Prepackaged Plan, (a) each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan, each Second Lien Administrative Party who opts in to the release contained in Section 11.6 of the Prepackaged Plan, and each holder of a Second Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan shall be deemed to forever release, waive and discharge the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the NHL Released Parties, and the Purchaser Released Parties (if the Stalking Horse is the Purchaser), of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise and (b) the NHL shall be deemed to forever release, waive and discharge each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in*

*Section 11.6 of the Prepackaged Plan, each Second Lien Administrative Party who opts in to the release contained in Section 11.6 of the Prepackaged Plan, and each holder of a Second Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise; provided, however, that nothing contained in Section 11.6 of the Prepackaged Plan shall operate as a release, waiver or discharge of the matter of GSP Finance LLP v. KPMG, Index No. 650841/2011, commenced March 29, 2011 in the Supreme Court of the State of New York, New York County, or any claims, causes of action, or rights in connection therewith.*

*Notwithstanding the foregoing, (i) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party to receive indemnification or reimbursement pursuant to section 9.6 of the First Lien Credit Agreement, (ii) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party or any other holder of a First Lien Secured Claim against GSP Finance LLC, any Second Lien Administrative Party or any other holder of a Second Lien Secured Claim arising out of (a) the filing of, pursuit of or recovery (if any) from the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County or (b) the Intercreditor Agreement, (iii) on an after the Effective Date, the contractual rights and obligations between and among the First Lien Administrative Parties and holders of First Lien Secured Claims under the First Lien Credit Agreement and related loan documents shall survive and continue with respect to any acts, omissions, facts, matters, transactions or occurrences on or after the Effective Date, and (iv) except as set forth in Section 4.3(c) of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by the Prepackaged Plan. Furthermore, notwithstanding the foregoing, such releases, waivers and discharges shall not operate as a release, waiver or discharge of (i) any First Lien Released Party, any Second Lien Released Party, Debtor Released Party, NHL Released Party or Purchaser Released Party in respect of any contractual obligations of any such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan, (ii) any counterclaims or crossclaims against any First Lien Released Party or any Second Lien Released Party by any NHL Released Party arising out of or related to an action against any NHL Released Party arising out of or relating to any claim which is released pursuant to the Prepackaged Plan, (iii) any counterclaims or crossclaims against any NHL Released Party by a First Lien Released Party arising out of or related to an action against such First Lien Released Party arising out of or relating to any claim which is released pursuant to the Prepackaged Plan, (iv) any counterclaims or crossclaims against any NHL Released Party by a Second Lien Released Party arising out of or related to an action against such Second Lien Released Party arising out of or relating to any claim which is released pursuant to the Prepackaged Plan, or (v) any cause of action by a party granting a release under Section 11.6 of the Prepackaged Plan against a Released Party[34] that is both unknown as of the Commencement Date to*

---

[34] "Released Party" means (i) any party being released under Section 13.12 of the Stalking Horse Asset Purchase Agreement, or such similar section of the Asset Purchase Agreement if the Stalking Horse is not the Purchaser, and (ii) any party entitled to exculpation under Section 11.4 of the Prepackaged Plan, and/or (iii) any party entitled to a release under Sections 11.5 and 11.6 of the Prepackaged Plan, as described herein. For the avoidance of doubt,

*the party granting the release under this Section 11.6 and arises out of or relates to willful misconduct or gross negligence by the Released Party as determined by a Final Order of the Bankruptcy Court.*

### 7. Waiver of Avoidance Actions.

To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

### 8. Term of Injunctions or Stays.

a.      Except as otherwise specifically provided in the Prepackaged Plan, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 11.5 or 11.6 of the Prepackaged Plan (whether in a direct capacity or derivative capacity); provided, however, the First Lien Administrative Agent shall not be enjoined from taking any enforcement action with respect to any Lien against assets that it is entitled to receive under Section 11.1 of the Prepackaged Plan.

b.      Unless otherwise provided in the Prepackaged Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 9. Indemnification Obligations of the Debtors and Stalking Horse.

Except to the extent assumed by the Purchaser under the Asset Purchase Agreement or pursuant to an assumed contract or as set forth in Section 12.2 of the Asset Purchase Agreement, all contribution or indemnification obligations shall be rejected by the Debtors and classified as Non-Assumed General Unsecured Claims.  For the avoidance of doubt and in order to clarify but not to limit any contractual indemnification obligation of the Stalking Horse under the Stalking Horse Senior Secured Credit Agreement and related loan documents, the Purchaser shall not indemnify the holders of First Lien Secured Claims, the holders of Second Lien Secured Claims, the First Lien Administrative Parties, or the

---

Released Parties excludes any Hicks Affiliate (as defined in the Prepackaged Plan).  Prepackaged Plan at Sections 1.88, 11.4.

Second Lien Administrative Parties, or pay for or reimburse losses, claims, damages, liabilities or related expenses of such parties to the extent arising in connection with or under or pursuant to (1) the First Lien Credit Agreement or any agreements entered into pursuant thereto, (2) the Second Lien Credit Agreement or any agreements entered into pursuant thereto, (3) any agreement with any Hicks Affiliate or any Intercompany Claim, or (4) any matter arising in connection with or under or pursuant to events occurring prior to the Closing Date related to any of the matters referred to in clauses (1) through (4) immediately herein above.

