**<u>EXHIBIT A</u>**

Prepackaged Plan

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ---------------------------------------------------------------------- | x | |
| | : | |
| In re | : | **Chapter 11** |
| | : | |
| **DALLAS STARS, L.P.,** *et al.*[1] | : | **Case No. __-_____ (___)** |
| | : | |
| Debtors. | : | **Joint Administration** |
| | : | **Requested** |
| ---------------------------------------------------------------------- | x | |

## JOINT PREPACKAGED PLAN OF REORGANIZATION OF
## DALLAS STARS, L.P., *ET AL.* UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

  Dallas Stars, L.P., Dallas Arena LLC, Dallas Stars U.S. Holdings Corp., and StarCenters LLC as debtors and debtors in possession, propose the following joint prepackaged chapter 11 plan for the Debtors pursuant to section 1121(a) of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corp. (0485); and StarCenters LLC (4430).

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND INTERPRETATION ........................................ 1

A.    Definitions ................................................................................................................ 1

B.    Rules of Interpretation ........................................................................................... 13

ARTICLE II      PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS ........ 14

2.1    Administrative Expense Claims .............................................................. 14

2.2    Professional Compensation and Reimbursement Claims ......................... 14

2.3    Priority Tax Claims .................................................................................. 15

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ...... 15

ARTICLE IV      TREATMENT OF CLAIMS AND EQUITY INTERESTS .............. 18

4.1    Classes 1A through 1D – Priority Non-Tax Claims ................................. 18

4.2    Classes 2A through 2D – First Lien Secured Claims ............................... 18

4.3    Classes 3A through 3D – Second Lien Secured Claims ........................... 19

4.4    Class 4A – CFV Claim ............................................................................. 20

4.5    Classes 5A through 5D – Secured Tax Claims ........................................ 21

4.6    Classes 6A through 6D – Other Secured Claims ..................................... 21

4.7    Classes 7A through 7D – Assumed General Unsecured Claims .............. 21

4.8    Classes 8A through 8D – Non-Assumed General Unsecured Claims ...... 22

4.9    Classes 9A through 9D – Equity Interests in Debtors ............................. 22

ARTICLE V      IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION ............................................... 22

5.1    Holders of Claims and Equity Interests Entitled to Vote ........................ 22

5.2    Holders of Claims and Equity Interests Not Entitled to Vote ................. 23

5.3    Nonconsensual Confirmation .................................................................. 23

ARTICLE VI      MEANS OF IMPLEMENTATION AND POST-EFFECTIVE DATE GOVERNANCE ...................................................................... 23

6.1    Asset Purchase Agreement and Related Documents ................................ 23

6.2    General Corporate Actions ....................................................................... 24

6.3    Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases ................................................................................... 24

US_ACTIVE:\43794806\03\40036.0005

6.4    Cancellation of Liens ..................................................................25

ARTICLE VII    PROVISIONS GOVERNING DISTRIBUTIONS............................26

7.1    Date of Distributions on Account of Allowed Claims ............................26

7.2    Sources of Cash for the Prepackaged Plan Distribution..........................26

7.3    Disbursing Agent .....................................................................26

7.4    Rights and Powers of Disbursing Agent ................................................26

7.5    Expenses of the Disbursing Agent .....................................................26

7.6    Record Date for Distribution ..................................................27

7.7    Delivery of Distributions .........................................................27

7.8    Manner of Payment Under Prepackaged Plan........................................28

7.9    Setoffs and Recoupment ...................................................................28

7.10    Distributions After Effective Date.........................................28

7.11    Allocation of Payments under the Prepackaged Plan..............................28

ARTICLE VIII    PROCEDURES FOR TREATING  CLAIMS UNDER THE PREPACKAGED PLAN.....................................................................28

8.1    Disputed Claims/Process .................................................................29

8.2    No Postpetition Interest on Claims.......................................................29

ARTICLE IX    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.....................................................................29

9.1    Assumption of Contracts and Leases .....................................................29

9.2    Payments Related to Assumption of Contracts and Leases.....................30

9.3    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........................................................................................31

9.4    Compensation and Benefit Plans and Treatment of Retirement Plan ......31

9.5    Insurance Policies ..........................................................................31

ARTICLE X    CONDITIONS PRECEDENT  TO EFFECTIVE DATE .................32

10.1    Conditions Precedent to Effective Date of Prepackaged Plan.................32

10.2    Effect of Failure of Conditions.............................................................32

10.3    Reservation of Rights ........................................................................33

10.4    Substantial Consummation ...............................................................33

ARTICLE XI       EFFECT OF CONFIRMATION ........................................................33

     11.1     Vesting of Assets ............................................................33

     11.2     Binding Effect ................................................................34

     11.3     Discharge of the Debtors ..............................................34

     11.4     Exculpation ....................................................................34

     11.5     Releases by the Debtors and Stalking Horse ...........................35

     11.6     Releases By Holders of Claims .....................................35

     11.7     Waiver of Avoidance Actions ......................................37

     11.8     Term of Injunctions or Stays .......................................37

     11.9     Indemnification Obligations of the Debtors and Stalking Horse ............38

ARTICLE XII      RETENTION OF JURISDICTION ...................................................38

ARTICLE XIII     MISCELLANEOUS ........................................................................39

     13.1     Payment of Statutory Fees ...........................................39

     13.2     Filing of Additional Documents ..................................40

     13.3     Schedules and Exhibits Incorporated ..........................40

     13.4     Amendment or Modification of the Prepackaged Plan ............40

     13.5     Inconsistency ................................................................40

     13.6     Section 1125(e) of the Bankruptcy Code ...................40

     13.7     Preservation of Rights of Action; Settlement of Litigation Claims ........41

     13.8     Compromise of Controversies .....................................41

     13.9     Exemption from Certain Transfer Taxes ......................41

     13.10    Compliance with Tax Requirements ............................42

     13.11    Determination of Tax Filings and Taxes ......................42

     13.12    Severability of Provisions in the Prepackaged Plan .................42

     13.13    Governing Law .............................................................43

     13.14    Notices ..........................................................................43

     13.15    Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment ........................................................44

US_ACTIVE:\43794806\03\40036.0005

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.    Definitions**.

The following terms used herein shall have the respective meanings set forth below:

1.1    ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed under and in accordance with, as applicable, sections 330, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to section 503(b) of the Bankruptcy Code, and (d) the Stalking Horse Protection Claim, if any.  Any fees or charges assessed against the Estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section  13.1 (Payment of Statutory Fees) hereof.

1.2    ***Affiliate Agreement*** means, that certain letter agreement, dated August 31, 2011, by and among the Dallas Stars, Dallas Arena, Plano StarCenter, HSG, HSGH, and Hicks Holdings LLC, as may be amended from time to time.

1.3    ***Allowed*** means, with reference to any Claim or Equity Interest, (a) any Claim or Equity Interest arising on or before the Effective Date (i) as to which there is no dispute as to allowance or amount, or (ii) as to which any dispute has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Equity Interest as to which the liability of the Debtors (or to the extent assumed by the Purchaser, the Purchaser) and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (c) any Claim or Equity Interest expressly allowed hereunder.

1.4    ***Amended Corporate Organizational Documents*** means the amended and restated corporate organizational documents to be adopted by each Post-Effective Date Debtor that is a corporation (as such term is defined in the Bankruptcy Code) prior to or on the Effective Date to satisfy the requirements of section 1123(a)(6) of the Bankruptcy Code, which shall be substantially in the form to be filed as part of the Prepackaged Plan Supplement.

1.5    ***Asset Purchase Agreement*** means that asset purchase agreement between the Debtors and the Purchaser providing for the sale of the Purchased Assets, as amended, restated, amended and restated, or otherwise modified from time to time.  If the Stalking Horse is the Purchaser and there is no Auction, the Stalking Horse Asset Purchase Agreement shall be the Asset Purchase Agreement.

1.6     **Assumed General Unsecured Claim** means a General Unsecured Claim that is being assumed by the Purchaser under the Asset Purchase Agreement.

1.7     **Auction** means the auction for the Purchased Assets that shall occur under the Bidding Procedures and Confirmation Scheduling Order if there is more than one Qualified Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order).

1.8     **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time.

1.9     **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Cases.

1.10    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.11    **Bidding Procedures and Confirmation Scheduling Order** means the order entered by the Bankruptcy Court in the Chapter 11 Cases approving bidding procedures governing the Auction and sale of the Debtors' assets, with such changes as may be required by the Bankruptcy Court that are not materially adverse to the Purchaser or the Debtors, substantially in the form set forth in <u>Exhibit C</u> of the Stalking Horse Asset Purchase Agreement.

1.12    **Business Day** means any day other than a Saturday, Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    **Cash** means legal tender of the United States of America.

1.14    **Cash Collateral Order** means an order or orders of the Bankruptcy Court authorizing the use of cash collateral during the pendency of the Chapter 11 Cases.

1.15    **CFV Claim** means any Claim, including for any post-petition interest, against Dallas Stars arising under or in connection with the CFV Debt Agreement.

1.16    **CFV Debt Agreement** means that certain promissory note, dated January 14, 2011, in the original principal amount of $45,000,000, made by Dallas Stars and payable to CFV I LLC, an affiliate of the NHL, as amended from time to time.

1.17    **CFV Debt Amount** means the net amount owed by Dallas Stars to CFV I LLC, an affiliate of the NHL, pursuant to the CFV Debt Agreement.

