# EXHIBIT C

Stalking Horse Asset Purchase Agreement

***This Agreement (as defined below) is intended for discussion purposes only, is non-binding, and the rights, obligations and remedies contained herein are subject to, among other things, (a) the negotiation, documentation and execution of definitive documents by the parties hereto and (b) authorization and approval of the execution by the National Hockey League. Only execution and delivery of definitive documentation by the parties hereto shall result in any binding or enforceable obligations of any party relating to the transactions described herein.***

ASSET PURCHASE AGREEMENT[1]

among

DALLAS STARS, L.P.,

DALLAS ARENA LLC,

STARCENTERS LLC and

DALLAS STARS U.S. HOLDINGS CORP.

as Sellers,

and

DALLAS SPORTS & ENTERTAINMENT, L.P.,

DSE HOCKEY CLUB, L.P.,

DSE HOCKEY CENTERS, L.P., and

DSE PLANO GP, INC.

as Purchasers

Dated as of [_____], 2011

---

[1] Note: Subject to comment and approval by NHL and applicable Lenders.

# TABLE OF CONTENTS

Article I      DEFINITIONS ................................................................................ 2

     1.1     Certain Definitions ......................................................................... 2

     1.2     Other Definitional and Interpretive Matters ....................................... 20

Article II     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ....................................................................... 22

     2.1     Purchase and Sale of Assets ........................................................... 22

     2.2     Excluded Assets ........................................................................... 23

     2.3     Assumption of Liabilities ............................................................... 24

     2.4     Excluded Liabilities ...................................................................... 26

     2.5     Cure Amounts ............................................................................. 27

     2.6     Further Conveyances and Assumptions; Consent of Third Parties ............ 27

     2.7     Bulk Sales Laws .......................................................................... 28

Article III    CONSIDERATION ......................................................................... 28

     3.1     Consideration .............................................................................. 28

     3.2     Purchase Price Deposit ................................................................. 29

     3.3     Payment of Purchase Price ............................................................. 30

     3.4     Purchase Price Adjustment ............................................................ 31

Article IV    CLOSING AND TERMINATION ....................................................... 33

     4.1     Closing Date ............................................................................... 33

     4.2     Termination of Agreement ............................................................. 33

     4.3     Procedure Upon Termination .......................................................... 35

     4.4     Effect of Termination .................................................................... 35

Article V     REPRESENTATIONS AND WARRANTIES OF DALLAS STARS .............. 37

     5.1     Organization and Good Standing ..................................................... 37

     5.2     Authorization of Agreement ........................................................... 37

     5.3     Conflicts; Consents of Third Parties ................................................. 38

     5.4     Capitalization .............................................................................. 38

     5.5     Financial Statements ..................................................................... 39

     5.6     Accounts Receivable ..................................................................... 40

     5.7     Title to Purchased Assets; Sufficiency .............................................. 40

     5.8     Absence of Certain Developments .................................................... 41

# TABLE OF CONTENTS

5.9 Taxes .................................................................................................... 41

5.10 Real Property ...................................................................................... 42

5.11 Tangible Personal Property ................................................................ 43

5.12 Intellectual Property .......................................................................... 43

5.13 Stars Material Contracts .................................................................... 44

5.14 Employee Benefits ............................................................................. 46

5.15 Labor .................................................................................................. 48

5.16 Litigation ........................................................................................... 48

5.17 Compliance with Laws; Permits ....................................................... 48

5.18 Environmental Matters ...................................................................... 48

5.19 Insurance ............................................................................................ 49

5.20 NHL Matters ...................................................................................... 50

5.21 Player Matters .................................................................................... 50

5.22 Deferred Compensation Liability ...................................................... 50

5.23 No Guarantees .................................................................................... 50

5.24 Indebtedness for Borrowed Money .................................................... 50

5.25 Financial Advisors ............................................................................. 50

5.26 Related Party Transactions ................................................................ 50

5.27 Non-reliance of Dallas Stars ............................................................. 51

Article VI REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA ............. 52

6.1 Organization and Good Standing ...................................................... 52

6.2 Authorization of Agreement .............................................................. 52

6.3 Conflicts; Consents of Third Parties ................................................. 52

6.4 Capitalization ..................................................................................... 53

6.5 Financial Statements .......................................................................... 54

6.6 Absence of Certain Developments ..................................................... 54

6.7 Taxes .................................................................................................. 54

6.8 Real Property ...................................................................................... 55

6.9 Tangible Personal Property ................................................................ 56

6.10 Intellectual Property .......................................................................... 56

6.11 Arena Material Contracts ................................................................... 57

6.12 Employee Benefits ............................................................................. 59

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 6.13 | Labor | 59 |
| 6.14 | Litigation | 60 |
| 6.15 | Compliance with Laws; Permits | 60 |
| 6.16 | Environmental Matters | 60 |
| 6.17 | Insurance | 61 |
| 6.18 | Financial Advisors | 61 |
| 6.19 | Related Party Transactions | 61 |
| 6.20 | Non-reliance of Dallas Arena | 61 |
| Article VII | REPRESENTATIONS AND WARRANTIES OF PURCHASERS | 62 |
| 7.1 | Organization and Good Standing | 62 |
| 7.2 | Authorization of Agreement | 62 |
| 7.3 | Conflicts; Consents of Third Parties | 63 |
| 7.4 | Litigation | 63 |
| 7.5 | Financial Advisors | 63 |
| 7.6 | Investment Intention | 63 |
| 7.7 | Financial Capability | 64 |
| 7.8 | NHL Information Requirements | 64 |
| 7.9 | Non-reliance of Purchasers | 64 |
| Article VIII | BANKRUPTCY COURT MATTERS | 65 |
| 8.1 | Competing Transaction | 65 |
| 8.2 | Sellers' Chapter 11 Bankruptcy Cases | 65 |
| 8.3 | Confirmation Order | 66 |
| 8.4 | Cooperation in Bankruptcy Court Matters | 66 |
| 8.5 | Break Up Fee and Expense Reimbursement | 67 |
| 8.6 | Leases and Contracts | 67 |
| 8.7 | Notice to Parties-in-Interest | 67 |
| Article IX | COVENANTS | 68 |
| 9.1 | Access to Information | 68 |
| 9.2 | Conduct of the Business Pending the Closing | 69 |
| 9.3 | Consents | 71 |
| 9.4 | Regulatory Approvals | 71 |
| 9.5 | Further Assurances | 73 |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 9.6 | Confidentiality | 73 |
| 9.7 | Preservation of Records | 73 |
| 9.8 | Publicity | 74 |
| 9.9 | NHL Approvals | 74 |
| 9.10 | Stars Foundation | 74 |
| 9.11 | Senior Secured Loan | 74 |
| 9.12 | Guarantee | 75 |
| 9.13 | Disclosure Schedules; Supplementation and Amendment of Schedules | 75 |
| 9.14 | Insurance | 76 |
| 9.15 | Change of Name | 77 |
| 9.16 | Bankruptcy Compliance | 77 |
| 9.17 | Plano StarCenter | 77 |
| Article X | EMPLOYEES AND EMPLOYEE BENEFITS | 78 |
| 10.1 | Employment | 78 |
| 10.2 | Employee Benefits | 79 |
| Article XI | CONDITIONS TO CLOSING | 80 |
| 11.1 | Conditions Precedent to Obligations of Purchasers | 80 |
| 11.2 | Conditions Precedent to Obligations of Sellers | 81 |
| 11.3 | Conditions Precedent to Obligations of Sellers and Purchasers | 81 |
| 11.4 | Frustration of Closing Conditions | 82 |
| Article XII | SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES | 82 |
| 12.1 | Survival | 82 |
| 12.2 | Indemnification by Sellers | 83 |
| 12.3 | Indemnification by Purchasers | 83 |
| 12.4 | Indemnification Procedures | 84 |
| 12.5 | Certain Limitations on Indemnification | 85 |
| 12.6 | Calculation of Losses | 86 |
| 12.7 | Tax Treatment of Indemnity Payments | 86 |
| 12.8 | Specific Performance | 87 |
| 12.9 | Exclusive Remedy | 87 |
| 12.10 | Nature of Representations and Warranties; Schedules | 88 |
| 12.11 | DTPA WAIVER | 88 |

# TABLE OF CONTENTS

12.12   Limitation of Lender Liability ........................................................................... 89

12.13   Purchasers' Rights ........................................................................................ 89

Article XIII   MISCELLANEOUS ...................................................................................... 89

13.1   Tax Matters ................................................................................................. 89

13.2   Expenses ..................................................................................................... 90

13.3   Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury ................................................................................... 90

13.4   Entire Agreement ........................................................................................ 91

13.5   Amendments and Waivers ........................................................................... 91

13.6   Governing Law ........................................................................................... 92

13.7   Notices ....................................................................................................... 92

13.8   Severability ................................................................................................ 93

13.9   Binding Effect; Third Party Beneficiaries; Assignment ..................................... 93

13.10   Non-Recourse ............................................................................................ 94

13.11   Legal Representation ................................................................................... 94

13.12   General Releases ........................................................................................ 94

13.13   Counterparts ............................................................................................... 96

13.14   Sellers' Representative ................................................................................. 96

Exhibits

| | |
|---|---|
| A | Plan of Reorganization |
| B | Disclosure Statement |
| C | Bidding Procedures Order |
| D | Confirmation Order |
| E | Escrow Agreement |
| F | NHL Owner Consent |
| G | NHL/Lender Cooperation Agreement |
| H | NHL Guaranty |
| I | Purchaser/NHL Proxy |
| J | Senior Secured Loan |
| K | Bill of Sale |
| L | Assignment and Assumption Agreement |

Schedules

| | |
|---|---|
| A | Pro Forma Balance Sheet |
| B | Pro Forma NWC |
| C | Pro Forma Purchase Price |
| 1.1(a)(i) | Non-Excluded Affiliate Contracts |
| 1.1(a)(ii) | Excluded Contracts |
| 1.1(b) | NHL Documents |
| 1.1(c) | Permitted Exceptions |
| 2.1(b) | Excluded Contracts—Accounts Receivable |
| 2.2(e) | Excluded Assets—Deposits, Prepaid Charges and Prepaid Expenses |
| 2.3(h) | Beneficiary Contracts |
| 2.3(i) | Affiliate Guarantees |
| 5.3(a) | Dallas Stars Conflicts |
| 5.3(b) | Dallas Stars Consents of Third Parties |
| 5.4(a) | Dallas Stars Capitalization |
| 5.4(f)(i) | Dallas Stars Required Equity Issuances |
| 5.4(f)(ii) | Dallas Stars Voting Trusts |
| 5.4(g) | Dallas Stars Entity Information |
| 5.5 | Dallas Stars Financial Statements |
| 5.6 | Dallas Stars Accounts Receivable |
| 5.7(a) | Dallas Stars Condition of Purchased Assets |
| 5.7(b) | Dallas Stars Continued Ownership of Purchased Assets |
| 5.7(c)(i) | Dallas Stars Title to Purchased Assets |
| 5.7(c)(ii) | Dallas Stars Sufficiency of Purchased Assets |
| 5.8 | Dallas Stars Absence of Certain Developments |
| 5.9 | Dallas Stars Taxes |
| 5.10(a)(i) | Dallas Stars Owned Property |
| 5.10(a)(ii) | Dallas Stars Owned Property Liens |
| 5.10(b) | Dallas Stars Real Property Leases |

5.10(c)(i)    Dallas Stars Real Property Insurance Claims
5.10(c)(ii)   Dallas Stars Structural Matters
5.11          Dallas Stars Personal Property Leases
5.12(a)       Dallas Stars Registered Intellectual Property
5.12(b)       Dallas Stars – Purchased Intellectual Property – Ownership or Valid Licenses
5.12(c)       Dallas Stars – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property
5.12(d)       Dallas Stars – Purchased Intellectual Property – Violations and Infringements by Third Parties
5.13(a)       Dallas Stars Material Contracts
5.13(b)       Dallas Stars Material Contract Defaults
5.14(a)       Dallas Stars Employee Benefit Plans
5.14(d)       Dallas Stars Benefit Plan Actions, Suits or Claims
5.14(e)       Dallas Stars Transaction Effects on Benefits
5.15(a)       Dallas Stars Labor or Collective Bargaining Agreements
5.15(b)       Dallas Stars Labor Strikes, Grievances, and Related Matters
5.16          Dallas Stars Litigation
5.18          Dallas Stars Environmental Matters
5.19          Dallas Stars Insurance
5.20(b)       CFV Debt Amount
5.21          Player Matters
5.22          Deferred Compensation Liability
5.23          Dallas Stars Guarantees
5.24          Dallas Stars Indebtedness
5.25          Financial Advisors of Dallas Stars
5.26          Dallas Stars Related Party Transactions
6.3(a)        Dallas Arena Conflicts
6.3(b)        Dallas Arena Consents of Third Parties
6.4(d)(i)     Dallas Arena Required Equity Issuances
6.4(d)(ii)    Dallas Arena Voting Trusts
6.5           COC Financial Statements
6.6           Dallas Arena Absence of Certain Developments
6.7           Dallas Arena Taxes
6.8(b)        Dallas Arena Real Property Leases
6.8(c)        Dallas Arena Real Property Insurance Claims
6.9           COC Personal Property Lease Defaults
6.10(a)       Dallas Arena Registered Intellectual Property
6.10(b)       Dallas Arena – Purchased Intellectual Property – Ownership or Valid Licenses
6.10(c)       Dallas Arena – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property
6.10(d)       Dallas Arena – Purchased Intellectual Property – Violations and Infringement by Third Parties
6.11(a)       Dallas Arena Material Contracts
6.11(b)       COC Material Contracts
6.11(c)       Dallas Arena Material Contract Defaults

| 6.11(d) | COC Material Contract Defaults |
|---------|-------------------------------|
| 6.13(a) | Dallas Arena Labor or Collective Bargaining Agreements |
| 6.13(b) | Dallas Arena Labor Strikes, Grievances, and Related Matters |
| 6.14 | Dallas Arena Litigation |
| 6.16 | Dallas Arena Environmental Matters |
| 6.17 | Dallas Arena Insurance |
| 6.18 | Financial Advisors of Dallas Arena |
| 6.19 | Dallas Arena Related Party Transactions |
| 7.3 | Purchaser Conflicts |
| 7.5 | Financial Advisors of Purchaser |
| 9.2(a) | Conduct of the Business – Required Conduct |
| 9.2(b) | Conduct of the Business – Prohibited Conduct |
| 10.1(a) | Employees of Dallas Stars |
| 10.1(d) | Severance |
| 11.3(d) | Required Consents |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [_____], 2011, among Dallas Stars, L.P., a Delaware limited partnership ("Dallas Stars"), Dallas Arena LLC, a Texas limited liability company ("Dallas Arena"), StarCenters LLC, a Texas limited liability company ("StarCenters"), Dallas Stars U.S. Holdings Corp., a Delaware corporation ("U.S. Holdings" and collectively with Dallas Stars, Dallas Arena and StarCenters, "Sellers" and each, a "Seller"), and Dallas Sports & Entertainment, L.P., a Delaware limited partnership ("DSE"), DSE Hockey Club, L.P., a Delaware limited partnership ("Hockey Club"), DSE Hockey Centers, L.P., a Delaware limited partnership ("Hockey Centers"), DSE Plano GP, Inc., a Delaware corporation ("DSE Plano" and collectively with DSE, Hockey Club and Hockey Centers, "Purchasers" and each, a "Purchaser"), and, solely with respect to Sections 9.12 and 12.8 and Article XIII of this Agreement, Tom Gaglardi, an individual resident of Vancouver, British Columbia ("Guarantor").

## RECITALS:

1.      Dallas Stars owns and operates a professional hockey team that is a member of the National Hockey League (the "NHL") and is known as the Dallas Stars (the "Stars"), and leases and operates (i) the Dr Pepper Arena in Frisco, which is the practice facility home to the Stars and home arena for the Texas Tornado of the North American Hockey League and the Texas Legends of the NBA Development League, (ii) the Dr Pepper StarCenter in Euless, (iii) the Dr Pepper StarCenter in Farmers Branch, and (iv) the Dr Pepper StarCenter in McKinney at Craig Ranch (collectively, the "Leased StarCenters");

2.      Dallas Stars subleases the arena located at 2500 Victory Avenue, Dallas, Texas and known as the American Airlines Center ("AAC") as the home ice arena for the Stars;

3.      Each of StarCenters, Plano StarCenter, LLC, a Texas limited liability company ("Plano StarCenter"), and U.S. Holdings, is a direct wholly-owned Subsidiary of Dallas Stars;

4.      StarCenters is the employer of all personnel of the Dr Pepper StarCenters (as defined below);

5.      Plano StarCenter owns the Dr Pepper StarCenter located in Plano, Texas (collectively with the Leased StarCenters, the "Dr Pepper StarCenters");

6.      U.S. Holdings owns a 1% equity interest in Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company ("Hockey Enterprises"). Dallas Stars owns a 99% equity interest in Hockey Enterprises. Hockey Enterprises holds a limited partnership interest in NHL Enterprises Canada, L.P. and is a stockholder of National Hockey League Enterprises Canada, Inc., which is the general partner of NHL Enterprises Canada, L.P.;

7.      Dallas Arena owns a 50% member interest in Center GP, LLC, a Texas limited liability company ("Center GP"), and a 49.95% limited partner interest in Center Operating Company, L.P., a Texas limited partnership ("COC"). Center GP owns a 0.1% general partner

interest in COC. COC leases and operates the AAC and owns the issued and outstanding stock of Arena Operating Company, Inc., a Texas corporation;

8.      Each of StarCenters, Plano StarCenter, U.S. Holdings and Hockey Enterprises (collectively, the "Stars Subsidiaries"), Dallas Arena and Dallas Stars is a direct or indirect, wholly-owned Subsidiary of HSG Sports Group LLC, a Texas limited liability company ("HSG"), which is ultimately majority-owned by Hicks;

9.      Sellers have solicited the Lenders (as defined in Section 1.1), and have obtained approval of the Requisite Lenders, for acceptance of a plan of reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the terms set forth on Exhibit A (as it may be amended from time to time consistent with this Agreement, the "Plan") pursuant to a Disclosure Statement in substantially the form attached as Exhibit B hereto (the "Disclosure Statement") and in accordance with section 1126(b) of the Bankruptcy Code and Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

10.     Within two (2) Business Days after the execution of this Agreement, Sellers propose to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such proceedings, collectively, the "Bankruptcy Case") and, simultaneously therewith, file motions seeking (i) approval of the Disclosure Statement and confirmation of the Plan; and (ii) Bankruptcy Court approval of the Bidding Procedures Order (as defined in Section 1.1); and

11.     Sellers intend, pursuant to the terms of the final form of the Bidding Procedures Order approved by the Bankruptcy Court and the Plan, to conduct a sales process to sell all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

In consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"AAC" has the meaning given in the Recitals.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding the fact that HSG no longer

controls Sellers or the Stars Subsidiaries by virtue of the NHL Proxy, for purposes of this Agreement, a Hicks Affiliate shall nevertheless be considered an Affiliate of Sellers.  For the avoidance of doubt, neither COC, any Subsidiary of COC, Center GP, the NHL nor any NHL Entity or other NHL Affiliated Party shall be considered an Affiliate of any Seller or any of the Transferred Subsidiaries.

"Aggregate Purchaser Termination Amount" has the meaning given in Section 4.4(d).

"Aggregate Seller Termination Amount" has the meaning given in Section 4.4(d).

"Agreement" has the meaning given in the Preamble.

"Antitrust Fees" has the meaning given in Section 9.4(b).

"Antitrust Laws" has the meaning given in Section 9.4(b).

"Arena Associate" has the meaning given in Section 6.19.

"Arena Material Contract" has the meaning given in Section 6.11(a).

"Associate" has the meaning given in Section 5.26.

"Assumed Liabilities" has the meaning given in Section 2.3.

"Auction" has the meaning given in the Bidding Procedures Order.

"Back-Up Bidder" has the meaning given in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning given in the Recitals.

"Bankruptcy Code" has the meaning given in the Recitals.

"Bankruptcy Court" has the meaning given in the Recitals.

"Bankruptcy Petitions" has the meaning given in the Recitals.

"Bankruptcy Rules" has the meaning given in the Recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in substantially the form attached as Exhibit C hereto, with such changes as may be required by the Bankruptcy Court that are not materially adverse to Purchasers or Sellers, that, among other things, (i) approves the payment of the Break-Up Fee on the terms and conditions set forth in Section 8.5 hereof and (ii) establishes a date by which Competing Bids must be submitted by bidders and establishes procedures for the Auction process.

"Break-Up Fee" has the meaning given in Section 8.5(a).

"Broker" has the meaning given in Section 5.25.

"<u>Business</u>" means the business comprised of the Purchased Assets as currently owned and operated by Sellers and the Transferred Subsidiaries, including, without limitation, the business of operating the Stars.

"<u>Business Day</u>" means any day of the year on which national banking institutions in Texas are open to the public for conducting business and are not required or authorized to close.

"<u>Center GP</u>" has the meaning given in the Recitals.

"<u>CFV Debt Agreement</u>" means that certain promissory note dated January 14, 2011, in the stated principal amount of $45,000,000, made by Dallas Stars and payable to CFV I LLC, an Affiliate of the NHL, as amended from time to time.

"<u>CFV Debt Amount</u>" means the amount owed by Dallas Stars to CFV I LLC, an Affiliate of the NHL, pursuant to the CFV Debt Agreement.

"<u>Clayton Act</u>" means the Clayton Antitrust Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"<u>Closing</u>" has the meaning given in <u>Section 4.1</u>.

"<u>Closing Balance Sheet</u>" has the meaning given in <u>Section 3.4(b)</u>.

"<u>Closing Date</u>" has the meaning given in <u>Section 4.1</u>.

"<u>Closing Documents</u>" has the meaning given in <u>Section 3.4(b)</u>.

"<u>Closing NWC</u>" has the meaning given in <u>Section 3.4(b)</u>.

"<u>COC</u>" has the meaning given in the Recitals.

"<u>COC Entities</u>" means, collectively, (i) COC and (ii) Center GP.

"<u>COC Equity Interests</u>" means (i) the 50% member interest in Center GP held by Dallas Arena; and (ii) the 49.95% limited partnership interest in COC held by Dallas Arena.

"<u>COC Interim Balance Sheet</u>" has the meaning given in <u>Section 6.5</u>.

"<u>COC Interim Balance Sheet Date</u>" has the meaning given in <u>Section 6.5</u>.

"<u>COC Financial Statements</u>" has the meaning given in <u>Section 6.5</u>.

"<u>COC Material Contract</u>" has the meaning given in <u>Section 6.11(b)</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Collective Bargaining Agreement</u>" means the Collective Bargaining Agreement, dated as of July 22, 2005, by and between the NHL and the NHLPA.

"Commitment Termination Date" has the meaning given in the Senior Secured Loan.

"Competing Bid" means a Qualified Bid other than a Qualified Bid of the Purchasers.

"Confidentiality Agreement" has the meaning given in Section 9.6(a).

"Confirmation Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes as may be required by the Bankruptcy Court; provided, however, if Purchasers are deemed to have the highest or best bid by Sellers, any changes to the form of the Confirmation Order affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion.

"Continuing Employees" has the meaning given in Section 10.1(c).

"Contract" means any written contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license.

"control" (including the terms "controlled by" and "under common control with") has the meaning given in Section 1.1 (in the definition of "Affiliate").

"Copyrights" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Cumulative Budgeted Loss" means the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries as at the end of each of (i) September 2011 of $0, (ii) October 2011 (cumulative of September and October 2011) of ($4,866,731), (iii) November 2011 (cumulative of September, October and November 2011) of ($11,123,247), and (iv) December 2011 (cumulative of September, October, November and December 2011) of ($15,058,541); provided that for August 2011 and any month prior to August 2011, the amount of the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries shall be deemed to be zero.

"Currency Agreement" means, with respect to any Person, any foreign exchange Contract, currency swap agreement, futures Contract, option Contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"Dallas Arena" has the meaning given in the Preamble.

"Dallas Arena Documents" has the meaning given in Section 6.2.

"Dallas Stars" has the meaning given in the Preamble.

"Dallas Stars Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Documents" has the meaning given in Section 5.2.

"Dallas Stars Financial Statements" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet Date" has the meaning given in Section 5.5.

"Disclosure Statement" has the meaning given in the Recitals.

"Dispute Notice" has the meaning given in Section 3.4(c)(ii).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related exclusively to, or necessary for the operation of, the Business and the Purchased Assets in each case whether or not in electronic form.

"Domain Names" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Dr Pepper StarCenters" has the meaning given in the Recitals.

"DSE" has the meaning given in the Preamble.

"DSE Plano" has the meaning given in the Preamble.

"Employee" means all employees, as of the date hereof, whether or not actively at work as of the date hereof, of Dallas Stars or any of the Stars Subsidiaries, together with individuals who are hired by Dallas Stars or any Stars Subsidiary after the date hereof and prior to the Closing.

"Employee Benefit Plans" means all material "employee benefit plans," as defined in Section 3(3) of ERISA, all individual consulting, employment or compensation agreements, and all other material plans or agreements providing for bonus, incentive, equity or equity-based compensation, stock purchase, pension, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, life insurance or scholarship maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or is obligated to contribute thereunder for current or former employees of Sellers and their respective Subsidiaries primarily in respect of the Business.

"Environmental Law" means any applicable Law currently in effect relating to the protection of the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and

the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"Environmental Permits" has the meaning given in Section 5.18(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning given in Section 3.2.

"Escrow Agreement" has the meaning given in Section 3.2.

"Escrowed Funds" has the meaning given in Section 3.2.

"Estimated Closing Balance Sheet" has the meaning given in Section 3.4(a).

"Excess Cash Payment" has the meaning given in Section 3.1(d).

"Excluded Assets" has the meaning given in Section 2.2.

"Excluded Contracts" means the following Contracts: (i) this Agreement and the other documents related to this Agreement or the transactions contemplated hereby, (ii) all Contracts between any Seller and any broker, investment banker or similar advisor relating to this Agreement or the transactions contemplated hereby (other than GSP), (iii) all Contracts between any Seller and any Affiliate of Sellers or any other Hicks Affiliate (other than Contracts to which the only parties that are Affiliates of any Seller or any other Hicks Affiliate consist of (A) any Seller and any other Seller or (B) any Seller and any Transferred Subsidiary), except as set forth in Schedule 1.1(a)(i), (iv) the Contracts listed on Schedule 1.1(a)(ii) and (v) all Contracts relating to the Senior Indebtedness.

"Excluded Equity Interests" means the StarCenters Equity Interests and the U.S. Holdings Shares.

"Excluded Insurance Claim" has the meaning given in Section 9.14(b).

"Excluded Insurance Policy" has the meaning given in Section 9.14(b).

"Excluded Liabilities" has the meaning given in Section 2.4.

"Excluded Matter" has the meaning given in Section 1.1 (in the definition of "Material Adverse Effect").

"Excluded NWC Amounts" means each of the following:

(i)      all Liabilities, including any reserve or accrual for Liability, of Dallas Arena and the COC Entities, including, but not limited to, those set forth on, reserved for or accrued for on the COC Financial Statements;

(ii)      all Liabilities, including any reserve or accrual for Liability, for Texas franchise or margin Tax in excess of Tax accruals calculated in accordance with the past

practices of Dallas Stars, including (i) Liabilities as a result of any Sellers' joint and several liability and (ii) Liabilities relating to or resulting from the consummation of the transactions contemplated by the Agreement;

(iii)    all Liabilities, including any reserve or accrual for Liability, for Liability for sales Taxes, in excess of Tax accruals for the then current and following month periods calculated in accordance with the past practices of Dallas Stars;

(iv)    all Liabilities, including any reserve or accrual for Liability, for the non-current portion of any unearned revenue or deferred expense; and

(v)    all Liabilities, including any reserve or accrual for Liability, related to the Plano StarCenter property damage.

"Expense Reimbursement" has the meaning given in Section 8.5(a).

"Family" means, with respect to any natural person, such person's spouse and children (including adopted and step children).

"Federal Trade Commission Act" means the Federal Trade Commission Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"Final NWC" has the meaning given in Section 3.4(c)(i), Section 3.4(d) or Section 3.4(e), as applicable.

"First Lien Agent" means JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent under the First Lien Credit Agreement.

"First Lien Cash Payment" has the meaning set forth in Section 3.1(e).

"First Lien Credit Agreement" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, Barclays Bank PLC, as Co-Syndication Agent and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, as amended from time to time.

"First Lien Lender" means any Lender under the First Lien Credit Agreement.

"Former Employee" means all individuals (including common law employees, individual independent contractors and individual consultants) who were employed or engaged by or on behalf of Dallas Stars or any of the Stars Subsidiaries (it being understood that prior to January 1, 2011, all employees employed or engaged on behalf of Dallas Stars or any of the Stars Subsidiaries were employed by HSG on behalf of Dallas Stars and the Stars Subsidiaries), but who are no longer so employed or engaged as of the Closing Date.

"FTC" means the Federal Trade Commission.

"<u>Furniture and Equipment</u>" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property, including all artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, that are owned by Dallas Stars.

"<u>GAAP</u>" means generally accepted accounting principles in the United States as of the date hereof.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"<u>GSP</u>" means GSP Securities LLC.

"<u>Guarantor</u>" has the meaning given in the Preamble.

"<u>Hardware</u>" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"<u>Hedge Agreement</u>" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender counterparty in connection with or to satisfy the requirements of the First Lien Credit Agreement or the Second Lien Credit Agreement, including the (i) ISDA Master Agreement, dated as of December 5, 2001, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, (ii) ISDA Master Agreement, dated as of February 9, 2006, as amended and supplemented from time to time, between Wachovia Bank, National Association and HSG, (iii) ISDA Master Agreement, dated as of March 9, 2006, as amended and supplemented from time to time, between Goldman Sachs Capital Markets, L.P. and HSG, (iv) ISDA Master Agreement, dated as of June 26, 2006, as amended and supplemented from time to time, between Sovereign Bank and HSG, (v) ISDA Master Agreement, dated as of June 28, 2006, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, and (vi) ISDA Master Agreement, dated as of September 15, 2006, as amended and supplemented from time to time, between Barclays Bank Plc and HSG.

"<u>Hicks</u>" means Thomas O. Hicks, in his individual capacity.

"<u>Hicks Affiliate</u>" means Hicks, his Family or any trust for the benefit of him or his Family or any Person (other than Sellers or any Transferred Subsidiary) controlled by Hicks, his Family, or any trust for the benefit of him or his Family.

"<u>Hockey Centers</u>" has the meaning given in the Preamble.

"<u>Hockey Club</u>" has the meaning given in the Preamble.

"<u>Hockey Enterprises</u>" has the meaning given in the Recitals.

"Hockey Enterprises Equity Interest" has the meaning given in Section 5.4(c).

"Hockey Enterprises Shares" has the meaning given in Section 5.4(c).

"Hockey Player Employee" means each hockey player party to a contract with Dallas Stars or any of its Subsidiaries, as entered into or assumed by Dallas Stars or entered into by or on behalf of Dallas Stars pursuant to any minor league affiliation agreement.

"HSG" has the meaning given in the Recitals.

"HSGH" means HSG Sports Group Holdings LLC, a Texas limited liability company, which wholly-owns HSG as its direct Subsidiary.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules and regulations promulgated thereunder.

"Inactive Employee" has the meaning given in Section 10.1(b).

"Intercompany Amounts" means all accounts receivable or accounts payable of (i) any Seller payable to or owed by (A) any other Seller, (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17) or (C) Hockey Enterprises, (ii) to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17, Plano StarCenter payable to or owed by (A) any Seller or (B) Hockey Enterprises or (iii) Hockey Enterprises payable to or owed by (A) any Seller or (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17).

"Indebtedness" of any Person means, without duplication, (i) the principal and accreted value and accrued and unpaid interest, fees, expenses, penalties and other amounts payable in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current Liabilities); (iii) all obligations of the type referred to in clauses (i) and (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indemnification Claim" has the meaning given in Section 12.4(b).

"Independent Accounting Firm" has the meaning given in Section 3.4(e).

"Insurance Policies" has the meaning given in Section 5.19(a).

"Intellectual Property" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, reexaminations and reissues of any of the foregoing (collectively, "Patents"); (ii) all trademarks, service marks, trade names, service names, brand names, trade dress, logos, corporate names and other source or business identifiers, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) copyrights and works of authorship, and all registrations, applications, renewals and extensions and reversions of any of the foregoing (collectively, "Copyrights"); (iv) all trade secrets (collectively, "Trade Secrets"); and (v) all internet domain names, and all registrations, applications, renewals and extensions of any of the foregoing (collectively, "Domain Names").

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Dallas Arena" means the actual knowledge of Tony Tavares or Robert Hutson.

"Knowledge of Dallas Stars" means the actual knowledge of Tony Tavares or Robert Hutson.

"Law" means any foreign, federal, state or local law, statute, code, ordinance, Order, rule or regulation.

"Leased Real Property" means any real property subject to a Real Property Lease.

"Leased StarCenters" has the meaning given in the Recitals.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"Lender" means, with respect to the Senior Indebtedness, each financial institution listed on the signature pages thereto as a lender, and any other Person that becomes a lender pursuant to an assignment agreement in accordance therewith.

"Lender Related Parties" has the meaning given in Section 12.12.

"Liability" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs and expenses relating thereto.

"Liens" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, charge, option, right of first refusal, interests (as such term is used in section 363(f) of the Bankruptcy Code), easement or servitude.

"Loss(es)" has the meaning given in Section 12.2(a)(i).

"Marks" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon the business, assets, liabilities, properties, prospects, results of operations or financial condition of Sellers and the Transferred Subsidiaries (taken as a whole), (ii) a material adverse effect upon the legality, validity, binding effect or enforceability against Sellers of this Agreement or any Seller Document or Purchaser Document to which it is a party, or (iii) a material adverse effect upon the ability of Sellers to consummate the transactions contemplated by this Agreement, and in respect of the foregoing subsections (i), (ii) and (iii), other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Sellers and the Transferred Subsidiaries operate; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in applicable Laws or accounting rules; (v) the failure of Sellers to meet any of their internal projections; (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; (vii) actions taken by the NHL affecting all NHL member teams; (viii) the physical condition of any player under contract to Dallas Stars; (ix) changes in GAAP; (x) any act, omission or event occurring in accordance with the terms and conditions of this Agreement or to which any Purchaser consents in writing; (xi) transactions or other circumstances involving players, coaches or executives under contract to Dallas Stars, including, but not limited to, trade, injury, death, disability, retirement, termination, suspension or contract extension; (xii) the on-ice performance of the Stars; (xiii) any sale, or announced or pending sale, of a member team of the NHL; (xiv) the number of games won or lost by the Stars or attendance at Stars games; or (xv) the filing of, and the continued pendency of, the Bankruptcy Case.

"Material Contracts" means, collectively, the Stars Material Contracts and the Arena Material Contracts.

"Monarch" means Monarch Master Funding Ltd., as a First Lien Lender.

"NHL" has the meaning given in the Recitals.

"NHL Affiliated Party" means each of the NHL Entities and each of the NHL Member Clubs (except Dallas Stars, but including future NHL Member Clubs) and each of their respective Subsidiaries and other Affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors.

"NHL Approvals" means such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings as are required under applicable NHL Rules and other rules and regulations of the NHL or any NHL Document.

"NHL Benefit Plans" has the meaning given in Section 5.14(a).

"NHL Board of Governors" means the Board of Governors of the NHL, as established under the NHL Constitution, and any successor chief governing body of the NHL that may be later established.

"NHL By-Laws" means the By-Laws of the NHL, as adopted under the NHL Constitution, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions and decisions issued by the NHL Commissioner or his designee.

"NHL Commissioner" means the person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

"NHL Constitution" means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings and decisions issued by the NHL Commissioner or his designee.

"NHL Documents" means all documents and agreements between Sellers or their Subsidiaries and the NHL relating to the Business, including the documents and agreements listed in Schedule 1.1(b), together with any of the foregoing which are entered into after the effective date of this Agreement in the Ordinary Course of Business in connection with the Business.

"NHL Entities" means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the NHL Member Clubs generally after the date of this Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective Affiliates and subsidiaries; provided that the "NHL Entities" shall not include the NHL Member Clubs.

"NHL Guaranty" has the meaning given in Section 9.9.

"NHL/Lender Cooperation Agreement" has the meaning given in Section 9.9.

"NHL Member Clubs" means the hockey clubs set forth in Article III of the NHL Constitution, as amended.

"NHL Owner Consent" has the meaning given in Section 9.9.

"<u>NHLPA</u>" means the National Hockey League Players' Association.

"<u>NHL Proxy</u>" means (i) the Irrevocable Proxy, dated January 14, 2010, by HSG to the NHL Commissioner; (ii) the Irrevocable Proxy, dated January 14, 2010, by HSGH to the NHL Commissioner; (iii) the Irrevocable Proxy, dated January 14, 2010, by HSG Partnership Holdings LLC to the NHL Commissioner; and (iv) the Irrevocable Proxy, dated January 14, 2010, by Dallas Arena to the NHL Commissioner.

"<u>NHL Rules</u>" means (i) the NHL Constitution, (ii) the NHL By-Laws, (iii) the governing documents of each of the NHL Entities, (iv) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities and the NHL Board of Governors, (v) the current and future collective bargaining agreements between the NHL and the NHLPA and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other persons, on the other hand, in furtherance of the NHL's (or any NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-Laws, and (vi) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time.

"<u>Nonassignable Assets</u>" has the meaning given in <u>Section 2.6(b)</u>.

"<u>Notice Deadline</u>" has the meaning given in <u>Section 8.7</u>.

"<u>NWC</u>" means the consolidated net working capital (defined as current assets less current liabilities) of Dallas Stars and its Subsidiaries calculated in a manner consistent with the Pro Forma NWC in accordance with <u>Section 3.4(g)</u>.  For the avoidance of doubt, (i) NWC may be a positive or a negative number (*i.e.*, a deficit), (ii) current liabilities shall exclude all Excluded Liabilities, the CFV Debt Amount, all net Intercompany Amounts and all Excluded NWC Amounts and (iii) current liabilities shall include Specified Expenses.

"<u>Officer Indemnification Agreements</u>" means (i) the Letter Agreement, dated December 29, 2010, by Dallas Stars and Dallas Arena for the benefit of Robert Hutson, and (ii) the Employment  Agreement, dated December 14, 2010, by and between Dallas Stars and Tony Tavares, as the same may be amended or extended.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business, including the ordinary and usual course of normal day-to-day operations of the Business during the Bankruptcy Case which, for the avoidance of doubt, may deviate from the ordinary and usual course of normal day-to-day operations prior to filing the Bankruptcy Case.

"Owned Property" or "Owned Properties" has the meaning given in Section 5.10(a).

"Parking Easement" means the Parking Agreement and Easement, dated as of April 16, 2008, by and among Dallas Stars, SSR and SSR GP Interests, L.P.

"Patents" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Permit" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in existing policies of title insurance (including any mortgagee, owner or lessee policy) to the extent copies of which have been provided to Purchasers; (ii) Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body; (v) title of a lessor under a capital or operating lease or other personal property; (vi) rights of subtenants, landlords, licensees, sponsors and concessionaires; (vii) the terms and conditions of the Real Property Leases; (viii) the Shared Parking Letter; (ix) the Parking Easement; (x) all Liens that will be extinguished by the Confirmation Order; (xi) other imperfections in title, charges, easements, restrictions and encumbrances which do not materially detract from the value of or materially interfere with the Business or the property subject thereto; and (xii) all matters listed on Schedule 1.1(c).

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" means any lease of personal property by Dallas Stars or any Stars Subsidiary.

"Petition Date" means the date on which the Bankruptcy Petitions are duly filed with the Bankruptcy Court.

"Plan" has the meaning given in the Recitals.

"Plano StarCenter" has the meaning given in the Recitals.

"Post-Closing Covenants" has the meaning given in Section 12.1(b).

"Post-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Post-Closing Expense Amount" means $750,000.

"Pre-Closing Covenants" has the meaning given in Section 12.1(b).

"Pre-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Pro Forma Balance Sheet" means the pro forma consolidated balance sheet of Dallas Stars and its Subsidiaries as of June 30, 2011, attached hereto as Schedule A.

"Pro Forma NWC" means the pro forma calculation of NWC as of June 30, 2011, attached hereto as Schedule B.

"Pro Forma Purchase Price" means the pro forma calculation of the Purchase Price as of June 30, 2011, attached hereto as Schedule C.

["Proposed NHL Approval Requirements" means the proposed substantive terms of the NHL Owner Consent, the NHL Guaranty, the Purchaser/NHL Proxy, and the NHL/Lender Cooperation Agreement.][2]

"Prorated Budgeted Loss" means an amount equal to (i) a fraction, the numerator of which shall be the number of days that elapsed in the month of Closing through and including the Closing Date and the denominator of which shall be the total number of days in the month of Closing, *multiplied* by (ii) the Cumulative Budgeted Loss for the month of Closing *less* the Cumulative Budgeted Loss as of the end of the immediately preceding month.

"Purchase Price" has the meaning given in Section 3.1(e).

"Purchased Assets" has the meaning given in Section 2.1.

"Purchased Contracts" means all Contracts (other than Excluded Contracts) to which any Seller is a party, including all Ticket Contracts.

"Purchased Intellectual Property" means all Intellectual Property (i) owned by Sellers (the "Sellers' Intellectual Property") or (ii) owned by any of the Transferred Subsidiaries, including, in each case (i) and (ii), the Registered Intellectual Property.

"Purchaser(s)" has the meaning given in the Preamble.

"Purchaser Documents" has the meaning given in Section 7.2.

"Purchaser Indemnified Parties" has the meaning given in Section 12.2(a).

"Purchaser/NHL Proxy" has the meaning given in Section 9.9.

"Purchaser Plans" has the meaning given in Section 10.2(b).

"Qualified Bid" has the meaning given to such term in the Bidding Procedures Order.

"Qualified Bidder" has the meaning given to such term in the Bidding Procedures Order.

---

[2] [To be updated upon completion of NHL diligence.]

"Real Property Lease" means any lease of real property to which Dallas Stars or any Stars Subsidiary is party as lessor or lessee.

"Registered Intellectual Property" means all issued Patents, pending Patent applications, registered Marks, pending applications for registration of Marks, registered Copyrights and Domain Name registrations, in each case, owned, filed or applied for by (i) any Seller or (ii) any Transferred Subsidiary.

"Requisite Lenders" means the Lenders under the First Lien Credit Agreement and the Second Lien Credit Agreement (i) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement and (ii) representing at least fifty percent (50%) of the Lenders under the First Lien Credit Agreement and Second Lien Credit Agreement; provided, however, that at the option of Sellers with the approval of the NHL, the definition of Requisite Lenders shall mean the First Lien Lenders (x) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and (y) representing at least fifty percent (50%) of the First Lien Lenders.

"RLF" means Richards, Layton & Finger, a Professional Association.

"Second Lien Credit Agreement" means that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, and GSP Finance LLC (as successor to Barclays Bank PLC) as Administrative Agent, Collateral Agent and Co-Syndication Agent, as amended from time to time.

"Second Lien Expense Reimbursement" has the meaning given in the Plan.

"Securities Act" has the meaning given in Section 7.6.

"Seller(s)" has the meaning given in the Preamble.

"Seller Benefit Plan" has the meaning given in Section 5.14(a).

"Seller Documents" means the Dallas Stars Documents and the Dallas Arena Documents.

"Seller Indemnified Parties" has the meaning given in Section 12.3(a).

"Seller Released Parties" has the meaning given in Section 13.12(a).

"Seller Releasing Parties" has the meaning given in Section 13.12(b).

"Sellers' Intellectual Property" has the meaning given in Section 1.1 (in the definition of "Purchased Intellectual Property").

"Sellers' Representative" has the meaning given in Section 13.14.

"Senior Indebtedness" means the obligations arising under, in connection with or in respect of (i) the First Lien Credit Agreement, (ii) the Second Lien Credit Agreement, (iii) the amounts due under, or otherwise due in connection with the termination of, the Hedge Agreements, and (iv) any other agreement entered into in connection with the foregoing.

"Senior Secured Loan" has the meaning given in Section 9.11.

"Shared Parking Letter" means the Letter Agreement, dated September 12, 2003, between SSR GP Interests, L.P., Dallas Stars, SSG/Mandalay Baseball Partners, L.P. and SSR, regarding the shared-parking arrangement at the Frisco sports complex.

"Shared Services Agreement" means the Shared Services Agreement, dated as of October 3, 2008, by and among HSG and certain of its affiliated entities signatory thereto, pursuant to which HSG provides certain shared services to each of Dallas Stars, the Stars Subsidiaries and other Affiliates of HSG.

"Sherman Act" means the Sherman Antitrust Act of 1890, as amended, and the rules and regulations promulgated thereunder.

"Specified Expenses" means those unpaid fees and expenses relating to the sale process and the related matters contemplated by this Agreement as and in the amount submitted in final form in writing by Sellers to Purchasers at least three (3) Business Days prior to the Closing Date, and not subject to review or approval by Purchasers but only by Sellers in advance of Closing (and which may include estimates thereof through the Closing Date), including (i) amounts due to GSP (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by Section 7.8), (iii) fees of Sellers' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) the Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement, including, without limitation, any Antitrust Fees and any fees resulting from the filings contemplated under Section 9.15.

"SSR" means SSR Collin Land, L.P., a Texas limited partnership.

"StarCenters" has the meaning given in the Preamble.

"StarCenters Equity Interests" means the limited liability company membership interests in and to StarCenters.

"Stars" has the meaning given in the Recitals.

"Stars Benefit Plan" has the meaning given in Section 5.14(a).

"Stars Entities" means each of Dallas Stars and the Stars Subsidiaries.

"Stars Foundation" means Dallas Stars Foundation, Inc., a Texas non-profit corporation.

"Stars Material Contract" has the meaning given in Section 5.13(a).

"Stars Pension Plan" has the meaning given in Section 5.14(b).

"Stars Subsidiaries" has the meaning given in the Recitals.

"Subsidiary" means, with respect to a Person, any Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person.

"Subsidiary Released Parties" has the meaning given in Section 13.12(b).

"Subsidiary Releasing Parties" has the meaning given in Section 13.12(a).

"Successful Bidder" has the meaning given in the Bidding Procedures Order.

"Suite Contract" means a Contract to which any Seller is a party that gives another party thereto the right to use a suite at the AAC or any Dr Pepper StarCenter for more than one game in any season, other than sponsorship or advertising and promotional agreements.

"Target NWC" means $7,750,000.

"Tax(es)" means (i) all federal, state, local or foreign taxes, charges, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any Liability in respect of any items described in clauses (i) or (ii) payable by reason of Treasury Regulation Section 1.1502-6 or any analogous or similar provision under federal, state, local or foreign Law.

"Tax Benefit" has the meaning given in Section 12.6(b).

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes a Seller, any of its Subsidiaries, or any of their Affiliates.

"Taxing Authority" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"Termination Date" means the later of (i) December 31, 2011 and (ii) in the event the Auction has occurred and Purchasers are not the Successful Bidder, the earlier of (A) the closing of the Competing Bid and (B) forty-five (45) days after the close of the Auction.

"Ticket Contracts" means all Contracts, licenses and subscriptions to which any Seller is a party relating to attendance at any event at the AAC or any Dr Pepper StarCenter including, without limitation, season ticket subscriptions and Suite Contracts.

"Trade Secrets" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Transaction Expenses" means all fees, charges, disbursements and expenses, paid out-of-pocket to third parties incurred in contemplation of or in connection with the transactions contemplated hereby, including fees, expenses and costs of legal counsel, accountants, financial advisors, consultants, agents and other representatives, incurred in connection with the transactions contemplated hereby.

"Transfer Taxes" has the meaning given in Section 13.1(a).

"Transferred Equity Interests" means (i) the 100% member interest in Plano StarCenter held by Dallas Stars, but only to the extent Sellers do not elect to treat such member interests as an Excluded Asset pursuant to Section 9.17 , (ii) 99% of the issued and outstanding capital stock of Hockey Enterprises held by Dallas Stars, (iii) the Hockey Enterprises Equity Interest and (iv) the COC Equity Interests.

"Transferred Subsidiaries" means (i) Hockey Enterprises and, (ii) to the extent Sellers do not elect to treat the member interests of the same as an Excluded Asset pursuant to Section 9.17, Plano StarCenter.

"U.S. Holdings" has the meaning given in the Preamble.

"U.S. Holdings Shares" has the meaning given in Section 5.4(c).

"Weil" has the meaning given in Section 4.1.

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or

indication that breach or violation exists or has actually occurred.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi) <u>Herein</u>.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) <u>Including</u>.  The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii) <u>Reflected On or Set Forth In</u>.  An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statements, or (c) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix) <u>Recitals</u>.  The Recitals to this Agreement are incorporated by reference herein and made a part hereof.

(b) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.  Further, prior drafts of this Agreement or any ancillary agreements hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

# ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchasers all of Sellers' right, title and interest in, to and under the Purchased Assets.  "<u>Purchased Assets</u>" shall mean all assets of Sellers (other than the Excluded Assets), including the following assets:

(a)    the Purchased Contracts;

(b)    all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Sellers (other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on <u>Schedule 2.1(b)</u>);

(c)    all inventory and supplies of Sellers;

(d)    all rights of Sellers with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)    all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Sellers, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)    all rights of Sellers under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(g)    all rights and privileges held by Sellers associated with the NHL, including rights to membership and franchise of the Stars in the NHL and all ownership interests of Sellers in any NHL Entity;

(h)    the Furniture and Equipment;

(i)    the Transferred Equity Interests (subject to the election of Sellers pursuant to <u>Section 9.17</u> to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j)    Sellers' Intellectual Property;

(k)    all Documents of Sellers used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the

Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Sellers (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Sellers shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Sellers, but only to the extent such Permits are assignable or otherwise transferable;

(m)     all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Seller and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Sellers' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Sellers to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings, team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, the Reunion Arena (the former home ice arena for the Stars), or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Sellers associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

2.2     Excluded Assets.  Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchasers, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets of Sellers:

(a)     the Excluded Contracts, including those accounts receivable identified on Schedule 2.1(b);

(b)     all minute books, organizational documents, stock or other equity registers and such other books and records and corporate or other entity filings of Sellers as pertain to ownership, organization or existence of each Seller and duplicate copies of such Documents as are necessary to enable Sellers to file Tax Returns and reports and comply with any applicable Laws or internal policies regarding document retention;

(c)     any personnel files pertaining to any individuals (including common law employees and independent contractors), other than the personnel files of any Continuing Employee and any independent contractors who are a party to a Purchased Contract;

(d)     any (i) other Documents or other books and records that any Seller is required by Law to retain or that any Seller determines are necessary or advisable to retain; provided, however, that Purchasers shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (ii) documents relating to proposals to acquire the Business by Persons other than Purchasers;

(e)     all of Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets as identified on Schedule 2.2(e);

(f)     the Excluded Equity Interests;

(g)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Excluded Asset;

(h)     any claim, right or interest of Sellers with respect to any Excluded Liability; and

(i)     to the extent Sellers so elect pursuant to Section 9.17, the 100% membership interests in Plano StarCenter held by Dallas Stars.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall assume, effective as of the Closing, and shall timely perform, pay and discharge in accordance with their respective terms, all Liabilities of Sellers (collectively, the "Assumed Liabilities") other than Excluded Liabilities.  The Assumed Liabilities include, but are not limited to, the following Liabilities of the Sellers:

(a)     except to the extent specifically provided in Article X, all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services of any individual by or on behalf of any Seller or any of the Transferred Subsidiaries on or before the Closing Date, (ii) workers' compensation claims against any Seller or any of the Transferred Subsidiaries, or any other entity with respect to the employment of any Former Employee on behalf of any Seller or any Transferred Subsidiary, that relate to the period ending on the Closing Date, irrespective of whether such claims are made prior to, on or after the Closing, or (iii) any Employee Benefit Plan;

(b)　　all Liabilities arising from the sale of products sold or services provided in the Ordinary Course of Business pursuant to product or service warranties, returns and rebates;

(c)　　all Liabilities constituting, or arising in connection with, accounts payable existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(d)　　all Liabilities for Taxes;

(e)　　all Liabilities for Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)　　all Liabilities with respect to the Business, the Purchased Assets or the Continuing Employees arising after the Closing;

(g)　　all Liabilities for the CFV Debt Amount;

(h)　　all Liabilities of Dallas Stars for benefits received as a third party beneficiary under or otherwise received as a result of the Contracts listed on Schedule 2.3(h);

(i)　　all Liabilities of Dallas Stars for contribution and indemnity at law to HSG or HSGH arising out of HSG's or HSGH's guaranty obligations under the Contracts set forth on Schedule 2.3(i), but only to the extent that HSG or HSGH actually makes any payments thereunder as a result of Dallas Stars' or its Subsidiaries' default of their obligations;

(j)　　all Liabilities for the Specified Expenses;

(k)　　all Liabilities and obligations of Sellers for the aggregate amount of gross deferred compensation as set forth on the schedule provided pursuant to Section 5.22, including for Hockey Player Employees and coaches;

(l)　　all Liabilities of Sellers arising under the Purchased Contracts, including any cure amounts as set forth in Section 2.5;

(m)　　all Liabilities of Sellers to the extent covered by Insurance Policies or benefits of Insurance Policies that are assigned to and assumed by Purchasers;

(n)　　all Liabilities of Sellers under the Officer Indemnification Agreements;

(o)　　all Liabilities constituting, or arising in connection with, trade payables; and

(p)　　all Liabilities of Sellers to the NHL, any NHL Affiliated Party, any other entity formed generally by the NHL Member Clubs after the date hereof, or any other NHL Member Club, whether in accordance with the terms of the NHL Constitution and Agreements (as defined in that certain letter agreement, dated December 19, 2006, as has been or may be further amended, restated, supplemented or otherwise modified from time to time, by and among the NHL, the First Lien Agent, the Administrative Agent under the Second Lien Credit

Agreement, HSG, HSGH, Dallas Stars, Dallas Arena, U.S. Holdings, StarCenters, and certain other subsidiaries of HSG), applicable Law or otherwise.

2.4    Excluded Liabilities.  Purchasers will not assume or be liable for any Liabilities of Sellers other than the Assumed Liabilities.  "Excluded Liabilities" shall consist of the following Liabilities of Sellers:

(a)    all Liabilities of Sellers arising out of the Excluded Assets, including the Excluded Contracts, except as otherwise provided in Section 2.3(d);

(b)    all Liabilities of HSG or any Hicks Affiliates, except as otherwise provided (i) in Section 2.3(d) or 2.3(e), in each case, solely to the extent that Sellers are jointly and severally liable with HSG or any Hicks Affiliates with respect thereto pursuant to applicable Law and (ii) in Section 2.3(a), 2.3(h), 2.3(i) or 2.3(p);

(c)    all Liabilities arising out of or relating to the Senior Indebtedness (including any and all Liabilities of or to GSP in its capacity as Lender and agent under the Second Lien Credit Agreement), except as otherwise provided in Section 2.3(p);

(d)    all Liabilities of Sellers owed to any of their Affiliates or any Hicks Affiliate (but, for the avoidance of doubt, (i) such Affiliates or Hicks Affiliate shall not include any other Seller or any Transferred Subsidiary, and (ii) such Liabilities shall not include any Liabilities owed pursuant to any Contract set forth on Schedule 1.1(a)(i) hereto);

(e)    all Liabilities, if any, to proposed purchasers or bidders not party hereto and who are unaffiliated with any Purchaser arising from the negotiations of or on behalf of Sellers or HSG with such Persons;

(f)    any Liabilities to the extent covered by any Insurance Policies (including any extension of any "claims made" liability insurance policies effected pursuant to Sellers' obligations under Section 9.14 and any renewals of any Insurance Policies), to the extent such Insurance Policies and the benefits of such Insurance Policies are not assigned to and assumed by Purchasers, and only to the extent that Sellers, after fulfilling all obligations set forth in Section 9.14, actually recover the amount of such Liabilities under the applicable policies;

(g)    all Liabilities based upon or resulting from any employee pension benefit plan that is subject to Section 302 or Title IV of ERISA (other than a Seller Benefit Plan or NHL Benefit Plan) directly maintained or contributed to by any member (other than Sellers or any of their Subsidiaries) of a group under common control (under Section 414(b) or (c) of the Code) with Sellers or any of their Subsidiaries prior to the Closing Date;

(h)    all Liabilities of Sellers under this Agreement, including any indemnification obligations under Article XII;

(i)    except as provided in Section 2.3(g), any Liabilities under the CFV Debt Agreement; and

(j)    any Liabilities to a Broker (other than to GSP).

2.5    Cure Amounts.  At Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assign to Purchasers and Purchasers shall assume from Sellers, the Purchased Contracts.  The cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts, Personal Property Leases and Real Property Leases, shall be paid by Purchasers, on or before Closing, and not by Sellers, and Sellers shall have no liability therefor.

2.6    Further Conveyances and Assumptions; Consent of Third Parties.

(a)    From time to time following the Closing, Sellers and Purchasers shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to fully convey, transfer and assign to Purchasers and their successors or assigns, all of the rights, titles and interests in the Purchased Assets and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)    Nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which by its terms or by Law is nonassignable without the consent of a third party or a Governmental Body or is cancelable by a third party in the event of an assignment ("Nonassignable Assets") unless and until such consent shall have been obtained or the Bankruptcy Court shall have authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals).  With respect to Material Contracts or Permits that are material for the Business as a going concern after the Closing Date, Sellers shall use their commercially reasonable efforts to promptly obtain such consents prior to the Closing and, if the Closing occurs, after the Closing Date; provided, however, that such efforts shall not require any Seller or any of its Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily or contingently liable for any Assumed Liability to obtain any such consent.  Purchasers and Sellers shall use their respective commercially reasonable efforts to obtain, or cause to be obtained, any consent, substitution, approval or amendment required to novate all Liabilities under any and all Purchased Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of Sellers and their Affiliates so that, in any such case, Purchasers shall be solely responsible for such Liabilities.  To the extent permitted by applicable Law and the terms of the Nonassignable Assets, in the event consents to the assignment thereof cannot be obtained or the Bankruptcy Court has not authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals), such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchasers and the covenants and obligations thereunder shall be performed by Purchasers in such Seller's name and all benefits and obligations existing thereunder shall be for Purchasers' account.  Sellers shall take or cause to be taken at Purchasers' expense such actions in their name or otherwise as Purchasers may reasonably request so as to provide Purchasers with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and

Sellers shall promptly pay over to Purchasers all money or other consideration received by it in respect of all Nonassignable Assets.  As of and from the Closing Date, each Seller authorizes each Purchaser, to the extent permitted by applicable Law and the terms of the Nonassignable Assets, at Purchasers' expense, to perform all the obligations and receive all the benefits of such Seller under the Nonassignable Assets and appoints each Purchaser its attorney-in-fact to act in its name on its behalf, and Purchasers agree to indemnify and hold such Seller and its Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchasers' performance of, or failure to perform, such obligations under the Nonassignable Assets and any actions taken upon exercise of such power of attorney.  Following the Closing, Sellers shall not terminate, modify or amend any Nonassignable Asset without Purchasers' prior written consent.

2.7    <u>Bulk Sales Laws</u>.  Except as may otherwise be required by the Bankruptcy Court, Purchasers hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchasers.

ARTICLE III

CONSIDERATION

3.1    <u>Consideration</u>.  The aggregate consideration for the Purchased Assets (which, for the avoidance of doubt, shall be a joint and several obligation of Purchasers) shall be:

(a)    an amount in cash equal to the CFV Debt Amount;

(b)    an amount in cash as necessary to pay in full the Specified Expenses;

(c)    the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 in partial satisfaction of the Senior Indebtedness; <u>provided</u> that the original principal amount of the Senior Secured Loan and the indebtedness of DSE to be incurred in connection therewith shall be adjusted:

(i)    by deducting the amount, if any, by which the CFV Debt Amount exceeds $50,000,000;

(ii)    by (A) deducting the amount, if any, by which the Target NWC exceeds the Final NWC (for the avoidance of doubt, if the Final NWC is a deficit number, the amount deducted shall be equal to the aggregate of (x) the full amount of the deficit, and (y) the Target NWC) or (B) adding the amount if any by which the Final NWC exceeds the Target NWC; and

(iii)    (A) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on the last day of a month, by adding an amount equal to the absolute value of the Cumulative Budgeted Loss for such month, (B) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on a date other than the last day of a month (and, for greater certainty, no amount has been added under <u>Section 3.1(c)(iii)(A)</u>), by adding an amount equal to (x) the absolute value of the

Cumulative Budgeted Loss for the immediately preceding calendar month *plus* (y) the absolute value of the Prorated Budgeted Loss for the month in which Closing occurs, or (C) if the Closing Date occurs on or after January 1, 2012, by adding an amount equal to the absolute value of ($15,058,541);

further, provided that, the final principal amount of the Senior Secured Loan, as may be adjusted under <u>Section 3.1(c)</u> hereinabove, shall not exceed $100,000,000;

(d)     if the aggregate principal amount of the Senior Secured Loan as adjusted under <u>Section 3.1(c)</u> would exceed $100,000,000 but for the last proviso of <u>Section 3.1(c)</u>, an amount in cash equal to the excess amount thereof, if any, in excess of $100,000,000 (the "<u>Excess Cash Payment</u>");

(e)     an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount (the "<u>First Lien Cash Payment</u>") (collectively, the sum of the amounts determined pursuant to the foregoing subsections (a), (b), (c), (d) and (e), the "<u>Purchase Price</u>", which shall be calculated pursuant to this <u>Section 3.1</u> in a manner consistent with the preparation of the Pro Forma Purchase Price); and

(f)     the assumption of the Assumed Liabilities.

3.2     <u>Purchase Price Deposit</u>.  Upon the execution of this Agreement, Purchasers shall immediately deposit with Citibank, N.A., in its capacity as escrow agent (the "<u>Escrow Agent</u>"), the sum of Fifteen Million U.S. Dollars ($15,000,000) by wire transfer of immediately available funds (the "<u>Escrowed Funds</u>"), to be released by the Escrow Agent and delivered to either Purchasers or to or on behalf of Sellers, in accordance with the provisions of the Escrow Agreement, which will be entered into by Purchasers, Sellers and the Escrow Agent immediately upon execution of this Agreement in substantially the form attached as <u>Exhibit E</u> (the "<u>Escrow Agreement</u>").  The Escrow Agreement shall provide, among other things, that the Escrow Agent shall provide Sellers and Purchasers with written notice immediately upon receipt of the Escrowed Funds.  Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(a)     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied towards the Purchase Price payable by Purchasers to Sellers under <u>Section 3.3</u> hereof;

(b)     the Escrowed Funds, together with all accrued investment income thereon, shall be promptly returned to Purchasers, if this Agreement is terminated:

(i)     pursuant to <u>Section 4.2(a)</u>;

(ii)     by Purchasers or Sellers pursuant to <u>Section 4.2(c)</u>, but not in the event that the Order contemplated by <u>Section 4.2(c)</u> was due to the failure of Purchasers to perform any of their obligations under this Agreement;

(iii)     by Sellers pursuant to <u>Section 4.2(d)(i)</u>, but not in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under

this Agreement (including, without limitation, their obligations under <u>Section 9.9</u>) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

<blockquote>
(iv) by Purchasers pursuant to <u>Section 4.2(e)</u>;

(v) pursuant to <u>Section 4.2(h)</u>; or

(vi) by Purchasers pursuant to <u>Section 4.2(i)</u>; and
</blockquote>

(c) if this Agreement is terminated for any reason other than as set forth in <u>Section 3.2(b)</u>, the Escrowed Funds, together with all accrued investment income thereon, shall in each case be delivered to Sellers.

3.3 <u>Payment of Purchase Price</u>.

(a) On the Closing Date, (i) the Escrow Agent shall pay the Escrowed Funds and all accrued investment income thereon by wire transfer of immediately available United States funds to an account designated by CFV I LLC, and (ii) Purchasers shall pay the Purchase Price (less the Escrowed Funds and all accrued investment income thereon) to Sellers, which shall be paid (A) by wire transfer of immediately available United States funds in an amount equal to the CFV Debt Amount (less the Escrowed Funds and all accrued investment income thereon) to an account designated by CFV I LLC; (B) by wire transfer of immediately available United States funds in an amount equal to the Specified Expenses to accounts and in the amounts designated by Sellers and the NHL, respectively, and to the extent direct payment of Specified Expenses owed to RLF, Weil and GSP, respectively, is permitted by the Bankruptcy Court at Closing, to the accounts and in the amounts designated by RLF, Weil and GSP, respectively; (C) by wire transfer of immediately available United States funds in an amount equal to the First Lien Cash Payment to an account designated by the First Lien Agent; and (D) by the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 (subject to adjustment as provided in <u>Sections 3.1(c)</u> and <u>3.4</u> hereof).

(b) Within three (3) Business Days following the determination of the Final NWC pursuant to <u>Section 3.4</u>, (i) the aggregate principal amount of the Senior Secured Loan shall be adjusted as calculated pursuant to <u>Sections 3.1(c)</u> and <u>3.4</u> hereof and the principal amount of the Senior Secured Loan shall automatically be adjusted pursuant to its terms; and (ii) Purchasers shall pay by wire transfer of immediately available United States funds an amount equal to the Excess Cash Payment, if any, to an account designated by the First Lien Agent.

(c) Sellers shall cause all wire transfer instructions needed for payment of the Purchase Price under this <u>Section 3.3</u> to be delivered to Purchasers at least three (3) Business Days prior to Closing.  At the Closing, and upon the payment of the Excess Cash Payment, if any, Purchasers shall deliver, or cause to be delivered, to Sellers evidence of the wire transfers referred to in this <u>Section 3.3</u>.

3.4     Purchase Price Adjustment.

(a)     No later than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchasers the following: (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries prepared on an estimated basis as of the close of business on the Closing Date (the "Estimated Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, and (ii) Sellers' calculation of the NWC as of the close of business on the Closing Date based on the Estimated Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g).

(b)     Within thirty (30) days after the Closing Date, Purchasers shall prepare and deliver to Sellers' Representative the following (collectively, the "Closing Documents"): (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries as of the close of business on the Closing Date (the "Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, (ii) Purchasers' calculation of the NWC as of the close of business on the Closing Date (the "Closing NWC") based on the Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g), and (iii) a certificate of the chief financial officer of Purchasers verifying that the Closing Balance Sheet and Closing NWC have been prepared in the manner required by this Agreement.

(c)     Within twenty (20) Business Days after delivery of the Closing Documents, Sellers' Representative will deliver to Purchasers a written response in which Sellers' Representative will either:

(i)     agree in writing with the Closing NWC, in which case the Closing NWC will be final and binding (herein the "Final NWC"); or

(ii)     dispute the Closing NWC by delivering to Purchasers a written notice (a "Dispute Notice") setting forth in reasonable detail the basis for each such disputed item.

For purposes of this Section 3.4(c), Sellers' Representative may only deliver a Dispute Notice if the aggregate value of all disputed items is in excess of $100,000.  For purposes of Sections 3.4(b) and 3.4(c), Purchasers will promptly furnish to Sellers' Representative such work papers and other documents and information that Sellers' Representative may request to the extent the same are available to Purchasers (or their independent public accountants).  Purchasers shall also permit such reasonable access to their businesses and their officers and that of their Subsidiaries as may be required by the Sellers' Representative to permit it to complete its review of the Closing NWC and to do so in a timely manner.

(d)     If Sellers' Representative fails to take either of the actions specified in Section 3.4(c) within twenty (20) Business Days after delivery of the Closing Documents, then

Sellers' Representative will be deemed to have irrevocably accepted the Closing NWC, in which case, the Closing NWC will be final and binding (herein also the "Final NWC").

(e)     If Sellers' Representative timely delivers a Dispute Notice to Purchasers, then Purchasers and Sellers' Representative will attempt in good faith, for a period of ten (10) Business Days, to agree on the Closing NWC for purposes of this Agreement.  Any resolution agreed in writing by Purchasers and Sellers' Representative during such ten (10)-Business Day period as to any disputed items will be final and binding on the parties.  If Purchasers and Sellers' Representative do not resolve all disputed items by the end of ten (10) Business Days after the date of delivery of the Dispute Notice, then Purchasers and Sellers' Representative will engage a mutually agreeable independent accounting firm to determine the remaining disputed items provided that the aggregate value of the remaining disputed items is in excess of $100,000 and if the aggregate value of the remaining disputed items is $100,000 or less, then the parties shall each be deemed to prevail on their position regarding an amount equal to 50% of such remaining disputed amount.  If Purchasers and Sellers' Representative are unable to jointly select such independent accounting firm within five (5) Business Days after such ten (10) Business Day period, Sellers' Representative may, upon notice to Purchasers, apply to any court of competent jurisdiction for the court to select an independent accounting firm for such purpose (such selected independent accounting firm, whether pursuant to this sentence or the preceding sentence, the "Independent Accounting Firm").  The Independent Accounting Firm shall render its determination with respect to the matters in dispute in a written report that specifies the conclusions of the Independent Accounting Firm as to each item in dispute and provide a revised Closing NWC consistent with all prior agreements of the parties and its determination of the matters in dispute (herein also the "Final NWC").  The Independent Accounting Firm's determination as set forth in its report will be final and binding on the parties for all purposes of this Agreement.

(f)     Purchasers and Sellers' Representative will each use their commercially reasonable efforts to cause the Independent Accounting Firm to render its determination within twenty (20) days after referral of the items to such firm or as soon thereafter as reasonably practicable.  Purchasers and Sellers' Representative will furnish to each other and to the Independent Accounting Firm such work papers and other documents and information relating to the disputed items as the Independent Accounting Firm may request and are available to that party (or its independent public accountants) and will be afforded the opportunity to present to the Independent Accounting Firm any material related to the disputed items and to discuss the items with the Independent Accounting Firm.  Purchasers may require that the Independent Accounting Firm enter into a customary form of confidentiality agreement with respect to the work papers and other documents and information provided to the Independent Accounting Firm.  Purchasers shall also permit such reasonable access to their business and their officers and that of their Subsidiaries as may be required by the Independent Accounting Firm to permit them to complete their work and to do so in a timely manner.  The Independent Accounting Firm will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the items in dispute as originally submitted to the Independent Accounting Firm; provided that any such costs borne by Sellers shall be paid in cash by Purchasers and shall be added to the Specified Expenses for purposes of the calculation of the Final NWC.  For example, should the items in dispute total in amount to $1,000 and the Independent Accounting Firm awards $600 in favor of Sellers'

Representative's (on behalf of Sellers) position, 60% of the costs of its review would be borne by Purchasers and 40% of the costs would be borne by Sellers.

(g)    Notwithstanding anything herein or in any Schedule hereto to the contrary, the calculation of NWC (including the calculation of the Pro Forma NWC, the Closing NWC and the Final NWC) shall not include, or make any adjustments for, any Excluded NWC Amounts. For the avoidance of doubt, an agreed upon amount reflecting an adjustment for all Excluded NWC Amounts is reflected in the calculation of the Target NWC.

ARTICLE IV

CLOSING AND TERMINATION

4.1    Closing Date.  The consummation of the transactions contemplated by this Agreement provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP ("Weil") located at 200 Crescent Court, Suite 300, Dallas, TX 75201 (or at such other place as the parties may designate in writing) at 10:00 am CDT time on a date to be specified by the parties (the "Closing Date"), which date shall be the third Business Day after the satisfaction or waiver of the conditions set forth in Article XI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), unless another time, date or place is agreed to in writing by the parties hereto.

4.2    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    at the election of Sellers or Purchasers at any time on or after the Termination Date if the Closing shall not have occurred by the close of business on such date, provided that the terminating party is not in breach of any of its obligations hereunder that would prevent the Closing conditions in Article XI, as applicable, from being satisfied;

(b)    by mutual written consent of Sellers and Purchasers;

(c)    by Sellers or Purchasers, upon written notice to the other, if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that subject to Section 9.4(b) hereof, the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); provided, however, that the right to terminate this Agreement under this Section 4.2(c) shall not be available to a party if such Order was due to the failure of such party to perform any of its obligations under this Agreement;

(d)    by written notice from Sellers to Purchasers in the event that (i) either party has received a formal notification from the NHL stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; provided that the right of Sellers to terminate this Agreement under this Section 4.2(d)(i) shall not be available to Sellers if such failure to obtain consent or formal notification from the NHL was due to the failure of Sellers to perform any of their obligations under this Agreement, or (ii) Purchasers are (A) in breach of

their representations and warranties set forth in <u>Section 7.7</u>, (B) in breach of their covenants set forth in <u>Section 9.11</u> or (C) have not reasonably satisfied the condition set forth in <u>Section 11.2(c)</u> and all other conditions precedent in <u>Section 11.1</u> and <u>Section 11.3</u> have been satisfied or waived, other than the failure to satisfy any such condition precedent that could reasonably be considered to have resulted from Purchasers' or any of their Affiliates' failure to perform any of their obligations or breach of any of their representations and warranties under this Agreement; <u>provided</u>, <u>however</u>, that with respect to this <u>Section 4.2(d)(ii)</u>, such breach has not been cured within three (3) Business Days after written notice of such breach has been delivered to Purchasers;

(e) by written notice from Purchasers to Sellers in the event that either party has received a formal notification stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; <u>provided</u>, <u>however</u>, that the right of Purchasers to terminate this Agreement under this <u>Section 4.2(e)</u> shall not be available to Purchasers if Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under <u>Section 9.9</u>) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

(f) by written notice from Purchasers to Sellers in the event that Sellers are in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13</u>, except for those updates that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect); <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Sellers; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(f)</u> shall not be available to Purchasers if any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement;

(g) by written notice from Sellers to Purchasers in the event that any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement; <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Purchasers; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(g)</u> shall not be available to Sellers if any Seller is in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13</u>);

(h) immediately (i) upon the closing of a Competing Bid in accordance with the Bidding Procedures Order or (ii) on the Commitment Termination Date, in each case, subject to Purchasers' right to payment of the Break-Up Fee in accordance with the provisions of <u>Section 8.5</u>;

(i) by Purchasers, upon written notice to Sellers after entry of an Order (i) dismissing the Bankruptcy Case, (ii) rendering it impossible to obtain confirmation of the Plan prior to the Termination Date, or (iii) denying confirmation of the Plan, <u>provided</u> <u>that</u>, in each case, the same has not been cured within fourteen (14) days after the entry of such Order.

(j)       by Sellers, upon written notice to Purchasers, if (i) Sellers have obtained all consents set forth on <u>Schedule 11.3(d)</u> (including NHL Approvals) and court orders required to close the transaction on the terms and conditions set forth in this Agreement, (ii) all other conditions to Purchasers' obligation to close the transaction contemplated by this Agreement have been satisfied, (iii) Sellers are not in breach of any representation, warranty or covenant in any provision of this Agreement, (iv) Sellers are ready, willing and able to close the transaction on the terms and conditions set forth in this Agreement, (v) Purchasers are not otherwise entitled to terminate this Agreement pursuant to <u>Section 4.2</u>, and, (vi) notwithstanding (i) through (v) above, Purchasers fail or refuse to close the transaction on the terms and conditions set forth in this Agreement, then Sellers may provide Purchasers with a written demand to close the transaction on the terms and conditions set forth in this Agreement within five (5) Business Days following the receipt of such demand and, if Purchasers fail or refuse to close the transaction during such five (5) Business-Day period, Sellers may terminate this Agreement by written notice to Purchasers; or

(k)       by written notice from Purchasers to Sellers, if as of the Closing, Sellers are unable to assume and assign to Purchasers any Purchased Contract and such failure results, or could reasonably be expected to result, in a Material Adverse Effect within the meaning of clause (i) of the definition of Material Adverse Effect, but not in the event that the inability to assume and assign any such Purchased Contract is due to Purchasers' failure to demonstrate adequate assurance of future performance of any such Purchased Contract.

4.3       <u>Procedure Upon Termination</u>.  In the event of termination and abandonment by Purchasers or Sellers, or both, pursuant to <u>Section 4.2</u> hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchasers or Sellers, other than refunding, release or payment of the Aggregate Seller Termination Amount or the Aggregate Purchaser Termination Amount, if applicable, in accordance with <u>Section 4.4</u>.

4.4       <u>Effect of Termination</u>.

(a)       In the event that this Agreement is validly terminated in accordance with <u>Sections 4.2</u> and <u>4.3</u>, then each of the parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any Purchaser or any Seller; <u>provided</u> <u>that</u> the obligations of the parties set forth in <u>Section 3.2</u>, this <u>Section 4.4</u> and <u>Articles XII</u> and <u>XIII</u> hereof shall survive any such termination and shall be enforceable hereunder.

(b)       Nothing in this <u>Section 4.4</u> shall relieve any Seller or any Purchaser of any Liability for a deliberate breach of any of its covenants or agreements or deliberate breach of its representations and warranties contained in this Agreement prior to the date of termination, provided that Sellers' liability hereunder for any and all such breaches shall be capped at an amount equal to the Expense Reimbursement and/or the Break-Up Fee, as applicable. Purchasers shall only be entitled to payment of the Expense Reimbursement from Sellers in the following circumstances: (i) if Sellers are unable to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities) by

the Termination Date, (ii) if the Lenders do not consent (to the extent necessary) to the transactions contemplated by this Agreement on or prior to the Termination Date based on the failure of Sellers to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), or (iii) as contemplated by Section 8.5; provided that, in connection with subsections (i) and (ii) above, Purchasers are ready, willing and able to consummate the transactions contemplated by this Agreement and are not in breach of any representation, warranty or covenant in any provision of this Agreement. Purchasers shall only be entitled to payment of the Break-Up Fee on the terms and conditions contemplated by Section 8.5. For the avoidance of doubt, (x) the payment of reasonable out-of-pocket expenses pursuant to this Section 4.4(b) shall not be paid in duplication of any of Purchasers' expenses to be reimbursed by Sellers under Section 8.5 and (y) in the event that the Closing occurs subsequent to any payment to Purchasers of the Expense Reimbursement, Purchasers shall be required to refund such payment to Sellers. For the avoidance of doubt, prior to Closing, in no event shall Sellers be liable to Purchasers for any amount in excess of the Break-Up Fee plus the Expense Reimbursement.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.4 shall relieve Purchasers or Sellers of their obligations under the Confidentiality Agreement. If this Agreement is terminated in accordance with Sections 4.2 and 4.3, Purchasers agree that the prohibition in the Confidentiality Agreement restricting each Purchaser's ability to solicit any employee of Sellers or their Affiliates to join the employ of Purchasers or any of their Affiliates shall be extended to a period of two years from the date of this Agreement.

(d)     Each Seller and each Purchaser acknowledges and agrees that (i) Sellers' receipt, and Purchasers' forfeiture, of the Escrowed Funds pursuant to Section 3.2(c), or (ii) Purchasers' receipt of the Break-Up Fee and/or the Expense Reimbursement, shall constitute a payment of liquidated damages and not a penalty and that the amount of the Escrowed Funds or the Break-Up Fee and/or the Expense Reimbursement, as applicable, is reasonable in light of the substantial but indeterminate harm anticipated to be caused if the transactions contemplated by this Agreement are not consummated, the difficulty of proof of loss and damages, the inconvenience or non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder. Further, each Seller and each Purchaser acknowledges and agrees that the agreements contained in this Section 4.4 are an integral part of the transactions contemplated by this Agreement. In the event that Purchasers or Sellers shall fail to pay or release the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, when due, the parties responsible for payment or release of such amount shall reimburse the parties entitled to receive such amount for all reasonable costs and expenses actually incurred or accrued by such entitled parties in connection with the collection under and enforcement of this Section 4.4, but in the case of Purchasers, in the aggregate all of Purchasers' Transaction Expenses paid by Sellers shall not exceed the amount of the Expense Reimbursement. Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated and Sellers or Purchasers have a right to receive payment of the Escrowed Funds and all accrued investment income thereon or Break-Up Fee and/or the Expense Reimbursement, as applicable, pursuant to this Section 4.4 and Section 8.5 (subject to the satisfaction of the conditions precedent to the payment of the Break-Up Fee and Expense Reimbursement set forth in Section 8.5), together with any costs or

expenses to be reimbursed in accordance with the foregoing sentence or any other provision of this Agreement (collectively, with the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, the "Aggregate Purchaser Termination Amount" or the "Aggregate Seller Termination Amount," respectively), prior to Closing such right shall be the sole and exclusive remedy of the parties receiving such amount against the parties paying such amount, for any and all Losses or claims arising under, out of, or related to this Agreement, including the termination of this Agreement, or the sale or purchase of the Purchased Assets, including the failure to consummate such sale or purchase. Nothing in this Agreement shall prevent the enforcement of the remedy of specific performance set forth in Section 12.8 in lieu of termination of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF DALLAS STARS

Dallas Stars hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

5.1     Organization and Good Standing.  Dallas Stars is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of Delaware. StarCenters is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  Plano StarCenter is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  U.S. Holdings is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Hockey Enterprises is an unlimited liability company duly organized, validly existing and in good standing under the Laws of the Province of Nova Scotia.  Each of the Stars Entities has all requisite power and authority to own, lease and operate its properties and to carry on its businesses as now conducted.  Each of the Stars Entities is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2     Authorization of Agreement.  Each of the Stars Entities has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party, if any, or to be executed by such Stars Entity in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Stars Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and each of the Dallas Stars Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of the Stars Entities party thereto.  This Agreement has been, and each of the Dallas Stars Documents will be at or prior to the Closing, duly and validly executed and delivered by Stars Entities party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the

Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Stars Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Stars Entities enforceable against the Stars Entities party thereto in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 5.3(a), none of the execution and delivery by any Stars Entity of this Agreement or the Dallas Stars Documents to which it is party, if any, the consummation of the transactions contemplated hereby or thereby, or compliance by the Stars Entities with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of the Stars Entities; (ii) subject to entry of the Confirmation Order, any Contract or Permit to which any Stars Entity is a party or by which any of the properties or assets of the Stars Entities are bound; (iii) subject to entry of the Confirmation Order, any Order of any Governmental Body applicable to the Stars Entities or by which any of the properties or assets of the Stars Entities are bound; or (iv) subject to entry of the Confirmation Order, any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 5.3(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Stars Entities in connection with the execution and delivery of this Agreement or the Dallas Stars Documents, the compliance by the Stars Entities party hereto and thereto with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.4     Capitalization.

(a)     Schedule 5.4(a) sets forth the name of each Stars Entity and, with respect to each such Stars Entity, the jurisdiction in which it is organized, the jurisdictions, if any, in which it is qualified to do business, the names of all equity owners and the amount of equity owned by each such owner.

(b)     Dallas Stars owns (i) a 100% limited liability company interest in StarCenters and (ii) a 100% limited liability company interest in Plano StarCenter.

(c)     Dallas Stars owns (i) all of the issued and outstanding capital stock of U.S. Holdings and (ii) 99 shares of common stock of Hockey Enterprises.  U.S. Holdings owns one share of common stock of Hockey Enterprises (the "Hockey Enterprises Equity Interest").  The authorized capital stock of U.S. Holdings consists of 1,000 shares of common stock, $.01 par value per share (the "U.S. Holdings Shares"), and as of the date hereof, all 1,000 shares of such stock are issued and outstanding.  The authorized capital stock of Hockey Enterprises consists of 40,000 common shares, without par value, and as of the date hereof, there are 100 shares of such stock issued and outstanding (the "Hockey Enterprises Shares").

(d)     None of the 100% limited liability company interests in StarCenters and Plano StarCenter held by Dallas Stars is certificated.  None of the Transferred Equity Interests has been registered under the Securities Act or any applicable state securities Laws.

(e)     All of the equity interests referred to in Sections 5.4(a), 5.4(b), 5.4(c) and 5.4(d) were duly authorized for issuance and are validly issued, and those referred to in Sections 5.4(b), 5.4(c) and 5.4(d) are fully paid and non-assessable.

(f)     Except as set forth on Schedule 5.4(f)(i), there exists no existing option, warrant, call, right, or Contract to which Dallas Stars is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the Stars Subsidiaries or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the Stars Subsidiaries.  Except as set forth on Schedule 5.4(f)(ii), none of the Stars Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the Transferred Equity Interests.

(g)     Schedule 5.4(g) identifies the name and jurisdiction of incorporation or organization of each Person (other than a Subsidiary or NHL Entity) in which any Stars Entity holds an equity interest, the nature and class of such interest, and the number of shares or other equity interests of such class held by such Stars Entity.

5.5     Financial Statements.  Dallas Stars has made available to Purchasers copies of (i) the audited consolidated balance sheets of Dallas Stars and its Subsidiaries as at June 30, 2008, 2009 and 2010 (the most recent of which, the "Dallas Stars Balance Sheet") and the related audited consolidated statements of income and of cash flows of Dallas Stars and its Subsidiaries for the years then ended, and (ii) the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011, and the related unaudited consolidated statement of income of Dallas Stars and its Subsidiaries for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Dallas Stars Financial Statements").  Except as set forth in the notes thereto and as disclosed in Schedule 5.5, each of the Dallas Stars Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of Dallas Stars and its Subsidiaries as at the dates and for the periods indicated therein.  For the purposes hereof, the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011 are

collectively referred to as the "Dallas Stars Interim Balance Sheet" and May 31, 2011 is referred to as the "Dallas Stars Interim Balance Sheet Date."  Dallas Stars and the Stars Subsidiaries have no Liabilities except for (a) Liabilities accrued or reserved for on the Dallas Stars Interim Balance Sheet; (b) Liabilities incurred in the Ordinary Course of Business or any other Liabilities not incurred in the Ordinary Course of Business that do not exceed $5,000,000 in the aggregate; (c) Liabilities incurred in connection with the transactions contemplated herein; (d) Excluded Liabilities; (e) any Liabilities which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and (f) as set forth on Schedule 5.5.

5.6     Accounts Receivable.  In all material respects, all accounts receivable of Dallas Stars and the Stars Subsidiaries are reflected properly on the Dallas Stars Balance Sheet, the Dallas Stars Interim Balance Sheet and the accounting records of Dallas Stars as of the Closing Date and represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business.  Except as set forth on Schedule 5.6 or reserved for in the Dallas Stars Financial Statements, there is no contest, claim, defense or right of setoff, other than returns in the Ordinary Course of Business, relating to the amount or validity of such notes or accounts receivable, except for any such contests, claims, defenses or rights of setoff which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.6 sets forth an accurate and complete list and the aging of all notes and accounts receivable as of the Dallas Stars Interim Balance Sheet Date.

5.7     Title to Purchased Assets; Sufficiency.

(a)     Except as set forth on Schedule 5.7(a), to the Knowledge of Dallas Stars, the Purchased Assets that are tangible assets of any kind or description taken as a whole are in good operating condition and repair, ordinary wear and tear excepted, except where the failure to be in such condition and repair, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 5.7(b) and except for Excluded Assets, all of the assets reflected on the Dallas Stars Interim Balance Sheet are included in the Purchased Assets or in the assets of the Stars Subsidiaries unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.  Except as set forth on Schedule 5.7(b), all Purchased Assets and assets of the Stars Entities reflected on the Dallas Stars Interim Balance Sheet are owned by the Stars Entities, unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.

(c)     Except as set forth in Schedule 5.7(c)(i) and other than the real property subject to the Real Property Leases, intellectual property licensed to any Seller, and personal property subject to the Personal Property Leases, Dallas Stars or one of the Stars Subsidiaries owns and has good title to each of the Purchased Assets (other than Purchased Assets owned by Dallas Arena), free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets constitute all of the assets used in the Business as currently conducted or

necessary together with Sellers' agreements hereunder and under the Seller Documents for Purchasers to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business, except insurance, management, legal, corporate, administrative and other services provided by HSG pursuant to the Shared Services Agreement, the Excluded Assets and as set forth in <u>Schedule 5.7(c)(ii)</u>.

5.8    <u>Absence of Certain Developments</u>.  Except as contemplated by this Agreement or as set forth on <u>Schedule 5.8</u>, since the Dallas Stars Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as contemplated by this Agreement or as set forth on <u>Schedule 5.8</u>, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the Dallas Stars Interim Balance Sheet Date, Dallas Stars and the Stars Subsidiaries have conducted the Business relating to Dallas Stars and the Stars Subsidiaries only in the Ordinary Course of Business and there has been no:

(a)    commitments for capital expenditures (to the extent unpaid) with respect to the Business, other than commitments for capital expenditures that do not exceed $100,000 individually or $400,000 in the aggregate;

(b)    material increases in the base salary of, or payment of any material bonus to, any Employee, other than (i) in the Ordinary Course of Business, (ii) with respect to any Hockey Player Employee, coach or general manager, or (iii) pursuant to a Contract with any Employee;

(c)    change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(d)    authorization, approval, agreement or commitment to do any of the foregoing; or

(e)    distribution in cash or property in respect of the equity interest of any Stars Entity (other than distributions solely among any Stars Entity (other than distributions made by Dallas Stars) and/or any COC Entity); <u>provided</u>, <u>that</u> distributions by Dallas Stars shall not include any amounts paid to Dallas Arena.

5.9    <u>Taxes</u>.  To the Knowledge of Dallas Stars, except as set forth on <u>Schedule 5.9</u>, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    Each Stars Entity has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns.  All such Tax Returns are correct and complete in all material respects;

(b)    Each Stars Entity has complied in all material respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c) There are no Liens for Taxes upon any of the Purchased Assets, the assets of Plano StarCenter and the assets of Hockey Enterprises, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d) No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against any Stars Entity that are still pending. No requests for waivers of the time to assess any such Taxes have been made that are still pending. No Tax Return of any Stars Entity is under current examination by the IRS or by any state, local, or foreign Taxing Authority and no such Tax audit is threatened in writing. All assessments for Taxes due from any Stars Entity with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e) None of the Stars Entities is liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f) Since February 27, 2004, each of Dallas Stars, StarCenters and Plano StarCenter has been properly treated as a disregarded entity for U.S. federal income tax purposes;

(g) Since its formation, Hockey Enterprises has been treated as a partnership for U.S. federal income tax purposes;

(h) HSGH is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(i) None of the Stars Entities has entered into any "reportable transactions" within the meaning of Treasury Regulation Section 1.6011-4, other than any "loss transaction" described in Treasury Regulations Section 1.6011-4(b)(5).

5.10 <u>Real Property</u>.

(a) <u>Schedule 5.10(a)(i)</u> sets forth a complete list of all real property and interests in real property owned in fee by Dallas Stars and the Stars Subsidiaries (individually, an "<u>Owned Property</u>" and collectively, the "<u>Owned Properties</u>"). Plano StarCenter has fee title to all Owned Property, free and clear of all Liens of any nature whatsoever except (A) Liens set forth on <u>Schedule 5.10(a)(ii)</u>, (B) Permitted Exceptions and (C) Assumed Liabilities.

(b) <u>Schedule 5.10(b)</u> sets forth (i) a complete list of all Real Property Leases under which any Stars Entity is a lessee and (ii) a complete list of all Real Property Leases by any Stars Entity as lessor, except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Stars Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any Stars Entity under any of the Real Property Leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The Stars Entities are current in their rental payments under

all Real Property Leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 5.10(c)(i), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any of its Owned Property or its Leased Real Property, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.10(c)(ii), and except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, all Owned Properties and Leased Real Properties are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Dallas Stars, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such Owned Property and Leased Real Property, and neither Dallas Stars nor any Stars Subsidiary has received within the prior year written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.11     Tangible Personal Property.  Schedule 5.11 sets forth all Personal Property Leases of Dallas Stars and the Stars Subsidiaries involving annual payments in excess of $100,000 except for such omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Except as set forth on Schedule 5.11, and except for such notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Dallas Stars has not received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by Dallas Stars under any such Personal Property Leases.

5.12     Intellectual Property.

(a)     Schedule 5.12(a) sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property.  Except as could not, individually or in the aggregate, have a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries in full force and effect.

(b)     Except as set forth on Schedule 5.12(b), Dallas Stars and the Stars Subsidiaries own or have valid licenses to use all material Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries as the same are used by Dallas Stars or the applicable Stars Subsidiary in the Ordinary Course of Business as of the date hereof, except to

the extent the failure to be the owner or a valid licensee thereof could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 5.12(c) and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, (i) none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) none of Dallas Stars or the Stars Subsidiaries has received any written notice alleging that any such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries.

(d)     Except as set forth on Schedule 5.12(d) and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries is being infringed, misappropriated or violated by any Person.

5.13     Stars Material Contracts.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Schedule 5.13(a) sets forth the following material, written Contracts to which any Stars Entity is bound, each of which is a Purchased Contract (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on Schedule 5.13(a), collectively, the "Stars Material Contracts"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)     Contracts with any labor union or association representing any Employees of Dallas Stars;

(iii)     Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)     Contracts under which (A) Dallas Stars or any of the Stars Subsidiaries grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Stars a license under any material Intellectual Property used or held for use exclusively in the Business or grants to any of the Stars Subsidiaries a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)     Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)     Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)     Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)     Suite Contracts to which Dallas Stars or any Stars Subsidiary is a party;

(ix)     Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)     Contracts containing or providing for any Tax sharing, Tax allocation or Tax indemnification (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes);

(xi)     Contracts for a partnership, joint venture or similar agreement;

(xii)     Contracts relating to any acquisition to be made by any Stars Entity of any operating business or the capital stock of any other Person;

(xiii)     Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiv)     Contracts, other than Contracts with Employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xv)     marketing or advertising Contracts with anticipated revenue to Dallas Stars or any Stars Subsidiary in any 12-month period reasonably expected to be greater than $100,000;

(xvi)     Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvii)     other than league-wide broadcast Contracts entered into by any NHL Entity or pursuant to the NHL Documents, Contracts granting any rights to

broadcasts, whether radio, television or otherwise, of NHL games in which the Stars are a participant.

(b)        With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except for NHL Documents and any Contract currently in effect between Dallas Stars and the NHL, including those listed on Schedule 1.1(b) (as applicable), or as a result of the Bankruptcy Case or as otherwise set forth on Schedule 5.13(b): (i) all of the Stars Material Contracts are in full force and effect and are valid and binding on and enforceable against the Stars Entities party thereto, and, to the Knowledge of Dallas Stars, the other parties thereto in accordance with their terms; (ii) no Stars Entity is in payment default under or monetary breach of, or to the Knowledge of Dallas Stars, otherwise in default under or in breach of, any Stars Material Contract to which it is a party; (iii) no Stars Entity has waived any material future right under any Stars Material Contract to which it is a party; (iv) to the Knowledge of Dallas Stars, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Stars Material Contract; and (v) to the Knowledge of Dallas Stars, no Stars Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Stars Material Contract that has not been resolved.

(c)        Dallas Stars has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Stars Material Contract.

5.14    Employee Benefits.

(a)        Schedule 5.14(a) lists each material "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material employee benefit plan or agreement maintained by Dallas Stars or any of the Stars Subsidiaries (each, a "Stars Benefit Plan") or on behalf of Dallas Stars for the benefit of any Employee or Former Employee (each, a "Seller Benefit Plan"), but does not list any such plans and agreements that are maintained or administered by or on behalf of the NHL for the benefit of the professional hockey players, minor league hockey players and certain coaches employed by Dallas Stars or any of the Stars Subsidiaries, and current or former general managers, trainers and certain other hockey operations personnel (the "NHL Benefit Plans").  Dallas Stars has made available to Purchasers correct and complete copies of each Stars Benefit Plan (or, in the case of any such Stars Benefit Plan that is unwritten, descriptions thereof), and if applicable, as to each such plan: (i) the most recent annual report on Form 5500 required to be filed with the IRS (if any such report was required), (ii) the most recent summary plan description, and (iii) the most recent trust agreement or insurance Contract. Each Stars Benefit Plan has been administered in accordance with its terms and the applicable provisions of ERISA, the Code and all other applicable Laws, except for any non-compliance that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Seller Benefit Plans will cease to produce active coverage after Closing for any Continuing Employee or Former Employee.

(b)        To the Knowledge of Dallas Stars, (i) the 401(k) plan in which Employees participate (the "Stars Pension Plan") qualifies under Section 401(a) of the Code and (ii) no

event has occurred since the date of the most recent determination letter or application therefor relating to such Stars Pension Plan that would adversely affect the qualification of such Stars Pension Plan. Dallas Stars has made available to Purchasers a correct and complete copy of the most recent determination letter received with respect to the Stars Pension Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)     All contributions, premiums and benefit payments under or in connection with the Stars Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Stars Benefit Plans have been timely made. All contributions and premium payments to the NHL Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the NHL Benefit Plans have been timely made. No Stars Benefit Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(d)     Except as set forth on Schedule 5.14(d), there are no actions (other than an audit or investigation), suits or claims (other than routine claims for benefits) with respect to any Stars Benefit Plan pending or, to the Knowledge of Dallas Stars, threatened, which could give rise to a material liability of Dallas Stars or the Stars Subsidiaries, and to the Knowledge of Dallas Stars, there are no facts that are reasonably likely to give rise to any such actions (other than an audit or investigation), suits or claims (other than routine claims for benefits). There is currently no audit or investigation by any Governmental Body against or involving any Stars Benefit Plan pending, and to the Knowledge of Dallas Stars, there is no such audit or investigation threatened by any such Governmental Body.

(e)     Except as set forth on Schedule 5.14(e), neither the execution or delivery of this Agreement, nor the consummation of the transactions contemplated herein, will, with respect to any Employee and solely as a result of the consummation of such transactions: (i) increase any benefits otherwise payable under any Stars Benefit Plan or Seller Benefit Plan; (ii) result in any acceleration of the time of payment or vesting of any such benefits; (iii) result in the payment of any retention, stay bonus, change of control, enhanced severance, or similar payments or (iv) require the funding of any trust or other funding vehicle.

(f)     Except for any representations and warranties in this Article V regarding Contracts with Employees or compensation payable to Employees, this Section 5.14 represents the sole and exclusive representation and warranty of Dallas Stars regarding employee benefit matters. Dallas Stars makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or other employee benefit plans that are not maintained by Dallas Stars or any of the Stars Subsidiaries except as expressly set forth herein.

(g)     Schedule 10.1(a) lists all non-player Employees, as of the date hereof, including, for each such Employee, his or her (i) name, (ii) job title, (iii) department, (iv) base salary or wage rate, (v) date of hire, (vi) status as a full-time or part-time employee, (vii) location, (viii) exempt or non-exempt status, and (ix) calendar year 2010 bonus or commission with respect to non-exempt clerical personnel. Schedule 10.1(a) also lists (x) the name of each non-player Employee who is on a leave of absence as of such date, as well as the names of all Hockey Player Employees as of such date and (y) the bonus pool for non-executive Employees

with respect to fiscal year 2010 and the bonus pool for executive Employees with respect to fiscal year 2010.

5.15    Labor.

(a)    Except as set forth on Schedule 5.15(a), Dallas Stars is not a party to any labor or collective bargaining agreement.

(b)    Except as set forth on Schedule 5.15(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Stars, threatened against or involving Dallas Stars, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Stars, threatened by or on behalf of any Employee, Former Employee or group of Employees or Former Employees of Dallas Stars, except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.16    Litigation.  Except as set forth on Schedule 5.16 there are no Legal Proceedings pending or threatened in writing against Dallas Stars or the Stars Subsidiaries, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 5.16, neither Dallas Stars nor the Stars Subsidiaries is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

5.17    Compliance with Laws; Permits.

(a)    Dallas Stars is in compliance with all Laws applicable to the Purchased Assets of Dallas Stars or the Business, except where the failure to be in compliance could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Stars currently has all Permits which are required for the operation of the Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Stars is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.18    Environmental Matters.  The representations and warranties contained in this Section 5.18 are the sole and exclusive representations and warranties of Dallas Stars pertaining or relating to any Environmental Laws or any matter arising under or associated with any Environmental Laws.  Except as set forth on Schedule 5.18 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)　the operations of Dallas Stars and the Stars Subsidiaries are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Permits required under all applicable Environmental Laws necessary to operate its Business ("Environmental Permits");

(b)　none of Dallas Stars or the Stars Subsidiaries is subject to any pending, or to the Knowledge of Dallas Stars, threatened claim alleging that Dallas Stars may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law;

(c)　to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars incurring any liability pursuant to any Environmental Law;

(d)　to the Knowledge of Dallas Stars, there is no current condition at any of the real property owned or leased by Dallas Stars or any Stars Subsidiary (including the Dr Pepper StarCenters), or relating to the operations of the Business or the Purchased Assets or relating to the operations of the Stars Entities, that would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring Liabilities under Environmental Laws; and

(e)　to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring any material Liability pursuant to any Environmental Law.

5.19　Insurance.

(a)　Schedule 5.19 contains a list of all insurance policies that are currently in force, or under which there are any open claims, as to: (i) that are owned or held by Dallas Stars or any Stars Subsidiary, (ii) under which Dallas Stars or Stars Subsidiary is insured, or (iii) that cover the Business, any Employees or any Purchased Assets (collectively, the "Insurance Policies").  For the avoidance of doubt, "Insurance Policies" shall not include any Stars Benefit Plan, Seller Benefit Plan or NHL Benefit Plan.  Additionally, for each of the Insurance Policies, Schedule 5.19 indicates whether such policy was purchased under an insurance program offered by an NHL Entity or was separately purchased by Dallas Stars or any of its Affiliates.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Stars or any Stars Subsidiary with respect to any such policy.

(b)　Dallas Stars, the Stars Subsidiaries, and the Business have complied in all material respects with the provisions of each of the Insurance Policies under which they and the Purchased Assets are insured, and all material claims under the Insurance Policies have been filed in a timely fashion.

5.20    NHL Matters.

(a)    Dallas Stars is the owner, holder and operator of a valid, subsisting and effective NHL franchise, which permits and authorizes Dallas Stars to operate a professional NHL team currently known as the "Dallas Stars."

(b)    Schedule 5.20(b) sets forth as of the date hereof a true and complete calculation of the CFV Debt Amount (as may be updated for the Closing pursuant to Section 9.13).

5.21    Player Matters.  To the Knowledge of Dallas Stars, except as disclosed on Schedule 5.21 and except for matters that are required to be kept confidential and for such omissions which could not reasonably be expected to have a Material Adverse Effect, no Hockey Player Employee is subject to suspension by Dallas Stars, and no Hockey Player Employee is subject to any investigation by Dallas Stars that may result in suspension, expulsion or material fines.  Schedule 5.21 sets forth a list of each Hockey Player Employee and his service time under the NHL Rules.

5.22    Deferred Compensation Liability.  Schedule 5.22 (current as of the date specified therein) sets forth all deferred compensation (other than by or under any NHL Benefit Plan) payable by Dallas Stars to any current or former NHL player, coach, or general manager relating to such current or former NHL player's, coach's, or general manager's service as an NHL player, coach, or general manager.  Prior to Closing, Sellers shall update Schedule 5.22 and deliver such updated Schedule to Purchasers.

5.23    No Guarantees.  Except as set forth on Schedule 5.23, none of the Liabilities of the Stars Subsidiaries is guaranteed by or subject to a similar contingent obligation of any other Person.  Except as set forth on Schedule 5.23, none of the Stars Subsidiaries has guaranteed or become subject to a similar contingent obligation in respect of the Liabilities of any other Person. Except as set forth on Schedule 5.23, there are no outstanding letters of credit, surety bonds or similar instruments of any Stars Subsidiary in connection with or relating to the Business or the Purchased Assets.

5.24    Indebtedness for Borrowed Money. Except for Sellers' Liabilities as guarantors of the Senior Indebtedness and except as provided on Schedule 5.24, no Stars Subsidiary has any Liabilities relating to Indebtedness for borrowed money (other than purchase money Indebtedness for personal property included in the Purchased Assets), whether as a borrower, guarantor or otherwise.

5.25    Financial Advisors.  Except as set forth on Schedule 5.25, no Person has acted, directly or indirectly, as a broker, finder or financial advisor (a "Broker") for Dallas Stars in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

5.26    Related Party Transactions.  Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii), Schedule 5.26 or Schedule 5.7(c)(ii), to the Knowledge of Dallas Stars, no Hicks Affiliates, director, manager, partner or officer of Dallas Stars or the Stars Subsidiaries, or Affiliate of any such director or officer (each, an "Associate") (i) owns, directly or indirectly,

and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) in the case of Dallas Stars' or the Stars Subsidiaries' officers and directors, salaries and employee benefits and other transactions pursuant to any Seller Benefit Plan in the Ordinary Course of Business, (y) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars and (z) such transactions that will be terminated or unwound prior to the Closing.

5.27    Non-reliance of Dallas Stars.  Except for the specific representations and warranties expressly made by Purchasers in Article VII of this Agreement, Dallas Stars (1) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchasers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Stars or its representatives or made available to Dallas Stars and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (2) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (3) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article VII of this Agreement or by applicable Law; and (4) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in Article VII of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article XII.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA

Dallas Arena hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

6.1     Organization and Good Standing.  Dallas Arena is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Center GP is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  COC is a limited partnership duly organized and validly existing and in good standing under the Laws of the State of Texas.  Each of Dallas Arena, COC and Center GP has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each of Dallas Arena, COC and Center GP is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2     Authorization of Agreement.  Dallas Arena has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Dallas Arena in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Arena Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and each of the Dallas Arena Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of Dallas Arena.  This Agreement has been, and each of the Dallas Arena Documents will be at or prior to the Closing, duly and validly executed and delivered by Dallas Arena, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Arena Documents when so executed and delivered will constitute, legal, valid and binding obligations of Dallas Arena, enforceable against Dallas Arena in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 6.3(a), none of the execution and delivery by Dallas Arena of this Agreement or the Dallas Arena Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Dallas Arena with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or

cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of Dallas Arena or, as applicable, COC or Center GP; (ii) any Contract or Permit to which Dallas Arena or, as applicable, COC or Center GP, is a party or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; (iii) any Order of any Governmental Body applicable to Dallas Arena or, as applicable, COC or Center GP, or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; or (iv) any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 6.3(b)</u>, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Dallas Arena, COC or Center GP in connection with Dallas Arena's execution and delivery of this Agreement or the Dallas Arena Documents, the compliance by Dallas Arena with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under <u>Section 8.2</u>, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.4     <u>Capitalization</u>.

(a)     Dallas Arena owns a 50% limited liability company interest in Center GP and a 49.95% limited partnership interest of COC.  Center GP holds a 0.1% general partner interest of COC and is the sole general partner of COC.

(b)     The COC Equity Interests are not certificated.  The COC Equity Interests have not been registered under the Securities Act or any applicable state securities Laws.

(c)     All of the equity interests referenced in <u>Section 6.4(a)</u> and <u>6.4(b)</u> above were duly authorized for issuance and are validly issued.

(d)     Except as set forth on <u>Schedule 6.4(d)(i)</u>, there exists no existing option, warrant, call, right, or Contract to which Dallas Arena or, to the Knowledge of Dallas Arena, any COC Entity is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the COC Entities or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the COC Entities.  Except as set forth on <u>Schedule 6.4(d)(ii)</u>, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the COC Equity Interests.

6.5     Financial Statements.  Dallas Arena has made available to Purchasers copies of (i) the audited consolidated balance sheets of COC and its Subsidiary as at December 31, 2008, 2009 and 2010, and the related audited consolidated statements of income and cash flows of COC and its Subsidiary for the years then ended, and (ii) the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011, and the related unaudited consolidated statement of income of COC and its Subsidiary for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "COC Financial Statements").  Except as set forth in the notes thereto and as disclosed in Schedule 6.5, to the Knowledge of Dallas Arena, each of the COC Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of COC and its Subsidiary as at the dates and for the periods indicated therein.  For the purposes hereof, the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011 are collectively referred to as the "COC Interim Balance Sheet" and May 31, 2011 is referred to as the "COC Interim Balance Sheet Date."

6.6     Absence of Certain Developments.  Except as contemplated by this Agreement or as set forth on Schedule 6.6, since the COC Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as contemplated by this Agreement or as set forth on Schedule 6.6, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the COC Interim Balance Sheet Date, Dallas Arena has conducted the Business relating to the COC Equity Interests only in the Ordinary Course of Business, and to the Knowledge of Dallas Arena, there has been no:

(a)     change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(b)     distribution in cash or property in respect of the equity interest of Dallas Arena (other than distributions by any COC Entity); provided, that distributions by Dallas Arena shall not include any amounts paid to Dallas Stars; or

(c)     authorization, approval, agreement or commitment to do any of the foregoing.

6.7     Taxes.  To the Knowledge of Dallas Arena, except as set forth on Schedule 6.7, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)     Dallas Arena has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns.  All such Tax Returns are correct and complete in all material respects;

(b)     Dallas Arena has complied in all respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c)     There are no Liens for Taxes upon any of the Purchased Assets, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d)     No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against Dallas Arena that are still pending.  No requests for waivers of the time to assess any such Taxes have been made that are still pending.  No Tax Return of Dallas Arena is under current examination by the IRS or by any state, local, or foreign Taxing Authority, and there is no threat of a Tax audit with respect to any Tax Return of Dallas Arena.  All assessments for Taxes due from Dallas Arena with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e)     Dallas Arena is not liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f)     Since its formation, Dallas Arena has been properly treated as a disregarded entity for U.S. federal income tax purposes; and

(g)     Dallas Arena has not entered into any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, other than any "loss transactions" described in Treasury Regulation Section 1.6011-4(b)(5).

6.8     Real Property.

(a)     Dallas Arena does not own or lease any real property.

(b)     To the Knowledge of Dallas Arena, Schedule 6.8(b) sets forth (i) a complete list of all real property leases by any COC Entity as lessee and (ii) a complete list of all real property leases by any COC Entity as lessor except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  To the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any COC Entity under any of its real property leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Dallas Arena, each COC Entity is current in its rental payments under all of its real property leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     To the Knowledge of Dallas Arena, except as set forth on Schedule 6.8(c), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any leased real property of any COC Entity, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse

Effect. To the Knowledge of Dallas Arena, except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, all leased real properties of each COC Entity are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Dallas Arena, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such leased real property of the COC Entities, and neither Dallas Arena nor any of its Affiliates has received within the prior three (3) years written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

6.9     <u>Tangible Personal Property</u>. Dallas Arena does not own or lease any personal property. Except as set forth on <u>Schedule 6.9</u>, and except for notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by such COC Entity under any of its personal property leases to which it is a party.

6.10     <u>Intellectual Property</u>.

(a)     <u>Schedule 6.10(a)</u> sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Arena, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property. Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Arena have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Arena in full force and effect.

(b)     Except as set forth on <u>Schedule 6.10(b)</u>, Dallas Arena owns or has valid licenses to use all Purchased Intellectual Property owned by Dallas Arena as the same is used by Dallas Arena in the Ordinary Course of Business as of the date hereof, except to the extent the failure to be the owner or a valid licensee thereof could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Except as set forth on <u>Schedule 6.10(c)</u> and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, (i) none of the Purchased Intellectual Property owned by Dallas Arena nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) Dallas Arena has not received any written notice alleging that such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Arena.

(d)     Except as set forth on <u>Schedule 6.10(d)</u> and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, none of the Purchased Intellectual Property owned by Dallas Arena is being infringed, misappropriated or violated by any Person.

6.11     <u>Arena Material Contracts</u>.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, <u>Schedule 6.11(a)</u> sets forth the following material, written Contracts to which Dallas Arena is bound (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on <u>Schedule 6.11(a)</u>, collectively, the "<u>Arena Material Contracts</u>"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)     Contracts with any labor union or association representing any employees of Dallas Arena;

(iii)     Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)     Contracts under which (A) Dallas Arena grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Arena a license under any material Intellectual Property used or held for use exclusively in the Business or grants to Dallas Arena a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)     Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)     Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)     Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)     the Suite Contracts to which Dallas Arena is a party;

(ix)     Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)     Contracts for a partnership, joint venture or similar agreement;

(xi)     Contracts relating to any acquisition to be made by Dallas Arena of any operating business or the capital stock of any other Person;

(xii)     Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiii)     Contracts, other than Contracts with employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xiv)     marketing or advertising Contracts (A) with anticipated revenue to Dallas Arena in any 12-month period reasonably expected to be greater than $100,000 or (B) granting any material exclusive rights;

(xv)     Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvi)     Contracts granting any rights to broadcasts, whether radio, television or otherwise, games or events.

(b)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, Schedule 6.11(b) sets forth the following material, written Contracts to which any COC Entity is bound  (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on Schedule 6.11(b), collectively, the "COC Material Contracts"):

(i)     Contracts for a partnership, joint venture or similar agreement;

(ii)     Contracts relating to any acquisition to be made by any of the COC Entities of any operating business or the capital stock of any other Person; and

(iii)     Contracts relating to the incurrence of Indebtedness, or the making of any loans.

(c)     With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(c): (i) all of the Arena Material Contracts are in full force and effect and are valid and binding on and enforceable against Dallas Arena, and, to the Knowledge of Dallas Arena, the other parties thereto in accordance with their

terms; (ii) Dallas Arena is not in payment default under or monetary breach of, or to the Knowledge of Dallas Arena, otherwise in default under or in breach of, any Arena Material Contract to which it is a party; (iii) Dallas Arena has not waived any material future right under any Arena Material Contract to which it is a party; (iv) to the Knowledge of Dallas Arena, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Arena Material Contract; and (v) to the Knowledge of Dallas Arena, Dallas Arena has not given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Arena Material Contract that has not been resolved.

(d)     To the Knowledge of Dallas Arena and with such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(d): (i) all of the COC Material Contracts are in full force and effect and are valid and binding on and enforceable against the COC Entity party thereto and the other parties thereto in accordance with their terms; (ii) no COC Entity is in payment default under or monetary breach of, or otherwise in default under or in breach of, any COC Material Contract to which it is a party; (iii) no COC Entity has waived any material future right under any COC Material Contract to which it is a party; (iv) no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any COC Material Contract; and (v) no COC Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any COC Material Contract that has not been resolved.

(e)     Dallas Arena has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Arena Material Contract.

6.12    Employee Benefits.

(a)     Dallas Arena does not maintain any material "employee benefit plan" (as defined by ERISA) or any other material employee benefit plan or agreement.

(b)     Except for any representations and warranties in this Article VI regarding Contracts with Employees or compensation payable to Employees, this Section 6.12 represents the sole and exclusive representation and warranty of Dallas Arena regarding employee benefit matters.  Dallas Arena makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or any other plans that are not maintained by Dallas Arena.

6.13    Labor.

(a)     Except as set forth on Schedule 6.13(a), Dallas Arena is not a party to any labor or collective bargaining agreement.

(b)     Except as set forth on Schedule 6.13(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Arena, threatened against or involving Dallas Arena, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Arena, threatened by or on behalf of any

employee or group of employees or former employees of Dallas Arena, except in each case as could not reasonably be expect to have, individually or in the aggregate, a Material Adverse Effect.

6.14    Litigation.  Except as set forth on Schedule 6.14, there are no Legal Proceedings pending or threatened in writing against Dallas Arena, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.14, to the Knowledge of Dallas Arena, there are no material Legal Proceedings pending or threatened in writing against the COC Entities.  Except as set forth on Schedule 6.14, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

6.15    Compliance with Laws; Permits.

(a)    Dallas Arena is in compliance with all Laws applicable to the COC Equity Interests held by Dallas Arena and its Business, except where the failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.  Dallas Arena has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Arena has all Permits which are required for the operation of its Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Arena is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Arena is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.16    Environmental Matters. The representations and warranties contained in this Section 6.16 are the sole and exclusive representations and warranties of Dallas Arena pertaining or relating to any Environmental Laws or any matter arising under or associated with Environmental Laws.  Except as set forth on Schedule 6.16 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    the operations of Dallas Arena related to its ownership of the COC Equity Interests and, to the Knowledge of Dallas Arena, the operations of the COC Entities are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Environmental Permits;

(b)    none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any pending, or to the Knowledge of Dallas Arena, threatened claim alleging that Dallas Arena or such COC Entity may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law; and

(c)     to the Knowledge of Dallas Arena, there are no pending or threatened investigations of the Business or the AAC under Environmental Laws, which could reasonably be expected to result in Dallas Arena or any COC Entity incurring any material liability pursuant to any Environmental Law.

6.17     Insurance.  Schedule 6.17 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and: (i) that are owned or held by Dallas Arena or (ii) under which Dallas Arena is insured.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Arena with respect to any such policy.  Dallas Arena has complied in all material respects with the provisions of each such insurance policy under which they are insured, and all material claims under such insurance policies have been filed in a timely fashion.

6.18     Financial Advisors.  Except as set forth on Schedule 6.18, no Person has acted, directly or indirectly, as Broker for Dallas Arena in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

6.19     Related Party Transactions.  Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii) or Schedule 6.19, to the Knowledge of Dallas Arena, no Hicks Affiliates, director, manager, partner or officer of Dallas Arena or Affiliate of any such director or officer (each, an "Arena Associate") (i) owns, directly or indirectly, and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena and (y) such transactions that will be terminated or unwound prior to the Closing.

6.20     Non-reliance of Dallas Arena.  Except for the specific representations and warranties expressly made by Purchasers in Article VII of this Agreement, Dallas Arena (a) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations,

investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Arena or its representatives or made available to Dallas Arena and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (b) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (c) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement or by applicable Law; and (d) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article XII</u>.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby jointly and severally represent and warrant to Sellers as of the date of this Agreement and as of the Closing Date that:

7.1     <u>Organization and Good Standing</u>.  Each Purchaser is a limited partnership or corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited partnership or corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Purchaser is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization.

7.2     <u>Authorization of Agreement</u>.  Each Purchaser has full limited partnership or corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by such Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by each Purchaser of this Agreement and each Purchaser Document, to which such Purchaser is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all necessary limited partnership or corporate action on behalf of such Purchaser.  This Agreement has been, and each Purchaser Document to which such Purchaser is a party will be at or prior to the Closing, duly and validly executed and delivered by each such Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under <u>Section 8.2</u>, the entry of the Bidding Procedures Order) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights

and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

7.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 7.3 hereto, none of the execution and delivery by any Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by any Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of limited partnership, certificate of incorporation, limited partnership agreement, bylaws (or other organizational and governing documents) of any Purchaser, (ii) any Contract or Permit to which any Purchaser is a party or by which any Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to any Purchaser or by which any of the properties or assets of any Purchaser are bound, or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by any Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, the taking by any Purchaser of any other action contemplated hereby or for such Purchaser to conduct the Business, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, and (iv) the NHL Approvals.

7.4     Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchasers, threatened against any Purchaser, or to which any Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would be reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.  No Purchaser is subject to any Order of any Governmental Body except to the extent the same could not reasonably be expected to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.

7.5     Financial Advisors.  Except as set forth on Schedule 7.5, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

7.6     Investment Intention.  Each Purchaser is an accredited investor as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act").  Each applicable Purchaser is acquiring the Transferred Equity Interests for its own account, for investment purposes only and not with a view to the distribution thereof (as such term is used in

Section 2(11) of the Securities Act. Each Purchaser understands that the Transferred Equity Interests have not been registered under the Securities Act or any applicable state securities Laws, and that the Transferred Equity Interests cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

7.7  Financial Capability. As of the Closing Date, Purchasers will have sufficient cash to pay the consideration contemplated by Sections 3.1(a), (b), (d) and (e) to consummate the transactions contemplated by this Agreement.

7.8  NHL Information Requirements. As of the date hereof and as of the Closing Date, each Purchaser has provided all information to the NHL concerning itself and its Affiliates and its equity and debt financing sources (including the executed organizational documents of Purchasers, and personal background and financial information of all of the direct and indirect owners of Purchasers) required by the NHL to obtain the NHL Approvals, which information is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading, including completing and filing any and all necessary applications, background information forms, and any other documents and information required of them by the NHL to obtain the NHL Approvals in connection herewith. Purchasers and their Affiliates do not own, directly or indirectly, any interest in any NHL franchise. Purchasers agree to pay any and all fees and expenses owed to the NHL in connection with the transactions contemplated by this Agreement that are not otherwise paid, provided that the same shall be deemed to constitute Specified Expenses to the extent paid by Purchasers pursuant to Section 3.1(b) or otherwise. Purchasers have no reasonable basis to believe that Purchasers will fail to obtain any NHL Approvals necessary in connection with the transactions contemplated by this Agreement as a result of any facts known to Purchasers that have not otherwise been disclosed to the NHL, including any failure that is related to any of their debt or equity financing sources.

7.9  Non-reliance of Purchasers. Except for the specific representations and warranties expressly made by the respective Sellers in Articles V and VI of this Agreement:

(a)  each Purchaser acknowledges and agrees that (i) no Seller or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets including any Purchased Assets, the nature or extent of any Liabilities including the Assumed Liabilities, the prospects of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information including any Documents, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Sellers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise) furnished to Purchasers or its representatives or made available to Purchasers and their representatives in any "data rooms," "virtual data rooms," management

presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever, and (ii) no officer, agent, representative or employee of any Seller or any other Person has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided;

(b)     each Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Sellers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person;

(c)     each Purchaser specifically disclaims any obligation or duty by any Seller to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Articles V</u> and <u>VI</u> of this Agreement or by applicable Law; and

(d)     each Purchaser acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including acquiring the Purchased Assets and assuming the Assumed Liabilities, subject only to the specific representations and warranties set forth in <u>Articles V</u> and <u>VI</u> of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article XII</u>.

ARTICLE VIII

BANKRUPTCY COURT MATTERS

8.1     <u>Competing Transaction</u>.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of Competing Bids.  Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchasers and their Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to Sellers, the Purchased Assets and the Business and the assets of Sellers to Qualified Bidders.

8.2     <u>Sellers' Chapter 11 Bankruptcy Cases</u>.  Sellers and Purchasers acknowledge and agree that this Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court.  Sellers hereby agree to file the Bankruptcy Petitions and a motion seeking approval of the Bidding Procedures Order within two (2) Business Days of the execution of this Agreement, and to use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order no later than seven (7) days after the Petition Date.  On the Petition Date, Sellers shall file with the Bankruptcy Court the Plan, which shall include a request for Bankruptcy Court approval of this Agreement and the transactions contemplated hereby, subject to higher or better offers received by Sellers in accordance with the Bidding Procedures Order.  Sellers shall promptly advise Purchasers of any

written objection(s) filed with the Bankruptcy Court or otherwise served on Sellers either to this Agreement, the Plan or the Bidding Procedures Order.

8.3    Confirmation Order.  Sellers shall use their commercially reasonable efforts to promptly obtain the entry of the Confirmation Order and to perform such other acts as may be necessary to permit Sellers and their Subsidiaries to convey any interests they have in the Purchased Assets to Purchasers in accordance with the terms and conditions of this Agreement. Any changes to the form of the Confirmation Order or Plan affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion.  Upon entry of the Confirmation Order, and provided that no stay of the Confirmation Order is in effect, Sellers and Purchasers shall proceed to Closing so long as the Confirmation Order contains findings that Purchasers and Sellers are each acting in good faith and that Purchasers are acquiring rights in the Purchased Assets in good faith reliance on the Confirmation Order.  Sellers shall give Purchasers reasonable advance written notice of any hearings regarding the motions required to obtain the issuance of the Confirmation Order.

8.4    Cooperation in Bankruptcy Court Matters.

(a)    To the extent reasonably practicable, Sellers shall provide Purchasers, and Purchasers shall provide Sellers, with the opportunity to review and provide comments on any other filings and presentations of evidence with respect to any court proceeding related to the transactions contemplated hereunder, the Confirmation Order or the Bidding Procedures Order, and Sellers and Purchasers shall each use their commercially reasonable efforts (and Sellers and Purchasers shall cooperate, assist and consult with each other in connection with such efforts) to secure the entry of (i) the Confirmation Order and (ii) the Bidding Procedures Order.

(b)    Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchasers under the Purchased Contracts as required by section 365(b)(1)(C) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by such Purchaser under this Agreement and the Purchased Contracts and demonstrating that such Purchaser is purchasing the Purchased Assets in good faith and in good faith reliance on the Confirmation Order.  Purchasers agree that they will promptly take all actions reasonably required by Sellers or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of an order approving this Agreement, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its employees and representatives available to be interviewed by Sellers' attorneys and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Purchasers under the Purchased Contracts.  If a written objection is filed to the motion seeking approval of this Agreement, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Sellers and Purchasers shall use commercially reasonable efforts to have such objection overruled.  In the event the entry of the Confirmation

Order or the Bidding Procedures Order shall be appealed, Sellers and Purchasers shall use their respective commercially reasonable efforts to defend such appeal.

8.5     Break Up Fee and Expense Reimbursement.

(a)     Each party agrees and acknowledges that the parties' negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by the parties, and that the negotiation and execution of this Agreement have provided value to the parties.  Therefore, if (x) this Agreement is terminated pursuant to Section 4.2(h), by Sellers pursuant to Section 4.2(a) or Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e), and (y) a Competing Bid closes within 180 days of such termination, then Sellers shall cause Purchasers to be paid out of the proceeds of such Competing Bid an amount equal to $4,000,000 as a break-up fee (the "Break-Up Fee") and shall reimburse Purchasers for the Transaction Expenses of Purchasers in an amount not to exceed $500,000 (the "Expense Reimbursement") in immediately available funds and without need for further Order of or from the Bankruptcy Court (other than the Bidding Procedures Order); provided, that the Break-Up Fee and Expense Reimbursement shall not be payable if this Agreement is terminated by Sellers pursuant to Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e) in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under Section 9.9) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals.

(b)     Any Break-Up Fee payable pursuant to Section 8.5(a) shall be paid directly to Purchasers out of the purchase price paid by the Successful Bidder contemporaneously with the closing of a Competing Bid along with the payment of any obligations still outstanding under the Expense Reimbursement if not yet satisfied, and Sellers shall cause such payment(s) to be made as a condition to the closing of a Competing Bid.  The Expense Reimbursement payable pursuant to Section 8.5(a) shall be paid by Sellers within three (3) Business Days of receipt of reasonable evidence of the amounts constituting Purchasers' Transaction Expenses, in the form of a summary invoice, redacted to preserve attorney-client privilege and attorney work product.

(c)     Sellers hereby acknowledge that their obligations to pay the Break-Up Fee and Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.  Such obligations of Sellers shall have administrative superpriority status against Sellers and their Subsidiaries and their respective estates under Section 503(b) and 507(a) of the Bankruptcy Code, and with priority over all other expenses of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code.

8.6     Leases and Contracts.  Pursuant to Section 365 of the Bankruptcy Code, all of Sellers' right, title and interest in and to the Purchased Contracts shall be assumed by Sellers and assigned to Purchasers pursuant to the assignment and assumption agreement described in Exhibit L.

8.7     Notice to Parties-in-Interest.  Not later than three (3) Business Days following entry of the Bidding Procedures Order, or by such other date as ordered by the Bankruptcy Court

(the "Notice Deadline"), (a) the Office of the United States Trustee for the District of Delaware; (b) the parties included on the Master Service List filed with the Bankruptcy Court in connection with the Bankruptcy Cases; (c) all counterparties to the Purchased Contracts; (d) all parties with Liens on or against the Purchased Assets; and (e) all affected federal, state and local Governmental Bodies and Taxing Authorities, including the IRS, and any federal, state or local Governmental Body with regulatory or tax jurisdiction with respect to the Purchased Assets or the Assumed Liabilities, shall, in each case, be duly notified by Sellers of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein.  On or before the Notice Deadline, Sellers shall use commercially reasonable efforts to duly notify the foregoing and such other Persons reasonably requested and identified by Purchasers, in each case, of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein. Not later than three (3) Business Days following the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall also publish notice of the Auction in the *Wall Street Journal* and *Dallas Morning News*.

## ARTICLE IX

## COVENANTS

9.1     Access to Information. From and after the date of this Agreement and until the Closing, Sellers shall, and shall use commercially reasonable efforts to cause the COC Entities and their respective Subsidiaries to, permit Purchasers, through their officers, employees and representatives (including their legal advisors and accountants), to make such investigation of the properties, businesses and operations of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business and such examination of the books and records of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers to cooperate with Purchasers and Purchasers' representatives in connection with such investigation and examination, and Purchasers and their representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to the business of Sellers and their Subsidiaries.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Seller is bound.  Notwithstanding anything to the contrary contained herein, prior to the Closing, without the prior written consent of Sellers, which may be withheld for any reason, Purchasers shall not contact any suppliers to, or customers of, any Seller or, except as permitted by Section 9.6 hereof, any lenders to any Seller. Purchasers shall have no right to perform invasive or subsurface investigations of the properties or facilities of Sellers or any of their Subsidiaries without the prior written consent of Sellers in their sole and absolute discretion.

9.2     <u>Conduct of the Business Pending the Closing</u>.

(a)     Prior to the Closing, except (I) as set forth on <u>Schedule 9.2(a)</u>, (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement, (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall and shall cause the Transferred Subsidiaries and (to the extent feasible under governing documents of the COC Entities) the COC Entities to:

(i)     conduct the Business only in the Ordinary Course of Business;

(ii)     use their commercially reasonable efforts to preserve the present business operations, organization and goodwill of Dallas Stars, Dallas Arena, the Stars Subsidiaries and the Business, which will not require any Seller to renew any Contracts or exercise any rights under any Contracts outside of the Ordinary Course of Business;

(iii)     promptly deliver notice to Purchasers in writing of any specific event or circumstance of which any Seller receives notice that: (A) has resulted or could reasonably be expected to result in any of the conditions set forth in <u>Section 11.1</u> or <u>11.2</u> not being satisfied; (B) any Legal Proceeding (other than the Bankruptcy Case contemplated by this Agreement) is pending or threatened that relates to the transactions contemplated by this Agreement; or (C) any of the covenants or agreements of any Seller contained in this Agreement is breached in any material respect; and

(iv)     continue in full force and effect all Insurance Policies or renewal of Insurance Policies on equivalent terms with the same or different insurance carriers.

(b)     Prior to the Closing, except (I) as set forth on <u>Schedule 9.2(b)</u>, (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement (including in connection with any Competing Bid), (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall not and shall cause the Transferred Subsidiaries not to:

(i)     other than in the Ordinary Course of Business (A) materially increase the annual level of compensation of any executive officer of Dallas Stars or any other Continuing Employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any executive officer of Dallas Stars or any other Continuing Employee, (C) adopt, or materially increase the coverage or benefits available under, any Stars Benefit Plan or, solely with regard to the Continuing Employees, any Seller Benefit Plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any executive officer of Dallas Stars or any other Continuing Employee, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Benefit Plans (except with respect to new hires) and except with respect to any Hockey Player Employee, coach, or general manager;

(ii)  subject any of the Purchased Assets to any Lien, except for Permitted Exceptions and Assumed Liabilities;

(iii)  acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of a material portion of the Purchased Assets (except pursuant to an existing Contract set forth on Schedule 5.13(a), 6.11(a) or 6.11(b), Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory, otherwise in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets or as required by NHL);

(iv)  cancel or compromise any material debt or claim or waive or release any material right of Sellers that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)  enter into any commitment for capital expenditures of the Business in excess of $400,000 in the aggregate, except as approved by the NHL or reasonably necessary to address a public safety issue or to continue the current level of operations of the Business;

(vi)  enter into, modify or terminate any labor or collective bargaining agreement related to the Business, except as approved by the NHL;

(vii)  enter into or agree to enter into any merger or consolidation with any Person;

(viii)  other than in the Ordinary Course of Business or as required by applicable Law or the NHL, enter into any agreement that would amend any Real Property Lease, or otherwise affect the operation of any real property subject to a Real Property Lease or any real property set forth on Schedule 5.10(a)(i) or 5.10(b);

(ix)  make any distribution in cash or property in respect of the equity interest of Sellers or the Transferred Subsidiaries (other than solely between any Seller and/or any Transferred Subsidiary);

(x)  (A) sell, assign, transfer, issue or otherwise dispose of any interest in the Stars Subsidiaries, or any securities or obligations convertible into or exchangeable for any such interests, or any options, warrants or conversion or other rights to acquire any such interests, or any such securities or obligations; (B) effect any reorganization or recapitalization; or (C) split, combine or reclassify any interest of the Stars Subsidiary, or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for any interest of the Stars Subsidiaries;

(xi)  propose or adopt any amendments to the governance documents of the Stars Subsidiaries;

(xii)  incur any Indebtedness for borrowed money (other than pursuant to the CFV Debt Agreement);

(xiii)   make any contribution, loan or other payment, or enter into any agreement with, any Hicks Affiliate (other than Sellers, the Transferred Subsidiaries, or the COC Entities); or

(xiv)   agree to do anything prohibited by this Section 9.2(b).

Notwithstanding the foregoing, nothing herein shall limit or otherwise impair Dallas Stars' unfettered right to operate the Stars as it deems fit in its sole and absolute discretion, or give Purchasers, directly or indirectly, any right to control or direct (including by way of any veto right) the operations of the Stars, including without limitation with respect to (i) the making or not making of any player personnel decisions, including assignments, trades, acquisitions, dispositions, waivers, drafts, or the like, (ii) hiring or firing (or changing or eliminating the responsibilities of) of any hockey operations personnel, including any general manager, coach, assistant coach, scout, trainer, team medical and athletic training personnel, and (iii) the conduct, performance or management of any hockey activities; provided, however, that prior to: (A) entering into any standard player's contract, or extending any existing standard player's contract, with any Hockey Player Employee that would provide for: (I) potential payments during any season in an amount greater than $2,000,000 or a signing bonus in an amount greater than $750,000, or (II) a term of three (3) years or more, (B) the hiring or firing of the general manager or head coach of the Stars, or (C) trading any Hockey Player Employee who had been on the Stars' active roster for at least 43 NHL games during the 2010-2011 season, Dallas Stars shall give reasonable notice thereof to Tom Gaglardi, on behalf of Purchasers and shall consult with Tom Gaglardi on behalf of Purchasers with respect thereto if and to the extent such notice and consultation is, in Dallas Stars' sole discretion, reasonable and appropriate under the circumstances and otherwise in compliance with NHL Rules, provided, further that for the avoidance of doubt, failing to so consult for whatever reason and/or the taking of any action set forth in clauses (A)-(C) above without notice or consultation following any notice and consultation shall not be a breach of this Agreement.

9.3    Consents.  Subject to the respective specific obligations of the parties under this Agreement to obtain certain consents and approvals, Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b), Section 6.3(b) and Section 7.3(b) hereof; provided however, that no party shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or initiate any litigation or Legal Proceedings to obtain any such consent or approval, in each case except as otherwise specifically contemplated by this Agreement.

9.4    Regulatory Approvals.

(a)    If necessary, Purchasers and Sellers shall (i) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 15 Business Days after the date of this Agreement in the case of all filings required under the HSR Act and within four weeks in the

case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or Affiliates from the FTC or the U.S. Department of Justice or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of the FTC or the U.S. Department of Justice or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use its commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers, on the one hand, or Purchasers, on the other hand, may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 9.4</u> as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(b)     Each Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "<u>Antitrust Laws</u>"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any Antitrust Law, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and, at Purchasers' option and at Purchasers' sole cost and expense, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by reasonably pursuing available avenues of administrative and judicial appeal. Each Purchaser and Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such

transactions as promptly as possible after the date of this Agreement.  All fees associated with filings required by the HSR Act or any other Antitrust Laws shall be paid by Sellers (the "Antitrust Fees").

9.5     Further Assurances.  Subject to, and not in limitation of, Sections 9.3 and 9.4, each Seller and each Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

9.6     Confidentiality.

(a)     Subject to Section 9.6(b) below, each Purchaser acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of the confidentiality agreement between HSG and Tom Gaglardi dated as of March 31, 2010 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference and remain in full force and effect after the execution of this Agreement, and which shall be binding on each Purchaser as if such Purchaser were Tom Gaglardi and shall be binding on Purchasers for the benefit of Sellers as if Sellers were HSG under the Confidentiality Agreement, subject to the following modifications: Purchasers and their Representatives (as defined in the Confidentiality Agreement) are permitted to (i) communicate with the Lenders regarding the transactions contemplated by this Agreement and (ii) communicate with the NHL.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information to the extent relating to the Business, the Assumed Liabilities and the Purchased Assets; provided, however, that each Purchaser acknowledges that any and all other Confidential Information (as defined in the Confidentiality Agreement) provided to it by any Seller or its representatives concerning any Seller or its Affiliates (other than any Transferred Subsidiary), any Excluded Liability or any Excluded Asset shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)     Notwithstanding anything in this Agreement or the Confidentiality Agreement to the contrary, Purchasers and Sellers acknowledge and agree that in connection with filing the Bankruptcy Case, this Agreement will be filed with the Bankruptcy Court and made publicly available.

9.7     Preservation of Records.  Purchasers agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business for a period of seven years from the Closing Date, and each Seller shall, and shall use commercially reasonably efforts to cause their Affiliates to, preserve and keep records held by them relating to the Business until the earlier of such Seller's dissolution or the expiration of a period of seven years from the Closing Date, and each party shall provide reasonable access to and make such records and personnel available to the other as may be reasonably required by such party and its Affiliates during regular business hours and upon reasonable advance notice in connection with, among other things, preparation of regulatory filings, Tax Returns, any insurance claims, Legal Proceedings or Tax audits or examination against or governmental investigations of Sellers or Purchasers or any of their Affiliates or in order to enable Sellers or Purchasers to comply with

their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. Sellers or Purchasers, as applicable, at their sole cost and expense may make copies of the books and records to which they are entitled to access pursuant to this Section 9.7.

9.8    Publicity.  Prior to Closing, except as required by applicable Law, NHL Rules, or the NHL Documents, neither Sellers nor Purchasers shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the judgment of Purchasers or Sellers, as applicable, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that, the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the timing and content thereof.

9.9    NHL Approvals.  Prior to or on the date hereof, Purchasers shall have, and shall have caused all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to have, completed and filed with the NHL all necessary applications, background information forms, and any other documents and information required of them under the NHL Constitution and NHL By-Laws to obtain the NHL Approvals.  Upon Closing, Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries (as required by the NHL) to, execute the NHL owner's consent in substantially the form attached hereto as Exhibit F (the "NHL Owner Consent"), the NHL/lender cooperation letter agreement in substantially the form attached hereto as Exhibit G (the "NHL/Lender Cooperation Agreement"), the NHL guaranty in substantially the form attached hereto as Exhibit H (the "NHL Guaranty"), and one or more NHL proxies in substantially the forms attached hereto as Exhibit I (the "Purchaser/NHL Proxy").  Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to, use commercially reasonable efforts to obtain receipt of NHL Approvals at the earliest practicable date; provided that Purchasers shall not be required to enter into any additional material obligations to the extent such obligations are not provided for in the NHL Owner Consent, NHL/Lender Cooperation Agreement, NHL Guaranty or Purchaser/NHL Proxy in the forms attached hereto as Exhibits F through H, respectively, other than any additional obligations required by the NHL as a result of any information provided to the NHL after the date hereof or any other action, requirement or request from Purchasers.

9.10    Stars Foundation.  Effective as of the Closing, Sellers shall use their commercially reasonable efforts to secure resignations of current officers and directors of the Stars Foundation as of the Closing and to cause the Stars Foundation to elect such replacement officers and directors as directed by Purchasers or their designated Affiliates.

9.11    Senior Secured Loan.  Prior to or contemporaneously with the Closing, Purchasers shall execute a credit agreement dated as of the Closing Date in substantially the form attached hereto as Exhibit J (the "Senior Secured Loan"), subject to such changes that are not materially adverse to Purchasers or the transactions contemplated by this Agreement, and deliver executed copies of the Senior Secured Loan to the lenders thereunder.  Additionally, prior to or

contemporaneously with the Closing, Purchasers shall satisfy all of the conditions precedent to funding under the Senior Secured Loan and all other documents related thereto, save and except for (i) execution and delivery of the NHL/Lender Cooperation Agreement by parties other than the Purchasers and their Affiliates or (ii) satisfaction of the conditions set forth in Article IV(c) of the Senior Secured Loan, provided that the failure to satisfy Article IV(c) of the Senior Secured Loan is not the result of any breach by the Purchasers or their Affiliates of any provision of this Agreement or any other provision of the Senior Secured Loan. Purchasers shall perform their obligations, and cause any of their Affiliates party thereto to perform their obligations, under the Senior Secured Loan as of and on the Closing Date. Purchasers shall take all action necessary to cause all other parties to the Senior Secured Loan to perform such party's obligations under the Senior Secured Loan as of and on the Closing Date. Purchasers shall cause the First Lien Lenders to enter into the Senior Secured Loan and the NHL/Lender Cooperation Agreement in substantially the forms attached hereto as Exhibit J and Exhibit G, respectively.

9.12    Guarantee. Guarantor hereby fully and irrevocably guarantees the payment and performance of Purchasers' obligations under this Agreement, including payment of the Purchase Price at Closing. Guarantor is hereby made fully responsible for the acts and omissions of Purchasers pursuant to the terms of this Agreement. This guarantee shall be a full, unconditional, irrevocable, absolute and continuing guarantee of payment and performance and not a guarantee of collection, and Guarantor shall remain liable for the Purchase Price hereunder until its payment in full. Guarantor hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against any Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 9.12.

9.13    Disclosure Schedules; Supplementation and Amendment of Schedules. Sellers may, in their reasonable discretion, include in the Schedules items that are not material in order reasonably to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other applicable Schedule if the applicability of such information to such other Schedules is reasonably apparent on its face. From time to time prior to the Closing, Sellers shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement to have been omitted in error (including by creating new schedules where none are currently referenced herein); provided that, such supplement or amendment shall thereafter be deemed to modify the applicable Schedule or Schedules and this Agreement and the representations and warranties contained herein (both as of the date hereof and as of the Closing Date) for all purposes under this Agreement (except to the extent limited under Section 4.2(f) and 4.2(g)), including for the purpose of determining whether the conditions to Closing set forth in Section 11.1(a) have been satisfied. For purposes of this Section 9.13, any items included or described in the Schedules that are based on documents that have not been made available to Purchasers at any time prior to the date hereof shall be deemed to have been provided in a supplement to the Schedules delivered by Sellers on the date hereof. No supplement or amendment to a Schedule pursuant to this Section 9.13 shall be deemed to be an amendment to this Agreement for purposes of Section 13.5. In conjunction with Sellers' delivery to Purchasers

of any supplement or amendment to a Schedule pursuant to this <u>Section 9.13</u>, Sellers shall also deliver to Purchasers such underlying documentation and information as reasonably necessary for Purchasers to be able to understand and analyze the matter(s) reflected in such supplement or amendment.

9.14    <u>Insurance</u>.

(a)    To the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "occurrence based" liability insurance, Sellers shall use their commercially reasonable efforts, prior to the Closing, to cause, or cause any applicable Affiliate of Sellers to cause, Purchasers to be added as an additional insured, on a primary and noncontributory basis, under such Insurance Policy for the current policy year and the preceding six (6) policy years solely with respect to pre-Closing occurrences, injury and/or damage. Additionally, to the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "claims made" liability insurance coverage, Sellers shall use their commercially reasonable efforts, prior to Closing, to ensure that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Business or the Purchased Assets for a period of not less than six (6) years following the Closing. Notwithstanding the foregoing, no Seller shall be required to make any payment to any insurance provider in order to secure coverage for Purchasers under any Insurance Policy prior to or after Closing, nor will any Seller have any obligation to continue to make any premium payments or to take any other affirmative actions with respect to the Insurance Policies from and after the Closing Date; <u>provided</u>, <u>however</u>, that if prior to or after Closing, if Purchasers determine that any payments are necessary to secure coverage for Purchasers under any Insurance Policy, as provided in this <u>Section 9.14(a)</u>, then to the extent permitted by applicable Law and the terms of such Insurance Policy, Purchasers shall have the option to make such payment on behalf of Sellers to effectuate such continued coverage.

(b)    If Purchasers provide a written notice to Sellers after the Closing that any claim has arisen, or otherwise exists, that is covered under any Insurance Policy that is not assigned to Purchasers under <u>Section 2.1(o)</u> (an "<u>Excluded Insurance Policy</u>") and under which Purchasers have not then been added as an additional insured as provided in <u>Section 9.14(a)</u> relating to a matter that would be an Assumed Liability if not covered by such Excluded Insurance Policy (such claim, an "<u>Excluded Insurance Claim</u>"), and if such notice is accompanied by instructions regarding the process for reporting and pursuing recovery on such Excluded Insurance Claim under the relevant Insurance Policies, then promptly following receipt of such written notice from Purchasers, Sellers shall use their commercially reasonable efforts to report such Excluded Insurance Claim within such time and in such manner as required under such Excluded Insurance Policy (to the extent such time period has not expired) and shall further use their commercially reasonable efforts to pursue recovery on such Excluded Insurance Claim, all in accordance with Purchasers' instructions, and upon the receipt by Sellers of any insurance proceeds, Sellers shall promptly pay Purchasers such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any losses, damages or other amounts borne by Purchasers arising from such Excluded Insurance Claim). However, Purchasers shall be responsible for and reimburse Sellers for any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses

associated with Sellers' own employees) incurred by any Seller in pursuing any Excluded Insurance Claim for the benefit of any Purchaser pursuant to its obligations under this <u>Section 9.14(b)</u>, along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses that would otherwise be borne by Sellers as a result of any such Excluded Insurance Claim. At the reasonable request of any Seller, Purchasers shall advance such out-of-pocket costs to Sellers. Sellers (in their sole discretion) may elect to authorize any Purchaser, to the extent permitted by applicable Law and the terms of such Excluded Insurance Policies, at Purchasers' expense, to perform all the obligations and receive all the benefits of Sellers under such Excluded Insurance Policies relating to any Excluded Insurance Claim and appoint any Purchaser as their attorney-in-fact to act in their name on their behalf, in which case, (i) Purchasers agree to indemnify and hold Sellers and their Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to any Purchaser's performance of, or failure to perform, such obligations under such Excluded Insurance Policies and (ii) Sellers shall be relieved of their obligations under this <u>Section 9.14(b)</u> with respect to such Excluded Insurance Claim, but only to the extent Purchasers are allowed to perform such obligations under Applicable Law and the terms of such Excluded Insurance Policies. Nothing herein shall be deemed to require any Seller to maintain its existence for any period of time following the Closing.

9.15 <u>Change of Name</u>. Within five (5) Business Days after the Closing Date, Sellers shall discontinue the use of the "Dallas Stars" and "StarCenter" name in any manner and shall change their limited partnership, corporate or limited liability company name to a name that does not include "Dallas Stars" or "StarCenter" or any confusingly similar variations thereof; <u>provided</u>, <u>however</u>, that each Seller may continue to use the "Dallas Stars" and "StarCenter" names in connection with identifying itself as a former owner of the Stars, the Dr Pepper StarCenters or any of the Stars Entities or COC Entities. Upon the written request of Purchasers, Sellers shall execute such consents, to be delivered at Closing, as any Purchaser may reasonably require in connection with the Delaware or Texas Secretaries of State, as applicable, to change its corporate, limited partnership or limited liability company name at Closing to a name containing "Dallas Stars" or "StarCenter".

9.16 <u>Bankruptcy Compliance</u>. Prior to the entry of the Confirmation Order, Sellers and Purchasers that are corporations (as defined by the Bankruptcy Code) shall take such actions as are necessary for those corporations to comply with the requirements of Section 1123(a)(6) of the Bankruptcy Code.

9.17 <u>Plano StarCenter</u>. Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all necessary consents and approvals of General Electric Capital Corporation, as lender under that certain Loan Agreement, dated as of September 1998, by and between General Electric Capital Corporation and Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), as amended, required to consummate the transactions contemplated by this Agreement. In the event that General Electric Capital Corporation fails or refuses to provide such necessary consents and approvals on terms and conditions reasonably satisfactory to Sellers, then Sellers in their sole and absolute discretion may elect, by delivering written notice to Purchasers on or before the Closing Date, that the 100% membership interests in Plano StarCenter held by Dallas Stars shall not be deemed a Transferred Equity Interest or a Purchased Asset and shall instead be

an Excluded Asset hereunder which will not be transferred to Purchasers at the Closing. Notwithstanding anything to the contrary set forth in this Agreement, if General Electric Capital Corporation shall fail or refuse to grant its consent or approval and the Sellers elect to treat the membership interests in Plano StarCenter as an Excluded Asset pursuant to this <u>Section 9.17</u>, (i) Purchasers shall have no right to terminate this Agreement as a result thereof and (ii) such consent of General Electric Capital Corporation shall in no event constitute a condition precedent to Closing, and (iii) the parties agree that there shall be no adjustment to the Purchase Price as a result thereof.

ARTICLE X

EMPLOYEES AND EMPLOYEE BENEFITS

10.1    <u>Employment.</u>

(a)    <u>Employees.</u> Sellers shall update <u>Schedule 10.1(a)</u> within three (3) Business Days prior to the Closing for any changes thereto and shall deliver the updated <u>Schedule 10.1(a)</u> to Purchasers at the Closing.

(b)    <u>Offer of Employment</u>.  Prior to the Closing, Purchasers shall offer employment to each non-player Employee who is not a party to a Purchased Contract, to commence employment with Purchasers immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment.  Notwithstanding the foregoing, any such offer of employment to a non-player Employee who is not a participant in an NHL Benefit Plan as of the Closing and who is on a leave of absence on the Closing Date by reason of military leave or long-term disability, whether such leave is paid, unpaid or otherwise (an "<u>Inactive Employee</u>"), may be conditioned upon: (i) the Closing occurring, and (ii) such Inactive Employee commencing active employment with Purchasers on a date that is the later of (A) nine months after the Closing Date (or the next applicable work-day to the extent such date does not fall on a work-day) or (B) such longer period of time as required by Law.

(c)    <u>Continuing Employees</u>.  All non-player Employees who actually commence employment with Purchasers (including all Inactive Employees who commence employment with Purchasers as described in <u>Section 10.1(b)</u>), as well as all Hockey Player Employees, are referred to as "<u>Continuing Employees</u>."

(d)    <u>Severance</u>.  Notwithstanding anything to the contrary contained in <u>Section 10.1(b)</u>, Purchasers shall provide each Continuing Employee who incurs a termination of employment on or before the first anniversary of the Closing Date with severance payments and severance benefits that are no less favorable than the severance payments and severance benefits to which such individual would have been entitled with respect to such termination under the severance policies (including any applicable Contracts with such Continuing Employee) in place immediately prior to the Closing, as described in any such applicable Contracts and in Sellers' guidelines for severance pay as set forth in <u>Schedule 10.1(d)</u>; <u>provided</u>, <u>however</u>, Purchasers shall not be obligated to provide to any Continuing Employee who is not a party to a written employment, collective bargaining, severance or similar agreement with cash severance

payments in excess of eight (8) weeks of such Continuing Employee's base salary as in effect immediately prior to the Closing Date.

(e)    Standard Procedure.  Pursuant to the "Standard Procedure" provided in section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Purchasers and Sellers shall report on a predecessor/successor basis as set forth therein, (ii) Sellers will not be relieved from filing a Form W-2 with respect to any Continuing Employees, and (iii) Purchasers will undertake to file (or cause to be filed) a Form W-2 for each such Continuing Employee with respect to the portion of the year during which such Continuing Employees are employed by Purchasers that includes the Closing Date, excluding the portion of such year that such Continuing Employee was employed by Sellers.

(f)    Sellers and Purchasers hereby agree that the "Asset Purchase Transaction Exception" set forth in Section 1.409A-1(h)(4) of the Treasury Regulations shall apply to the transactions contemplated under this Agreement so that each Continuing Employee will not be treated as having experienced a separation from service for purposes of applying the provisions of any nonqualified deferred compensation plan maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or are obligated to contribute for such Continuing Employee.

10.2    Employee Benefits.

(a)    Benefits.  Purchasers shall provide, or cause to be provided, from the Closing Date through December 31, 2011 or such longer period of time required by applicable Law, to each of the Continuing Employees, compensation (including salary, wages and opportunities for commissions, bonuses, incentive pay, overtime and premium pay), employee benefits, location of employment and a position of employment that are, in the aggregate, substantially comparable to those provided to such Continuing Employee immediately prior to the Closing; provided that Purchasers shall not have any obligation to issue, or adopt any plans or arrangements providing for the issuance of, equity, warrants, options or other rights in respect of any equity of any entity or any securities convertible or exchangeable into such shares pursuant to any such plans or arrangements; provided further, that no plans or arrangements of Sellers providing for such issuance shall be taken into account in determining whether employee benefits are substantially comparable in the aggregate.  Purchasers hereby acknowledge that the Seller Benefit Plans will not be available for the benefit of, and will cease to produce active coverage for, any Continuing Employee after the Closing.  Purchasers acknowledge and agree that Sellers make no representations or warranties to Purchasers regarding the NHL Benefit Plans.

(b)    Purchaser Plans.  For purposes of eligibility, vesting and levels of benefits under the employee benefit plans of Purchasers providing benefits to Continuing Employees (the "Purchaser Plans"), Purchasers shall credit each Continuing Employee with his or her years of service with Sellers, to the same extent as such Continuing Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. The Purchaser Plans shall not deny Continuing Employees coverage on the basis of pre-existing conditions and shall credit such Continuing Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in the Purchaser Plans.

(c)     No Employee Restrictions.  Nothing contained in this Section 10.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Continuing Employee or any change in the employee benefits available to any individual Continuing Employee.

(d)     Accrued Vacation.  Except as required by applicable Law, Purchasers shall be responsible for all Liabilities with respect to Continuing Employees attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.

(e)     Worker's Compensation.  Purchasers hereby agree to assume, as of the Closing, all Liabilities, if any, of Dallas Stars and the Stars Subsidiaries with respect to worker's compensation relating to Employees and Former Employees, if applicable, but only to the extent that (i) such Liabilities, if any, are not covered by the Insurance Policies or (ii) such Liabilities, if any, are covered by any Insurance Policies and such Insurance Policies or the benefits thereof are assigned to Purchaser pursuant to the terms hereof.

ARTICLE XI

CONDITIONS TO CLOSING

11.1     Conditions Precedent to Obligations of Purchasers.  The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since the Dallas Stars Interim Balance Sheet Date or the COC Interim Balance Sheet Date, respectively;

(d)     Sellers shall have delivered, or caused to be delivered, to Purchasers stock certificates (or affidavits of lost stock certificates) representing the Hockey Enterprises Shares that are owned by Sellers, duly endorsed in blank or accompanied by stock transfer powers;

(e)     Dallas Stars shall have delivered, or caused to be delivered, to Purchasers a duly executed bill of sale in the form of Exhibit K hereto;

(f)     Sellers shall have delivered, or caused to be delivered, to Purchasers a duly executed assignment and assumption agreement in the form of Exhibit L hereto;

(g)     Sellers shall have delivered, or caused to be delivered, to Purchasers the applicable Seller Documents;

(h)     Sellers shall have delivered, or caused to be delivered, to Purchasers an updated calculation of the CFV Debt Amount as of the Closing Date; and

(i)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9.

11.2     Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchasers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date;

(c)     Purchasers shall have delivered, or caused to be delivered, to Sellers evidence of the wire transfers referred to in Section 3.3(a);

(d)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9; and

(e)     Purchasers shall have delivered, or caused to be delivered, to Sellers a duly executed assignment and assumption agreement in the form of Exhibit L hereto and executed versions of the applicable Purchaser Documents.

11.3     Conditions Precedent to Obligations of Sellers and Purchasers.  The obligations of either Sellers or Purchasers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers or Purchasers (except as provided in Section 11.3(g)) in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(c)     Sellers and Purchasers shall have obtained a release of all Liens held pursuant to the Senior Indebtedness against the Purchased Assets pursuant to the Confirmation Order;

(d)     Sellers shall have obtained those consents listed on <u>Schedule 11.3(d)</u> in a form reasonably satisfactory to Purchasers and copies thereof shall have been delivered to Purchasers;

(e)     the Bankruptcy Court shall have entered the Bidding Procedures Order;

(f)     the Bankruptcy Court shall have entered the Confirmation Order and any stay period applicable to the Confirmation Order shall have expired or shall have been waived by the Bankruptcy Court; and

(g)     the Closing Date (as defined in the Senior Secured Loan) shall have occurred and the Term Loans (as defined in the Senior Secured Loan) shall have been deemed made pursuant to the terms of the Senior Secured Loan; for the avoidance of doubt, the condition precedent provided in this <u>Section 11.3(g)</u> may not be waived by Purchasers or Sellers without the consent of the First Lien Agent and Monarch as provided in <u>Section 13.5</u>.

11.4     <u>Frustration of Closing Conditions</u>.  No Seller or Purchaser may rely on the failure of any condition set forth in <u>Section 11.1</u>, <u>11.2</u> or <u>11.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XII

SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES

12.1     <u>Survival</u>.

(a)     The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

(b)     All of the covenants or other agreements of the parties contained in this Agreement shall survive until the earlier of such covenant or agreement being fully performed or fulfilled or until the termination of the applicable survival period referenced in the next sentence, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance. No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed at or prior to Closing (the "<u>Pre-Closing Covenants</u>") may be made or brought by any party hereto more than

180 days following the Closing Date (the "Pre-Closing Covenant Survival Period") and (ii) by their nature are required to be performed after Closing (the "Post-Closing Covenants") may be made or brought by any party hereto after the one (1)-year anniversary of the last date on which each such Post-Closing Covenant was required to be performed (in each case, a "Post-Closing Covenant Survival Period"); provided, however, that any obligation under Sections 12.2(a)(i), 12.2(a)(iii), 12.3(a)(i), and 12.3(a)(iv) shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor in reasonable detail to the indemnifying party in accordance with Section 12.4 before the termination of the Pre-Closing Covenant Survival Period or Post-Closing Covenant Survival Period, as applicable.

12.2    Indemnification by Sellers.

(a)    Subject to this Article XII, each Seller hereby agrees from and after the Closing to, severally and not jointly, indemnify and hold Purchasers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Purchaser Indemnified Parties") harmless from and against:

(i)    any and all losses, Liabilities, claims, demands, assessments, judgments, notices, suits, actions, proceedings, obligations, damages, fines, penalties, costs and expenses, including attorneys' and other professionals' fees and disbursements (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Sellers;

(ii)    any and all Losses based upon or arising directly from any Excluded Asset or any Excluded Liability; and

(iii)    any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of Sellers.

(b)    Purchasers acknowledge and agree that Sellers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Purchasers after the Closing Date in breach of this Agreement.  Purchasers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.3    Indemnification by Purchasers.

(a)    Subject to this Article XII, each Purchaser hereby agrees from and after the Closing to, jointly and severally, indemnify and hold Sellers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Seller Indemnified Parties") harmless from and against:

(i)    any and all Losses based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Purchasers;

(ii)　　any and all Losses based upon or arising directly out of any Assumed Liability;

(iii)　　any and all Losses based upon or arising directly out of any Purchased Asset or Purchasers' operation of the Business after the Closing Date; and

(iv)　　any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of any Purchaser.

(b)　　Sellers acknowledge and agree that Purchasers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Sellers after the Closing Date in breach of this Agreement.  Sellers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.4　　Indemnification Procedures.

(a)　　A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

(b)　　In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought under Sections 12.2 and 12.3 hereof (regardless of the limitations set forth in Section 12.5) (an "Indemnification Claim"), the indemnified party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party.  The failure of the indemnified party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is prejudiced as a result of such failure.  The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with such Indemnification Claim, which relates to any Losses indemnified against by it hereunder.  If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party of its intent to do so.  If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel)

for all indemnified parties in connection with any Indemnification Claim. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 12.4 to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all Liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of Sections 12.5 and 12.6, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate Liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim. If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such Indemnification Claim.

(c)    After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

12.5    Certain Limitations on Indemnification.

(a)    Notwithstanding anything herein to the contrary, Sellers shall not be jointly and severally liable for any Losses.

(b)    Sellers shall not be required to indemnify any Purchaser Indemnified Party and Purchasers shall not be required to indemnify any Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the party seeking indemnification.

(c)    Nothing in this Article XII shall reduce the aggregate consideration for the Purchased Assets set forth in Section 3.1 (including, without limitation, by reducing the principal amount of the Senior Secured Loan pursuant to Section 3.1(c)).

12.6    Calculation of Losses.

(a)    The amount of any Losses for which indemnification is provided under this Article XII shall be net of any amounts actually recovered or recoverable by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).  Purchasers shall use their commercially reasonable efforts to recover under insurance policies for any Losses prior to seeking indemnification under this Agreement.

(b)    The amount of the Indemnification Claim shall be (i) increased to take account of any net Tax cost incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase, if any) in the event that the Tax treatment of such indemnity payment prescribed by Section 12.7 is not permitted by applicable Law and (ii) reduced to take account of any net Tax Benefit currently realizable by the indemnified party arising from the incurrence or payment of any such Loss.  To the extent such Indemnification Claim does not give rise to a currently realizable Tax Benefit, if the amount with respect to which any Indemnification Claim is made gives rise to a subsequently realized Tax Benefit to the indemnified party that made the Indemnification Claim, such indemnified party shall refund to the indemnifying party the amount of such Tax Benefit (grossed-up to reflect any Tax Benefit currently realized by the indemnified party as a result of making such refund payment) when, as and if realized (it being understood that such indemnified party shall use its reasonable efforts to realize such Tax Benefit).  For purposes of this Section 12.6, a "Tax Benefit" means an amount by which the Tax Liability of the party (or the consolidated, combined, unitary or similar Tax group including the party) or, if the party is a pass-through entity for Tax purposes, the members of the party, is actually reduced (including by deduction, reduction of income by virtue of increased Tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant Taxing Authority.  In computing the amount of any such Tax cost or Tax Benefit, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified Loss.  For purposes of this Section 12.6, a Tax Benefit is "currently realizable" to the extent that such Tax Benefit can be realized in the current taxable period or year or in any Tax Return with respect thereto (including through a carryback to a prior taxable period) or in any taxable period or year prior to the date of the Indemnification Claim.  The amount of any increase, reduction or payment hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD or a successor form) with respect to the indemnified party's Liability for Taxes, and payments between the parties to this Agreement to reflect such adjustment shall be made if necessary.

(c)    Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any Losses that are not legally recoverable under applicable Law as actual breach of contract damages of such other Person.

12.7    Tax Treatment of Indemnity Payments.  Sellers and Purchasers agree to treat any indemnity payment made pursuant to this Article XII as an adjustment to the Purchase Price for federal, state, local and foreign income Tax purposes, except as required by applicable Law.

12.8    Specific Performance.  Sellers, on the one hand, and Purchasers and Guarantor, on the other hand, acknowledge and agree that a breach of this Agreement would cause irreparable damage to the other party and such other party will not have an adequate remedy at law. Therefore, prior to the termination of this Agreement, all obligations of Sellers, on the one hand, and all obligations of Purchasers or Guarantor, on the other hand, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, including, without limitation, the obligation of Purchasers to pay the Purchase Price and/or enforcement of the terms of the Senior Secured Loan against the lenders thereunder in accordance with the terms thereof, and appropriate injunctive relief may be applied for and granted in connection therewith; provided, however, that (i) any election by Purchasers or Sellers, as the case may be, to pursue specific performance under this Section 12.8 shall be in lieu of and not in addition to Purchasers' or Sellers' right to receive the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, respectively, in accordance with Section 4.4(d) hereof, except that in the event specific performance is not granted, Purchasers or Sellers as the case may be, may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of Section 4.4(d) and (ii) in order to be entitled to the remedy of specific performance under this Section 12.8, the party instituting Legal Proceedings for specific performance must not be in breach (which breach is incapable of being cured) of any of its obligations hereunder that would prevent the Closing conditions in Article XI from being satisfied.  Notwithstanding anything to the contrary set forth in Section 4.4(d), if Purchasers or Sellers, as the case may be, shall elect to pursue specific performance pursuant to this Section 12.8 by instituting a Legal Proceeding as contemplated hereby, (A) such election shall thereupon become the sole and exclusive remedy of Purchaser or Seller, as the case may be, for such breach and (B) the party instituting such Legal Proceedings shall thereby waive any right to seek money damages or any other remedy available in law or in equity against the other party in connection with such breach.  Each of the parties hereto hereby agrees that specific performance is an agreed upon contractual remedy of the parties and waives any defense in respect of an action of specific performance that would be available to the parties in the absence of this provision, except that in the event specific performance is not granted, either party may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of Section 4.4(d).  Each of the parties hereto waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.  If, prior to the Termination Date, any party brings any Legal Proceeding to enforce specifically the performance of the terms and provisions hereof by any other party, the Termination Date shall automatically be extended by (x) the amount of time during which such Legal Proceeding is pending, plus 20 Business Days or (y) such other time period established by the Bankruptcy Court.

12.9    Exclusive Remedy.  Following the Closing, the sole and exclusive remedy for any and all claims arising under, out of, or related to this Agreement, or the sale and purchase of the Purchased Assets, shall be the rights of indemnification and specific performance set forth in this Article XII and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise; it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties hereto to the fullest extent permitted by Law.  The provisions of this Section 12.9 and the limited remedies provided in Section 3.2, Section 4.4, Article XII and Section 13.10, were specifically bargained-for between Purchasers

and Sellers and were taken into account by Purchasers and Sellers in arriving at the Purchase Price. Sellers have specifically relied upon the provisions of <u>Section 3.2</u>, <u>Section 4.4</u> and this <u>Section 12.9</u> and the limited remedies provided in <u>Section 3.2</u>, <u>Section 4.4</u>, <u>Article XII</u> and <u>Section 13.10</u>, in agreeing to the Purchase Price and in agreeing to provide the specific representations and warranties set forth herein.

12.10  <u>Nature of Representations and Warranties; Schedules</u>.  Except for the representations and warranties contained in <u>Articles V</u> and <u>VI</u> (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their respective Affiliates, officers, managers, partners, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in <u>Articles V</u> and <u>VI</u> hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Sellers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchasers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchasers by any manager, partner, officer, equityholder, employee, agent, consultant, or representative of Sellers or any of their respective Affiliates).  Sellers make no representations or warranties to Purchasers regarding the probable success or profitability of the Business.  Except for the representations and warranties contained in <u>Article VII</u> (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Purchasers nor any other Person makes any other express or implied representation or warranty with respect to Purchasers or the transactions contemplated by this Agreement, and Purchasers disclaim any other representations or warranties, whether made by Purchasers or any of their respective Affiliates, officers, managers, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in <u>Article VII</u> hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Purchasers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any partner, officer, member, employee, agent, consultant, or representative of Purchasers or any of their respective Affiliates).  The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed.  All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.  The sole purpose of the representations and warranties set forth in this Agreement is to allocate financial responsibility pursuant to the express provisions of this Agreement should the representations and warranties prove to have been inaccurate; and no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort) are permitted to any party hereto as a result of the untruth of any such representation and warranty.

12.11  <u>DTPA WAIVER</u>.  TO THE GREATEST EXTENT ALLOWED BY LAW, PURCHASERS HEREBY WAIVE AND RELINQUISH ALL PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT (CHAPTER 17, SUBCHAPTER E, OF THE TEXAS BUSINESS AND COMMERCE CODE) IN

CONNECTION WITH THE SALES TRANSACTION CONTEMPLATED BY THIS AGREEMENT.  PURCHASERS REPRESENT AND WARRANT TO SELLERS THAT: (A) PURCHASERS ARE NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION; (B) PURCHASERS ARE REPRESENTED BY EXPERIENCED AND KNOWLEDGEABLE LEGAL COUNSEL OF THEIR OWN CHOOSING WHO HAVE FULLY NEGOTIATED THE TERMS OF THIS AGREEMENT (INCLUDING THE FORM OF ALL CONVEYANCE DOCUMENTS ATTACHED TO OR ENTERED INTO IN CONNECTION WITH THE EXECUTION OR CONSUMMATION OF THIS AGREEMENT); AND (C) PURCHASERS ARE KNOWLEDGEABLE AND EXPERIENCED IN THE PURCHASE AND SALE OF SPORTS TEAMS, AND ARE FULLY ABLE TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION.

12.12   Limitation of Lender Liability.  Purchasers acknowledge and agree that the terms and conditions of this Agreement (including, without limitation, Article XII hereof) shall not give Purchasers or any of their Affiliates any right of recovery against, or shall cause any Liability to attach to, any of the NHL Affiliated Parties, the First Lien Lenders, the First Lien Agent or any of their respective Affiliates (the "Lender Related Parties"), by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, or otherwise, and Purchasers acknowledge and agree on their behalf and on behalf of their Affiliates not to make any claims against any of the Lender Related Parties in connection therewith.  The Lender Related Parties shall be third party beneficiaries of this Section 12.12.

12.13   Purchasers' Rights.  Sellers acknowledge that nothing in Section 12.12 limits or otherwise affects Purchasers' rights to enforce the terms of this Agreement against Sellers.

ARTICLE XIII

MISCELLANEOUS

13.1   Tax Matters.

(a)   Payment of Sales, Use or Similar Taxes.  Purchasers shall be responsible for (and shall indemnify and hold harmless Sellers and their managers, directors, members, partners, officers, employees, equityholders, Affiliates, agents, successors and permitted assigns against) any sales Taxes applicable to the Purchased Assets and for all other applicable sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges (including real property transfer Taxes, UCC-3 filing fees, real estate, aircraft and motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings) in connection with the transactions contemplated by this Agreement including any interest and penalty thereon (other than Taxes measured by or with respect to income imposed on Sellers or their Affiliates) ("Transfer Taxes").  Sellers shall, however, seek to include in the Confirmation Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(a).  To the extent that any Transfer Taxes are required to be paid by any Seller (or such Transfer Taxes are assessed against any Seller), Purchasers shall promptly reimburse Sellers, as applicable, for such Transfer Taxes.  Sellers and Purchasers shall cooperate and consult with each other prior to filing

any Tax Returns in respect of Transfer Taxes.  Sellers and Purchasers shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(b)     Disputes.  Notwithstanding anything to the contrary in this Agreement, if a Legal Proceeding, controversy, audit, or other dispute shall arise between one or more Sellers and any Taxing Authority concerning Taxes for which Purchasers are responsible under this Agreement, Purchasers (and at the direction of Purchasers, Purchasers' counsel) shall have the sole right, but not obligation, to represent such Seller(s) in resolving such Legal Proceeding, controversy, audit, or other dispute, provided that this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute with respect to which Seller would not have had the right to represent itself absent the transaction which is the subject of this Agreement.  For purposes of clarification and without limitation, this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute relating to Taxes which is subject to the control of a Person that owns an interest in the applicable Seller.

13.2     Expenses.  Except as otherwise provided in this Agreement, Sellers, on the one hand, and Purchasers, on the other hand, shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.  Notwithstanding the foregoing, Purchasers shall be responsible for, and shall pay directly or promptly reimburse Sellers and the Transferred Subsidiaries for amounts paid by or on behalf of Sellers, all filing fees lawfully payable to or at the request of any Governmental Body in connection with this Agreement, the Seller Documents, the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby.

13.3     Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury.

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of the State of Texas (or, if such court does not have sufficient jurisdiction, the Texas state courts located in Dallas County, Texas) and any appellate court from any thereof, for the resolution of any such claim or dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection, which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum

for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

(c)     Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.4    <u>Entire Agreement</u>.  This Agreement (including the Schedules and Exhibits hereto) contains the entire agreement of the parties respecting the transactions contemplated by this Agreement and supersedes all prior agreements among the parties respecting the transactions contemplated by this Agreement, including that certain Memorandum of Understanding, effective as of April 13, 2011, by and among Dallas Stars, Dallas Arena, and Tom Gaglardi.  The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the transactions contemplated by this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement.  Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's length transaction.  The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the transactions contemplated by this Agreement shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and the parties hereby agree that neither party hereto shall have any remedies or causes of action (whether in contract or in tort) for any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

13.5    <u>Amendments and Waivers</u>.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by all of the parties hereto; <u>provided</u> <u>that</u> no amendment, supplement, change or waiver (i) to <u>Section 11.3(g)</u> or <u>Section 12.12</u> hereof, (ii) that would have the effect of reducing the Excess Cash Payment, the First Lien Cash Payment or the principal amount of the Senior Secured Loan in a manner not otherwise contemplated by this Agreement or (iii) that would otherwise materially adversely effect the Excess Cash Payment, the First Lien Cash Payment or the terms and conditions of the Senior Secured Loan shall be effective, in each case, without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement.  Purchasers agree not to consent to any amendment to the Confirmation Order or Plan that Purchasers are permitted to consent to pursuant to <u>Section 8.3</u> hereof that would adversely effect the terms and

conditions of the Senior Secured Loan without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement, which consent shall not be unreasonably withheld or delayed. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The First Lien Agent and Monarch shall be third party beneficiaries of this <u>Section 13.5</u>.

13.6    <u>Governing Law</u>. Unless any Exhibit or Schedule to this Agreement specifies a different choice of law, this Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, its Exhibits and Schedules, the negotiation, execution, performance, validity, interpretation, construction and enforcement of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the State of Texas (without giving effect to any choice or conflict of Law provision or rules (whether of the State of Texas or otherwise) that would cause the application of Laws of any other jurisdiction).

13.7    <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission), or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to any Seller, to:

Dallas Stars, L.P.
2601 Avenue of the Stars
Frisco, TX 75034
Facsimile:  (214) 387-5610
Attention:  Robert Hutson

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201

Facsimile: (214) 746-7777
Attention: Glenn D. West

If to any Purchaser, to:

Dallas Sports & Entertainment, L.P.
c/o Northland Properties Corporation
310 - 1755 W Broadway
Vancouver, British Columbia V6J 4S5
CANADA
Facsimile: (604) 730-4645
Attention: Tom Gaglardi

With a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
Brookfield Place
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario M5J 2T3
CANADA
Facsimile: (416) 863-6275
Attention: Jim Rossiter

13.8    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    <u>Binding Effect; Third Party Beneficiaries; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement except (a) as provided in this <u>Section 13.9</u> and <u>Sections 12.12</u>, <u>13.5</u>, <u>13.10</u>, <u>13.11</u> and <u>13.12</u> herein and (b) only after the Closing has occurred, the rights of the NHL, the First Lien Lenders, Weil and GSP to receive the payments pursuant to <u>Section 3.3</u> only. No assignment of this Agreement or of any rights, interests or obligations hereunder may be made by either Sellers or Purchasers, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other parties hereto and the NHL and any attempted assignment without the required consents shall be void. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

13.10   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, manager, partner, equityholder, employee, Affiliate, agent, attorney or representative of Sellers, the Transferred Subsidiaries, Purchasers, or any of their respective Affiliates shall have any Liability (whether in contract or in tort) for any obligations or Liabilities of Sellers, the Transferred Subsidiaries or Purchasers arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement, including, without limitation, any alleged non-disclosure or misrepresentation made by any such Persons; provided, however, that nothing in this Section 13.10 shall prohibit any legal action against or enforcement of or recovery for any Liability (whether in contract or in tort) against Guarantor for, or be deemed to waive or release any obligations of Guarantor under this Agreement or any party to the Senior Secured Loan for any obligations or Liabilities of Purchasers as a result of the failure of such party to the Senior Secured Loan to provide financing to Purchasers pursuant to the Senior Secured Loan.

13.11   Legal Representation.  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, managers, members, partners, shareholders, officers, employees and Affiliates, that Weil serves as counsel to Sellers and their Affiliates (other than the Transferred Subsidiaries and their respective Subsidiaries), on the one hand, and to the Transferred Subsidiaries and their respective Subsidiaries, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transaction contemplated hereby.  Sellers, Purchasers, and the Transferred Subsidiaries hereby agree that, in the event that a dispute arises after the Closing between Sellers or any of their respective Affiliates (other than the Transferred Subsidiaries) and Purchasers or the Transferred Subsidiaries, Weil may represent Sellers and any of their Affiliates (other than the Transferred Subsidiaries) in such dispute even though the interests of Sellers or their Affiliates (other than the Transferred Subsidiaries) may be directly adverse to the Transferred Subsidiaries and Purchasers, and even though Weil has previously represented the Transferred Subsidiaries. The Transferred Subsidiaries and Purchasers further agree that, as to all communications among Weil, the Transferred Subsidiaries and Sellers or their Affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney or solicitor-client privilege and the expectation of client confidence belongs to each Seller and may be controlled by such Seller and shall not pass to or be claimed by the Transferred Subsidiaries or any Purchaser. Notwithstanding the foregoing, in the event that a dispute arises between the Transferred Subsidiaries and a third party other than a party to this Agreement after the Closing, the Transferred Subsidiaries may assert the attorney or solicitor-client privilege to prevent disclosure of confidential communications by Weil to such third party; provided, however, that none of the Transferred Subsidiaries may waive such privilege without the prior written consent of Sellers.

13.12   General Releases.

(a)     Effective as of the Closing Date, the Transferred Subsidiaries (collectively, the "Subsidiary Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge Sellers and any and all of their Affiliates, Subsidiaries (whether or not such entities are wholly owned), parent entities, and other direct or indirect related entities (as well as each of their respective predecessors, successors, and assigns) and the

NHL Affiliated Parties and each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Affiliates, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Seller Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Seller Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Transferred Subsidiaries, breach of any other duty, appropriation of any business opportunity of the Transferred Subsidiaries, dealing with the Transferred Subsidiaries in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Subsidiary Releasing Parties, or that any of the Subsidiary Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(b)     Effective as of the Closing Date, Sellers (collectively, the "Seller Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge the Transferred Subsidiaries and any and all of their Subsidiaries (whether or not such entities are wholly owned), and the NHL Affiliated Parties and, other than the Hicks Affiliates, each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Subsidiary Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Subsidiary Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or*

*negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Sellers, breach of any other duty, appropriation of any business opportunity of the Sellers, dealing with the Sellers in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Seller Releasing Parties, or that any of the Seller Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(c)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 13.12</u> shall not release, acquit or discharge any rights, actions, causes of action, claims or demands that now exist or that may hereafter accrue by and among any Seller, any Transferred Subsidiary and/or any Purchaser relating to or arising in connection with this Agreement or any agreement or document executed pursuant hereto, including those arising under <u>Article XII</u> of this Agreement.  The releases provided in this <u>Section 13.12</u> are intended to survive indefinitely and shall remain enforceable after the Closing of the transaction contemplated by this Agreement.

13.13   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.14   <u>Sellers' Representative</u>.  Sellers hereby appoint [_____][3], or any successor to [_____] (the "<u>Sellers' Representative</u>"), as the Sellers' sole and exclusive representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of the Sellers solely with respect to the determination of the Final NWC pursuant to <u>Section 3.4</u> hereof, and in accordance with the terms and provisions of this Agreement and to act on behalf of such Sellers in any Legal Proceeding involving the determination of the Final NWC.  If the Sellers' Representative otherwise appointed is unwilling or becomes unable to serve as Sellers' Representative, such other Person or Persons as may be designated by the First Lien Agent in accordance with this <u>Section 13.14</u> shall succeed as the Sellers' Representative.

**\*\* REMAINDER OF PAGE INTENTIONALLY LEFT BLANK \*\***

---

[3] [Sellers to propose in consultation with First Lien Agent.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

DALLAS STARS, L.P.

By: _____
     Name:  Robert Hutson
     Title:   Chief Financial Officer

DALLAS ARENA LLC

By: _____
     Name:  Robert Hutson
     Title:   Chief Financial Officer

STARCENTERS LLC

By: _____
     Name:  Robert Hutson
     Title:   Chief Financial Officer

DALLAS STARS U.S. HOLDINGS CORP.

By: _____
     Name:  Robert Hutson
     Title:   Treasurer

DALLAS SPORTS & ENTERTAINMENT, L.P.

By: DSE GP, Inc., its General Partner

By: _____
     Name: Tom Gaglardi
     Title: President

DSE HOCKEY CLUB, L.P.

By: DSE Hockey Club GP, Inc., its General Partner

By: _____
     Name: Tom Gaglardi
     Title: President

DSE HOCKEY CENTERS, L.P.

By: DSE Hockey Center GP, Inc., its General Partner

By: _____
     Name: Tom Gaglardi
     Title: President

DSE PLANO GP, INC.

By: _____
     Name: Tom Gaglardi
     Title: President

Tom Gaglardi, in his individual capacity, solely with respect to Sections 9.12, 12.8 and Article XIII of this Agreement

_____

**The Prepackaged Plan**

[Attached as Exhibit A to the Disclosure Statement]

Exhibit B

**Disclosure Statement**

[Not Attached]

Exhibit C

**Bidding Procedures/ Bidding Procedures and Confirmation Scheduling Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------------- x
                                          :

In re                                  :    **Chapter 11**

DALLAS STARS, L.P., *et al.*[1]    :    **Case No. __-_____ (___)**

      **Debtors.**            :    **Joint Administration**
                                      :    **Requested**

------------------------------------------------------------------- x

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, AND 503 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, AND 9014 (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING THE DALLAS SPORTS AND ENTERTAINMENT, L.P. ASSET PURCHASE AGREEMENT AS A STALKING HORSE AGREEMENT, (C) APPROVING BID PROTECTIONS, (D) SCHEDULING A COMBINED HEARING TO CONSIDER (1) APPROVAL OF THE DISCLOSURE STATEMENT, (2) APPROVAL OF SOLICITATION PROCEDURES AND FORMS OF BALLOTS, (3) CONFIRMATION OF THE PREPACKAGED PLAN, AND (4) APPROVAL OF THE SALE; (E) ESTABLISHING A DEADLINE TO OBJECT TO THE SALE, THE DISCLOSURE STATEMENT, AND THE PREPACKAGED PLAN; (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND OF THE CHAPTER 11 CASES; AND (G) GRANTING ANY RELATED RELIEF

Upon the motion (the "Motion") of Dallas Stars, L.P. ("Dallas Stars"), Dallas Arena LLC

("Dallas Arena"), Dallas Stars U.S. Holdings Corporation ("U.S. Holdings"), and StarCenters

LLC ("StarCenters"), as debtors and debtors in possession (collectively, the "Debtors"), pursuant

to sections 105, 363, 365, and 503 of the Bankruptcy Code,[2] and sections 2002, 4001, 6004,

6006, 9008, and 9014 of the Bankruptcy Rules for an order (I) For an Order Scheduling a

Hearing on Shortened Notice to Consider Bidding Procedures and to Determine Confirmation-

Related Deadlines and Approving the Form and Manner of Notice Thereof; and (II) For an Order

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485); and StarCenters LLC (4430).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets;

(b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset

Purchase Agreement; (c) Approving Bid Protections; (d) Scheduling a Combined Hearing to

Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures

and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale;

(e) Establishing an Deadline to Object to the Disclosure Statement, Sale and the Prepackaged

Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related

Relief all as more fully described in the Motion; and upon the [Hutson] Declaration; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the hearing to

consider the relief requested therein (the "Hearing") having been given to: (i) the Office of the

United States Trustee for the District of Delaware; (ii) the Debtors' thirty largest unsecured

creditors (on a consolidated basis); (iii) counsel to National Hockey League, (iv) counsel to agent

under the First Lien Credit Agreement, (v) counsel to agent under the Second Lien Credit

Agreement, (vi) those parties that have requested notice pursuant to Bankruptcy Rule 2002, (vii)

counsel to the Purchaser, (viii) any party that may hold a lien on the Debtors properties; (ix) any

party that has signed a non-disclosure agreement with the NHL in connection with a potential

purchase of the Purchased Assets; and (x) all parties required by Local Rule 9013-1(m) in

compliance with the Bankruptcy Code, the Bankruptcy Rules and the Shorten Notice Order,

dated [_____, 2011] [Docket No. ___] , authorizing and approving the form and manner of

notice of the Hearing, as established by the Affidavit of Service of [_____] of the Bid

Procedures/Scheduling Hearing Notice, dated [_____, 2011] [Docket No. __]; and the legal and

factual bases set forth in the Motion establishing just and sufficient cause to grant the relief requested therein; and the relief granted herein being in the best interests of the Debtors, their estates, creditors, and all parties in interest; and the Court having held the Hearing with the appearances of interested parties noted in the record of the Hearing; and upon the entire record and all of the proceedings before the Court, it is hereby further FOUND AND DETERMINED THAT:

A.     The proposed Summary and Notice will constitute due, adequate, and timely notice of the commencement of the Debtors' chapter 11 cases, the Bidding Procedures, the Auction, the Combined Hearing, the Objection Deadline, the procedures for objecting to the adequacy of the Disclosure Statement and to confirmation of the Prepackaged Plan, and the procedures for objecting to the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith in accordance with Bankruptcy Rule 2002.

B.     The Debtors have articulated good and sufficient reasons for approving the Bidding Procedures.

C.     The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the return for the Purchased Assets.  The Bidding Procedures were negotiated in good faith between the Debtors and Dallas Sports & Entertainment L.P. and certain of its affiliates (the "Proposed Buyers").

D.     The Proposed Buyers have expended, and likely will continue to expend, considerable time, money, and energy pursuing the purchase of the Purchased Assets and have engaged in extended arm's-length and good faith negotiations. The Stalking Horse Asset Purchase Agreement is the culmination of these efforts.

E.      The Debtors have demonstrated a compelling and sound business justification for authorization to (i) enter into the Stalking Horse Asset Purchase Agreement to establish the minimum bidding purchase price for the Business and (ii) pay the Break-Up Fee and Expense Reimbursement under the terms and conditions set forth in the Stalking Horse Asset Purchase Agreement.  The Break-Up Fee and Expense Reimbursement are material inducements for, and condition of, the Proposed Buyers' entry into the Stalking Horse Asset Purchase Agreement. The Proposed Buyers are unwilling to commit to purchase the Purchased Assets under the terms of the Stalking Horse Asset Purchase Agreement unless the Proposed Buyers are assured the Expense Reimbursement and Break-Up Fee.

F.      Recognizing this expenditure of time, energy, and resources, the Debtors have agreed to pay the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers under certain terms and conditions.  The Break-Up Fee and the Expense Reimbursement are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Proposed Buyers; (iii) reasonable and appropriate in light of the size and nature of the proposed sale, comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Proposed Buyers; and (iv) necessary to induce the Proposed Buyers to continue to pursue the purchase of the Business and to be bound by the Stalking Horse Asset Purchase Agreement.

G.      The assurance of the payment in cash of the Break-Up Fee and Expense Reimbursement (i) will promote more competitive bidding by inducing the Proposed Buyers' bid, which otherwise would not have been made and which may be the highest or best available offer for the Purchased Assets, (ii) has induced the Proposed Buyers to research the value of the Purchased Assets, conduct extensive due diligence and propose the transaction, including, among

other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely, and (iii) will provide a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth.

H.     No other party to date has entered into an asset purchase agreement for the Purchased Assets on terms acceptable to the Debtors.  The Stalking Horse Asset Purchase Agreement provides the Debtors with the opportunity to sell their business on a "going concern" basis for the benefit of all parties.  The execution of the Stalking Horse Asset Purchase Agreement is a necessary prerequisite to determining whether any party other than the Proposed Buyers are willing to enter into a definitive agreement for the Purchased Assets on terms acceptable to the Debtors and their creditor constituencies.

I.     The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers.  The Break-Up Fee and the Expense Reimbursement have been negotiated at arm's-length and are reasonable under the circumstances; and therefore,

IT IS HEREBY ORDERED THAT:

1.     The Motion is granted to the extent set forth herein.

2.     The objections, if any, to entry of this Order are overruled in their entirety.

3.     The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby authorized and approved in all respects.

4.     The sale transaction contemplated by the purchase agreement annexed hereto as <u>Exhibit 2</u> is designated as the "<u>Stalking Horse Asset Purchase Agreement.</u>"

5.     Immediately upon entry of this Order, the Stalking Horse Asset Purchase Agreement shall be binding upon the parties thereto in accordance with its terms.

6. The Break-Up Fee and the Expense Reimbursement are approved in their entirety. The Debtors shall pay the Break-Up Fee and the Expense Reimbursement to the Proposed Buyers out of the purchase price paid by the Successful Bidder pursuant to the terms and conditions set forth in the Stalking Horse Asset Purchase Agreement without need for further order of the Court.

7. To constitute a "Qualified Bid", a bid must be received by the Bid Deadline (as defined in the Bidding Procedures) and otherwise comply with all of the applicable provisions of the Bidding Procedures.

8. The failure specifically to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision. The Bidding Procedures are hereby authorized and approved in their entirety.

9. The Debtors shall file a Notice of Successful Bidder identifying the Successful Bidder and the terms of the Successful Bid within one business day following the completion of the Auction.

10. A hearing to consider the adequacy of the Disclosure Statement, approval of the Solicitation Procedures, approval of the Sale, and confirmation of the Debtors' Prepackaged Plan (the "Combined Hearing") is hereby scheduled to be held before this Court on _____, 2011 at __:__ Eastern Time or as soon thereafter as counsel may be heard.

11. Objections, if any, to the Disclosure Statement, the Solicitation Procedures, the Prepackaged Plan, any filed supplements thereto, the Sale, or the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith shall: (i) be in writing; (ii) set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estates or properties of the Debtors, (iii) specify

with particularity the legal and factual basis of the objection, (iv) if the objection relates to the assumption and assignment of an executory contract or unexpired leases, including the cure amount relating thereto or the adequate assurance of future performance provided in connection therewith, include a copy of such contract or lease or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates; and (v) be filed with the Court together with proof of service thereof and simultaneously served on: (a) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin Sosland and Weil, Gotshal & Manges LLP, 767 Fifth Ave., New York, New York, 10153, attn: Ronit J. Berkovich); (b) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan); (d) counsel to JP Morgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006-5417, attn: Andrew LeBlanc); and (f) counsel to the Committee, if one shall be appointed, so as to be actually received by __:00 p.m. (Eastern Time) on _____, 2011 (the "Objection Deadline").

12.    Any objections not timely filed and served in the manner set forth in this Order may, in the Court's discretion not be considered and may be overruled.

13.    The form and sufficiency of the Summary and Notice attached hereto as Exhibit 3 are hereby approved.

14.    The Debtors shall serve the Summary and Notice on all parties in interest on a date no greater than __ business days after entry of this Order.

15.     Service of the Summary and Notice in the manner set forth herein constitutes good and sufficient notice of the commencement of the Debtors' chapter 11 cases, the Bidding Procedures, the Auction, the Combined Hearing, the Objection Deadline, the procedures for objecting to the adequacy of the Disclosure Statement, to the Solicitation Procedures, and to confirmation of the Plan, and the procedures for objecting to the assumption and assignment of executory contracts and unexpired leases, including the cure amounts relating thereto and the adequate assurance of future performance provided in connection therewith, and the applicable provisions of the Bankruptcy Code and any requirements for other notice are hereby waived and dispensed with pursuant to Rules 2002, 6006, 9006, and 9007 of the Bankruptcy Rules and section 105(a) of the Bankruptcy Code; provided, however, that any provision of Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Disclosure Statement and Prepackaged Plan to parties not entitled to vote, whether because they are unimpaired or because they are deemed to reject the Prepackaged Plan, or any parties in interest other than as prescribed in this Order, shall be waived; provided further, however, the Disclosure Statement and Prepackaged Plan shall remain posted to the following page on the World Wide Web at [WEBSITE] and shall be provided in either electronic or paper form to any parties in interest upon written request to the Debtors.

16.     The Debtors are authorized, pursuant to Bankruptcy Rule 2002(*l*), to give supplemental publication notice of the Auction and Combined Hearing by publication in the *Wall Street Journal*, national edition, the *Dallas Morning News*, or any other newspaper in their discretion and on a date no greater than __ business days after entry of this Order.

17.     The meeting pursuant to section 341(a) of the Bankruptcy Code shall not be convened and is hereby cancelled unless the Prepackaged Plan is not confirmed by this Court within ninety days after the Commencement Date.

18.	The Debtors shall not be required to file reports pursuant to Bankruptcy Rule 2015.3 unless the U.S. Trustee convenes a meeting under section 341 of the Bankruptcy Code; *provided that*, nothing herein shall affect the Debtors' rights to request an extension of time to comply with, or modification of the requirements of Bankruptcy Rule 2015.3.

19.	The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

20.	This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order, including any matter or dispute relating to the Sale of the Purchased Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, or the Backup Bid.


Dated: _____, 2011
	Wilmington, Delaware
	_____
	UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Bidding Procedures**

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with an auction (the "Auction") for the sale (the "Sale") of certain assets and equity interests (the "Purchased Assets") of Dallas Stars, L.P., Dallas Arena LLC, StarCenters LLC and Dallas Stars U.S. Holdings Corp. (the "Debtors") and the rights necessary to operate the Dallas Stars National Hockey League hockey franchise (the "Team") as a National Hockey League ("NHL") franchise in the Team's current Home Territory, as defined in the NHL Constitution (as defined below). At a hearing following the Auction (the "Combined Hearing"), the Debtors will seek entry of an order (the "Confirmation Order") from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") authorizing and approving the Sale to the Qualified Bidder (as defined below) that the Debtors determine to have made the highest or otherwise best bid.

## I.   Assets to Be Sold

All of the Debtors' right, title and interest in, to the following assets:[1]

(a)      the Purchased Contracts;

(b)      all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Debtors, other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on Schedule 2.1(b) to the Stalking Horse Asset Purchase Agreement (as defined below);

(c)      all inventory and supplies of Debtors;

(d)      all rights of Debtors with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)      all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Debtors, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)      all rights of Debtors under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such term in the Stalking Horse Asset Purchase Agreement.

(g)     all rights and privileges held by Debtors associated with the NHL, including rights to membership and franchise of the Team in the NHL and all ownership interests of Debtors in any NHL Entity;

(h)     the Furniture and Equipment;

(i)     the Transferred Equity Interests (subject to the election of Sellers pursuant to Section 9.17 of the Stalking Horse Asset Purchase Agreement (as defined below) to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j)     the Sellers' Intellectual Property;

(k)     all Documents of Debtors used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Debtors (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Debtor shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Debtors, but only to the extent such Permits are assignable or otherwise transferable;

(m)     all rights of Debtors under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Debtor or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Debtors under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Debtor and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Debtors' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Debtors to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings,

team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, Reunion Arena or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Debtors associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

## II.     Application Submissions and Due Diligence

### A.     Submission of Background Information

Any person or entity that is interested in becoming a potential purchaser or holder of a direct or indirect interest in the Purchased Assets, including, without limitation, each direct or indirect equity holder of such prospective purchaser or holder and each trustee and beneficiary of any trust included therein (each a "Potential Bidder")[2] shall notify the Debtors and the NHL and shall submit the following information:

1.     Submission of Background Information

A Potential Bidder who has not previously done so in connection with the Sale shall complete, execute and submit to the NHL no later than seven (7) days after entry of the Bidding Procedures and Confirmation Scheduling Order (as defined below) that portion of the Application to Acquire NHL Membership, or an Ownership Interest in an NHL Member Club (in the form annexed hereto as Exhibit A) (the "NHL Application") labeled "Background Information – Application for Membership – Individual" or "Background Information – Application for Membership – Corporate/Partnership/Trust", whichever is applicable (the "Background Portion") and shall notify the Debtors of such submission. The Background Portion, including the Representations and Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

---

[2] If two or more Potential Bidders are part of a single group, such group of Potential Bidders shall be referred to herein as a "Potential Bidders Group."

2.      No Transaction or Operations Information

None of the information that would otherwise be required by the NHL Application with respect to the proposed transaction or the post-acquisition operations or management of the Team (the "Transaction Portion") shall be required as a condition for the NHL to begin its review of the Background Portion.  Potential Bidders may, but are not required to, provide the Transaction Portion of the NHL Application to the NHL prior to the Bid Deadline (as defined below).

3.      Confidentiality Agreement

In addition, if not previously executed and delivered in connection with the Sale, each Potential Bidder shall provide an executed confidentiality agreement substantially in the form annexed hereto as Exhibit B with such changes as are reasonably acceptable to the NHL and Debtors (the "Confidentiality Agreement").

In the event that any of the background information contained in any NHL Application or Background Portion with regard to a Potential Bidder differs from information previously provided to the NHL by such Potential Bidder, such changes shall be highlighted in the completed Background Portion.

The NHL shall treat the information in the NHL Application and Background Portion confidentially in accordance with the NHL's existing procedures.   To the extent disclosure of any such information is required in connection with the chapter 11 cases, the NHL Application and Background Portion shall be deemed to have been filed under seal.

**B.      Due Diligence**

The NHL shall review any submitted Background Portion in accordance with its normal procedures as promptly as practicable following receipt by the NHL and shall notify the Debtors that it has commenced such review.  Promptly after the NHL determines that a Potential Bidder does not appear to be approved for purposes of conducting due diligence with respect to the Purchased Assets, the NHL shall so notify the Potential Bidder and, not acting in bad faith, seek to resolve any such impediment if the NHL determines in its sole discretion such action is possible.

A Potential Bidder or Potential Bidder Group, as the case may be, who is approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets shall be given access to a data room for such purpose; provided, that, prior to being allowed access to the data room, such Potential Bidder or Potential Bidder Group, as the case may be, shall have submitted to the Debtors the executed Confidentiality Agreement.

To the extent practicable, the Debtors shall provide each Potential Bidder or Potential Bidder Group, as the case may be, who has been approved for such purpose by the NHL with access to (i) the same confidential evaluation materials and information provided by

the Debtors to each other Potential Bidder and the Proposed Buyers (as defined below) and (ii) such other financial information and other data related to the Debtors as the Potential Bidder may reasonably request, which requests may include reasonable access to the Debtors' senior management and advisors and shall be deemed to include, in any event, the Debtors' good faith estimate of the potential cure costs and rejection damages associated with each material contract and lease subject to assumption in conjunction with the Sale.

## III.   Submission of Bids

Each offer, solicitation or proposal (a "Bid") from a Potential Bidder or Potential Bidders Group, as the case may be, must be in writing and must be received by the Debtors, the NHL and the Notice Parties[3] on or before thirty (30) days after entry of the Bid Procedures Order, at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline").   As detailed in subparagraphs A through C below, a Potential Bidder or Potential Bidders Group, as the case may be, that submits a Bid on or before the Bid Deadline that includes: (i) to the NHL, a fully completed and executed NHL Application, (ii) to the Notice Parties, an executed mark-up of the Stalking Horse Asset Purchase Agreement (as defined below), and (iii) to the Debtors, the Good Faith Deposit (as defined below), shall be deemed an "Acceptable Potential Bidder."

A Potential Bidder or a Potential Bidders Group, as the case may be, that submits a Bid after the Bid Deadline shall not constitute an Acceptable Potential Bidder.   Each Bid must be accompanied by:

---

[3] The "Notice Parties" shall include: (a) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (b) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin A. Sosland and Glenn D. West); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan); (d) counsel to JPMorgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006-5417, attn: Andrew M. LeBlanc); (f) the Collateral Trustee for the benefit and security of the holders from time to time of the notes associated with that certain Note Purchase Agreement, dated as of April 23, 1999 (the "Note Purchase Agreement") by and among Center Operating Company, L.P. and several institutional investors named therein (the "Collateral Trustee") (The Bank of New York Mellon, 10161 Centurion Parkway, Jacksonville, Florida 32256, attn: Geri Creswell); and (g) counsel to the noteholders of the Note Purchase Agreement (the "Noteholders") (Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, attn: Allen G. Kadish).

### A. The Completed NHL Application

On or before the Bid Deadline, each Potential Bidder shall submit to the NHL a fully completed and executed NHL Application, including (to the extent not previously submitted) both the Background and Transaction Portions, and all required schedules, exhibits, financial information, tax returns, etc. A Potential Bidder shall also notify the Debtors of such submission. The NHL Application, including the Representations and Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

### B. Mark-Up of Stalking Horse Asset Purchase Agreement

To facilitate the Auction and to assist the Debtors and other interested parties in assessing the terms of each Bid, each Potential Bidder or Potential Bidders Group, as the case may be, must work from the Asset Purchase Agreement (the "Stalking Horse Asset Purchase Agreement") between the Debtors and Dallas Sports & Entertainment L.P., and certain of its affiliates (collectively, the "Proposed Buyers" or the "Stalking Horse") to prepare its bid and shall submit as part of its Bid, a fully executed asset purchase agreement, marked to show all proposed changes to such Stalking Horse Asset Purchase Agreement. Each Bid shall include a summary term sheet including a summary of the material terms proposed to be included in the Bid. The Stalking Horse Asset Purchase Agreement is attached to the Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement, (c) Approving Bid Protections, (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing a Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief (the "Bidding Procedures and Confirmation Scheduling Order")[4] as Exhibit B, and is also available on the main docket of these cases.

Each Bid must include as a condition of the Debtors' obligation to consummate the sale of the Purchased Assets, approval by the NHL under the Constitution of the NHL (the "NHL Constitution"), the By-Laws of the NHL (the "NHL By-Laws") and all other applicable requirements of the NHL.

To the extent practicable, the Debtors will make members of senior management and advisors available to discuss the terms of a Bid and seek to provide to each Acceptable Potential Bidder, who has been approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets, the disclosure schedules to the Acceptable Potential Bidder's Bid in connection with the preparation of such Bid.

---

[4] The Bidding Procedures and Confirmation Scheduling Order is defined as the Bidding Procedures Order in the Stalking Horse Asset Purchase Agreement.

### C.     Good Faith Deposit

Potential Bidders will be required to submit to the Debtors, in immediately available funds, letter of credit or other form of security reasonably acceptable to Debtors, a good faith deposit in an amount equal to US $15,000,000.00 (the "Good Faith Deposit") at the time the Potential Bidder submits a Bid.  The Good Faith Deposit shall be returned to the respective Potential Bidder if such bidder is determined not to be a Qualified Bidder, or following the Auction if the Acceptable Potential Bidder is a Qualified Bidder but not the Backup Bidder (as defined below) or the Successful Bidder (as defined below), except that the return of the Good Faith Deposit of the Proposed Buyers shall be governed by the terms of the Stalking Horse Asset Purchase Agreement.  The Good Faith Deposit shall be returned to the Backup Bidder on the earlier of: (i) the closing of the Sale to the Successful Bidder (as defined below) and (ii) 45 days after the close of the Auction.

### IV.     Determining Qualified Bids and Qualified Bidders

### A.     Terms and Conditions of a Qualified Bid

In addition to the requirements for an Acceptable Potential Bidder, in order for a Bid from an Acceptable Potential Bidder to be deemed a "Qualified Bid" and for the Acceptable Potential Bidder to be deemed a "Qualified Bidder", the Bid must: (i) satisfy each of the conditions listed below in paragraphs 1 through 8 and (ii) be submitted on or before the Bid Deadline.  A Bid submitted after the Bid Deadline shall not constitute a Qualified Bid.  The Stalking Horse Bid (as defined below) satisfies each of the conditions of a Qualified Bid listed below other than the condition set forth in paragraph 8 below.

The Debtors may determine in their reasonable discretion, after consultation with JPMorgan Chase Bank, N.A. and Monarch Alternative Capital LLC (the "Senior Lenders") and the NHL, whether an Acceptable Potential Bidder's Bid is a Qualified Bid, except that the Senior Lenders and the Debtors shall have no right to be consulted with regard to Sections IV.A.4 and IV.A.8 of these Bidding Procedures.

Promptly after determining that any Acceptable Potential Bidder does not appear to be a Qualified Bidder, the Debtors and the NHL shall notify each other and such Bidder of this determination and, not acting in bad faith, shall seek to resolve any impediment to the Acceptable Potential Bidder's becoming a Qualified Bidder if possible.

### 1.     Financial Capability

To the extent not previously provided, a Bid shall contain evidence (in the form of binding commitment letters, guarantees or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions including, but not limited to, paying liquidated damages, if any.

2.      Corporate Authority

A Bid shall contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies) approval of the contemplated transaction.

3.      Nature of Bids for Purchased Assets and Minimum Overbid

The Bid must be for all of the Purchased Assets, including substantially all of the assets of the Debtors necessary to conduct the Purchased Assets as an NHL team in the Team's current Home Territory (as defined in the NHL Constitution).

The Bid must also be at least US $10,000,000 greater than the total value of the Bid as evidenced by the Stalking Horse Asset Purchase Agreement (the "Stalking Horse Bid") (inclusive of any amounts to be paid by such bidder for the Break-Up Fee (as defined in the Bidding Procedures and Confirmation Scheduling Order) and the Expense Reimbursement (as defined in the Bidding Procedures and Confirmation Scheduling Order)). For purposes of calculating the value of the Stalking Horse Bid, the debt component of the Stalking Horse Bid shall be 100% of the face amount of the notes provided for in the Stalking Horse Bid, taking into account the anticipated net effect of the working capital adjustment.

4.      NHL Consent

The Bid must provide that (i) the Acceptable Potential Bidder will be, and the transactions contemplated therein will comply with and be, subject to NHL approval, pursuant to all of the NHL's applicable ownership transfer requirements, including, without limitation, as set forth in Articles 3.5 and 3.6 of the NHL Constitution, By-Law 35 of the NHL By-Laws, and the applicable procedural guidelines (collectively, the "NHL Rules"); (ii) the Acceptable Potential Bidder will cooperate with the review process of the NHL, including, providing promptly information requested by the NHL and meeting with the NHL Executive Committee and NHL officials in connection with such review, (iii) if successful, the Acceptable Potential Bidder will execute a standard form of Consent Agreement, a standard form of NHL Guaranty and a standard form of NHL Proxy with the NHL (in substantially the forms annexed hereto as Exhibits C, D, and E) with such changes as are reasonably acceptable to the NHL; and (iv) the Acceptable Potential Bidder will deliver or cause to be delivered, as a condition to closing, any agreements or other documents that the NHL requires with respect to the financing of the acquisition, including, if applicable, from lenders or other financing sources.

5.      No Break-Up Fee, Etc. for Qualified Bidders

A Bid, other than a Qualified Bid submitted by the Proposed Buyers, may not request any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, neither the tendering of a Bid nor the determination that a Bid is a Qualified

Bid shall entitle the Acceptable Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

6.      Other Bid Requirements

A Bid must: (i) not be conditioned on the outcome of unperformed due diligence, board approval or a financing contingency; (ii) provide that the bidder's offer is irrevocable until the earlier of (x) consummation of the Sale of the Purchased Assets, (y) the close of the Auction unless the Potential Bidder is selected as the Successful Bidder or the Backup Bidder and (z) 45 days after the close of the Auction if the Potential Bidder is selected as the Backup Bidder; (iii) contain the form of Confirmation Order the bidder would request the Debtors to seek court approval of at the Combined Hearing; (iv) include evidence of the bidder's ability to provide adequate assurance of future performance of such contracts, permits and licenses it would require the Debtors to assume and assign; (v) assume that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time) under the Prepackaged Plan; and (vi) provide that the Potential Bidder will enter into an Assumption Agreement (as defined in that certain consent agreement dated [DATE] by and among the Collateral Trustee, the Noteholders, and certain of the Debtors (the "COC Consent Agreement")), substantially in the form attached to the COC Consent Agreement as Exhibit F (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), and a Pledge and Assumption Agreement (as defined in the COC Consent Agreement), substantially in the form attached to the COC Consent Agreement as Exhibit G (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), with the Collateral Trustee.[5]

7.      Asset Purchase Agreement and Ancillary Agreements

As stated above in Section III.B, a Bid must include a fully executed form of asset purchase agreement and must also include any agreements ancillary to the Sale, each executed by an Acceptable Potential Bidder.

8.      Approval of the NHL

Each Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby must be approved for ownership transfer by the NHL under the NHL Rules. Two (2) days before the commencement of the Auction (the "NHL Determination Date"), each Acceptable Potential Bidder, the Debtors and the Notice Parties shall have been notified by the NHL whether the Acceptable Potential Bidder or the Acceptable Potential Bidder Group, the Bid and the transactions contemplated thereby have been approved for ownership transfer by the NHL under the NHL Rules.

---

[5] The Debtors will include this requirement if COC and the Debtors have entered into the COC Consent Agreement at the time of the Bidding Procedures and Scheduling Hearing.

### B. Qualified Bidders

Only the Acceptable Potential Bidders who have satisfied the foregoing requirements, and whose applications for the transfer of ownership have been approved by the NHL, shall be Qualified Bidders. If one or no Qualified Bid is timely received, the Debtors will not conduct an Auction. If only one Qualified Bid from a Qualified Bidder is timely received, the Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Combined Hearing.

### C. Notification by the Debtors of the Best Qualified Bid

On or prior to 5:00 p.m. (prevailing Eastern time) on the NHL Determination Date, the Debtors shall provide each Qualified Bidder that has submitted a Qualified Bid: (i) written notice of the Auction and (ii) notice of the Qualified Bid with which the Debtors intend to commence the Auction (the "<u>Best Qualified Bid</u>") and (iii) copies of all Qualified Bids.

## V. <u>The Auction</u>

If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 commencing sixty (60) days following the entry of the Bidding Procedures and Confirmation Scheduling Order at 10:00 a.m. (CT) to determine the highest or otherwise best bid with respect to the Purchased Assets.

### A. Participation in the Auction

Only Qualified Bidders who have submitted a Qualified Bid shall be eligible to participate in the Auction.

### B. The Auction Process

All Bids made at the Auction after the commencement thereof (each, an "<u>Overbid</u>") shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Overbids made and announced at the Auction, including the Successful Bid (as defined below). The Debtors, in their reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale of the Purchased Assets for any reason, including to seek further clarification from the Bankruptcy Court regarding any issues, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

The Debtors shall announce at the Auction the material terms of each Overbid, and in consultation with the NHL, the Senior Lenders and representatives of any statutory

committee, the total consideration offered in each such Overbid to provide a floor for further bidding. The current highest or best offer for the Purchased Assets, as determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, shall represent the new Best Qualified Bid. A Qualified Bidder need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

Any Overbid shall be made in overbid increments of at least US $5,000,000 greater than the Best Qualified Bid. For the avoidance of doubt, US $4,500,000 (the Break-Up Fee and Expense Reimbursement) shall be deducted from each Qualified Bid and Overbid submitted by a Qualified Bidder (including the initial Qualified Bid) other than the Proposed Buyers in determining the value of each such Qualified Bid or Overbid.

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid as set forth above.

To the extent not previously provided (which shall be determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee) demonstrating such Qualified Bidder's ability to close the proposed transaction.

Except as expressly provided herein, the procedures set forth herein cannot be amended or modified without the approval of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to construe these Bidding Procedures and determine any disputes arising under them.

## VI.    Identification of the Successful Bidder and Acceptance of Successful Bid

### A.    Identification of the Successful Bidder

At the close of the Auction, the Debtors, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). The Debtors reserve the right to determine, in their reasonable business judgment and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia* the Break-Up Fee and the Expense Reimbursement, if any).

After the Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, so determine the Successful Bid, the Auction will be closed.

The Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, will then determine and announce which bid has been determined to be the second highest or otherwise best bid (the "Backup Bid" and such bidder being the "Backup Bidder").  In determining which bid is the Backup Bid, the Debtors, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee will use their reasonable business judgment.

Notwithstanding anything herein to the contrary, the Debtors, in their reasonable discretion and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, reserve the right to reject at any time prior to entry of a court order approving an offer, without liability, any offer (other than the offer submitted by the Proposed Buyers) that the Debtors deem to be:  (x) inadequate or insufficient, (y) contrary to the best interests of the Debtors and their estates, or (z) with the advice of counsel, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein.

The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted the Bid only when the Bid has been approved by the Bankruptcy Court at the Combined Hearing.

### B. Acceptance of Bid From Successful Bidder

The Debtors presently intend to sell the Purchased Assets to the Successful Bidder, pursuant to the terms of the Successful Bid. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Combined Hearing.

Except as otherwise provided in the Successful Bid agreed to by the Debtors, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, encumbrances, and interests thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens attaching to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

## VII. The Combined Hearing

The Combined Hearing shall be held in the Bankruptcy Court two (2) days following the completion of the Auction, and may be adjourned from time to time without further notice to creditors or parties in interest other than an announcement in open court at the Combined Hearing.  Any objections to the approval of the sale of the Purchased Assets shall be argued at the Combined Hearing.

## VIII.  Closing with the Backup Bidder(s)

Without any further order of the Bankruptcy Court after Confirmation, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Backup Bidder will be deemed to have submitted the highest or best bid and the Debtors and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Debtors and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

Following the Combined Hearing, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder, the Debtors reserve the right to seek all available damages from the defaulting Successful Bidder as modified by the applicable purchase agreement, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtors, the Successful Bidder shall have no recourse against the Debtors other than for recovery of its deposit or against the NHL, provided that if the Successful Bidder is the Proposed Buyers, the Proposed Buyers shall have such rights as are provided for in the Stalking Horse Asset Purchase Agreement.

Dated: _____

**Exhibit 2**

**Stalking Horse Asset Purchase Agreement**

**[Attached as Exhibit C to the Disclosure Statement]**

**Exhibit 3**

**Summary and Notice**

**[Not Attached]**

<u>Exhibit D</u>

**Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------------  x
                                                                    :
In re                                                               :         Chapter 11
                                                                    :
DALLAS STARS, L.P., et al.¹                                         :         Case No. __-_____ (___)
                                                                    :
        Debtors.                                                    :         Joint Administration
                                                                    :         Requested
------------------------------------------------------------------  x
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
(I) APPROVING THE DEBTORS' (A) DISCLOSURE STATEMENT PURSUANT
TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (B) SOLICITATION
OF VOTES AND VOTING PROCEDURES, AND (C) FORMS OF BALLOTS, AND
(II) CONFIRMING THE DEBTORS' JOINT PREPACKAGED PLAN OF
<u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

Dallas Stars, L.P. ("<u>Dallas Stars</u>"), Dallas Arena LLC ("<u>Dallas Arena</u>"), Dallas

Stars U.S. Holdings Corp. ("<u>U.S. Holdings</u>"), and StarCenters LLC ("<u>StarCenters</u>"), as debtors

and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>"),

having jointly proposed and filed with the United States Bankruptcy Court for the District of

Delaware (the "<u>Court</u>") the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.*

Under Chapter 11 of the Bankruptcy Code dated as of [____ __], 2011 (the "<u>Prepackaged Plan</u>")

[Docket No. __], annexed hereto as <u>Exhibit A</u> and that certain supplement to the Prepackaged

Plan, dated and filed with the Court on [_____], 2011 [Docket No. __] (as the documents

contained therein have been or may be further amended or supplemented, including as amended

on [____], 2011 [Docket No. __, the "<u>Prepackaged Plan Supplement</u>"); the Disclosure

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485), and StarCenters LLC (4430).

Statement Relating to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.*, Under Chapter 11 of the Bankruptcy Code, dated [_____ __], 2011 (the "Disclosure Statement") [Docket No. __]; and ballots for voting on the Prepackaged Plan, in the forms attached as [Exhibits "__" through "__" to the Affidavit of Service and Vote Certification of The Garden City Group, Inc. (the "____Affidavit"), sworn to by [_____ of Balloting Agent ("_____")] and filed with the Court on [_____, 2011] (the "Voting Certification") [Docket No. __] having been duly transmitted to holders of Claims[2] in compliance with the procedures (the "Solicitation Procedures") set forth in the Voting Certification; and the Court having entered an order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement; (c) Approving Bid Protections; (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing a Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief (the "Bidding Procedures and Confirmation Scheduling Order") [Docket No. ___], which, among other things, scheduled the hearing to approve the Disclosure Statement for [_____], 2011, to be immediately followed by a hearing to consider confirmation of the Prepackaged Plan (the "Confirmation Hearing"); and due notice of the Confirmation Hearings having been given to holders of Claims against and Equity Interests in the Debtors and other parties in interest in compliance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), the Bidding Procedures and Confirmation Scheduling Order, and the Solicitation Procedures, as

---

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Prepackaged Plan or the Bidding Procedures and Confirmation Scheduling Order.

established by the affidavits of service, mailing, and/or publication filed with the Court, including [(1) the Affidavit of Service of [_____] regarding the Notice of (I) Filing of Bankruptcy Petitions and Related Pleadings and (II) First-Day Hearing thereon, dated [_____], 2011 [Docket No. __]]; (2) the Affidavit of Service of [_____] of the Summary and Notice authorizing and approving the form and manner of notice of the Bidding Procedures, the Auction, the Combined Hearing, related deadlines, and the commencement of the Chapter 11 Cases (the "Summary and Notice"), dated [_____, 2011] [Docket No. __]; and (3) the Affidavit of [_____] regarding publication in [*The Wall Street Journal, Dallas Morning News]* of the Summary and Notice, dated [_____] [Docket No. __] (the "Notice Affidavits"), and such notice being sufficient under the circumstances and no further notice being required; and due notice of the Prepackaged Plan Supplement is good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures and the Local Rules and no other or further notice is or shall be required; and based upon and after full consideration of the entire record of the Confirmation Hearings, including (A) the Disclosure Statement, the Prepackaged Plan and the Voting Certification, (B) the Debtors' memorandum of law, dated [_____, 2011], in support of confirmation of the Prepackaged Plan, [Docket No. __] (C) the Declaration of [_____] in Support of Confirmation of the Prepackaged Plan, dated [_____, 2011 (the "_____ Declaration")] [Docket No. __]; objections, if any, to the approval of the Disclosure Statement or confirmation of the Prepackaged Plan all being withdrawn or overruled; and the Court being familiar with the Disclosure Statement and the Prepackaged Plan and other relevant factors affecting the Debtors' Chapter 11 Cases; and the Court being familiar with, and having taken judicial notice of, the entire record of the Debtors' Chapter 11 Cases; and upon the arguments of counsel and the evidence proffered and adduced at the Confirmation Hearings; and

the Court having found and determined that the Disclosure Statement should be approved and the Prepackaged Plan should be confirmed as reflected by the Court's rulings made herein and at the Confirmation Hearings; and after due deliberation and sufficient cause appearing therefor; the Court hereby FINDS, DETERMINES, AND CONCLUDES that:

## **FINDINGS OF FACT**

A.      <u>Findings and Conclusions</u>.  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>. The Court has jurisdiction over the Debtors' Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Approval of the Disclosure Statement and confirmation of the Prepackaged Plan are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.  The Debtors are eligible debtors under section 109 of the Bankruptcy Code. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

C.      <u>Chapter 11 Petitions</u>.  On [_____], 2011 (the "<u>Commencement Date</u>"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed pursuant

to section 1104 of the Bankruptcy Code.  [No statutory committee of unsecured creditors has been appointed pursuant to section 1102 of the Bankruptcy Code.]  Further, in accordance with an order of this Court, the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

D.      Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

E.      Burden of Proof.  The Debtors have the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.  Each Debtor has met such burden.

F.      Adequacy of Disclosure Statement.  The Disclosure Statement (a) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Prepackaged Plan, and the transactions contemplated therein, and (b) is approved in all respects.

G.      Voting.  As evidenced by the Voting Certification, votes to accept or reject the Prepackaged Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and applicable nonbankruptcy law.

H.      Solicitation.  Prior to the Commencement Date, the Prepackaged Plan, the Disclosure Statement, and the Ballots, and, subsequent to the Commencement Date, notice of the Confirmation Hearings, were transmitted and served in compliance with the Bankruptcy Rules,

including Bankruptcy Rules 3017 and 3018, the Local Rules, and the Bidding Procedures and

Confirmation Scheduling Order.  The forms of the Ballots adequately addressed the particular

needs of these Chapter 11 Cases and were appropriate for holders of Classes 2A through 2D

(First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) – the

Classes of Claims entitled to vote to accept or reject the Prepackaged Plan.  The period during

which the Debtors solicited acceptances to the Prepackaged Plan was a reasonable period of time

for holders to make an informed decision to accept or reject the Prepackaged Plan.  The Debtors

were not required to solicit votes from the holders of Classes 1A through 1D (Priority Non-Tax

Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Claims), Classes 6A through

6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims),

as each such class is unimpaired under the Prepackaged Plan and is deemed to accept the

Prepackaged Plan.  The Debtors also were not required to solicit votes from the holders of

Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D

(Equity Interests in Debtors), as each such Class receives no recovery under the Prepackaged

Plan and is deemed to reject the Prepackaged Plan.  As described in and as evidenced by the

Voting Certification and the Notice Affidavits, the transmittal and service of the Prepackaged

Plan, the Disclosure Statement, the Ballots, the notice of the Confirmation Hearings, and the

publication of such notice of the Confirmation Hearings (all of the foregoing, the "Solicitation")

were timely, adequate, and sufficient under the circumstances.  The Solicitation of votes on the

Prepackaged Plan complied with the Solicitation Procedures, was appropriate and satisfactory

based upon the circumstances of these Chapter 11 Cases, was conducted in good faith, and was

in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local

Rules, and any other applicable rules, laws and regulations.  The Debtors (including the Post-

Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, [the holders of Second Lien Secured Claims, the Second Lien Administrative Agent,][3] the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees, and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons, the Post-Effective Date Debtors, and any and all affiliates, members, managers, shareholders, partners, employees, attorneys, and advisors of the foregoing are entitled to the protection of section 1125(e) of the Bankruptcy Code.

I.      Notice.  As is evidenced by the Voting Certification and the Notice Affidavits, the transmittal and service of the Prepackaged Plan, the Disclosure Statement, and the Ballots were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearings (including the deadline for filing and serving objections to confirmation of the Prepackaged Plan) have been given due, proper, timely, and adequate notice in accordance with the Bidding Procedures and Confirmation Scheduling Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and applicable nonbankruptcy law and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.

J.      Prepackaged Plan Supplement.  On [____], 2011, the Debtors filed the Prepackaged Plan Supplement, which includes, among other things, drafts of the following documents: Amended Corporate Organization Documents [and _____].

K.      [Modifications of the Prepackaged Plan.  Modifications made to the Prepackaged Plan since the Solicitation (a) complied in all respects with section 1127 of the

---

[3] To be included if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

Bankruptcy Code and Bankruptcy Rule 3019 and (b) do not require re-solicitation of votes with respect to the Prepackaged Plan. Adequate and sufficient notice of such modifications has been given, no further notice is or shall be required and such modifications are approved in full, and the votes cast to accept the Prepackaged Plan are deemed to have been cast with respect to the Prepackaged Plan as so modified.]

## The Sale Process

L.     The Court held the hearing to consider the Bidding Procedures and Confirmation Scheduling Order and established (i) the Bid Deadline for any Qualified Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order) wishing to participate in the Auction to submit a Qualified Bid (as defined in the Bidding Procedures and Confirmation Scheduling Order) and (ii) the date and time for the Auction. [As Dallas Sports & Entertainment, L.P., DSE Hockey Club L.P., DSE Hockey Centers L.P. and DSE Plano GP, Inc. were determined to be a Qualified Bidder pursuant to the approved Bidding Procedures and submitted the only Qualified Bid that was received by the Bid Deadline, pursuant to the approved Bidding Procedures, the Debtors did not hold an Auction and thus Dallas Sports & Entertainment, L.P., DSE Hockey Club L.P., DSE Hockey Centers L.P. and DSE Plano GP, Inc. are collectively the Successful Bidder] OR [The Debtors received __ Qualified Bids and pursuant to the Bidding Procedures, proceeded to hold an Auction].

M.     [Auction. The Auction was conducted properly and in good faith, without collusion, and in accordance with the Bidding Procedures and Confirmation Scheduling Order. At the Auction, the Debtors, in consultation with JPMorgan Chase Bank, N.A., Monarch Master Funding Ltd., and the NHL, selected _____ as the Successful Bidder, and _____ as the Backup Bidder.] "Purchaser" as used in this Order shall mean the Qualified Bidder who closes the transaction to acquire the Dallas Stars.

N.     Asset Purchase Agreement.  The Asset Purchase Agreement constitutes the highest or best offer for the Debtors' assets.  The Debtors' determination that the Asset Purchase Agreement is the highest or best offer for the Debtors' assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Asset Purchase Agreement and all transactions, agreements, and documents related thereto are essential elements of the Prepackaged Plan and entry into and consummation of the Asset Purchase Agreement is in the best interest of the Debtors and their estates.  The Debtors and the Purchaser have acted in good faith in connection with the Prepackaged Plan, these Chapter 11 Cases, and the formulation and confirmation of the Prepackaged Plan.  Moreover, the Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  [Except as otherwise disclosed to the Court,][4] neither the Purchaser, nor any of its affiliates or their respective representatives is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Neither the Debtors, nor the Purchaser, nor any of their respective agents or representatives have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code had the purchase of the Debtors' assets been conducted pursuant to section 363 of the Bankruptcy Code, or other applicable law.  Specifically, neither the Purchaser nor any of its representatives have acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The terms and conditions of the Asset Purchase Agreement and the transactions contemplated thereby (including, without limitation. the consideration provided in respect thereof) are fair and reasonable and shall not be avoided under the Bankruptcy Code or other applicable law.

---

[4] To be deleted depending upon the identity of the Purchaser.

O.    Good Faith of the Purchaser.  The Purchaser is, in all respects, a good faith purchaser of the Purchased Assets purchased pursuant to the Asset Purchase Agreement and is, therefore, entitled to all of the protections afforded thereby, including the protections of section 363(m) of the Bankruptcy Code to the fullest extent possible.  The Purchaser acquired all rights in the Purchased Assets in good faith reliance on the Confirmation Order, including, without limitation, the portions thereof relating to the transfer of the Debtors' assets free and clear of any and all interests, except as set forth in the Asset Purchase Agreement.

P.    Fair Consideration.  The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement constitutes reasonably equivalent value or fair consideration under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code and/or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  Neither the Debtors nor the Purchaser entered into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent conveyance and fraudulent transfer claims.  The Asset Purchase Agreement represents a fair and reasonable offer to purchase the Debtors' assets under the circumstances of these Chapter 11 Cases.  Based on the record at the Confirmation Hearing, no other person or entity or group of entities, other than the Purchaser, has offered to purchase the Debtors' assets on terms that would give greater economic value to the Debtors' estates.  Approval of the Asset Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, and all other parties in interest.

Q.     [<u>Stalking Horse Senior Secured Credit Agreement</u>.  The Stalking Horse Senior Secured Credit Agreement and the other Loan Documents (as defined therein) (collectively, the "<u>Stalking Horse Senior Secured Credit Facility</u>") have been negotiated in good faith and on an arms' length basis and each party thereto may rely upon the provisions of this Order in closing the Stalking Horse Senior Secured Credit Facility.  The financial accommodations to be extended pursuant to the Stalking Horse Senior Secured Credit Facility are being extended in good faith, for legitimate business reasons, are reasonable, and shall not be subject to recharacterization for any purpose whatsoever, and shall not constitute preferences or fraudulent transfers under the Bankruptcy Code or any other applicable nonbankruptcy law.][5]

**<u>Compliance with the Requirements of Section 1129 of the Bankruptcy Code</u>**

R.     <u>Prepackaged Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016, the Prepackaged Plan is dated and identifies the Debtors as proponents, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(a)     <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims, which need not be classified, Articles III and IV of the Prepackaged Plan classify thirty three Classes of Claims and Equity Interests.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Prepackaged

---

[5] BRACKETED LANGUAGE IN THIS ORDER REGARDING THE STALKING HORSE SENIOR SECURED CREDIT AGREEMENT TO BE INCLUDED IF THE STALKING HORSE SENIOR SECURED CREDIT AGREEMENT IS PROVIDED AS CONSIDERATION UNDER THE ASSET PURCHASE AGREEMENT.

Plan.  The Prepackaged Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)      Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Articles III, IV and V of the Prepackaged Plan specify that Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims), are unimpaired under the Prepackaged Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)      Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles III, IV and V of the Prepackaged Plan designate Classes 2A through 2D (First Lien Secured Claims), Classes 3A through 3D (Second Lien Secured Claims), Classes 8A through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) as impaired within the meaning of section 1124 of the Bankruptcy Code and specify the treatment of the Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(d)      No Discrimination (11 U.S.C. § 1123(a)(4)).  The Prepackaged Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to or elected a less favorable or different treatment of such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)      Implementation of the Prepackaged Plan (11 U.S.C. § 1123(a)(5)).  The Prepackaged Plan and the various documents and agreements set forth in the Prepackaged Plan Supplement provides adequate and proper means for the implementation of the Prepackaged

Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including (i) the continued corporate existence of the Debtors, (ii) the process for designation of the Officer of the Post-Effective Date Debtors, (iii) consummation of the transactions contemplated by the Asset Purchase Agreement (including the assumption by the Debtors of executory contracts and unexpired leases, and assignment of such contracts and leases to the Purchaser) [and by the Stalking Horse Senior Secured Credit Agreement], (iv) the cancellation of certain liens, (v) the vesting of the assets of the Debtors' estates in the Post-Effective Date Debtors, (vi) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents related to the foregoing, and (vii) provisions for the dissolution, consolidation, or other termination of legal existence of the Post-Effective Date Debtors.

(f) Non-Voting Equity Securities / Allocation of Voting Power (11 U.S.C. § 1123(a)(6)). The Amended Corporate Organizational Documents of each of the Debtors that is a corporation, as set forth in the Prepackaged Plan Supplement, and the corporate organizational documents of any Purchaser that is a corporation (the entity to which properties of the estates are being transferred under the Prepackaged Plan under section 1123(a)(5)(B) of the Bankruptcy Code), include a provision prohibiting the issuance of nonvoting equity securities and provide, as to the several classes of securities possessing voting power, when there are multiple classes, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

(g) Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)). Section 6.2(c) of Article VI of the Prepackaged Plan contain provisions with respect to the manner of

appointment of the Officer for the Post-Effective Date Debtors that is consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(h)    Impairment/Unimpairment of Classes of Claims and Equity Interests (11 U.S.C. § 1123(b)(1)).  Pursuant to Article III, IV, and V of the Prepackaged Plan, (a) Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) are unimpaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code, and (b) Classes 2A through 2D (First Lien Secured Claims), Classes 3A through 3D (Second Lien Secured Claims), Classes 8A through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) are impaired.

(i)    Assumption and Rejection (11 U.S.C. § 1123(b)(2)).  Article IX of the Prepackaged Plan addresses the assumption and rejection of executory contracts and unexpired leases, and meets the requirements of section 365(b) of the Bankruptcy Code.  [All objections to the Debtors' assumption of executory contracts and unexpired leases pursuant to Article IX of the Prepackaged Plan have either been specifically reserved or resolved or are hereby overruled.] OR [There have been no objections to the Debtors' assumption of executory contracts and unexpired leases pursuant to Article IX of the Prepackaged Plan.]

(j)    Settlement, Adjustment and Retention of Claims and Interests (11 U.S.C. § 1123(b)(3)(A) and 1123(b)(3)(B)).  Section 11.7 of the Prepackaged Plan provides that on the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the

Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession. Thus, the Prepackaged Plan complies with sections 1123(b)(3)(A) and 1123(b)(3)(B) of the Bankruptcy Code.

(k)     Sale of Substantially All Assets (11 U.S.C. § 1123(b)(4)).  The Prepackaged Plan provides for the Sale on the Effective Date of substantially all of the assets of the Debtors.  As a result of the Sale and in accordance with the terms of the Prepackaged Plan, all holders of Allowed Administrative Expense Claims, the CFV Claim and Allowed Assumed General Unsecured Claims against the Debtors will receive payment in full of their allowed claims.  In addition, all holders of First Lien Secured Claims and if the Discharge of the First Lien Obligations has occurred all holders of Second Lien Secured Claims will receive distributions from the Sale.  Thus, the Prepackaged Plan complies with section 1123(b)(4) of the Bankruptcy Code.

(l)     Unaffected Rights of Holders of Classes of Claims (11 U.S.C. § 1123(b)(5)).  The Prepackaged Plan leaves unaffected the rights of holders of Claims in Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims).  Thus, the Prepackaged Plan complies with section 1123(b)(5) of the Bankruptcy Code.

(m)     Additional Plan Provisions (11 U.S.C. § 1123(b)(6)).  The provisions of the Prepackaged Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

(n)     <u>Debtors Are Not Individuals (11 U.S.C. § 1123(c))</u>.  The Debtors are not individuals, and accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

(o)     <u>Cure of Defaults (11 U.S.C. § 1123(d))</u>.  Sections 9.1 and 9.2 of the Prepackaged Plan provide that the Purchaser will promptly pay the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtors under the Prepackaged Plan, and provide each contract counterparty an opportunity to object to and be heard by the Court with respect to such proposed cure amount.  If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption and assignment, Cure shall occur within seven days following the entry of a Final Order of the Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  Thus, the Prepackaged Plan complies with section 1123(d) of the Bankruptcy Code.

S.     <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>.  The Debtors have complied with the applicable provisions of the Bankruptcy Code.  Specifically:

(a)     Each of the Debtors is an eligible debtor under section 109 of the Bankruptcy Code; and

(b)     The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court, and in transmitting the Prepackaged Plan, the Prepackaged Plan Supplement, the Disclosure Statement, the Ballots, and

related documents and notices and in soliciting and tabulating the votes on the Prepackaged Plan, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126(b), the Bankruptcy Rules, the Local Rules, applicable nonbankruptcy law, the Bidding Procedures and Confirmation Scheduling Order, and all other applicable law.

T.  <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Prepackaged Plan (and all related documents, including the Asset Purchase Agreement) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors proposed the Prepackaged Plan with the honest purpose of selling substantially all of the assets of the Debtors and expeditiously distributing value to creditors, and they have thus met their good faith obligations under section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearings and other proceedings held in these Chapter 11 Cases.  The Prepackaged Plan (including the Asset Purchase Agreement, [the Stalking Horse Senior Secured Credit Agreement,] and all other documents necessary to effectuate the Prepackaged Plan) were negotiated at arms' length among representatives of the Debtors, holders of First Lien Secured Claims, the First Lien Administrative Agent, [holders of Second Lien Secured Claims, the Second Lien Administrative Agent,][6] NHL, CFV I LLC, the Purchaser, and their respective professionals. Each of the Debtors, holders of First Lien Secured Claims, the First Lien Administrative Agent, [the holders of Second Lien Secured Claims, the Second Lien Administrative Agent,][7] NHL, CFV I LLC, and the Purchaser supports the Sale of the Purchased Assets to the Purchaser and confirmation of the

---

[6] To be included if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

[7] To be included if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

Prepackaged Plan. Further, the Prepackaged Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arms' length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are necessary to the proposed reorganization and the implementation of the Prepackaged Plan.

U.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Any payment made or to be made by the Debtors for services or for costs and expenses of the Debtors' professionals in connection with their Chapter 11 Cases, or in connection with the Prepackaged Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

V.    Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Section 6.2(c) of the Prepackaged Plan provides for the appointment of the Officer of the Post-Effective Date Debtors as the sole officer of the Post-Effective Date Debtors. The identity of the Officer has been disclosed by the Debtors prior to or at the Confirmation Hearing.

W.    No Rate Changes (11 U.S.C. § 1129(a)(6)). The Prepackaged Plan does not provide for rate changes by any of the Post-Effective Date Debtors. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

X.    Best Interest of Creditors (11 U.S.C. § 1129(a)(7)). The Prepackaged Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Debtors entered into the Asset Purchase Agreement after an intensive marketing process, both prepetition and postpetition, that ensured that they received the highest value possible for their assets under the circumstances. In

a chapter 7 liquidation, the Debtors would not receive more value for their assets, the chapter 7 stigma could disrupt the Debtors' businesses and affect their value, and there would be substantial costs of liquidation. As such, under the Prepackaged Plan, each holder of a Claim or Equity Interest will receive not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

   Y. <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>. Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) are Classes of unimpaired Claims that are conclusively presumed to have accepted the Prepackaged Plan in accordance with section 1126(f) of the Bankruptcy Code. [Classes 3A through 3D (Second Lien Secured Claims)],[8] Classes 8A and through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) are impaired and have not accepted the Prepackaged Plan. Classes 2A through 2D (First Lien Secured Claims) [and Classes 3A through 3D (Second Lien Secured Claims)] have voted to accept the Prepackaged Plan in accordance with sections 1126(b) and (c) of the Bankruptcy Code, without regard to the votes of insiders of the Debtors. Accordingly, the Prepackaged Plan does not comply with section 1129(a)(8) of the Bankruptcy Code.

   Z. <u>Treatment of Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims (11 U.S.C. § 1129(a)(9))</u>. The treatment of Allowed Administrative Expense Claims pursuant to section 2.1 of the Prepackaged Plan satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code. The treatment of

---

[8] BRACKETS AROUND ACCEPTANCE/REJECTION BY HOLDERS OF SECOND LIEN CLAIMS AND RELATED PROVISIONS TO BE REMOVED AND INAPPLICABLE LANGUAGE DELETED ONCE IT IS DETERMINED HOW SUCH CLASS VOTES.

Priority Non-Tax Claims pursuant to section 4.1 of the Prepackaged Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code. The treatment of Priority Tax Claims pursuant to section 2.3 of the Prepackaged Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

AA.     Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). Classes 2A through 2D (First Lien Secured Claims) and [Classes 3A through 3D (Second Lien Secured Claims)] voted to accept the Prepackaged Plan by the requisite majorities, determined without including any acceptance of the Prepackaged Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

BB.     Feasibility (11 U.S.C. § 1129(a)(11)). The information in the Disclosure Statement, the [_____] Declaration, and the evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has not been controverted by other evidence, and (iii) establishes that the Prepackaged Plan is feasible because, in the context of the Prepackaged Plan where there will be no ongoing business for the Post-Effective Date Debtors, the Post-Effective Date Debtors have the ability to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds from the Post-Closing Expense Amount to meet their post-confirmation obligations to pay for the costs of administering and fully consummating the Prepackaged Plan, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

CC.     Payment of Fees (11 U.S.C. § 1129(a)(12)). All fees currently payable under section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or before the Effective Date pursuant to section 13.1 of the Prepackaged Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

DD.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  Section 9.4 of the Prepackaged Plan provides that except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan and assigned to the Purchaser under the Asset Purchase Agreement.  The Prepackaged Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

EE.     No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation.  Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

FF.     Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15)).  The Debtors are not individuals, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

GG.     No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16)).  The Debtors are each a moneyed, business, or commercial corporation, and accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

HH.     No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).  Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) are deemed to have rejected the Prepackaged Plan.  [Classes 3A

through 3D (Second Lien Secured Claims) are impaired and have not voted to accept the Prepackaged Plan.]⁹ Based upon the evidence proffered, adduced, and presented by the Debtors at the Confirmation Hearing, the Prepackaged Plan does not discriminate unfairly against, and is fair and equitable with respect to, these Classes, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because no holder of any claim or interest that is junior to such Classes will receive or retain any property under the Prepackaged Plan on account of such junior claim or interest, and no holder of a Claim in a Class senior to such Classes is receiving more than 100% recovery on account of its Claim or such Claim's treatment is a result of a valid subordination agreement under section 510(a) of the Bankruptcy Code. Moreover, to the extent there are any Non-Assumed General Unsecured Claims, other than Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, there is no unfair discrimination, as the unsecured claims that are receiving a recovery are doing so at the election of the Purchaser based upon the Purchaser's determination as to which Claims to pay. Thus, the Prepackaged Plan may be confirmed notwithstanding the deemed rejection of the Prepackaged Plan by these Classes and non-compliance with section 1129(a)(8) of the Bankruptcy Code.

II.      <u>Only One Plan (11 U.S.C. § 1129(c))</u>. The Prepackaged Plan is the only plan filed in each of these cases, and accordingly, section 1129(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

JJ.      <u>Principal Purpose of the Prepackaged Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the Prepackaged Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the United States Securities Act of 1933, as amended and no governmental entity has objected to the confirmation of the Prepackaged Plan on any such

---

⁹ To delete if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

grounds.  The Prepackaged Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

KK.     Debtors are Not a Small Business (11 U.S.C. § 1129(e)).  The Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

LL.     Good Faith Solicitation (11 U.S.C. § 1125(e)).  Based on the record before the Court in these Chapter 11 Cases, including evidence presented at the Confirmation Hearings, the Debtors (including the Post-Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, [the holders of Second Lien Secured Claims, the Second Lien Administrative Agent,][10] the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Prepackaged Plan and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Prepackaged Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of

---

[10] To be included if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities

under the Prepackaged Plan, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code and, to the extent such parties are listed therein, the exculpation and release

provisions set forth in Article XI of the Prepackaged Plan.

MM.    Satisfaction of Confirmation Requirements.  Based upon the foregoing,

the Prepackaged Plan satisfies the requirements for confirmation set forth in section 1129 of the

Bankruptcy Code.

NN.    Implementation.  All documents necessary to implement the Prepackaged

Plan, including those contained in the Prepackaged Plan Supplement [and the Stalking Horse

Senior Secured Credit Facility], and all other relevant and necessary documents have been

negotiated in good faith and at arms' length and shall, upon completion of documentation and

execution, be valid, binding, and enforceable agreements and not be in conflict with any federal

or state law.

OO.    Injunction, Exculpation, and Releases.  The Court has jurisdiction under

sections 1334(a) and (b) of title 28 of the United States Code to approve the injunction,

exculpation and releases set forth in Article XI of the Prepackaged Plan.  Section 105(a) of the

Bankruptcy Code permits issuance of the injunction and approval of the unopposed releases set

forth in Article XI of the Prepackaged Plan if, as has been established here based upon the record

in these Chapter 11 Cases and the evidence presented at the Confirmation Hearings, such

provisions (i) were integral to the agreement among the various parties in interest and are

essential to the formulation and implementation of the Prepackaged Plan, as provided in section

1123 of the Bankruptcy Code, (ii) confer substantial benefits on the Debtors' estates, (iii) are

fair, equitable and reasonable, and (iv) are in the best interests of the Debtors, their estates, and

parties in interest.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the releases, exculpation, and injunction set forth in the Prepackaged Plan and implemented by this Order are fair, equitable, reasonable, and in the best interests of the Debtors, the Post-Effective Date Debtors and their estates, creditors and equity holders.  The releases of non-Debtors under the Prepackaged Plan are fair and are necessary to the proposed reorganization and are supported by fair, sufficient, and adequate consideration provided by each and all of the parties receiving such releases.  The record of the Confirmation Hearing and these Chapter 11 Cases is sufficient to support the releases, exculpation, and injunction provided for in Article XI of the Prepackaged Plan.  Accordingly, based upon the record of these Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation Hearing, this Court finds that the injunction, exculpation, and releases set forth in Article XI of the Prepackaged Plan are consistent with the Bankruptcy Code and applicable law.  The failure to implement the injunction, exculpation and releases would seriously impair the Debtors' ability to confirm the Prepackaged Plan.

PP.    Settlement.  Except as otherwise provided in the Prepackaged Plan and this Order, the Prepackaged Plan represents a settlement among the Debtors and their creditors and equity holders of all Claims, Equity Interests and litigation against the Debtors, pending or threatened, or that was or could have been commenced against the Debtors prior to the date of entry of this Order.

QQ.    Good Faith.  The Debtors, the Purchaser, the holders of First Lien Secured Claims, the First Lien Administrative Agent, [the holders of Second Lien Secured Claims, the Second Lien Administrative Agent,][11] the NHL, CFV I LLC, and their respective successors,

---

[11] To be included if each of Classes 3A through 3D votes to accept the Prepackaged Plan.

predecessors, control persons, members, affiliates, officers, directors, employees, and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons will be acting in good faith if they proceed to (i) consummate the Prepackaged Plan and the agreements, settlements, transactions, and transfers contemplated thereby (ii) take the actions authorized or directed by this Order [and (iii) execute and consummate the Stalking Horse Senior Secured Credit Facility].

RR.     Valuation.  Based on the Qualified Bids received as a result of the Bidding Procedures and the Auction, if any, the value of the Debtors is insufficient to support a distribution to holders of Second Lien Secured Claims, Non-Assumed General Unsecured Claims, and Equity Interests in Debtors under absolute priority principles.

SS.     Retention of Jurisdiction.  The Court may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XII of the Prepackaged Plan and section 1142 of the Bankruptcy Code.  For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement, NHL Agreements, and NHL/Lender Cooperation Agreement.

**The Plan Satisfies Confirmation Requirements**

TT.     Based upon the foregoing, the Prepackaged Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**ORDER**

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

1.     Findings of Fact and Conclusions of Law.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth

herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule

7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact

shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2.     Notice of the Confirmation Hearings.  Notice of the Confirmation

Hearings complied with the terms of the Bidding Procedures and Confirmation Scheduling

Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases,

and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules.

3.     Solicitation.  The solicitation of votes on the Prepackaged Plan complied

with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances

of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules and applicable nonbankruptcy law.

4.     Ballots.  The forms of Ballots annexed to the Voting Certification are in

compliance with Bankruptcy Rule 3018(c), conform to Official Form Number 14, and are

approved in all respects.

5.     Plan Modifications.  Modifications made to the Prepackaged Plan

following the solicitation of votes thereon satisfied the requirements of section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, there have been no Lender Adverse Modifications

without the consent of the First Lien Administrative Agent acting in its reasonable discretion,

and no further solicitation is required.

6.     The Disclosure Statement.  The Disclosure Statement (i) contains adequate

information of a kind generally consistent with the disclosure requirements of applicable

nonbankruptcy law, (ii) contains "adequate information" (as such term is defined in section

1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Prepackaged Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

7.     <u>Confirmation of the Prepackaged Plan</u>. The Prepackaged Plan and each of their provisions shall be, and hereby are, CONFIRMED under section 1129 of the Bankruptcy Code. The documents contained in the Prepackaged Plan Supplement are authorized and approved. The terms of the Prepackaged Plan, including the Prepackaged Plan Supplement, are incorporated by reference into and are an integral part of this Order.

8.     <u>Objections</u>. All Objections, responses to, and statements and comments, if any, in opposition to, the Prepackaged Plan and/or the Disclosure Statement, respectively, other than those specifically reserved, resolved, or withdrawn in their entirety prior to, or on the record at, the Confirmation Hearings, shall be, and hereby are, overruled in their entirety for the reasons stated on the record.

9.     <u>No Action</u>. Pursuant to section 1142(b) of the Bankruptcy Code, no action of the respective officers, directors, or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Prepackaged Plan and any contract, instrument, or other document to be executed, delivered, adopted or amended in connection with the implementation of the Prepackaged Plan.

10.     <u>Binding Effect</u>. Pursuant to section 1141 and the other applicable provisions of the Bankruptcy Code, on or after entry of this Order and subject to the occurrence of the Effective Date, the provisions of the Prepackaged Plan (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection

therewith, including those contained in the Prepackaged Plan Supplement) and this Order shall bind the Debtors, the Post-Effective Date Debtors, all holders of Claims and Equity Interests of the Debtors (irrespective of whether such Claims or Equity Interests are impaired under the Prepackaged Plan or whether the holders of such Claims or Equity Interests accepted or are deemed to have accepted the Prepackaged Plan), each Person receiving, retaining or otherwise acquiring property under the Prepackaged Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any Person making an appearance in the Chapter 11 Cases, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

11.     Bidding Procedures.  The Auction was conducted properly and in good faith, without collusion, and in accordance with the Bidding Procedures and Confirmation Scheduling Order.

12.     Free and Clear.  Except as otherwise provided in the Prepackaged Plan and as contemplated under the Asset Purchase Agreement, the Debtors, as Post-Effective Date Debtors, shall continue to exist on and after the Effective Date as separate Persons with all of the powers available to such legal entities under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with applicable law and the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan, the property of the Debtors' estates that is not specifically disposed of pursuant to the Prepackaged Plan or purchased by the Purchaser under the Asset Purchase Agreement, if any, shall vest in the Post-Effective Date Debtors on the Effective Date.  Except as otherwise provided in the Prepackaged Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy

Rules, and the Court.  As of the Effective Date, all property of the Post-Effective Date Debtors

not sold to the Purchaser, if any, shall be free and clear of all Claims, encumbrances, charges,

and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order;

provided however, that any valid, perfected prepetition liens against the Debtors' assets shall

attach to the assets remaining in the possession of the Post-Effective Date Debtors following the

Effective Date and the proceeds thereof with the same force and effect, priority, and validity as

existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and

the Intercreditor Agreement shall continue to be of full force and effect with respect to such

assets.  Without limiting the generality of the foregoing, the Post-Effective Date Debtors may,

without application to or approval by the Court, pay professional fees and expenses incurred by

the Post-Effective Date Debtors after the Confirmation Date.  Notwithstanding anything to the

contrary herein, the Post-Effective Date Debtors shall remain bound by the terms of the

confirmed Prepackaged Plan and Confirmation Order.

          13.    <u>Valid Transfer</u>.  On the Effective Date, the Debtors are authorized to enter

into the Asset Purchase Agreement and any related agreements and take all actions necessary to

effectuate the Asset Purchase Agreement and any related agreements.  In the event the

Successful Bidder does not close the transaction within such time as is determined reasonable by

the Debtors, the Debtors in their sole discretion after consultation with the NHL and First Lien

Administrative Agent, are authorized to close the transaction described in the Backup Bid with

the Backup Bidder as soon as is commercially reasonable.  [If the Stalking Horse is neither the

Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails

to consummate the Sale within such time as is determined reasonable by the Debtors, in their

sole discretion after consultation with the NHL and Senior Lenders, the Debtors and the Stalking

Horse are authorized to effect the Sale to the Stalking Horse.]  Prior to the transfer of the

Purchased Assets to the Purchaser under the Asset Purchase Agreement on or after the Effective

Date, the Debtors are and were the sole and lawful owner of such assets.  Except as otherwise

provided herein, in the Prepackaged Plan [or in the Stalking Horse Senior Secured Credit

Facility,] as contemplated under the Asset Purchase Agreement and subject to the satisfaction of

the conditions precedent to the Effective Date, the transfer of the Purchased Assets to the

Purchaser under the Asset Purchase Agreement on or after the Effective Date shall be a legal,

valid, and effective transfer of the Purchased Assets, and shall vest the Purchaser with all right,

title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims (as

defined in section 101(5) of the Bankruptcy Code, and including, without limitation, successor

liability claims), encumbrances, obligations, liabilities, demands, guarantees, options, rights,

restrictions, contractual commitments, rights of first refusal, or interests of any kind or nature

whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or

non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or

after the commencement of these Chapter 11 Cases, and whether imposed by agreement,

understanding, law, equity or otherwise (collectively, the "Released Liens"), including, but not

limited to, (i) those that purport to give to any party a right or option to effect any forfeiture,

modification or termination of the Debtors' interests in the Purchased Assets, or any similar

rights, (ii) those relating to taxes arising under or out of, in connection with, or in any way

relating to the operation of the Purchased Assets prior to the closing of the Sale, (iii) those

arising under all mortgages, deeds of trust, security interests, conditional sale or other title

retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal,

or charges of any kind or nature, if any, including without limitation any restriction on the use,

voting, transfer, receipt of income, or other exercise of any attributes of ownership, and (iv) those arising in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors, affiliates, or representatives, including, but not limited to, Released Liens arising under any bulk-transfer laws, doctrines of successor liability or similar theories. For the further avoidance of doubt, and without limiting the effect of any of the foregoing, except as otherwise provided in the Prepackaged Plan or as contemplated under the Asset Purchase Agreement, the transfer, assumption and assignment, of any of the executory contracts shall be free and clear of all Released Liens.

14. <u>Good Faith Purchaser</u>. The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein shall not affect the validity of the transfer of the Purchased Assets to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

15. <u>No Successor Liability</u>. Except as otherwise provided herein, in the Prepackaged Plan, [or the Stalking Horse Senior Secured Credit Facility] or as contemplated under the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchaser under the Asset Purchase Agreement shall not result in the Purchaser having any liability or responsibility (i) for any Claim against the Debtors or against an insider of the Debtors, (ii) to the Debtors or to third parties, or (iii) for the satisfaction in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, of any Released Liens. Without limiting the effect or scope of the foregoing, to the fullest extent permitted by law, except as

otherwise provided in the Prepackaged Plan or as contemplated under the Asset Purchase

Agreement, the transfer of the Purchased Assets from the Debtors to the Purchaser shall not

subject the Purchaser or its affiliates, successors or assigns or their respective properties

(including the Purchased Assets) to any liability for Released Liens against the Debtors in such

Purchased Assets by reason of such transfer under the laws of the United States or any state,

territory, or possession thereof, or the District of Columbia, applicable to such transactions,

including, without limitation, any bulk-transfer laws, successor liability, or similar theories.  For

the avoidance of doubt, and without limiting the effect and/or generality of any of the

foregoing, except as otherwise provided herein, in the Prepackaged Plan [or the Stalking Horse

Senior Secured Credit Facility,] or as contemplated under the Asset Purchase Agreement, the

transfer, assumption, and assignment of any of the executory contracts are free and clear of all

Released Liens.

        16.     <u>No Liability Findings Needed by Purchaser</u>.  The Purchaser would not

have entered into the Asset Purchase Agreement and would not have consummated the transactions

contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors,

if the sale of the Purchased Assets to the Purchaser, and the assumption and assignment or transfer

of the executory contracts, was not free and clear of all Released Liens of any kind or nature

whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Released

Liens, in each case except as otherwise provided herein, in the Prepackaged Plan, [the Stalking

Horse Senior Secured Credit Facility,] or as contemplated under the Asset Purchase Agreement.

        17.     <u>Implementation of the Asset Purchase Agreement and Prepackaged Plan</u>.

On or (as applicable) prior to the Effective Date, the Debtors and the Post-Effective Date

Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the

agreements, documents, and instruments contemplated by the Asset Purchase Agreement or the

Prepackaged Plan, including those contained in the Prepackaged Plan Supplement, (or necessary

or desirable to effect the transactions contemplated by the Asset Purchase Agreement or the

Prepackaged Plan) in the name of and on behalf of the Post-Effective Date Debtors, including,

without limitation, any and all agreements, documents, and instruments related to the foregoing.

Such authorizations and approvals will be effective notwithstanding any requirements under non-

bankruptcy law.

    18.  [Stalking Horse Senior Secured Credit Facility.  Upon the occurrence of

the Effective Date, the First Lien Administrative Agent shall be granted valid, perfected first

priority liens on and security interests in all of the Purchased Assets (other than any Purchased

Assets that are specifically excluded from the Collateral (as defined in the Stalking Horse Senior

Secured Credit Agreement) pursuant to the terms of the Stalking Horse Senior Secured Credit

Facility), for the benefit of the holders of First Lien Secured Claims pursuant to the Stalking

Horse Senior Secured Credit Facility and the Purchaser shall be bound by the Stalking Horse

Senior Secured Credit Facility in accordance with its terms.  Upon the occurrence of the

Effective Date, each holder of a First Lien Secured Claim (and each holder of a Second Lien

Secured Claim if each of Classes 3A through 3D votes to accept the Prepackaged Plan) shall (i)

be bound by the terms of the Stalking Horse Senior Secured Credit Facility and, as applicable,

any related Loan Documents (as defined in the Stalking Horse Senior Secured Credit

Agreement) and the NHL/Lender Cooperation Agreement whether or not each holder of a First

Lien Secured Claim (and each holder of a Second Lien Secured Claim if each of Classes 3A

through 3D votes to accept the Prepackaged Plan) executes such documents (ii) shall be deemed

to have appointed the First Lien Administrative Agent as the administrative agent under the

Stalking Horse Senior Secured Credit Facility pursuant to the terms thereof, and (iii) shall be deemed to have authorized the First Lien Administrative Agent to take such actions as administrative agent under the Stalking Horse Senior Secured Credit Facility as are contemplated thereby, including, without limitation, executing and delivering the NHL/Lender Cooperation Agreement and any supplements or amendments thereto and executing and delivering certain post-closing collateral documents specified in the Stalking Horse Senior Secured Credit Facility.]

19.     <u>Compliance with Section 1123(a)(6) of the Bankruptcy Code</u>.  The Amended Corporate Organizational Documents of every Debtor and Purchaser that is a corporation comply in all respects with section 1123(a)(6) of the Bankruptcy Code, and are hereby approved.  The adoption and filing by the Debtors and the Purchaser of such documents is hereby authorized, ratified, and approved.

20.     <u>Cancellation of Liens</u>.  Except as provided herein, [in the Stalking Horse Senior Secured Credit Facility] and in the Prepackaged Plan, and in accordance with the Asset Purchase Agreement, upon the occurrence of the Effective Date, any Lien encumbering the Purchased Assets prior to the Effective Date shall be deemed released, and the holder of the Claim secured by such Lien shall be authorized and directed to release any Collateral or other property of the Debtors constituting Purchased Assets (including any Cash collateral) held by such holder and to take such actions as may be requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets), to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets); *provided*, *however*, that such Liens shall be released regardless of whether any such filing or recordings are made; *provided, further*, that any valid, perfected

prepetition liens against the Debtors' assets shall attach to the assets remaining in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority, and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets.  Following the Effective Date, (i) the First Lien Collateral Agent shall have the right, at its sole discretion at any time prior to dissolution of the Debtors' estates, to accept an in-kind distribution of any non-cash assets remaining in the Debtors' estates and (ii) upon dissolution of the Debtors' estates, the Post-Effective Date Debtors shall distribute any remaining cash in the estates to the First Lien Collateral Agent, in each case to be applied by the First Lien Collateral Agent in accordance with the First Lien Security Agreement.  In addition, if any Person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents evidencing Liens encumbering the Purchased Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the Person or entity has with respect to the Purchased Assets, then (a) the Debtors and Post-Effective Date Debtors are authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the Person or entity with respect to the Purchased Assets and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature whatsoever.

21.     Subordination.  Except as otherwise expressly provided in the Prepackaged Plan, this Order or a separate order of this Court, the classification and manner of

satisfying all Claims and Equity Interests under the Prepackaged Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Except as provided in the Prepackaged Plan or in that certain letter agreement by and among the NHL, the First Lien Administrative Agent, the Second Lien Administrative Agent, Hicks Sports Group, LLC, Hicks Sports Group Holdings LLC, the Dallas Stars, Dallas Arena, HSG Partnership Holdings LLC, Texas Rangers Baseball Partners, Emerald Diamond, L.P., Southwest Sports Television, L.P., Southwest Sports Group Baseball, L.P., Dallas Stars U.S. Holdings Corp. and Starcenter LLC, dated December 19, 2006 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "NHL Letter Agreement"), all subordination rights that a holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Prepackaged Plan shall be discharged and terminated and all actions related to the enforcement of such subordination rights shall be enjoined permanently.  Except as otherwise provided in the Prepackaged Plan or the NHL Letter Agreement, the distributions under the Prepackaged Plan to the holders of Allowed Claims and Equity Interests will not be subject to payment of a beneficiary of such subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

22.     NHL/Lender Cooperation Agreement.  If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement[12], each holder of a First Lien Secured Claim (and Second Lien Secured Claim, if applicable) that will receive a distribution under the

---

[12] If the Purchaser is not the Stalking Horse and provides consideration in the form of a secured debt obligation to the holders of First Lien Secured Claims (and Second Lien Secured Claims, if applicable), this paragraph shall be amended to provide that each holder of a First Lien Secured Claim (and Second Lien Secured Claim, if applicable) that will receive a distribution under the Prepackaged Plan shall, on account of such claim, be bound by the terms of the new secured debt agreement and pursuant to the terms of such agreement and this Order, the NHL/Lender Cooperation Agreement, whether or not such holder of a First Lien Secured Claim (or Second Lien Secured Claim, if applicable) executes the new secured debt agreement.

Prepackaged Plan shall, on account of such claim, be bound by the terms of the Stalking Horse Credit Agreement and pursuant to the terms of such agreement and this Order, the NHL/Lender Cooperation Agreement, whether or not such holder of a First Lien Secured Claim (or Second Lien Secured Claim, if applicable) executes the Stalking Horse Credit Agreement.

23.     <u>Compromise of Controversies</u>.  In consideration for the distributions and other benefits, including releases, provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved under the Prepackaged Plan, and the entry of this Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

24.     <u>Plan Distributions</u>.

(i)     On and after the Effective Date, all distributions under the Prepackaged Plan shall be effectuated in accordance with the Prepackaged Plan, including Articles IV and VII thereof.

(ii)    If this Court or any other court of competent jurisdiction orders disgorgement of any distribution made by the First Lien Administrative Agent pursuant to section 7.7(b) of the Prepackaged Plan, then (i) each holder of First Lien Secured Claims shall only be required to disgorge its pro rata share of such payments and the holder of First Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the First Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of First Lien Secured Claims and which are no longer in the First Lien Administrative Agent's possession.

(iii)   After the expiration of one year from the Effective Date, all unclaimed property or interests in property distributable under the Prepackaged Plan shall revert automatically to the Purchaser or the Post-Effective Date Debtors, as applicable, and without need for a further Order by the Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Person to such property or interest (including Equity Interest) in such property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(iv)    The provisions of Article VIII of the Prepackaged Plan, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are fair and reasonable and are approved.

25.    <u>Assumption or Rejection of Contracts and Leases</u>.

(i)    <u>General</u>.  Pursuant to section 9.1 of the Prepackaged Plan, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Prepackaged Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each executory contract and unexpired lease to which it is a party, pursuant to section 365 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) is an Excluded Contract.  Such contract and lease assumptions, assumptions and assignments, or rejections are hereby approved under sections 365 and 1123(b) of the Bankruptcy Code as of the Effective Date.

(ii)    <u>Excluded Contracts and Rejected Contracts</u>.  On the Effective Date, any executory contracts and unexpired leases that (i) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (ii) is an Excluded Contract shall be deemed rejected by the Debtors.

(iii)    <u>Objections to Rejection, Assumption, or Assumption and Assignment</u>.  Any party wishing to object to the rejection, assumption, or assumption and assignment of any executory contract or unexpired lease under the Prepackaged Plan was required to follow the instructions described in the Summary and Notice for filing objections to the Prepackaged Plan and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or

unexpired lease to which any such objection relates. Any counterparty that did not timely and properly object to the rejection, assumption, or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, shall be deemed to have consented to such rejection, assumption, or assumption and assignment.

26. <u>Cure and Adequate Assurance</u>. The Purchaser has: (i) to the extent necessary, cured, or provided adequate assurance of cure of, any default with respect to the executory contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code; and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default with respect to the executory contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code. The Purchaser's contractual obligation to pay the cure amounts listed in the Cure Schedule (as set forth in the Summary and Notice and as may be amended by stipulations approved by the Court), and Purchaser's contractual obligation to perform under the executory contracts after the closing date constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. To the extent that any counterparty to an executory contract did not object to its cure amount by the applicable deadline set forth in the Bidding Procedures and Confirmation Scheduling Order, such counterparty is deemed to have consented to such cure amounts and the assignments of its respective executory contracts to the Purchaser.

27. <u>Rejection Claims</u>. All Claims, if any, arising out of the rejection of executory contracts and unexpired leases by the Debtors shall be classified as Non-Assumed General Unsecured Claims and are not entitled to receive any distributions under the

Prepackaged Plan.  The Purchaser shall not have any liability or responsibility for any liability of the Debtors arising under or related to the Non-Assumed General Unsecured Claims.

28.　　<u>Disputed Claims</u>.  On and after the Effective Date, except as otherwise provided herein, all Claims shall be paid in the ordinary course of business of the Purchaser if assumed under the Asset Purchase Agreement.  If the Debtors, the Purchaser, or any other party in interest disputes any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of Assumed General Unsecured Claims under the Prepackaged Plan and that the holders of Non-Assumed General Unsecured Claims are not entitled to any recovery under the Prepackaged Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors.  Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn.  The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under section 8.1 of the Prepackaged Plan to assert its Claims against the Purchaser, solely to the extent the Claim was assumed by the Purchaser under the Asset Purchase Agreement, or against the Post-Effective Date Debtors solely to the extent the Claim was not assumed by the Purchaser and is entitled to a distribution hereunder, in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  Notwithstanding anything to the contrary herein, the Purchaser or any holder of a Disputed Claim shall be entitled to file a motion in the Bankruptcy Court to determine whether any Claim was assumed by the Purchaser under the Asset Purchase Agreement.

29.     <u>Conditions to Effective Date</u>.  The Prepackaged Plan shall not become effective unless and until the conditions set forth in section 10.1 of the Prepackaged Plan have been satisfied.

30.     <u>Professional Compensation</u>.  Except as provided in section 2.1 of the Prepackaged Plan, all entities seeking awards by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is ninety days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred (a "<u>Final Fee Application</u>") and (b) be paid in full, in Cash, in such amounts as are Allowed by the Court in accordance with the order relating to or Allowing any such Administrative Expense Claim.  Notice of a hearing (the "<u>Final Fee Hearing</u>") on the Final Fee Applications shall be provided in accordance with the Bankruptcy Rules and Local Rules.  The Post-Effective Date Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Court approval.  The Asset Purchase Agreement shall provide that the portion of Specified Expenses that covers compensation for professional services or reimbursement of expenses incurred by professionals for which Bankruptcy Court approval is required shall be provided by Purchaser to the Post-Effective Date Debtors in Cash pursuant to section 2.2 of the Prepackaged Plan.  On the Effective Date, the Post-Effective Date Debtors shall set aside such Cash in a separate, interest-bearing escrow account pending final allowance by the Bankruptcy Court of all professional fee applications.

31.     Objections to Final Fee Applications.  All objections to any Final Fee Applications shall be filed with the Court, together with proof of service thereof, and served upon the applicant and the Notice Parties, so as to be received not later than 4:00 p.m. prevailing Eastern Time on the date that is five Business Days prior to the Final Fee Hearing.

32.     Discharge.  To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, as of the Effective Date, the confirmation of the Prepackaged Plan shall (i) pursuant to section 11.3 of the Prepackaged Plan and except as otherwise provided in the Prepackaged Plan or herein, discharge and release all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estates or properties or interests in property, and (ii) except as provided otherwise in the Prepackaged Plan or herein, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full in exchange for the consideration provided under the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan or herein, all Persons shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

33.     No Retained Liabilities.  Neither the Debtors nor the Post-Effective Date Debtors shall retain any liability for any Claims arising from liabilities assumed by the Purchaser pursuant to the Asset Purchase Agreement, and all such Claims against the Debtors shall be discharged and forever barred.

34.     <u>Releases by the Debtors and Stalking Horse</u>.  Except as otherwise

specifically provided herein and to the extent permitted by applicable law and approved by the

Bankruptcy Court, effective immediately prior to the occurrence of the Effective Date (provided

the Effective Date occurs), the releases set forth in section 13.12 of the Stalking Horse Asset

Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the

Purchaser) and in the NHL Owner Consent (as defined in the Stalking Horse Asset Purchase

Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) shall

be effective and, except for the right to enforce the Prepackaged Plan, (i) the Debtors and (ii) if

the Stalking Horse is the Purchaser, the Purchaser and the Owner Support Parties shall be

deemed to forever release, waive and discharge the First Lien Released Parties and the Second

Lien Released Parties of and from any and all Claims, demands, causes of action and the like,

relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity

Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or

other occurrence that occurred on or prior to the Effective Date, whether direct or derivative,

liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed,

known or unknown, foreseen or unforeseen, in law, equity or otherwise.  Notwithstanding the

foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge

of (i) any First Lien Released Party or Second Lien Released Party in respect of any contractual

obligations of any such First Lien Released Party or Second Lien Released Party pursuant to the

contracts, instruments, releases, and other agreements or documents delivered under or in

connection with the Prepackaged Plan or assumed by the Debtors and assigned to the Purchaser

pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court or (ii) any causes of

action unknown to the Debtors, the Purchasers, or the Owner Support Parties, respectively, as of

the Commencement Date arising out of willful misconduct or gross negligence of any such First Lien Released Party or Second Lien Released Party as determined by a Final Order of the Bankruptcy Court.

35.    Releases by Holders of Claims.

Except as otherwise specifically provided in this Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, other than the right to enforce the Prepackaged Plan, (a) each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this Section 11.6 shall be deemed to forever release, waive and discharge the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the NHL Released Parties, and the Purchaser Released Parties (if the Stalking Horse is the Purchaser), of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise and (b) the NHL shall be deemed to forever release, waive and discharge each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this Section 11.6 of and from any and all Claims,

demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise; provided, however, that nothing contained in this Section 11.6 shall operate as a release, waiver or discharge of the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County, or any claims, causes of action, or rights in connection therewith.

Notwithstanding the foregoing, (i) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party to receive indemnification or reimbursement pursuant to section 9.6 of the First Lien Credit Agreement, (ii) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party or any other holder of a First Lien Secured Claim against GSP Finance LLC, any Second Lien Administrative Party or any other holder of a Second Lien Secured Claim arising out of (a) the filing of, pursuit of or recovery (if any) from the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County or (b) the Intercreditor Agreement, (iii) on an after the Effective Date, the contractual rights and obligations between and among the First Lien Administrative Parties and holders of First Lien Secured Claims under the First Lien Credit Agreement and related loan documents shall survive and continue with respect to any acts, omissions, facts, matters, transactions or occurrences on or after the Effective Date, and (iv) except as set forth in Section 4.3 of the Prepackaged Plan, the

Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan. Furthermore, notwithstanding the foregoing, such releases, waivers and discharges shall not operate as a release, waiver or discharge of (i) any First Lien Released Party, any Second Lien Released Party, Debtor Released Party, NHL Released Party or Purchaser Released Party in respect of any contractual obligations of any such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan, (ii) any counterclaims or crossclaims against any First Lien Released Party or any Second Lien Released Party by any NHL Released Party arising out of or related to an action against any NHL Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iii) any counterclaims or crossclaims against any NHL Released Party by a First Lien Released Party arising out of or related to an action against such First Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iv) any counterclaims or crossclaims against any NHL Released Party by a Second Lien Released Party arising out of or related to an action against such Second Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, or (v) any cause of action by a party granting a release under this Section 11.6 against a Released Party that is both unknown as of the Commencement Date to the party granting the release under this Section 11.6 and arises out of or relates to willful misconduct or gross negligence by the Released Party as determined by a Final Order of the Bankruptcy Court.

36. <u>Release and Exculpation Provisions</u>. All release and exculpation provisions embodied in the Prepackaged Plan, including but not limited to those contained in sections 11.4, 11.5 and 11.6 of the Prepackaged Plan, are (i) integral parts of the Prepackaged

Plan, (ii) fair, equitable and reasonable, (iii) given for valuable consideration and (iv) are in the best interest of the Debtors and all parties in interest, and such provisions are approved and shall be effective and binding on all persons and entities, to the extent provided herein.

37.     Waiver of Avoidance Actions.  To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

38.     Term of Injunctions or Stays.  Except as otherwise specifically provided herein, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant

to section 11.5 or 11.6 of the Prepackaged Plan; *provided, however,* the First Lien Administrative Agent shall not be enjoined from taking any enforcement action with respect to any Lien against assets that it is entitled to receive under section 11.1 of the Prepackaged Plan. Unless otherwise provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

39. <u>Indemnification Obligations of the Debtors and Stalking Horse</u>. Except to the extent assumed by the Purchaser under the Asset Purchase Agreement or pursuant to an assumed contract or as set forth in section 12.2 of the Asset Purchase Agreement, all contribution or indemnification obligations shall be rejected by the Debtors and classified as Non-Assumed General Unsecured Claims. For the avoidance of doubt and in order to clarify but not to limit any contractual indemnification obligation of the Stalking Horse under the Stalking Horse Senior Secured Credit Agreement and related loan documents, the Purchaser shall not indemnify the holders of First Lien Secured Claims, the holders of Second Lien Secured Claims, the First Lien Administrative Parties, or the Second Lien Administrative Parties, or pay for or reimburse losses, claims, damages, liabilities or related expenses of such parties to the extent arising in connection with or under or pursuant to (1) the First Lien Credit Agreement or any agreements entered into pursuant thereto, (2) the Second Lien Credit Agreement or any agreements entered into pursuant thereto, (3) any agreement with any Hicks Affiliate or any Intercompany Claim, or (4) any matter arising in connection with or under or pursuant to events occurring prior to the Closing Date related to any of the matters referred to in clauses (1) through (4) immediately herein above.

40.     Payment of Statutory Fees.  All fees payable under section 1930, chapter 123, title 28, United States Code shall be paid by a Debtor until such Debtor's chapter 11 case is closed.

41.     Compliance with Tax Requirements.  In connection with the Prepackaged Plan and all distributions thereunder, any party issuing any instruments or making any distribution under the Prepackaged Plan, including any party described in section 7.3 thereof, shall, to the extent applicable as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Prepackaged Plan shall be subject to any such withholding and reporting requirements.  Each such party shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims shall be required to provide completed Forms W-8, W-9 and/or any other forms or information necessary to effect information reporting and the withholding of such taxes, as determined by the applicable party issuing any instruments or making any distribution under the Prepackaged Plan. Notwithstanding any other provisions of the Prepackaged Plan to the contrary, with respect to any Allowed Claim the payment of which is subject to any withholding tax (i) each holder of such an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distributions, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Prepackaged Plan unless and until such holder has made arrangements satisfactory to the applicable party issuing any instruments or making any distribution under the Prepackaged Plan for the payment and satisfaction of such tax obligations.  Any Cash, Senior Promissory Notes,

documents, and/or other consideration or property to be distributed pursuant to the Prepackaged

Plan shall, pending the receipt of such forms and/or implementation of such arrangements, be

treated as an unclaimed distribution pursuant to section 7.7(a) therein. Any party issuing any

instruments or making any distribution under the Prepackaged Plan has the right, but not the

obligation, to not make a distribution until such holder has provided the necessary tax forms or

information and/or made arrangements satisfactory to such issuing or distributing party for

payment of any such tax obligations.

      42.    <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(a) of the

Bankruptcy Code, the issuance, transfer or exchange of notes or other securities under or in

connection with the Prepackaged Plan, the creation of any mortgage, deed of trust, or other

security interest, the making or assignment of any lease or sublease, or the making or delivery of

any deed or other instrument of transfer under, in furtherance of, or in connection with the

Prepackaged Plan, including the Asset Purchase Agreement and any merger agreements or

agreements of consolidation, deeds, bills of sale or assignments executed in connection with any

of the transactions contemplated under the Prepackaged Plan, shall not be subject to any stamp,

real estate transfer, mortgage recording, or other similar tax.

      43.    <u>Dissolution of Post-Effective Date Debtors</u>. Upon (i) the adjudication by

the Bankruptcy Court of all applications by professionals for final allowances of compensation

for services and reimbursement of expenses and the issuance of a Final Order for each

application and the payment of all amounts payable thereunder and (ii) the completion of all

other matters necessary to occur in the Chapter 11 Cases, the Post-Effective Date Debtors shall

seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the

Bankruptcy Code and the Bankruptcy Rules. Upon the closing of the Chapter 11 Cases and the

completion of all matters required to be performed by the Post-Effective Date Debtors under the Prepackaged Plan, the Asset Purchase Agreement, and applicable law other than dissolution, the Post-Effective Date Debtors shall be dissolved or otherwise consolidated without the need for further action (*i.e.*, without the need to file a certificate of dissolution or merger with or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of, or consolidate, the Post-Effective Date Debtors); provided however, that the Post-Effective Date Debtors shall be required to provide notice to the Bankruptcy Court of Dissolution.  In the event the Post-Effective Date Debtors remain in possession of any Cash immediately prior to Dissolution, except as otherwise provided in section 2.2 of the Prepackaged Plan, such Cash shall be distributed to the First Lien Collateral Agent pursuant to sections 6.3 and 11.1 of the Prepackaged Plan..

44.    Change of Name.  Notwithstanding anything contained in their respective organizational documents or applicable state law to the contrary, each of the Debtors is authorized, within five Business Days after the Effective Date, to change its respective name to a name that does not include "Dallas Stars" or "StarCenter" or any confusingly similar variations thereof and any amendment to the organizational documents (including the certificate of organization or certificate of incorporation) to effect such a change is authorized and approved, without partner, member, board, or shareholder approval.  Upon any such change with respect to the Debtors, the Debtors shall file with the Court a notice of change of case caption within ten Business Days of the Effective Date, and the change of case caption for these Chapter 11 Cases shall be deemed effective as of the Effective Date.

45.     Documents, Mortgages, and Instruments.  Each and every federal, state, commonwealth, local, or foreign governmental agency, department, or office is hereby authorized and directed to accept this Order and any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Prepackaged Plan and this Order. This Order shall likewise be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities that may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

46.     Reversal/Stay/Modification/Vacatur of Order.  Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, Purchasers, or the Post-Effective Date Debtors as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order and the Prepackaged Plan or any amendments or modifications thereto.  In accordance with section 1144 of the Bankruptcy Code, any reversal, stay, modification, or vacatur of this Order shall contain such provisions as are necessary to

protect the Purchaser as the Purchaser acquired all rights in the Purchased Assets in good faith reliance on this Order.

47.  Retention of Jurisdiction.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court, except as otherwise provided in the Prepackaged Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent as is legally permissible, including, but not limited to, jurisdiction over the matters set forth in Article XII of the Prepackaged Plan.  For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement and the NHL Agreements.

48.  Modifications.  Without need for further order or authorization of the Court, the Debtors, subject to the approval of the NHL, or the Post-Effective Date Debtors are authorized and empowered to make any and all modifications to the Prepackaged Plan, any and all documents included as part of the Prepackaged Plan Supplement, the Asset Purchase Agreement, and any other document that is necessary to effectuate the Prepackaged Plan; *provided* there shall be no Lender Adverse Modification without the consent of the First Lien Administrative Agent acting in its reasonable discretion.  Subject to section 1127 of the Bankruptcy Code, holders of Claims that have accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan, as altered, amended, or modified, without further solicitation or notice and hearing being required pursuant to Bankruptcy Rule 3019; *provided* there has been no Lender Adverse Modification without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

49. <u>Provisions of Prepackaged Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Prepackaged Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

50. <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent [the Stalking Horse Senior Secured Credit Agreement or] any exhibit to the Prepackaged Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Prepackaged Plan or the Prepackaged Plan Supplement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflict of laws.

51. <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Prepackaged Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

52. <u>Waiver of Filings</u>.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee), is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

53. <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Prepackaged Plan and Disclosure Statement, any documents, instruments, or agreements, and any

amendments or modifications thereto, and any other acts referred to in, or contemplated by, the

Prepackaged Plan and the Disclosure Statement.

54. <u>Notice of Order</u>. In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order, substantially in the form annexed hereto as <u>Exhibit B</u>, to all parties who hold a Claim or Equity Interest in these cases and the U.S. Trustee. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

55. <u>Substantial Consummation</u>. On the Effective Date, the Prepackaged Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

56. <u>Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment</u>. Any Committee appointed in the Chapter 11 Cases shall be dissolved on the Effective Date. The Post-Effective Date Debtors shall no longer be responsible for paying any fees and expenses incurred by the advisors to any Committee after the Effective Date.

57. <u>Waiver of Stay</u>. The stay of this Order provided by any Bankruptcy Rule (including Bankruptcy Rule 3020(e)), whether for fourteen days or otherwise, is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Court.

58. <u>Inconsistency</u>. To the extent of any inconsistency between this Order and the Prepackaged Plan, this Order shall govern.

59. <u>No Waiver</u>.  The failure to specifically include any particular provision of the Prepackaged Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Prepackaged Plan is confirmed in its entirety and incorporated herein by this reference.

Dated:  _____, 2011
   Wilmington, Delaware

       _____
       **UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

The Prepackaged Plan

**[Attached as Exhibit A to the Disclosure Statement]**

## **Exhibit B**

Notice of Entry of the Order

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
                                                              :
In re                                                         :      Chapter 11
                                                              :
DALLAS STARS, L.P., et al.¹                                   :      Case No. __-_____ (___)
                                                              :
        Debtors.                                              :      Joint Administration
                                                              :      Requested
------------------------------------------------------------  x
```

## NOTICE OF (A) ENTRY OF ORDER (i) APPROVING THE DEBTORS' (a) DISCLOSURE STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (b) SOLICITATION OF VOTES AND VOTING PROCEDURES, AND (c) FORMS OF BALLOTS, AND (ii) CONFIRMING THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND (B) OCCURRENCE OF EFFECTIVE DATE

**TO CREDITORS, EQUITY INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that an order (the "Order") of the [Honorable _____], United States Bankruptcy Judge, approving the disclosure statement, solicitation of votes and voting procedures, and forms of ballots, and confirming the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.*, Under Chapter 11 of the Bankruptcy Code dated as of [_____ , 2011) (as amended and supplemented, the "Prepackaged Plan"), of Dallas Stars, L.P. ("Dallas Stars"), Dallas Arena LLC ("Dallas Arena"), Dallas Stars U.S. Holdings Corp. ("U.S. Holdings"), and StarCenters LLC ("StarCenters"), as debtors and debtors in possession (collectively, the "Debtors"), was entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on [___, 2011]. Unless otherwise defined in this notice, capitalized terms used herein shall have the meanings ascribed to them in the Prepackaged Plan and the Order.

PLEASE TAKE FURTHER NOTICE that the Order is available for inspection during regular business hours in the office of the [Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.] The Order is also available on the internet site

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corporation (0485), and StarCenters LLC (4430).

of the Debtors' noticing agent,[_____] or by accessing the Bankruptcy Court's website, at www.deb.uscourts.gov.  Please note that a PACER password and login are required to access documents on the Bankruptcy Court's website.

     PLEASE TAKE FURTHER NOTICE that the Effective Date of the Prepackaged Plan occurred on [_____, 2011].

     PLEASE TAKE FURTHER NOTICE that the Prepackaged Plan and the provisions thereof are binding on the Debtors, the Post-Effective Date Debtors, any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder or entity voted to accept the Prepackaged Plan.

Dated:  _____, 2011
   Wilmington, Delaware

         _____
         John H. Knight (No. 3848)
         RICHARDS, LAYTON & FINGER, P.A.
         One Rodney Square
         920 North King Street
         Wilmington, Delaware 19801
         Telephone: (302) 651-7700
         Facsimile:  (302) 651-7701

            – and –

         Martin A. Sosland (*pro hac vice*)
         WEIL, GOTSHAL & MANGES LLP
         200 Crescent Court, Suite 300
         Dallas, Texas 75201
         Telephone:  (214) 746-7700
         Facsimile:    (214) 746-7777

         Ronit J. Berkovich (*pro hac vice*)
         WEIL, GOTSHAL & MANGES LLP
         767 Fifth Avenue
         New York, New York  10153
         Telephone:  (212) 310-8000
         Facsimile:  (212) 310-8007

         Attorneys for Debtors and
         Debtors in Possession

**Escrow Agreement**

[Not Attached]

<u>Exhibit F</u>

**NHL Owner Consent**

[Not Attached]

Exhibit G

**NHL/Lender Cooperation Agreement**

[Not Attached]

<u>Exhibit H</u>

**NHL Guaranty**

[Not Attached]

<u>Exhibit I</u>

**Purchaser/ NHL Proxy**

[Not Attached]

Exhibit J

**Stalking Horse Senior Secured Credit Agreement/ Senior Secured Loan**

**CREDIT AGREEMENT**

dated as of **[ ]**, 2011

among

**DALLAS SPORTS & ENTERTAINMENT, L.P.,**

as the Borrower,

**CERTAIN SUBSIDIARIES OF DALLAS SPORTS & ENTERTAINMENT, L.P.,**

as Guarantors,

**JPMORGAN CHASE BANK, N.A.,**

as Administrative Agent,

and

the Lenders party hereto

**JPMORGAN CHASE BANK, N.A.,**

as

Sole Lead Arranger and Book Manager

Table of Contents

**ARTICLE I.** DEFINITIONS AND ACCOUNTING TERMS ................................................................... 2

    1.01      Defined Terms ............................................................................... 2
    1.02      Other Interpretive Provisions .......................................................... 24
    1.03      Accounting Terms ........................................................................ 25
    1.04      Rounding .................................................................................. 25
    1.05      Times of Day ............................................................................. 25

**ARTICLE II.** THE COMMITMENTS AND CREDIT EXTENSIONS ................................................ 25

    2.01      Deemed Term Loan Commitments; Term Loans ................................. 25
    2.02      Conversions and Continuations of Term Loans ................................... 26
    2.03      Prepayments .............................................................................. 27
    2.04      Repayment of Loans .................................................................... 28
    2.05      Interest .................................................................................... 28
    2.06      Fees ....................................................................................... 29
    2.07      Computation of Interest and Fees ................................................... 29
    2.08      Evidence of Debt ........................................................................ 29
    2.09      Payments Generally; Administrative Agent's Clawback ......................... 30
    2.10      Sharing of Payments by Lenders ..................................................... 30
    2.11      Application of Insurance Proceeds ................................................... 31

**ARTICLE III.** TAXES, YIELD PROTECTION AND ILLEGALITY ................................................. 31

    3.01      Taxes ...................................................................................... 31
    3.02      Illegality .................................................................................. 34
    3.03      Inability to Determine Rates .......................................................... 34
    3.04      Increased Costs .......................................................................... 35
    3.05      Compensation for Losses .............................................................. 36
    3.06      Mitigation Obligations; Replacement of Lenders ............................... 36
    3.07      Survival ................................................................................... 36

**ARTICLE IV.** CONDITIONS PRECEDENT TO TERM LOAN BORROWING ............................... 37

**ARTICLE V.** REPRESENTATIONS AND WARRANTIES ............................................................ 40

    5.01      Existence, Qualification and Power; Compliance with Laws ................... 40
    5.02      Authorization; No Contravention ................................................... 40
    5.03      Governmental Authorization; Other Consents ................................... 40
    5.04      Binding Effect ........................................................................... 41
    5.05      Financial Statements .................................................................... 41
    5.06      Litigation ................................................................................. 41
    5.07      No Default ................................................................................ 41
    5.08      Real Property; Liens, Etc. ............................................................. 41
    5.09      Environmental Compliance ........................................................... 42
    5.10      Insurance ................................................................................. 42
    5.11      Taxes ...................................................................................... 42
    5.12      ERISA Compliance ..................................................................... 43
    5.13      Subsidiaries .............................................................................. 43
    5.14      Margin Regulations; Investment Company Act ................................... 43
    5.15      Disclosure ................................................................................ 44
    5.16      Security Interests and Liens ........................................................... 44

| 5.17 | Compliance with Laws | 44 |
|---|---|---|
| 5.18 | Intellectual Property; Licenses, Etc. | 44 |
| 5.19 | Offices, Etc. | 45 |
| 5.20 | Indebtedness; Solvency | 45 |
| 5.21 | Employee Matters | 45 |
| 5.22 | Labor Matters | 45 |

**ARTICLE VI. AFFIRMATIVE COVENANTS** ........................................................................ 46

| 6.01 | Financial Statements | 46 |
|---|---|---|
| 6.02 | Certificates; Other Information | 47 |
| 6.03 | Notices | 48 |
| 6.04 | Payment of Obligations | 48 |
| 6.05 | Preservation of Existence, Etc. | 48 |
| 6.06 | Maintenance of Properties | 49 |
| 6.07 | Maintenance of Insurance | 49 |
| 6.08 | Compliance with Laws | 49 |
| 6.09 | Books and Records | 49 |
| 6.10 | Inspection Rights | 49 |
| 6.11 | Use of Proceeds | 49 |
| 6.12 | Stars Prefunding Account | 49 |
| 6.13 | Real Property | 50 |
| 6.14 | Additional Collateral; Further Assurances | 50 |
| 6.15 | Interest Reserve Account. | 51 |
| 6.16 | Post-Closing Covenant | 52 |

**ARTICLE VII. NEGATIVE COVENANTS** ................................................................................ 52

| 7.01 | Liens | 52 |
|---|---|---|
| 7.02 | Investments | 53 |
| 7.03 | Indebtedness | 54 |
| 7.04 | Fundamental Changes | 54 |
| 7.05 | Dispositions | 55 |
| 7.06 | Restricted Payments; Etc. | 55 |
| 7.07 | Material Acquisitions | 56 |
| 7.08 | Change in Nature of Business | 56 |
| 7.09 | Transactions with Affiliates | 56 |
| 7.10 | Burdensome Agreements | 57 |
| 7.11 | Compliance with the NHL Rules | 57 |
| 7.12 | Use of Proceeds | 57 |
| 7.13 | Fixed Charge Coverage Ratio | 57 |
| 7.14 | Minimum Adjusted EBITDA | 57 |
| 7.15 | Plan of Reorganization and Confirmation Order | 57 |
| 7.16 | Material Agreements | 57 |
| 7.17 | Permitted Activities of Borrower | 57 |
| 7.18 | Restrictions on Subsidiary Distributions | 58 |

**ARTICLE VIII. EVENTS OF DEFAULT AND REMEDIES** ..................................................... 58

| 8.01 | Events of Default | 58 |
|---|---|---|
| 8.02 | Remedies Upon Event of Default | 61 |
| 8.03 | Application of Funds | 61 |
| 8.04 | Capital Contributions and Equity Cure Contributions; Borrower's Right to Cure | 62 |

**ARTICLE IX.** ADMINISTRATIVE AGENT ...................................................................................... 62

    9.01        Appointment and Authority ................................................................. 62
    9.02        Rights as a Lender .............................................................................. 63
    9.03        Exculpatory Provisions ....................................................................... 63
    9.04        Reliance by Administrative Agent ...................................................... 63
    9.05        Delegation of Duties .......................................................................... 64
    9.06        Resignation of Administrative Agent .................................................. 64
    9.07        Non-Reliance on Administrative Agent and Other Lenders ............... 65
    9.08        No Other Duties, Etc. ......................................................................... 65
    9.09        Administrative Agent May File Proofs of Claim ................................ 65
    9.10        Collateral Matters .............................................................................. 65
    9.11        Lenders' Representations, Warranties and Acknowledgment ............ 66
    9.12        Withholding Tax ................................................................................. 66

**ARTICLE X.** MISCELLANEOUS ...................................................................................................... 66

    10.01      Amendments, Etc. .............................................................................. 66
    10.02      Notices; Effectiveness; Electronic Communication .......................... 67
    10.03      No Waiver; Cumulative Remedies ..................................................... 69
    10.04      Expenses; Indemnity; Damage Waiver .............................................. 69
    10.05      Payments Set Aside ............................................................................ 71
    10.06      Successors and Assigns ...................................................................... 71
    10.07      Treatment of Certain Information; Confidentiality ............................ 74
    10.08      Right of Set-off .................................................................................. 75
    10.09      Interest Rate Limitation ..................................................................... 76
    10.10      Counterparts; Integration; Effectiveness............................................ 76
    10.11      Survival of Representations and Warranties ...................................... 76
    10.12      Severability ........................................................................................ 76
    10.13      Replacement of Lenders ..................................................................... 77
    10.14      Governing Law; Jurisdiction; Etc. ..................................................... 77
    10.15      Waiver of Jury Trial........................................................................... 78
    10.16      No Advisory or Fiduciary Responsibility .......................................... 78
    10.17      Electronic Execution of Assignments and Certain Other Documents ................ 79
    10.18      USA PATRIOT Act Notice ............................................................... 79
    10.19      Time of the Essence ........................................................................... 79
    10.20      No Third-Party Beneficiary ............................................................... 79
    10.21      Acknowledgment ............................................................................... 79
    10.22      NHL Requirements............................................................................. 79

NY\1799724.24

## SCHEDULES

2.01   Deemed Term Loan Commitments and Pro Rata Shares
5.10   Insurance
5.13   Subsidiaries and Other Equity Interests
5.19   Offices
6.14   StarsCenter Leaseholds
6.16   Post-Closing Matters
7.01   Existing Liens
7.03   Existing Indebtedness
7.16   Material Agreements
10.02  Administrative Agent's Office, Certain Addresses for Notices

## EXHIBITS

A   Form of Term Loan Notice
B   Form of Term Loan Note
C   Form of Compliance Certificate
D   Form of Assignment and Assumption
E   NHL Consent Letter
F   The Bank of New York Form of Acknowledgment
G   Form of Mortgage
H   Form of Authorizing & Incumbency Certificates & Resolutions
I-1  Legal Opinion of Baker & McKenzie LLP, counsel to the Loan Parties
I-2  Legal Opinion of Baker & McKenzie LLP, Canadian counsel to the Loan Parties
I-3  Legal Opinion of Thorsteinssons LLP, Canadian counsel to the Loan Parties
J   Joinder Agreement
K   Security Agreement
L   Guarantor Security Agreement
M   Guaranty
N   Owner Support Agreement
O   Solvency Certificate
P   Responsible Officer's Certificate
Q   Perfection Certificate

**CREDIT AGREEMENT**

This CREDIT AGREEMENT (this "<u>Agreement</u>") is entered into as of **[    ]**, 2011, among DALLAS SPORTS & ENTERTAINMENT, L.P., a Delaware limited partnership (the "<u>Borrower</u>"), CERTAIN SUBSIDIARIES OF BORROWER parties hereto, as Guarantors, each lender from time to time party hereto (collectively, the "<u>Lenders</u>" and individually, a "<u>Lender</u>") and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

**WITNESSETH:**

WHEREAS, Dallas Stars, L.P., a Delaware limited partnership ("<u>Dallas Stars</u>"), Dallas Arena, LLC, a Texas limited liability company ("<u>Dallas Arena</u>"), Dallas Stars U.S. Holdings Corp., a Delaware corporation ("<u>Dallas Stars Holding Corp</u>"), and StarCenters LLC, a Texas limited liability company ("<u>StarCenters</u>"), are parties to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, by and among HSG Sports Group LLC (f/k/a Hicks Sports Group LLC), HSG Sports Group Holdings LLC (f/k/a Hicks Sports Group Holdings LLC), certain other subsidiaries of HSG Sports Group LLC, as guarantors, the lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the other agents and parties party thereto from time to time, as amended on February 1, 2010 and January 14, 2011, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "<u>Prepetition First Lien Credit Agreement</u>");

WHEREAS, on **[ ]**, 2011, Dallas Stars, Dallas Arena, Dallas Stars Holdings Corp, and StarCenters LLC (together, the "<u>Debtors</u>") commenced Chapter 11 Case Nos. **[ ]**, as administratively consolidated as Chapter 11 Case No. **[ ]** (each a "<u>Chapter 11 Case</u>" and collectively, the "<u>Chapter 11 Cases</u>") by filing separate voluntary petitions for reorganization under the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, on **[ ]**, 2011, the Bankruptcy Court entered the Confirmation Order confirming the Plan of Reorganization;

WHEREAS, pursuant to the terms of the Plan of Reorganization, the Borrower has (i) agreed to purchase all or substantially all of the assets and assume certain liabilities of the Debtors (the "<u>Sale</u>") and (ii) requested, and the Lenders agree to enter into a term loan facility upon and subject to the terms and conditions set forth in this Agreement;

WHEREAS, subject to the terms and conditions set forth herein, the Administrative Agent is willing to act as agent for the Lenders and each Lender will be deemed to have made a Term Loan to the Borrower (with such Term Loans to be extended on a non-cash basis in the aggregate principal amount of $100,000,000 to partially satisfy the Prepetition First Lien Claims) on the Closing Date in an amount of its Deemed Term Loan Commitment hereunder;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

# ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Adjusted EBITDA" means, for the Combined Group for any period, EBITDA for such period, plus, without duplication:  (1) cash on hand of the Combined Group on the first day of such period, if any, plus (2) without duplication upfront payments on contracts received during such period, plus (3) non-cash expenses including without limitation deferred compensation to the extent such amounts are reflected as a deduction to EBITDA during such period, plus (4) without duplication, any cash common equity contribution or Owner Support Party Loan made by either of the Owner Support Parties with respect to such period (including Capital Contributions that are deemed to be made with respect to such period pursuant to Section 8.04(a) and Equity Cure Contributions that are deemed to be made with respect to such period pursuant to Section 8.04(b)), minus (A) the provision for federal, state, local and foreign taxes in respect of income of the Combined Group paid in cash during such period, minus (B) deferred compensation, signing bonus and other payments made by the Borrower during such period in respect of Player Contracts to the extent such amounts are not reflected as a deduction to EBITDA during such period, minus (C) other extraordinary cash disbursements to the extent such amounts are not reflected as a reduction to EBITDA during such period, minus (D) Capital Expenditures during such period.

"Administrative Agent" means JPMCB in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Applicable Rate" means (i) prior to the one-year anniversary of the Closing Date, 3.25% per annum with respect to Eurodollar Rate Loans and 2.25% per annum with respect to Base Rate Loans and (ii) from and after the one-year anniversary of the Closing Date, 4.25% per annum with respect to Eurodollar Rate Loans and 3.25% per annum with respect to Base Rate Loans.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender, in each case that can perform the obligations of such Lender hereunder.

"Arena" means American Airlines Center, a professional sports arena located in Dallas, Texas.

"Arena Lease" means the Second Amended and Restated Arena Lease – Dallas Stars, dated as of May 22, 2002 but effective as of July 28, 1998, by and between Dallas Stars, as tenant, and COC, as landlord, as amended by that certain First Amendment to Second Amended and Restated Arena Lease – Dallas Stars, dated as of November 16, 2005 but effective as of July 1, 2003, by and between COC and Dallas Stars, as further amended by that certain Second Amendment to Amended and Restated Arena

Lease – Dallas Stars, dated as of November 29, 2005, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease – Dallas Stars, dated as of May 12, 2010, by and between COC and Dallas Stars, as further amended by that certain Side Letter to Second Amended and Restated Arena Lease – Dallas Stars, dated as of March 23, 2011, by and between COC and Dallas Stars, as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Arranger" means JPMCB, in its capacity as sole lead arranger and book manager.

"Asset Purchase Agreement" means the Asset Purchase Agreement among the Debtors, as Sellers, and Dallas Sports & Entertainment, L.P, DSE Hockey Club, L.P., DSE Hockey Centers, L.P, and DSE Plano GP, Inc. as Purchasers, dated as of [    ], 2011.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment adviser.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, substantially in the form attached hereto as Exhibit D or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"Assumed Interest Rate" means, at any time, an assumed rate of interest equal to one percent (1.00%) above the rate payable at such time on Eurodollar Rate Loans with an Interest Period of six (6) months.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external counsel.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Auction" shall have the meaning specified in the Bidding Procedures and Confirmation Scheduling Order.

"Audited Financial Statements" means the audited consolidated balance sheet of the Dallas Stars for the Fiscal Year ended June 30, 2010, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, including the notes thereto.

"Bankruptcy Code" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as now and hereafter in effect, or any successor statute).

"Bankruptcy Court" means the Bankruptcy Court for the District of Delaware.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by JPMCB as its "prime rate" and (c) the Eurodollar Rate plus 1.000%. The "prime rate" is a rate set by JPMCB based upon various factors including JPMCB's costs and desired return, general economic

conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the "prime rate" announced by JPMCB shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Term Loan that bears interest based on the Base Rate.

"Bidding Procedures and Confirmation Scheduling Order" shall have the meaning specified in the Plan of Reorganization.

"Bill of Sale" means the Bill of Sale delivered as of [  ], 2011 by and among Debtors, as Sellers, and the Borrower, the Stars, DSE Hockey Centers, and DSE Plano GP, Inc. as Purchasers.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Budget" has the meaning specified in Section 6.02(g).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Contribution" has the meaning specified in Section 8.04(a).

"Capital Expenditures" means all expenditures which would be classified as capital expenditures in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

NY\1799724.24

"Casualty Event" means any single event of damage, destruction, condemnation, seizure or appropriation of all or any material portion of any property of any Loan Party.

"CBA Expiration Date" has the meaning specified in Section 6.15(a).

"Center GP" means Center GP, LLC, a Texas limited liability company.

"Center Operating Company" or "COC" means Center Operating Company, L.P., a Texas limited partnership.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, for purposes of this Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith are deemed to have gone into effect and been adopted after the Closing Date.

"Change of Control" means an event or series of events by which:

(a) any Person or two or more Persons (including, without limitation, the NHL or the NHL Commissioner pursuant to the NHL Rules) acting in concert other than the Owner shall have acquired by contract, deed of trust or otherwise (i) Control over the Borrower, (ii) Control over the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or group has the right to acquire pursuant to any option right) representing 50% or more of the combined voting power of such securities or (iii) Control over Northland Properties Corporation; or

(b) the Owner or his nominee (which nominee has been approved by the Administrative Agent in its sole discretion and by the NHL) is no longer the Governor of the Stars pursuant to the NHL Rules.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Closing Date" means the first Business Day all the conditions precedent in Article IV are satisfied or waived by the Administrative Agent.

"Closing Date Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon the business, assets, liabilities, properties, prospects, results of operations or financial condition of the Borrower and its Subsidiaries (taken as a whole), (ii) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower or its Subsidiaries of this Agreement or any other Loan Document, or (iii) a material adverse effect upon the ability of the Borrower or its Subsidiaries to consummate the transactions contemplated by this Agreement, and in respect of the foregoing subsections (i), (ii) and (iii), other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Dallas Stars, Dallas Arena, L.L.C and the Stars Subsidiaries (as defined in the Asset Purchase Agreement) operate; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in applicable Laws or accounting rules; (v) the failure of the Borrower or its Subsidiaries to meet any of their internal projections; (vi) any effect

resulting from the public announcement of this Agreement or the Asset Purchase Agreement, compliance with terms of this Agreement or the Asset Purchase Agreement or the consummation of the transactions contemplated by this Agreement or the Asset Purchase Agreement; (vii) actions taken by the NHL affecting all NHL member teams; (viii) the physical condition of any player under contract to Dallas Stars; (ix) changes in GAAP; (x) any act, omission or event occurring in accordance with the terms and conditions of this Agreement or the Asset Purchase Agreement or to which any party hereto or to the Asset Purchase Agreement, respectively, consents in writing; (xi) transactions or other circumstances involving players, coaches or executives under contract to Dallas Stars, including, but not limited to, trade, injury, death, disability, retirement, termination, suspension or contract extension; (xii) the on-ice performance of the Stars; (xiii) any sale, or announced or pending sale, of a member team of the NHL; (xiv) the number of games won or lost by the Stars or attendance at Stars games; or (xv) the filing of, and the continued pendency of, the Chapter 11 Cases.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property and interests in property now owned or hereafter acquired in or upon which a Lien has been or is purported or intended to have been granted to the Administrative Agent or any Lender under any of the Security Documents.

"Combined Group" means, collectively, the Borrower and its Subsidiaries.

"Commitment Termination Date" means the date on which the administrative agent under the Prepetition First Lien Credit Agreement, acting at the direction of the "Requisite Lenders" thereunder, delivers written notice to the Borrower stating that such date is the Commitment Termination Date, provided such date shall be no earlier than the later of (i) December 31, 2011 and (ii) in the event the Auction has occurred and the Purchasers are not the Successful Bidder, forty-five (45) days after the close of the Auction.

"Compliance Certificate" means a certificate substantially in the form attached hereto as Exhibit C.

"Confirmation Order" means an order of the Bankruptcy Court in the form attached to the Asset Purchase Agreement as Exhibit D.

"Consolidated Operating Income" means, for any period, for the Combined Group on a consolidated basis, the Operating Income of the Combined Group for that period.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means, when used with respect to a specified Person, the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or ownership interests, by contract, deed of trust or otherwise. "Controlled" and "Controlling" have correlative meanings.

"Copyright Security Agreement" means each Copyright Security Agreement made by each relevant Loan Party in favor of the Administrative Agent (for the benefit of the Secured Parties) and delivered pursuant to the Security Agreement or the Guarantor Security Agreement.

"Dallas Arena" has the meaning specified in the recitals hereto.

NY\1799724.24

"**Dallas Stars**" has the meaning specified in the recitals hereto.

"**Dallas Stars Holding Corp**" has the meaning specified in the recitals hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Deemed Term Loan Commitment**" means, as to each Lender, the deemed commitment of such Lender with respect to the Term Loans in an amount equal to such Lender's Pro Rata Share of the Prepetition First Lien Claims multiplied by $100,000,000.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate, if any, applicable to Base Rate Loans plus (iii) 2% per annum; provided, however, that with respect to a Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Term Loan plus 2% per annum.

"**Defaulting Lender**" means any Lender that (a) has failed to pay over to the Administrative Agent or any other Lender any amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, or (b) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Disclosure Statement**" means the Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* under Chapter 11 of the Bankruptcy Code, dated August [   ], 2011.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property (other than Player Contracts, draft picks and other rights to players) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**DSE Hockey Centers**" means DSE Hockey Centers, L.P., a Delaware limited partnership.

"**EBITDA**" means, for any period, for the Combined Group on a consolidated basis, an amount equal to Consolidated Operating Income for such period plus the amount of depreciation and amortization expense (including amortization of Player Contracts) deducted in determining such Consolidated Operating Income.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.06(b)(iii), (iv), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.06(b)(iii)).

"**Environmental Laws**" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment,

or the release of any materials into the environment, including those related to storage, handling or disposal of hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Cure Contribution" has the meaning specified in Section 8.04(b).

"Equity Interests" means, with respect to any Person, all of the shares of capital stock or partnership interests of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock or partnership interests of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock or partnership interests of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares or partnership interests (or such other interests), and all of the other ownership or profit interests in such Person (including member or trust interests therein), whether voting or nonvoting, and whether or not such shares, partnership interests, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (or Section 414(m) or (o) of the Code for purposes of provisions relating to Section 412 or 430 of the Code or Section 302 or 303 of ERISA).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; or (e) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Eurodollar Rate" means, (a) with respect to each Eurodollar Rate Loan, for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to (i) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, or (ii) if such rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first

day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by JPMCB and with a term equivalent to such Interest Period would be offered by JPMCB's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and (b) for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) BBA LIBOR, at approximately 11:00 a.m. (London time), determined two Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Loan being made or maintained by JPMCB and with a term equal to one month would be offered by JPMCB's London Branch to major banks in the London interbank eurodollar market at their request at the date and time of determination.

"Eurodollar Rate Loan" means a Term Loan that bears interest at a rate based on the Eurodollar Rate as calculated pursuant to clause (a) of such definition.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any Obligation of the Borrower hereunder (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the United States (or any political subdivision thereof) or the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any other jurisdiction in which the Borrower is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any United States Federal withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or in the case of an assignee, on the effective date of the Assignment and Assumption pursuant to which such assignee became a Lender), or designates a new Lending Office, or is attributable to such Foreign Lender's failure or inability (including inability due to law other than as a result of a Change in Law) to comply with Section 3.01(e), except in each case under this clause (c) to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 3.01(a) and (d) any U.S. withholding Taxes imposed as a result of a Foreign Lender's failure to satisfy the conditions for exemption under FATCA.

"Extraordinary Cash Receipts" means cash receipts in respect of extraordinary distributions from the NHL received by any Loan Party, including without limitation payments in respect of the relocation of an NHL Member Club or the addition of a new NHL Member Club or the sale of any Equity Interests in any NHL Entity, in each case in accordance with the NHL Rules.

"FATCA" means Sections 1471 through 1474 of the Code (as of the date hereof) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so

published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to JPMCB on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the letter agreement, dated as of the date of this Agreement, among the Borrower, the Administrative Agent and the Arranger.

"Final NWC" has the meaning specified in the Asset Purchase Agreement.

"Fiscal Year" means the fiscal year of the Combined Group, which commences on July 1 of a calendar year and ends on June 30 of such calendar year.

"Fixed Charge Coverage Ratio" means, at any date, the ratio of (a) Adjusted EBITDA to (b) Fixed Charges, in each case for the Twelve Month Trailing Period ended on such date.

"Fixed Charges" means, for any period, all scheduled payments of principal and all interest expense determined in accordance with GAAP on any Indebtedness for such period by the Combined Group.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"Flood Program" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"Flood Zone" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"Foreign Lender" means any Lender that is not a "United States Person" under Section 7701(a)(3) of the Code.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or any other political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive,

legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor Security Agreement" means the Security Agreement of even date herewith among the Guarantors and the Administrative Agent (for the benefit of the Secured Parties), substantially in the form attached hereto as Exhibit L or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"Guarantors" means each of the Borrower's domestic Subsidiaries; provided that, for so long as Plano StarCenter is prohibited from entering into the Guaranty Agreement pursuant to the terms of that certain Loan Agreement, dated as of the Closing Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), between General Electric Capital Corporation and Plano StarCenter, Plano StarCenter shall not be a Guarantor hereunder and shall not be required to become a Guarantor hereunder pursuant to the terms of this Agreement or any other Loan Document.

"Guaranty Agreement" means the Guaranty Agreement of even date herewith by each Guarantor in favor of the Administrative Agent (for the benefit of the Secured Parties), substantially in the form attached hereto as Exhibit M or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)       all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)       net obligations of such Person under any Swap Contract;

(d)       all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and obligations to players);

(e)       indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)       capital leases and Synthetic Lease Obligations; and

(g)       all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Expense" means, with respect to any Person and any period, total interest expense with respect to all outstanding Indebtedness for borrowed money (including that portion attributable to Capital Lease Obligations in accordance with GAAP and capitalized interest) of the Person for that period, determined in accordance with GAAP, applied on a consistent basis with the latest audited financial statements of the relevant Person.

"Interest Expense Reserve Amount" means, at any date, an amount equal to the amount of interest that would be payable on the Outstanding Amount for a period of 9 months from such date at the Assumed Interest Rate.

"Interest Payment Date" means, (a) as to any Term Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Term Loan and the Maturity Date; provided, however, that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Term Loan that is a Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two, three or six months thereafter, as selected by the Borrower in its Term Loan Notice; provided that:

NY\1799724.24

(h)　　any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(i)　　any Interest Period that begins on the last Business Day of a calendar month or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(j)　　no Interest Period shall extend beyond the Maturity Date.

"Interest Reserve Account" has the meaning specified in Section 6.15(a).

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person consisting of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service, or any Governmental Authority succeeding to any of its principal functions.

"JPMCB" means JPMorgan Chase Bank, N.A. or its successors.

"Landlord Estoppel" means an estoppel certificate in form and substance satisfactory to the Administrative Agent, which states that the Administrative Agent, for the benefit of the Secured Parties and their respective successors and assigns may rely thereon.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property and any financing lease having substantially the same economic effect as any of the foregoing).

NY\1799724.24

"<u>Loan Documents</u>" means this Agreement, each Term Loan Note, the Fee Letter, the Security Documents and each other agreement (including any guaranty), certificate, document or instrument related to the Term Loans delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"<u>Loan Party</u>" means the Borrower and each Guarantor.

"<u>Master Lease</u>" means the Lease Agreement, dated as of July 28, 1998, by and between City of Dallas, Texas, as lessor, and COC, as lesee (pursuant to that certain Assignment and Release Agreement, dated as of September 30, 1999, by and among Arena/Dallas Stars, Inc., Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., Corporate Arena Associates, Inc. and COC), as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Material Adverse Effect</u>" means a material adverse effect upon (a) the business, assets or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) the ability of any Loan Party or either Owner Support Party to perform any material obligation under any Loan Document to which it is a party; or (c) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents.

"<u>Material Adverse Valuation Event</u>" means the average aggregate selling price of the most recent three bona fide third party sales of NHL franchises and their hockey-related assets or controlling interests therein (other than the Sale) is for an amount less than two times the Outstanding Amount; <u>provided</u> that in the case of the sale of any controlling interest of less than 100%, the aggregate selling price shall be equal to (i) the actual aggregate sale price of such controlling interest (disregarding the sale prices for minority interests), divided by (ii) the percentage (expressed as a decimal) of ownership represented by such controlling interest.

"<u>Maturity Date</u>" means the fifth anniversary of the Closing Date.

"<u>Moody's</u>" means Moody's Investor Services, Inc.

"<u>Mortgage</u>" means an agreement, including a fee and/or leasehold mortgage, deed of trust or any other document, creating and evidencing a first priority Lien (subject to Permitted Liens) on an owned or leased Mortgaged Property, as applicable, which shall be substantially in the form attached hereto as <u>Exhibit G</u> or otherwise in form and substance reasonably acceptable to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign Laws.

"<u>Mortgaged Property</u>" means the Stars' leasehold interest in the Arena Lease.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means, with respect to any Disposition, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such sale (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by such asset and that is repaid in connection with the sale thereof (other than Indebtedness under the Loan Documents), (B) the out-of-pocket expenses incurred by any Loan Party in connection with such sale and (C) income taxes reasonably estimated to be actually payable by the applicable Loan Party within two

years of the date of the relevant asset sale as a result of any gain recognized in connection therewith (provided that any estimated amounts which are subsequently determined not to be payable shall constitute Net Cash Proceeds).

"Net Debt Proceeds" means, with respect to the incurrence or issuance of any Indebtedness for borrowed money, (i) the gross cash proceeds received in connection with such incurrence or issuance, as and when received, minus (ii) all reasonable out-of-pocket transaction costs and expenses (including legal, investment banking or other fees and disbursements) actually incurred in connection therewith, satisfactorily documented and paid.

"Net Issuance Proceeds" means, with respect to the sale or issuance of Equity Interests in, or any capital contribution to, the Borrower or any Subsidiary to or from a source other than the Borrower or a Subsidiary, (i) the gross cash proceeds received in connection with such sale or issuance or such capital contribution, as and when received, minus (ii) all reasonable out-of-pocket transaction costs and expenses (including legal, investment banking or other fees and disbursements) associated therewith actually incurred in connection therewith, satisfactorily documented and paid.

"Net Operating Cash Flow" means, with respect to any Person, for any period, without duplication, (i) Unrestricted Cash and Cash Equivalents of such Person and its Subsidiaries on a consolidated basis on hand on the first day of such period, plus (ii) EBITDA for such period, less (iii) the aggregate amount of Interest Expense for such period, less (iv) the aggregate amount of Taxes paid in cash of such Person and its Subsidiaries on a consolidated basis for such period, less (v) any increase (or plus any decrease) in Working Capital during such period, less (vi) any increase in long-term assets of such Person and its Subsidiaries on a consolidated basis during such period including Capital Expenditures for such period, plus (vii) any increase (or less any decrease) in Indebtedness (other than any Indebtedness included in current liabilities) or other long-term liabilities of such Person and its Subsidiaries on a consolidated basis during such period, and plus (viii) the amount of any capital contributions or Permitted Indebtedness received by such Person during such period.

"NHL" means the National Hockey League, a joint venture organized as a not-for-profit unincorporated association.

"NHL Approvals" means such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings as re required under applicable NHL Constitution and other rules and regulations of the NHL.

"NHL Board of Governors" means the Board of Governors of the NHL, as established under the NHL Constitution, and any successor chief governing body of the NHL that may be later established.

"NHL By-Laws" means the By-Laws of the NHL, as adopted under the NHL Constitution, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions and decisions issued by the NHL Commissioner or his designee.

"NHL Commissioner" means the Person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any Person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

"NHL Consent Letter" has the meaning specified in Section 10.22.

"**NHL Constitution**" means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings and decisions issued by the NHL Commissioner or his designee.

"**NHL Documents**" means the NHL Rules, the NHL Approvals and the NHL Consent Letter.

"**NHL Entities**" means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P. NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., any entity that may be formed by the NHL Member Clubs generally after the date of this Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective Affiliates and subsidiaries; provided that the "NHL Entities" shall not include the NHL Member Clubs.

"**NHL Member Clubs**" means the hockey clubs set forth in Article III of the NHL Constitution, as amended.

"**NHL Rules**" means (i) the NHL Constitution, (ii) the NHL By-Laws, (iii) the governing documents of each of the NHL Entities, (iv) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities and the NHL Board of Governors, (v) the current and future collective bargaining agreements between the NHL and the NHLPA and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other Persons, on the other hand, in furtherance of the NHL's (or any NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-Laws, and (vi) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time.

"**NHLPA**" means the National Hockey League Players' Association.

"**Northland Properties Corporation**" means Northland Properties Corporation, a Canadian corporation.

"**Note Purchase Agreement**" means that certain Note Purchase Agreement, dated as of April 23, 1999, as amended, modified or supplemented from time to time, among Center Operating Company, as issuer, as assignee of Arena/Dallas Stars, Inc., Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., on the one hand, and the several institutional investors named therein, as purchasers.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Term Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

16

"Operating Income" means, with reference to a Person and any period, the net income or loss of that Person for such period determined on a consolidated basis excluding unrealized mark-to-market amounts arising from Swap Contracts during that period:

(a)     increased by the sum of (without duplication):

      (i)     total Interest Expense for such period;

      (ii)     income tax expense for such period;

      (iii)     losses from extraordinary, unusual or non-recurring items;

      (iv)     any aggregate net loss arising from the sale, exchange or other disposition of capital assets by such Person (including any fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets);

in each case to the extent that such amounts were deducted in the calculation of net income for such period; and

(b)     decreased by the sum of (without duplication):

      (i)     income tax credits or reductions in deferred taxes;

      (ii)     interest income;

      (iii)     gains from extraordinary, unusual or non-recurring items;

      (iv)     any aggregate net gain arising from the sale, exchange or other disposition of capital assets by such Person (including any fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets); and

      (v)     any non-cash gains;

in each case to the extent that such amounts were included in the calculation of net income for such period,

(c) except that, with respect only to the Borrower, its net income will also be decreased by the amount of its share of the net income of Center Operating Company for the period as recognized under the equity method of accounting, and increased by the amount of cash distributions, net of cash contributions, received from Center Operating Company during such period.

"Operating Shortfall" has the meaning specified in Section 6.12.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Outstanding Amount**" means, on any date, the aggregate outstanding principal amount of Term Loans after giving effect to the Term Loan Borrowing and prepayments or repayments of Term Loans occurring on such date.

"**Owner**" means Thomas Gaglardi or, upon his death or declared mental incapacity, each of Thomas Gaglardi's Relatives who Control his estate or who become his successor with respect to Thomas Gaglardi's (i) governorship and entire interest in the Stars franchise and the rights, privileges and other property rights of the Stars as an NHL member club under the NHL Rules and (ii) interest in Northland Properties Corporation; provided that, in the case of clause (i) above, such successor has been approved as such by the NHL.

"**Owner Contribution**" has the meaning specified in the Owner Support Agreement.

"**Owner Support Agreement**" means the Owner Support Agreement, dated as of the date hereof, executed by the Owner Support Parties in favor of the Administrative Agent for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit N or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"**Owner Support Parties**" means the Owner and Northland Properties Corporation.

"**Owner Support Party Loan**" means an unsecured subordinated loan made by an Owner Support Party to the Borrower which satisfies the following requirements: (i) immediately prior to and after giving effect to such loan, no Default or Event of Default shall have occurred and be continuing or result therefrom, (ii) all such Indebtedness shall be evidenced by a Owner Support Party Note, (iii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to subordination documentation in form and substance reasonably acceptable to the Administrative Agent, (iv) all such Indebtedness shall mature after the Maturity Date and shall not provide for any scheduled repayment, mandatory prepayment, repurchase, redemption or sinking fund obligations prior to the Maturity Date, (v) all such Indebtedness shall not bear interest (whether payable in cash or in kind), (vi) the terms and conditions of such Indebtedness shall not be more restrictive to the Borrower than those set forth in this Agreement; (vii) none of the Borrower's Subsidiaries shall be an obligor with respect to such Indebtedness, (viii) such Indebtedness may be convertible, at the election of such Owner Support Party, into common equity of the Borrower at any time provided no Default or Event of Default has occurred and is continuing or would result therefrom and (ix) such Indebtedness may be convertible, at the election of the Administrative Agent, into common equity of the Borrower at any time following the occurrence and continuance of an Event of Default .

"**Owner Support Party Note**" means a promissory note in form and substance reasonably acceptable to the Administrative Agent between either Owner Support Party and the Borrower to evidence a capital contribution in the form of an Owner Support Party Loan.

"**Participant**" has the meaning specified in Section 10.06(d).

"**Patent Security Agreement**" means each Patent Security Agreement  made by each relevant Loan Party in favor of the Administrative Agent (for the benefit of the Secured Parties) and delivered pursuant to the Security Agreement or the Guarantor Security Agreement.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation, as defined in Subtitle A of Title IV of ERISA, or any successor thereto.

"<u>Pension Plan</u>" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six plan years.

"<u>Perfection Certificate</u>" means the perfection certificate of the Loan Parties dated as of **[  ]**, 2011 delivered to the Administrative Agent, substantially in the form attached hereto as <u>Exhibit Q</u> or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"<u>Permitted Indebtedness</u>" has the meaning specified in <u>Section 7.03</u>.

"<u>Permitted Liens</u>" has the meaning specified in <u>Section 7.01</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established, maintained or sponsored by the Borrower or any ERISA Affiliate.

"<u>Plan of Reorganization</u>" means the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al*., proposed by the Debtors under Chapter 11 of the Bankruptcy Code, and all schedules and exhibits thereto, in the form attached to the Disclosure Statement.

"<u>Plano StarCenter</u>" means Plano StarCenter L.P., a Texas limited partnership.

"<u>Player Contracts</u>" means, collectively, the employment contracts between the Borrower and the players of the Stars and its minor league affiliates.

"<u>Pledged Collateral</u>" means any item of Collateral for which possession is required to perfect a security interest therein under the UCC.

"<u>Prepayment Account</u>" means a deposit account of the Borrower maintained with JPMCB entitled "**[  ]**."

"<u>Prepetition First Lien Claims</u>" means the First Lien Secured Claims, as defined in the Plan of Reorganization.

"<u>Prepetition First Lien Credit Agreement</u>" has the meaning specified in the recitals hereto.

"<u>Pro Rata Share</u>" means, with respect to each Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loans of such Lender at such time and the denominator of which is the Outstanding Amount at such time. The initial Pro Rata Share of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"<u>Purchasers</u>" shall have the meaning specified in the Asset Purchase Agreement.

"<u>Real Property</u>" shall mean, collectively, all right, title and interest in and to any and all parcels of or interests in real property directly owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, and proceeds of the same.

"<u>Register</u>" has the meaning specified in <u>Section 10.06(c)</u>.

"<u>Regulation U</u>" shall mean Regulation U of the FRB as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"<u>Relatives</u>" means, with respect to any Person who is an individual, such Person's spouse, any former spouse, any descendant of any such Person or any such spouse (whether natural or adopted) (including such Person's children and grandchildren), parents and any descendant of any such parent (whether natural or adopted) (including such Person's brothers and sisters, and any such brothers' and sisters' descendants (e.g., such Person's nieces and nephews)), grandparents and any descendant of such grandparent (whether natural or adopted) (including, such Person's aunts and uncles), and any spouse of any of the foregoing Persons.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders holding in the aggregate more than 50% of the Outstanding Amount; <u>provided</u> that the portion of the Outstanding Amount held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Responsible Officer</u>" means the chief executive officer, president, any executive vice-president, chief financial officer, controller, treasurer or secretary of the Borrower, a Guarantor or an Owner Support Party, as applicable. Any document delivered hereunder that is signed by a Responsible Officer shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the Borrower, a Guarantor or an Owner Support Party, as applicable, and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower or a Guarantor or the Owner Support Parties, as applicable.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent Person thereof).

"<u>Sale</u>" has the meaning specified in the recitals hereto.

"<u>S&P</u>" means Standard & Poor's, a Division of The McGraw -Hill Companies, Inc.

"<u>Secured Parties</u>" means the Lenders and the Administrative Agent.

"<u>Security Agreement</u>" means the Security Agreement, dated as of the date hereof, between the Borrower and the Administrative Agent (for the benefit of the Secured Parties), substantially in the form attached hereto as <u>Exhibit K</u> or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"<u>Security Documents</u>" means the Security Agreement, each Trademark Security Agreement, each Patent Security Agreement, each Copyright Security Agreement, the Owner Support Agreement, the Guaranty Agreement, the Guarantor Security Agreement, each Mortgage and all Uniform Commercial Code financing statements required by this Agreement or any Security Document.

"<u>Seller Closing Date Material Adverse Effect</u>" means (i) a material adverse change in, or a material adverse effect upon the business, assets, liabilities, properties, prospects, results of operations or financial condition of the Sellers (as defined in the Asset Purchase Agreement) and the Transferred Subsidiaries (as defined in the Asset Purchase Agreement) (taken as a whole), (ii) a material adverse effect upon the legality, validity, binding effect or enforceability against the Sellers of the Asset Purchase Agreement or any other Seller Document or Purchaser Document (each as defined in the Asset Purchase Agreement) to which it is a party, or (iii) a material adverse effect upon the ability of the Borrower or its Subsidiaries to consummate the transactions contemplated by the Asset Purchase Agreement, and in respect of the foregoing subsections (i), (ii) and (iii), other than an effect resulting from a Seller Excluded Matter. "<u>Seller Excluded Matter</u>" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Sellers and the Transferred Subsidiaries operate; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in applicable Laws or accounting rules; (v) the failure of the Sellers to meet any of their internal projections; (vi) any effect resulting from the public announcement of this Agreement or the Asset Purchase Agreement, compliance with terms of this Agreement or the Asset Purchase Agreement or the consummation of the transactions contemplated by this Agreement or the Asset Purchase Agreement; (vii) actions taken by the NHL affecting all NHL member teams; (viii) the physical condition of any player under contract to Dallas Stars; (ix) changes in GAAP; (x) any act, omission or event occurring in accordance with the terms and conditions of this Agreement or the Asset Purchase Agreement or to which any party hereto or to the Asset Purchase Agreement, respectively, consents in writing; (xi) transactions or other circumstances involving players, coaches or executives under contract to Dallas Stars, including, but not limited to, trade, injury, death, disability, retirement, termination, suspension or contract extension; (xii) the on-ice performance of the Stars; (xiii) any sale, or announced or pending sale, of a member team of the NHL; (xiv) the number of games won or lost by the Stars or attendance at Stars games; or (xv) the filing of, and the continued pendency of, the Chapter 11 Cases.

"<u>Solvent</u>" and "<u>Solvency</u>" mean, with respect to any Person on any date of determination, that on such date, taking into account the commitments under the Owner Support Agreement to provide any funding to such Person (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business

or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Special Subsidiaries" means Plano StarCenter and DSE Hockey Centers

"Specified Representations" means the representations and warranties of the Loan Parties set forth in Sections 5.01, 5.02, 5.03, 5.04, 5.06, 5.07, 5.11, 5.13, 5.14 and 5.16 of this Agreement.

"StarCenters" has the meaning specified in the recitals hereto.

"Stars" means DSE Hockey Club, L.P., a Delaware limited partnership, d/b/a the Dallas Stars.

"Stars Non-Relocation Agreement" means that certain Stars Non-Relocation Agreement, dated as of April 23, 1999, by and between the Dallas Stars, L.P., and The Bank of New York, as collateral trustee, as assigned by the Dallas Stars to the Stars pursuant to the Bill of Sale dated as of the date hereof and the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Stars Prefunding Account" means that certain bank deposit account of Stars established and maintained with JPMCB, into which payments under Section 6.12 are deposited.

"Stars Prefunding Interest Account" means that certain bank deposit account of the Stars established and maintained with JPMCB, into which payments under Section 6.12 are deposited.

"Stars Team Agreement" means that certain Stars Team Agreement, dated as of April 23, 1999, by and between Dallas Stars, and The Bank of New York, as collateral trustee, as assigned by the Dallas Stars to the Stars pursuant to the Bill of Sale dated as of the date hereof and as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower. For the avoidance of doubt, Center Operating Company, its general partner, Center GP, LLC, a Texas limited liability company, and Center Operating Company's subsidiary, Arena Operating Company, Inc., a Texas corporation, are not "Subsidiaries" of the Borrower as of the date hereof.

"Successful Bidder" shall have the meaning specified in the Bidding Procedures and Confirmation Scheduling Order.

"Survey" means a survey of any Mortgaged Property (and all improvements thereon) which is sufficient to enable the Title Company to remove the standard survey exception from the Title Policy (as defined in Schedule 6.16) (or to issue a survey deletion endorsement) with respect to such Mortgaged Property and otherwise reasonably acceptable to the Administrative Agent.

"<u>Swap Contract</u>" means (a) any and all interest rate swap transactions, interest rate options, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement, each of which is for the purpose of hedging the interest rate exposure associated with the Loan Parties' operations and not for speculative purposes.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"<u>Synthetic Lease Obligation</u>" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"<u>Taxes</u>" means any present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Loan</u>" has the meaning specified in <u>Section 2.01(a)</u>.

"<u>Term Loan Borrowing</u>" means the borrowing of Term Loans on the Closing Date pursuant to <u>Section 2.01(a)</u>.

"<u>Term Loan Note</u>" means a promissory note made by the Borrower in favor of a Lender evidencing Term Loans made by such Lender, substantially in the form attached hereto as <u>Exhibit B</u>.

"<u>Term Loan Notice</u>" means a notice of (a) a conversion of Term Loans from one Type to the other, or (b) a continuation of Eurodollar Rate Loans which, if in writing, shall be substantially in the form attached hereto as <u>Exhibit A</u>.

"<u>Threshold Amount</u>" means $2,000,000.

"<u>Title Company</u>" means any title insurance company as shall be retained by Borrower and reasonably acceptable to the Administrative Agent.

"<u>Trademark Security Agreement</u>" means each Trademark Collateral Security Agreement made by each relevant Loan Party in favor of the Administrative Agent (for the benefit of the Secured Parties) and delivered pursuant to the Security Agreement or the Guarantor Security Agreement.

"Twelve Month Trailing Period" means, at any date, the period of the 12 consecutive months ending on such date, or, if such date is not the last day of a month, the period of the most immediately completed consecutive 12 months.

"Type" means, with respect to a Term Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA for the applicable plan year, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 or 430 of the Code or Section 302 or 303 of ERISA for such plan year.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

"United States" and "U.S." mean the United States of America.

"Unrestricted Cash" means the aggregate amount of cash or deposit account balances of deposit accounts included in the cash listed on the consolidated balance sheet of the Combined Group and classified as "unrestricted cash" for purposes of GAAP as at such date including such amounts only to the extent the use thereof for application to the payment of Indebtedness under the Loan Documents is not prohibited by law or any contract to which the Borrower or any Subsidiary is a party.

"Working Capital" means all assets or liabilities which would be classified as working capital (i.e., current assets in excess of current liabilities) in accordance with GAAP.

1.02    **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, restated, amended

and restated, supplemented or otherwise modified from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

###### 1.03     **Accounting Terms**.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

###### 1.04     **Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

###### 1.05     **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

### ARTICLE II.
### THE COMMITMENTS AND CREDIT EXTENSIONS

###### 2.01     **Deemed Term Loan Commitments; Term Loans**.

(a)     Subject to the terms and conditions set forth herein, each Lender shall be deemed to have made term loans (each such loan, a "Term Loan") to the Borrower on the Closing Date, in an aggregate amount equal to the amount of such Lender's Deemed Term Loan Commitment at such time.  A single draw of the full amount of the Deemed Term Loan Commitment shall be deemed to have been made on the Closing Date, with no cash disbursement made by any Lender, upon satisfaction of the conditions precedent set forth in Article IV.  The Deemed Term Loan Commitments shall automatically terminate

upon the Term Loans being deemed made on the Closing Date. Any amount deemed borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed. Term Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein. Subject to Section 2.03, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Maturity Date.

(b)     If the original aggregate principal amount of the Senior Secured Loans (as defined in the Asset Purchase Agreement) is required to be reduced pursuant to adjustments made in accordance with Section 3.1(c) of the Asset Purchase Agreement, the Term Loans shall be deemed repaid without cost, penalty or premium on the date that the aggregate principal amount of the Senior Secured Loans are finally adjusted under Section 3.3(b) of the Asset Purchase Agreement (the "Final Adjustment Date") in an aggregate principal amount equal to the sum of: (i) the cumulative amount by which the original aggregate principal amount of the Senior Secured Loans are required to be reduced pursuant to and in accordance with clauses (i), (ii) and (ii) of Section 3.1(c) of the Asset Purchase Agreement through the Final Adjustment Date (such cumulative amount, the "Deemed Prepayment Amount") and (ii) any interest paid in respect of the Deemed Prepayment Amount through the Final Adjustment Date. Any interest accrued but unpaid in respect of the Deemed Prepayment Amount shall be waived by the Lenders on the Final Adjustment Date. Any such repayment of the Term Loans hereunder shall be made ratably among the Lenders in accordance with their respective Deemed Term Loan Commitments. Any adjustment pursuant to this Section 2.01(b) is intended to achieve a retroactive adjustment to the aggregate principal amount of the Term Loans as of the Closing Date, and the parties agree to treat it as such for U.S federal income tax purposes.

### 2.02    Conversions and Continuations of Term Loans.

(a)     Each Term Loan deemed to be made on the Closing Date shall be a Base Rate Loan until or unless the Borrower timely delivers a Term Loan Notice hereunder. Each conversion of Term Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone, no later than 11:00 a.m. three Business Days prior to the requested date of any conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Term Loan Notice, appropriately completed and signed by a Responsible Officer. Each conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $500,000 in excess thereof. Each conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Term Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a conversion of Term Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Term Loans to be converted or continued, (iv) the Type of Term Loans to which existing Term Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be converted to Base Rate Loans; provided that if the Borrower fails to give a timely notice requesting a conversion or continuation of a Eurodollar Rate Loan, then the applicable Eurodollar Rate Loan shall be converted or continued as a Eurodollar Rate Loan having an Interest Period of one month. Any such automatic conversion or continuation of Base Rate Loans or Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term Loans. If the Borrower requests a conversion to, or continuation of Eurodollar Rate Loans in any such Term Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Term Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Term Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or Eurodollar Rate Loans described in the preceding subsection.

(c)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan.  During the existence of a Default, no Term Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in JPMCB's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to the Term Loan Borrowing, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than seven Interest Periods in effect with respect to Term Loans.

### 2.03     Prepayments.

(a)     The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part without premium or penalty; provided that, unless a Default or Event of Default has occurred and is continuing hereunder (in which case such prepayment shall be made at par), in the event that all of the Term Loans and other Obligations hereunder are repaid for any reason (i) on or prior to the six-month anniversary of the Closing Date, the Borrower shall receive a prepayment discount equal to 2.0% of the principal amount of the Term Loans prepaid and (ii) after the six-month anniversary of the Closing Date, but on or prior to the first anniversary of the Closing Date, the Borrower shall receive a prepayment discount equal to 1.0% of the principal amount of the Term Loans prepaid; provided further that (i) each such notice must be received by the Administrative Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $500,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Term Loans to be prepaid.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Each such prepayment shall be applied to the Term Loans of the Lenders in accordance with their respective Pro Rata Shares.

(b)     Subject to clause (i) below, if any Loan Party Disposes of any property or asset (excluding any Equity Interests) (i) in breach of Section 7.05 or pursuant to Section 7.05(h)(i)(c), the Borrower shall prepay the Term Loans at par in an amount equal to 100% of the Net Cash Proceeds therefrom immediately upon receipt thereof by such Loan Party or (ii) pursuant to Section 7.05(g)(i)(b), to the extent the Net Cash Proceeds therefrom shall not be used or reserved for a purpose related to the

Borrower's operations, or for Investments permitted under Section 7.02, the Borrower shall prepay the Term Loans at par in an amount equal to 100% of such Net Cash Proceeds therefrom immediately upon receipt thereof by such Loan Party.

(c)     Subject to clause (i) below, the Borrower shall prepay the Term Loans at par in an amount equal to 100% of any Extraordinary Cash Receipts immediately upon receipt thereof by any Loan Party.

(d)     If any Loan Party shall incur or otherwise become liable for Indebtedness in breach of Section 7.03, the Borrower shall prepay the Term Loans at par in an amount equal to 100% of the Net Debt Proceeds therefrom immediately upon the receipt thereof by such Loan Party.

(e)     Subject to clause (i) below, if the Borrower or any Subsidiary Disposes of or issues any Equity Interests, to the extent the Net Issuance Proceeds therefrom shall not be used or reserved for a purpose related to the Borrower's operations, or for Investments permitted under Section 7.02, the Borrower shall prepay the Term Loans at par in an amount equal to 100% of such Net Issuance Proceeds therefrom immediately upon receipt thereof by such Loan Party.

(f)     Subject to clause (i) below, upon the occurrence of the condition set forth in the second proviso of the first sentence of Section 2.11, six months after any Loan Party receives proceeds of any insurance payment or condemnation award in respect of any of its assets or properties, the Borrower shall prepay the Term Loans at par in an amount equal to 100% of such proceeds.

(g)     All prepayments under this Section 2.03 shall be made together with accrued and unpaid interest on the amount prepaid and all fees and other amounts then due and owing as a result of such prepayment.

(h)     With respect to prepayments under this Section 2.03, other than prepayments made pursuant to clause (a) above, such prepayments shall be applied first to outstanding Base Rate Loans until such Term Loans are repaid in full and then to Eurodollar Rate Term Loans until such Term Loans are repaid in full.

(i)     With respect to prepayments made pursuant to clauses (b), (c), (e) and (f) above, the Borrower shall have the option of making such prepayments directly to the Administrative Agent or depositing such prepayments into the Prepayment Account. Amounts on deposit from time to time in the Prepayment Account shall be applied in the manner and priority described in clause (h) above, provided that prepayments of Eurodollar Rate Loans from amounts on deposit in the Prepayment Account shall be made at such times as to ensure that the Borrower does not incur breakage costs in connection therewith pursuant to Section 3.05.

    2.04     **Repayment of Loans**.  The Borrower unconditionally promises to pay to the Lenders on the Maturity Date the aggregate principal amount of Term Loans outstanding on such date.

    2.05     **Interest**.

(a)     Subject to the provisions of clause (b) below, (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(i)     If any amount payable by the Borrower under any Loan Document is not paid when due and such non-payment constitutes an Event of Default, whether at stated maturity, by acceleration or otherwise, or if any Event of Default under Section 8.01(f) or (g) exists, all outstanding Obligations hereunder and under the other Loan Documents shall thereafter automatically, and without any further action by the Administrative Agent or the Lenders, bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Upon the request of the Required Lenders, while any Event of Default other than those specified in Section 2.05(a)(i) exists, the Borrower shall pay interest on all outstanding Obligations hereunder and under the other Loan Documents at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)   All past due amounts (including interest on past due interest) shall be due and payable upon demand.

(b)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.06    Fees**.

(a)     The Borrower shall pay to the Administrative Agent the administrative agent fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)     The Borrower shall pay to the Administrative Agent for the account of the Lenders the fees provided for in the Fee Letter and at the time so specified in the Fee Letter.  Such fee shall be fully earned when paid and shall not be refundable (other than as specifically provided in the Fee Letter) for any reason whatsoever.

**2.07    Computation of Interest and Fees**.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Term Loan for the day on which the Term Loan is made, and shall not accrue on a Term Loan, or any portion thereof, for the day on which the Term Loan or such portion is paid.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.08    Evidence of Debt**.  The Term Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Term Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest

NY\1799724.24

error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Term Loan Note, which shall evidence such Lender's Term Loans in addition to such accounts or records.  Each Lender may attach schedules to its Term Loan Note and endorse thereon the date, Type (if applicable), amount and maturity of its Term Loans and payments with respect thereto.

### 2.09    Payments Generally; Administrative Agent's Clawback.

(a)    <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    <u>Payments by Borrower; Presumptions by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  A notice of the Administrative Agent to the Borrower with respect to any amount owing under this clause (b) shall be conclusive, absent manifest error.

(c)    <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make payments pursuant to <u>Section 10.04(c)</u> are several and not joint.  The failure of any Lender to make any payment under <u>Section 10.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its payment under <u>Section 10.04(c)</u>.

(d)    <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

### 2.10    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Term Loans made by it resulting in such Lender's receiving payment of a proportion of the aggregate

amount of such Term Loans and accrued interest thereon greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Term Loans or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans and other amounts owing to them, provided that:

        (i)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

        (ii)      the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant, other than to any Loan Party thereof (as to which the provisions of this Section shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

        **2.11**      **Application of Insurance Proceeds**.  Upon the occurrence of a Casualty Event, the Borrower may apply the proceeds of any insurance to the restoration or replacement of the property or asset which was the subject of such loss; provided, however, that, if such Casualty Event relates to the Collateral, the Borrower shall demonstrate to the reasonable satisfaction of the Administrative Agent that the property or asset subject to such Casualty Event will be restored to substantially its previous condition or will be replaced by a substantially identical property or asset, without material interruption in the Borrower's business and without Default of any nature under this Agreement; provided, further, however, that if such property or asset is not restored or replaced within six (6) months after the receipt of the insurance proceeds related to such Casualty Event, then such proceeds shall be applied in accordance with Section 2.03(f) hereof unless the Administrative Agent is reasonably satisfied that the Borrower is making diligent efforts to restore or replace such property or asset.  As further assurance for the payment and performance of the Term Loans and all other Obligations hereunder, all sums, including any returned or unearned premiums, which may become payable under any policy of insurance in respect of the Collateral shall constitute Collateral pledged for the benefit of the Lenders under the Security Agreement.

**ARTICLE III.**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

        **3.01**      **Taxes**.

        (a)      Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Indemnified Taxes or Other Taxes, provided that if any Indemnified Taxes or Other Taxes shall be required to be deducted or withheld from such payments, then (i) the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been

made, (ii) the Borrower, the Guarantor or the applicable withholding agent shall make such deductions or withholdings and (iii) the Borrower, the Guarantor or the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  Without limiting the provisions of clause (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by the Borrower.

(i)    The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  This indemnification shall be made within 30 days from the date such Lender or Administrative Agent, as the case may be, makes written demand therefor.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)    Without limiting the provisions of subsection (a) or (b) above, each Lender shall indemnify the Borrower, within 30 days after demand therefor, for any Taxes imposed or asserted against the Borrower by any Governmental Authority, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto as a result of the inaccuracy, inadequacy or deficiency of any documentation required to be delivered by such Lender to the Borrower pursuant to Section 3.01(e).  The agreement in this clause (ii) shall survive any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of the Term Loan.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of any receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding (including backup withholding) tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will

enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding (including backup withholding) or information reporting requirements.

(ii)     Without limiting the generality of the foregoing, any Foreign Lender shall, to the extent it is legally able to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement, or, in the case of any Lender that becomes a party to this Agreement pursuant to an Assignment and Assumption, on or prior to the effective date of such Assignment and Assumption (and promptly upon the expiration, obsolescence or invalidity of any previously delivered form and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed original copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(ii)     duly completed original copies of Internal Revenue Service Form W-8ECI;

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed original copies of Internal Revenue Service Form W-8BEN;

(iv)     duly completed original copies of Internal Revenue Service Form W-81MY together with any required attachments; or

(v)     any other original copies of form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made.

(iii)     Each Lender that is not a Foreign Lender shall deliver to the Borrower, to the extent such Lender is legally able, and Administrative Agent (in such number of copies as shall be requested by the recipient) duly completed original copies of Internal Revenue Service Form W-9.  Each such Lender agrees to provide the Borrower and Administrative Agent with new forms prescribed by the Internal Revenue Service upon the expiration or obsolescence of any previously delivered form, or after the occurrence of any change in circumstances of any Lender which requires a change in the most recent forms delivered by it to the Borrower and the Administrative Agent.

(iv)     If a payment made to a Lender hereunder would be subject to United States Federal withholding tax under FATCA, such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent, such documentation prescribed by applicable law and such additional documentation reasonably requested by the Borrower or the

Administrative Agent to comply with its obligations under FACTA, including to determine the amount to deduct and withhold from such payment. Solely for purposes of the immediately preceding sentence, the term "FATCA" shall include any amendments to FATCA after the date hereof.

(v)     Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction under any documentation delivered pursuant to this Section 3.01(e).

(f)     Treatment of Certain Refunds.  If the Administrative Agent or any Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.02     Illegality**.  If any Lender determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03     Inability to Determine Rates**.  If the Required Lenders reasonably determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Term Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a

conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a conversion to Base Rate Loans in the amount specified therein.

### 3.04    Increased Costs.

(a)      Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement);

(ii)      subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Term Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Term Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive,

then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.05 **Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requested amounts, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any out-of-pocket loss, cost or expense incurred by it as a result of:

(a) any continuation, conversion, payment or prepayment of any Term Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Term Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b) any failure by the Borrower to prepay, continue or convert any Term Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c) any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 10.13;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Term Loan or from fees payable to terminate the deposits from which such funds were obtained, but net of earnings on the reemployment of such funds.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Term Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

3.06 **Mitigation Obligations; Replacement of Lenders**.

(a) <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrower may replace such Lender in accordance with <u>Section 10.13</u>.

3.07 **Survival**.  All of the Borrower's obligations under this <u>Article III</u> shall survive the repayment of all Obligations hereunder and resignation of the Administrative Agent.

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO TERM LOAN BORROWING**

This Agreement and the obligations of the Secured Parties and of each Loan Party hereunder shall become effective on the Closing Date, subject to satisfaction of the following conditions precedent, unless waived by the Administrative Agent:

(a)     The Administrative Agent's receipt of the following, each of which shall be originals or telecopies, each properly executed by a Responsible Officer and each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)     executed counterparts of this Agreement, the Perfection Certificate and each other Loan Document, sufficient in number for distribution to the Administrative Agent, each Lender and the Borrower;

(ii)     a Term Loan Note executed by the Borrower in favor of each Lender that has requested Term Loan Notes at least two Business Days prior to the Closing Date;

(iii)     such customary certificates of resolutions or other action and incumbency certificates of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents, all in substantially the form set forth on Exhibit H or otherwise in form and substance reasonably acceptable to the Administrative Agent;

(iv)     such customary documents and certifications to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in the jurisdiction of its organization or formation, the State of Texas and in each other jurisdiction where their ownership, lease or operation of properties or the conduct of their respective businesses reasonably requires such qualification;

(v)     (i) a favorable opinion of Baker & McKenzie LLP, counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, in substantially the form attached hereto as Exhibit I-1 or otherwise in form and substance reasonably acceptable to the Administrative Agent, (ii) a favorable opinion of Baker & McKenzie LLP, Canadian counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, in substantially the form attached hereto as Exhibit I-2 or otherwise in form and substance reasonably acceptable to the Administrative Agent and (iii) a favorable opinion of Thorsteinssons LLP, Canadian counsel to the Loan Parties, addressed to Baker & McKenzie LLP, the Administrative Agent and each Lender, in substantially the form attached hereto as Exhibit I-3 or otherwise in form and substance reasonably acceptable to the Administrative Agent;

(vi)     all UCC financing statements in appropriate form for filing and other documents and instruments as may be required under applicable rules and regulations of any Governmental Authority to establish and perfect the first-priority Liens granted pursuant to the Security Documents (including the execution and delivery of any agreements governing deposit accounts as required therein) to the extent perfection of such Liens is required therein, and, upon filing, evidence of the payment of all taxes, fees and other charges payable in connection with the foregoing; provided that with respect to any Collateral the security interest in which may not be perfected by filing of a UCC financing statement, by making a filing with the U.S. Patent and Trademark Office or the U.S. Copyright Office or by delivery and possession of stock certificates and other instruments, if perfection of the Administrative Agent's security interest in such

Collateral may not be accomplished on or before the Closing Date after the Borrower's and its Subsidiaries' use of commercial reasonable efforts to do so, then failure to perfect such security interest shall not constitute a failure to satisfy the condition set forth in this clause (vi);

(vii)    the Pledged Collateral;

(viii)    evidence that all insurance set forth in Schedule 5.10 has been obtained and is in effect and certificates of insurance with respect to such property and casualty policies, naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured or loss payee;

(ix)    customary and reasonably detailed instructions describing the flow of funds in connection with the payment of fees set forth in the Fee Letter;

(x)    a certificate signed by the president or chief financial officer of the Borrower stating that none of the Loan Parties has any Indebtedness other than Permitted Indebtedness and that the Borrower is Solvent after giving effect to the making of the Term Loans on the Closing Date, substantially in the form attached hereto as Exhibit O or otherwise in form and substance reasonably acceptable to the Administrative Agent;

(xi)    a duly executed NHL Consent Letter, substantially in the form attached hereto as Exhibit E or otherwise in form and substance reasonably acceptable to the Administrative Agent, has been obtained and delivered;

(xii)    the Loan Parties and the Owner Support Parties shall have provided the documentation and other information to the Lenders that is required by applicable Governmental Authorities under applicable "Know Your Customer" and anti-money-laundering rules and regulations including, without limitation, the Act (as hereinafter defined) to the extent requested at least five Business Days prior to the Closing Date;

(xiii)    the Accountant's Letters (as defined in the Owner Support Agreement) have been delivered in accordance with the Owner Support Agreement;

(xiv)    an executed copy of the Asset Purchase Agreement;

(xv)    the (A) Audited Financial Statements; and (B) unaudited consolidated balance sheet of the Stars for the fiscal quarters ended September 30, 2010, December 31, 2010, March 31, 2011, June 30, 2011 and, if the Closing Date occurs on or after November 30, 2011, September 30, 2011, and the related consolidated statements of income or operations, shareholders' equity and cash flows of the Stars for the fiscal quarter ended on such dates; and

(xvi)    the annual Budget for the Combined Group for the Fiscal Year ended June 30, 2012, accompanied by a statement of the chief financial officer of the Borrower to the effect that such annual Budget is a reasonable estimate of such information and calculations for the period covered thereby, all to the extent and in the form required by the NHL.

(b)    Any fees required to be paid by the Borrower to any Secured Party under the Fee Letter on or before the Closing Date shall have been paid.

(c)    (I) The Administrative Agent shall have received evidence reasonably satisfactory to it that the conditions in Sections 11.1 and 11.3 (excluding Section 11.3(g)) of the Asset Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof; and (II) without

derogating any rights of the Secured Parties under rule 3019 of the Federal Rules of Bankruptcy Procedure, neither the Confirmation Order nor the Plan of Reorganization shall have been amended or waived in a manner materially adverse to the Secured Parties without the consent of the Administrative Agent in its reasonable discretion. For the purposes of the previous clause (II) and without limitation thereto, any amendments or waivers of the following provisions or terms shall be deemed "materially adverse to the Secured Parties": (i) the maturity, interest rate or principal amount of the Term Loans (including the terms of any adjustment to the aggregate principal amount of the Term Loans pursuant to Article III of the Asset Purchase Agreement), (ii) the property comprising the Collateral securing the Obligations, (iii) the validity, priority and perfection of the Secured Parties' Liens on and security interests in the Collateral (including as provided in the Confirmation Order), (iv) the identity of the Loan Parties and Owner Support Parties, (v) the terms and conditions of the Owner Support Agreement, (vi) the Confirmation Order's findings that the Secured Parties have acted in good faith in connection with (A) the solicitation of votes on the Plan of Reorganization, (B) the negotiation and consummation of the Plan of Reorganization and related documents and (C) the negotiation and deemed extension of the Senior Secured Loan, (vii) the Confirmation Order's findings that the Senior Secured Loan is not a preference or a fraudulent transfer and that the transactions contemplated by the Asset Purchase Agreement are not fraudulent transfers, (viii) the releases and exculpation for the benefit of the Secured Parties under the Plan of Reorganization and Confirmation Order and (ix) the provisions of the Plan of Reorganization and Confirmation Order ordering the sale of the Purchased Assets free and clear of all claims, liens, liabilities and interests.

(d)　　The Closing Date shall have occurred by the Commitment Termination Date. Each of the Effective Date and substantial consummation of the Plan of Reorganization shall have occurred or shall be scheduled to occur but for the occurrence of the Closing Date and the deemed extension of Term Loans hereunder, and the Plan of Reorganization and the Confirmation Order shall be in full force and effect and not subject to a stay as of the Closing Date.

(e)　　The representations and warranties of the Loan Parties contained in Article V or any other Loan Document, or which are contained in any certificate furnished under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided, that any breach of any such representation or warranty shall not constitute a failure to satisfy the condition set forth in this clause (e) unless such breach is a breach of a Specified Representation.

(f)　　No Default or Event of Default shall exist, or would result from, the proposed Term Loan Borrowing; provided, that any Default or Event of Default resulting from (A) the failure to provide any perfected security interest on the Collateral on the Closing Date that does not constitute a failure to satisfy the condition set forth in clause (a)(vi), above, or (B) any breach of any representation or warranty made by any Loan Party pursuant to any Loan Document, other than any breach of a Specified Representation, shall in each case not constitute a Default or Event of Default solely for purposes of this clause (f).

(g)　　A certificate of a Responsible Officer of Borrower, substantially in the form attached hereto as Exhibit P or otherwise in form and substance reasonably acceptable to the Administrative Agent, stating that:

(i)　　the conditions in clauses (e) and (f) of this Article IV shall have been satisfied; and

(ii)　　there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by

or against any Loan Party or against any of their properties or revenues that (a) materially impairs (i) the ability of any Loan Party or either Owner Support Party to execute and deliver the Loan Documents to which it is a party or perform any of its obligations under any Loan Document to which it is a party , (ii) consummation of transactions contemplated by the Loan Documents or the Asset Purchase Agreement or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Seller Closing Date Material Adverse Effect.

Without limiting the generality of the provisions of <u>Section 9.04</u>, for purposes of determining compliance with the conditions specified in this <u>Article IV</u> and the Closing Date, the Administrative Agent and each Lender shall be deemed to have irrevocably consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or a Lender.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and the Lenders as of the Closing Date that:

**5.01 Existence, Qualification and Power; Compliance with Laws**. Each of the Loan Parties and each of their respective Subsidiaries (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, and (d) is in compliance with all Laws, except in each case referred to in clause (b)(i), (c) or (d), to the extent that failure to do so could not reasonably be expected to have a Closing Date Material Adverse Effect.

**5.02 Authorization; No Contravention**. The execution, delivery and performance by each of the Loan Parties of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under or require any payment to be made under (i) any material Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law. Each of the Loan Parties and each of their respective Subsidiaries is in compliance with all Contractual Obligations referred to in clause (b)(i), except to the extent that failure to do so could not reasonably be expected to have a Closing Date Material Adverse Effect.

**5.03 Governmental Authorization; Other Consents**. Except for such approvals, consents, exemptions, authorizations, actions and notices as have already been obtained, or delivered, as applicable, including without limitation all necessary consents by the NHL and by the Bankruptcy Court in connection with the Plan of Reorganization, and filings contemplated by the Security Documents, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan

Document; provided, that the parties acknowledge and agree that if the Administrative Agent proceeds to foreclose on the Collateral pursuant to the Security Documents, certain approvals and consents may be required to the transfer of certain of the Collateral.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by the Loan Parties party hereto and thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of each of the Loan Parties party hereto and thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law), including, without limitation, principles regarding good faith and fair dealing.

**5.05    Financial Statements**.    The unaudited consolidated balance sheet of the Combined Group dated [    ], and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (a) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (b) fairly present in all material respects the financial condition of the Combined Group as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (a) and (b), to the absence of footnotes and to normal year-end audit adjustments.

**5.06    Litigation**.  Other than in connection with or arising from the Chapter 11 Cases, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party, any Subsidiary of any Loan Party or against any of its assets that (a) materially impairs (i) the ability of any Loan Party or either Owner Support Party to execute and deliver the Loan Documents to which it is a party or perform any of its obligations under any Loan Document to which it is a party, (ii) consummation of transactions contemplated by the Loan Documents or the Asset Purchase Agreement or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Seller Closing Date Material Adverse Effect.

**5.07    No Default**.  None of the Loan Parties, nor any of their respective Subsidiaries is in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Closing Date Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document other than any Default or Event of Default solely as a result of the Borrower's failure to satisfy the requirements of clause (a)(vi) of Article IV other than the matters set forth in the proviso therein.

**5.08    Real Property; Liens, Etc.**

(a)      Each of the Loan Parties and each of their respective Subsidiaries has good and marketable title in fee simple to, or valid leasehold interests in, all of its Real Property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Closing Date Material Adverse Effect.  The Real Property owned by the Loan Parties and their respective Subsidiaries is subject to no Liens, other than Permitted Liens.  The Borrower has delivered to the Administrative Agent a true, correct and complete copy of the Arena Lease and the Master Lease.

41

(b)    (i) Stars is the sole owner of the entire tenant's interest in the Arena Lease, subject to Permitted Liens, (ii) the Arena Lease is valid and enforceable and in full force and effect, (iii) all rent and other amounts due under the Arena Lease have been paid in full as of the date hereof and (iv) no revenues or other amounts payable to Borrower under the Arena Lease have been assigned or otherwise pledge or hypothecated.

(c)    Stars is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in the Arena Lease.  No party under the Arena Lease or, to the knowledge of Borrower, under the Master Lease, is in default in any material respect, there is no event of default, and there are no events that have occurred that, with the passage of time and/or the giving of notice would constitute a default under the Arena Lease or to the knowledge of Stars, the Master Lease and would reasonably be expected to have a Closing Date Material Adverse Effect. To Stars' actual knowledge, there exist no offsets or defenses to the payment of any revenues or other amounts payable to Stars under the Arena Lease.

(d)    The Mortgaged Property is zoned in all material respects to permit the uses for which the Mortgaged Property is currently being used.  The present uses of the Mortgaged Property and the current operations of the Loan Parties' and their respective Subsidiaries' businesses do not violate in any material respect any provision of any applicable building codes, subdivision regulations, fire regulations, health regulations or building and zoning by-laws.

(e)    There is no pending or, to the knowledge of Stars, threatened condemnation or eminent domain proceeding with respect to, or that could affect any of, the Real Property of Stars that could reasonably be expected to have a Closing Date Material Adverse Effect.

5.09    **Environmental Compliance**.  Except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Closing Date Material Adverse Effect:

(a)    Each of the Loan Parties and each of their respective Subsidiaries is in compliance with all applicable Environmental Laws; and

(b)    None of the Loan Parties, nor any of their respective Subsidiaries is subject to any pending or threatened Environmental Liabilities; and

(c)    None of the Loan Parties, nor any of their respective Subsidiaries has released, disposed of, or arranged for the release or disposal of, Hazardous Materials at Real Property and, to Borrower's knowledge, no Hazardous Materials have been released, disposed of, or have otherwise come to be present at, on or under any Real Property owned, leased or operated by any Loan Party or any Subsidiary of any Loan Party.

5.10    **Insurance**.  The Borrower will, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance policies in such amounts, and with deductibles and against such risks substantially similar to that which was maintained by the Debtors on August 1, 2011.  Schedule 5.10 references a document that correctly states the numbers, amounts and expiration dates of all insurance policies held by or for the benefit of the Debtors on August 1, 2011 and includes the names of the issuing companies and the properties (if applicable) and risks covered thereby.

5.11    **Taxes**.  Each of the Loan Parties and each of their respective Subsidiaries has filed all Federal, state and other tax returns and reports required to be filed, and has paid all Federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon it or its properties, income or assets otherwise due and payable, except those which are being contested in good faith by

appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against any Loan Party or any Subsidiary of any Loan Party that could, if made, have a Closing Date Material Adverse Effect. None of the Loan Parties, nor any of their respective Subsidiaries is party to any tax sharing agreement.

### 5.12 ERISA Compliance.

(a) Each Plan is in compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws, except where noncompliance would not have a Closing Date Material Adverse Effect. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all material required contributions to each Pension Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code or Section 302 of ERISA has been made with respect to any Pension Plan.

(b) There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Closing Date Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Closing Date Material Adverse Effect.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur that could reasonably be expected to have a Closing Date Material Adverse Effect; (ii) no Pension Plan has any Unfunded Pension Liability that could reasonably be expected to have a Closing Date Material Adverse Effect; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA) that could reasonably be expected to have a Closing Date Material Adverse Effect; (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan that could reasonably be expected to have a Closing Date Material Adverse Effect; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

### 5.13 Subsidiaries. The Borrower has no Subsidiaries and has no Equity Interests in any Person other than those specifically disclosed in <u>Schedule 5.13</u>.

### 5.14 Margin Regulations; Investment Company Act.

(a) None of the Loan Parties, nor any of their respective Subsidiaries is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b) None of the Loan Parties, nor any of their respective Subsidiaries, nor any Person Controlling any Loan Party or any Subsidiary of any Loan Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**.  As of the date of this Agreement, the Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary of any Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Closing Date Material Adverse Effect.  No report, financial statement, certificate or other information furnished in writing by or on behalf of any Loan Party or any Subsidiary of any Loan Party to the Administrative Agent or any Lender on or prior to the date of this Agreement in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided that, with respect to any projected financial information provided under the Loan Documents at any time, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being agreed by the parties hereto that there can be no assurance that such expectations, beliefs and projections will be achieved or accomplished and that such projections are subject to an increasing degree of uncertainty as they relate to later periods of time.

5.16    **Security Interests and Liens**.  The Loan Parties hold good, marketable and valid title, or a valid leasehold interest or rights to use, in and to all of the Collateral, free and clear of all Liens other than Permitted Liens.  The Security Documents create, as security for the Obligations, valid and enforceable first-priority security interests in the Collateral other than Permitted Liens.  Upon (a) the filing of the documents delivered pursuant to clause (a)(vi) in Article IV, and (b) the filing, if any, of registrations and filings in jurisdictions located outside of the United States covering rights in such jurisdictions relating to trademarks, patents and copyrights arising under the laws of such jurisdictions, such security interests in and Liens on the Collateral to the extent required under the Security Documents shall be perfected, superior to and prior to the rights of all third Persons (except for Permitted Liens expressly permitted hereby and thereby), and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (i) the filing of continuation statements as required by any Governmental Authority, (ii) the filing of amendments to the UCC financing statements filed against the Loan Parties to describe adequately any Commercial Tort Claims (as defined under the UCC) to which any Loan Party become party after the date hereof, (iii) the Administrative Agent's having possession of instruments, documents and chattel paper (as each such term is defined in the UCC) and cash constituting Collateral acquired by any Loan Party after the date hereof, (iv) the Administrative Agent's obtaining control of any electronic chattel paper, investment property and letter-of-credit rights (as each such term is defined in the UCC) constituting Collateral acquired after the date hereof and (v) the recordation of the security interest against all registered copyrights, and all patents and trademark registrations and applications, acquired after the date hereof.

5.17    **Compliance with Laws**.  Each of the Loan Parties and each of their respective Subsidiaries is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties (including those of the NHL), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Closing Date Material Adverse Effect.

5.18    **Intellectual Property; Licenses, Etc.**  Each of the Loan Parties and each of their respective Subsidiaries possesses (by virtue of ownership, license or other permission) the right to use all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, rights of publicity and personality, trade secrets and other proprietary information rights and other

intellectual property rights that are reasonably necessary for or material to the operation of their respective businesses.  To the knowledge of the Borrower without inquiry, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary of any Loan Party, or any other conduct, or operation of the business of any Loan Party or any Subsidiary of any Loan Party, infringes upon any rights held by any other Person, which could reasonably be expected to have a Closing Date Material Adverse Effect, individually or in the aggregate.  No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Closing Date Material Adverse Effect.

      **5.19**     **Offices, Etc.**  The chief executive office or chief place of business (as such term is used in Article 9 of the Uniform Commercial Code as in effect in any relevant jurisdiction from time to time) of the Borrower is set forth on Schedule 5.19.

      **5.20**     **Indebtedness; Solvency**.  The Loan Parties and their respective Subsidiaries do not have any Indebtedness and are not directly or indirectly liable with respect to any Indebtedness, other than Permitted Indebtedness.  The Borrower is Solvent.  The Loan Parties and their respective Subsidiaries, taken as a whole, are, and upon the incurrence of the Term Loan by the Borrower on the Closing Date, will be, Solvent.

      **5.21**     **Employee Matters**.  Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Closing Date Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them before the National Labor Relations Board that could reasonably be expected to have a Closing Date Material Adverse Effect and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any of its Subsidiaries or to the knowledge of the Borrower, threatened against any of them that could reasonably be expected to have a Closing Date Material Adverse Effect, (b) no strike or work stoppage in existence or, to the knowledge of the Borrower, threatened involving the Borrower or any of its Subsidiaries that could reasonably be expected to have a Closing Date Material Adverse Effect, and (c) to the knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the knowledge of the Borrower, no union organization activity that is taking place, except as is not reasonably likely to have a Closing Date Material Adverse Effect.

      **5.22**     **Labor Matters**.  As of the date hereof, there are no strikes, lockouts, slowdowns or stoppages against the NHL, any Loan Party or any Subsidiary of any Loan Party pending or, to the knowledge of the Borrower, threatened.  Neither the Borrower nor any Subsidiary of any Loan Party will be engaged in any unfair labor practice that could reasonably be expected to have, individually or in the aggregate, a Closing Date Material Adverse Effect.  As of the date hereof, there is (a) no unfair labor practice or complaint pending or overtly threatened against any Loan Party, any Subsidiary of any Loan Party or, to the knowledge of any Loan Party, the NHL, before the National Labor Relations Board, (b) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement pending or overtly threatened against any Loan Party, any Subsidiary of any Loan Party or, to the knowledge of any Loan Party, the NHL, (c) no labor dispute pending or overtly threatened against any Loan Party, any Subsidiary of any Loan Party or, to the knowledge of Company, the NHL, (d) to the knowledge of any Loan Party, no union representation question existing with respect to the employees of any Loan Party, any Subsidiary of any Loan Party or the NHL and (e) to the knowledge of any Loan Party no union organizing activities taking place with respect to the employees of any Loan Party or any Subsidiary of any Loan Party, except in each case, such as could not be reasonably expected to result, individually or in the aggregate, in a Closing Date Material Adverse Effect.  The hours worked by and payments made to

employees of the Borrower and the Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or, if required, will be accrued as a liability on the books of the Borrower or such Subsidiary in accordance with GAAP. The consummation of the transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Term Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Loan Party shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each of its Subsidiaries to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent in form and detail reasonably satisfactory to the Administrative Agent and the Administrative Agent shall provide such copies to each Lender:

(a)    as soon as available, but in any event within 120 days after the end of each Fiscal Year (commencing with the first Fiscal Year ending after the Closing Date), a consolidated balance sheet of the Combined Group as at the end of such Fiscal Year, and the related consolidated statements of income or operations and consolidated statements of stockholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of standing reasonably acceptable to the Administrative Agent (provided that any reputable independent accounting firm affiliated with the auditors of Northland Properties Corporation on the Closing Date shall be deemed acceptable to the Administrative Agent for such purpose for so long as they are independent certified public accountants of standing), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit; and

(b)    (i) if the Closing Date occurs prior to November 30, 2011, on November 30, 2011, an unaudited consolidated balance sheet of the Stars for the fiscal quarter ended September 30, 2011 and the related consolidated statements of income or operations, shareholders' equity and cash flows of the Stars for the fiscal quarter ended on such date and (ii) as soon as available, but in any event within 60 days after the end of each of the first three fiscal quarters of each Fiscal Year (commencing with the first full fiscal quarter ending after the Closing Date), a consolidated balance sheet of the Combined Group as at the end of such fiscal quarter, and the related consolidated statements of income or operations, and consolidated statements of stockholders' equity and cash flows for such fiscal quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all certified by a Responsible Officer as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Combined Group in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

As to any information contained in materials furnished pursuant to Section 6.02(f), the Borrower shall not be separately required to furnish such information under clause (a) or (b) above, but the

foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in clauses (a) and (b) above at the times specified therein.

6.02    **Certificates; Other Information**.  Deliver to the Administrative Agent, and the Administrative Agent shall provide copies to each Lender (other than the certificate delivered pursuant to Section 6.02(h)), in form and detail reasonably satisfactory to the Administrative Agent:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default under the financial covenants set forth herein or, if any such Default shall exist, stating the nature and status of such event;

(b)    within 10 days after the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer;

(c)    promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors of Borrower by independent accountants in connection with the accounts or books of the Borrower or any Subsidiary, or any audit of any of them;

(d)    promptly following the adoption thereof, any material amendments, supplements or other modifications to the NHL Rules that could be reasonably expected to have a Material Adverse Effect on any Loan Party or any Subsidiary of any Loan Party or that relate to any modification of the provisions of the NHL Rules relating to the indebtedness of the NHL Member Clubs;

(e)    promptly after the same are available, copies of each annual report, proxy or financial statement or other material report or communication sent to the board of directors of the Borrower;

(f)    promptly, such additional information regarding the business, financial or corporate or partnership affairs of any Loan Party or any Subsidiary of any Loan Party, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request;

(g)    a detailed consolidated annual budget for the Combined Group for the then-current Fiscal Year of the Borrower, including budgeted statements of revenues and Net Operating Cash Flow and reasonable estimates of aggregate Capital Expenditures, together with detailed attendance data for such Fiscal Year including projected attendance for such Fiscal Year and actual attendance for the prior Fiscal Year and setting forth both paid and turnstile figures (the "Budget"), accompanied by a statement of the chief financial officer of the Borrower to the effect that such annual Budget is a reasonable estimate of such information and calculations for the period covered thereby, all to the extent and in the form required by the NHL; which Budget (i) shall be delivered to the Administrative Agent on the Closing Date and, thereafter, on the date of delivery of the same to the NHL and, in any event, no later than October 31st of each Fiscal Year and (ii) shall remain effective until a subsequent Budget is delivered to the Administrative Agent pursuant to this Section, and

(h)    the financial information with respect to the Owner Support Parties as required by the Owner Support Agreement.

NY\1799724.24

**6.03    Notices.** Promptly notify the Administrative Agent (and the Administrative Agent shall notify each Lender):

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary of any Loan Party; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary of any Loan Party and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary of any Loan Party, including pursuant to any applicable Environmental Laws;

(c)    of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect;

(d)    of the receipt of (i) any notice from the NHL of any action or proceeding by the NHL, including any suspension, termination or other material remedial action stipulated or permitted by the NHL Rules which could reasonably be expected to have a Material Adverse Effect on the Borrower or (ii) any communication from or to the NHL which is material to the operations of any Loan Party or any Subsidiary of any Loan Party or which relates to any event which alone or together with any other events that have occurred could reasonably be expected to have a Material Adverse Effect on the Borrower;

(e)    of any application to any NHL Entity that relates to the transfer of the Stars franchise or an ownership interest of 10% or more in the Borrower;

(f)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary of any Loan Party; and

(g)    of any event that requires mandatory prepayment under Section 2.03.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations.**  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party or such Subsidiary, as applicable; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

**6.05    Preservation of Existence, Etc.**  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business consistent with past practice, including without limitation the Stars franchise, except to the

extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**6.06** **Maintenance of Properties**. (a) Maintain, preserve and protect all of its material properties, including, without limitation, the Arena to the extent required under the Arena Lease and equipment reasonably necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all reasonably necessary repairs thereto and renewals and replacements thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

**6.07** **Maintenance of Insurance**. Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds that is customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons or of substantially the type and amount set forth in Schedule 5.10, and providing for not less than 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance. With respect to each Mortgaged Property, obtain flood insurance in such total amount as is required by applicable Law, if at any time the area in which any improvements located on any Mortgaged Property is designated a Flood Zone, and otherwise comply with the Flood Program.

**6.08** **Compliance with Laws**. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property (including those of the NHL), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09** **Books and Records**. (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

**6.10** **Inspection Rights**. Permit representatives and independent contractors of the Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Administrative Agent and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

**6.11** **Use of Proceeds**. The making of the Term Loan shall be in partial satisfaction of the Prepetition First Lien Claims in accordance with the Plan of Reorganization.

**6.12** **Stars Prefunding Account**. If the Budget evidences negative Net Operating Cash Flow (such negative amount, the "Operating Shortfall") for such Fiscal Year of the Borrower, the

Borrower shall cause, within 30 Business Days of its issuance of such Budget, to be deposited (i) in the Stars Prefunding Interest Account, an amount equal to that portion of the Operating Shortfall attributable to the Interest Expense under this Agreement for such Fiscal Year and (ii) in the Stars Prefunding Account, an amount equal to such Operating Shortfall less the amount deposited in the Stars Prefunding Interest Account pursuant to clause (i) above, such funds to be applied or withdrawn, provided no Event of Default has occurred and is continuing, by the Borrower solely for the purpose of meeting the operating expenses of the Loan Parties and to pay Obligations arising under this Agreement; provided further that so long as no Default or Event of Default has occurred and is continuing, any remaining balance in the Stars Prefunding Account at the end of the regular NHL season (less the amount of Net Operating Cash Flow required by the Stars for the remainder of such Fiscal Year as set forth in the Budget) may be withdrawn by the Borrower for its general purposes.

6.13    **Real Property**.    Borrower shall or shall cause the Stars to (i) observe and punctually perform all the obligations imposed upon the tenant under the Arena Lease, (ii) enforce all of the material terms, covenants and conditions contained in the Arena Lease on the part of the landlord thereunder to be observed or performed, short of termination thereof and (iii) not execute any assignment or material sublease of tenant's interest in the Arena Lease other than the assignment of rents and leases under the Mortgage with respect to the Arena Lease, in each case as would not be reasonably expected to have a Material Adverse Effect. Borrower shall or shall cause the Stars to promptly deliver to the Administrative Agent a copy of each material written notice from landlord under the Arena Lease, including any notice claiming that Borrower or the Stars is in default in the performance or observance of any of the terms, covenants or conditions thereof to be performed or observed by Borrower or the Stars.

6.14    **Additional Collateral; Further Assurances.**

(a)    Subject to applicable law, the Borrower and each Subsidiary shall cause each of its domestic Subsidiaries formed or acquired after the Closing Date in accordance with the terms of this Agreement hereto to become a Loan Party by executing the Joinder Agreement set forth as Exhibit J hereto (the "Joinder Agreement"). Upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) subject to Permitted Liens, will grant Liens to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, in any property of such Loan Party which constitutes Collateral, including any parcel of Mortgaged Property located in the U.S. owned by any Loan Party.

(b)    The Borrower and each Subsidiary will cause (i) 100% of the issued and outstanding Equity Interests of each of its domestic Subsidiaries and (ii) 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (1) could not reasonably be expected to cause the undistributed earnings of such foreign Subsidiary as determined for U.S. federal income tax purposes to be treated as a deemed dividend to such foreign Subsidiary's U.S. parent and (2) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2) in each foreign Subsidiary directly owned by the Borrower or any domestic Subsidiary to be subject at all times to a first-priority, perfected Lien in favor of the Administrative Agent pursuant to the terms and conditions of the Loan Documents or other Security Documents as the Administrative Agent shall reasonably request.

(c)    Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing

and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Article IV and Schedule 6.16, as applicable), which may be required by law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens in the Collateral created or intended to be created by the Security Documents, all at the expense of the Loan Parties; provided that the Loan Parties shall not be required to take any such actions with respect to (i) Real Property or improvements thereto or any interest therein having a fair market value less than $2,500,000 in the aggregate for all Real Property acquired after the Closing Date (ii) the fee simple interest in the property commonly known as Plano StarCenter and the leasehold interests in the properties commonly known as StarCenters and the leasehold interest in the parking lot set forth on Schedule 6.14 hereto (including any amendment, modifications or restatement thereto).

(d)     If any material assets (including any Real Property or improvements thereto or any interest therein) are acquired by the Borrower or any Subsidiary after the Closing Date (other than assets constituting Collateral under the Security Agreement or the Guarantor Security Agreement, as applicable, that become subject to the Lien in favor of the Security Agreement upon acquisition thereof), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the Subsidiaries to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, subject to Permitted Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

(e)     Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, the Borrower shall correct any material defect or error that may be discovered in any Security Document or in the execution, acknowledgment, filing or recordation thereof.

### 6.15     Interest Reserve Account.

(a)     At least 30 days prior to the then-current expiration date of the NHL collective bargaining agreement ("CBA"), as extended from time to time (the "CBA Expiration Date"), unless a new CBA is announced by the NHL prior to such date, the Borrower shall establish a cash collateral account with the Administrative Agent in substance and form reasonably acceptable to the Administrative Agent (the "Interest Reserve Account") over which the Administrative Agent shall have sole control and exclusive rights of withdrawal, subject to the provisions of this Section 6.15, and deposit or cause to be deposited in immediately available funds an amount equal to the Interest Expense Reserve Amount.

(b)     Amounts in the Interest Reserve Account will be available to the Borrower to pay regularly-scheduled interest and fees owed under this Agreement and will otherwise secure the payment of the Obligations. Amounts in the Interest Reserve Account shall be invested by the Administrative Agent at the direction of the Borrower in Investments permitted by Section 7.02 hereto; provided that the investment of such amounts shall be controlled solely by the Administrative Agent during the continuance of any Default or Event of Default.

(c)     The Borrower hereby grants to the Administrative Agent (for the benefit of the Secured Parties) a security interest in all amounts from time to time on deposit in the Interest Reserve Account, including all Investments purchased with amounts therein, earnings thereon, and proceeds thereof, and agrees that all such amounts, Investments, earnings, and proceeds shall constitute Collateral subject to the Security Documents.

(d)     Promptly following the earlier of (i) the repayment of the Term Loans, (ii) the extension of the CBA Expiration Date to a date following the last day of the next succeeding full NHL season (including playoffs), or (iii) a new CBA having been announced by the NHL, and provided that no Default or Event of Default then exists, the remaining amounts in the Interest Reserve Account shall be returned to the Borrower.

(e)     The Administrative Agent shall make all calculations pursuant to this Section 6.15 and such calculations shall be conclusive and binding on the parties hereto absent manifest error

(f)     Whenever any amount of regularly-scheduled interest or fee is due and payable hereunder, unless such regularly-scheduled interest or fee is paid when due, the Administrative Agent shall and is hereby irrevocably authorized and directed to utilize funds in the Interest Reserve Account to make payment of such regularly-scheduled interest or fee, in each case, without the necessity of any further approval or authorization of the Borrower.  The Administrative Agent shall promptly notify the Borrower of any such payment effected pursuant to this paragraph.  Upon any payment effected pursuant to this paragraph of the entire amount of any interest or fee owed hereunder, any Default or Event of Default arising from the failure by the Borrower to pay such interest or fee shall be deemed cured without the necessity of any action by the Administrative Agent or any Lender.

**6.16     Post-Closing Covenant**.  Deliver or cause to be delivered to the Administrative Agent such documents and instruments, and take or cause to be taken such other actions (i) as set forth on Schedule 6.16 hereto, within 10 days of the Closing Date and (ii) as may be reasonably necessary to (A) provide the perfected first-priority Liens described in clause (a)(vi) of Article IV that are not so provided on the Closing Date and (B) satisfy each condition precedent that was not actually satisfied, but rather "deemed" satisfied on the Closing Date pursuant to the provisions set forth in Article IV, in each case, within 30 days of the Closing Date or, if the Borrower is using its commercially reasonable efforts to cause such delivery and to take such actions during such first 30-day period, as determined by the Administrative Agent in its sole discretion, an additional 30 days therefrom.

# ARTICLE VII.
# NEGATIVE COVENANTS

So long as any Term Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Loan Party shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

**7.01     Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than (any of the following, "Permitted Liens"):

(a)     Liens pursuant to any Loan Document;

(b)     Liens existing on the date hereof and listed on Schedule 7.01 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased (other than, with respect to item 7 on Schedule 7.01, as permitted by the Note Purchase Agreement), (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.03(f) or, with respect to item 7 on Schedule 7.01, the Note Purchase Agreement;

(c)     Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e) Liens incurred or pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA that is not released within 30 days;

(f) deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g) easements, rights-of-way, covenants, restrictions and other similar encumbrances affecting Real Property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h) Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h) or securing appeal or other surety bonds related to such judgments, so long as (i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP; and

(i) Liens securing Indebtedness permitted under Section 7.03(c); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition.

**7.02    Investments**.  Make any Investments, except any of the following:

(a) Investments held by the Borrower or such Subsidiary in the form of Cash Equivalents;

(b) unless a Default or Event of Default has occurred and is continuing or would result therefrom, advances to officers, directors and employees of the Stars for travel, entertainment, relocation and analogous ordinary business purposes, which advances are consistent with past practice and necessary and customary for NHL teams in the ordinary course of business;

(c) (i) signing bonuses and other advances to players and loans to players provided for in acquired Player Contracts and (ii) signing bonuses and other advances to other employees and loans to other employees in an aggregate amount not exceeding $250,000 during any Fiscal Year;

(d) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e) Investments in Cash Equivalents or other payments and expenditures by the Borrower or the Stars for the purpose of funding deferred compensation payments in respect of Player Contracts in accordance with or as may be required by the NHL Rules or the NHL Approvals;

(f)     Investments between the Borrower and any Guarantor Subsidiary, except as permitted under Section 7.04;

(g)     Investments in Center Operating Company (i) that are required to be contributed pursuant to the governing documents of Center Operating Company in effect as of the Closing Date and (ii) that are not otherwise permitted under clause (i), in an aggregate principal amount not to exceed $5,000,000 during the term of this Agreement;

(h)     Investments in league-wide licensing or other NHL ventures in which all NHL member clubs are required to participate, made on the same terms and subject to the same conditions as available to other NHL member clubs;

(i)     Investments designated only for a specified purpose in an aggregate amount not exceeding the lesser of (i) $10,000,000 in any Fiscal Year and (ii) the amount of any cash common equity contribution made by either Owner Support Party to the Borrower during the term of this Agreement; and

(j)     unless a Default or Event of Default has occurred and is continuing or would result therefrom, other Investments in an aggregate amount not exceeding $1,000,000 during the term of this Agreement.

        7.03    **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, other than (any of the following, "Permitted Indebtedness"):

(a)     Indebtedness under the Loan Documents;

(b)     obligations (contingent or otherwise) of the Borrower or any Subsidiary existing or arising under any Swap Contract; provided that such Swap Contract is in the ordinary course and not for speculative purposes;

(c)     Indebtedness in respect of Capital Lease Obligations, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i) provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $1,000,000;

(d)     unless a Default or an Event of Default has occurred and is continuing or would result therefrom, any Indebtedness of the Stars incurred pursuant to the NHL Rules or NHL Approvals in which substantially all NHL Member Clubs are required to participate, made on substantially the same terms and subject to substantially the same conditions for all NHL Member Clubs;

(e)     Indebtedness in respect of Owner Support Party Loans incurred by the Borrower in accordance with this Agreement or the Owner Support Agreement in an aggregate principal amount not to exceed $25,000,000 at any time outstanding;

(f)     Indebtedness existing on the date hereof and listed on Schedule 7.03; and

(g)     unless a Default or Event of Default has occurred and is continuing or would result therefrom, unsecured Indebtedness in an aggregate principal amount not to exceed $1,000,000 at any time outstanding.

        7.04    **Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially

all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, other than with or into Subsidiaries; provided that (i) in the case of a merger or consolidation with a Guarantor Subsidiary, the Guarantor Subsidiary shall be the continuing or surviving Person and (ii) in the case of a Disposition where the transferor is a Guarantor Subsidiary, then the transferee must either be the Borrower or a Guarantor Subsidiary.

7.05 **Dispositions**. Make any Disposition or enter into any agreement to make any Disposition, except any of the following:

(a) Dispositions of obsolete or worn out property and assets that are no longer necessary for the Borrower's or any Subsidiary's business, whether now owned or hereafter acquired, in the ordinary course of business;

(b) Dispositions of inventory and other goods in the ordinary course of business;

(c) Dispositions permitted by Section 7.04;

(d) licenses, sublicenses, leases and sub-leases in the ordinary course of business;

(e) Dispositions required by Laws promulgated by Governmental Authorities having appropriate jurisdiction over the Borrower or its properties;

(f) Dispositions between the Borrower and any Subsidiary; provided that if the transferor in such transaction is a Guarantor Subsidiary, then the transferee must either be the Borrower or a Guarantor Subsidiary;

(g) Dispositions of the Borrower's direct and indirect Equity Interests in the Special Subsidiaries or any assets of the Special Subsidiaries; provided that (i)(a) in the case of a Disposition of the Borrower's direct and indirect Equity Interests in the Special Subsidiaries, the Net Issuance Proceeds therefrom shall be applied in accordance with Section 2.03(e) and (b) in the case of a Disposition of any assets of the Special Subsidiaries, the Net Cash Proceeds therefrom shall be applied in accordance with Section 2.03(b), (ii) the consideration received for such Equity Interests or assets shall be in an amount at least equal to the fair market value thereof and (iii) no less than 80% thereof shall be paid in Cash;

(h) other Dispositions, the Net Cash Proceeds of which shall not in an aggregate exceed $5,000,000 during the term of this Agreement, provided that (i) the Net Cash Proceeds therefrom shall be used or reserved, at the Borrower's election, (a) to make Investments permitted under Section 7.02, (b) to purchase replacement assets, or (c) to prepay the Term Loans pursuant to Section 2.03(b), (ii) the consideration received for such Disposition shall be in an amount at least equal to the fair market value thereof and (iii) no less than 80% thereof shall be paid in Cash; and

(i) Dispositions permitted by Section 7.02.

7.06 **Restricted Payments; Etc.** Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests; provided that, (a) the Borrower is permitted to issue and sell additional Equity Interests (i) to Northland Properties Corporation; and (ii) to any other Person if (A) the Net Issuance Proceeds thereof are applied in the manner set forth in Section 2.03(e), (B) such Person has been approved by the NHL and (C) no Change of Control will result therefrom; (b) the Borrower is permitted to make Restricted Payments to Northland Properties Corporation as long as the Borrower is properly treated as a pass-through entity for U.S. federal, state and local income tax or Canadian income tax purposes, to permit the payment of U.S.

federal, state and local income tax liability or Canadian income tax liability (net of maximum available credits (or, if such credits are not available, deductions) relating to U.S. federal, state and local taxes), as may be relevant, by Northland Properties Corporation on account of income earned by the Borrower (including those Subsidiaries of the Borrower that are pass-through entities for U.S. federal, state and local income tax or Canadian income tax purposes) that is allocable to Northland Properties Corporation, taking into account Northland Properties Corporation's distributive share of any net losses of the Borrower (and any such Subsidiaries) that had been previously allocated to Northland Properties Corporation and had not previously been taken into account in computing an amount to be distributed pursuant to this clause (b), provided that the aggregate amount distributed pursuant to this clause (b) for any relevant taxable period (plus the U.S. federal, state and local income taxes and/or Canadian income taxes directly paid by the Borrower, if any) shall never exceed 45% of the net hypothetical taxable income of the Borrower (and any such Subsidiaries) that are allocable to Northland Properties Corporation for such taxable period; (c) the Borrower and the Subsidiaries shall be permitted to make Restricted Payments (i) among the Borrower and any Guarantor Subsidiary, (ii) to the Borrower or (iii) to the owners of any non-Guarantor Subsidiary in connection with a transaction between such non-Guarantor Subsidiary and the Borrower or a Guarantor Subsidiary that is permitted by <u>Section 7.04</u>; and (d) so long as no Default or Event of Default shall exist or would result therefrom, the Borrower is permitted to make one or more Restricted Payments to any Owner Support Party commencing at any time on and after the first anniversary of the Closing Date; provided that for purposes of this clause (d), (i) such Restricted Payment may only be made between June and September of each Fiscal Year, (ii) such Restricted Payment is in an aggregate principal amount not to exceed the amount of cash common equity contributions and/or Owner Support Party Loans (other than Equity Cure Contributions) made to the Borrower between October of the previous Fiscal Year and May of the then current Fiscal Year; (iii) the Borrower shall be in pro forma compliance with Sections 7.13 and 7.14, (iv) the Borrower shall have delivered to the Administrative agent a certificate of a Responsible Officer stating that (A) the projected financial information of the Combined Group indicates that the financial covenants in Section 7.13 and 7.14, after giving effect to such withdrawal, are reasonably expected to be satisfied for the immediately subsequent four fiscal quarters, (B) such projected financial information was determined in good faith based upon assumptions believed by such Responsible Officer to be reasonable at the time (including reasonable reliance upon assurances made to such Responsible Officer by any Owner Support Party with respect to cash common equity contributions or Owner Support Party Loans to be made by such Owner Support Party during such period), it being understood that no assurances can be made that such expectations or projections will be achieved or accomplished and (v) the Working Capital of the Borrower and its Subsidiaries, both before and after giving effect to such withdrawal, is at least equal to $10,000,000.

      **7.07**    **Material Acquisitions**.  Acquire by purchase or otherwise any property or assets of, or stock or other evidence of beneficial ownership of, any Person, except purchases of inventory, equipment, materials, supplies and rights to players in the ordinary course of business and except for transactions permitted under <u>Sections 7.02</u> and <u>7.15</u> herein.

      **7.08**    **Change in Nature of Business**.  Engage in any material line of business substantially different from those lines of business conducted by the Loan Parties on the date hereof or any business substantially related or incidental thereto.

      **7.09**    **Transactions with Affiliates**.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than (a) on fair and reasonable terms substantially as favorable to such Loan Party as would be obtainable by such Loan Party at the time in a comparable arm's length transaction with a Person other than an Affiliate, (b) transactions among the Combined Group that do not violate another provision of this Agreement, and (c) transactions otherwise permitted by <u>Section 7.02</u>.

**7.10    Burdensome Agreements**.  Enter into any Contractual Obligation (other than this Agreement, any other Loan Document, as required by the NHL Rules, or Contractual Obligations with respect to Permitted Liens) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrower or to otherwise transfer property to the Borrower, (ii) of any Subsidiary to Guarantee the Indebtedness of the Borrower or (iii) of any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this clause (iii) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.03(c) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Compliance with the NHL Rules.**  Take any action that would violate the NHL Rules to the extent such action could be reasonably expected to result in a Material Adverse Effect or that would otherwise result in the non-appealable imposition by the NHL of material pecuniary damages or loss of the Stars franchise.

**7.12    Use of Proceeds**.  Use the proceeds of the Term Loan Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**7.13    Fixed Charge Coverage Ratio**.  Permit the Fixed Charge Coverage Ratio for the Twelve Month Trailing Period ending as of the last day of each fiscal quarter of the Borrower ending December 31, March 31, June 30 or September 30 of each Fiscal Year, beginning [  ], 2011, to be less than 1.00:1.00; provided that, for any fiscal quarter ending prior to [September 30], 2012, the Fixed Charge Coverage Ratio means the ratio of (a) actual Adjusted EBITDA from [October 1], 2011 through the last day of the applicable fiscal quarter to (b) actual Fixed Charges from [October 1], 2011 through the last day of the applicable fiscal quarter.

**7.14    Minimum Adjusted EBITDA**.  Permit Adjusted EBITDA for the Twelve Month Trailing Period ending as of the last day of each fiscal quarter of the Borrower ending December 31, March 31, June 30 or September 30 of each Fiscal Year, beginning on the last day of the fiscal quarter in which the first anniversary of the Closing Date occurs, to be less than $3,000,000.

**7.15    Plan of Reorganization and Confirmation Order**.  Agree to amend, supplement, waive or otherwise modify any provision of the Plan of Reorganization or Confirmation Order or take or fail to take any action under the Plan of Reorganization or Confirmation Order or any other order of the Bankruptcy Court, in each case, in a manner materially adverse to the Secured Parties.

**7.16    Material Agreements**.  Unless otherwise consented to in writing by Administrative Agent, such consent not to be unreasonably withheld, the Borrower shall not amend, modify, terminate, renew or surrender any rights or remedies under the Arena Lease (or, with respect to the Master Lease, agree to any such amendment, modification, termination, renewal or surrender of rights or remedies) or any agreement listed on Schedule 7.16 hereto to the extent such action, individually or in the aggregate, could be reasonably expected to result in a Material Adverse Effect.

**7.17    Permitted Activities of Borrower.**  Borrower shall not (a) engage in any business other than in connection with or incidental to (i) purchasing and owning the Equity Interests of its Subsidiaries, COC or Center GP, (ii) issuing and selling its Equity Interests or options or warrants in respect thereof, (iii) entering into and performing its obligations under and in accordance with the Loan Documents to which it is a party, (iv) the business of its Subsidiaries, COC or Center GP, and (v) other

activities contemplated by this Section 7.17 or by the NHL Rules; (b) own any assets other than (i) the Equity Interests of its Subsidiaries, COC or Center GP, (ii) cash and Cash Equivalents not for speculative purposes, and (iii) pursuant to a purchase or acquisition of all or substantially all of the property and assets or business or a division of a Person, or all of the Equity Interests in a Person; (c) have any Indebtedness other than its obligations under the Loan Documents or Owner Support Party Loans made by the Owner Support Parties to the Borrower in accordance with this Agreement and the Owner Support Agreement; or (d) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**7.18    Restrictions on Subsidiary Distributions.**  Except as provided herein, no Loan Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of the Borrower to (a) pay dividends or make any other distributions on any of such Subsidiary's Equity Interests owned by the Borrower or any other Subsidiary, (b) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary, (c) make loans or advances to the Borrower or any other Subsidiary, or (d) transfer any of its property or assets to the Borrower or any other Subsidiary other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 7.03(b) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Equity Interests not otherwise prohibited under this Agreement, or (iv) imposed by applicable law or by the NHL Rules.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Term Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment or otherwise, or (ii) within three days after the same becomes due, any interest on any Term Loan due hereunder, or (iii) within five Business Days after the same becomes due and the Borrower having received written notice thereof, any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  Any Loan Party or any of its Subsidiaries fails to perform or observe any material term, covenant or agreement contained in any of Sections 6.01, 6.02(a), (b), (d), (g) and (h), 6.03(a), (d) or (e), 6.05(a) or (b), 6.08, 6.10, 6.11, 6.12 or Article VII; provided that in the case of any Event of Default under Section 7.13 or 7.14, the time period set forth in Section 8.04(b) shall have expired without cure as contemplated therein; or fails to perform or observe any material term, covenant or agreement contained in any of Sections 6.02(c), (e) or (f), 6.03(b), (c) or (f), 6.05(c) or 6.14 and such condition continues for 10 days; or

(c)    Other Defaults.  Any Loan Party or any of its Subsidiaries fails to perform or observe any other material term, covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document to which it is a party on its part to be performed or observed and such condition continues for 30 days; or

(d)    Representations and Warranties.  Any representation or warranty made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any certificate delivered in

connection herewith or therewith, shall be incorrect or misleading when made or deemed made in any material respect and such condition continues for 10 days; or

(e)    <u>Cross-Default</u>.  Any Loan Party or any of its Subsidiaries  (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, and after giving effect to any notice and cure period) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount (including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount ("Specified Indebtedness"), or (B) fails to observe or perform any other agreement or condition relating to any Specified Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of Specified Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), prior to its stated maturity; or

(f)    <u>Insolvency Proceedings, Etc</u>.  Any Loan Party or any of its Subsidiaries institutes or consents to the institution of any proceeding against such Loan Party under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)    <u>Inability to Pay Debts; Attachment</u>.  (i) Subject to any applicable cure period set forth in Section 8.01(e) above, any Loan Party or any of its Subsidiaries becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or substantially all of the property of such Loan Party or its Subsidiary and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(h)    <u>Judgments</u>.  There is entered against any Loan Party or any of its Subsidiaries (i) a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage or not otherwise paid, discharged or vacated), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, and (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount that could reasonably be expected to have a Material Adverse Effect, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to have a Material Adverse Effect; or

(j)     <u>Invalidity of Loan Documents</u>.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder prior to the satisfaction in full of all the Obligations, ceases to be in full force and effect, and such condition continues for five days; or any Loan Party or any of its Subsidiaries or either Owner Support Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party or any of its Subsidiaries or either Owner Support Party denies that it or he has any liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)     <u>Change of Control</u>.  There occurs any Change of Control; or

(l)     <u>Security Documents</u>.     Any of the Security Documents shall cease to give the Administrative Agent the primary benefits thereof, including a perfected, enforceable first priority security interest in, and Lien on, all of the Collateral (other than items of collateral that are, individually and in the aggregate, immaterial) in accordance with and subject to the terms thereof, or the Confirmation Order shall cease to give the Administrative Agent a perfected, enforceable first priority security interest in, and Lien on, all of the Collateral (other than items of collateral that are, individually and in the aggregate, immaterial) in accordance with and subject to the terms thereof, and, in each case, such condition continues for five days; or

(m)     <u>Loss of Franchise</u>.  The Borrower shall cease to own or shall suffer the impending loss of the Stars franchise or the rights, privileges and other property rights of the Stars as an NHL Member Club under the NHL Rules; or

(n)     <u>Relocation</u>.  The relocation of the NHL franchise owned by the Stars from the Dallas/Fort Worth metropolitan area; or

(o)     <u>League Action</u>.  (i) any Loan Party (other than DSE Hockey Centers) or any Subsidiary of any Loan Party shall be in material default under the NHL Documents, and if such default is capable of being cured by such Obligor, such default is not cured within the period granted therefor under the NHL Documents or in any notice from the NHL or in any longer cure period granted by the Administrative Agent, (ii) the franchise rights granted pursuant to the NHL Constitution and NHL By-laws shall be terminated, suspended, cancelled or rescinded during the term of this Credit Agreement, (iii) the Stars cease for any reason to be a Club in good standing in the NHL and, if the event leading to such failure to be in good standing is capable of being cured, the Stars are not in good standing within the period granted therefor in the notice from the NHL or the Administrative Agent, (iv) the NHL shall notify any Loan Party or any Subsidiary of any Loan Party in writing of its intention to commence any action to terminate, seize or otherwise dispose of the Stars under the NHL Constitution or the NHL By-Laws, in any court of competent jurisdiction or otherwise and such notice is not revoked within ten (10) business days, (v) any Loan Party agrees to amend or modify any of the NHL Documents and such amendment or modification could reasonably be expected to have a material adverse effect on the ability of any Loan Party or either Owner Support Party to perform any material obligation under any Loan Document to which it is a party or on the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, (vi) the Stars shall fail to play ten (10) or more regularly scheduled games at American Airlines Center during the regular NHL season other than by reason of force majeure or a work stoppage; (vii) the NHL imposes on any Loan Party or any Subsidiary of any Loan Party consents to any material cash call or material mandatory reserve not imposed on other NHL teams generally and which may reasonably result in an a Material Adverse Effect; or (viii) any other action shall be taken by or involving the NHL that could reasonably be expected to have a Material Adverse Effect; or

(p)     <u>Confirmation Order</u>.  (i) In determining whether an Event of Default has occurred on or prior to the Closing Date solely for the purpose of any condition to the Closing Date, any Loan Party or

any Subsidiary of any Loan Party shall fail to comply in any material respect with the Confirmation Order in a manner materially adverse to the Secured Parties; or (ii) for all other purposes, any Loan Party or any Subsidiary of any Loan Party shall fail to comply in any material respect with the Confirmation Order in a manner adverse to the Secured Parties; or

(q)     <u>Owner Support Agreement</u>.  Either Owner Support Party fails to perform or observe any material term, covenant or agreement contained the Owner Support Agreement, and such condition continues for fifteen days; or

(r)     <u>Trigger Event</u>.  There occurs a "Trigger Event" as defined in the Stars Team Agreement.

(s)     <u>Material Adverse Valuation Event</u>.  A Material Adverse Valuation Event shall occur and continue for a period of 30 days; <u>provided</u> that it shall not constitute an Event of Default under this subsection (s) if within such period the Borrower delivers to the Administrative Agent an appraisal of the Stars franchise that demonstrates that the Outstanding Amount is no greater than sixty six and two-third percent (66 2/3%) of the value of the Stars franchise and that is otherwise satisfactory to the Administrative Agent acting reasonably.

**8.02     Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the unpaid principal amount of all outstanding Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and

(b)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law;

<u>provided</u>, <u>however</u>, that upon the occurrence of an Event of Default under <u>Sections 8.01(f) or (g)</u>, the unpaid principal amount of all outstanding Term Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

**8.03     Application of Funds**.  After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Term Loans have automatically become immediately due and payable as set forth in the proviso to <u>Section 8.02</u>), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including Attorney Costs and amounts payable under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Second</u> payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans ratably among the Lenders; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

**8.04    Capital Contributions and Equity Cure Contributions; Borrower's Right to Cure**.

(a)    Notwithstanding anything to the contrary contained in Section 8.01, with respect to any fiscal quarter, any cash common equity contribution or Owner Support Party Loan made to the Borrower after the last day of any fiscal quarter and on or prior to the earliest to occur of the day that (i) is 30 days after the last day of such fiscal quarter or (ii) the Borrower delivers a Compliance Certificate pursuant to Section 6.02(b) (each, a "Capital Contribution") will, at the request of the Borrower, be included in the calculation of Adjusted EBITDA for all purposes hereunder including, without limitation, for determining compliance with the financial covenants at the end of such fiscal quarter and any subsequent period that includes such fiscal quarter.

(b)    Notwithstanding anything to the contrary contained in Section 8.01, with respect to any fiscal quarter, any cash common equity contribution or Owner Support Party Loan made to the Borrower after the earliest to occur of the day that (i) is 30 days after the last day of such fiscal quarter or (ii) the Borrower delivers a Compliance Certificate pursuant to Section 6.02(b), and on or prior to the day that is 10 days after the day on which financial statements are required to be delivered for that fiscal quarter (the "Contribution Deadline") (each, an "Equity Cure Contribution") will, at the request of the Borrower, be included in the calculation of Adjusted EBITDA for all purposes hereunder including, without limitation, for determining compliance with the financial covenants at the end of such fiscal quarter and any subsequent period that includes such fiscal quarter.

## ARTICLE IX.
## ADMINISTRATIVE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders is deemed by its acceptance of its Term Loan to irrevocably appoint JPMCB to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and the NHL Consent Letter and authorize (i) the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto, including, without limitation, (x) granting of waivers under the NHL Consent Letter and exercising such powers and performing such duties as are required under the provisions of the NHL Consent Letter, and any other instruments or agreements referred to therein or as are reasonably incidental thereto, (y) making, on each such Lender's behalf, the representations, warranties, covenants and agreements deemed made by such Lender under the provisions of the NHL Consent Letter, and (z) taking such action under the NHL Consent Letter as is authorized by a vote of Required Lenders, and (ii) JPMCB, as Administrative Agent, to enter into the NHL Consent Letter (including, without limitation, any amendment, modifications or restatements) on such Lender's behalf. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and the Loan Parties shall not have rights as a third-party beneficiary of any of such provisions.

**9.02     Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**9.03     Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly provided for herein or in the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct.  Except for actual knowledge of non-payment, the Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**9.04     Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or

otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Term Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender or prior to the making of such Term Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05 **Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

9.06 **Resignation of Administrative Agent**. The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall, subject to the prior approval of the Borrower unless and until a Default or Event of Default has occurred and is continuing, at which time no approval of the Borrower is required, appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above and subject to the prior approval of the Borrower unless and until a Default or Event of Default has occurred and is continuing, at which time no approval of the Borrower is required; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

9.07    **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.08    **No Other Duties, Etc.**  Anything herein to the contrary notwithstanding, JPMCB shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

9.09    **Administrative Agent May File Proofs of Claim**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party or either Owner Support Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.06 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

9.10    **Collateral Matters**.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent indemnification obligations), (ii) that is Disposed of or to be Disposed of as part of or in connection with any Disposition

permitted hereunder or under any other Loan Document, or (iii) subject to <u>Section 10.01</u>, if approved, authorized or ratified in writing by the Required Lenders; and

(b)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 7.01</u>.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property.

**9.11    Lenders' Representations, Warranties and Acknowledgment**.  Each Lender has been provided with a copy of the NHL Consent Letter and each Loan Document and, by accepting its Term Loan, is deemed to have agreed to be bound by the terms, conditions and other provisions contained in the NHL Consent Letter as fully as if it were a signatory thereto, and Appendix A attached to the NHL Consent Letter will be a true and complete list of all of the Lenders as of the date of the NHL Consent Letter.  Whether or not expressly stated in any provision of the NHL Consent Letter, each Lender shall be fully bound by the provisions of the NHL Consent Letter.

**9.12    Withholding Tax**.

(a)    To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.

(b)    If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) or if any payment has been made to any Lender by the Administrative Agent without the applicable withholding Tax being withheld from such payment and the Administrative Agent has paid over the applicable withholding Tax to the Internal Revenue Service or any other Governmental Authority, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

## ARTICLE X.
## MISCELLANEOUS

**10.01    Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by (x) the Administrative Agent (only to the extent the Administrative Agent is expressly so permitted to enter into such amendment, waiver or consent under the relevant Loan Document) and the Borrower or (y) by the Required Lenders, the Borrower and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in clause (a) of <u>Article IV</u> without the written consent of Required Lenders;

(b)     postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them), including, without limitation, the Maturity Date, without the written consent of each Lender directly affected thereby;

(c)     reduce the principal of, or the rate of interest specified herein on, any Term Loan or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Term Loan or to reduce any fee payable hereunder;

(d)     except as set forth in Section 9.10, release all or substantially all of the Collateral, release all or substantially all of the Guarantors from the Guaranty Agreement or release any of the Owner Support Parties, without the written consent of each Lender;

(e)     agree to subordinate the Liens of the Secured Parties on all or substantially all of the Collateral, without the written consent of Required Lenders and the Administrative Agent;

(f)     change Section 2.09 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender; or

(g)     change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

and, provided further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder.

**10.02    Notices; Effectiveness; Electronic Communication**.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrower or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Platform, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.

(e)     <u>Reliance by Administrative Agent and Lenders</u>.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Term Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent and each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03   No Waiver; Cumulative Remedies**.   No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each of the other Loan Documents, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein, or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.02</u> for the benefit of all the Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 10.08</u> (subject to the terms of <u>Section 2.09</u>), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 8.02</u> and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to <u>Section 2.09</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04   Expenses; Indemnity; Damage Waiver**.

(a)     <u>Costs and Expenses</u>.  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the administration of this Agreement and the other Loan Documents incurred after the Closing Date or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent and any Lender (including the fees, charges and disbursements of counsel for the Administrative Agent and counsel for any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Term Loans deemed to be made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Term Loans.

(b)    Indemnification by the Loan Parties.    The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any outside counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Loan Party or either Owner Support Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance or breach by the Loan Parties of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Term Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party, or any Environmental Liability related in any way to any Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party or either Owner Support Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Loan Party or either Owner Support Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party or such Owner Support Party, as applicable, has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction; provided that, notwithstanding the foregoing herein in this Section 10.04(b), the Loan Parties shall not pay for or reimburse separate counsel or other separate expenses for Lenders from that of the Administrative Agent.

(c)    Reimbursement by Lenders.    To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.09(c).

(d)    Waiver of Consequential Damages, Etc.    To the fullest extent permitted by applicable law, each Loan Party shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent the damages are

found in a final, nonappealable judgment by a court of competent jurisdiction to have arisen from the Indemnitee's breach, gross negligence or willful misconduct.

(e) <u>Payments</u>.  All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f) <u>Survival</u>.  The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender and the repayment, satisfaction or discharge of all the Obligations.

**10.05  Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06  Successors and Assigns**.

(a) <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations as Lender under this Agreement (including all or a portion of its Term Loans); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts</u>.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Term Loans at the time owing to it hereunder or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the principal outstanding balance of the Term Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Term Loans assigned;

(iii)     Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition, the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Term Loan if such assignment is to a Person that is not a Lender with a Term Loan, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $2,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)     No Assignment to any Loan Party.  No such assignment shall be made to any Loan Party or any of the Loan Parties' Affiliates; and

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural Person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 10.06, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits and subject to the obligations of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, the Borrower (at its expense) shall execute and deliver a Term Loan Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 10.06.

72

Notwithstanding anything herein to the contrary, all assignments shall be subject to the restrictions of the NHL as described in the NHL Consent Letter.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amounts of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, and by any Lender at any reasonable time and from time to time upon reasonable prior notice and as required by the NHL Consent Letter.

(d)     Participations.  Any Lender may at any time sell participations to any Person (other than a natural Person or any Loan Party or any of the Loan Parties' Affiliates) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Loans owing to it); provided that (i) such Lender has first notified the Borrower and the Administrative Agent of its intention to sell a participation, (ii) such Lender's obligations under this Agreement shall remain unchanged, (iii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant; provided further that any participation that proposes to grant any such rights to a Participant shall be subject to the prior approval of the Borrower, unless a Default or Event of Default has occurred and is continuing.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by law, each Participant that has been approved by the Borrower also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.09 as though it were a Lender.

Each assignee under Section 10.06(b) and each Participant shall, by entering into an Assignment Agreement or acquiring a participation interest, as the case may be, be deemed to acknowledge that it has received a copy of the NHL Consent Letter and to have agreed to be bound by each and every term and condition set forth in the NHL Consent Letter as fully as if it were a signatory thereto.

Notwithstanding anything herein to the contrary, all participations shall be subject to the restrictions of the NHL as described in the NHL Consent Letter.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless (i) the sale of the participation to such Participant is made with the Borrower's prior written consent or (ii) it relates to any Indemnified Taxes resulting from any change in Law after the participant becomes a participant.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless

such Participant agrees, for the benefit of the Borrower, to comply with Section 3.01(e) as though it were a Lender.

(f)     Participant Register.  Each Lender that sells a participation shall maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under this Agreement or other Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, Term Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or except as required by the NHL Consent Letter.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(g)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Loan Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; provided that the Administrative Agent and the Lenders, as applicable, shall inform the Borrower (to the extent permitted by such subpoena, regulation or law) with respect thereto so that the Borrower may seek appropriate protective relief, (d) to any other party hereto or the NHL, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender or any of their respective Related Parties on a non-confidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from any Loan Party, either Owner Support Party, or any of their Affiliates relating to any Loan Party, either Owner Support Party, or any of their Affiliates or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the any Loan Party or either Owner Support Party, including Borrower Materials.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have

complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning any Loan Party or either Owner Support Party, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(f) or (g) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder relating to the Borrower and its Subsidiaries (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system that is a secured site and limited to review by the Lenders (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

10.08   **Right of Set-off**.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time, and from time to

time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower under the Loan Documents against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or un-matured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and each of their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application.

10.09   **Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

10.10   **Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic mail shall be effective as delivery of a manually executed counterpart.

10.11   **Survival of Representations and Warranties**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of the Term Loan Borrowing, and shall continue in full force and effect as long as any Term Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.12   **Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the

illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.13   **Replacement of Lenders**. If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)      the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.06(b);

(b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

10.14   **Governing Law; Jurisdiction; Etc.**

(a)      GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      SUBMISSION TO JURISDICTION.   THE BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT OF THE EASTERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE

ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) <u>WAIVER OF VENUE</u>. THE BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) <u>SERVICE OF PROCESS</u>. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 10.02</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**10.15 Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16 No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Arranger, are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand, (B) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Loan Parties are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and the Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties or any of their Affiliates, or any other Person and (B) neither the Administrative Agent nor the Arranger has any obligation to any Loan Party or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor the Arranger has any obligation to disclose any of such interests to the Loan Parties or their respective

NY\1799724.24

Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.17   Electronic Execution of Assignments and Certain Other Documents**.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.18   USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 07-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" anti-money laundering rules and regulations, including the Act.

**10.19   Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.20   No Third-Party Beneficiary**.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**10.21   Acknowledgment**.  Each Lender acknowledges receipt and review of The Bank of New York Form of Acknowledgment regarding the Dallas Arena Project (as defined in the Stars Non-Relocation Agreement) substantially in the form attached hereto as Exhibit F or otherwise in form and substance reasonably acceptable to the Administrative Agent and each Lender consents to be bound by the terms thereof, including to be subject to the terms of the Stars Non-Relocation Agreement and to assume the obligations of the Stars under the Stars Non-Relocation Agreement and under the Arena Lease and Stars Non-Disturbance Agreement (as defined in the Stars Non-Relocation Agreement), if upon the exercise of their respective rights and remedies, the Lenders, or the Administrative Agent on behalf of the Lenders, become the owners of the franchise granted by the NHL to the Stars, whether in a foreclosure sale or by conveyance in lieu of foreclosure or otherwise. Each Lender further directs the Administrative Agent to execute and deliver on such Lender's behalf The Bank of New York Form of Acknowledgment, which execution and delivery shall be binding upon and enforceable against such Lender as if such execution and delivery had been made by such Lender directly.  To the extent necessary to comply with the terms of the Stars Non-Relocation Agreement, each Lender agrees to execute and deliver an original counterpart of The Bank of New York Form of Acknowledgment for the benefit of such Collateral Trustee (as defined in the Stars Non-Relocation Agreement) upon request.

**10.22   NHL Requirements**.  It is acknowledged, understood and agreed that, notwithstanding anything in this document or any other Operative Document to the contrary, (a) the exercise by any Lender of remedies under any Operative Document will be made in accordance with the

NY\1799724.24

terms and provisions of the NHL Consent Letter, the terms, conditions and provisions of which each of the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the event of any conflict or inconsistency between the terms of the NHL Consent Letter and the terms of any Operative Document (including without limitation this document/agreement), the terms of the NHL Consent Letter will control. All capitalized terms used in this Section and not defined in this Section are defined in that certain letter agreement, dated as of [_____], by and among the NHL, JPMorgan Chase Bank, N.A., as agent, on its own behalf and on behalf of each Lender (as defined therein), Dallas Sports & Entertainment, L.P., DSE Hockey Club, L.P., the other guarantors party thereto and the other parties thereto (as amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time, the "<u>NHL Consent Letter</u>").

Each Lender acknowledges that it has been provided with a copy of the NHL Consent Letter and agrees to be bound by each and every term and condition set forth in the NHL Consent Letter as fully as if it were a signatory thereto. Appendix A attached to the NHL Consent Letter will be a true and complete list of all of the Lenders as of the date of the NHL Consent Letter. Whether or not expressly stated in any provision of the NHL Consent Letter, each Lender shall be fully bound by each and every term and condition set forth in the NHL Consent Letter.

[Signature pages follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**DALLAS SPORTS & ENTERTAINMENT, L.P.**

By: _____
Name:
Title:

**DSE HOCKEY CLUB GP, INC.**

By: _____
Name:
Title:

**DSE HOCKEY CLUB, L.P.**

By: _____
Name:
Title:

**DSE PLANO GP, INC.**

By: _____
Name:
Title:

**DSE HOCKEY CENTERS GP, INC.**

By: _____
Name:
Title:

**DSE HOCKEY CENTERS, L.P.**

By: _____
     Name:
     Title:

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent


By: _____
    Name:
    Title:

**[  ],**
as a Lender

By: _____

Name:

Title:

<u>Exhibit K</u>

**Bill of Sale**

[Not Attached]

<u>Exhibit L</u>

**Assignment and Assumption Agreement**

[Not Attached]