**<u>Exhibit 1</u>**

**Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with an auction (the "Auction") for the sale (the "Sale") of certain assets and equity interests (the "Purchased Assets") of Dallas Stars, L.P., Dallas Arena LLC, StarCenters LLC and Dallas Stars U.S. Holdings Corp. (the "Debtors") and the rights necessary to operate the Dallas Stars National Hockey League hockey franchise (the "Team") as a National Hockey League ("NHL") franchise in the Team's current Home Territory, as defined in the NHL Constitution (as defined below). At a hearing following the Auction (the "Combined Hearing"), the Debtors will seek entry of an order (the "Confirmation Order") from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") authorizing and approving the Sale to the Qualified Bidder (as defined below) that the Debtors determine to have made the highest or otherwise best bid.

## I.   Assets to Be Sold

All of the Debtors' right, title and interest in, to the following assets:[1]

(a)    the Purchased Contracts;

(b)    all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Debtors, other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on Schedule 2.1(b) to the Stalking Horse Asset Purchase Agreement (as defined below);

(c)    all inventory and supplies of Debtors;

(d)    all rights of Debtors with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)    all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Debtors, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)    all rights of Debtors under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such term in the Stalking Horse Asset Purchase Agreement.

(g)     all rights and privileges held by Debtors associated with the NHL, including rights to membership and franchise of the Team in the NHL and all ownership interests of Debtors in any NHL Entity;

(h)     the Furniture and Equipment;

(i)     the Transferred Equity Interests (subject to the election of Sellers pursuant to Section 9.17 of the Stalking Horse Asset Purchase Agreement (as defined below) to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j)     the Sellers' Intellectual Property;

(k)     all Documents of Debtors used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Debtors (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Debtor shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Debtors, but only to the extent such Permits are assignable or otherwise transferable;

(m)     all rights of Debtors under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Debtor or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Debtors under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Debtor and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Debtors' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Debtors to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings,

team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, Reunion Arena or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Debtors associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

## II.     Application Submissions and Due Diligence

### A.     Submission of Background Information

Any person or entity that is interested in becoming a potential purchaser or holder of a direct or indirect interest in the Purchased Assets, including, without limitation, each direct or indirect equity holder of such prospective purchaser or holder and each trustee and beneficiary of any trust included therein (each a "Potential Bidder")[2] shall notify the Debtors and the NHL and shall submit the following information:

#### 1.     Submission of Background Information

A Potential Bidder who has not previously done so in connection with the Sale shall complete, execute and submit to the NHL no later than seven (7) days after entry of the Bidding Procedures and Confirmation Scheduling Order (as defined below) that portion of the Application to Acquire NHL Membership, or an Ownership Interest in an NHL Member Club (in the form annexed hereto as Exhibit A) (the "NHL Application") labeled "Background Information – Application for Membership – Individual" or "Background Information – Application for Membership – Corporate/Partnership/Trust", whichever is applicable (the "Background Portion") and shall notify the Debtors of such submission. The Background Portion, including the Representations and Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

---

[2] If two or more Potential Bidders are part of a single group, such group of Potential Bidders shall be referred to herein as a "Potential Bidders Group."

2. No Transaction or Operations Information

None of the information that would otherwise be required by the NHL Application with respect to the proposed transaction or the post-acquisition operations or management of the Team (the "Transaction Portion") shall be required as a condition for the NHL to begin its review of the Background Portion. Potential Bidders may, but are not required to, provide the Transaction Portion of the NHL Application to the NHL prior to the Bid Deadline (as defined below).

3. Confidentiality Agreement

In addition, if not previously executed and delivered in connection with the Sale, each Potential Bidder shall provide an executed confidentiality agreement substantially in the form annexed hereto as Exhibit B with such changes as are reasonably acceptable to the NHL and Debtors (the "Confidentiality Agreement").

In the event that any of the background information contained in any NHL Application or Background Portion with regard to a Potential Bidder differs from information previously provided to the NHL by such Potential Bidder, such changes shall be highlighted in the completed Background Portion.

The NHL shall treat the information in the NHL Application and Background Portion confidentially in accordance with the NHL's existing procedures. To the extent disclosure of any such information is required in connection with the chapter 11 cases, the NHL Application and Background Portion shall be deemed to have been filed under seal.

**B. Due Diligence**

The NHL shall review any submitted Background Portion in accordance with its normal procedures as promptly as practicable following receipt by the NHL and shall notify the Debtors that it has commenced such review. Promptly after the NHL determines that a Potential Bidder does not appear to be approved for purposes of conducting due diligence with respect to the Purchased Assets, the NHL shall so notify the Potential Bidder and, not acting in bad faith, seek to resolve any such impediment if the NHL determines in its sole discretion such action is possible.

A Potential Bidder or Potential Bidder Group, as the case may be, who is approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets shall be given access to a data room for such purpose; provided, that, prior to being allowed access to the data room, such Potential Bidder or Potential Bidder Group, as the case may be, shall have submitted to the Debtors the executed Confidentiality Agreement.

To the extent practicable, the Debtors shall provide each Potential Bidder or Potential Bidder Group, as the case may be, who has been approved for such purpose by the NHL with access to (i) the same confidential evaluation materials and information provided by

the Debtors to each other Potential Bidder and the Proposed Buyers (as defined below) and (ii) such other financial information and other data related to the Debtors as the Potential Bidder may reasonably request, which requests may include reasonable access to the Debtors' senior management and advisors and shall be deemed to include, in any event, the Debtors' good faith estimate of the potential cure costs and rejection damages associated with each material contract and lease subject to assumption in conjunction with the Sale.

## III. Submission of Bids

Each offer, solicitation or proposal (a "Bid") from a Potential Bidder or Potential Bidders Group, as the case may be, must be in writing and must be received by the Debtors, the NHL and the Notice Parties[3] on or before thirty (30) days after entry of the Bid Procedures Order, at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline"). As detailed in subparagraphs A through C below, a Potential Bidder or Potential Bidders Group, as the case may be, that submits a Bid on or before the Bid Deadline that includes: (i) to the NHL, a fully completed and executed NHL Application, (ii) to the Notice Parties, an executed mark-up of the Stalking Horse Asset Purchase Agreement (as defined below), and (iii) to the Debtors, the Good Faith Deposit (as defined below), shall be deemed an "Acceptable Potential Bidder."

A Potential Bidder or a Potential Bidders Group, as the case may be, that submits a Bid after the Bid Deadline shall not constitute an Acceptable Potential Bidder. Each Bid must be accompanied by:

### A. The Completed NHL Application

On or before the Bid Deadline, each Potential Bidder shall submit to the NHL a fully completed and executed NHL Application, including (to the extent not previously submitted) both the Background and Transaction Portions, and all required schedules, exhibits, financial information, tax returns, etc. A Potential Bidder shall also notify the Debtors of such submission. The NHL Application, including the Representations and

---

[3] The "Notice Parties" shall include: (a) the National Hockey League (1185 Avenue of the Americas, New York, New York 10036, attn: David Zimmerman); (b) counsel to the Debtors (Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, attn: Martin A. Sosland and Glenn D. West); (c) counsel to the NHL (Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, attn: Thomas W. Gowan and J. Gregory Milmoe); (d) counsel to JPMorgan, the agent under the First Lien Credit Agreement (Latham & Watkins, LLP, 885 Third Ave., New York, New York 10022, attn: David Teh); (e) counsel to Monarch Investment Group (Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006-5417, attn: Andrew M. LeBlanc); (f) the Collateral Trustee for the benefit and security of the holders from time to time of the notes associated with that certain Note Purchase Agreement, dated as of April 23, 1999 (the "Note Purchase Agreement") by and among Center Operating Company, L.P. and several institutional investors named therein (the "Collateral Trustee") (The Bank of New York Mellon, 10161 Centurion Parkway, Jacksonville, Florida 32256, attn: Geri Creswell); and (g) counsel to the noteholders of the Note Purchase Agreement (the "Noteholders") (Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, attn: Allen G. Kadish).

Covenants and the General Authorization set forth therein, shall be executed by each Potential Bidder, without modification.

## B.     Mark-Up of Stalking Horse Asset Purchase Agreement

To facilitate the Auction and to assist the Debtors and other interested parties in assessing the terms of each Bid, each Potential Bidder or Potential Bidders Group, as the case may be, must work from the Asset Purchase Agreement (the "Stalking Horse Asset Purchase Agreement") between the Debtors and Dallas Sports & Entertainment L.P., and certain of its affiliates (collectively, the "Proposed Buyers" or the "Stalking Horse") to prepare its bid and shall submit as part of its Bid, a fully executed asset purchase agreement, marked to show all proposed changes to such Stalking Horse Asset Purchase Agreement. Each Bid shall include a summary term sheet including a summary of the material terms proposed to be included in the Bid. The Stalking Horse Asset Purchase Agreement is attached to the Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement, (c) Approving Bid Protections, (d) Scheduling a Combined Hearing to Consider: (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing an Deadline to Object to the Disclosure Statement, Sale and the Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief (the "Bidding Procedures and Confirmation Scheduling Order")[4] as Exhibit B, and is also available on the main docket of these cases.

Each Bid must include as a condition of the Debtors' obligation to consummate the sale of the Purchased Assets, approval by the NHL under the Constitution of the NHL (the "NHL Constitution"), the By-Laws of the NHL (the "NHL By-Laws") and all other applicable requirements of the NHL.

To the extent practicable, the Debtors will make members of senior management and advisors available to discuss the terms of a Bid and seek to provide to each Acceptable Potential Bidder, who has been approved by the NHL for purposes of conducting due diligence with respect to the Purchased Assets, the disclosure schedules to the Acceptable Potential Bidder's Bid in connection with the preparation of such Bid.

## C.     Good Faith Deposit

Potential Bidders will be required to submit to the Debtors, in immediately available funds, letter of credit or other form of security reasonably acceptable to Debtors, a good faith deposit in an amount equal to US $15,000,000.00 (the "Good Faith Deposit") at the time the Potential Bidder submits a Bid. The Good Faith Deposit shall be returned to the respective Potential Bidder if such bidder is determined not to be a Qualified Bidder, or following the Auction if the Acceptable Potential Bidder is a Qualified Bidder but not the

---

[4] The Bidding Procedures and Confirmation Scheduling Order is defined as the Bidding Procedures Order in the Stalking Horse Asset Purchase Agreement.

Backup Bidder (as defined below) or the Successful Bidder (as defined below), except that the return of the Good Faith Deposit of the Proposed Buyers shall be governed by the terms of the Stalking Horse Asset Purchase Agreement. The Good Faith Deposit shall be returned to the Backup Bidder on the earlier of: (i) the closing of the Sale to the Successful Bidder (as defined below) and (ii) 45 days after the close of the Auction.

## IV. Determining Qualified Bids and Qualified Bidders

### A. Terms and Conditions of a Qualified Bid

In addition to the requirements for an Acceptable Potential Bidder, in order for a Bid from an Acceptable Potential Bidder to be deemed a "Qualified Bid" and for the Acceptable Potential Bidder to be deemed a "Qualified Bidder", the Bid must: (i) satisfy each of the conditions listed below in paragraphs 1 through 8 and (ii) be submitted on or before the Bid Deadline. A Bid submitted after the Bid Deadline shall not constitute a Qualified Bid. The Stalking Horse Bid (as defined below) satisfies each of the conditions of a Qualified Bid listed below other than the condition set forth in paragraph 8 below.

The Debtors may determine in their reasonable discretion, after consultation with JPMorgan Chase Bank, N.A. and Monarch Alternative Capital LLC (the "Senior Lenders") and the NHL, whether an Acceptable Potential Bidder's Bid is a Qualified Bid, except that the Senior Lenders and the Debtors shall have no right to be consulted with regard to Sections IV.A.4 and IV.A.8 of these Bidding Procedures.

Promptly after determining that any Acceptable Potential Bidder does not appear to be a Qualified Bidder, the Debtors and the NHL shall notify each other and such Bidder of this determination and, not acting in bad faith, shall seek to resolve any impediment to the Acceptable Potential Bidder's becoming a Qualified Bidder if possible.

#### 1. Financial Capability

To the extent not previously provided, a Bid shall contain evidence (in the form of binding commitment letters, guarantees or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions including, but not limited to, paying liquidated damages, if any.

#### 2. Corporate Authority

A Bid shall contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies) approval of the contemplated transaction.

3. Nature of Bids for Purchased Assets and Minimum Overbid

The Bid must be for all of the Purchased Assets, including substantially all of the assets of the Debtors necessary to conduct the Purchased Assets as an NHL team in the Team's current Home Territory (as defined in the NHL Constitution).

The Bid must also be at least US $10,000,000 greater than the total value of the Bid as evidenced by the Stalking Horse Asset Purchase Agreement (the "Stalking Horse Bid") (inclusive of any amounts to be paid by such bidder for the Break-Up Fee (as defined in the Bidding Procedures and Confirmation Scheduling Order) and the Expense Reimbursement (as defined in the Bidding Procedures and Confirmation Scheduling Order)). For purposes of calculating the value of the Stalking Horse Bid, the debt component of the Stalking Horse Bid shall be 100% of the face amount of the notes provided for in the Stalking Horse Bid, taking into account the anticipated net effect of the working capital adjustment.

4. NHL Consent

The Bid must provide that (i) the Acceptable Potential Bidder will be, and the transactions contemplated therein will comply with and be, subject to NHL approval, pursuant to all of the NHL's applicable ownership transfer requirements, including, without limitation, as set forth in Articles 3.5 and 3.6 of the NHL Constitution, By-Law 35 of the NHL By-Laws, and the applicable procedural guidelines (collectively, the "NHL Rules"); (ii) the Acceptable Potential Bidder will cooperate with the review process of the NHL, including, providing promptly information requested by the NHL and meeting with the NHL Executive Committee and NHL officials in connection with such review, (iii) if successful, the Acceptable Potential Bidder will execute a standard form of Consent Agreement, a standard form of NHL Guaranty and a standard form of NHL Proxy with the NHL (in substantially the forms annexed hereto as Exhibits C, D, and E) with such changes as are reasonably acceptable to the NHL; and (iv) the Acceptable Potential Bidder will deliver or cause to be delivered, as a condition to closing, any agreements or other documents that the NHL requires with respect to the financing of the acquisition, including, if applicable, from lenders or other financing sources.

5. No Break-Up Fee, Etc. for Qualified Bidders

A Bid, other than a Qualified Bid submitted by the Proposed Buyers, may not request any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, neither the tendering of a Bid nor the determination that a Bid is a Qualified Bid shall entitle the Acceptable Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

6. Other Bid Requirements

A Bid must: (i) not be conditioned on the outcome of unperformed due diligence, board approval or a financing contingency; (ii) provide that the bidder's offer is irrevocable until the earlier of (x) consummation of the Sale of the Purchased Assets, (y) the close of the Auction unless the Potential Bidder is selected as the Successful Bidder or the Backup Bidder and (z) 45 days after the close of the Auction if the Potential Bidder is selected as the Backup Bidder; (iii) contain the form of Confirmation Order the bidder would request the Debtors to seek court approval of at the Combined Hearing; (iv) include evidence of the bidder's ability to provide adequate assurance of future performance of such contracts, permits and licenses it would require the Debtors to assume and assign; (v) assume that certain Stars Team Agreement, dated as of April 23, 1999 (as amended and otherwise modified from time to time) under the Prepackaged Plan; and (vi) provide that the Potential Bidder will enter into an Assumption Agreement (as defined in that certain consent agreement dated September 14, 2011 by and among the Collateral Trustee, the Noteholders, and certain of the Debtors (the "COC Consent Agreement")), substantially in the form attached to the COC Consent Agreement as Exhibit F (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), and a Pledge and Assumption Agreement (as defined in the COC Consent Agreement), substantially in the form attached to the COC Consent Agreement as Exhibit G (with such modifications mutually agreed to by the Potential Bidder and the Collateral Trustee), with the Collateral Trustee.[5]

7. Asset Purchase Agreement and Ancillary Agreements

As stated above in Section III.B, a Bid must include a fully executed form of asset purchase agreement and must also include any agreements ancillary to the Sale, each executed by an Acceptable Potential Bidder.

8. Approval of the NHL

Each Acceptable Potential Bidder, the Bid, and the transactions contemplated thereby must be approved for ownership transfer by the NHL under the NHL Rules. Two (2) days before the commencement of the Auction (the "NHL Determination Date"), each Acceptable Potential Bidder, the Debtors and the Notice Parties shall have been notified by the NHL whether the Acceptable Potential Bidder or the Acceptable Potential Bidder Group, the Bid and the transactions contemplated thereby have been approved for ownership transfer by the NHL under the NHL Rules.

**B. Qualified Bidders**

Only the Acceptable Potential Bidders who have satisfied the foregoing requirements, and whose applications for the transfer of ownership have been approved by the NHL, shall be Qualified Bidders. If one or no Qualified Bid is timely received, the Debtors will

---

[5] The Debtors will include this requirement if COC and the Debtors have entered into the COC Consent Agreement at the time of the Bidding Procedures and Scheduling Hearing.

not conduct an Auction. If only one Qualified Bid from a Qualified Bidder is timely received, the Debtors will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Combined Hearing.

### C. Notification by the Debtors of the Best Qualified Bid

On or prior to 5:00 p.m. (prevailing Eastern time) on the NHL Determination Date, the Debtors shall provide each Qualified Bidder that has submitted a Qualified Bid: (i) written notice of the Auction and (ii) notice of the Qualified Bid with which the Debtors intend to commence the Auction (the "Best Qualified Bid") and (iii) copies of all Qualified Bids.

## V. The Auction

If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201 commencing sixty (60) days following the entry of the Bidding Procedures and Confirmation Scheduling Order at 10:00 a.m. (CT) to determine the highest or otherwise best bid with respect to the Purchased Assets.

### A. Participation in the Auction

Only Qualified Bidders who have submitted a Qualified Bid shall be eligible to participate in the Auction.

### B. The Auction Process

All Bids made at the Auction after the commencement thereof (each, an "Overbid") shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Overbids made and announced at the Auction, including the Successful Bid (as defined below). The Debtors, in their reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale of the Purchased Assets for any reason, including to seek further clarification from the Bankruptcy Court regarding any issues, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

The Debtors shall announce at the Auction the material terms of each Overbid, and in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, the total consideration offered in each such Overbid to provide a floor for further bidding. The current highest or best offer for the Purchased Assets, as determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, shall represent the new Best Qualified Bid. A Qualified Bidder

need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

Any Overbid shall be made in overbid increments of at least US $5,000,000 greater than the Best Qualified Bid. For the avoidance of doubt, US $4,500,000 (the Break-Up Fee and Expense Reimbursement) shall be deducted from each Qualified Bid and Overbid submitted by a Qualified Bidder (including the initial Qualified Bid) other than the Proposed Buyers in determining the value of each such Qualified Bid or Overbid.

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid as set forth above.

To the extent not previously provided (which shall be determined by the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors in consultation with the NHL, the Senior Lenders and representatives of any statutory committee) demonstrating such Qualified Bidder's ability to close the proposed transaction.

Except as expressly provided herein, the procedures set forth herein cannot be amended or modified without the approval of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to construe these Bidding Procedures and determine any disputes arising under them.

## VI.     Identification of the Successful Bidder and Acceptance of Successful Bid

### A.     Identification of the Successful Bidder

At the close of the Auction, the Debtors, in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). The Debtors reserve the right to determine, in their reasonable business judgment and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia* the Break-Up Fee and the Expense Reimbursement, if any).

