# Exhibit 2

## Stalking Horse Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

among

DALLAS STARS, L.P.,

DALLAS ARENA LLC,

STARCENTERS LLC and

DALLAS STARS U.S. HOLDINGS CORP.

as Sellers,

and

DALLAS SPORTS & ENTERTAINMENT, L.P.,

DSE HOCKEY CLUB, L.P.,

DSE HOCKEY CENTERS, L.P., and

DSE PLANO GP, INC.

as Purchasers

Dated as of September 15, 2011

# TABLE OF CONTENTS

| Article I | DEFINITIONS | 2 |
|---|---|---|
| 1.1 | Certain Definitions | 2 |
| 1.2 | Other Definitional and Interpretive Matters | 20 |
| Article II | PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES | 22 |
| 2.1 | Purchase and Sale of Assets | 22 |
| 2.2 | Excluded Assets | 23 |
| 2.3 | Assumption of Liabilities | 24 |
| 2.4 | Excluded Liabilities | 26 |
| 2.5 | Cure Amounts | 27 |
| 2.6 | Further Conveyances and Assumptions; Consent of Third Parties | 27 |
| 2.7 | Bulk Sales Laws | 28 |
| Article III | CONSIDERATION | 28 |
| 3.1 | Consideration | 28 |
| 3.2 | Purchase Price Deposit | 29 |
| 3.3 | Payment of Purchase Price | 30 |
| 3.4 | Purchase Price Adjustment | 31 |
| Article IV | CLOSING AND TERMINATION | 33 |
| 4.1 | Closing Date | 33 |
| 4.2 | Termination of Agreement | 33 |
| 4.3 | Procedure Upon Termination | 35 |
| 4.4 | Effect of Termination | 35 |
| Article V | REPRESENTATIONS AND WARRANTIES OF DALLAS STARS | 37 |
| 5.1 | Organization and Good Standing | 37 |
| 5.2 | Authorization of Agreement | 37 |
| 5.3 | Conflicts; Consents of Third Parties | 38 |
| 5.4 | Capitalization | 38 |
| 5.5 | Financial Statements | 39 |
| 5.6 | Accounts Receivable | 40 |
| 5.7 | Title to Purchased Assets; Sufficiency | 40 |
| 5.8 | Absence of Certain Developments | 41 |

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 5.9 | Taxes | 41 |
| 5.10 | Real Property | 42 |
| 5.11 | Tangible Personal Property | 43 |
| 5.12 | Intellectual Property | 43 |
| 5.13 | Stars Material Contracts | 44 |
| 5.14 | Employee Benefits | 46 |
| 5.15 | Labor | 48 |
| 5.16 | Litigation | 48 |
| 5.17 | Compliance with Laws; Permits | 48 |
| 5.18 | Environmental Matters | 48 |
| 5.19 | Insurance | 49 |
| 5.20 | NHL Matters | 50 |
| 5.21 | Player Matters | 50 |
| 5.22 | Deferred Compensation Liability | 50 |
| 5.23 | No Guarantees | 50 |
| 5.24 | Indebtedness for Borrowed Money | 50 |
| 5.25 | Financial Advisors | 50 |
| 5.26 | Related Party Transactions | 50 |
| 5.27 | Non-reliance of Dallas Stars | 51 |
| Article VI | REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA | 52 |
| 6.1 | Organization and Good Standing | 52 |
| 6.2 | Authorization of Agreement | 52 |
| 6.3 | Conflicts; Consents of Third Parties | 52 |
| 6.4 | Capitalization | 53 |
| 6.5 | Financial Statements | 54 |
| 6.6 | Absence of Certain Developments | 54 |
| 6.7 | Taxes | 54 |
| 6.8 | Real Property | 55 |
| 6.9 | Tangible Personal Property | 56 |
| 6.10 | Intellectual Property | 56 |
| 6.11 | Arena Material Contracts | 57 |
| 6.12 | Employee Benefits | 59 |

# TABLE OF CONTENTS

| 6.13 | Labor | 59 |
| 6.14 | Litigation | 60 |
| 6.15 | Compliance with Laws; Permits | 60 |
| 6.16 | Environmental Matters | 60 |
| 6.17 | Insurance | 61 |
| 6.18 | Financial Advisors | 61 |
| 6.19 | Related Party Transactions | 61 |
| 6.20 | Non-reliance of Dallas Arena | 61 |
| Article VII | REPRESENTATIONS AND WARRANTIES OF PURCHASERS | 62 |
| 7.1 | Organization and Good Standing | 62 |
| 7.2 | Authorization of Agreement | 62 |
| 7.3 | Conflicts; Consents of Third Parties | 63 |
| 7.4 | Litigation | 63 |
| 7.5 | Financial Advisors | 63 |
| 7.6 | Investment Intention | 63 |
| 7.7 | Financial Capability | 64 |
| 7.8 | NHL Information Requirements | 64 |
| 7.9 | Non-reliance of Purchasers | 64 |
| Article VIII | BANKRUPTCY COURT MATTERS | 65 |
| 8.1 | Competing Transaction | 65 |
| 8.2 | Sellers' Chapter 11 Bankruptcy Cases | 65 |
| 8.3 | Confirmation Order | 66 |
| 8.4 | Cooperation in Bankruptcy Court Matters | 66 |
| 8.5 | Break Up Fee and Expense Reimbursement | 67 |
| 8.6 | Leases and Contracts | 67 |
| 8.7 | Notice to Parties-in-Interest | 67 |
| Article IX | COVENANTS | 68 |
| 9.1 | Access to Information | 68 |
| 9.2 | Conduct of the Business Pending the Closing | 69 |
| 9.3 | Consents | 71 |
| 9.4 | Regulatory Approvals | 71 |
| 9.5 | Further Assurances | 73 |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 9.6 | Confidentiality | 73 |
| 9.7 | Preservation of Records | 73 |
| 9.8 | Publicity | 74 |
| 9.9 | NHL Approvals | 74 |
| 9.10 | Stars Foundation | 74 |
| 9.11 | Senior Secured Loan | 74 |
| 9.12 | Guarantee | 75 |
| 9.13 | Disclosure Schedules; Supplementation and Amendment of Schedules | 75 |
| 9.14 | Insurance | 76 |
| 9.15 | Change of Name | 77 |
| 9.16 | Bankruptcy Compliance | 77 |
| 9.17 | Plano StarCenter | 77 |
| Article X | EMPLOYEES AND EMPLOYEE BENEFITS | 78 |
| 10.1 | Employment | 78 |
| 10.2 | Employee Benefits | 79 |
| Article XI | CONDITIONS TO CLOSING | 80 |
| 11.1 | Conditions Precedent to Obligations of Purchasers | 80 |
| 11.2 | Conditions Precedent to Obligations of Sellers | 81 |
| 11.3 | Conditions Precedent to Obligations of Sellers and Purchasers | 81 |
| 11.4 | Frustration of Closing Conditions | 82 |
| Article XII | SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES | 82 |
| 12.1 | Survival | 82 |
| 12.2 | Indemnification by Sellers | 83 |
| 12.3 | Indemnification by Purchasers | 83 |
| 12.4 | Indemnification Procedures | 84 |
| 12.5 | Certain Limitations on Indemnification | 85 |
| 12.6 | Calculation of Losses | 86 |
| 12.7 | Tax Treatment of Indemnity Payments | 86 |
| 12.8 | Specific Performance | 87 |
| 12.9 | Exclusive Remedy | 87 |
| 12.10 | Nature of Representations and Warranties; Schedules | 88 |
| 12.11 | DTPA WAIVER | 88 |

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| 12.12 | Limitation of Lender Liability | 89 |
| 12.13 | Purchasers' Rights | 89 |
| Article XIII | MISCELLANEOUS | 89 |
| 13.1 | Tax Matters | 89 |
| 13.2 | Expenses | 90 |
| 13.3 | Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury | 90 |
| 13.4 | Entire Agreement | 91 |
| 13.5 | Amendments and Waivers | 91 |
| 13.6 | Governing Law | 92 |
| 13.7 | Notices | 92 |
| 13.8 | Severability | 93 |
| 13.9 | Binding Effect; Third Party Beneficiaries; Assignment | 93 |
| 13.10 | Non-Recourse | 94 |
| 13.11 | Legal Representation | 94 |
| 13.12 | General Releases | 94 |
| 13.13 | Counterparts | 96 |
| 13.14 | Sellers' Representative | 96 |

Exhibits

| | |
|---|---|
| A | Plan of Reorganization |
| B | Disclosure Statement |
| C | Bidding Procedures Order |
| D | Confirmation Order |
| E | Escrow Agreement |
| F | NHL Owner Consent |
| G | NHL/Lender Cooperation Agreement |
| H | NHL Guaranty |
| I | Purchaser/NHL Proxy |
| J | Senior Secured Loan |
| K | Bill of Sale |
| L | Assignment and Assumption Agreement |


Schedules

| | |
|---|---|
| A | Pro Forma Balance Sheet |
| B | Pro Forma NWC |
| C | Pro Forma Purchase Price |
| 1.1(a)(i) | Non-Excluded Affiliate Contracts |
| 1.1(a)(ii) | Excluded Contracts |
| 1.1(b) | NHL Documents |
| 1.1(c) | Permitted Exceptions |
| 2.1(b) | Excluded Contracts—Accounts Receivable |
| 2.2(e) | Excluded Assets—Deposits, Prepaid Charges and Prepaid Expenses |
| 2.3(h) | Beneficiary Contracts |
| 2.3(i) | Affiliate Guarantees |
| 5.3(a) | Dallas Stars Conflicts |
| 5.3(b) | Dallas Stars Consents of Third Parties |
| 5.4(a) | Dallas Stars Capitalization |
| 5.4(f)(i) | Dallas Stars Required Equity Issuances |
| 5.4(f)(ii) | Dallas Stars Voting Trusts |
| 5.4(g) | Dallas Stars Entity Information |
| 5.5 | Dallas Stars Financial Statements |
| 5.6 | Dallas Stars Accounts Receivable |
| 5.7(a) | Dallas Stars Condition of Purchased Assets |
| 5.7(b) | Dallas Stars Continued Ownership of Purchased Assets |
| 5.7(c)(i) | Dallas Stars Title to Purchased Assets |
| 5.7(c)(ii) | Dallas Stars Sufficiency of Purchased Assets |
| 5.8 | Dallas Stars Absence of Certain Developments |
| 5.9 | Dallas Stars Taxes |
| 5.10(a)(i) | Dallas Stars Owned Property |
| 5.10(a)(ii) | Dallas Stars Owned Property Liens |
| 5.10(b) | Dallas Stars Real Property Leases |

5.10(c)(i)   Dallas Stars Real Property Insurance Claims
5.10(c)(ii)  Dallas Stars Structural Matters
5.11         Dallas Stars Personal Property Leases
5.12(a)      Dallas Stars Registered Intellectual Property
5.12(b)      Dallas Stars – Purchased Intellectual Property – Ownership or Valid Licenses
5.12(c)      Dallas Stars – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property
5.12(d)      Dallas Stars – Purchased Intellectual Property – Violations and Infringements by Third Parties
5.13(a)      Dallas Stars Material Contracts
5.13(b)      Dallas Stars Material Contract Defaults
5.14(a)      Dallas Stars Employee Benefit Plans
5.14(d)      Dallas Stars Benefit Plan Actions, Suits or Claims
5.14(e)      Dallas Stars Transaction Effects on Benefits
5.15(a)      Dallas Stars Labor or Collective Bargaining Agreements
5.15(b)      Dallas Stars Labor Strikes, Grievances, and Related Matters
5.16         Dallas Stars Litigation
5.18         Dallas Stars Environmental Matters
5.19         Dallas Stars Insurance
5.20(b)      CFV Debt Amount
5.21         Player Matters
5.22         Deferred Compensation Liability
5.23         Dallas Stars Guarantees
5.24         Dallas Stars Indebtedness
5.25         Financial Advisors of Dallas Stars
5.26         Dallas Stars Related Party Transactions
6.3(a)       Dallas Arena Conflicts
6.3(b)       Dallas Arena Consents of Third Parties
6.4(d)(i)    Dallas Arena Required Equity Issuances
6.4(d)(ii)   Dallas Arena Voting Trusts
6.5          COC Financial Statements
6.6          Dallas Arena Absence of Certain Developments
6.7          Dallas Arena Taxes
6.8(b)       Dallas Arena Real Property Leases
6.8(c)       Dallas Arena Real Property Insurance Claims
6.9          COC Personal Property Lease Defaults
6.10(a)      Dallas Arena Registered Intellectual Property
6.10(b)      Dallas Arena – Purchased Intellectual Property – Ownership or Valid Licenses
6.10(c)      Dallas Arena – Purchased Intellectual Property – Violations and Infringements of Third Party Intellectual Property
6.10(d)      Dallas Arena – Purchased Intellectual Property – Violations and Infringement by Third Parties
6.11(a)      Dallas Arena Material Contracts
6.11(b)      COC Material Contracts
6.11(c)      Dallas Arena Material Contract Defaults

