(a)     the operations of Dallas Stars and the Stars Subsidiaries are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Permits required under all applicable Environmental Laws necessary to operate its Business ("Environmental Permits");

(b)     none of Dallas Stars or the Stars Subsidiaries is subject to any pending, or to the Knowledge of Dallas Stars, threatened claim alleging that Dallas Stars may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law;

(c)     to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars incurring any liability pursuant to any Environmental Law;

(d)     to the Knowledge of Dallas Stars, there is no current condition at any of the real property owned or leased by Dallas Stars or any Stars Subsidiary (including the Dr Pepper StarCenters), or relating to the operations of the Business or the Purchased Assets or relating to the operations of the Stars Entities, that would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring Liabilities under Environmental Laws; and

(e)     to the Knowledge of Dallas Stars, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Dallas Stars or any Stars Subsidiary incurring any material Liability pursuant to any Environmental Law.

5.19     Insurance.

(a)     Schedule 5.19 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and: (i) that are owned or held by Dallas Stars or any Stars Subsidiary, (ii) under which Dallas Stars or Stars Subsidiary is insured, or (iii) that cover the Business, any Employees or any Purchased Assets (collectively, the "Insurance Policies"). For the avoidance of doubt, "Insurance Policies" shall not include any Stars Benefit Plan, Seller Benefit Plan or NHL Benefit Plan. Additionally, for each of the Insurance Policies, Schedule 5.19 indicates whether such policy was purchased under an insurance program offered by an NHL Entity or was separately purchased by Dallas Stars or any of its Affiliates. All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Stars or any Stars Subsidiary with respect to any such policy.

(b)     Dallas Stars, the Stars Subsidiaries, and the Business have complied in all material respects with the provisions of each of the Insurance Policies under which they and the Purchased Assets are insured, and all material claims under the Insurance Policies have been filed in a timely fashion.

5.20    NHL Matters.

(a)    Dallas Stars is the owner, holder and operator of a valid, subsisting and effective NHL franchise, which permits and authorizes Dallas Stars to operate a professional NHL team currently known as the "Dallas Stars."

(b)    Schedule 5.20(b) sets forth as of the date hereof a true and complete calculation of the CFV Debt Amount (as may be updated for the Closing pursuant to Section 9.13).

5.21    Player Matters.  To the Knowledge of Dallas Stars, except as disclosed on Schedule 5.21 and except for matters that are required to be kept confidential and for such omissions which could not reasonably be expected to have a Material Adverse Effect, no Hockey Player Employee is subject to suspension by Dallas Stars, and no Hockey Player Employee is subject to any investigation by Dallas Stars that may result in suspension, expulsion or material fines.  Schedule 5.21 sets forth a list of each Hockey Player Employee and his service time under the NHL Rules.

5.22    Deferred Compensation Liability.  Schedule 5.22 (current as of the date specified therein) sets forth all deferred compensation (other than by or under any NHL Benefit Plan) payable by Dallas Stars to any current or former NHL player, coach, or general manager relating to such current or former NHL player's, coach's, or general manager's service as an NHL player, coach, or general manager.  Prior to Closing, Sellers shall update Schedule 5.22 and deliver such updated Schedule to Purchasers.

5.23    No Guarantees.  Except as set forth on Schedule 5.23, none of the Liabilities of the Stars Subsidiaries is guaranteed by or subject to a similar contingent obligation of any other Person.  Except as set forth on Schedule 5.23, none of the Stars Subsidiaries has guaranteed or become subject to a similar contingent obligation in respect of the Liabilities of any other Person. Except as set forth on Schedule 5.23, there are no outstanding letters of credit, surety bonds or similar instruments of any Stars Subsidiary in connection with or relating to the Business or the Purchased Assets.

5.24    Indebtedness for Borrowed Money. Except for Sellers' Liabilities as guarantors of the Senior Indebtedness and except as provided on Schedule 5.24, no Stars Subsidiary has any Liabilities relating to Indebtedness for borrowed money (other than purchase money Indebtedness for personal property included in the Purchased Assets), whether as a borrower, guarantor or otherwise.

5.25    Financial Advisors.  Except as set forth on Schedule 5.25, no Person has acted, directly or indirectly, as a broker, finder or financial advisor (a "Broker") for Dallas Stars in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

5.26    Related Party Transactions.  Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii), Schedule 5.26 or Schedule 5.7(c)(ii), to the Knowledge of Dallas Stars, no Hicks Affiliates, director, manager, partner or officer of Dallas Stars or the Stars Subsidiaries, or Affiliate of any such director or officer (each, an "Associate") (i) owns, directly or indirectly,

and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Stars or any of the Stars Subsidiaries, except for (x) in the case of Dallas Stars' or the Stars Subsidiaries' officers and directors, salaries and employee benefits and other transactions pursuant to any Seller Benefit Plan in the Ordinary Course of Business, (y) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Stars or the Stars Subsidiaries as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Associate or an Affiliate of Dallas Stars and (z) such transactions that will be terminated or unwound prior to the Closing.

5.27    Non-reliance of Dallas Stars. Except for the specific representations and warranties expressly made by Purchasers in Article VII of this Agreement, Dallas Stars (1) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchasers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Stars or its representatives or made available to Dallas Stars and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (2) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (3) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article VII of this Agreement or by applicable Law; and (4) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in Article VII of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article XII.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF DALLAS ARENA

Dallas Arena hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

6.1     Organization and Good Standing.  Dallas Arena is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Center GP is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.  COC is a limited partnership duly organized and validly existing and in good standing under the Laws of the State of Texas.  Each of Dallas Arena, COC and Center GP has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each of Dallas Arena, COC and Center GP is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2     Authorization of Agreement.  Dallas Arena has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Dallas Arena in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Dallas Arena Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and each of the Dallas Arena Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of Dallas Arena.  This Agreement has been, and each of the Dallas Arena Documents will be at or prior to the Closing, duly and validly executed and delivered by Dallas Arena, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under Section 8.2, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Dallas Arena Documents when so executed and delivered will constitute, legal, valid and binding obligations of Dallas Arena, enforceable against Dallas Arena in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 6.3(a), none of the execution and delivery by Dallas Arena of this Agreement or the Dallas Arena Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Dallas Arena with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or

cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership or limited liability company agreement or comparable organizational documents of Dallas Arena or, as applicable, COC or Center GP; (ii) any Contract or Permit to which Dallas Arena or, as applicable, COC or Center GP, is a party or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; (iii) any Order of any Governmental Body applicable to Dallas Arena or, as applicable, COC or Center GP, or by which any of the properties or assets of Dallas Arena or, as applicable, COC or Center GP, are bound; or (iv) any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 6.3(b)</u>, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Dallas Arena, COC or Center GP in connection with Dallas Arena's execution and delivery of this Agreement or the Dallas Arena Documents, the compliance by Dallas Arena with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under <u>Section 8.2</u>, (iv) the NHL Approvals, and (v) such other consents, waivers, approvals, Orders, Permits, declarations, filings, notifications or authorizations the failure of which to be obtained or made could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.4     <u>Capitalization</u>.

(a)     Dallas Arena owns a 50% limited liability company interest in Center GP and a 49.95% limited partnership interest of COC. Center GP holds a 0.1% general partner interest of COC and is the sole general partner of COC.

(b)     The COC Equity Interests are not certificated. The COC Equity Interests have not been registered under the Securities Act or any applicable state securities Laws.

(c)     All of the equity interests referenced in <u>Section 6.4(a)</u> and <u>6.4(b)</u> above were duly authorized for issuance and are validly issued.

(d)     Except as set forth on <u>Schedule 6.4(d)(i)</u>, there exists no existing option, warrant, call, right, or Contract to which Dallas Arena or, to the Knowledge of Dallas Arena, any COC Entity is a party requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in the COC Entities or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in the COC Entities. Except as set forth on <u>Schedule 6.4(d)(ii)</u>, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of any of the COC Equity Interests.

6.5    Financial Statements. Dallas Arena has made available to Purchasers copies of (i) the audited consolidated balance sheets of COC and its Subsidiary as at December 31, 2008, 2009 and 2010, and the related audited consolidated statements of income and cash flows of COC and its Subsidiary for the years then ended, and (ii) the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011, and the related unaudited consolidated statement of income of COC and its Subsidiary for the eleven (11)-month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "COC Financial Statements"). Except as set forth in the notes thereto and as disclosed in Schedule 6.5, to the Knowledge of Dallas Arena, each of the COC Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal year-end adjustments, none of which, individually or in the aggregate, would be material, and the lack of footnotes thereto) and presents fairly in all material respects the financial position, results of operations and cash flows of COC and its Subsidiary as at the dates and for the periods indicated therein. For the purposes hereof, the unaudited consolidated balance sheets of COC and its Subsidiary as at May 31, 2011 are collectively referred to as the "COC Interim Balance Sheet" and May 31, 2011 is referred to as the "COC Interim Balance Sheet Date."

6.6    Absence of Certain Developments. Except as contemplated by this Agreement or as set forth on Schedule 6.6, since the COC Interim Balance Sheet Date, there has been no event, change, occurrence or circumstance that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect. Except as contemplated by this Agreement or as set forth on Schedule 6.6, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, since the COC Interim Balance Sheet Date, Dallas Arena has conducted the Business relating to the COC Equity Interests only in the Ordinary Course of Business, and to the Knowledge of Dallas Arena, there has been no:

(a)    change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(b)    distribution in cash or property in respect of the equity interest of Dallas Arena (other than distributions by any COC Entity); provided, that distributions by Dallas Arena shall not include any amounts paid to Dallas Stars; or

(c)    authorization, approval, agreement or commitment to do any of the foregoing.

6.7    Taxes. To the Knowledge of Dallas Arena, except as set forth on Schedule 6.7, and except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    Dallas Arena has timely filed all Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and has timely paid all Taxes shown as due on such Tax Returns. All such Tax Returns are correct and complete in all material respects;

(b)     Dallas Arena has complied in all respects with all applicable Laws relating to the withholding of Taxes and has paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid;

(c)     There are no Liens for Taxes upon any of the Purchased Assets, other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions;

(d)     No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against Dallas Arena that are still pending. No requests for waivers of the time to assess any such Taxes have been made that are still pending. No Tax Return of Dallas Arena is under current examination by the IRS or by any state, local, or foreign Taxing Authority, and there is no threat of a Tax audit with respect to any Tax Return of Dallas Arena. All assessments for Taxes due from Dallas Arena with respect to any concluded litigation or audit have been fully paid, settled or withdrawn;

(e)     Dallas Arena is not liable (x) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (y) for any unpaid Taxes of any Affiliate other than HSGH and its Affiliates;

(f)     Since its formation, Dallas Arena has been properly treated as a disregarded entity for U.S. federal income tax purposes; and

(g)     Dallas Arena has not entered into any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, other than any "loss transactions" described in Treasury Regulation Section 1.6011-4(b)(5).

6.8     Real Property.

(a)     Dallas Arena does not own or lease any real property.

