## EXHIBIT 1

E-filed in the Office of the Clerk
for the Business Court of Texas
10/28/2025 11:27 AM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0049

# IN THE TEXAS BUSINESS COURTS
## FIRST BUSINESS COURT DIVISION

DALLAS SPORTS GROUP, LLC AND §
RADICAL ARENA, LTD. §
　　　　　　　　　　　　　　　§
　　　　**Plaintiffs,** §　　　　25-BC01B-0049
　　　　　　　　　　　　　　　§　　**Cause No. _____**
　　**vs.** §
　　　　　　　　　　　　　　　§
**DSE HOCKEY CLUB, L.P.** §
　　　　　　　　　　　　　　　§
　　　　**Defendant.** §

## ORIGINAL PETITION AND APPLICATION FOR INJUNCTIVE RELIEF

Dallas Sports Group, LLC and Radical Arena, Ltd.[1] (collectively, the "Dallas Mavericks" or "DSRA") file this Original Petition and Application for Injunctive Relief against DSE Hockey Club, L.P. (the "Dallas Stars" or "Hockey Club"[2]).

## I.　　INTRODUCTION

1.　　The Dallas Mavericks bring this action against the Dallas Stars to enforce the terms of the partnership contracts the teams signed nearly a quarter century ago. Pursuant to those contracts, the Mavericks and the Stars jointly owned the companies that lease the American Airlines Center from the City of Dallas and run and operate the American Airlines Center. But the Stars relinquished their rights in that partnership when they breached their contracts with the City of Dallas and uprooted their headquarters to Frisco, Texas. The governing agreements could not be clearer: when one partner breaches its contractual commitment to stay in Dallas, the other is empowered to redeem that partner's interest.

---

[1] DSRA are companies that, together, own and operate the Dallas Mavericks.
[2] Hockey Club owns a controlling interest in the Dallas Stars Hockey team.

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**　　　　　　　　　　　　**Page 1**

Copy from re:SearchTX

2.      The Mavericks exercised their contractual right to redeem the Stars' interest in the Arena operating entities on October 25, 2024, and became those entities' sole owner.  Rather than accept that outcome as the inevitable consequence of their breach, the Stars have embarked on a mission of obstruction, blocking necessary maintenance and improvements to the Arena and interfering with its operations at every turn.  Their objective is transparent: leverage fabricated uncertainty regarding who controls the Arena to force a return of the ownership interest that was purchased when they breached their agreements with Dallas and moved their headquarters to Frisco.

3.      To put it plainly, the Stars are holding the American Airlines Center hostage.  Much-needed maintenance and improvements to the Arena are being delayed while the Stars block investment in the future and demand cash distributions from a partnership in which they no longer have an ownership stake. The teams, their fans, visiting performers, and the City of Dallas now face the very real prospect of this world-class venue slipping into disrepair.

4.      Unfortunately, the effect of the Stars' tactics extends beyond Arena upkeep and improvements—it is impacting the lives and livelihood of the men and women who operate the Arena.

5.      In mid-July 2025, Stars' management brazenly decreed that they would block payment of the bonuses earned by Arena employees until operations were returned to the pre-breach status quo:

**ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF**                                    **Page 2**

Copy from re:SearchTX

> I just received a text from Brad Alberts on behalf of Tom.
>
> "We aren't going to approve any bonuses until the arena's business can be returned to normal state. At that point the bonuses for employees can be evaluated."
>
> Craig Courson
> Chief Executive Officer
>
> American Airlines Center

6. Many Arena employees have worked there for decades and, as a result, have invaluable institutional knowledge; they know how to run the venue better than anyone else. The Stars' unilateral veto over the longstanding practice of paying these earned annual bonuses based on the Arena's financial performance—a practice that is critical to employee morale and retention—has caused veteran employees to begin polishing their résumés, placing the Arena's ability to deliver an unparalleled experience to its fans in serious jeopardy.

7. Cognizant of the damage this loss of experienced employees would have on their home Arena, and after repeated, unsuccessful attempts to convince the Stars to withdraw their veto, the Mavericks offered to fund the $512,000 in bonuses on September 18, 2025. But the Arena's management companies, fearful of the Stars' wrath, declined the Mavericks' offer.

8. Having exhausted all efforts to resolve these issues amicably, the Mavericks now turn to this Court. The Mavericks respectfully request that the Court enforce the parties' agreements, confirm the Mavericks as the sole owners of the Arena entities, and enjoin the Stars from further obstructing the operation and

**ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF**                                **Page 3**

Copy from re:SearchTX

stewardship of the American Airlines Center. Moreover, given the Arena's packed schedule, the Mavericks request that this Court intervene as soon as is practicable. The public interest requires swift judicial intervention to restore stability, protect the workforce, and safeguard a vital Dallas asset.

## II.    PARTIES

9.    Plaintiff Dallas Sports Group, LLC is a company duly formed under the state of Delaware with its principal place of business in Dallas County, Texas.

10.    Plaintiff Radical Arena, Ltd. is a Texas limited liability company with its principal place of business in Dallas County, Texas.

11.    Defendant DSE Hockey Club, L.P. is a Delaware limited partnership with its principal place of business in Collin County, Texas, and may be served at its principal corporate and executive offices at 2601 Avenue of the Stars, Frisco, Texas.

## III.    NATURE OF THE CASE

12.    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, the Mavericks seek a declaration of the parties' rights under the Limited Partnership Agreement of Center Operating Company, L.P., dated September 30, 1999, and the Limited Liability Company Agreement of Center GP, LLC, dated September 30, 1999.

13.    The Mavericks also seek monetary damages for the Stars' actual and tortious interference with the Mavericks' performance of the Mavericks' rights and obligations under the Limited Partnership Agreement of Center Operating

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                                **Page 4**

Copy from re:SearchTX

Company, L.P., dated September 30, 1999, and the Limited Liability Company Agreement of Center GP, LLC, dated September 30, 1999.

14.     And finally, the Mavericks seek temporary and permanent injunctive relief under Chapter 65 of the Texas Civil Practice and Remedies Code and Texas Rule of Civil Procedure 680 to preserve the status quo and prevent irreparable harm pending final adjudication of the parties' ownership dispute. Specifically, the Mavericks request temporary and permanent injunctive relief prohibiting the Stars from interfering with the Mavericks' ownership and control of Center Operating Company, L.P. and Center GP, LLC and, specifically, the payment of management-approved bonuses to Center Operating Company, L.P. employees, and the right to invest in improvements to the American Airlines Center.

## IV.     DISCOVERY CONTROL PLAN

15.     Plaintiffs intend to conduct discovery under Level 3 pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

## V.     STATEMENT OF RELIEF

16.     Plaintiffs seek nonmonetary injunctive relief as well as actual and consequential damages, attorneys' fees and costs. TEX. R. CIV. P. 47(c)(5).

## VI.     VENUE & JURISDICTION

17.     This Court has jurisdiction over this matter and over the parties under the laws of the State of Texas and Texas Government Code Sections 25A.004(b)(2) and 25A.004(e) because this is "an action regarding the governance, governing documents, or internal affairs of an organization" and the amount in controversy,

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                    **Page 5**

Copy from re:SearchTX

exclusive of interest, attorneys' fees, and costs, exceeds $5 million. *See* TEX. GOV'T CODE § 25A.004(b)(2). Specifically, the value of the rights at issue here—control of a partnership that owns a multi-year lease interest in the American Airlines Center and the concomitant rights to direct, approve, and fund many millions of dollars in improvements to American Airlines Center—exceeds the $5 million jurisdictional requirement of this Court. *See C Ten 31 LLC v. Tarbox, et al.*, 2025 Tex. Bus. 1, 12, 15–18 (Tex. Bus. Court—1st Div. Jan. 3, 2025). Additionally, this Court has jurisdiction because Plaintiffs' declaratory judgment claim under Chapter 37 of the Texas Civil Practice and Remedies Code is "a dispute based on a claim within the court's jurisdiction under Subsection . . . (b)" because it involves a declaration that concerns Defendant's noncompliance with the governing documents of an organization, as well as that organization's internal affairs.

18.    This Court may exercise personal jurisdiction over Defendant because it maintains offices and operations in Texas and engaged with persons within the State of Texas by negotiating and entering into a joint venture in Dallas, Texas.

19.    Venue is proper in the First Business Court Division because all or a substantial part of the events giving rise to the claim occurred in Dallas County. *See* TEX. CIV. PRAC. REM. CODE § 15.002(1). Specifically, in Dallas County, Plaintiffs (1) agreed, negotiated, and executed the joint venture and underlying contractual documents, and (2) substantially performed the contracts.

Copy from re:SearchTX

## VII.  <u>FACTS</u>

20.    DSRA are companies that are controlled by Dallas Sports Group, LLC, which acquired a controlling interest in the Dallas Mavericks in December 2023, and have owned and operated the Mavericks since. The Dallas Mavericks are an American professional basketball team based in Dallas, Texas, that competes in the National Basketball Association as a member of the Southwest Division of the Western Conference.

21.    Hockey Club owns and operates the Dallas Stars, the professional ice hockey team headquartered in Frisco that competes in the National Hockey League.

22.    Center Operating Company, L.P. ("COC Partnership") leases the American Airlines Center (the "Arena") from the City of Dallas, Texas (the "City").

23.    The Arena is operated and staffed by COC Partnership, which is managed by Center GP, LLC ("Center GP"). Prior to October 25, 2024, both COC Partnership and Center GP were owned 50% by the Mavericks (via DSRA) and 50% by the Stars (via Hockey Club). *See* Center Operating Company Limited Partnership Agreement ("COC Partnership Agreement"); Center GP Limited Liability Company Agreement ('Center GP Agreement").[3] The Mavericks and Stars sub-lease the Arena from COC Partnership and play their home games there.

---

[3] The COC Partnership Agreement and Center GP Agreement are referred to as "Arena Agreements."

<u>ORIGINAL PETITION AND</u>
<u>APPLICATION FOR INJUNCTIVE RELIEF</u>                                    **Page 7**

Copy from re:SearchTX

24.    Seemingly complex, the arrangement can be boiled down as follows:



25.    For many years, this arrangement proved fruitful and substantially benefited not only the teams, but also the City, its residents, and the teams' many fans. The Arena consistently ranks as one of the busiest in the world, frequently bringing big-name performers and hot-ticket games to Dallas. The Mavericks and the Stars each have historically taken home 50% of the revenue earned on those Dallas events in accordance with the Arena Agreements' terms. The Stars' refusal

Copy from re:SearchTX

to abide by the governing contracts and obstructionist behavior in recent years, however, have brought that once mutually beneficial relationship to an abrupt halt.

## A. The Mavericks identify necessary Arena improvements and renovations.

26. As 50-50 partners, both the Mavericks and the Stars were required to approve Arena expenses—regardless of whether one or both parties ultimately contribute any capital. *See* COC Partnership Agreement § 4.3(d); Center GP Agreement § 4.2(d). Operational decisions about the Arena therefore required some amount of agreement and cooperation.

27. Renovations to the Arena present special challenges because work must be completed without interfering with the Mavericks' and Stars' games. For example, in 2023, COC Partnership completed an upgrade with new fan seating and a new videoboard and sound system; all of that was installed without interfering with either team's playing schedule. Following those upgrades, the Mavericks' leadership met with COC Partnership to assess additional necessary improvements to keep the Arena competitive going forward. The meeting confirmed that the Arena needed $75 to $100 million worth of maintenance on mechanical systems approaching end of life and hundreds of millions of dollars in improvements to maintain the Arena's competitiveness as an event venue.

28. More improvements were, in the opinion of many, needed to maintain the Arena's standing as a world-class facility. To facilitate the swift execution of improvements to their home arena, the Mavericks approached the Stars in early 2024 with an offer to contribute significant capital for remedial renovations. These

Copy from re:SearchTX

renovations, the Mavericks explained, were critical to ensuring the Arena's—and the City's—ability to remain competitive in the events market.

29.    The Mavericks anticipated that the Stars would readily agree to pitching in for those necessary improvements, especially considering comments the Stars' CEO and President, Brad Alberts, had recently made about the Arena:[4]

> "We think it's a great place to play for a long time," Alberts said in a recent interview with the *Business Journal*. "We love this location; we love being in the city of Dallas. At the same time, it's more than 20 years old. and it's no different than a house that's 20 years old. It's got great bones. It doesn't need to be torn down, but it needs a renovation. It needs interior finish-outs and needs some new facelifts."

## B.  The Stars stonewall the Mavericks' efforts to renovate the Arena.

30.    Like Alberts, the Mavericks knew the Arena needed renovation to maintain its reputation. Given the scope of the anticipated renovation, the Mavericks approached the Stars about engaging with the owner of the building, the City of Dallas. The Stars agreed, so the teams initiated discussions with the City in Spring 2024.

31.    While they worked through options with the City, the Mavericks and the Stars began working with a team of architects, designers, and other experts to develop a renovation plan for the Arena. After five months of meetings, the teams' senior management and their hand-picked professionals had come up with plans for

---

[4] Holden Wilen, *Amid Push For A New Arena, Stars CEO Makes A Case For Staying*, DALLAS BUSINESS JOURNAL (Aug. 15, 2022), https://www.wfaa.com/article/sports/nhl/stars/amid-push-new-arena-stars-ceo-makes-case-staying/287-7ed8866d-6fd4-4c5d-88b2-70bff0b20900#:~:text=Dallas%20Stars%20CEO%20Brad%20Alberts,arena%20at%20less%20than%202050%25.

**ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF**

**Page 10**

Copy from re:SearchTX

improvements to public concourses at all levels of the Arena, food and beverage facilities, and suites; a complete renovation to create a new Stars' locker room; significant event-level changes designed to improve event- and game-day operations; and the addition of more event-level fan areas for both the Mavericks and the Stars. As Alberts acknowledged just months prior, these were precisely the type of "premium opportunities" the Arena needed to keep up with the times:[5]

> "The Stars would love to increase and improve our premium hospitality options. If you look at the modern stadiums that have either been renovated or built in the last decade, they all have event-level clubs and bunker suites for additional premium opportunities. Dallas is a great, premium city for that."

32.    The plans were not simply theoretical—the Mavericks' and COC Partnership's leaders spent significant time and resources working with Stars' senior management throughout the Fall of 2024 developing detailed plans. As just one example, the architects emailed both teams' leadership the *seventh* update of the proposed plans in September 2024:

> Thank you for the great meeting today –we appreciate all your feedback. Here is the Sharepoint link to the content we reviewed today with some additional dimensional information that Patrick had asked for on the suite plans.
> Let us know if you have any questions or further ideas. Thanks!
>
> 📄 2024.09.11 AAC Design Update 7 - sm.pdf

---

[5] Ben Swanger, *A $10 Million Video Board and New Seats: Cynt Marshall and Brad Alberts Talk AAC's Face Lift*, D Magazine (Sept. 25, 2023), https://www.dmagazine.com/business-economy/2023/09/cynt-marshall-and-brad-alberts-discuss-aacs-20-million-face-lift/?utm_source=chatgpt.com.

ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF                                         **Page 11**

Copy from re:SearchTX

33.   It appeared likely that the teams would reach a deal to proceed with the renovations when Alberts verbally agreed to plans in early October 2024. The City of Dallas, who owns the Arena, was an active partner in the renovation negotiations. The parties began negotiating and drafting the details of the renovations and responsibilities of the Mavericks, the Stars and the City.

34.   A provision proposed by the City revealed the Stars' lack of commitment to the City and the project. That language provided:

> The parties acknowledge that the Stars are currently out of compliance with the Franchise Agreement due to the headquarters move to Frisco. No later than December 31, 2025, Stars will ensure that the team's corporate ownership moves its team headquarters to Dallas and will thereafter maintain its corporate headquarters within the City of Dallas for the duration of its sublease with Operator. Likewise, the Stars will ensure that the team's practice facility is relocated to the City of Dallas no later than December 31, 2025, and will thereafter maintain its practice facility within the City of Dallas for the duration of its sublease with Operator.

35.   Apparently, the Stars were unwilling to move their headquarters from Frisco back to Dallas as required by the plain terms of their decades-old, highly profitable Franchise Agreement with the City. The City, for its part, continued to encourage the Stars to move back to Dallas within a reasonable period of time.

36.   The Stars refused to remedy their breach and decided that, with only six years left on the Star's Arena lease, they would rather pocket the remaining profits COC Partnership would earn instead of investing those profits and additional capital in Arena improvements. Given that goal, Stars CEO Brad Alberts abruptly terminated the negotiations in an October 16, 2024 text exchange with Mavericks governor Patrick Dumont:

<u>ORIGINAL PETITION AND</u>
<u>APPLICATION FOR INJUNCTIVE RELIEF</u>                                      **Page 12**

Copy from re:SearchTX



37.    The Arena was left in a state of limbo with no plan to complete the renovations and maintenance that would benefit the Mavericks, the Stars, and non-sporting performers.  The City of Dallas would later describe the Stars' abandonment of the proposed deal as a "baffling change of course."

## C.  The Mavericks seek solutions.

38.    The Stars' pattern of obstructive behavior left the Mavericks uneasy, highly concerned about the Arena's future, and in need of a solution.

39.    The teams' Franchise Agreements with the City and the Arena Agreements between the two teams expressly memorialize the inherent value of the teams' presence in Dallas. Section 2.1 of the Stars' Franchise Agreement with the

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                             **Page 13**

Copy from re:SearchTX

City, for example, provides that the Stars "shall continuously designate the City [of Dallas] as the location (a) in which the Home Games shall be played and (b) in which the principal corporate and executive offices of the Team shall be maintained." Section 4.8 of the COC Partnership Agreement between the Mavericks and the Stars expressly incorporates the Stars Franchise Agreement's location requirement, defining a "Relocation Event" to mean, "with respect to the Dallas Stars, a breach by the Dallas Stars of … Section 2.1 … of the Stars Franchise Agreement."

40.    Critically, in the event the Stars breached the Franchise Agreement and moved outside of Dallas, Section 4.8 of the COC Partnership Agreement specifically authorized the Mavericks to redeem the Stars' interest in COC Partnership:

> If a Relocation Event occurs for any reason, then the Partnership may purchase and redeem the entire partnership interest of the Relocation Partners for an aggregate amount of $100. Any Partner that is not a Relocation Partner (referred to herein as the "Remaining Partner" [i.e., the Dallas Mavericks]) may cause the Partnership to so purchase and redeem the Partnership Interest of the Relocation Partners. After any such purchase and redemption, the partnership interest of the Relocation Partners shall be considered terminated….

41.    And in Section 4.5 of the Center GP Agreement, the Mavericks and the Stars agreed to nearly identical terms:

> If a Relocation Event occurs for any reason, the Company may purchase and redeem the entire [membership] interest of the Relocation Members for an aggregate amount equal to $10. Any Remaining Member may cause the Company to so purchase and redeem the Company interest of the Relocation Members [i.e., the Dallas Stars]. After any such purchase and redemption, the Company Interest of the Relocation Members shall be considered terminated…[6]

---

[6] *See* Center GP Agreement at 15 ("'Relocation Event' has the meaning set forth in the [COC Partnership Agreement].").

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                      **Page 14**

Copy from re:SearchTX

42.    The practical effect of these contractual provisions is intentionally severe: if one team moves outside of Dallas, the other is entitled to purchase its interests in the Arena's operating entities for one hundred and ten dollars.  Put another way, the Arena Agreements were specifically designed to keep the teams operating and playing in the City of Dallas.

43.    In clear violation of their Franchise Agreement with the City and their Arena Agreements with the Mavericks, the Stars moved their principal corporate and executive offices and the team's practice facilities to 2601 Avenue of the Stars, Frisco, Texas.[7]  Obviously, the City of Frisco is not located in the City of Dallas. *See*, Mike Piellucci, *The Great Frisco Caper*, D MAGAZINE (Feb. 16, 2022)("But, as Dallas Stars President Brad Alberts says, … 'Wow, this [Frisco] is a whole different area.'").

44.    Just weeks ago, the Stars revealed their plan to double down on their defection from the City of Dallas.  Recent reporting suggests that the Stars are looking to play their home games outside of the City of Dallas, reportedly seeking options for a new stadium in Plano, Frisco, The Colony, and Fort Worth.[8]  Without any recognition of the Stars' contractual commitments, Mr. Alberts seemingly intends to pursue "real estate plays" outside of the City of Dallas.

**D.  The City of Dallas formally declares the Stars are in breach of contract.**

45.    There is no doubt that the Stars' move was, in fact, a breach, and the City formally recognized their breach in a letter dated October 3, 2025.  The City's

---

[7] *See* Official Stars Website, https://www.nhl.com/stars/starcenters/locations/frisco.

[8]  https://www.dallasnews.com/sports/stars/2025/10/07/dallas-stars-nhl-move-relocation-plano-frisco-the-colony-fort-worth/.

<u>ORIGINAL PETITION AND</u>
<u>APPLICATION FOR INJUNCTIVE RELIEF</u>                                          **Page 15**

Copy from re:SearchTX

notice declared that the Stars are "not in compliance with the Franchise Agreement" because their headquarters remain in Frisco, contrary to Section 2.1's requirement that the team maintain its principal corporate and executive offices within the City of Dallas.

46. As a result, the City's notice letter made clear that it would "serve as our notice of the Stars' default with regard to Section 2.1 of the Franchise Agreement." The City's notice followed months of efforts to obtain a cure through negotiations, including the City's draft term sheet requiring a return of the Stars' headquarters to Dallas.

**E. The Mavericks purchase the Stars' interests in COC Partnership and Center GP.**

47. The Stars' move to Frisco constituted a "Relocation Event" under the Arena Agreements, formally rendering the Stars a "Relocation Partner" and the Mavericks, in turn, a "Remaining Partner." *See* COC Partnership Agreement § 4.8(a); Center GP Agreement at 15; Stars Franchise Agreement § 2.1.

48. The City had previously advised the Stars of its objections to the team's move to Frisco and reminded the Stars of their contractual commitments to stay in Dallas. And during the parties' renovation negotiations, when the City later requested that the Stars remedy their breach and move back to Dallas, the Stars walked—leaving the Mavericks, and their home arena, at an impasse.

49. Accordingly, on October 25, 2024, the Mavericks exercised their contractual right to cause COC Partnership and Center GP to redeem the Stars'

Copy from re:SearchTX

partnership interest in COC Partnership and membership interest in Center GP, thereby becoming the sole owners of the Arena's operating entities.

50.     The buyout was a last resort for the Mavericks, only made necessary by the Stars' refusal to cooperate with its long-term partner and invest in the pair's home arena, its reputation, and its ability to compete with similarly situated arenas. The motive behind the Mavericks' decision to enforce the Arena Agreements' plain terms, however, is irrelevant. Under any reasonable interpretation of the term, the Stars' relocation to Frisco constitutes a "Relocation Event." *See* COC Partnership Agreement § 4.8(a); Center GP Agreement at 15; Stars Franchise Agreement § 2.1. The Arena Agreements expressly authorize a buyout on these facts, and the Mavericks strictly complied with those contracts' terms.

51.     The transaction is complete; COC Partnership and Center GP validly purchased 100% of the Stars' ownership interests on October 25, 2024, at which point the Stars' company interests terminated. The Mavericks have been sole owners of each entity ever since. And as the 100% owner, the Mavericks *should be* able to proceed with renovations and improvements without waiting for the Stars' approval.

52.     But the Stars have refused to acknowledge the ownership change and blocked renovations and improvements.

**F.  The Stars retaliate and refuse to allow COC Partnership to operate the Arena.**

53.     By letter dated November 1, 2024, the Stars denied the validity of the October 25, 2024 buyout and termination of their interests in COC Partnership and Center GP.

Copy from re:SearchTX

54.    The Stars' conduct since has only made that difficult situation worse.

55.    The Stars' table pounding created an unstable environment wherein COC Partnership was forced to disclose in a footnote to its year-end financial audit review that it was uncertain as to its ownership. Without clarification on this issue, COC Partnership perceives risk for any action it takes absent the Stars' approval.

56.    Even though their COC Partnership interest was terminated, the Stars remain an incredibly valuable and important lessee. The Stars fill the Arena with dedicated fans for approximately 40 home games each year. And the Mavericks certainly want the Stars to continue playing at the Arena.

57.    Against that backdrop, COC Partnership has only proceeded with expenditures approved by both teams. But given the Stars' current position, few—if any—necessary expenditures have been approved. Instead of working collaboratively to resolve the problem or otherwise rehabilitate the partnership, the Stars have opted to communicate unilaterally with COC Partnership through hostile emails to which the Mavericks' management team is notably not a party. Alberts, for one, has been sending multiple and frequent emails to COC Partnership, aggressively stating that the Stars do not and will not approve anything. That resistance applies equally to go-forward projects that are critical to sustaining Arena operations and maintenance that all parties—including the Stars—had previously agreed was necessary.

58.    Because of the Stars' combative position and refusal to accept the consequences of the terms to which they agreed, COC Partnership has been

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                                **Page 18**

Copy from re:SearchTX

unwilling to expend any funds without the Stars' approval. The harm caused by the Stars' stonewalling will only increase as time passes, facilities deteriorate, and fans flock to competitor venues.

59. The most unfortunate victim of the Stars' retaliatory gridlock so far, however, is not the Mavericks—it's the Arena's employees. On July 18, 2025, COC Partnership CEO Craig Courson sent a detailed and thoughtful request to the Stars and the Mavericks requesting approval to distribute hundreds of thousands of dollars in annual bonuses to key Arena employees. The teams had been approving these earned annual bonuses based on Arena financial performance for years, and the Mavericks have long understood this practice as being vital to employee morale and retention.

60. This was especially true in July 2025, at which point the Arena's work force had become "acutely aware" of the teams' dispute and "anxious" about the future of both COC Partnership and the Arena. And given most Arena employees' irreplaceable knowledge and understanding of Arena operations, the Arena—along with the teams—simply cannot afford to lose them. Courson explained all of this in detail to the teams' management on July 18, emphasizing that his intent in issuing this year's bonus was "to alleviate employee concerns" and "prevent employees from potentially seeking alternative employment."

61. The Mavericks readily approved the request to pay employee bonuses.

62. The Stars refused.

Copy from re:SearchTX

63.    In an August 6, 2025 text message to Craig Courson, Brad Alberts bluntly stated that "no bonuses would be approved until the arena's business can be returned to a normal state."

64.    Determined to keep their relationship with their former partner and Arena employee morale afloat, the Mavericks continued to seek the Stars' approval even after their initial August 6 veto, most recently on September 8, 2025.

65.    The Stars denied each of those requests for approval.

66.    Pursuant to their authority as sole owners of COC Partnership, the Mavericks—backed into a corner and unwilling to lose critical employees over the Stars' behavior—on September 18, 2025, asked COC Partnership to allow the Mavericks to unilaterally fund the $512,000 in employee bonuses. After spending months on the receiving end of the Stars' erratic behavior, however, COC Partnership told the Mavericks it was unwilling to accept their funds over the Stars' objection.

67.    In short, the Stars are recklessly disregarding the need for improvements to the Arena and replacement of end-of-life mechanical systems, ignoring their obligations to the City of Dallas, and mistreating long-tenured Arena employees, all in the pursuit of cash distributions from a partnership in which they no longer have an interest. The Stars' terrorist conduct is a hindrance to both teams, the Arena, the City, and the hundreds of thousands of fans the Arena opens its doors to every year. They have refused to cooperate and ceased all constructive contact

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                    **Page 20**

Copy from re:SearchTX

with the Mavericks. Now, backed into a corner, the Mavericks respectfully request that this Court intervene and put a stop to the Stars' retaliatory crusade.

## VIII. CAUSES OF ACTION

### COUNT I: CLAIM FOR DECLARATORY RELIEF

68.    The Mavericks incorporate by reference and re-allege each allegation contained in the above-numbered paragraphs.

69.    A justiciable controversy exists as to the rights, status, or other legal relations between the Mavericks and the Stars under the Arena Agreements, and the Mavericks request that the Court declare their rights under those agreements. Specifically, a controversy exists as to whether the Mavericks' exercise of their rights to purchase or redeem the Stars' interests in COC Partnership and Center GP on October 25, 2024 rendered the Mavericks the sole partners of COC Partnership, the sole members of Center GP, and the sole lessees of the Arena.

### The Stars' Relocation

70.    The COC Partnership Agreement and Center GP Agreement provide that in the event of a Stars Relocation Event, the Mavericks may cause the COC Partnership and Center GP to purchase and redeem the Stars' entire ownership interest in COC Partnership and Center GP. A "Relocation Event" includes the Stars' failure to maintain the City of Dallas as its "principal corporate and executive offices." *See* COC Partnership Agreement § 4.8; Center GP Agreement § 4.5. The Mavericks request that the Court declare a "Relocation Event" under the Arena Agreements has occurred, and that the Mavericks are the "Remaining Partners"

Copy from re:SearchTX

under the COC Partnership Agreement and "Remaining Members" under the Center GP Agreement.

**Redemption of the Stars' Interests in COC Partnership and Center GP**

71.    Pursuant to Section 4.8 of the COC Partnership Agreement and the occurrence of a Relocation Event, the "Remaining Partners" of COC Partnership may cause COC Partnership to purchase the "Relocation Partner's" entire interest in COC Partnership for the redemption price set forth in that agreement. The Mavericks, as the "Remaining Partners" of COC Partnership, exercised their right to cause COC Partnership to redeem the Stars' entire partnership interest in COC Partnership for the redemption price on October 25, 2024.

72.    Pursuant to Section 4.5 of the Center GP Agreement and the occurrence of a "Relocation Event," the "Remaining Members" of Center GP may cause Center GP to purchase and redeem the "Relocation Member's" entire interest in Center GP for the redemption price set forth in that agreement. The Mavericks, as the "Remaining Members" of Center GP, exercised their right to cause Center GP to purchase and redeem the Stars' entire company interest in Center GP for the redemption price on October 25, 2024.

73.    The Mavericks request that the Court declare the Mavericks purchased and redeemed the Stars' company interests in COC Partnership and Center GP, and the Mavericks became on that date the sole partner of COC Partnership and the sole member of Center GP.

## Forfeiture of Rights to Designate Board Members of Center GP

74.     Section 7.2(e)(ii)(C) of the Center GP Agreement provides that, upon the Stars becoming a Relocation Partner under the COC Partnership Agreement, the Stars' designated Board Members of Center GP "shall immediately be deemed to have resigned from the Board" and the Mavericks "shall then have the right to designate Board members in the stead" of the Stars' designated Board Members.

75.     Accordingly, the Mavericks seek a declaration that R. Thomas Gaglardi (Place 4), Therese Baird (Place 5) and Brad Alberts (Place 6) are deemed to have resigned from the Board of Center GP.

## COUNT II: TORTIOUS INTERFERENCE

76.     The Mavericks incorporate by reference and re-allege each allegation contained in the above-numbered paragraphs.

77.     At all times relevant to this dispute, the Mavericks were parties to a series of binding, enforceable agreements that govern the ownership, operation, and maintenance of the Arena and impose ongoing contractual obligations on the Mavericks. *See generally* COC Partnership Agreement; Center GP Agreement; Mavericks Franchise Agreement.

78.     The Stars had full knowledge of the foregoing contracts and of the Mavericks' obligations thereunder because the Stars (1) signed the same agreements; (2) received the agreements as lessee and sub-lessee of the Arena; and (3) participated for more than two decades in the joint governance structure established by those contracts.

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                              **Page 23**

Copy from re:SearchTX

79. The Stars have willfully and intentionally undertaken a calculated course of conduct designed to impede, delay, and ultimately prevent the Mavericks from performing their contractual duties, thereby breaching the Stars' independent duty not to interfere with another's contracts. The Stars' actionable conduct includes, but is not limited to, the following:

80. ***Refusing to acknowledge the October 25, 2024 buyout:*** Section 4.8 of the COC Partnership Agreement specifically authorizes the Mavericks to redeem the Stars' partnership interest in COC Partnership upon the occurrence of a "Relocation Event" under the Stars' Franchise Agreement with the City. Section 4.5 of the Center GP Agreement authorizes the Mavericks to redeem the Stars' membership interest in Center GP under the same circumstances. By refusing to acknowledge the redemption of their interests in COC Partnership and Center GP, the Stars wrongfully interfered with the Mavericks' right—as the "Remaining Member" of Center GP and the "Remaining Partner" in COC Partnership—to unilaterally approve expenditures by COC Partnership.

81. ***Interfering with Expenditures Required by the Arena Agreements:*** Additionally, or alternatively, the Stars wrongfully interfered with the Mavericks' performance of their obligations under the Arena Agreements by vetoing certain expenditures required by the Arena Agreements. Section 3.1 of the Center GP Agreement provides that Center GP's purpose is to "take any and all actions that may be necessary or required" to perform its obligations, as General Partner, under the COC Partnership Agreement. Critically, Section 3.1(c) of the COC Partnership

Copy from re:SearchTX

Agreement states that one of the purposes of the Partnership is to "occupy, operate, manage, repair, maintain, and otherwise use" the Arena. Section 7.1(b) of the COC Partnership Agreement directs the General Partner (*i.e.*, Center GP) "to do all things reasonably deemed necessary or desirable by it" to fulfill that purpose, including, but not limited to, (1) "the making of any expenditures, … the borrowing of money, … and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership;" (2) the use of Partnership assets for Partnership purposes "on any terms it sees fit"; and (3) the determination of Arena employees' "compensation and other terms of employment or hiring." And Section 7.2(d) of the COC Partnership Agreement prohibits the General Partner (*i.e.*, Center GP) from "doing anything in contravention of" the COC Partnership Agreement's express purpose. Thus, as a member of Center GP and partner of COC Partnership, the Stars have wrongfully interfered with the Mavericks' ability to satisfy their obligations under the Arena Agreements by, among other things:

(i)   withholding consent to COC Partnership's July 18, 2025 request to distribute annual employee bonuses;

(ii)  withholding consent to multiple requests to fund regular maintenance and renovations to the Arena;

(iii) refusing to allow COC Partnership to use Partnership assets to fulfill COC Partnership's express purpose; and

(iv)  otherwise interfering with the Mavericks' obligation to fulfill the purposes of the Arena Agreements.

82.   The Stars' interference was neither justified nor excused. The Stars acted solely to retaliate for the Mavericks' lawful exercise of their buy-out right under Section 4.8 of the COC Partnership Agreement and Section 4.5 of the Center

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                      **Page 25**

Copy from re:SearchTX

GP Agreement and to extort an illegitimate restoration of the Stars' interests in COC Partnership and Center GP.

83.    The Stars' wrongful interference has proximately caused, and continues to cause, substantial damages in an amount to be proven at trial.

## IX.    REQUEST FOR TEMPORARY INJUNCTIVE RELIEF

84.    The Mavericks request that the Court issue a Temporary Injunction Order against the Stars to prevent imminent and irreparable harm to the Mavericks. In support of this Application for Temporary Injunction, the Mavericks respectfully show the Courts as follows:

## APPLICATION FOR TEMPORARY INJUNCTION

85.    The Mavericks incorporate by reference and re-allege each allegation contained in the above-numbered paragraphs. The Declaration of Patrick Dumont in support of this Application for temporary injunctive relief is attached hereto as Exhibit A and is also incorporated by reference.

86.    Temporary injunctive relief is authorized under Texas Civil Practices & Remedies Code § 65.011. The Mavericks are ready and willing to post bond in support of this Application for Temporary Injunction. *See* TEX. R. CIV. P. 684.

87.    As set forth above, the Stars have engaged in a pattern of conduct designed to interfere with the Mavericks' ability to operate, maintain, and manage the Arena in accordance with their contractual obligations and rights as the sole member of Center GP and sole partner of COC Partnership.

88.    Additionally or alternatively, the Stars have engaged in a pattern of conduct designed to interfere with the Mavericks' ability to operate, maintain, and

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                    **Page 26**

Copy from re:SearchTX

manage the Arena in accordance with their contractual obligations and rights under the Arena Agreements. *See generally* COC Partnership Agreement; Center GP Agreement.

89.    Unless the Stars are enjoined and restrained, they will continue to wrongfully interfere with the Mavericks' valid contracts by, among other things, refusing to acknowledge the Mavericks as the sole owners and/or refusing to approve COC Partnership's expenditures for routine maintenance and employee bonuses.

90.    The Stars' conduct demonstrates their awareness of both parties' rights and obligations under the Arena Agreements as well as their willful interference with the Mavericks' performance under the Arena Agreements.

91.    The Stars' conduct has caused and will continue to cause irreparable harm to the Mavericks, including but not limited to: disruption of Arena operations, deterioration of the Arena, loss of key employees, inability to make necessary expenditures for maintenance and employee compensation, including the Arena employee bonuses requested on July 18, 2025, and exposure to liability for breach of contractual and other legal obligations.

92.    If this Application is not granted and the Stars are not immediately enjoined, the Mavericks will continue to suffer the effects of the Stars' wrongful interference with the Mavericks' performance of their obligations under the Arena Agreements and refusal to recognize the Mavericks as the sole member of Center GP and sole partner of COC Partnership for an undeterminable amount of time and extent, making the calculation of money damages difficult or impossible to ascertain.

**ORIGINAL PETITION AND**
**APPLICATION FOR INJUNCTIVE RELIEF**                                        **Page 27**

Copy from re:SearchTX

Thus, there is no adequate remedy at law for the probable, imminent, ongoing, and future irreparable harm caused by the Stars' interference, and injunctive relief is necessary to prevent further damage to the Mavericks and the Arena.

93.     The Mavericks request that the Court issue a Temporary Injunction Order immediately enjoining the Stars from the acts described above to protect the Mavericks from the irreparable harm described above and maintain the status quo. Specifically, the Mavericks request that the Court issue a Temporary Injunction Order preventing the Stars from taking the following actions:

i)   Objecting to, interfering with, or acting to prevent, the payment of bonuses earned by COC Partnership employees as requested by COC Partnership on July 18, 2025;

ii)  Objecting to, interfering with, or acting to prevent, any reasonable expenditure within COC Partnership and Center GP's ordinary course discretion for the maintenance or operation of the Arena;

iii) Objecting to, interfering with, or acting to prevent with the Mavericks' sole ownership discretion and authority under the Arena Agreements, including but not limited to the right to direct, approve, and fund Arena operations, improvements, and expenditures; and

iv)  Interfering with or preventing the Mavericks from performing their obligations and exercising their rights under the Arena Agreements.

### REQUEST FOR TEMPORARY INJUNCTION HEARING

94.     The Mavericks request that the Court set their Application for Temporary Injunction for a hearing within fourteen (14) days after the filing of this Petition and, after a hearing, issue a temporary injunction against the Stars pending final resolution at a trial on the merits of this action.

**ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF**                                    **Page 28**

Copy from re:SearchTX

## X.    REQUEST FOR PERMANENT INJUNCTION

95.    The Mavericks incorporate by reference and re-allege each allegation contained in the above-numbered paragraphs.

96.    In addition to the temporary relief requested herein, the Mavericks request that, upon final trial and adjudication, the Court enter a Permanent Injunction permanently enjoining the Stars, and anyone acting in concert with them, from interfering with the Mavericks' sole ownership discretion and authority under the Arena Agreements, including but not limited to the right to direct, approve, and fund Arena operations, improvements, and expenditures.

## XI.    CONDITIONS PRECEDENT

97.    The Mavericks complied with all of their duties under the various agreements detailed in the above-numbered paragraphs.

98.    All conditions precedent to the Mavericks bringing this action and requesting the relief sought herein have been performed, have occurred, or have been waived.

## XII.    REQUEST FOR ATTORNEYS' FEES

99.    The Mavericks have retained the undersigned attorneys to represent them in this action and have agreed to pay them reasonable and necessary compensation for their service in this action. The Mavericks are therefore entitled to recover their reasonable and necessary attorneys' fees under the Texas Uniform Declaratory Judgments Act and any other applicable law. *See* TEX. CIV. PRAC. & REM. CODE § 37.009.

Copy from re:SearchTX

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Dallas Sports Group, LLC and Radical Arena, Ltd. respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant DSE Hockey Club, L.P. and further award Plaintiffs the following relief:

1. Injunctive relief as requested above, first in the manner of a temporary injunction, and to the extent necessary and appropriate, as a permanent injunction;

2. Judgment against DSE Hockey Club, L.P. for actual and consequential compensatory damages, including lost profits, lost sales, loss of good will and employees, and loss of business opportunities;

3. Costs and attorneys' fees;

4. Prejudgment and post-judgment interest at the highest rate permitted by applicable law; and

5. Such other and further relief to which the law and equity may deem Plaintiffs justly entitled.

Copy from re:SearchTX

Dated: October 28, 2025.

Respectfully submitted,

By: */s/ Charles L. Babcock*
    Charles L. Babcock
    State Bar No. 01479500
    cbabcock@jw.com
    Christopher R. Bankler
    State Bar No. 24066754
    cbankler@jw.com
    Sarah J. Starr
    State Bar No. 24132203
    sstarr@jw.com

**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000
(214) 661-6853 – Fax

**ATTORNEYS FOR PLAINTIFFS
DALLAS SPORTS GROUP, LLC AND
RADICAL ARENA, LTD.**

Copy from re:SearchTX

EXHIBIT

1
___

## IN THE TEXAS BUSINESS COURTS
## FIRST BUSINESS COURT DIVISION

| | | |
|---|---|---|
| **DALLAS SPORTS GROUP, LLC AND RADICAL ARENA, LTD.** | § | |
| **Plaintiffs,** | § | Cause No. _____ |
| **vs.** | § | |
| **DSE HOCKEY CLUB, L.P.** | § | |
| **Defendant.** | § | |

## DECLARATION OF PATRICK DUMONT

1.      My name is Patrick Dumont. My business address is 1333 N. Stemmons Fwy, #105, Dallas, Texas, 75207. I am over twenty-one years of age, of sound mind, and capable of making this declaration.

2.      I serve as Governor of the Dallas Mavericks and as an authorized representative of Dallas Sports Group, LLC and Radical Arena, Ltd. (together, the "Mavericks" or "DSRA"). In that capacity, I am familiar with the ownership and operation of Center Operating Company, L.P. ("COC") and Center GP, LLC ("Center GP"), the American Airlines Center ("Arena") operations and renovation planning, the Mavericks' negotiations and interactions with DSE Hockey Club, L.P. (the "Stars"), and the contracts governing the Arena.

3.      This declaration is submitted in support of Plaintiffs' Original Petition and Application for Temporary Injunction (the "Petition") filed against the Stars.

4.      In early 2024, consistent with the Mavericks' longstanding commitment to maintain the Arena as a first-class venue for the people of Dallas and our fans, I, along with Mavericks leadership, initiated a comprehensive effort to plan and fund significant renovations and critical infrastructure upgrades at the Arena. This planning specifically contemplated addressing end-of-life mechanical and building systems essential to safe, reliable operations and baseline maintenance required to preserve the Arena as a world-class facility. The focus was simple: do right by the City of Dallas, protect a vital civic asset, and enhance the fan experience for the hundreds of thousands of people who spend their time and money at the Arena.

5.      While we worked through options with the City, the Mavericks and the Stars began working with a team of architects, designers, and other experts to develop a renovation plan for the Arena. After five months of meetings, we had

DECLARATION OF PATRICK DUMONT                                                    Page 1

developed plans for improvements to public concourses at all levels of the Arena, food and beverage facilities, and suites; a complete renovation to create a new Stars' locker room; significant event-level changes designed to improve event- and game-day operations; and the addition of more event-level fan areas for both the Mavericks and the Stars. By September 2024, the architects had circulated multiple iterations of detailed plans to both teams' leadership. The Mavericks also engaged with the City of Dallas—the Arena's owner—on a comprehensive public-private renovation framework.

6.      By early October 2024, we understood that the renovation framework was materially agreed. The City was prepared to support a plan under which the Mavericks would shoulder significant capital commitments to ensure the Arena's long-term competitiveness. The Mavericks were prepared to invest to keep the Arena competitive and to benefit both teams' fans and the broader Dallas community.

7.      Despite months of progress and the City's active support, on or about October 16, 2024, Stars CEO and President Brad Alberts abruptly communicated to me by text message that the Stars would not proceed with the renovation deal. This reversal was both surprising and disappointing given the deal's mutual benefits and the extensive work of both organizations and the City.

8.      After the Stars backed out, the comprehensive renovation plan stalled. This meant that critical maintenance and the replacement of end-of-life building and mechanical systems were halted and would be far more costly to remedy later if they were to fail. The necessary improvements—to maintain the Arena's standing as a top-tier venue for Dallas and for fans of both teams—were left without a path forward.

9.      At the same time, the Stars had moved their headquarters and practice facilities to Frisco, Texas. After the Stars declined to move their executive offices back to Dallas during the renovation negotiations, the Mavericks exercised their contractual right, on October 25, 2024, to cause COC and Center GP to purchase and redeem the Stars' interests pursuant to Section 4.8 of the COC Partnership Agreement and Section 4.5 of the Center GP Agreement. From that date forward, the Mavericks became the sole owner of COC and Center GP.

10.      On November 1, 2024, the Stars, through counsel, sent a letter denying the validity of the redemption. Nearly a year later, I received a letter from the City, dated October 3, 2025, declaring that the Stars are in breach of the Franchise Agreement by reason of the Stars moving their executive offices out of Dallas.

11.      Since the October 25, 2024 redemption, the Stars have refused to acknowledge the Mavericks' sole ownership of COC and Center GP and have engaged in a sustained course of obstruction aimed at halting maintenance and improvements and sowing uncertainty within COC's management.

DECLARATION OF PATRICK DUMONT                                          Page 2

12.     Due to the Stars' conduct, COC hesitated to undertake even routine capital expenditures and disclosed uncertainty regarding ownership in its year-end financial audit review. The effect has been paralysis on necessary improvements and maintenance, to the detriment of Arena operations, the fan experience, and the City of Dallas.

13.     COC's CEO, Craig Courson, requested approval from both teams on July 18, 2025 to pay routine annual bonuses to key Arena employees—a longstanding practice vital to the preservation of employee morale and retention, especially during heightened uncertainty.  The bonuses, based on Arena financial performance, had already been earned by COC's employees. On behalf of the Mavericks, I promptly approved this request.

14.     I understand that the Stars have refused to approve employee bonuses that had already been earned.

15.     To prevent the loss of key employees and keep operations stable for fans and events, on September 18, 2025, the Mavericks offered to fund the $512,000 in bonuses unilaterally. COC declined, noting the Stars' objection. This obstruction has directly harmed the Arena's workforce—people who make events safe, enjoyable, and memorable for the public—and risks degradation in service, safety, and event quality.

16.     The Stars have attempted to continue exercising board rights and to impede COC's operations by asserting board authority they no longer possess. This includes insisting that COC maintain a practice of dual-approval and threatening to withhold approvals altogether, creating operational gridlock. This conduct will cause irreparable harm to Arena operations, slow or prevent necessary maintenance and improvement spending, drive away valued Arena personnel, and undermine the City's and the public's interest in a high-functioning, world-class venue.

17.     The Arena is a City asset and a point of civic pride. The Mavericks' renovation initiative and our efforts to protect COC's workforce have been guided by the principle that Dallas and the fans come first. The Stars' conduct has thwarted timely improvements and routine operational decisions, delayed or prevented investment that preserves the Arena's competitiveness, and risked losing experienced staff.  The inability to proceed with maintenance and to replace end-of-life systems threatens core Arena operations and, if not addressed promptly, will result in irreparable harm and potential service disruptions.

18.     In my capacity as Governor of the Mavericks and a custodian of records for DSRA with respect to the Arena-related entities, I have reviewed each of the following documents, which are created and maintained in the regular course of business activity.  These records were made at or near the time of the act, event, condition or opinion recorded, or reasonably soon thereafter. Attached as exhibits are true and correct copies of the following documents:

DECLARATION OF PATRICK DUMONT                                         Page 3

19.     **Exhibit A** is a true and correct copy of the Center Operating Company, L.P. Limited Partnership Agreement dated September 30, 1999.

20.     **Exhibit B** is a true and correct copy of the Center GP, LLC Limited Liability Company Agreement dated September 30, 1999.

21.     **Exhibit C** is a true and correct copy of the Dallas Mavericks Franchise Agreement with the City of Dallas dated September 30, 1999.

22.     **Exhibit D** is the Dallas Stars Franchise Agreement with the City of Dallas dated September 30, 1999, as it was provided to the Dallas Mavericks.

23.     **Exhibit E** is the Mavericks' October 25, 2024 letter exercising the contractual right to cause COC and Center GP to purchase and redeem the Stars' partnership and membership interests.

24.     **Exhibit F** is the Stars' response letter dated November 1, 2024, disputing the redemption.

25.     **Exhibit G** is the City of Dallas's letter dated October 3, 2025, determining that the Stars are not in compliance with Section 2.1 of the Stars Franchise Agreement, providing notice of default, and addressing certain of the Stars' requests to the City.

26.     I declare under penalty of perjury that each of the foregoing statements is true and correct.


Executed in Dallas County, Texas, on October 27, 2025.



/s/
Patrick Dumont

DECLARATION OF PATRICK DUMONT                                          Page 4

Copy from re:SearchTX

EXHIBIT

**1-A**

# AGREEMENT OF LIMITED PARTNERSHIP

# OF

# CENTER OPERATING COMPANY, L.P.

Copy from re:SearchTX

# AGREEMENT OF LIMITED PARTNERSHIP
## OF
## CENTER OPERATING COMPANY, L.P.

## TABLE OF CONTENTS

**Page**

ARTICLE I - ORGANIZATIONAL MATTERS..................................................................1

1.1     Formation ...............................................................................................................1
1.2     Name........................................................................................................................1
1.3     Offices and Addresses of Partners .........................................................................2
1.4     Term.........................................................................................................................2
1.5     Assumed Name Certificate .....................................................................................2
1.6     Ownership................................................................................................................2
1.7     No Individual Authority..........................................................................................2
1.8     Title to Partnership Property ..................................................................................2
1.9     Limits of Partnership...............................................................................................3

ARTICLE II – DEFINITIONS ..........................................................................................3

ARTICLE III – PURPOSE ...............................................................................................20

3.1     Purposes and Scope...............................................................................................20

ARTICLE IV - CAPITAL CONTRIBUTIONS ...............................................................20

4.1     Initial Capital Contributions of Partners ..............................................................20
4.2     Initial Equity Requirement Under the Note Purchase Agreement.......................22
4.3     Additional Capital Contributions..........................................................................23
4.4     Special Provisions Relating to Additional Capital Contributions .......................24
4.5     Default by a Limited Partner in Making Interim Contributions ..........................32
4.6     Default by Partner in Making Other Additional Capital Contributions...............34
4.7     Trigger Event Defaults..........................................................................................37
4.8     Relocation Events ..................................................................................................41
4.9     Capital Accounts....................................................................................................41
4.10    Interest....................................................................................................................44
4.11    No Withdrawal.......................................................................................................44
4.12    Limitation on Capital Contributions and Loans...................................................44

ARTICLE V – ALLOCATIONS.......................................................................................45

5.1     Allocation of Profits and Losses ..........................................................................45
5.2     Special Allocations ...............................................................................................48
5.3     Curative Allocations..............................................................................................49

i

Copy from re:SearchTX

5.4    Tax Allocations: Code Section 704(c) ...................................................................50
5.5    Other Allocation Rules ...............................................................................................50

ARTICLE VI – DISTRIBUTIONS ........................................................................................51

6.1    Distributions of Available Loan Proceeds .............................................................51
6.2    Payments and Distributions of Available Cash .....................................................51
6.3    Special Payments of Other Charges on Interim Loan Promissory Notes .........53
6.4    Amounts Withheld ......................................................................................................53
6.5    Excess Distributions ...................................................................................................53

ARTICLE VII - MANAGEMENT OF THE PARTNERSHIP ..........................................54

7.1    Rights and Obligations of General Partner ...........................................................54
7.2    Restrictions ..................................................................................................................55
7.3    Certificate of Limited Partnership ..........................................................................55
7.4    Reliance by Third Parties ..........................................................................................56
7.5    Compensation and Reimbursement of Partners ....................................................56
7.6    Outside Activities .......................................................................................................57
7.7    Partnership Funds .......................................................................................................57
7.8    Duties ............................................................................................................................57
7.9    Transactions with Affiliates ......................................................................................57
7.10   Indemnification of Partners ......................................................................................58
7.11   Liability of Partners ...................................................................................................60
7.12   Insurance ......................................................................................................................60

ARTICLE VIII - BOOKS, RECORDS, ACCOUNTING AND REPORTS .....................61

8.1    Records and Accounting .............................................................................................61
8.2    Fiscal Year ...................................................................................................................61
8.3    Reports ..........................................................................................................................61
8.4    Documents ....................................................................................................................62

ARTICLE IX - TAX MATTERS ..........................................................................................62

9.1    Tax Matters Partner ....................................................................................................62
9.2    Annual Tax Returns ....................................................................................................62
9.3    Notice and Limitations on Authority .......................................................................62
9.4    Tax Elections ...............................................................................................................63
9.5    Organizational Expenses ...........................................................................................63
9.6    Taxation as a Partnership ..........................................................................................63

ARTICLE X -TRANSFERS OF PARTNERSHIP INTERESTS .....................................63

10.1   Transfer Rights ............................................................................................................63

ii

10.2   Admission as a Partner.................................................................................64
10.3   Distributions and Allocations ........................................................................65

ARTICLE X1 - DISSOLUTION AND LIQUIDATION ...........................................65

11.1   Dissolution.....................................................................................................65
11.2   Continuation of the Partnership ....................................................................66
11.3   Liquidation.....................................................................................................66
11.4   Reserves .........................................................................................................67
11.5   Distribution in Kind .......................................................................................67
11.6   Disposition of Documents and Records.........................................................67
11.7   Negative Capital Accounts.............................................................................67
11.8   Cancellation of Certificate .............................................................................67
11.9   Return of Capital............................................................................................68
11.10  Waiver of Partition.........................................................................................68

ARTICLE XII – AMENDMENT OF AGREEMENT ..............................................68

12.1   Amendment Procedures..................................................................................68

ARTICLE XIII – GENERAL PROVISIONS.............................................................69

13.1   Addresses and Notices...................................................................................69
13.2   Titles and Captions ........................................................................................69
13.3   Pronouns and Plurals......................................................................................69
13.4   Further Action ................................................................................................70
13.5   Binding............................................................................................................70
13.6   Integration ......................................................................................................70
13.7   No Third Party Beneficiary............................................................................70
13.8   Waiver.............................................................................................................70
13.9   Counterparts....................................................................................................70
13.10  Applicable Law ..............................................................................................70
13.11  Invalidity of Provisions..................................................................................70
13.12  Attorneys Fees ...............................................................................................71
13.13  Computation of Time Periods ........................................................................71
13.14  Construction....................................................................................................71
13.15  Time ................................................................................................................71
13.16  Incorporation by Reference............................................................................71
13.17  Representations and Warranties of Limited Partners.....................................71
13.18  Representations and Warranties of the General Partner .................................73
13.19  Confidentiality................................................................................................73
13.20  Legal Counsel Relationships..........................................................................74
13.21  Special Purpose Entity Requirements ............................................................74

Copy from re:SearchTX

**EXHIBIT**

| | |
|---|---|
| A | List of Partners, Addresses, and Notice Parties |
| B | Procedure for Making Team Payments |
| C | List of Excluded Assets and Liabilities |
| D | Form of Interim Loan Promissory Note |
| E | Schedule of Partners' Undistributed First, Second, Third, Fourth and Fifth Priority Capital Accounts on the Effective Date |
| F | Form of Assignments |
| G | Form of ADS Note |

Copy from re:SearchTX

THE SECURITIES CREATED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.   EXCEPT FOR ANY PLEDGES REQUIRED IN CONNECTION WITH THE TRANSACTION DOCUMENTS, THESE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, WITHOUT REGISTRATION, EXCEPT ON DELIVERY TO THE PARTNERSHIP OF AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERS OF THE PARTNERSHIP THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR THE SUBMISSION TO THE PARTNERS OF THE PARTNERSHIP OF OTHER EVIDENCE SATISFACTORY TO THE PARTNERS TO THE EFFECT THAT A TRANSFER WILL NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATIONS PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE SECURITIES IS SUBJECT TO CERTAIN LIMITED RESTRICTIONS CONTAINED IN THE AGREEMENT OF LIMITED PARTNERSHIP OF THE PARTNERSHIP.

## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## CENTER OPERATING COMPANY, L.P.

This AGREEMENT OF LIMITED PARTNERSHIP OF CENTER OPERATING COMPANY, L.P. (this "Agreement") is entered into as of 11:59 p.m. on the 30th day of September, 1999 (the "Effective Date"), by and among Center GP, LLC, a Texas limited liability company ("Center GP"), as general partner, and Hillwood Arena Partners, Inc., a Texas corporation (together with its successors and assigns, "HAP"), DBL Arena Partners, Inc., a Texas corporation (together with its successors and assigns, "DAP"), Corporate Arena Associates, Inc., a Texas corporation (together with its successors and assigns, "CAA"), and Arena/Dallas Stars, Inc., a Delaware corporation (together with its successors and assigns, "ADS"), as limited partners, together with any Person who becomes a Partner as provided herein.

Certain terms used in this Agreement are defined in Article II.

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1   Formation.  Subject to the provisions of this Agreement, the Partners hereby form the Partnership as a limited partnership pursuant to the provisions of the Texas Act. The Partners hereby enter into this Agreement in order to set forth the rights and obligations of the Partners and certain related matters.  Except as expressly provided and permitted herein to the contrary, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Texas Act.

1.2   Name.  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of, Center Operating Company, L.P.  The Partnership's

1

Copy from re:SearchTX

business may be conducted under any other name or names approved by the General Partner; provided however, the name of the Partnership shall not include the name of a Partner (other than the General Partner) or the name of such Partner's principal beneficial owner unless such Partner consents to the use of such name.

 1.3  Offices and Addresses of Partners.

   (a)  The registered office of the Partnership in the State of Texas shall be at 1845 Woodall Rogers, #1700, Dallas, Texas 75201, and the registered agent for service of process on the Partnership at such registered office shall be Brad Mayne.

   (b)  The initial principal office of the Partnership shall be at 1845 Woodall Rogers, #1700, Dallas, Texas 75201. The principal office of the Partnership may be changed to another location in the Dallas-Fort Worth metropolitan area as may be approved by the General Partner.

   (c)  The addresses of the Partners as of the Effective Date are set forth on Exhibit A. The address of a Partner may be changed in accordance with the requirements set forth in Section 13.1(b).

 1.4  Term. The Partnership shall commence on the Effective Date and shall continue in existence until the first to occur of the following:

   (a)  December 31, 2099; or

   (b)  The dissolution of the Partnership pursuant to the express provisions of Article XI hereof (other than a dissolution that is followed by the reconstitution of the Partnership pursuant to Section 11.2).

 1.5  Assumed Name Certificate. The Partners shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Partnership.

 1.6  Ownership. The interest of each Partner in the Partnership shall be personal property for all purposes. All property and interests in property, real or personal, owned by the Partnership shall be deemed owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property or interest except by having an ownership interest in the Partnership as a Partner.

 1.7  No Individual Authority. No Partner, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty, or responsibility on behalf of any other Partner or the Partnership except as otherwise expressly provided in this Agreement.

 1.8  Title to Partnership Property. It is the desire and intention of the Partners that legal title to all property of the Partnership shall be held and conveyed in the name of the Partnership.

Copy from re:SearchTX

1.9   <u>Limits of Partnership</u>. The relationship between the parties hereto shall be limited to the carrying on of the business of the Partnership in accordance with the terms of this Agreement. Such relationship shall be construed and deemed to be a limited partnership for the sole and limited purpose of carrying on such business. Except as otherwise provided for or contemplated in this Agreement, nothing herein shall be construed to create a general partnership or any other relationship between the Partners or to authorize any Partner to act as an agent for any other Partner.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"<u>Adjusted Capital Account</u>" means, with respect to any Partner, a special account maintained for such Partner, the balance of which shall equal such Partner's Capital Account balance, increased by the amount (if any) of such Partner's share of the Partnership Minimum Gain and Partner Minimum Gain.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)   Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations section 1.704-1(b)(2)(iv)(c), the penultimate sentence of Regulations section 1.704-2(g)(1), or the penultimate sentence of Regulations section 1.704-2(i)(5);

(b)   Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"<u>ADS</u>" means Arena/Dallas Stars, Inc., a Delaware corporation, together with its successors and assigns.

"<u>Affiliate</u>" means, with respect to a particular Person, any Person who, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the Person in question.

"<u>ADS Loans</u>" means those certain revolving interest-bearing loans made by ADS to the Partnership pursuant to <u>Section 4.1</u>, <u>Section 4.3</u> and <u>Section 4.5</u> in an amount not to exceed

3

$30,000,000 (or, in the event the Stars Credit Facility is amended to so provide, $35 million) at any one time outstanding.

"ADS Note" means a promissory note executed and delivered by the Partnership to ADS with respect to the ADS Loans in the form of Exhibit G hereunder.

"ADS Transfer" means the consummation of a series of transactions after which Dallas Arena LLC, a Texas limited liability company, will own all of the assets and assume all of the liabilities of ADS.

"Agreement" means this Agreement of Limited Partnership of Center Operating Company, L.P., as it may be amended, restated, modified, or supplemented from time to time.

"Amended Parking Rights Agreement" means that certain Amended and Restated Parking Rights Agreement that is expected to be executed and delivered by certain Parking Tract Owners and the Arena Partnership on or prior to the Initial Funding Date (but has not been completed as of the Effective Date).

"Annex I" means Annex I to the Note Purchase Agreement.

"AOC" means Arena Operating Company, Inc., a Texas corporation.

"Arena" means that certain 18,000 - 21,000 seat multi-purpose indoor entertainment and sports arena, the Parking Facilities, and related entertainment, retail sales, office and other facilities (including related infrastructure) located on the Arena Site, all as more fully described in the Master Agreement, to serve as the home arena for the National Hockey League franchise currently known as the Dallas Stars and the National Basketball Association franchise currently known as the Dallas Mavericks.

"Arena Loan" means that certain loan to be advanced from the Purchasers to the Partnership from time to time in the maximum principal amount of $210 million, which loan is evidenced by the Arena Loan Documents.

"Arena Loan Documents" means: (a) the Note Purchase Agreement; (b) the Security Agreement; (c) the Disbursement Agreement; (d) the Team Agreements; (e) the Reimbursement Agreement; (f) the Non-Relocation Agreements; and (g) all Notes and other documents, instruments, financing statements, security agreements, and/or other agreements related to the Arena Loan in each case, as the same may be amended, restated, modified, or supplemented from time to time.

"Arena Project" means: (a) the development, construction, and financing of the Arena, the Arena Site, the 3,000 parking spaces located on the Parking Tracts, and the Arena-Related Improvements pursuant to the Transaction Documents; (b) the Operation of the Arena, the Arena Site, and the 3,000 parking spaces located on the Parking Tracts; and (c) the occupancy, operation, repair, maintenance, and use of Reunion Arena. The Arena Project, however, does not include the Excluded Assets and Liabilities.

4

Copy from re:SearchTX

"Arena-Related Improvements" means collectively, the Roadway Improvements (as defined in Annex I), the improvements to the Parking Tracts and any landscaping, lighting, drainage, and similar site improvements necessary to make available and operate 3,000 parking spaces on the Parking Tracts pursuant to the Definitive Parking Rights Agreement.

"Arena Site" means the site owned by the City on which the Arena and the Parking Facilities will be located (but excluding any land on which the Parking Tracts are located).

"Assignments" means the City Assignment and the Main Assignment.

"Available Cash" of the Partnership as of any date means all cash funds of the Partnership on hand as of such date from all sources, reduced by: (a) all Partnership Costs and Expenses that are due and payable as of such date and/or that are expected to become due and payable in the next 60 days; (b) Available Loan Proceeds; provided, however, if: (i) the Switch Date has occurred; (ii) a Trigger Event Default has occurred; or (iii) a Relocation Event has occurred, then from and after such date, the amount of Available Loan Proceeds shall not reduce the amount of Available Cash; (c) the amount of cash reserves on hand from Arena Loan proceeds or Capital Contributions: (i) that will be used to pay Partnership Costs and Expenses that are expected to become due and payable after 60 days; and (ii) for which another source of payment is not expected to be available; and (d) provision for adequate reserves (working capital and/or capital), with the amount of such reserves to be determined by the General Partner.

"Available Loan Proceeds" means the amount of Arena Loan proceeds that are available under the Arena Loan Documents to reimburse the Interim Contributions of the Partners (and in certain cases, to return other amounts to such Partners) in accordance with the Arena Loan Documents (i.e., the proceeds that are available after the application of: (a) the Arena Loan proceeds through the distribution "waterfall" described in section 5.1 of the Security Agreement; and (b) the disbursement procedures described in article 4 of the Disbursement Agreement).

"Back-End Percentage Interest" means the percentage interest of a Partner in certain allocations of Profits, Losses and other items of income, gain, loss or deduction and in certain distributions of cash and/or property. The initial Back-End Percentage Interest of each Partner is set forth below:

| Partner | Back-End Percentage Interest |
|---|---|
| Center GP | .100% |
| HAP | 33.466% |
| DAP | 10.300% |
| CAA | 6.184% |
| ADS | 49.950% |
| | 100.000% |

5

Copy from re:SearchTX

The Back-End Percentage Interest of a Partner may be adjusted pursuant to Section 4.5 or Section 4.6 hereof or as a result of a Transfer pursuant to Section 10.1. After such adjustment, the Back-End Percentage Interest of such Partner, as adjusted, shall constitute such Partner's Back-End Percentage Interest for all purposes under this Agreement.

"BOA" has the meaning set forth in Section 4.1(d)(ii).

"Board" has the meaning set forth in the GP LLC Agreement.

"Book Depreciation" has the meaning set forth in Section 4.9(b)(v).

"Book Value" has the meaning set forth in Section 4.9(c).

"Business Day" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States shall not be regarded as a Business Day.

"CAA" means Corporate Arena Associates, Inc., a Texas corporation, together with its successors and assigns.

"Capital Account" means the capital account maintained for a Partner pursuant to Section 4.9.

"Capital Contribution" means, with respect to any Partner, the amount of money and the initial Book Value of any property (other than money) contributed to the Partnership with respect to the interest in the Partnership held by such Partner, reduced by the amount of any liabilities of the Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership. For purposes of this Agreement, and notwithstanding anything to the contrary in the preceding sentence, Interim Contributions shall be considered Capital Contributions.

"Cash/LC Requirement" has the meaning set forth in Section 4.4(f)(iii).

"Center GP" means Center GP, LLC, a Texas limited liability company, together with its permitted successors and assigns.

"Certificate" means the Certificate of Limited Partnership filed with the Secretary of State of Texas on or prior to the Effective Date, as it may be amended and/or restated from time to time.

"City" means the City of Dallas, a duly incorporated home rule city of the State of Texas.

"City Assignment" means that certain Assignment and Release Agreement (City Documents), dated as of the Effective Date, by and among ADS, HAP, DAP, and CAA, as tenants in common, as assignors, and the Partnership, as assignee, substantially in the form of

Copy from re:SearchTX

that certain Assignment and Release Agreement (City Documents) attached as <u>Exhibit F-1</u> to this Agreement.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"<u>Collateral Trustee</u>" means The Bank of New York, a New York banking corporation, or its successor, acting in its capacity as trustee under the Arena Loan Documents.

"<u>Contribution Date</u>" has the meaning set forth in <u>Section 4.3(b)(iii)</u>.

"<u>Contribution Notice</u>" has the meaning set forth in <u>Section 4.3(a)(iii)</u>.

"<u>Contribution Percentages</u>" means the percentage of additional Capital Contributions that each Limited Partner is required to make from time to time in accordance with this Agreement. The Contribution Percentage of each Limited Partner as of the Effective Date is set forth below:

| Partner | Back-End Percentage Interest |
|---|---|
| HAP | 33.50% |
| DAP | 10.31% |
| CAA | 6.19% |
| ADS | 50.00% |
| | 100.00% |

The Contribution Percentage of a Limited Partner will not change unless such Limited Partner Transfers all or any portion of its then existing Partnership Interest pursuant to <u>Section 10.1(b)</u>. In connection with any such Transfer, the Person that succeeds to the Transferred Partnership Interest shall also succeed to the Contribution Percentage (or the applicable portion thereof) of the Limited Partner that Transferred all or a portion of its Partnership Interest.

"<u>Control</u>" or any derivation thereof, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"<u>Dallas Stars</u>" means Dallas Stars, L.P., a Delaware limited partnership, and any successor-in-interest to Dallas Stars, L.P. as the owner of the National Hockey League franchise commonly known as the Dallas Stars.

"<u>DAP</u>" means DBL Arena Partners, Inc., a Texas corporation, together with its successors and assigns.

Copy from re:SearchTX

"DBL" means Dallas Basketball Limited, a Texas limited partnership, and any successor-in-interest to Dallas Basketball Limited as the owner of the National Basketball Association franchise commonly known as the Dallas Mavericks.

"Default" means an Interim Contribution Default or a Section 4.6 Default.

"Definitive Parking Rights Agreement" means collectively: (a) as applicable: (i) prior to the execution and delivery of the Amended Parking Rights Agreement, the Original Parking Rights Agreement; and (ii) after the execution and delivery of the Amended Parking Rights Agreement, the Amended Parking Rights Agreement (but not the Original Parking Rights Agreement); and (b) that certain Easement and Parking Rights Agreement to be executed on or before the Initial Funding Date, between the Parking Tract Owners and the Partnership, substantially in the form of Exhibit H-1 to the Note Purchase Agreement, with such changes as are approved by the Partnership and the Purchasers, as the same may be amended, restated, modified, or supplemented from time to time.

"Development Agreement" means that certain Amended and Restated Development Management Services Agreement, dated as of April 23, 1999, originally by and among the Original Issuers and HW/Services, as the same may be amended, restated, modified, or supplemented from time to time. The Development Agreement is one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the Main Assignment.

"Disbursement Agreement" means that certain Disbursement Agreement, dated as of April 23, 1999, by and among the Original Issuers, the Collateral Trustee, and The Bank of New York, also acting in its capacity as the disbursing agent, as such Disbursement Agreement may be amended, restated, modified, or supplemented from time to time. The Disbursement Agreement is a Project Agreement that will be assigned by the Original Issuers to the Partnership pursuant to the Main Assignment.

"Dissolution Event" has the meaning set forth in Section 11.1(b).

"Effective Date" means 11:59 p.m. on September 30, 1999.

"Equity Adjustment Date" shall be the earlier of: (A) the date on which the final payment of all Project Costs has been made; or (B) the date on which the Collateral Trustee has released and returned all Letters of Credit.

"Event of Bankruptcy" means, with respect to any Partner or the Partnership, any of the following acts or events:

      (a)    making an assignment for the benefit of creditors;

      (b)    filing a voluntary petition in bankruptcy;

      (c)    becoming the subject of an order for relief or being declared insolvent or bankrupt in any federal or state bankruptcy or insolvency proceeding;

Copy from re:SearchTX

(d)      filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

(e)      filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in a proceeding of the type described in parts (a) through (d) of this definition;

(f)      seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of all or any substantial part of its properties; or

(g)      the expiration of ninety (90) days after the date of the commencement of a proceeding against such Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation if the proceeding has not been previously dismissed, or the expiration of sixty (60) days after the date of the appointment, without such Partner's consent or acquiescence, of a trustee, receiver, or liquidator of such Partner or of all or any substantial part of such Partner's properties, if the appointment has not previously been vacated or stayed, or the expiration of sixty (60) days after the date of expiration of a stay, if the appointment has not been previously vacated.

"Excess Amount" has the meaning, with respect to any Partner, set forth in Section 5.1(a)(ix).

"Excluded Assets and Liabilities" means those assets and liabilities owned and/or owed by the Limited Partners on the Effective Date that will not be assigned and/or assumed by the Arena Partnership pursuant to the Assignments. All such Excluded Assets and Liabilities are described on Exhibit C attached to this Agreement.

"Financial Advisory Agreement" means that certain Financial Advisory Agreement, dated as of July 28, 1998, by and among the Original Issuers and Hicks, Muse & Co. Partners, L.P., a Texas limited partnership, as amended by that certain First Amendment to Financial Advisory Agreement, dated as of April 23, 1999, by and among the Original Issuers and Hicks, Muse & Co. Partners, L.P., as the same may be further amended, restated, modified, or supplemented from time to time. The Financial Advisory Agreement is one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the Main Assignment.

"Fiscal Year" means the 12 month period ending December 31 of each year; provided, however, that the initial Fiscal Year shall be the period beginning on the Effective Date and ending December 31, 1999, and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation and termination of the Partnership is completed and ending on the date such final liquidation and termination is completed (to the extent any computation or other provision hereof provides for an action to be taken on a Fiscal

9

Copy from re:SearchTX

Year basis, an appropriate proration or other adjustment shall be made in respect of the initial and final Fiscal Years to reflect that such periods are less than full calendar year periods).

"Fourth Priority Preference Amount" means, with respect to a Limited Partner, an aggregate amount computed like interest at a rate equal to fifteen percent (15%) per annum, compounded quarterly, on the outstanding balance from time to time during such period of a Limited Partner's Undistributed Fourth Priority Capital, reduced by the sum of: (a) distributions made to such Limited Partner pursuant to Section 6.2(b)(v); (b) that portion of any accrued but unpaid Fourth Priority Preference Amount of such Limited Partner that is converted on the Switch Date into accrued but unpaid Second Priority Preference Amount of such Limited Partner pursuant to Section 4.6(e); (c) if applicable, that portion of any distributions made to such Limited Partner, in its capacity as a Good Partner, pursuant to Section 4.7 that are properly allocable to a return of such Good Partner's accrued but unpaid Fourth Priority Preference Amount; and (d) if applicable, the amount of such Limited Partner's Fourth Priority Preference Amount that is eliminated and/or forfeited pursuant to Section 4.7 or Section 4.8, as applicable, as a result of such Limited Partner being a Trigger Event Partner or a Relocation Partner.

"Funding Deficit" has the meaning set forth in Annex I.

"GAAP" means generally accepted accounting principles as set forth from time to time in the opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements of the Financial Accounting Standards Board or in such opinions and statements of such other groups as shall be approved by a significant segment of the accounting profession.

"General Partner" means Center GP and/or any other Person who has been admitted as a General Partner in the Partnership and whose admission has been reflected on the books and records of the Partnership.

"Good Partners" has the meaning set forth in Section 4.7(a).

"GP LLC Agreement" means that certain Limited Liability Company Agreement of Center GP, LLC, by and among ADS, HAP, CAA, and DAP, dated as of the Effective Date, as the same may be amended, restated, modified, or supplemented from time to time.

"HAP" means Hillwood Arena Partners, Inc., a Texas corporation, together with its successors and assigns.

"HDC" means Hillwood Development Corporation, a Texas corporation.

"HW/Services" means Hillwood Services, L.P., a Texas limited partnership.

"Hillwood/1642" means Hillwood/ 1642, Ltd., a Texas limited partnership.

"Indemnitee" has the meaning set forth in Section 7.10.

10

007500.00176:463592.01J

Copy from re:SearchTX

"Indemnity Agreement" means that certain Indemnity Agreement, to be dated as of the Effective Date, by and among Dallas Arena LLC, as successor-in-interest to ADS, HAP, DAP, CAA, Dallas Stars, and DBL, as the same may be amended, restated, modified, or supplemented from time to time.

"Independent Accountants" means any national or regional accounting firm in the United States that has been approved by the General Partner.

"Initial Funding Date" has the meaning set forth in section 1.5(b) of the Note Purchase Agreement.

"Initial Payout" has the meaning set forth in Section 4.7(b)(ii)(A)(VIII).

"Initial Payout Amount" has the meaning set forth in Section 4.7(b)(ii)(A)(VIII).

"Interim Contribution Default" has the meaning set forth in Section 4.5(b).

"Interim Contribution Default Amount" has the meaning set forth in Section 4.5(b).

"Interim Contribution Default Date" has the meaning set forth in Section 4.5(b).

"Interim Contribution Default Notice" has the meaning set forth in Section 4.5(a).

"Interim Contribution Default Partner" has the meaning set forth in Section 4.5(b).

"Interim Contributions" means the Interim Loans and the Interim Equity Contributions.

"Interim Equity Contributions" means the capital contributions that are: (a) made by the Mavericks Arena Corporations to the Partnership pursuant to Section 4.1; and (b) made by a Partner to the Partnership pursuant to Section 4.3 and Section 4.5 that are classified as Interim Contributions on the applicable Contribution Notice in accordance with Section 4.3 and with respect to which the Limited Partner has elected pursuant to Section 4.4(a)(iii) (or is otherwise deemed to have made such an election) to treat the additional Capital Contribution as an Interim Equity Contribution.

"Interim Loan Promissory Note" means a promissory note executed and delivered by the Partnership to a Partner that has made an Interim Loan pursuant to this Agreement, which promissory note shall be in the form of the Interim Loan Promissory Note attached to this Agreement as Exhibit D, or with respect to the ADS Loans, in the form of the ADS Note.

"Interim Loans" means the ADS Loans and any other revolving, interest-bearing loans made by a Partner to the Partnership pursuant to Section 4.3 and Section 4.5 that are classified as Interim Contributions on the applicable Contribution Notice in accordance with Section 4.3 and with respect to which the Limited Partner has elected pursuant to Section 4.4(a)(iii) (or is otherwise deemed to have made such an election) to treat the additional Capital Contribution as an Interim Loan. Interim Loans shall be made pursuant to an Interim Loan Promissory Note.

11

007500.00176:463592.011

Copy from re:SearchTX

"Letters of Credit" means the Stars Letter of Credit and/or the Mavericks Letter of Credit, as the context may require, together with any other letters of credit that are delivered by a Partner or a Team pursuant to or under the Note Purchase Agreement, as the context may require.

"Limited Partner" means ADS, HAP, DAP, and/or CAA, as the context may require, together with any other Person who has been admitted as a limited partner in the Partnership in accordance with this Agreement and whose admission has been reflected on the books and records of the Partnership.

"Losses" has the meaning set forth in Section 4.9(b).

"Main Assignment" means that certain Assignment and Release Agreement, dated as of the Effective Date, by and among ADS, HAP, DAP, and CAA, as tenants in common, as assignors, and the Partnership, as assignee, substantially in the form of that certain Assignment and Release Agreement attached as Exhibit F-2 to this Agreement.

"Master Agreement" means that certain Master Agreement, dated as of December 10, 1997, by and among the City and the Original Issuers, as the same may be amended, restated, modified, or supplemented from time to time. The Master Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the City Assignment.

"Mavericks Arena Corporations" means HAP, DAP, and CAA.

"Mavericks Franchise Agreement" means that certain Mavericks Franchise Agreement, dated July 28, 1998, by and between the City and DBL.

"Mavericks Lease" means that certain Amended and Restated Arena Lease-Mavericks, to be executed on or about the Initial Funding Date but to be dated effective as of July 28, 1998, to be entered into by and among the Original Issuers and the Partnership, as lessor, and DBL, as lessee, as such lease may be amended, restated, modified, or supplemented from time to time. The Mavericks Lease amends and restates that certain Arena Lease – Mavericks, dated as of July 28, 1998, by and among the Original Issuers and DBL, which is one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the City Assignment.

"Mavericks Letter of Credit" means that certain irrevocable direct pay letter of credit in the undrawn face amount of $20,700,000 that may be delivered by the Mavericks Arena Corporations (or by an Affiliate of the Mavericks Arena Corporations) to the Collateral Trustee pursuant to the Note Purchase Agreement, as the same may be amended, renewed, replaced, supplemented, restated, or otherwise modified in accordance with the Note Purchase Agreement.

"Mavericks Non-Relocation Agreement" means that certain Mavericks Non-Relocation Agreement, dated as of April 23, 1999, between DBL and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

12

Copy from re:SearchTX

"Mavericks Team Agreement" means that certain Mavericks Team Agreement, dated as of April 23, 1999, by and between DBL and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

"Naming Rights Agreement" means that certain Letter Agreement, dated as of March 18, 1999, by and among the Original Issuers, Dallas Stars, DBL, and American Airlines, Inc., and any definitive agreement subsequently entered into with respect thereto, as the same may be amended, restated, modified, or supplemented from time to time. The Naming Rights Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the Main Assignment.

"Net Equity Value" means, at a particular time, an amount equal to the sum of: (a) the Undistributed First Priority Capital of all of the Partners; (b) the Undistributed Second Priority Capital of all of the Partners; (c) the Undistributed Third Priority Capital of all of the Partners; (d) the Undistributed Fourth Priority Capital of all of the Partners; and (e) the Undistributed Fifth Priority Capital of all of the Partners.

"Non-Defaulting Partners" has the meaning set forth in Section 4.5(b).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Note Purchase Agreement" means that certain Note Purchase Agreement, dated as of April 23, 1999, originally by and among the Original Issuers and the Purchasers, as such Note Purchase Agreement may be amended, restated, modified, or supplemented from time to time. The Note Purchase Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the Main Assignment.

"Notes" has the meaning set forth in Annex I.

"Opening Date" means the first date on which the Arena opens to the public for the purpose of exhibiting a game played by either of the Teams or a non-Team event for which admission is charged.

"Operation" or any derivation thereof, as the context may require, means the ownership, occupation, repair, operation, maintenance, use, and financing of the Arena and related facilities.

"Opinion of Counsel" means a written opinion of counsel (who may be regular counsel to the Partnership or a Partner) approved by the General Partner.

"Original Issuers" means ADS, HAP, DAP, and CAA.

"Original Parking Rights Agreement" means that certain Parking Rights Agreement, dated as of July 28, 1998, among the Original Issuers and HDC, as amended by that certain First Amendment to Parking Rights Agreement, dated as of November 30, 1998, by and among the

13

Copy from re:SearchTX

Original Issuers and HDC, as further amended by that certain Second Amendment to Parking Rights Agreement, dated as of January 29, 1999, by and among the Original Issuers and HDC,

"Other Charges" has the meaning set forth in Section 4.4(a)(iv).

"Parking Facilities" means the structured parking facilities to be constructed on the Arena Site.

"Parking Tracts" means, as of a particular date, the tracts of real property owned by the Parking Tract Owners on which the Partnership holds an easement estate pursuant to the Definitive Parking Rights Agreement.

"Parking Tract Owners" means Anland 1A/IC, L.P., Anland 1B, L.P., Anland 2A, L.P., Anland 2B, L.P., Anland 2C, L.P., Anland 3, L.P., Anland 5B/6, L.P., Anland 10, L.P., Anland 12, L.P., Anland 13, L.P., and Anland 14, L.P., each a Texas limited partnership.

"Partner Minimum Gain" shall mean partner nonrecourse debt minimum gain as determined under the rules of Regulations Section 1.704-2(i).

"Partner Nonrecourse Deduction" has the meaning set forth in Regulations Section 1.704-2(i)(1) and (2).

"Partner(s)" means a General Partner and/or a Limited Partner.

"Partnership" means the limited partnership established pursuant to this Agreement by the filing of the Certificate with the Secretary of State of the State of Texas.

"Partnership Costs and Expenses" mean all of the expenditures of any kind made or to be made with respect to the Operations, business, and affairs of the Partnership, including without limitation, costs of developing and constructing the Arena Project, principal, interest, fees, points, penalties, and other amounts payable on Partnership indebtedness (including amounts payable with respect to the Arena Loan), Operation costs and expenses, the costs and expenses of occupying, repairing, operating, maintaining, and using Reunion Arena, insurance premiums, professional fees, advertising, marketing costs, utilities costs, office expenses, consulting fees, salaries, wages, fringe benefits, and any other costs, expenses, charges, liabilities and obligations of the Partnership consistent with or contemplated by the purposes of the Partnership described in Article III.

"Partnership Interest" means the interest of a Partner in the Partnership, including, without limitation, such Partner's right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction, and credit of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) to vote on those matters described in the Agreement; and (d) to participate in the management and Operation of the Partnership as provided in this Agreement.

"Partnership Minimum Gain" shall mean partnership minimum gain as set forth in Regulations Section 1.704-2(d).

14

Copy from re:SearchTX

"Person" means an individual, corporation, partnership, limited liability company, limited partnership, trust, estate, unincorporated organization, association or other entity.

"Pledge" or any derivation thereof means, as the context may require, a pledge, encumbrance, lien, mortgage, hypothecation, or similar disposition (other than a Transfer) with respect to the applicable property in connection with the granting of a lien or security interest to secure an obligation of the pledgor or another Person.

"Priority Capital Election" has the meaning set forth in Section 4.6(c)(i)(A).

"Profits" has the meaning set forth in Section 4.9(b).

"Project Agreements" means, as of the Effective Date, all of the agreements listed or provided for on Schedule I to the Assignments.

"Project Costs" has the meaning set forth in Annex I.

"Projected Funding Deficit Amount" has the meaning set forth in Annex I.

"Purchasers" mean: (a) the Prudential Insurance Company of America; (b) Teachers Insurance and Annuity Association of America; (c) Life Insurance Company of the Southwest; (d) National Life Insurance Company and (e) their permitted successors and assigns.

"Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

"Regulatory Allocations" has the meaning set forth in Section 5.3.

"Reimbursement Agreement" means that certain $105 million Letter of Credit and Reimbursement Agreement, dated July 28, 1998, by and among the Original Issuers, the Chase Manhattan Bank, as payment certificate agent, and NationsBank, N.A., as syndication agent, Chase Securities, Inc., as arranger, and Chase Bank of Texas, N.A., as disbursement account bank, L/C agent, and administrative agent, as amended by that First Amendment to the Letter of Credit and Reimbursement Agreement, dated as of August 27, 1998, by and among the foregoing parties, as the same may be further amended, restated, modified or supplemented from time to time.  The Reimbursement Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Main Assignment.

"Relocation Event" has the meaning set forth in Section 4.8(c).

"Relocation Partners" has the meaning set forth in Section 4.8(d).

"Remaining Partners" has the meaning set forth in Section 4.8(a).

"Reunion Arena" means the Reunion Arena located in downtown Dallas, Texas.

15

Copy from re:SearchTX

"Second Priority Preference Amount" means, with respect to a Limited Partner, an aggregate amount computed like interest at a rate equal to fifteen percent (15%) per annum, compounded quarterly, on the outstanding balance from time to time during such period of a Limited Partner's Undistributed Second Priority Capital: (a) increased by that portion of any accrued but unpaid Fourth Priority Preference Amount that is converted on the Switch Date into an accrued but unpaid Second Priority Preference Amount pursuant to Section 4.6(e); and (b) reduced by the sum of: (i) distributions made to such Limited Partner pursuant to Section 6.1(b)(i) and Section 6.2(b)(ii); plus (ii) if applicable, that portion of any distributions made to such Limited Partner, in its capacity as a Good Partner, pursuant to Section 4.7 that is properly allocable to a return of such Good Partner's accrued but unpaid Second Priority Preference Amount; and (iii) if applicable, the amount of such Limited Partner's Second Priority Preference Amount that is eliminated and/or forfeited pursuant to Section 4.7 or Section 4.8, as applicable, as a result of such Limited Partner's being a Trigger Event Partner or a Relocation Partner.

"Section 4.6 Back-End Percentage Interest Election" has the meaning set forth in Section 4.6(c)(ii).

"Section 4.6 Default" has the meaning set forth in Section 4.6(b).

"Section 4.6 Default Date" has the meaning set forth in Section 4.6(b).

"Section 4.6 Default Amount" has the meaning set forth in Section 4.6(b).

"Section 4.6 Default Notice" has the meaning set forth in Section 4.6(a).

"Section 4.6 Default Partner" has the meaning set forth in Section 4.6(b).

"Section 4.6 Election Notice" has the meaning set forth in Section 4.6(c).

"Securities Act" has the meaning set forth in Section 13.17(f).

"Security Agreement" means that certain Trust and Security Agreement, dated as of April 23, 1999, by and among the Original Issuers and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time. The Security Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Main Assignment.

"Separate Team Obligations" has the meaning set forth in Section 4.4(d)(i)(B).

"Settlement Notice" has the meaning set forth in Section 7.10(c).

"Sixty-Five Percent Interest" means the owners of 65% or more of the Back-End Percentage Interests of the Partnership.

16

Copy from re:SearchTX

"Special Trigger Event" means a Trigger Event with respect to a particular Team, other than a Trigger Event that also constitutes a Relocation Event with respect to such Team.

"Stars Credit Facility" means that certain credit facility provided by BOA, as successor in interest to NationsBank, N.A., as agent, and certain other lenders to Dallas Stars, L.P. pursuant to that certain Amended and Restated Credit Agreement, dated as of December 30, 1998, by and among Dallas Stars, L.P., certain lenders named therein, and BOA, as successor in interest to NationsBank, N.A., as agent, as the same may be amended, restated, modified, or supplemented from time to time.

"Stars Franchise Agreement" means that certain Stars Franchise Agreement, dated July 28, 1998, by and between the City and Dallas Stars.

"Stars Lease" means that certain Amended and Restated Arena Lease-Dallas Stars, to be executed on or about the Initial Funding Date, but to be dated effective as of July 28, 1998, to be entered into by and among the Original Issuers and the Partnership, as lessor, and Dallas Stars, as lessee, as such lease may be amended, restated, modified, or supplemented from time to time. The Stars Lease amends and restates that certain Arena Lease – Dallas Stars, dated as of July 28, 1998, by and among the Original Issuers and Dallas Stars, which is one of the Project Agreements that will be assigned by the Original Issuers to the Partnership pursuant to the Assignment.

"Stars Letter of Credit" means that certain irrevocable direct pay letter of credit in the undrawn face amount of $20,700,000 that will be delivered by ADS (or by an Affiliate of ADS) to the Collateral Trustee pursuant to the Note Purchase Agreement, as the same may be amended, renewed, replaced, supplemented, restated, or otherwise modified in accordance with Note Purchase Agreement.

"Stars Non-Relocation Agreement" means that certain Stars Non-Relocation Agreement, dated as of April 23, 1999, between Dallas Stars and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

"Stars Team Agreement" means that certain Stars Team Agreement, dated as of April 23, 1999, by and between Dallas Stars, L.P. and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

"Switch Date" means the latest to occur of the following dates:  (a) the Opening Date; and (b) the date on which: (i) all amounts available to be drawn under the Arena Loan have been drawn (taking into account for these purposes any appropriate reductions in the amount that may be drawn under the terms of the Arena Loan Documents); (ii) to the extent permitted under the Arena Loan Documents, the amounts so drawn are applied through the distribution "waterfall" described in section 5.1 of the Security Agreement and the disbursement procedures described in article 4 of the Disbursement Agreement; and (iii) any Available Loan Proceeds that are available for distribution and/or payment to the Partners after the application through such "waterfall" and disbursement procedures are then distributed and/or paid to the Partners in accordance with this Agreement.

17

Copy from re:SearchTX

"Tax Matters Partner" has the meaning set forth in Section 9.1.

"Team" or "Teams" means, as the context may require, the National Hockey League team commonly known as the Dallas Stars and/or the National Basketball Association team commonly known as the Dallas Mavericks.

"Team Agreements" means the Mavericks Team Agreement and the Stars Team Agreement.

"Team/Partnership Obligation" has the meaning set forth in Section 4.4(d)(i)(A).

"Texas Act" means the Texas Revised Limited Partnership Act, Article 6132a-1 of Title 105 of the Texas Revised Civil Statutes, as it may be amended from time to time, and any successor to such Texas Act.

"Transaction Documents" has the meaning set forth in Annex I.

"Transfer," "Transferred," or any other derivation thereof, means as the context may require, a direct or indirect sale, assignment, transfer, merger, consolidation, interest exchange, conversion, or other disposition (other than a Pledge) of the applicable property, by operation of law or otherwise.

"Trigger Event" means: (a) with respect to DBL, a "Trigger Event" as defined in the Mavericks Team Agreement; and (b) with respect Dallas Stars, a "Trigger Event" as defined in the Stars Team Agreement.

"Trigger Event Default" has the meaning set forth in Section 4.7(a).

"Trigger Event Partners" has the meaning set forth in Section 4.7(a).

"Trigger Event Team" has the meaning set forth in Section 4.7(a).

"Undistributed First Priority Capital" means, with respect to a Limited Partner, the amount in a special recordkeeping account maintained by the Partnership for such Limited Partner, equal to: (a) the amount of Unused L/C Capital moved from the Undistributed Fifth Priority Capital of a Limited Partner to the Undistributed First Priority Capital of such Limited Partner pursuant to Section 4.4(f) (or through the application of similar principles pursuant to Section 4.4(g)); reduced (but not below zero) by: (b) the sum of: (i) the aggregate amount of cash distributed to such Limited Partner pursuant to Section 6.2(b)(i) below; plus (ii) if applicable, that portion of any distributions made to such Limited Partner pursuant to Section 4.7 that is properly allocable to a return of such Limited Partner's Undistributed First Priority Capital.

"Undistributed Fourth Priority Capital" means, with respect to a Limited Partner, the amount in a special recordkeeping account maintained by the Partnership for such Limited Partner, equal to: (a) the amounts described in Section 4.6(c) and Section 4.6(d) that increase the

18

Copy from re:SearchTX

Undistributed Fourth Priority Capital of a Non-Defaulting Partner in connection with a request for Capital Contributions with respect to which there has been a Section 4.6 Default; reduced (but not below zero) by: (b) the sum of: (i) the aggregate amount of cash distributed to such Limited Partner pursuant to Section 6.2(b)(vi); plus (ii) the amount, if any, of Undistributed Fourth Priority Capital that is converted to Undistributed Second Priority Capital on the Switch Date pursuant to Section 4.6(e); plus (iii) if applicable, that portion of any distributions made to such Limited Partner pursuant to Section 4.7 that is properly allocable to a return of such Limited Partner's Undistributed Fourth Priority Capital.

"Undistributed Fifth Priority Capital" means, with respect to a Limited Partner, the amount in a special recordkeeping account maintained by the Partnership for such Limited Partner, equal to: (a) the sum of: (i) in the case of a Mavericks Arena Corporation, the amount of Undistributed Third Priority Capital that such Limited Partner converted to Undistributed Fifth Priority Capital pursuant to Section 4.2(c); (ii) the amount of cash deemed contributed by such Limited Partner to the Partnership in connection with a draw on the Stars Letter of Credit or the Mavericks Letter of Credit as described in Section 4.2(d); (iii) the amount of cash actually contributed by such Limited Partner in lieu of a draw on either Letter of Credit; plus; (iv) additional Capital Contributions made pursuant to Section 4.3 and Section 4.4 (other than those Capital Contributions described in Section 4.4(e) that do not increase a Partner's Undistributed Fifth Priority Capital); reduced (but not below zero) by: (b) the sum of: (i) the aggregate amount of cash distributed to such Limited Partner pursuant to Section 6.2(b)(vii) below, plus (ii) the amount of Unused L/C Capital converted from the Undistributed Fifth Priority Capital of such Limited Partner to the Undistributed First Priority Capital of such Limited Partner pursuant to Section 4.4(f) and/or Section 4.4(g); plus (iii) if applicable, that portion of any distributions made to such Limited Partner pursuant to Section 4.7 that is properly allocable to a return of such Limited Partner's Undistributed Fifth Priority Capital.

"Undistributed Second Priority Capital" means, with respect to a Limited Partner, the amount in a special recordkeeping account maintained by the Partnership for such Limited Partner, equal to: (a) the sum of: (i) the amount, if any, of Undistributed Fourth Priority Capital that is converted to Undistributed Second Priority Capital on the Switch Date pursuant to Section 4.6(e); plus (ii) the amounts described in Section 4.5(c), Section 4.5(d), Section 4.6(c), and Section 4.6(d) that increase the Undistributed Second Priority Capital of a Non-Defaulting Partner in connection with a request for Capital Contributions with respect to which there has been an Interim Contribution Default; reduced (but not below zero) by: (b) the sum of: (i) the aggregate amount of cash distributed to such Limited Partner pursuant to Section 6.1(b)(ii) and Section 6.2(b)(iii) below; plus (ii) if applicable, that portion of any distributions made to such Limited Partner pursuant to Section 4.7 that is properly allocable to a return of such Limited Partner's Undistributed Second Priority Capital.

"Undistributed Third Priority Capital" means, with respect to a Partner, the amount in a special recordkeeping account maintained by the Partnership for such Partner, equal to: (a) the sum of: (i) the amount that each Partner is considered to have in its Undistributed Third Priority Capital account as of the Effective Date, as described in Section 4.1(d); (ii) the amount of additional Capital Contributions contributed by such Partner to the Partnership to the extent such additional Capital Contributions are classified as Interim Contributions under this Agreement

19

Copy from re:SearchTX

(other than Interim Contribution described in Section 4.5(c) and/or Section 4.5(d)); reduced (but not below zero) by: (b) the sum of: (i) the amount, if any, of Undistributed Third Priority Capital that is converted to Undistributed Fifth Priority Capital pursuant to Section 4.2(c) in the event the Mavericks Arena Corporations do not deliver the Mavericks Letter of Credit on or prior to the Initial Funding Date, as described in Section 4.2(c); plus (ii) the aggregate amount of cash distributed to such Partner pursuant to Section 6.1(b)(iii) and Section 6.2(b)(iv) below; plus (ii) if applicable, that portion of any distributions made to such Limited Partner pursuant to Section 4.7 that is properly allocable to a return of such Limited Partner's Undistributed Third Priority Capital.

"Unexpected Shortfall" has the meaning set forth in Section 4.3(a)(iii).

"Unused L/C Capital" has the meaning set forth in Section 4.4(f)(ii).

## ARTICLE III

## PURPOSE

3.1    Purposes and Scope.  Subject to the provisions of this Agreement, the purposes of the Partnership are to:

(a)    acquire the Arena Project;

(b)    develop, construct, manage, Operate, finance, sell, and/or otherwise dispose of the Arena Project;

(c)    occupy, operate, manage, repair, maintain, and otherwise use Reunion Arena;

(d)    take any and all actions that may be necessary or required to perform the Partnership's duties and obligations under the Transaction Documents;

(e)    borrow money in furtherance of any or all of the objectives of the Partnership business and to secure the same by mortgage, pledge, or other liens; and

(f)    do any and all other acts or things which may be incidental or necessary to carry on the business of the Partnership as herein contemplated.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1    Initial Capital Contributions of Partners.

(a)    As of the Effective Date, the General Partner shall contribute $100.00 in cash to the Partnership.

20

Copy from re:SearchTX

(b)    As of the Effective Date, the Limited Partners shall contribute their entire undivided interests in the Arena Project to the Partnership. Such contribution shall be made pursuant to the Assignments in accordance with section 16.3(b) of the Note Purchase Agreement, and shall include, without limitation, the assignment by the Limited Partners of their undivided interests in all of the Project Agreements. The undivided interest of each Limited Partner in the Arena Project as of the Effective Date is set forth below:

| Limited Partner | Undivided Interest |
|---|---|
| HAP | 33.50% |
| DAP | 10.31% |
| CAA | 6.19% |
| ADS | 50.00% |

(c)    In connection with the Assignments, the Partnership shall assume and agree to perform, discharge, and comply with all covenants, conditions, obligations, liabilities, and duties of the Original Issuers under and in respect of the Project Agreements. Such assumption shall be evidenced by the Partnership's execution and delivery of the Assignments.

(d)    The Partners hereby acknowledge and agree that immediately after taking into account the Capital Contributions described in Section 4.1(a) and Section 4.1(b) above, but prior to taking into account the application of Section 4.2 below, each Partner will have a zero balance in its Undistributed First Priority Capital account, a zero balance in its Undistributed Second Priority Capital account, a zero balance in its Undistributed Fourth Priority Capital account, a zero balance in Undistributed Fifth Priority Capital account, and a positive balance in its Undistributed Third Priority Capital account equal to the applicable amounts set forth next to such Partner's name on Exhibit E attached hereto.

(i)    The Capital Contributions made by the Mavericks Arena Corporations to the Partnership pursuant to this Section 4.1 shall constitute Interim Equity Contributions for all purposes under this Agreement.

(ii)    The Capital Contributions made by ADS to the Partnership pursuant to this Section 4.1 shall constitute an Interim Loan for all purposes under this Agreement. In connection therewith, the Partnership shall execute and deliver in favor of ADS the ADS Note, which ADS will pledge to Dallas Stars, L.P., which in turn will be pledged by Dallas Stars, L.P. to Bank of America, N.A., as successor in interest to NationsBank, N.A. ("BOA") in accordance with the Stars Credit Facility. The ADS Note is subject to and governed by this Agreement. As long as: (A) any amounts remain unpaid under the ADS Note; (B) any amounts remain unpaid under the Stars Credit Facility; and/or (C) the

Copy from re:SearchTX

Pledge and Security Agreement executed by ADS in favor of BOA, per the terms of the Stars Credit Facility, remains in effect, then all distributions payable to ADS pursuant to Section 6.1 or Section 6.3 of this Agreement on account of amounts which remain unpaid under the ADS Note shall be payable to, and ADS directs that the Partnership make such payment directly to, BOA.

4.2    Initial Equity Requirement Under Note Purchase Agreement.

(a)    Pursuant to section 4.2(g) of the Note Purchase Agreement, the Purchasers must have received on or prior to the Initial Funding Date: (i) the Stars Letter of Credit; and (ii) either: (A) the Mavericks Letter of Credit; or (B) evidence satisfactory to the Purchasers that the Partnership has converted $20,700,000 of Interim Contributions (i.e., Undistributed Third Priority Capital) into Undistributed Fifth Priority Capital.

(b)    On or before the Initial Funding Date, ADS shall deliver the Stars Letter of Credit to the Collateral Trustee in accordance with section 4.2(g) of the Note Purchase Agreement.

(c)    (i)    On or prior to the Initial Funding Date, the Mavericks Arena Corporations shall either: (A) deliver, or cause delivery of, the Mavericks Letter of Credit to the Collateral Trustee in accordance with section 4.2(g) of the Note Purchase Agreement; or (B) notify the General Partner that the Mavericks Arena Corporations desire to convert $20,700,000 of their Undistributed Third Priority Capital into Undistributed Fifth Priority Capital.

(ii)    If the Mavericks Arena Corporations fail to deliver, or fail to cause the delivery of, the Mavericks Letter of Credit on or prior to the Initial Funding Date, the Mavericks Arena Corporations will be deemed to have elected to convert $20,700,000 of their Undistributed Third Priority Capital into Undistributed Fifth Priority Capital.  Any such conversion of $20,700,000 of Undistributed Third Priority Capital by the Mavericks Arena Corporation shall be done on a pro rata basis in accordance with the relative Contribution Percentages of the Mavericks Arena Corporations (i.e., 67% from HAP, 20.62% from DAP, and 12.38% from CAA).  The amount so converted will increase the Undistributed Fifth Priority Capital of the Mavericks Arena Corporations and will decrease the Undistributed Third Priority Capital of such Mavericks Arena Corporations.

(d)    The Partners anticipate that if the Collateral Trustee requests a draw on one or both Letters of Credit, then the applicable Partners will make (and are permitted to make under this Agreement) additional Capital Contributions to the Partnership instead of permitting the Collateral Trustee to draw on the applicable Letter of Credit.  If the Collateral Trustee should ever draw on the Stars Letter of Credit and/or the Mavericks Letter of Credit, then the amount so drawn shall be considered a Capital Contribution made by the Partner (or in the case of the Mavericks Letter of Credit, the Partners) who delivered (or whose Affiliate delivered) the applicable letter of credit.  Any such Capital

22

007500.00176:463592.011
Copy from re:SearchTX

Contributions (i.e., either those made by a Partner to prevent a draw on an applicable Letter of Credit or those deemed made by a Partner as a result of a draw on the Letter of Credit) shall increase the applicable Partner's Undistributed Fifth Priority Capital. To the extent any amount is drawn on the Mavericks Letter of Credit, then such additional Capital Contributions shall be considered made by the Mavericks Arena Corporations pro rata in accordance with their relative Contribution Percentages.

4.3    Additional Capital Contributions.

(a)    Unexpected Shortfalls. Subject to Section 4.4(i) below, if at any time the General Partner (or, under those circumstances described in the GP LLC Agreement, a member of the General Partner) determines that the Partnership will not have sufficient cash funds on hand to pay when due:

(i)    The costs and expenses required to complete the development and construction of the Arena Project (including Capital Contributions that may be required to pay Team/Partnership Obligations);

(ii)    Any amounts due and payable with respect to the Arena Loan, or anticipated to become due and payable by the Partnership with respect to the Arena Loan within the next 60 days;

(iii)    Subject to Section 7.10(d), other Partnership Costs and Expenses that are due and payable, or are expected to become due and payable within the next 60 days (the amount by which: (A) the sum of: (I) development and construction costs described in subparagraph (i); (II) the required payments with respect to the Arena Loan described in subparagraph (ii); and (III) subject to Section 7.10(d), the other Partnership Costs and Expenses then due and payable or expected to become due and payable within the next 60 days described in this subparagraph (iii); exceeds (B) the available cash on hand, is referred to as an "Unexpected Shortfall") then the General Partner (or, under those circumstances described in the GP LLC Agreement, a member of the General Partner) may deliver (or in the case of an obligation described in Section 4.4(a), (b), and/or (c), will deliver) a notice to each of the Limited Partners (this notice is referred to as the "Contribution Notice"), requesting that each Limited Partner make additional Capital Contributions to the Partnership in accordance with their Contribution Percentages.

(b)    Contribution Notices.    Any Contribution Notice shall specify the following information:

(i)    The aggregate amount of Capital Contributions requested in the Contribution Notice (which cannot exceed the amount of the Unexpected Shortfall approved by the General Partner or, under those circumstances described in the GP LLC Agreement, approved by a member of the General Partner);

23

Copy from re:SearchTX

(ii)     The amount of additional Capital Contributions each Limited Partner is required to contribute and/or loan to the Partnership, which Capital Contributions shall be made pro rata in accordance with their Contribution Percentages;

(iii)    The date (the "Contribution Date") on which such additional Capital Contributions are due, which date shall not be less than eleven (11) Business Days after the date on which the Contribution Notice is delivered;

(iv)    A brief description of the Arena Project costs, Arena Loan payments, and other Partnership Costs and Expenses that will be paid with the proceeds of such additional Capital Contributions;

(v)     The amount, if any, of the Unexpected Shortfall that is attributable to a Funding Deficit (as described in Section 4.4(c) below);

(vi)    The amount, if any, of such Unexpected Shortfall that is attributable to a Projected Funding Deficit Amount (as described in Section 4.4(b) below);

(vii)   The amount, if any, of such Unexpected Shortfall that relates to costs and expenses of the Arena Project that are to be paid with proceeds of Interim Contributions (as described in Section 4.4(a) below);

(viii)  A description of the recordkeeping account into which the additional Capital Contribution will be credited under this Agreement (i.e., Undistributed Third Priority Capital or Undistributed Fifth Priority Capital); and

(ix)    Wiring instructions for the bank account into which the additional Capital Contributions are to be deposited.

(c)     Requirement to Make Additional Capital Contributions.  The Limited Partners shall, on or prior to the Contribution Date, make the additional Capital Contributions to the Partnership in the amount and manner requested in the Contribution Notice.  After the Effective Date, the General Partner shall not be required to make any additional Capital Contributions.

(d)     Limitation on Other Additional Capital Contributions.  Except as provided in this Article IV, no Partner shall have any obligation or right to make any additional Capital Contributions unless such additional Capital Contributions have been approved by the General Partner.

4.4    Special Provisions Relating to Additional Capital Contributions.

(a)     Interim Contributions.

007500.00176:463592.011

Copy from re:SearchTX

(i)     Pursuant to article 3 of the Disbursement Agreement, the Partnership is required to pay Arena Project development and construction costs with the proceeds of Interim Contributions made by the Partners. In connection with any request for additional Capital Contributions, the General Partner shall reasonably determine the amount of any such additional Capital Contributions that should be classified as an Interim Contribution, with such determination being made in a manner consistent with the Arena Loan Documents.

(ii)    If the General Partner or a member of the General Partner determines that the Partnership needs the proceeds of Interim Contributions to pay Arena Project costs, then the General Partner shall immediately make an appropriate request for additional Capital Contributions pursuant to Section 4.3. Except as provided in Section 4.5, if a Limited Partner makes an additional Capital Contribution that is classified as an Interim Contribution, such additional Capital Contribution shall increase such Limited Partner's Undistributed Third Priority Capital by the amount of such Interim Contribution.

(iii)   Interim Contributions include both Interim Loans and Interim Equity Contributions. When a Limited Partner is required to make an additional Capital Contribution that is classified as an Interim Contribution, the Limited Partner may satisfy its obligation by making either an Interim Equity Contribution or an Interim Loan. In connection with making any additional Capital Contribution that is classified as an Interim Contribution, the contributing Limited Partner shall notify the General Partner whether such Interim Contribution will be made as an Interim Equity Contribution or as an Interim Loan. If an Interim Contribution is classified as an Interim Loan (but not an ADS Loan), the Partnership shall promptly execute and deliver an Interim Loan Promissory Note to the contributing Limited Partner in the form attached hereto as Exhibit D with respect to such Interim Contribution. If an Interim Loan is classified as an ADS Loan, the amount contributed shall be considered contributed to the Partnership pursuant to the ADS Note. If a Mavericks Arena Corporation fails to notify the General Partner of such Mavericks Arena Corporation's election, then such Mavericks Arena Corporation will be deemed to have made an Interim Equity Contribution. If ADS fails to notify the General Partner of ADS's election, then ADS will be deemed to have made an Interim Loan that is classified as an ADS Loan (unless $30 million in ADS Loans are outstanding (or in the event the Stars Credit Facility is amended to so provide, $35 million in ADS Loans), in which case ADS will be deemed to have made an Interim Loan pursuant to the Interim Promissory Note in the form attached hereto as Exhibit D with respect to any amounts in excess of $30 million or $35 million, as the case may be).

(iv)    The Interim Loan Promissory Notes provide for the payment of interest, fees, charges, and other costs (referred to collectively as "Other Charges") to the Persons that hold such Interim Loan Promissory Notes. The Partners acknowledge and agree that, notwithstanding anything to the contrary in this Agreement, the Interim Loan Promissory Notes, or the Transaction

25

007500.00176:463592.011

Copy from re:SearchTX

Documents: (A) payments of Other Charges on the Interim Loan Promissory Notes shall only be made pursuant to Section 6.3, and then only to the extent permitted therein; and (B) before any payments of Other Charges are made on an Interim Loan Promissory Note, the Person that holds such Interim Loan Promissory Note, or an Affiliate of such Person, must make an additional Capital Contribution to the Partnership in an amount equal to the Other Charges that are to be paid with respect to the applicable Interim Loan Promissory Note (to the extent an amount equal to such Other Charges is contributed by an Affiliate of the Person that holds such Interim Loan Promissory Note, such Affiliate shall be deemed to have loaned the applicable amount to the Person that holds such Interim Loan Promissory Note, and such Person shall then be deemed to have contributed such amount to the Partnership). If the applicable Person (or an Affiliate thereof) does not make an additional Capital Contribution to fund the payments of such Other Charges, then no payment and/or distribution shall be made pursuant to Section 6.3 with respect to such Other Charges on the Interim Loan Promissory Note.

(v)   (A)   The Partners acknowledge and agree that Interim Equity Contributions and Interim Loans that are classified as Undistributed Second Priority Capital pursuant to this Agreement shall be treated in the same manner for all purposes under this Agreement, and Interim Equity Contributions and Interim Loans that are classified as Undistributed Third Priority Capital pursuant to this Agreement shall be treated in the same manner for all purposes under this Agreement. Interim Equity Contributions will be treated on a *pari passu* basis with Interim Loans that are classified in the same category of "undistributed capital" (i.e., either Undistributed Second Party Capital and/or Undistributed Third Priority Capital, as the case may be) and will have the same rights with respect to priority of payments as Interim Loans in the same category of "undistributed capital" for all purposes under this Agreement, even though an Interim Loan is referred to as a "loan" under this Agreement.

(B)   Under no circumstances (including any bankruptcy or insolvency proceedings) shall a holder of an Interim Loan in a particular category of undistributed capital have any "priority" payment rights over a holder of an Interim Equity Contribution in the same category of undistributed capital, and each holder of Interim Loans hereby expressly waives any priority payment rights that may otherwise exist under this Agreement or under applicable law. The Partners further acknowledge and agree that: (I) even though an Interim Loan Promissory Note has a maturity date, payments on an Interim Loan Promissory Note will only be made to the extent a distribution is made with respect to Undistributed Second Priority Capital and/or Undistributed Third Priority Capital, as the case may be, pursuant to Section 6.1 or Section 6.2 below, or a payment of Other Charges on such Interim Loan Promissory Note is made pursuant to Section 6.3 below; (II) payments with respect to Interim Loans and

26

Copy from re:SearchTX

Interim Equity Contributions in the same category of undistributed capital shall be made at the same time; and (III) payments with respect to Interim Loans and Interim Equity Contributions shall be made only in accordance with this Agreement.

(C)   This Agreement shall be and shall remain enforceable notwithstanding any bankruptcy or other insolvency proceedings by or against the Partnership. Nothing herein shall effect or limit the right of any Partner to take any action in any bankruptcy or other insolvency proceeding by or against the Partnership, or to vote its claim, or to appear and to be heard with respect to any matter; provided, however, that all provisions hereof with respect to priorities of payment and distributions from the Partnership shall continue in full force and effect during any such bankruptcy or other insolvency proceeding.

(b)   Projected Funding Deficit Amount.

(i)   Pursuant to section 1.3(b) of the Team Agreements, if a Projected Funding Deficit Amount is determined to exist, then each Team may be required, within thirteen (13) Business Days after written notice from the Collateral Trustee, to either:

(A)   deposit with the Collateral Trustee cash funds in an amount equal to 50% of such Projected Funding Deficit Amount;

(B)   deliver to the Collateral Trustee an irrevocable transferable direct pay letter of credit naming the Collateral Trustee as beneficiary in a face amount equal to 50% of the Projected Funding Deficit Amount; or

(C)   make or cause the Partnership to make cash equity contributions to the Equity Account (as defined in Annex I) in immediately available funds in an amount equal to 50% of the Projected Funding Deficit Amount.

(ii)   The Partners acknowledge and agree that, notwithstanding anything to the contrary in the Team Agreements, if a Projected Funding Deficit Amount is determined to exist, then the General Partner shall promptly request additional Capital Contributions from the Limited Partners to satisfy such Projected Funding Deficit Amount (in the manner contemplated in section 1.3(b)(iii) of the Team Agreement), thereby relieving the Teams of the obligation to pay such Projected Funding Deficit Amount (subject to the right of either Team to make such payment on behalf of its Affiliated Partners in the manner contemplated in Section 4.4(d) below). A Limited Partner, in its discretion, may also satisfy its obligation to make an additional Capital Contribution pursuant to this Section 4.4(b) by posting a letter of credit for the requisite amount in accordance with the Arena Loan Documents.

27

Copy from re:SearchTX

(iii)     The Partners acknowledge and agree that one of the purposes of this Section 4.4(b) is to impose on the Limited Partners the obligations to make additional Capital Contributions to the Partnership or post a letter of credit in accordance with the Arena Loan Documents to fund the payment of Partnership Costs and Expenses without imposing additional burdens on the Teams.  If a Limited Partner then fails to make its required Capital Contributions under this Article IV or fails to post the requisite letter of credit, the Partnership Interest of such defaulting Limited Partner may be diluted in the manner contemplated in Section 4.5 and Section 4.6.

(c)     Funding Deficits.  If a Funding Deficit is determined to exist under the Arena Loan Documents, then the General Partner shall immediately request additional Capital Contributions from the Limited Partners pursuant to Section 4.3 to pay such Funding Deficit.

(d)     Coordination with Other Team Obligations.

(i)     Pursuant to the Team Agreements and the other Arena Loan Documents, the Teams have two (2) principal types of obligations:

(A)     Obligations under the Arena Loan Documents or the other Transaction Documents that: (I) can be funded either by the Teams or by the Partnership; or (II) relate directly to the payment of, or the advance payment of, a Partnership Cost or Expense for which the Partnership has, or should have, the primary obligation to make such payment (referred to as a "Team/Partnership Obligation").  A Team/Partnership Obligation includes, without limitation, the obligation to make payments with respect to Funding Deficits, the obligation to provide funds for Interim Contributions, the obligation to make indemnity payments with respect to certain breaches of representations and warranties, and the obligation to make payments with respect to Projected Funding Deficit Amounts.

(B)     Separate obligations that the Teams have pursuant to the Arena Loan Documents or the other Transaction Documents (referred to as a "Separate Team Obligations").  A Separate Team Obligation includes, without limitation, a Team's obligation to purchase the Notes pursuant to section 1.1 of the Team Agreement, the obligations described in section 1.2 of each Team Agreement (with respect to "COI milestones"), the obligation not to relocate the applicable Team franchises for 30 years, and the obligation to comply with the terms of each respective Team lease (i.e., the Mavericks Lease and the Stars Lease).

(ii)     (A)     The Partners intend that the Partnership shall have primary responsibility for paying Team/Partnership Obligations, and the General Partner shall request additional Capital Contributions in a manner that is

28

007500.00176:463592.011

Copy from re:SearchTX

consistent with this intent. For example, pursuant to Section 4.4(a), (b), and (c), the General Partner is required to request Capital Contributions to satisfy Team/Partnership Obligations. The Partners agree that to the extent other Team/Partnership Obligations arise that are not specifically enumerated in Section 4.4(a), (b), (c), or (d)(i)(A), the General Partner shall request additional Capital Contributions from the Limited Partners pursuant to Section 4.3 to satisfy such Team/Partnership Obligations. The Partners further agree that to the extent a particular Team/Partnership Obligation may be satisfied under the Arena Loan Documents by the posting of a letter of credit, then each Limited Partner may, in its discretion, satisfy its obligations to make additional Capital Contributions pursuant to this Section 4.4(d)(ii) by posting a letter of credit in the requisite amount in accordance with such Arena Loan Documents.

(B)     A Limited Partner may permit an Affiliated Team to satisfy a Team/Partnership Obligation on its behalf by causing or allowing the Affiliated Team to make an additional Capital Contribution on behalf of such Limited Partner or, if permitted under the Arena Loan Documents, posting a letter of credit in accordance with the Arena Loan Documents on behalf of such Limited Partner. If a Limited Partner intends to cause or allow an Affiliated Team to make an additional Capital Contribution to the Partnership in the stead of such Partner with respect to a Team/Partnership Obligation, then the applicable Limited Partner must notify the General Partner and each other Limited Partner in writing that such Affiliated Team will make such additional Capital Contribution in a timely manner so as to prevent any defaults under the Transaction Documents. If the Affiliated Team then makes the required payment or posts the required letter of credit, the applicable Team shall be deemed to have loaned the applicable amount to the Affiliated Partner, and such Limited Partner shall be deemed to have contributed (or, if applicable, loaned as an Interim Loan) such amount to the Partnership in accordance with this Agreement.

(iii)     Notwithstanding anything to the contrary in this Agreement, if a Limited Partner fails to make a required Capital Contribution to the Partnership under this Agreement in connection with a Team Partnership Obligation, or, if permitted under the Arena Loan Documents, fails to post a letter of credit in connection with a Team Partnership Obligation in accordance with such Arena Loan Documents, and the applicable Team does not make the additional Capital Contribution on behalf of the Affiliated Partner in the manner permitted under Section 4.4(d)(ii)(B), or, if permitted, post a letter of credit in accordance with the Arena Loan Documents on behalf of the Affiliated Partner, but such Affiliated Team subsequently is required, under any applicable Transaction Documents to which such Affiliated Team is a party, to make a payment as a result of such default, then such Affiliated Team shall have no right to receive any payments from or to make a claim against the Partnership or its non-Affiliate Partners, and

29

Copy from re:SearchTX

such Affiliated Team may look only to the Affiliated Partner to recover such payment.

(iv)    The Partnership and the Partners shall have no obligation under this Agreement to make any payments with respect to Separate Team Obligations; provided, however, in the event a Trigger Event Default or a Relocation Event occurs, then the General Partner, the Good Partners, and/or the Remaining Partners may take such actions, in their sole discretion, as may be necessary to allow the Partnership to satisfy the conditions set forth in section 6.8(b) of the Security Agreement, including without limitation, requesting additional Capital Contributions or requesting the posting of additional letters of credit from all of the Partners to satisfy such conditions.

(e)    <u>Undistributed Fifth Priority Capital</u>. All Capital Contributions made by a Partner (or deemed made by a Partner) pursuant to this <u>Article IV</u> shall increase such Partner's Undistributed Fifth Priority Capital except for:

(i)    Capital Contributions described in <u>Section 4.4(a)(ii)</u> (with respect to Interim Contributions, which shall increase a Limited Partner's Undistributed Third Priority Capital);

(ii)    all Capital Contributions made by Non-Defaulting Partners in connection with a request for additional Capital Contributions with respect to which an Interim Contribution Default has occurred, as described in <u>Section 4.5</u>, which shall increase the Undistributed Second Priority Capital of the Non-Defaulting Partners by the amounts described in <u>Section 4.5</u>;

(iii)    all Capital Contributions made by Non-Defaulting Partners in connection with a request for additional Capital Contributions with respect to which a Section 4.6 Default has occurred, as described in <u>Section 4.6</u>, which shall increase the Undistributed Fourth Priority Capital or the Undistributed Second Priority Capital, as applicable, of the Non-Defaulting Partners by the amounts described in <u>Section 4.6</u>;

(iv)    all Capital Contributions made by a holder of an Interim Loan Promissory Note (or an Affiliate of such holder) pursuant to <u>Section 4.4(a)(iv)</u> with respect to Other Charges owed on or with respect to such Interim Loan Promissory Note, which Capital Contribution shall not increase the Undistributed First Priority Capital, the Undistributed Second Priority Capital, the Undistributed Third Priority Capital, the Undistributed Fourth Priority Capital, or the Undistributed Fifth Priority Capital of the applicable Limited Partner; and

(v)    Capital Contributions made pursuant to <u>Section 4.1</u> that increased a Partner's Undistributed Third Priority Capital, as described on <u>Exhibit E</u> attached hereto.

30

007500.00176:463592.011

Copy from re:SearchTX

(f)     Undistributed First Priority Capital.

(i)     The Partners acknowledge and agree that a fundamental principle in this Agreement is that ADS and the Mavericks Arena Corporations generally are obligated to each contribute 50% of all required cash funds to the Partnership and to receive 50% of the distributions from the Partnership, adjusted as appropriate for the effect of Defaults, Transfers, and actions taken under the Indemnity Agreement.   Because of certain provisions in the Arena Loan Documents and this Agreement, however, it is possible that deviations from this "50-50" principle may occur.  For example, if ADS has delivered the Stars Letter of Credit and the Mavericks Arena Corporations elected to convert part of their Undistributed Third Priority Capital to Undistributed Fifth Priority Capital, then the Mavericks Arena Corporations may have more than 50% of the "equity" in the Partnership until the Purchasers draw the full amount of the Stars Letter of Credit. If the Purchasers, however, should never draw the full amount of the Stars Letter of Credit, then a permanent difference will exist in the amount of equity invested by ADS and the Mavericks Arena Corporations in the Partnership.  The Partners intend that, under these or similar circumstances, this difference in the equity investment should be eliminated on the Equity Adjustment Date (but not before such date) by increasing the Undistributed First Priority Capital of the Limited Partner that made the excess Capital Contributions by an amount equal to the Unused L/C Capital of such Limited Partner and decreasing the Undistributed Fifth Priority Capital of such Limited Partner by a like amount.

(ii)    For purposes of this Agreement, "Unused L/C Capital" means that portion of the cash contributed by a Limited Partner to satisfy a Cash/LC Requirement that, when compared to total cash so contributed by such Limited Partner with respect to such Cash/LC Requirement, is in the same ratio as that portion of any "unused" letter of credit that another Limited Partner initially obtained to satisfy its obligations with respect to such Cash/LC Requirement, bears to the total amount of the applicable letter of credit originally obtained by such other Limited Partner to satisfy its Cash/LC Requirement.

(iii)   For purposes of this Agreement, the  "Cash/LC Requirement" means an obligation of the Partnership (or its Affiliates) under the Arena Loan Documents that may be satisfied by the Partnership and/or the Partners by either making a cash contribution or delivering a letter of credit (e.g., the Mavericks Arena Corporations may either deliver the Mavericks Letter of Credit or convert a portion of its Undistributed Third Priority Capital to Undistributed Fifth Priority Capital pursuant to Section 4.2).

(g)     Other Letters of Credit.  The Arena Loan Documents provide under certain circumstances (in addition to those circumstances described in Section 4.2) that the Limited Partners or the Teams may make an additional Capital Contribution of cash or deliver an appropriate letter of credit. Each Limited Partner and/or each Team, as the case may be, shall make all determinations as to whether it will satisfy such obligations

31

Copy from re:SearchTX

by contributing cash or delivering such letter of credit. If one Team or one or more Limited Partners delivers a letter of credit in satisfaction of a Cash/LC Requirement, and one or more Limited Partners or the other Team delivers cash in satisfaction of such Cash/LC Requirement, then the General Partner shall apply principles similar to those described in Section 4.2 and Section 4.4(f) to reduce and eliminate differences that may arise from the Limited Partners and/or the Teams satisfying the Cash/LC Requirement in different ways.

(h)  Cooperation. The Partners acknowledge and agree that this Agreement cannot address every Capital Contribution scenario that may arise in connection with the development of the Arena Project and/or the administration of the Arena Loan pursuant to the Arena Loan Documents. If certain situations arise that are unaddressed under this Agreement, the Partners shall cooperate with each other in resolving any issues in a manner consistent with the principles outlined in this Agreement.

(i)  Rejection of Capital Contribution Request by Sixty-Five Percent Interest. Notwithstanding anything to the contrary in this Article IV, if the General Partner or any member of the General Partner (to the extent such member is authorized to do so under the GP LLC Agreement) requests additional Capital Contributions pursuant to Section 4.3, but a Sixty-Five Percent Interest notifies the General Partner, in writing, that such Sixty-Five Percent Interest disapproves such request for additional Capital Contributions, then the General Partner's request for additional Capital Contributions shall be denied, and no Partner shall have any obligation to make any additional Capital Contributions with respect to the request that the Sixty-Five Percent Interest disapproved.

4.5  Default by a Limited Partner in Making Interim Contributions.

(a)  If the General Partner or any other Partner reasonably determines that a Limited Partner (or the Affiliated Team, to the extent applicable under Section 4.4(d)(ii)(B)) has failed to make an Interim Contribution on or prior to the applicable Contribution Date, such General Partner or other Partner shall immediately send a written notice (the "Interim Contribution Default Notice") to the Limited Partner that failed to make its required Interim Contribution, notifying such Limited Partner of its failure to make such contribution, the amount to be contributed, that such contribution is classified as an Interim Contribution, the date such contribution was due, and requesting that such contribution be made immediately.

(b)  If such Limited Partner (or the Affiliated Team, to the extent applicable under Section 4.4(d)(ii)(B)) fails to make such additional Interim Contribution within two (2) Business Days after receiving the Interim Contribution Default Notice described in Section 4.5(a) (the date that is two (2) Business Days after the receipt of the applicable Default Notice is referred to as the "Interim Contribution Default Date"), then such Limited Partner shall be in default (such an event is referred to as a "Interim Contribution Default," the Limited Partner that committed the Interim Contribution Default is referred to as a "Interim Contribution Default Partner," and the amount that such Interim Contribution Default Partner failed to contribute is referred to as the "Interim

32

Copy from re:SearchTX

Contribution Default Amount"). The Limited Partners not in default with respect to a particular request for additional Capital Contributions under this Section 4.5 or Section 4.6 (the "Non-Defaulting Partners"), in their sole and absolute discretion, may elect to make an Interim Contribution in the stead of the Interim Contribution Default Partner in an amount up to the Interim Contribution Default Amount pursuant to the following provisions in this Section 4.5 (and with the remedies and consequences described in this Section 4.5).

(c)     (i)     If one or more Non-Defaulting Partners elect to make Interim Contributions in the stead of the Interim Contributions Default Partner, then: (A) the Undistributed Second Priority Capital of each such Non-Defaulting Partner shall be increased by an amount equal to all of the Interim Contributions made by such Non-Defaulting Partner in connection with the request for additional Capital Contributions with respect to which an Interim Contribution Default has occurred (including the Capital Contributions that the Non-Defaulting Partner was required to contribute in connection with such request with respect to its own Contribution Percentage); and (B) the Back-End Percentage Interest of the Interim Contribution Default Partner shall be reduced by an amount equal to the product of: (I) the quotient of: (1) the Interim Contribution Default Amount; divided by (2) the greater of: (a) $30,000,000; or (b) the Net Equity Value at such time; multiplied by (II) 3.0.

(ii)     For purposes of illustration only, if HAP is the Interim Contribution Default Partner with respect to a particular request for additional Capital Contributions, if HAP's Back-End Percentage Interest prior to the Interim Contribution Default is 33.5%, if HAP fails to contribute $500,000, if ADS contributed $746,268 with respect to its own Contribution Percentage, if ADS elects to contribute the entire $500,000 Interim Contribution in the stead of HAP, and if the Net Equity Value is $17,000,000, then as a result of the Interim Contribution Default, ADS's Undistributed Second Priority Capital will be increased by $1,246,268 (i.e., $746,268 plus $500,000) and HAP's Back-End Percentage Interest will be reduced from 33.5% to 28.5% pursuant to this Section 4.5(c)(ii), computed as follows: [33.5% - (($500,000/ $30,000,000) x 3.0) = 33.5% -5.0% = 28.5%].

(iii)     The amount of the reduction in the Back-End Percentage Interest of the Interim Contribution Default Partner pursuant to Section 4.5(c)(i) shall be allocated to the Non-Defaulting Partners in proportion to the amount of the Interim Contributions made by such Non-Defaulting Partners in connection with such Interim Contribution Default.

(d)     If an Interim Contribution Default has occurred, but the Non-Defaulting Partners do not elect to make an additional Capital Contribution in the stead of the Interim Contribution Default Partner pursuant to this Section 4.5, the Undistributed Second Priority Capital of such Non-Defaulting Partners shall still be increased by the amount of additional Capital Contributions made by such Non-Defaulting Partners with

007500.00176:463592.011

Copy from re:SearchTX

respect to their own Contribution Percentages in connection with the request for additional Capital Contributions with respect to which such Interim Contribution Default has occurred.

(e)     The Partners acknowledge and agree that any additional Capital Contributions made by the Partners pursuant to this Section 4.5, or any Interim Contributions that are reclassified as Undistributed Second Priority Capital pursuant to this Section 4.5, shall have the status of Interim Contributions for all purposes under this Agreement (with appropriate effect to be given to the different categories of "undistributed capital" that such Interim Contributions may represent (i.e., either Undistributed Second Priority Capital and/or Undistributed Third Priority Capital)).

4.6     Default by Partner in Making Other Additional Capital Contributions.

(a)     If the General Partner or any other Partner reasonably determines that a Limited Partner (or the Affiliated Team, to the extent applicable under Section 4.4(d)(ii)(B)) has failed to deliver a letter of credit or make an additional Capital Contribution required under this Article IV (other than an Interim Contribution) on or prior to the applicable Contribution Date, such General Partner or Limited Partner shall immediately send a written notice (the "Section 4.6 Default Notice") to the Limited Partner that failed to make its required Capital Contribution, notifying such Limited Partner of its failure to make such contribution, the amount to be contributed, the date such contribution was due, and requesting that such contribution be made immediately.

(b)     If such Limited Partner (or the Affiliated Team, to the extent applicable under Section 4.4(d)(ii)(B)) fails to deliver an applicable letter of credit or make an additional Capital Contribution required under this Article IV (other than an Interim Contribution) within two (2) Business Days after receiving the Section 4.6 Default Notice described in Section 4.6(a) (the date that is two (2) Business Days after receipt of the Section 4.6 Default Notice is referred to as the "Section 4.6 Default Date"), then such Limited Partner shall be in default (such an event is referred to as a "Section 4.6 Default," the Limited Partner that committed the Section 4.6 Default is referred to as a "Section 4.6 Default Partner," and the amount that such Section 4.6 Default Partner failed to contribute or deliver in the form of a letter of credit is referred to as the "Section 4.6 Default Amount"). If a Section 4.6 Default occurs as a result of a failure to deliver a letter of credit, the Section 4.6 Default Amount under such circumstances shall be the face amount of the letter of credit that was required to be delivered. The Non-Defaulting Partners in their sole and absolute discretion, may elect to make the additional Capital Contribution or deliver additional letters of credit (to the extent permitted under the Arena Loan Documents) in the stead of the Section 4.6 Default Partner in an amount up to the Section 4.6 Default Amount pursuant to the following provisions in this Section 4.6 (and with the remedies and consequences described in this Section 4.6).

(c)     In connection with a Section 4.6 Default with respect to which the Non-Defaulting Partners make additional Capital Contributions or deliver additional letters of credit (in accordance with the Arena Loan Documents) in the stead of the Section 4.6

34

Copy from re:SearchTX

Default Partner, the Non-Defaulting Partners shall, at the time that the additional Capital Contribution and/or delivery of the additional letters of credit is made in the stead of the Section 4.6 Default Partner, send the General Partner a written notice (the "Section 4.6 Election Notice") that the Non-Defaulting Partners have made one of the following elections:

(i)    The Priority Capital Election.

(A)    If the Non-Defaulting Partners make an election pursuant to this Section 4.6(c)(i) (referred to as a "Priority Capital Election"), then prior to the Switch Date, the Undistributed Fourth Priority Capital of each Non-Defaulting Partner, and on and after the Switch Date, the Undistributed Second Priority Capital of each Non-Defaulting Partner, shall be increased by the sum of: (I) the additional Capital Contributions (or, in the event a letter of credit is delivered in accordance with the Arena Loan Documents to satisfy the Capital Contribution obligation of the Non-Defaulting Partner, the amount or amounts drawn on (or amounts contributed in lieu of a draw thereon) such letter of credit) made by such Non-Defaulting Partner with respect to its own Contribution Percentage in connection with the request for additional Capital Contributions with respect to which a Section 4.6 Default has occurred; plus (II) the product of: (1) the additional Capital Contribution (or, in the event a letter of credit is delivered in accordance with the Arena Loan Documents to satisfy the Section 4.6 Default, the amount or amounts drawn on (or amounts contributed in lieu of a draw thereon) such letter of credit) made by such Non-Defaulting Partner in the stead of the Section 4.6 Default Partner; multiplied by (2) 3.0;

(B)    For purposes of illustration only, if HAP is the Section 4.6 Default Partner, if HAP fails to contribute $500,000 prior to the Switch Date, if ADS contributed $746,268 with respect to its own Contribution Percentage, if ADS elects to contribute the entire $500,000 additional Capital Contribution in the stead of HAP, and if ADS makes the Priority Capital Election, then as a result of the default, ADS' Undistributed Fourth Priority Capital shall be increased by $2,246,268 pursuant to this Section 4.6(c)(i), computed as follows: [$746,268 plus (3.0 x $500,000) = $2,246,268].

(ii)    The Section 4.6 Back End Percentage Interest Election.

(A)    If the Non-Defaulting Partners make an election pursuant to this Section 4.6(c)(ii) (referred to as a "Section 4.6 Back-End Percentage Interest Election"), then: (I) prior to the Switch Date, the Undistributed Fourth Priority Capital of each Non-Defaulting Partner, and on and after the Switch Date, the Undistributed Second Priority Capital of each Non-Defaulting Partner, shall be increased by an amount equal to all of the

35

additional Capital Contributions (or, in the event a letter of credit is delivered in accordance with the Arena Loan Documents to satisfy the Section 4.6 Default, the amount or amounts drawn on (or amounts contributed in lieu of a draw thereon) such letter of credit) made by the Non-Defaulting Partner in connection with the request for additional Capital Contributions with respect to which such Section 4.6 Default has occurred (including the Capital Contributions (or, in the event a letter of credit is delivered in accordance with the Arena Loan Documents to satisfy the Capital Contribution obligations of the Non-Defaulting Partners, the amount or amounts drawn on (or amounts contributed in lieu of a draw thereon) such letter of credit) that the Non-Defaulting Partners were required to contribute in connection with such request with respect to its own Contribution Percentage); and (II) the Back-End Percentage Interest of the Section 4.6 Default Partner shall be reduced by an amount equal to the product of: (1) the quotient of: (a) the Section 4.6 Default Amount; divided by (b) the greater of: (i) $30,000,000; or (ii) the Net Equity Value at such time; multiplied by (2) 3.0.

(B)    For purposes of illustration only, if HAP is the Section 4.6 Default Partner, if HAP's Back-End Percentage Interest prior to the Section 4.6 Default is 33.5%, if HAP fails to contribute $500,000 prior to the Switch Date, if ADS contributed $746,268 with respect to its own Contribution Percentage, if ADS elects to contribute the entire $500,000 additional Capital Contribution in the stead of HAP, if ADS makes the Section 4.6 Back-End Percentage Interest Election, and if the Net Equity Value is $17,000,000, then as a result of the Section 4.6 Default, ADS' Undistributed Fourth Priority Capital will be increased by $1,246,268 (i.e., $746,268 plus $500,000) and HAP's Back-End Percentage Interest will be reduced from 33.5% to 28.5% pursuant to this Section 4.6(c)(ii), computed as follows:   [33.5%- (($500,000/ $30,000,000) x 3.0) = 33.5% -5.0% = 28.5%].

(C)    The amount of the reduction in the Back-End Percentage Interest of the Section 4.6 Default Partner pursuant to this Section 4.6(c)(ii) shall be allocated to the Non-Defaulting Partners in proportion to the amount of the additional Capital Contributions made by such Non-Defaulting Partners and, if applicable, the face amount of the letter of credit delivered by the Non-Defaulting Partners in accordance with the Arena Loan Documents.

(iii)    For purposes of this Section 4.6(c), the Non-Defaulting Partner that owns the largest Back-End Percentage Interest immediately prior to the date on which an election is to be made pursuant to this Section 4.6(c) shall act on behalf of the other Non-Defaulting Partners in making the applicable election. If the Non-Defaulting Partners fail to deliver an Election Notice pursuant to this

007500.00176:463592.011

Section 4.6(c), the Non-Defaulting Partners will be deemed to have made a Section 4.6 Back-End Percentage Interest Election.

(d)     If a Default has occurred, but the Non-Defaulting Partners do not elect to make an additional Capital Contribution or deliver a letter of credit in accordance with the Arena Loan Documents in the stead of the Section 4.6 Default Partner pursuant to this Section 4.6, the Undistributed Fourth Priority Capital (prior to the Switch Date), and the Undistributed Second Priority Capital (on and after the Switch Date) of such Non-Defaulting Partners shall still be increased by the amount of additional Capital Contributions made by such Non-Defaulting Partners or, in the event a letter of credit is delivered in accordance with the Arena Loan Documents to satisfy the Capital Contribution obligations of such Non-Defaulting Partners, the amount or amounts drawn on (or amounts contributed in lieu of a draw thereon) such letter of credit) with respect to their own Contribution Percentages in connection with the request for additional Capital Contributions with respect to which such Section 4.6 Default has occurred.

(e)     On the Switch Date: (i) the Undistributed Fourth Priority Capital of each Limited Partner shall be converted into Undistributed Second Priority Capital, for all purposes under this Agreement; and (ii) any accrued but unpaid Fourth Priority Preference Amount at such time shall be converted into accrued but unpaid Second Priority Preference Amount for all purposes under this Agreement.

(f)     THE PARTNERS ACKNOWLEDGE AND AGREE THAT THEY FULLY UNDERSTAND THAT THEIR INTEREST IN THE PARTNERSHIP MAY BE SUBSTANTIALLY DILUTED FOR FAILING TO MAKE REQUIRED CONTRIBUTIONS OR DELIVERING REQUIRED LETTERS OF CREDIT UNDER ARTICLE IV. EACH PARTNER FURTHER ACKNOWLEDGES AND AGREES THAT THE REMEDIES AVAILABLE TO A NON-DEFAULTING PARTNER PURSUANT TO SECTION 4.5 OR THIS SECTION 4.6 ARE A FAIR AND ADEQUATE MEASURE OF THE LIQUIDATED DAMAGES WHICH SUCH NON-DEFAULTING PARTNER IS ENTITLED TO RECEIVE UNDER APPLICABLE LAWS.

4.7     Trigger Event Defaults. The Partners acknowledge and agree that the provisions set forth in this Section 4.7 shall apply notwithstanding anything to the contrary in this Agreement, except as provided in Section 4.8 below.

(a)     A "Trigger Event Default" shall occur if: (i) a Special Trigger Event occurs with respect to a particular Team (the Team with respect to which such Special Trigger Event occurs is referred to as the "Trigger Event Team"); (ii) the Required Holders (as defined in the applicable Team Agreement) then deliver a Trigger Event Put Notice (as defined in the applicable Team Agreement) to the Trigger Event Team; and (iii) the Trigger Event Team does not purchase 50% of the Notes in the manner required under section 4.1 of the applicable Team Agreement. The Limited Partners that are Affiliated with such Trigger Event Team as of the date on which the Special Trigger Event occurs shall be referred to as the "Trigger Event Partners" and the Limited Partners

37

that are not Affiliated with such Trigger Event Team as of the date on which the Special Trigger Event occurs shall be referred to as the "Good Partners" for purposes of this Agreement.

(b)    The Partners acknowledge and agree that the following consequences shall result from and the following actions shall be taken in connection with the occurrence of a Trigger Event Default:

(i)    The management and control of the Partnership shall continue to be vested in the General Partner, but pursuant to the GP LLC Agreement, the control of the General Partner will be vested in the hands of the Good Partners (or their Affiliates, if applicable) (i.e., the Board members appointed by the Trigger Event Partners shall be immediately removed from the Board, and the Trigger Event Partners shall no longer have the right to designate the members to the Board).

(ii)    From and after the date on which the Trigger Event Default occurs, all distributions of Available Cash (which includes Available Loan Proceeds as a result of the occurrence of the Trigger Event Default), all liquidating distributions, and any other distributions of cash or property shall be made to the Partners as follows (and Section 6.1, Section 6.2, and Section 11.3(c) shall no longer have any force or effect):

(A)    First, all such distributions shall be made to the Good Partners in the manner set forth below:

(I)    First, to each Good Partner to the extent such Good Partner has Undistributed First Priority Capital, in proportion to each such Good Partner's Undistributed First Priority Capital, in an amount up to the Undistributed First Priority Capital of each such Good Partner;

(II)    Next, to each Good Partner to the extent such Good Partner has an accrued but unpaid Second Priority Preference Amount, in proportion to each such Good Partner's accrued but unpaid Second Priority Preference Amount, in an amount up to the accrued but unpaid Second Priority Preference Amount of each such Good Partner;

(III)    Next, to each Good Partner to the extent such Good Partner has Undistributed Second Priority Capital, in proportion to each such Good Partner's Undistributed Second Priority Capital, in an amount up to the Undistributed Second Priority Capital of each such Good Partner;

38

(IV)   Next, to each Good Partner to the extent such Good Partner has Undistributed Third Priority Capital, in proportion to each such Good Partner's Undistributed Third Priority Capital, in an amount up to the Undistributed Third Priority Capital of each such Good Partner;

(V)   Next, to each Good Partner to the extent such Good Partner has an accrued but unpaid Fourth Priority Preference Amount, in proportion to each such Good Partner's accrued but unpaid Fourth Priority Preference Amount, in an amount up to the accrued but unpaid Fourth Priority Preference Amount of each such Good Partner;

(VI)   Next, to each Good Partner to the extent such Good Partner has Undistributed Fourth Priority Capital, in proportion to each such Good Partner's Undistributed Fourth Priority Capital, in an amount up to the Undistributed Fourth Priority Capital of each such Good Partner;

(VII)   Next, to each Good Partner to the extent such Good Partner has Undistributed Fifth Priority Capital, in proportion to each such Good Partner's Undistributed Fifth Priority Capital, in an amount up to the Undistributed Fifth Priority Capital of each such Good Partner;

(VIII)   Next, to each Good Partner in the amount required to cause such Good Partner to have achieved (based on distributions actually received) a 15% internal rate of return on its aggregate investment in the Partnership (the amount required to cause each such Good Partner to have achieved a 15% internal rate of return is referred to as the "Initial Payout Amount", and after all of the Good Partners have received their Initial Payout Amounts, the "Initial Payout" shall be considered to have occurred);

(B)   Second, if there are any amounts remaining to be distributed after the application of Section 4.7(b)(ii)(A) above, then such amounts shall be distributed to the Trigger Event Partners in the manner set forth below:

(I)   First, to each Trigger Event Partner to the extent such Trigger Event Partner has Undistributed First Priority Capital, in proportion to each such Trigger Event Partner's Undistributed First Priority Capital, in an amount up to the Undistributed First Priority Capital of each such Trigger Event Partner;

39

Copy from re:SearchTX

(II)    Next, to each Trigger Event Partner to the extent such Trigger Event Partner has Undistributed Second Priority Capital, in proportion to each such Trigger Event Partner's Undistributed Second Priority Capital, in an amount up to the Undistributed Second Priority Capital of each such Trigger Event Partner;

(III)    Next, to each Trigger Event Partner to the extent such Trigger Event Partner has Undistributed Third Priority Capital, in proportion to each such Trigger Event Partner's Undistributed Third Priority Capital, in an amount up to the Undistributed Third Priority Capital of each such Trigger Event Partner;

(IV)    Next, to each Trigger Event Partner to the extent such Trigger Event Partner has Undistributed Fourth Priority Capital, in proportion to each such Trigger Event Partner's Undistributed Fourth Priority Capital, in an amount up to the Undistributed Fourth Priority Capital of each such Trigger Event Partner; and

(V)    Next, to each Trigger Event Partner to the extent such Trigger Event Partner has Undistributed Fifth Priority Capital, in proportion to each such Trigger Event Partner's Undistributed Fifth Priority Capital, in an amount up to the Undistributed Fifth Priority Capital of each such Trigger Event Partner; and

(C)    If there are any amounts remaining to be distributed after the application of Section 4.7(b)(ii)(A) and Section 4.7(b)(ii)(B) above, then such amounts shall be distributed to the Partners in proportion to their Back-End Percentage Interests.

(iii)    The Trigger Event Partners shall continue to have the same Contribution Percentages and the same obligations to make Capital Contributions to the Partnership as were in effect prior to the Trigger Event Default; and

(iv)    Appropriate adjustments shall be made to the allocation, distribution, and other provisions in this Agreement to effectuate the changes set forth above in the event such a Trigger Event Default occurs.  The Partners acknowledge and agree that, subject to Section 4.8, to the extent any of the provisions in this Agreement are inconsistent with this Section 4.7, the provisions set forth in this Section 4.7 shall override and control any such conflicting provisions.

40

Copy from re:SearchTX

(v)    Notwithstanding anything to the contrary in this <u>Section 4.7(b)</u>, no distributions shall be made to any Partner pursuant to <u>Section 4.7(b)(ii)</u> prior to the Opening Date, except for distributions with respect to amounts described in <u>Section 4.7(b)(ii)(A)(II)</u>, <u>(III)</u>, and <u>(IV)</u>.

4.8    <mark>Relocation Events.</mark>

(a)    If a Relocation Event occurs for any reason, then the Partnership may purchase and redeem the entire Partnership Interest of the Relocation Partners for an aggregate amount equal to $100. Any Partner that is not a Relocation Partner (referred to herein as a "<u>Remaining Partner</u>") may cause the Partnership to so purchase and redeem the Partnership Interests of the Relocation Partners. After any such purchase and redemption, the Partnership Interests of the Relocation Partners shall be considered terminated, and no additional distributions or payments shall be required or be made with respect to such redeemed Partnership Interests (including, without limitation, if applicable, any additional payments or distributions with respect to the ADS Loan and/or the ADS Note).

(b)    The Partners further acknowledge and agree that in connection with any such Relocation Event, the Partnership will recognize a built-in loss equal to the amount by which the aggregate Capital Account balances of the Relocation Partners at the time of such redemption exceed $100 (the aggregate redemption price). Notwithstanding anything to the contrary in this Agreement, this built-in loss shall be specially allocated to the Relocation Partners in connection with the redemption of their Partnership Interests in a manner that reduces their aggregate Capital Account balances to $100.

(c)    For purposes of this Agreement, a "<u>Relocation Event</u>" means: (i) with respect to DBL, a breach by DBL prior to the 30th anniversary of the Opening Date of: (A) section 1 of the Mavericks Non-Relocation Agreement; or (B) section 2.1, section 2.2, and/or section 2.3 of the Mavericks Franchise Agreement; and (ii) with respect to the Dallas Stars, a breach by the Dallas Stars prior to the 30th anniversary of the Opening Date of: (A) section 1 of the Stars Non-Relocation Agreement; or (B) section 2.1, section 2.2, and/or section 2.3 of the Stars Franchise Agreement.

(d)    For purposes of this Agreement, the "<u>Relocation Partners</u>" means the Limited Partners that are Affiliates of the Team that has caused a Relocation Event to occur.

4.9    <u>Capital Accounts.</u>

(a)    <u>Maintenance Rules</u>. The Partnership shall maintain for each Partner a separate Capital Account in accordance with this <u>Section 4.9</u>, which shall control the division of assets upon liquidation of the Partnership as provided in <u>Section 11.3</u>. The Capital Account shall be maintained in accordance with the following provisions:

41

Copy from re:SearchTX

(i)     Such Capital Account shall be increased by the cash amount or Book Value of any property contributed by such Partner to the Partnership pursuant to this Agreement, such Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated to such Partner pursuant to Section 4.7, Section 5.2 and Section 5.3 hereof, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any property distributed to such Partner.

(ii)    Such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Partner pursuant to this Agreement, such Partner's allocable share of Losses and any items in the nature of deductions or losses which are specially allocated to such Partner pursuant to Section 4.7, Section 4.8(b), Section 5.2 and Section 5.3 hereof, and the amount of any liabilities of the Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

(iii)   In the event all or a portion of an interest in the Partnership is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred interest, provided, however, that if the Transfer causes a termination of the Partnership under Section 708(b)(1)(B) of the Code, then the Partnership shall be deemed to have contributed its assets to a new Partnership in exchange for interests in the new partnership (which new partnership will be taxed as a partnership for federal income tax purposes), followed by a distribution of the interests in such new partnership to the Partners in liquidation of the Partnership. Such deemed exchange of interests followed by a distribution and liquidation shall not cause the Partnership to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax, unless otherwise provided in Article XI.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts generally are intended to comply with Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner reasonably determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Regulations, the General Partner may authorize such modifications, provided that it does not have any adverse effect on the amounts distributable to any Person pursuant to Section 11.3 hereof upon the dissolution of the Partnership.

(b)     Definition of Profits and Losses. "Profits" and "Losses" mean, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

42

Copy from re:SearchTX

(i)     Income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 4.9(b) shall be added to such taxable income or loss;

(ii)    Any expenditures of the Partnership described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this Section 4.9(b) shall be subtracted from such taxable income or loss;

(iii)   In the event the Book Value of any Partnership asset is adjusted pursuant to Section 4.9(c)(ii) or Section 4.9(c)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v)     In lieu of the deduction for depreciation, cost recovery or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation. "Book Depreciation" for any asset means for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the General Partner; and

(vi)    Notwithstanding any other provision of this Section 4.9(b), any items that are specially allocated pursuant to Section 4.7, Section 4.8(b), Section 5.2 or Section 5.3 shall not be taken into account in computing Profits and Losses.

(c)     Definition of Book Value. "Book Value" means for any asset the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the General Partner.

43

Copy from re:SearchTX

(ii)     The Book Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times:  (A) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership, (B) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (C) the liquidation of the Partnership within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g);

(iii)    The Book Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution, as determined by the General Partner in a manner consistent with subparagraph (ii) above.

(iv)    The Book Values of Partnership assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 5.2(d) hereof, provided, however, that Book Values shall not be adjusted pursuant to this Section 4.9(c)(iv) to the extent the General Partner determines that an adjustment pursuant to Section 4.9(c)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 4.9(c)(iv).

(v)     If the Book Value of an asset has been determined or adjusted pursuant to Section 4.9(c)(i), Section 4.9(c)(ii), or Section 4.9(c)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

4.10    Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

4.11    No Withdrawal.  No Partner shall be entitled to withdraw any part of its Capital Contribution or its Capital Account or to receive any distribution from the Partnership, except as provided in Articles IV, VI, and XI.

4.12    Limitation on Capital Contributions and Loans.  Except as specifically provided in this Article IV and/or Article VII, no Partner may contribute capital, loan, or advance money to the Partnership.

007500.00176:463592.011
Page 84 of 252

Copy from re:SearchTX

## ARTICLE V

## ALLOCATIONS

5.1     Allocation of Profits and Losses.

(a)     Allocation of Profits Generally.  After giving effect to the allocations set forth in Section 4.7, Section 4.8(b), Section 5.2 and Section 5.3, and after giving effect to all distributions of cash or property (other than cash or property to be distributed pursuant to Article XI), Profits for any Fiscal Year shall be allocated to the Partners in the following manner:

(i)     First, to each Partner with a negative balance in its Adjusted Capital Account, pro rata in accordance with such negative Adjusted Capital Account balances, until such negative Adjusted Capital Account balances have been eliminated;

(ii)     Next, to such of the Partners that have Undistributed First Priority Capital in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(iii)     Next, to such of the Partners that have:  (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(iv)     Next, to such of the Partners that have:  (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount; plus (C) Undistributed Second Priority Capital, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(v)     Next, to such of the Partners that have:  (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount; plus (C) Undistributed Second Priority Capital; plus (D) Undistributed Third Priority Capital, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(vi)     Next, to such of the Partners that have:  (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount; plus (C) Undistributed Second Priority Capital; plus (D) Undistributed Third Priority Capital; plus (E) accrued and unpaid Fourth Priority Preference Amount;, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(vii)     Next, to such of the Partners that have:  (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount;

45

Copy from re:SearchTX

plus (C) Undistributed Second Priority Capital; plus (D) Undistributed Third Priority Capital; plus (E) accrued and unpaid Fourth Priority Preference Amount; plus (F) Undistributed Fourth Priority Capital, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(viii)   Next, to such of the Partners that have: (A) Undistributed First Priority Capital; plus (B) accrued and unpaid Second Priority Preference Amount; plus (C) Undistributed Second Priority Capital; plus (D) Undistributed Third Priority Capital; plus (E) accrued and unpaid Fourth Priority Preference Amount; plus (F) Undistributed Fourth Priority Capital; plus (G) Undistributed Fifth Priority Capital, in excess of such Partner's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(ix)   Next, to the Partners in the minimum amount necessary to cause the ratios among their "Excess Amounts" to equal the ratios among their Back-End Percentage Interests.   For purposes of this Agreement, a Partner's "Excess Amount" equals the positive balance in such Partner's Adjusted Capital Account (computed after the allocation of Profits under subparagraphs (i) through (viii) of this Section 5.1(a) for the Fiscal Year of the allocation), reduced by the sum of such Partner's: (A) Undistributed First Priority Capital; (B) accrued and unpaid Second Priority Preference Amount; (C) Undistributed Second Priority Capital; (D) Undistributed Third Priority Capital; (E) accrued and unpaid Fourth Priority Preference Amount; (F) Undistributed Fourth Priority Capital; and (G) Undistributed Fifth Priority Capital (with such amounts in subparagraphs (A) through (G) being computed after giving effect to all Capital Contributions and all distributions that took place during and before the Fiscal Year with respect to which the allocation is being made); and

(x)   Next, to the Partners in proportion to their Back-End Percentage Interests.

(b)   Allocation of Losses.

(i)   After giving effect to the allocations set forth in Section 4.7, Section 4.8(b), Section 5.2 and Section 5.3, and after giving effect to all distributions of cash or property (other than cash or property to be distributed pursuant to Article XI), and subject to the limitation set forth in Section 5.1(b)(ii), Losses for any Fiscal Year shall be allocated to the Partners in the following manner:

(A)   First, in circumstances in which all Partners have positive Excess Amounts, to the Partners in the minimum amounts necessary to cause their positive Excess Amounts to be in the same ratios as their Back-End Percentage Interests, and in circumstances in which one or more Partners, but not all Partners, have positive Excess Amounts, to the Partners with positive Excess Amounts in the minimum amounts

46

Copy from re:SearchTX

necessary to cause such Partners' positive Excess Amounts to be in the same ratios as their Back-End Percentage Interests;

(B)     Next, to the Partners with positive Excess Amounts pro rata in accordance with their positive Excess Amounts, until such positive Excess Amounts have been eliminated;

(C)     Next, to each Partner that has Undistributed Fifth Priority Capital, pro rata to the extent necessary to cause each such Partner's positive Adjusted Capital Account balance to equal the sum of such Partner's:  (I) Undistributed First Priority Capital; (II) accrued and unpaid Second Priority Preference Amount; (III) Undistributed Second Priority Capital; plus (IV) Undistributed Third Priority Capital; (V) accrued and unpaid Fourth Priority Preference Amount; and (VI) Undistributed Fourth Priority Capital;

(D)     Next, to each Partner that has Undistributed Fourth Priority Capital, pro rata to the extent necessary to cause each such Partner's positive Adjusted Capital Account balance to equal the sum of such Partner's:  (I) Undistributed First Priority Capital; (II) accrued and unpaid Second Priority Preference Amount; (III) Undistributed Second Priority Capital; plus (IV) Undistributed Third Priority Capital; and (V) accrued and unpaid Fourth Priority Preference Amount;

(E)     Next, to each Partner that has accrued and unpaid Fourth Priority Preference Amount, pro rata to the extent necessary to cause each such Partner's positive Adjusted Capital Account balance to equal the sum of such Partner's:  (I) Undistributed First Priority Capital; (II) accrued and unpaid Second Priority Preference Amount; (III) Undistributed Second Priority Capital; and (IV) Undistributed Third Priority Capital;

(F)     Next, to each Partner that has Undistributed Third Priority Capital, pro rata to the extent necessary to cause each such Partner's positive Adjusted Capital Account balance to equal the sum of such Partner's:  (I) Undistributed First Priority Capital; (II) accrued and unpaid Second Priority Preference Amount; plus (III) Undistributed Second Priority Capital;

(G)     Next, to each Partner that has Undistributed Second Priority Capital, pro rata to the extent necessary to cause each such Partner's positive Adjusted Capital Account balance to equal the sum of such Partner's:  (I) Undistributed First Priority Capital; and (II) accrued and unpaid Second Priority Preference Amount;

(H)     Next, to each Partner that has an accrued and unpaid Second Priority Preference Amount, pro rata to the extent necessary to

47

Copy from re:SearchTX

cause each Partner's positive Adjusted Capital Account balance to equal such Partner's Undistributed First Priority Capital;

(I)     Next, to each Partner with a positive Adjusted Capital Account balance, pro rata in accordance with such positive Adjusted Capital Account balances, until such positive Adjusted Capital Account balances have been reduced to zero; and

(J)     Next, to the Partners in proportion to their Back-End Percentage Interests.

(ii)    Notwithstanding anything to the contrary in Section 5.1(b)(i):

(A)     The Losses allocated pursuant to Section 5.1(b)(i) hereof to any Partner for any Fiscal Year shall not exceed the maximum amount of Losses that may be allocated to such Partner without causing such Partner to have an Adjusted Capital Account Deficit at the end of such Fiscal Year.

(B)     If some but not all of the Partners would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.1(b)(i) hereof, the limitations set forth in this Section 5.1(b)(ii) shall be applied by allocating Losses pursuant to this Section 5.1(b)(ii) only to those Partners who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation of Losses (with the allocation of such Losses among such Partners to be determined by the General Partner, based on the allocation that is most likely to effectuate the distribution priorities set forth in Section 6.1 hereof).

(C)     If no Partner may receive an additional allocation of Losses pursuant to Section 5.1(b)(ii)(B) above, such additional Losses not allocated pursuant to Section 5.1(b)(ii)(B) shall be allocated to the General Partner.

5.2    Special Allocations.

(a)     Minimum Gain Chargeback-Partnership Nonrecourse Liabilities.  If there is a net decrease in Partnership Minimum Gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Partners in the amounts and manner described in Regulations section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Regulations section 1.704-2(f)(2), (3), (4), and (5).  This Section 5.2(a) is intended to comply with the minimum gain chargeback requirement (set forth in Regulations section 1.704-2(f)) relating to partnership nonrecourse liabilities (as defined in Regulations section 1.704-2(b)(3)) and shall be so interpreted.

48

Copy from re:SearchTX

(b)     Minimum Gain Chargeback--Partner Nonrecourse Debt. If there is a net decrease in Partner Minimum Gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Partners who had a share of the Partner Minimum Gain (determined pursuant to Regulations section 1.704-2(i)(5)) in the amounts and manner described in Regulations section 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 5.2(b) is intended to comply with the minimum gain chargeback requirement (set forth in Regulations section 1.704-2(i)(4)) relating to partner nonrecourse debt (as defined in Regulations section 1.704-2(b)(4)) and shall be so interpreted.

(c)     Qualified Income Offset. If, after applying Section 5.2(a) and Section 5.2(b), any Partner has an Adjusted Capital Account Deficit, items of Partnership income and gain shall be specially allocated (on a gross basis) to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.

(d)     Optional Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code sections 734(b) or 743(b) is required, pursuant to Regulations section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be considered an additional item of taxable loss or deduction that is included in the determination of Profits and Losses pursuant to Section 4.9(b) and that is then allocated among the Partners as part of the allocation of Profits and Losses.

(f)     Partner Nonrecourse Deductions. Partner Nonrecourse Deductions shall be allocated pursuant to Regulations section 1.704-2(b)(4) and (i)(1) to the Partner or Partners who bear the economic risk of loss with respect to such deductions.

5.3     Curative Allocations. The allocations set forth in Section 5.1(b)(ii) and Section 5.2(a) through Section 5.2(f) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 5.3. Therefore, notwithstanding any other provisions of this Article V (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to Section 4.7, Section 4.8(b), Section 5.1(a) and Section 5.1(b)(i).

49

Copy from re:SearchTX

In exercising its discretion under this Section 5.3, the General Partner shall take into account future Regulatory Allocations under Sections 5.2(a) and 5.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 5.2(e) and 5.2(f).

5.4     Tax Allocations: Code Section 704(c).

(a)     In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Book Value (computed in accordance with Section 4.9(c)(i) hereof).

(b)     If the Book Value of any Partnership asset is adjusted pursuant to Section 4.9(c)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code section 704(c) and the Regulations thereunder.

(c)     Any elections or other decisions relating to such allocation shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of the Agreement.   Allocations pursuant to this Section 5.4 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Person's Capital Account, Adjusted Capital Account, or share of Profits, Losses, and other items or distributions pursuant to any provision of this Agreement.

5.5     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other item allocable to any period, Profits, Losses and any such other item shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code section 706 and the Regulations thereunder.

(b)     For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Partners in accordance with the allocations under Sections 4.7, 4.8(b), 5.1, 5.2, 5.3, and 5.4.

(c)     The Partners are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Partnership income and loss for income tax purposes.

(d)     It is generally intended that the allocations in Sections 4.7, 4.8(b), 5.1, 5.2, 5.3, and 5.4 hereof effect an allocation for federal income tax purposes consistent with section 704 of the Code and comply with any limitations or restrictions therein.

50

Copy from re:SearchTX

(e)     The Partners agree that their Back-End Percentage Interests represent their respective interests in Partnership profits for purposes of allocating excess nonrecourse liabilities (as defined in Regulations section 1.752-3(a)(3)) pursuant to Regulations Section 1.752-3(a)(3).

## ARTICLE VI

## DISTRIBUTIONS

6.1     Distributions of Available Loan Proceeds.

(a)     Distributions shall only be made pursuant to this Section 6.1 if:  (i) the Switch Date has not occurred, a Trigger Event Default has not occurred, and a Relocation Event has not occurred; and (ii) there are Available Loan Proceeds to distribute.  If these conditions are not satisfied with respect to a particular proposed distribution, then such proposed distribution shall be made in accordance with Section 6.2 below.

(b)     If the conditions described in Section 6.1(a) have been satisfied, then the General Partner shall distribute such Available Loan Proceeds to each Partner in the following manner:

(i)     First, to each Limited Partner to the extent such Limited Partner has accrued but unpaid Second Priority Preference Amount, in proportion to each such Limited Partner's accrued but unpaid Second Priority Preference Amount, in an amount up to the accrued but unpaid Second Priority Preference Amount of each such Limited Partner;

(ii)     Next, to each Limited Partner to the extent such Limited Partner has Undistributed Second Priority Capital, in proportion to each such Limited Partner's Undistributed Second Priority Capital, in an amount up to the Undistributed Second Priority Capital of each such Limited Partner; and

(iii)     Next, to each Partner to the extent such Partner has Undistributed Third Priority Capital, in proportion to each such Partner's Undistributed Third Priority Capital, in an amount up to the Undistributed Third Priority Capital of each such Partner.

(c)     No Partner shall have any right to receive Available Loan Proceeds pursuant to this Section 6.1 in excess of the sum of its: (i) accrued but unpaid Second Priority Preference Amount; (ii) Undistributed Second Priority Capital; and (iii) Undistributed Third Priority Capital;

6.2     Payments and Distributions of Available Cash.  The Partners anticipate that no distributions will be made pursuant to this Section 6.2 until after the Opening Date because of certain limitations contained in the Arena Loan Documents.

51

Copy from re:SearchTX

(a)     Subject to Section 4.7, Section 4.8 and Section 11.3, the General Partner shall determine if there is any Available Cash. If the General Partner determines that Available Cash exists, then the General Partner shall promptly make the payments to the Teams in accordance with the procedure described on Exhibit B.

(b)     Subject to Section 4.7 and Section 4.8, if there is any Available Cash remaining after the payments described in Section 6.2(a) above, then the General Partner shall promptly distribute such Available Cash to the Partners in the manner set forth below:

(i)     First, to each Limited Partner to the extent such Limited Partner has Undistributed First Priority Capital, in proportion to each such Limited Partner's Undistributed First Priority Capital, in an amount up to the Undistributed First Priority Capital of each such Limited Partner;

(ii)     Next, to each Limited Partner to the extent such Limited Partner has an accrued but unpaid Second Priority Preference Amount, in proportion to each such Limited Partner's accrued but unpaid Second Priority Preference Amount, in an amount up to the accrued but unpaid Second Priority Preference Amount of each such Limited Partner;

(iii)     Next, to each Limited Partner to the extent such Limited Partner has Undistributed Second Priority Capital, in proportion to each such Limited Partner's Undistributed Second Priority Capital, in an amount up to the Undistributed Second Priority Capital of each such Limited Partner;

(iv)     Next, to each Partner to the extent such Partner has Undistributed Third Priority Capital, in proportion to each such Partner's Undistributed Third Priority Capital, in an amount up to the Undistributed Third Priority Capital of each such Partner;

(v)     Next, to each Limited Partner to the extent such Limited Partner has an accrued but unpaid Fourth Priority Preference Amount, in proportion to each such Limited Partner's accrued but unpaid Fourth Priority Preference Amount, in an amount up to the accrued but unpaid Fourth Priority Preference Amount of each such Limited Partner;

(vi)     Next, to each Limited Partner to the extent such Limited Partner has Undistributed Fourth Priority Capital, in proportion to each such Limited Partner's Undistributed Fourth Priority Capital, in an amount up to the Undistributed Fourth Priority Capital of each such Limited Partner;

(vii)     Next, to each Limited Partner to the extent such Limited Partner has Undistributed Fifth Priority Capital, in proportion to each such Limited Partner's Undistributed Fifth Priority Capital, in an amount up to the Undistributed Fifth Priority Capital of each such Limited Partner; and

52

Copy from re:SearchTX

(viii)   Next, to the Partners in proportion to their Back-End Percentage Interests,

(ix)   Notwithstanding anything to the contrary above, if Available Cash is derived from a transaction that occurs in connection with the dissolution, termination, and liquidation of the Partnership, any Available Cash that is derived from or attributable to such a transaction shall be distributed to the Partners in accordance with Section 11.3 hereof.

6.3   Special Payments of Other Charges on Interim Loan Promissory Notes.   If a Person that holds an Interim Loan Promissory Note (or an Affiliate of such Person) has made additional Capital Contributions to the Partnership pursuant to Section 4.4(a)(iv) with respect to Other Charges owed by the Partnership to such Person with respect to such Interim Loan Promissory Note, then the Partnership shall promptly pay such Other Charges to the Person that holds the applicable Interim Loan Promissory Note (but only to the extent of the additional Capital Contribution made by such Person (or its Affiliate) pursuant to Section 4.4(a)(iv)). Under no circumstances shall any payments with respect to Other Charges owed on an Interim Loan Promissory Note be made pursuant to Section 6.1, Section 6.2, or any other provision of this Agreement, other than this Section 6.3, and such payments shall only be made pursuant to this Section 6.3 to the extent funded with the proceeds of additional Capital Contributions described in Section 4.4(a)(iv).

6.4   Amounts Withheld.   Notwithstanding any other provision of this Agreement to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to such Partner as a result of such Partner's participation in the Partnership. If the Partnership is required to withhold or pay any such taxes, such Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time such withholding or tax is paid, which payment shall be deemed to be a distribution with respect to such Partner's Partnership Interest to the extent that the Partner (or any successor to such Partner's Partnership Interest) is entitled to receive a distribution. Any withholdings authorized by this Section 6.4 shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

6.5   Excess Distributions.   To the extent that the aggregate amount of actual and deemed distributions to a Partner under this Article VI for any period (i.e., deemed distributions are those distributions that result from the application of withholding under Section 6.4) exceed the actual distributions to which such Partner is entitled for such period, the amount of such excess shall be considered a loan from the Partnership to such Partner. Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at 15% per annum, computed annually, until discharged by such Partner by repayment, which may be made in the sole discretion of the General Partner out of distributions to which such Partner would otherwise be subsequently entitled.

53

Copy from re:SearchTX

## ARTICLE VII

## MANAGEMENT OF THE PARTNERSHIP

7.1     Rights and Obligations of General Partner.

(a)     The Partners hereby designate Center GP, LLC as the sole General Partner of the Partnership.

(b)     Subject to Section 7.2, the General Partner shall conduct, direct, and exercise control over all activities of the Partnership, and all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable laws or that are granted to the General Partner under any provision of this Agreement, but subject to the limitations contained in Section 7.2 hereof, the General Partner shall have full power and authority to do all things reasonably deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation:

(i)     The determination of the activities in which the Partnership will participate;

(ii)     The making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership;

(iii)     The acquisition, development, redevelopment, operation, disposition, mortgage, pledge, encumbrance, hypothecation, sale, or exchange of any or all of the assets of the Partnership;

(iv)     The use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations of the Partnership;

(v)     The negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement;

(vi)     The distribution of Partnership assets;

007500.00176:463592.011

Copy from re:SearchTX

(vii)   The selection, hiring, and dismissal of employees, attorneys, accountants, consultants, contractors, agents, and representatives, and the determination of their compensation and other terms of employment or hiring;

(viii)  The maintenance of such insurance for the benefit of the Partnership as it deems necessary;

(ix)   The formation of, or ownership or participation in, any limited or general partnerships, joint ventures, corporations, limited liability companies, or other relationships that it deems desirable and the contribution to such entities of assets and properties of the Partnership;

(x)   The making of all decisions in connection with the development and construction of the Arena Project;

(xi)   The making of all decisions under and the taking of all actions with respect to the Arena Loan Documents; and

(xii)   The control of any matters affecting the rights and obligations of the Partnership, including the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

7.2    Restrictions.  Without the prior written consent of all of the Limited Partners, the General Partner shall not have the authority to act on any matter constituting a Major Decision. The term "Major Decision," as used in this Agreement, means any of the following decisions:

(a)    Doing any act in contravention of this Agreement;

(b)    Doing any act which would make it impossible to carry on the ordinary business of the Partnership;

(c)    Using the Partnership's name, credit, or assets for other than Partnership purposes;

(d)    Changing the purposes of the Partnership from those purposes set forth in Section 3.1 above, or engaging in any activities on behalf of the Partnership outside the scope of the purposes of the Partnership as set forth in Section 3.1 above; and

(e)    Causing the Partnership to take any other action that requires the consent or approval of all the Limited Partners under this Agreement.

7.3    Certificate of Limited Partnership.  The General Partner has caused the Certificate to be filed with the Secretary of State of Texas prior to the Effective Date.  The General Partner shall cause to be filed at the Partnership's expense such other certificates or documents as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation or qualification and operation of a limited partnership (or a company in which the

Copy from re:SearchTX

member has limited liability) in the State of Texas and in any other state in which the Partnership may elect to do business.

7.4     Reliance by Third Parties.

(a)     Notwithstanding any other provision of this Agreement to the contrary, no lender, purchaser, or any other Person dealing with the Partnership shall be required to verify any representation made by the General Partner as to its authority to encumber, sell, or otherwise use any assets or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.

(b)     In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the General Partner or its representatives have authority, on behalf of the Partnership, to engage in such business or transaction if such dealings involve: (i) the payment by the Partnership of less than $500,000; or (ii) the execution of a contract with a term of less than one (1) year; (iii) the execution of a contract that is reasonably expected to be substantially completed within one (1) year; or (iv) the execution of a contract that is terminable on 60 days prior notice by the Partnership. Each such Person dealing with the General Partner or the General Partner's representatives with respect to any business or property of the Partnership shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.

(c)     Except as otherwise provided in Section 7.4(b), in no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative; and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of each and every Person relying thereon or claiming thereunder that:  (i) at the time of the execution and delivery thereof this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver each and every such instrument or document for and on behalf of the Partnership. Nothing contained in this Section 7.4, however, will affect the relationship among the Partners nor constitute approval by the Limited Partners of any act taken by the General Partner in contravention of this Agreement.

7.5     Compensation and Reimbursement of Partners.  No Partner shall be compensated for any services rendered to the Partnership and no Partner shall be entitled to any reimbursements from the Partnership, unless such reimbursements have been specifically approved by the General Partner.

56

Copy from re:SearchTX

7.6     Outside Activities.

(a)     Except as provided in Section 7.6(b), the Partners, any Affiliates thereof, and each director, officer, constituent member, manager, agent, constituent partner or employee of a Partner and/or any Affiliates thereof, shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership and may engage in any other businesses and activities for their own accounts and for the accounts of others without having or incurring any obligation to offer any interest in or funds from such properties, businesses or activities to the Partnership or any Partner as a result of their ownership of an interest in the Partnership.   Subject to Section 7.6(b), no other provision of this Agreement shall be deemed to prohibit the Partners or any such other Person from conducting such other businesses and activities. Subject to Section 7.6(b), neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the relationship created hereby, to participate in or the right to own any interest in any business ventures of any of the other Partners, any Affiliates thereof, or any director, officer, constituent member, manager, agent, constituent partner, or employee of any such Partner and/or Affiliate.

(b)     Notwithstanding anything to the contrary in Section 7.6(a), the Partners acknowledge and agree that nothing in this Agreement is intended to limit the application of provisions in other agreements (e.g., the Arena Loan Documents, the Master Agreement (and documents contemplated thereby), the Amended and Restated Agreement of Limited Partnership of Hillwood/1642, Ltd., dated as of September 16, 1998, and the Amended and Restated Agreement of Limited Partnership of Arena Land Partners, L.P., dated as of July 1, 1999) that might otherwise limit or restrict a Partner, an Affiliate thereof, or a director, officer, member, partner, manager, agent, partner, or employee of a partner and/or any Affiliate thereof, from engaging in certain activities.

7.7     Partnership Funds.   The funds of the Partnership shall be deposited in such segregated money-market Partnership account or Partnership accounts as are designated by the General Partner or, to the extent applicable, as may be required by the Arena Loan Documents. The General Partner shall not commingle Partnership funds with any funds or accounts of any other Person.   Any withdrawals from or charges against such accounts may be made by the General Partner or by its officers or agents, in accordance with the terms of the Agreement.  The General Partner may authorize certain Persons to establish Partnership accounts.

7.8     Duties.   The General Partner shall act honestly, in good faith and in the best interest of the Partnership.   The General Partner shall devote itself to the business of the Partnership to the extent necessary for the efficient carrying on thereof and in a manner that will permit the General Partner to fulfill those duties and responsibilities described in this Agreement.

7.9     Transactions with Affiliates.

(a)     Subject to the Arena Loan Documents, the General Partner may not, on behalf of the Partnership, enter into any transaction, agreement, or contract with respect

57

Copy from re:SearchTX

to the Partnership and/or the business and affairs of the Partnership, with any Person that is a Partner, an Affiliate of any Partner, and/or an Affiliate of the Partnership, unless the terms to the Partnership of any such transaction, agreement, or contract involving the Partnership with any Partner, any Affiliate of any Partner, and any Affiliate of the Partnership, including the amount of fees to be paid by the Partnership to such Person, shall be competitive with the terms of similar transactions, agreements, or contracts obtained by persons in the same business as the Partnership in arms-length agreements with unrelated parties.

(b)     In connection with the execution of this Agreement, the Partners have unanimously approved the Partnership's assumption and acceptance of the Original Issuers' rights and obligations under: (i) the Development Agreement; (ii) the Financial Advisory Agreement; (iii) the Mavericks Lease; (iv) the Stars Lease; and (v) all other applicable Transaction Documents.

7.10    Indemnification of Partners.  Except as provided in the Arena Loan Documents, the Partnership shall indemnify and hold harmless the Partners, their directors, officers, shareholders, constituent partners, constituent members, managers, and employees, and the officers and directors of AOC (individually, an "Indemnitee"), as follows:

(a)     (i)     In any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, to which an Indemnitee was or is a party or is threatened to be made a party by reason of the fact that such Indemnitee is or was a Partner, or a director, officer, shareholder, employee, constituent partner, manager, or constituent member of a Partner, or an officer or a director of AOC, the Partnership shall indemnify such Indemnitee against attorneys' fees, judgments, fines, penalties, settlements, and reasonable expenses actually incurred by such Indemnitee in connection with the defense and/or settlement of such action, suit or proceeding, if such Indemnitee acted in good faith, and in the case of the exercise of authority by the Indemnitee under the Texas Act or this Agreement, other than service for another enterprise, in a manner reasonably believed by such Indemnitee to be in the best interests of the Partnership and, in all other cases, that the Indemnitee's conduct was at least not opposed to the Partnership's best interests, and with respect to any criminal action or proceeding, the Indemnitee did not have reasonable cause to believe that his conduct was unlawful.

(ii)     In no event, however, shall indemnification ever be made: (A) in relation to a proceeding in which the Indemnitee has been found liable for fraud, a criminal act, a breach of fiduciary duty, gross negligence, or willful or intentional misconduct in the Indemnitee's performance of its duty to the Partnership; (B) with respect to a material breach by the Indemnitee of the terms and provisions of this Agreement; (C) with respect to a claim or suit brought by one Indemnite against another Indemnitee; or (D) with respect to any amount that an Indemnitee may owe to another Person under the Indemnity Agreement.

007500.00176:463592.011

Copy from re:SearchTX

(iii)    The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that an Indemnitee did not act in good faith and in a manner reasonably believed by such Indemnitee to be in the interests of the Partnership or not opposed to the Partnership's interests.

(b)    If a claim or assertion of liability is made or asserted by a third party against an Indemnitee by reason of the fact that such Indemnitee was or is a party or is threatened to be a party by reason of the fact that such Indemnitee is or was a Partner, or is a director, officer, employee, shareholder, constituent partner, constituent member, or manager of a Partner, or an officer or a director of AOC, Indemnitee will forthwith give to the Partnership and the General Partner written notice of the claims or assertion of liability and request the Partnership to defend the same and any other related claims or assertions of liability that are included in the same complaint.  Failure to so notify the Partnership will not relieve the Partnership of any liability which the Partnership might have to Indemnitee except to the extent that such failure actually prejudices the Partnership's legal position.  The Partnership will have the obligation to defend against such claims or assertions and the Partnership will give written notice to the Indemnitee of acceptance of the defense of such claims and the name of the counsel selected by the Partnership to defend such claims.  The Indemnitee will be entitled to participate with the Partnership in such defense and also will be entitled at its option (and expenses) to employ separate counsel for such defense.  In the event the Partnership does not accept the defense of the claims or in the event that the Partnership or its counsel fails to use reasonable care in maintaining such defense, the Indemnitee will have the right to employ counsel for such defense at the expense of the Partnership.  The Partnership and the Indemnitee will cooperate with each other in the defense of any such action and the relevant records of each will be made available to the other with respect to such defense. If, at the conclusion of any such proceedings, it is determined that the Indemnitee would not have been entitled to indemnification pursuant to this <u>Section 7.10</u> for such claims or assertions, then the Indemnitee shall immediately reimburse the Partnership for any costs and expenses paid by the Partnership to defend the Indemnitee pursuant to this <u>Section 7.10(b)</u>.

(c)    No Indemnitee will be entitled to indemnification under this <u>Section 7.10</u> if it has entered into any settlement or compromise of any claim giving rise to any indemnifiable loss without the written consent of the Partnership.  If a bona fide settlement offer is made with respect to a claim and the Partnership desires to accept and agree to such offer, the Partnership will give written notice to the Indemnitee to that effect (the "<u>Settlement Notice</u>").  If the Indemnitee fails to consent to the settlement offer within ten (10) calendar days after receipt of the Settlement Notice, then the Indemnitee will be deemed to have rejected such settlement offer and will be responsible for continuing the defense of such claim and, in such event, the maximum liability of the Partnership as to such claim will not exceed the amount of such settlement offer plus any and all reasonable costs and expenses paid or incurred by the Indemnitee up to the date of the Settlement Notice and which are otherwise the responsibility of the Partnership pursuant to this <u>Section 7.10</u>.

007500.00176:463592.011

Copy from re:SearchTX

(d)    Any indemnification permitted under this <u>Section 7.10</u> shall be made only out of the assets of the Partnership and no Partner shall be obligated to contribute to the capital of or loan funds to, the Partnership to enable the Partnership to provide such indemnification.

(e)    The indemnification provided by this <u>Section 7.10</u> shall be in addition to any other rights to which each Indemnitee may be entitled under any agreement or vote of the Partners or as a matter of law or otherwise, as to an action in the Indemnitee's capacity as a Partner, as a director, officer, employee, shareholder, constituent partner, constituent member, or manager of a Partner, or as an officer or director of AOC, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns, administrators, and personal representatives of the Indemnitee.

(f)    Except as otherwise provided in this Agreement, the Partnership may purchase and maintain insurance on behalf of any one or more Indemnitees if approved by the General Partner.

(g)    In no event may an Indemnitee subject a Partner to personal liability by reason of the indemnification provisions of this Agreement.

(h)    The provisions of this <u>Section 7.10</u> are for the benefit of the Indemnitees and the heirs, successors, assigns, administrators, and personal representatives of the Indemnitees and shall not be deemed to create any rights for the benefit of any other Persons.

(i)    Any action to be taken by the Partnership pursuant to this <u>Section 7.10</u> shall instead be taken by and require approval of the General Partner.

7.11    <u>Liability of Partners</u>. The General Partner shall not be liable to the Partnership or to any other Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence, fraud, criminal misconduct, a breach of fiduciary duty, or willful and intentional misconduct.  None of the constituent members, managers, officers, employees, directors, or shareholders of any Partner, however, shall ever be liable to the Partnership or to any other Partner for any act or omission of such related Partner.

7.12    <u>Insurance</u>.   The General Partner, on behalf of the Partnership and at the Partnership's cost and expense, shall during the entire term hereof, obtain, maintain and keep in full force and effect, such insurance coverage as the General Partner deems advisable.

007500.00176:463592.011

Copy from re:SearchTX

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

8.1    <u>Records and Accounting</u>.  The General Partner shall keep or cause to be kept complete books and records with respect to the Partnership's business (including without limitation, any books, records, statements, or information required to be maintained by the Partnership under the Texas Act), which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may approve for such purposes.  Any books and records maintained by the Partnership in the regular course of its business may be kept on any information storage device, provided that the books and records so kept are convertible into clearly legible written form within a reasonable period of time.   The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis method of accounting.

8.2    <u>Fiscal Year</u>.  The Fiscal Year of the Partnership shall be the calendar year for tax and accounting purposes.

8.3    <u>Reports</u>.

(a)    The General Partner shall deliver to each Partner, not later than 120 days following the end of each Fiscal Year, a balance sheet, an income statement, and an annual statement of cash flow of the Partnership for such Fiscal Year.  Upon the request of any Partner, at the Partnership's expense, the General Partner shall cause the Partnership's Independent Accountants to review and certify such statements.

(b)    The General Partner shall use commercially reasonable efforts to prepare, or cause to be prepared at the Partnership's expense, and deliver to each Partner, within 45 days following the end of each calendar quarter:

(i)    Unaudited financial statements prepared in accordance with generally accepted accounting principles consistently applied (which financial statements shall include a balance sheet, an income statement, a statement of cash flows, and a statement of Partner's equity);

(ii)    A comparison of the current year-to-date financial statements to financial statements covering the same period of time during the preceding Fiscal Year (if available); and

(iii)    Detailed reports of any payments made by the Partnership to any Affiliates of the Partnership.

(c)    At the request of a Partner at any time, the General Partner shall additionally cause to be provided to the Partners:  (i) an annual analysis detailing the components, and changes therein, of the Partners' Capital Accounts, the Partners' Adjusted Capital Accounts, and each Partner's Undistributed First Priority Capital,

61

Copy from re:SearchTX

Undistributed Second Priority Capital, Undistributed Third Priority Capital, Undistributed Fourth Priority Capital, Undistributed Fifth Priority Capital, and any accrued but unpaid Second Priority Preference Amounts and any accrued but unpaid Fourth Priority Preference Amounts; (ii) an annual analysis detailing all allocations of Profit, Loss, and other items of income, gain, loss and deduction; and (iii) such other financial statements or information as may be reasonably requested by a Partner.

8.4    Documents.  Each Partner shall have the right during regular business hours and after prior written notice to inspect, review, make copies (at Partnership expense) of, and audit all documents relating to the business of the Partnership, including without limitation, all reports, studies, and other items prepared by or obtained by any Partners of the General Partner in connection with the performance of its duties hereunder.

## ARTICLE IX

## TAX MATTERS

9.1    Tax Matters Partner.  The General Partner shall be the tax matters partner (the "Tax Matters Partner") for federal income tax purposes pursuant to Section 6231 of the Code with respect to each applicable taxable year of the Partnership.  The General Partner is authorized to do whatever is necessary to qualify as such.

9.2    Annual Tax Returns.

(a)    The General Partner shall cause the Partnership's accountants to prepare, at the Partnership's expense, and shall file, or cause the filing of, all tax returns and shall, on behalf of the Partnership, file, or cause the filing of, all other writings required by any governmental authority having jurisdiction to require such filing within 180 days after the end of each applicable calendar year (commencing with the calendar year ending December 31, 1999).  The proposed annual federal income tax returns for the Partnership must be approved by the General Partner before such returns are filed.

(b)    Without the prior approval of the General Partner, no Partner shall file an amended return of the Partnership or a request for an administrative adjustment under Section 6227 of the Code, nor shall any Partner (other than the Tax Matters Partner, as provided herein) commence any administrative or judicial proceeding relating to a return of the Partnership.  Nothing herein shall be construed to prevent a Partner from undertaking any administrative or judicial proceeding with respect to its own return.

9.3    Notice and Limitations on Authority.  The Tax Matters Partner is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the Tax Matters Partner in connection with such proceedings.

62

Copy from re:SearchTX

9.4    Tax Elections. The General Partner shall do all acts, make all elections, and take whatever reasonable steps are required to maximize, in the aggregate, the federal, state, and local income tax advantages available to the Partnership and shall defend all tax audits and litigation with respect thereto at the expense of the Partnership. The General Partner shall cause the books, records, and tax returns of the Partnership to be maintained in a manner consistent with the acts, elections, and steps taken by the Partnership.

9.5    Organizational Expenses. The Partnership shall elect to deduct expenses incurred in organizing the Partnership ratably over a 60 month period as provided in Section 709 of the Code.

9.6    Taxation as a Partnership. The Partners intend for the Partnership to be taxed as a partnership for federal income tax purposes. No election shall be made by the Partnership, the General Partner, or any Partner for the Partnership to be classified as an association or a corporation under Section 7701 of the Code and the Regulations issued thereunder and no election shall be made to exclude the Partnership from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws. If the default classification rules under Section 7701 of the Regulations are ever amended so as to classify the Partnership as an association or corporation unless it elects otherwise, either Partner shall cause the Partnership to elect to be classified as a partnership pursuant to Section 7701 of the Regulations, as amended, for the taxable year in which such amendment to the Code or Regulations occurs.

## ARTICLE X

## TRANSFERS OF PARTNERSHIP INTERESTS

10.1    Transfer Rights.

(a)    Subject to Section 10.2, the General Partner may Pledge and/or Transfer all (but not less than all) of its Partnership Interests to any other Person, but only if the General Partner first obtains the prior written approval of all of the Limited Partners, which approval may be unreasonably withheld. Subject to Section 10.2, any Transferee of the General Partner's Partnership Interest shall succeed to all of the rights and obligations of the General Partner under this Agreement.

(b)    Subject to Section 10.2, a Limited Partner may Pledge and/or Transfer all or any portion of its Partnership Interest to any other Person without having to obtain the prior consent or approval of the General Partner or any other Partner so long as: (i) such Pledge and/or Transfer does not create a default under the Reimbursement Agreement or the Note Purchase Agreement; and (ii) except with respect to Pledges required in connection with the Arena Loan, such Limited Partner simultaneously Transfers and/or Pledges to the Transferee and/or Pledgee, as the case may be, the same proportionate interest that such Limited Partner owns in Center GP. Subject to Section 10.2, any Transferee of a Limited Partner's Partnership Interest shall succeed to all of the rights and

Copy from re:SearchTX

obligations, or the applicable portion thereof, of the Transferring Partner under this Agreement.

(c)    The Partners acknowledge and agree that it is their intent that each Partner shall, at all times, own the same proportionate "back-end percentage interest" in Center GP. The Partnership as such Limited Partner owns in Center GP. Except for those Pledges required in connection with the Arena Loan, the Limited Partners shall at all times take such actions as may be necessary to maintain the same proportionality in the Back-End Percentage Interest in the Partnership and the "back-end percentage interest" in Center GP, including without limitation, in connection with Transfers described in this Article X, and in connection with the dilution of Back-End Percentage Interests described in Article IV above. Any Transfers or Pledges in contravention of this Section 10.1(c) shall be void ab initio and strictly prohibited.

(d)    Notwithstanding anything to the contrary in this Agreement, in connection with the execution of this Agreement, the Partners unanimously approve the Pledge by the General Partner of its Partnership Interests to the Collateral Trustee for the benefit of the Purchasers pursuant to that certain Pledge Agreement, substantially in the form of the Pledge Agreement attached as Exhibit E to the Note Purchase Agreement.

10.2    Admission as a Partner.

(a)    A permitted Transferee of a Partnership Interest pursuant to Section 10.1 shall be admitted as a Partner only after satisfaction of the conditions set forth in subparagraphs (i) through (iv) below, and if applicable, subparagraph (v):

(i)    The Transferee accepts and agrees to be bound by the terms and provisions of this Agreement;

(ii)    A counterpart of this Agreement, the Indemnity Agreement, the GP LLC Agreement, and such other documents or instruments as the General Partner may reasonably require is executed by the Transferee to evidence such acceptance and agreement;

(iii)    Other than with respect to the ADS Transfer, the Transferee pays or reimburses the Partnership for all reasonable legal fees, filing. and publication costs incurred by the Partnership in connection with the admission of the Transferee as a Partner;

(iv)    Other than with respect to the ADS Transfer, either:  (A) such Partnership Interest is registered under the Securities Act of 1933, as amended, and any applicable state securities laws; or (B) the transferor shall provide an Opinion of Counsel or other evidence satisfactory to the General Partner that the proposed Transfer is exempt from such registration requirements (the Partners acknowledge and agree that the Partnership and the other Partners have no obligation or intention whatsoever either to register Partnership Interests for resale

64

Copy from re:SearchTX

under any federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws); and

(v)    Other than with respect to the ADS Transfer, if the Transferee is not an individual, the Transferee provides the Partnership with evidence satisfactory to counsel for the Partnership of the authority of such transferee to become a Partner under the terms and provisions of this Agreement.

(b)    The General Partner shall make all official filings and publications as promptly as practicable after the satisfaction by the transferee of the conditions contained in this Article X to the admission of such transferee as a Partner.

10.3    <u>Distributions and Allocations</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of this Article X, Profits, Losses, and all other items attributable to the transferred (or adjusted) interest for such period shall be divided and allocated between the affected Persons by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and approved by the General Partner.  All distributions on or before the date of such transfer shall be made to the transferor.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

11.1    <u>Dissolution</u>.

(a)    Except as set forth in this Agreement, no Partner shall have the right to terminate this Agreement, to resign or withdraw from the Partnership, or to dissolve the Partnership by its express will or by withdrawal or resignation without, in each case, the consent of the other Partners.

(b)    The Partnership shall be dissolved upon the first to occur of any of the following events (each such event is referred to as a "Dissolution Event"):

(i)    the expiration of its term as provided in Section 1.4;

(ii)    the General Partner suffers an Event of Bankruptcy or is otherwise liquidated and dissolved;

(iii)    the Partners unanimously consent in writing to dissolve the Partnership; or

(iv)    any other event occurs that under the Texas Act requires the Partnership to dissolve regardless of an agreement of the Partners to the contrary; it being recognized that a dissolution event set forth in the Texas Act that can be

65

007500.00176:463592.011

Copy from re:SearchTX

altered or eliminated by an agreement of the Partners shall be deemed to be altered or eliminated and not included within this Section 11.1(b).

11.2    Continuation of the Partnership.

(a)    Upon the occurrence of an event described in Section 11.1(b)(ii) or Section 11.11(b)(iv), the Partnership shall be deemed to be dissolved and reconstituted only if the Limited Partners holding an Eighty Percent Interest elect to continue the Partnership within 90 days of such event. If a proper election to continue the Partnership is made pursuant to this Section 11.2 upon the occurrence of an event described in Section 11.1(b)(ii) or Section 11.1(b)(iv), then:

(i)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article XI; and

(ii)    All necessary and appropriate steps shall be taken to amend or restate this Agreement and the Certificate.

(b)    If no action to continue the Partnership is made pursuant to this Section 11.2 within 90 days of the occurrence of an event described in Section 11.1(b)(ii) or Section 11.1(b)(iv), then the Partnership shall conduct only those activities necessary and appropriate to wind up its affairs.

11.3    Liquidation.

(a)    Upon dissolution of the Partnership, unless an election to continue the Partnership is made pursuant to Section 11.2, the General Partner shall supervise and effectuate the liquidation of the Partnership.

(b)    Except as expressly provided in this Article XI, the General Partner may exercise all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the General Partner to carry out its duties and functions hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the General Partner to complete the winding up and liquidation of the Partnership as provided for herein.

(c)    Subject to Section 4.7 and Section 4.8, the General Partner shall liquidate the assets of the Partnership, and, after making all locations and distributions otherwise required by this Agreement, shall apply and distribute the net proceeds of such liquidation in the following order of priority:

(i)    to the creditors of the Partnership, including Partners, in the order of priority provided by applicable law; and

66

Copy from re:SearchTX

(ii)    to the Partners in ·the same manner and order of priority as provided for distributions under Section 6.2 hereof, provided, however, that the General Partner may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the General Partner to be appropriate for such purposes.

11.4    Reserves. After all of the assets of the Partnership have been distributed, the Partnership shall terminate. If at any time thereafter any funds in any cash reserve fund referred to in Section 11.3(c)(ii) are released because the need for such cash reserve fund has ended, such funds shall be distributed to the Partners in the same manner as if such distribution had been made pursuant to Section 11.3(c).

11.5    Distribution in Kind. Notwithstanding the provisions of Section 11.3 which require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if upon the dissolution of the Partnership, the General Partner determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the General Partner may, in good faith, defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners). In addition, the General Partner may distribute to the Partners, in lieu of cash, such Partnership assets as the General Partner deems not suitable for liquidation.    Any distributions in kind shall be subject to such conditions relating to the disposition and management thereof as the General Partner deems reasonable and equitable.

11.6    Disposition of Documents and Records.    All documents and records of the Partnership, including, without limitation, all financial records, vouchers, canceled checks, and bank statements, shall be delivered to the General Partner upon termination of the Partnership. The General Partner shall retain such documents and records for a period of not less than eight (8) years and shall make such documents and records available during normal business hours to any other Partner for inspection and copying at the other Partner's cost and expense.

11.7    Negative Capital Accounts. If, after the allocations of Profit, Loss, and other items of income, gain, loss, deduction, or credit under Article V, and after distributions of cash under Article VI and this Article XI, any Partner shall ever have a negative balance in such Partner's Capital Account, no Partner shall have any obligation to restore such negative balance, or to make any contribution to the capital of the Partnership by reason thereof, and such negative balance shall under no circumstances be considered a liability of the Partnership or of any Partner.

11.8    Cancellation of Certificate.    Upon the completion of the distribution of Partnership property as provided in Sections 11.3, 11.4, and 11.5, the Partnership shall be terminated, and the General Partner shall cause the cancellation of the Certificate in the State of Texas, and shall take such other actions as may be necessary to terminate the Partnership.

007500.00176:463592.011

Copy from re:SearchTX

11.9    Return of Capital.  No Partner shall be personally liable for the return of the Capital Contributions of any other Partner or any portion thereof, it being expressly understood that any such return shall be made solely from Partnership assets.

11.10    Waiver of Partition.  No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of the property owned by the Partnership.  Notwithstanding any provision of any applicable law to the contrary, each Partner hereby irrevocably waives any and all rights to maintain any action for a partition or to compel any sale with respect to its Partnership Interest, or with respect to any property owned by the Partnership, except as expressly provided in this Agreement.

## ARTICLE XII

## AMENDMENT OF AGREEMENT

12.1    Amendment Procedures.  Amendments to this Agreement may be proposed by the General Partner.  The General Partner shall submit in writing the text of any such amendment to all of the Limited Partners and shall seek the written consents of the Limited Partners with respect to the proposed amendment.  If the General Partner and a Sixty-Five Percent Interest of the Partners shall have given their written consent, then such proposed amendment shall become effective as of the date specified in such proposal; provided, however, that:

(a)    Without the consent of each Partner to be adversely affected, the Agreement shall not be amended so as to:

(i)    designate a new General Partner;

(ii)    modify the limited liability of a Limited Partner; or

(iii)    Amend Article IV, Article V, Article VI, Article VII, Article XI, this Article XII, or a definition in Article II that is used in any of the foregoing Articles.

(b)    In the case of any provision of this Agreement which requires the action, approval, or consent of the Partners holding a specified interest in the Partnership, such provision may not be amended without the consent of the Partners holding such specified interest.

(c)    The General Partner shall notify all Limited Partners upon the final adoption or rejection of any proposed amendment.

68

Copy from re:SearchTX

## ARTICLE XIII

## GENERAL PROVISIONS

13.1    Addresses and Notices.

(a)    Any notice provided in or permitted under this Agreement shall be made in writing and may be given or served by: (i) delivering the same in person to the party to be notified; (ii) depositing the same in the mail, postage prepaid, registered or certified with return receipt requested, and addressed to the party to be notified at the address specified on Exhibit A; (iii) delivering the same on a prepaid basis via a nationally recognized courier service, such as Federal Express; or (iv) sending the same by facsimile transmission, followed by delivery of a hard copy of same via a nationally recognized courier service, such as Federal Express. If notice is deposited in the mail pursuant to subparagraph (ii), it will be deemed received on the delivery date that the U.S. Post Office stamps on the return receipt. If notice is delivered by facsimile transmission pursuant to subparagraph (iv), it will be deemed received upon the sending of such facsimile transmission so long as the other requirements set forth in subparagraph (iv) above are satisfied. Notice given in any other manner shall be deemed received only if and when actually received by the party to be notified. For the purpose of notice, the address of the parties shall be the addresses set forth on Exhibit A attached hereto, with such changes as may be made in accordance with Section 13.1(b).

(b)    Each party shall have the right at any time to change its respective address and to specify as its address any other address by giving at least ten (10) days' prior written notice to the other parties. Each Partner shall have the right from time to time to specify up to two additional parties to whom notice hereunder must be given by either: (i) delivering to the other Partner ten (10) days' prior written notice thereof, setting forth the address of such additional parties; or (ii) in connection with the execution of this Agreement as of the Effective Date, listing the names and addresses of such additional notice parties on Exhibit A. Notice required to be delivered hereunder to any Partner shall not be deemed to be effective until the additional parties, if any, designated by such Partner have been given notice in a manner deemed effective pursuant to the terms of this Section 13.1.

13.2    Titles and Captions. All article and section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

13.3    Pronouns and Plurals. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The locative adverbs "hereof," "herein," "hereafter," etc. refer to this Agreement as a whole.

69

007500.00176:463592.011

Copy from re:SearchTX

13.4   <u>Further Action</u>.  The parties shall execute all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

13.5   <u>Binding</u>.  This Agreement shall be solely binding upon and solely inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

13.6   <u>Integration</u>.  This Agreement, the GP LLC Agreement, and the Indemnity Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto, including, without limitation, that certain Amended and Restated Memorandum of Understanding, dated as of April 23, 1999, by and among the Original Issuers, DBL, and Dallas Stars.

13.7   <u>No Third Party Beneficiary</u>.  Except for <u>Exhibit B</u> (which is for the benefit of the Teams), this Agreement is made solely and specifically between and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person whatsoever shall have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.  It is expressly understood that the right of the Partnership or the Partners to require any additional Capital Contributions under the terms of this Agreement shall not be construed as conferring any rights or benefits to or upon any Person not a party to this Agreement.

13.8   <u>Waiver</u>.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

13.9   <u>Counterparts</u>.  This Agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

13.10  <u>Applicable Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Texas without regard to the principles of conflicts of law.

13.11  <u>Invalidity of Provisions</u>.  If any provision of this Agreement is declared or found to be illegal, unenforceable or void, in whole or in part, then the parties shall be relieved of all obligations arising under such provision, but only to extent that it is illegal, unenforceable or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

007500.00176:463592.011
Page 110 of 252
Copy from re:SearchTX

13.12   Attorneys Fees.  The prevailing party in any legal proceeding regarding this Agreement or any other Transaction Document shall be entitled to recover from the other party all reasonable attorneys fees and costs incurred in connection with such proceeding.

13.13   Computation of Time Periods.  The time periods provided for in this Agreement shall be computed by excluding the first day and including the last day.  All periods of time referred to in this Agreement shall include all Saturdays, Sundays and national holidays unless the period of time specified is Business Days; provided, however, that if the date or the last date to perform any act or to give any notice with respect to this Agreement shall fall on a Saturday, a Sunday, or a national holiday, then such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday, or national holiday.

13.14   Construction.  Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Partner.

13.15   Time.  Time is of the essence with respect to this Agreement.

13.16   Incorporation by Reference.  Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

13.17   Representations and Warranties of Limited Partners.  In connection with the transactions contemplated hereby, each Limited Partner hereby represents and warrants to the Partnership and to the General Partner that:

(a)     Such Limited Partner is a corporation properly formed under the laws of the state of its incorporation and is validly existing and in good standing as of the Effective Date.

(b)     Such Limited Partner has all necessary corporate power and authority to own its Partnership Interest and to enter into and carry out the provisions of this Agreement and all other documents which may be necessary to give effect to the transactions contemplated by this Agreement;

(c)     This Agreement and all agreements referred to in this Agreement which have been or will be entered into by such Limited Partner in accordance with this Agreement, have been duly authorized, executed and delivered by such Limited Partner and will constitute the binding obligations of such Limited Partner;

(d)     Neither the execution and delivery of this Agreement, nor of any other agreement referred to in this Agreement, nor the fulfillment of or compliance with the terms and conditions hereof or thereof:

(i)     conflicts with or will conflict with or result in a breach of any of the terms, conditions or provisions of or constitute a material default under such Limited Partner's certificate of incorporation, bylaws, or other governing documents; or

71

Copy from re:SearchTX

(ii)    conflicts with or will conflict with or result in a material breach of any of the terms, conditions or provisions of or constitute a material default under any agreement or instrument to which such Limited Partner is a party or by which it is bound relative to its Partnership Interest; and

(e)    There are no actions, suits or proceedings pending, or to the knowledge of such Limited Partner threatened against such Limited Partner or its Affiliates which, if adversely determined, could materially adversely affect the ability of such Limited Partner or its Affiliates to perform its obligations under this Agreement or materially adversely affect the Partnership Interest of another Partner.

(f)    Such Limited Partner is an "accredited investor," as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and has executed and delivered such documents in evidence thereof as the Partnership has reasonably requested.

(g)    Such Limited Partner has been furnished access to the business and financial records of the Partnership and such additional information and documents as such Limited Partner has requested, and has been afforded an opportunity to ask questions of, and receive answers from, representatives of the Partnership concerning the terms and conditions of this Agreement, the Partnership Interests, the business plans, operations, capitalization, financial condition and prospects of the Partnership, and all other matters deemed relevant to such Limited Partner.

(h)    Such Limited Partner is acquiring Partnership Interests for its own account for investment purposes only, and not with a view to resale or distribution. Such Limited Partner has no present intention to distribute or sell the Partnership Interests. Such Limited Partner has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the Transfer of any of the Partnership Interests.

(i)    Such Limited Partner understands that the Partnership Interests have not been registered under the Securities Act or the laws of any state, and that the Partnership Interests may not be Transferred without compliance with the provisions of this Agreement, the Securities Act, and applicable state securities laws.

(j)    Such Limited Partner has sufficient knowledge and experience in financial or business matters to evaluate the merits and risks of an investment in the Partnership Interests. Such Limited Partner can afford to bear the economic risk of holding the Partnership Interests for an indefinite period of time and can afford to suffer the complete loss of the investment in the Partnership Interests. Such Limited Partner understands that due to the substantial restrictions on the transferability of the Partnership Interests and the lack of a public market, it may not be possible for Limited Partner to liquidate the investment in the Partnership Interests in the case of emergency, if at all.

72

(k)    Such Limited Partner understands that, except as otherwise expressly provided herein, the Partnership Interests of the Limited Partners have no voting rights and no rights to participate in the management and control of the Partnership.

13.18    Representations and Warranties of the General Partner.    The General Partner represents and warrants to the Partnership as follows (which representations and warranties shall survive the Effective Date):

(a)    The General Partner has full power and authority to enter into and to perform this Agreement in accordance with its terms.

(b)    This Agreement has been duly executed and delivered by such General Partner and constitutes the valid and binding obligation of such General Partner, enforceable against such General Partner in accordance with its terms (except as enforcement may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights, or by general equity principles).

13.19    Confidentiality.

(a)    The Partners acknowledge and agree that the Partnership is a private company. No Partner shall disclose the terms of this Agreement to any other Person without first obtaining the consent of the General Partner.  The Limited Partners also agree that they shall not disclose, via public announcements, press releases, interviews, or otherwise, any financial statements or financial information, any business, financial, or operational plans, any financial or other analysis, or any summaries, strategies, pro formas, valuations, agreements, plans, or projections of or pertaining to the Partnership or any other proprietary information of the Partnership (defined to include all information not previously publicly disclosed by the Partnership and/or by the General Partner) unless such Limited Partner first obtains the General Partner's prior written consent which consent shall not unreasonably be withheld.

(b)    Any documents provided by one party to another party pursuant to this Agreement shall be kept confidential and shall not be disclosed to any Person except: (i) as may be required by applicable law; (ii) as may be required in connection with a judicial proceeding; (iii) as may be required or permitted under Section 13.19(a) above; or (iv) with the consent of the party that provided such documents to the other party.

(c)    Each Partner covenants and agrees that it will not, during the term of its ownership of a Partnership Interest and thereafter, make any disparaging remarks about the Partnership, any Partner, and/or any Affiliate of a Partner; provided, however, this Section 13.19(c) shall not in any way prevent a Partner from making any statements or remarks that such Partner deems necessary or reasonable in any judicial proceedings.

(d)    Notwithstanding anything to the contrary contained herein:    (i) the provisions of this Section 13.19 shall not apply to information that is in the public domain or otherwise generally available to the public; and (ii) any Partner may disclose the

73

Copy from re:SearchTX

information described in subsections (a) and/or (b) of this Section 13.19: (A) to such Partner's direct and indirect owners, attorneys, accountants or other advisors so long as such Persons are informed by such Partner of the confidential nature of such information and are directed by such Partner to treat such information confidentially; or (B) to the extent such Partner reasonably deems necessary or desirable pursuant to any court or governmental order, applicable securities or other laws or regulations or financial reporting requirements; (C) to the Collateral Trustee and/or to the Purchasers in connection with obtaining the Arena Loan.

13.20   Legal Counsel Relationships.

(a)   The Partners acknowledge and agree that Weil, Gotshal & Manges, LLP, has represented the Original Issuers in connection with the Transaction Documents, and ADS and Dallas Stars, L.P. in connection with this Agreement and the other Transaction Documents. Except for Weil, Gotshal & Manges, LLP's representation of the Original Issuers with respect to the Transaction Documents, in no event shall an attorney/client relationship exist between Weil, Gotshal & Manges, LLP, on the one hand, and the Mavericks Arena Corporations, Dallas Basketball Limited and/or their Affiliates, on the other hand.

(b)   The Partners acknowledge and agree that Hughes & Luce, L.L.P. has represented the Original Issuers in connection with the Transaction Documents, and the Mavericks Arena Corporations, Dallas Basketball Limited, and their Affiliates in connection with this Agreement and the other Transaction Documents. Except for Hughes & Luce, L.L.P.'s representation of the Original Issuers with respect to the Transaction Documents, in no event shall an attorney/client relationship exist between Hughes & Luce, L.L.P., on the one hand, and ADS, Dallas Stars, L.P. and/or their Affiliates, on the other hand.

(c)   The parties agree and consent that Weil, Gotshal & Manges, LLP and/or Hughes & Luce, L.L.P. shall be permitted to render legal advice and to provide legal services to the Partnership or the General Partner from time to time, and each of the Partners covenant and agree that such representation of the Partnership and/or the General Partner by either or both such firms from time to time, shall not disqualify such firms from providing legal advice and legal services to their respective client Partners, Teams or Affiliates in matters related or unrelated to this Agreement and the Transaction Documents.

13.21   Special Purpose Entity Requirements.

(a)   Voting Requirements for Partnership Actions. As long as the Arena Loan is outstanding, the Partnership shall require the unanimous consent of all Partners for the Partnership to:

(i)   file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding; institute any proceedings under any applicable

74

Copy from re:SearchTX

insolvency law or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally;

(ii)     seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Partnership or a substantial portion of its properties;

(iii)    make any assignment for the benefit of the Partnership's creditors; or

(iv)    take any action in furtherance of any of the foregoing.

(b)     <u>Separateness Covenants</u>.  As long as the Arena Loan is outstanding, but subject to the Transaction Documents, the Partnership shall be required:

(i)     to maintain books and records separate from any other person or entity;

(ii)    to maintain its bank accounts separate from any other person or entity;

(iii)   not to commingle its assets with those of any other person or entity and to hold all of its assets in its own name, except that AOC may enter into contracts as nominee for the Partnership;

(iv)    to conduct its own business in its own name, except that AOC may enter into contracts as nominee for the Partnership;

(v)     to maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other person or entity and not to have its assets listed on the financial statement of any other entity;

(vi)    to file its tax returns separate from those of any other entity and not to file a consolidated federal income tax return with any other person or entity;

(vii)   to observe all partnership and other formalities;

(ix)    to maintain a sufficient number of employees in light of its contemplated business operation;

(x)     not to hold out its credit as being available to satisfy the obligations of any other person or entity other than AOC;

(xi)    to pay its own liabilities and expenses only out of its own funds;

75

Copy from re:SearchTX

(xii)    to enter into transactions with Affiliates only if the terms of such transactions are competitive with the terms of similar transactions obtained by persons in the same business as the Partnership in arms-length agreements with unrelated parties;

(xiii)    to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

(xiv)    to use separate stationery, invoices, and checks bearing its own name;

(xv)    to hold itself out as a separate entity;

(xvi)    to correct any known misunderstanding regarding its separate identity;

(xvii)    not to identify itself as a division of any other person or entity; and

(xviii)    maintain adequate capital in light of its contemplated business operations.

**[REMAINING PORTION OF PAGE INTENTIONALLY LEFT BLANK]**

76

007500.00176:463592.011

Copy from re:SearchTX

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Agreement as of the day and year first above written.

## GENERAL PARTNER

CENTER GP, LLC,
a Texas limited liability company

By: _____
Name: _      Brad Mayne
Title: __      President

## LIMITED PARTNERS

ARENA/DALLAS STARS, INC.,
a Delaware corporation

By: _____
Name: __      Peter S. Brodsky
Title: __      Vice President and
             Assistant Secretary

HILLWOOD ARENA PARTNERS, INC.,
a Texas corporation

By: _____
Name: _____
Title: _____

DBL ARENA PARTNERS, INC.,
a Texas corporation

By: _____
Name: _____
Title: _____

77

Copy from re:SearchTX

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Agreement as of the day and year first above written.

### GENERAL PARTNER

CENTER GP, LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

### LIMITED PARTNERS

ARENA/DALLAS STARS, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

HILLWOOD ARENA PARTNERS, INC.,
a Texas corporation

By: _David A. Newsom_____
Name: ____DAVID A. NEWSOM_____
Title: _____VICE PRESIDENT_____

DBL ARENA PARTNERS, INC.,
a Texas corporation

By: _David A. Newsom_____
Name: ____DAVID A. NEWSOM_____
Title: _____VICE PRESIDENT_____

77

Copy from re:SearchTX

CORPORATE ARENA ASSOCIATES, INC.,
a Texas corporation

By: _David A. Newsom_____
Name: _____DAVID A. NEWSOM_____
Title: _____VICE PRESIDENT_____

78

007500.00176:463592.010

Copy from re:SearchTX

.

## EXHIBIT A

## LIST OF PARTNERS, ADDRESSES, AND NOTICE PARTIES

**GENERAL PARTNER:**

Center GP, LLC
1845 Woodall Rodgers, Suite 1700
Dallas, Texas 75201
Attention: Brad Mayne
Telephone: (214) 740-5630
Facsimile: 214) 740-9777
E-mail Address: bmayne@thearenagroup.com

Notice Parties for General Partner:

Copy to:

Hillwood Development Corporation
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas 75225
Attention: Richard G. Patterson
Telephone: (972) 788-3000
Facsimile: (972) 788-3096
E-mail: rick.patterson@hillwood.com

Copy to:

Arena/Dallas Stars, Inc.
200 Crescent Court, Suite 1600
Dallas, Texas 75201
Attention: Lawrence D. Stuart, Jr.
Telephone: (214) 740-7300
Facsimile: (214) 720-7888
E-mail Address: lstuart@hmtf.com

A-1

Copy from re:SearchTX

**LIMITED PARTNERS**

ARENA/DALLAS STARS, INC.
200 Crescent Court, Suite 1600
Dallas, Texas  75201
Attention:  Lawrence D. Stuart, Jr.
Telephone:  (214) 740-7300
Facsimile:  (214) 720-7888
E-mail: lstuart@hmtf.com

      Notice Party for ADS:

      Copy to:

      Southwest Sports Group
      200 Crescent Court, Suite 1065
      Dallas, Texas  75201
      Attention:  Joseph B. Armes
      Telephone:  (214) 965-7979
      Facsimile:  (214) 965-7989
      E-mail Address:  jarmes@hmtf.com

      With additional copy to:

      Weil, Gotshal & Manges, LLP
      100 Crescent Court, Suite 1300
      Dallas, Texas  75201
      Attention:  Glenn D. West, Esq.
      Telephone:  (214) 746-7700
      Facsimile:  (214) 746-7777
      E-mail:  glenn.west@weil.com

HILLWOOD ARENA PARTNERS, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas  75225
Attention:  Richard G. Patterson
Telephone:  (972) 788-3000
Facsimile:  (972) 788-3096
E-mail: rick.patterson@hillwood.com

A-2

DBL ARENA PARTNERS, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas  75225
Attention:  Richard G. Patterson
Telephone:  (972) 788-3000
Facsimile:  (972) 788-3096
E-mail:  rick.patterson@hillwood.com

CORPORATE ARENA ASSOCIATES, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas  75225
Attention:  Richard G. Patterson
Telephone:  (972) 788-3000
Facsimile:  (972) 788-3096
E-mail:  rick.patterson@hillwood.com

> Notice Parties for Hillwood Arena Partners, Inc.,
> DBL Arena Partners, Inc., and Corporate Arena
> Associates, Inc.:
>
> Copy to:
>
> Hillwood Development Corporation
> 12377 Merit Drive
> 1700 Lakeside Square
> Dallas, Texas 75251
> Attention: David A. Newsom
> Telephone: (972) 383-1605
> Facsimile: (972) 383-1667
> E-mail Address: david.newsom@hillwood.com
>
> With an additional copy to:
>
> Hughes & Luce, LLP
> 1717 Main Street, Suite 2900
> Dallas, Texas  75201
> Attention:  Scott C. Drablos
> Telephone:  (214) 939-5408
> Facsimile:  (214) 939-5849
> E-mail:  drablos@hughesluce.com

007500.00176:463592.011

Copy from re:SearchTX

## EXHIBIT B

## PROCEDURE FOR MAKING TEAM PAYMENTS

This Exhibit B specifies how the Partnership will make payments to the Teams pursuant to Section 6.2(a):

      1.    From and after the Opening Date, the Partnership shall rebate to each Team a portion of its rent under the Mavericks Lease and the Stars Lease in an amount equal to the relative value of the sponsorship rights that each Team is providing to American Airlines, Inc. pursuant to Schedule 2 of the Naming Rights Agreement, subject to an aggregate annual maximum payment to both Teams of $1.5 million for each 12-month period beginning on the Opening Date and thereafter on each anniversary of the Opening Date (each such 12 month period, a "Rebate Period").

      2.    For the first three (3) Rebate Periods commencing on the Opening Date and ending on the third anniversary of the Opening Date, the Partnership shall pay $750,000 each year to each Team.

      3.    Prior to the third anniversary of the Opening Date, the General Partner shall re-evaluate the relative amount of rebate payments that the Partnership is making to each Team, based on the relative value of Team sponsorship rights that each Team is providing to American Airlines, Inc. pursuant to Schedule 2 of the Naming Rights Agreement. The General Partner may then adjust the relative amount that the Partnership pays to each Team, subject to the annual maximum cap of $1.5 million that may be paid to the Teams for any applicable Rebate Period.

      4.    Every three Rebate Periods thereafter, the General Partner shall re-evaluate and, if necessary, adjust, the relative amounts that the Partnership will pay to each Team pursuant to Section 6.2(a).

      5.    If the Partnership does not pay part or all of the requisite amount to a Team for a particular Rebate Period, then the unpaid amount shall carry over and be paid in a subsequent Rebate Period, together with interest on the unpaid balance at eight percent (8%) per annum, compounded annually.

      6.    Payments required to be made to a Team pursuant to Section 6.2(a) shall be made simultaneously with any applicable payments that are also required to be made to the other Team pursuant to Section 6.2(a).

B-1

## EXHIBIT C

## LIST OF EXCLUDED ASSETS AND LIABILITIES

1.    Cash or other short-term investments held in:

    (a)    Hillwood Arena Partners, Inc. Operating Account #46108096919 with related Fidelity Investments Money Market Account #331506;

    (b)    DBL Arena Partners, Inc. Operating Account #46108096927 with related Fidelity Investments Money Market Account #331508;

    (c)    Corporate Arena Associates, Inc. Operating Account #46108096901 with related Fidelity Investments Money Market Account #331507; and

    (d)    Arena/Dallas Stars, Inc. Account #3751028545 with Bank of America, N.A.

2.    Deferred tax assets.

3.    Intercompany receivables.

4.    That certain Administrative and Management Services Agreement, dated as of November 1, 1998, by and between Hillwood Services, L.P. and HAP.

5.    That certain Administrative and Management Services Agreement, dated as of November 1, 1998, by and between Hillwood Services, L.P. and DAP.

6.    That certain Administrative and Management Services Agreement, dated as of November 1, 1998, by and between Hillwood Services, L.P. and CAA.

7.    The rights and obligations of ADS, as payee, under the ADS Note.

8.    The reimbursement obligations of any Mavericks Arena Corporation relating to the Mavericks Letter of Credit.

9.    The 1642 Loans.

C-1

Copy from re:SearchTX

# EXHIBIT D

## FORM OF INTERIM LOAN PROMISSORY NOTE

### [Attached]

D-1

Copy from re:SearchTX

[FORM OF INTERIM LOAN PROMISSORY NOTE]

PROMISSORY NOTE

$[_____]

Dallas, Texas
[_____ ___], 1999

FOR VALUE RECEIVED, the undersigned, CENTER OPERATING COMPANY, L.P., a Texas limited partnership (the "Borrower"), hereby promises to pay to the order of **[Lender]** (the "Lender"), at **[Address of Lender]**, in lawful money of the United States of America and in immediately available funds, (i) the principal amount of [_____] ($[_____]) or (ii) if less, the aggregate unpaid principal amount of all loans made by the Lender pursuant to this Note. The Borrower promises to pay interest on the unpaid principal amount of this Note at an interest rate equal to [__]%. The Borrower promises to pay interest, on demand, on any overdue principal and, to the extent permitted by law, overdue interest from their due dates at the rate applicable pursuant to the preceding sentence, plus 2% per annum (but in no event to exceed the maximum amount allowed by applicable law).

All borrowings evidenced by this Note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided however that the failure of the holder hereof to make such a notation or any error in such a notation shall not affect the obligations of the Borrower under this Note.

Interest on the principal sum of this Note shall be calculated on the basis of a three hundred sixty (360) day year composed of twelve (12) months of thirty (30) days each except that interest due and payable for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said 360 day year. All amounts due under this Note shall be payable without set off, counterclaim or any other deduction whatsoever. Each determination of accrued interest by Lender pursuant to any provision of this Note shall be conclusive and binding on Borrower absent manifest error.

The Borrower shall be entitled to prepay, in full or in part, without penalty, all sums due under this Note.

Notwithstanding any provisions to the contrary in this Note or in any other instrument or document securing payment hereof or otherwise relating hereto, in no event shall the aggregate of all consideration that constitutes interest under law applicable to the Lender that is contracted for, taken, reserved, charged or received under this Note exceed the maximum amount allowed by such applicable law. If any such excess of interest contracted for, charged or received under this Note or under the terms of any of the documents securing payment hereof or otherwise relating hereto, or if the maturity of the indebtedness evidenced by this Note is accelerated in whole or in part, or in the event that all or part of the principal amount of interest contracted for,

E-1

Copy from re:SearchTX

charged or received under this Note or under any of the documents securing payment hereof or otherwise related hereto, on the amount of principal actually outstanding from time to time under this Note shall exceed the maximum amount of interest permitted by applicable usury laws, then in any such event (i) the Borrower shall not be obligated to pay in excess of the maximum amount of interest permitted to be contracted for by or charged to under applicable usury laws, (ii) any such excess either shall be applied as a credit against the then unpaid principal amount on this Note or refunded to the person paying the same, at the holder's option, and (iii) the effective rate of interest shall be automatically reduced to the maximum lawful rate of interest permitted under applicable usury laws as now or hereafter construed by the courts having jurisdiction hereof. It is further agreed that, without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under this Note or under such other documents or instruments which are made for the purpose of determining whether such rate exceeds the maximum lawful rate of interest shall be made, to the extent permitted by applicable usury laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness evidenced by this Note, all interest at any time contracted for, charged or received from the Borrower in connection with this Note.

Upon the occurrence of a default under this Note, the holder of this Note may declare all amounts then remaining unpaid on this Note immediately due and payable, and pursue any and all other remedies available to it at law or in equity, but failure to do so at any time shall not constitute a waiver of such holder's right to do so at any other time. Failure to exercise this option upon any default shall not constitute a waiver of the right to exercise it in the event of any subsequent defaults.

All parties now and hereafter liable with respect to this Note, whether Borrower, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind. Further, to the extent permitted by law, Borrower and any and all sureties, guarantors and endorsers of this Note and all other parties now or hereafter liable hereon, severally waive the provisions of Tex. Bus. & Com. Code Ann. Ch. 17, as amended.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA, EXCEPT THAT CHAPTER 346 OF THE TEXAS FINANCE CODE, AS AMENDED (WHICH REGULATES CERTAIN REVOLVING CREDIT LOAN ACCOUNTS AND REVOLVING TRI-PARTY ACCOUNTS), SHALL NOT APPLY HERETO.

In the event this Note is not paid when due at any stated or accelerated maturity, the Borrower agrees to pay, in addition to the principal of and interest on this Note, all costs of collection, including reasonable attorneys' fees. Time is of the essence in this Note.

Notwithstanding anything to the contrary contained in this Note: (a) any amounts payable on this Note shall be payable by the Borrower only from amounts equal to the distributions from time to time that would otherwise be payable to the holder of this Note with respect to the limited partnership interest held by Lender in Center Operating Company, L.P., as such limited partnership interest may be adjusted from time to time, under that certain Agreement of Limited

E-2

007500.00176:463592.011

Copy from re:SearchTX

Partnership of Center Operating Company, L.P. entered into as of the 30th day of September, 1999 (the "LP Agreement"), by and among Center GP, LLC, a Texas limited liability company, as general partner and the Lender, [_____], [_____], and [_____], each as a limited partner; (b) the holder of this Note shall otherwise have no recourse against the Borrower (or any holder of partnership interests in the Borrower); and (c) all amounts payable under this Note are subject to and governed by the LP Agreement.

   THIS NOTE CONSTITUTES A WRITTEN AGREEMENT AND, TOGETHER WITH THE LP AGREEMENT, REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

        CENTER OPERATING COMPANY, L.P., a Texas
        limited partnership

       By: Center GP, LLC, a Texas limited liability
          company, its general partner


         By: _____
         Name: _____
         Title: _____

007500.00176:463592.011

Copy from re:SearchTX

## LOANS AND PAYMENTS

| Date | Amount of Loan | Type of Loan | Payments | | Unpaid Principal Balance | Notations Made By |
|---|---|---|---|---|---|---|
| | | | Principal | Interest | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

E-4

Copy from re:SearchTX

**EXHIBIT E**

**SCHEDULE OF PARTNERS'
UNDISTRIBUTED FIRST, SECOND, THIRD, FOURTH AND FIFTH
PRIORITY CAPITAL ACCOUNTS ON THE EFFECTIVE DATE**

|        | Center GP | HAP           | DAP          | CAA          | ADS           |
|--------|-----------|---------------|--------------|--------------|---------------|
| First  | 0         | 0             | 0            | 0            | 0             |
| Second | 0         | 0             | 0            | 0            | 0             |
| Third  | 100.00    | 17,560,007.32 | 5,404,289.17 | 3,244,670.15 | 26,208,966.64 |
| Fourth | 0         | 0             | 0            | 0            | 0             |
| Fifth  | 0         | 0             | 0            | 0            | 0             |

E-5

Copy from re:SearchTX

**EXHIBIT F**

**FORM OF ASSIGNMENTS**

**[Attached]**

F-1

Copy from re:SearchTX

# EXHIBIT G

## FORM OF ADS NOTE

**[Attached]**

G-1

Copy from re:SearchTX

EXHIBIT

**1-B**

# LIMITED LIABILITY COMPANY

# AGREEMENT

# OF

# CENTER GP, LLC

007500.00176:459874.**

Copy from re:SearchTX

# LIMITED LIABILITY COMPANY

## AGREEMENT OF

## CENTER GP, LLC

### TABLE OF CONTENTS

**Page**

| | | |
|---|---|---:|
| ARTICLE I - ORGANIZATIONAL MATTERS | | 1 |
| 1.1 | Formation | 1 |
| 1.2 | Name | 2 |
| 1.3 | Offices and Addresses of Members | 2 |
| 1.4 | Term | 2 |
| 1.5 | Assumed Name Certificate | 2 |
| 1.6 | Ownership | 2 |
| 1.7 | No Individual Authority | 3 |
| 1.8 | Title to Company Property | 3 |
| 1.9 | Limits of Company | 3 |
| 1.10 | Regulations | 3 |
| ARTICLE II - DEFINITIONS | | 3 |
| ARTICLE III - PURPOSE | | 17 |
| 3.1 | Purposes and Scope | 17 |
| ARTICLE IV - CAPITAL CONTRIBUTIONS | | 18 |
| 4.1 | Initial Capital Contributions of Members and Formation of Arena Partnership | 18 |
| 4.2 | Additional Capital Contributions | 18 |
| 4.3 | Default in Making Additional Capital Contributions | 20 |
| 4.4 | Trigger Event Defaults | 22 |
| 4.5 | Relocation Events | 22 |
| 4.6 | Capital Accounts | 23 |
| 4.7 | Interest | 26 |
| 4.8 | No Withdrawal | 26 |
| 4.9 | Limitation on Capital Contributions and Loans | 26 |
| ARTICLE V - ALLOCATIONS | | 26 |
| 5.1 | Allocation of Profits and Losses | 26 |
| 5.2 | Special Allocations | 29 |

i

007500.00176:459874.09

Copy from re:SearchTX

5.3    Curative Allocations ............................................................ 30
5.4    Tax Allocations:  Code Section 704(c) .................................. 30
5.5    Other Allocation Rules ....................................................... 30

ARTICLE VI - DISTRIBUTIONS ..................................................... 31

6.1    Distributions of Available Cash........................................... 31
6.2    Amounts Withheld ............................................................. 32
6.3    Excess Distributions........................................................... 32

ARTICLE VII - MANAGEMENT OF THE COMPANY ......................... 32

7.1    Management by Members and the Board .............................. 32
7.2    Board Appointments and Procedures.................................... 33
7.3    Major Decisions................................................................ 38
7.4    Officers of the Company .................................................... 43
7.5    Articles of Organization..................................................... 45
7.6    Compensation and Reimbursement of Members ................... 45
7.7    Outside Activities.............................................................. 45
7.8    Company Funds ................................................................ 46
7.9    Duties .............................................................................. 46
7.10   Transactions with Affiliates ............................................... 46
7.11   Indemnification of Members............................................... 46
7.12   Liability of Members ........................................................ 49

ARTICLE VIII - BOOKS, RECORDS, ACCOUNTING AND REPORTS............ 49

8.1    Records and Accounting .................................................... 49
8.2    Fiscal Year ....................................................................... 49
8.3    Reports ............................................................................ 49
8.4    Documents ....................................................................... 50

ARTICLE IX - TAX MATTERS ....................................................... 50

9.1    Tax Matters Member.......................................................... 50
9.2    Annual Tax Returns .......................................................... 50
9.3    Notice and Limitations on Authority ................................... 51
9.4    Tax Elections ................................................................... 51
9.5    Organizational Expenses.................................................... 51
9.6    Taxation as a Partnership .................................................. 51

ARTICLE X -TRANSFERS OF COMPANY INTERESTS ...................... 51

10.1   Transfer Rights................................................................. 51

ii

007500.00176:459874.09

Copy from re:SearchTX

10.2    Admission as a Member.......................................................................    52
10.3    Distributions and Allocations ............................................................    53


ARTICLE XI - DISSOLUTION AND LIQUIDATION ......................................    53

11.1    Dissolution..........................................................................................    53
11.2    Continuation of the Company ...........................................................    54
11.3    Liquidation..........................................................................................    54
11.4    Termination and Reserves..................................................................    55
11.5    Distribution in Kind ...........................................................................    55
11.6    Disposition of Documents and Records...........................................    55
11.7    Negative Capital Accounts ...............................................................    55
11.8    Cancellation of the Articles ..............................................................    56
11.9    Return of Capital ...............................................................................    56
11.10   Waiver of Partition.............................................................................    56


ARTICLE XII – AMENDMENT OF AGREEMENT .........................................    56

12.1    Amendment Procedures .....................................................................    56


ARTICLE XIII – GENERAL PROVISIONS.......................................................    57

13.1    Addresses and Notices .......................................................................    57
13.2    Title and Captions...............................................................................    58
13.3    Pronouns and Plurals..........................................................................    58
13.4    Further Action.....................................................................................    58
13.5    Binding Effect.....................................................................................    58
13.6    Integration...........................................................................................    58
13.7    No Third Party Beneficiary ...............................................................    58
13.8    Waiver..................................................................................................    58
13.9    Counterparts ........................................................................................    58
13.10   Applicable Law ..................................................................................    59
13.11   Invalidity of Provisions .....................................................................    59
13.12   Attorneys Fees ...................................................................................    59
13.13   Computation of Time Periods............................................................    59
13.14   Construction........................................................................................    59
13.15   Time .....................................................................................................    59
13.16   Incorporation by Reference................................................................    59
13.17   Representations and Warranties of Members ...................................    59
13.18   Confidentiality ...................................................................................    61
13.19   Legal Counsel Relationships.............................................................    62
13.20   Special Purpose Entity Requirements...............................................    62

iii

**EXHIBIT**

A       List of Members, Addresses, and Notice Parties
B       Initial Capital Contributions

iv

007500.00176:459874.09

Copy from re:SearchTX

THE SECURITIES CREATED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. EXCEPT FOR ANY PERMITTED GP MEMBER PLEDGES, THESE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, WITHOUT REGISTRATION, EXCEPT ON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MEMBERS OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR THE SUBMISSION TO THE MEMBERS OF THE COMPANY OF OTHER EVIDENCE SATISFACTORY TO THE MEMBERS TO THE EFFECT THAT A TRANSFER WILL NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATIONS PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE SECURITIES IS SUBJECT TO CERTAIN LIMITED RESTRICTIONS CONTAINED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY.

# LIMITED LIABILITY COMPANY

# AGREEMENT

# OF

# CENTER GP, LLC

This LIMITED LIABILITY COMPANY AGREEMENT OF CENTER GP, LLC (this "Agreement") is entered into as of 11:59 p.m. on the 30th day of September, 1999 (the "Effective Date"), by and among Arena/Dallas Stars, Inc., a Delaware corporation (together with its successors and assigns, "ADS"), Hillwood Arena Partners, Inc., a Texas corporation (together with its successors and assigns, "HAP"), DBL Arena Partners, Inc., a Texas corporation (together with its successors and assigns, "DAP"), and Corporate Arena Associates, Inc., a Texas corporation (together with its successors and assigns, "CAA"), as members, together with any Person who becomes a member as provided herein.

Certain terms used in this Agreement are defined in Article II.

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1    Formation. Subject to the provisions of this Agreement, the Members hereby form the Company as a limited liability company pursuant to the provisions of the Texas Act. The Members hereby enter into this Agreement in order to set forth the rights and obligations of the

1

007500.00176:459874.09

Copy from re:SearchTX

Members and certain related matters.  Except as expressly provided and permitted herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Texas Act.

1.2    Name.  The name of the Company shall be, and the business of the Company shall be conducted under the name of, Center GP, LLC.  The Company's business may be conducted under any other name or names approved by the Board; provided, however, the name of the Company shall not include the name of a Member or the name of such Member's principal beneficial owner unless such Member consents to the use of such name.

1.3    Offices and Addresses of Members.

(a)    The registered office of the Company in the State of Texas shall be at 1845 Woodall Rodgers, #1700, Dallas, Texas 75201, and the registered agent for service of process on the Company at such registered office shall be Brad Mayne.

(b)    The initial principal office of the Company shall be at 1845 Woodall Rodgers, #1700, Dallas, Texas 75201.  The principal office of the Company may be changed to another location in the Dallas-Fort Worth metropolitan area as may be approved by the Board.

(c)    The addresses of the Members as of the Effective Date are set forth on Exhibit A.  The address of a Member may be changed in accordance with the requirements set forth in Section 13.1.

1.4    Term.  The Company shall commence on the Effective Date and shall continue in existence until the first to occur of the following:

(a)    December 31, 2099; or

(b)    The dissolution of the Company pursuant to the express provisions of Article XI (other than a dissolution that is followed by the reconstitution of the Company pursuant to Section 11.2).

1.5    Assumed Name Certificate.  The Members shall execute and file any assumed or fictitious name certificate or certificates or any similar documents required by law to be filed in connection with the formation and operation of the Company.

1.6    Ownership.  The interest of each Member in the Company shall be personal property for all purposes.  All property and interests in property, real or personal, owned by the Company shall be deemed owned by the Company as an entity, and no Member, individually, shall have any ownership of such property or interest except by having an ownership interest in the Company as a Member.

007500.00176:459874.09

Copy from re:SearchTX

1.7     No Individual Authority.  No Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of any other Member or the Company except as otherwise expressly provided in this Agreement.

1.8     Title to Company Property.  It is the desire and intention of the Members that legal title to all property of the Company shall be held and conveyed in the name of the Company.

1.9     Limits of Company.  The relationship between the parties hereto shall be limited to the carrying on of the business of the Company in accordance with the terms of this Agreement.  Such relationship shall be construed and deemed to be a limited liability company for the sole and limited purpose of carrying on such business.  Except as otherwise provided for or contemplated in this Agreement, nothing herein shall be construed to create a partnership or any other relationship between the Members or to authorize any Member to act as an agent for any other Member.

1.10    Regulations.  This Agreement shall constitute the regulations of the Company under the Texas Act.

## ARTICLE II

## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"Adjusted Capital Account" means, with respect to any Member, a special account maintained for such Member, the balance of which shall equal such Member's Capital Account balance, increased by the amount (if any) of such Member's share of the Company Minimum Gain and Member Minimum Gain.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations section 1.704-1(b)(2)(iv)(c), the penultimate sentence of Regulations section 1.704-2(g)(1), or the penultimate sentence of Regulations section 1.704-2(i)(5);

(b)     Debit to such Capital Account the items described in Regulations section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

3

Copy from re:SearchTX

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with Regulations section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"ADS" means Arena/Dallas Stars, Inc., a Delaware corporation, together with its successors and assigns (including without limitation, Dallas Arena LLC and its successors and assigns).

"ADS Member" and "ADS Members" have the meanings set forth in Section 7.2(b).

"ADS Transfer" has the meaning set forth in the Arena Partnership Agreement.

"Affiliate" means, with respect to a particular Person, any Person who, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under Control with, the Person in question.

"Agreement" means this Limited Liability Company Agreement of Center GP, LLC, as it may be amended, restated, modified, or supplemented from time to time.

"Amended Parking Rights Agreement" means that certain Amended and Restated Parking Rights Agreement that is expected to be executed and delivered by certain Parking Tract Owners and the Arena Partnership on or prior to the Initial Funding Date (but has not been completed as of the Effective Date).

"Annex I" means Annex I to the Note Purchase Agreement.

"AOC" means Arena Operating Company, Inc., a Texas corporation.

"Arena" means that certain 18,000 - 21,000 seat multi-purpose indoor entertainment and sports arena, the Parking Facilities, and related entertainment, retail sales, office and other facilities (including related infrastructure) to be developed, constructed, owned and managed by the Arena Partnership on the Arena Site, all as more fully described in the Master Agreement. The Arena will serve as the home arena for the Dallas Stars and the Dallas Mavericks.

"Arena GP Interest" means the general partnership interest in the Arena Partnership owned by the Company from time to time.

"Arena Loan" means that certain loan to be advanced from the Purchasers to the Arena Partnership from time to time in the maximum principal amount of $210 million, which loan is evidenced by the Arena Loan Documents.

"Arena Loan Documents" means: (a) the Note Purchase Agreement; (b) the Security Agreement; (c) the Disbursement Agreement; (d) the Team Agreements; (e) the Reimbursement Agreement; (f) the Non-Relocation Agreements (as defined in the Arena Partnership Agreement); and (g) all Notes and other documents, instruments, financing statements, security

007500.00176:459874.09

Copy from re:SearchTX

agreements, and/or other agreements related to the Arena Loan, in each case, as the same may be amended, restated, modified, or supplemented from time to time.

"Arena Partnership" means Center Operating Company, L.P., a Texas limited partnership.

"Arena Partnership Agreement" means that certain Agreement of Limited Partnership of Center Operating Company, L.P., dated as of the Effective Date, as it may be further amended, restated, modified, or supplemented from time to time.

"Arena Partnership Costs and Expenses" means all of the expenditures of any kind made or to be made with respect to the Operations, business, and affairs of the Arena Partnership, as reflected in a budget for the Arena Partnership that has been approved by the Company, including without limitation, costs of developing and constructing the Arena Project, principal, interest, fees, points, penalties, and other amounts payable on Arena Partnership indebtedness (including amounts payable with respect to the Arena Loan), Operation costs and expenses, the costs and expenses of occupying, repairing, operating, maintaining, and using Reunion Arena, insurance premiums, professional fees, advertising, marketing costs, utilities costs, office expenses, consulting fees, salaries, wages, fringe benefits, and any other costs, expenses, charges, liabilities and obligations of the Arena Partnership consistent with or contemplated by the purposes of the Arena Partnership described in article III of the Arena Partnership Agreement.

"Arena Partnership Limited Partners" means, at a particular time, the limited partners of the Arena Partnership.

"Arena Partnership Unexpected Shortfall" has the meaning set forth in Section 4.2(f).

"Arena Project" means: (a) the development, construction, and financing by the Arena Partnership of the Arena, the Arena Site, the 3,000 parking spaces located on the Parking Tracts, and the Arena-Related Improvements pursuant to the Transaction Documents; (b) the Operation by the Arena Partnership of the Arena, the Arena Site, and the 3,000 parking spaces located on the Parking Tracts; and (c) the occupancy, Operation, repair, maintenance, and use of Reunion Arena. The Arena Project, however, does not include the Excluded Assets and Liabilities.

"Arena-Related Improvements" means, with respect to the Arena Partnership, the Roadway Improvements (as defined in Annex I), the improvements to the Parking Tracts and any landscaping, lighting, drainage, and similar site improvements necessary to make available and operate 3,000 parking spaces on the Parking Tracts pursuant to the Definitive Parking Rights Agreement.

"Arena Site" means the site owned by the City on which the Arena and the Parking Facilities will be located (but excluding any land on which the Parking Tracts are located).

"Articles" means the Articles of Organization filed with the Office of the Secretary of State of Texas on August 31, 1999, as they may be amended and/or restated from time to time.

5

007500.00176:459874.09

Copy from re:SearchTX

"Assignments" mean those certain Assignment and Release Agreements, dated as of the Effective Date, by and among ADS, HAP, DAP, and CAA, as tenants in common, as assignors, and the Arena Partnership, as assignee, substantially in the forms attached as Exhibit F to the Arena Partnership Agreement.

"Available Cash" of the Company as of any date means all cash funds of the Company on hand as of such date from all sources, including distributions received by the Company from the Arena Partnership, reduced by: (a) all Company Costs and Expenses that are due and payable as of such date and/or that are expected to become due and payable in the next 60 days; and (b) provision for reasonable working capital reserves, with the amount of such reserves to be determined by the Board.

"Available Loan Proceeds" means the amount of Arena Loan proceeds that are available under the Arena Loan Documents to reimburse the Interim Contributions of the partners of the Arena Partnership (and in certain cases, to return other amounts to such partners) in accordance with the Arena Loan Documents (i.e., the proceeds that are available after the application of: (a) the Arena Loan proceeds through the distribution "waterfall" described in section 5.1 of the Security Agreement; and (b) the disbursement procedures described in article IV of the Disbursement Agreement).

"Back-End Percentage Interest" means the percentage interest of a Member in certain allocations of Profits, Losses and other items of income, gain, loss or deduction and in certain distributions of cash and/or property. The initial Back-End Percentage Interest of each Member is set forth below:

| Member | Back-End Percentage Interest |
|---|---|
| ADS | 50.00% |
| HAP | 33.50% |
| DAP | 10.31% |
| CAA | 6.19% |
| | 100% |

The Back-End Percentage Interest of a Member may be adjusted pursuant to Section 4.3(d) or in connection with a Transfer permitted under Section 10.1. After such adjustment, the Back-End Percentage Interest of such Member, as adjusted, shall constitute such Member's Back-End Percentage Interest for all purposes under this Agreement.

"Board" has the meaning set forth in Section 7.1(a).

"Board Members" has the meaning set forth in Section 7.1(a).

"Book Depreciation" has the meaning set forth in Section 4.6(b)(v).

6

007500.00176:459874.09

Copy from re:SearchTX

"Book Value" has the meaning set forth in Section 4.6(c).

"Business Day" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States shall not be regarded as a Business Day.

"CAA" means Corporate Arena Associates, Inc., a Texas corporation, together with its successor and assigns.

"Capital Account" means the capital account maintained for a Member pursuant to Section 4.6.

"Capital Contribution" means, with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member, reduced by the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

"City" means the City of Dallas, a duly incorporated home rule city of the State of Texas.

"City Lease Agreement" means that certain Lease Agreement, dated as of July 28, 1998, by and among the City, as lessor, and the Original Issuers, as lessee, as such lease may be amended, restated, modified, or supplemented from time to time.  The City Lease Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time. All references herein to the Code shall include any corresponding provision or provisions of succeeding law.

"Collateral Trustee" means The Bank of New York, a New York banking corporation, or its successor, acting in its capacity as trustee under the Arena Loan Documents.

"Company" means Center GP, LLC, a Texas limited liability company established by the filing of the Articles with the Secretary of State of Texas.

"Company Costs and Expenses" mean all of the expenditures of any kind made or to be made with respect to the operations, business, and affairs of the Company as the general partner of the Arena Partnership that do not constitute Arena Partnership Costs and Expenses, if any.

"Company Interest" means the interest of a Member in the Company, including, without limitation, such Member's right: (a) to a distributive share of the Profits, Losses, and other items of income, gain, loss, deduction and credit of the Company; (b) to a distributive share of the assets of the Company; (c) to vote on those matters described in this Agreement; and (d) to participate in the management and operation of the Company as provided in this Agreement.

7

007500.00176:459874.09

Copy from re:SearchTX

"Company Minimum Gain" shall mean partnership minimum gain as set forth in Regulations Section 1.704-2(d).

"Contribution Date" has the meaning set forth in Section 4.2(b)(iii).

"Contribution Notice" has the meaning set forth in Section 4.2(a).

"Control" or any derivation thereof, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"Dallas Mavericks" means the National Basketball Association franchise commonly known as the Dallas Mavericks.

"Dallas Stars" means the National Hockey League franchise commonly known as the Dallas Stars.

"DAP" means DBL Arena Partners, Inc., a Texas corporation, together with its successors and assigns.

"Default Amount" has the meaning set forth in Section 4.3(b).

"Default Date" has the meaning set forth in Section 4.3(b).

"Default Member" has the meaning set forth in Section 4.3(b).

"Default Notice" has the meaning set forth in Section 4.3(a).

"Definitive Parking Rights Agreement" means collectively: (a) as applicable: (i) prior to the execution and delivery of the Amended Parking Rights Agreement, the Original Parking Rights Agreement; and (ii) after the execution and delivery of the Amended Parking Rights Agreement, the Amended Parking Rights Agreement (but not the Original Parking Rights Agreement); and (b) that certain Easement and Parking Rights Agreement, to be executed on or before the Initial Funding Date, between the Parking Tract Owners, and the Arena Partnership, substantially in the form of Exhibit H-1 to the Note Purchase Agreement, with such changes as are approved by the Arena Partnership and the Purchasers, as the same may be amended, restated, modified, or supplemented from time to time.

"Development Agreement" means that certain Amended and Restated Development Management Services Agreement, dated as of April 23, 1999, originally by and among the Original Issuers and HW/Services, as the same may be amended, restated, modified, or supplemented from time to time. The Development Agreement is one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

8

Copy from re:SearchTX

"Disbursement Agreement" means that certain Disbursement Agreement, dated as of April 23, 1999, by and among the Original Issuers, the Collateral Trustee, and The Bank of New York, also acting in its capacity as the disbursing agent, as such Disbursement Agreement may be amended, restated, modified, or supplemented from time to time.   The Disbursement Agreement is a Project Agreement that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Disinterested Board Member" means an individual natural person who is not a Special Affiliate of any Member or a Special Affiliate of any Affiliate of a Member.

"Dissolution Event" has the meaning set forth in Section 11.1(b).

"Effective Date" means 11:59 p.m. on September 30, 1999.

"Event of Bankruptcy" means, with respect to any Member or the Company, any of the following acts or events:

(a)     making an assignment for the benefit of creditors;

(b)     filing a voluntary petition in bankruptcy;

(c)     becoming the subject of an order for relief or being declared insolvent or bankrupt in any federal or state bankruptcy or insolvency proceeding;

(d)     filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

(e)     filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in a proceeding of the type described in parts (a) through (d) of this definition;

(f)     seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of all or any substantial part of its properties; or

(g)     the expiration of 90 days after the date of the commencement of a proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation if the proceeding has not been previously dismissed, or the expiration of 60 days after the date of the appointment, without such Member's consent or acquiescence, of a trustee, receiver, or liquidator of such Member or of all or any substantial part of such Member's properties, if the appointment has not previously been vacated or stayed, or the expiration of 60 days after the date of expiration of a stay, if the appointment has not been previously vacated.

9

007500.00176:459874.09

"Excess Amount" has the meaning, with respect to any Member, set forth in Section 5.1(a)(v).

"Excluded Assets and Liabilities" means those assets and liabilities owned and/or owed by the Members on the Effective Date that will not be assigned and/or assumed by the Arena Partnership pursuant to the Assignments. All such Excluded Assets and Liabilities are described on Exhibit C attached to the Arena Partnership Agreement.

"Extended HRP, Jr. Family Group" means: (a) any member of the HRP, Jr. Family Group; (b) a key employee or consultant of HDC; (c) a key employee of Dallas Basketball Limited or a key employee of the general partner of Dallas Basketball Limited; and/or (d) the estate, heirs, or legatees of any of the Persons described in subparagraphs (a) through (c) above.

"Financial Advisory Agreement" means that certain Financial Advisory Agreement, dated as of July 28, 1998, by and among the Original Issuers and Hicks, Muse & Co. Partners, L.P., a Texas limited partnership, as amended by that certain First Amendment to Financial Advisory Agreement, dated as of April 23, 1999, by and among the Original Issuers and Hicks, Muse & Co. Partners, L.P., as the same may be further amended, restated, modified, or supplemented from time to time. The Financial Advisory Agreement is one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"First Priority Preference Amount" means an aggregate amount computed like interest at a rate equal to 15% per annum, compounded quarterly, on the outstanding balance from time to time during such period of a Member's Undistributed First Priority Capital, reduced by the distributions made to such Member pursuant to Section 6.1(a).

"Fiscal Year" means the 12 month period ending December 31 of each year; provided that the initial Fiscal Year shall be the period beginning on the Effective Date and ending December 31, 1999, and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation and termination of the Company is completed and ending on the date such final liquidation and termination is completed (to the extent any computation or other provision hereof provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the initial and final Fiscal Years to reflect that such periods are less than full calendar year periods).

"Funding Deficit" has the meaning set forth in Annex I.

"GAAP" means generally accepted accounting principles as set forth from time to time in the opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements of the Financial Accounting Standards Board or in such opinions and statements of such other groups as shall be approved by a significant segment of the accounting profession.

10

007500.00176:459874.09

Copy from re:SearchTX

"Good Members" means the Members that are the same Persons as the "Good Partners" under the Arena Partnership Agreement.

"HAP" means Hillwood Arena Partners, Inc., a Texas corporation, together with its successors and assigns.

"HDC" means Hillwood Development Corporation, a Texas corporation.

"Hicks" means Thomas O. Hicks.

"Hillwood/1642" means Hillwood/1642, Ltd., a Texas limited partnership.

"HRP, Jr." means H.R. Perot, Jr.

"HRP, Jr. Family Group" means: (a) HRP, Jr.; (b) an ascendant or descendant of HRP, Jr.; (c) a sibling, aunt, uncle, nephew, or niece of HRP, Jr.; (d) the estate of any of the persons described in subparagraphs (a), (b), and/or (c) above; and/or (e) a trust for the benefit of any of the Persons described in subparagraphs (a), (b), (c), and/or (d) above.

"HW/Services" means Hillwood Services, L.P., a Texas limited partnership.

"Indemnitee" has the meaning set forth in Section 7.11.

"Indemnity Agreement" means that certain Indemnity Agreement, to be dated as of the Effective Date, by and among Dallas Arena LLC, as successor in interest to ADS, HAP, DAP, CAA, Dallas Stars, L.P., and Dallas Basketball Limited, as the same may be amended, restated, modified, or supplemented from time to time.

"Independent Accountants" means any national or regional accounting firm in the United States that has been approved by the Board.

"Initial Funding Date" has the meaning set forth in section 1.5(b) of the Note Purchase Agreement.

"Initial Payout" has the meaning set forth in Section 4.4(b).

"Interim Contributions" means the Interim Loans and the Interim Equity Contributions.

"Interim Equity Contributions" means the "Interim Equity Contributions" as defined in the Arena Partnership Agreement.

"Interim Loans" means the "Interim Loans" as defined in the Arena Partnership Agreement. Interim Loans shall be made pursuant to an Interim Loan Promissory Note (as defined in the Arena Partnership Agreement).

11

007500.00176:459874.09

Copy from re:SearchTX

"Losses" has the meaning set forth in Section 4.6(b).

"Major Decision" means, as the context may require, a Majority Major Decision, a Special Major Decision, or a Unanimous Major Decision.

"Majority Major Decision" has the meaning set forth in Section 7.3(b).

"Master Agreement" means that certain Master Agreement, dated as of December 10, 1997, by and among the City and the Original Issuers, as the same may be amended, restated, modified, or supplemented from time to time. The Master Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Mavericks Arena Corporations" means HAP, DAP, and CAA.

"Mavericks Lease" means that certain Amended and Restated Arena Lease-Mavericks, to be executed on or about the Initial Funding Date but to be dated effective as of July 28, 1998, to be entered into by the Original Issuers and the Arena Partnership, as lessor, and Dallas Basketball Limited, a Texas limited partnership, as lessee, as such lease may be amended, restated, modified, or supplemented from time to time. The Mavericks Lease amends and restates that certain Arena Lease – Mavericks, dated as of July 28, 1998, by and among the Original Issuers and Dallas Basketball Limited, which is one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Mavericks Letter of Credit" means that certain irrevocable direct pay letter of credit in the undrawn face amount of $20,700,000 that may be delivered by the Mavericks Arena Corporations (or by an Affiliate of the Mavericks Arena Corporations) to the Collateral Trustee pursuant to the Note Purchase Agreement, as the same may be amended, renewed, replaced, restated, supplemented, or otherwise modified in accordance with the Note Purchase Agreement.

"Mavericks Member" and "Mavericks Members" have the meanings set forth in Section 7.2(b).

"Mavericks Team Agreement" means that certain Mavericks Team Agreement, dated as of April 23, 1999, by and between Dallas Basketball Limited and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

"Member(s)" means ADS, HAP, DAP, CAA, and/or any other Person who is admitted as a Member in the Company in accordance with this Agreement on and after the Effective Date and whose admission has been reflected on the books and records of the Company in accordance with the applicable provisions of this Agreement.

"Member Minimum Gain" shall mean partner nonrecourse debt minimum gain as determined under the rules of Regulations Section 1.704-2(i).

007500.00176:459874.09

Copy from re:SearchTX

"Naming Rights Agreement" means that certain Letter Agreement, dated as of March 18, 1999, by and among the Original Issuers, Dallas Stars, L.P., Dallas Basketball Limited, and American Airlines, Inc., and any definitive agreement subsequently entered into with respect thereto, as the same may be amended, restated, modified, or supplemented from time to time. The Naming Rights Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Non-Defaulting Member" has the meaning set forth in Section 4.3(b).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Note Purchase Agreement" means that certain Note Purchase Agreement, dated as of April 23, 1999, originally by and among the Original Issuers and the Purchasers, as such Note Purchase Agreement may be amended, restated, modified, or supplemented from time to time. The Note Purchase Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Opening Date" means the first date on which the Arena opens to the public for the purpose of exhibiting a game played by either of the Teams or a non-Team event for which admission is charged.

"Operation," or any derivation thereof, as the context may require, means the ownership, occupation, repair, operation, maintenance, use, and financing of the Arena and related facilities.

"Opinion of Counsel" means a written opinion of counsel (who may be regular counsel to the Company or a Member) approved by the Board.

"Original Issuers" means ADS, HAP, DAP, and CAA.

"Original Parking Rights Agreement" means that certain Parking Rights Agreement, dated as of July 28, 1998, among the Original Issuers and HDC, as amended by that certain First Amendment to Parking Rights Agreement, dated as of November 30, 1998, by and among the Original Issuers and HDC, as further amended by that certain Second Amendment to Parking Rights Agreement, dated as of January 29, 1999, by and among the Original Issuers and HDC.

"Parking Facilities" means the structured parking facilities to be constructed on the Arena Site.

"Parking Tracts" means, as of a particular date, the tracts of real property owned by the Parking Tract Owners on which the Arena Partnership holds an easement estate pursuant to the Definitive Parking Rights Agreement.

13

007500.00176:459874.09

Copy from re:SearchTX

"Parking Tract Owners" means Anland 1A/1C, L.P., Anland 1B, L.P., Anland 2A, L.P., Anland 2B, L.P., Anland 2C, L.P., Anland 3, L.P., Anland 5B/6, L.P., Anland 10, L.P., Anland 12, L.P., Anland 13, L.P., and Anland 14, L.P., each a Texas limited partnership.

"Partner Nonrecourse Deduction" has the meaning set forth in Regulations section 1.704-2(i)(1) and (2).

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association or other entity.

"Place 7 Vacancy Event" has the meaning set forth in Section 7.2(c).

"Pledge" or any derivation thereof means, as the context may require, a pledge, encumbrance, lien, mortgage, hypothecation, or similar disposition (other than a Transfer) with respect to the applicable property in connection with the granting of a lien or security interest to secure an obligation of the pledgor or another Person.

"Potential Candidate List" has the meaning set forth in Section 7.2(c)(i).

"Profits" has the meaning set forth in Section 4.6(b).

"Project Agreements" means, as of the Effective Date, all of the agreements listed or provided for on Schedule I to the Assignment.

"Projected Funding Deficit Amount" has the meaning set forth in Annex I.

"Purchasers" mean: (a) the Prudential Insurance Company of America; (b) Teachers Insurance and Annuity Association of America; (c) Life Insurance Company of the Southwest; (d) National Life Insurance Company; and (e) their permitted successors and assigns.

"Regulations" means the Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of any succeeding regulations).

"Regulatory Allocations" has the meaning set forth in Section 5.3.

"Reimbursement Agreement" means that certain $105 million Letter of Credit and Reimbursement Agreement, dated July 28, 1998, by and among the Original Issuers, The Chase Manhattan Bank, as payment certificate agent, NationsBank, N.A., as syndication agent, Chase Securities, Inc., as arranger, and Chase Bank of Texas, N.A., as disbursement account bank, L/C agent, and administrative agent, as amended by that First Amendment to the Letter of Credit and Reimbursement Agreement, dated as of August 27, 1998, by and among the foregoing parties, as the same may be further amended, restated, modified, or supplemented from time to time. The Reimbursement Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

14

Copy from re:SearchTX

"Remaining Members" means the Members that are the same Persons as the "Remaining Partners" under the Arena Partnership Agreement.

"Relocation Event" has the meaning set forth in the Arena Partnership Agreement.

"Relocation Members" means the Members that are the same Persons as the "Relocation Partners" under the Arena Partnership Agreement.

"Reunion Arena" means the Reunion Arena located in downtown Dallas, Texas.

"Security Agreement" means that certain Trust and Security Agreement, dated as of April 23, 1999, by and among the Original Issuers and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.  The Security Agreement constitutes one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Settlement Notice" has the meaning set forth in Section 7.11(c).

"1642 Loans" mean the loans in the original aggregate principal amount of $8,659,529.90 made by the Mavericks Arena Corporations to Hillwood/1642, evidenced by the three separate promissory notes, each dated May 11, 1998, issued by Hillwood/1642, the proceeds of which loans were applied by Hillwood/1642 to pay the purchase price of certain land on which the Arena or the Roadway Improvements are to be located.

"Special Affiliate" means, with respect to an applicable Member or Affiliate of a Member: (a) any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; (b) any other Person, owning or Controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of such Person; (c) any officer, director, constituent member, constituent partner, or employee of such Person or of any other Person described in subparagraph (a) or (b) above; (d) any spouse, mother, father, brother, sister, ascendant, or descendant of such Person or of any other Person described in subparagraph (a), (b), or (c) above; (e) any trust, family partnership, or other entity established primarily for the benefit of such Person or of any of the Persons described in subparagraph (a), (b), (c), or (d) above; and (f) any Person who, during the preceding 12 months, has had a substantial business relationship, directly or indirectly, with HRP, Jr., Hicks, any Affiliate of HRP, Jr. or Hicks, any Member, and/or any Board Member (whether as a partner, member, shareholder, consultant, attorney, investor, co-investor, agent, or in any similar capacity) as a result of which the Person received, directly or indirectly, a benefit or benefits equal to or greater than $5,000.00.

"Special Major Decision" has the meaning set forth in Section 7.3(c).

"Stars Lease" means that certain Amended and Restated Arena Lease-Dallas Stars, to be executed on or about the Initial Funding Date but to be dated efffective of July 28, 1998, to be entered into by the Original Issuers and the Arena Partnership, as lessor, and Dallas Stars, L.P., as lessee, as such lease may be amended, restated, modified, or supplemented from time to time.

15

007500.00176:459874.09

Copy from re:SearchTX

The Stars Lease amends and restates that certain Arena Lease – Dallas Stars, dated as of July 28, 1998, by and among the Original Issuers and Dallas Stars, L.P., which is one of the Project Agreements that will be assigned by the Original Issuers to the Arena Partnership pursuant to the Assignments.

"Stars Letter of Credit" means that certain irrevocable direct pay letter of credit in the undrawn face amount of $20,700,000 that will be delivered by ADS (or by an Affiliate of ADS) to the Collateral Trustee pursuant to the Note Purchase Agreement, as the same may be amended, renewed, replaced, restated, supplemented, or otherwise modified in accordance with the Note Purchase Agreement.

"Stars Team Agreement" means that certain Stars Team Agreement, dated as of April 23, 1999, by and between Dallas Stars, L.P. and the Collateral Trustee, as the same may be amended, restated, modified, or supplemented from time to time.

"Tax Matters Member" has the meaning set forth in Section 9.1.

"Team" or "Teams" means, as the context may require, the National Hockey League team commonly known as the Dallas Stars and/or the National Basketball Association team commonly known as the Dallas Mavericks.

"Team Agreements" means the Mavericks Team Agreement and the Stars Team Agreement.

"Team/Partnership Obligation" has the meaning set forth in section 4.4(c)(i)(A) of the Arena Partnership Agreement.

"Texas Act" means the Texas Limited Liability Company Act, Article 1528n of Title 32 of the Texas Revised Civil Statutes, as it may be amended from time to time, and any successor to such Texas Act.

"Transaction Documents" has the meaning set forth in Annex I.

"Transfer" "Transferred", or any other derivative thereof, means as the context may require, a direct or indirect sale, assignment, transfer, merger, consolidation, interest exchange, conversion or other disposition (other than a Pledge) of the applicable property, by operation of law or otherwise.

"Trigger Date" means the first date on which: (a) the members of the HRP, Jr. Family Group collectively own, directly or indirectly: (i) less than 51% of the voting interests in the Dallas Mavericks; (ii) less than 40% of the equity interests in the Dallas Mavericks; or (iii) less than 75% of the voting power of the Mavericks Arena Corporations; or (b) the members of the Extended HRP Family Group collectively own, directly or indirectly, less than 51% of the equity interests in the Dallas Mavericks;

16

007500.00176:459874.09

Copy from re:SearchTX

"Trigger Event Default" has the same meaning as set forth in the Arena Partnership Agreement.

"Trigger Event Members" means the same Members that are "Trigger Event Partners" under the Arena Partnership Agreement.

"Unanimous Major Decision" has the meaning set forth in Section 7.3(d).

"Undistributed First Priority Capital" means, with respect to a Member, the amount in a special record-keeping account maintained by the Company for such Member, equal to: (a) the amount of cash contributed by such Member, in its capacity as a Non-Defaulting Member, in connection with a request for Capital Contributions with respect to which there has been a Default, including both the amount contributed by the Non-Defaulting Member in the stead of the Default Member and all other amounts contributed by such Non-Defaulting Member with respect to its own Back-End Percentage Interest in connection with such request for additional Capital Contributions; reduced (but not below zero) by: (b) the aggregate amount of cash distributed to such Member pursuant to Section 6.1(b) below.

"Undistributed Second Priority Capital" means, with respect to a Member, the amount in a special record-keeping account maintained by the Company for such Member, equal to: (a) the sum of: (i) the initial Capital Contribution made by such Member pursuant to Section 4.1; plus (ii) except as otherwise provided in Section 4.3, additional Capital Contributions made by such Member pursuant to Section 4.2; reduced (but not below zero); by (b) the aggregate amount of cash distributed to such Member pursuant to Section 6.1(c) below.

"Unexpected Shortfall" has the meaning set forth in Section 4.2(a).

## ARTICLE III

## PURPOSE

3.1     Purposes and Scope.  Subject to the provisions of this Agreement, the purposes of the Company are to:

(a)     acquire the Arena GP Interest and perform the Company's obligations under the Arena Partnership Agreement;

(b)     take any and all actions that may be necessary or required to perform the Company's duties and obligations as the sole general partner of the Arena Partnership;

(c)     hold, manage, monitor, sell, exchange, assign, and/or otherwise dispose of or deal with the Arena GP Interest and/or the proceeds derived therefrom;

17

Copy from re:SearchTX

(d)    borrow money in furtherance of any or all of the objectives of the Company business and secure the same by mortgage, pledge, or other liens <u>provided, however</u>, the Company shall be prohibited from borrowing any money as long as any amounts are outstanding and/or remain unpaid under the Arena Loan; and

(e)    do any and all other acts or things which may be incidental or necessary to carry on the business of the Company as herein contemplated.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS

4.1    <u>Initial Capital Contributions of Members and Formation of Arena Partnership</u>.

(a)    As of the Effective Date, each Member shall contribute to the Company, in cash, the amount set forth next to such Member's name on <u>Exhibit B</u> attached hereto. The Company shall then contribute such amount to the Arena Partnership pursuant to section 4.1 of the Arena Partnership Agreement in connection with the formation of the Arena Partnership.

(b)    Simultaneously with the Company's contribution to the Arena Partnership of the cash amount described in section 4.1(a) of the Arena Partnership Agreement, the Original Issuers shall contribute their entire undivided interests in the Arena Project to the Arena Partnership pursuant to section 4.1 of the Arena Partnership Agreement in connection with the formation of the Arena Partnership.

4.2.    <u>Additional Capital Contributions</u>.

(a)    If the Board determines that the Company requires additional cash funds in order to pay Company Costs and Expenses that are then due and payable or are due and payable within 60 days (the amount by which such Company Costs and Expenses exceed the Company's available funds is referred to as the "Unexpected Shortfall"), then the Board shall deliver a notice to each of the Members (this notice is referred to as the "Contribution Notice") requesting that each Member make Capital Contributions to the Company in proportion to their Back-End Percentage Interests that were in effect as of the Effective Date (but taking into account any adjustments in the Back-End Percentage Interests made as a result of an assignment of a Company Interest permitted hereunder).

(b)    Any such Contribution Notice shall specify the following information:

(i)    The aggregate amount of Capital Contributions requested in the Contribution Notice (which cannot exceed the amount of the Unexpected Shortfall that will be required);

18

007500.00176:459874.09

Copy from re:SearchTX

(ii)    The amount of additional cash funds that each Member is required to contribute to the Company (which Capital Contributions shall be made pro rata in accordance with each Member's Back-End Percentage Interest in effect on the Effective Date (but taking into account any adjustments in the Back-End Percentage Interests made as a result of an assignment of a Company Interest permitted hereunder);

(iii)    The date (the "Contribution Date") on which such additional Capital Contributions are due, which date shall not be less than eleven Business Days after the date on which the Contribution Notice is delivered;

(iv)    A brief description of the Company Costs and Expenses that will be paid with the proceeds of such additional Capital Contributions; and

(v)    Wiring instructions for the bank account into which the additional Capital Contributions are to be deposited.

(c)    The Members shall, prior to the Contribution Date, make the additional Capital Contributions to the Company in the amount and manner requested in the Contribution Notice.

(d)    Except as provided in Section 4.1 and this Section 4.2, no Member shall have any obligation or right to make any additional Capital Contributions unless such additional Capital Contributions have been approved by the Board.

(e)    No Member shall be obligated to make an additional Capital Contribution to satisfy an indemnification permitted under Section 7.11.

(f)    If:

(i)    any Member reasonably determines that the Arena Partnership does not have sufficient cash funds on hand: (A) to pay Arena Project costs that are required to be funded with the proceeds of Interim Contributions as described in section 4.4(a) of the Arena Partnership Agreement; (B) to satisfy a Projected Funding Deficit Amount, as described in section 4.4(b) of the Arena Partnership Agreement; (C) to satisfy a Funding Deficit obligation, as described in section 4.4(c) of the Arena Partnership Agreement; (D) to satisfy other Team/Partnership Obligations, as described in section 4.4(d)(ii) of the Arena Partnership Agreement; or (E) to pay other Arena Partnership obligations described in section 4.3(a)(i) and section 4.3(a)(ii) of the Arena Partnership Agreement; or

(ii)    the Board reasonably determines that the Arena Partnership does not have sufficient cash funds on hand: (A) to pay any of the obligations, costs, or expenses described in Section 4.2(f)(i): or (B) to pay any other Arena Partnership

19

007500.00176:459874.09

Copy from re:SearchTX

Costs and Expenses that are then due and payable or that are expected to become due and payable within the next 60 days.

(the amount by which such obligations and Arena Partnership Costs and Expenses described in this Section 4.2(f) exceeds the cash funds available to the Arena Partnership is referred to as an "Arena Partnership Unexpected Shortfall"), then such Member and/or the Board, as the case may be, may request that the Arena Partnership Limited Partners make additional capital contributions to the Arena Partnership to enable the Arena Partnership to pay the obligations, costs, and expenses that resulted in the Arena Partnership Unexpected Shortfall. The applicable Member and/or the Board shall follow the procedures set forth in the Arena Partnership Agreement for requesting additional Capital Contributions from the Arena Partnership Limited Partners.

4.3    Default in Making Additional Capital Contributions.

(a)    If any Board Members and/or any Member reasonably determines that a Member has failed to make an additional Capital Contribution required under Section 4.2(a) on or prior to the applicable Contribution Date, any Board Member or Member shall immediately send a written notice (the "Default Notice") to the Member that failed to make its required Capital Contribution, notifying such Member of its failure to make such contribution, the amount to be contributed, the date such contribution was due, and requesting that such contribution be made immediately.

(b)    If such Member fails to make an additional Capital Contribution required under Section 4.2(a) within two (2) Business Days after receiving the Default Notice described in Section 4.3(a) (the date that is two (2) Business days after the receipt of the applicable Default Notice is referred to as the "Default Date"), then such Member shall be in default (such Person, as the Member in default, is referred to as a "Default Member," and the amount that Default Member failed to contribute is referred to as the "Default Amount"). The Members not in default (the "Non-Defaulting Members"), in their sole and absolute discretion, may elect to make additional Capital Contributions in the stead of the Default Member in an amount up to the Default Amount. If the Non-Defaulting Members elect to make such additional Capital Contributions in the stead of the Default Member, then all of the additional Capital Contributions made by the Non-Defaulting Members in connection with a request for additional Capital Contributions with respect to which a Default has occurred shall increase the Undistributed First Priority Capital of the Non-Defaulting Members (including the Capital Contributions that the Non-Defaulting Members are required to contribute with respect to their own Back-End Percentage Interests).

(c)    (i)    Subject to Section 4.3(c)(ii), if a Member or an Affiliate of a Member becomes a "Default Partner" under the Arena Partnership Agreement, then such Member shall no longer have the right to appoint or designate members to the Board. The Members of the Board that were previously designated by such Member may then be replaced pursuant to Section 7.2(e) by the Member that is

20

007500.00176:459874.09

not a "Default Partner" under the Arena Partnership Agreement (and that has no Affiliates that are "Default Partners" under the Arena Partnership Agreement).

(ii)    Notwithstanding anything to the contrary in Section 4.3(c)(i), if a Mavericks Arena Corporation makes an additional capital contribution to the Arena Partnership on behalf of another Mavericks Arena Corporation pursuant to the Arena Partnership Agreement prior to any applicable "Default Date," then none of the Mavericks Arena Corporations shall be considered a "Default Partner" under the Arena Partnership Agreement for purposes of this Section 4.3(c), and the Mavericks Arena Corporations shall not lose the right to designate Board Members.

(iii)    For purposes of this Section 4.3(c) the Members acknowledge and agree that if, under any circumstances, a Member does not hold the same Back-End Percentage Interest as such Member owns in the Arena Partnership (e.g., this could occur if a Pledge of a Member's Company Interest pursuant to a Permitted GP Member Pledge is foreclosed on and/or a Pledge made by a Member of its interests in the Arena Partnership pursuant to the Transaction Documents is foreclosed on), then this Section 4.3(c) shall be applied by terminating a Member's rights to appoint or designate members of the Board if: (A) in the case of a foreclosure of a Pledge of a Company Interest, the Affiliate of a Member whose interest is so foreclosed becomes a "Default Partner" under the Arena Partnership Agreement; and (B) in the case of a foreclosure of a Pledge of an interest in the Arena Partnership, the successor in interest to such foreclosed interest in the Arena Partnership becomes a "Default Partner" under the Arena Partnership Agreement.

(d)    If the "back-end percentage interest" of a Member in the Arena Partnership is reduced under section 4.5 or section 4.6 of the Arena Partnership Agreement, then the Back-End Percentage Interest of such Member in the Company shall be reduced by the same amount (so that such Member always owns the same "back-end percentage interest" in the Company and in the Partnership, as described in Section 10.1 below).

(e)    THE MEMBERS ACKNOWLEDGE AND AGREE THAT: (i) THEIR COMPANY INTEREST MAY BE DILUTED FOR FAILING TO MAKE REQUIRED CAPITAL CONTRIBUTIONS UNDER SECTION 4.2 AND (ii) THEY MAY LOSE THEIR RIGHT TO APPOINT MEMBERS TO THE BOARD IF THEY OR THEIR AFFILIATES FAIL TO MAKE REQUIRED CAPITAL CONTRIBUTIONS TO THE ARENA PARTNERSHIP. EACH MEMBER FURTHER ACKNOWLEDGES AND AGREES THAT THE REMEDIES AVAILABLE TO A NON-DEFAULTING MEMBER PURSUANT TO THIS SECTION 4.3 ARE A FAIR AND ADEQUATE MEASURE OF THE LIQUIDATED DAMAGES WHICH SUCH NON-DEFAULTING MEMBER IS ENTITLED TO RECEIVE UNDER APPLICABLE LAWS.

21

007500.00176:459874.09

Copy from re:SearchTX

4.4    Trigger Event Defaults.    The Members acknowledge and agree that, notwithstanding anything to the contrary in this Agreement, but subject to Section 4.5 below, if a Trigger Event Default occurs with respect to a Trigger Event Member, then:

(a)    The Board members previously appointed by such Trigger Event Member shall be immediately removed from the Board, such Trigger Event Member's right to control the selection and replacement of Board members and/or to make any other decision or to take any other action with respect to Board Members shall terminate as provided in Section 7.2(e), and the Good Members shall then have the right to control the selection and replacement of Board members and/or to make any other decision or to take any other action with respect thereto as provided in Section 7.2(e).

(b)    From and after the date on which the Trigger Event Default occurs, all of the unreturned capital of the Good Members as of such date, together with such additional amounts as may be required to cause the Good Members to realize a 15% internal rate of return on their investment in the Company, shall be distributed and returned to the Good Members before any additional payments or distributions are made to the Trigger Event Members (after the Good Members have received such amount, the "Initial Payout" shall be considered to have occurred).   After the Initial Payout, the Trigger Event Members shall be entitled to receive their unreturned capital (but no accumulated or future preferred return on such unreturned capital) out of any remaining proceeds available for distribution.  If there are any remaining funds after making all of the payments and distributions described  in the two preceding sentences, then any remaining proceeds shall be shared in accordance with Back-End Percentage Interests in effect at the time of such distributions.

(c)    The Trigger Event Members shall continue to have the same obligations to make Capital Contributions to the Company as were in effect prior to the Trigger Event Default; and

(d)    Appropriate adjustments shall be made to the allocation, distribution, and other provisions in this Agreement to effectuate the changes set forth above in the event such a Trigger Event Default occurs.  The Members acknowledge and agree that, subject to Section 4.5, to the extent any of the provisions in this Agreement are inconsistent with this Section 4.4, the provisions set forth in this Section 4.4 shall override and control any such conflicting provisions.

4.5    Relocation Events.

(a)    If a Relocation Event occurs for any reason, then the Company may purchase and redeem the entire Partnership Interest of the Relocation Members for an aggregate amount equal to $10.  Any Remaining Member may cause the Company to so purchase and redeem the Company Interests of the Relocation Members.  After any such purchase and redemption, the Company Interests of the Relocation Members shall be considered terminated, and no additional distributions or payments shall be required or be

22

007500.00176:459874.09

made with respect to such redeemed Company Interests (including, without limitation, if applicable, any additional payments or distributions with respect to the ADS Loan and/or the ADS Note).

(b)     The Members further acknowledge and agree that in connection with any such Relocation Event, the Company will probably recognize a built-in loss equal to the amount by which the aggregate Capital Account balances of the Relocation Members at the time of such redemption exceed $10 (the aggregate redemption price). Notwithstanding anything to the contrary in this Agreement, any such built-in loss shall be specially allocated to the Relocation Members in connection with the redemption of their Company Interests in a manner that reduces their aggregate Capital Account balances to $10.

4.6     Capital Accounts.

(a)     Maintenance Rules.   The Company shall maintain for each Member a separate Capital Account in accordance with this Section 4.6, which shall control the division of assets upon liquidation of the Company as provided in Section 11.3.   The Capital Account shall be maintained in accordance with the following provisions:

(i)     Such Capital Account shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gain which are specially allocated to such Member pursuant to Section 4.4, Section 5.2 and Section 5.3 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(ii)     Such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses which are specially allocated to such Member pursuant to Section 4.4, Section 4.5, Section 5.2 and Section 5.3 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)     In the event all or a portion of an interest in the Company is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred interest, provided, however, that if the Transfer causes a termination of the Company under Code section 708(b)(1)(B), then the Company shall be deemed to have contributed its assets to a new limited liability company in exchange for interests in such new limited liability company (which new limited liability company will be taxed as a partnership for federal income tax purposes), followed by a distribution of the interests in the new limited liability company to

23

the Members of the Company in liquidation of the Company. Such deemed exchange of interests followed by a distribution and liquidation shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax, unless otherwise provided in Article XI.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts generally are intended to comply with Regulations section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. If the Board reasonably determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Regulations, the Board may authorize such modifications, provided that it does not have any adverse effect on the amounts distributable to any Person pursuant to Section 11.3 upon the dissolution of the Company.

    (b)    Definition of Profits and Losses. "Profits" and "Losses" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

        (i)    Income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 4.6(b) shall be added to such taxable income or loss;

        (ii)    Any expenditures of the Company described in Code section 705(a)(2)(B), or treated as Code section 705(a)(2)(B) expenditures pursuant to Regulations section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this Section 4.6(b) shall be subtracted from such taxable income or loss;

        (iii)    In the event the Book Value of any Company asset is adjusted pursuant to Section 4.6(c)(ii) or Section 4.6(c)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

        (iv)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

        (v)    In lieu of the deduction for depreciation, cost recovery or amortization taken into account in computing such taxable income or loss, there

24

007500.00176:459874.09

shall be taken into account "Book Depreciation." "Book Depreciation" for any asset means for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board; and

(vi)    Notwithstanding any other provision of this Section 4.6(b), any items that are specially allocated pursuant to Section 4.4, Section 4.5, Section 5.2 or Section 5.3 shall not be taken into account in computing Profits and Losses.

(c)    Definition of Book Value. "Book Value" means for any asset the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board.

(ii)    The Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (C) the liquidation of the Company within the meaning of Regulation section 1.704-1(b)(2)(ii)(g);

(iii)    The Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Board in a manner consistent with subparagraph (ii) above;

(iv)    The Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations section 1.704-1(b)(2)(iv)(m) and Section 5.2(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section

25

007500.00176:459874.09

4.6(c)(iv) to the extent the Board determines that an adjustment pursuant to Section 4.6(c)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 4.6(c)(iv);

      (v)    If the Book Value of an asset has been determined or adjusted pursuant to Section 4.6(c)(i), Section 4.6(c)(ii), or Section 4.6(c)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

    4.7    Interest. No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

    4.8    No Withdrawal. No Member shall be entitled to withdraw any part of its Capital Contribution or its Capital Account or to receive any distribution from the Company, except as specifically provided in this Agreement.

    4.9    Limitation on Capital Contributions and Loans. Except as specifically provided in this Article IV and/or Article VII, no Member may contribute capital, loan, or advance money to the Company.

# ARTICLE V

# ALLOCATIONS

5.1    Allocation of Profits and Losses.

    (a)    Allocation of Profit Generally. After giving effect to the allocations set forth in Section 4.4, Section 4.5, Section 5.2 and Section 5.3, and after giving effect to all distributions of cash or property (other than cash or property to be distributed pursuant to Article XI), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

      (i)    First, to each Member with a negative balance in its Adjusted Capital Account, pro rata in accordance with such negative Adjusted Capital Account balances, until such negative Adjusted Capital Account balances have been eliminated;

      (ii)    Next, to such of the Members that have accrued and unpaid First Priority Preference Amounts in excess of such Member's positive Capital Account balance, pro rata to the extent of such excess;

      (iii)    Next, to such of the Members that have: (A) accrued and unpaid First Priority Preference Amounts; and (B) Undistributed First Priority Capital, in

26

007500.00176:459874.09

Copy from re:SearchTX

excess of such Member's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(iv)    Next, to such of the Members that have: (A) accrued and unpaid First Priority Preference Amount; (B) Undistributed First Priority Capital; and (C) Undistributed Second Priority Capital, in excess of such Member's positive Adjusted Capital Account balance, pro rata to the extent of such excess;

(v)    Next, to the Members in the minimum amount necessary to cause the ratios among their "Excess Amounts" to equal the ratios among their Back-End Percentage Interests.  For purposes of this Agreement, a Member's "Excess Amount" equals the positive balance in such Member's Adjusted Capital Account (computed after the allocation of Profits under subparagraphs (i) through (iv) of this Section 5.1(a) for the Fiscal Year of the allocation), reduced by the sum of such Member's: (A) accrued and unpaid First Priority Preference Amount; (B) Undistributed First Priority Capital; and (C) Undistributed Second Priority Capital (with such amounts in subparagraphs (A) through (C) being computed after giving effect to all Capital Contributions and all distributions that took place during and before the Fiscal Year with respect to which the allocation is being made); and

(vi)    Next, to the Members in proportion to their Back-End Percentage Interests.

(b)    Allocation of Losses.

(i)    After giving effect to the allocations set forth in Section 4.4, Section 4.5, Section 5.2 and Section 5.3, and after giving effect to all distributions of cash and property (other than cash or property to be distributed pursuant to Article XI), and subject to the limitation set forth in Section 5.1(b)(ii), Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(A)    First, in circumstances in which all Members have positive Excess Amounts, to the Members in the minimum amounts necessary to cause their positive Excess Amounts to be in the same ratios as their Back-End Percentage Interests, and in circumstances in which one or more Members, but not all Members, have positive Excess Amounts, to the Members with positive Excess Amounts in the minimum amounts necessary to cause such Members' positive Excess Amounts to be in the same ratios as their Back-End Percentage Interests;

(B)    Next, to the Members with positive Excess Amounts pro rata in accordance with their positive Excess Amounts, until such positive Excess Amounts have been eliminated;

27

007500.00176:459874.09

Copy from re:SearchTX

(C)    Next to each Member that has Undistributed Second Priority Capital, pro rata to the extent necessary to cause each such Member's positive Adjusted Capital Account balance to equal the sum of such Member's: (I) Undistributed First Priority Capital; and (II) accrued and unpaid First Priority Preference Amount;

(D)    Next, to each Member that has Undistributed First Priority Capital, pro rata to the extent necessary to cause each such Member's positive Adjusted Capital Account balance to equal such Member's accrued and unpaid First Priority Preference Amount;

(E)    Next, to each Member with a positive Adjusted Capital Account balance, pro rata in accordance with such positive Adjusted Capital Account balances, until such positive Adjusted Account balances have been reduced to zero; and

(F)    Next, to the Members in proportion to their Back-End Percentage Interests.

(ii)    Notwithstanding anything to the contrary in Section 5.1(b)(i):

(A)    The Losses allocated pursuant to Section 5.1(b)(i) to any Member for any Fiscal Year shall not exceed the maximum amount of Losses that may be allocated to such Member without causing such Member to have an Adjusted Capital Account Deficit at the end of such Fiscal Year.

(B)    If some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.1(b)(i), the limitations set forth in this Section 5.1(b)(ii) shall be applied by allocating Losses pursuant to this Section 5.1(b)(ii) only to those Members who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation of Losses (with the allocation of such Losses among such Members to be determined by the Board, based on the allocation that is most likely to effectuate the distribution priorities set forth in Section 6.1).

(C)    If no Member may receive an additional allocation of Losses pursuant to Section 5.1(b)(ii)(B), such additional Losses not allocated pursuant to Section 5.1(b)(ii)(B) shall be allocated Members in a manner that is most likely to effectuate the distribution priorities set forth in Section 6.1), as reasonably determined by the Board;

28

007500.00176:459874.09

Copy from re:SearchTX

5.2     Special Allocations.

(a)     Minimum Gain Chargeback--Company Nonrecourse Liabilities. If there is a net decrease in Company Minimum Gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Regulations section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Regulations section 1.704-2(f)(2), (3), (4), and (5). This Section 5.2(a) is intended to comply with the minimum gain chargeback requirement (set forth in Regulations section 1.704-2(f)) relating to partnership nonrecourse liabilities (as defined in Regulations section 1.704-2(b)(3)) and shall be so interpreted.

(b)     Minimum Gain Chargeback--Member Nonrecourse Debt. If there is a net decrease in Member Minimum Gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member Minimum Gain (determined pursuant to Regulations section 1.704-2(i)(5)) in the amounts and manner described in Regulations section 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 5.2(b) is intended to comply with the minimum gain chargeback requirement (set forth in Regulations section 1.704-2(i)(4)) relating to partner nonrecourse debt (as defined in Regulations section 1.704-2(b)(4)) and shall be so interpreted.

(c)     Qualified Income Offset. If, after applying Section 5.2(a) and Section 5.2(b), any Member has an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible.

(d)     Optional Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code sections 734(b) or 743(b) is required, pursuant to Regulations section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be considered an additional item of taxable loss or deduction that is included in the determination of Profits and Losses pursuant to Section 4.6(b) and that is then allocated among the Members as part of the allocation of Profits and Losses.

(f)     Partner Nonrecourse Deductions. Partner Nonrecourse Deductions shall be allocated pursuant to Regulations section 1.704-2(b)(4) and (i)(1) to the Member or Members who bear the economic risk of loss with respect to such deductions.

29

007500.00176:459874.09

Copy from re:SearchTX

5.3     Curative Allocations.  The allocations set forth in Section 5.1(b)(ii) and Section 5.2(a) through Section 5.2(f) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.3.  Therefore, notwithstanding any other provisions of this Article V (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.4, Section 4.5, Section 5.1(a) and Section 5.1(b)(i).  In exercising its discretion under this Section 5.3, the Board shall take into account future Regulatory Allocations under Sections 5.2(a) and 5.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 5.2(e) and 5.2(f).

5.4     Tax Allocations: Code Section 704(c).

(a)     In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value (computed in accordance with Section 4.6(c)(i)).

(b)     If the Book Value of any Company asset is adjusted pursuant to Section 4.6(c)(ii), subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)     Any elections or other decisions relating to such allocation shall be made by the Board in any manner that reasonably reflects the purpose and intention of the Agreement.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Person's Capital Account, Adjusted Capital Account, or share of Profits, Losses, and other items or distributions pursuant to any provision of this Agreement.

5.5     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other item allocable to any period, Profits, Losses and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Board using any permissible method under Code Section 706 and the Regulations thereunder.

30

007500.00176:459874.09

Copy from re:SearchTX

(b)     For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 4.4, 4.5, 5.1, 5.2, 5.3, and 5.4.

(c)     The Members are aware of the income tax consequences of the allocations made by Article IV and this Article V and hereby agree to be bound by the provisions of Article IV and this Article V in reporting their shares of Company income and loss for income tax purposes.

(d)     It is generally intended that the allocations in Sections 4.4, 4.5, 5.1, 5.2., 5.3, and 5.4 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

(e)     The Members agree that their Back-End Percentage Interests represent their respective interests in Company profits for purposes of allocating excess nonrecourse liabilities (as defined in Regulations Section 1.752-3(a)(3)) pursuant to Regulations section 1.752-3(a)(3).

## ARTICLE VI

## DISTRIBUTIONS

6.1     Distributions of Available Cash.    Subject to Section 11.3, the Board shall periodically determine if there is any Available Cash.  If the Board determines that Available Cash exists, then the Board shall promptly distribute such Available Cash to the Members in the manner set forth below:

(a)     First to each Member to the extent such Member has an accrued and unpaid First Priority Preference Amount, in proportion to each such Member's accrued and unpaid First Priority Preference Amount, in an amount up to the accrued and unpaid First Priority Preference Amount of each such Member;

(b)     Next to each Member to the extent that such Member has Undistributed First Priority Capital, in proportion to each such Member's Undistributed First Priority Capital, in an amount up to the Undistributed First Priority Capital of each such Member;

(c)     Next, to each Member to the extent such Member has Undistributed Second Priority Capital, in proportion to each such Member's Undistributed Second Priority Capital, in an amount up to the Undistributed Second Priority Capital of each such Member; and

(d)     Next, to the Members in proportion to their Back-End Percentage Interests.

31

007500.00176:459874.09

Copy from re:SearchTX

(e)    Notwithstanding anything to the contrary above, if Available Cash is derived from a transaction that occurs in connection with the dissolution, termination and liquidation of the Company, any Available Cash that is derived from or attributable to such a transaction shall be distributed to the Members in accordance with Section 11.3 hereof.

6.2    Amounts Withheld. Notwithstanding any other provision of this Agreement to the contrary, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Company with respect to such Member as a result of such Member's participation in the Company.  If the Company is required to withhold or pay any such taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or tax is paid, which payment shall be deemed to be a distribution with respect to such Member's Company Interest to the extent that the Member (or any successor to such Member's Company Interest) is entitled to receive a distribution.  Any withholdings authorized by this Section 6.2 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Board shall have received evidence satisfactory to the Board to the effect that a lower rate is applicable, or that no withholding is applicable.

6.3    Excess Distributions.  To the extent that the aggregate amount of actual and deemed distributions to a Member under this Article VI for any period (i.e., deemed distributions are those distributions that result from the application of withholding under Section 6.2), exceed the actual distributions to which such Member is entitled for such period, the amount of such excess shall be considered a loan from the Company to such Member.  Such loan shall bear interest (which interest shall be treated as an item of income to the Company) at 15% per annum, computed annually, until discharged by such Member by repayment, which may be made in the sole discretion of the Board out of distributions to which such Member would otherwise be subsequently entitled.

# ARTICLE VII

# MANAGEMENT OF THE COMPANY

7.1    Management by Members and the Board.

(a)    The Members have established the Company as a member-managed limited liability company under the Texas Act.  The Members also have agreed to designate a committee of up to nine (9) Persons (which committee shall be reduced to eight (8) Persons after the Trigger Date) to manage the Company and its business and affairs (this committee is referred to as the "Board" and the Persons appointed to the Board are referred to as the "Board Members").  The Board Members shall be designated by the ADS Members and the Mavericks Members in accordance with this Agreement.

32

007500.00176:459874.09

Copy from re:SearchTX

(b)    The Board may exercise all powers of the Company and may do all such lawful acts and things as are not specifically required by statute or by this Agreement to be exercised or done by the Members.  The Board will be responsible for making all Major Decisions and for managing all other business and affairs of the Company.  Because the Company is the sole general partner of the Arena Partnership, the Board also will be responsible for managing the business and affairs of the Arena Partnership.

(c)    The Board, in its sole discretion, may delegate its rights and powers to manage the business and affairs of the Company to one or more other Persons; provided, however, the Board may not delegate the right to make Special Major Decisions and/or Unanimous Major Decisions to any other Person.  The Board, in its sole discretion, may establish officer positions for the Company pursuant to Section 7.4.  The Board also may employ attorneys, accountants, consultants, contractors, agents, employees, and other Persons to assist the Board in carrying out its duties and responsibilities under this Agreement.  The wages, salaries, and other compensation of any such Persons shall be determined by the Board.

(d)    The Members unanimously agree that the Board Members shall not be considered managers of the Company under the Texas Act.  The Board Members are representatives of the Members and derive all of the their right, power, and authority under this Agreement as a result of a delegation of such right, power, and authority by the Members to the Board Members.

7.2    Board Appointments and Procedures.

(a)    Initial Board Members.  Prior to the Trigger Date, the Board shall consist of up to nine (9) Board Members.  The initial Board Members are set forth below:

| Board Seat | Name of Board Member |
| --- | --- |
| Place 1 | H.R. Perot, Jr. |
| Place 2 | Tom Luce |
| Place 3 | Richard G. Patterson |
| Place 4 | Thomas O. Hicks |
| Place 5 | David B. Deniger |
| Place 6 | Lawrence D. Stuart, Jr. |
| Place 7 | **[Vacant]** |
| Place 8 | Richard Knight |
| Place 9 | Joe Alcantar |

(b)    Replacement of First Six Board Places.  For purposes of this Article VII, the Mavericks Arena Corporations, and their successors and assigns (including any of their Transferees), shall sometimes be referred to herein individually as a "Mavericks Member" and collectively as the "Mavericks Members," and ADS and its successors and assigns (including without limitation, Dallas Arena LLC and any other Transferees) shall

33

007500.00176:459874.09

Copy from re:SearchTX

sometimes be referred to herein individually as an "ADS Member" and collectively as the "ADS Members". Except as otherwise provided in this Section 7.2(b) and Section 7.2(e), the Mavericks Members may at any time designate replacements for the Place 1, Place 2, and Place 3 Board seats by delivering a written notice of such replacement to the ADS Members, and the ADS Members may at any time designate replacements for the Place 4, Place 5, and Place 6 Board seats by delivering a written notice of such replacement to the Mavericks Members.

(i)    The Members acknowledge and agree that it is intended that the Mavericks Members shall act as a group in taking any actions with respect to the Place 1, Place 2, and Place 3 Board seats, and the ADS Members (to the extent applicable) shall act as a group in taking any actions with respect to the Place 4, Place 5, and Place 6 Board seats.  To facilitate the process, however, the Mavericks Members and the ADS Members shall each designate, in writing, one of their respective Members to act on behalf of the other Members in the applicable group in making any decisions, appointments, removals, or taking any other actions under this Article VII with respect to the applicable Board seats controlled by such group of Members.  If a particular group of Members fails to specifically designate a Member to act on behalf of the other Members in the applicable group, then the Member holding the largest Back-End Percentage Interest of the Members in such group shall automatically be vested with the responsibility to act on behalf of such other Members in the group in making any decisions, appointments, removals, or taking any other actions under this Article VII with respect to the applicable Board seats unless and until a different Member has been designated.  Initially, HAP shall act on behalf of the Mavericks Members and ADS shall act on behalf of the ADS Members in making any decisions or taking any actions under this Article VII with respect to the applicable Board seats.

(ii)    If a vacancy should ever occur in one or more of the first six Board seats, the applicable group of Members (i.e., the ADS Members or the Mavericks Members, as the case may be) and the applicable designated Member within each such group (i.e., initially HAP and ADS) shall be responsible for designating a replacement for such vacant Board seat shall promptly designate such a replacement and shall deliver written notice of such replacement to the other Members.

(iii)    If at any time one group of Members notifies the other group of Members that any Board member appointed by the Member group delivering such notice is no longer to serve in such capacity, the Board member designated in such notice shall, from and after the date on which the other group of Members receives such notice, be deemed to have resigned from the Board and shall have no authority, power, or capacity with respect to any matter whatsoever relating to the Board.

34

007500.00176:459874.09

Copy from re:SearchTX

(c)    <u>The Place 7 Board Seat</u>. On the Trigger Date, the Place 7 Board seat shall be eliminated, and the number of potential Board Members shall be reduced from nine (9) to eight (8). If, prior to the Trigger Date, the Place 7 Board seat is vacant, or the Place 7 Board Member should die, resign, no longer qualify as a Disinterested Board Member, or otherwise fail or be unable to serve as the Place 7 Board Member (the occurrence of such an event prior to the Trigger Date is referred to as a "<u>Place 7 Vacancy Event</u>"), the Mavericks Members may select a replacement for the Place 7 Board seat as follows:

(i)    The Mavericks Members and the ADS Members have agreed that the following seven (7) persons (the "<u>Potential Candidate List</u>") are the only pre-approved potential replacements for the Place 7 Board seat in the event one or more Place 7 Vacancy Events occur:

(A)    David Biegler;

(B)    Richard Rainwater;

(C)    Gregg Engles;

(D)    J.M. Haggar, III; and

(E)    Gerald Turner;

(F)    Donald J. Carter; and

(G)    Arnold Holtberg.

(ii)    Upon the occurrence of a Place 7 Vacancy Event, the Mavericks Members, in their sole discretion, may select any Person from the Potential Candidate List to serve as the replacement Place 7 Board Member so long as such Person is a Disinterested Board Member. If the Person selected by the Mavericks Members refuses to serve as the Place 7 Board Member, then the Mavericks Members shall select another Person from the Potential Candidate List to serve as the Place 7 Board Member so long as such Person is a Disinterested Board Member. If a Person from the Potential Candidate List agrees to serve as the Place 7 Board Member, and a Place 7 Vacancy Event subsequently occurs with respect to such Person, then the Mavericks Members, in their sole discretion, may select another Person from the Potential Candidate List to become the Place 7 Board Member.

(iii)    If, at any time prior to the Trigger Date, there is a vacancy in the Place 7 Board seat, and there are no Persons from the Potential Candidate List who are able, willing, or qualified to serve as the Place 7 Board Member, then the Mavericks Members, in their sole discretion, may select any Person who is a Disinterested Board Member as a replacement for such Place 7 Board seat.

35

007500.00176:459874.09

Copy from re:SearchTX

(iv)    If a Person on the Potential Candidate List dies, becomes disabled, refuses an appointment or is otherwise unable to serve as the Place 7 Board Member, such Person shall be permanently removed from the Potential Candidate List.

(v)    The ADS Members and the Mavericks Members, by mutual written agreement, may at any time add additional Persons to the Potential Candidate List.

(d)    The Place 8 and Place 9 Board Seats.  Except as otherwise provided in Section 7.2(e), the Mavericks Members and the ADS Members shall jointly designate replacements for the Place 8 and the Place 9 Board seats.

(i)    If a vacancy should ever occur in one or more of the Place 8 and Place 9 Board seats, the Mavericks Members and the ADS Members shall promptly designate a replacement for such vacant Board seat and shall deliver written notice of such replacement to the other Members.

(ii)    The Mavericks Members and the ADS Members may at any time jointly remove a Person who is holding a Place 8 and/or a Place 9 Board seat for any reason, and upon such removal, such former holder of the Place 8 or the Place 9 Board seat shall have no further authority, power, or capacity with respect to any matter whatsoever relating to the Board.

(iii)    Each Person that holds a Place 8 or a Place 9 Board seat must also be a Disinterested Board Member.  If a Person who holds a Place 8 or a Place 9 Board seat no longer qualifies as a Disinterested Board Member, then such Person shall be deemed to have resigned from such Place 8 and/or Place 9 Board seat on the date on which such Person no longer qualified as a Disinterested Board Member.

(e)    Forfeiture of Right to Designate Board Members.  The ADS Members and the Mavericks  Members shall lose their respective right to designate Board Members: (i) if, in the case of the Mavericks Members: (A) the "back-end percentage interests" of the Mavericks Members and their successors and assigns (collectively) in the Arena Partnership (excluding, for these purposes, the ADS Members or any Affiliate of the ADS Members if an ADS Member or any such Affiliate were to become a successor or assign of a Mavericks Member) are reduced to less than 40% under the Arena Partnership Agreement; (B) one or more Mavericks Members becomes a Trigger Event Partner under the Arena Partnership Agreement; or (C) one or more Mavericks Members becomes a Relocation Partner under the Arena Partnership Agreement; or (ii) if, in the case of the ADS Members: (A) the "back-end percentage interest" of the ADS Members and their successors and assigns (collectively) in the Arena Partnership

36

007500.00176:459874.09

(excluding, for these purposes, the Mavericks Members and any Affiliate of the Mavericks Members if a Mavericks Member or any such Affiliate were to become a successor or assign of an ADS Member) is reduced to less than 40% under the Arena Partnership Agreement; (B) an ADS Member becomes a Trigger Event Partner under the Arena Partnership Agreement; or (C) an ADS Member becomes a Relocation Partner under the Arena Partnership Agreement.   Upon the occurrence of such an event, any Board Members then serving at the request of the group of Members that includes the defaulting Member shall immediately be deemed to have resigned from the Board.  The applicable Member not in default shall then have the right to designate Board Members in the stead of the Member in default (or whose Affiliates are in default).

(f)     Meetings of the Board.

(i)     Regular meetings of the Board shall be held at such time and place and on such notice, if any, as shall be determined from time to time by the Board;

(ii)     Special meetings of the Board may be called at any time by at least three (3) Board Members on at least five (5) Business Days prior written notice from such Board Members to all of the other Board Members.

(iii)     At all meetings of the Board, a majority of the Board Members at the time in office shall be necessary and sufficient to constitute a quorum for the transaction of business.  If a quorum is not present at any meeting of the Board, the Board Members thereat may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum shall be present.

(g)     Committees.  The Board may create committees for such terms and with such powers and duties as the Board deems appropriate; provided, however, the Board may not delegate to any such committee the right to make a Special Major Decision or a Unanimous Major Decision; provided, further, that each such committee shall include the same number of Board Members holding the Place 1, Place 2, and Place 3 seats as the Board Members holding the Place 4, Place 5, and Place 6 seats.

(h)     Voting and Proxies.

(i)     All Majority Major Decisions must be approved by a majority of the Board Members then serving on the Board.

(ii)     All Special Major Decisions must be approved by at least four (4) of the Board Members holding the Place 1 Board seat through the Place 7 Board seat.

(iii)     All Unanimous Major Decisions must be approved by a majority of the Board Members holding the Place 1, Place 2, and Place 3 Board seats and a

37

007500.00176:459874.09

Copy from re:SearchTX

majority of the Board Members holding the Place 4, Place 5, and Place 6 Board seats (i.e., the votes of the Persons holding the Place 7, Place 8 and Place 9 Board seats are not relevant for these purposes).

(iv)    HRP, Jr. (or such other Board Member as the Mavericks Members may designate) shall have the proxy for the Place 1, Place 2 and Place 3 Board Members.  Hicks (or such other Board Member as the ADS Members may designate) shall have the proxy for the Place 4, Place 5 and Place 6 Board Members.

(v)    The Place 8 and the Place 9 Board Members may not grant a proxy to any other Person.

(i)    Telephone Meetings.  Board Members may attend any meeting of the Board or any committee thereof by conference telephone, radio, television, or similar means of communication by which all Persons participating in the meeting can hear each other, and all Board Members so attending shall be deemed present at the meeting for all purposes, including the determination of whether a quorum is present.

(j)    Action by Written Consent.  Any action required or permitted to be taken by the Board or a committee may be taken without a meeting if a consent in writing, setting forth the action so taken: (i) is signed by all of the Board Members, or (ii) with two (2) prior Business Days notice to all Board Members, is signed by the requisite number of Board Members that must approve such action.  "Writing" for these purposes includes any handwritten, typewritten, telegraphic, telexed, or telecopied communication.

(k)    Wavier of Notice.  Whenever any notice is required to be given to any Board Member under the provisions of this Agreement, a waiver thereof in writing signed by the person or Persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Attendance at any Board meeting shall also constitute a waiver of notice thereof.

7.3    Major Decisions.

(a)    No Member, Board Member, or any other Person shall have the right or the power to make any commitment or engage in any undertaking on behalf of the Company as the general partner of the Arena Partnership in respect of a Major Decision unless or until the same has been approved by the requisite number of Board Members pursuant to this Section 7.3.

(b)    The term "Majority Major Decision" means any matter, action, and and/or decision item relating to the Company's business and affairs as the general partner of the Arena Partnership other than a Special Major Decision or a Unanimous Major Decision.

38

(c)    The term "Special Major Decision" means any action, omission, or decision with respect to the following matters:

(i)    approval of an annual operating budget for the Company, and any amendments or modifications thereto;

(ii)    approval of any additional Capital Contributions to the Company to be made by the Members pursuant to Section 4.2;

(iii)    approval of the annual federal income tax returns of the Company;

(iv)    approval of the officer positions of the Company, approval of the terms, powers, duties, and compensation associated with any such officer position, approval and removal of the key executive officers, and approval of the staffing needs of the Company (including without limitation any decisions or actions to be taken pursuant to Section 7.4);

(v)    approval of cash distributions by the Company to the Members;

(vi)    appointment and/or removal of the officers of the Company pursuant to Section 7.4; and

(vii)    approval of any of the following matters with respect to the Arena Partnership (such approval will be made in the Company's capacity as the sole general partner of the Arena Partnership):

(A)    Approval of the location of the Arena Project (subject to Section 7.3(d)(i) below);

(B)    Approval of the design of the Arena Project (including the scope, quality, and capacity of the Arena Project);

(C)    Approval of a pre-development budget for the Arena Project, and approval of any amendments or modifications thereto;

(D)    Approval of the construction budget for the Arena Project, and approval of any amendments or modifications thereto;

(E)    Approval of the designer and architect for the Arena Project, approval of any contracts with such Persons, and approval of any modifications or amendments to such contracts;

(F)    Approval of the consultants, professional advisors, and contractors for the development and construction of the Arena Project,

39

007500.00176:459874.09

Copy from re:SearchTX

approval of any contracts with such Persons, and approval of any modifications or amendments to such contracts;

(G)    Approval of a premium seat and suite marketing plan for the Arena Project, approval of any premium suite and suite licensing agreements, and approval of any modifications or amendments to such plans and/or agreements;

(H)    Approval of advertising and naming rights for the Arena Project, approval of any advertising or naming rights contracts, and approval of any amendments or modifications to such contracts;

(I)    Approval of an annual operating and capital budget for the Arena Project, and approval of any modifications or amendments thereto;

(J)    Approval of any financing for the construction, development, and Operation of the Arena Project (including the placement of any liens or encumbrances on all or part of the Arena Project in connection with any such financing), and approval of any modifications or amendments thereto;

(K)    Approval of zoning, permits, and other entitlements for the Arena Project, and any amendments or modifications thereto;

(L)    Approval of any additional capital contributions to be made by the partners of the Arena Partnership, other than: (I) those additional Capital Contributions that any Member may request pursuant to Section 4.2(f)(i); and (II) any additional Capital Contributions that requires the approval of the Board pursuant to Section 7.3(d)(vii)(H) below;

(M)    Approval of any distributions and/or payments to the partners of the Arena Partnership (excluding any reimbursements of Interim Contributions);

(N)    Approval of the amount of any distributions to the partners of the Arena Partnership on account of reimbursement of Interim Contributions;

(O)    approval of any other material contracts or agreements relating to the Arena Partnership, and any modifications or amendments to such contracts or agreements;

(P)    approval of any expenditures in excess of amounts provided for in an approved pre-development, construction, operating, and/or capital budget, other than costs and expenses to be paid with the

40

007500.00176:459874.09

Copy from re:SearchTX

proceeds of additional capital contributions requested by the Board or any Member pursuant to Section 4.2(f)(i);

(Q)    approval of any decision to institute any lawsuit on behalf of the Arena Partnership;

(R)    approval of any action or decision to be taken by the Arena Partnership under any contract, agreement, or instrument to which the Arena Partnership is a party;

(S)    approval of any amendments to the Arena Partnership Agreement; and

(T)    approval of any other matters that the Board Members holding the Place 1 through the Place 7 seats determine (based on a majority vote) should be a Special Major Decision.

(d)    The term "Unanimous Major Decision" means any decision with respect to the following matters:

(i)    Sale, transfer, pledge, or other disposition to any Person of the Arena GP Interest;

(ii)    Admission of any new Members to the Company that dilute the Interests of all the existing Members in the Company (i.e., this does not prohibit, restrict, or limit in any way a Member's right to Transfer all or less than all of his Company Interest to another Person pursuant to Article X);

(iii)    Causing the Company to engage in any business other than owning the Arena GP Interest and performing the Company's duties as the sole general partner of the Arena Partnership;

(iv)    Approval of the liquidation and dissolution of the Company pursuant to Section 11.1(b)(v), and approval of the filing of any voluntary bankruptcy petition with respect to the Company or taking any other action that would constitute the approval of a voluntary bankruptcy proceeding with respect to the Company;

(v)    Approval of the merger or consolidation of the Company with any other entity, and approval of any in-kind distributions to the Members pursuant to Section 11.5;

(vi)    Approval of any transaction, agreement, or contract with respect to the Company and/or the business and affairs of the Company, with any Person

41

007500.00176:459874.09

Copy from re:SearchTX

that is a Member, an Affiliate of any Member, and/or an Affiliate of the Company;

(vii)    Approval of any of the following matters with respect to the Arena Partnership (such approval will be made in the Company's capacity as the sole general partner of the Arena Partnership);

(A)    Approval of the location of the Sports Arena at a site that is substantially different from the site that has been identified as of the Effective Date outside of the downtown Dallas area;

(B)    Approval of the sale, transfer, or assignment of the Arena Project; provided, however, approval of a pledge, mortgage, or encumbrance of the Arena Project in connection with financing that has been approved in accordance with Section 7.3(c) will constitute a Special Major Decision, not a Unanimous Major Decision);

(C)    Approval of the merger and consolidation of the Arena Partnership with any other entity, and approval of any in-kind distributions to the partners of the Arena Partnership pursuant to section 11.5 of the Arena Partnership Agreement;

(D)    Admission of new partners to the Arena Partnership that dilute the interests of all of the existing partners in the Arena Partnership (i.e., this restriction does not in any way limit or restrict the rights of partners in the Arena Partnership to Transfer all or part of their partnership interests in the Arena Partnership to any other person pursuant to Article X of the Arena Partnership Agreement);

(E)    Causing the Arena Partnership to engage in any business other than owning and operating the Arena Project or owning and operating businesses related to the Arena Project (e.g., parking, concessions, ticket sales, and similar lines of business);

(F)    Approval of the Arena Partnership's acquisition of an equity interest in any other entity if the purchase price or acquisition costs of such equity interest exceeds $5,000,000;

(G)    Approval of the liquidation and dissolution of the Arena Partnership pursuant to section 11.1(b)(iii) of the Arena Partnership Agreement, and approval of the filing of any voluntary bankruptcy petition with respect to the Arena Partnership or taking any other action that would constitute the approval of a voluntary bankruptcy proceeding with respect to the Arena Partnership;

42

007500.00176:459874.09

Copy from re:SearchTX

(H)    Approval of a request for capital contributions to the Arena Partnership pursuant to Section 4.2(f)(ii)(B) of this Agreement to the extent the aggregate requests for capital contributions pursuant to Section 4.2(f)(ii)(B) of this Agreement during the term of the Company exceeds $20,000,000;

(I)    Approval of any amendments or modifications to the Master Agreement and approval of any termination of the Master Agreement;

(J)    Approval of any amendments or modifications to the City Lease Agreement and approval of any termination of the City Lease Agreement;

(K)    Approval of any modifications or amendments to: (I) the Development Agreement; (II) the Financial Advisory Agreement; (III) the Definitive Parking Rights Agreement; and (IV) the forms of the Interim Loan Promissory Note (as defined in the Arena Partnership Agreement);

(L)    Approval of any adjustment in the agreement of rental rebate payments to be made by the Arena Partnership pursuant to section 6.2 and Exhibit B of the Arena Partnership Agreement;

(M)    Approval of any transaction, agreement, or contract with respect to the Arena Partnership and/or the business and affairs of the Arena Partnership with any Person that is a partner in the Arena Partnership, an Affiliate of any such partner in the Arena Partnership, and/or an Affiliate of the Arena Partnership; and

(N)    Approval of any other matters that the Board Members holding the Place 1 through the Place 6 seats unanimously determine should be a Unanimous Major Decision.

7.4    Officers of the Company.

(a)    The Board may, in its sole discretion, appoint officers of the Company in accordance with this Section 7.4. Each officer shall hold office until his successor shall have been duly elected pursuant to Section 7.4(b), until his death, or until he shall resign or shall have been removed pursuant to Section 7.4(c). Any two or more offices may be held by the same Person. None of the officers need be a Member of the Company or a resident of the State of Texas.

(b)    Each officer of the Company shall be elected and appointed to his respective office by the Board.

43

007500.00176:459874.09

Copy from re:SearchTX

(c)     Any officer elected or appointed pursuant to Section 7.4(b) may be removed by the Board at any time.  Election or appointment of an officer shall not of itself create contract rights.

(d)     Any vacancy occurring in any office of the Company (by death, resignation, removal or otherwise) may be filled in the manner set forth in Section 7.4(b) hereof.  The Board is not required to designate Persons to serve in all of the officer positions or to fill any vacancies that may occur.

(e)     Officers shall have such authority and perform such duties in the management of the Company as may be described in Section 7.4(g) or as may be deemed appropriate by the Board.

(f)     The compensation, if any, of officers shall be fixed from time to time by the Board.

(g)     The following officers of the Company, upon their election pursuant to Section 7.4(b), shall have the following powers and duties, as such powers and duties may be amended from time to time by the Board:

(i)     President.  The President shall be the Chief Operating Officer of the Company and shall, subject to the control and authorization of the Board, supervise and control the management of the properties and operations of the Company in the ordinary course of business (including managing the Company's activities as the sole general partner of the Arena Partnership).

(ii)    Vice Presidents.  Each Vice President shall have such powers and duties as may be assigned to him by the Board, and shall exercise the powers of the President during that officer's absence or inability to act.

(iii)   Treasurer.  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Company and shall perform such other duties as may be incident thereto and delegated to him or by the Board or the President.

(iv)    Assistant Treasurers.  Each Assistant Treasurer shall have such powers and duties as may be assigned to him by the Board and the Treasurer.

(v)     Secretary.  The Secretary shall keep the minutes of all meetings of the Members in books provided for that purpose, and shall attend to the giving and service of all notices.  The Secretary shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board and the President.

44

007500.00176:459874.09

Copy from re:SearchTX

(vi)    Assistant Secretaries.  Each Assistant Secretary shall have such powers and duties as may be provided thereby by the Board and the Secretary.

(h)    Limitation on Authority.  In no event and under no circumstances shall any provision of this Agreement be construed as granting any officer of the Company any power or authority that would exceed or otherwise be beyond the scope of the powers and authority granted to the Board under this Agreement or that was not approved by the Board as required by this Agreement.

7.5    Articles of Organization.  The Board has caused the Articles to be filed with the Secretary of State of Texas on or prior to the Effective Date.  The Board shall cause to be filed at the Company's expense such other certificates or documents (including, without limitation, copies, renewals, amendments, or restatements of the Articles and/or this Agreement) as may be determined by the Board to be reasonable and necessary or appropriate for the formation or qualification and operation of a limited liability company (or a Company in which the member has limited liability) in the State of Texas and in any other state in which the Company may elect to do business.

7.6    Compensation and Reimbursement of Members.  No Member shall be compensated for any services rendered to the Company and no Member shall be entitled to any reimbursements from the Company, unless such reimbursements have been specifically approved by the Board pursuant to Section 7.3(d).

7.7    Outside Activities.

(a)    Except as provided in Section 7.7(b), the Members, any Affiliates thereof, and each director, officer, constituent member, manager, agent, constituent partner or employee of a Member and/or any Affiliates thereof, shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company and may engage in any other businesses and activities for their own accounts and for the accounts of others without having or incurring any obligation to offer any interest in or funds from such properties, businesses or activities to the Company or any Member.  Subject to Section 7.7(b), no other provision of this Agreement shall be deemed to prohibit the Members or any such other Person from conducting such other businesses and activities.  Subject to Section 7.7(b), neither the Company nor any of the Members shall have any rights by virtue of this Agreement or the relationship created hereby, to participate in or the right to own any interest in any business ventures of any of the other Members, any Affiliates thereof, or any director, officer, constituent member, manager, agent, constituent partner or employee of any such Member and/or Affiliate.

(b)    Notwithstanding anything to the contrary in Section 7.7(a), the Members acknowledge and agree that nothing in this Agreement is intended to limit the application of provisions in other agreements (e.g., the Arena Loan Documents, the Master Agreement (and documents contemplated thereby), the Amended and Restated Agreement of Limited Partnership of Hillwood/1642, Ltd., dated as of September 16,

45

007500.00176:459874.09

Copy from re:SearchTX

1998, and the Amended and Restated Agreement of Limited Partnership of Arena Land Partners, L.P., dated as of July 1, 1999, as it may be amended) that might otherwise limit or restrict a Member, an Affiliate thereof, or a director, officer, constituent member, constituent partner, manager, agent, or employee of a Member and/or any Affiliate thereof, from engaging in certain activities.

7.8   Company Funds.   The funds of the Company shall be deposited in such segregated money-market Company account or Company accounts as are designated by the Board. The Board shall not commingle Company funds with any funds or accounts of any other Person. Any withdrawals from or charges against such accounts may be made by the Board or by its officers or agents, in accordance with the terms of the Agreement. The Board may, from time to time, authorize certain Persons to establish Company accounts and may authorize the same or other Persons to establish Arena Partnership bank accounts.

7.9   Duties.   Each Member shall act honestly, in good faith and in the best interest of the Company. Each Member shall devote itself to the business of the Company to the extent necessary for the efficient carrying on thereof and in a manner that will permit each Member to fulfill those duties and responsibilities described in Article IV, Article VII, and elsewhere in this Agreement.

7.10   Transactions with Affiliates

(a)   Except as provided in Section 7.10(b) and Section 13.19, the Board may not, on behalf of the Company, enter into any transaction, agreement or contract with respect to the Company and/or the business and affairs of the Company, with any Person that is a Member, an Affiliate of any Member, and/or an Affiliate of the Company, unless such transaction, agreement or contract is approved by the Board in the manner required under Section 7.2 and Section 7.3. Under all circumstances, the terms to the Company of any such transaction, agreement or contract involving the Company with any Member, any Affiliate of any Member, and any Affiliate of the Company, including the amount of fees to be paid by the Company to such Person, shall be competitive with the terms of similar transactions, agreements or contracts obtained by Persons in the same business as the Company in arms-length agreements with unrelated parties.

(b)   In connection with the execution of this Agreement, the Members have unanimously approved the Arena Partnership's assumption and acceptance of the Original Issuers' rights and obligations under: (i) the Development Agreement; (ii) the Financial Advisory Agreement; (iii) the Mavericks Lease; (iv) the Stars Lease; and (v) all other applicable Transaction Documents (as defined in the Arena Partnership Agreement).

7.11   Indemnification of Members.   The Company shall indemnify and hold harmless the Members, their directors, officers, shareholders, constituent partners, constituent members, managers, and employees, and the Board Members (individually, an "Indemnitee"), as follows:

46

007500.00176:459874.09

Copy from re:SearchTX

(a)    (i)    In any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, to which an Indemnitee was or is a party or is threatened to be made a party by reason of the fact that such Indemnitee is or was a Member or a director, officer, shareholder, employee, constituent partner, manager, or constituent member of a Member, or a Board Member, the Company shall indemnify such Indemnitee against attorneys' fees, judgments, fines, penalties, settlements, and reasonable expenses actually incurred by such Indemnitee in connection with the defense and/or settlement of such action, suit or proceeding, if such Indemnitee acted in good faith, and in the case of the exercise of authority by the Indemnitee under the Texas Act or this Agreement, other than service for another enterprise, in a manner reasonably believed by such Indemnitee to be in the interests of the Company and, in all other cases, that the Indemnitee's conduct was at least not opposed to the Company's best interests, and with respect to any criminal action or proceeding, the Indemnitee did not have reasonable cause to believe that his conduct was unlawful.

(ii)    In no event, however, shall indemnification ever be made: (A) in relation to a proceeding in which the Indemnitee has been found liable for fraud, a criminal act, a breach of fiduciary duty, gross negligence, or willful or intentional misconduct in the Indemnitee's performance of its duty to the Company; (B) with respect to a material breach by the Indemnitee of the terms and provisions of this Agreement; (C) with respect to a claim or suit brought by one Indemnitee against another Indemnitee; or (D) with respect to any amount that an Indemnitee may owe to another Person under the Indemnity Agreement.

(iii)    The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that an Indemnitee did not act in good faith and in a manner reasonably believed by such Indemnitee to be in the interests of the Company or not opposed to the Company's interests.

(b)    If a claim or assertion of liability is made or asserted by a third party against an Indemnitee by reason of the fact that such Indemnitee was or is a party or is threatened to be a party by reason of the fact that such Indemnitee is or was a Member or is a director, officer, shareholder, employee, constituent partner, constituent member, or manager of a Member, or a Board Member, Indemnitee will forthwith give to the Company and the Board written notice of the claims or assertion of liability and request the Company to defend the same and any other related claims or assertions of liability that are included in the same complaint. Failure to so notify the Company will not relieve the Company of any liability which the Company might have to Indemnitee except to the extent that such failure actually prejudices the Company's legal position. The Company will have the obligation to defend against such claims or assertions, and the Company will give written notice to the Indemnitee of acceptance of the defense of such claims and the name of the counsel selected by the Company to defend such claims. The Indemnitee

47

007500.00176:459874.09

Copy from re:SearchTX

will be entitled to participate with the Company in such defense and also will be entitled at its option (and expenses) to employ separate counsel for such defense. In the event the Company does not accept the defense of the claims or in the event that the Company or its counsel fails to use reasonable care in maintaining such defense, the Indemnitee will have the right to employ counsel for such defense at the expense of the Company. The Company and the Indemnitee will cooperate with each other in the defense of any such action and the relevant records of each will be made available to the other with respect to such defense. If, at the conclusion of any such proceedings, it is determined that the Indemnitee would not have been entitled to indemnification pursuant to this Section 7.11 for such claims or assertions, then the Indemnitee shall immediately reimburse the Company for any costs and expenses paid by the Company to defend the Indemnitee pursuant to this Section 7.11(b).

(c)     No Indemnitee will be entitled to indemnification under this Section 7.11 if it has entered into any settlement or compromise of any claim giving rise to any indemnifiable loss without the written consent of the Company. If a bona fide cash settlement offer is made with respect to a claim and the Company desires to accept and agree to such offer, the Company will give written notice to the Indemnitee to that effect (the "Settlement Notice"). If the Indemnitee fails to consent to the cash settlement offer within ten (10) calendar days after receipt of the Settlement Notice, then the Indemnitee will be deemed to have rejected such cash settlement offer and will be responsible for continuing the defense of such claim and, in such event, the maximum liability of the Company as to such claim will not exceed the amount of such cash settlement offer plus any and all reasonable costs and expenses paid or incurred by the Indemnitee up to the date of the Settlement Notice and which are otherwise the responsibility of the Company pursuant to this Section 7.11.

(d)     Any indemnification permitted under this Section 7.11 shall be made only out of the assets of the Company, and no Member shall be obligated to contribute to the capital of or loan funds to, the Company to enable the Company to provide such indemnification.

(e)     The indemnification provided by this Section 7.11 shall be in addition to any other rights to which each Indemnitee may be entitled under any agreement or vote of the Members, as a matter of law or otherwise, as to action in the Indemnitee's capacity as a Member, as a director, officer, shareholder, employee, constituent partner, constituent member, or manager of a Member, or as a Board Member, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns, administrators and personal representatives of the Indemnitee.

(f)     Except as otherwise provided in this Agreement, the Company may purchase and maintain insurance on behalf of any one or more Indemnitees if approved by the Board.

48

007500.00176:459874.09

Copy from re:SearchTX

(g)     In no event may an Indemnitee subject a Member to personal liability by reason of the indemnification provisions of this Agreement.

(h)     The provisions of this Section 7.11 are for the benefit of the Indemnitees and the heirs, successors, assigns, administrators and personal representatives of the Indemnitees and shall not be deemed to create any rights for the benefit of any other Persons.

(i)     Any action to be taken by the Company pursuant to this Section 7.11 shall instead be taken by and require approval of the Board.

7.12    Liability of Members.  None of the Members shall be liable to the Company or to any other Member for errors in judgment or for any acts or omissions that do not constitute a gross negligence, a breach of fiduciary duty, fraud, criminal misconduct, or willful and intentional misconduct.  None of the constituent members, managers, officers, employees, directors, or shareholders of any Member, however, shall ever be liable to the Company or to any other Member for any act or omission of the related Member.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

8.1    Records and Accounting.  The Board shall keep or cause to be kept complete books and records with respect to the Company's and the Arena Partnership's business (including without limitation, any books, records, statements, or information required to be maintained by the Company under the Texas Act and any books, records, statements, or information required to be maintained under the Arena Partnership Agreement), which shall at all times be kept at the principal office of the Company or such other office as the Board may approve for such purposes.  Any books and records maintained by the Company in the regular course of its business may be kept on any information storage device, provided that the books and records so kept are convertible into clearly legible written form within a reasonable period of time.  The books of the Company shall be maintained for financial reporting purposes on the accrual basis method of accounting.

8.2    Fiscal Year.  The Fiscal Year of the Company shall be the calendar year for tax and accounting purposes.

8.3    Reports.

(a)     The Board shall deliver to each Member, not later than 120 days following the end of each Fiscal Year, a balance sheet, an income statement, and an annual statement of cash flow of the Company for such Fiscal Year.  Upon the request of any Member, at the Company's expense, the Board shall cause the Company's Independent Accountants to review and certify such statements.

49

007500.00176:459874.09

Copy from re:SearchTX

(b)     The Board shall cause the Company to prepare the financial statements and other reports required under the Arena Partnership Agreement.  The Board shall promptly send each Member a copy of each report and/or other information statement that the Company receives from Arena Partnership relating to the Arena GP Interest.

(c)     At the request of a Member at any time, the Board shall additionally cause to be provided to the Members: (i) an annual analysis detailing the components, and changes therein, of the Members' Capital Accounts, the Members' Adjusted Capital Accounts, each Member's accrued and unpaid First Priority Preference Amount, each Member's Undistributed First Priority Capital, and each Member's Undistributed Second Priority Capital; (ii) an annual analysis detailing all allocations of Profit, Loss, and other items of income, gain, loss and deduction; and (iii) such other financial statements or information as may be reasonably requested by a Member.

8.4     Documents.  Each Member shall have the right during regular business hours and after prior written notice to inspect, review, make copies (at Company expense) of, and audit all documents relating to the business of the Company, including without limitation, all reports, studies, and other items prepared by or obtained by any members of the Board in connection with the performance of its duties hereunder.

## ARTICLE IX

## TAX MATTERS

9.1     Tax Matters Member.  HAP shall be the "tax matters partner" (the "Tax Matters Member") for federal income tax purposes pursuant to Section 6231 of the Code with respect to each applicable taxable year of the Company.  HAP is authorized to do whatever is necessary to qualify as such.

9.2     Annual Tax Returns.

(a)     The Board shall cause the Company's accountants to prepare, at the Company's expense, and shall file, or cause the filing of, all tax returns and shall, on behalf of the Company, file, or cause the filing of, all other writings required by any governmental authority having jurisdiction to require such filing within 180 days after the end of each applicable calendar year (commencing with the calendar year ending December 31, 1999).  The proposed annual federal income tax returns for the Company must be approved by the Board before such returns are filed.

(b)     Without the prior approval of the Board, no Member shall file an amended return of the Company or a request for an administrative adjustment under Section 6227 of the Code, nor shall any Member (other than the Tax Matters Partner, as provided herein) commence any administrative or judicial proceeding relating to a return of the

50

007500.00176:459874.09

Copy from re:SearchTX

Company. Nothing herein shall be construed to prevent a Member from undertaking any administrative or judicial proceeding with respect to its own return.

9.3    Notice and Limitations on Authority. The Tax Matters Member is authorized and required, with the assistance of the Board, to represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate the Tax Matters Member and the Board in connection with such proceedings.

9.4    Tax Elections. The Board shall do all acts, make all elections and take whatever reasonable steps are required to maximize, in the aggregate, the federal, state and local income tax advantages available to the Company and shall defend, with the assistance of the Tax Matters Member, all tax audits and litigation with respect thereto at the expense of the Company. The Board shall cause the books, records and tax returns of the Company to be maintained in a manner consistent with the acts, elections and steps taken by the Company.

9.5    Organizational Expenses. The Company shall elect to deduct expenses incurred in organizing the Company ratably over a 60 month period as provided in Section 709 of the Code.

9.6    Taxation as a Partnership. The Members intend for the Company to be taxed as a partnership for federal income tax purposes. No election shall be made by the Company, the Board, or any Member for the Company to be classified as an association or a corporation under Section 7701 of the Code and the Regulations issued thereunder and no election shall be made to exclude the Company from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws. If the default classification rules under Section 7701 of the Regulations are ever amended so as to classify the Company as an association or corporation unless it elects otherwise, either Member shall cause the Company to elect to be classified as a partnership pursuant to Section 7701 of the Regulations, as amended, for the taxable year in which such amendment to the Code or Regulations occurs.

# ARTICLE X

## TRANSFERS OF COMPANY INTERESTS

10.1    Transfer Rights.

(a)    Subject to Section 10.2, a Member may Transfer or Pledge all or any portion of its Company Interest to any other Person without having to obtain the prior consent or approval of the Board or any Member: (i) so long as such Transfer or Pledge does not create a default under the Reimbursement Agreement or the Note Purchase Agreement; and (ii) except with respect to Pledges required in connection with the Arena Loan, such Member Transfers and/or Pledges the same proportionate interest that such

51

007500.00176:459874.09

Member owns in the Arena Partnership to the Transferee and/or Pledgee, as the case may be. Subject to Section 10.2, any such Transferee of a Member's Company Interest shall succeed to all of the rights and obligations of the Transferring Member under this Agreement.

(b)     The Members acknowledge and agree that it is their intent that each Member shall, at all times, own the same proportionate "back-end percentage interest" in the Company as such Member owns in the Arena Partnership. Except for those Pledges required in connection with the Arena Loan, the Members shall at all times take such actions as may be necessary to maintain the same proportionality in the Back-End Percentage Interests in the Company and the "back-end percentage interests" in the Arena Partnership, including without limitation, in connection with Transfers described in this Article X and in connection with the dilution of Back-End Percentage Interests described in Section 4.3(d) below. Any Transfers in contravention of this Section 10.1(b) shall be void ab initio and strictly prohibited.

10.2    Admission as a Member.

(a)     A permitted Transferee of a Company Interest pursuant to Section 10.1 shall be admitted as a Member only after satisfaction of the conditions set forth in subparagraphs (i) through (iv) below, and if applicable, subparagraph (v):

(i)     The Transferee accepts and agrees to be bound by the terms and provisions of this Agreement;

(ii)     A counterpart of this Agreement, the Indemnity Agreement, the Arena Partnership Agreement, and such other documents or instruments as the Board may reasonably require is executed by the Transferee to evidence such acceptance and agreement;

(iii)     Other than with respect to the ADS Transfer, the Transferee pays or reimburses the Company for all reasonable legal fees, filing and publication costs incurred by the Company in connection with the admission of the Transferee as a Member;

(iv)     Other than with respect to the ADS Transfer, either:  (A) such Company Interest is registered under the Securities Act of 1933, as amended, and any applicable state securities laws; or (B) the Transferor shall provide an Opinion of Counsel that the proposed Transfer is exempt from such registration requirements (the Members acknowledge and agree that the Company and the other Members have no obligation or intention whatsoever either to register Company Interests for resale under any federal or state securities laws or to take any action which would make available to any Person any exemption from the registration requirements of such laws); and

52

Copy from re:SearchTX

(v)     Other than with respect to the ADS Transfer, if the Transferee is not an individual, the Transferee provides the Company with evidence satisfactory to counsel for the Company of the authority of such transferee to become a Member under the terms and provisions of this Agreement.

(b)     The Board Member shall make all official filings and publications as promptly as practicable after the satisfaction by the transferee of the conditions contained in this Article X to the admission of such transferee as a Member.

10.3    Distributions and Allocations.  If any Company Interest is Transferred during any Fiscal Year in compliance with the provisions of this Article X, Profits, Losses, and all other items attributable to the transferred (or adjusted) interest for such period shall be divided and allocated between the affected Persons by taking into account their varying interests during the period in accordance with Code section 706(d), using any conventions permitted by law and approved by the Board.  All distributions on or before the date of such transfer shall be made to the transferor.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

11.1    Dissolution.

(a)     Except as set forth in this Agreement: (i) no Member shall have the right to terminate this Agreement, to resign or withdraw from the Company, or to dissolve the Company by its express will or by withdrawal or resignation without, in each case, the consent of the other Members; (ii) the death, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company will not cause a dissolution of the Company.

(b)     The Company shall be dissolved upon the first to occur of any of the following events (each such event is referred to as a "Dissolution Event"):

(i)     the expiration of its term as provided in Section 1.4;

(ii)    the entry of a decree of judicial dissolution under section 6.02 of the Texas Act;

(iii)   the dissolution and liquidation of the Arena Partnership;

(iv)    the Members unanimously consent in writing to dissolve the Company; and

53

007500.00176:459874.09

(v)     the Board Members holding the Place 1 through the Place 6 Board seats unanimously consent in writing to dissolve the Company.

11.2    Continuation of the Company.

(a)     Upon the occurrence of an event described in Section 11.1(b)(iii), if there remains at least one Member, the business of the Company shall be carried on by such Member without dissolution if, within 90 days following the occurrence of such event, the continuation of the Company is approved by Members holding 50% or more of the Back-End Percentage Interests (excluding for these purposes any Back-End Percentage Interests held by the Member and its Affiliates who triggered such Dissolution Event). Under such circumstances, if there is only one remaining Member, and such Member desires to continue the business of the Company, such Member may admit another Person as a Member of the Company, and such admission shall be deemed to be effective immediately prior to the Dissolution Event.

(b)     Upon the occurrence of an event described in Section 11.1(b)(i) or (v), the Company shall be deemed to be dissolved and reconstituted only if Members holding 100% of the Back-End Percentage Interests elect to continue the Company within 90 days of such event.  If a proper election to continue the Company is made pursuant to this Section 11.2 upon the occurrence of an event described in Section 11.1(b)(i) or (v), then:

(i)     The Company shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article XI; and

(ii)     All necessary and appropriate steps shall be taken to amend or restate this Agreement and the Articles.

(c)     If no action to continue the Company is made pursuant to this Section 11.2 within 90 days of the occurrence of an event described in Section 11.1(b)(i) or (v), then the Company shall conduct only those activities necessary and appropriate to wind up its affairs.

11.3    Liquidation.

(a)     Upon dissolution of the Company, unless an election to continue the Company is made pursuant to Section 11.2, the Board shall supervise and effectuate the liquidation of the Company.

(b)     Except as expressly provided in this Article XI, the Board may exercise all of the powers conferred upon the Board under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Board to carry out its duties and functions hereunder for and during such period of time as shall be

54

reasonably required in the good faith judgment of the Board to complete the winding up and liquidation of the Company as provided for herein.

(c)    The Board shall liquidate the assets of the Company, and, after making all allocations and distributions otherwise required by this Agreement, shall apply and distribute the net proceeds of such liquidation in the following order of priority:

(i)    to the creditors of the Company, including Members, in the order of priority provided by applicable law; and

(ii)    to the Members in the same manner and order of priority as provided for distributions under Section 6.1 hereof; provided, however, that the Board may place in escrow a reserve of cash or other assets of the Company for contingent liabilities in an amount determined by the Board to be appropriate for such purposes.

11.4    Termination and Reserves.    After all of the assets of the Company have been distributed, the Company shall terminate.  If at any time thereafter any funds in any cash reserve fund referred to in Section 11.3(c)(ii) are released because the need for such cash reserve fund has ended, such funds shall be distributed to the Members in the same manner as if such distribution had been made pursuant to Section 11.3(c).

11.5    Distribution in Kind.    Notwithstanding the provisions of Section 11.3 which require the liquidation of the assets of the Company, but subject to the order of priorities set forth therein, if upon the dissolution of the Company, the Board determines that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss to the Members, the Board may, in good faith, defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Company (other than those to Members).  In addition, the Board may distribute to the Members, in proportion to the distributions otherwise to be made to the Members and in lieu of cash, such Company assets as the Board deems not suitable for liquidation.  Any distributions in kind shall be subject to such conditions relating to the disposition and management thereof as the Board deems reasonable and equitable pursuant to Section 7.3(d)(v).

11.6    Disposition of Documents and Records.    All documents and records of the Company, including, without limitation, all financial records, vouchers, canceled checks and bank statements, shall be delivered to HAP upon termination of the Company. HAP shall retain such documents and records for a period of not less than eight (8) years and shall make such documents and records available during normal business hours to any other Member for inspection and copying at the other Member's cost and expense.

11.7    Negative Capital Accounts.    If, after the allocations of Profit, Loss, and other items of income, gain, loss, deduction or credit under Article V, and after distributions of cash under Article VI and this Article XI, any Member shall ever have a negative balance in such Member's Capital Account, no Member shall have any obligation to restore such negative

55

007500.00176:459874.09

balance, or to make any contribution to the capital of the Company by reason thereof, and such negative balance shall under no circumstances be considered a liability of the Company or of any Member.

11.8    Cancellation of the Articles.  Upon the completion of the distribution of Company property as provided in Sections 11.3, 11.4, and 11.5, the Company shall be terminated, and the Board shall cause the cancellation of the Articles in the State of Texas, and shall take such other actions as may be necessary to terminate the Company.

11.9    Return of Capital.  No Member shall be personally liable for the return of the Capital Contributions of the any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from Company assets.

11.10   Waiver of Partition.  No Member shall, either directly or indirectly, take any action to require partition or appraisement of the Company or any of the property owned by the Company.  Notwithstanding any provision of any applicable law to the contrary, each Member hereby irrevocably waives any and all rights to maintain any action for a partition or to compel any sale with respect to its Company Interest, or with respect to any property owned by the Company, except as expressly provided in this Agreement.

# ARTICLE XII

## AMENDMENT OF AGREEMENT

12.1    Amendment Procedures.

12.1    Amendment Procedures.  Amendments to this Agreement may be proposed by any Member or the Board.  The applicable Member or the Board, as the case may be, shall submit in writing the text of any such proposed amendment to all of the Members and shall seek the written consents of the Members with respect to the proposed amendment.  If the Members owning 65% or more of the then effective Back-End Percentage Interests shall have given their written consent, then such proposed amendment shall become effective as of the date specified in such proposal; provided, however, that:

(a)    Without the consent of each Member to be adversely affected, the Agreement shall not be amended so as to:

(i)    modify the limited liability of a Member; or

(ii)    Amend Article IV, Article V, Article VI, Article VII, Article XI, this Article XII, or a definition in Article II that is used in any of the foregoing Articles.

56

007500.00176:459874.09

Copy from re:SearchTX

(b)    In the case of any provision of this Agreement which requires the action, approval, or consent of the Members holding a specified interest in the Company, such provision may not be amended without the consent of the Members holding such specified interest.

(c)    The Board shall notify all Members upon the final adoption or rejection of any proposed amendment.

## ARTICLE XIII

## GENERAL PROVISIONS

13.1    Addresses and Notices.

(a)    Any notice provided in or permitted under this Agreement shall be made in writing and may be given or served by: (i) delivering the same in person to the party to be notified; (ii) depositing the same in the mail, postage prepaid, registered or certified with return receipt requested, and addressed to the party to be notified at the address herein specified; (iii) delivering the same on a prepaid basis via a nationally recognized courier service, such as Federal Express; or (iv) sending the same by facsimile transmission, followed by delivery of a hard copy of same via a nationally recognized courier service, such as Federal Express. If notice is deposited in the mail pursuant to subparagraph (ii), it will be deemed received on the delivery date that the U.S. Post Office stamps on the return receipt. If Notice is delivered by facsimile transmission pursuant to subparagraph (iv), it will be deemed received upon the sending of such facsimile transmission so long as the other requirements set forth in subparagraph (iv) above are satisfied. Notice given in any other manner shall be deemed received only if and when actually received by the party to be notified. For the purpose of notice, the address of the parties shall be the addresses set forth on Exhibit A attached hereto, with such changes as may be made in accordance with Section 13.1(b).

(b)    Each Member shall have the right at any time to change its respective address and to specify as its address any other address by giving at least ten (10) days' prior written notice to the other Members. Each Member shall have the right from time to time to specify up to two additional parties to whom notice hereunder must be given by either: (i) delivering to the other Member ten (10) days' prior written notice thereof, setting forth the address of such additional parties; or (ii) in connection with the execution of this Agreement as of the Effective Date, listing the names and addresses of such additional notice parties on Exhibit A. Notice required to be delivered hereunder to any Member shall not be deemed to be effective until the additional parties, if any, designated by such Member have been given notice in a manner deemed effective pursuant to the terms of this Section 13.1.

57

007500.00176:459874.09

Copy from re:SearchTX

13.2    Titles and Captions.  All article and section titles and captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

13.3    Pronouns and Plurals.  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The locative adverbs "hereof," "herein," "hereafter," etc. refer to this Agreement as a whole.

13.4    Further Action.  The parties shall execute all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

13.5    Binding Effect.  This Agreement shall be binding solely upon and inure solely to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

13.6    Integration.  This Agreement, the Arena Partnership Agreement, the Indemnity Agreement, and the organizational documents relating to AOC, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto, including, without limitation, that certain Amended and Restated Memorandum of Understanding, dated as of April 23, 1999, by and among the Original Issuers, Dallas Basketball Limited, and Dallas Stars, L.P.

13.7    No Third Party Beneficiary.  This Agreement is made solely and specifically between and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person whatsoever shall have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.  It is expressly understood that the right of the Company or the Members to require any additional Capital Contributions under the terms of this Agreement shall not be construed as conferring any rights or benefits to or upon any Person not a party to this Agreement.

13.8    Waiver.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

13.9    Counterparts.  This Agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

58

007500.00176:459874.09

Copy from re:SearchTX

13.10 <u>Applicable Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas without regard to the principles of conflicts of law.

13.11 <u>Invalidity of Provisions</u>. If any provision of this Agreement is declared or found to be illegal, unenforceable or void, in whole or in part, then the parties shall be relieved of all obligations arising under such provision, but only to extent that it is illegal, unenforceable or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

13.12 <u>Attorneys Fees</u>. The prevailing party in any legal proceeding regarding this Agreement or any other Transaction Document shall be entitled to recover from the other party all reasonable attorneys fees and costs incurred in connection with such proceeding.

13.13 <u>Computation of Time Periods</u>. The time periods provided for in this Agreement shall be computed by excluding the first day and including the last day. All periods of time referred to in this Agreement shall include all Saturdays, Sundays and national holidays unless the period of time specified is Business Days; <u>provided</u>, <u>however</u>, that if the date or the last date to perform any act or to give any notice with respect to this Agreement shall fall on a Saturday, a Sunday, or a national holiday, then such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday, or national holiday.

13.14 <u>Construction</u>. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

13.15 <u>Time</u>. Time is of the essence with respect to this Agreement.

13.16 <u>Incorporation by Reference</u>. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

13.17 <u>Representations and Warranties of Members</u>. In connection with the transactions contemplated hereby, each Member hereby represents and warrants to the Company and to the other Members that:

(a)    Such Member is a corporation properly formed under the laws of the state of its incorporation and is validly existing and in good standing as of the Effective Date.

(b)    Such Member has all necessary corporate power and authority to own its Company Interest and to enter into and to carry out the provisions of this Agreement and all other documents which may be necessary to give effect to the transactions contemplated by this Agreement;

(c)    This Agreement and all agreements referred to in this Agreement which have been or will be entered into by such Member in accordance with this Agreement,

59

007500.00176:459874.09

Copy from re:SearchTX

have been duly authorized, executed and delivered by such Member and will constitute the binding obligations of such Member;

(d)    Neither the execution and delivery of this Agreement, nor of any other agreement referred to in this Agreement, nor the fulfillment of or compliance with the terms and conditions hereof or thereof:

(i)    conflicts with or will conflict with or result in a breach of any of the terms, conditions or provisions of or constitute a material default under such Member's certificate of incorporation, bylaws, or other governing documents; or

(ii)    conflicts with or will conflict with or result in a material breach of any of the terms, conditions or provisions of or constitute a material default under any agreement or instrument to which such Member is a party or by which it is bound relative to its Company Interest; and

(e)    There are no actions, suits or proceedings pending, or to the knowledge of such Member threatened against such Member or its Affiliates which, if adversely determined, could materially adversely affect the ability of such Member or its Affiliates to perform its obligations under this Agreement or materially adversely affect the Company Interest of any other Member.

(f)    Such Member is an "accredited investor," as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and has executed and delivered such documents in evidence thereof as the Company has reasonably requested.

(g)    Such Member has been furnished access to the business and financial records of the Company and such additional information and documents as such Member has requested, and has been afforded an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this Agreement, the Company Interests, the business plans, operations, capitalization, financial condition and prospects of the Company, and all other matters deemed relevant to such Member.

(h)    Such Member is acquiring Company Interests for its own account for investment purposes only, and not with a view to resale or distribution. Such Member has no present intention to distribute or sell the Company Interests. Such Member has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the Transfer of any of the Company Interests.

(i)    Such Member understands that the Company Interests have not been registered under the Securities Act or the laws of any state, and that the Company Interests may not be Transferred without compliance with the provisions of this Agreement, the Securities Act, and applicable state securities laws.

60

007500.00176:459874.09

Copy from re:SearchTX

(j)    Such Member has sufficient knowledge and experience in financial or business matters to evaluate the merits and risks of an investment in the Company Interests. Such Member can afford to bear the economic risk of holding the Company Interests for an indefinite period of time and can afford to suffer the complete loss of the investment in the Company Interests. Such Member understands that due to the substantial restrictions on the transferability of the Company Interests and the lack of a public market, it may not be possible for such Member to liquidate the investment in the Company Interests in the case of emergency, if at all.

(k)    Such Member understands that, except as otherwise expressly provided herein, the Company Interests of the Members have no voting rights and no rights to participate in the management and control of the Company.

13.18  Confidentiality.

(a)    The Members acknowledge and agree that the Company is a private company. No Member shall disclose the terms of this Agreement to any other Person without first obtaining the consent of all of the Members. The Members also agree that they shall not disclose, via public announcements, press releases, interviews, or otherwise, any financial statements or financial information, any business, financial, or operational plans, any financial or other analysis, or any summaries, strategies, pro formas, valuations, agreements, plans, or projections of or pertaining to the Company or the Arena Partnership or any other proprietary information of the Company or the Arena Partnership (defined to include all information not previously publicly disclosed by the Company or the Arena Partnership) unless such Member first obtains the approval of the Board.

(b)    Any documents provided by one party to another party pursuant to this Agreement shall be kept confidential and shall not be disclosed to any Person except: (i) as may be required by applicable law; (ii) as may be required in connection with a judicial proceeding; (iii) as may be required or permitted under Section 13.18(a); or (iv) with the consent of the party that provided such documents to the other party.

(c)    Each Member covenants and agrees that it will not, during the term of its ownership of a Company Interest and thereafter, make any disparaging remarks about the Company, any Member, and/or any Affiliate of a Member; provided, however, this Section 13.18(c) shall not in any way prevent a Member from making any statements or remarks that such Member deems necessary or reasonable in any judicial proceedings.

(d)    Notwithstanding anything to the contrary contained herein: (i) the provisions of this Section 13.18 shall not apply to information that is in the public domain or otherwise generally available to the public; and (ii) any Member may disclose the information described in subsections (a) and/or (b) of this Section 13.18: (A) to such Member's direct and indirect owners, attorneys, accountants or other advisors so long as

61

007500.00176:459874.09

Copy from re:SearchTX

such Persons are informed by such Member of the confidential nature of such information and are directed by such Member to treat such information confidentially; (B) to the extent such Member reasonably deems necessary or desirable pursuant to any court or governmental order, applicable securities or other laws or regulations or financial reporting requirements; or (C) to the Collateral Trustee and/or to the Purchasers in connection with obtaining the Arena Loan.

13.19   Legal Counsel Relationships.

(a)     The Members acknowledge and agree that Weil, Gotshal & Manges, LLP, has represented the Original Issuers in connection with the Transaction Documents, and ADS and Dallas Stars, L.P. in connection with this Agreement, the Arena Partnership Agreement, and the other Transaction Documents. Except for Weil, Gotshal & Manges, LLP's representation of the Original Issuers with respect to the Transaction Documents, in no event shall an attorney/client relationship exist between Weil, Gotshal & Manges, LLP, on the one hand, and the Mavericks Arena Corporations, Dallas Basketball Limited, and/or their Affiliates, on the other hand.

(b)     The Members acknowledge and agree that Hughes & Luce, L.L.P. has represented the Original Issuers in connection with the Transaction Documents, and the Mavericks Arena Corporations, Dallas Basketball Limited, and their Affiliates in connection with this Agreement, the Arena Partnership Agreement, and the other Transaction Documents. Except for Hughes & Luce, L.L.P.'s representation of the Original Issuers with respect to the Transaction Documents, in no event shall an attorney/client relationship exist between Hughes & Luce, L.L.P., on the one hand, and ADS, Dallas Stars, L.P., and/or their Affiliates, on the other hand.

(c)     The Members agree and consent that Weil, Gotshal & Manges, LLP and/or Hughes & Luce, L.L.P. shall be permitted to render legal advice and to provide legal services to the Members or the Company from time to time, and each of the Members covenant and agree that such representation of a Member and/or the Company by either or both such firms from time to time, shall not disqualify such firms from providing legal advice and legal services to their respective client Members, Teams (as defined in the Arena Partnership Agreement), or Affiliates in matters related or unrelated to this Agreement, the Arena Partnership Agreement, and the Transaction Documents.

13.20   Special Purpose Entity Requirements.  As long as the Arena Loan is outstanding, but subject to the Transaction Documents, the Company shall be required:

(a)     to maintain books and records separate from any other person or entity;

(b)     to maintain its bank accounts separate from any other person or entity;

(c)     not to commingle its assets with those of any other person or entity and to hold all of its assets in its own name;

62

Copy from re:SearchTX

(d)    to conduct its own business in its own name;

(e)    to maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other person or entity and not to have its assets listed on the financial statement of any other entity;

(f)    to file its tax returns separate from those of any other entity and not to file a consolidated federal income tax return with any other person or entity;

(g)    to observe all partnership and other formalities;

(h)    to maintain a sufficient number of employees in light of its contemplated business operation;

(i)    not to hold out its credit as being available to satisfy the obligations of any other person or entity other than AOC;

(j)    to pay its own liabilities and expenses only out of its own funds;

(k)    enter into transactions with Affiliates only if the terms of such transactions are competitive with the terms of similar transactions obtained by persons in the same business as the Company in arms-length agreements with unrelated parties;

(l)    to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

(m)    to use separate stationery, invoices, and checks bearing its own name;

(n)    to hold itself out as a separate entity;

(o)    to correct any known misunderstanding regarding its separate identity;

(p)    not to identify itself as a division of any other person or entity; and

(q)    maintain adequate capital in light of its contemplated business operations.

**[THE REMAINING PORTION OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

63

007500.00176:459874.09

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Agreement as of the day and year first above written.

**MEMBERS**

ARENA/DALLAS STARS, INC.,
a Delaware corporation

By:_____

Name:_____
               **Peter S. Brodsky**

Title:_____
             **Vice President and**
             **Assistant Secretary**

HILLWOOD ARENA PARTNERS, INC.,
a Texas corporation

By:_____

Name:_____

Title:_____

DBL ARENA PARTNERS, INC.,
a Texas corporation

By:_____

Name:_____

Title:_____

CORPORATE ARENA ASSOCIATES, INC.,
a Texas corporation

By:_____

Name:_____

Title:_____

64

007500.00176:459874.08

Copy from re:SearchTX

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Agreement as of the day and year first above written.

**MEMBERS**

ARENA/DALLAS STARS, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

HILLWOOD ARENA PARTNERS, INC.,
a Texas corporation

By:_ *David A. Newsom* _____
Name:___DAVID A. NEWSON_____
Title:_____VICE PRESIDENT_____

DBL ARENA PARTNERS, INC.,
a Texas corporation

By:_ *David A. Newsom* _____
Name:___DAVID A. NEWSOM_____
Title:_____VICE PRESIDENT_____

CORPORATE ARENA ASSOCIATES, INC.,
a Texas corporation

By:_ *David A. Newsom* _____
Name:___DAVID A. NEWSOM_____
Title:_____VICE PRESIDENT_____

64

Copy from re:SearchTX

## COUNTERPART SIGNATURE PAGE FOR
## THE LIMITED LIABILITY COMPANY AGREEMENT
## OF
## CENTER GP, LLC

Arena/Dallas Stars, Inc. ("ADS") acquired a 50% member interest (the "Member Interest") in Center GP, LLC, a Texas limited partnership ("Center GP"), pursuant to that certain Limited Liability Company Agreement of Center GP, LLC (the "LLC Agreement"), dated September 30, 1999, by and among ADS, Hillwood Arena Partners, Inc., a Texas corporation, Corporate Arena Associates, Inc., a Texas corporation, and DBL Arena Partners, Inc., a Texas corporation.

Immediately following ADS's acquisition of the Member Interest pursuant to the LLC Agreement, ADS transferred the Member Interest to Southwest Sports Group Holdings LLC, a Texas limited liability company ("SSGH"), pursuant to that certain Assignment and Assumption Agreement (the "First Assignment"), dated September 30, 1999, by and between ADS and SSGH.

Immediately following SSGH's acquisition of the Member Interest pursuant to the First Assignment, SSGH transferred the Member Interest to Southwest Sport Group, LLC, a Texas limited liability company ("SSG"), pursuant to that certain Assignment and Assumption Agreement (the "Second Assignment"), dated September 30, 1999, by and between SSGH and SSG.

Immediately following SSG's acquisition of the Member Interest pursuant to the Second Assignment, SSG transferred the Member Interest to the undersigned pursuant to that certain Assignment and Assumption Agreement (the "Third Assignment"), dated September 30, 1999, by and between SSH and the undersigned.

In connection with acquisition of the Member Interest from SSG, the undersigned hereby agrees to be bound by the terms and provisions of the LLC Agreement.

IN WITNESS WHEREOF, the undersigned executes this counterpart signature page to the LLC Agreement.

Dated to be effective as of September 30, 1999.

DALLAS ARENA, LLC,
a Texas limited liability company

By:   Southwest Sports Group, LLC,
a Texas limited liability company, its
sole member

By: _____
Name: _____
       Peter S. Brodsky
Title: _____
       Vice President, Assistant
       Secretary and Treasurer

007658.00010:475366.01

# EXHIBIT A

## LIST OF MEMBERS, ADDRESSES, AND NOTICE PARTIES

*MEMBERS:*

ARENA/DALLAS STARS, INC.
200 Crescent Court, Suite 1600
Dallas, Texas 75201
Attention: Lawrence D. Stuart, Jr.
Telephone: (214) 740-7300
Facsimile: (214) 720-7888
E-mail: lstuart@hmtf.com

    Notice Party for ADS:

    Copy to:

    Southwest Sports Group
    200 Crescent Court, Suite 1065
    Dallas, Texas 75201
    Attention: Joseph B. Armes
    Telephone: (214) 965-7979
    Facsimile: (214) 965-7989
    E-mail: jarmes@hmtf.com

    With additional copy to:

    Weil, Gotshal & Manges, LLP
    100 Crescent Court, Suite 1300
    Dallas, Texas 75201
    Attention: Glenn D. West, Esq.
    Telephone: (214) 746-7700
    Facsimile: (214) 746-7777
    E-mail: glenn.west@weil.com

HILLWOOD ARENA PARTNERS, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas 75225
Attention: Richard G. Patterson
Telephone: (972) 788-3000
Facsimile: (972) 788-3096
E-mail: rick.patterson@hillwood.com

1

007500.00176:459874.09

Copy from re:SearchTX

DBL ARENA PARTNERS, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas 75225
Attention: Richard G. Patterson
Telephone: (972) 788-3000
Facsimile: (972) 788-3096
E-mail: rick.patterson@hillwood.com

CORPORATE ARENA ASSOCIATES, INC.
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas 75225
Attention: Richard G. Patterson
Telephone: (972) 788-3000
Facsimile: (972) 788-3096
E-mail: rick.patterson@hillwood.com


Notice Parties for Hillwood Arena Partners, Inc.
DBL Arena Partners, Inc., and Corporate Arena
Associates, Inc.:

Copy

Hillwood  Development Corporation
12377 Merit Drive
1700 Lakeside Square
Dallas, Texas 75251
Attention:  David A. Newsom
Telephone:  (972) 383-1605
Facsimile:  (972) 383-1667
E-mail: david.newsom@hillwood.com

With an additional copy to:

Hughes & Luce, LLP
1717 Main Street, suite 2900
Dallas, Texas 75201
Attention:  Scott C. Drablos
Telephone: (214) 939-5408
Facsimile: (214) 939-5849
E-mail: drablos@hughesluce.com

2

Copy from re:SearchTX

**EXHIBIT B**

**INITIAL CAPITAL CONTRIBUTIONS**

| Member | Initial Capital Contribution |
|---|---|
| Arena/Dallas Stars, Inc. | $ 50.00 |
| Hillwood Arena Partners, Inc. | $ 33.50 |
| DBL Arena Partners, Inc. | $ 10.31 |
| Corporate Arena Associates, Inc. | $  6.19 |
| | $100.00 |

1

Copy from re:SearchTX



# NOTICE REGARDING CHANGE IN BOARD AND BOARD MEMBERS UNDER ARTICLE VII OF LIMITED LIABILITY COMPANY AGREEMENT OF CENTER GP, LLC

WHEREAS, Radical Acquisitions, LLC, a Delaware limited liability company ("Radical Acquisitions"), acquired (i) all of the membership interests of Hillwood Arena Partners, Inc., a Texas corporation ("HAP") in Center GP, LLC, a Texas limited liability company ("Center GP") pursuant to that certain Assignment and Assumption of Membership Interest dated as of April 13, 2000, by and between Radical Acquisitions and HAP, and (ii) all of the partnership interests of HAP in Center Operating Company, L.P., a Texas limited partnership ("COC"), pursuant to that certain Assignment and Assumption of Partnership Interest dated as of April 13, 2000, by and between Radical Acquisitions and HAP;

WHEREAS, pursuant to Section 10.1(a) of the Limited Liability Company Agreement of Center GP, LLC, dated September 30, 1999 (the "LLC Agreement") and Section 10.1(b) of the Agreement of Limited Partnership of Center Operating Company, L.P., dated September 30, 1999 (the "Partnership Agreement"), Radical Acquisitions, as a successor in interest to HAP, succeeds to all of the rights and obligations of HAP under the LLC Agreement and Partnership Agreement; and

WHEREAS, Radical Acquisitions replaced HAP as a Mavericks Member under the LLC Agreement.

NOW THEREFORE, pursuant to Article VII of the LLC Agreement, notice is hereby given to Dallas Arena LLC as the ADS Member of Center GP, that the following changes shall be made with respect to the Board Members appointed by the Mavericks Members:

1.    The Mavericks Members hereby remove all current board members appointed to Place 1, Place 2 and Place 3, and in their stead hereby appoint the following board members for the Place 1, Place 2 and Place 3 Board seats:

      a.    Place 1 – Mark Cuban

      b.    Place 2 – H.R. Perot, Jr.

      c.    Place 3 – Richard G. Patterson

2.    The Mavericks Members hereby remove HAP as their designated Member and designate Radical Acquisitions to act on behalf of the Mavericks Members pursuant to Section 7.2(b)(i) of the LLC Agreement.

3.    The Mavericks Members hereby grant Mark Cuban the proxy for the Place 1, Place 2 and Place 3 Board Members pursuant to Section 7.2(h)(iv) of the LLC Agreement.

IN WITNESS WHEREOF, the undersigned, being all of the members of Center GP constituting the Mavericks Members, do adopt the foregoing changes regarding the Board and their Board Members.

RADICAL ACQUISITIONS, LLC,
a Delaware limited liability company

By: Radical Arena, LTD,
    a Texas limited partnership
Its: General Partner

By:    Radical Cuban, LLC,
       a Texas limited liability
       company
Its:    General Partner

By: _____
      Mark Cuban, President


CORPORATE ARENA ASSOCIATES,
INC., a Texas corporation

By: _____
      Mark Cuban, President


DBL ARENA PARTNERS, INC.,
a Texas corporation

By: _____
      Mark Cuban, President

50102862_1.DOC

Copy from re:SearchTX

EXHIBIT

**1-C**

(Final)

# MAVERICKS FRANCHISE AGREEMENT

between

## CITY OF DALLAS, TEXAS

and

## DALLAS BASKETBALL LIMITED

**Dated: July 28, 1998**

6 1\F \FINAN\DAL524\10000\MAV_FRA.AGM

Copy from re:SearchTX

# TABLE OF CONTENTS

Page

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## ARTICLE II

## LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1    Location Commitment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 2.2    Sales or Mortgages of Franchise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 2.3    Team Play of Home Games  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 2.4    Unconditional Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 2.5    Limited Rights of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## ARTICLE III

## WARRANTIES AND SPECIAL COVENANTS

Section 3.1    By the City  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 3.2    By the Owner  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## ARTICLE IV

## SPECIFIC PERFORMANCE

Section 4.1    Adoption of Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 4.2    Acknowledgments and Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8


EXECUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## MAVERICKS FRANCHISE AGREEMENT

This MAVERICKS FRANCHISE AGREEMENT (this "Franchise Agreement"), made and entered into this 28th day of July, 1998, by and between the City of Dallas, Texas (the "City"), a duly incorporated home rule city of the State of Texas, and Dallas Basketball Limited, a Texas limited partnership (the "Owner");

### WITNESSETH:

WHEREAS, the City and the Arena Group (herein defined) entered into that certain Arena Master Agreement (the "Master Agreement") dated December 10, 1997, pursuant to which the City and the Arena Group agreed to the terms for the financing and construction of a new indoor sports and entertainment arena complex in downtown Dallas; and

WHEREAS, as a condition to the City's funding commitment under the Master Agreement, this Franchise Agreement is required to be executed and delivered by the Owner; and

WHEREAS, the Owner and the City intend by this Franchise Agreement to set forth the terms of the Owner's obligations to the City regarding the Team (as defined herein) and the Franchise and the terms of the City's obligations to Owner to provide the Team with access to the Arena Project for playing Home Games (herein defined);

NOW, THEREFORE, as a condition and specific inducement to the City to fund $125 million of the Project Costs pursuant to and as defined in the Master Agreement, and further, in consideration of Ten Dollars ($10) and other good and valuable consideration, the parties hereto do hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.1    <u>Definitions</u>. In each place in this Franchise Agreement wherein the following words and terms are used, the same, unless a different meaning or intent clearly appears from the context, shall have the following meanings, respectively:

"Act" - Chapter 334, Local Government Code of the State of Texas.

"Arena" - the indoor sports and entertainment arena which is to be part of the Dallas sports arena project approved by the voters of the City on January 17, 1998 and to be constructed pursuant to and in accordance with the Master Agreement.

"Arena Group" - Arena/Dallas Stars, Inc., a Delaware Corporation, and Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., each a Texas corporation.

"Arena Project" - the meaning assigned to such term in the Master Agreement.

"Association" - the association of member franchise owners, headquartered in New York, New York, which sanctions and authorizes competitive professional basketball games in various cities and towns under the name the National Basketball Association ("NBA") and its successors.

"City" - the meaning assigned to such term in the preamble above.

6 1\F.\FINAN\DAL524\10000\MAV_FRA.AGM

Copy from re:SearchTX

"Club Subleases" - the subleases or other agreements conforming to the requirements of section 5.5 of the Lease.

"Commencement Date" - the date of this Franchise Agreement as first shown above.

"Force Majeure" - an event that is beyond the reasonable control of a party whose performance hereunder is delayed or made impossible thereby, including without limitation condemnation, casualty, damage, strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor, regulations or order of any governmental or regulatory body, enemy action, civil disturbance, fire or unavoidable casualties.

"Franchise Agreement" - this Franchise Agreement as from time to time amended and supplemented by mutual written agreement of the City and the Owner.

"Franchise" - the rights of the Owner that were issued, granted, and sanctioned to the Owner by the Association (as defined herein), authorizing the Owner to field and operate the Team as a competing member team of the Association.

"Home Games" - professional basketball games in which the Team is the "host" team, including regular season games and post-season games, in competition with other members of the Association, but excluding preseason games, exhibition games and Association-sanctioned games played outside of the City of Dallas even though the Owner is designated as the "home team" by the Association.

"Lease" - that certain Lease Agreement by and among the City and the Arena Group executed and delivered in accordance with the Master Agreement and any and all amendments thereto.

"Lessee" - the meaning assigned to such term in the Lease.

"Master Agreement" - the meaning assigned to such term in the preamble above and any and all amendments thereto.

"Master Agreement Guaranties" - the guaranties of the Owner and the Stars delivered to the City in accordance with the Master Agreement and any and all amendments thereto.

"Operational Date" - the meaning assigned to such term in the Lease.

"Operator" - any person or entity (other than the Owner) who may be granted the right from time to time to possess and operate the Arena Project. If a third party is not granted such rights, then such term shall mean the City.

"Owner" - Dallas Basketball Limited and any successor in interest to the ownership rights in the Franchise and the Team including a purchaser or mortgagee (that acquires such rights by foreclosure or otherwise) of such ownership rights.

"Owner Sublease" - the Club Sublease executed by the Owner and any and all amendments thereto.

"Rent and Performance Guaranties" - the provisions of the Owner Sublease and a similar Club Sublease executed by the Stars conforming to section 5.5 of the Lease, and, if nonconforming, then the provisions of section 5.5 of the Lease.

Copy from re:SearchTX

"Reunion Arena" - the professional basketball and ice hockey arena belonging to the City that is used by the Owner to conduct the Home Games on the date hereof.

"Stars" - Dallas Stars, L.P., a Delaware limited partnership and its successors and assigns.

"Team" - collectively, the players, coaches, trainers and administrative employees who represent the Franchise from time to time in competitive basketball games in the Association, known as the "Dallas Mavericks."

"Term" - the period commencing on the Commencement Date and ending on the date of the thirtieth (30th) anniversary of the Operational Date.

## ARTICLE II

## LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1    Location Commitment. Subject to the rights of termination set forth in Section 2.5, and to the exculpatory provisions set forth in Section 2.3, throughout the Term, the Owner shall continuously designate the City as the location (a) in which the Home Games shall be played, and (b) in which the principal corporate and executive offices of the Team shall be maintained.

Section 2.2    Sales or Mortgages of Franchise.

(a)    The Owner may at its sole election at any time or from time to time assign, sell or otherwise transfer, or place security interests or mortgage liens (collectively, the "Lien(s)") upon, any and all ownership rights in the Franchise; provided, however, that any such assignment, sale or Liens shall be made or granted subject to the requirements and obligations of Owner under this Franchise Agreement, so that any person who acquires the Franchise (i) pursuant to any such assignment or sale, or (ii) pursuant to any foreclosure or other transaction under any such Liens, shall take the Franchise strictly subject to the requirements and burdens imposed on the Owner by this Franchise Agreement and such person shall thereafter be deemed the Owner for the purposes of this Agreement. Upon any such assignment or purchase or granting of any such Liens, Owner shall obtain from each such assignee, purchaser or any Lien holder, as the case may be, a written acknowledgment and acceptance of the terms, provisions and restrictions contained herein and shall provide an executed copy thereof to the City, or in the case of a purchase pursuant to a foreclosure or otherwise under such Lien, shall state in the instrument creating such Lien that any sale is subject to the terms of this Agreement.

(b)    In the event involuntary liens or material encumbrances are placed on the Franchise that, upon foreclosure, would result in a violation of this Franchise Agreement, the Owner will use its good faith efforts to promptly remove such liens or material encumbrances after reasonable contest periods (or provide security against the same as reasonably acceptable to the City).

Section 2.3    Team Play of Home Games. Subject to the rights of termination set forth in Section 2.5, the Owner:

(i)    shall (A) during the period commencing on the Commencement Date and ending on the Operational Date, and (B) during any period thereafter if the Arena Project is not available for playing Home Games by reason of Force Majeure, but not beyond the Term, provided that Reunion Arena remains configured substantially as it was configured as of the Commencement Date with access to patron parking for Home Games in an amount and

Copy from re:SearchTX

walking-distance to Reunion Arena comparable to the parking that was provided to patrons for Home Games during December, 1997, is in a condition of repair, operation and maintenance equivalent to such conditions as of the Commencement Date and is available and satisfies the requirements of the Association as a venue for playing the Home Games, cause the Team to play all of its Home Games at Reunion Arena; and

      (ii)     shall, during the Term, other than for those periods referred to in (i) above, cause the Team to play all of its Home Games at the Arena.

Notwithstanding the provisions of subparagraphs (i) and (ii) above, if at any time neither Reunion Arena nor the Arena Project shall be suitable for playing Home Games by the Team, by reason of the configuration or condition of Reunion Arena, or Force Majeure as to the Arena Project or Reunion Arena, or is otherwise unavailable for playing Home Games, the Owner may utilize (A) any facilities located elsewhere in the North Texas area to play Home Games, or (B) the facilities of other NBA teams to play Home Games if so required by the Association, in either case until such time as either Reunion Arena or the Arena Project is restored to the same conditions contemplated by subparagraphs (i) and (ii), above, and is available for playing Home Games by the Team.

      Section 2.4    Unconditional Requirements.

      (a)    Owner's Unconditional Obligation. Subject to the provisions of Section 2.3 and Section 2.5, the Owner's obligations under this Franchise Agreement are not conditioned or contingent upon the completion of construction or continued suitability for use by the Team of the Arena Project, since the Owner, the Stars and the Arena Group have given certain assurances of such matters in the Master Agreement Guaranties, in the Rent and Performance Guaranties and in the Master Agreement.

      (b)    Access to Arena. So long as the City has not terminated the Lease in accordance with its terms, the Owner and the Stars shall be provided access to and use of the Arena Project pursuant to the requirements of section 5.5 of the Lease. If the Lease is terminated by the City, access will be provided under and subject to the provisions of this Section 2.4.

      (c)    Team Lease on Same Terms as Arena Group Lease. If the Lease is terminated by the City pursuant to the terms of the Lease, the City shall promptly thereafter tender a lease in writing (i) to both the Owner and the Stars (each having a 50% undivided interest as tenants in common), if neither is then in default under the Rent and Performance Guaranties, or (ii) if one of such parties is in default under the Rent and Performance Guaranties, then to such non-defaulting party, containing identical terms as the Lease, except that the term of the new lease will be for the unelapsed term of the Lease. Each non-defaulting party receiving the tendered lease under this paragraph (c) shall have 30 days after the lease is tendered to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee; provided, however, if such lease is tendered to both the Owner and the Stars pursuant to Section 2.4(c)(i), (A) both may accept the tendered lease as tenants in common, or (B) if only one of the Owner and the Stars accepts such lease, then the accepting party shall have an additional 10 days after the termination of the initial 30-day period in which to (x) waive further tender under Sections 2.4(c)(ii) or 2.4(d), or (y) designate a third party to accept the tendered lease as lessee, or accept the tendered lease itself as lessee, pursuant to either Section 2.4(c)(ii) or 2.4(d), at such accepting party's election (such accepting party, if it is the Owner, shall be treated as though it were a single non-defaulting party under the Rent and Performance Guaranties for the application of such Sections 2.4(c)(ii) and 2.4(d)). The City shall grant to the accepting party or parties, as the case may be, an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty

Copy from re:SearchTX    

executed by such accepting party or parties, as the case may be, shall terminate upon acceptance of the lease pursuant to this paragraph (c).

(d)    Single Non-Defaulting Party Arena Lease. If there is one defaulting party under the Rent and Performance Guaranties and the lease tendered in paragraph (c) above is not accepted within the 30 day tender period by the non-defaulting party, the City shall promptly thereafter tender a lease in writing to such non-defaulting party having and containing identical terms as the Lease, except that (i) the term of the new lease shall be for the unelapsed term of the Lease; (ii) the annual rent payable to the City by such non-defaulting party shall be the total of $1,700,000, plus the greater of (A) 50% of the annual net cash flow derived by such lessee from the operations of the Arena Project (calculated according to generally accepted accounting principles) provided that (i) all cash applied to pay debt and to pay capital expenditures (including funds placed in reserve for maintenance and capital expenditures) shall be deducted, and (ii) all game-day revenues and expenses attributable to Home Games and all rent paid by the Owner and the Stars up to $3,400,000 per year shall be excluded, in calculating such annual net cash flow, or (B) the amount actually collected by the non-defaulting party as rent from the defaulting party under paragraph (f) of this section, up to $1,700,000 annually; (iii) appropriate provision shall be made for the creation of Arena Project improvement and maintenance reserves in lieu of "Annual Payments," as defined in the Lease; (iv) the tendered lease shall require the accepting lessee to provide to the defaulting party seasonal access to the Arena Project for playing the Home Games of the defaulting party upon the terms required by paragraph (f) of this section, and (v) the City shall grant to the accepting party an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty executed by such non-defaulting party shall terminate upon acceptance of a lease pursuant to this paragraph (d).

The non-defaulting party receiving the tendered lease under this paragraph (d) shall have 30 days after the lease is tendered, to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee. If the tendered lease is not accepted, the City shall have the right to offer a lease having similar terms to a third-party Operator, or to itself become the Operator as owner of the Arena Project, subject to the requirements of paragraph (e) and (f) of this section.

(e)    Team Lease of Arena for Games Only. If no lease tendered pursuant to paragraphs (c) or (d) above is accepted by a non-defaulting party by the expiration date of the tender period under paragraph (d), the City shall, or shall cause the third-party Operator of the Arena Project to, tender to each non-defaulting party a lease for playing such non-defaulting party's Home Games at the Arena Project for the period of time equal to the unelapsed term of the Lease, and each such non-defaulting party shall accept such lease, upon the following terms:

(i)    Each non-defaulting party shall pay rent annually in the amount of $2.2 million; shall pay all game-day operating expenses of the Arena Project for its Home Games, shall retain 100% of game-day revenues for its Home Games, and shall indemnify and hold harmless the Operator for damages and claims, including expenses for defense, resulting from the Home Games conducted in the Arena. The Rent and Performance Guaranties as to the non-defaulting party and possession of the Arena Project as to all parties under the Club Sublease shall terminate upon the date the City or such third party becomes Operator.

(ii)    On an annual basis, the Operator shall pay to such non-defaulting party, so long as such non-defaulting party has paid the rent required by clause (i) above, an amount equal to 25% (or 50% if it is the only non-defaulting party) of the net cash flow derived by the Operator from the operations of the Arena Project (calculated according to generally

Copy from re:SearchTX

accepted accounting principles provided that all rent paid by the Owner and Stars up to $3,400,000 annually, and all game-day revenues and expenses attributable to Home Games of the Owner and the Stars shall not be included, and all capital expenditures shall be deducted, in calculating such annual net revenue. The Operator shall not have any responsibility, obligation or duty to maximize gross or net revenues).

(iii)    Subject to the availability of gross revenues sufficient for the purpose, the Arena Project shall be maintained in good condition and repair and operated in the configuration and with the amenities as exist as of the Operational Date and in such state that satisfies the requirements of the Association for the playing of the Home Games. The Operator's obligation is limited to the availability of such revenues.

(iv)    The lease tendered to each non-defaulting party under this paragraph (e) shall be in writing, shall be in a form appropriate for such lease transaction and shall be identical to the lease tendered to the other non-defaulting party if there is one. The City (or third-party Operator) and each non-defaulting party shall act in good faith in negotiating the form of such lease pursuant to this subparagraph (e).

(f)    Obligations of Defaulting Party. If the Owner defaults under the Rent and Performance Guaranties thereby making it ineligible to receive a tendered lease pursuant to paragraphs (c), (d) or (e) of this section, the Owner's obligations under such Rent and Performance Guaranties shall not be released by reason of the City tendering a lease to the Stars.

If the Owner shall at any time be in default in the payment of rent in the full amount required by subparagraph (e)(i) of this section, all net cash flow payable to the Owner pursuant to subparagraph (e)(ii) of this section shall thereafter be applied to pay such past due rent until all past due rent shall have been paid in full. In no event shall the non-payment of rent under subparagraph (e)(i) excuse the Owner from continuing to play all of its Home Games in accordance with the terms of the lease entered into pursuant to paragraph (e) unless the City shall have exercised its termination rights thereunder. This covenant may be enforced by the Operator under subparagraph (e) above.

(g)    Lender Requirements. Notwithstanding anything else herein to the contrary, the City and the Owner shall negotiate in good faith to modify the provisions of the above subparagraphs of this Section 2.4 in order to facilitate the requirements of third-party lenders to the City, the Arena Group, and/or the Owner and the Stars in connection with the Closing of the Master Agreement.

Section 2.5    Limited Rights of Termination. Notwithstanding the other provisions of this Franchise Agreement, the Owner shall have the right to terminate this Franchise Agreement in the following, but under no other, circumstances:

(i)    Breach of Agreements. If the City defaults in its warranties and covenants in Section 3.1 or if the City defaults in any of its obligations under (A) the Master Agreement, (B) section 3.4(b), 12.1.6, or Article XV of the Lease (or similar provisions under a tendered lease), or (C) this Franchise Agreement;

(ii)    Frustration of Title. If the Master Agreement is terminated pursuant to section 8.5 of the Master Agreement; or

(iii)    Termination of Lease. If the Lease is terminated by the Lessee pursuant to sections 5.2, 5.3(b) or 11.6(b) thereof (or similar provisions of a tendered lease), or pursuant

Copy from re:SearchTX

to a final, unappealable order of a court acting at the request of the Owner under section 10.1 of the Lease.

## ARTICLE III

## WARRANTIES AND SPECIAL COVENANTS

Section 3.1    <u>By the City</u>. The City warrants, covenants and agrees as follows:

(a)    The City is authorized by the Act and other applicable law to execute and deliver the Master Agreement, the Lease, the Option Contract, and this Franchise Agreement;

(b)    The City has irrevocably deposited its share of Project Costs (as defined in the Master Agreement), in the amount of $125,000,000, as required by the Master Agreement on the Commencement Date, from lawfully available funds and the same are not subject to withdrawal or recall for any purpose at any time except in accordance with the Master Agreement;

(c)    The City represents that, simultaneously with the execution of this Franchise Agreement, it is signing an identical franchise Agreement with the Stars (the "Stars Franchise Agreement"); and

(d)    The City will not amend the Stars Franchise Agreement without the prior written consent of the Owner.

Section 3.2    <u>By the Owner</u>. The Owner warrants, covenants and agrees as follows:

(a)    The execution and delivery of this Franchise Agreement, its Master Agreement Guaranty, and its Rent and Performance Guaranty do not violate any contract, covenant, agreement, loan document, mortgage, judgment of a court, or regulatory proceeding to which the owner is a party or is subject.

(b)    The Owner is the owner of the Franchise and the Team, has full power and authority to execute this Franchise Agreement and to honor the restrictions contained herein, and promises to keep the Franchise in full force and effect and in good standing in accordance with the contracts, rules and regulations of the Association.

(c)    This Franchise Agreement is binding and enforceable against the Owner and all necessary approvals have been obtained. Upon transfer of the Franchise as referenced in Section 2.2 above and the execution by such transferee of the acknowledgment and acceptance referenced in said section, the transferor Owner shall have no further obligations under this Franchise Agreement.

## ARTICLE IV

## SPECIFIC PERFORMANCE

Section 4.1    <u>Adoption of Act</u>. The City and the Owner acknowledge and agree that this Franchise Agreement is an Agreement of the kind, type and substance described in Section 334.005 of the Act and that said section is applicable hereto.

Copy from re:SearchTX

Section 4.2    <u>Acknowledgments and Findings</u>. The Owner acknowledges and agrees that (i) the presence of the Team in the City and at the Arena Project in accordance with the terms hereof provide a unique value to the City that cannot be valued in money; and (ii) the City will suffer irrevocable injury if the Owner breaches its obligations to play the Home Games of the Team at the Arena Project when and as herein required; and, accordingly, the Owner and the City agree that this Franchise Agreement is enforceable by specific performance in the courts of the State of Texas, and by other equitable remedies, including injunctive remedies. The Owner expressly waives the right to require the City to post any bond or other security, as a condition to the granting of any equitable relief by court.

(Left Blank Intentionally)

Copy from re:SearchTX

This Franchise Agreement has been executed and delivered on and as of the Commencement Date, as above defined and written.

CITY OF DALLAS, TEXAS

By: _____
    Assistant City Manager

APPROVED AS TO FORM:

Sam Lindsay, City Attorney

By: _____
    Assistant City Attorney

DALLAS BASKETBALL LIMITED,
a Texas limited partnership

By:   Hillwood DBL, Ltd.
      a Texas limited partnership,
      General Partner

      By:  Hillwood DBL Management, Inc.,
           a Texas Corporation,
           General Partner

      By: _____
          Name: _____ M. THOMAS MASON
          Title: _____ SECRETARY

Copy from re:SearchTX

EXHIBIT
**1-D**

(Final)

# STARS FRANCHISE AGREEMENT

between

## CITY OF DALLAS, TEXAS

and

## DALLAS STARS, L.P.

Dated: July 28, 1998

6:\1F:\FINAN\DAL.524\10000\STAR_FRA.AGM

Copy from re:SearchTX

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.1   Definitions ...................................................... 1

## ARTICLE II

### LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1   Location Commitment ............................................ 3
Section 2.2   Sales or Mortgages of Franchise .................................... 4
Section 2.3   Team Play of Home Games ......................................... 4
Section 2.4   Unconditional Requirements ........................................ 6
Section 2.5   Limited Rights of Termination ...................................... 7

## ARTICLE III

### WARRANTIES AND SPECIAL COVENANTS

Section 3.1   By the City ...................................................... 7
Section 3.2   By the Owner .................................................... 7

## ARTICLE IV

### SPECIFIC PERFORMANCE

Section 4.1   Adoption of Act .................................................. 8
Section 4.2   Acknowledgments and Findings ..................................... 8

EXECUTION ................................................................ 9

Copy from re:SearchTX

## STARS FRANCHISE AGREEMENT

This STARS FRANCHISE AGREEMENT (this "Franchise Agreement"), made and entered into this 28th day of July, 1998, by and between the City of Dallas, Texas (the "City"), a duly incorporated home rule city of the State of Texas, and Dallas Stars, L.P., a Delaware limited partnership (the "Owner");

### WITNESSETH:

WHEREAS, the City and the Arena Group (herein defined) entered into that certain Arena Master Agreement (the "Master Agreement") dated December 10, 1997, pursuant to which the City and the Arena Group agreed to the terms for the financing and construction of a new indoor sports and entertainment arena complex in downtown Dallas; and

WHEREAS, as a condition to the City's funding commitment under the Master Agreement, this Franchise Agreement is required to be executed and delivered by the Owner; and

WHEREAS, the Owner and the City intend by this Franchise Agreement to set forth the terms of the Owner's obligations to the City regarding the Team (as defined herein) and the Franchise and the terms of the City's obligations to Owner to provide the Team with access to the Arena Project for playing Home Games (herein defined);

NOW, THEREFORE, as a condition and specific inducement to the City to fund $125 million of the Project Costs pursuant to and as defined in the Master Agreement, and further, in consideration of Ten Dollars ($10) and other good and valuable consideration, the parties hereto do hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions. In each place in this Franchise Agreement wherein the following words and terms are used, the same, unless a different meaning or intent clearly appears from the context, shall have the following meanings, respectively:

"Act" - Chapter 334, Local Government Code of the State of Texas.

"Arena" - the indoor sports and entertainment arena which is to be part of the Dallas sports arena project approved by the voters of the City on January 17, 1998 and to be constructed pursuant to and in accordance with the Master Agreement.

"Arena Group" - Arena/Dallas Stars, Inc., a Delaware Corporation, and Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., each a Texas corporation.

"Arena Project" -the meaning assigned to such term in the Master Agreement.

"City" - the meaning assigned to such term in the preamble above.

"Club Subleases" - the subleases or other agreements conforming to the requirements of section 5.5 of the Lease.

"Commencement Date" - the date of this Franchise Agreement as first shown above.

6.1\F:\FINAN\DALLS24\l0000\STAR_FRA.AGM

"Force Majeure" - an event that is beyond the reasonable control of a party whose performance hereunder is delayed or made impossible thereby, including without limitation condemnation, casualty, damage, strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor, regulations or order of any governmental or regulatory body, enemy action, civil disturbance, fire or unavoidable casualties.

"Franchise Agreement" - this Franchise Agreement as from time to time amended and supplemented by mutual written agreement of the City and the Owner.

"Franchise" - the rights of the Owner that were issued, granted, and sanctioned to the Owner by the League (as defined herein), authorizing the Owner to field and operate the Team as a competing member team of the League.

"Home Games" - professional ice hockey games in which the Team is the "host" team, including regular season games and post-season games, in competition with other members of the League, but excluding preseason games, exhibition games and League-sanctioned games played outside of the City of Dallas even though the Owner is designated as the "home team" by the League.

"League" - the association of member franchise owners, headquartered in New York, New York, which sanctions and authorizes competitive professional ice hockey games in various cities and towns under the name the National Hockey League ("NHL") and its successors.

"Lease" - that certain Lease Agreement by and among the City and the Arena Group executed and delivered in accordance with the Master Agreement and any and all amendments thereto.

"Lessee" - the meaning assigned to such term in the Lease.

"Master Agreement" - the meaning assigned to such term in the preamble above and any and all amendments thereto.

"Master Agreement Guaranties" - the guaranties of the Owner and the Mavericks delivered to the City in accordance with the Master Agreement and any and all amendments thereto.

"Mavericks" - Dallas Basketball Limited, a Texas limited partnership and its successors and assigns.

"Operational Date" - the meaning assigned to such term in the Lease.

"Operator" - any person or entity (other than the Owner) who may be granted the right from time to time to possess and operate the Arena Project. If a third party is not granted such rights, then such term shall mean the City.

"Owner" - Dallas Stars, L.P. and any successor in interest to the ownership rights in the Franchise and the Team including a purchaser or mortgagee (that acquires such rights by foreclosure or otherwise) of such ownership rights.

"Owner Sublease" - the Club Sublease executed by the Owner and any and all amendments thereto.

"Rent and Performance Guaranties" - the provisions of the Owner Sublease and a similar Club Sublease executed by the Mavericks conforming to section 5.5 of the Lease, and, if nonconforming, then the provisions of section 5.5 of the Lease.

"Reunion Arena" - the professional basketball and ice hockey arena belonging to the City that is used by the Owner to conduct the Home Games on the date hereof.

"Team" - collectively, the players, coaches, trainers and administrative employees who represent the Franchise from time to time in competitive ice hockey games in the League, known as the "Dallas Stars."

"Term" - the period commencing on the Commencement Date and ending on the date of the thirtieth (30th) anniversary of the Operational Date.

## ARTICLE II

## LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1      Location Commitment. Subject to the rights of termination set forth in Section 2.5, and to the exculpatory provisions set forth in Section 2.3, throughout the Term, the Owner shall continuously designate the City as the location (a) in which the Home Games shall be played, and (b) in which the principal corporate and executive offices of the Team shall be maintained.

Section 2.2      Sales or Mortgages of Franchise.

(a)      The Owner may at its sole election at any time or from time to time assign, sell or otherwise transfer, or place security interests or mortgage liens (collectively, the "Lien(s)") upon, any and all ownership rights in the Franchise; provided, however, that any such assignment, sale or Liens shall be made or granted subject to the requirements and obligations of Owner under this Franchise Agreement, so that any person who acquires the Franchise (i) pursuant to any such assignment or sale, or (ii) pursuant to any foreclosure or other transaction under any such Liens, shall take the Franchise strictly subject to the requirements and burdens imposed on the Owner by this Franchise Agreement and such person shall thereafter be deemed the Owner for the purposes of this Agreement. Upon any such assignment or purchase or granting of any such Liens, Owner shall obtain from each such assignee, purchaser or any Lien holder, as the case may be, a written acknowledgment and acceptance of the terms, provisions and restrictions contained herein and shall provide an executed copy thereof to the City, or in the case of a purchase pursuant to a foreclosure or otherwise under such Lien, shall state in the instrument creating such Lien that any sale is subject to the terms of this Agreement.

(b)      In the event involuntary liens or material encumbrances are placed on the Franchise that, upon foreclosure, would result in a violation of this Franchise Agreement, the Owner will use its good faith efforts to promptly remove such liens or material encumbrances after reasonable contest periods (or provide security against the same reasonably acceptable to the City).

Section 2.3      Team Play of Home Games. Subject to the rights of termination set forth in Section 2.5, the Owner:

(i)      shall (A) during the period commencing on the Commencement Date and ending on the Operational Date, and (B) during any period thereafter if the Arena Project is not available for playing Home Games by reason of Force Majeure, but not beyond the Term, provided that Reunion Arena remains configured substantially as it was configured as of the Commencement Date with access to patron parking for Home Games in an amount and walking-distance to Reunion Arena comparable to the parking that was provided to patrons for Home Games during December, 1997, is in a condition of repair, operation and maintenance equivalent to such conditions as of the Commencement Date and is available and

Copy from re:SearchTX

satisfies the requirements of the League as a venue for playing the Home Games, cause the Team to play all of its Home Games at Reunion Arena; and

(ii)    shall, during the Term other than for those periods referred to in (i) above, cause the Team to play all of its Home Games at the Arena.

Notwithstanding the provisions of subparagraphs (i) and (ii) above, if at any time neither Reunion Arena nor the Arena Project shall be suitable for playing Home Games by the Team, by reason of the configuration or condition of Reunion Arena, or Arena Project or Reunion Arena, or is otherwise unavailable for playing Home Games, the Owner may utilize (A) any facilities located elsewhere in the North Texas area to play Home Games, or (B) the facilities of other NHL teams to play Home Games if so required by the League, in either case until such time as either Reunion Arena or the Arena Project is restored to the same conditions contemplated by, subparagraphs (i) and (ii) above, and is available for playing Home Games by the Team.

Section 2.4    Unconditional Requirements.

(a)    Owner's Unconditional Obligation. Subject to the provisions of Section 2.3 and Section 2.5, the Owner's obligations under this Franchise Agreement are not conditioned or contingent upon the completion of construction or continued suitability for use by the Team of the Arena Project, since the Owner, the Mavericks and the Arena Group have given certain assurances of such matters in the Master Agreement Guaranties, in the Rent and Performance Guaranties and in the Master Agreement.

(b)    Access to Arena. So long as the City has not terminated the Lease in accordance with its terms, the Owner and the Mavericks shall be provided access to and use of the Arena Project pursuant to the requirements of section 5.5 of the Lease. If the Lease is terminated by the City, access will be provided under and subject to the provisions of this Section 2.4.

(c)    Team Lease on Same Terms as Arena Group Lease. If the Lease is terminated by the City pursuant to the terms of the Lease, the City shall promptly thereafter tender a lease in writing (i) to both the Owner and the Mavericks (each having a 50% undivided interest as tenants in common), if neither is then in default under the Rent and Performance Guaranties, or (ii) if one of such parties is in default under the Rent and Performance Guaranties, then to such non-defaulting party, containing identical terms as the Lease, except that the term of the new lease will be for the unelapsed term of the Lease. Each non-defaulting party receiving the tendered lease under this paragraph (c) shall have 30 days after the lease is tendered to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee; provided, however, if such lease is tendered to both the Owner and the Mavericks pursuant to Section 2.4(c)(i), (A) both may accept the tendered lease as tenants in common, or (B) if only one of the Owner and the Mavericks accepts such lease, then the accepting party shall have an additional 10 days after the termination of the initial 30-day period in which to (x) waive further tender under Sections 2.4(c)(ii) or 2.4(d), or (y) designate a third party to accept the tendered lease as lessee, or accept the tendered lease itself as lessee, pursuant to either Section 2.4(c)(ii) or 2.4(d), at such accepting party's election (such accepting party, if it is the Owner, shall be treated as though it were a single non-defaulting party under the Rent and Performance Guaranties for the application of such Sections 2.4(c)(ii) and 2.4(d)). The City shall grant to the accepting party or parties, as the case may be, an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty executed by such accepting party or parties, as the case may be, shall terminate upon acceptance of the lease pursuant to this paragraph (c).

6.1\F:\FINAN\DAL524\10000\STAR_FRA.AGM                 -4-

(d)    Single Non-Defaulting Party Arena Lease. If there is one defaulting party under the Rent and Performance Guaranties and the lease tendered in paragraph (c) above is not accepted within the 30 day tender period by the non-defaulting party, the City shall promptly thereafter tender a lease in writing to such non-defaulting party having and containing identical terms as the Lease, except that (i) the term of the new lease shall be for the unelapsed term of the Lease; (ii) the annual rent payable to the City by such non-defaulting party shall be the total of $1,700,000, plus the greater of (A) 50% of the annual net cash flow derived by such lessee from the operations of the Arena Project (calculated according to generally accepted accounting principles) provided that (i) all cash applied to pay debt and to pay capital expenditures (including funds placed in reserve for maintenance and capital expenditures) shall be deducted, and (ii) all game-day revenues and expenses attributable to Home Games and all rent paid by the Owner and the Mavericks up to $3,400,000 per year shall be excluded, in calculating such annual net cash flow, or (B) the amount actually collected by the non-defaulting party, as rent from the defaulting party under paragraph (f) of this section, up to $1,700,000 annually; (iii) appropriate provision shall be made for the creation of Arena Project improvement and maintenance reserves in lieu of "Annual Payments," as defined in the Lease; (iv) the tendered lease shall require the accepting lessee to provide to the defaulting party seasonal access to the Arena Project for playing the Home Games of the defaulting party upon the terms required by paragraph (f) of this section, and (v) the City shall grant to the accepting party an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty executed by such non-defaulting party shall terminate upon acceptance of a lease pursuant to this paragraph (d).

The non-defaulting party receiving the tendered lease under this paragraph (d) shall have 30 days after the lease is tendered, to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee. If the tendered lease is not accepted, the City shall have the right to offer a lease having similar terms to a third-party Operator, or to itself become the Operator as owner of the Arena Project, subject to the requirements of paragraph (e) and (f) of this section.

(e)    Team Lease of Arena for Games Only. If no lease tendered pursuant to paragraphs (c) or (d) above is accepted by a non-defaulting party by the expiration date of the tender period under paragraph (d), the City shall, or shall cause the third-party Operator of the Arena Project to, tender to each non-defaulting party a lease for playing such non-defaulting party's Home Games at the Arena Project for the period of time equal to the unelapsed term of the Lease, and each such non-defaulting party shall accept such lease, upon the following terms:

(i)    Each non-defaulting party shall pay rent annually in the amount of $2.2 million; shall pay all game-day operating expenses of the Arena Project for its Home Games, shall retain 100% of game-day revenues for its Home Games, and shall indemnify and hold harmless the Operator for damages and claims, including expenses for defense, resulting from the Home Games conducted in the Arena. The Rent and Performance Guaranties as to the non-defaulting party and possession of the Arena Project as to all parties under the Club Sublease shall terminate upon the date the City or such third party becomes Operator.

(ii)    On an annual basis, the Operator shall pay to such non-defaulting party, so long as such non-defaulting party has paid the rent required by clause (i) above, an amount equal to 25% (or 50% if it is the only non-defaulting party) of the net cash flow derived by the Operator from the operations of the Arena Project (calculated according to generally accepted accounting principles provided that all rent paid by the Owner and Mavericks up to $3,400,000 annually, and all game-day revenues and expenses attributable to Home Games of the Owner and the Mavericks shall not be included, and all capital expenditures shall be

deducted, in calculating such annual net revenue). The Operator shall not have any responsibility, obligation or duty to maximize gross or net revenues.

(iii)    Subject to the availability of gross revenues sufficient for the purpose, the Arena Project shall be maintained in good condition and repair and operated in the configuration and with the amenities as exist as of the Operational Date and in such state that satisfies the requirements of the League for the playing of the Home Games. The Operator's obligation is limited to the availability of such revenues.

(iv)    The lease tendered to each non-defaulting party under this paragraph (e) shall be in writing, shall be in a form appropriate for such lease transaction and shall be identical to the lease tendered to the other non-defaulting party if there is one. The City (or third-party Operator) and each non-defaulting party shall act in good faith in negotiating the form of such lease pursuant to this subparagraph (e).

(f)    <u>Obligations of Defaulting Party.</u> If the Owner defaults under the Rent and Performance Guaranties thereby making it ineligible to receive a tendered lease pursuant to paragraphs (c), (d) or (e) of this section, the Owner's obligations under such Rent and Performance Guaranties shall not be released by reason of the City tendering a lease to the Mavericks.

If the Owner shall at any time be in default in the payment of rent in the full amount required by subparagraph (e)(i) of this section, all net cash flow payable to the Owner pursuant to subparagraph (e)(ii) of this section shall thereafter be applied to pay such past due rent until all past due rent shall have been paid in full. In no event shall the non-payment of rent under subparagraph (e)(i) excuse the Owner from continuing to play all of its Home Games in accordance with the terms of the lease entered into pursuant to paragraph (e) unless the City shall have exercised its termination rights thereunder. This covenant may be enforced by the Operator under subparagraph (e) above.

(g)    <u>Lender Requirements.</u> Notwithstanding anything else herein to the contrary, the City and the Owner shall negotiate in good faith to modify the provisions of the above subparagraphs of this Section 2.4 in order to facilitate the requirements of third-party lenders to the City, the Arena Group, and/or the Owner and the Mavericks in connection with the Closing of the Master Agreement.

Section 2.5    <u>Limited Rights of Termination.</u> Notwithstanding the other provisions of this Franchise Agreement, the Owner shall have the right to terminate this Franchise Agreement in the following, but under no other, circumstances:

(i)    <u>Breach of Agreements.</u> If the City defaults in its warranties and covenants in Section 3.1, or if the City defaults in any of its obligations under (A) the Master Agreement, (B) section 3.4(b), 12.1.6, or Article XV of the Lease (or similar provisions under a tendered lease), or (C) this Franchise Agreement;

(ii)    <u>Frustration of Title.</u> If the Master Agreement is terminated pursuant to section 8.5 of the Master Agreement; or

(iii)    <u>Termination of Lease.</u> If the Lease is terminated by the Lessee pursuant to sections 5.2, 5.3(b) or 11.6(b) thereof (or similar provisions of a tendered lease), or pursuant to a final, unappealable order of a court acting at the request of the Owner under section 10.1 of the Lease.

## ARTICLE III

## WARRANTIES AND SPECIAL COVENANTS

Section 3.1     By the City. The City warrants, covenants and agrees as follows:

(a)     The City is authorized by the Act and other applicable law to execute and deliver the Master Agreement, the Lease, the Option Contract, and this Franchise Agreement;

(b)     The City has irrevocably deposited its share of Project Costs (as defined in the Master Agreement), in the amount of $125,000,000, as required by the Master Agreement on the Commencement Date, from lawfully available funds and the same are not subject to withdrawal or recall for any purpose at any time except in accordance with the Master Agreement;

(c)     The City represents that, simultaneously with the execution of this Franchise Agreement, it is signing an identical franchise Agreement with the Mavericks (the "Mavericks Franchise Agreement"); and

(d)     The City will not amend the Mavericks Franchise Agreement without the prior written consent of the Owner.

Section 3.2     By the Owner. The Owner warrants, covenants and agrees as follows:

(a)     The execution and delivery of this Franchise Agreement, its Master Agreement Guaranty, and its Rent and Performance Guaranty do not violate any contract, covenant, agreement, loan document, mortgage, judgment of a court, or regulatory proceeding to which the owner is a party or is subject.

(b)     The Owner is the owner of the Franchise and the Team, has full power and authority to execute this Franchise Agreement and to honor the restrictions contained herein, and promises to keep the Franchise in full force and effect and in good standing in accordance with the contracts, rules and regulations of the League.

(c)     This Franchise Agreement is binding and enforceable against the Owner and all necessary approvals have been obtained. Upon transfer of the Franchise as referenced in Section 2.2 above and the execution by such transferee of the acknowledgment and acceptance referenced in said section, the transferor Owner shall have no further obligations under this Franchise Agreement.

## ARTICLE IV

## SPECIFIC PERFORMANCE

Section 4.1     Adoption of Act. The City and the Owner acknowledge and agree that this Franchise Agreement is an Agreement of the kind, type and substance described in Section 334.005 of the Act and that said section is applicable hereto.

Section 4.2     Acknowledgments and Findings. The Owner acknowledges and agrees that (i) the presence of the Team in the City and at the Arena Project in accordance with the terms hereof provide a unique value to the City that cannot be valued in money; and (ii) the City will suffer irrevocable injury if the Owner breaches its obligations to play the Home Games of the Team at the Arena Project when and as herein required; and, accordingly, the Owner and the City agree that this Franchise Agreement is enforceable by specific performance in the courts of the State of Texas, and by other equitable remedies, including injunctive

6.1\F:\FINAN:DAL52411|0000\STAR_FRA.AGM                    -7-

remedies. The Owner expressly waives the right to require the City to post any bond or other security, as a condition to the granting of any equitable relief by court.

*(Left Blank Intentionally)*

6.1\F:\FINAN\DAL524\I0000\STAR_FRA:AGM                                    -8-

Copy from re:SearchTX

This Franchise Agreement has been executed and delivered on and as of the Commencement Date, as above defined and written.

CITY OF DALLAS, TEXAS

By: _____
              Assistant City Manager

APPROVED AS TO FORM:

Sam Lindsay, City Attorney

By: _____
              Assistant City Attorney

DALLAS STARS, L.P.,
A Delaware Limited Partnership

By: Dallas Stars GP Partners,
      A Delaware Limited Partnership,
      General Partner

      By: Hicks, Inc.,
            A Delaware Corporation,
            Managing General Partner

      By: _____
      Name: Lawrence D. Stuart Jr.
      Title: Vice President

6.1\F:\FINAN\DAL524\10000\STAR_FRA.AGM                -9-

Copy from re:SearchTX



Charles L. Babcock<br/>CBabcock@jw.com

October 25, 2024

***Via Hand Delivery***

DSE Hockey Club, L.P.
2601 Avenue of the Stars
Frisco, TX 75034
       Attention: R. Thomas Gaglardi
             Brad Alberts

**EXHIBIT**<br/>**1-E**

Dear DSE Hockey Club, LP:

I write on behalf of Dallas Sports Group, LLC and Radical Arena, Ltd. (collectively, "*DSRA*") who own 50% of the company interests in Center GP, LLC ("*CGP*") and 50% of the Limited Partner Partnership Interests in Center Operating Company, LP ("*COC*"). I write to DSE Hockey Club, L.P. ("*DHC*") in its capacity as the other Member of CGP owning 50% of the Company Interests of CGP and the other Limited Partner of COC owning 50% of the Limited Partner Partnership Interests of COC.

**The Dallas Stars Relocation.** The COC Limited Partnership Agreement and the CGP Limited Liability Company Agreement both provide that in the event of a Dallas Stars Relocation Event, DSRA may cause COC and CGP to purchase and redeem DHC's entire ownership interest in COC and CGP, respectively, as more specifically detailed below. A "Relocation Event" includes the Dallas Stars' failure to maintain the City of Dallas as its "principal corporate and executive offices". See Section 4.8 of COC's Limited Partnership Agreement and Section 4.5 of CGP Limited Liability Company Agreement.

The Dallas Stars relocated their principal corporate and executive offices from the City of Dallas to 2601 Avenue of the Stars in Frisco, Texas. That fact is listed as such on the Dallas Stars' website and DHC's Public Information Report on file with the Texas Secretary of State. The City of Frisco is not in the City of Dallas. As a result, a Relocation Event has occurred.

**Redemption of DHC interest in COC**. Pursuant to Section 4.8 of the COC Limited Partnership Agreement and the occurrence of a Relocation Event, the "Remaining Partners" of COC may cause COC to purchase and redeem the entire interest in COC owned by DHC as the "Relocation Partner" for an aggregate amount of $100. DSRA, as the "Remaining Partners" of COC, hereby exercise their right to cause COC to hereby redeem DHC's entire Partnership Interest in COC for the $100 redemption price. A $100 Federal Reserve Note accompanies this letter and constitutes payment in full of the consideration required to be paid to the Relocation Partner by Section 4.8 of the COC Limited Partnership Agreement.

**Redemption of DHC interest in CGP**. Pursuant to Section 4.5 of the CGP Limited Liability Company Agreement and the occurrence of a "Relocation Event", the "Remaining Members" of CGP may cause CGP to purchase and redeem the entire interest in CGP owned by DHC as the "Relocation Member" for an aggregate amount of $10. DSRA, as the "Remaining Members" of CGP, hereby exercise their right to cause CGP to purchase and hereby redeem DHC's entire Company Interest in CGP for the $10 redemption price. A $10 Federal Reserve Note accompanies this letter and constitutes payment in full of the consideration required to be paid to the Relocation Member pursuant to Section 4.5 of the CGP

Copy from re:SearchTX

DSE Hockey Club L.P.
October 25, 2024
Page 2

Limited Liability Company Agreement.

**Forfeiture of Right to Designate Board Members of CGP.**  Section 7.2(e)(ii)(C) of the CGP Limited Liability Company Agreement provides that upon DHC becoming a Relocation Partner under the COC Limited Partnership Agreement, DHC's designated Board Members of CGP "shall immediately be deemed to have resigned from the Board" and DSRA "shall then have the right to designate Board members in the stead" of DHC's designated Board Members. Accordingly, R. Thomas Gaglardi (Place 4), Therese Baird (Place 5) and Brad Alberts (Place 6) are deemed to have resigned from the Board of CGP effective immediately.

Sincerely yours,

Charles L. Babcock

Attached: $100 and $10 Federal Reserve Notes





Copy from re:SearchTX



**WINSTEAD**

Austin | Charlotte | Dallas | Fort Worth | Houston | Nashville | New York | San Antonio | The Woodlands

2728 N. Harwood Street          214.745.5400 OFFICE
Suite 500                                 214.745.5390 FAX
Dallas, TX 75201                     winstead.com

Joshua M. Sandler
(214) 745-5103
jsandler@winstead.com

*__Via Hand Delivery__*

November 1, 2024

```
EXHIBIT
  1-F
```

Mr. Charles L. Babcock
Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, Texas 75201

     RE:    Dallas Sports Group, LLC and Radical Arena, Ltd.'s letter dated October
            25, 2024 regarding attempted purchase of company interest in Center
            Operating Company, LP and Center GP, LLC and their attempt to remove
            Center GP, LLC board members.

Dear Mr. Babcock:

      On October 25, 2024, DSE Hockey Club, LP ("DHC") received your letter (the
"Letter") wherein you indicated your representation of Dallas Sports Group, LLC and
Radical Arena, Ltd. (collectively, "DSRA"). The Letter acknowledges DSRA's capacity as
a 50 percent owner of company interests in Center GP, LLC ("CGP") and as a 50 percent
owner of the Limited Partnership interests of Center Operating Company, LP ("COC").
The Letter further recognizes DHC's 50 percent ownership in CGP and COC, respectively.
With regard to the subject of the Letter, please be advised that the undersigned law firm
represents DHC in the above-described capacity. Please direct all future communications
with respect to this matter to my attention.

      In the Letter, DSRA alleges that (i) a "Relocation Event" has occurred under COC's
Limited Partnership Agreement (the "COC Agreement") and CGP's Limited Liability
Company Agreement (the "CGP Agreement") (the COC Agreement and CGP Agreement
are collectively referred to herein as the "Corporate Agreements"); (ii) the occurrence of
said Relocation Event allows DSRA to "cause" COC and CGP to purchase and redeem
DHC's 50 percent ownership interests in the respective companies; and (iii) DHC's
designated Board Members of CGP are "deemed to have resigned from the Board."

      As outlined below, DSRA has no basis in law or fact to unilaterally declare a Relocation
Event, much less declare the removal of DHC's designated Board Members on the CGP
Board. Accordingly, your Letter has no legal effect.

Copy from re:SearchTX

Mr. Charles L. Babcock
November 1, 2024
Page 2

A "Relocation Event" is plainly defined in the Corporate Agreements. Section 4.8(c)(ii) of the COC Agreement provides:

> (c)    For purposes of this Agreement, a "Relocation Event" means: (i) with respect to DBL, a breach by DBL prior to the 30th anniversary of the Opening Date of: (A) section 1 of the Mavericks Non-Relocation Agreement; or (B) section 2.1, section 2.2, and/or section 2.3 of the Mavericks Franchise Agreement; and (ii) with respect to the Dallas Stars, a breach by the Dallas Stars prior to the 30th anniversary of the Opening Date of:    (A) section 1 of the Stars Non-Relocation Agreement; or (B) section 2.1, section 2.2, and/or section 2.3 of the Stars Franchise Agreement.

Section 4.5 of the CGP Agreement provides that a Relocation Event has the meaning set forth in the COC Agreement above.

The effect of a "Relocation Event" is also consistently defined in the Corporate Agreements. For example, under Section 4.8(a) of the COC Agreement, in the event of a Relocation Event, "[COC] may purchase and redeem the entire Partnership Interest of the Relocation Partners for an aggregate amount equal to $100." Likewise, under Section 4.5 of the CGP Agreement, should a Relocation Event occur, "[CGP] may purchase and redeem the entire Partnership Interest in the Relocation Members for an aggregate amount equal to $10." Under Section 4.8(d) of the COC Agreement and the Definition section of the CGP Agreement, "[f]or purposes of [the COC Agreement], the Relocation Partners means the Limited Partners that are Affiliates of the Team that has caused a Relocation Event to occur."

In the Letter, DSRA mischaracterizes the definition of Relocation Event to "include[] the Dallas Stars' *failure* to maintain the City of Dallas as its 'principal corporate and executive offices.'" (emphasis added). But neither Section 4.8 of the COC Agreement nor Section 4.5 of the CGP Agreement references the Dallas Stars' obligation to meet an office-location requirement. Without a citation or explanation, DHC can only assume that the "failure" alleged by DSRA relates to one of the relevant provisions in the two agreements between the Dallas Stars and third parties mentioned in Section 4.8(c) of the COC Agreement: the Dallas Stars Non-Relocation Agreement and the Dallas Stars Franchise Agreement (collectively, the "Stars Third-Party Agreements"). However, because DSRA is not a party to the Stars Third-Party Agreements, DSRA cannot unilaterally enforce the Stars Third-Party Agreements nor can it determine the intent or performance of any provisions therein.

Contrary to DSRA's assertion, a Relocation Event is not triggered by a "failure," but rather an actual "breach" of certain select provisions identified in the Stars Third-Party Agreements. *See* Section 4.8(c) of the COC Agreement. If the parties to the Corporate Agreements intended that a failure by the Dallas Stars to maintain its "principal corporate and executive offices" in Dallas constituted a Relocation Event, they could have—and perhaps would have—stated so. Instead, the parties to the Corporate Agreements expressly tied a Relocation Event to an actual "breach" of specific provisions within the Stars Third-Party Agreements.

Mr. Charles L. Babcock
November 1, 2024
Page 3

It is perhaps unsurprising that DSRA avoided discussing the fact that, pursuant to the Corporate Agreements, a Relocation Event requires a breach. After all, DSRA has no basis or authority to *declare* a breach of any provisions in the Stars Third-Party Agreements. DSRA does not, and cannot, identify a single claim or allegation made by any of the third parties in privity with the Stars Third-Party Agreements. DSRA does not, and cannot, identify a judgment by a court declaring a breach of the aforementioned provisions, let alone a lawsuit filed to adjudicate such a breach. Moreover, because the Stars Third-Party Agreements were not executed for DSRA's benefit, it has no standing to enforce the Stars Third-Party Agreements. DSRA has no ground to stand on.

> ***Simply put, because DSRA cannot unilaterally declare a breach or identify a breach declared by any third party or court, a Relocation Event has not occurred. Accordingly, as previously noted, your Letter has no legal effect***.

Because a Relocation Event has not occurred, CGP has no right to purchase DHC's 50 percent ownership of company interests in CGP (Section 4.5 of the CGP Agreement) and COC has no right to purchase DHC's 50 percent ownership of Limited Partnership Interests in COC (Section 4.8(a) of the COC Agreement). To the extent DSRA actually attempted to purchase such interests on behalf of CGP and COC,[1] DSRA's purported purchases via its Letter are void. Consequently, enclosed with this letter please find the $110 previously delivered with your Letter.

Likewise, because a Relocation Event has not occurred, DHC has not become a Relocation Partner. *See* COC Agreement 4.8(d) ("Relocation Partners means the Limited Partners that are Affiliates of the Team that has caused a Relocation Event to occur."). Therefore, DHC has not lost its right to designate Board Members under Section 7.2(e) of the CGP Agreement and DHC's designated Board Members are not "deemed to have resigned from the Board" of CGP under Section 7.2(e)(ii)(C) of the CGP Agreement.

DHC is deeply concerned with the purported rationale employed by DSRA, as well as the bad faith manner in which DSRA attempted to revoke DHC's ownership interests in CGP and COC and to remove DHC's designated Board Members from the CGP Board. While DHC is only beginning to investigate this issue, DHC hopes to clarify whether DSRA

---

[1] Beyond the DSRA's erroneous construction of the Corporate Agreements, DHC has serious questions about who was acting through the Letter and whether those entities had full authority to act. The Letter states that Chip Babcock, on behalf of Jackson Walker, LLP, represents DSRA, not CGP or COC. The right to purchase the relevant ownership interests of Relocation Partners is limited to CGP and COC, respectively, not those Partners who "may cause the Partnership to so purchase and redeem the Partnership Interests of the Relocation Partners." COC Agreement § 4.8(a). The Letter seems to indicate DSRA is "causing" CGP and COC to redeem DHC's interests. However, it is unclear how or why DSRA has the authority to execute the actual redemption in a letter from its own counsel—who does not represent—or even claim to represent either CGP or COC. The source of the purported consideration is unclear as well. For the purposes of determining whether DSRA was acting improperly on behalf of CGP or COC or whether DSRA was purporting to act on its own to accomplish something within the sole power of CGP or COC, DHC requests that DSRA identify which entities Jackson Walker represents, the authority of DSRA to execute a redemption of ownership interests on behalf of CGP or COC, and the source of the purported consideration.

Copy from re:SearchTX

Mr. Charles L. Babcock
November 1, 2024
Page 4

was acting on behalf of CGP or COC at any point or whether CGP or COC were acting pursuant to a proper vote consistent with the Corporate Agreements as well as the Texas Business Organizations Code. *See, e.g.*, CGP Agreement § 7.3 (voting on major decisions). At this early stage, DHC has cause to believe that, by attempting to take self-interested actions to the detriment of the interests of CGP and COC, DSRA has likely breached its fiduciary duties to both companies. For that reason, DHC requests that DSRA provide answers to the following questions by the end of business on Tuesday, November 5, 2024:

- Identify the individuals who directed DSRA to declare a Relocation Event.

- Does counsel for DSRA also represent CGP or COC in any capacity? If so, please provide information regarding any vote by CGP or COC approving such representation.

- Has CGP or COC taken any votes since purportedly expelling the designated Board Members of DHC? Please provide all board minutes, votes, or resolutions related to the subject matter of the Letter or this correspondence.

- Has CGP or COC taken any act or omission potentially adverse to DHC or its Board Members?

- Who provided the consideration for the purported redemption of DHC's ownership interests in CGP and COC?

If DSRA sent the Letter without authorization of CGP and/or COC, DHC demands that DSRA make this information immediately known. By transmission of this letter, DSRA is also on notice that any further adverse action against DHC will result in court intervention whereby DHC will seek all legal and equitable relief available, including the recovery of damages suffered by DHC against DSRA, and for attorney's fees. Nothing contained in this letter nor any action or omission on behalf of DHC shall constitute an election of remedies by DHC or a waiver of any of the rights, remedies, or recourse available to DHC based upon DSRA's Letter or the recent actions taken by DSRA.

Thank you for your prompt attention to this matter.

Respectfully,

WINSTEAD PC

By: _Joshua M. Sandler_
Joshua M. Sandler

Mr. Charles L. Babcock
November 1, 2024
Page 5


JMS/hm
Enclosures





Copy from re:SearchTX



CITY OF DALLAS

EXHIBIT
**1-G**

October 3, 2025

Mr. Tom Gaglardi
Dallas Stars Hockey Club
2601 Avenue of the Stars
Frisco, TX 75034

Dear Tom,

I am writing to you today to restart our conversations about the future of the Stars in Dallas. The Dallas Stars are far more than a premier hockey team—you are a cornerstone of Dallas' identity and a deeply valued part of our community. Since your arrival in 1993, the Stars have built a legacy that extends well beyond the rink. You have helped grow the sport of hockey in Texas, inspired generations of young athletes, and cultivated one of the most passionate fan bases in the National Hockey League (NHL). The City of Dallas has been proud to stand with you every step of the way, as a committed and collaborative partner. The construction of the American Airlines Center (AAC) was a major civic investment—one we undertook alongside the Stars with a shared vision of long-term success. For 25 years, the AAC has been your home, and it continues to be a place where unforgettable moments are made—for players, fans, and the entire Dallas community.

The City of Dallas remains fully committed to the Dallas Stars and has worked in good faith for over a year to secure the AAC as the long-term home for the Dallas Stars beyond the current lease expiration in 2031. Beginning in the summer of 2024, the City of Dallas actively engaged in negotiations with both the Stars and the Dallas Mavericks to develop a shared master plan for recommendation to the City Council of a comprehensive renovation of the AAC that would enhance the fan experience and address long-overdue infrastructure upgrades.

Throughout the summer and fall of 2024, I held multiple one-on-one meetings with Brad Alberts, President and CEO on behalf of the Stars to discuss the future of your team at the AAC. Brad made me aware that the City and the Mavericks would have to carry the financial lift for the arena renovation, and in each of those meetings, I assured Brad of the City's commitment to keep the Stars at the AAC long term and to negotiate a path forward that would be a win-win for the Stars. During these conversations, I believed that Brad Alberts represented your voice in matters concerning the Stars. It has become apparent now as you communicated that you were unaware of those conversations that he did not. So, in all future conversations, I believe it's critical that I request that you and I work together directly.

In addition to my individual conversations with Brad, my team and I held a series of meetings with Brad, and with Cynt Marshall and Patrick Dumont representing the Mavericks. This larger group worked together to develop a plan to improve the AAC fan experience and upgrade the facility's infrastructure. The plan detailed the financial commitments of the City and Mavericks, and the Stars' commitment to a long-term home in the AAC.

1

Copy from re:SearchTX

By October 2024, I believed we had finalized deal terms. The Mavericks and Stars, through the Center Operating Company (COC) partnership, would lead a $300 million renovation of the AAC, with the City of Dallas and the Dallas Mavericks each funding half of the cost. **The Stars had no financial obligation**. In exchange for the City of Dallas and Mavericks' investment, the draft term sheet included, with Brad's concurrence, the Stars would play all home games at the AAC through 2061 and build and operate a StarsCenter multisport arena in southern Dallas to be supported by up to $50 million from the City of Dallas. The Dallas Mavericks would stay at the AAC through 2031 and then move into a newly constructed NBA arena.

Brad, Cynt, and I agreed to hold a special-called City Council meeting to approve the deal on October 24, 2024. We also planned a public announcement event to be held at the Mavericks season opener at the AAC later that day. Everyone walked out of that room in lockstep - the deal terms gave everyone what they claimed to want. **The Stars would receive a renovated arena and a long-term home in Dallas with no financial commitment.** The Mavericks would receive flexibility to pursue a new arena and continue to maintain the COC partnership with the Stars to manage a renovated AAC. The City of Dallas secured a long-term commitment from the Stars, a path forward with the Mavericks, and a renovation that would ensure the AAC as both the Stars' home and as a premier entertainment venue for decades to come.

The October 2024 deal also addressed an ongoing City concern with the Stars operations. **As we discussed in our meetings over the summer of 2024, section 2.1 of the Stars' Franchise Agreement with the City of Dallas requires the Stars to maintain its corporate headquarters in Dallas. Since the Stars headquarters are in Frisco, you are not in compliance with the Franchise Agreement.** Brad and I discussed this issue and solution at length during the negotiation process, and our draft term sheet offered a path for the Stars to address this concern, and avoid a City assertion of default, by the Stars moving the headquarters back to Dallas.

Within days of our October 2024 agreement, Brad alerted Assistant City Manager Robin Bentley that the proposed deal was off, stating that the Stars were no longer willing to accept the negotiated terms. This baffling change of course has still not been fully explained to me by the Stars, and to my knowledge, the Mavericks are also unclear as to what went awry.

Since the Stars walked away from the proposed deal, the City of Dallas has continued to work to revive the proposed deal, reengage in conversations and get the Stars back to the table. My team and I have repeatedly asked you and Brad to send us new terms acceptable to the Stars. However, it was not until Tuesday, September 9 that Brad finally communicated an unofficial list of the Stars' requirements out of respect for my requests. I apricate that Brad was clear in our conversation that the list is only a starting point for discussion, and that satisfaction of the items would not be a commitment that the Stars either stay or leave the AAC. I am taking the opportunity to respond in writing to each of the items that Brad communicated to me. As you will see, many of these items are difficult to address, since the requests contain unreasonable, unclear, and in some cases, impossible deliverables:

1. **The Stars requested that the Mavericks resolve the ongoing dispute between the two franchises regarding management of the AAC and your corporate partnership relationship, and that the Mavericks disperse certain financial distributions you believe you are owed under the COC agreement**. The dispute described is between the Mavericks and the Stars. The City of Dallas is not a party to your partnership, and we are not involved in your legal dispute with the Mavericks. The Stars will have to resolve this dispute without City of Dallas participation.

2

2. **The Stars requested that the COC, the partnership between the Stars and Mavericks, dissolve in 2031**. Again, this matter is not within the City of Dallas' control. The Stars must resolve your dispute with the Mavericks without City of Dallas participation. The City of Dallas' agreement to manage the AAC is with COC, and we will continue to work with the COC entity and its staff as outlined in our agreement.

3. **The Stars requested that the City of Dallas fund $400-500 million in AAC renovations, with no financial obligation for the Stars. The Stars also asked that the City of Dallas fund all future capital expenses required to maintain the AAC at "industry standards."** As described above, the master plan developed by the Stars and Mavericks last fall calls for a total renovation of $300 Million. It is unclear to me how this new inflated renovation budget was developed. Unlike in our October 2024 proposed deal terms, the Stars' new request has no cost sharing or contribution by the AAC tenants or management – the Stars instead request that the City of Dallas fund the entire renovation, and then also agree to fund unlimited ongoing capital expenditures in future years. This request is beyond unreasonable.

4. **The Stars requested that the City of Dallas waive all AAC rent.** Currently the COC pays annual rent of $3.4 Million, an amount that has not changed since it was negotiated in 1997. Under the October 2024 proposed deal terms, the rent would be raised to an inflation-adjusted $6.6 Million per year. It is unreasonable to expect the City of Dallas to allow use of a city-owned facility for free. Gifts of taxpayer funds or public facilities are not allowed under state law.

5. **The Stars requested a real estate subsidy.** It is not clear to me what the Stars are requesting, or what additional real estate incentives could possibly be in play. The City of Dallas owns the AAC, and as such it is a tax-exempt property. I am unaware of any additional real estate investment or development underway by the Stars.

6. **The Stars requested advertising control in the Victory District.** Again, it is not clear to me what this request means. The COC already controls advertising in and around the AAC.

Given that moving your headquarters to City of Dallas was not included in Brad's list of points for further discussion, I can no longer assume that the Stars are working to resolve the Franchise Agreement compliance issue discussed above. **As such, this letter shall serve as our notice of the Stars' default with regard to Section 2.1 of the Franchise Agreement. A copy of the agreement is attached for your convenience.**

While our current positions may differ, the City of Dallas remains fully committed to reengaging in meaningful, good-faith negotiations with the Dallas Stars. Our dedication to your organization is unwavering—we want the Stars to continue calling both the American Airlines Center and the City of Dallas home for generations to come. We are ready and willing to return to the table at your earliest convenience, and we remain optimistic that, together, we can find a path forward that honors our shared vision and long-standing relationship.

The Dallas Stars are an essential part of the city's identity—deeply woven into the cultural, civic, and sports fabric of the City of Dallas. A move away from the AAC would not only disrupt a successful and enduring relationship, but it would also abandon a fan base and community that has embraced and uplifted this team for over three decades. By remaining in Dallas, the Stars can build on that legacy, strengthen your roots, and further cement the Stars' place in one of the

3

Copy from re:SearchTX

most vibrant, diverse, and sports-passionate cities in the country.  Surrounded by a thriving entertainment district and supported by one of the fastest-growing hockey communities in the nation, Dallas offers the ideal foundation for long-term success—on the ice and beyond.

Any successful plan to resolve the concerns outlined above must include both the Stars and Mavericks, since you are partners in the COC and co-tenants at the AAC. Therefore, I have copied Patrick Dumont on this letter and ask that you each send me your availability for an in-person meeting before the end of October. **I ask that this letter and our conversations stay between the three of us.** I do not negotiate in the media, and I am confident that if we all get back at the table we can find a solution. I look forward to connecting at your convenience to discuss a path forward.

Service First, Now!

Kimberly Bizor Tolbert
City Manager

Cc: Patrick Dumont, Governor, Dallas Mavericks

Attachment: Stars Franchise Agreement

4

Copy from re:SearchTX

(Final)

STARS FRANCHISE AGREEMENT

between

CITY OF DALLAS, TEXAS

and

DALLAS STARS, L.P.

Dated: July 28, 1998

6.1\F:\FINAM\DALST4\10000\STAR_FRA.AGM

Copy from re:SearchTX

**TABLE OF CONTENTS**

Page

ARTICLE I

DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions  ......................................................  1

ARTICLE II

LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1    Location Commitment ..........................................  3
Section 2.2    Sales or Mortgages of Franchise  ...............................  3
Section 2.3    Team Play of Home Games  ....................................  4
Section 2.4    Unconditional Requirements  ...................................  4
Section 2.5    Limited Rights of Termination ..................................  6

ARTICLE III

WARRANTIES AND SPECIAL COVENANTS

Section 3.1    By the City ....................................................  7
Section 3.2    By the Owner  ................................................  7

ARTICLE IV

SPECIFIC PERFORMANCE

Section 4.1    Adoption of Act ...............................................  8
Section 4.2    Acknowledgments and Findings .................................  8


EXECUTION ...................................................................  9

Copy from re:SearchTX

## STARS FRANCHISE AGREEMENT

This STARS FRANCHISE AGREEMENT (this "Franchise Agreement"), made and entered into this 28th day of July, 1998, by and between the City of Dallas, Texas (the "City"), a duly incorporated home rule city of the State of Texas, and Dallas Stars, L.P., a Delaware limited partnership (the "Owner");

## WITNESSETH:

WHEREAS, the City and the Arena Group (herein defined) entered into that certain Arena Master Agreement (the "Master Agreement") dated December 10, 1997, pursuant to which the City and the Arena Group agreed to the terms for the financing and construction of a new indoor sports and entertainment arena complex in downtown Dallas; and

WHEREAS, as a condition to the City's funding commitment under the Master Agreement, this Franchise Agreement is required to be executed and delivered by the Owner; and

WHEREAS, the Owner and the City intend by this Franchise Agreement to set forth the terms of the Owner's obligations to the City regarding the Team (as defined herein) and the Franchise and the terms of the City's obligations to Owner to provide the Team with access to the Arena Project for playing Home Games (herein defined);

NOW, THEREFORE, as a condition and specific inducement to the City to fund $125 million of the Project Costs pursuant to and as defined in the Master Agreement, and further, in consideration of Ten Dollars ($10) and other good and valuable consideration, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.1      Definitions. In each place in this Franchise Agreement wherein the following words and terms are used, the same, unless a different meaning or intent clearly appears from the context, shall have the following meanings, respectively:

"Act" - Chapter 334, Local Government Code of the State of Texas.

"Arena" - the indoor sports and entertainment arena which is to be part of the Dallas sports arena project approved by the voters of the City on January 17, 1998 and to be constructed pursuant to and in accordance with the Master Agreement.

"Arena Group" - Arena/Dallas Stars, Inc., a Delaware Corporation, and Hillwood Arena Partners, Inc., DBL Arena Partners, Inc., and Corporate Arena Associates, Inc., each a Texas corporation.

"Arena Project" -the meaning assigned to such term in the Master Agreement.

"City" - the meaning assigned to such term in the preamble above.

"Club Subleases" - the subleases or other agreements conforming to the requirements of section 5.5 of the Lease.

"Commencement Date" - the date of this Franchise Agreement as first shown above.

6.1\F\SFINAN.DAL5Z4\10000\STAR_FRA.AGM

Copy from re:SearchTX

"Force Majeure" - an event that is beyond the reasonable control of a party whose performance hereunder is delayed or made impossible thereby, including without limitation condemnation, casualty, damage, strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor, regulations or order of any governmental or regulatory body, enemy action, civil disturbance, fire or unavoidable casualties.

"Franchise Agreement" - this Franchise Agreement as from time to time amended and supplemented by mutual written agreement of the City and the Owner.

"Franchise" - the rights of the Owner that were issued, granted, and sanctioned to the Owner by the League (as defined herein), authorizing the Owner to field and operate the Team as a competing member team of the League.

"Home Games" - professional ice hockey games in which the Team is the "host" team, including regular season games and post-season games, in competition with other members of the League, but excluding preseason games, exhibition games and League-sanctioned games played outside of the City of Dallas even though the Owner is designated as the "home team" by the League.

"League" - the association of member franchise owners, headquartered in New York, New York, which sanctions and authorizes competitive professional ice hockey games in various cities and towns under the name the National Hockey League ("NHL") and its successors.

"Lease" - that certain Lease Agreement by and among the City and the Arena Group executed and delivered in accordance with the Master Agreement and any and all amendments thereto.

"Lessee" - the meaning assigned to such term in the Lease.

"Master Agreement" - the meaning assigned to such term in the preamble above and any and all amendments thereto.

"Master Agreement Guaranties" - the guaranties of the Owner and the Mavericks delivered to the City in accordance with the Master Agreement and any and all amendments thereto.

"Mavericks" - Dallas Basketball Limited, a Texas limited partnership and its successors and assigns.

"Operational Date" - the meaning assigned to such term in the Lease.

"Operator" - any person or entity (other than the Owner) who may be granted the right from time to time to possess and operate the Arena Project. If a third party is not granted such rights, then such term shall mean the City.

"Owner" - Dallas Stars, L.P. and any successor in interest to the ownership rights in the Franchise and the Team including a purchaser or mortgagee (that acquires such rights by foreclosure or otherwise) of such ownership rights.

"Owner Sublease" - the Club Sublease executed by the Owner and any and all amendments thereto.

"Rent and Performance Guaranties" - the provisions of the Owner Sublease and a similar Club Sublease executed by the Mavericks conforming to section 5.5 of the Lease, and, if nonconforming, then the provisions of section 5.5 of the Lease.

Copy from re:SearchTX

"Reunion Arena" - the professional basketball and ice hockey arena belonging to the City that is used by the Owner to conduct the Home Games on the date hereof.

"Team" - collectively, the players, coaches, trainers and administrative employees who represent the Franchise from time to time in competitive ice hockey games in the League, known as the "Dallas Stars."

"Term" - the period commencing on the Commencement Date and ending on the date of the thirtieth (30th) anniversary of the Operational Date.

## ARTICLE II

## LOCATION AND OTHER TEAM OBLIGATIONS

Section 2.1     Location Commitment. Subject to the rights of termination set forth in Section 2.5, and to the exculpatory provisions set forth in Section 2.3, throughout the Term, the Owner shall continuously designate the City as the location (a) in which the Home Games shall be played, and (b) in which the principal corporate and executive offices of the Team shall be maintained.

Section 2.2     Sales or Mortgages of Franchise.

(a)     The Owner may at its sole election at any time or from time to time assign, sell or otherwise transfer, or place security interests or mortgage liens (collectively, the "Lien(s)") upon, any and all ownership rights in the Franchise; provided, however, that any such assignment, sale or Liens shall be made or granted subject to the requirements and obligations of Owner under this Franchise Agreement, so that any person who acquires the Franchise (i) pursuant to any such assignment or sale, or (ii) pursuant to any foreclosure or other transaction under any such Liens, shall take the Franchise strictly subject to the requirements and burdens imposed on the Owner by this Franchise Agreement and such person shall thereafter be deemed the Owner for the purposes of this Agreement. Upon any such assignment or purchase or granting of any such Liens, Owner shall obtain from each such assignee, purchaser or any Lien holder, as the case may be, a written acknowledgment and acceptance of the terms, provisions and restrictions contained herein and shall provide an executed copy thereof to the City, or in the case of a purchase pursuant to a foreclosure or otherwise under such Lien, shall state in the instrument creating such Lien that any sale is subject to the terms of this Agreement.

(b)     In the event involuntary liens or material encumbrances are placed on the Franchise that, upon foreclosure, would result in a violation of this Franchise Agreement, the Owner will use its good faith efforts to promptly remove such liens or material encumbrances after reasonable contest periods (or provide security against the same reasonably acceptable to the City).

Section 2.3     Team Play of Home Games. Subject to the rights of termination set forth in Section 2.5, the Owner:

(i)     shall (A) during the period commencing on the Commencement Date and ending on the Operational Date, and (B) during any period thereafter if the Arena Project is not available for playing Home Games by reason of Force Majeure, but not beyond the Term, provided that Reunion Arena remains configured substantially as it was configured as of the Commencement Date with access to patron parking for Home Games in an amount and walking-distance to Reunion Arena comparable to the parking that was provided to patrons for Home Games during December, 1997, is in a condition of repair, operation and maintenance equivalent to such conditions as of the Commencement Date and is available and

Copy from re:SearchTX

satisfies the requirements of the League as a venue for playing the Home Games, cause the Team to play all of its Home Games at Reunion Arena; and

    (ii)     shall, during the Term other than for those periods referred to in (i) above, cause the Team to play all of its Home Games at the Arena.

Notwithstanding the provisions of subparagraphs (i) and (ii) above, if at any time neither Reunion Arena nor the Arena Project shall be suitable for playing Home Games by the Team, by reason of the configuration or condition of Reunion Arena, or Force Majeure as to the Arena Project or Reunion Arena, or is otherwise unavailable for playing Home Games, the Owner may utilize (A) any facilities located elsewhere in the North Texas area to play Home Games, or (B) the facilities of other NHL teams to play Home Games if so required by the League, in either case until such time as either Reunion Arena or the Arena Project is restored to the same conditions contemplated by, subparagraphs (i) and (ii) above, and is available for playing Home Games by the Team.

Section 2.4    Unconditional Requirements.

(a)    Owner's Unconditional Obligation. Subject to the provisions of Section 2.3 and Section 2.5, the Owner's obligations under this Franchise Agreement are not conditioned or contingent upon the completion of construction or continued suitability for use by the Team of the Arena Project, since the Owner, the Mavericks and the Arena Group have given certain assurances of such matters in the Master Agreement Guaranties, in the Rent and Performance Guaranties and in the Master Agreement.

(b)    Access to Arena. So long as the City has not terminated the Lease in accordance with its terms, the Owner and the Mavericks shall be provided access to and use of the Arena Project pursuant to the requirements of section 5.5 of the Lease. If the Lease is terminated by the City, access will be provided under and subject to the provisions of this Section 2.4.

(c)    Team Lease on Same Terms as Arena Group Lease. If the Lease is terminated by the City pursuant to the terms of the Lease, the City shall promptly thereafter tender a lease in writing (i) to both the Owner and the Mavericks (each having a 50% undivided interest as tenants in common), if neither is then in default under the Rent and Performance Guaranties, or (ii) if one of such parties is in default under the Rent and Performance Guaranties, then to such non-defaulting party, containing identical terms as the Lease, except that the term of the new lease will be for the unelapsed term of the Lease. Each non-defaulting party receiving the tendered lease under this paragraph (c) shall have 30 days after the lease is tendered to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee; provided, however, if such lease is tendered to both the Owner and the Mavericks pursuant to Section 2.4(c)(i), (A) both may accept the tendered lease as tenants in common, or (B) if only one of the Owner and the Mavericks accepts such lease, then the accepting party shall have an additional 10 days after the termination of the initial 30-day period in which to (x) waive further tender under Sections 2.4(c)(ii) or 2.4(d), or (y) designate a third party to accept the tendered lease as lessee, or accept the tendered lease itself as lessee, pursuant to either Section 2.4(c)(ii) or 2.4(d), at such accepting party's election (such accepting party, if it is the Owner, shall be treated as though it were a single non-defaulting party under the Rent and Performance Guaranties for the application of such Sections 2.4(c)(ii) and 2.4(d)). The City shall grant to the accepting party or parties, as the case may be, an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty executed by such accepting party or parties, as the case may be, shall terminate upon acceptance of the lease pursuant to this paragraph (c).

(d)    Single Non-Defaulting Party Arena Lease. If there is one defaulting party under the Rent and Performance Guaranties and the lease tendered in paragraph (c) above is not accepted within the 30 day tender period by the non-defaulting party, the City shall promptly thereafter tender a lease in writing to such non-defaulting party having and containing identical terms as the Lease, except that (i) the term of the new lease shall be for the unelapsed term of the Lease; (ii) the annual rent payable to the City by such non-defaulting party shall be the total of $1,700,000, plus the greater of (A) 50% of the annual net cash flow derived by such lessee from the operations of the Arena Project (calculated according to generally accepted accounting principles) provided that (i) all cash applied to pay debt and to pay capital expenditures (including funds placed in reserve for maintenance and capital expenditures) shall be deducted, and (ii) all game-day revenues and expenses attributable to Home Games and all rent paid by the Owner and the Mavericks up to $3,400,000 per year shall be excluded, in calculating such annual net cash flow, or (B) the amount actually collected by the non-defaulting party, as rent from the defaulting party under paragraph (f) of this section, up to $1,700,000 annually; (iii) appropriate provision shall be made for the creation of Arena Project improvement and maintenance reserves in lieu of "Annual Payments," as defined in the Lease; (iv) the tendered lease shall require the accepting lessee to provide to the defaulting party seasonal access to the Arena Project for playing the Home Games of the defaulting party upon the terms required by paragraph (f) of this section, and (v) the City shall grant to the accepting party an option to purchase the Arena Project in substantially the same form and content as the Option Contract executed on the Commencement Date by the City and the Arena Group. The Rent and Performance Guaranty executed by such non-defaulting party shall terminate upon acceptance of a lease pursuant to this paragraph (d).

The non-defaulting party receiving the tendered lease under this paragraph (d) shall have 30 days after the lease is tendered, to either designate a third party to accept the tendered lease as lessee, or to accept the tendered lease itself as lessee. If the tendered lease is not accepted, the City shall have the right to offer a lease having similar terms to a third-party Operator, or to itself become the Operator as owner of the Arena Project, subject to the requirements of paragraph (e) and (f) of this section.

(e)    Team Lease of Arena for Games Only. If no lease tendered pursuant to paragraphs (c) or (d) above is accepted by a non-defaulting party by the expiration date of the tender period under paragraph (d), the City shall, or shall cause the third-party Operator of the Arena Project to, tender to each non-defaulting party a lease for playing such non-defaulting party's Home Games at the Arena Project for the period of time equal to the unelapsed term of the Lease, and each such non-defaulting party shall accept such lease, upon the following terms:

(i)    Each non-defaulting party shall pay rent annually in the amount of $2.2 million; shall pay all game-day operating expenses of the Arena Project for its Home Games, shall retain 100% of game-day revenues for its Home Games, and shall indemnify and hold harmless the Operator for damages and claims, including expenses for defense, resulting from the Home Games conducted in the Arena. The Rent and Performance Guaranties as to the non-defaulting party and possession of the Arena Project as to all parties under the Club Sublease shall terminate upon the date the City or such third party becomes Operator.

(ii)    On an annual basis, the Operator shall pay to such non-defaulting party, so long as such non-defaulting party has paid the rent required by clause (i) above, an amount equal to 25% (or 50% if it is the only non-defaulting party) of the net cash flow derived by the Operator from the operations of the Arena Project (calculated according to generally accepted accounting principles provided that all rent paid by the Owner and Mavericks up to $3,400,000 annually, and all game-day revenues and expenses attributable to Home Games of the Owner and the Mavericks shall not be included, and all capital expenditures shall be

Copy from re:SearchTX

deducted, in calculating such annual net revenue). The Operator shall not have any responsibility, obligation or duty to maximize gross or net revenues.

(iii)    Subject to the availability of gross revenues sufficient for the purpose, the Arena Project shall be maintained in good condition and repair and operated in the configuration and with the amenities as exist as of the Operational Date and in such state that satisfies the requirements of the League for the playing of the Home Games. The Operator's obligation is limited to the availability of such revenues.

(iv)    The lease tendered to each non-defaulting party under this paragraph (e) shall be in writing, shall be in a form appropriate for such lease transaction and shall be identical to the lease tendered to the other non-defaulting party if there is one. The City (or third-party Operator) and each non-defaulting party shall act in good faith in negotiating the form of such lease pursuant to this subparagraph (e).

(f)    Obligations of Defaulting Party. If the Owner defaults under the Rent and Performance Guaranties thereby making it ineligible to receive a tendered lease pursuant to paragraphs (c), (d) or (e) of this section, the Owner's obligations under such Rent and Performance Guaranties shall not be released by reason of the City tendering a lease to the Mavericks.

If the Owner shall at any time be in default in the payment of rent in the full amount required by subparagraph (e)(i) of this section, all net cash flow payable to the Owner pursuant to subparagraph (e)(ii) of this section shall thereafter be applied to pay such past due rent until all past due rent shall have been paid in full. In no event shall the non-payment of rent under subparagraph (e)(i) excuse the Owner from continuing to play all of its Home Games in accordance with the terms of the lease entered into pursuant to paragraph (e) unless the City shall have exercised its termination rights thereunder. This covenant may be enforced by the Operator under subparagraph (e) above.

(g)    Lender Requirements. Notwithstanding anything else herein to the contrary, the City and the Owner shall negotiate in good faith to modify the provisions of the above subparagraphs of this Section 2.4 in order to facilitate the requirements of third-party lenders to the City, the Arena Group, and/or the Owner and the Mavericks in connection with the Closing of the Master Agreement.

Section 2.5    Limited Rights of Termination. Notwithstanding the other provisions of this Franchise Agreement, the Owner shall have the right to terminate this Franchise Agreement in the following, but under no other, circumstances:

(i)    Breach of Agreements. If the City defaults in its warranties and covenants in Section 3.1, or if the City defaults in any of its obligations under (A) the Master Agreement, (B) section 3.4(b), 12.1.6, or Article XV of the Lease (or similar provisions under a tendered lease), or (C) this Franchise Agreement;

(ii)    Frustration of Title. If the Master Agreement is terminated pursuant to section 8.5 of the Master Agreement; or

(iii)    Termination of Lease. If the Lease is terminated by the Lessee pursuant to sections 5.2, 5.3(b) or 11.6(b) thereof (or similar provisions of a tendered lease), or pursuant to a final, unappealable order of a court acting at the request of the Owner under section 10.1 of the Lease.

Copy from re:SearchTX

## ARTICLE III

## WARRANTIES AND SPECIAL COVENANTS

Section 3.1      By the City. The City warrants, covenants and agrees as follows:

(a)      The City is authorized by the Act and other applicable law to execute and deliver the Master Agreement, the Lease, the Option Contract, and this Franchise Agreement;

(b)      The City has irrevocably deposited its share of Project Costs (as defined in the Master Agreement), in the amount of $125,000,000, as required by the Master Agreement on the Commencement Date, from lawfully available funds and the same are not subject to withdrawal or recall for any purpose at any time except in accordance with the Master Agreement;

(c)      The City represents that, simultaneously with the execution of this Franchise Agreement, it is signing an identical franchise Agreement with the Mavericks (the "Mavericks Franchise Agreement"); and

(d)      The City will not amend the Mavericks Franchise Agreement without the prior written consent of the Owner.

Section 3.2      By the Owner. The Owner warrants, covenants and agrees as follows:

(a)      The execution and delivery of this Franchise Agreement, its Master Agreement Guaranty, and its Rent and Performance Guaranty do not violate any contract, covenant, agreement, loan document, mortgage, judgment of a court, or regulatory proceeding to which the owner is a party or is subject.

(b)      The Owner is the owner of the Franchise and the Team, has full power and authority to execute this Franchise Agreement and to honor the restrictions contained herein, and promises to keep the Franchise in full force and effect and in good standing in accordance with the contracts, rules and regulations of the League.

(c)      This Franchise Agreement is binding and enforceable against the Owner and all necessary approvals have been obtained. Upon transfer of the Franchise as referenced in Section 2.2 above and the execution by such transferee of the acknowledgment and acceptance referenced in said section, the transferor Owner shall have no further obligations under this Franchise Agreement.

## ARTICLE IV

## SPECIFIC PERFORMANCE

Section 4.1      Adoption of Act. The City and the Owner acknowledge and agree that this Franchise Agreement is an Agreement of the kind, type and substance described in Section 334.005 of the Act and that said section is applicable hereto.

Section 4.2      Acknowledgments and Findings. The Owner acknowledges and agrees that (i) the presence of the Team in the City and at the Arena Project in accordance with the terms hereof provide a unique value to the City that cannot be valued in money; and (ii) the City will suffer irrevocable injury if the Owner breaches its obligations to play the Home Games of the Team at the Arena Project when and as herein required; and, accordingly, the Owner and the City agree that this Franchise Agreement is enforceable by specific performance in the courts of the State of Texas, and by other equitable remedies, including injunctive

Copy from re:SearchTX

remedies. The Owner expressly waives the right to require the City to post any bond or other security, as a condition to the granting of any equitable relief by court.

*(Left Blank Intentionally)*

6.1\F:\FINANDAL524\10000\STAR_FRA:AGM

-8-

Copy from re:SearchTX

This Franchise Agreement has been executed and delivered on and as of the Commencement Date, as above defined and written.

CITY OF DALLAS, TEXAS

By: _____
Assistant City Manager

APPROVED AS TO FORM:

Sam Lindsay, City Attorney

By: _____
Assistant City Attorney

DALLAS STARS, L.P.,
A Delaware Limited Partnership

By: Dallas Stars GP Partners,
    A Delaware Limited Partnership,
    General Partner

    By: Hicks, Inc.,
        A Delaware Corporation,
        Managing General Partner

        By: _____
        Name: Lawrence D. Stuart Jr.
        Title: Vice President

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pam Collins on behalf of Charles Babcock
Bar No. 1479500
pcollins@jw.com
Envelope ID: 107370541
Filing Code Description: Petition
Filing Description: Original Petition and Application for Injunctive Relief
Status as of 10/28/2025 11:41 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Charles L.Babcock | | cbabcock@jw.com | 10/28/2025 11:27:49 AM | SENT |
| Chris Bankler | | cbankler@jw.com | 10/28/2025 11:27:49 AM | SENT |
| Sarah Starr | | sstarr@jw.com | 10/28/2025 11:27:49 AM | SENT |
| Laura Lisenbee | | llisenbee@jw.com | 10/28/2025 11:27:49 AM | SENT |
| Pam Collins | | pcollins@jw.com | 10/28/2025 11:27:49 AM | SENT |
| Lea Ann Del Angel | | ldelangel@jw.com | 10/28/2025 11:27:49 AM | SENT |

Copy from re:SearchTX