### M. RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Prepackaged Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a. To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases;

b. To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Cases and grant or deny any application involving the Debtors that may be pending on the Effective Date;

c. To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Prepackaged Plan;

d. To hear and determine any timely objections to the classification of any Claim or Equity Interest, in whole or in part;

e. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

f. To issue such orders in aid of execution of the Prepackaged Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

g. To consider any amendments to or modifications of the Prepackaged Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

h. To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

i. To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Asset Purchase Agreement, the Prepackaged Plan, the Confirmation Order, the documents comprising the Prepackaged Plan Supplement, or other document governing or relating to any of the foregoing; provided, however, that the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse

Senior Secured Credit Agreement, NHL Agreements,[35] and NHL/Lender Cooperation Agreement (as described above);

        j.      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

        k.      To hear any other matter not inconsistent with the Bankruptcy Code;

        l.      To hear and determine all disputes involving the existence, scope, and nature of the discharges granted under Section 11.3 of the Prepackaged Plan;

        m.      To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 11.4 of the Prepackaged Plan;

        n.      To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Prepackaged Plan; and

        o.      To enter a final decree(s) closing the Chapter 11 Cases.

**N.      MISCELLANEOUS**

**1.      Payment of Statutory Fees.**

All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Purchaser on the Effective Date.

**2.      Filing of Additional Documents.**

The Debtors or the Post-Effective Date Debtors, as applicable, may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan.

**3.      Schedules and Exhibits Incorporated.**

All exhibits and schedules to the Prepackaged Plan, including the Prepackaged Plan Supplement, are incorporated into and are a part of the Prepackaged Plan as if fully set forth in the Prepackaged Plan.

**4.      Amendment or Modification of the Prepackaged Plan.**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments, or modifications of the

---

[35] Under the Prepackaged Plan, "NHL Agreements" means "the NHL Owner Consent, NHL Guaranty, and Purchaser/NHL Proxy, each as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser." Prepackaged Plan at Section 1.65.

Prepackaged Plan may be proposed in writing by the Debtors at any time prior to or after the Confirmation Date. Holders of Claims that have accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan, as altered, amended, or modified. The Prepackaged Plan further provides that the First Lien Agent, acting in its reasonable discretion, has the right to consent under Section 13.4 of the Prepackaged Plan to any postpetition amendments to the Prepackaged Plan that constitute "Lender Adverse Modifications" as defined in Section 1.59 of the Prepackaged Plan, which generally means any amendment or waiver of the Prepackaged Plan, Confirmation Order, or any provision contained therein that is materially adverse to the holders of First Lien Secured Claims. The definition of "Lender Adverse Modifications" in Section 1.60 of the Prepackaged Plan also contains a list of express amendments or waivers or terms that would be deemed a Lender Adverse Modification.[36]

The Prepackaged Plan further prohibits any alteration, amendment, or modification that materially and adversely changes the treatment of the First Lien Secured Claims. Prepackaged Plan at 13.4. Moreover, the Prepackaged Plan provides that any holders of Claims that were deemed to accept the Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept the Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired. Prepackaged Plan at 13.4.

### 5. Inconsistency.

In the event of any inconsistency among the Prepackaged Plan, this Disclosure Statement, and any exhibit or schedule to this Disclosure Statement, the provisions of the Prepackaged Plan shall govern. In the event of any inconsistency between the Prepackaged Plan and the Confirmation Order, the Confirmation Order shall govern.

---

[36] Pursuant to the Prepackaged Plan, any "any amendments or waivers" of the following provisions would be deemed a Lender Adverse Modification: "(i) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with (A) the solicitation of votes on the Prepackaged Plan, (B) the negotiation and consummation of the Prepackaged Plan and related documents, (ii) the releases and exculpation for the benefit of the First Lien Administrative Parties and other holders of First Lien Secured Claims under the Prepackaged Plan and Confirmation Order, and (iii) the provisions of the Prepackaged Plan and Confirmation Order ordering the sale of the Purchased Assets free and clear of all claims, liens, liabilities and interests. In addition, if the Stalking Horse is the Purchaser, any amendments or waivers of the following provisions or terms shall also be deemed a Lender Adverse Modification: (i) the maturity, interest rate or principal amount of the Term Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) (including the terms of any adjustment to the aggregate principal amount of the Term Loans pursuant to Article III of the Stalking Horse Asset Purchase Agreement), (ii) the property comprising the Collateral securing the Obligations (each as defined in the Stalking Horse Senior Secured Credit Agreement), (iii) the validity, priority and perfection of the liens on and security interests in the Collateral (including as provided in the Confirmation Order) granted in favor of the First Lien Administrative Parties and other holders of First Lien Secured Claims, (iv) the identity of the "Loan Parties" and "Owner Support Parties" under the Stalking Horse Senior Secured Credit Agreement, (v) the terms and conditions of the Owner Support Agreement (as defined in the Stalking Horse Senior Secured Credit Agreement), (vi) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with the negotiation and deemed extension of the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement), and (vii) the Confirmation Order's findings that the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement) is not a preference or a fraudulent transfer and that the transactions contemplated by the Stalking Horse Asset Purchase Agreement are not fraudulent transfers." Prepackaged Plan at Section 1.60.