1.18    **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and styled *In re Dallas Stars, L.P., et al.*

1.19    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.20    **Class** means any group of substantially similar Claims or Equity Interests classified by the Prepackaged Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.21    **Collateral** means any property or interest in property of the Estates of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

1.22    **Commencement Date** means the date on which the Debtors file their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

1.23    **Committee** means any official committee appointed in the Chapter 11 Cases, if any, as such committee may be reconstituted from time to time.

1.24    **Confirmation Date** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.25    **Confirmation Hearing** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Prepackaged Plan, as such hearing may be adjourned or continued from time to time.

1.26    **Confirmation Order** means the order or orders of the Bankruptcy Court confirming the Prepackaged Plan, which shall be substantially in the form of Exhibit D to the Asset Purchase Agreement as the same may be amended, supplemented or otherwise modified in accordance with the terms of this Prepackaged Plan; provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

1.27    **Cure** means the payment of Cash by the Debtors or the Purchaser, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease or assume and assign such executory contract or unexpired lease to Purchaser under section 365(a) and/or section 365(f) of the Bankruptcy Code.

1.28    **Dallas Stars** means Dallas Stars, L.P., a Delaware limited partnership.

1.29    **Dallas Arena** means Dallas Arena LLC, a Texas limited liability company.

1.30    **Debtor** means each of Dallas Stars, Dallas Arena, U.S Holdings, and StarCenters in its capacity as a debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.31    **Debtor Released Party** means the Debtors and their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment

bankers, accountants, and other professionals retained by such persons) (but in the case of each of the foregoing, solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.32 ***Determined Hedge Claim*** means, with respect to each holder of a First Lien Secured Claim under a Hedge Agreement (as defined in the First Lien Credit Agreement): (i) the allowed amount of such holder's Claim as stipulated by such holder and the debtors in *In re Rangers Equity Holdings, L.P., et al*., Case No. 10-43624 (Bankr. N.D. Tex. 2010) on or about December 21, 2010, pursuant to docket entries No. 140, 143, 146, 155 and 159 in such case, *minus* (ii) the aggregate amount of any distributions on account of such Claims received by such holder from the First Lien Administrative Agent or First Lien Collateral Agent following December 21, 2010, *plus* (iii) interest accrued on such Claim following the date of such stipulation, calculated in a manner consistent with the calculation of post-termination interest utilized by the debtors in *In re Rangers Equity Holdings, L.P. et al.* in stipulating to such allowed Claim amounts on or about December 21, 2010.

1.33 ***Disbursing Agent*** means the Officer or any party designated by the Post-Effective Date Debtors, in their sole discretion, to serve as a disbursing agent under Section 7.3 hereof.

1.34 ***Discharge of First Lien Obligations*** shall have the meaning ascribed to such term in the Intercreditor Agreement and shall be determined as of the Effective Date.

1.35 ***Disclosure Statement*** means that certain disclosure statement relating to the Prepackaged Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time.

1.36 ***Disputed Claim*** means any Claim that is not Allowed.

1.37 ***Disputed Equity Interest*** means any Equity Interest that is not an Allowed Equity Interest.

1.38 ***Dissolution*** means the dissolution, consolidation, or other termination of legal existence of the Post-Effective Date Debtors after the Effective Date.

1.39 ***Distribution Record Date*** means the record date for purposes of making distributions under the Prepackaged Plan on account of Allowed Claims, which date shall be three Business Days prior to the Effective Date.

1.40 ***Effective Date*** means the first Business Day on which all the conditions precedent to the Effective Date specified in Section 10.1 hereof shall have been satisfied.

1.41 ***Equity Interest*** means any partnership interest, membership interest, or the interest of any holders of equity securities of any of the Debtors represented by issued and outstanding shares of common or preferred stock or other instruments evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.42    **_Estates_** means the estates of the Debtors as created under section 541 of the Bankruptcy Code.

1.43    **_Excluded Contract_** means (i) the Asset Purchase Agreement and all documents related thereto, (ii) all contracts between the Debtors and any broker or investment banker related to the Asset Purchase Agreement, other than GSP Securities LLC, (iii) except as set forth on Schedule 1.1(a)(i) of the Asset Purchase Agreement, all contracts between the Debtors and any Affiliate of the Debtors or any other Hicks Affiliate (other than contracts to which the only parties that are Affiliates of the Debtors or any other Hicks Affiliate consist of (A) any Debtor and any other Debtor or (B) any Debtor and any Transferred Subsidiary), (iv) the contracts listed on Schedule 1.1(a)(ii) of the Asset Purchase Agreement, and (v) the First Lien Credit Agreement and Second Lien Credit Agreement, and all contracts related thereto.

1.44    **_Excluded Liabilities_** shall have the meaning given in the Asset Purchase Agreement.

1.45    **_Final Order_** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for _certiorari_, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for _certiorari_ or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of _certiorari_, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, _certiorari_ shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for _certiorari_, or move for a stay, new trial, reargument or rehearing shall have expired; _provided_, _however_, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.46    **_First Lien Administrative Agent_** means JPMorgan Chase Bank, N.A., as administrative and collateral agent to the lenders under the First Lien Credit Agreement.

1.47    **_First Lien Administrative Parties_** means JPMorgan Securities Inc., as joint lead arranger, joint bookrunner, and co-syndication agent, Barclays Capital Inc., as joint lead arranger, and joint bookrunner, Barclays Bank PLC, as co-syndication agent and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, in each case pursuant to the First Lien Credit Agreement.

1.48    **_First Lien Collateral Agent_** means JPMorgan Chase Bank, N.A., as collateral agent under the First Lien Security Agreement.

1.49    **_First Lien Credit Agreement_** means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG as guarantors, the lenders party thereto, the First Lien Administrative

Parties, and the other Persons party thereto from time to time, as amended, restated, amended and restated, or otherwise modified from time to time.

1.50    ***First Lien Released Parties*** means (i) the holders of First Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) the First Lien Administrative Parties, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.51    ***First Lien Secured Claim*** means any Claim against a Debtor arising under or in connection with the First Lien Credit Agreement, including, without limitation, all Obligations (as defined in the First Lien Credit Agreement) or any Claim of a Prepetition First Lien Secured Party (as defined in the Cash Collateral Order) arising under the Cash Collateral Order related to the Senior Adequate Protection (as defined in the Cash Collateral Order).

1.52    ***First Lien Security Agreement*** means that certain Amended and Restated First Lien Pledge and Security Agreement, dated December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG as grantors and JPMorgan Chase Bank, N.A., as Collateral Agent, and the other Persons party thereto from time to time, as amended, restated, amended and restated, or otherwise modified from time to time.

1.53    ***General Unsecured Claim*** means any Claim against the Debtors that (a) is not an Administrative Expense Claim, Priority Non-Tax Claim, Priority Tax Claim, First Lien Secured Claim, Second Lien Secured Claim, CFV Claim, Secured Tax Lien Claim, Other Secured Lien Claim, or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.54    ***Hicks Affiliate*** means Thomas O. Hicks, his spouse and children (including adopted and step children), or any trust for the benefit of such persons or any Person (other than the Debtors or any Transferred Subsidiary) controlled by Thomas O. Hicks, his spouse and children (including adopted and step children), or any trust for the benefit of such persons.

1.55    ***Hockey Enterprises*** means Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company.

1.56    ***HSG*** means HSG Sports Group LLC, a Texas limited liability company.

1.57    ***HSGH*** means HSG Sports Group Holdings LLC, a Texas limited liability company.

1.58    ***Intercompany Claim*** means any Claim held by a non-Debtor affiliate of a Debtor against a Debtor; *provided, however,* Intercompany Claim shall not include (i) any Claim held by Center Operating Company, L.P., a Texas limited partnership, Center GP, LLC, a Texas limited liability company, or Transferred Subsidiaries, (ii) any Claim arising out of any contract set forth

on Schedule 1.1(a)(i) of the Asset Purchase Agreement, or (iii) any Claim specifically assumed under the Asset Purchase Agreement.

1.59     ***Intercreditor Agreement*** means that certain Intercreditor Agreement dated as of December 19, 2006 by and among HSG, JPMorgan Chase Bank, N.A. in its capacity as collateral agent for the First Lien Obligations (as defined therein) and GSP Finance LLC, as successor in interest to Barclays Bank PLC, in its capacity as collateral agent for the Second Lien Obligations (as defined therein) (as has been or may be further amended, restated, supplemented or otherwise modified from time to time).

1.60     ***Lender Adverse Modifications*** means any amendment or waiver of this Prepackaged Plan, the Confirmation Order, or any provision thereof in a manner materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims. For the purposes of this definition of Lender Adverse Modifications, and without limitation thereto, any amendments or waivers of the following provisions or terms shall be deemed "materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims": (i) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with (A) the solicitation of votes on the Prepackaged Plan, (B) the negotiation and consummation of the Prepackaged Plan and related documents, (ii) the releases and exculpation for the benefit of the First Lien Administrative Parties and other holders of First Lien Secured Claims under the Prepackaged Plan and Confirmation Order, and (iii) the provisions of the Prepackaged Plan and Confirmation Order ordering the sale of the Purchased Assets free and clear of all claims, liens, liabilities and interests.  In addition, if the Stalking Horse is the Purchaser, any amendments or waivers of the following provisions or terms shall also be deemed "materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims": (i) the maturity, interest rate or principal amount of the Term Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) (including the terms of any adjustment to the aggregate principal amount of the Term Loans pursuant to Article III of the Stalking Horse Asset Purchase Agreement), (ii) the property comprising the Collateral securing the Obligations (each as defined in the Stalking Horse Senior Secured Credit Agreement), (iii) the validity, priority and perfection of the liens on and security interests in the Collateral (including as provided in the Confirmation Order) granted in favor of the First Lien Administrative Parties and other holders of First Lien Secured Claims, (iv) the identity of the "Loan Parties" and "Owner Support Parties" under the Stalking Horse Senior Secured Credit Agreement, (v) the terms and conditions of the Owner Support Agreement (as defined in the Stalking Horse Senior Secured Credit Agreement), (vi) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with the negotiation and deemed extension of the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement), and (vii) the Confirmation Order's findings that the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement) is not a preference or a fraudulent transfer and that the transactions contemplated by the Stalking Horse Asset Purchase Agreement are not fraudulent transfers.