After the Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, so determine the Successful Bid, the Auction will be closed. The Debtors, in consultation with the NHL, the Senior Lenders and representatives of any statutory committee, will then determine and announce which bid has been determined to be the second highest or otherwise best bid (the "Backup Bid" and such bidder being the "Backup Bidder"). In determining which bid is the Backup Bid, the Debtors, in

consultation with the NHL, the Senior Lenders, and representatives of any statutory committee will use their reasonable business judgment.

Notwithstanding anything herein to the contrary, the Debtors, in their reasonable discretion and in consultation with the NHL, the Senior Lenders, and representatives of any statutory committee, reserve the right to reject at any time prior to entry of a court order approving an offer, without liability, any offer (other than the offer submitted by the Proposed Buyers) that the Debtors deem to be: (x) inadequate or insufficient, (y) contrary to the best interests of the Debtors and their estates, or (z) with the advice of counsel, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein.

The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted the Bid only when the Bid has been approved by the Bankruptcy Court at the Combined Hearing.

### B.    Acceptance of Bid From Successful Bidder

The Debtors presently intend to sell the Purchased Assets to the Successful Bidder, pursuant to the terms of the Successful Bid. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Combined Hearing.

Except as otherwise provided in the Successful Bid agreed to by the Debtors, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, encumbrances, and interests thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens attaching to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

## VII.    The Combined Hearing

The Combined Hearing shall be held in the Bankruptcy Court two (2) days following the completion of the Auction, and may be adjourned from time to time without further notice to creditors or parties in interest other than an announcement in open court at the Combined Hearing.  Any objections to the approval of the sale of the Purchased Assets shall be argued at the Combined Hearing.

## VIII.    Closing with the Backup Bidder(s)

Without any further order of the Bankruptcy Court after Confirmation, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Backup Bidder will be deemed to have submitted the highest or best

bid and the Debtors and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtors, in their sole discretion after consultation with the NHL and Senior Lenders, the Debtors and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

Following the Combined Hearing, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder, the Debtors reserve the right to seek all available damages from the defaulting Successful Bidder as modified by the applicable purchase agreement, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtors, the Successful Bidder shall have no recourse against the Debtors other than for recovery of its deposit or against the NHL, provided that if the Successful Bidder is the Proposed Buyers, the Proposed Buyers shall have such rights as are provided for in the Stalking Horse Asset Purchase Agreement.


Dated: _____

**EXHIBIT A**

NATIONAL HOCKEY LEAGUE

Application to Acquire NHL Membership,
or an Ownership Interest in an NHL Member Club

Article 3.5 of the NHL Constitution provides in part that "[n]o membership[1] or ownership interest in a Member Club may be sold, assigned or otherwise transferred except (a) with the consent of three-fourths of the members of the League, and (b) upon the condition that the transferee will at all times be bound by and comply with the terms, provisions and conditions of this Constitution, and (c) upon the further condition that the transferee shall assume or guarantee all debts, liabilities and obligations of the transferor member existing at the date of transfer. Application for the sale, transfer or assignment of a membership or ownership interest must be made in writing to the Commissioner. Upon receipt of such application, the Commissioner shall conduct such investigation as he deems appropriate. Upon completion of the investigation, the Commissioner shall submit the application to the members for approval, together with his recommendations thereon and all such information that the Commissioner deems pertinent."

This application sets forth the initial information requirements that the Commissioner has established in connection with a proposed transfer of an ownership interest in a membership or Member Club. If a proposed transfer involves an ownership interest in a Member Club of less than 10% and will not affect control, the parties may seek the approval of the Commissioner to make more limited financial disclosure with respect to individual owners than is required by part IV.

Following the Commissioner's review of this initial application, the Commissioner may request additional information about the proposed transfer, the proposed transferee, each prospective owner of a direct or indirect interest in the proposed transferee, any persons or entities with which the proposed transferee or each of its prospective owners is associated or affiliated, and such other matters, whether or not confidential, as the Commissioner shall deem relevant in his sole discretion. All responses to these additional information requests will be considered part of the application. In addition, personal interviews of, and detailed background checks with respect to, the prospective transferee(s) and their direct and indirect owners will be conducted.

When the Commissioner determines that an application and appropriate background checks have been completed, the Commissioner will forward the application to the League's Executive Committee for its consideration. Prospective transferees of significant ownership interests will be interviewed by the Executive Committee. If approved by the

---

[1]     "Membership" means the rights, privileges, and benefits granted to a Member Club by the League, including, without limitation, the right to organize and operate a professional hockey team to play in the National Hockey League.

Executive Committee, the application will be forwarded to the full membership for its consideration.[2]

Approval of any proposed transfer will be conditioned upon the execution, delivery and performance by the transferring owner, the proposed transferee and each prospective owner of any interest in the proposed transferee, and their respective controlled subsidiaries and affiliates, of certain documents that the Commissioner shall prescribe from time to time. Drafts of these documents will be provided following the filing of the initial application with the League, provided that the Commissioner determines that he has received sufficient information.

This application uses several capitalized terms that have been assigned particular meanings. "Proposed Transactions" means all transactions of every kind and description between the prospective transferor(s) and their direct and indirect owners, on the one hand, and the prospective transferee(s) and their direct and indirect owners, on the other hand. "New Owner Transactions" means all transactions of every kind and description that have occurred (or will occur) among the prospective acquirers of a direct or indirect ownership interest in an NHL membership or Member Club and which could affect the ownership, operation or control of the Member Club, or the ownership, transferability or voting rights of their respective ownership interests in the Member Club, after the closing. All other capitalized terms are defined elsewhere in this application.

Applicants may submit their applications in stages but generally should seek to deliver a complete part of the application with each submission. The information required by the application may, however, be submitted separately by the prospective direct and indirect transferors and transferees, particularly if they wish to keep certain information provided to the League confidential from one another. **Under NHL rules, it is the obligation of the transferring owner to ensure that the Commissioner timely receives all information and documents that the Commissioner or the League may request in connection with any proposed transfer and that the information submitted remains true and correct through the closing of the transaction.**

The application must include the following information and should be organized in accordance with the numbering of this document:

---

[2]     Under the NHL Constitution, the Commissioner has the right to approve certain transfers involving an ownership interest of less than 5% and the Executive Committee has the right to approve certain transactions involving an ownership interest of less than 10%.

I.    Narrative Description of Transaction

Part I of the application must set forth a narrative description of the material terms of the Proposed Transactions. The narrative should include, but not be limited to, a description of the following:

(a)    the name and principal business address of each of the prospective transferors and transferees

(b)    the assets of and/or direct or indirect interests in, the Member Club that are the subject of the Proposed Transactions

(c)    the aggregate consideration being exchanged, including all contingent, conditional and deferred consideration (which should be identified as such)

(d)    the interest, if any, being retained in the Member Club by any of the prospective transferors

(e)    the principal conditions to closing and the status of all material governmental and third-party consents or filings necessary for consummation of the Proposed Transactions

(f)    the expected closing date and any outside closing date (i.e., the date by which either party may terminate the Proposed Transactions)

II.   Narrative Description of Current and Post-Closing Ownership

Part II of the application should provide the following information with respect to ownership:

A.    Current Ownership. The name and principal business address of the entity that currently owns the Member Club and each person or entity that, directly or indirectly, legally and/or beneficially owns or controls a direct or indirect ownership interest in the Member Club (each such person or entity being a "Current Owner"). The application should describe the type and quantity of the Current Owner's ownership interest in the Member Club (e.g., number of shares of common stock, limited or general partner interest, limited liability company interest) and the percentage of all interests in the Member Club (on both a currently outstanding and fully-diluted basis) held by each Current Owner. This information should also be reflected in a schematic diagram showing the complete direct and indirect ownership of the Member Club at the current time.

B.    Post-Closing Ownership. The name and principal business address of the entity that will own the Member Club, and of each person or entity that, directly or indirectly, will legally and/or beneficially own or control a direct or indirect ownership interest in the Member Club (each such person or entity, including the entity that will own the Member Club,

being a "Prospective Owner"), if the Proposed Transactions and New Owner Transactions are approved by the NHL and consummated in accordance with their terms. The application should describe the type and quantity of each Prospective Owner's expected ownership interest in the Member Club and the percentage of all ownership interests in the Member Club (on both a currently outstanding and fully-diluted basis) that each Prospective Owner is expected to hold immediately after the closing. This information should also be reflected in a schematic diagram showing the complete direct and indirect ownership of the Member Club that is expected to exist after the closing.

C.  <u>General Principles; Public Company Exception to II.A and B</u>.  In responding to Parts II.A and B, the application should identify (i) the direct and indirect ownership interest in the Member Club held (or to be held) by each Current Owner and Prospective Owner, no matter how small the amount of the interest, (ii) any security or right held by any person or entity that is convertible, exchangeable or exercisable into or for an ownership interest in the Member Club, (iii) all trustees and beneficiaries of any Current Owner or Prospective Owner that is a trust, and (iv) the securities that were considered (or excluded) in any calculation of the fully-diluted ownership interest of a Current Owner or Prospective Owner. If, however, the Member Club or any Current Owner or Prospective Owner is an entity with a class of securities registered under section 12 of the Securities Exchange Act of 1934, as amended, or any analogous provision of any foreign securities law, or otherwise would commonly be viewed as a "public" company, the application must only identify each Current Owner or Prospective Owner that has a 5% or greater ownership interest in such public company. By way of example, if the Member Club will be held by a private entity but a public company will have an ownership interest in that private entity, the application should identify the public company, the amount of the proposed ownership interest in the Member Club (even if less than 5%), and each person or entity having a 5% ownership interest in such public company.

III.  <u>Narrative Description of Post-Closing Ownership and Management Arrangements</u>

Part III of the application should do the following:

A.  Identify each individual who will have the ability to bind the Member Club on all NHL matters following the closing. If there is more than one such individual, the application should identify the individual who will serve as the Member Club's governor and the individual(s) who will serve as its alternate governors.

B.    Provide a narrative description of all New Owner Transactions, including, among other things, a description of all governing instruments of the Prospective Owners (such as shareholder, partnership, trust and limited liability company agreements) and all puts, calls, rights of first refusal or negotiation, options, voting trusts, or other voting arrangements (including any special voting provisions set forth in any agreement or governing document), and management agreements, and all arrangements relating to the possible removal or replacement of the persons who will have the ability to bind the Member Club on all NHL matters.

C.    Provide the names, addresses, titles and general responsibilities of all officers and directors of the entity that will own the Member Club (or its general partner or manager, as the case may be) and all other persons who will play a significant role in the management of the Member Club.

IV.    <u>Financial Information Relating to Prospective Owners</u>

A.    With respect to each Prospective Owner that is an entity (other than any newly formed entities for which such information is unavailable), the application should include the materials listed below:

i)    An audited balance sheet, statement of operations, statement of cash flows and any related statements and schedules, together with an auditors' opinion from a nationally recognized independent accounting firm acceptable to the Commissioner, for each of the three most recent fiscal years;

ii)    For each of the three most recent fiscal years, letters from counsel to the entity to its auditors regarding pending or threatened litigation involving or affecting the entity;

iii)    A brief description of all material pending or threatened litigation not identified under clause (ii) and all litigation alleging discrimination or harassment on any basis (including, but not limited to, race, religion, gender, sexual orientation or age).  If such disclosure regarding discrimination and harassment cases would be burdensome because of the number of such cases, the Prospective Owner should represent and warrant that fact in its application and then identify and briefly describe any such litigation that the entity regards as material; and

iv)    If the entity is a publicly traded entity, copies of any filings with the U.S. Securities and Exchange Commission on Form 10-K (or, if applicable, 20-F) with respect to the three most recent fiscal years, together with any filings on Form 10-Q or Form 8-K (or 6-K) since the date of the last filing on Form 10-K (or 20-F),

and/or any similar filings with any applicable foreign regulatory agency. Also include any proxy statements filed with the SEC during the periods covered by the filings on Forms 10-K and 10-Q, and any Schedule 13D or Schedule 13G filing (or analogous foreign filings) received by the entity since its last proxy filing, and any exhibit documents incorporated by reference in any of those filings or proxy statements.

B.  Each Prospective Owner that is an individual and who will have a 5% or greater ownership interest in the Member Club or control over the Member Club shall provide (i) an audited personal balance sheet and income statement, and appropriate footnote disclosures, as of a recent date, together with an opinion from a nationally-recognized independent accounting firm acceptable to the Commissioner, (ii) a statement of the methods and procedures used to determine the estimated current amount of assets and the estimated current amounts of liabilities, (iii) copies of his or her personal federal tax returns for each of the past three years, together with a certificate from the individual Prospective Owner that all such returns have been filed and all taxes shown as due thereon have been paid, and (iv) a statement describing the status of any material pending tax examinations. (For this purpose a potential assessment of greater than 2% of the applicable tax year's gross revenues shall be material.)

C.  Each Prospective Owner that is a trust shall provide (i) an audited balance sheet, income or distribution statement and trustee statement, with appropriate footnote disclosures, as of a recent date for the trust, together with an opinion from a nationally-recognized independent accounting firm acceptable to the Commissioner, (ii) a statement of the methods and procedures used to determine the estimated current amount of assets and the estimated current amounts of liabilities, (iii) copies of the trust's federal tax returns for the past three years, together with a certificate from an authorized person that all such returns have been filed and all taxes shown as due thereon have been paid, and (iv) a statement describing the status of any material pending tax examination. (For this purpose a potential assessment of greater than 2% of the applicable tax year's gross revenues shall be material.)

D.  For each of B. and C. above, disclose any other relevant contingencies and commitments, including, without limitation, the following:

i)  Contingent liabilities, including litigation and administrative actions by government agencies.

ii)  Restrictions on the use or transfer of assets.

V.   General Information and Authorization to Investigate

Each Prospective Owner shall provide the following:

A.   A completed NHL Background Information -- New Membership Application, either in the form of Exhibit V.A.1 (if an individual) or V.A.2 (if an entity or trust).

B.   A completed NHL General Authorization Form, either in the form attached to Exhibit V.A.1 or V.A.2.

C.   A complete list of the name, jurisdiction of formation, and principal place of business of each entity in which it has a 5% or greater interest, together with a statement of its total interest in such entity.

D.   A statement that such Prospective Owner will not hold its interest in the Member Club for the benefit of any undisclosed person or organization.

E.   A list of any interest, regardless of the size of the interest, in a professional sports team that is (or has been) held, or that was applied for, directly or indirectly, by such Prospective Owner (or any of its controlled subsidiaries or affiliates) or which such Prospective Owner (or any of its controlled subsidiaries or affiliates) has the right (or reasonably expects to have the right) to acquire.

F.   A list of any pending litigation (regardless of materiality) between any Prospective Owner (or any of its controlled subsidiaries and affiliates) and any other Member Club or the operator of any arena in which any Member Club plays.

G.   A list of any material business relationships between any Prospective Owner (or any of its controlled subsidiaries and affiliates) and any other Member Club.

VI.   Sources of Funds

Part VI of the application should provide the following information regarding the direct and indirect sources of funding for (i) the consideration being exchanged by the parties to the Proposed Transactions, (ii) any consideration being exchanged by the parties to the New Owner Transactions, (iii) the post-closing working capital needs of the Member Club, and (iv) all transaction expenses (together, the "Required Funding"):

A.     A narrative description of

      i)     The respective total amounts of equity and debt financing and the material terms of such equity and debt financing;

      ii)     The identity of the sources for such financing, including the amount and sources of the equity to be provided by each Prospective Owner; and

      iii)     The expected uses of such funds at or after the closing.

B.     All documentation relating to such Required Funding, including copies of any loan commitment letters or definitive loan and security agreements relating to any debt to be incurred by the Member Club at or after the closing, or any borrowings or other debt being incurred by any Prospective Owner relating to its equity contribution if such debt will be secured by its direct or indirect interest in the Member Club. If any Prospective Owner is obtaining its equity contribution through the issuance of equity securities, or is providing its equity contribution in kind, the sources, terms and documentation relating to that equity issuance or contribution in kind must be disclosed.

VII.     <u>Transaction Documents</u>

A.     The application should include copies of all documents (including all schedules and exhibits) relating to:

      i)     the Proposed Transactions
      ii)     the New Owner Transactions

B.     The documents required under paragraph VII.A(i) generally include, without limitation, the Purchase and Sale Agreement, all documents entered into in connection with that agreement and all amendments to or replacements of the governing documents of the Member Club.

C.     The documents required under paragraph VII.A(ii) generally include, without limitation, the following:

      i)     if the relevant entity is a corporation, its certificate or articles of incorporation, its by-laws and all shareholders agreements
      ii)     if the relevant entity is a partnership, its agreement of general or limited partnership and, if applicable, its certificate of formation
      iii)     if the relevant entity is a limited liability company, its limited liability company or operating agreement and certificate of formation

iv)    if the relevant entity is a trust, the trust agreement (if an inter vivos trust) or the applicable will (if a testamentary trust), and evidence of the authority of all trustees

v)    if applicable, all subscription, voting and management agreements and all agreements relating to the ownership, transferability and voting rights of ownership interests in the Member Club

## VIII.   Other Information

Part VIII of the application is purely voluntary. In this section, the parties may provide to the Commissioner any other information they believe to be relevant to the application.

\*      \*      \*

Before submitting any part of the application, the transferring owner should contact the General Counsel of the League to ensure that the transferring owner has the most current form of the application and to obtain instructions with respect to the number of copies of the application to be sent to the League and its outside counsel.

EXHIBIT V.A. 1

## BACKGROUND INFORMATION – APPLICATION FOR MEMBERSHIP

## INDIVIDUAL

### 1.    Personal Information

Name _____     SS# _____

Date of birth _____     Place of birth _____

Citizenship _____

Drivers License Number _____

State of issuance _____     Expiration date _____

Father's full name _____     His place of birth _____

Mother's full
maiden name _____     Her place of birth _____

Marital status _____

If applicable, spouse's full name _____

County and state where married _____

If applicable, prior spouse(s) full name(s), time period of marriage, county and state where married (attach as **Schedule A**)

Children's names and ages (attach as **Schedule B**)

Residential addresses during previous 10 years, including current residence, form of occupancy (own, rent) and all applicable dates (attach as **Schedule C**)

### 2.    Professional Information

Names, addresses and descriptions of principal businesses or employers during prior 10 years, including time periods and titles (attach as **Schedule D**).