| 6.11(d) | COC Material Contract Defaults |
|---------|---------------------------------|
| 6.13(a) | Dallas Arena Labor or Collective Bargaining Agreements |
| 6.13(b) | Dallas Arena Labor Strikes, Grievances, and Related Matters |
| 6.14 | Dallas Arena Litigation |
| 6.16 | Dallas Arena Environmental Matters |
| 6.17 | Dallas Arena Insurance |
| 6.18 | Financial Advisors of Dallas Arena |
| 6.19 | Dallas Arena Related Party Transactions |
| 7.3 | Purchaser Conflicts |
| 7.5 | Financial Advisors of Purchaser |
| 9.2(a) | Conduct of the Business – Required Conduct |
| 9.2(b) | Conduct of the Business – Prohibited Conduct |
| 10.1(a) | Employees of Dallas Stars |
| 10.1(d) | Severance |
| 11.3(d) | Required Consents |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 15, 2011, among Dallas Stars, L.P., a Delaware limited partnership ("Dallas Stars"), Dallas Arena LLC, a Texas limited liability company ("Dallas Arena"), StarCenters LLC, a Texas limited liability company ("StarCenters"), Dallas Stars U.S. Holdings Corp., a Delaware corporation ("U.S. Holdings" and collectively with Dallas Stars, Dallas Arena and StarCenters, "Sellers" and each, a "Seller"), and Dallas Sports & Entertainment, L.P., a Delaware limited partnership ("DSE"), DSE Hockey Club, L.P., a Delaware limited partnership ("Hockey Club"), DSE Hockey Centers, L.P., a Delaware limited partnership ("Hockey Centers"), DSE Plano GP, Inc., a Delaware corporation ("DSE Plano" and collectively with DSE, Hockey Club and Hockey Centers, "Purchasers" and each, a "Purchaser"), and, solely with respect to Sections 9.12 and 12.8 and Article XIII of this Agreement, Tom Gaglardi, an individual resident of Vancouver, British Columbia ("Guarantor").

## RECITALS:

1.      Dallas Stars owns and operates a professional hockey team that is a member of the National Hockey League (the "NHL") and is known as the Dallas Stars (the "Stars"), and leases and operates (i) the Dr Pepper Arena in Frisco, which is the practice facility home to the Stars and home arena for the Texas Tornado of the North American Hockey League and the Texas Legends of the NBA Development League, (ii) the Dr Pepper StarCenter in Euless, (iii) the Dr Pepper StarCenter in Farmers Branch, and (iv) the Dr Pepper StarCenter in McKinney at Craig Ranch (collectively, the "Leased StarCenters");

2.      Dallas Stars subleases the arena located at 2500 Victory Avenue, Dallas, Texas and known as the American Airlines Center ("AAC") as the home ice arena for the Stars;

3.      Each of StarCenters, Plano StarCenter, LLC, a Texas limited liability company ("Plano StarCenter"), and U.S. Holdings, is a direct wholly-owned Subsidiary of Dallas Stars;

4.      StarCenters is the employer of all personnel of the Dr Pepper StarCenters (as defined below);

5.      Plano StarCenter owns the Dr Pepper StarCenter located in Plano, Texas (collectively with the Leased StarCenters, the "Dr Pepper StarCenters");

6.      U.S. Holdings owns a 1% equity interest in Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company ("Hockey Enterprises"). Dallas Stars owns a 99% equity interest in Hockey Enterprises. Hockey Enterprises holds a limited partnership interest in NHL Enterprises Canada, L.P. and is a stockholder of National Hockey League Enterprises Canada, Inc., which is the general partner of NHL Enterprises Canada, L.P.;

7.      Dallas Arena owns a 50% member interest in Center GP, LLC, a Texas limited liability company ("Center GP"), and a 49.95% limited partner interest in Center Operating Company, L.P., a Texas limited partnership ("COC"). Center GP owns a 0.1% general partner

interest in COC. COC leases and operates the AAC and owns the issued and outstanding stock of Arena Operating Company, Inc., a Texas corporation;

8.      Each of StarCenters, Plano StarCenter, U.S. Holdings and Hockey Enterprises (collectively, the "Stars Subsidiaries"), Dallas Arena and Dallas Stars is a direct or indirect, wholly-owned Subsidiary of HSG Sports Group LLC, a Texas limited liability company ("HSG"), which is ultimately majority-owned by Hicks;

9.      Sellers have solicited the Lenders (as defined in Section 1.1), and have obtained approval of the Requisite Lenders, for acceptance of a plan of reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the terms set forth on Exhibit A (as it may be amended from time to time consistent with this Agreement, the "Plan") pursuant to a Disclosure Statement in substantially the form attached as Exhibit B hereto (the "Disclosure Statement") and in accordance with section 1126(b) of the Bankruptcy Code and Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

10.     Within two (2) Business Days after the execution of this Agreement, Sellers propose to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such proceedings, collectively, the "Bankruptcy Case") and, simultaneously therewith, file motions seeking (i) approval of the Disclosure Statement and confirmation of the Plan; and (ii) Bankruptcy Court approval of the Bidding Procedures Order (as defined in Section 1.1); and

11.     Sellers intend, pursuant to the terms of the final form of the Bidding Procedures Order approved by the Bankruptcy Court and the Plan, to conduct a sales process to sell all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

In consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"AAC" has the meaning given in the Recitals.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding the fact that HSG no longer

controls Sellers or the Stars Subsidiaries by virtue of the NHL Proxy, for purposes of this Agreement, a Hicks Affiliate shall nevertheless be considered an Affiliate of Sellers. For the avoidance of doubt, neither COC, any Subsidiary of COC, Center GP, the NHL nor any NHL Entity or other NHL Affiliated Party shall be considered an Affiliate of any Seller or any of the Transferred Subsidiaries.

"Aggregate Purchaser Termination Amount" has the meaning given in Section 4.4(d).

"Aggregate Seller Termination Amount" has the meaning given in Section 4.4(d).

"Agreement" has the meaning given in the Preamble.

"Antitrust Fees" has the meaning given in Section 9.4(b).

"Antitrust Laws" has the meaning given in Section 9.4(b).

"Arena Associate" has the meaning given in Section 6.19.

"Arena Material Contract" has the meaning given in Section 6.11(a).

"Associate" has the meaning given in Section 5.26.

"Assumed Liabilities" has the meaning given in Section 2.3.

"Auction" has the meaning given in the Bidding Procedures Order.

"Back-Up Bidder" has the meaning given in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning given in the Recitals.

"Bankruptcy Code" has the meaning given in the Recitals.

"Bankruptcy Court" has the meaning given in the Recitals.

"Bankruptcy Petitions" has the meaning given in the Recitals.

"Bankruptcy Rules" has the meaning given in the Recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in substantially the form attached as Exhibit C hereto, with such changes as may be required by the Bankruptcy Court that are not materially adverse to Purchasers or Sellers, that, among other things, (i) approves the payment of the Break-Up Fee on the terms and conditions set forth in Section 8.5 hereof and (ii) establishes a date by which Competing Bids must be submitted by bidders and establishes procedures for the Auction process.

"Break-Up Fee" has the meaning given in Section 8.5(a).

"Broker" has the meaning given in Section 5.25.

"Business" means the business comprised of the Purchased Assets as currently owned and operated by Sellers and the Transferred Subsidiaries, including, without limitation, the business of operating the Stars.

"Business Day" means any day of the year on which national banking institutions in Texas are open to the public for conducting business and are not required or authorized to close.

"Center GP" has the meaning given in the Recitals.

"CFV Debt Agreement" means that certain promissory note dated January 14, 2011, in the stated principal amount of $45,000,000, made by Dallas Stars and payable to CFV I LLC, an Affiliate of the NHL, as amended from time to time.

"CFV Debt Amount" means the amount owed by Dallas Stars to CFV I LLC, an Affiliate of the NHL, pursuant to the CFV Debt Agreement.

"Clayton Act" means the Clayton Antitrust Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"Closing" has the meaning given in Section 4.1.

"Closing Balance Sheet" has the meaning given in Section 3.4(b).

"Closing Date" has the meaning given in Section 4.1.

"Closing Documents" has the meaning given in Section 3.4(b).

"Closing NWC" has the meaning given in Section 3.4(b).

"COC" has the meaning given in the Recitals.

"COC Entities" means, collectively, (i) COC and (ii) Center GP.

"COC Equity Interests" means (i) the 50% member interest in Center GP held by Dallas Arena; and (ii) the 49.95% limited partnership interest in COC held by Dallas Arena.

"COC Interim Balance Sheet" has the meaning given in Section 6.5.

"COC Interim Balance Sheet Date" has the meaning given in Section 6.5.

"COC Financial Statements" has the meaning given in Section 6.5.

"COC Material Contract" has the meaning given in Section 6.11(b).

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Collective Bargaining Agreement" means the Collective Bargaining Agreement, dated as of July 22, 2005, by and between the NHL and the NHLPA.

"Commitment Termination Date" has the meaning given in the Senior Secured Loan.

"Competing Bid" means a Qualified Bid other than a Qualified Bid of the Purchasers.

"Confidentiality Agreement" has the meaning given in Section 9.6(a).

"Confirmation Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes as may be required by the Bankruptcy Court; provided, however, if Purchasers are deemed to have the highest or best bid by Sellers, any changes to the form of the Confirmation Order affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion.

"Continuing Employees" has the meaning given in Section 10.1(c).

"Contract" means any written contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license.

"control" (including the terms "controlled by" and "under common control with") has the meaning given in Section 1.1 (in the definition of "Affiliate").

"Copyrights" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Cumulative Budgeted Loss" means the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries as at the end of each of (i) September 2011 of $0, (ii) October 2011 (cumulative of September and October 2011) of ($4,866,731), (iii) November 2011 (cumulative of September, October and November 2011) of ($11,123,247), and (iv) December 2011 (cumulative of September, October, November and December 2011) of ($15,058,541); provided that for August 2011 and any month prior to August 2011, the amount of the cumulative consolidated budgeted cash loss of Dallas Stars and its Subsidiaries shall be deemed to be zero.

"Currency Agreement" means, with respect to any Person, any foreign exchange Contract, currency swap agreement, futures Contract, option Contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"Dallas Arena" has the meaning given in the Preamble.

"Dallas Arena Documents" has the meaning given in Section 6.2.

"Dallas Stars" has the meaning given in the Preamble.

"Dallas Stars Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Documents" has the meaning given in Section 5.2.

"Dallas Stars Financial Statements" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet" has the meaning given in Section 5.5.

"Dallas Stars Interim Balance Sheet Date" has the meaning given in Section 5.5.

"Disclosure Statement" has the meaning given in the Recitals.

"Dispute Notice" has the meaning given in Section 3.4(c)(ii).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related exclusively to, or necessary for the operation of, the Business and the Purchased Assets in each case whether or not in electronic form.

"Domain Names" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Dr Pepper StarCenters" has the meaning given in the Recitals.

"DSE" has the meaning given in the Preamble.

"DSE Plano" has the meaning given in the Preamble.

"Employee" means all employees, as of the date hereof, whether or not actively at work as of the date hereof, of Dallas Stars or any of the Stars Subsidiaries, together with individuals who are hired by Dallas Stars or any Stars Subsidiary after the date hereof and prior to the Closing.

"Employee Benefit Plans" means all material "employee benefit plans," as defined in Section 3(3) of ERISA, all individual consulting, employment or compensation agreements, and all other material plans or agreements providing for bonus, incentive, equity or equity-based compensation, stock purchase, pension, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, life insurance or scholarship maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or is obligated to contribute thereunder for current or former employees of Sellers and their respective Subsidiaries primarily in respect of the Business.

"Environmental Law" means any applicable Law currently in effect relating to the protection of the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and

the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"Environmental Permits" has the meaning given in Section 5.18(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning given in Section 3.2.

"Escrow Agreement" has the meaning given in Section 3.2.

"Escrowed Funds" has the meaning given in Section 3.2.

"Estimated Closing Balance Sheet" has the meaning given in Section 3.4(a).

"Excess Cash Payment" has the meaning given in Section 3.1(d).

"Excluded Assets" has the meaning given in Section 2.2.

"Excluded Contracts" means the following Contracts: (i) this Agreement and the other documents related to this Agreement or the transactions contemplated hereby, (ii) all Contracts between any Seller and any broker, investment banker or similar advisor relating to this Agreement or the transactions contemplated hereby (other than GSP), (iii) all Contracts between any Seller and any Affiliate of Sellers or any other Hicks Affiliate (other than Contracts to which the only parties that are Affiliates of any Seller or any other Hicks Affiliate consist of (A) any Seller and any other Seller or (B) any Seller and any Transferred Subsidiary), except as set forth in Schedule 1.1(a)(i), (iv) the Contracts listed on Schedule 1.1(a)(ii) and (v) all Contracts relating to the Senior Indebtedness.