(b)     To the Knowledge of Dallas Arena, Schedule 6.8(b) sets forth (i) a complete list of all real property leases by any COC Entity as lessee and (ii) a complete list of all real property leases by any COC Entity as lessor except, in each case, the omission of which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. To the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by any COC Entity under any of its real property leases, except for such defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the Knowledge of Dallas Arena, each COC Entity is current in its rental payments under all of its real property leases, except for such non-payments that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     To the Knowledge of Dallas Arena, except as set forth on Schedule 6.8(c), as of the date hereof, there is no current or pending insurance claim involving $150,000 or more with respect to any leased real property of any COC Entity, except for such claims that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse

Effect. To the Knowledge of Dallas Arena, except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, all leased real properties of each COC Entity are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Dallas Arena, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such leased real property of the COC Entities, and neither Dallas Arena nor any of its Affiliates has received within the prior three (3) years written notice from any provider of such services of any changes required to any facilities used in connection with such utilities, in each case except for such inadequacies and changes that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

6.9 <u>Tangible Personal Property</u>. Dallas Arena does not own or lease any personal property. Except as set forth on <u>Schedule 6.9</u>, and except for notices of defaults or events that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, no COC Entity has received any written notice of any default or event that with notice or lapse of time or both would constitute a material default by such COC Entity under any of its personal property leases to which it is a party.

6.10 <u>Intellectual Property</u>.

(a) <u>Schedule 6.10(a)</u> sets forth a true and correct list of all material Registered Intellectual Property owned by Dallas Arena, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending, and (iii) the date and number of such item of Registered Intellectual Property. Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all fees and filings in connection with the Registered Intellectual Property owned by Dallas Arena have been paid to or filed with the relevant Governmental Bodies and Domain Name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property owned by Dallas Arena in full force and effect.

(b) Except as set forth on <u>Schedule 6.10(b)</u>, Dallas Arena owns or has valid licenses to use all Purchased Intellectual Property owned by Dallas Arena as the same is used by Dallas Arena in the Ordinary Course of Business as of the date hereof, except to the extent the failure to be the owner or a valid licensee thereof could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c) Except as set forth on <u>Schedule 6.10(c)</u> and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, (i) none of the Purchased Intellectual Property owned by Dallas Arena nor the conduct of the Ordinary Course of Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) Dallas Arena has not received any written notice alleging that such entity is infringing, misappropriating or violating any Intellectual Property of any Person or challenging the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Dallas Arena.

(d)     Except as set forth on <u>Schedule 6.10(d)</u> and except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Dallas Arena, none of the Purchased Intellectual Property owned by Dallas Arena is being infringed, misappropriated or violated by any Person.

6.11    <u>Arena Material Contracts</u>.

(a)     Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, <u>Schedule 6.11(a)</u> sets forth the following material, written Contracts to which Dallas Arena is bound (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on <u>Schedule 6.11(a)</u>, collectively, the "<u>Arena Material Contracts</u>"):

(i)     Contracts with any other Seller or any Affiliate, Hicks Affiliate or current or former officer, partner or manager of any Seller;

(ii)    Contracts with any labor union or association representing any employees of Dallas Arena;

(iii)   Contracts for the sale of any of the Purchased Assets, other than Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory or in the Ordinary Course of Business;

(iv)    Contracts under which (A) Dallas Arena grants to any Person a license under any material Purchased Intellectual Property or (B) any Person grants to Dallas Arena a license under any material Intellectual Property used or held for use exclusively in the Business or grants to Dallas Arena a license under any Intellectual Property material to the Ordinary Course of Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $50,000);

(v)     Contracts relating to any guaranty of any obligation for Indebtedness or otherwise and Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (in each case, other than endorsements for collection or deposit made in the Ordinary Course of Business);

(vi)    Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(vii)   Contracts for the use of personal property involving payments in excess of $50,000 per annum;

(viii)  the Suite Contracts to which Dallas Arena is a party;

(ix)    Contracts imposing any material restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (ix), anti-assignment provisions;

(x)    Contracts for a partnership, joint venture or similar agreement;

(xi)    Contracts relating to any acquisition to be made by Dallas Arena of any operating business or the capital stock of any other Person;

(xii)    Contracts relating to the incurrence of Indebtedness for borrowed money (as defined in clause (i) of the definition of Indebtedness) or the making of any loans;

(xiii)    Contracts, other than Contracts with employees, which involve the expenditure of more than $200,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by any Seller without penalty on notice of ninety (90) days or less;

(xiv)    marketing or advertising Contracts (A) with anticipated revenue to Dallas Arena in any 12-month period reasonably expected to be greater than $100,000 or (B) granting any material exclusive rights;

(xv)    Contracts pursuant to which material services remain to be performed with developers, architects, contractors, or tenants; and

(xvi)    Contracts granting any rights to broadcasts, whether radio, television or otherwise, games or events.

(b)    Except for any omissions that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of Dallas Arena, Schedule 6.11(b) sets forth the following material, written Contracts to which any COC Entity is bound  (other than (x) any Contract that that is an Excluded Contract and (y) any Contract that is otherwise an Excluded Asset) (all Contracts required to be listed on Schedule 6.11(b), collectively, the "COC Material Contracts"):

(i)    Contracts for a partnership, joint venture or similar agreement;

(ii)    Contracts relating to any acquisition to be made by any of the COC Entities of any operating business or the capital stock of any other Person; and

(iii)    Contracts relating to the incurrence of Indebtedness, or the making of any loans.

(c)    With such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(c): (i) all of the Arena Material Contracts are in full force and effect and are valid and binding on and enforceable against Dallas Arena, and, to the Knowledge of Dallas Arena, the other parties thereto in accordance with their

terms; (ii) Dallas Arena is not in payment default under or monetary breach of, or to the Knowledge of Dallas Arena, otherwise in default under or in breach of, any Arena Material Contract to which it is a party; (iii) Dallas Arena has not waived any material future right under any Arena Material Contract to which it is a party; (iv) to the Knowledge of Dallas Arena, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Arena Material Contract; and (v) to the Knowledge of Dallas Arena, Dallas Arena has not given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Arena Material Contract that has not been resolved.

(d)     To the Knowledge of Dallas Arena and with such exceptions as, individually or in the aggregate, do not have, and could not reasonably be expected to have, a Material Adverse Effect, and except as a result of the Bankruptcy Case or as otherwise set forth on Schedule 6.11(d): (i) all of the COC Material Contracts are in full force and effect and are valid and binding on and enforceable against the COC Entity party thereto and the other parties thereto in accordance with their terms; (ii) no COC Entity is in payment default under or monetary breach of, or otherwise in default under or in breach of, any COC Material Contract to which it is a party; (iii) no COC Entity has waived any material future right under any COC Material Contract to which it is a party; (iv) no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any COC Material Contract; and (v) no COC Entity has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any COC Material Contract that has not been resolved.

(e)     Dallas Arena has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Arena Material Contract.

6.12     Employee Benefits.

(a)     Dallas Arena does not maintain any material "employee benefit plan" (as defined by ERISA) or any other material employee benefit plan or agreement.

(b)     Except for any representations and warranties in this Article VI regarding Contracts with Employees or compensation payable to Employees, this Section 6.12 represents the sole and exclusive representation and warranty of Dallas Arena regarding employee benefit matters. Dallas Arena makes no representations or warranties to Purchasers regarding the NHL Benefit Plans or any other plans that are not maintained by Dallas Arena.

6.13     Labor.

(a)     Except as set forth on Schedule 6.13(a), Dallas Arena is not a party to any labor or collective bargaining agreement.

(b)     Except as set forth on Schedule 6.13(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Dallas Arena, threatened against or involving Dallas Arena, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Dallas Arena, threatened by or on behalf of any

employee or group of employees or former employees of Dallas Arena, except in each case as could not reasonably be expect to have, individually or in the aggregate, a Material Adverse Effect.

6.14    Litigation. Except as set forth on Schedule 6.14, there are no Legal Proceedings pending or threatened in writing against Dallas Arena, except for such Legal Proceedings which, if adversely determined, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.14, to the Knowledge of Dallas Arena, there are no material Legal Proceedings pending or threatened in writing against the COC Entities. Except as set forth on Schedule 6.14, none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to have a Material Adverse Effect.

6.15    Compliance with Laws; Permits.

(a)    Dallas Arena is in compliance with all Laws applicable to the COC Equity Interests held by Dallas Arena and its Business, except where the failure to be in compliance could not reasonably be expected to have a Material Adverse Effect. Dallas Arena has not received any written notice of or been charged with the violation of any Laws, except where such violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Dallas Arena has all Permits which are required for the operation of its Business as presently conducted, other than those the failure of which to possess could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Dallas Arena is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Dallas Arena is a party, except where such default or violation could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.16    Environmental Matters. The representations and warranties contained in this Section 6.16 are the sole and exclusive representations and warranties of Dallas Arena pertaining or relating to any Environmental Laws or any matter arising under or associated with Environmental Laws. Except as set forth on Schedule 6.16 hereto and except in each case as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    the operations of Dallas Arena related to its ownership of the COC Equity Interests and, to the Knowledge of Dallas Arena, the operations of the COC Entities are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Environmental Permits;

(b)    none of Dallas Arena or, to the Knowledge of Dallas Arena, the COC Entities is subject to any pending, or to the Knowledge of Dallas Arena, threatened claim alleging that Dallas Arena or such COC Entity may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law; and

(c)     to the Knowledge of Dallas Arena, there are no pending or threatened investigations of the Business or the AAC under Environmental Laws, which could reasonably be expected to result in Dallas Arena or any COC Entity incurring any material liability pursuant to any Environmental Law.

6.17     Insurance. Schedule 6.17 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and: (i) that are owned or held by Dallas Arena or (ii) under which Dallas Arena is insured. All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Dallas Arena with respect to any such policy. Dallas Arena has complied in all material respects with the provisions of each such insurance policy under which they are insured, and all material claims under such insurance policies have been filed in a timely fashion.

6.18     Financial Advisors. Except as set forth on Schedule 6.18, no Person has acted, directly or indirectly, as Broker for Dallas Arena in connection with the transactions contemplated by this Agreement and no Person is entitled to payment with respect to having acted as such.

6.19     Related Party Transactions. Except as set forth on Schedule 1.1(a)(i), Schedule 1.1(a)(ii) or Schedule 6.19, to the Knowledge of Dallas Arena, no Hicks Affiliates, director, manager, partner or officer of Dallas Arena or Affiliate of any such director or officer (each, an "Arena Associate") (i) owns, directly or indirectly, and whether on an individual, joint or other basis, any interest in, or serves as an officer or director of, any Person that has ongoing material business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena, (y) such transactions that will be terminated or unwound prior to the Closing, and (z) any non-controlling interest in the securities of any such Person; or (ii) directly has ongoing business dealings or a material financial interest in any transaction with Dallas Arena or any of the COC Entities, except for (x) business dealings conducted in the Ordinary Course of Business on terms and conditions as favorable to Dallas Arena or the COC Entities as would have been obtained by it at the time in a comparable arm's-length transaction with a Person other than an Arena Associate or an Affiliate of Dallas Arena and (y) such transactions that will be terminated or unwound prior to the Closing.