6. **Section 1125(e) of the Bankruptcy Code.**

As of the Confirmation Date, the Debtors (including the Post-Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Prepackaged Plan and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Prepackaged Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities under the Prepackaged Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation and release provisions set forth in Article XI of the Prepackaged Plan.

7. **Preservation of Rights of Action; Settlement of Litigation Claims.**

Except as otherwise specifically provided in the Prepackaged Plan or in the Asset Purchase Agreement, or in any contract, instrument, release, or other agreement entered into in connection with the Prepackaged Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors or the Purchaser (to the extent transferred to the Purchaser) shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person or entity without the approval of the Bankruptcy Court. The Post-Effective Date Debtors or their successor(s), including the Purchaser, may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Post-Effective Date Debtors or their successor(s), including the Purchaser, that hold such rights.

8. **Compromise of Controversies.**

In consideration for the distributions and other benefits provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Prepackaged Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

9. **Exemption from Certain Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Prepackaged Plan, including the Asset Purchase Agreement, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the

transactions contemplated under the Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 10. **Compliance with Tax Requirements.**

In connection with the Prepackaged Plan and all distributions thereunder, any party issuing any instruments or making any distribution under the Prepackaged Plan, including any party described in Section 7.3 of the Prepackaged Plan, shall, to the extent applicable as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Prepackaged Plan shall be subject to any such withholding and reporting requirements. Each such party shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims shall be required to provide completed Forms W-8, W-9 and/or any other forms or information necessary to effect information reporting and the withholding of such taxes, as determined by the applicable party issuing any instruments or making any distribution under the Prepackaged Plan. Notwithstanding any other provisions of the Prepackaged Plan to the contrary, with respect to any Allowed Claim the payment of which is subject to any withholding tax (i) each holder of such an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distributions, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Prepackaged Plan unless and until such holder has made arrangements satisfactory to the applicable party issuing any instruments or making any distribution under the Prepackaged Plan for the payment and satisfaction of such tax obligations. Any Cash, Stalking Horse Senior Secured Obligations, documents, and/or other consideration or property to be distributed pursuant to the Prepackaged Plan shall, pending the receipt of such forms and/or implementation of such arrangements, be treated as an unclaimed distribution pursuant to Section 7.7(a) of the Prepackaged Plan. Any party issuing any instruments or making any distribution under the Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has provided the necessary tax forms or information and/or made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

### 11. **Determination of Tax Filings and Taxes.**

The Post-Effective Date Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 12. **Severability of Provisions in the Prepackaged Plan.**

If, prior to Confirmation, any term or provision of the Prepackaged Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, upon consultation with the Purchaser and the NHL, and provided there shall be no amendment or waiver of the Prepackaged Plan that is materially adverse to the holders of First Lien Secured Claims (as described above the "Lender Adverse Modifications") without the consent of the First Lien Administrative Agent acting in its reasonable discretion, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that

each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.     **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent the Stalking Horse Senior Secured Credit Agreement or any exhibit to the Prepackaged Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

14.     **Notices.**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly specifically provided in the Prepackaged Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas  75201
> Attention:  Martin A. Sosland
> Facsimile:  (214) 746-7777
> Email:  martin.sosland@weil.com
>
> and
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York  10153
> Attention:  Ronit J. Berkovich
> Facsimile:  (212) 310-8007
> Email:  ronit.berkovich@weil.com
>
> with copies to:
>
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware  19801
> Attention:  John H. Knight
> Telephone:  (302) 651-7700
> Facsimile:  (302) 651-7701

15. **Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment.**

Any Committee appointed in the Chapter 11 Cases shall be dissolved on the Effective Date. The Post-Effective Date Debtors shall no longer be responsible for paying any fees and expenses incurred by the advisors to any Committee after the Effective Date.

## V.

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PREPACKAGED PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Prepackaged Plan to the Debtors, to holders of Allowed First Lien Secured Claims and to holders of Allowed Second Lien Secured Claims. This discussion does not address the U.S. federal income tax consequences to (i) holders of Claims who are unimpaired or otherwise entitled to payment in full in cash under the Prepackaged Plan and (ii) holders of Non-Assumed General Unsecured Claims and Equity Interests (as they are deemed to reject the Prepackaged Plan).

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, holders whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that have elected to use a mark-to-market method of tax accounting for their securities, persons subject to the alternative minimum tax, and persons holding Claims that are part of a straddle, hedging, constructive sale or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires the Stalking Horse Senior Secured Obligation in the secondary market.

This discussion assumes that the Claims and the Stalking Horse Senior Secured Obligation are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that the Stalking Horse Senior Secured Obligation is treated as indebtedness for U.S. federal income tax purposes. This discussion also assumes that, for U.S. federal income tax purposes, any adjustment to the principal amount of the Stalking Horse Senior Secured Obligation on account of the final net working capital of the Debtors is treated as a purchase price adjustment and, for this and other reasons, the Stalking Horse Senior Secured Obligation is not a "contingent payment debt instrument." If the Stalking Horse Senior Secured Obligation is a "contingent

payment debt instrument," the tax consequences to the Debtors and the holders of Allowed First Lien Secured Claims may be materially different from those described herein. You should consult your own tax advisor regarding the tax characterization of the Stalking Horse Senior Secured Obligation.