1.61     ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.62     ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the District of Delaware.

1.63     ***NHL*** means the National Hockey League.

1.64     ***NHL Affiliated Party*** means each of the NHL Entities and each of the NHL Member Clubs (except Dallas Stars, but including future NHL Member Clubs) and each of their respective subsidiaries and other affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors.

1.65     ***NHL Agreements*** means the NHL Owner Consent, NHL Guaranty, and Purchaser/NHL Proxy, each as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser.

1.66     ***NHL Entities*** means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the NHL Member Clubs generally after the date of the Asset Purchase Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective affiliates and subsidiaries; *provided* that the "NHL Entities" shall not include the NHL Member Clubs.

1.67     ***NHL Commissioner*** means the person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

1.68     ***NHL Constitution*** means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings, and decisions issued by the NHL Commissioner or his or her designee.

1.69     ***NHL/Lender Cooperation Agreement***  means (i) if the Stalking Horse is the Purchaser, the NHL/Lender Cooperation Agreement shall have the meaning given in section 9.9 of the Stalking Horse Asset Purchase Agreement, with such modifications as may be acceptable to the NHL and the First Lien Administrative Agent, or (ii) if the Stalking Horse is not the Purchaser and the Purchaser provides consideration in the form of a secured debt obligation to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if applicable), that letter agreement to be entered into among the NHL, the Purchaser, any of its owner-support parties, any guarantors, pledgors, or similar parties, and the administrative agent with respect to such debt obligation, in form and substance reasonably satisfactory to the NHL and the First Lien Administrative Agent.

1.70     ***NHL Member Clubs*** means the hockey clubs of the NHL.

1.71    ***NHL Released Parties*** means, the NHL Affiliated Parties and their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of the foregoing, solely in their capacities as such).

1.72    ***NHL Rules*** shall have the meaning given in the Asset Purchase Agreement.

1.73    ***Non-Assumed General Unsecured Claim*** means a General Unsecured Claim that is not being assumed by the Purchaser under the Asset Purchase Agreement, including all Intercompany Claims and Excluded Liabilities. [2]

1.74    ***Officer*** means the Person appointed by the Debtors and identified at or prior to the Confirmation Hearing to be the sole officer of each of the Post-Effective Date Debtors as of the Effective Date to wind up the affairs of the Post-Effective Date Debtors.

1.75    ***Other Secured Claim*** means a Secured Claim other than a First Lien Secured Claim, a Second Lien Secured Claim, or a Secured Tax Claim.

1.76    ***Owner Support Parties*** has the meaning ascribed to such term in the Stalking Horse Senior Secured Credit Agreement.

1.77    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.78    ***Plano StarCenter*** means Plano StarCenter LLC, a Texas limited liability company.

1.79    ***Post-Closing Expense Amount*** means the $750,000 in Cash paid by the Purchaser to the Debtors on the Effective Date pursuant to the Asset Purchase Agreement.

1.80    ***Post-Effective Date Debtors*** means any of the Debtors after the Effective Date.

1.81    ***Prepackaged Plan*** means this joint prepackaged plan of reorganization, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code, including the exhibits and schedules hereto; provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

1.82    ***Prepackaged Plan Supplement*** means the compilation of documents, including the Amended Corporate Organizational Documents and any exhibits to the Prepackaged Plan not included herewith that the Debtors may file with the Bankruptcy Court on or before the date that

---

[2] Except for Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, the Debtors are not aware of any Non-Assumed General Unsecured Claims.

is five Business Days prior to the initial deadline scheduled by the Bankruptcy Court to object to the Prepackaged Plan.

1.83 ***Priority Non-Tax Claim*** means any Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.84 ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.85 ***Purchased Assets*** means the assets sold under the Asset Purchase Agreement. For the avoidance of doubt, the Purchased Assets shall not include any Claims or causes of action released by the Debtors pursuant to Section 11.5(a) hereof.

1.86 ***Purchaser*** means the Qualified Bidder or Qualified Bidders (as defined in <u>Exhibit 1</u> to the Bidding Procedures and Confirmation Scheduling Order), which may be the Stalking Horse, selected pursuant to the Bidding Procedures and Confirmation Scheduling Order and approved by the Bankruptcy Court at the Confirmation Hearing that will acquire the Purchased Assets on the Effective Date.

1.87 ***Purchaser Released Parties*** means, solely if the Stalking Horse is the Purchaser: (i) the Purchaser, (ii) the Owner Support Parties, (iii) the Transferred Subsidiaries, and (iv) for each of (i), (ii), and (iii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), (iii), and (iv), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.88 ***Released Parties*** means (i) any party being released under section 13.12 of the Stalking Horse Asset Purchase Agreement, or such similar section of the Asset Purchase Agreement if the Stalking Horse is not the Purchaser, (ii) any party entitled to exculpation under Section 11.4 of the Prepackaged Plan, and/or (iii) any party entitled to a release under Sections 11.5 and 11.6 of the Prepackaged Plan. For the avoidance of doubt, Released Parties shall exclude any Hicks Affiliate.

1.89 ***Second Lien Administrative Agent*** means GSP Finance LLC, as successor-in-interest to Barclays Bank PLC, as administrative and collateral agent to the lenders under the Second Lien Credit Agreement.

1.90 ***Second Lien Administrative Parties*** means JPMorgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, GSP Finance LLC, as successor-in-interest to Barclays Bank PLC, as administrative agent, collateral agent and co-syndication agent to the lenders under the Second Lien Credit Agreement.

1.91 ***Second Lien Credit Agreement*** means that certain Second Lien Credit and Guaranty Agreement, dated December 19, 2006, by and among HSGH, HSG, certain

subsidiaries of HSG, as guarantors, the lenders party thereto, the Second Lien Administrative Parties, and the other Persons party thereto from time to time, as amended, restated, amended and restated or otherwise modified from time to time.

1.92    ***Second Lien Expense Reimbursement*** means the fees of the Second Lien Administrative Agent's legal and accounting advisors for reviewing the Prepackaged Plan and Disclosure Statement's terms related to the consideration provided to holders of Second Lien Secured Claims under Section 4.3 of the Prepackaged Plan, up to an amount of $25,000 that is payable to the Second Lien Administrative Agent.

1.93    ***Second Lien Released Parties*** means (i) the holders of Second Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) any Second Lien Administrative Party that submits to the Debtors by the deadline for the solicitation of votes on the Prepackaged Plan, in accordance with the notice requirements set forth in Section 13.14 of the Prepackaged Plan, a fully executed copy of the Consent to Release Form by Second Lien Administrative Party, a copy of which is attached hereto as <u>Exhibit A</u>, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.94    ***Second Lien Secured Claim*** means a Claim against a Debtor arising under or in connection with the Second Lien Credit Agreement, including, without limitation, all Obligations (as defined in the Second Lien Credit Agreement).

1.95    ***Secured Claim*** means, a Claim that is secured by a Lien that is valid, perfected, and enforceable, and not avoidable, upon property in which a Debtor has an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed to by a Debtor or Post-Effective Date Debtor and the holder of such Claim.

1.96    ***Secured Creditor Consideration*** means (i) the consideration provided under the Asset Purchase Agreement to the holders of First Lien Secured Claims and, if the Discharge of First Lien Obligations has occurred, the holders of Second Lien Secured Claims, plus (ii) property distributed to the First Lien Administrative Agent pursuant to Sections 6.3 and 11.1 hereof.  If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the consideration provided to the holders of First Lien Secured Claims shall be (i) the Stalking Horse Senior Secured Obligations, (ii) any Cash payments made under the Stalking Horse Asset Purchase Agreement to the First Lien Administrative Agent for the benefit of the holders of First Lien Secured Claims, and (iii) any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 hereof.  If the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, then the consideration provided to each holder of First Lien Secured Claims, and if the Discharge of First Lien Obligations has occurred, to the holders of Second Lien Secured Claims, shall be (i) (a) the aggregate consideration (other than the liabilities assumed under the Asset Purchase Agreement) provided under the Asset Purchase

Agreement (which, pursuant to the Bidding Procedures and Confirmation Scheduling Order, shall be of a higher or better value than the consideration provided to holders of First Lien Secured Claims and (if the Discharge of First Lien Obligations has occurred) Second Lien Secured Claims under the Stalking Horse Asset Purchase Agreement), plus (b) any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 hereof, minus the sum of (x) the aggregate amount of Cash necessary to satisfy the CFV Claim and the Specified Expenses plus (y) the Stalking Horse Protection Claim, if such claim is payable pursuant to the terms of the Stalking Horse Asset Purchase Agreement; *provided*, that, unless otherwise expressly agreed in writing by the First Lien Administrative Agent with the consent of the holders of a majority in amount of the First Lien Secured Claims, the consideration set forth in the Asset Purchase Agreement may be in the form of a debt obligation to the holders of First Lien Secured Claims *only* if the Stalking Horse is the Purchaser and such debt is in the amount and on the terms set forth in the Stalking Horse Senior Secured Credit Agreement.