Have you ever done business of any kind, or been associated in any kind of business, with any person who, or firm or corporation which, presently owns or previously owned 10% or more of any member of the National Hockey League?  Yes _____   No _____
If yes, attach **Schedule E** setting forth:

A)    Business name and address
B)    Description of business and names of corporate officers
C)    Date when business or association began and, if not still continuing, date ended
D)    Nature of business or association

Have you ever been, or applied to be, an investor, partner, owner, general manager, officer or the like, in any professional sports enterprise? Yes _____ No _____
If yes, attach **Schedule F** setting forth:

A)    Name and description of enterprise
B)    Description of your participation
C)    Names of principal persons associated with you in the enterprise
D)    Date when engagement began and, if not still continuing, date ended

Business-related real estate owned or under long-term lease (greater than 5 years from inception)

| Address | Description | Own/Lease |
|---------|-------------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## 3.   Military Service

Branch of Service _____        Dates of Service _____

Service # _____        Rank/Rate_____

Date of Discharge _____        Type of Discharge _____

## 4.   Litigation History

Have you ever been a party to any litigation, including litigation alleging harassment or discrimination?          Yes _____        No _____
If yes, attach **Schedule G** setting forth:

A)     If you were the plaintiff or defendant
B)     Description of the case/matter/proceeding
C)     Names of other parties
D)     Location and name of court
E)     Date and disposition

Have you ever been a party to any proceeding by a private, governmental or quasi-governmental association or agency?      Yes _____      No _____
If yes, attach **Schedule H** setting forth:

A)     If you were the plaintiff or defendant/claimant or respondent
B)     Description of the case/matter/proceeding
C)     Names of other parties
D)     Location and name of agency/association
E)     Date and disposition

Have you ever been arrested?      Yes _____      No _____
If yes, attach **Schedule I** setting forth:

A)     Description of charge
B)     Location and name of court
C)     Date and disposition


**5.**     **Education**

Name of High School _____

Address _____

Dates attended _____ Graduation date _____

Type of Degree/Diploma _____


Name of College _____

Address _____

Dates attended _____ Graduation date _____

Type of Degree/Diploma _____

Name of Graduate, Post Graduate, etc. School _____

Address _____

Dates attended _____     Graduation date _____

Type of Degree/Diploma _____

## 6.     **Affiliations**

Association Memberships (attach as **Schedule J**, if necessary)

Name & Address                                                    Date joined

_____          _____

_____          _____

_____          _____

_____          _____

Type of Licenses and/or Certifications Held (attach as **Schedule J-1**, if necessary)

_____

_____

Has any license or professional certification ever been revoked, suspended, challenged, etc.?      Yes _____    .    No _____
If yes, attach **Schedule K** setting forth:

A)     Type of License and/or Certification
B)     Issuing Agency, date of issue and date of revocation, suspension, challenge, etc.
C)     Reason for revocation, suspension, challenge, etc.
D)     Disposition

## 7.     **References**

Personal Bank Account(s) References, including names of officials handling accounts, addresses, account numbers and contact telephone numbers (attach as **Schedule L**)

BACKGRND

Personal Brokerage Account(s) References, including names of officials handling accounts, addresses, account numbers and contact telephone numbers (attach as **Schedule L-1**)

Business References, including names, businesses and contact numbers (attach as **Schedule M**)

Personal References, including names, businesses and contact numbers (attach as **Schedule M-1**)

## 8. **Notices**

All communications regarding this application and requests for further information should be addressed to:

_____

_____

_____

_____

## 9. **Representations and Covenants**

The applicant makes the following representations and covenants:

A.    The applicant is duly authorized to submit this application and the person(s) whose signature(s) appears below is (are) authorized to sign and submit this application.

B.    The applicant acknowledges that regardless of whether it has seen any financial projections prepared by the League or any NHL Member Club (except the Club), in submitting this application, it has not relied upon such projections, or upon any other oral or written representations.  The League and its Member Clubs (except the Club) expressly disclaim any and all liability for representations and warranties, expressed or implied, and statements contained in, and for omissions from, any written material furnished or information orally transmitted to the applicant (including, but not limited to, any opinions, information or advice which may be provided to the applicant by any officer, director, shareholder, employee, agent, representative or consultant of the League or its Member Clubs (except the Club)).  The applicant acknowledges that it alone is responsible for any due diligence, including due diligence as to expected financial results, and that it will make no claim against the NHL or any Member Club

(except the Club) based on any projections, or other oral or written representations it has seen.

C.     The applicant understands that the League may request additional information and agrees to supply all such further information as may be requested by the League concerning any aspect of this application.

D.     The applicant acknowledges its obligation promptly to amend the application based on any material changes in the facts.

E.     The applicant acknowledges and agrees that the League shall have the right in its sole and absolute discretion to evaluate any application and to reject any or all applications without assigning any reasons therefore.  The applicant further agrees that the League shall have the right, in its sole discretion, without giving reasons therefore, at any time and in any respect, to terminate discussions with any or all prospective applicants.  The applicant hereby authorizes the NHL or its designees to conduct such financial and other investigation deemed appropriate by the League.  The applicant, and all persons or entities holding an interest in the applicant, fully and unconditionally releases the NHL, its Member Clubs, and their affiliates and each of their respective owners, directors, officers, shareholders, partners, and employees from any liability or claim, whether at law or equity, and whether arising under the laws of Canada, the United States, or any other jurisdiction or any political subdivision thereof relating to or arising out of the submission of this application, or the League's decision to approve or not to approve the applicant's requested transfer of ownership.

I, the undersigned, certify that the information provided above has been carefully read and is true and correct.  I further certify that the information contained herein does not contain any untrue statement of a material fact or omit to state any fact necessary in order to make the statements contained herein not misleading.

_____        _____
Date                             Name

## NATIONAL HOCKEY LEAGUE
## GENERAL AUTHORIZATION

I authorize the National Hockey League and its designees and representatives to request and receive any information concerning me from any persons, companies, corporations, partnerships, associations, credit bureaus, law enforcement agencies and licensing agencies.

I also authorize any of the aforementioned parties to furnish the National Hockey League, its designees and representatives with information and credit reports concerning me as requested by the National Hockey League. I further release all such parties and the National Hockey League, its designees and representatives from any and all liability and responsibility arising out of the release of any such information or credit reports.

_____

Name (Print)

_____

Signature

_____

Date

EXHIBIT V.A. 2

## BACKGROUND INFORMATION – APPLICATION FOR MEMBERSHIP

## CORPORATE/PARTNERSHIP/TRUST

### 1. General Information

Formal Name
Of Applicant _____     Identification Number _____

Type of Entity _____     State of Organization _____

Names of all affiliates of Applicant (entities in which Applicant has a 10% interest or greater, whether direct or indirect) (attach as **Schedule A**)

Locations where Applicant and affiliates are registered to do business (attach as **Schedule B**)

Addresses and/or business-related real estate of Applicant and affiliates during previous 10 years, including headquarter offices, form of occupancy (own, rent) and all applicable dates (attach as **Schedule C**)

Names of all persons holding ownership interests of 5% or greater, whether direct or indirect, in Applicant or any affiliate (attach as **Schedule D**)

Names of all officers or trustees of Applicant and affiliates (attach as **Schedule E**)

If Applicant is a trust, names of all beneficiaries and a narrative description of beneficiaries' rights (attach as **Schedule F**)

### 2. Related Businesses Information

Names, addresses and descriptions of principal businesses and principal businesses of all affiliates (if not disclosed in Schedule A) during prior 10 years, including time periods (attach as **Schedule G**)

Has Applicant, any affiliate or any of their respective owners or officers ever done business of any kind, or been associated in any kind of business, with any person who, or firm or corporation which, presently owns or previously owned 10% or more of any member of the National Hockey League?  Yes _____   No _____
If yes, attach **Schedule H** setting forth:

A)  Business name and address
B)  Description of business and names of corporate officers
C)  Date when business or association began and, if not still continuing, date ended
D)  Nature of business or association

Has Applicant, any affiliate or any of their respective owners or officers ever been, or applied to be, an investor, partner, owner, general manager, officer or the like, in any professional sports enterprise?  Yes _____ No _____

If yes, attach **Schedule I** setting forth:

A)   Name and description of enterprise
B)   Description of participation
C)   Names of principal persons associated in the enterprise
D)   Date when engagement began and, if not still continuing, date ended


3.   **Litigation History**

Has Applicant, any affiliate, or any of their respective owners or officers ever been a party to any litigation, including litigation alleging harassment or discrimination?

Yes _____ No _____

If yes, attach **Schedule J** setting forth:

A)   The plaintiff or defendant
B)   Description of the case/matter/proceeding
C)   Names of other parties
D)   Location and name of court
E)   Date and disposition

Has Applicant, any affiliate, or any of their respective owners or officers ever been a party to any proceeding by a private, governmental or quasi-governmental association or agency?

Yes _____ No _____

If yes, attach **Schedule K** setting forth:

A)   The plaintiff or defendant/claimant or respondent
B)   Description of the case/matter/proceeding
C)   Names of other parties
D)   Location and name of agency/association
E)   Date and disposition

Has any owner or officer of Applicant or any affiliate ever been arrested?

Yes _____ No _____

If yes, attach **Schedule L** setting forth:

A)   Description of charge
B)   Location and name of court
C)   Date and disposition

## 4.    Affiliations, Licenses, Certifications

Association Memberships (attach as **Schedule M**, if necessary)

Type of Licenses and/or Certifications Held by Applicant, affiliates, owners or officers (attach as **Schedule N**, if necessary)

Has Applicant, any affiliate or any of their respective owners or officers ever had any license or professional certification revoked, suspended, challenged, etc.?

Yes _____          No _____

If yes, attach **Schedule O** setting forth:

A)    Type of License and/or Certification
B)    Issuing Agency, date of issue and date of revocation, suspension, challenge, etc.
C)    Reason for revocation, suspension, challenge, etc.
D)    Disposition


## 5.    References

Bank Account(s) References, including names of officials handling accounts, addresses, account numbers and contact telephone numbers (attach as **Schedule P**)

Brokerage Account(s) References, including names of officials handling accounts, addresses, account numbers and contact telephone numbers (attach as **Schedule Q**)

Other References, including names, businesses and contact numbers (attach as **Schedule R**)


## 6.    Notices

All communications regarding this application and requests for further information should be addressed to:

_____

_____

_____

_____

_____

Backgrnd_corp

## 7.    Representations and Covenants

The applicant makes the following representations and covenants:

A.    The applicant is duly authorized to submit this application and the person(s) whose signature(s) appears below is (are) authorized to sign and submit this application.

B.    The applicant acknowledges that regardless of whether it has seen any financial projections prepared by the League or any NHL Member Club (except the Club), in submitting this application, it has not relied upon such projections, or upon any other oral or written representations. The League and its Member Clubs (except the Club) expressly disclaim any and all liability for representations and warranties, expressed or implied, and statements contained in, and for omissions from, any written material furnished or information orally transmitted to the applicant (including, but not limited to, any opinions, information or advice which may be provided to the applicant by any officer, director, shareholder, employee, agent, representative or consultant of the League or its Member Clubs (except the Club)). The applicant acknowledges that it alone is responsible for any due diligence, including due diligence as to expected financial results, and that it will make no claim against the NHL or any Member Club (except the Club) based on any projections, or other oral or written representations it has seen.

C.    The applicant understands that the League may request additional information and agrees to supply all such further information as may be requested by the League concerning any aspect of this application.

D.    The applicant acknowledges its obligation promptly to amend the application based on any material changes in the facts.

E.    The applicant acknowledges and agrees that the League shall have the right in its sole and absolute discretion to evaluate any application and to reject any or all applications without assigning any reasons therefore. The applicant further agrees that the League shall have the right, in its sole discretion, without giving reasons therefore, at any time and in any respect, to terminate discussions with any or all prospective applicants. The applicant hereby authorizes the NHL or its designees to conduct such financial and other investigation deemed appropriate by the League. The applicant, and all persons or entities holding an interest in the applicant, fully and unconditionally releases the NHL, its Member Clubs, and their affiliates and each of their respective owners, directors, officers, shareholders, partners, and employees from any liability or claim, whether at law or equity, and whether arising under the laws of Canada, the United States, or any other jurisdiction or any political subdivision thereof relating to or arising out of the submission of this application, or the League's decision to approve or not to approve the applicant's requested transfer of ownership.

I, the undersigned, certify that I am duly authorized to submit this application on behalf of Applicant and that the information provided above has been carefully read and is true

and correct.  I further certify that the information contained herein does not contain any untrue statement of a material fact or omit to state any fact necessary in order to make the statements contained herein not misleading.

Applicant:

Date _____          By: _____

## NATIONAL HOCKEY LEAGUE
## GENERAL AUTHORIZATION

Applicant authorizes the National Hockey League and its designees and representatives to request and receive any information concerning applicant from any persons, companies, corporations, partnerships, associations, credit bureaus, law enforcement agencies and licensing agencies.

Applicant also authorizes any of the aforementioned parties to furnish the National Hockey League, its designees and representatives with information and credit reports concerning applicant as requested by the National Hockey League. Applicant further releases all such parties and the National Hockey League, its designees and representatives from any and all liability and responsibility arising out of the release of any such information or credit reports.

Applicant:

By: _____

Date _____

Backgrnd_corp

# EXHIBIT B

## CONFIDENTIALITY AGREEMENT

**[Date]**

**[Name & Address of Recipient of
Confidential Information]**


Ladies and Gentlemen:

In connection with the evaluation by **[Insert name of Recipient]** ("you", "your" and related terms) of a possible transaction (the "Transaction") with or involving Dallas Stars, L.P. ("Dallas Stars") and/or Dallas Arena LLC ("Dallas Arena"), you have requested information concerning Dallas Stars, Dallas Arena, HSG Sports Group LLC (collectively, and together with their Affiliates and any Affiliates of Thomas O. Hicks, the "Company"), and the Transaction from the Company. As a condition to your receipt of such Confidential Information (as hereinafter defined), you agree to treat the Confidential Information and any other information concerning the Transaction or the Company which is furnished to you or your Representatives (as defined below) by or on behalf of the Company in accordance with the provisions of this Confidentiality Agreement (this "Agreement") and to take or refrain from taking certain other actions herein set forth.

1.       You recognize and acknowledge the competitive value and confidential nature of the Confidential Information and the damage that would result to the Company and its Affiliates if any of the Confidential Information is disclosed to any third party. You hereby agree that the Confidential Information will be used solely for the purpose of evaluating the Transaction and that all of the Confidential Information will be kept confidential; provided that any such information may be disclosed only to your officers, directors, employees, agents, and outside advisors (such Persons hereinafter collectively being referred to as "Representatives"), who are actually engaged in and need to know the Confidential Information for the purpose of evaluating the Transaction, who have been informed of the confidential nature of the Confidential Information, and who have been advised by and agree with you that such information is to be kept confidential and shall not be used for any purpose other than the evaluation of the Transaction. You agree that you will cause your Representatives to observe all terms of this Agreement, that you shall be responsible for any breach of this Agreement by any of your Representatives, and that (at your own expense) you will specifically enforce your agreements with any such breaching Representatives through court proceedings.

2.       The term "Confidential Information" includes (i) all information furnished by the Company or any of its representatives, whether furnished before or after the date hereof, whether oral or written, and regardless of the manner in which it is furnished, (ii) all analyses, compilations, forecasts, studies, interpretations or other documents prepared by you or your Representatives in connection with your evaluation of the Transaction (including, without limitation, such that reflects or is based upon, in whole or part, the information furnished to you or your Representatives pursuant hereto), and (iii) the fact that discussions or negotiations are taking place concerning a possible Transaction between the Company and you, and any of the terms, conditions or other facts with

respect to any such possible Transaction, including the status thereof. The term "Confidential Information" does not include any information which (i) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of its disclosure by you or your Representatives in breach of this Agreement), (ii) was lawfully available to you on a non-confidential basis prior to disclosure by the Company, or (iii) becomes available to you on a non-confidential basis from a Person who is not bound by a confidentiality agreement with the Company, or is not otherwise prohibited from transmitting the information to you. The Confidential Information shall remain the property of the Company. No rights to use, license, or otherwise exploit the Confidential Information are granted to you, by implication or otherwise. You will not by virtue of our disclosure of the Confidential Information and/or your use of the Confidential Information acquire any rights with respect thereto, all of which rights shall remain exclusively with the Company.

3.      Given the nature of the Confidential Information and our current discussions, the Company would be irreparably damaged by any unauthorized disclosure or use of any Confidential Information or of our discussions or by any breach of this Agreement by you or your Representatives. Without prejudice to the rights and remedies otherwise available to the Company, you, therefore, agree that the Company shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including an injunction or specific performance, in the event of any breach or threatened breach of the provisions of this Agreement by you or your Representatives. Such remedies shall not be deemed to be exclusive remedies but shall be in addition to all other remedies available at law or equity to the Company. In the event of litigation relating to this Agreement, if a court of competent jurisdiction determines that you or any of your Representatives have breached this Agreement, then you shall be liable and pay to the Company the reasonable costs and expenses (including attorney's fees) incurred by the Company in connection with such litigation, including any appeal therefrom.

4.      In the event you or any of your Representatives become legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigation, demand, order or other legal process) to disclose any of the contents of the Confidential Information, or either the fact that discussions or negotiations are taking place concerning a possible Transaction between the Company and you, or any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof, the Company agrees that you and your Representatives may do so without liability, provided you (i) promptly notify Dallas Stars prior to any such disclosure to the extent practicable, (ii) cooperate with the Company in any attempts it may make to obtain a protective order or other appropriate assurance that confidential treatment will be afforded the Confidential Information, and (iii) if no protective order is obtained and disclosure is required, (a) furnish only that portion of the Confidential Information that, in your counsel's opinion, you are legally compelled to disclose, and (b) take all reasonable measures to obtain reliable assurance that confidential treatment will be accorded the Confidential Information.

5.      The Company may elect at any time to terminate further access by you to the Confidential Information. At any time you determine not to proceed with the possible Transaction, you will promptly notify the Company. Following any request by the Company or any of its representatives, you agree (i) to promptly redeliver to the

Company all written Confidential Information and any other written material containing or reflecting any of the Confidential Information in your possession or your Representatives' possession, (ii) you and your Representatives will not retain any copies, extracts or other reproductions in whole or in part, mechanical or electronic, of such written material, and (iii) all computer records, documents, memoranda, notes and other writings whatsoever prepared by you or your Representatives based on the Confidential Information will be destroyed, and that any such destruction shall be confirmed to the Company in writing.

6.      You understand and acknowledge that neither the Company nor any of its representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information.  You agree that neither the Company nor any of its representatives shall have any liability to you or any of your Representatives relating to or resulting from your or their use of the Confidential Information or any errors therein or omissions therefrom.  You further understand and agree that (i) the Company (a) shall be free to conduct the process for the Transaction as it in its sole discretion shall determine (including changing or terminating such process, providing any information to any other Person, negotiating with any other Person or entering into a definitive agreement with any other Person with respect to any transaction, in each case, at any time and without notice to you or any other Person) and (b) shall be free at its sole discretion to at any time to accept or reject any proposal relating to the Company for any reason without notice to you or any other Person, and (ii) you shall have no claim against the Company or any of its representatives in connection with any of the foregoing.

7.      For a period of two (2) years after the date hereof, you will not solicit for employment or hire, or cause to be solicited or hired, any employee of the Company; provided that this Agreement shall not prohibit any advertisement or general solicitation (or hiring as a result thereof) that is not specifically targeted at such persons.

8.      You hereby represent and warrant that you are not bound by the terms of a confidentiality agreement or other agreement with a third party that would conflict with any of your obligations under this Agreement.

9.      In accepting and reviewing the Confidential Information, you represent and warrant that you are acting solely for yourself.  Further you represent and warrant that you have not discussed and you hereby covenant that you will not discuss or share with any Person (other than your Representatives) any aspect of the Confidential Information or the fact that the Company is interested in a proposed Transaction, either on your own or in conjunction with any other interested Person in violation of this Agreement, unless (a) such Person has submitted all of the required National Hockey League ("NHL") documentation and received approval from the NHL, (b) such Person has executed and delivered to Dallas Stars or its representatives a confidentiality agreement in substantially the same form as this Agreement and (c) you have received prior written consent from Dallas Stars.  You acknowledge that the effect of this covenant is that without the full disclosure to and the written consent of Dallas Stars, and the fulfillment of clauses (a) and (b) of the preceding sentence, you cannot act as agent, partner, co-participant or co-venturer for any third party or third parties with respect to a proposed Transaction.  In order to obtain the consent of Dallas Stars, which Dallas Stars is entitled to withhold in its sole discretion, and to coordinate the fulfillment of clauses (a) and (b) above, you shall notify the contact persons set forth in subparagraph (iv) of Paragraph 11 herein of the

identity of each Person for whom or with whom you had considered pursuing a possible Transaction, and the nature and interest you and each such Person would have in respect of such possible Transaction.