"Excluded Equity Interests" means the StarCenters Equity Interests and the U.S. Holdings Shares.

"Excluded Insurance Claim" has the meaning given in Section 9.14(b).

"Excluded Insurance Policy" has the meaning given in Section 9.14(b).

"Excluded Liabilities" has the meaning given in Section 2.4.

"Excluded Matter" has the meaning given in Section 1.1 (in the definition of "Material Adverse Effect").

"Excluded NWC Amounts" means each of the following:

      (i)     all Liabilities, including any reserve or accrual for Liability, of Dallas Arena and the COC Entities, including, but not limited to, those set forth on, reserved for or accrued for on the COC Financial Statements;

      (ii)     all Liabilities, including any reserve or accrual for Liability, for Texas franchise or margin Tax in excess of Tax accruals calculated in accordance with the past

practices of Dallas Stars, including (i) Liabilities as a result of any Sellers' joint and several liability and (ii) Liabilities relating to or resulting from the consummation of the transactions contemplated by the Agreement;

(iii)     all Liabilities, including any reserve or accrual for Liability, for Liability for sales Taxes, in excess of Tax accruals for the then current and following month periods calculated in accordance with the past practices of Dallas Stars;

(iv)     all Liabilities, including any reserve or accrual for Liability, for the non-current portion of any unearned revenue or deferred expense; and

(v)     all Liabilities, including any reserve or accrual for Liability, related to the Plano StarCenter property damage.

"Expense Reimbursement" has the meaning given in Section 8.5(a).

"Family" means, with respect to any natural person, such person's spouse and children (including adopted and step children).

"Federal Trade Commission Act" means the Federal Trade Commission Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"Final NWC" has the meaning given in Section 3.4(c)(i), Section 3.4(d) or Section 3.4(e), as applicable.

"First Lien Agent" means JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent under the First Lien Credit Agreement.

"First Lien Cash Payment" has the meaning set forth in Section 3.1(e).

"First Lien Credit Agreement" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, Barclays Bank PLC, as Co-Syndication Agent and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, as amended from time to time.

"First Lien Lender" means any Lender under the First Lien Credit Agreement.

"Former Employee" means all individuals (including common law employees, individual independent contractors and individual consultants) who were employed or engaged by or on behalf of Dallas Stars or any of the Stars Subsidiaries (it being understood that prior to January 1, 2011, all employees employed or engaged on behalf of Dallas Stars or any of the Stars Subsidiaries were employed by HSG on behalf of Dallas Stars and the Stars Subsidiaries), but who are no longer so employed or engaged as of the Closing Date.

"FTC" means the Federal Trade Commission.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property, including all artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, that are owned by Dallas Stars.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"GSP" means GSP Securities LLC.

"Guarantor" has the meaning given in the Preamble.

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hedge Agreement" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender counterparty in connection with or to satisfy the requirements of the First Lien Credit Agreement or the Second Lien Credit Agreement, including the (i) ISDA Master Agreement, dated as of December 5, 2001, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, (ii) ISDA Master Agreement, dated as of February 9, 2006, as amended and supplemented from time to time, between Wachovia Bank, National Association and HSG, (iii) ISDA Master Agreement, dated as of March 9, 2006, as amended and supplemented from time to time, between Goldman Sachs Capital Markets, L.P. and HSG, (iv) ISDA Master Agreement, dated as of June 26, 2006, as amended and supplemented from time to time, between Sovereign Bank and HSG, (v) ISDA Master Agreement, dated as of June 28, 2006, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, and (vi) ISDA Master Agreement, dated as of September 15, 2006, as amended and supplemented from time to time, between Barclays Bank Plc and HSG.

"Hicks" means Thomas O. Hicks, in his individual capacity.

"Hicks Affiliate" means Hicks, his Family or any trust for the benefit of him or his Family or any Person (other than Sellers or any Transferred Subsidiary) controlled by Hicks, his Family, or any trust for the benefit of him or his Family.

"Hockey Centers" has the meaning given in the Preamble.

"Hockey Club" has the meaning given in the Preamble.

"Hockey Enterprises" has the meaning given in the Recitals.

"Hockey Enterprises Equity Interest" has the meaning given in Section 5.4(c).

"Hockey Enterprises Shares" has the meaning given in Section 5.4(c).

"Hockey Player Employee" means each hockey player party to a contract with Dallas Stars or any of its Subsidiaries, as entered into or assumed by Dallas Stars or entered into by or on behalf of Dallas Stars pursuant to any minor league affiliation agreement.

"HSG" has the meaning given in the Recitals.

"HSGH" means HSG Sports Group Holdings LLC, a Texas limited liability company, which wholly-owns HSG as its direct Subsidiary.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules and regulations promulgated thereunder.

"Inactive Employee" has the meaning given in Section 10.1(b).

"Intercompany Amounts" means all accounts receivable or accounts payable of (i) any Seller payable to or owed by (A) any other Seller, (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17) or (C) Hockey Enterprises, (ii) to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17, Plano StarCenter payable to or owed by (A) any Seller or (B) Hockey Enterprises or (iii) Hockey Enterprises payable to or owed by (A) any Seller or (B) Plano StarCenter (but only to the extent Sellers do not elect to treat the member interests of Plano StarCenter as an Excluded Asset pursuant to Section 9.17).

"Indebtedness" of any Person means, without duplication, (i) the principal and accreted value and accrued and unpaid interest, fees, expenses, penalties and other amounts payable in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current Liabilities); (iii) all obligations of the type referred to in clauses (i) and (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indemnification Claim" has the meaning given in Section 12.4(b).

"Independent Accounting Firm" has the meaning given in Section 3.4(e).

"Insurance Policies" has the meaning given in Section 5.19(a).

"Intellectual Property" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, reexaminations and reissues of any of the foregoing (collectively, "Patents"); (ii) all trademarks, service marks, trade names, service names, brand names, trade dress, logos, corporate names and other source or business identifiers, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) copyrights and works of authorship, and all registrations, applications, renewals and extensions and reversions of any of the foregoing (collectively, "Copyrights"); (iv) all trade secrets (collectively, "Trade Secrets"); and (v) all internet domain names, and all registrations, applications, renewals and extensions of any of the foregoing (collectively, "Domain Names").

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Dallas Arena" means the actual knowledge of Tony Tavares or Robert Hutson.

"Knowledge of Dallas Stars" means the actual knowledge of Tony Tavares or Robert Hutson.

"Law" means any foreign, federal, state or local law, statute, code, ordinance, Order, rule or regulation.

"Leased Real Property" means any real property subject to a Real Property Lease.

"Leased StarCenters" has the meaning given in the Recitals.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"Lender" means, with respect to the Senior Indebtedness, each financial institution listed on the signature pages thereto as a lender, and any other Person that becomes a lender pursuant to an assignment agreement in accordance therewith.

"Lender Related Parties" has the meaning given in Section 12.12.

"Liability" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs and expenses relating thereto.

"Liens" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, charge, option, right of first refusal, interests (as such term is used in section 363(f) of the Bankruptcy Code), easement or servitude.

"Loss(es)" has the meaning given in Section 12.2(a)(i).

"Marks" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon the business, assets, liabilities, properties, prospects, results of operations or financial condition of Sellers and the Transferred Subsidiaries (taken as a whole), (ii) a material adverse effect upon the legality, validity, binding effect or enforceability against Sellers of this Agreement or any Seller Document or Purchaser Document to which it is a party, or (iii) a material adverse effect upon the ability of Sellers to consummate the transactions contemplated by this Agreement, and in respect of the foregoing subsections (i), (ii) and (iii), other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which Sellers and the Transferred Subsidiaries operate; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in applicable Laws or accounting rules; (v) the failure of Sellers to meet any of their internal projections; (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; (vii) actions taken by the NHL affecting all NHL member teams; (viii) the physical condition of any player under contract to Dallas Stars; (ix) changes in GAAP; (x) any act, omission or event occurring in accordance with the terms and conditions of this Agreement or to which any Purchaser consents in writing; (xi) transactions or other circumstances involving players, coaches or executives under contract to Dallas Stars, including, but not limited to, trade, injury, death, disability, retirement, termination, suspension or contract extension; (xii) the on-ice performance of the Stars; (xiii) any sale, or announced or pending sale, of a member team of the NHL; (xiv) the number of games won or lost by the Stars or attendance at Stars games; or (xv) the filing of, and the continued pendency of, the Bankruptcy Case.

"Material Contracts" means, collectively, the Stars Material Contracts and the Arena Material Contracts.

"Monarch" means Monarch Master Funding Ltd., as a First Lien Lender.

"NHL" has the meaning given in the Recitals.

"NHL Affiliated Party" means each of the NHL Entities and each of the NHL Member Clubs (except Dallas Stars, but including future NHL Member Clubs) and each of their respective Subsidiaries and other Affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors.

"NHL Approvals" means such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings as are required under applicable NHL Rules and other rules and regulations of the NHL or any NHL Document.

"NHL Benefit Plans" has the meaning given in Section 5.14(a).

"NHL Board of Governors" means the Board of Governors of the NHL, as established under the NHL Constitution, and any successor chief governing body of the NHL that may be later established.

"NHL By-Laws" means the By-Laws of the NHL, as adopted under the NHL Constitution, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions and decisions issued by the NHL Commissioner or his designee.

"NHL Commissioner" means the person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

"NHL Constitution" means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings and decisions issued by the NHL Commissioner or his designee.

"NHL Documents" means all documents and agreements between Sellers or their Subsidiaries and the NHL relating to the Business, including the documents and agreements listed in Schedule 1.1(b), together with any of the foregoing which are entered into after the effective date of this Agreement in the Ordinary Course of Business in connection with the Business.

"NHL Entities" means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the NHL Member Clubs generally after the date of this Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective Affiliates and subsidiaries; provided that the "NHL Entities" shall not include the NHL Member Clubs.

"NHL Guaranty" has the meaning given in Section 9.9.

"NHL/Lender Cooperation Agreement" has the meaning given in Section 9.9.

"NHL Member Clubs" means the hockey clubs set forth in Article III of the NHL Constitution, as amended.

"NHL Owner Consent" has the meaning given in Section 9.9.

"NHLPA" means the National Hockey League Players' Association.

"NHL Proxy" means (i) the Irrevocable Proxy, dated January 14, 2010, by HSG to the NHL Commissioner; (ii) the Irrevocable Proxy, dated January 14, 2010, by HSGH to the NHL Commissioner; (iii) the Irrevocable Proxy, dated January 14, 2010, by HSG Partnership Holdings LLC to the NHL Commissioner; and (iv) the Irrevocable Proxy, dated January 14, 2010, by Dallas Arena to the NHL Commissioner.

"NHL Rules" means (i) the NHL Constitution, (ii) the NHL By-Laws, (iii) the governing documents of each of the NHL Entities, (iv) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities and the NHL Board of Governors, (v) the current and future collective bargaining agreements between the NHL and the NHLPA and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect or entered into between or among any NHL Entity or Entities, on the one hand, and the NHL Member Clubs generally, on the other hand, or any NHL Entity or Entities and/or the NHL Member Clubs generally, on the one hand, and other persons, on the other hand, in furtherance of the NHL's (or any NHL Entity's) business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the applicable NHL Entity, the NHL Constitution or the NHL By-Laws, and (vi) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under, any of the foregoing, all as may be amended from time to time.

"Nonassignable Assets" has the meaning given in Section 2.6(b).

"Notice Deadline" has the meaning given in Section 8.7.

"NWC" means the consolidated net working capital (defined as current assets less current liabilities) of Dallas Stars and its Subsidiaries calculated in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g). For the avoidance of doubt, (i) NWC may be a positive or a negative number (i.e., a deficit), (ii) current liabilities shall exclude all Excluded Liabilities, the CFV Debt Amount, all net Intercompany Amounts and all Excluded NWC Amounts and (iii) current liabilities shall include Specified Expenses.

"Officer Indemnification Agreements" means (i) the Letter Agreement, dated December 29, 2010, by Dallas Stars and Dallas Arena for the benefit of Robert Hutson, and (ii) the Employment Agreement, dated December 14, 2010, by and between Dallas Stars and Tony Tavares, as the same may be amended or extended.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business, including the ordinary and usual course of normal day-to-day operations of the Business during the Bankruptcy Case which, for the avoidance of doubt, may deviate from the ordinary and usual course of normal day-to-day operations prior to filing the Bankruptcy Case.

"Owned Property" or "Owned Properties" has the meaning given in Section 5.10(a).

"Parking Easement" means the Parking Agreement and Easement, dated as of April 16, 2008, by and among Dallas Stars, SSR and SSR GP Interests, L.P.