6.20     Non-reliance of Dallas Arena. Except for the specific representations and warranties expressly made by Purchasers in Article VII of this Agreement, Dallas Arena (a) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchaser's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, Liabilities, operations,

investors, lenders, prospects, or condition (financial or otherwise) furnished to Dallas Arena or its representatives or made available to Dallas Arena and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (b) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (c) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement or by applicable Law; and (d) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in <u>Article VII</u> of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article XII</u>.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby jointly and severally represent and warrant to Sellers as of the date of this Agreement and as of the Closing Date that:

7.1     <u>Organization and Good Standing</u>.  Each Purchaser is a limited partnership or corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited partnership or corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each Purchaser is duly qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization.

7.2     <u>Authorization of Agreement</u>.  Each Purchaser has full limited partnership or corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by such Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by each Purchaser of this Agreement and each Purchaser Document, to which such Purchaser is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all necessary limited partnership or corporate action on behalf of such Purchaser.  This Agreement has been, and each Purchaser Document to which such Purchaser is a party will be at or prior to the Closing, duly and validly executed and delivered by each such Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Confirmation Order, and, with respect to Sellers' obligations under <u>Section 8.2</u>, the entry of the Bidding Procedures Order) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights

and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

7.3 Conflicts; Consents of Third Parties.

(a) Except as set forth on Schedule 7.3 hereto, none of the execution and delivery by any Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by any Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of limited partnership, certificate of incorporation, limited partnership agreement, bylaws (or other organizational and governing documents) of any Purchaser, (ii) any Contract or Permit to which any Purchaser is a party or by which any Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to any Purchaser or by which any of the properties or assets of any Purchaser are bound, or (iv) any applicable Law.

(b) No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by any Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, the taking by any Purchaser of any other action contemplated hereby or for such Purchaser to conduct the Business, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Confirmation Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under Section 8.2, and (iv) the NHL Approvals.

7.4 Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchasers, threatened against any Purchaser, or to which any Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would be reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby. No Purchaser is subject to any Order of any Governmental Body except to the extent the same could not reasonably be expected to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.

7.5 Financial Advisors. Except as set forth on Schedule 7.5, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

7.6 Investment Intention. Each Purchaser is an accredited investor as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act"). Each applicable Purchaser is acquiring the Transferred Equity Interests for its own account, for investment purposes only and not with a view to the distribution thereof (as such term is used in

Section 2(11) of the Securities Act). Each Purchaser understands that the Transferred Equity Interests have not been registered under the Securities Act or any applicable state securities Laws, and that the Transferred Equity Interests cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

    7.7    <u>Financial Capability</u>. As of the Closing Date, Purchasers will have sufficient cash to pay the consideration contemplated by <u>Sections 3.1(a)</u>, <u>(b)</u>, <u>(d)</u> and <u>(e)</u> to consummate the transactions contemplated by this Agreement.

    7.8    <u>NHL Information Requirements</u>. As of the date hereof and as of the Closing Date, each Purchaser has provided all information to the NHL concerning itself and its Affiliates and its equity and debt financing sources (including the executed organizational documents of Purchasers, and personal background and financial information of all of the direct and indirect owners of Purchasers) required by the NHL to obtain the NHL Approvals, which information is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading, including completing and filing any and all necessary applications, background information forms, and any other documents and information required of them by the NHL to obtain the NHL Approvals in connection herewith. Purchasers and their Affiliates do not own, directly or indirectly, any interest in any NHL franchise. Purchasers agree to pay any and all fees and expenses owed to the NHL in connection with the transactions contemplated by this Agreement that are not otherwise paid, provided that the same shall be deemed to constitute Specified Expenses to the extent paid by Purchasers pursuant to <u>Section 3.1(b)</u> or otherwise. Purchasers have no reasonable basis to believe that Purchasers will fail to obtain any NHL Approvals necessary in connection with the transactions contemplated by this Agreement as a result of any facts known to Purchasers that have not otherwise been disclosed to the NHL, including any failure that is related to any of their debt or equity financing sources.

    7.9    <u>Non-reliance of Purchasers</u>. Except for the specific representations and warranties expressly made by the respective Sellers in <u>Articles V</u> and <u>VI</u> of this Agreement:

    (a)    each Purchaser acknowledges and agrees that (i) no Seller or any other Person is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets including any Purchased Assets, the nature or extent of any Liabilities including the Assumed Liabilities, the prospects of Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Seller's respective business, assets, Liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information including any Documents, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Sellers, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of any Sellers' respective business, assets, Liabilities, operations, prospects, or condition (financial or otherwise) furnished to Purchasers or its representatives or made available to Purchasers and their representatives in any "data rooms," "virtual data rooms," management

presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever, and (ii) no officer, agent, representative or employee of any Seller or any other Person has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided;

        (b)     each Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Sellers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person;

        (c)     each Purchaser specifically disclaims any obligation or duty by any Seller to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Articles V and VI of this Agreement or by applicable Law; and

        (d)     each Purchaser acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including acquiring the Purchased Assets and assuming the Assumed Liabilities, subject only to the specific representations and warranties set forth in Articles V and VI of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article XII.

## ARTICLE VIII

## BANKRUPTCY COURT MATTERS

     8.1    Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of Competing Bids. Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchasers and their Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to Sellers, the Purchased Assets and the Business and the assets of Sellers to Qualified Bidders.

     8.2    Sellers' Chapter 11 Bankruptcy Cases. Sellers and Purchasers acknowledge and agree that this Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court. Sellers hereby agree to file the Bankruptcy Petitions and a motion seeking approval of the Bidding Procedures Order within two (2) Business Days of the execution of this Agreement, and to use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order no later than seven (7) days after the Petition Date. On the Petition Date, Sellers shall file with the Bankruptcy Court the Plan, which shall include a request for Bankruptcy Court approval of this Agreement and the transactions contemplated hereby, subject to higher or better offers received by Sellers in accordance with the Bidding Procedures Order. Sellers shall promptly advise Purchasers of any

written objection(s) filed with the Bankruptcy Court or otherwise served on Sellers either to this Agreement, the Plan or the Bidding Procedures Order.

8.3 <u>Confirmation Order</u>. Sellers shall use their commercially reasonable efforts to promptly obtain the entry of the Confirmation Order and to perform such other acts as may be necessary to permit Sellers and their Subsidiaries to convey any interests they have in the Purchased Assets to Purchasers in accordance with the terms and conditions of this Agreement. Any changes to the form of the Confirmation Order or Plan affecting the terms of the transactions contemplated by this Agreement in a manner materially adverse to Purchasers must be approved by Purchasers in their sole and absolute discretion. Upon entry of the Confirmation Order, and provided that no stay of the Confirmation Order is in effect, Sellers and Purchasers shall proceed to Closing so long as the Confirmation Order contains findings that Purchasers and Sellers are each acting in good faith and that Purchasers are acquiring rights in the Purchased Assets in good faith reliance on the Confirmation Order. Sellers shall give Purchasers reasonable advance written notice of any hearings regarding the motions required to obtain the issuance of the Confirmation Order.

8.4 <u>Cooperation in Bankruptcy Court Matters</u>.

(a) To the extent reasonably practicable, Sellers shall provide Purchasers, and Purchasers shall provide Sellers, with the opportunity to review and provide comments on any other filings and presentations of evidence with respect to any court proceeding related to the transactions contemplated hereunder, the Confirmation Order or the Bidding Procedures Order, and Sellers and Purchasers shall each use their commercially reasonable efforts (and Sellers and Purchasers shall cooperate, assist and consult with each other in connection with such efforts) to secure the entry of (i) the Confirmation Order and (ii) the Bidding Procedures Order.

(b) Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchasers under the Purchased Contracts as required by section 365(b)(1)(C) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by such Purchaser under this Agreement and the Purchased Contracts and demonstrating that such Purchaser is purchasing the Purchased Assets in good faith and in good faith reliance on the Confirmation Order. Purchasers agree that they will promptly take all actions reasonably required by Sellers or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of an order approving this Agreement, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its employees and representatives available to be interviewed by Sellers' attorneys and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Purchasers under the Purchased Contracts. If a written objection is filed to the motion seeking approval of this Agreement, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Sellers and Purchasers shall use commercially reasonable efforts to have such objection overruled. In the event the entry of the Confirmation

Order or the Bidding Procedures Order shall be appealed, Sellers and Purchasers shall use their respective commercially reasonable efforts to defend such appeal.

8.5     Break Up Fee and Expense Reimbursement.

(a)     Each party agrees and acknowledges that the parties' negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by the parties, and that the negotiation and execution of this Agreement have provided value to the parties. Therefore, if (x) this Agreement is terminated pursuant to Section 4.2(h), by Sellers pursuant to Section 4.2(a) or Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e), and (y) a Competing Bid closes within 180 days of such termination, then Sellers shall cause Purchasers to be paid out of the proceeds of such Competing Bid an amount equal to $4,000,000 as a break-up fee (the "Break-Up Fee") and shall reimburse Purchasers for the Transaction Expenses of Purchasers in an amount not to exceed $500,000 (the "Expense Reimbursement") in immediately available funds and without need for further Order of or from the Bankruptcy Court (other than the Bidding Procedures Order); provided, that the Break-Up Fee and Expense Reimbursement shall not be payable if this Agreement is terminated by Sellers pursuant to Section 4.2(a) or Section 4.2(d)(i) or by Purchasers pursuant to Section 4.2(e) in the event that Purchasers' or any of their Affiliates' failure to perform any of their obligations under this Agreement (including, without limitation, their obligations under Section 9.9) could reasonably be considered to have resulted in the failure to obtain all required NHL Approvals.

(b)     Any Break-Up Fee payable pursuant to Section 8.5(a) shall be paid directly to Purchasers out of the purchase price paid by the Successful Bidder contemporaneously with the closing of a Competing Bid along with the payment of any obligations still outstanding under the Expense Reimbursement if not yet satisfied, and Sellers shall cause such payment(s) to be made as a condition to the closing of a Competing Bid. The Expense Reimbursement payable pursuant to Section 8.5(a) shall be paid by Sellers within three (3) Business Days of receipt of reasonable evidence of the amounts constituting Purchasers' Transaction Expenses, in the form of a summary invoice, redacted to preserve attorney-client privilege and attorney work product.

(c)     Sellers hereby acknowledge that their obligations to pay the Break-Up Fee and Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement. Such obligations of Sellers shall have administrative superpriority status against Sellers and their Subsidiaries and their respective estates under Section 503(b) and 507(a) of the Bankruptcy Code, and with priority over all other expenses of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code.

8.6     Leases and Contracts. Pursuant to Section 365 of the Bankruptcy Code, all of Sellers' right, title and interest in and to the Purchased Contracts shall be assumed by Sellers and assigned to Purchasers pursuant to the assignment and assumption agreement described in Exhibit L.

8.7     Notice to Parties-in-Interest. Not later than three (3) Business Days following entry of the Bidding Procedures Order, or by such other date as ordered by the Bankruptcy Court

(the "Notice Deadline"), (a) the Office of the United States Trustee for the District of Delaware; (b) the parties included on the Master Service List filed with the Bankruptcy Court in connection with the Bankruptcy Cases; (c) all counterparties to the Purchased Contracts; (d) all parties with Liens on or against the Purchased Assets; and (e) all affected federal, state and local Governmental Bodies and Taxing Authorities, including the IRS, and any federal, state or local Governmental Body with regulatory or tax jurisdiction with respect to the Purchased Assets or the Assumed Liabilities, shall, in each case, be duly notified by Sellers of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein. On or before the Notice Deadline, Sellers shall use commercially reasonable efforts to duly notify the foregoing and such other Persons reasonably requested and identified by Purchasers, in each case, of Sellers' entry into this Agreement and intent to consummate the sale and transfer of the Purchased Assets to Purchasers contemplated herein. Not later than three (3) Business Days following the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall also publish notice of the Auction in the *Wall Street Journal* and *Dallas Morning News*.