To the extent an Auction is held for the Debtors' assets under the Bidding Procedures and Confirmation Scheduling Order and, as a result of such Auction, the Asset Purchase Agreement is not the Stalking Horse Asset Purchase Agreement, the tax consequences to the holders of Allowed Claims may be different from those described herein.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstance.*

*Internal Revenue Service Circular 230 Notice:  To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that:  (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstance from an independent tax advisor.*

A.      CONSEQUENCES TO THE DEBTORS

1.      **Consequences to Dallas Stars, Dallas Arena, and StarCenters**.

Each of Dallas Stars, Dallas Arena, and StarCenters is treated as a "disregarded entity" for U.S. federal income tax purposes.  Accordingly, the U.S. federal income tax consequences of the Prepackaged Plan generally will not be borne by each such entity, but instead will be borne by each entity's respective owner for U.S. federal income tax purposes.

Pursuant to the Prepackaged Plan and the Stalking Horse Asset Purchase Agreement, Dallas Stars, Dallas Arena, and StarCenters will each transfer substantially all of its assets to Purchaser in exchange for their respective allocable shares of Cash, the assumption of liabilities, and the Stalking Horse Senior Secured Obligation in a taxable transaction.  Because each of Dallas Stars, Dallas Arena, and StarCenters is a disregarded entity, any gain or loss realized on such transfer of assets will be realized by the respective owner of each such entity for U.S. federal income tax purposes.

2.      **Consequences to U.S. Holdings**.

Pursuant to the Prepackaged Plan and the Stalking Horse Asset Purchase Agreement, U.S. Holdings will transfer substantially all of its assets to the Purchaser in exchange for its allocable share of Cash, the assumption of liabilities, and the Stalking Horse Senior Secured Obligation in a taxable transaction.  U.S. Holdings generally should recognize gain or loss on such transaction in an amount equal to the difference, if any, between (i) the sum of the Cash, the amount of any liabilities assumed, and the "issue price" of the Stalking Horse Senior Secured Obligation (*see* Section V.B.5—"Ownership and Disposition of Stalking Horse Senior Secured Obligation—OID and Issue Price") allocable to U.S. Holdings, and (ii) its adjusted tax basis in the assets transferred to the Purchaser.  The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined, on an asset-by-asset basis, in accordance with the character and holding period of each of the

assets sold.  Additionally, following the Effective Date and in accordance with Section 6.3 of the Prepackaged Plan, U.S. Holdings is expected to liquidate for U.S. federal income tax purposes.

### B.  CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS

#### 1.  Exchanges of Claims Under the Prepackaged Plan.

Pursuant to the Prepackaged Plan and the Stalking Horse Asset Purchase Agreement, on the Effective Date (i) holders of Allowed First Lien Secured Claims will receive, in exchange for their Allowed First Lien Secured Claims, their *pro rata* share of the Stalking Horse Senior Secured Obligation and Cash (which shall include any fees payable to such holders in connection with the issuance of the Stalking Horse Senior Secured Obligation), and (ii) holders of Allowed Second Lien Secured Claims will receive, in exchange for their Allowed Second Lien Secured Claims, their *pro rata* share of the Stalking Horse Senior Secured Obligation if such holders vote to accept the Prepackaged Plan.  The remainder of this discussion assumes that the holders of Allowed Second Lien Secured Claims vote to accept the Prepackaged Plan.

Because the holders of both First Lien Secured Claims and Second Lien Secured Claims will continue to have claims against the non-Debtor parties to the First Lien Credit Agreement and Second Lien Credit Agreement, respectively, it is uncertain whether such exchanges will be treated, for U.S. federal income tax purposes, as the receipt by such holders of a partial payment of the loans made under the respective credit agreements or as an exchange of the entire amount of such loans for the consideration received pursuant to the Prepackaged Plan.  If the exchanges are treated as partial payments, then a holder of First Lien Secured Claims or Second Lien Secured Claims may not be entitled to recognize any loss as a result of such exchange, and the payments received from the Debtors may be allocated first to accrued but unpaid interest.  *See* Section V.B.4—"Distributions With Respect to Accrued But Unpaid Interest."  Holders of First Lien Secured Claims and Second Lien Secured Claims are urged to consult their own tax advisors regarding the appropriate U.S. federal income tax characterization of the consideration received in respect of their Claims pursuant to the Prepackaged Plan.

#### 2.  Fully Taxable Exchange.

The remainder of this discussion assumes that the consideration received by holders of Allowed First Lien Secured Claims and holders of Allowed Second Lien Secured Claims will be treated as payments received in exchange for the full amount of their loans under the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively (as opposed to partial payments thereon).

Accordingly, under the Stalking Horse Asset Purchase Agreement, each holder of an Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of any Cash (including any fees payable to holders of Allowed First Lien Secured Claims in connection with the issuance of the Stalking Horse Senior Secured Obligation and any additional cash payable to such holders as a result of the Purchase Price Adjustment) and the fair market value of the Stalking Horse Senior Secured Obligation and any other property received by the holder in respect of such Claim (other than in respect of a Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest).  *See* Section V.B.3—"Character of Gain or Loss."  Such holder also will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* Section V.B.4—"Distributions With Respect to Accrued But Unpaid Interest."