1.97    ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority and right of payment under section 507(a)(8) of the Bankruptcy Code.

1.98    ***Specified Expenses*** means those unpaid fees and expenses relating to the sale process and the related matters contemplated by the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) as set forth therein, including (i) amounts due to GSP Finance LLC (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by section 7.8 of the Stalking Horse Asset Purchase Agreement), (iii) fees of Debtors' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement (including, without limitation, any antitrust fees and any fees resulting from the filings contemplated under section 9.15 of the Stalking Horse Asset Purchase Agreement).

1.99    ***Stalking Horse*** means, collectively and individually, (i) Dallas Sports & Entertainment, L.P., a Delaware limited partnership, (ii) DSE Hockey Club, L.P., a Delaware limited partnership, (iii) DSE Hockey Centers, L.P., a Delaware limited partnership, and (iv) DSE Plano GP, Inc., a Delaware corporation.

1.100    ***Stalking Horse Asset Purchase Agreement*** means the asset purchase agreement among the Debtors and the Stalking Horse, dated [_____ __, 2011], as amended, restated, amended and restated, or otherwise modified from time to time.

1.101    ***Stalking Horse Protection Claim*** means the Claim by the Stalking Horse against the Debtors payable under the Bidding Procedures and Confirmation Scheduling Order if the Stalking Horse is not the Successful Bidder.

1.102    ***Stalking Horse Senior Secured Credit Agreement*** means the credit agreement by and among the Stalking Horse, the First Lien Administrative Agent, and the holders of First Lien

Secured Claims, as amended or otherwise modified from time to time, governing the Stalking Horse Senior Secured Obligation, a copy of which is attached as Exhibit J to the Stalking Horse Asset Purchase Agreement.

1.103 **Stalking Horse Senior Secured Obligation** means the obligation to be owed by the Stalking Horse to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) as of the Effective Date pursuant to the Stalking Horse Asset Purchase Agreement, the terms of which shall be set forth in the Stalking Horse Senior Secured Credit Agreement whether or not the holder of a First Lien Secured Claim (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) executes the Stalking Horse Senior Secured Credit Agreement, which if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement shall be in the original principal amount of $100,000,000 (as may be adjusted downwards pursuant to the terms of the Stalking Horse Asset Purchase Agreement) in partial satisfaction of the First Lien Secured Claims and, if applicable, Second Lien Secured Claims.

1.104 **StarCenters** means StarCenters LLC, a Texas limited liability company.

1.105 **Successful Bidder** means the Successful Bidder as defined in the Bidding Procedures and Confirmation Scheduling Order or the Back-up Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order) if the Back-up Bidder is required to and does consummate the purchase of the Purchased Assets.

1.106 **Transferred Subsidiaries** means Hockey Enterprises, and to the extent not excluded under section 9.17 of the Stalking Horse Asset Purchase Agreement or as applicable, the similar provision under the Asset Purchase Agreement, Plano StarCenter.

1.107 **U.S. Holdings** means Dallas Stars U.S. Holdings Corp., a Delaware corporation.

## B. Rules of Interpretation.

For purposes of the Prepackaged Plan: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) unless otherwise specified, any reference in the Prepackaged Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Prepackaged Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (5) unless otherwise specified, all references in the Prepackaged Plan to articles or sections are references to the articles or sections of the Prepackaged Plan; (6) unless otherwise specified, all references in the Prepackaged Plan to exhibits are references to exhibits contained or included in

the Prepackaged Plan Supplement; (7) the words "herein," "hereof," and "hereto" refer to the Prepackaged Plan in its entirety rather than to a particular portion of the Prepackaged Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Prepackaged Plan, the rights and obligations arising pursuant to the Prepackaged Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to articles of the Prepackaged Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Prepackaged Plan; (10) unless otherwise set forth in the Prepackaged Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form in the Prepackaged Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents filed in the Debtors' Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Debtors' Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Post-Effective Date Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Prepackaged Plan all without further order of the Bankruptcy Court.

In computing any period of time prescribed or allowed by the Prepackaged Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS

2.1 *Administrative Expense Claims*.

Except as set forth in Section 2.2 of this Prepackaged Plan, to the extent an Allowed Administrative Claim is assumed by the Purchaser under the Asset Purchase Agreement, that Claim shall be paid by the Purchaser in the ordinary course of business as and when due. The Debtors are not aware of any Administrative Claim that will not be assumed and paid by the Purchaser; however, in the event any Allowed Administrative Claim is not assumed and paid by the Purchaser, the Debtors will satisfy such claim from the Post-Closing Expense Amount in the ordinary course of business.

2.2 *Professional Compensation and Reimbursement Claims*.

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, other than professionals retained in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses, shall (a) file,

on or before the date that is ninety days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses in the ordinary course and without the need for Bankruptcy Court approval.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred by professionals after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

The Asset Purchase Agreement shall provide that the portion of Specified Expenses that covers compensation for professional services or reimbursement of expenses incurred by professionals for which Bankruptcy Court approval is required shall be provided by Purchaser to the Post-Effective Date Debtors in Cash.  On the Effective Date, the Post-Effective Date Debtors shall set aside such Cash in a separate, interest-bearing escrow account pending final allowance by the Bankruptcy Court of all professional fee applications.  To the extent any Cash remains in the escrow account after the payment of all compensation for professional services or reimbursement of expenses incurred by professionals following the entry of Final Orders with respect to all professionals, the Post-Effective Date Debtors shall authorize the release of such Cash from the escrow account to the Purchaser.

2.3     *Priority Tax Claims*.

Under the Asset Purchase Agreement, the Purchaser shall assume all of the Debtors' tax obligations for all taxable periods.  With respect to any Priority Tax Claims not paid as of the Effective Date, except to the extent that a holder of an Allowed Priority Tax Claim against the Debtors agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date by the Purchaser; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business, by the Purchaser; or (c) be treated on such other terms and conditions as are acceptable to the Purchaser and the holder of such Claim.

## ARTICLE III

## CLASSIFICATION OF CLAIMS
## AND EQUITY INTERESTS

The following table designates the Classes of Claims against, and Equity Interests in, the Debtors and specifies which of those Classes and Equity Interests are (a) impaired or unimpaired by the Prepackaged Plan, (b) entitled to vote to accept or reject the Prepackaged Plan

in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Prepackaged Plan.

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| Class 1A | Dallas Stars | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1B | Dallas Arena | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1C | U.S. Holdings | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1D | StarCenters | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2A | Dallas Stars | First Lien Secured Claims | Impaired | Yes |
| Class 2B | Dallas Arena | First Lien Secured Claims | Impaired | Yes |
| Class 2C | U.S. Holdings | First Lien Secured Claims | Impaired | Yes |
| Class 2D | StarCenters | First Lien Secured Claims | Impaired | Yes |
| Class 3A | Dallas Stars | Second Lien Secured Claims | Impaired | Yes |
| Class 3B | Dallas Arena | Second Lien Secured Claims | Impaired | Yes |
| Class 3C | U.S. Holdings | Second Lien Secured Claims | Impaired | Yes |
| Class 3D | StarCenters | Second Lien Secured Claims | Impaired | Yes |
| Class 4A | Dallas Stars | CFV Claim | Unimpaired | No (deemed to accept) |

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 5A | Dallas Stars | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5B | Dallas Arena | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5C | U.S. Holdings | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5D | StarCenters | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 6A | Dallas Stars | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6B | Dallas Arena | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6C | U.S. Holdings | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6D | StarCenters | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 7A | Dallas Stars | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7B | Dallas Arena | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7C | U.S. Holdings | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7D | StarCenters | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 8A | Dallas Stars | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8B | Dallas Arena | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |

US_ACTIVE:\43794806\03\40036.0005

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| Class 8C | U.S. Holdings | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8D | StarCenters | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 9A | Dallas Stars | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9B | Dallas Arena | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9C | U.S. Holdings | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9D | StarCenters | Equity Interests in Debtors | Impaired | No (deemed to reject) |

# ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1     ***Classes 1A through 1D – Priority Non-Tax Claims***.

(a)     <u>Impairment and Voting</u>.  Classes 1A through 1D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)     <u>Distributions</u>.  Allowed Priority Non-Tax Claims, if any, will be assumed by Purchaser and paid in Cash on the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a different treatment.

4.2     ***Classes 2A through 2D – First Lien Secured Claims***.

(a)     <u>Impairment and Voting</u>.  Classes 2A through 2D are impaired by the Prepackaged Plan.  Each holder of a First Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

(b)     Distributions.  The First Lien Secured Claims shall be Allowed Claims and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, impairment, objection, or any other challenge under any applicable law or regulation by any person or entity.  On the Effective Date (or, as expressly contemplated by Sections 6.3 and 11.1 hereof, after the Effective Date), each holder of a First Lien Secured Claim shall be issued (on behalf of the Debtors) its pro rata share (in accordance with the First Lien Security Agreement) of the Secured Creditor Consideration up to the full Allowed amount of such Claim, including accrued interest under the First Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of First Lien Secured Claims is in the form of secured debt obligations to the holders of First Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.,* Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims.  Notwithstanding anything to the contrary herein or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; *provided, however*, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent hereunder shall be in the form of a secured debt obligation in the original principal amount of $500,000; *provided further, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as provided in Section 4.3 of the Prepackaged Plan, the holders of Second Lien Secured Claims shall neither receive nor retain any distribution hereunder unless and until the Discharge of First Lien Obligations has occurred.