10.     You agree that, unless and until a binding agreement is entered into between the Company and you with respect to the Transaction, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to the Transaction by virtue of this or any other written or oral expression, except with respect to the matters specifically agreed to herein.  Except as provided in <u>Paragraphs 8</u>, and <u>9</u> herein, nothing contained in any discussions between you and the Company or in any Confidential Information shall be deemed to constitute a representation or warranty.  Except for the matters set forth in this Agreement or in any such binding agreement, neither party shall be entitled to rely on any statement, promise, agreement or understanding, whether oral or written, any custom, usage of trade, course of dealing or conduct.

11.     You agree that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, will be submitted or directed only to Brent Johnson, Managing Director, at (212) 850-4997, or J. Daniel O'Brien, Vice-President, at (212) 850-4988, each of Galatioto Sports Partners.  You further agree that under no circumstances will you or your Representatives discuss or otherwise communicate any aspect of the Transaction to any member of the management of the Company without the express written consent of Dallas Stars.  Without Dallas Stars' prior written consent, you shall not, and you shall direct your Representatives not to, make any contact of any nature regarding a proposed Transaction (including inquiries or requests concerning Confidential Information) with any supplier, vendor, customer, labor union, landlord, lessor, bank or other lender of or to the Company or any of its Affiliates.  For purposes of clarity, and notwithstanding anything to the contrary in the provisions of this Agreement, this Agreement shall not prohibit, preclude or otherwise prevent you or your Representatives from engaging in any discussions or disclosure of the Confidential Information with or to the NHL or any of its officers and employees.

12.     In consideration for the Confidential Information being furnished to you under this Agreement, you agree that for a period of one year from the date hereof, you shall not and you shall cause your Affiliates not to acquire, offer, seek or propose to acquire ownership of any debt or equity securities of the Company or any of its Affiliates, or any rights or options to acquire such ownership, and you shall not and you shall cause your Affiliates not to acquire, offer, seek or propose to acquire any indebtedness of the Company (including but not limited to, any (i) obligations for borrowed money or advances, (ii) obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) obligations upon which interest charges are customarily paid or accrued), or any rights or options to acquire such indebtedness, in each case without the Company's prior written consent.

13.     This Agreement shall be governed and construed in accordance with the laws of the State of Texas without regard to conflict of laws principles.  You hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States of America located in the Northern District of the State of Texas for any action, suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby, and you agree not to commence any action,

suit, or proceeding relating thereto except in such courts, and further agree that any service of any process, summons, notice or document by US registered mail or internationally recognized carrier to your address set forth above shall be effective service of process in any action, suit or proceeding brought against you in any such court. You irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or transactions contemplated hereby in the courts of the State of Texas or the United States of America located in the Northern District of the State of Texas, and hereby further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

14.     The provisions of this Agreement shall be binding solely upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, expressly including any successor to or acquirer of the Company, provided that your obligations are personal to you and may not be assigned to another party.

15.     This Agreement represents the entire understanding and agreement of the parties hereto and may be modified only by a separate written agreement executed by you, Dallas Stars and Dallas Arena expressly modifying this Agreement.  This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the Transaction.

16.     In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law, and such invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the Company's intention with respect to such invalid or unenforceable term or provision.

17.     The failure or refusal of the Company to insist upon strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failures or refusals be deemed a custom or practice contrary to such provision or right.

18.     For purposes of this Agreement, except as otherwise defined herein:  (a) "Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise); and (b) "Person" shall be broadly interpreted to include any individual, corporation, company, partnership, limited liability company, trust or other group or entity (including any court, government or agency, commission, board or authority thereof, federal, state or local, domestic, foreign or multinational).

19.     This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same Agreement.

20.     This Agreement shall terminate upon the earlier to occur of (i) the closing of the Transaction contemplated by this Agreement, and (ii) three (3) years after the date hereof.

Please confirm your agreement with the foregoing by signing and returning to the undersigned a duplicate copy of this Agreement.

Sincerely,

**DALLAS STARS, L.P.**

By: _____
Name:
Title:

**DALLAS ARENA LLC**

By: _____
Name:
Title:

ACCEPTED AS OF THE DATE FIRST
WRITTEN ABOVE:

**[INSERT NAME OF RECIPIENT, IF ENTITY]**

By: _____
Name: _____
Title: _____

_____
**[INSERT NAME OF RECIPIENT, IF INDIVIDUAL]**

**EXHIBIT C**

EXHIBIT C

**[SUBJECT TO CONFIRMATION OF THE TRANSACTION AND OWNERSHIP STRUCTURE AND RECEIPT AND REVIEW OF COPIES OF ALL TRANSACTION AND ORGANIZATIONAL DOCUMENTS.  ADDITIONAL MODIFICATIONS MAY BE REQUIRED.]**

CONSENT AGREEMENT

This CONSENT AGREEMENT is made this **[___]** day of **[_____]**, by and among:

(i)     the National Hockey League, a joint venture organized as an unincorporated association not-for-profit (the "<u>NHL</u>");

(ii)     **[INSERT NAMES, STATES OF FORMATION, TYPES OF ENTITIES OF CURRENT DIRECT AND INDIRECT CLUB OWNERS]** (together, the "<u>Sellers</u>"); and

(ii)     **[INSERT CLUB NAME, STATE OF FORMATION, TYPE OF ENTITY]** (the "<u>Club</u>") **[***Drafting Note:  depending on the structure of the Club and other related entities (e.g., arena company, broadcasting company, etc., the "Club" definition may need to be broadened to a "Club Group" concept***]**; and **[FOR EACH PROPOSED DIRECT AND INDIRECT OWNER OR HOLDER OF ANY INTEREST (OF RECORD, BENEFICIAL OR OTHERWISE) IN THE CLUB, INSERT NAME, AND AS APPLICABLE, STATE OF FORMATION AND TYPE OF ENTITY]** (together, with the Club, the "<u>Acquiring Parties</u>").

Background:

(a)     <u>Proposed Transaction</u>. (i)  Dallas Stars, L.P., a Delaware limited partnership ("<u>DSLP</u>"), is the holder of the NHL franchise known as the Dallas Stars(the "<u>Franchise</u>").

(ii)     Pursuant to that certain **[AGREEMENT OF THE TRANSACTION]**, dated **[_____ __]**, 2011 (the "<u>Purchase Agreement</u>"), among the **[SELLERS]** and **[PURCHASER PARTIES TO THE TRANSACTION]** (the "<u>Purchasers</u>"), the parties thereto desire to consummate a transaction pursuant to which the Purchasers shall acquire the Franchise and substantially all of the other assets of, and shall assume all of the liabilities of, the Sellers **[DESCRIPTION OF TRANSACTION(S)]**.

(iii)     **[DESCRIBE PARTIES TO THE TRANSACTION, AND ANY DIRECT OR INDIRECT OWNERSHIP THEREIN, INCLUDING INFORMATION RELATED TO ANY BENEFICIAL OWNERSHIP INTEREST IN THE CLUB.]**

(iv)     Upon consummation of the closing under the Purchase Agreement, the Sellers shall cease to be direct or indirect owners of the Franchise and all of the direct and indirect ownership and other interests in the Club and the Franchise will be held as set forth on Schedule A hereof.

(v)     The transactions specifically described in the foregoing clauses (ii) and (iii) shall be referred to herein as the "Proposed Transaction."

(b)     Consent Required.  The consent of the NHL Board of Governors is required for the  Proposed Transaction in accordance with the NHL Constitution and Agreements (as defined below), including without limitation Article 3.5 of the NHL Constitution and By-law 35.

(c)     Transaction Documents.  Pursuant to the NHL Constitution and Agreements, the Sellers and the Acquiring Parties have furnished to the NHL true and complete copies of all documents relating to the Proposed Transaction, including, without limitation, the Purchase Agreement and the Organizational Documents (as defined below), a complete list of which is provided on Schedule B hereof (collectively, the "Transaction Documents").  In this Consent Agreement, "Organizational Documents" means, in respect of the Club or any other Acquiring Party, the certificate of formation, certificate of limited partnership, limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of incorporation, articles of incorporation, shareholders agreement, security-holders agreement, contribution agreement, registration rights agreement, management services agreement, trust agreement or other constitutive or organizational document in respect of such entity.

(d)     Resolutions.  The NHL Board of Governors has adopted resolutions (the "Resolutions") approving the Proposed Transaction, all subject to certain terms and conditions, including the terms and conditions of this Consent Agreement, the Guaranty (as defined below), the Proxies (as defined below) [and the Lender Letter Agreement (as defined below)].

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     NHL Consent.  Subject to the terms and conditions set forth in this Consent Agreement, the Proxies[, the Lender Letter Agreement] and in that certain Guaranty in favor of the NHL, dated as of the date hereof and in the form of Exhibit B hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Guaranty"), the NHL hereby consents to the Proposed Transaction.  For purposes of clarity, the Acquiring Parties and the Sellers hereby agree and acknowledge that, notwithstanding any other provision contained herein to the contrary, the consent of the NHL referred to herein is specifically subject to and conditioned upon, and such consent shall not be deemed granted unless and until: (a) the Acquiring Parties have executed and delivered to the NHL the Guaranty,

2

(b) the Acquiring Parties and the Sellers have executed and delivered to the NHL this Consent Agreement**[**, (c) the parties to the Lender Letter Agreement have executed and delivered to the NHL the Lender Letter Agreement,**]** and (d) the applicable Acquiring Parties (each a "<u>Proxy Grantor</u>" and, collectively, the "<u>Proxy Grantors</u>") have executed and delivered to the NHL the Proxies (the documents, agreements and instruments referred to in clauses (a) through (d) above, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "<u>Relevant Agreements</u>").

The consent granted herein is limited to the Proposed Transaction and does not extend to any other transfer, sale, disposition, foreclosure, liquidation, wind-up, dissolution, merger, consolidation, mortgage, hypothecation, assignment, pledge or other impairment, encumbrance or distribution (collectively, a "<u>Transfer</u>") of any assets of, or direct or indirect ownership or other interests in, the Franchise, or to any other transaction, whether or not the same may be contemplated by the Transaction Documents or identified in any schedule or exhibit hereto or thereto, including, without limitation, any exercise of any of the options, warrants, puts, calls and other rights referred to in Paragraph 9(b)(v) hereof.

2. <u>Performance of Agreements</u>.

(a) The Acquiring Parties and the Sellers agree to perform, and to cause their respective subsidiaries and other affiliates to perform, all of the covenants, agreements, terms and conditions applicable to each contained in the Transaction Documents.

(b) The Acquiring Parties jointly and severally represent and warrant that <u>Schedule 2(b)</u> hereof is a true and accurate list of all debts relating to, in each case after giving effect to the Proposed Transaction: (i) the Club and each other **[Club Group Party]**, (ii) the Franchise, (iii) any and all assets owned, leased or used by the Club or used in or necessary for the customary operation of the Club or the performance or exhibition by the Club of NHL games in which it is a participant, and (iv) any asset arising out of or in connection with the admission or current status of the Club as a member club of the NHL (including, by way of example and not of limitation, uniforms, playing and practice equipment) (the assets described in clauses (iii) and (iv) above are collectively referred to as the "<u>Hockey-Related Assets</u>").  **[***OTHER REPRESENTATIONS REGARDING OUTSTANDING DEBT/ESTOPPEL LETTERS MAY BE NECESSARY DEPENDING ON TRANSACTION***]**

3. <u>NHL Constitution and Agreements</u>.

(a) Notwithstanding anything contained to the contrary in any Transaction Document:

(i) The Acquiring Parties jointly and severally agree to be bound by and comply with, and to cause their respective subsidiaries and other affiliates to comply with: (A) the NHL Constitution, (B) the NHL By-laws, (C) the governing documents of each of the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL

3

Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the member clubs of the NHL (the "NHL Member Clubs") generally after the date of this Consent Agreement, and each of their respective affiliates and subsidiaries (all of the foregoing entities, including the NHL but excluding the NHL Member Clubs, the "NHL Entities"), (D) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities, (E) the current and future Collective Bargaining Agreements between the NHL and the National Hockey League Players' Association ("NHLPA") and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other persons, on the other hand, in furtherance of the NHL's (or any other NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-laws, (F) this Consent Agreement, (G) the other Relevant Agreements, and (H) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time (collectively, the "NHL Constitution and Agreements");

(ii)     The Acquiring Parties and the Sellers jointly and severally agree not to take or support, and to cause their respective subsidiaries and other affiliates not to take or support, any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or the NHL Member Clubs; and

(iii)    The Acquiring Parties and the Sellers jointly and severally agree not to challenge, and to cause their respective subsidiaries and other affiliates not to challenge, at any time or in any forum any provision, term or other aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)      Without limiting or otherwise modifying the foregoing, the Acquiring Parties and the Sellers jointly and severally represent, warrant, agree and covenant to the NHL that: (i) the Club is assuming as of the date hereof all debts, liabilities, obligations and expenses of the Sellers to any other party, including, without limitation, to the NHL Entities, the NHL Member Clubs or any other related or affiliated entity of the NHL Entities or of any of the NHL Member Clubs, including, without limitation, any employees' contracts (including players' contracts) or deferred compensation to current or past players and other employees and the full and timely performance thereof by the Sellers, and (ii) the transactions contemplated by the

Transaction Documents shall not adversely affect the Franchise or the operation or financial condition of the Franchise. Each of the parties hereto agrees, represents and covenants to the NHL that it will not take any action that impairs the debts, liabilities and obligations of [any Acquiring Party] described in this Paragraph 3(b) or otherwise in this Consent Agreement, except to the extent expressly consented to in writing by the NHL.

4.    Location and Territory of Franchise.

(a)    The Acquiring Parties jointly and severally represent, warrant and covenant to the NHL that they have received no representation, commitment, promise, assurance or other indication of any kind whatsoever with respect to any future transfer of ownership or change in location of the Franchise.

(b)    The Acquiring Parties jointly and severally represent, warrant and covenant to the NHL that the acquisition of interests in the Franchise pursuant to the Purchase Agreement is solely for the purpose of operating the Franchise in its current location and hereby jointly and severally covenant and agree to so operate the Franchise and to play the Franchise's schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements. The territorial definition of the Franchise is as provided for in the NHL Constitution and Agreements, including without limitation, Article IV of the NHL Constitution. The Acquiring Parties and the Sellers jointly and severally hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described on Exhibit A hereto and each jointly and severally further represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

(c)    The Acquiring Parties jointly and severally acknowledge, covenant and agree that for a period of at least seven (7) calendar years from the date hereof, they will not: (i) move or transfer, request to move or transfer, or attempt to move or transfer, the Franchise to a new Home Territory, (ii) engage or participate in discussions or negotiations with a third party relating to moving or transferring the Franchise to a new Home Territory, or (iii) sell or propose to sell any ownership or equity interest in the Franchise to the public, whether by way of a public offering, private placement or similar vehicle.

5.    Post Transaction Capital Structure and Other Conditions.

(a)    Unless otherwise consented to by the NHL or the NHL Member Clubs, as appropriate, in accordance with and as required by the NHL Constitution and Agreements: (i) the Sellers and the Acquiring Parties jointly and severally covenant and agree that the Proposed Transaction shall be consummated as of the date hereof in accordance with the terms and conditions set forth in the Transaction Documents, (ii) the Acquiring Parties jointly and severally covenant and agree that, as of, at and at all times following, the consummation of the Proposed Transaction: (A) all direct and indirect ownership and other interests in the Club and the other Acquiring Parties shall be held as identified and described in Schedule A hereof, which truly,

accurately and completely lists all holders of a direct or indirect ownership and other interest in the Club and the other Acquiring Parties, as well as a description of each such holder's respective ownership and other interests in the Club and the other Acquiring Parties, and [(B) the sole trustee[s] and beneficiar[y/ies] of any trust with a direct or indirect ownership or other interest in the Club or any other Acquiring Party shall be as identified and described on Schedule A hereof] and (iii) the Sellers and the Acquiring Parties jointly and severally covenant and agree that none of the Sellers or their respective subsidiaries or other affiliates shall at any time following the date hereof own or have any rights whatsoever to any Hockey-Related Assets as all of such assets are, and at all times following the date hereof shall be, owned solely and directly by the Club, without restriction by, or reservation of rights in favor of, the Sellers. If the Proposed Transaction is not consummated on the date hereof in accordance in all material respects with the terms of the Transaction Documents, the consent of the NHL set forth in this Consent Agreement with respect to the Proposed Transaction (but not the representations, warranties and obligations of the Acquiring Parties and the Sellers hereunder) shall be void *ab initio*. The Commissioner of the NHL shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order rescission of any transaction consummated (or purportedly consummated) in violation of this Consent Agreement or the other NHL Constitution and Agreements, as well as the right to order such other relief or remedy as may be within his powers under the NHL Constitution and Agreements.

(b) **[*NHL APPROVED PLEDGE OF ASSETS AND BORROWINGS TO FINANCE PROPOSED TRANSACTION, IF ANY, WILL BE ADDRESSED HERE.*]** None of the Acquiring Parties shall pledge the Franchise, any direct or indirect interest therein or any other Hockey-Related Assets to secure any debt or obligation without the NHL's prior written consent, which consent the NHL may withhold in its sole and absolute discretion[; provided, however, that the Club [_____] may, as the case may be, pledge the assets of, and the direct ownership interests in, the Franchise and the Club (as well as any other Hockey-Related Assets) in accordance with, and subject to, the terms and conditions of that certain letter agreement, dated [_____], by and among the NHL, [_____], the Club, [_____] and the other parties thereto relating to certain obligations secured, among other things, by certain Hockey-Related Assets of the Club (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Lender Letter Agreement")].

6. Ownership, Control, Change in Documents.

(a) The Acquiring Parties jointly and severally represent, warrant and covenant that the Chief Executive Officer of [NAME OF ACQUIRING PARTY] and the Governor of the Club is [_____], and he is responsible for and has the authority to manage the business and affairs of the [NAME OF ACQUIRING PARTY]. [Other information as to stockholders, key officers, partner information, etc.] [REPEAT AS NECESSARY FOR EACH ACQUIRING PARTY.]

(b)     The Acquiring Parties jointly and severally covenant and agree that, notwithstanding any provision in any other agreement which may be to the contrary, the NHL Entities and the NHL Member Clubs may rely upon as binding upon the Club and the other Acquiring Parties any action of the Governor or any alternate governor of the Club with respect to any communication, agreement, understanding, action, consent or other transaction with or concerning any NHL Entity, the NHL Member Clubs or any of their respective affiliates until such time as a different individual, who shall also be an officer, manager or director of the Club, shall be designated in writing pursuant to Paragraph 13(c) hereof by the Club and consented to in writing by the NHL, which consent the NHL may withhold in its sole and absolute discretion.

(c)     The Acquiring Parties jointly and severally acknowledge and agree that:

(i)     The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed Transfer of any assets of, or Transfer or issuance of any direct or indirect ownership or other interest in, the Club or any other Acquiring Parties are subject to and conditioned upon the NHL Constitution and Agreements, including the prior written consent of the NHL and those of the NHL Member Clubs as may be applicable under the NHL Constitution and Agreements, which consent may be withheld in the NHL's or such NHL Member Club's sole and absolute discretion.