"Patents" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Permit" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in existing policies of title insurance (including any mortgagee, owner or lessee policy) to the extent copies of which have been provided to Purchasers; (ii) Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body; (v) title of a lessor under a capital or operating lease or other personal property; (vi) rights of subtenants, landlords, licensees, sponsors and concessionaires; (vii) the terms and conditions of the Real Property Leases; (viii) the Shared Parking Letter; (ix) the Parking Easement; (x) all Liens that will be extinguished by the Confirmation Order; (xi) other imperfections in title, charges, easements, restrictions and encumbrances which do not materially detract from the value of or materially interfere with the Business or the property subject thereto; and (xii) all matters listed on Schedule 1.1(c).

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" means any lease of personal property by Dallas Stars or any Stars Subsidiary.

"Petition Date" means the date on which the Bankruptcy Petitions are duly filed with the Bankruptcy Court.

"Plan" has the meaning given in the Recitals.

"Plano StarCenter" has the meaning given in the Recitals.

"Post-Closing Covenants" has the meaning given in Section 12.1(b).

"Post-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Post-Closing Expense Amount" means $750,000.

"Pre-Closing Covenants" has the meaning given in Section 12.1(b).

"Pre-Closing Covenant Survival Period" has the meaning given in Section 12.1(b).

"Pro Forma Balance Sheet" means the pro forma consolidated balance sheet of Dallas Stars and its Subsidiaries as of June 30, 2011, attached hereto as Schedule A.

"Pro Forma NWC" means the pro forma calculation of NWC as of June 30, 2011, attached hereto as Schedule B.

"Pro Forma Purchase Price" means the pro forma calculation of the Purchase Price as of June 30, 2011, attached hereto as Schedule C.

"Proposed NHL Approval Requirements" means the proposed substantive terms of the NHL Owner Consent, the NHL Guaranty, the Purchaser/NHL Proxy, and the NHL/Lender Cooperation Agreement.

"Prorated Budgeted Loss" means an amount equal to (i) a fraction, the numerator of which shall be the number of days that elapsed in the month of Closing through and including the Closing Date and the denominator of which shall be the total number of days in the month of Closing, _multiplied_ by (ii) the Cumulative Budgeted Loss for the month of Closing _less_ the Cumulative Budgeted Loss as of the end of the immediately preceding month.

"Purchase Price" has the meaning given in Section 3.1(e).

"Purchased Assets" has the meaning given in Section 2.1.

"Purchased Contracts" means all Contracts (other than Excluded Contracts) to which any Seller is a party, including all Ticket Contracts.

"Purchased Intellectual Property" means all Intellectual Property (i) owned by Sellers (the "Sellers' Intellectual Property") or (ii) owned by any of the Transferred Subsidiaries, including, in each case (i) and (ii), the Registered Intellectual Property.

"Purchaser(s)" has the meaning given in the Preamble.

"Purchaser Documents" has the meaning given in Section 7.2.

"Purchaser Indemnified Parties" has the meaning given in Section 12.2(a).

"Purchaser/NHL Proxy" has the meaning given in Section 9.9.

"Purchaser Plans" has the meaning given in Section 10.2(b).

"Qualified Bid" has the meaning given to such term in the Bidding Procedures Order.

"Qualified Bidder" has the meaning given to such term in the Bidding Procedures Order.

"Real Property Lease" means any lease of real property to which Dallas Stars or any Stars Subsidiary is party as lessor or lessee.

"Registered Intellectual Property" means all issued Patents, pending Patent applications, registered Marks, pending applications for registration of Marks, registered Copyrights and Domain Name registrations, in each case, owned, filed or applied for by (i) any Seller or (ii) any Transferred Subsidiary.

"Requisite Lenders" means the Lenders under the First Lien Credit Agreement and the Second Lien Credit Agreement (i) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement and (ii) representing at least fifty percent (50%) of the Lenders under the First Lien Credit Agreement and Second Lien Credit Agreement; provided, however, that at the option of Sellers with the approval of the NHL, the definition of Requisite Lenders shall mean the First Lien Lenders (x) holding at least two-thirds of the outstanding principal amount of indebtedness under the First Lien Credit Agreement and (y) representing at least fifty percent (50%) of the First Lien Lenders.

"RLF" means Richards, Layton & Finger, a Professional Association.

"Second Lien Credit Agreement" means that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the Lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, and GSP Finance LLC (as successor to Barclays Bank PLC) as Administrative Agent, Collateral Agent and Co-Syndication Agent, as amended from time to time.

"Second Lien Expense Reimbursement" has the meaning given in the Plan.

"Securities Act" has the meaning given in Section 7.6.

"Seller(s)" has the meaning given in the Preamble.

"Seller Benefit Plan" has the meaning given in Section 5.14(a).

"Seller Documents" means the Dallas Stars Documents and the Dallas Arena Documents.

"Seller Indemnified Parties" has the meaning given in Section 12.3(a).

"Seller Released Parties" has the meaning given in Section 13.12(a).

"Seller Releasing Parties" has the meaning given in Section 13.12(b).

"Sellers' Intellectual Property" has the meaning given in Section 1.1 (in the definition of "Purchased Intellectual Property").

"Sellers' Representative" has the meaning given in Section 13.14.

"Senior Indebtedness" means the obligations arising under, in connection with or in respect of (i) the First Lien Credit Agreement, (ii) the Second Lien Credit Agreement, (iii) the

amounts due under, or otherwise due in connection with the termination of, the Hedge Agreements, and (iv) any other agreement entered into in connection with the foregoing.

"Senior Secured Loan" has the meaning given in Section 9.11.

"Shared Parking Letter" means the Letter Agreement, dated September 12, 2003, between SSR GP Interests, L.P., Dallas Stars, SSG/Mandalay Baseball Partners, L.P. and SSR, regarding the shared-parking arrangement at the Frisco sports complex.

"Shared Services Agreement" means the Shared Services Agreement, dated as of October 3, 2008, by and among HSG and certain of its affiliated entities signatory thereto, pursuant to which HSG provides certain shared services to each of Dallas Stars, the Stars Subsidiaries and other Affiliates of HSG.

"Sherman Act" means the Sherman Antitrust Act of 1890, as amended, and the rules and regulations promulgated thereunder.

"Specified Expenses" means those unpaid fees and expenses relating to the sale process and the related matters contemplated by this Agreement as and in the amount submitted in final form in writing by Sellers to Purchasers at least three (3) Business Days prior to the Closing Date, and not subject to review or approval by Purchasers but only by Sellers in advance of Closing (and which may include estimates thereof through the Closing Date), including (i) amounts due to GSP (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by Section 7.8), (iii) fees of Sellers' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) the Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement, including, without limitation, any Antitrust Fees and any fees resulting from the filings contemplated under Section 9.15.

"SSR" means SSR Collin Land, L.P., a Texas limited partnership.

"StarCenters" has the meaning given in the Preamble.

"StarCenters Equity Interests" means the limited liability company membership interests in and to StarCenters.

"Stars" has the meaning given in the Recitals.

"Stars Benefit Plan" has the meaning given in Section 5.14(a).

"Stars Entities" means each of Dallas Stars and the Stars Subsidiaries.

"Stars Foundation" means Dallas Stars Foundation, Inc., a Texas non-profit corporation.

"Stars Material Contract" has the meaning given in Section 5.13(a).

"Stars Pension Plan" has the meaning given in Section 5.14(b).

"Stars Subsidiaries" has the meaning given in the Recitals.

"Subsidiary" means, with respect to a Person, any Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person.

"Subsidiary Released Parties" has the meaning given in Section 13.12(b).

"Subsidiary Releasing Parties" has the meaning given in Section 13.12(a).

"Successful Bidder" has the meaning given in the Bidding Procedures Order.

"Suite Contract" means a Contract to which any Seller is a party that gives another party thereto the right to use a suite at the AAC or any Dr Pepper StarCenter for more than one game in any season, other than sponsorship or advertising and promotional agreements.

"Target NWC" means $7,750,000.

"Tax(es)" means (i) all federal, state, local or foreign taxes, charges, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any Liability in respect of any items described in clauses (i) or (ii) payable by reason of Treasury Regulation Section 1.1502-6 or any analogous or similar provision under federal, state, local or foreign Law.

"Tax Benefit" has the meaning given in Section 12.6(b).

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes a Seller, any of its Subsidiaries, or any of their Affiliates.

"Taxing Authority" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"Termination Date" means the later of (i) December 31, 2011 and (ii) in the event the Auction has occurred and Purchasers are not the Successful Bidder, the earlier of (A) the closing of the Competing Bid and (B) forty-five (45) days after the close of the Auction.

"Ticket Contracts" means all Contracts, licenses and subscriptions to which any Seller is a party relating to attendance at any event at the AAC or any Dr Pepper StarCenter including, without limitation, season ticket subscriptions and Suite Contracts.

"Trade Secrets" has the meaning given in Section 1.1 (in the definition of "Intellectual Property").

"Transaction Expenses" means all fees, charges, disbursements and expenses, paid out-of-pocket to third parties incurred in contemplation of or in connection with the transactions contemplated hereby, including fees, expenses and costs of legal counsel, accountants, financial advisors, consultants, agents and other representatives, incurred in connection with the transactions contemplated hereby.

"Transfer Taxes" has the meaning given in Section 13.1(a).

"Transferred Equity Interests" means (i) the 100% member interest in Plano StarCenter held by Dallas Stars, but only to the extent Sellers do not elect to treat such member interests as an Excluded Asset pursuant to Section 9.17 , (ii) 99% of the issued and outstanding capital stock of Hockey Enterprises held by Dallas Stars, (iii) the Hockey Enterprises Equity Interest and (iv) the COC Equity Interests.

"Transferred Subsidiaries" means (i) Hockey Enterprises and, (ii) to the extent Sellers do not elect to treat the member interests of the same as an Excluded Asset pursuant to Section 9.17, Plano StarCenter.

"U.S. Holdings" has the meaning given in the Preamble.

"U.S. Holdings Shares" has the meaning given in Section 5.4(c).

"Weil" has the meaning given in Section 4.1.

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or

indication that breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)    Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)    Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statements, or (c) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)    Recitals. The Recitals to this Agreement are incorporated by reference herein and made a part hereof.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Further, prior drafts of this Agreement or any ancillary agreements hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

# ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchasers all of Sellers' right, title and interest in, to and under the Purchased Assets.  "<u>Purchased Assets</u>" shall mean all assets of Sellers (other than the Excluded Assets), including the following assets:

(a)     the Purchased Contracts;

(b)     all cash, cash equivalents, bank deposits or similar cash items and accounts receivable of Sellers (other than any accounts receivable arising out of or in connection with any Excluded Contract as identified on <u>Schedule 2.1(b)</u>);

(c)     all inventory and supplies of Sellers;

(d)     all rights of Sellers with respect to minor or junior league hockey affiliations (including the Texas Stars, Idaho Steelheads, and Allen Americans);

(e)     all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses of Sellers, including any prepaid rent, related to any Purchased Assets including all prepaid charges, expenses and rent under the Real Property Leases, Personal Property Leases or in respect of the Owned Property, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(f)     all rights of Sellers under each Owned Property and Real Property Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(g)     all rights and privileges held by Sellers associated with the NHL, including rights to membership and franchise of the Stars in the NHL and all ownership interests of Sellers in any NHL Entity;

(h)     the Furniture and Equipment;

(i)     the Transferred Equity Interests (subject to the election of Sellers pursuant to <u>Section 9.17</u> to exclude the 100% membership interests in Plano StarCenter held by Dallas Stars);

(j)     Sellers' Intellectual Property;

(k)     all Documents of Sellers used in the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on the

Owned Property or any of the premises leased under a Real Property Lease referred to in clause (f) above, but excluding personnel files for Employees of Sellers (other than Continuing Employees), and excluding such files as may be required under applicable Law regarding privacy; provided that Sellers shall be permitted to retain copies of any or all Documents;

(l)     all Permits of Sellers, but only to the extent such Permits are assignable or otherwise transferable;

(m)     all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller or to the extent affecting the Business or any Purchased Assets;

(n)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and Former Employees or with third parties;

(o)     to the extent assignable, all Insurance Policies issued to any Seller and each Employee Benefit Plan the benefits under which are covered by any such Insurance Policy;

(p)     to the extent assignable, all of Sellers' rights to insurance proceeds under the Insurance Policies and condemnation proceeds to the extent relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(q)     all rights of Sellers to any archives of the Dallas Stars hockey club (or any predecessor hockey club) video and audio footage, memorabilia, pictures, recordings, team records and other information and materials related to hockey, the Dallas Stars hockey club, any predecessor hockey club to the Dallas Stars hockey club, the AAC, the Reunion Arena (the former home ice arena for the Stars), or any other home arena of the Dallas Stars hockey club or any such predecessor hockey club;

(r)     all goodwill owned by Sellers associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(s)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Purchased Asset; and

(t)     any claim, right or interest of Sellers with respect to any Assumed Liability, including, without limitation, any rights of the Sellers for contribution and indemnity at law arising from or relating to the Sellers' joint and several liability with HSG or any Hicks Affiliate for Taxes not relating to the Business to the extent the same constitute an Assumed Liability.