ARTICLE IX

COVENANTS

9.1     Access to Information. From and after the date of this Agreement and until the Closing, Sellers shall, and shall use commercially reasonable efforts to cause the COC Entities and their respective Subsidiaries to, permit Purchasers, through their officers, employees and representatives (including their legal advisors and accountants), to make such investigation of the properties, businesses and operations of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business and such examination of the books and records of Dallas Stars, the Stars Subsidiaries, Dallas Arena, the COC Entities, the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances. Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers to cooperate with Purchasers and Purchasers' representatives in connection with such investigation and examination, and Purchasers and their representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to the business of Sellers and their Subsidiaries. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Seller is bound. Notwithstanding anything to the contrary contained herein, prior to the Closing, without the prior written consent of Sellers, which may be withheld for any reason, Purchasers shall not contact any suppliers to, or customers of, any Seller or, except as permitted by Section 9.6 hereof, any lenders to any Seller. Purchasers shall have no right to perform invasive or subsurface investigations of the properties or facilities of Sellers or any of their Subsidiaries without the prior written consent of Sellers in their sole and absolute discretion.

9.2     Conduct of the Business Pending the Closing.

(a)     Prior to the Closing, except (I) as set forth on Schedule 9.2(a), (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement, (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall and shall cause the Transferred Subsidiaries and (to the extent feasible under governing documents of the COC Entities) the COC Entities to:

(i)     conduct the Business only in the Ordinary Course of Business;

(ii)     use their commercially reasonable efforts to preserve the present business operations, organization and goodwill of Dallas Stars, Dallas Arena, the Stars Subsidiaries and the Business, which will not require any Seller to renew any Contracts or exercise any rights under any Contracts outside of the Ordinary Course of Business;

(iii)     promptly deliver notice to Purchasers in writing of any specific event or circumstance of which any Seller receives notice that: (A) has resulted or could reasonably be expected to result in any of the conditions set forth in Section 11.1 or 11.2 not being satisfied; (B) any Legal Proceeding (other than the Bankruptcy Case contemplated by this Agreement) is pending or threatened that relates to the transactions contemplated by this Agreement; or (C) any of the covenants or agreements of any Seller contained in this Agreement is breached in any material respect; and

(iv)     continue in full force and effect all Insurance Policies or renewal of Insurance Policies on equivalent terms with the same or different insurance carriers.

(b)     Prior to the Closing, except (I) as set forth on Schedule 9.2(b), (II) as required by applicable Law or Contract (with Sellers providing Purchasers reasonably prompt written notices of any such requirement), (III) as otherwise contemplated by this Agreement (including in connection with any Competing Bid), (IV) as required by the NHL, or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall not and shall cause the Transferred Subsidiaries not to:

(i)     other than in the Ordinary Course of Business (A) materially increase the annual level of compensation of any executive officer of Dallas Stars or any other Continuing Employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any executive officer of Dallas Stars or any other Continuing Employee, (C) adopt, or materially increase the coverage or benefits available under, any Stars Benefit Plan or, solely with regard to the Continuing Employees, any Seller Benefit Plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any executive officer of Dallas Stars or any other Continuing Employee, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Benefit Plans (except with respect to new hires) and except with respect to any Hockey Player Employee, coach, or general manager;

(ii)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions and Assumed Liabilities;

(iii)    acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of a material portion of the Purchased Assets (except pursuant to an existing Contract set forth on Schedule 5.13(a), 6.11(a) or 6.11(b), Contracts for the sale of tickets, Suite Contracts, sponsorship or advertising and promotional agreements, and Contracts for sales of inventory, otherwise in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets or as required by NHL);

(iv)    cancel or compromise any material debt or claim or waive or release any material right of Sellers that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)    enter into any commitment for capital expenditures of the Business in excess of $400,000 in the aggregate, except as approved by the NHL or reasonably necessary to address a public safety issue or to continue the current level of operations of the Business;

(vi)    enter into, modify or terminate any labor or collective bargaining agreement related to the Business, except as approved by the NHL;

(vii)    enter into or agree to enter into any merger or consolidation with any Person;

(viii)    other than in the Ordinary Course of Business or as required by applicable Law or the NHL, enter into any agreement that would amend any Real Property Lease, or otherwise affect the operation of any real property subject to a Real Property Lease or any real property set forth on Schedule 5.10(a)(i) or 5.10(b);

(ix)    make any distribution in cash or property in respect of the equity interest of Sellers or the Transferred Subsidiaries (other than solely between any Seller and/or any Transferred Subsidiary);

(x)    (A) sell, assign, transfer, issue or otherwise dispose of any interest in the Stars Subsidiaries, or any securities or obligations convertible into or exchangeable for any such interests, or any options, warrants or conversion or other rights to acquire any such interests, or any such securities or obligations; (B) effect any reorganization or recapitalization; or (C) split, combine or reclassify any interest of the Stars Subsidiary, or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for any interest of the Stars Subsidiaries;

(xi)    propose or adopt any amendments to the governance documents of the Stars Subsidiaries;

(xii)    incur any Indebtedness for borrowed money (other than pursuant to the CFV Debt Agreement);

(xiii)   make any contribution, loan or other payment, or enter into any agreement with, any Hicks Affiliate (other than Sellers, the Transferred Subsidiaries, or the COC Entities); or

(xiv)   agree to do anything prohibited by this Section 9.2(b).

Notwithstanding the foregoing, nothing herein shall limit or otherwise impair Dallas Stars' unfettered right to operate the Stars as it deems fit in its sole and absolute discretion, or give Purchasers, directly or indirectly, any right to control or direct (including by way of any veto right) the operations of the Stars, including without limitation with respect to (i) the making or not making of any player personnel decisions, including assignments, trades, acquisitions, dispositions, waivers, drafts, or the like, (ii) hiring or firing (or changing or eliminating the responsibilities of) of any hockey operations personnel, including any general manager, coach, assistant coach, scout, trainer, team medical and athletic training personnel, and (iii) the conduct, performance or management of any hockey activities; provided, however, that prior to: (A) entering into any standard player's contract, or extending any existing standard player's contract, with any Hockey Player Employee that would provide for: (I) potential payments during any season in an amount greater than $2,000,000 or a signing bonus in an amount greater than $750,000, or (II) a term of three (3) years or more, (B) the hiring or firing of the general manager or head coach of the Stars, or (C) trading any Hockey Player Employee who had been on the Stars' active roster for at least 43 NHL games during the 2010-2011 season, Dallas Stars shall give reasonable notice thereof to Tom Gaglardi, on behalf of Purchasers and shall consult with Tom Gaglardi on behalf of Purchasers with respect thereto if and to the extent such notice and consultation is, in Dallas Stars' sole discretion, reasonable and appropriate under the circumstances and otherwise in compliance with NHL Rules, provided, further that for the avoidance of doubt, failing to so consult for whatever reason and/or the taking of any action set forth in clauses (A)-(C) above without notice or consultation following any notice and consultation shall not be a breach of this Agreement.

9.3     Consents.  Subject to the respective specific obligations of the parties under this Agreement to obtain certain consents and approvals, Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b), Section 6.3(b) and Section 7.3(b) hereof; provided however, that no party shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or initiate any litigation or Legal Proceedings to obtain any such consent or approval, in each case except as otherwise specifically contemplated by this Agreement.

9.4     Regulatory Approvals.

(a)     If necessary, Purchasers and Sellers shall (i) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 15 Business Days after the date of this Agreement in the case of all filings required under the HSR Act and within four weeks in the

case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or Affiliates from the FTC or the U.S. Department of Justice or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of the FTC or the U.S. Department of Justice or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use its commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers, on the one hand, or Purchasers, on the other hand, may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 9.4</u> as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(b)      Each Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "<u>Antitrust Laws</u>").  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as in violation of any Antitrust Law, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and, at Purchasers' option and at Purchasers' sole cost and expense, each Purchaser and Seller shall cooperate and use its commercially reasonable efforts to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by reasonably pursuing available avenues of administrative and judicial appeal.  Each Purchaser and Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such

transactions as promptly as possible after the date of this Agreement. All fees associated with filings required by the HSR Act or any other Antitrust Laws shall be paid by Sellers (the "Antitrust Fees").

9.5     Further Assurances. Subject to, and not in limitation of, Sections 9.3 and 9.4, each Seller and each Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

9.6     Confidentiality.

(a)     Subject to Section 9.6(b) below, each Purchaser acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of the confidentiality agreement between HSG and Tom Gaglardi dated as of March 31, 2010 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference and remain in full force and effect after the execution of this Agreement, and which shall be binding on each Purchaser as if such Purchaser were Tom Gaglardi and shall be binding on Purchasers for the benefit of Sellers as if Sellers were HSG under the Confidentiality Agreement, subject to the following modifications: Purchasers and their Representatives (as defined in the Confidentiality Agreement) are permitted to (i) communicate with the Lenders regarding the transactions contemplated by this Agreement and (ii) communicate with the NHL. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information to the extent relating to the Business, the Assumed Liabilities and the Purchased Assets; provided, however, that each Purchaser acknowledges that any and all other Confidential Information (as defined in the Confidentiality Agreement) provided to it by any Seller or its representatives concerning any Seller or its Affiliates (other than any Transferred Subsidiary), any Excluded Liability or any Excluded Asset shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)     Notwithstanding anything in this Agreement or the Confidentiality Agreement to the contrary, Purchasers and Sellers acknowledge and agree that in connection with filing the Bankruptcy Case, this Agreement will be filed with the Bankruptcy Court and made publicly available.

9.7     Preservation of Records. Purchasers agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business for a period of seven years from the Closing Date, and each Seller shall, and shall use commercially reasonably efforts to cause their Affiliates to, preserve and keep records held by them relating to the Business until the earlier of such Seller's dissolution or the expiration of a period of seven years from the Closing Date, and each party shall provide reasonable access to and make such records and personnel available to the other as may be reasonably required by such party and its Affiliates during regular business hours and upon reasonable advance notice in connection with, among other things, preparation of regulatory filings, Tax Returns, any insurance claims, Legal Proceedings or Tax audits or examination against or governmental investigations of Sellers or Purchasers or any of their Affiliates or in order to enable Sellers or Purchasers to comply with

their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. Sellers or Purchasers, as applicable, at their sole cost and expense may make copies of the books and records to which they are entitled to access pursuant to this Section 9.7.

9.8    Publicity.  Prior to Closing, except as required by applicable Law, NHL Rules, or the NHL Documents, neither Sellers nor Purchasers shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the judgment of Purchasers or Sellers, as applicable, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that, the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the timing and content thereof.