A holder's adjusted tax basis in its Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim will be equal to the cost of the Claim to such holder, increased by any original issue discount ("OID") previously included in income. If applicable, a holder's adjusted tax basis in its Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim also will be (i) increased by any market discount previously included in income by such holder pursuant to an election to include market discount in gross income currently as it accrues and (ii) reduced by any cash payments received on the Claim other than payments of "qualified stated interest," and by any amortizable bond premium that the holder has previously deducted.

A holder's tax basis in the Stalking Horse Senior Secured Obligation received will equal its fair market value. The holder's holding period in the Stalking Horse Senior Secured Obligation should begin on the day following the exchange date.

### 3. <u>**Character of Gain or Loss**</u>.

Except to the extent that any consideration received pursuant to the Prepackaged Plan is received in satisfaction of accrued but unpaid interest during its holding period (*see* Section V.B.4— "Distributions With Respect to Accrued But Unpaid Interest"), where a holder recognizes gain or loss in respect of the satisfaction and exchange of its Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim, such gain or loss will be capital gain or loss except to the extent any gain is recharacterized as ordinary income pursuant to the market discount rules discussed below. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

A holder that purchased its Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim from a prior holder at a "market discount" (relative to the principal amount of the Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these rules, any gain recognized on the exchange of an Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary interest income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant interest basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of an Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the holder recognizes in the exchange.

### 4. <u>**Distributions With Respect to Accrued But Unpaid Interest**</u>.

In general, to the extent that any consideration received pursuant to the Prepackaged Plan by a holder of an Allowed First Lien Secured Claim or Allowed Second Lien Secured Claim (whether Cash or the Stalking Horse Senior Secured Obligation) is received in satisfaction of interest accrued but unpaid during its holding period, such amount will be taxable to the holder as interest income (if not

previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent that any accrued interest or amortized OID was previously included in its gross income and is not paid in full. The IRS, however, has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any accrued but unpaid OID, because such OID is treated as part of the principal amount of the security for U.S. federal income tax purposes. Accordingly, it is unclear whether, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Pursuant to the Prepackaged Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a *pro rata* allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Section 7.11 of the Prepackaged Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes, particularly if the payments received pursuant to the Prepackaged Plan are treated as partial payments on the underlying loan. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration to, and the deductibility of a loss with respect to, accrued but unpaid interest for U.S. federal income tax purposes.

### 5. Ownership and Disposition of the Stalking Horse Senior Secured Obligation.

Stated Interest. A holder of the Stalking Horse Senior Secured Obligation will be required to include stated interest on such debt instrument in income in accordance with the holder's regular method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash at least annually. The stated interest payable on the Stalking Horse Senior Secured Obligation is qualified stated interest.

OID and Issue Price. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest.

If the Stalking Horse Senior Secured Obligation is treated as issued with OID, a holder of such debt instrument generally will be required to include such OID in income over the term of the debt in accordance with a constant yield method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the Stalking Horse Senior Secured Obligation. Accordingly, a holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the tax basis of the holder in its Stalking Horse Senior Secured Obligation. A holder will not be required to include separately in income cash payments received on the Stalking Horse Senior Secured Obligation to the extent such payments constitute payments of previously accrued OID, and such payments will reduce its tax basis in its Stalking Horse Senior Secured Obligation by the amount of such payments.

Under the constant yield method, OID is calculated by assuming that the Purchaser will exercise or not exercise any options in a manner that minimizes the yield on the Stalking Horse Senior Secured Obligation. Accordingly, the Purchaser's option to voluntarily prepay the Stalking Horse Senior Secured Obligation and, in certain situations, receive a prepayment discount on the principal amount of the Stalking Horse Senior Secured Obligation prepaid must be taken into account in determining the

amount of OID includible in the income of the holder.  If the Purchaser does or does not in fact exercise its voluntary prepayment option in a manner that differs from the assumption dictated by the OID rules, a holder's OID calculation for future periods will be adjusted by treating the Stalking Horse Senior Secured Obligation as if it had been retired and then reissued for an amount equal to its adjusted issue price at that time and re-calculating the yield to maturity of the reissued debt (taking into account the application of the option rule under applicable Treasury regulations discussed above).

Because the Stalking Horse Senior Secured Obligation is a floating rate debt instrument, accruals of OID should be calculated by assuming that interest will be paid over the life of the Stalking Horse Senior Secured Obligation based on the value of the floating rate used in setting the interest rate for the first accrual period, and then adjusting the income for each subsequent accrual period for any difference between the actual value of the floating rate used in setting interest for that subsequent accrual period and the assumed rate.

The issue price of the Stalking Horse Senior Secured Obligation depends on whether, at any time during the 60-day period ending 30 days after the exchange date, the Stalking Horse Senior Secured Obligation is traded on an "established market."  Pursuant to applicable Treasury regulations, an "established market" need not be a formal market.  It is sufficient that the Stalking Horse Senior Secured Obligation appears on a system of general circulation (including a computer list disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions.  Also, under certain circumstances, debt is considered to be traded on an established market when price quotations for such debt are readily available from dealers, brokers, or traders.

If the Stalking Horse Senior Secured Obligation is treated for U.S. federal income tax purposes as traded on an established market, the issue price of the Stalking Horse Senior Secured Obligation will equal the fair market value of such loan on the Effective Date.  In such event, the Stalking Horse Senior Secured Obligation will be treated as issued with OID to the extent that its issue price is less than its stated redemption price at maturity.  Depending on the fair market value of the Stalking Horse Senior Secured Obligation, the total amount of OID could be substantial.