4.3     ***Classes 3A through 3D – Second Lien Secured Claims***.

(a)     Impairment and Voting.  Classes 3A through 3D are impaired by the Prepackaged Plan.  Each holder of a Second Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

(b)     Distributions.  The Second Lien Secured Claims shall be Allowed Claims.  In full satisfaction, settlement, release, and discharge of, and in exchange for, each Second Lien Secured Claim, in the event that the Discharge of First Lien Obligations has occurred, each holder of a Second Lien Secured Claim, on account of its Second Lien Secured Claim, on the Effective Date shall be issued (on behalf of the Debtors) its pro rata share of  the

Secured Creditor Consideration remaining after the Discharge of First Lien Obligations (including payment of accrued interest under the First Lien Credit Agreement through the Effective Date), up to the full Allowed amount of the Second Lien Secured Claim, including accrued interest under the Second Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.,* Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims.  Other than as set forth herein, on the Effective Date, any Second Lien Secured Claim shall be extinguished and the holders of any Second Lien Secured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Second Lien Secured Claim; *provided, however*, and notwithstanding anything to contrary herein or in the Intercreditor Agreement, on the Effective Date the Second Lien Administrative Agent shall receive the Second Lien Expense Reimbursement.

(c)     Distributions if Classes 3A through 3D Accepts the Prepackaged Plan.  Notwithstanding anything to the contrary herein or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; *provided, however*, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent hereunder shall be in the form of a secured debt obligation in the original principal amount of $500,000; *provided further, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  Except as set forth in this Section 4.3, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan.

4.4     ***Class 4A – CFV Claim***.

(a)     Impairment and Voting.  Class 4A is unimpaired by the Prepackaged Plan.  Each holder of an Allowed CFV Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)      Distributions.  The CFV Claim shall be an Allowed Claim.  On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the CFV Claim shall be paid in full in Cash by the Purchaser under the Asset Purchase Agreement, as provided therein.

4.5      ***Classes 5A through 5D – Secured Tax Claims***.

(a)      Impairment and Voting.  Classes 5A through 5D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)      Distributions.  Each holder of an Allowed Secured Tax Claim that is assumed by the Purchaser under the Asset Purchase Agreement shall retain its existing lien, if any, in the Purchased Assets and any rights associated therewith pursuant to applicable non-bankruptcy law, and shall be paid in Cash by the Purchaser when such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business.

4.6      ***Classes 6A through 6D – Other Secured Claims***.

(a)      Impairment and Voting.  Classes 6A through 6D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)      Distributions.  Allowed Other Secured Claims will be assumed by the Purchaser on the Effective Date under the Asset Purchase Agreement.  Each holder of an Allowed Other Secured Claim shall, on the Effective Date, either (i) retain its existing lien in the Purchased Assets and be paid by the Purchaser when such Allowed Other Secured Claim becomes due and owing in the ordinary course of business, or (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

4.7      ***Classes 7A through 7D – Assumed General Unsecured Claims***.

(a)      Impairment and Voting.  Classes 7A through 7D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to accept the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)      Distributions.  Each holder of an Allowed Assumed General Unsecured Claim will be paid by the Purchaser on the Effective Date or when and as such Allowed Assumed General Unsecured Claim becomes due and owing in the ordinary course of business.

4.8    ***Classes 8A through 8D – Non-Assumed General Unsecured Claims***.

(a)    <u>Impairment and Voting</u>.  Classes 8A through 8D are impaired by the Prepackaged Plan.  To the extent there are any claims in Classes 8A through 8D, each holder of an Allowed Non-Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to reject the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Distributions</u>.  On the Effective Date, any Non-Assumed General Unsecured Claim shall be extinguished and the holders of any Non-Assumed General Unsecured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Non-Assumed General Unsecured Claim.  In the event the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.  Except for Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, the Debtors are not aware of any Non-Assumed General Unsecured Claim.

4.9    ***Classes 9A through 9D – Equity Interests in Debtors***.

(a)    <u>Impairment and Voting</u>.  Classes 9A through 9D are impaired by the Prepackaged Plan.  Each holder of an Allowed Equity Interest in Debtors is deemed to reject the Prepackaged Plan.

(b)    <u>Distribution</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Debtors shall be maintained; *provided, however,* the holders of the Allowed Equity Interests in Debtors shall not be entitled to transfer such Allowed Equity Interests in Debtors to any party, and shall not receive or retain any property or interest in property on account of such Allowed Equity Interests in Debtors unless the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, in which case the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.

**ARTICLE V**

**<u>IDENTIFICATION OF CLASSES OF CLAIMS AND
EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR
REJECTION OF THIS PLAN OF REORGANIZATION</u>**

5.1    ***Holders of Claims and Equity Interests Entitled to Vote***.

Each of Classes 2A through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) is entitled to vote to accept or reject this Prepackaged Plan.

5.2     ***Holders of Claims and Equity Interests Not Entitled to Vote***.

Each of Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) is unimpaired by the Prepackaged Plan and the holders of Allowed Claims in Classes 1A through 1D, 4A, 5A through 5D, 6A through 6D, and 7A through 7D are conclusively deemed to have accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.

Each of Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) is impaired by the Prepackaged Plan and will receive no distribution under the Prepackaged Plan.  The holders of claims in Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) are conclusively deemed to have rejected the Prepackaged Plan.

5.3     ***Nonconsensual Confirmation***.

If any impaired Class of Claims or Interests entitled to vote shall not accept the Prepackaged Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Prepackaged Plan in accordance with Section 13.4 of the Prepackaged Plan or to undertake to have the Bankruptcy Court confirm the Prepackaged Plan under section 1129(b) of the Bankruptcy Code or both.


**ARTICLE VI**

**MEANS OF IMPLEMENTATION
AND POST-EFFECTIVE DATE GOVERNANCE**

6.1     ***Asset Purchase Agreement and Related Documents***.

(a)     <u>General</u>.  On the Effective Date, the transactions contemplated by the Asset Purchase Agreement and any documents in connection therewith, including the Affiliate Agreement, shall be consummated.  Except as otherwise explicitly provided herein or in the Asset Purchase Agreement, on the Effective Date, substantially all of the Debtors' property shall be sold and transferred to the Purchaser in accordance with the terms of the Asset Purchase Agreement and the Prepackaged Plan in exchange for the consideration set forth in the Asset Purchase Agreement.  Any property comprising the Estates that is not transferred under the Asset Purchase Agreement shall revest in the Post-Effective Date Debtors.

(b)     <u>Amendments</u>.  To the extent there are material amendments to the Stalking Horse Asset Purchase Agreement or if the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, the Debtors shall file the Asset Purchase Agreement (and any related documents) prior to the Confirmation Hearing.  After the Confirmation Date, the Debtors are authorized to enter into non-material amendments to the Asset Purchase Agreement or any other documents in accordance with the terms of the Asset Purchase Agreement in

furtherance of the transactions contemplated thereby without the need for further notice or Court approval.

6.2     ***General Corporate Actions.***

(a)     <u>General</u>.  Upon the Effective Date, all actions contemplated by the Prepackaged Plan will be deemed authorized and approved in all respects, including (i) the consummation of the Asset Purchase Agreement and (ii) all other actions contemplated by the Asset Purchase Agreement and the Prepackaged Plan (whether to occur before, on or after the Effective Date).  All matters and transactions provided for in the Asset Purchase Agreement and the Prepackaged Plan concerning the structure of the Debtors or the Post-Effective Date Debtors, and any partnership, membership, or shareholder action required by the Debtors or the Post-Effective Date Debtors in connection with the Asset Purchase Agreement and the Prepackaged Plan will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the Debtors or the Post-Effective Date Debtors.  On or (as applicable) prior to the Effective Date, the general partner or the appropriate officers of each Debtor or Post-Effective Date Debtor, as applicable, shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by the Asset Purchase Agreement and the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Asset Purchase Agreement and the Prepackaged Plan), including the Amended Corporate Organizational Documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan and the Asset Purchase Agreement, in each case in the name of and on behalf of such Debtor or Post-Effective Date Debtor.  Such authorizations and approvals will be effective notwithstanding any requirements under non-bankruptcy law.

(b)     <u>Continued Legal Existence</u>.  Except as otherwise provided in the Prepackaged Plan, each Debtor will continue to exist after the Effective Date as a separate legal entity with all the powers of such entity under applicable law pursuant to the Debtor's corporate organizational document(s), as may be amended, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law, including as set forth herein.

(c)     <u>Officers of the Post-Effective Date Debtor</u>. On the Effective Date, all existing officers of the Debtors shall resign or be deemed to have resigned and the Officer shall be appointed as the sole officer of each of the Post-Effective Date Debtors to wind up the affairs of the Post-Effective Date Debtors.

6.3     ***Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases***.