(ii)     The consummation of the Proposed Transaction will not result in the creation of a pledge, lien or other encumbrance upon any of the assets of, or direct or indirect ownership or other interests in, the Club [other than the pledge of the assets of, and the direct and indirect ownership or other interests in, the Franchise and the Club (as well as any other Hockey-Related Assets) in accordance with, and subject to, the terms and conditions of the Lender Letter Agreement].

(iii)     Without limiting the provisions of subparagraph (i) above, the Acquiring Parties shall not cause, permit or effect, without the prior written consent of the NHL and those of the NHL Member Clubs as may be applicable under the NHL Constitution and Agreements, which consent may be withheld in the NHL's or such NHL Member Club's sole and absolute discretion:

(A)     any of the Acquiring Parties that are entities to change their respective status or jurisdiction of organization, formation or creation, as the case may be;

(B)     a change in or removal of any general partner, manager, managing member, trustee or controlling person of any Acquiring Party or the diminishing of the power of any such general partner, manager, managing member, trustee or controlling person, whether or not provided in any Organizational Document or other documents of any Acquiring Party;

(C)     any transaction that will result in a change, directly or indirectly, in the ownership or management of the Club or any other Acquiring Parties, whether or not provided in any Organizational Document or other documents of any Acquiring Party;

(D)     whether directly or indirectly, any Transfer of any assets of, or direct or indirect ownership or other interests in, or issuance of any direct or indirect ownership or other interests in, the Club or any other Acquiring Parties, whether or not provided in any Organizational Document or other documents of any Acquiring Party;

(E)     [any change or removal of any trustee of any [TRUST PARTY], revocation of any [TRUST PARTY],  any change of the beneficiaries of any [TRUST PARTY] or any action to diminish the powers of the trustees under any [TRUST PARTY], whether or not provided in any Organizational Document or  other documents of any Acquiring Party; or]

(F)     directly or indirectly, implicitly or explicitly, any rescission, revocation, cancellation, termination, amendment, waiver, supplement, restatement or other modification (collectively, "Change") of the Organizational Documents of any Acquiring Party.

(iv)     The foregoing covenants apply and shall be enforceable notwithstanding any provision of any document or instrument to the contrary.

(d)     [*DRAFTING NOTE: TO BE REVISED BASED UPON THE OWNERSHIP STRUCTURE OF ANY WIDELY HELD FUND THAT HOLDS A DIRECT OR INDIRECT INTEREST IN THE CLUB.*]  Each Acquiring Party that is a [FUND] further represents, warrants and covenants to the NHL that:

8

(i)     As of the date hereof and at all times hereafter, unless otherwise consented to in writing by the NHL in its sole discretion: [(A) DESCRIBE OWNERSHIP STRUCTURE AND CONTROL OF FUND], (B) other than ("[_____ Entity]"), no person or other entity or group (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules of the Securities and Exchange Commission) owns or controls or shall own or control more than 5% of any interests in [FUND], provided, for purposes of clarity, that any such person, entity or group shall not have any ownership or other interest whatsoever in, or relationship with: (x) any other NHL Member Club or (y) any person or entity which would violate or conflict with any provisions of the NHL Constitution (including, without limitation, Articles 8 and 13 thereof).

(ii)     As of the date hereof and at all times hereafter, unless otherwise consented to in writing by the NHL in its sole discretion, other than [_____ Entity], no person or entity (including, without limitation any other person or entity holding any interest in any [_____ Entity]) has or shall have any right or ability to make, direct or otherwise influence, directly or indirectly, any decision with respect to any investment made by Fund.

(iii)     Unless otherwise consented to in writing by the NHL in its sole discretion, [FUND] shall not, and shall not permit [_____ Entity] or any member, principal, manager, employee, officer, director or agent of [_____ Entity] to, disclose to any other person or entity who has any interests in, or relationship with, any other NHL Member Club (including, without limitation any such person or entity holding any interest in [FUND]) any information relating to the Club.

(iv)     As of the date hereof and at all times hereafter, unless otherwise consented to in writing by the NHL in its sole discretion no [_____Entity], nor any member, principal, manager, employee, officer or director of any [_____ Entity], has or shall have any ownership or other interest whatsoever in, or relationship with, any person or entity which would violate or conflict with any provisions of the NHL Constitution (including, without limitation, Articles 8 and 13 thereof).

(v)     For purposes of this Paragraph 6(d), "control" means the possession of the power: (A) to vote 5% or more of voting power of a person or entity having ordinary voting power for the election of directors, managing members or general partners (as applicable) or (B) to direct or cause the direction of the management or policies of a person or entity, whether through the ability to exercise voting power, by contract or otherwise; "controlling" and "controlled" have meanings correlative thereto.

(vi)     The foregoing covenants apply and shall be enforceable notwithstanding any provision of any document or instrument to the contrary.

9

(e)     The Sellers jointly and severally represent and warrant to the NHL that the description set forth in paragraph (a)(i) of the "Background" section is a true, accurate and complete description of the ownership of the Franchise immediately prior to the consummation of the Proposed Transaction.

(f)     The Acquiring Parties jointly and severally represent, warrant and covenant that the following language is (or will be) included in bold face and in a prominent manner in any currently existing (or future) stockholder, partnership, operating, limited liability company, trust or other agreement or ownership certificate relating to direct or indirect ownership or other interests in the Club or any other Acquiring Party to which such Acquiring Party is (or becomes) a party and on any stock or other ownership certificate representing a direct or indirect ownership or other interest in the Club, any other Acquiring Party or the Franchise, including without limitation, all contingent, convertible or similar rights, such as puts, calls, options, and convertible debt instruments (which language may not be Changed without the prior written consent of the NHL, which may be withheld in its sole and absolute discretion):

**"NATIONAL HOCKEY LEAGUE RULES PROHIBIT ANY DIRECT OR INDIRECT SALE, FORECLOSURE, LIQUIDATION, WIND-UP, DISSOLUTION, MORTGAGE, MERGER, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION, ENCUMBRANCE OR OTHER IMPAIRMENT OR DISPOSITION OF, OR WITH RESPECT TO, THE DALLAS STARS FRANCHISE, OR ANY DIRECT OR INDIRECT INTEREST THEREIN, WITHOUT THE PRIOR WRITTEN CONSENT OF THE NATIONAL HOCKEY LEAGUE.  PLEASE CONTACT THE NATIONAL HOCKEY LEAGUE, GENERAL COUNSEL, 1185 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036 TO DETERMINE THE APPLICABLE REQUIREMENTS."**

(g)     The Acquiring Parties and the Sellers jointly and severally represent, warrant and covenant that:

(i)  without limiting or otherwise modifying, and in addition to, Paragraph 6(c)(iii)(F) above, no Transaction Document, including, without limitation, the Purchase Agreement, shall be Changed in any respect which may or will affect the conditions, obligations or duties set forth in the NHL Constitution and Agreements, including, without limitation, this Consent Agreement, or adversely affect the interests of the NHL Entities or the NHL Member Clubs, without the prior written consent of the NHL and those of the NHL Member Clubs as may be applicable under the NHL Constitution and Agreements, which consent may be withheld in the NHL's or such NHL Member Clubs' sole and absolute discretion;

(ii)  no party to a Transaction Document shall assign, delegate or otherwise Transfer in any manner its rights or obligations thereunder without the prior written consent of such of the NHL and those of the NHL Member Clubs as may be

803126.05-New York Server 3A - MSW

applicable under the NHL Constitution and Agreements, which consent may be withheld in the NHL's or such NHL Member Clubs' sole and absolute discretion, and the parties hereto and to any such Transaction Document hereby agree that any proposed assignment, delegation or other Transfer of the rights or obligations under any such Transaction Document without such prior written consent, shall be deemed void *ab initio* and of no force or effect; and

(iii) the NHL shall be notified in writing, pursuant to Paragraph 13(c) hereof, of any proposed Change to a Transaction Document, whether or not the NHL has consent rights with respect to the Change, at least ten (10) days before such Change is effected.

(h)     [[*DRAFTING NOTE: TO BE REVISED/EXCISED BASED UPON THE OWNERSHIP STRUCTURE OF THE CLUB.*] Each Acquiring Party acknowledges and agrees that, notwithstanding any contrary provision in any Transaction Document or any other contract or agreement, in the event that either: (i) any [manager, member, shareholder, director or partner] of any Acquiring Party recommends that any other [manager, members, shareholders, directors or partners] of any Acquiring Party take a specified action relating to the operations, management or control of any [Club Group/other Acquiring Parties], including, without limitation, approval of an annual budget or the incurrence of debt, and such [manager, members, shareholders, directors or partners] of any Acquiring Party fail to take or approve such action or (ii) any [manager, member, shareholder, director or partner] of any Acquiring Party (or the board of directors or similar body of any other Acquiring Party) fails to obtain the requisite vote necessary to authorize an action relating to the operations, management or control of any [Club Group/other Acquiring Parties] (the occurrences described in clauses (i) and (ii), each a "Failure"), and, in each case, the NHL determines, in its sole and absolute discretion, that such Failure could have a material adverse impact on the operations of any [Club Group/other Acquiring Parties], the NHL Commissioner shall have the right and power, but not the obligation (in addition to the rights set forth in this Consent Agreement and the Proxies) to: (A) correct or resolve the Failure, including by requiring that any [Club Group/other Acquiring Parties] take or refrain from taking actions as determined by the NHL Commissioner in his sole and absolute discretion (in which case the Acquiring Parties shall take, and to cause the [Club Group/other Acquiring Parties] to take, such actions as may be designated by the NHL Commissioner), or (B) designate that any such officer or director of any Club Party selected by the NHL Commissioner in his sole and absolute discretion shall have the sole authority to correct or resolve the Failure, including by causing the [Club Group/other Acquiring Parties] to take or refrain from taking certain actions. Any resolution pursuant to clauses (A) or (B) shall be final and binding on the Acquiring Parties. [NAME OF ACQUIRING PARTY] hereby agrees that he shall immediately notify the NHL Commissioner upon the occurrence or existence of any Failure which could have an adverse impact on the operations of any [Club Group/other Acquiring Parties] and which is not resolved within twenty-four (24) hours of its inception.]

7.     <u>Working Capital, Guaranties and Capital Contributions</u>.

(a)     The Club covenants and agrees that at all times it shall pay in the ordinary course and in a timely fashion all of its Operating Expenses (as defined below in paragraph (c)) and shall maintain Net Working Capital (as defined below in paragraph (b)) solely for the use in the operations of the Franchise in an amount equal to not less than $10 million.  Notwithstanding anything set forth in any Transaction Document or any other agreement, the Club and the other Acquiring Parties acknowledge, covenant and agree that there will be no payment or distribution by the Club (including, without limitation, any payment of interest or principal on debt) to any Acquiring Party or to any of their respective subsidiaries and affiliates, successors and assigns, or their past, present or future, direct or indirect, owners, partners, members, managers, shareholders, directors,  agents, trustees and governors, if such payment or distribution would reduce the amount of the Net Working Capital below the amount required to be maintained by the Club as set forth in this Consent Agreement.

(b)     For purposes of this Consent Agreement, "Net Working Capital" means: (i) the amount of current assets as determined in accordance with generally accepted accounting principles, plus (ii) the amount, if any of Drawable Funds (as defined below), less (iii) current liabilities as determined in accordance with generally accepted accounting principles.  The computation and determination of Net Working Capital shall not take into account as an asset any monies, deposits or receipts with respect to advance ticket sales or, as a liability, a reserve or equivalent account in respect of such advance ticket sales.  All other current assets and current liabilities, determined in accordance with generally accepted accounting principles, shall be taken into account in making such working capital computation.  "Drawable Funds" shall mean amounts available to be drawn by the Club under a working capital line of credit with, or a letter of credit from, a bank or other lender satisfactory to the NHL or under any other financing arrangement satisfactory to the NHL (an "Approved Line of Credit"), provided that such amounts shall be included as "Drawable Funds" solely to the extent sufficient evidence has been provided to the NHL Commissioner, satisfactory to him in his sole and absolute discretion, of the availability of such amounts and that such amounts have been sufficiently set aside and otherwise reserved for use solely by the Club for working capital purposes.

(c)     For purposes of this Consent Agreement, "Operating Expenses" means all debts, obligations, liabilities and expenses of the Club, including, but not limited to, the following: all obligations incurred by the Club in the operation of the Franchise; all obligations incurred by the Club in the operation of any minor league club; all dues and assessments payable to the NHL Entities; all amounts due to other NHL Member Clubs; all amounts due to any third party on account of league-sponsored or league-related programs; any sums required to pay, or to cure defaults in the payment of, salaries, bonuses, deferred compensation, pension contributions, and any other compensation earned by any and all of the Club's players and other Club employees; all withholding taxes and unemployment taxes payable with respect to such compensation; the payment of premiums on insurance to cover in the customary manner the appropriate compensation which may be due or become due to players in the event a player becomes disabled and unable to perform his duties in the course of his employment pursuant to then current collective bargaining agreement between the NHL and the NHLPA or any

applicable collective bargaining agreement with a minor league's players' association; and any other sums due to any player or otherwise required to be paid so that the Franchise shall hold valid, enforceable and transferable player contracts for all of its players.

(d)     Notwithstanding anything to the contrary contained in this Consent Agreement or in any other document or agreement (and in addition to, rather than in limitation of, the Guaranty), unless the NHL shall expressly agree in writing to waive the following provisions:

(i)     the Acquiring Parties (other than the Club) jointly and severally agree to, and do hereby guarantee to provide to the Club from time to time such amounts as from time to time may be necessary for: (A) the Club to maintain a minimum of Ten Million Dollars ($10,000,000) of Net Working Capital and (B) the Club to otherwise pay all Operating Expenses in the ordinary course and in a timely fashion; and

(ii)     the Acquiring Parties (other than the Club) jointly and severally guarantee to and for the benefit of the NHL the full and punctual payment and performance of all Operating Expenses of the Club, whether now or hereafter existing and however incurred, in the ordinary course and in a timely fashion.

(e)     Without limiting the foregoing, in the event that the NHL at any time determines, in its sole and absolute discretion, but not acting in bad faith, that there are grounds for insecurity with respect to the continued timely performance by the Club of its obligations with respect to Operating Expenses or by the other Acquiring Parties of any of their respective debts, obligations or liabilities, however incurred, then the other Acquiring Parties jointly and severally agree to deliver and contribute to the Club or such Acquiring Parties, as applicable, such amounts, in the aggregate, as the NHL may in its sole and absolute discretion reasonably request, in addition to any other sums required by this Consent Agreement or the Transaction Documents and in addition to any other requirements or provisions of this Paragraph 7 or the Guaranty, to cover and satisfy such obligations.  Before the NHL may demand delivery of any such amounts, the NHL shall give at least ten (10) days' (or such shorter period of time as the NHL may determine, in its sole and absolute discretion) written notice to the [Specify Acquiring Party], specifying the grounds for its insecurity, and shall have determined that the basis of such insecurity has not been cured within such notice period.  Any amounts delivered by the Acquiring Parties in accordance with this Paragraph 7(e) shall be promptly applied and used by the Club or the other Acquiring Parties, as applicable, solely for the purpose of providing funds to pay outstanding obligations, or to secure the payment of outstanding obligations, of such entity.

The foregoing agreements in paragraphs (a) through and including (e) above are for the benefit only of the NHL, and in each case shall be enforceable by the NHL, and shall not be construed as for the benefit of any third party; provided, however, that the NHL shall be

permitted, in its sole and absolute discretion, to pay any and all sums received pursuant to this Paragraph 7 to any third party or parties to which the guaranteed obligations are owed.

(f)     The Club and the other Acquiring Parties jointly and severally acknowledge and agree that the NHL is a direct beneficiary of the agreements set forth in Paragraphs 7(a), (d) and (e) hereof and that the NHL's consent contained herein has been conditioned upon the provision of such agreements.  The NHL (even in the absence of the consent of the Club or any other Acquiring Party, as applicable) shall have the right to require that the agreements set forth in Paragraphs 7(a), 7(d) and 7(e) hereof be enforced in accordance with their terms.  Nothing contained in this Paragraph 7(f) is intended to limit in any way the intention of the parties to this Consent Agreement that the NHL shall be a direct beneficiary of the other provisions of this Consent Agreement or the NHL's right to enforce any other provisions hereof.

(g)     Each Acquiring Party (other than an individual) shall furnish to the NHL, within ninety (90) days of the end of each fiscal year of such Acquiring Party, true and complete financial statements (which financial statements shall be audited if so requested by the NHL Commissioner): (i) for the Acquiring Party, on a stand alone basis, with respect to such fiscal year, and (ii) for the Acquiring Party and its subsidiaries, on a consolidated basis, with respect to such fiscal year.  Such financial statements shall include: (A) a balance sheet, (B) statement of operations, (C) statement of cash flows and any related statements and schedules, and (D) if so requested by the NHL Commissioner, an auditor's opinion from a nationally recognized independent accounting firm acceptable to the NHL Commissioner; and shall be accompanied by: (x) letters from its counsel to its auditors regarding pending or threatened litigation involving or affecting it, and (y) a brief description of all material pending or threatened litigation not identified by counsel and all litigation alleging discrimination or harassment on any basis.  Each Acquiring Party who is an individual shall furnish to the NHL, within ninety (90) days of the end of each fiscal year of the Club: (1) a certification, signed by an independent auditor of good standing, setting forth such Acquiring Party's personal net worth, and (2) at the NHL's request, true and complete personal financial statements, including: (I) a personal balance sheet and income statement, as of a recent date, (II) a statement of the methods and procedures used to determine the estimated current amount of assets and the estimated current amount of liabilities, (III) copies of his or her personal federal tax return for the previous year, together with a certificate from the individual that the return has been filed and all taxes shown as due thereon have been paid, and (IV) a statement describing the status of any material (i.e. greater than 2% of the applicable tax year's gross revenues) pending tax examinations.  In addition, such Acquiring Party individual shall disclose to the NHL any other relevant contingencies and commitments, including without limitation, contingent liabilities, including litigation and administrative actions by government agencies, and restrictions on use or transfer of assets.  The Acquiring Parties will give the NHL access, at the NHL's request on reasonable notice, to such Acquiring Party's premises and books and records in order to verify the accuracy of the foregoing financial statements or any other financial information provided to the NHL.

(h)     In addition to the financial statements described above, the Acquiring Parties shall deliver to the NHL such other financial statements with respect to any of the Acquiring Parties as the NHL may reasonably request from time to time.  All audited financial statements delivered to the NHL shall be prepared by a nationally recognized independent accounting firm and all financial statements, whether audited or unaudited, which are delivered to the NHL shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be in form and substance reasonably satisfactory to the NHL Commissioner or his designee.

(i)     Upon the NHL's request, the Club and the Acquiring Parties, shall: (i) promptly deliver to the NHL a confirmation, in such form and substance as the NHL may reasonably request, that the Club then currently maintains the required level of Net Working Capital, and (ii) provide the NHL (or its representatives) access to the Club's and the Acquiring Parties' books and records in order that the NHL may confirm the same is true and correct.