2.2     Excluded Assets. Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchasers, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean the following assets of Sellers:

(a)     the Excluded Contracts, including those accounts receivable identified on Schedule 2.1(b);

(b)     all minute books, organizational documents, stock or other equity registers and such other books and records and corporate or other entity filings of Sellers as pertain to ownership, organization or existence of each Seller and duplicate copies of such Documents as are necessary to enable Sellers to file Tax Returns and reports and comply with any applicable Laws or internal policies regarding document retention;

(c)     any personnel files pertaining to any individuals (including common law employees and independent contractors), other than the personnel files of any Continuing Employee and any independent contractors who are a party to a Purchased Contract;

(d)     any (i) other Documents or other books and records that any Seller is required by Law to retain or that any Seller determines are necessary or advisable to retain; provided, however, that Purchasers shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (ii) documents relating to proposals to acquire the Business by Persons other than Purchasers;

(e)     all of Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets as identified on Schedule 2.2(e);

(f)     the Excluded Equity Interests;

(g)     all causes of action, claims, credits, demands, rights, interests or rights of set-off of Sellers to the extent related to or arising from any Excluded Asset;

(h)     any claim, right or interest of Sellers with respect to any Excluded Liability; and

(i)     to the extent Sellers so elect pursuant to Section 9.17, the 100% membership interests in Plano StarCenter held by Dallas Stars.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall assume, effective as of the Closing, and shall timely perform, pay and discharge in accordance with their respective terms, all Liabilities of Sellers (collectively, the "Assumed Liabilities") other than Excluded Liabilities.  The Assumed Liabilities include, but are not limited to, the following Liabilities of the Sellers:

(a)     except to the extent specifically provided in Article X, all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services of any individual by or on behalf of any Seller or any of the Transferred Subsidiaries on or before the Closing Date, (ii) workers' compensation claims against any Seller or any of the Transferred Subsidiaries, or any other entity with respect to the employment of any Former Employee on behalf of any Seller or any Transferred Subsidiary, that relate to the period ending on the Closing Date, irrespective of whether such claims are made prior to, on or after the Closing, or (iii) any Employee Benefit Plan;

(b)     all Liabilities arising from the sale of products sold or services provided in the Ordinary Course of Business pursuant to product or service warranties, returns and rebates;

(c)     all Liabilities constituting, or arising in connection with, accounts payable existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(d)     all Liabilities for Taxes;

(e)     all Liabilities for Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)     all Liabilities with respect to the Business, the Purchased Assets or the Continuing Employees arising after the Closing;

(g)     all Liabilities for the CFV Debt Amount;

(h)     all Liabilities of Dallas Stars for benefits received as a third party beneficiary under or otherwise received as a result of the Contracts listed on Schedule 2.3(h);

(i)     all Liabilities of Dallas Stars for contribution and indemnity at law to HSG or HSGH arising out of HSG's or HSGH's guaranty obligations under the Contracts set forth on Schedule 2.3(i), but only to the extent that HSG or HSGH actually makes any payments thereunder as a result of Dallas Stars' or its Subsidiaries' default of their obligations;

(j)     all Liabilities for the Specified Expenses;

(k)     all Liabilities and obligations of Sellers for the aggregate amount of gross deferred compensation as set forth on the schedule provided pursuant to Section 5.22, including for Hockey Player Employees and coaches;

(l)     all Liabilities of Sellers arising under the Purchased Contracts, including any cure amounts as set forth in Section 2.5;

(m)     all Liabilities of Sellers to the extent covered by Insurance Policies or benefits of Insurance Policies that are assigned to and assumed by Purchasers;

(n)     all Liabilities of Sellers under the Officer Indemnification Agreements;

(o)     all Liabilities constituting, or arising in connection with, trade payables; and

(p)     all Liabilities of Sellers to the NHL, any NHL Affiliated Party, any other entity formed generally by the NHL Member Clubs after the date hereof, or any other NHL Member Club, whether in accordance with the terms of the NHL Constitution and Agreements (as defined in that certain letter agreement, dated December 19, 2006, as has been or may be further amended, restated, supplemented or otherwise modified from time to time, by and among the NHL, the First Lien Agent, the Administrative Agent under the Second Lien Credit

Agreement, HSG, HSGH, Dallas Stars, Dallas Arena, U.S. Holdings, StarCenters, and certain other subsidiaries of HSG), applicable Law or otherwise.

2.4    Excluded Liabilities.  Purchasers will not assume or be liable for any Liabilities of Sellers other than the Assumed Liabilities. "Excluded Liabilities" shall consist of the following Liabilities of Sellers:

(a)    all Liabilities of Sellers arising out of the Excluded Assets, including the Excluded Contracts, except as otherwise provided in Section 2.3(d);

(b)    all Liabilities of HSG or any Hicks Affiliates, except as otherwise provided (i) in Section 2.3(d) or 2.3(e), in each case, solely to the extent that Sellers are jointly and severally liable with HSG or any Hicks Affiliates with respect thereto pursuant to applicable Law and (ii) in Section 2.3(a), 2.3(h), 2.3(i) or 2.3(p);

(c)    all Liabilities arising out of or relating to the Senior Indebtedness (including any and all Liabilities of or to GSP in its capacity as Lender and agent under the Second Lien Credit Agreement), except as otherwise provided in Section 2.3(p);

(d)    all Liabilities of Sellers owed to any of their Affiliates or any Hicks Affiliate (but, for the avoidance of doubt, (i) such Affiliates or Hicks Affiliate shall not include any other Seller or any Transferred Subsidiary, and (ii) such Liabilities shall not include any Liabilities owed pursuant to any Contract set forth on Schedule 1.1(a)(i) hereto);

(e)    all Liabilities, if any, to proposed purchasers or bidders not party hereto and who are unaffiliated with any Purchaser arising from the negotiations of or on behalf of Sellers or HSG with such Persons;

(f)    any Liabilities to the extent covered by any Insurance Policies (including any extension of any "claims made" liability insurance policies effected pursuant to Sellers' obligations under Section 9.14 and any renewals of any Insurance Policies), to the extent such Insurance Policies and the benefits of such Insurance Policies are not assigned to and assumed by Purchasers, and only to the extent that Sellers, after fulfilling all obligations set forth in Section 9.14, actually recover the amount of such Liabilities under the applicable policies;

(g)    all Liabilities based upon or resulting from any employee pension benefit plan that is subject to Section 302 or Title IV of ERISA (other than a Seller Benefit Plan or NHL Benefit Plan) directly maintained or contributed to by any member (other than Sellers or any of their Subsidiaries) of a group under common control (under Section 414(b) or (c) of the Code) with Sellers or any of their Subsidiaries prior to the Closing Date;

(h)    all Liabilities of Sellers under this Agreement, including any indemnification obligations under Article XII;

(i)    except as provided in Section 2.3(g), any Liabilities under the CFV Debt Agreement; and

(j)    any Liabilities to a Broker (other than to GSP).

2.5     Cure Amounts.  At Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assign to Purchasers and Purchasers shall assume from Sellers, the Purchased Contracts.  The cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts, Personal Property Leases and Real Property Leases, shall be paid by Purchasers, on or before Closing, and not by Sellers, and Sellers shall have no liability therefor.

2.6     Further Conveyances and Assumptions; Consent of Third Parties.

(a)     From time to time following the Closing, Sellers and Purchasers shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to fully convey, transfer and assign to Purchasers and their successors or assigns, all of the rights, titles and interests in the Purchased Assets and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)     Nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which by its terms or by Law is nonassignable without the consent of a third party or a Governmental Body or is cancelable by a third party in the event of an assignment ("Nonassignable Assets") unless and until such consent shall have been obtained or the Bankruptcy Court shall have authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals).  With respect to Material Contracts or Permits that are material for the Business as a going concern after the Closing Date, Sellers shall use their commercially reasonable efforts to promptly obtain such consents prior to the Closing and, if the Closing occurs, after the Closing Date; provided, however, that such efforts shall not require any Seller or any of its Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily or contingently liable for any Assumed Liability to obtain any such consent.  Purchasers and Sellers shall use their respective commercially reasonable efforts to obtain, or cause to be obtained, any consent, substitution, approval or amendment required to novate all Liabilities under any and all Purchased Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of Sellers and their Affiliates so that, in any such case, Purchasers shall be solely responsible for such Liabilities.  To the extent permitted by applicable Law and the terms of the Nonassignable Assets, in the event consents to the assignment thereof cannot be obtained or the Bankruptcy Court has not authorized such assignment without the requirement of obtaining such third party consent (other than the NHL Approvals), such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchasers and the covenants and obligations thereunder shall be performed by Purchasers in such Seller's name and all benefits and obligations existing thereunder shall be for Purchasers' account.  Sellers shall take or cause to be taken at Purchasers' expense such actions in their name or otherwise as Purchasers may reasonably request so as to provide Purchasers with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and

Sellers shall promptly pay over to Purchasers all money or other consideration received by it in respect of all Nonassignable Assets. As of and from the Closing Date, each Seller authorizes each Purchaser, to the extent permitted by applicable Law and the terms of the Nonassignable Assets, at Purchasers' expense, to perform all the obligations and receive all the benefits of such Seller under the Nonassignable Assets and appoints each Purchaser its attorney-in-fact to act in its name on its behalf, and Purchasers agree to indemnify and hold such Seller and its Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchasers' performance of, or failure to perform, such obligations under the Nonassignable Assets and any actions taken upon exercise of such power of attorney. Following the Closing, Sellers shall not terminate, modify or amend any Nonassignable Asset without Purchasers' prior written consent.

2.7     Bulk Sales Laws. Except as may otherwise be required by the Bankruptcy Court, Purchasers hereby waive compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchasers.

## ARTICLE III

## CONSIDERATION

3.1     Consideration. The aggregate consideration for the Purchased Assets (which, for the avoidance of doubt, shall be a joint and several obligation of Purchasers) shall be:

(a)     an amount in cash equal to the CFV Debt Amount;

(b)     an amount in cash as necessary to pay in full the Specified Expenses;

(c)     the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 in partial satisfaction of the Senior Indebtedness; provided that the original principal amount of the Senior Secured Loan and the indebtedness of DSE to be incurred in connection therewith shall be adjusted:

(i)     by deducting the amount, if any, by which the CFV Debt Amount exceeds $50,000,000;

(ii)     by (A) deducting the amount, if any, by which the Target NWC exceeds the Final NWC (for the avoidance of doubt, if the Final NWC is a deficit number, the amount deducted shall be equal to the aggregate of (x) the full amount of the deficit, and (y) the Target NWC) or (B) adding the amount if any by which the Final NWC exceeds the Target NWC; and

(iii)     (A) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on the last day of a month, by adding an amount equal to the absolute value of the Cumulative Budgeted Loss for such month, (B) if the Closing Date occurs on or after September 1, 2011 but prior to January 1, 2012 and falls on a date other than the last day of a month (and, for greater certainty, no amount has been added under Section 3.1(c)(iii)(A)), by adding an amount equal to (x) the absolute value of the

Cumulative Budgeted Loss for the immediately preceding calendar month *plus* (y) the absolute value of the Prorated Budgeted Loss for the month in which Closing occurs, or (C) if the Closing Date occurs on or after January 1, 2012, by adding an amount equal to the absolute value of ($15,058,541);

further, provided that, the final principal amount of the Senior Secured Loan, as may be adjusted under Section 3.1(c) hereinabove, shall not exceed $100,000,000;

(d)     if the aggregate principal amount of the Senior Secured Loan as adjusted under Section 3.1(c) would exceed $100,000,000 but for the last proviso of Section 3.1(c), an amount in cash equal to the excess amount thereof, if any, in excess of $100,000,000 (the "Excess Cash Payment");

(e)     an amount in cash equal to the positive difference, if any, of $50,000,000 minus the CFV Debt Amount (the "First Lien Cash Payment") (collectively, the sum of the amounts determined pursuant to the foregoing subsections (a), (b), (c), (d) and (e), the "Purchase Price", which shall be calculated pursuant to this Section 3.1 in a manner consistent with the preparation of the Pro Forma Purchase Price); and

(f)     the assumption of the Assumed Liabilities.