9.9    NHL Approvals.  Prior to or on the date hereof, Purchasers shall have, and shall have caused all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to have, completed and filed with the NHL all necessary applications, background information forms, and any other documents and information required of them under the NHL Constitution and NHL By-Laws to obtain the NHL Approvals.  Upon Closing, Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries (as required by the NHL) to, execute the NHL owner's consent in substantially the form attached hereto as Exhibit F (the "NHL Owner Consent"), the NHL/lender cooperation letter agreement in substantially the form attached hereto as Exhibit G (the "NHL/Lender Cooperation Agreement"), the NHL guaranty in substantially the form attached hereto as Exhibit H (the "NHL Guaranty"), and one or more NHL proxies in substantially the forms attached hereto as Exhibit I (the "Purchaser/NHL Proxy").  Purchasers shall, and shall cause all of the direct and indirect owners of Purchasers and any related trustees and beneficiaries to, use commercially reasonable efforts to obtain receipt of NHL Approvals at the earliest practicable date; provided that Purchasers shall not be required to enter into any additional material obligations to the extent such obligations are not provided for in the NHL Owner Consent, NHL/Lender Cooperation Agreement, NHL Guaranty or Purchaser/NHL Proxy in the forms attached hereto as Exhibits F through H, respectively, other than any additional obligations required by the NHL as a result of any information provided to the NHL after the date hereof or any other action, requirement or request from Purchasers.

9.10    Stars Foundation.  Effective as of the Closing, Sellers shall use their commercially reasonable efforts to secure resignations of current officers and directors of the Stars Foundation as of the Closing and to cause the Stars Foundation to elect such replacement officers and directors as directed by Purchasers or their designated Affiliates.

9.11    Senior Secured Loan.  Prior to or contemporaneously with the Closing, Purchasers shall execute a credit agreement dated as of the Closing Date in substantially the form attached hereto as Exhibit J (the "Senior Secured Loan"), subject to such changes that are not materially adverse to Purchasers or the transactions contemplated by this Agreement, and deliver executed copies of the Senior Secured Loan to the lenders thereunder.  Additionally, prior to or

contemporaneously with the Closing, Purchasers shall satisfy all of the conditions precedent to funding under the Senior Secured Loan and all other documents related thereto, save and except for (i) execution and delivery of the NHL/Lender Cooperation Agreement by parties other than the Purchasers and their Affiliates or (ii) satisfaction of the conditions set forth in Article IV(c) of the Senior Secured Loan, provided that the failure to satisfy Article IV(c) of the Senior Secured Loan is not the result of any breach by the Purchasers or their Affiliates of any provision of this Agreement or any other provision of the Senior Secured Loan. Purchasers shall perform their obligations, and cause any of their Affiliates party thereto to perform their obligations, under the Senior Secured Loan as of and on the Closing Date. Purchasers shall take all action necessary to cause all other parties to the Senior Secured Loan to perform such party's obligations under the Senior Secured Loan as of and on the Closing Date. Purchasers shall cause the First Lien Lenders to enter into the Senior Secured Loan and the NHL/Lender Cooperation Agreement in substantially the forms attached hereto as Exhibit J and Exhibit G, respectively.

      9.12    Guarantee. Guarantor hereby fully and irrevocably guarantees the payment and performance of Purchasers' obligations under this Agreement, including payment of the Purchase Price at Closing. Guarantor is hereby made fully responsible for the acts and omissions of Purchasers pursuant to the terms of this Agreement. This guarantee shall be a full, unconditional, irrevocable, absolute and continuing guarantee of payment and performance and not a guarantee of collection, and Guarantor shall remain liable for the Purchase Price hereunder until its payment in full. Guarantor hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against any Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 9.12.

      9.13    Disclosure Schedules; Supplementation and Amendment of Schedules. Sellers may, in their reasonable discretion, include in the Schedules items that are not material in order reasonably to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other applicable Schedule if the applicability of such information to such other Schedules is reasonably apparent on its face. From time to time prior to the Closing, Sellers shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement to have been omitted in error (including by creating new schedules where none are currently referenced herein); provided that, such supplement or amendment shall thereafter be deemed to modify the applicable Schedule or Schedules and this Agreement and the representations and warranties contained herein (both as of the date hereof and as of the Closing Date) for all purposes under this Agreement (except to the extent limited under Section 4.2(f) and 4.2(g)), including for the purpose of determining whether the conditions to Closing set forth in Section 11.1(a) have been satisfied. For purposes of this Section 9.13, any items included or described in the Schedules that are based on documents that have not been made available to Purchasers at any time prior to the date hereof shall be deemed to have been provided in a supplement to the Schedules delivered by Sellers on the date hereof. No supplement or amendment to a Schedule pursuant to this Section 9.13 shall be deemed to be an amendment to this Agreement for purposes of Section 13.5. In conjunction with Sellers' delivery to Purchasers

of any supplement or amendment to a Schedule pursuant to this <u>Section 9.13</u>, Sellers shall also deliver to Purchasers such underlying documentation and information as reasonably necessary for Purchasers to be able to understand and analyze the matter(s) reflected in such supplement or amendment.

9.14   <u>Insurance</u>.

(a)   To the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "occurrence based" liability insurance, Sellers shall use their commercially reasonable efforts, prior to the Closing, to cause, or cause any applicable Affiliate of Sellers to cause, Purchasers to be added as an additional insured, on a primary and noncontributory basis, under such Insurance Policy for the current policy year and the preceding six (6) policy years solely with respect to pre-Closing occurrences, injury and/or damage. Additionally, to the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(o)</u> provides "claims made" liability insurance coverage, Sellers shall use their commercially reasonable efforts, prior to Closing, to ensure that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Business or the Purchased Assets for a period of not less than six (6) years following the Closing.  Notwithstanding the foregoing, no Seller shall be required to make any payment to any insurance provider in order to secure coverage for Purchasers under any Insurance Policy prior to or after Closing, nor will any Seller have any obligation to continue to make any premium payments or to take any other affirmative actions with respect to the Insurance Policies from and after the Closing Date; <u>provided</u>, <u>however</u>, that if prior to or after Closing, if Purchasers determine that any payments are necessary to secure coverage for Purchasers under any Insurance Policy, as provided in this <u>Section 9.14(a)</u>, then to the extent permitted by applicable Law and the terms of such Insurance Policy, Purchasers shall have the option to make such payment on behalf of Sellers to effectuate such continued coverage.

(b)   If Purchasers provide a written notice to Sellers after the Closing that any claim has arisen, or otherwise exists, that is covered under any Insurance Policy that is not assigned to Purchasers under <u>Section 2.1(o)</u> (an "<u>Excluded Insurance Policy</u>") and under which Purchasers have not then been added as an additional insured as provided in <u>Section 9.14(a)</u> relating to a matter that would be an Assumed Liability if not covered by such Excluded Insurance Policy (such claim, an "<u>Excluded Insurance Claim</u>"), and if such notice is accompanied by instructions regarding the process for reporting and pursuing recovery on such Excluded Insurance Claim under the relevant Insurance Policies, then promptly following receipt of such written notice from Purchasers, Sellers shall use their commercially reasonable efforts to report such Excluded Insurance Claim within such time and in such manner as required under such Excluded Insurance Policy (to the extent such time period has not expired) and shall further use their commercially reasonable efforts to pursue recovery on such Excluded Insurance Claim, all in accordance with Purchasers' instructions, and upon the receipt by Sellers of any insurance proceeds, Sellers shall promptly pay Purchasers such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any losses, damages or other amounts borne by Purchasers arising from such Excluded Insurance Claim). However, Purchasers shall be responsible for and reimburse Sellers for any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses

associated with Sellers' own employees) incurred by any Seller in pursuing any Excluded Insurance Claim for the benefit of any Purchaser pursuant to its obligations under this Section 9.14(b), along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses that would otherwise be borne by Sellers as a result of any such Excluded Insurance Claim. At the reasonable request of any Seller, Purchasers shall advance such out-of-pocket costs to Sellers. Sellers (in their sole discretion) may elect to authorize any Purchaser, to the extent permitted by applicable Law and the terms of such Excluded Insurance Policies, at Purchasers' expense, to perform all the obligations and receive all the benefits of Sellers under such Excluded Insurance Policies relating to any Excluded Insurance Claim and appoint any Purchaser as their attorney-in-fact to act in their name on their behalf, in which case, (i) Purchasers agree to indemnify and hold Sellers and their Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to any Purchaser's performance of, or failure to perform, such obligations under such Excluded Insurance Policies and (ii) Sellers shall be relieved of their obligations under this Section 9.14(b) with respect to such Excluded Insurance Claim, but only to the extent Purchasers are allowed to perform such obligations under Applicable Law and the terms of such Excluded Insurance Policies. Nothing herein shall be deemed to require any Seller to maintain its existence for any period of time following the Closing.

9.15    Change of Name. Within five (5) Business Days after the Closing Date, Sellers shall discontinue the use of the "Dallas Stars" and "StarCenter" name in any manner and shall change their limited partnership, corporate or limited liability company name to a name that does not include "Dallas Stars" or "StarCenter" or any confusingly similar variations thereof; provided, however, that each Seller may continue to use the "Dallas Stars" and "StarCenter" names in connection with identifying itself as a former owner of the Stars, the Dr Pepper StarCenters or any of the Stars Entities or COC Entities. Upon the written request of Purchasers, Sellers shall execute such consents, to be delivered at Closing, as any Purchaser may reasonably require in connection with the Delaware or Texas Secretaries of State, as applicable, to change its corporate, limited partnership or limited liability company name at Closing to a name containing "Dallas Stars" or "StarCenter".

9.16    Bankruptcy Compliance. Prior to the entry of the Confirmation Order, Sellers and Purchasers that are corporations (as defined by the Bankruptcy Code) shall take such actions as are necessary for those corporations to comply with the requirements of Section 1123(a)(6) of the Bankruptcy Code.

9.17    Plano StarCenter. Sellers and Purchasers shall use their commercially reasonable efforts, and Purchasers and Sellers shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all necessary consents and approvals of General Electric Capital Corporation, as lender under that certain Loan Agreement, dated as of September 1998, by and between General Electric Capital Corporation and Plano StarCenter (f/k/a Plano Ice Arena, L.L.C.), as amended, required to consummate the transactions contemplated by this Agreement. In the event that General Electric Capital Corporation fails or refuses to provide such necessary consents and approvals on terms and conditions reasonably satisfactory to Sellers, then Sellers in their sole and absolute discretion may elect, by delivering written notice to Purchasers on or before the Closing Date, that the 100% membership interests in Plano StarCenter held by Dallas Stars shall not be deemed a Transferred Equity Interest or a Purchased Asset and shall instead be

an Excluded Asset hereunder which will not be transferred to Purchasers at the Closing. Notwithstanding anything to the contrary set forth in this Agreement, if General Electric Capital Corporation shall fail or refuse to grant its consent or approval and the Sellers elect to treat the membership interests in Plano StarCenter as an Excluded Asset pursuant to this Section 9.17, (i) Purchasers shall have no right to terminate this Agreement as a result thereof and (ii) such consent of General Electric Capital Corporation shall in no event constitute a condition precedent to Closing, and (iii) the parties agree that there shall be no adjustment to the Purchase Price as a result thereof.