If the Stalking Horse Senior Secured Obligation is not traded on an established market, both the issue price and the initial stated redemption price at maturity of the Stalking Horse Senior Secured Obligation should be 98% of the stated principal amount of the Stalking Horse Senior Secured Obligation.  In such event, the Stalking Horse Senior Secured Obligation initially will not be treated as issued with OID.  However, if the Stalking Horse Senior Secured Obligation is not fully prepaid within six months following the issue date, then in accordance with the deemed reissuance rule discussed above the Stalking Horse Senior Secured Obligation should be treated for purposes of the OID rules as being reissued with a stated redemption price at maturity equal to 99% of the stated principal amount of the Stalking Horse Senior Secured Obligation.  In such event, the Stalking Horse Senior Secured Obligation will be treated as reissued with OID to the extent that its issue price is less than its stated redemption price at maturity.  Thereafter, if the Stalking Horse Senior Secured Obligation is not fully prepaid within one year following the issue date, then in accordance with the deemed reissuance rule discussed above the Stalking Horse Senior Secured Obligation should be treated for purposes of the OID rules as being reissued with a stated redemption price at maturity equal to 100% of the stated principal amount of the Stalking Horse Senior Secured Obligation.  In such event, the Stalking Horse Senior Secured Obligation will be treated as reissued with a higher amount of OID.  It is uncertain whether the Stalking Horse Senior Secured Obligation will be traded on an established market.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases.  Accordingly, you should consult your own tax advisor

regarding the determination of the issue price of the Stalking Horse Senior Secured Obligation and the possible application of the OID rules.

Sale, Redemption or Repurchase. Holders generally will recognize capital gain or loss upon the sale, redemption (including at maturity) or other taxable disposition of the Stalking Horse Senior Secured Obligation in an amount equal to the difference between (i) the sum of any cash plus the fair market value of any property received from the disposition of such debt instrument (other than amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary interest income for U.S. federal income tax purposes to the extent not previously so taxed) and (ii) the holder's adjusted tax basis in the disposed debt instrument. Generally, a holder's adjusted tax basis in its Stalking Horse Senior Secured Obligation will be equal to its initial tax basis (as determined above), increased by any OID previously included in income, and reduced by any cash payments received on the Stalking Horse Senior Secured Obligation other than payments of "qualified stated interest."

The gain or loss generally will be treated as capital gain or loss, which generally should be long-term if the holder's holding period for its Stalking Horse Senior Secured Obligation is more than one year at the time of disposition. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

## 6. Information Reporting and Backup Withholding.

Payments of interest (including OID) and any other reportable payments, possibly including amounts received pursuant to the Prepackaged Plan and payments of proceeds from the sale, retirement or other disposition of the Stalking Horse Senior Secured Obligation, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments or accruals, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Prepackaged Plan would be subject to these regulations and require disclosure on their tax returns.

## VI.

## CONFIRMATION OF THE PREPACKAGED PLAN

### A. CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all

known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.

Contemporaneously with the filing of the Chapter 11 Cases, the Debtors intend to ask the Bankruptcy Court to schedule the Confirmation Hearing and approve procedures and deadlines for objecting to the Prepackaged Plan and Disclosure Statement. The Debtors expect that these procedures and requirements will be set forth in a scheduling order the Bankruptcy Court will enter early in the cases.

Objections to confirmation of the Prepackaged Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.** **REQUIREMENTS FOR CONFIRMATION OF THE PREPACKAGED PLAN—CONSENSUAL CONFIRMATION**

**1.** <u>**General Requirements.**</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Prepackaged Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Debtors or by a Person acquiring property under the Prepackaged Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Prepackaged Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Prepackaged Plan is reasonable, or if such payment is to be fixed after confirmation of the Prepackaged Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (i) the identity and affiliations of any individual proposed to serve, after Confirmation of the Prepackaged Plan, as a director, officer, or voting trustee of the Post-Effective Date Debtors, (ii) any affiliate of the Debtors participating in the Prepackaged Plan with the Debtors, or a successor to the Debtors under the Prepackaged Plan, and (iii) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the applicable Prepackaged Plan, over the rates of the Debtors, as applicable, has

approved any rate change provided for in the applicable Prepackaged Plan, or such rate change is expressly conditioned on such approval.

- With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Prepackaged Plan or will receive or retain under the Prepackaged Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Prepackaged Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of the "Best Interests Test" below.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Prepackaged Plan provides that Administrative Expense Claims and Other Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding five years after the date of the Final Order for relief, of a value, as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date.

- Confirmation of the Prepackaged Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Prepackaged Plan, unless such liquidation or reorganization is proposed in the Prepackaged Plan. *See* discussion of "Feasibility Analysis" below.

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Prepackaged Plan provides for the payment of all such fees on the Effective Date of the Prepackaged Plan.

- The Prepackaged Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to Confirmation of the Prepackaged Plan, for the duration of the period the Debtors has obligated itself to provide such benefits.

## 2. <u>Best Interests Test</u>.

The "best interests of creditors" requires that, to be confirmed, a plan must be in the best interests of each holder of an impaired claim or equity interest that has not voted to accept the Plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires that the bankruptcy court find that the plan provides to each non-consenting holder in such impaired class a recovery on account of such holder's claim or equity interest that has a value at least equal to the value of the distribution that each such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.