Upon (i) the adjudication by the Bankruptcy Court of all applications by professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder and (ii) the completion of all other matters necessary to occur in the Chapter 11

Cases, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. Upon the closing of the Chapter 11 Cases and the completion of all matters required to be performed by the Post-Effective Date Debtors under the Prepackaged Plan, the Asset Purchase Agreement, and applicable law other than dissolution, the Post-Effective Date Debtors shall be dissolved or otherwise consolidated without the need for further action (*i.e.*, without the need to file a certificate of dissolution or merger with or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of, or consolidate, the Post-Effective Date Debtors); *provided, however*, that the Post-Effective Date Debtors shall be required to provide notice to the Bankruptcy Court of Dissolution; and *provided further, however*, that notwithstanding the foregoing, the Officer or other authorized person of Dallas Stars shall file a certificate of cancellation of Dallas Stars' certificate of limited partnership with the Secretary of State of the State of Delaware in accordance with the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* and that the Officer shall file a certificate of dissolution of U.S. Holdings with the Secretary of State of the State of Delaware in accordance with the General Corporation Law of the State of Delaware, 8 Del. C. § 101, *et seq.* In the event the Post-Effective Date Debtors remain in possession of any Cash immediately prior to Dissolution, except as otherwise provided in Section 2.2 hereof, such Cash shall revert to the First Lien Collateral Agent, as contemplated by Section 11.1 hereof; *provided, however*, that if the Discharge of First Lien Obligations has occurred, such Cash shall revert to the Second Lien Administrative Agent, for the benefit of the holders of Second Lien Secured Claims.

### 6.4 *Cancellation of Liens*.

Except as otherwise specifically provided herein and in accordance with the Asset Purchase Agreement, upon the occurrence of the Effective Date, any Lien encumbering the Purchased Assets shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors constituting Purchased Assets (including any Cash collateral) held by such holder and to take such actions as may be requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets), to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets); *provided*, *however*, that such Liens shall be released regardless of whether any such filing or recordings are made. Any valid, perfected prepetition liens against the Debtors' assets shall remain in force against such assets to the extent such assets remain in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets. Upon the occurrence of the Effective Date, the Purchaser may file or record a certified copy of this Prepackaged Plan and any order confirming same, as well as any other documents evidencing the release of a Lien, in any state or county office to evidence the release of any Lien encumbering the Purchased Assets prior to the Effective Date.

# ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

7.1 ***Date of Distributions on Account of Allowed Claims***.

Except as otherwise specifically provided herein or in the Asset Purchase Agreement, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter, *provided* that, any Cash distributions to the holders of (i) CFV Claims, (ii) First Lien Secured Claims (except as expressly contemplated by Sections 6.3 and 11.1 hereof), and (iii) Second Lien Secured Claims (if applicable) shall be made on the Effective Date. In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

7.2 ***Sources of Cash for the Prepackaged Plan Distribution***.

Except as otherwise specifically provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' cash on hand or the Purchaser.

7.3 ***Disbursing Agent***.

All distributions under the Prepackaged Plan shall be made by the Purchaser as set forth in the Asset Purchase Agreement, by the Officer as the Disbursing Agent, or by such other Person designated as a Disbursing Agent pursuant to the Prepackaged Plan or by the Post-Effective Date Debtors. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.4 ***Rights and Powers of Disbursing Agent***.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Prepackaged Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

7.5 ***Expenses of the Disbursing Agent***.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Post-Closing Expense Amount in the ordinary course of business.

7.6    ***Record Date for Distribution***.

The record date for distributions shall be the Distribution Record Date.

7.7    ***Delivery of Distributions***.

(a)    <u>Last Known Address</u>.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Debtors, unless the applicable Debtor has been notified in writing of a change of address.  In the event that any distribution to any holder is returned as undeliverable, the Purchaser or Disbursing Agent, as applicable, shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Purchaser or Disbursing Agent, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Purchaser or Post-Effective Date Debtors, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(b)    <u>Distributions by First Lien Administrative Agent</u>.  The First Lien Administrative Agent shall be the Disbursing Agent for the Allowed First Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed First Lien Secured Claims shall be made by the First Lien Administrative Agent to the holders of such Allowed First Lien Secured Claims.  In connection therewith, the First Lien Administrative Agent shall distribute to each holder of a First Lien Secured Claim under a Hedge Agreement (as defined in the First Lien Credit Agreement) its pro rata share of the Secured Creditor Consideration, with such pro rata share calculated as such holder's Determined Hedge Claim divided by the aggregate amount of all First Lien Secured Claims (which, for the avoidance of doubt, includes the aggregate amount of Determined Hedge Claims).  The First Lien Administrative Agent shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of distributions.  If this Court or any other court of competent jurisdiction orders disgorgement of the payments made by the First Lien Administrative Agent pursuant to this Section, then (i) each holder of a First Lien Secured Claim shall only be required to disgorge its pro rata share of such payments and the holders of First Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the First Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a First Lien Secured Claim and which are no longer in the First Lien Administrative Agent's possession.

(c)    <u>Distributions by the Second Lien Administrative Agent</u>.  The Second Lien Administrative Agent shall be the Disbursing Agent for the Allowed Second Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed Second Lien Secured Claims, if any, shall be made by the Second Lien Administrative Agent to the holders of such Allowed Second Lien Secured Claims.  The Second Lien Administrative Agent

shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of distributions. If this Court or any other court of competent jurisdiction orders disgorgement of the payments made by the Second Lien Administrative Agent pursuant to this Section, then (i) each holder of a Second Lien Secured Claim shall only be required to disgorge its pro rata share of such payments and the holders of Second Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the Second Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a Second Lien Secured Claim and which are no longer in the Second Lien Administrative Agent's possession.

### 7.8 *Manner of Payment Under Prepackaged Plan*.

At the option of the Purchaser or the Disbursing Agent, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements; *provided* that any Cash payment to be made to the holders of the CFV Claim, the First Lien Administrative Agent (as disbursing agent for the holders of First Lien Secured Claims), or the Second Lien Administrative Agent (as disbursing agent for the holders of Second Lien Secured Claims) shall be made by wire transfer.

### 7.9 *Setoffs and Recoupment*.

Except as otherwise specifically provided for herein (including, without limitation, as provided for in Section 4.2(b) hereof), the Debtors may, but shall not be required to, setoff against or recoup from any Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors of any such claim they may have against such claimant.

### 7.10 *Distributions After Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 7.11 *Allocation of Payments under the Prepackaged Plan*.

In the case of distributions with respect to holders of Claims pursuant to the Prepackaged Plan, such distributions shall, for tax purposes only, be allocable first to the principal amount of any such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim. The aggregate original principal amount of the indebtedness incurred by the Stalking Horse under the Stalking Horse Senior Secured Obligations (if applicable) shall reduce, on a dollar-for-dollar basis, the outstanding amount of the obligations under the First Lien Credit Agreement and, if applicable, the Second Lien Credit Agreement.

## ARTICLE VIII

## PROCEDURES FOR TREATING
## CLAIMS UNDER THE PREPACKAGED PLAN

8.1     ***Disputed Claims/Process***.

On and after the Effective Date, except as otherwise provided herein, all Claims shall be paid in the ordinary course of business of the Purchaser if assumed under the Asset Purchase Agreement.  If the Debtors, the Purchaser or any other party in interest disputes any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of Assumed General Unsecured Claims under this Prepackaged Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors.  Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn.  The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this Section 8.1 of the Prepackaged Plan to assert their claims against the Purchaser, solely to the extent the Claim was assumed by the Purchaser under the Asset Purchase Agreement, or against the Post-Effective Date Debtors solely to the extent the Claim was not assumed by the Purchaser and is entitled to a distribution hereunder, in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  Notwithstanding anything to the contrary herein, the Purchaser or any holder of a Disputed Claim shall be entitled to file a motion in the Bankruptcy Court to determine whether any Claim was assumed by the Purchaser under the Asset Purchase Agreement.  Nothing contained in this Section 8.1 shall affect the allowance of Claims pursuant to Section 4.2 or 4.3 of the Prepackaged Plan.

8.2     ***No Postpetition Interest on Claims***.

Except as otherwise specifically provided for herein, in the Confirmation Order or in any other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.

## ARTICLE IX

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

9.1     ***Assumption of Contracts and Leases***.

(a)     <u>General</u>.  Except as otherwise specifically provided herein and the Asset Purchase Agreement, as of the Effective Date, the Debtors shall be deemed to have assumed and assigned to the Purchaser each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a

motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is an Excluded Contract.  All executory contracts and unexpired leases included in subsections (iii) and (iv) of the definition "Excluded Contracts" shall be deemed rejected as of the Effective Date, unless such contract has been previously rejected by the Debtors. Other than certain executory contracts with Affiliates (as such term is defined in the Asset Purchase Agreement), the Debtors are not aware of any executory contracts or unexpired leases that will be rejected by the Debtors on the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions, assumptions and assignments, or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on any schedule.

(b)     Objections to Rejection, Assumption, or Assumption and Assignment.  Any party wishing to object to the rejection, assumption, or assumption and assignment of any executory contract or unexpired lease hereunder or the Cure amount payable with respect to any assumed contract or unexpired lease must follow the instructions described in the notice of the Confirmation Hearing for filing objections to the Prepackaged Plan and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates.  Any counterparty that does not object to the rejection, assumption, or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, and the Cure amount payable upon assumption, shall be deemed to have consented to such rejection, assumption, or assumption and assignment, and the Cure amount payable upon assumption.

9.2     ***Payments Related to Assumption of Contracts and Leases***.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder are in default shall be satisfied promptly, under section 365(b)(1) of the Bankruptcy Code, by the Purchaser upon assumption and assignment thereof.  If there is a

dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption and assignment, Cure shall occur within seven days following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

9.3     ***Claims Based on Rejection of Executory Contracts or Unexpired Leases***.