8.     Ownership and Control Proxies.

(a)     As a condition to the NHL granting its consent to the Proposed Transaction and entering into this Consent Agreement, each Proxy Grantor hereby represents, warrants, covenants and agrees that to the fullest extent permitted by applicable law: (i) such Proxy Grantor, in its or his capacity as a manager, member, general partner, limited partner, shareholder or other equity owner of any of the Club and/or any other [Club Group/other Acquiring Parties] [SUBJECT TO CONFIRMATION OF OWNERSHIP STRUCTURE] (each, a "Proxy Subject Entity", and collectively, the "Proxy Subject Entities"), and on behalf of its, his or her successors and assigns, is entering into and delivering to the NHL, simultaneously with the execution of this Consent Agreement, an irrevocable proxy in the form attached hereto as Exhibit C (each a "Proxy", and, collectively, the "Proxies") with respect to all direct ownership interests that such Proxy Grantor holds in any Proxy Subject Entity; (ii) [if such Proxy Grantor is delivering a Proxy with respect to [limited partnership or general partnership] interests in [_____], such Proxy Grantor is expressly permitted, pursuant to the terms of the [_____] limited partnership or general partnership agreement, as the case may be, to grant an irrevocable proxy with respect to such interests;] and (iii) such Proxy Grantor shall not challenge the enforceability or validity of any Proxy for any purpose or in any forum and shall re-execute a Proxy (or other documentation vesting the NHL Commissioner with ownership and control rights similar to those contemplated by the Proxies) in favor of the NHL at any time and from time to time upon the request of the NHL, including, without limitation, in circumstances where an existing Proxy (or other documentation) has expired, terminated or is otherwise unenforceable (and the NHL may include any Change thereto that the NHL deems necessary in its sole and absolute discretion to ensure the validity or enforceability of the Proxy (or other documentation)).

(b)     In addition to, and not in limitation of, the releases set forth in Paragraph 12 hereof, each Acquiring Party, on behalf of itself and its subsidiaries and other affiliates, and

the heirs, executors, administrators, trustees, beneficiaries, legal representatives, successors and assigns of each such person or entity, hereby forever releases and discharges, and agrees to hold harmless, each of the NHL Commissioner, any other proxy substituted or resubstituted for the NHL Commissioner, and each other Affiliated NHL Party (as defined below) from any and all Claims (as defined below) arising out of, attributable to, in connection with, or in any way relating to any conduct, act, omission, transaction or occurrence taken (or not taken) or occurring at any time under, pursuant to or otherwise in relation to the powers granted by any Proxy (or other documentation), together with all Claims arising as a result thereof (other than acts, omissions, transactions or occurrences constituting willful misconduct). Each Acquiring Party, on behalf of itself and its subsidiaries and other affiliates, and the heirs, executors, administrators, trustees, beneficiaries, legal representatives, successors and assigns of each such person or entity, covenants and agrees not to bring any action, proceeding, suit, or claim, or to execute, attach, levy, distrain or pursue any other legal process or take any steps in furtherance of the same against any or all of the NHL Commissioner, any other proxy substituted or resubstituted for the NHL Commissioner, or any other Affiliated NHL Parties or their properties in respect of the matters released hereunder or challenging the validity of, or seeking to invalidate, any Proxy (or other documentation).

        (c)     Each of the Acquiring Parties, jointly and severally, represents, warrants, covenants and agrees that: (i) each Proxy Subject Entity's Organizational Documents, in each case the provisions of which shall be enforceable to the fullest extent permitted by applicable law, provides that an affirmative vote of its shareholders, partners or members, as applicable shall be required as a condition to: (A) such Proxy Subject Entity voluntarily filing for or otherwise pursuing or taking actions in furtherance of any bankruptcy, dissolution, liquidation or reorganization of such Proxy Subject Entity or the appointment of any conservator of, or trustee or similar official for, such Proxy Subject Entity or any substantial part of its assets (including, without limitation, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); and (B) any Change to the Organizational Documents of such Proxy Subject Entity that would affect in any way the requirement of prior shareholder, member or partner approval, as the case may be, with respect to the matters referenced in clause (A) of this sentence or that would otherwise Change the voting or consent or dissent rights of the issued and outstanding ownership interests in such Proxy Subject Entity and (ii) pursuant to the Proxy or Proxies delivered by any Proxy Grantor, neither such Proxy Grantor nor any other person or entity, other than the NHL Commissioner (or his designee), shall have the power or authority to exercise any rights necessary to ratify the actions referenced in this Paragraph 8(c) with respect to the Proxy Subject Entities with respect to which such Proxy Grantor has delivered a Proxy and, accordingly, no such action can or will be taken without the prior written consent of the NHL Commissioner (or his designee) which may be granted or withheld in the NHL Commissioner's (or his designee's) sole and absolute discretion.

        9.      <u>Representations and Warranties</u>.

(a)     The Sellers hereby jointly and severally represent and warrant to the NHL as follows:

(i)     Each of the Sellers that is a trust, corporation, limited partnership, limited liability company or other entity is duly created or organized, as the case may be, validly existing and in good standing under the laws of its state of existence, and each has the power and authority to own, operate and lease its properties and to carry on its business and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification.

(ii)     Each of the Club, [_____], [_____] and the Sellers has the power and authority to execute and deliver this Consent Agreement and to perform its, his or her, as applicable, obligations hereunder.

(iii)     The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of the Club, [_____], [_____] and each Seller enforceable in accordance with its terms.

(iv)     The Franchise and the other assets being transferred to the [Acquiring Parties] are being transferred free and clear of any liens, security interests, pledges, charges, encumbrances or claims of liability and free of any options or any other rights of acquisition or conversion that would entitle any other person or entity to acquire an ownership or other interest, direct or indirect, in the Franchise or the other assets of the Sellers being transferred to the [Acquiring Parties] pursuant to the Purchase Agreement.

(v)     There is no action, suit, or proceeding pending against any Seller or any other party which involves the likelihood of any adverse judgment or liability not fully covered by insurance and which may result in a material adverse change in the business, properties or assets, or in the condition, financial or otherwise, of the Franchise or which may prevent or impede the consummation of the transactions contemplated by the Transaction Documents or this Consent Agreement.  There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of the Sellers, requested by, any court or governmental agency which does or may result in any material adverse change in the business, properties or assets, or in the condition, financial or otherwise, of the Franchise or which may prevent or impede the consummation of the Proposed Transaction or this Consent Agreement.

(vi)     All consents, waivers, approvals, orders, and authorizations of any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities) that are required in connection with the Proposed Transaction have been obtained and are in full force and effect.

(vii)     The execution and delivery of this Consent Agreement, and compliance with the terms hereof by the Sellers and the consummation of the transactions contemplated by the Purchase Agreement and this Consent Agreement, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of the properties or assets of any of them (except as contemplated or disclosed herein or the schedules hereto) pursuant to, any indenture, mortgage, lease, agreement or other instrument to which any of them is a party or by which they are bound, including, without limitation, the Organizational Documents of such entity.

(viii)     Each of the Sellers has performed in all material respects all obligations required to be performed by it (or him or her, as the case may be) to date with respect to the transactions contemplated by this Consent Agreement and none of them is in default in any respect under any contract, agreement, lease, or other instrument relating to the same to which any of them is a party or by which it (or he or she, as the case may be) is bound.  True, correct and complete copies of all documents described or referred to herein or in any schedule attached hereto have heretofore been delivered or made available to the NHL or will be made available upon request and will be certified by an officer of the Club or any Seller for identification upon request of the NHL**.**

(ix)     The Transaction Documents have been executed in the form delivered to the NHL and there are no other arrangements, agreements, or understandings, whether written or oral, among the parties to the Transaction Documents which relate to the Proposed Transaction.

(b)     The Acquiring Parties hereby jointly and severally represent and warrant to the NHL as follows:

(i)     Each of the Club, [_____] and [_____] is a [TYPE OF ENTITY], duly organized, validly existing and in good standing under the laws of [STATE OF FORMATION], and has the power and authority to own, operate and lease its properties and to carry on its business and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification.

(ii)     Each of the other Acquiring Parties that is an entity, is duly organized or created, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its organization or creation, as the case may be, and has the power and authority to own, operate and lease its properties and to carry on its business and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification.  [_____] has been organized for the sole purpose of effecting the Proposed Transaction and, except for liabilities and obligations incurred pursuant to the

Transaction Documents, has incurred no material liabilities or obligations prior to the date hereof.

(iii)     Each of the Acquiring Parties has the power and authority to execute and deliver this Consent Agreement and to perform its (or his/her, as the case may be) obligations hereunder.

(iv)     The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of each of the Acquiring Parties enforceable in accordance with its terms.

(v)     The direct and indirect ownership or other interests in the Club referenced in Schedule A hereof are validly issued and fully paid and are held free and clear of any liens, security interests, pledges, charges, encumbrances or claims of liability [other than the pledge of certain direct ownership or other interests in the Club in favor of [_____] in accordance with and subject to the terms and conditions of, the Lender Letter Agreement]. No Acquiring Party presently has any intention of selling any part of its, his or her interest in the Club, whether direct or indirect, or any of the assets of the Club, or any other Acquiring Party and ,except as set forth on Schedule 9(b)(v) hereof, there are no options, warrants, put or call rights, rights of first refusal or any other rights of acquisition or conversion that would entitle any person or entity to acquire any direct or indirect interest, whether equity or otherwise, in any Acquiring Party.

(vi)     All balance sheets, income statements and other financial statements heretofore furnished by the Acquiring Parties to the NHL in connection with the application for this consent have been prepared in accordance with generally accepted accounting principles, were made in good faith and were true, complete and correct at the time such information was provided and are true, complete and correct as of the date hereof.

(vii)     There is no action, suit, or proceeding pending against any Acquiring Party or any other party which involves the likelihood of any adverse judgment or liability not fully covered by insurance and which may result in a material adverse change in the business, properties or assets, or in the condition, financial or otherwise, of any Acquiring Party or which may prevent or impede the consummation of the transactions contemplated by the Transaction Documents or this Consent Agreement. There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of any Acquiring Parties, requested by, any court or governmental agency which does or may result in any material adverse change in the business, properties or assets, or in the condition, financial or otherwise, of any Acquiring Party or which may prevent or impede the consummation of the Proposed Transaction or this Consent Agreement.

(viii)   To the best knowledge and belief of each of the Acquiring Parties, each has complied in all material respects with all material laws, regulations and orders, federal or otherwise.

(ix)   All consents, waivers, approvals, orders, and authorizations of any persons or entities or governmental or regulatory authorities (including, without limitation, [_____] and any holder of any direct or indirect interests in the Club or any other Acquiring Party) (or registrations, declarations, filings or recordings with any such authorities) that are required in connection with the Proposed Transaction have been obtained and are in full force and effect.

(x)   Each of the Acquiring Parties has performed in all material respects all obligations required to be performed by it (or him or her, as the case may be) to date with respect to the transactions contemplated by this Consent Agreement and, [except as disclosed in Schedule 9(b)(x) hereof,] none of them is in default in any respect under any contract, agreement, lease, or other instrument relating to the same to which any of them is a party or by which it (or he or she, as the case may be) is bound.  True, correct and complete copies of all documents described or referred to herein or in any schedule attached hereto have heretofore been delivered or made available to the NHL or will be made available upon request and will be certified by an officer of the Club or the Acquiring Party for identification upon request of the NHL.

(xi)   The execution and delivery of this Consent Agreement, and compliance with the terms hereof by each Acquiring Party and the consummation of the transactions contemplated by the Transaction Documents and this Consent Agreement, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of the properties or assets of any of them (except as contemplated or disclosed herein or the schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which any of them is a party or by which they are bound.

(xii)   Since the date of the financial statements referred to in Paragraph 9(b)(vi) hereof there has been no material adverse change in the condition, financial or otherwise, of any Acquiring Party.

[(xiii)   With respect to each trust which has any direct or indirect ownership or other interest in the Club or any other Acquiring Party: (x) the trustees and sole beneficiaries identified in Paragraph 5(a) hereof are the sole trustees and the sole beneficiaries of such trusts and: (A) such trustees shall at all times remain the sole trustees of, and shall have exclusive control over, such trusts and (B) the sole beneficiaries of such trusts shall hereafter be limited to such sole beneficiaries or lineal descendants of the grantor of such trust, and (y) the beneficiaries of such trusts shall not

20

take any action to affect the management of, the right to vote any direct or indirect interest in, or effective control over, the Club or any direct or indirect holder of any interest in the Club, unless authorized in writing by the applicable trustees and, to the extent required under the NHL Constitution and Agreements, approved by the NHL.]

(xiv)   All information and documents submitted or provided by or on behalf of the Acquiring Parties to the NHL or any designee of the NHL in connection with the Acquiring Parties' application for ownership was true, complete and correct at the time such information was provided and is true, complete and correct as of the date hereof.

(xv)   The Transaction Documents have been executed in the form delivered to the NHL and there are no other arrangements, agreements, or understandings, whether written or oral, among the parties to the Transaction Documents which relate to the Proposed Transaction.

10.   Cable Agreements and Prohibition on Gambling.

(a)   (i)   The Club and the other Acquiring Parties jointly and severally covenant and agree to take all actions necessary so that any cable entity at any time having the right to cablecast Club games shall be obligated to, and shall, broadcast such games consistent with the past practice of the Club on a basic channel which is made available to all subscribers, and not on a channel which is made available only to premium service subscribers.

(ii)   At all times, the Club and the other Acquiring Parties jointly and severally covenant and agree to, and jointly and severally covenant and agree to cause any entity having the right to telecast Club games to, make available to the NHL or its designee, free of charge, a "clean" feed and a "dirty" feed of all of the Club home and away games being telecast (whether exhibition, regular season, playoff or finals), to be used by the NHL or its designee for any and all purposes, including domestic and international telecasts, pay-per-view, back-yard dish and satellite to home.

(b)   Except to the extent expressly permitted under the NHL Constitution and Agreements, the Club and the other Acquiring Parties jointly and severally covenant and agree that none of the Club, any other Acquiring Party nor any affiliate of any of the foregoing: (i) shall at any time carry on or be involved in any gaming ventures, gambling activities or businesses associated, directly or indirectly, with a gaming venture or a gambling activity (a "Gaming Activity"); (ii) shall permit, allow or induce any player, coach or other employee of the Club, any other Acquiring Party, any other NHL Member Club or any other person directly involved or identified with the Franchise or any other NHL Member Club, to promote or otherwise be in any way associated or affiliated with, directly or indirectly, any Gaming Activity; or (iii) shall use, or permit any other person or entity to use, the NHL's or the Dallas Stars' name insignia or other intellectual property in connection with any Gaming Activity.  Unless the

21

NHL's prior written consent is obtained (which consent may be withheld by the NHL in its sole and absolute discretion): (I) no person may serve as an officer, manager or director of the Club or any other Acquiring Party if such person also serves as an officer, manager or director of any entity that conducts a Gaming Activity and (II) there shall be no intercompany loans or intercompany agreements or transactions entered into between any entity involved in any Gaming Activity and the Club or any other Acquiring Party.

           11.    <u>Financing Statements</u>.  The Club and the other Acquiring Parties hereby authorizes the NHL to file, and jointly and severally covenant and agree to execute, any and all financing or other information statements or filings requested by the NHL that the NHL deems necessary to notify creditors of the Club and the other Acquiring Parties of the existence of Article III of the NHL Constitution and this Consent Agreement.

           12.    <u>Release and Limitation of Liability</u>.

           (a)    As partial consideration for the NHL providing the consents contained herein, the Sellers, the Club and the other Acquiring Parties, on their own behalf and on behalf of their respective subsidiaries and other affiliates and the heirs, executors, administrators, trustees, beneficiaries, legal representatives, successors and assigns of each such person or entity (collectively, the "<u>Releasors</u>"), hereby forever release and discharge each of the NHL Entities and each of the NHL Member Clubs (except the Club, but including future NHL Member Clubs) and each of their respective subsidiaries and other affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors (but only to the extent they are acting as agents for, or acting for or on behalf of, the NHL Entities, the NHL Member Clubs (except the Club) or in their individual capacities) (collectively, "<u>Affiliated NHL Parties</u>") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), whether known or unknown ("<u>Claims</u>"), arising out of, attributable to or relating to any act, omission, transaction or occurrence taken (or not taken) or occurring (or not occurring) at any time up to and including the date of the execution of this Consent Agreement or continuing materially unchanged after the date of this Consent Agreement, except for those amounts, if any, which may be due to any of the Releasors from any Affiliated NHL Party in the ordinary course of business.

           (b)    Other than in respect of amounts, if any, which may be due to any of the Releasors from an Affiliated NHL Party in the ordinary course of business, the Affiliated NHL Parties shall have no liability whatsoever for actions taken (or not taken) following the date hereof on behalf of any NHL Entity or an NHL Member Club, provided that such actions do not constitute willful misconduct.  Accordingly, the Sellers, the Club and the other Acquiring Parties on their own behalf and on behalf of their heirs, executors, administrators, trustees, beneficiaries, legal representatives, successors and assigns, hereby: (i) release and covenant not to sue in

connection with or assert, and agree to cause their respective subsidiaries and other affiliates not to sue in connection with or assert, any Claims which they or any other party may hereafter have in connection with any acts taken (or not taken) following the date of this Consent Agreement by any Affiliated NHL Party, provided that such actions are taken (directly or indirectly) by the Affiliated NHL Party on behalf of an NHL Entity or an NHL Member Club and do not constitute willful misconduct on the part of such Affiliated NHL Party, and (ii) jointly and severally agree to indemnify, and agree to cause their respective subsidiaries and other affiliates to release and indemnify, the Affiliated NHL Parties from such Claims.

If any Affiliated NHL Party asserts a claim against any Acquiring Party or any Seller, then the releases contained in paragraphs (a) and (b) above shall not prohibit or limit in any manner such Acquiring Party or Seller, as the case may be, from asserting a defense to that claim.

(c)  Without limiting any other rights any Affiliated NHL Party may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement and/or any other Relevant Agreement, the Sellers, the Club and the other Acquiring Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with Affiliated NHL Parties) (collectively, "Losses") incurred or required to be paid by an Affiliated NHL Party, arising out of, attributable to or relating to: (i) the Proposed Transaction and any other  transactions or other acts or occurrences relating to or contemplated by the Proposed Transaction or the Transaction Documents and/or the NHL's and NHL Member Clubs', where applicable, consideration of and consent to the Proposed Transaction, (ii) any act, omission, liability or obligation (including, without limitation, all obligations set forth in this Consent Agreement and/or any other Relevant Agreements) of any Seller, the Club or any other Acquiring Party, any of their respective subsidiaries or other affiliates or any of their respective former or present shareholders, partners, members, managers, investors, directors, officers, employees, representatives or agents, or (iii) any breach of any warranty, covenant or agreement or any misrepresentation in this Consent Agreement or any other Relevant Agreements by any Seller, the Club or any other Acquiring Party.  The NHL agrees: (x) that in the event it reasonably expects to seek indemnification from the Club, any other Acquiring Party or Seller with respect to any such third party claim, it will give such party notice of the claim, and (y) that so long as such indemnifying party confirms and affirms to the NHL its indemnity obligations hereunder in a writing in form and substance satisfactory to the NHL in its sole and absolute discretion (provided that the NHL's waiver of such obligation and/or the indemnifying party's failure to do so shall in no event have any effect whatsoever on the indemnifying party's obligations hereunder): (A) such party will be consulted on a reasonable basis concerning the defense, settlement, or other response to such claim, (B) such party shall have the right to participate, but not control the defense or other response to such a claim and (C) no third party claim which is based on an act or omission of the Club, any other Acquiring Party or Seller for which indemnification is sought will be settled without the consent of the Club or the applicable other Acquiring Party or Seller, such consent not to be

unreasonably withheld.  In any event, each of the Sellers, the Club and the other Acquiring Parties agree that they shall fully cooperate with the NHL, its designated counsel and other representatives in connection with any such claim.