3.2     Purchase Price Deposit. Upon the execution of this Agreement, Purchasers shall immediately deposit with Citibank, N.A., in its capacity as escrow agent (the "Escrow Agent"), the sum of Fifteen Million U.S. Dollars ($15,000,000) by wire transfer of immediately available funds (the "Escrowed Funds"), to be released by the Escrow Agent and delivered to either Purchasers or to or on behalf of Sellers, in accordance with the provisions of the Escrow Agreement, which will be entered into by Purchasers, Sellers and the Escrow Agent immediately upon execution of this Agreement in substantially the form attached as Exhibit E (the "Escrow Agreement"). The Escrow Agreement shall provide, among other things, that the Escrow Agent shall provide Sellers and Purchasers with written notice immediately upon receipt of the Escrowed Funds. Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(a)     if the Closing shall occur, the Escrowed Funds and all accrued investment income thereon shall be applied towards the Purchase Price payable by Purchasers to Sellers under Section 3.3 hereof;

(b)     the Escrowed Funds, together with all accrued investment income thereon, shall be promptly returned to Purchasers, if this Agreement is terminated:

(i)     pursuant to Section 4.2(a);

(ii)     by Purchasers or Sellers pursuant to Section 4.2(c), but not in the event that the Order contemplated by Section 4.2(c) was due to the failure of Purchasers to perform any of their obligations under this Agreement;

(iii)     by Sellers pursuant to Section 4.2(d)(i), but not in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under

this Agreement (including, without limitation, their obligations under Section 9.9) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

   (iv)   by Purchasers pursuant to Section 4.2(e);

   (v)   pursuant to Section 4.2(h); or

   (vi)   by Purchasers pursuant to Section 4.2(i); and

   (c)   if this Agreement is terminated for any reason other than as set forth in Section 3.2(b), the Escrowed Funds, together with all accrued investment income thereon, shall in each case be delivered to Sellers.

   3.3   Payment of Purchase Price.

   (a)   On the Closing Date, (i) the Escrow Agent shall pay the Escrowed Funds and all accrued investment income thereon by wire transfer of immediately available United States funds to an account designated by CFV I LLC, and (ii) Purchasers shall pay the Purchase Price (less the Escrowed Funds and all accrued investment income thereon) to Sellers, which shall be paid (A) by wire transfer of immediately available United States funds in an amount equal to the CFV Debt Amount (less the Escrowed Funds and all accrued investment income thereon) to an account designated by CFV I LLC; (B) by wire transfer of immediately available United States funds in an amount equal to the Specified Expenses to accounts and in the amounts designated by Sellers and the NHL, respectively, and to the extent direct payment of Specified Expenses owed to RLF, Weil and GSP, respectively, is permitted by the Bankruptcy Court at Closing, to the accounts and in the amounts designated by RLF, Weil and GSP, respectively; (C) by wire transfer of immediately available United States funds in an amount equal to the First Lien Cash Payment to an account designated by the First Lien Agent; and (D) by the incurrence of indebtedness by DSE under the Senior Secured Loan in an aggregate original principal amount of $100,000,000 (subject to adjustment as provided in Sections 3.1(c) and 3.4 hereof).

   (b)   Within three (3) Business Days following the determination of the Final NWC pursuant to Section 3.4, (i) the aggregate principal amount of the Senior Secured Loan shall be adjusted as calculated pursuant to Sections 3.1(c) and 3.4 hereof and the principal amount of the Senior Secured Loan shall automatically be adjusted pursuant to its terms; and (ii) Purchasers shall pay by wire transfer of immediately available United States funds an amount equal to the Excess Cash Payment, if any, to an account designated by the First Lien Agent.

   (c)   Sellers shall cause all wire transfer instructions needed for payment of the Purchase Price under this Section 3.3 to be delivered to Purchasers at least three (3) Business Days prior to Closing. At the Closing, and upon the payment of the Excess Cash Payment, if any, Purchasers shall deliver, or cause to be delivered, to Sellers evidence of the wire transfers referred to in this Section 3.3.

3.4    Purchase Price Adjustment.

(a)    No later than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchasers the following: (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries prepared on an estimated basis as of the close of business on the Closing Date (the "Estimated Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, and (ii) Sellers' calculation of the NWC as of the close of business on the Closing Date based on the Estimated Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g).

(b)    Within thirty (30) days after the Closing Date, Purchasers shall prepare and deliver to Sellers' Representative the following (collectively, the "Closing Documents"): (i) an unaudited consolidated balance sheet of Dallas Stars and its Subsidiaries as of the close of business on the Closing Date (the "Closing Balance Sheet") prepared in a manner consistent with the methods, assumptions and practices used to prepare the Pro Forma Balance Sheet and without giving effect to any purchase accounting adjustments arising from the transactions contemplated by this Agreement, (ii) Purchasers' calculation of the NWC as of the close of business on the Closing Date (the "Closing NWC") based on the Closing Balance Sheet and prepared in a manner consistent with the Pro Forma NWC in accordance with Section 3.4(g), and (iii) a certificate of the chief financial officer of Purchasers verifying that the Closing Balance Sheet and Closing NWC have been prepared in the manner required by this Agreement.

(c)    Within twenty (20) Business Days after delivery of the Closing Documents, Sellers' Representative will deliver to Purchasers a written response in which Sellers' Representative will either:

(i)    agree in writing with the Closing NWC, in which case the Closing NWC will be final and binding (herein the "Final NWC"); or

(ii)    dispute the Closing NWC by delivering to Purchasers a written notice (a "Dispute Notice") setting forth in reasonable detail the basis for each such disputed item.

For purposes of this Section 3.4(c), Sellers' Representative may only deliver a Dispute Notice if the aggregate value of all disputed items is in excess of $100,000. For purposes of Sections 3.4(b) and 3.4(c), Purchasers will promptly furnish to Sellers' Representative such work papers and other documents and information that Sellers' Representative may request to the extent the same are available to Purchasers (or their independent public accountants). Purchasers shall also permit such reasonable access to their businesses and their officers and that of their Subsidiaries as may be required by the Sellers' Representative to permit it to complete its review of the Closing NWC and to do so in a timely manner.

(d)    If Sellers' Representative fails to take either of the actions specified in Section 3.4(c) within twenty (20) Business Days after delivery of the Closing Documents, then

Sellers' Representative will be deemed to have irrevocably accepted the Closing NWC, in which case, the Closing NWC will be final and binding (herein also the "Final NWC").

(e)     If Sellers' Representative timely delivers a Dispute Notice to Purchasers, then Purchasers and Sellers' Representative will attempt in good faith, for a period of ten (10) Business Days, to agree on the Closing NWC for purposes of this Agreement. Any resolution agreed in writing by Purchasers and Sellers' Representative during such ten (10)-Business Day period as to any disputed items will be final and binding on the parties. If Purchasers and Sellers' Representative do not resolve all disputed items by the end of ten (10) Business Days after the date of delivery of the Dispute Notice, then Purchasers and Sellers' Representative will engage a mutually agreeable independent accounting firm to determine the remaining disputed items provided that the aggregate value of the remaining disputed items is in excess of $100,000 and if the aggregate value of the remaining disputed items is $100,000 or less, then the parties shall each be deemed to prevail on their position regarding an amount equal to 50% of such remaining disputed amount. If Purchasers and Sellers' Representative are unable to jointly select such independent accounting firm within five (5) Business Days after such ten (10) Business Day period, Sellers' Representative may, upon notice to Purchasers, apply to any court of competent jurisdiction for the court to select an independent accounting firm for such purpose (such selected independent accounting firm, whether pursuant to this sentence or the preceding sentence, the "Independent Accounting Firm"). The Independent Accounting Firm shall render its determination with respect to the matters in dispute in a written report that specifies the conclusions of the Independent Accounting Firm as to each item in dispute and provide a revised Closing NWC consistent with all prior agreements of the parties and its determination of the matters in dispute (herein also the "Final NWC"). The Independent Accounting Firm's determination as set forth in its report will be final and binding on the parties for all purposes of this Agreement.

(f)     Purchasers and Sellers' Representative will each use their commercially reasonable efforts to cause the Independent Accounting Firm to render its determination within twenty (20) days after referral of the items to such firm or as soon thereafter as reasonably practicable. Purchasers and Sellers' Representative will furnish to each other and to the Independent Accounting Firm such work papers and other documents and information relating to the disputed items as the Independent Accounting Firm may request and are available to that party (or its independent public accountants) and will be afforded the opportunity to present to the Independent Accounting Firm any material related to the disputed items and to discuss the items with the Independent Accounting Firm. Purchasers may require that the Independent Accounting Firm enter into a customary form of confidentiality agreement with respect to the work papers and other documents and information provided to the Independent Accounting Firm. Purchasers shall also permit such reasonable access to their business and their officers and that of their Subsidiaries as may be required by the Independent Accounting Firm to permit them to complete their work and to do so in a timely manner. The Independent Accounting Firm will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the items in dispute as originally submitted to the Independent Accounting Firm; provided that any such costs borne by Sellers shall be paid in cash by Purchasers and shall be added to the Specified Expenses for purposes of the calculation of the Final NWC. For example, should the items in dispute total in amount to $1,000 and the Independent Accounting Firm awards $600 in favor of Sellers'

Representative's (on behalf of Sellers) position, 60% of the costs of its review would be borne by Purchasers and 40% of the costs would be borne by Sellers.

(g)     Notwithstanding anything herein or in any Schedule hereto to the contrary, the calculation of NWC (including the calculation of the Pro Forma NWC, the Closing NWC and the Final NWC) shall not include, or make any adjustments for, any Excluded NWC Amounts. For the avoidance of doubt, an agreed upon amount reflecting an adjustment for all Excluded NWC Amounts is reflected in the calculation of the Target NWC.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     Closing Date.  The consummation of the transactions contemplated by this Agreement provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP ("Weil") located at 200 Crescent Court, Suite 300, Dallas, TX 75201 (or at such other place as the parties may designate in writing) at 10:00 am CDT time on a date to be specified by the parties (the "Closing Date"), which date shall be the third Business Day after the satisfaction or waiver of the conditions set forth in Article XI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), unless another time, date or place is agreed to in writing by the parties hereto.

4.2     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     at the election of Sellers or Purchasers at any time on or after the Termination Date if the Closing shall not have occurred by the close of business on such date, provided that the terminating party is not in breach of any of its obligations hereunder that would prevent the Closing conditions in Article XI, as applicable, from being satisfied;

(b)     by mutual written consent of Sellers and Purchasers;

(c)     by Sellers or Purchasers, upon written notice to the other, if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that subject to Section 9.4(b) hereof, the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); provided, however, that the right to terminate this Agreement under this Section 4.2(c) shall not be available to a party if such Order was due to the failure of such party to perform any of its obligations under this Agreement;

(d)     by written notice from Sellers to Purchasers in the event that (i) either party has received a formal notification from the NHL stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; provided that the right of Sellers to terminate this Agreement under this Section 4.2(d)(i) shall not be available to Sellers if such failure to obtain consent or formal notification from the NHL was due to the failure of Sellers to perform any of their obligations under this Agreement, or (ii) Purchasers are (A) in breach of

their representations and warranties set forth in <u>Section 7.7,</u> (B) in breach of their covenants set forth in <u>Section 9.11</u> or (C) have not reasonably satisfied the condition set forth in <u>Section 11.2(c)</u> and all other conditions precedent in <u>Section 11.1</u> and <u>Section 11.3</u> have been satisfied or waived, other than the failure to satisfy any such condition precedent that could reasonably be considered to have resulted from Purchasers' or any of their Affiliates' failure to perform any of their obligations or breach of any of their representations and warranties under this Agreement; <u>provided, however,</u> that with respect to this <u>Section 4.2(d)(ii),</u> such breach has not been cured within three (3) Business Days after written notice of such breach has been delivered to Purchasers;

   (e) by written notice from Purchasers to Sellers in the event that either party has received a formal notification stating that Purchasers will not obtain all required NHL Approvals prior to the Termination Date; <u>provided, however,</u> that the right of Purchasers to terminate this Agreement under this <u>Section 4.2(e)</u> shall not be available to Purchasers if Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under <u>Section 9.9)</u> could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals;

   (f) by written notice from Purchasers to Sellers in the event that Sellers are in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13,</u> except for those updates that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect); <u>provided, however,</u> that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Sellers; <u>provided, further,</u> that the right to terminate this Agreement under this <u>Section 4.2(f)</u> shall not be available to Purchasers if any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement;

   (g) by written notice from Sellers to Purchasers in the event that any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement; <u>provided, however,</u> that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Purchasers; <u>provided, further,</u> that the right to terminate this Agreement under this <u>Section 4.2(g)</u> shall not be available to Sellers if any Seller is in material breach of any representations, warranties or covenants in any provision of this Agreement (without taking into consideration any update to the Schedules after the date hereof pursuant to <u>Section 9.13);</u>

   (h) immediately (i) upon the closing of a Competing Bid in accordance with the Bidding Procedures Order or (ii) on the Commitment Termination Date, in each case, subject to Purchasers' right to payment of the Break-Up Fee in accordance with the provisions of <u>Section 8.5;</u>

   (i) by Purchasers, upon written notice to Sellers after entry of an Order (i) dismissing the Bankruptcy Case, (ii) rendering it impossible to obtain confirmation of the Plan prior to the Termination Date, or (iii) denying confirmation of the Plan, <u>provided that,</u> in each case, the same has not been cured within fourteen (14) days after the entry of such Order.