## ARTICLE X

## EMPLOYEES AND EMPLOYEE BENEFITS

### 10.1 Employment.

(a) Employees. Sellers shall update Schedule 10.1(a) within three (3) Business Days prior to the Closing for any changes thereto and shall deliver the updated Schedule 10.1(a) to Purchasers at the Closing.

(b) Offer of Employment. Prior to the Closing, Purchasers shall offer employment to each non-player Employee who is not a party to a Purchased Contract, to commence employment with Purchasers immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment. Notwithstanding the foregoing, any such offer of employment to a non-player Employee who is not a participant in an NHL Benefit Plan as of the Closing and who is on a leave of absence on the Closing Date by reason of military leave or long-term disability, whether such leave is paid, unpaid or otherwise (an "Inactive Employee"), may be conditioned upon: (i) the Closing occurring, and (ii) such Inactive Employee commencing active employment with Purchasers on a date that is the later of (A) nine months after the Closing Date (or the next applicable work-day to the extent such date does not fall on a work-day) or (B) such longer period of time as required by Law.

(c) Continuing Employees. All non-player Employees who actually commence employment with Purchasers (including all Inactive Employees who commence employment with Purchasers as described in Section 10.1(b)), as well as all Hockey Player Employees, are referred to as "Continuing Employees."

(d) Severance. Notwithstanding anything to the contrary contained in Section 10.1(b), Purchasers shall provide each Continuing Employee who incurs a termination of employment on or before the first anniversary of the Closing Date with severance payments and severance benefits that are no less favorable than the severance payments and severance benefits to which such individual would have been entitled with respect to such termination under the severance policies (including any applicable Contracts with such Continuing Employee) in place immediately prior to the Closing, as described in any such applicable Contracts and in Sellers' guidelines for severance pay as set forth in Schedule 10.1(d); provided, however, Purchasers shall not be obligated to provide to any Continuing Employee who is not a party to a written employment, collective bargaining, severance or similar agreement with cash severance

payments in excess of eight (8) weeks of such Continuing Employee's base salary as in effect immediately prior to the Closing Date.

(e)     Standard Procedure.  Pursuant to the "Standard Procedure" provided in section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Purchasers and Sellers shall report on a predecessor/successor basis as set forth therein, (ii) Sellers will not be relieved from filing a Form W-2 with respect to any Continuing Employees, and (iii) Purchasers will undertake to file (or cause to be filed) a Form W-2 for each such Continuing Employee with respect to the portion of the year during which such Continuing Employees are employed by Purchasers that includes the Closing Date, excluding the portion of such year that such Continuing Employee was employed by Sellers.

(f)     Sellers and Purchasers hereby agree that the "Asset Purchase Transaction Exception" set forth in Section 1.409A-1(h)(4) of the Treasury Regulations shall apply to the transactions contemplated under this Agreement so that each Continuing Employee will not be treated as having experienced a separation from service for purposes of applying the provisions of any nonqualified deferred compensation plan maintained by Sellers and their respective Subsidiaries or to which Sellers and their respective Subsidiaries contributed or are obligated to contribute for such Continuing Employee.

10.2     Employee Benefits.

(a)     Benefits.  Purchasers shall provide, or cause to be provided, from the Closing Date through December 31, 2011 or such longer period of time required by applicable Law, to each of the Continuing Employees, compensation (including salary, wages and opportunities for commissions, bonuses, incentive pay, overtime and premium pay), employee benefits, location of employment and a position of employment that are, in the aggregate, substantially comparable to those provided to such Continuing Employee immediately prior to the Closing; provided that Purchasers shall not have any obligation to issue, or adopt any plans or arrangements providing for the issuance of, equity, warrants, options or other rights in respect of any equity of any entity or any securities convertible or exchangeable into such shares pursuant to any such plans or arrangements; provided further, that no plans or arrangements of Sellers providing for such issuance shall be taken into account in determining whether employee benefits are substantially comparable in the aggregate.  Purchasers hereby acknowledge that the Seller Benefit Plans will not be available for the benefit of, and will cease to produce active coverage for, any Continuing Employee after the Closing.  Purchasers acknowledge and agree that Sellers make no representations or warranties to Purchasers regarding the NHL Benefit Plans.

(b)     Purchaser Plans.  For purposes of eligibility, vesting and levels of benefits under the employee benefit plans of Purchasers providing benefits to Continuing Employees (the "Purchaser Plans"), Purchasers shall credit each Continuing Employee with his or her years of service with Sellers, to the same extent as such Continuing Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. The Purchaser Plans shall not deny Continuing Employees coverage on the basis of pre-existing conditions and shall credit such Continuing Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in the Purchaser Plans.

(c)     No Employee Restrictions.  Nothing contained in this Section 10.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Continuing Employee or any change in the employee benefits available to any individual Continuing Employee.

(d)     Accrued Vacation.  Except as required by applicable Law, Purchasers shall be responsible for all Liabilities with respect to Continuing Employees attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.

(e)     Worker's Compensation.  Purchasers hereby agree to assume, as of the Closing, all Liabilities, if any, of Dallas Stars and the Stars Subsidiaries with respect to worker's compensation relating to Employees and Former Employees, if applicable, but only to the extent that (i) such Liabilities, if any, are not covered by the Insurance Policies or (ii) such Liabilities, if any, are covered by any Insurance Policies and such Insurance Policies or the benefits thereof are assigned to Purchaser pursuant to the terms hereof.

## ARTICLE XI

## CONDITIONS TO CLOSING

11.1     Conditions Precedent to Obligations of Purchasers.  The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since the Dallas Stars Interim Balance Sheet Date or the COC Interim Balance Sheet Date, respectively;

(d)     Sellers shall have delivered, or caused to be delivered, to Purchasers stock certificates (or affidavits of lost stock certificates) representing the Hockey Enterprises Shares that are owned by Sellers, duly endorsed in blank or accompanied by stock transfer powers;

(e)     Dallas Stars shall have delivered, or caused to be delivered, to Purchasers a duly executed bill of sale in the form of Exhibit K hereto;

(f)     Sellers shall have delivered, or caused to be delivered, to Purchasers a duly executed assignment and assumption agreement in the form of Exhibit L hereto;

(g)     Sellers shall have delivered, or caused to be delivered, to Purchasers the applicable Seller Documents;

(h)     Sellers shall have delivered, or caused to be delivered, to Purchasers an updated calculation of the CFV Debt Amount as of the Closing Date; and

(i)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9.

11.2     Conditions Precedent to Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchasers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date;

(c)     Purchasers shall have delivered, or caused to be delivered, to Sellers evidence of the wire transfers referred to in Section 3.3(a);

(d)     all required NHL Approvals shall have been issued by the NHL in substantially the same manner as contemplated by the Proposed NHL Approval Requirements and any additional obligations required by the NHL pursuant Section 9.9; and

(e)     Purchasers shall have delivered, or caused to be delivered, to Sellers a duly executed assignment and assumption agreement in the form of Exhibit L hereto and executed versions of the applicable Purchaser Documents.

11.3     Conditions Precedent to Obligations of Sellers and Purchasers. The obligations of either Sellers or Purchasers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers or Purchasers (except as provided in Section 11.3(g)) in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(c)     Sellers and Purchasers shall have obtained a release of all Liens held pursuant to the Senior Indebtedness against the Purchased Assets pursuant to the Confirmation Order;

(d)     Sellers shall have obtained those consents listed on <u>Schedule 11.3(d)</u> in a form reasonably satisfactory to Purchasers and copies thereof shall have been delivered to Purchasers;

(e)     the Bankruptcy Court shall have entered the Bidding Procedures Order;

(f)     the Bankruptcy Court shall have entered the Confirmation Order and any stay period applicable to the Confirmation Order shall have expired or shall have been waived by the Bankruptcy Court; and

(g)     the Closing Date (as defined in the Senior Secured Loan) shall have occurred and the Term Loans (as defined in the Senior Secured Loan) shall have been deemed made pursuant to the terms of the Senior Secured Loan; for the avoidance of doubt, the condition precedent provided in this <u>Section 11.3(g)</u> may not be waived by Purchasers or Sellers without the consent of the First Lien Agent and Monarch as provided in <u>Section 13.5</u>.

11.4     <u>Frustration of Closing Conditions</u>. No Seller or Purchaser may rely on the failure of any condition set forth in <u>Section 11.1</u>, <u>11.2</u> or <u>11.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XII

## SURVIVAL AND INDEMNIFICATION; EXCLUSIVE REMEDIES

12.1     <u>Survival</u>.

(a)     The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

(b)     All of the covenants or other agreements of the parties contained in this Agreement shall survive until the earlier of such covenant or agreement being fully performed or fulfilled or until the termination of the applicable survival period referenced in the next sentence, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance. No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed at or prior to Closing (the "<u>Pre-Closing Covenants</u>") may be made or brought by any party hereto more than

180 days following the Closing Date (the "Pre-Closing Covenant Survival Period") and (ii) by their nature are required to be performed after Closing (the "Post-Closing Covenants") may be made or brought by any party hereto after the one (1)-year anniversary of the last date on which each such Post-Closing Covenant was required to be performed (in each case, a "Post-Closing Covenant Survival Period"); provided, however, that any obligation under Sections 12.2(a)(i), 12.2(a)(iii), 12.3(a)(i), and 12.3(a)(iv) shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor in reasonable detail to the indemnifying party in accordance with Section 12.4 before the termination of the Pre-Closing Covenant Survival Period or Post-Closing Covenant Survival Period, as applicable.

12.2    Indemnification by Sellers.

(a)    Subject to this Article XII, each Seller hereby agrees from and after the Closing to, severally and not jointly, indemnify and hold Purchasers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Purchaser Indemnified Parties") harmless from and against:

(i)    any and all losses, Liabilities, claims, demands, assessments, judgments, notices, suits, actions, proceedings, obligations, damages, fines, penalties, costs and expenses, including attorneys' fees and other professionals' fees and disbursements (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Sellers;

(ii)    any and all Losses based upon or arising directly from any Excluded Asset or any Excluded Liability; and

(iii)    any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of Sellers.

(b)    Purchasers acknowledge and agree that Sellers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Purchasers after the Closing Date in breach of this Agreement. Purchasers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.3    Indemnification by Purchasers.

(a)    Subject to this Article XII, each Purchaser hereby agrees from and after the Closing to, jointly and severally, indemnify and hold Sellers and their respective directors, managers, partners, members, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Seller Indemnified Parties") harmless from and against:

(i)    any and all Losses based upon, attributable to or resulting from the breach of any Post-Closing Covenant on the part of Purchasers;

(ii)     any and all Losses based upon or arising directly out of any Assumed Liability;

(iii)     any and all Losses based upon or arising directly out of any Purchased Asset or Purchasers' operation of the Business after the Closing Date; and

(iv)     any and all Losses based upon, attributable to or resulting from the breach of any Pre-Closing Covenant on the part of any Purchaser.