In this case, the Debtors will be selling their assets after a market-tested process that will yield the highest or best offer achievable for their assets. Given that in a chapter 7, the Debtors would likely be sold in a similar process, but the value would likely suffer as a result of the stigma of chapter 7 as well as the liquidation costs generally attendant thereto, the Debtors submit that each holder of a Claim or Equity Interest will necessarily receive as much under the Prepackaged Plan as such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors satisfy the Best Interests Test.

3. **Feasibility Analysis.**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Prepackaged Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Prepackaged Plan. The Debtors believe that proceeds from the sale will be sufficient to satisfy all of the Debtors' obligations under the Prepackaged Plan and, therefore, that there is not likely to be the need for further reorganization.

The Purchaser will be satisfying substantially all of the Debtors' obligations under the Prepackaged Plan, including assuming all known administrative claims. Moreover, the Purchaser will be providing $750,000 to the Post-Effective Date Debtors to ensure that all post-Closing obligations of the Debtors will be satisfied.[37] The Stalking Horse Senior Secured Obligation will be secured by the assets of the Stalking Horse and the other parties under the Stalking Horse Senior Secured Credit Agreement. In addition, under the Stalking Horse Asset Purchase Agreement, Mr. Gaglardi is required to execute the OSA, which in turn requires Mr. Gaglardi to maintain the financial stability of the assets and operations of NHL Stars and to fund cash operating losses, inclusive of projected debt service. The Stalking Horse has advised the Debtors that Accountant's Letters required by the OSA (discussed herein at Section I.E.4) will reflect that Mr. Gaglardi and the Owner Support Parties to the OSA will have a net worth in excess of $1,500,000,000 at closing. The OSA requires Mr. Gaglardi to maintain a net worth in excess of $500,000,000 (tested annually) so long as the term loan remains outstanding and to fund any shortfall between the team's budget and anticipated revenues each season in advance. Based on the foregoing, there is not likely to be the need for further reorganization.

C. **REQUIREMENTS FOR CONFIRMATION OF THE PREPACKAGED PLAN—NON-CONSENSUAL CONFIRMATION**

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any Class of Claims or Equity Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes—often referred to as "cram down"—is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Prepackaged Plan over the rejection or deemed rejection of the Prepackaged Plan by a Class of Claims or Equity Interests if the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1. **No Unfair Discrimination.**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

---

[37] Because all unsecured claims will be assumed by the Purchaser and thus satisfied under the Prepackaged Plan, the Debtors do not believe that appointment of a statutory creditors' committee is necessary or appropriate in the Chapter 11 Cases. If, however, a statutory creditors' committee is appointed, the fees and expenses of any such committee will be paid out of the $750,000 set aside to cover the Debtors' post-Closing obligations.

2. **Fair and Equitable Test.**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no Class of Claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class.

- *Secured Claims.* Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred Cash payments having a total value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Claims.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Equity Interests.* Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe that the Prepackaged Plan will satisfy the "fair and equitable" requirement. The Debtors expect that all classes of Claims against the Debtors, except potentially Classes 3A, 3B, 3C, and 3D, will either (i) be unimpaired, (ii) have accepted the Prepackaged Plan, or (iii) be deemed to reject the Prepackaged Plan. Nevertheless, the Debtors reserve the right to seek confirmation of the Prepackaged Plan notwithstanding any class's rejection of the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code, and will request the Bankruptcy Court to confirm the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting class.

The Debtors submit that the treatment afforded to all impaired and dissenting or rejecting classes of Claims and Equity Interests does not unfairly discriminate against any such class of Claims and Equity Interests and the Prepackaged Plan is "fair and equitable." Accordingly, the Debtors submit that the "no unfair discrimination" and "fair and equitable" requirements of section 1129 are satisfied with respect to the Prepackaged Plan.

## VII.

## CERTAIN FACTORS TO BE CONSIDERED

All holders of Claims and Equity Interests should be aware that although the Debtors have taken actions to minimize the risk of a chapter 11 filing on the Debtors' businesses, chapter 11 necessarily entails risk and uncertainty and this Disclosure Statement contains forward-looking statements that involve risks and uncertainty.

**Holders of Claims and Equity Interests should carefully consider the following factors in addition to the other information contained in this Disclosure Statement**.

It is possible that chapter 11 could have negative effects on the Debtors' businesses. Moreover, there is no certainty that the Prepackaged Plan will be confirmed or that the Purchaser will consummate the transactions contemplated by the Asset Purchase Agreement. If the transactions contemplated by the Asset Purchase Agreement and the Prepackaged Plan are not consummated as contemplated therein, including if the NHL does not approve the Stalking Horse Asset Purchase Agreement or any other bid or any bidder, the Debtors' Chapter 11 Cases will take a different path and the recoveries to holders of Claims and Equity Interests could be different from those provided in the Prepackaged Plan. In addition, based on current projections, the Debtors estimate that they have sufficient cash flow and liquidity to fund operations only until approximately November 30, 2011. After such date, the Debtors currently project that, absent additional funding sources, they will be unable to meet their ongoing operating expenses, such as payroll (including player salaries), and they will be unable to service their debt service obligations. Consequently, if the confirmation of the Prepackaged Plan or consummation of the Sale is delayed or if administrative expenses are greater than expected, the Debtors may need to seek additional financing to continue the administration of the Chapter 11 Cases. The Debtors have not arranged a commitment for postpetition financing, other than the use of cash collateral, in advance of commencing the Chapter 11 Cases. If the Debtors are not able to obtain additional financing, if necessary, the Debtors may not be able to continue the Chapter 11 Cases or proceed to confirmation of the Prepackaged Plan and consummation of the Sale. Please *see* Section VIII— "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PREPACKAGED PLAN" for a description of some of the potential outcomes of the Chapter 11 Cases if the Sale is not consummated.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Prepackaged Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors do not have any affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