All Claims arising out of the rejection of executory contracts and unexpired leases shall be Non-Assumed General Unsecured Claims and are not entitled to a distribution hereunder.

9.4     ***Compensation and Benefit Plans and Treatment of Retirement Plan***.

Except to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and employee benefit plans directly sponsored by the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan and assigned to the Purchaser under the Asset Purchase Agreement. Accordingly, the obligations under such plans and programs shall survive confirmation of the Prepackaged Plan, except for (i) executory contracts or benefit plans specifically rejected pursuant to the Prepackaged Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

9.5     ***Insurance Policies***.

Notwithstanding anything contained in the Prepackaged Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, shall be assumed by the Debtors and assigned to Purchaser and continued in accordance with the terms of the Asset Purchase Agreement. Nothing contained in this Section 9.5 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

# ARTICLE X

## CONDITIONS PRECEDENT
## TO EFFECTIVE DATE

10.1     ***Conditions Precedent to Effective Date of Prepackaged Plan***.

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

(a)     Confirmation Order.  The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)     Execution and Delivery of Other Documents.  All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Asset Purchase Agreement and Prepackaged Plan shall have been effectuated, including the documents comprising the Prepackaged Plan Supplement and, in each case, (i) shall have been approved by the Bankruptcy Court and (ii) all conditions to their effectiveness shall have been satisfied or waived pursuant to the terms thereof.

(c)     Regulatory Approvals.  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Prepackaged Plan and that are required by law, regulations, or order.

(d)     NHL Approvals.  The Debtors and the Purchaser (and all Persons and entities related thereto) shall have received all consents and approvals required by NHL to implement the Asset Purchase Agreement and the Prepackaged Plan.

(e)     NHL Consent.  Any amendments to or waivers of this Prepackaged Plan, the Confirmation Order, or any provision thereof in a manner (i) materially adverse to the NHL or any NHL Affiliated Party or (ii) inconsistent with the NHL Rules, has been consented to by the NHL.

(f)     Consents.  All other authorizations, consents, and approvals determined by the Debtors to be necessary to implement the terms of the Asset Purchase Agreement and Prepackaged Plan shall have been obtained.

10.2     ***Effect of Failure of Conditions***.

If the conditions specified in Section 10.1 hereof have not been satisfied by the Termination Date (as defined in the Asset Purchase Agreement) or such later date as may be agreed to in writing by the First Lien Administrative Agent (acting on behalf of the holders of First Lien Secured Claims), the NHL, the Debtors, and the Purchaser, then: (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Prepackaged Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be

restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Prepackaged Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors and the Prepackaged Plan shall be deemed withdrawn.

10.3    ***Reservation of Rights***.

The Prepackaged Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or action taken by the Debtors with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtors or any other party with respect to any Claims or Equity Interests or any other matter.

10.4    ***Substantial Consummation***.

Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## ARTICLE XI

## EFFECT OF CONFIRMATION

11.1    ***Vesting of Assets***.

The property of the Estates that is not specifically disposed of pursuant to the Prepackaged Plan or purchased by Purchaser under the Asset Purchase Agreement, if any, shall vest in the Post-Effective Date Debtors on the Effective Date to be distributed in accordance with the terms of the Prepackaged Plan. All property sold, conveyed, or transferred to the Purchaser is and shall be free and clear of all Liens, Claims, and interests of any kind in accordance with section 363(f) of the Bankruptcy Code, except to the extent the Purchaser has assumed such Liens, Claims, or interests under the Asset Purchase Agreement. Thereafter, the Post-Effective Date Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Post-Effective Date Debtors not sold to the Purchaser shall be free and clear of all Claims, encumbrances, charges, and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order. Following the Effective Date, unless the Discharge of First Lien Obligations has occurred, (i) the First Lien Collateral Agent shall have the right, at its sole discretion at any time prior to, or upon, dissolution of the Debtors' estates, to accept an in-kind distribution of any non-Cash assets remaining in the Debtors' estates and (ii) upon dissolution of the Debtors' estates, the Post-Effective Date Debtors shall distribute any remaining Cash in the Estates to the First Lien Collateral Agent, in each case to be applied by the First Lien Collateral Agent in accordance with the First Lien Security Agreement.

11.2    ***Binding Effect***.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder has accepted the Prepackaged Plan.

11.3    ***Discharge of the Debtors***.

Except as otherwise specifically provided herein and to the extent permitted by applicable law and approved by the Bankruptcy Court, the treatment of all Claims against or Equity Interests in the Debtors under the Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge, and release of, all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, from and after the Commencement Date, or against their Estates or properties or interests in property. Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged, and released in full in exchange for the consideration provided under the Prepackaged Plan. Except as otherwise provided in the Prepackaged Plan, all Persons shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. For the avoidance of doubt, as of the Effective Date, the Post-Effective Date Debtors shall have no liability with respect to any Assumed General Unsecured Claims or other Claims assumed under the Asset Purchase Agreement.

11.4    ***Exculpation***.

***Notwithstanding anything herein to the contrary (but subject to the following proviso), to the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, neither the Debtors, the Post-Effective Date Debtors, the Officer, the Stalking Horse, the Owner Support Parties, the Purchasers, the NHL Affiliated Parties, the Committee, the First Lien Released Parties, the Second Lien Released Parties nor their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any current or former attorneys, financial advisors, investment bankers (specifically including GSP Securities LLC in its capacity as investment banker and financial advisor to the Debtors), accountants, and other professionals retained by such persons), but in each case excluding any Hicks Affiliate, shall have or incur any liability to any holder of a Claim or Equity Interest for any Claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the marketing of the Debtors' assets, the Chapter 11 Cases, the negotiation, pursuit of approval, execution, or performance of the Asset Purchase Agreement, the Stalking Horse Senior Secured Credit Agreement, the Disclosure Statement, the Prepackaged Plan, the Prepackaged Plan Supplement, or any document related to the foregoing, or the solicitation of votes for, or confirmation of, the Prepackaged Plan or the***

*funding of the Prepackaged Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan; provided, however, this Exculpation shall not operate as a release, waiver of discharge of any party in respect of any contractual obligations of such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Purchasers pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court.*

      11.5    *Releases by the Debtors and Stalking Horse*.

      *Except as otherwise specifically provided herein and to the extent permitted by applicable law and approved by the Bankruptcy Court, effective immediately prior to the occurrence of the Effective Date (provided the Effective Date occurs), the releases set forth in section 13.12 of the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) and in the NHL Owner Consent (as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) shall be effective and, except for the right to enforce the Prepackaged Plan, (i) the Debtors and (ii) if the Stalking Horse is the Purchaser, the Purchaser and the Owner Support Parties shall be deemed to forever release, waive and discharge the First Lien Released Parties and the Second Lien Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.  Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any First Lien Released Party or Second Lien Released Party in respect of any contractual obligations of any such First Lien Released Party or Second Lien Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors and assigned to the Purchaser pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court or (ii) any causes of action unknown to the Debtors, the Purchasers, or the Owner Support Parties, respectively, as of the Commencement Date arising out of willful misconduct or gross negligence of any such First Lien Released Party or Second Lien Released Party as determined by a Final Order of the Bankruptcy Court.*

      11.6    *Releases By Holders of Claims.*

      *Except as otherwise specifically provided in this Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, other than the right to enforce the Prepackaged Plan, (a) each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this*

*Section 11.6 shall be deemed to forever release, waive and discharge the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the NHL Released Parties, and the Purchaser Released Parties (if the Stalking Horse is the Purchaser), of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise and (b) the NHL shall be deemed to forever release, waive and discharge each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this Section 11.6 of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise; provided, however, that nothing contained in this Section 11.6 shall operate as a release, waiver or discharge of the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County, or any claims, causes of action, or rights in connection therewith.*

*Notwithstanding the foregoing, (i) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party to receive indemnification or reimbursement pursuant to section 9.6 of the First Lien Credit Agreement, (ii) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party or any other holder of a First Lien Secured Claim against GSP Finance LLC, any Second Lien Administrative Party or any other holder of a Second Lien Secured Claim arising out of (a) the filing of, pursuit of or recovery (if any) from the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County or (b) the Intercreditor Agreement, (iii) on an after the Effective Date, the contractual rights and obligations between and among the First Lien Administrative Parties and holders of First Lien Secured Claims under the First Lien Credit Agreement and related loan documents shall survive and continue with respect to any acts, omissions, facts, matters, transactions or occurrences on or after the Effective Date, and (iv) except as set forth in Section 4.3 of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan. Furthermore, notwithstanding the foregoing, such releases, waivers and discharges shall not operate as a release, waiver or discharge of (i) any First Lien Released Party, any Second Lien Released Party, Debtor Released Party, NHL Released Party or Purchaser Released Party in respect of any contractual obligations of any such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan, (ii) any counterclaims or crossclaims against any First Lien*

***Released Party or any Second Lien Released Party by any NHL Released Party arising out of or related to an action against any NHL Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iii) any counterclaims or crossclaims against any NHL Released Party by a First Lien Released Party arising out of or related to an action against such First Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iv) any counterclaims or crossclaims against any NHL Released Party by a Second Lien Released Party arising out of or related to an action against such Second Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, or (v) any cause of action by a party granting a release under this Section 11.6 against a Released Party that is both unknown as of the Commencement Date to the party granting the release under this Section 11.6 and arises out of or relates to willful misconduct or gross negligence by the Released Party as determined by a Final Order of the Bankruptcy Court.***

### 11.7     *Waiver of Avoidance Actions*.

To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

### 11.8     *Term of Injunctions or Stays*.

(a)     Except as otherwise specifically provided herein, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 11.5 or 11.6 of the Prepackaged Plan (whether in a direct capacity or derivative capacity); *provided, however,* the First Lien Administrative Agent shall not be enjoined from taking any enforcement action with respect to any Lien against assets that it is entitled to receive under Section 11.1 of the Prepackaged Plan.