(d)     Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights: (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Club or any other entity, or (ii) to defer or off-set any distribution to the Club, all of which rights, and the seniority thereof, are hereby confirmed and affirmed by each of the Sellers, the Club and the other Acquiring Parties.  Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of the NHL Member Clubs, of any debts, liabilities or obligations whatsoever of the Club, any other Acquiring Party, any Seller or any other party.

13.     <u>Additional Provisions</u>.

(a)     The Sellers, the Club and the other Acquiring Parties jointly and severally covenant and agree that all legal, background checks and investigations and accounting fees and other costs and expenses incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Club and shall be the obligation thereof.

(b)     This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred.  This Consent Agreement, and the Sellers', the Club's and the other Acquiring Parties representations, warranties, covenants and agreements may not be assigned (directly, indirectly, by merger or consolidation, operation of law, change of control or otherwise) without the written consent of the NHL in its sole and absolute discretion.  Notwithstanding anything to the contrary contained in any Transaction Document (including, without limitation, Section [__] of the [_____]), any dispute among any of the parties hereunder relating to the subject matter hereof shall be deemed to be a dispute which shall be resolved in accordance with Article 6.3 of the NHL Constitution and the NHL Commissioner shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute whether or not the Proposed Transaction is consummated in accordance with its terms.  Notwithstanding anything to the contrary contained in any Transaction Document, the Club shall have the right: (i) to vote in favor of, or otherwise consent to, any amendment, modification, rescission or restatement of any governing, constitutive, operating and other agreements or documents relating to any NHL Entity, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities and (ii) to invest or acquire an interest in any entity in which the NHL or NHL Member Clubs generally are investing or acquiring interests.

(c)     All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date

803126.05-New York Server 3A - MSW

of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows:

> If to the NHL:
>
> National Hockey League
> 1185 Avenue of the Americas
> New York, New York 10036
> <u>Attention</u>:  David Zimmerman,
> Executive Vice President and General Counsel
>
> With a copy, which shall not constitute notice, to:
>
> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Attention: Thomas W. Gowan
>
> If to the Club or any Acquiring Party:
>
> [Name]
> [Address]
> [Attention:]
>
> If to any Seller:
> [Name]
> [Address]
> [Attention:]

or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

(d)     This Consent Agreement and the other Relevant Agreements and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the transactions contemplated herein and supersede all prior agreements or understandings among the parties hereto relating to the subject matter hereof. This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof.  Notwithstanding the foregoing, nothing in this Consent Agreement or in any other agreement or document delivered in connection herewith shall be construed to amend, affect, terminate or otherwise modify any of the terms or provisions of any consent agreement, guaranty or other agreement or document previously delivered by any Seller or any of their affiliates to the NHL, each of which is hereby affirmed, confirmed and ratified and shall remain in full force and effect.  It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this Consent Agreement by any other party hereto of any of its, his or her obligations hereunder and will not have an adequate remedy at law, and

25

therefore, the NHL shall in addition to any other remedy available to it at law or in equity, be entitled to temporary, preliminary and permanent injunctive relief and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. This Consent Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party.

(e)     This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument. In addition, this Consent Agreement may contain more than one counterpart of the signature page and may be executed by the affixing of the signatures of each of the parties to one of such counterparts. All of such counterparts shall be read as though one, and they shall have the same force and effect as though all the signers had signed a single page. Delivery of an executed counterpart of a signature page of this Consent Agreement by facsimile or by e-mail of a .pdf file shall be effective as delivery of a manually executed counterpart of this Consent Agreement.

(f)     No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)     The representations, warranties, covenants and agreements contained in this Consent Agreement shall be construed as representations, warranties, covenants and agreements between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as representations, warranties, covenants and agreements between any of such parties other than the NHL. Accordingly, any of such representations, warranties, covenants and agreements, and any of the transactions referred to in such representations, warranties, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party or parties other than the NHL to which such representations, warranties, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party. By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Club or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. No such waiver, amendment, consent or other approval shall be effective unless set forth in writing signed by the NHL and no waiver, amendment, consent or other approval of any provision on any occasion shall constitute a waiver, consent or approval with respect to such provision or any other provision on any subsequent occasion.

(h)     The parties hereto acknowledge, covenant and agree that the failure by the Club, any other Acquiring Parties or any other party to this Consent Agreement, any other Relevant Agreement or any other consent or letter agreements or guaranties entered into with respect to the Club after the date hereof to promptly and completely comply with any of the provisions of any such agreement, document or instrument, including, without limitation, Paragraph 7 hereof, shall constitute a material breach of this Consent Agreement that entitles the NHL to take action permitted by the NHL Constitution, this Consent Agreement and/or any such other agreement, document or instrument.  Said action includes, in addition to any and all other rights to which the NHL shall be entitled under the NHL Constitution and Agreements, this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation.  Furthermore, and without limiting any of the NHL's rights under this Paragraph 13(h) or otherwise in this Consent Agreement, any other Relevant Agreement, any other consent or letter agreements or guaranties entered into with respect to the Club after the date hereof, or at law, each of the Acquiring Parties expressly acknowledges and agrees and consents to the NHL, upon the failure of any party to promptly and completely fulfill any of its obligations under this Consent Agreement, any other Relevant Agreement or any other consent or letter agreements or guaranties entered into with respect to the Club after the date hereof, taking any and all such other actions as it deems necessary and/or appropriate to take over the operations and control of the Club and/or [Club Group/any other Acquiring Party], and to provide for the continued management, operation, ownership and financing of the Club, [Club Group/any other Acquiring Party] and/or their respective subsidiaries and affiliates in order, among other things, to preserve and protect the interests of the NHL and the NHL Member Clubs, including, without limitation, the Club, and the reputation and integrity of the NHL and professional hockey; provided, however, that the NHL shall be under no obligation to take any action (or not take any action) with respect to any of the foregoing at any time, but rather any decision by the NHL to take any such action (or not take any such action) shall be at the sole discretion of the NHL.  No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.  In addition to the indemnification liability of the Acquiring Parties contained in Paragraph 12 hereof, the Acquiring Parties acknowledge and agree that at all times the amount and value of the Acquiring Parties' investment (whether by equity or debt) in the **[Club Group/other Acquiring Parties]** will be subject to partial or complete loss, including without limitation, as a result of action that the NHL may take, in its sole and absolute discretion, as permitted by this Consent Agreement, the other Relevant Agreements and/or the NHL Constitution and Agreements (e.g., the NHL may take ownership and control of, or otherwise sell the **[Club Group/other Acquiring Parties]**, in a manner that results in the Acquiring Parties not receiving any value on account of the Acquiring Parties' investment (whether by equity or debt) in the **[Club Group/other Acquiring Parties]**).  Each of the Acquiring Parties expressly acknowledges and agrees that the obligations imposed on them in this Paragraph 13(h), and their agreement to be bound thereby, is a material inducement to the NHL to approve the Proposed Transaction and to enter into this Consent Agreement.

(i) All of the parties to this Consent Agreement acknowledge, covenant and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement, on the one hand, and any Transaction Document, on the other hand, the terms of this Consent Agreement shall control and all such conflicts or ambiguities shall be resolved in a manner that will provide the NHL with the maximum protection that may be afforded to it.

(j) Each of the Acquiring Parties and the Sellers represents and warrants that in entering into this Consent Agreement, it has proceeded with the advice of attorneys of its own respective choosing, that it has read the terms of this Consent Agreement, that the terms of this Consent Agreement have been fully and completely read and explained to it by its respective attorneys, and that those terms are fully understood and voluntarily accepted by it under no compulsion or duress of any kind whatsoever (including without limitation the terms of Paragraphs 7, 8 and 12 hereof).

(k) Each of the parties hereto other than the NHL jointly and severally represents and warrants to the NHL that, on or prior to the date hereof, the NHL has been provided with true, accurate and complete copies of all of the Transaction Documents (including, without limitation, any amendments to the Transaction Documents executed prior to the date hereof) and there are no agreements by or among the Club, any other Acquiring Parties, any Seller and/or any other parties with respect to the subject matter of such Transaction Documents not reflected in such copies. Each of the parties hereto other than the NHL acknowledges and agrees that: (i) the representations and warranties set forth in this paragraph are material inducements to the NHL to grant the consent granted hereby, and (ii) any modification of any Organizational Document and any material modification of any other Transaction Document or any of the obligations arising thereunder that is hereafter made without the consent of the NHL or that has heretofore been made but not disclosed to the NHL (or any breach of any representation or warranty set forth in this paragraph) may, at the NHL's option, be deemed to be a material breach of and under this Consent Agreement and/or the other NHL Constitution and Agreements, as the case may be, which such breach shall entitle the NHL to exercise its rights and remedies against any of the parties hereto in respect thereof under the NHL Constitution and Agreements and/or any and all applicable documents or agreements and/or withdraw its consent hereunder or exercise any rights that it may have hereunder with respect to such party.

(l) For greater certainty and clarity, notwithstanding anything contained in any Transaction Documents or otherwise, no person or other entity other than the NHL shall have any right under, or to enforce, any consent agreement (other than, with respect to the parties to this Consent Agreement, this Consent Agreement) entered into by the Club, the NHL and the

other parties thereto or any guaranty executed in connection therewith by any party thereto in favor of the NHL.

(m)     The headings in the paragraphs of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

(n)     Subject to the third sentence of Paragraph 13(b) hereof, the courts of New York State located in Manhattan and the United States District Court for the Southern District of New York shall have exclusive jurisdiction over the parties (and the subject matter) with respect to any dispute or controversy arising under or in connection with this Consent Agreement; and by execution of this Consent Agreement, each Seller and each Acquiring Party submits to and accepts the exclusive jurisdiction of those courts and irrevocably agrees to be bound by any final judgment rendered thereby in connection with this Consent Agreement or any matter affecting the Club, in general.  A summons or complaint in any such action or proceeding may be served in accordance with Paragraph 13(c) hereof.  Each Seller and each Acquiring Party irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it or he may now or hereafter have to the bringing of any such action or proceeding in any such jurisdiction.  Nothing in this Consent Agreement will limit the right of the NHL to serve process in any other manner permitted by law.

14.     Intercompany Debt.

(a)     Unless the NHL shall otherwise agree in writing in its sole and absolute discretion on a case by case basis, (i) no Acquiring Party (the "Holder") shall advance any debt ("Intercompany Debt") to [Club Group/other Acquiring Parties] (the "Obligor") unless such Intercompany Debt includes terms (of which the NHL shall be expressly be made a third party beneficiary) pursuant to which all amounts owing with respect to such Intercompany Debt (principal, interest and otherwise) will be convertible, at the sole option of the NHL (the "NHL Option") and at such times as the NHL may determine in its sole and absolute discretion, into equity interests in the capital of the Obligor, at a definitive rate of conversion explicitly set forth in the document evidencing such Intercompany Debt and (ii) no affiliate of any Acquiring Party shall advance any debt to any [Club Group/other Acquiring Parties].  The Holder and Obligor shall provide the NHL with advance notice of, and the right to approve in writing, the form of document evidencing any Intercompany Debt to confirm the NHL Option is included therein and that the NHL has been expressly been made a third party beneficiary thereof.  If the Holder and the Obligor fail to agree upon and include a definitive rate of conversion explicitly set forth in the document evidencing any Intercompany Debt, then, unless the NHL shall otherwise agree in writing in its sole and absolute discretion, the NHL may exercise the NHL Option with respect to such Intercompany Debt and convert such debt into equity interests in the capital of the Obligor at such rate as the NHL shall determine in its sole and absolute discretion.  The NHL Option with respect to any Intercompany Debt shall be exercisable in the NHL's sole and absolute discretion, at any time, both before and after demand or maturity, and both before and after

29

default and judgment, upon written notice to the Holder and Obligor, and until such date as: (i) all amounts owing under the Intercompany Debt have been paid in full, (ii) the Intercompany Debt has been cancelled, and (iii) the NHL has been provided with written notice thereof. Such equity interests shall be issued to the Holder as fully paid and non-assessable and shall be registered in the records of the Obligor in the name of the Holder as legal and beneficial owner. Upon the issuance of such equity interests to the Holder, all amounts owing by the Obligor to the Holder under the applicable Intercompany Debt shall be deemed fully paid and discharged.

(b)     In connection with incurring any Intercompany Debt (other than Intercompany Debt, if any, for which the NHL has in its sole and absolute discretion waived in writing the NHL Option), the Obligor shall take, or cause to be taken, all actions necessary to authorize and reserve for issuance the equity issuable upon conversion of such Intercompany Debt, so that no further approvals, consents or authorizations (other than from the NHL) shall be required in connection with the valid issuance of equity issuable upon exercise of the NHL Option. No Acquiring Party shall, at any time while any amount is outstanding under an Intercompany Debt, take any action which may restrict or impair the ability of the Obligor thereunder to issue the equity interests required to be issued pursuant to any exercise at any time of the NHL Option. For purposes of clarity, a Holder of any Intercompany Debt shall not have any rights or privileges as a shareholder of the Obligor thereunder with respect to any equity interests required to be issued pursuant to any exercise of the NHL Option unless and until the NHL Option is exercised and such equity interests have been issued.

(c)     Any [Club Group/other Acquiring Parties] issuing any Intercompany Debt at any time shall include the following language on the face of any note, bond, debenture or other instrument evidencing such Intercompany Debt:

"This note and the indebtedness evidenced hereby are subject to a right of conversion in favor of the NHL, which such right permits the NHL to require that all amounts owing hereunder at any time be converted into [Insert Applicable Equity Interest] in [Insert Obligor] at the conversion rate set forth herein. The NHL's right of conversion may be exercised at any time both before and after demand or maturity, and both before and after default and judgment, and in all cases in the sole and absolute discretion of the NHL, all as more particularly described in that certain Consent Agreement, dated as of [_____], 2011, as amended from time to time, by and among, inter alia, the parties hereto and the NHL. The terms of this note may not be amended or modified without the prior written consent of the NHL, which may be granted or withheld in the NHL's sole and absolute discretion."

[The remainder of page is intentionally left blank.]

803126.05-New York Server 3A - MSW

IN WITNESS WHEREOF, the parties have executed and delivered this Consent Agreement as of the date first written above.

NATIONAL HOCKEY LEAGUE


By: _____
    David Zimmerman
    Executive Vice President and General Counsel


[CLUB]


By: _____
Name:
Title:


[SIGNATURE BLOCKS FOR EACH SELLER PARTY]


By: _____
Name:
Title:


[SIGNATURE BLOCKS FOR EACH ACQUIRING PARTY]


By: _____
Name:
Title:

# **EXHIBIT D**

**[SUBJECT TO CONFIRMATION OF THE TRANSACTION AND OWNERSHIP STRUCTURE AND RECEIPT AND REVIEW OF COPIES OF ALL TRANSACTION AND ORGANIZATIONAL DOCUMENTS.  ADDITIONAL MODIFICATIONS MAY BE REQUIRED.]**

**FORM OF GUARANTY**

This GUARANTY is made as of [_____], 2011 by [FOR EACH PROPOSED DIRECT AND INDIRECT OWNER OR HOLDER OF ANY INTEREST IN THE CLUB INSERT NAME, AND AS APPLICABLE, STATE OF FORMATION AND TYPE OF ENTITY] ([____]; and together with [_____] and [_____], collectively, the "Guarantors"), in favor of the National Hockey League, a joint venture organized as an unincorporated, not-for-profit association with its primary office located at 1185 Avenue of the Americas, New York, New York 10036 (the "League").

W I T N E S S E T H

WHEREAS, the Guarantors have requested that the League approve certain transactions, including, *inter alia*, that certain Proposed Transaction (as defined in the Consent Agreement referred to below) pursuant to which, *inter alia*, [the Guarantors will acquire or retain certain direct and indirect interests in [_____], a [_____] (the "Club"), which is the holder of the National Hockey League franchise known as the Dallas Stars,]/[[_____], a [_____] (the "Club"), is acquiring on the date herof the National Hockey League franchise known as the Dallas Stars,] all as described in that certain Consent Agreement of even date herewith entered into by the Club, the Guarantors, certain other parties and the League (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Consent Agreement"), the current form of which is attached as Exhibit A hereto;

[WHEREAS, following the consummation of the Proposed Transaction, the Club shall continue to hold the National Hockey League franchise known as the [NAME OF TEAM] and the ownership of the [Club Group/other Acquiring Parties] shall be as set forth in Schedule A to the Consent Agreement;]

WHEREAS, as a condition precedent to the League providing its consent to the Proposed Transaction, the League is requiring that, *inter alia*, the Guarantors enter into this Guaranty; and

WHEREAS, the Guarantors desire, and deem it to be in their best interests, that the Proposed Transaction be consummated;

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in

1

order to induce the League to provide its consent to the Proposed Transaction, and in consideration thereof, the Guarantors, intending to be legally bound, hereby agree as follows:

1.  Definitions.  Capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Consent Agreement.

2.  Guaranty of Payment and Performance.

(a)  The Guarantors, jointly and severally, do hereby absolutely and unconditionally and irrevocably, to and for the benefit of the League: (i) guarantee and agree to provide to the [Club Group/other Acquiring Parties] from time to time such amounts as from time to time may be necessary for: (A) the Club to maintain a minimum of $10 Million ($10,000,000) of Net Working Capital and (B) the [Club Group/other Acquiring Parties] to otherwise pay all Operating Expenses in the ordinary course and in a timely fashion; (ii) guarantee the full and punctual payment and performance of all debts, expenses, obligations and liabilities of the [Club Group/other Acquiring Parties] (and any direct or indirect subsidiaries of the Club at any time hereafter existing) as and when the same shall become due and payable, whether now or hereafter arising and however incurred including but not limited to, all debts, expenses, obligations and liabilities of the Club under the Consent Agreement and (iii) guarantee and agree to provide to the Club or to any other member of the [Club Group/other Acquiring Parties] such amounts as from time to time may be requested by the League pursuant to Paragraph 7(e) of the Consent Agreement ((i), (ii) and (iii) are collectively referred to herein as the "Guaranteed Obligations").

(b)  This is an absolute, unconditional, irrevocable, unlimited and continuing guaranty of the Guaranteed Obligations and shall remain in full force and effect and shall be binding upon the Guarantors so long as there is any Guaranteed Obligation outstanding, regardless of whether there was a period of time when no Guaranteed Obligation was outstanding.  The liability of the Guarantors shall be effective immediately and shall be payable on demand by the League.  This Guaranty is a guaranty of performance and payment and not only of collection, and recovery may be had from the Guarantors in all cases without the League's first making, pursuing or exhausting any demand, claim or remedy against the Club or any other person or against any collateral for the Guaranteed Obligations or any other property, and despite any alleged or actual invalidity or unenforceability of any Guaranteed Obligation or of any instrument, writing or arrangement relating to any of the Guaranteed Obligations.  The League shall have no duty to collect or protect any collateral or any income thereon, nor to preserve any rights against other parties.

3.  Guarantors' Agreement to Pay.  The Guarantors further agree, jointly and severally, as principal obligors and not as guarantors only, to pay to the League, on demand, all reasonable costs and expenses (including court costs and legal and accounting expenses) incurred or expended by the League in connection with the Guaranteed Obligations, this Guaranty and the enforcement thereof.