(j)     by Sellers, upon written notice to Purchasers, if (i) Sellers have obtained all consents set forth on Schedule 11.3(d) (including NHL Approvals) and court orders required to close the transaction on the terms and conditions set forth in this Agreement, (ii) all other conditions to Purchasers' obligation to close the transaction contemplated by this Agreement have been satisfied, (iii) Sellers are not in breach of any representation, warranty or covenant in any provision of this Agreement, (iv) Sellers are ready, willing and able to close the transaction on the terms and conditions set forth in this Agreement, (v) Purchasers are not otherwise entitled to terminate this Agreement pursuant to Section 4.2, and, (vi) notwithstanding (i) through (v) above, Purchasers fail or refuse to close the transaction on the terms and conditions set forth in this Agreement, then Sellers may provide Purchasers with a written demand to close the transaction on the terms and conditions set forth in this Agreement within five (5) Business Days following the receipt of such demand and, if Purchasers fail or refuse to close the transaction during such five (5) Business-Day period, Sellers may terminate this Agreement by written notice to Purchasers; or

(k)     by written notice from Purchasers to Sellers, if as of the Closing, Sellers are unable to assume and assign to Purchasers any Purchased Contract and such failure results, or could reasonably be expected to result, in a Material Adverse Effect within the meaning of clause (i) of the definition of Material Adverse Effect, but not in the event that the inability to assume and assign any such Purchased Contract is due to Purchasers' failure to demonstrate adequate assurance of future performance of any such Purchased Contract.

4.3     Procedure Upon Termination.  In the event of termination and abandonment by Purchasers or Sellers, or both, pursuant to Section 4.2 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchasers or Sellers, other than refunding, release or payment of the Aggregate Seller Termination Amount or the Aggregate Purchaser Termination Amount, if applicable, in accordance with Section 4.4.

4.4     Effect of Termination.

(a)     In the event that this Agreement is validly terminated in accordance with Sections 4.2 and 4.3, then each of the parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any Purchaser or any Seller; provided that the obligations of the parties set forth in Section 3.2, this Section 4.4 and Articles XII and XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     Nothing in this Section 4.4 shall relieve any Seller or any Purchaser of any Liability for a deliberate breach of any of its covenants or agreements or deliberate breach of its representations and warranties contained in this Agreement prior to the date of termination, provided that Sellers' liability hereunder for any and all such breaches shall be capped at an amount equal to the Expense Reimbursement and/or the Break-Up Fee, as applicable. Purchasers shall only be entitled to payment of the Expense Reimbursement from Sellers in the following circumstances: (i) if Sellers are unable to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities) by

the Termination Date, (ii) if the Lenders do not consent (to the extent necessary) to the transactions contemplated by this Agreement on or prior to the Termination Date based on the failure of Sellers to deliver title to Purchasers to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), or (iii) as contemplated by Section 8.5; provided that, in connection with subsections (i) and (ii) above, Purchasers are ready, willing and able to consummate the transactions contemplated by this Agreement and are not in breach of any representation, warranty or covenant in any provision of this Agreement. Purchasers shall only be entitled to payment of the Break-Up Fee on the terms and conditions contemplated by Section 8.5. For the avoidance of doubt, (x) the payment of reasonable out-of-pocket expenses pursuant to this Section 4.4(b) shall not be paid in duplication of any of Purchasers' expenses to be reimbursed by Sellers under Section 8.5 and (y) in the event that the Closing occurs subsequent to any payment to Purchasers of the Expense Reimbursement, Purchasers shall be required to refund such payment to Sellers. For the avoidance of doubt, prior to Closing, in no event shall Sellers be liable to Purchasers for any amount in excess of the Break-Up Fee plus the Expense Reimbursement.

(c) The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.4 shall relieve Purchasers or Sellers of their obligations under the Confidentiality Agreement. If this Agreement is terminated in accordance with Sections 4.2 and 4.3, Purchasers agree that the prohibition in the Confidentiality Agreement restricting each Purchaser's ability to solicit any employee of Sellers or their Affiliates to join the employ of Purchasers or any of their Affiliates shall be extended to a period of two years from the date of this Agreement.

(d) Each Seller and each Purchaser acknowledges and agrees that (i) Sellers' receipt, and Purchasers' forfeiture, of the Escrowed Funds pursuant to Section 3.2(c), or (ii) Purchasers' receipt of the Break-Up Fee and/or the Expense Reimbursement, shall constitute a payment of liquidated damages and not a penalty and that the amount of the Escrowed Funds or the Break-Up Fee and/or the Expense Reimbursement, as applicable, is reasonable in light of the substantial but indeterminate harm anticipated to be caused if the transactions contemplated by this Agreement are not consummated, the difficulty of proof of loss and damages, the inconvenience or non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder. Further, each Seller and each Purchaser acknowledges and agrees that the agreements contained in this Section 4.4 are an integral part of the transactions contemplated by this Agreement. In the event that Purchasers or Sellers shall fail to pay or release the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, when due, the parties responsible for payment or release of such amount shall reimburse the parties entitled to receive such amount for all reasonable costs and expenses actually incurred or accrued by such entitled parties in connection with the collection under and enforcement of this Section 4.4, but in the case of Purchasers, in the aggregate all of Purchasers' Transaction Expenses paid by Sellers shall not exceed the amount of the Expense Reimbursement. Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated and Sellers or Purchasers have a right to receive payment of the Escrowed Funds and all accrued investment income thereon or Break-Up Fee and/or the Expense Reimbursement, as applicable, pursuant to this Section 4.4 and Section 8.5 (subject to the satisfaction of the conditions precedent to the payment of the Break-Up Fee and Expense Reimbursement set forth in Section 8.5), together with any costs or

expenses to be reimbursed in accordance with the foregoing sentence or any other provision of this Agreement (collectively, with the Escrowed Funds and all accrued investment income thereon or the Break-Up Fee and/or the Expense Reimbursement, as applicable, the "Aggregate Purchaser Termination Amount" or the "Aggregate Seller Termination Amount," respectively), prior to Closing such right shall be the sole and exclusive remedy of the parties receiving such amount against the parties paying such amount, for any and all Losses or claims arising under, out of, or related to this Agreement, including the termination of this Agreement, or the sale or purchase of the Purchased Assets, including the failure to consummate such sale or purchase. Nothing in this Agreement shall prevent the enforcement of the remedy of specific performance set forth in Section 12.8 in lieu of termination of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF DALLAS STARS

Dallas Stars hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

5.1     Organization and Good Standing. Dallas Stars is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of Delaware. StarCenters is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Plano StarCenter is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. U.S. Holdings is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Hockey Enterprises is an unlimited liability company duly organized, validly existing and in good standing under the Laws of the Province of Nova Scotia. Each of the Stars Entities has all requisite power and authority to own, lease and operate its properties and to carry on its businesses as now conducted. Each of the Stars Entities is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2     Authorization of Agreement. Each of the Stars Entities has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party, if any, or to be executed by such Stars Entity in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Stars Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and each of the Dallas Stars Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of the Stars Entities party thereto. This Agreement has been, and each of the Dallas Stars Documents will be at or prior to the Closing, duly and validly executed and delivered by Stars Entities party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the

Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Stars Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Stars Entities enforceable against the Stars Entities party thereto in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3 Conflicts; Consents of Third Parties.

(a) Except as set forth on Schedule 5.3(a), none of the execution and delivery by any Stars Entity of this Agreement or the Dallas Stars Documents to which it is party, if any, the consummation of the transactions contemplated hereby or thereby, or compliance by the Stars Entities with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of the Stars Entities; (ii) subject to entry of the Confirmation Order, any Contract or Permit to which any Stars Entity is a party or by which any of the properties or assets of the Stars Entities are bound; (iii) subject to entry of the Confirmation Order, any Order of any Governmental Body applicable to the Stars Entities or by which any of the properties or assets of the Stars Entities are bound; or (iv) subject to entry of the Confirmation Order, any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b) Except as set forth on Schedule 5.3(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Stars Entities in connection with the execution and delivery of this Agreement or the Dallas Stars Documents, the compliance by the Stars Entities party hereto and thereto with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.4 Capitalization.

(a) Schedule 5.4(a) sets forth the name of each Stars Entity and, with respect to each such Stars Entity, the jurisdiction in which it is organized, the jurisdictions, if any, in which it is qualified to do business, the names of all equity owners and the amount of equity owned by each such owner.

(b) Dallas Stars owns (i) a 100% limited liability company interest in StarCenters and (ii) a 100% limited liability company interest in Plano StarCenter.

(c)     Dallas Stars owns (i) all of the issued and outstanding capital stock of U.S. Holdings and (ii) 99 shares of common stock of Hockey Enterprises. U.S. Holdings owns one share of common stock of Hockey Enterprises (the "Hockey Enterprises Equity Interest"). The authorized capital stock of U.S. Holdings consists of 1,000 shares of common stock, $.01 par value per share (the "U.S. Holdings Shares"), and as of the date hereof, all 1,000 shares of such stock are issued and outstanding. The authorized capital stock of Hockey Enterprises consists of 40,000 common shares, without par value, and as of the date hereof, there are 100 shares of such stock issued and outstanding (the "Hockey Enterprises Shares").

(d)     None of the 100% limited liability company interests in StarCenters and Plano StarCenter held by Dallas Stars is certificated. None of the Transferred Equity Interests has been registered under the Securities Act or any applicable state securities Laws.

(e)     All of the equity interests referred to in Sections 5.4(a), 5.4(b), 5.4(c) and 5.4(d) were duly authorized for issuance and are validly issued, and those referred to in Sections 5.4(b), 5.4(c) and 5.4(d) are fully paid and non-assessable.

(f)     Except as set forth on Schedule 5.4(f)(i), there exists no existing option, warrant, call, right, or Contract to which Dallas Stars is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the Stars Subsidiaries or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the Stars Subsidiaries. Except as set forth on Schedule 5.4(f)(ii), none of the Stars Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the Transferred Equity Interests.

(g)     Schedule 5.4(g) identifies the name and jurisdiction of incorporation or organization of each Person (other than a Subsidiary or NHL Entity) in which any Stars Entity holds an equity interest, the nature and class of such interest, and the number of shares or other equity interests of such class held by such Stars Entity.

5.5     Financial Statements. Dallas Stars has made available to Purchasers copies of (i) the audited consolidated balance sheets of Dallas Stars and its Subsidiaries as at June 30, 2008, 2009 and 2010 (the most recent of which, the "Dallas Stars Balance Sheet") and the related audited consolidated statements of income and of cash flows of Dallas Stars and its Subsidiaries for the years then ended, and (ii) the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011, and the related unaudited consolidated statement of income of Dallas Stars and its Subsidiaries for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Dallas Stars Financial Statements"). Except as set forth in the notes thereto and as disclosed in Schedule 5.5, each of the Dallas Stars Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of Dallas Stars and its Subsidiaries as at the dates and for the periods indicated therein. For the purposes hereof, the unaudited consolidated balance sheets of Dallas Stars and its Subsidiaries as at May 31, 2011 are

collectively referred to as the "Dallas Stars Interim Balance Sheet" and May 31, 2011 is referred to as the "Dallas Stars Interim Balance Sheet Date." Dallas Stars and the Stars Subsidiaries have no Liabilities except for (a) Liabilities accrued or reserved for on the Dallas Stars Interim Balance Sheet; (b) Liabilities incurred in the Ordinary Course of Business or any other Liabilities not incurred in the Ordinary Course of Business that do not exceed $5,000,000 in the aggregate; (c) Liabilities incurred in connection with the transactions contemplated herein; (d) Excluded Liabilities; (e) any Liabilities which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and (f) as set forth on Schedule 5.5.

   5.6 Accounts Receivable. In all material respects, all accounts receivable of Dallas Stars and the Stars Subsidiaries are reflected properly on the Dallas Stars Balance Sheet, the Dallas Stars Interim Balance Sheet and the accounting records of Dallas Stars as of the Closing Date and represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Except as set forth on Schedule 5.6 or reserved for in the Dallas Stars Financial Statements, there is no contest, claim, defense or right of setoff, other than returns in the Ordinary Course of Business, relating to the amount or validity of such notes or accounts receivable, except for any such contests, claims, defenses or rights of setoff which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Schedule 5.6 sets forth an accurate and complete list and the aging of all notes and accounts receivable as of the Dallas Stars Interim Balance Sheet Date.

   5.7 Title to Purchased Assets; Sufficiency.

     (a) Except as set forth on Schedule 5.7(a), to the Knowledge of Dallas Stars, the Purchased Assets that are tangible assets of any kind or description taken as a whole are in good operating condition and repair, ordinary wear and tear excepted, except where the failure to be in such condition and repair, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

     (b) Except as set forth on Schedule 5.7(b) and except for Excluded Assets, all of the assets reflected on the Dallas Stars Interim Balance Sheet are included in the Purchased Assets or in the assets of the Stars Subsidiaries unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof. Except as set forth on Schedule 5.7(b), all Purchased Assets and assets of the Stars Entities reflected on the Dallas Stars Interim Balance Sheet are owned by the Stars Entities, unless disposed of or abandoned in the Ordinary Course of Business after the Dallas Stars Interim Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.