(b)     Sellers acknowledge and agree that Purchasers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to action taken by Sellers after the Closing Date in breach of this Agreement. Sellers shall take and shall cause their respective Affiliates to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

12.4     Indemnification Procedures.

(a)     A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

(b)     In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought under Sections 12.2 and 12.3 hereof (regardless of the limitations set forth in Section 12.5) (an "Indemnification Claim"), the indemnified party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party. The failure of the indemnified party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is prejudiced as a result of such failure. The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with such Indemnification Claim, which relates to any Losses indemnified against by it hereunder. If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within 30 days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party of its intent to do so. If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel)

for all indemnified parties in connection with any Indemnification Claim. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 12.4 to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all Liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of Sections 12.5 and 12.6, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate Liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim. If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such Indemnification Claim.

(c)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

12.5    Certain Limitations on Indemnification.

(a)     Notwithstanding anything herein to the contrary, Sellers shall not be jointly and severally liable for any Losses.

(b)     Sellers shall not be required to indemnify any Purchaser Indemnified Party and Purchasers shall not be required to indemnify any Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the party seeking indemnification.

(c)     Nothing in this Article XII shall reduce the aggregate consideration for the Purchased Assets set forth in Section 3.1 (including, without limitation, by reducing the principal amount of the Senior Secured Loan pursuant to Section 3.1(c)).

12.6    Calculation of Losses.

(a)    The amount of any Losses for which indemnification is provided under this Article XII shall be net of any amounts actually recovered or recoverable by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).  Purchasers shall use their commercially reasonable efforts to recover under insurance policies for any Losses prior to seeking indemnification under this Agreement.

(b)    The amount of the Indemnification Claim shall be (i) increased to take account of any net Tax cost incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase, if any) in the event that the Tax treatment of such indemnity payment prescribed by Section 12.7 is not permitted by applicable Law and (ii) reduced to take account of any net Tax Benefit currently realizable by the indemnified party arising from the incurrence or payment of any such Loss.  To the extent such Indemnification Claim does not give rise to a currently realizable Tax Benefit, if the amount with respect to which any Indemnification Claim is made gives rise to a subsequently realized Tax Benefit to the indemnified party that made the Indemnification Claim, such indemnified party shall refund to the indemnifying party the amount of such Tax Benefit (grossed-up to reflect any Tax Benefit currently realized by the indemnified party as a result of making such refund payment) when, as and if realized (it being understood that such indemnified party shall use its reasonable efforts to realize such Tax Benefit).  For purposes of this Section 12.6, a "Tax Benefit" means an amount by which the Tax Liability of the party (or the consolidated, combined, unitary or similar Tax group including the party) or, if the party is a pass-through entity for Tax purposes, the members of the party, is actually reduced (including by deduction, reduction of income by virtue of increased Tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant Taxing Authority.  In computing the amount of any such Tax cost or Tax Benefit, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified Loss.  For purposes of this Section 12.6, a Tax Benefit is "currently realizable" to the extent that such Tax Benefit can be realized in the current taxable period or year or in any Tax Return with respect thereto (including through a carryback to a prior taxable period) or in any taxable period or year prior to the date of the Indemnification Claim.  The amount of any increase, reduction or payment hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD or a successor form) with respect to the indemnified party's Liability for Taxes, and payments between the parties to this Agreement to reflect such adjustment shall be made if necessary.

(c)    Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any Losses that are not legally recoverable under applicable Law as actual breach of contract damages of such other Person.

12.7    Tax Treatment of Indemnity Payments.  Sellers and Purchasers agree to treat any indemnity payment made pursuant to this Article XII as an adjustment to the Purchase Price for federal, state, local and foreign income Tax purposes, except as required by applicable Law.

12.8    Specific Performance. Sellers, on the one hand, and Purchasers and Guarantor, on the other hand, acknowledge and agree that a breach of this Agreement would cause irreparable damage to the other party and such other party will not have an adequate remedy at law. Therefore, prior to the termination of this Agreement, all obligations of Sellers, on the one hand, and all obligations of Purchasers or Guarantor, on the other hand, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, including, without limitation, the obligation of Purchasers to pay the Purchase Price and/or enforcement of the terms of the Senior Secured Loan against the lenders thereunder in accordance with the terms thereof, and appropriate injunctive relief may be applied for and granted in connection therewith; provided, however, that (i) any election by Purchasers or Sellers, as the case may be, to pursue specific performance under this Section 12.8 shall be in lieu of and not in addition to Purchasers' or Sellers' right to receive the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, respectively, in accordance with Section 4.4(d) hereof, except that in the event specific performance is not granted, Purchasers or Sellers as the case may be, may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of Section 4.4(d) and (ii) in order to be entitled to the remedy of specific performance under this Section 12.8, the party instituting Legal Proceedings for specific performance must not be in breach (which breach is incapable of being cured) of any of its obligations hereunder that would prevent the Closing conditions in Article XI from being satisfied. Notwithstanding anything to the contrary set forth in Section 4.4(d), if Purchasers or Sellers, as the case may be, shall elect to pursue specific performance pursuant to this Section 12.8 by instituting a Legal Proceeding as contemplated hereby, (A) such election shall thereupon become the sole and exclusive remedy of Purchaser or Seller, as the case may be, for such breach and (B) the party instituting such Legal Proceedings shall thereby waive any right to seek money damages or any other remedy available in law or in equity against the other party in connection with such breach. Each of the parties hereto hereby agrees that specific performance is an agreed upon contractual remedy of the parties and waives any defense in respect of an action of specific performance that would be available to the parties in the absence of this provision, except that in the event specific performance is not granted, either party may in the alternative elect to seek the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, as applicable, in the event such amounts are otherwise payable to such party pursuant to the terms of Section 4.4(d). Each of the parties hereto waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief. If, prior to the Termination Date, any party brings any Legal Proceeding to enforce specifically the performance of the terms and provisions hereof by any other party, the Termination Date shall automatically be extended by (x) the amount of time during which such Legal Proceeding is pending, plus 20 Business Days or (y) such other time period established by the Bankruptcy Court.

12.9    Exclusive Remedy. Following the Closing, the sole and exclusive remedy for any and all claims arising under, out of, or related to this Agreement, or the sale and purchase of the Purchased Assets, shall be the rights of indemnification and specific performance set forth in this Article XII and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise; it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties hereto to the fullest extent permitted by Law. The provisions of this Section 12.9 and the limited remedies provided in Section 3.2, Section 4.4, Article XII and Section 13.10, were specifically bargained-for between Purchasers

and Sellers and were taken into account by Purchasers and Sellers in arriving at the Purchase Price. Sellers have specifically relied upon the provisions of Section 3.2, Section 4.4 and this Section 12.9 and the limited remedies provided in Section 3.2, Section 4.4, Article XII and Section 13.10, in agreeing to the Purchase Price and in agreeing to provide the specific representations and warranties set forth herein.

12.10    Nature of Representations and Warranties; Schedules. Except for the representations and warranties contained in Articles V and VI (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their respective Affiliates, officers, managers, partners, equityholders, employees, agents or representatives. Except for the representations and warranties contained in Articles V and VI hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Sellers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchasers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchasers by any manager, partner, officer, equityholder, employee, agent, consultant, or representative of Sellers or any of their respective Affiliates). Sellers make no representations or warranties to Purchasers regarding the probable success or profitability of the Business. Except for the representations and warranties contained in Article VII (as modified by the Schedules hereto as supplemented or amended prior to Closing), neither Purchasers nor any other Person makes any other express or implied representation or warranty with respect to Purchasers or the transactions contemplated by this Agreement, and Purchasers disclaim any other representations or warranties, whether made by Purchasers or any of their respective Affiliates, officers, managers, equityholders, employees, agents or representatives. Except for the representations and warranties contained in Article VII hereof (as modified by the Schedules hereto as supplemented or amended prior to Closing), Purchasers hereby disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any partner, officer, member, employee, agent, consultant, or representative of Purchasers or any of their respective Affiliates). The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed. All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein. The sole purpose of the representations and warranties set forth in this Agreement is to allocate financial responsibility pursuant to the express provisions of this Agreement should the representations and warranties prove to have been inaccurate; and no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort) are permitted to any party hereto as a result of the untruth of any such representation and warranty.

12.11    DTPA WAIVER. TO THE GREATEST EXTENT ALLOWED BY LAW, PURCHASERS HEREBY WAIVE AND RELINQUISH ALL PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT (CHAPTER 17, SUBCHAPTER E, OF THE TEXAS BUSINESS AND COMMERCE CODE) IN

CONNECTION WITH THE SALES TRANSACTION CONTEMPLATED BY THIS AGREEMENT. PURCHASERS REPRESENT AND WARRANT TO SELLERS THAT: (A) PURCHASERS ARE NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION; (B) PURCHASERS ARE REPRESENTED BY EXPERIENCED AND KNOWLEDGEABLE LEGAL COUNSEL OF THEIR OWN CHOOSING WHO HAVE FULLY NEGOTIATED THE TERMS OF THIS AGREEMENT (INCLUDING THE FORM OF ALL CONVEYANCE DOCUMENTS ATTACHED TO OR ENTERED INTO IN CONNECTION WITH THE EXECUTION OR CONSUMMATION OF THIS AGREEMENT); AND (C) PURCHASERS ARE KNOWLEDGEABLE AND EXPERIENCED IN THE PURCHASE AND SALE OF SPORTS TEAMS, AND ARE FULLY ABLE TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION.

12.12  Limitation of Lender Liability.  Purchasers acknowledge and agree that the terms and conditions of this Agreement (including, without limitation, Article XII hereof) shall not give Purchasers or any of their Affiliates any right of recovery against, or shall cause any Liability to attach to, any of the NHL Affiliated Parties, the First Lien Lenders, the First Lien Agent or any of their respective Affiliates (the "Lender Related Parties"), by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, or otherwise, and Purchasers acknowledge and agree on their behalf and on behalf of their Affiliates not to make any claims against any of the Lender Related Parties in connection therewith.  The Lender Related Parties shall be third party beneficiaries of this Section 12.12.

12.13  Purchasers' Rights.  Sellers acknowledge that nothing in Section 12.12 limits or otherwise affects Purchasers' rights to enforce the terms of this Agreement against Sellers.

ARTICLE XIII

MISCELLANEOUS

13.1  Tax Matters.

(a)  Payment of Sales, Use or Similar Taxes.  Purchasers shall be responsible for (and shall indemnify and hold harmless Sellers and their managers, directors, members, partners, officers, employees, equityholders, Affiliates, agents, successors and permitted assigns against) any sales Taxes applicable to the Purchased Assets and for all other applicable sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges (including real property transfer Taxes, UCC-3 filing fees, real estate, aircraft and motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings) in connection with the transactions contemplated by this Agreement including any interest and penalty thereon (other than Taxes measured by or with respect to income imposed on Sellers or their Affiliates) ("Transfer Taxes").  Sellers shall, however, seek to include in the Confirmation Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(a).  To the extent that any Transfer Taxes are required to be paid by any Seller (or such Transfer Taxes are assessed against any Seller), Purchasers shall promptly reimburse Sellers, as applicable, for such Transfer Taxes.  Sellers and Purchasers shall cooperate and consult with each other prior to filing

any Tax Returns in respect of Transfer Taxes. Sellers and Purchasers shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(b)     Disputes. Notwithstanding anything to the contrary in this Agreement, if a Legal Proceeding, controversy, audit, or other dispute shall arise between one or more Sellers and any Taxing Authority concerning Taxes for which Purchasers are responsible under this Agreement, Purchasers (and at the direction of Purchasers, Purchasers' counsel) shall have the sole right, but not obligation, to represent such Seller(s) in resolving such Legal Proceeding, controversy, audit, or other dispute, provided that this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute with respect to which Seller would not have had the right to represent itself absent the transaction which is the subject of this Agreement. For purposes of clarification and without limitation, this Section 13.1(b) shall not apply with respect to any Legal Proceeding, controversy, audit or other dispute relating to Taxes which is subject to the control of a Person that owns an interest in the applicable Seller.

13.2    Expenses. Except as otherwise provided in this Agreement, Sellers, on the one hand, and Purchasers, on the other hand, shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, Purchasers shall be responsible for, and shall pay directly or promptly reimburse Sellers and the Transferred Subsidiaries for amounts paid by or on behalf of Sellers, all filing fees lawfully payable to or at the request of any Governmental Body in connection with this Agreement, the Seller Documents, the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby.

13.3    Submission to Jurisdiction; Consent to Service of Process; Waiver of Right to Trial by Jury.

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of the State of Texas (or, if such court does not have sufficient jurisdiction, the Texas state courts located in Dallas County, Texas) and any appellate court from any thereof, for the resolution of any such claim or dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection, which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum

for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

        (b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

        (c)    Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

    13.4    <u>Entire Agreement</u>. This Agreement (including the Schedules and Exhibits hereto) contains the entire agreement of the parties respecting the transactions contemplated by this Agreement and supersedes all prior agreements among the parties respecting the transactions contemplated by this Agreement, including that certain Memorandum of Understanding, effective as of April 13, 2011, by and among Dallas Stars, Dallas Arena, and Tom Gaglardi. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the transactions contemplated by this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's length transaction. The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the transactions contemplated by this Agreement shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and the parties hereby agree that neither party hereto shall have any remedies or causes of action (whether in contract or in tort) for any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

    13.5    <u>Amendments and Waivers</u>. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by all of the parties hereto; <u>provided that</u> no amendment, supplement, change or waiver (i) to <u>Section 11.3(g)</u> or <u>Section 12.12</u> hereof, (ii) that would have the effect of reducing the Excess Cash Payment, the First Lien Cash Payment or the principal amount of the Senior Secured Loan in a manner not otherwise contemplated by this Agreement or (iii) that would otherwise materially adversely effect the Excess Cash Payment, the First Lien Cash Payment or the terms and conditions of the Senior Secured Loan shall be effective, in each case, without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement. Purchasers agree not to consent to any amendment to the Confirmation Order or Plan that Purchasers are permitted to consent to pursuant to <u>Section 8.3</u> hereof that would adversely effect the terms and

conditions of the Senior Secured Loan without the written consent of the First Lien Agent and Monarch, provided Monarch continues to be the nominal and beneficial holder of no less than twenty percent (20%) of the aggregate principal of loans outstanding under the First Lien Credit Agreement, which consent shall not be unreasonably withheld or delayed. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The First Lien Agent and Monarch shall be third party beneficiaries of this <u>Section 13.5</u>.

     13.6   <u>Governing Law</u>. Unless any Exhibit or Schedule to this Agreement specifies a different choice of law, this Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, its Exhibits and Schedules, the negotiation, execution, performance, validity, interpretation, construction and enforcement of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the State of Texas (without giving effect to any choice or conflict of Law provision or rules (whether of the State of Texas or otherwise) that would cause the application of Laws of any other jurisdiction).

     13.7   <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission), or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to any Seller, to:

     Dallas Stars, L.P.
     2601 Avenue of the Stars
     Frisco, TX 75034
     Facsimile: (214) 387-5610
     Attention: Robert Hutson

With a copy (which shall not constitute notice) to:

     Weil, Gotshal & Manges LLP
     200 Crescent Court, Suite 300
     Dallas, Texas 75201

Facsimile: (214) 746-7777
Attention: Glenn D. West

If to any Purchaser, to:

Dallas Sports & Entertainment, L.P.
c/o Northland Properties Corporation
310 - 1755 W Broadway
Vancouver, British Columbia V6J 4S5
CANADA
Facsimile: (604) 730-4645
Attention:  Tom Gaglardi

With a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
Brookfield Place
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario M5J 2T3
CANADA
Facsimile:  (416) 863-6275
Attention:  Jim Rossiter

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Third Party Beneficiaries; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement except (a) as provided in this Section 13.9 and Sections 12.12, 13.5, 13.10, 13.11 and 13.12 herein and (b) only after the Closing has occurred, the rights of the NHL, the First Lien Lenders, Weil and GSP to receive the payments pursuant to Section 3.3 only.  No assignment of this Agreement or of any rights, interests or obligations hereunder may be made by either Sellers or Purchasers, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other parties hereto and the NHL and any attempted assignment without the required consents shall be void.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

13.10   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, manager, partner, equityholder, employee, Affiliate, agent, attorney or representative of Sellers, the Transferred Subsidiaries, Purchasers, or any of their respective Affiliates shall have any Liability (whether in contract or in tort) for any obligations or Liabilities of Sellers, the Transferred Subsidiaries or Purchasers arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement, including, without limitation, any alleged non-disclosure or misrepresentation made by any such Persons; provided, however, that nothing in this Section 13.10 shall prohibit any legal action against or enforcement of or recovery for any Liability (whether in contract or in tort) against Guarantor for, or be deemed to waive or release any obligations of Guarantor under this Agreement or any party to the Senior Secured Loan for any obligations or Liabilities of Purchasers as a result of the failure of such party to the Senior Secured Loan to provide financing to Purchasers pursuant to the Senior Secured Loan.

13.11   Legal Representation.  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, managers, members, partners, shareholders, officers, employees and Affiliates, that Weil serves as counsel to Sellers and their Affiliates (other than the Transferred Subsidiaries and their respective Subsidiaries), on the one hand, and to the Transferred Subsidiaries and their respective Subsidiaries, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transaction contemplated hereby.  Sellers, Purchasers, and the Transferred Subsidiaries hereby agree that, in the event that a dispute arises after the Closing between Sellers or any of their respective Affiliates (other than the Transferred Subsidiaries) and Purchasers or the Transferred Subsidiaries, Weil may represent Sellers and any of their Affiliates (other than the Transferred Subsidiaries) in such dispute even though the interests of Sellers or their Affiliates (other than the Transferred Subsidiaries) may be directly adverse to the Transferred Subsidiaries and Purchasers, and even though Weil may have previously represented the Transferred Subsidiaries.  The Transferred Subsidiaries and Purchasers further agree that, as to all communications among Weil, the Transferred Subsidiaries and Sellers or their Affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney or solicitor-client privilege and the expectation of client confidence belongs to each Seller and may be controlled by such Seller and shall not pass to or be claimed by the Transferred Subsidiaries or any Purchaser.  Notwithstanding the foregoing, in the event that a dispute arises between the Transferred Subsidiaries and a third party other than a party to this Agreement after the Closing, the Transferred Subsidiaries may assert the attorney or solicitor-client privilege to prevent disclosure of confidential communications by Weil to such third party; provided, however, that none of the Transferred Subsidiaries may waive such privilege without the prior written consent of Sellers.

13.12   General Releases.

(a)     Effective as of the Closing Date, the Transferred Subsidiaries (collectively, the "Subsidiary Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge Sellers and any and all of their Affiliates, Subsidiaries (whether or not such entities are wholly owned), parent entities, and other direct or indirect related entities (as well as each of their respective predecessors, successors, and assigns) and the

NHL Affiliated Parties and each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Affiliates, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Seller Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Seller Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Transferred Subsidiaries, breach of any other duty, appropriation of any business opportunity of the Transferred Subsidiaries, dealing with the Transferred Subsidiaries in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Subsidiary Releasing Parties, or that any of the Subsidiary Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(b)     Effective as of the Closing Date, Sellers (collectively, the "Seller Releasing Parties"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt sufficiency of which is hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge the Transferred Subsidiaries and any and all of their Subsidiaries (whether or not such entities are wholly owned), and the NHL Affiliated Parties and, other than the Hicks Affiliates, each of their respective past, present and future directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Subsidiaries, beneficiaries, trustees, fiduciaries, accountants, attorneys and insurers (as well as each of their respective predecessors, successors, assigns and heirs) (collectively, the "Subsidiary Released Parties") from: *any and all Losses, Liabilities, proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, Orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, obligations, rights against the Subsidiary Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including, without limitation, any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or*

*negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Sellers, breach of any other duty, appropriation of any business opportunity of the Sellers, dealing with the Sellers in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim* now held, owned or possessed by any of the Seller Releasing Parties, or that any of the Seller Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, of whatever kind or nature.

(c)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 13.12</u> shall not release, acquit or discharge any rights, actions, causes of action, claims or demands that now exist or that may hereafter accrue by and among any Seller, any Transferred Subsidiary and/or any Purchaser relating to or arising in connection with this Agreement or any agreement or document executed pursuant hereto, including those arising under <u>Article XII</u> of this Agreement.  The releases provided in this <u>Section 13.12</u> are intended to survive indefinitely and shall remain enforceable after the Closing of the transaction contemplated by this Agreement.

13.13    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.14    <u>Sellers' Representative</u>. Prior to the Closing, Sellers shall appoint, in consultation with the First Lien Agent, a representative (such representative, or any successor thereto, the "<u>Sellers' Representative</u>") as the Sellers' sole and exclusive representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of the Sellers solely with respect to the determination of the Final NWC pursuant to <u>Section 3.4</u> hereof, and in accordance with the terms and provisions of this Agreement and to act on behalf of such Sellers in any Legal Proceeding involving the determination of the Final NWC.  If the Sellers' Representative otherwise appointed is unwilling or becomes unable to serve as Sellers' Representative, such other Person or Persons as may be designated by the First Lien Agent in accordance with this <u>Section 13.14</u> shall succeed as the Sellers' Representative.

** REMAINDER OF PAGE INTENTIONALLY LEFT BLANK **

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

DALLAS STARS, L.P.

By: _____
    Name:  Robert Hutson
    Title:    Chief Financial Officer


DALLAS ARENA LLC

By: _____
    Name:  Robert Hutson
    Title:    Chief Financial Officer


STARCENTERS LLC

By: _____
    Name:  Robert Hutson
    Title:    Chief Financial Officer


DALLAS STARS U.S. HOLDINGS CORP.

By: _____
    Name:  Robert Hutson
    Title:    Treasurer

DALLAS SPORTS & ENTERTAINMENT, L.P.

By: DSE GP, Inc., its General Partner

By: _____
     Name:  Tom Gaglardi
     Title:  President


DSE HOCKEY CLUB, L.P.

By: DSE Hockey Club GP, Inc., its General Partner

By: _____
     Name:  Tom Gaglardi
     Title:  President


DSE HOCKEY CENTERS, L.P.

By: DSE Hockey Center GP, Inc., its General Partner

By: _____
     Name:  Tom Gaglardi
     Title:  President


DSE PLANO GP, INC.

By: _____
     Name:  Tom Gaglardi
     Title:  President


Tom Gaglardi, in his individual capacity, solely
with respect to Sections 9.12, 12.8 and Article XIII
of this Agreement

_____