Any representations or inducements made to secure your acceptance or rejection of the Prepackaged Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PREPACKAGED PLAN

Although the Debtors believe that the Prepackaged Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Prepackaged Plan will not be required for confirmation, that such modifications would not adversely affect the holders of Claims and Equity Interests, or that such modifications would not necessitate solicitation or re-solicitation of votes. The Debtors believe that there is no alternative to the Prepackaged Plan that would afford holders of Claims and Equity Interests the potential for a greater realization on the Debtors' assets. If, however, the Prepackaged Plan is not confirmed and/or consummated, the theoretical alternatives include: (i) commencement of "non-prepackaged" or "traditional" chapter 11 cases, (ii) formulation of an alternative plan or plans of reorganization, or (iii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

A.    COMMENCEMENT OF "TRADITIONAL" CHAPTER 11 CASES

The Debtors could commence "traditional" chapter 11 cases, in which circumstance they could continue to operate their businesses and manage their properties as debtors in possession, but would become subject to the numerous restrictions imposed on debtors in possession by the Bankruptcy Code. It is not clear whether the Debtors could survive as going concerns in protracted chapter 11 cases without additional financing. The Debtors could have difficulty sustaining operations in the face of the high costs, erosion of fan confidence, loss of key employees (in particular, talented hockey players), and liquidity difficulties that could result if they remained in chapter 11 for an extended period of time.

B.    ALTERNATIVE PLANS

If the Prepackaged Plan is not confirmed, it is possible that the Debtors could seek to restructure their debts through a sale to an alternate buyer. However, the Debtors cannot be certain whether it would be able to effectuate a sale to another buyer or whether, if such a buyer existed, an alternative sale would provide as much value as the Stalking Horse Asset Purchase Agreement.

If the Prepackaged Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' business, including in connection with a sale of the Debtors' assets, or an orderly liquidation of assets.

With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the extensive negotiation process of the Stalking Horse Asset Purchase Agreement and the development of the Prepackaged Plan. The Debtors believe that the Prepackaged Plan, as described herein, which is the result of extensive negotiations between the Debtors and various constituencies and provides a bidding process that ensures the highest or best offer obtainable through a market test, enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization, the Prepackaged Plan has the greatest chance to be confirmed and consummated while providing the greatest value to the Debtors' creditors.

C.    LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11

If no plan is confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtors.

The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' assets. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors than the Prepackaged Plan

because of the greater return the Debtors anticipate is provided by the Prepackaged Plan. **THE DEBTORS BELIEVE THAT THE PREPACKAGED PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND EMPLOYEES THAN WOULD ANY OTHER REASONABLY CONFIRMABLE REORGANIZATION PLAN OR LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.**

Based on this analysis, it is possible that a liquidation of the Debtors' assets would result in smaller distributions being made to creditors than those provided for under the Prepackaged Plan because of (x) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (y) additional administrative expenses involved in the appointment of a trustee, and (z) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## IX.

## MISCELLANEOUS

If you have any questions or require further information about the packet of material you received, or if you wish to obtain an additional copy of the Prepackaged Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact:

Weil, Gotshal & Manges LLP
200 Crescent Court; Suite 300
Dallas, Texas 75201
Attn: Martin A. Sosland
Email: martin.sosland@weil.com
Telephone: (214) 746-7700
Facsimile: (214) 746-7777


Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Ronit J. Berkovich
Email: ronit.berkovich@weil.com
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

# X.

## RECOMMENDATION AND CONCLUSION

For all the reasons set forth in this Disclosure Statement, the Debtors believe that Confirmation and consummation of the Prepackaged Plan is in the best interests of all creditors and holders of equity interests, and urges holders of claims in Classes 2A, 2B, 2C, and 2D and Classes 3A, 3B, 3C, and 3D to vote to accept the Prepackaged Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (Eastern time) on September 13, 2011.

Dated:  September 1, 2011

Respectfully submitted,

**DALLAS STARS, L.P.**

By: /s/ *Robert L. Hutson*
      Name:  Robert L. Hutson
      Title:  Chief Financial Officer

**DALLAS ARENA LLC**

By: /s/ *Robert L. Hutson*
      Name:  Robert L. Hutson
      Title:  Chief Financial Officer

**DALLAS STARS U.S. HOLDINGS CORP.**

By: /s/ *Robert L. Hutson*
      Name:  Robert L. Hutson
      Title:  Treasurer

**STARCENTERS LLC**

By: /s/ *Robert L. Hutson*
      Name:  Robert L. Hutson
      Title:  Chief Financial Officer