(b)     Unless otherwise provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy

Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

11.9  ***Indemnification Obligations of the Debtors and Stalking Horse***.

Except to the extent assumed by the Purchaser under the Asset Purchase Agreement or pursuant to an assumed contract or as set forth in section 12.2 of the Asset Purchase Agreement, all contribution or indemnification obligations shall be rejected by the Debtors and classified as Non-Assumed General Unsecured Claims. For the avoidance of doubt and in order to clarify but not to limit any contractual indemnification obligation of the Stalking Horse under the Stalking Horse Senior Secured Credit Agreement and related loan documents, the Purchaser shall not indemnify the holders of First Lien Secured Claims, the holders of Second Lien Secured Claims, the First Lien Administrative Parties, or the Second Lien Administrative Parties, or pay for or reimburse losses, claims, damages, liabilities or related expenses of such parties to the extent arising in connection with or under or pursuant to (1) the First Lien Credit Agreement or any agreements entered into pursuant thereto, (2) the Second Lien Credit Agreement or any agreements entered into pursuant thereto, (3) any agreement with any Hicks Affiliate or any Intercompany Claim, or (4) any matter arising in connection with or under or pursuant to events occurring prior to the Closing Date related to any of the matters referred to in clauses (1) through (4) immediately herein above.

## ARTICLE XII

## <u>RETENTION OF JURISDICTION</u>

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Prepackaged Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)  To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases;

(b)  To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Cases and grant or deny any application involving the Debtors that may be pending on the Effective Date;

(c)  To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Prepackaged Plan;

(d)  To hear and determine any timely objections to the classification of any Claim or Equity Interest, in whole or in part;

(e)  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)     To issue such orders in aid of execution of the Prepackaged Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     To consider any amendments to or modifications of the Prepackaged Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)     To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Asset Purchase Agreement, the Prepackaged Plan, the Confirmation Order, the documents comprising the Prepackaged Plan Supplement, or other document governing or relating to any of the foregoing; *provided, however,* that the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement, NHL Agreements, and NHL/Lender Cooperation Agreement;

(j)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(k)     To hear any other matter not inconsistent with the Bankruptcy Code;

(l)     To hear and determine all disputes involving the existence, scope, and nature of the discharges granted under Section 11.3 of the Prepackaged Plan;

(m)     To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 11.4 of the Prepackaged Plan;

(n)     To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Prepackaged Plan; and

(o)     To enter a final decree(s) closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS

13.1     *Payment of Statutory Fees*.

All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Purchaser on the Effective Date.

13.2    ***Filing of Additional Documents***.

The Debtors or the Post-Effective Date Debtors, as applicable, may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan.

13.3    ***Schedules and Exhibits Incorporated***.

All exhibits and schedules to this Prepackaged Plan, including the Prepackaged Plan Supplement, are incorporated into and are a part of the Prepackaged Plan as if fully set forth herein.

13.4    ***Amendment or Modification of the Prepackaged Plan***.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments, or modifications of the Prepackaged Plan may be proposed in writing by the Debtors at any time prior to or after the Confirmation Date.  Holders of Claims that have accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan, as altered, amended, or modified, *provided* that there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion, *provided, further,* that such alteration, amendment, or modification may not materially and adversely change the treatment of the Claim of such holder; and *provided, further*, *however*, that any holders of Claims that were deemed to accept the Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept the Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

13.5    ***Inconsistency***.

In the event of any inconsistency among the Prepackaged Plan, the Disclosure Statement, and any exhibit or schedule to the Disclosure Statement, the provisions of the Prepackaged Plan shall govern.  In the event of any inconsistency between the Prepackaged Plan and the Confirmation Order, the Confirmation Order shall govern.

13.6    ***Section 1125(e) of the Bankruptcy Code***.

As of the Confirmation Date, the Debtors (including the Post-Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Prepackaged Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Prepackaged Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities under the Prepackaged Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation and release provisions set forth in Article XI of the Prepackaged Plan.

### 13.7     *Preservation of Rights of Action; Settlement of Litigation Claims*.

Except as otherwise specifically provided herein or in the Asset Purchase Agreement, or in any contract, instrument, release, or other agreement entered into in connection with the Prepackaged Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors or the Purchaser (to the extent transferred to the Purchaser) shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person or entity without the approval of the Bankruptcy Court.  The Post-Effective Date Debtors or their successor(s), including the Purchaser, may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Post-Effective Date Debtors or their successor(s), including the Purchaser, that hold such rights.

### 13.8     *Compromise of Controversies*.

In consideration for the distributions and other benefits provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Prepackaged Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

### 13.9     *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Prepackaged Plan, including the Asset Purchase Agreement, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

13.10 *Compliance with Tax Requirements*.

In connection with the Prepackaged Plan and all distributions thereunder, any party issuing any instruments or making any distribution under the Prepackaged Plan, including any party described in Section 7.3 hereof, shall, to the extent applicable as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Prepackaged Plan shall be subject to any such withholding and reporting requirements. Each such party shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims shall be required to provide completed Forms W-8, W-9 and/or any other forms or information necessary to effect information reporting and the withholding of such taxes, as determined by the applicable party issuing any instruments or making any distribution under the Prepackaged Plan. Notwithstanding any other provisions of the Prepackaged Plan to the contrary, with respect to any Allowed Claim the payment of which is subject to any withholding tax (i) each holder of such an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distributions, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Prepackaged Plan unless and until such holder has made arrangements satisfactory to the applicable party issuing any instruments or making any distribution under the Prepackaged Plan for the payment and satisfaction of such tax obligations. Any Cash, Stalking Horse Senior Secured Obligations, documents, and/or other consideration or property to be distributed pursuant to the Prepackaged Plan shall, pending the receipt of such forms and/or implementation of such arrangements, be treated as an unclaimed distribution pursuant to Section 7.7(a) herein. Any party issuing any instruments or making any distribution under the Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has provided the necessary tax forms or information and/or made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

13.11 *Determination of Tax Filings and Taxes*.

The Post-Effective Date Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

13.12 *Severability of Provisions in the Prepackaged Plan*.

If, prior to Confirmation, any term or provision of the Prepackaged Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, upon consultation with the Purchaser and the NHL, and provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such

holding, alteration, or interpretation, the remainder of the terms and provisions of the Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.13   *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent the Stalking Horse Senior Secured Credit Agreement or any exhibit to the Prepackaged Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

### 13.14   *Notices*.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly specifically provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Attention:  Martin A. Sosland
> Facsimile:  (214) 746-7777
> Email:  martin.sosland@weil.com
>
> and
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York  10153
> Attention:  Ronit J. Berkovich
> Facsimile:  (212) 310-8007
> Email: ronit.berkovich@weil.com
>
> with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attention: John H. Knight
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: knight@rlf.com


      13.15  ***Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment***.

      Any Committee appointed in the Chapter 11 Cases shall be dissolved on the Effective Date.  The Post-Effective Date Debtors shall no longer be responsible for paying any fees and expenses incurred by the advisors to any Committee after the Effective Date.

US_ACTIVE:\43794806\03\40036.0005

Dated:  September 1, 2011

Respectfully submitted,

**DALLAS STARS, L.P.**

By:    /s/ *Robert Hutson*
    Name:  Robert Hutson
    Title:  Chief Financial Officer

**DALLAS ARENA LLC**

By:    /s/ *Robert Hutson*
    Name:  Robert Hutson
    Title:  Chief Financial Officer

**DALLAS STARS U.S. HOLDINGS CORP.**

By:    /s/ *Robert Hutson*
    Name:  Robert Hutson
    Title:  Treasurer

**STARCENTERS LLC**

By:    /s/ *Robert Hutson*
    Name:  Robert Hutson
    Title:  Chief Financial Officer

COUNSEL:


___*/s/ Martin A. Sosland*___
John H. Knight
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19081
(302) 651-7700

       and

Martin A. Sosland
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
(214) 746-7700

Ronit J. Berkovich
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000


ATTORNEYS FOR THE DEBTORS

**<u>Exhibit A</u>**

Consent to Release Form by Second Lien Administrative Party

**Return Completed Form To:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention:  Martin A. Sosland
Facsimile:  (214) 746-7777
Email:  martin.sosland@weil.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:  Ronit J. Berkovich
Facsimile:  (212) 310-8007
Email: ronit.berkovich@weil.com

with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attention: John H. Knight
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: knight@rlf.com


I hereby certify that as a duly authorized representative of a Second Lien Administrative Party, as set forth in the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al. Under Chapter 11 of the Bankruptcy Code (the "Prepackaged Plan"), I hereby elect to be a Second Lien Released Party (as defined in the Prepackaged Plan) by consenting to the releases set forth in Sections 11.5 and 11.6 of the Prepackaged Plan.


Print Name of Second Lien Administrative Party: _____

Signature: _____

Title: _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Date Completed: _____