4.  Waivers by Guarantors.  The Guarantors hereby waive each of the following: (a) notice of acceptance of this Guaranty, demand of payment, presentment of this or

any instrument, notice of dishonor, protest and notice of protest, or other action taken in reliance hereon and all other demands and notices of any description in connection with this Guaranty; (b) all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshalling of assets, and all suretyship defenses generally; (c) any right to a jury trial with respect to any action or claim arising out of any dispute in connection with this Guaranty, any rights or obligations hereunder or the performance of such rights and obligations; and (d) any and all rights of subrogation, reimbursement, or indemnity which may now or hereafter accrue to the Guarantors directly or indirectly in respect of any assets or property of the [Club Group/other Acquiring Parties] and any and all rights of recourse to or with respect to any assets or property of the [Club Group/other Acquiring Parties] or to any other collateral for the Guaranteed Obligations.

5.  <u>Continuity of Guaranteed Obligations; Bankruptcy or Insolvency</u>.  If all or any part of any payment applied to any Guaranteed Obligation is or must be recovered, rescinded or returned to a Guarantor for any reason whatsoever (including, without limitation, bankruptcy or insolvency of any party), such Guaranteed Obligation shall be deemed to have continued in existence and this Guaranty shall continue in effect as to such Guaranteed Obligation, all as though such payment had not been made.  Upon the bankruptcy, insolvency, or dissolution of, or the commencement of any case or proceeding under any bankruptcy, insolvency, or similar law in respect of, the Club or any of the Guarantors, or upon the default of the Club or any of the Guarantors under the Consent Agreement, the Guarantors will forthwith pay and perform in full all outstanding Guaranteed Obligations, including any that would not otherwise then be due and payable.

6.  <u>League's Freedom to Act</u>.  This Guaranty shall remain in full force and effect despite, and the liability of the Guarantors with respect to any Guaranteed Obligation shall not be terminated by, and each of the Guarantors hereby assents to: (i) any amendment or other change in any of the Guaranteed Obligations, (ii) any extension or postponement of the time of payment of the Guaranteed Obligations, (iii) any forbearance, delays, waivers or compromises with respect to the Guaranteed Obligations, (iv) any other indulgence, modification, waiver or amendment of the terms of any agreement relating to the Guaranteed Obligations, (v) any substitution, exchange or release of any collateral securing the Guaranteed Obligations, (vi) the addition or release of any Guarantor or any other guarantor, or (vii) any other action or omission whatsoever of any person, all whether with or without any notice to the Guarantors (any right to notice or to consent being hereby expressly waived), and any and all of the foregoing shall be binding on the Guarantors.

7.  <u>Entire Agreement</u>.  This Guaranty, together with the Consent Agreement, sets forth the parties' final and entire agreement with respect to the matters set forth herein and supersedes any and all prior agreements, understandings and documents with respect to the subject matter hereof.  The Guarantors further specifically acknowledge, confirm and agree that the obligations contained herein shall be in addition to any and all obligations of the Guarantors and of any entity controlled by or affiliated with, the Guarantors, and to any and all rights the League may otherwise have, under applicable law or under the NHL Constitution and Agreements, the Consent Agreement or any other consent or letter agreements or guaranties entered into with respect to the Club, regardless of whether such obligations and/or rights set

forth therein are or may be duplicative of those contained herein, and notwithstanding the presence of any merger or similar clause contained therein. More particularly, but without limiting the generality of the foregoing, this Guaranty is not intended to, and shall not be argued, asserted, deemed or interpreted to, be a limitation on or modification of the League's rights, or of the obligations of the Guarantors or any other party set forth in the Consent Agreement (or otherwise).

8.     <u>Breach of Guaranty</u>. The Guarantors acknowledge and agree that the failure of any of the Guarantors to comply with any of the provisions of this Guaranty shall constitute a material breach of this Guaranty and of the Consent Agreement which entitles the League, in addition to any other rights or remedies it may have, to take action permitted by the NHL Constitution and Agreements and/or the Consent Agreement. Said action includes, in addition to any and all other rights to which the League shall be entitled under the NHL Constitution and Agreements, this Guaranty, the Consent Agreement or otherwise, the right of the League to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation.

9.     <u>Security; Set-Off</u>. The Guarantors grant to the League, as security for the full and punctual payment and performance of the Guarantors' obligations hereunder, a continuing lien on and security interest in all sums credited by or due from the League to the Guarantors, and regardless of the adequacy of any collateral or other means of obtaining repayment of the Guaranteed Obligations, the League is hereby authorized at any time and from time to time, without notice to the Guarantors (any such notice being expressly waived by the Guarantors) and to the fullest extent permitted by law, to set off and apply such sums against the obligations of the Guarantors under this Guaranty, whether or not the League shall have made any demand under this Guaranty and although such Guaranteed Obligations may be contingent or unmatured.

10.     <u>Notices</u>. All notices and other communications called for hereunder shall be made in writing and, unless otherwise specifically provided herein, shall be deemed to have been duly made or given when delivered or transmitted in accordance with the notice provisions in Paragraph [13] of the Consent Agreement.

11.     <u>Amendments</u>. No amendment or waiver of any provision of this Guaranty nor consent to any departure by a Guarantor therefrom shall be effective unless the same shall be in writing and signed by the League and the Guarantor affected by such amendment or waiver.

12.     <u>No Waiver</u>. No delay or omission on the League's part in exercising any rights hereunder shall operate as a waiver of such rights or any other rights, and no waiver of any right on any one occasion shall result in a waiver of such right on any future occasion or of any other rights; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

13.     <u>Successors and Assigns</u>. This Guaranty shall be binding upon the Guarantors, their heirs, executors, administrators, trustees, beneficiaries, legal representatives,

successors and assigns, and shall inure to the benefit of and be enforceable by the League and its successors and assigns; provided, however, that the Guarantors may not assign any part of this Guaranty without the prior written consent of the League, which such consent may be granted or withheld in the League's sole and absolute discretion, and any attempted assignment of this Guaranty in violation of this provision shall be void.

14.    Miscellaneous.

(a)    This Guaranty shall be interpreted and construed, both on its own and in conjunction with the Consent Agreement, so as to be enforceable to the fullest extent permitted by law and to provide the maximum protection possible to the League. No rule of construction shall be applied to the interpretation of this Guaranty which could or would result in a construction against the party drafting this document because, in whole or in part, that party so drafted this Guaranty. The Guarantors further agree that in the event the League asserts or attempts to assert any of its rights or enforce any other party's obligations pursuant to the Consent Agreement or any other consent or letter agreement or guaranty, on the one hand, or this Guaranty, on the other hand, the Guarantors shall not raise or use as a defense (in any manner whatsoever) to such rights or obligations, the existence or content of this Guaranty or of the Consent Agreement or such other consent or letter agreement or guaranty, respectively.

(b)    This Guaranty shall be governed by and construed in accordance with the internal laws of the State of New York without reference to its conflict of laws provisions.

(c)    The unenforceability of any one clause or provision shall not affect any other provision of this Guaranty.

(d)    Notwithstanding anything to the contrary contained herein, each and every statement, representation, warranty, covenant, agreement and obligation contained herein is intended to be, and is, joint and several as among the Guarantors.

(e)    The headings in the sections of this Guaranty are inserted for convenience of reference only and shall not constitute a part hereof.

(f)    This Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or in a .pdf format shall be effective as delivery of a manually executed counterpart of this Guaranty.

(g) Notwithstanding anything to the contrary contained herein, any dispute between or among any of the Guarantors relating to the subject matter hereof shall be deemed to be a dispute which shall be resolved in accordance with Article 6.3 of the NHL Constitution and the NHL Commissioner shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute whether or not the Proposed Transaction is consummated in accordance with its terms.

*[The remainder of this page is intentionally left blank.  Signature pages follow.]*

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the day and year first above set forth.

**[INSERT SIGNATURE BLOCKS FOR GUARANTORS]**

By:_____
Name:
Title:

Exhibit A

# Consent Agreement

**EXHIBIT E**

**[SUBJECT TO CONFIRMATION OF THE TRANSACTION AND OWNERSHIP STRUCTURE AND RECEIPT AND REVIEW OF COPIES OF ALL TRANSACTION AND ORGANIZATIONAL DOCUMENTS. ADDITIONAL MODIFICATIONS MAY BE REQUIRED.]**

**FORM OF IRREVOCABLE PROXY**

This irrevocable proxy, which is coupled with an interest, is granted by the undersigned to the Commissioner of the National Hockey League (the "NHL") pursuant to and in connection with that certain Consent Agreement, dated as of [_____], 2011 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "NHL Consent Agreement"), by and among, *inter alia*, the NHL, [FOR EACH PROPOSED DIRECT AND INDIRECT OWNER OR HOLDER OF ANY INTEREST (OF RECORD, BENEFICIAL OR OTHERWISE) IN THE CLUB, INSERT NAME, AND AS APPLICABLE, STATE OF FORMATION AND TYPE OF ENTITY]. This irrevocable proxy, which is coupled with an interest, is granted by the undersigned as a condition to the NHL's willingness to enter into, and to consent to the proposed transactions referenced in, the NHL Consent Agreement, and in order, *inter alia*, to further and protect the interests of the NHL and the NHL Member Clubs in the reputation and integrity of the NHL and professional hockey, and to preserve and enhance the value of the NHL Member Clubs.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the NHL Consent Agreement. In addition, for purposes of this irrevocable proxy, the term "Entities" shall mean [LIST PROXY SUBJECT ENTITIES OWNED BY PROXY GRANTOR], the [Club Group/other Acquiring Parties] [(other than the undersigned)], and any entities in which the undersigned owns an interest and which own a direct or indirect interest in any [Club Group/other Acquiring Parties], whether now existing or hereafter created.

The undersigned is the legal and beneficial owner of [____]% of the issued and outstanding [type of interests] of [INSERT APPLICABLE PROXY SUBJECT ENTITY AND REPEAT AS NECESSARY] (the "Interests," which term shall be deemed to include all ownership, membership, manager, partnership or other similar interests however designated of any Entity that, may now or in the future, be owned or controlled by or registered in the name of the undersigned or any successors).

1.      Effective immediately, and to the exclusion of the undersigned and all other persons or entities, the undersigned hereby irrevocably appoints the Commissioner of the NHL (whoever he or she from time to time hereafter may be or any person acting as the Commissioner of the NHL on an interim basis), as his, her or its, as the case may be, sole and exclusive true and lawful attorney and proxy with all powers the undersigned possesses, and with full power of substitution and resubstitution, to vote or express consent or dissent in the sole discretion of such proxyholder in respect of any or all of the Interests, to the fullest extent the holder of the Interests is entitled to vote or express consent or dissent (whether by operation of

law or otherwise) and notwithstanding anything in any limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation, shareholders agreement, securityholders agreement, contribution agreement, registration rights agreement, management services agreement or any other Organizational Document of any Entity or any Transaction Document to the contrary or otherwise, in each case with respect to the following: (a) the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any Entity's assets (including, without limitation, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); (b) any amendment to the limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation, shareholders agreement, securityholders agreement, contribution agreement, registration rights agreement, management services agreement or any other Organizational Document of any Entity that affects in any way the requirement of prior shareholder, manager, member or partner approval, as the case may be, with respect to the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any of such Entity's assets (including, without limitation, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); or (c) any amendment to the limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation, shareholders agreement, securityholders agreement, contribution agreement, registration rights agreement, management services agreement or any other Organizational Document of any Entity that alters or modifies, or purports to alter or modify, the voting or consent or dissent rights of the Interests.  Effective immediately, the foregoing appointment expressly supersedes any rights of the undersigned to vote on, consent to, dissent from or otherwise authorize or participate in any of the foregoing matters pursuant to any of the provisions of the limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation, shareholders agreement, securityholders agreement, contribution agreement, registration rights agreement, management services agreement or any other Organizational Document of any of the Entities.

2.      The undersigned, to the exclusion of the undersigned and all other persons or entities, hereby irrevocably appoints the Commissioner of the NHL as his, her or its, as the case may be, sole and exclusive true and lawful attorney and proxy in respect of all of the undersigned's Ownership and Control Rights (as defined below) in each case with all powers the undersigned possesses, and with full power of substitution and resubstitution, provided, that, as to any and all matters other than those specified in Paragraph 1, the proxyholder shall only be entitled to exercise the Ownership and Control Rights effective immediately upon the earliest to occur of the following (a "Trigger Event"):

(a)      any breach by any Acquiring Party of its, his or her covenants, representations or warranties set forth in the NHL Consent Agreement;

(b)      any breach by any party, other than the NHL, to any Relevant Agreement of its, his or her covenants, representations or warranties set forth in such Relevant Agreement;

- 2 -

(c)     the occurrence of a Failure which the NHL, in its sole and absolute discretion, determines could have an adverse impact on the operations of any [Club Group/other Acquiring Parties];

(d)     the submission to a vote of the owners, shareholders, managers, members or partners of any Entity of any matter under Paragraph 1 hereof (except to the extent that the NHL has consented in writing to such vote and expressly waived its rights under this Paragraph 2 as a result thereof);

(e)     the occurrence of any events or circumstances that would constitute a Trigger Event under and pursuant to Paragraph 2 of any of those certain Irrevocable Proxies, of even date herewith, granted by other Acquiring Parties to the Commissioner of the NHL;

(f)     the reasonable expectation of the Commissioner of the NHL of any imminent event or occurrence that may make or render invalid or unenforceable the power or authority of the proxyholder hereunder to exercise any of the Ownership and Control Rights granted herein, including, without limitation, the expiration of any statutorily prescribed period of validity without the prior delivery to the proxyholder of a new irrevocable proxy identical in form and substance to this irrevocable proxy except for its date of execution and delivery;

(g)     any challenge, directly or indirectly, by the undersigned or any other person or entity to the validity or enforceability of this irrevocable proxy or any other irrevocable proxy granted by the undersigned to the Commissioner of the NHL;

(h)     the determination by the NHL to exercise its sale rights or cure rights pursuant to Section [__] or Section [__] of the Lender Letter Agreement (or the determination by the NHL to exercise its rights pursuant to the corresponding provisions of any similar NHL consent agreements with respect to other debt at any time or from time to time owing by any of the [Club Group/other Acquiring Parties]);

(i)     the delivery to the NHL of a "Default Notice" pursuant to (and as such term is defined in) the Lender Letter Agreement (or the delivery of a Default Notice pursuant to (and as defined in) any similar NHL consent agreements with respect to other debt at any time or from time to time owing by any of the [Club Group/other Acquiring Parties]); or

(j)     any acceleration, either automatically, at the lenders' discretion or otherwise, of the Obligations (as such term is defined in the Lender Letter Agreement) (or of any other obligations for borrowed money at any time owing by any of the [Club Group/other Acquiring Parties]).

Immediately upon the occurrence of a Trigger Event and notwithstanding anything in any Transaction Document or Organizational Document to the contrary or otherwise, and without the need of providing any notice or the taking of any other action by the Commissioner of the NHL, the NHL or any other person or entity, the Commissioner of the NHL (including any other proxy substituted or resubstituted for the Commissioner of the NHL) shall have the sole and exclusive right and ability to exercise the Ownership and Control Rights in his or her sole discretion and the undersigned shall not have the right or ability to exercise any Ownership and Control Rights.

Any purported exercise of any Ownership and Control Rights by anyone other than the Commissioner of the NHL (including any other proxy substituted or resubstituted for the Commissioner of the NHL) shall be deemed void *ab initio* and of no force or effect.

3.     The undersigned acknowledges and agrees that the Ownership and Control Rights referenced in Paragraph 2 above shall mean, and shall include, any and all of the undersigned's interest, rights, powers and authority in or with respect to the Interests and all of the undersigned's ability, rights, powers and authority whether pursuant to the undersigned's ownership of any Interests, by contract, or otherwise, to manage, operate and/or control the Club and/or any other Entity or successors thereto, in each case with all rights, powers and authority the undersigned, as the case may be, possesses, including, without limitation, with respect to the following:

(a)     the voting or expression of consent or dissent in respect of any or all of any Interests to the fullest extent any of the undersigned is entitled to vote or express consent or dissent (whether by operation of law, pursuant to the Organizational Documents or otherwise) in each case for any and all purposes and upon any and all subjects, matters and issues and notwithstanding anything in any Transaction Document to the contrary or otherwise;

(b)     the removal and appointment or election of directors, managers, managing members, general partners, officers, employees and/or other agents of any Entity and/or any subsidiary of any Entity;

(c)     without limiting the rights of the proxyholder under Paragraph 1 hereof, the voluntary or involuntary bankruptcy, dissolution, liquidation, termination or reorganization of any Entity and/or any subsidiary of any Entity, or the appointment of any conservator of, or trustee or similar official for any of the foregoing, or any substantial part of any of their respective assets (including, without limitation, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such);

(d)     the negotiation, compromise, refinancing, modification and/or readjustment of credit, indebtedness or other arrangements with lenders and other providers of financing, credit and/or other financial accommodation to any Entity and/or any subsidiary of any Entity;

(e)     the Transfer, recapitalization, restructuring, dilution, cancellation, or other disposition of any of the equity interests of any of Entity and/or any subsidiary of any Entity (including, without limitation, the Interests), or the issuance of any new class of equity interests by any such entity and/or any of their respective subsidiaries, in each case in return for such consideration as the Commissioner of the NHL (or any other proxy substituted or resubstituted therefor) may in his or her sole and absolute discretion determine;

(f)     the Transfer of all or substantially all of the assets of any Entity and/or any subsidiary of any Entity, any sale, consolidation, or merger of any such entity and/or any of their respective subsidiaries, or Transfer of any assets of or any direct or indirect

- 4 -

interests in any of the foregoing, in each case in return for such consideration as the Commissioner of the NHL (or any other proxy substituted or resubstituted therefor) may in his or her sole and absolute discretion determine (and including, without limitation, any sale approved by the NHL in accordance with the terms of the Lender Letter Agreement);

(g)     all of the voting, consent, dissent, approval and any other rights otherwise arising under any limited liability company agreement, operating agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation, shareholders agreement, securityholders agreement, contribution agreement, registration rights agreement, management services agreement or any other Organizational Document or otherwise arising by law; and

(h)     any and all other issues relating to the management, operation and/or control of any Entity and/or any subsidiary of any Entity.

4.     This proxy is irrevocable (notwithstanding any provisions of any Transaction Document or any Organizational Document of any Entity to the contrary or otherwise) and coupled with an interest and shall survive to the maximum extent permitted by law (and, to the extent permitted by law, shall survive beyond any time period limitation that may exist, whether under the **[APPLICABLE STATE/PROVINCE] [APPLICABLE ORGANIZATIONAL LAW/ACT]** or otherwise).  The management, control, voting, consent and dissent rights granted by this irrevocable proxy may be exercised by the proxy at any time and from time to time at any meeting or in writing or in any other form or forum permitted by law.  This proxy revokes any other proxy granted by the undersigned at any time with respect to any Interests.

5.     The undersigned represents and warrants that, in granting this irrevocable proxy, the undersigned has proceeded voluntarily and with the advice of attorneys of the undersigned's own choosing, that the undersigned has read the terms of this irrevocable proxy and reviewed such terms with the undersigned's attorneys, that the terms of this irrevocable proxy have been fully and completely read and explained to the undersigned by the undersigned's attorneys, and that such terms are fully understood and voluntarily accepted by the undersigned, with no duress or coercion of any kind.

6.     The undersigned represents and warrants that the undersigned is signing this irrevocable proxy exactly as the undersigned's name appears on any and all certificates representing the Interests.

7.     This proxy shall be governed by and construed in accordance with the laws of **[NAME JURISDICTION WHERE ISSUER OF INTERESTS FORMED]**, irrespective of its conflicts of laws principles.

[Remainder of Page Intentionally Left Blank.]

_____
**[NAME OF PROXY GRANTOR]**

Date: _____, 2011