     (c) Except as set forth in Schedule 5.7(c)(i) and other than the real property subject to the Real Property Leases, intellectual property licensed to any Seller, and personal property subject to the Personal Property Leases, Dallas Stars or one of the Stars Subsidiaries owns and has good title to each of the Purchased Assets (other than Purchased Assets owned by Dallas Arena), free and clear of all Liens (other than Permitted Exceptions and Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets constitute all of the assets used in the Business as currently conducted or

necessary together with Sellers' agreements hereunder and under the Seller Documents for Purchasers to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business, except insurance, management, legal, corporate, administrative and other services provided by HSG pursuant to the Shared Services Agreement, the Excluded Assets and as set forth in Schedule 5.7(c)(ii).

5.8    Absence of Certain Developments. Except as contemplated by this Agreement or as set forth on Schedule 5.8, since the Dallas Stars Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect. Except as contemplated by this Agreement or as set forth on Schedule 5.8, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the Dallas Stars Interim Balance Sheet Date, Dallas Stars and the Stars Subsidiaries have conducted the Business relating to Dallas Stars and the Stars Subsidiaries only in the Ordinary Course of Business and there has been no:

(a)    commitments for capital expenditures (to the extent unpaid) with respect to the Business, other than commitments for capital expenditures that do not exceed $100,000 individually or $400,000 in the aggregate;

(b)    material increases in the base salary of, or payment of any material bonus to, any Employee, other than (i) in the Ordinary Course of Business, (ii) with respect to any Hockey Player Employee, coach or general manager, or (iii) pursuant to a Contract with any Employee;

(c)    change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(d)    authorization, approval, agreement or commitment to do any of the foregoing; or

(e)    distribution in cash or property in respect of the equity interest of any Stars Entity (other than distributions solely among any Stars Entity (other than distributions made by Dallas Stars) and/or any COC Entity); provided, that distributions by Dallas Stars shall not include any amounts paid to Dallas Arena.

5.9    Taxes. To the Knowledge of Dallas Stars, except as set forth on Schedule 5.9, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    Each Stars Entity has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns. All such Tax Returns are correct and complete in all material respects;

(b)    Each Stars Entity has complied in all material respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c)     There are no Liens for Taxes upon any of the Purchased Assets, the assets of Plano StarCenter and the assets of Hockey Enterprises, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d)     No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against any Stars Entity that are still pending. No requests for waivers of the time to assess any such Taxes have been made that are still pending. No Tax Return of any Stars Entity is under current examination by the IRS or by any state, local, or foreign Taxing Authority and no such Tax audit is threatened in writing. All assessments for Taxes due from any Stars Entity with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e)     None of the Stars Entities is liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f)     Since February 27, 2004, each of Dallas Stars, StarCenters and Plano StarCenter has been properly treated as a disregarded entity for U.S. federal income tax purposes;

(g)     Since its formation, Hockey Enterprises has been treated as a partnership for U.S. federal income tax purposes;

(h)     HSGH is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(i)     None of the Stars Entities has entered into any "reportable transactions" within the meaning of Treasury Regulation Section 1.6011-4, other than any "loss transaction" described in Treasury Regulations Section 1.6011-4(b)(5).

5.10     Real Property.

(a)     Schedule 5.10(a)(i) sets forth a complete list of all real property and interests in real property owned in fee by Dallas Stars and the Stars Subsidiaries (individually, an "Owned Property" and collectively, the "Owned Properties"). Plano StarCenter has fee title to all Owned Property, free and clear of all Liens of any nature whatsoever except (A) Liens set forth on Schedule 5.10(a)(ii), (B) Permitted Exceptions and (C) Assumed Liabilities.

(b)     Schedule 5.10(b) sets forth (i) a complete list of all Real Property Leases under which any Stars Entity is a lessee and (ii) a complete list of all Real Property Leases by any Stars Entity as lessor, except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Stars Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any Stars Entity under any of the Real Property Leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The Stars Entities are current in their rental payments under

all Real Property Leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 5.10(c)(i), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any of its Owned Property or its Leased Real Property, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.10(c)(ii), and except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, all Owned Properties and Leased Real Properties are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Dallas Stars, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such Owned Property and Leased Real Property, and neither Dallas Stars nor any Stars Subsidiary has received within the prior year written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.11     Tangible Personal Property.  Schedule 5.11 sets forth all Personal Property Leases of Dallas Stars and the Stars Subsidiaries involving annual payments in excess of $100,000 except for such omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Except as set forth on Schedule 5.11, and except for such notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Dallas Stars has not received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by Dallas Stars under any such Personal Property Leases.

5.12     Intellectual Property.

(a)     Schedule 5.12(a) sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property. Except as could not, individually or in the aggregate, have a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries in full force and effect.

(b)     Except as set forth on Schedule 5.12(b), Dallas Stars and the Stars Subsidiaries own or have valid licenses to use all material Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries as the same are used by Dallas Stars or the applicable Stars Subsidiary in the Ordinary Course of Business as of the date hereof, except to

the extent the failure to be the owner or a valid licensee thereof could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on <u>Schedule 5.12(c)</u> and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, (i) none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) none of Dallas Stars or the Stars Subsidiaries has received any written notice alleging that any such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries.

(d)     Except as set forth on <u>Schedule 5.12(d)</u> and except as could not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Dallas Stars, none of the Purchased Intellectual Property owned by Dallas Stars or any of the Stars Subsidiaries is being infringed, misappropriated or violated by any Person.

5.13     <u>Stars Material Contracts</u>.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect,  <u>Schedule 5.13(a)</u> sets forth the following material, written Contracts to which any Stars Entity is bound, each of which is a Purchased Contract (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on <u>Schedule 5.13(a)</u>, collectively, the "<u>Stars Material Contracts</u>"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)     Contracts with any labor union or association representing any Employees of Dallas Stars;

(iii)     Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)     Contracts under which (A) Dallas Stars or any of the Stars Subsidiaries grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Stars a license under any material Intellectual Property used or held for use exclusively in the Business or grants to any of the Stars Subsidiaries a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)  Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)  Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)  Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)  Suite Contracts to which Dallas Stars or any Stars Subsidiary is a party;

(ix)  Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)  Contracts containing or providing for any Tax sharing, Tax allocation or Tax indemnification (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes);

(xi)  Contracts for a partnership, joint venture or similar agreement;

(xii)  Contracts relating to any acquisition to be made by any Stars Entity of any operating business or the capital stock of any other Person;

(xiii)  Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiv)  Contracts, other than Contracts with Employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xv)  marketing or advertising Contracts with anticipated revenue to Dallas Stars or any Stars Subsidiary in any 12-month period reasonably expected to be greater than $100,000;

(xvi)  Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvii)  other than league-wide broadcast Contracts entered into by any NHL Entity or pursuant to the NHL Documents, Contracts granting any rights to

broadcasts, whether radio, television or otherwise, of NHL games in which the Stars are a participant.

(b)     With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except for NHL Documents and any Contract currently in effect between Dallas Stars and the NHL, including those listed on Schedule 1.1(b) (as applicable), or as a result of the Bankruptcy Case or as otherwise set forth on Schedule 5.13(b): (i) all of the Stars Material Contracts are in full force and effect and are valid and binding on and enforceable against the Stars Entities party thereto, and, to the Knowledge of Dallas Stars, the other parties thereto in accordance with their terms; (ii) no Stars Entity is in payment default under or monetary breach of, or to the Knowledge of Dallas Stars, otherwise in default under or in breach of, any Stars Material Contract to which it is a party; (iii) no Stars Entity has waived any material future right under any Stars Material Contract to which it is a party; (iv) to the Knowledge of Dallas Stars, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Stars Material Contract; and (v) to the Knowledge of Dallas Stars, no Stars Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Stars Material Contract that has not been resolved.

(c)     Dallas Stars has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Stars Material Contract.

5.14   Employee Benefits.

(a)     Schedule 5.14(a) lists each material "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material employee benefit plan or agreement maintained by Dallas Stars or any of the Stars Subsidiaries (each, a "Stars Benefit Plan") or on behalf of Dallas Stars for the benefit of any Employee or Former Employee (each, a "Seller Benefit Plan"), but does not list any such plans and agreements that are maintained or administered by or on behalf of the NHL for the benefit of the professional hockey players, minor league hockey players and certain coaches employed by Dallas Stars or any of the Stars Subsidiaries, and current or former general managers, trainers and certain other hockey operations personnel (the "NHL Benefit Plans"). Dallas Stars has made available to Purchasers correct and complete copies of each Stars Benefit Plan (or, in the case of any such Stars Benefit Plan that is unwritten, descriptions thereof), and if applicable, as to each such plan: (i) the most recent annual report on Form 5500 required to be filed with the IRS (if any such report was required), (ii) the most recent summary plan description, and (iii) the most recent trust agreement or insurance Contract. Each Stars Benefit Plan has been administered in accordance with its terms and the applicable provisions of ERISA, the Code and all other applicable Laws, except for any non-compliance that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Seller Benefit Plans will cease to produce active coverage after Closing for any Continuing Employee or Former Employee.

(b)     To the Knowledge of Dallas Stars, (i) the 401(k) plan in which Employees participate (the "Stars Pension Plan") qualifies under Section 401(a) of the Code and (ii) no

event has occurred since the date of the most recent determination letter or application therefor relating to such Stars Pension Plan that would adversely affect the qualification of such Stars Pension Plan. Dallas Stars has made available to Purchasers a correct and complete copy of the most recent determination letter received with respect to the Stars Pension Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)     All contributions, premiums and benefit payments under or in connection with the Stars Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Stars Benefit Plans have been timely made. All contributions and premium payments to the NHL Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the NHL Benefit Plans have been timely made. No Stars Benefit Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(d)     Except as set forth on Schedule 5.14(d), there are no actions (other than an audit or investigation), suits or claims (other than routine claims for benefits) with respect to any Stars Benefit Plan pending or, to the Knowledge of Dallas Stars, threatened, which could give rise to a material liability of Dallas Stars or the Stars Subsidiaries, and to the Knowledge of Dallas Stars, there are no facts that are reasonably likely to give rise to any such actions (other than an audit or investigation), suits or claims (other than routine claims for benefits). There is currently no audit or investigation by any Governmental Body against or involving any Stars Benefit Plan pending, and to the Knowledge of Dallas Stars, there is no such audit or investigation threatened by any such Governmental Body.

(e)     Except as set forth on Schedule 5.14(e), neither the execution or delivery of this Agreement, nor the consummation of the transactions contemplated herein, will, with respect to any Employee and solely as a result of the consummation of such transactions: (i) increase any benefits otherwise payable under any Stars Benefit Plan or Seller Benefit Plan; (ii) result in any acceleration of the time of payment or vesting of any such benefits; (iii) result in the payment of any retention, stay bonus, change of control, enhanced severance, or similar payments or (iv) require the funding of any trust or other funding vehicle.

(f)     Except for any representations and warranties in this Article V regarding Contracts with Employees or compensation payable to Employees, this Section 5.14 represents the sole and exclusive representation and warranty of Dallas Stars regarding employee benefit matters. Dallas Stars makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or other employee benefit plans that are not maintained by Dallas Stars or any of the Stars Subsidiaries except as expressly set forth herein.

(g)     Schedule 10.1(a) lists all non-player Employees, as of the date hereof, including, for each such Employee, his or her (i) name, (ii) job title, (iii) department, (iv) base salary or wage rate, (v) date of hire, (vi) status as a full-time or part-time employee, (vii) location, (viii) exempt or non-exempt status, and (ix) calendar year 2010 bonus or commission with respect to non-exempt clerical personnel. Schedule 10.1(a) also lists (x) the name of each non-player Employee who is on a leave of absence as of such date, as well as the names of all Hockey Player Employees as of such date and (y) the bonus pool for non-executive Employees

with respect to fiscal year 2010 and the bonus pool for executive Employees with respect to fiscal year 2010.

5.15    Labor.

(a)    Except as set forth on Schedule 5.15(a), Dallas Stars is not a party to any labor or collective bargaining agreement.

(b)    Except as set forth on Schedule 5.15(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Stars, threatened against or involving Dallas Stars, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Stars, threatened by or on behalf of any Employee, Former Employee or group of Employees or Former Employees of Dallas Stars, except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.16    Litigation. Except as set forth on Schedule 5.16 there are no Legal Proceedings pending or threatened in writing against Dallas Stars or the Stars Subsidiaries, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.16, neither Dallas Stars nor the Stars Subsidiaries is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

5.17    Compliance with Laws; Permits.

(a)    Dallas Stars is in compliance with all Laws applicable to the Purchased Assets of Dallas Stars or the Business, except where the failure to be in compliance could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Stars currently has all Permits which are required for the operation of the Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Stars is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Stars is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.18    Environmental Matters. The representations and warranties contained in this Section 5.18 are the sole and exclusive representations and warranties of Dallas Stars pertaining or relating to any Environmental Laws or any matter arising under or associated with any Environmental Laws. Except as set forth on Schedule 5.18 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: