**<u>EXHIBIT 2</u>**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DS Liquidation L.P., *et al.*,[1] | Case No. 11-12935-PJW |
| Debtors. | Jointly Administered |

## MOTION TO ENFORCE PLAN AND CONFIRMATION ORDER

DSE Hockey Club, L.P. ("DSE Hockey Club") hereby submits this motion (the "Motion")

seeking an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"),

enforcing the *Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P. et al under Chapter*

*11 of the Bankruptcy Code (as modified)* [Dkt # 177-1] (the "Plan") and the *Findings of Fact,*

*Conclusions of Law, and Order (I) Approving the Debtors' (A) Disclosure Statement, (B)*

*Solicitation of Votes and Voting Procedures and (C) Forms of Ballots, and (II) Confirming the*

*Debtors' Joint Prepackaged Plan of Reorganization* [Dkt # 177] (the "Confirmation Order")[2]

a n d directing Dallas Sports Group, LLC and Radical Arena, Ltd. (collectively, the

"Mavericks"[3]) to dismiss with prejudice the Mavericks' Lawsuit (as defined herein), which was

brought in clear violation of the Plan and Confirmation Order. In support of this Motion, DSE

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: DS Liquidation, L.P. f/k/a Dallas Stars, L.P. (9450); Dallas Arena, LLC (9999); DS U.S. Liquidation Corp. f/k/a Dallas Stars US Holdings Corp. (0458); and SC Liquidation, LLC f/k/a Stars Centers, LLC (4430) (collectively, the "Debtors").

[2] Capitalized terms not defined herein shall have the meanings given to such terms in the Plan or Confirmation Order, as applicable.

[3] The Mavericks are the companies that currently and since December 2023 own and operate the NBA franchise known as the Dallas Mavericks. Because the franchise was owned by three different majority ownership groups during the time relevant to this Motion and the Mavericks are the successor to the two owners before them, references to the Dallas Mavericks in this Motion are to the franchise, and not any specific ownership group.

Hockey Club respectfully states as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.

2.       This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Under Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), DSE Hockey Club consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.       Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.       The statutory bases for the relief requested in this Motion are sections 105(a) and 1142 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

## BACKGROUND

**A.       The Debtors Enter the Franchise Agreement and COC Agreements, and Move to Frisco.**

5.       On July 28, 1998, Dallas Stars, L.P. (the "Stars"), one of the Debtors, and the City of Dallas entered into the Stars Franchise Agreement (the "Franchise Agreement").  At that time, the Stars owned and operated the NHL franchise known as the Dallas Stars.

6.       On September 30, 1999, Arena/Dallas Stars, Inc. ("Arena"), one of the Debtors, entered into the Agreement of Limited Partnership of Center Operating Company, L.P. (the "LP Agreement").  Also on September 30, 1999, Arena entered into the Limited Liability Company Agreement of Center GP LLC (the "LLC Agreement" and together with the LP Agreement, the

"COC Agreements").  In general, the COC Agreements govern the control over the American Airlines Center, the arena at which both the Dallas Stars and the Dallas Mavericks play their home games, including the tens of millions of dollars a year in revenue generated by that arena.

7.    In 2003, the Stars moved their corporate and executive offices and team practice facility to 2601 Avenue of the Stars, Frisco, Texas.[4]  The Dallas Mavericks were well aware of this move, as their own NBA developmental league affiliate (the Texas Legends) has played its home games at the Stars' facility at 2601 Avenue of the Stars, Frisco, Texas since 2009.[5]

**B.    The Debtors File Bankruptcy and Sell Their Assets to the Purchaser.**

8.    Eight years after the move to Frisco, on September 15, 2011, the Stars filed a voluntary petition for relief under chapter 11 in this Court [Dkt # 1; case no. 11-12935].  On the petition, the Stars disclosed their address as 2601 Avenue of the Stars, Frisco, 75034, Collin County, Texas.

9.    Also, on September 15, 2011, Arena (then known as Dallas Arena, LLC) filed a voluntary petition for relief under chapter 11 in this Court [Dkt # 1; case no. 11-12965].

10.    On September 22, 2011, this Court entered its order approving bidding procedures for the sale of the assets of the Stars, Arena and the other Debtor entities and approving the purchase agreement (the "APA") with Dallas Sports & Entertainment, L.P. and DSE Hockey Club (among others) (collectively, the "Purchaser") as the stalking horse APA (the "Sale Procedures Order") [Dkt # 83; case no. 11-12935].  The Sale Procedures Order also approved the form and sufficiency of a summary notice (the "Summary Notice").

---

[4] This location in Frisco is about 10 miles north of the Dallas city limits.

[5] This arena is now called the Comerica Center. *See* Comerica Center, *Texas Legends*, https://www.comericacenter.com/events/texas-legends (last visited Nov. 17, 2025); Comerica Center, *Arena Information*, https://www.comericacenter.com/arena-information (last visited Nov. 17, 2025)

11.    On September 22, 2011, the Debtors filed the Summary Notice [Dkt # 84; case no.

11-12935].  Relevant provisions of the Summary Notice are copied below (emphasis added):

12.   Pursuant to section 9.1 of the Prepackaged Plan, as of the Effective Date, the **Debtors shall assume and assign to the Purchaser, pursuant to sections 365(a) and (f) of the Bankruptcy Code, each executory contract and unexpired lease to which it is a party other than the Excluded Contracts**. [6]   Excluded Contracts generally include (i) the Asset Purchase Agreement and all documents related thereto, (ii) all contracts between the Debtors and any broker or investment banker related to the Asset Purchase Agreement, other than GSP Securities LLC, (iii) except as set forth on Schedule 1.1(a)(i) of the Asset Purchase Agreement, all contracts between the Debtors and any Affiliate of the Debtors or any other Hicks Affiliate (other than contracts to which the only parties that are Affiliates of the Debtors or any other Hicks Affiliate consist of (A) any Debtor and any other Debtor or (B) any Debtor and any Transferred Subsidiary), (iv) the contracts listed on Schedule 1.1(a)(ii) of the Asset Purchase Agreement, and (v) the First Lien Credit Agreement and Second Lien Credit Agreement, and all contracts related thereto. **Unless an executory contract or unexpired lease is an Excluded Contract, it will be assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code and the Asset Purchase Agreement**. . . .

13.   Because the Debtors received authority from the Bankruptcy Court to pay the prepetition claims of certain trade and other unsecured creditors consistent with the terms of such obligations existing on the Commencement Date, or with past practice, **the Debtors do not believe they will owe any monetary amounts under any executory contract or unexpired lease to be assumed and assigned to the Purchaser under section 365(b)(1) of the Bankruptcy Code ("Cure Amount").**

14.   **Any party wishing to object to such assumption or assumption and assignment, or to assert that a Cure Amount is owed must follow the instructions described herein for filing objections to the Prepackaged Plan** and, with any objection, include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates. **Any counterparty that does not object to the assumption or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, shall be deemed to have consented to such assumption or assumption and assignment. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy**

---

[6] The Franchise Agreement and COC Agreements are clearly not Excluded Contracts, and the COC Agreements are specifically referenced as a purchased asset in the APA (defined as COC Equity Interests).

**Code approving the executory contract or unexpired lease assumption
or assumption and assignment as of the Effective Date and, for all
assumed contracts and leases, shall constitute an adjudication of the
accuracy of the Debtors' proposed Cure Amounts. A failure to contest
such accuracy through an objection to confirmation of the
Prepackaged Plan will waive a counterparty's right to any other or
additional Cure Amount, including the payment of any unpaid claims
on the contract or lease.**

16.    Objections, if any, to the adequacy of the Disclosure Statement,
approval of the Prepetition Solicitation Procedures, **the Sale of the
Purchased Assets, the Assumption and Assignment of Certain
Executory Contracts, or the confirmation of the Prepackaged Plan
must**: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy
Procedure (the "Bankruptcy Rules") and the Local Rules for the United
States Bankruptcy Court for the District of Delaware (the "Local Rules");
(c) **be filed with the clerk of the Bankruptcy Court for the District of
Delaware, Third Floor, 824 North Market Street, Wilmington,
Delaware 19801, on or before on or before 4:00 p.m. (Eastern Time) on
October 25, 2011 (the "Objection Deadline")**; . . . UNLESS AN
OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE
WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE
BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY
GRANT THE RELIEF REQUESTED IN THE BIDDING PROCEDURES
MOTION WITHOUT FURTHER HEARING AND NOTICE.

12.    On October 3, 2011, the Debtors filed an Affidavit of Service [Dkt # 101; case no.

11-12935] stating that, on September 27, 2011, the Summary Notice was served on (i) the City of

Dallas (p. 8); (ii) the Dallas Mavericks (p. 125); (iii) Texas D League Management, LLC (p. 26

and 417)[7]; (iv) three different attorneys at Jackson Walker, LLP, the Mavericks' counsel (p. 200

& 201)[8]; and (v) Center Operating Company, L.P. (p. 8 & 95).

13.    On October 6, 2011, the Debtors also filed their Affidavit of Publication [Dkt #

---

[7] As addressed below, this is the entity that owned the Texas Legends, the Dallas Mavericks' developmental team.

[8] It is unclear who Jackson Walker represented in the bankruptcy case, but it is significant that they were aware of the Stars' prior bankruptcy case and what occurred in it. Jackson Walker is a large law firm with a highly sophisticated practice, including bankruptcy practice. The firm has represented numerous debtors in bankruptcy mega-cases in the Southern District of Texas, and clearly understands the importance and effect of a confirmed plan and a confirmation order. *See e.g. In re J.C. Penney Direct Mktg. Servs., LLC* (20-20184); *In re Neiman Marcus Grp. LTD LLC, et al.* (20-32519); *In re Stage Stores, Inc., et al.* (20-32564); *In re Chesapeake Energy Corp., et al.* (20-33233); *In re Chesapeake Expl., LLC, et al.* (20-33239); *In re McDermott Int'l Inc., et al. (20-30336).*

105; case no. 11-12935] stating that the Summary Notice was published in the September 27, 2011 editions of The Wall Street Journal (National Edition) and The Dallas Morning News.

14.     On October 17, 2011, the Stars filed their Statement of Financial Affairs [Dkt # 124; case no. 11-12935] showing in multiple places the Stars' address as 2601 Avenue of the Stars, Frisco, Texas, including the address of all executive officers of the Stars and the location of the Stars' books and records and inventory.

15.     At no point did the City of Dallas, the Dallas Mavericks, Center Operating Company, L.P. or any person or entity affiliated with them file an objection to the assumption of any contract or lease (including the cure amount), the sale to the Purchaser, the Plan or any other pleading filed in this bankruptcy case, including raising any issue with the Stars' location at 2601 Avenue of the Stars, Frisco, Texas.  In fact, at this time the Dallas Mavericks' own developmental league team Texas Legends, which was owned by Donnie Nelson (then the Dallas Mavericks' General Manager and President), was playing its home games at the Stars' facility at 2601 Avenue of the Stars, Frisco, Texas **under a sub-lease with the Stars**.[9]  Thus, it seems extremely unlikely that, during the bankruptcy case in late 2011, the Dallas Mavericks did not know 2601 Avenue of the Stars, Frisco, Texas was the Stars' location or that they would raise an objection to such location considering their own ongoing use of that facility through the sublease.[10]

---

[9] The Texas Legends' use and sublease of the Stars' Frisco facility was disclosed on pages 1 and 12 of the Disclosure Statement (Dkt # 15, case No. 11-12935].  In 2011, the Comerica Center was called the Dr. Pepper Arena. *See* Press Release,  Texas Hockey Stars, *Comerica Bank Announce Naming Rights Agreement for Comerica Center* (Jan. 18, 2019),  https://www.nhl.com/stars/news/dallas-stars-comerica-bank-announce-naming-rights-agreement-for-comeri-303996194 (last visited Nov. 17, 2025).  As noted above, the Texas Legends received the Summary Notice and, thus, were aware of the Stars' bankruptcy case.

[10] Interestingly, Donnie Nelson's tenure with the Dallas Mavericks ended in messy litigation, including over the Texas Legends. *See* WFAA Staff, WFFA, *Ex-GM Donnie Nelson Sues Dallas Mavericks, Claims One of Mark Cuban's Executives Sexually Assaulted his Nephew,*  (March 18, 2022), https://www.wfaa.com/article/news/local/ex-gm-donnie-nelson-sues-mavericks-claims-one-of-cubans-executives-sexually-assaulted-nephew-team-denies-allegation/287-bd1b9dfb-9cc1-4cee-af4e-b001cd7580a0  (last visited Nov. 17, 2025).

16.     On November 18, 2011, this Court entered the Confirmation Order.  Among other things, the Confirmation Order confirmed the Plan, ordered the assumption and assignment of contracts and leases to the Purchaser and approved the sale of the Debtors' assets to the Purchaser. A copy of the Confirmation Order is attached as Exhibit B.

17.     On November 18, 2011, the sale to the Purchaser closed and the Effective Date of the Plan occurred [Dkt # 182; case no. 11-12935].  Pursuant to the Confirmation Order, the Plan, the APA and related documents, the Purchaser acquired substantially all of the Stars' and Arena's assets, including the Franchise Agreement and the COC Agreements.

18.     For the last 14 years, the Purchaser has operated the Dallas Stars NHL franchise representing the city of Dallas and playing its home games at the American Airlines Center located in the heart of Dallas alongside the Dallas Mavericks NBA franchise.  During the Purchaser's very successful ownership after the bankruptcy sale (with a primary assist from this Court), the Dallas Stars qualified for the Stanley Cup playoffs seven times, earning one trip to the Stanley Cup Finals, three trips to the Western Conference Finals and one Art Ross Trophy winner (the Stars' longtime captain, Jamie Benn).  Jim Nill, the Dallas Stars general manager, won NHL general manager of the year three consecutive times (2023, 2024 and 2025).  Most recently, beloved Dallas Stars announcer Daryl "Razor" Reaugh was inducted into the Hockey Hall of Fame.

**C.     The Mavericks Sue the Purchaser Based on the Debtors' Pre-Bankruptcy Move to Frisco.**

19.     On October 28, 2025, the Mavericks sued DSE Hockey Club (a Purchaser) by filing their Original Petition and Application for Injunctive Relief (the "Mavericks' Lawsuit") in the First Business Court Division of the Texas Business Courts.  A copy of the Mavericks' Lawsuit is attached as Exhibit C.

20.     The Mavericks' Lawsuit alleges "In clear violation of their Franchise Agreement

with the City and [the COC Agreements] with the Mavericks, the Stars moved their principal corporate and executive offices and the team's practice facilities to 2601 Avenue of the Stars, Frisco, Texas." ¶ 43. "There is no doubt the Stars' move was, in fact, a breach . . ." ¶ 45. The Mavericks' Lawsuit likewise alleges "The Stars' move to Frisco constituted a 'Relocation Event' under the [COC Agreements], formally rendering the Stars a 'Relocation Partner' and the Mavericks, in turn, a 'Remaining Partner'" the effect of which is the Stars allegedly forfeiting all rights under the COC Agreements for the nominal sum of $110. ¶ 47.

21.    As noted above, the Stars moved to Frisco in 2003 – 8 years before the Stars' and Arena's bankruptcy cases were filed and the Purchaser acquired the Stars' and Arena's assets in that bankruptcy, and 22 years before the Mavericks' Lawsuit.

## BASIS FOR RELIEF

### A.    This Court Retained Jurisdiction to Address the Matters Raised in the Motion.

22.    Under the Plan and Confirmation Order, the Court retains **exclusive** jurisdiction with respect to a broad range of matters relating to the Plan, the Confirmation Order, and prepetition claims. Article XII of the Plan and ¶ 49 of the Confirmation Order specify that the Court retains **exclusive** jurisdiction over all matters arising out of, or relating to, the bankruptcy cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) jurisdiction to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the APA, the Plan or the Confirmation Order, and (ii) to issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan.

23.    It is well-settled that the Court can construe and interpret its own prior orders, including its Confirmation Order. *See, e.g., In re Tribune Co.,* 464 B.R. 126, 179 n.63 (Bankr. D. Del. 2011) ("The Supreme Court has recognized that a 'Bankruptcy Court plainly ha[s] jurisdiction

to interpret and enforce its own prior orders.'") (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)); *In re Continental Airlines, Inc.,* 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders."), *aff'd,* 279 F.3d 226 (3d Cir. 2002).  It is also well-settled that the relief sought in this Motion constitutes a core proceeding.  *Mesabi Metallics Co. LLC v. B. Riley FBR, Inc. (In re Essar Steel Minn. LLC),* 47 F.4th 193, 199-200 (3d Cir. 2021) (interpreting and enforcing a plan and confirmation order injunction, including related contempt proceedings, are core proceedings); *Centennial & Allegheny Univ. Hospitals-East Tenet Healthsystem Phila., Inc. v. Nat'l Union of Hosp. & Health Care Emples. (In re Allegheny Health, Educ. & Research Found.),* 383 F.3d 169, 176 (3d Cir. 2004) (interpreting and enforcing a sale order is a core proceeding).

24.    Section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to issue any order, process or judgment necessary to carry out the provisions of the Bankruptcy Code, and "gives the bankruptcy court 'the power and the jurisdiction to enforce its valid orders.'" *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) (quoting *In re Radco Merck Servs., Inc.,* 111 B.R. 684, 688-89 (N.D. Ill. 1990)); 11 U.S.C. § 105(a).

25.    The relief requested in the Motion is consistent with the Plan and the Confirmation Order.

**B.**    **The Claims Asserted by the Mavericks in the Mavericks' Lawsuit are Barred by *Res Judicata*.**

26.    The law is crystal clear--particularly in this District--that the burden to come forward with any alleged contract defaults is on the non-debtor counterparty in the face of a section 365 assumption request, and that *res judicata* bars any later assertion of those defaults if it does not.  The counterparty cannot "lie in wait" and try to assert those defaults later.  Yet that is exactly what the Mavericks are attempting to do in the Mavericks' Lawsuit, and this case is a textbook

example of why *res judicata* should apply.

27.     Judge Walsh's *Cellnet* case is a seminal case on the *res judicata* effect of an assumed contract. *In re Cellnet Data Sys.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004). In *Cellnet*, a purchaser purchased substantially all of the debtor's assets through the bankruptcy process. One of the assets included a contract (called the DSA) with counterparty NSP. The DSA contract had a requirement that the debtor was to enter into and close another agreement with NSP, called the DATA. The debtor did not enter or close this other agreement (the DATA). Roughly three years after the date the debtor failed to enter the DATA agreement, the debtor filed bankruptcy. The DSA contract was assumed and assigned to the purchaser in the bankruptcy case, and NSP did not object to the sale, the proposed assumption and assignment or the cure amount for the contract (which was listed as $0). Litigation subsequently ensued between NSP and the purchaser, and NSP raised failure to enter and close the required DATA agreement as a breach of the DSA contract.

28.     In ruling for the purchaser and against NSP (the counterparty), Judge Walsh held:

> When a bankruptcy court approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist. *In Re Lykes Bros. Steamship Co.*, 221 B.R. 881, 883 (Bankr. M.D. Fla. 1997) ("If prior to the assumption of any executory contract there is no allegation of any existing default, the order approving the contract determines that no default exists."); *In re Diamond Mfg. Co.*, 164 B.R. 189, 197 (Bankr. S.D. Ga. 1994); *NCL Corp v. Lone Star Bldg. Centers (Eastern), Inc.*, 144 B.R. 170, 179 (S.D. Fla. 1992). Thus, "the nonbankrupt party [to an executory contract] bears [the] burden to assert any defaults prior to the assumption." *In re Diamond Mfg. Co.*, 164 B.R. at 199. Where the nonbankrupt party has knowledge of facts sufficient to place the party on notice that a "potential" pre-confirmation breach has occurred, res judicata bars that party from later asserting a claim based upon the pre-petition breach. Id. at 201.
>
> NSP was aware, or reasonably should have been aware, of CellNet's pre-petition failure to execute and perform under the DATA. NSP had notice that SLB intended to assume the DSA from CellNet and that the cure amount was represented to be zero. Notwithstanding appropriate notice to

NSP, it elected not to object to the zero cure amount and the deemed cure determination. Whether through neglect (which it has not asserted) or conscious decision making (which it has not asserted), or some other unexplained reason, NSP allowed the CellNet/SLB transaction to go forward with the consequences dictated by the Order.

NSP is not allowed to simply sit back while this Court confirmed SLB's assumption of the DSA and then seek to assert against SLB claims based upon CellNet's prepetition conduct. *Id.* at 199. Rather, the cases are clear that NSP's purported claim for pre-assumption defaults is barred by the Order under the doctrine of res judicata. *See NCL Corp. v. Lone Star Bldg. Centers(Eastern), Inc.*, 144 B.R. at 180; *see also Peltz v.Worldnet Corp. (In re USN Communs., Inc.),* 280 B.R. 573, 586 (Bankr. D. Del. 2002) ("The doctrine of res judicata (or claim preclusion) precludes a party from relitigating claims that were or could have been asserted in a prior action."); *Novacare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network Inc.),* 267 B.R. 46, 52 (Bankr. D. Del. 2001); *CoreStates Bank. N.A. v. Huls America. Inc.,* 176 F.3d 187, 194 (3d Cir. 1999).

29.     Other cases in this District are similar and reinforce Judge Walsh's ruling in

*Cellnet.    See Sportsman's Warehouse, Inc. v. McGillis/Eckman Invs.-Billings, LLC (In re*

*Sportsman's Warehouse, Inc.),* Nos. 09-10990 (CSS), 2013 Bankr. LEXIS 497, at *22-23 (Bankr.

D. Del. Feb. 7, 2013). In *Sportsman's Warehouse,* Judge Walsh found

Pursuant to Count IV of the complaint, SWI asserts that its failure to purchase the Premises by December 25, 2008 was a pre-petition breach of contract and a default under the Lease that must be cured for the Lease to be assumed. But, since Landlord did not object to assumption of the Lease or the cure amount of $0.00, the default is deemed cured and Landlord's claims are barred.

The Bankruptcy Code requires that before any executory contract or lease can be assumed any default must be cured or compensated. It then goes to reason that "[w]hen a bankruptcy court approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist. Thus, the nonbankrupt party to an executory contract bears the burden to assert any defaults prior to the assumption. Where the nonbankrupt party has knowledge of facts sufficient to place the party on notice that a potential preconfirmation breach has occurred, res judicata bars that party from later asserting a claim based upon a prepetition breach."

This is exactly what occurred in this case. SWI's failure to purchase the

Premises by December 25, 2008 was a breach of contract and a default under the Lease. SWI filed the Assumption Motion seeking to assume the Lease. In order for SWI to assume the lease it was required to cure the default. However, SWI took the position that no default had occurred and that there was nothing to cure. Thus, in connection with the Assumption Motion, SWI proposed a cure amount of $0.00. Landlord received notice of the proposed assumption of the Lease and the proposed cure amount. Nonetheless, Landlord did not object. The Court then entered the Assumption Order, approving assumption of the Lease and "fixing" the cure amount at $0.00.

Under the Assumption Order approving assumption of the Lease, SWI's default for failure to purchase the Premises by December 25, 2008 was cured upon the effective date of the Plan, i.e., August 14, 2009.

*Id*. at *22-23.

30.     Judge Sontchi found make similar findings in *Goody's Family Clothing*.

As the Second Circuit stated in *In re Wireless Data,* "[t]he resolution of these claims, generally referred to as 'cure claims,' strives to restore the 'debtor-creditor relationship . . . to pre-default conditions,' bringing the contract back into compliance with its terms." Thus, entry of the Cure Order **wiped away** Debtor I's default for failure to pay the 2008 Taxes, and **brought the Leases back into compliance with their terms.** Therefore, after entry the Cure Order on October 20, 2008, Debtor I was no longer liable to SJW for the 2008 Taxes.

*In re Goody's Family Clothing, Inc.,* 443 B.R. 5, 14 (Bankr. D. Del. 2010) (emphasis added) (internal citation omitted).

31.     To the extent the Mavericks try to avoid *res judicata* by arguing that they are asserting a post-confirmation breach (a common--and commonly rejected--tactic), this fails as well.  First, the language of the Mavericks' Lawsuit belies that assertion, as it clear that the breach of the Franchise Agreement and the "Relocation Event" under the COC Agreements that the Mavericks assert are the "move" or "relocation" to Frisco, which indisputably happened in 2003. Second, this argument puts the parties in the untenable and useless position of having a contract that is cured and assumed under section 365, but then a default (the same pre-petition default that was just cured) occurs the very next day even though nothing has changed between the parties.

The Bankruptcy Code cannot possibly be this ineffectual.

32.     Courts have recognized this argument for what it is and rejected it, noting that any post-confirmation default cannot be "necessarily grounded" on the debtor's pre-petition breach. *Arriva Pharm., Inc. v. Lezdey (In re Arriva Pharm., Inc.),* 456 B.R. 419, 427 (Bankr. N.D. Cal 2011). ("[Parties] may not 'lie in wait' by failing to allege prior to the time [of assumption] that [a breach occurred], and then turn around, after [assumption], and bring a claim … that is necessarily grounded on [the] alleged prior breach."). *Arriva Pharm.* quoted the Kansas Bankruptcy Court saying  "Bankruptcy Courts generally take a dim view of parties in interest who, for tactical or opportunistic reasons 'lay in the weeds' through confirmation, only to emerge later and bedevil previously confirmed plans." *Id.* (*citing* In re ALI Props., Inc., 334 B.R. 455, 461 (Bankr. D. Kan. 2005)).

33.     In this bankruptcy case, the Debtors gave very clear notice through Summary Notice that contract counterparties had to raise any assumption issues as an objection to the Plan, or such objections would be waived (sections 12, 13, 14 and 16 of the Summary Notice). The Confirmation Order then implements these noticed provisions (sections 25 and 26 of the Confirmation Order).

34.     It is undisputed that the City of Dallas received notice of the Star's intent to assume and assign the Franchise Agreement on September 27, 2011.  It is undisputed that the City of Dallas never filed an objection to that proposed assumption and assignment.  It is undisputed that the Confirmation Order resolved any cure, adequate assurance or other assumption issues that were raised or could have been raised at that time, including the highly obvious fact that the Stars moved to Frisco in 2003 and, as repeatedly disclosed in this bankruptcy case, were still operating in Frisco at the time of their bankruptcy.  Thus, it should be undisputed that any alleged defaults under the

Franchise Agreement arising from or "necessarily grounded" in the Stars' move to Frisco in 2003 were cured and "wiped away" by entry of the Confirmation Order.[11]

35.      Likewise, it is undisputed that the Dallas Mavericks received notice of the Star's intent to assume and assign the COC Agreements on September 27, 2011.  It is undisputed that the Dallas Mavericks never filed an objection to that proposed assumption and assignment.  It is undisputed that the Confirmation Order resolved any cure, adequate assurance or other assumption issues that were raised or could have been raised at that time, including the highly obvious fact that the Stars moved to Frisco in 2003 and, as repeatedly disclosed in this bankruptcy case, were still operating in Frisco at the time of their bankruptcy.  Thus, it should be undisputed that any alleged defaults or forfeitures under the COC Agreements arising from or "necessarily grounded" in the Stars' move to Frisco in 2003 were cured and "wiped away" by entry of the Confirmation Order.

36.      Thus, the Mavericks' claims in the Mavericks' Lawsuit for breach of the Franchise Agreement and the COC Agreements or the occurrence of a "Relocation Event" under the COC Agreements based on the Star's move to 2601 Avenue of the Stars, Frisco, Texas or the Purchaser continuing to utilize that location are barred by *res judicata*, and this Court should order as such.

**C.      The Claims Asserted in the Mavericks' Lawsuit Violate the Free and Clear Sale and Plan Injunction Provisions of the Confirmation Order and the Plan.**

37.      The Mavericks are bound by the Plan and Confirmation Order. "When a bankruptcy court enters a confirmation order, it renders a final judgment." *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018).  So long as a party was given a chance to challenge the Plan, they cannot challenge it now by resisting enforcement of the Confirmation Order. *See Travelers Indem. Co.*, 557 U.S. at 153; *see also In re Arctic Glacier*, 901 F.3d at 168–69 (holding that when potential

---

[11] Because a default under the Franchise Agreement is required for a "Relocation Event" under the COC Agreements, this determination, standing alone, is dispositive.  There is no Relocation Event if there is no extant default of the Franchise Agreement.

creditors receive due process in the form of notice that they must assert any existing claims, they "are bound by the Plan, including its releases, and its res judicata effect."). Here, the Dallas Mavericks were given proper notice of the commencement of the Debtors' bankruptcy cases, the Plan, the APA, and the sale of the COC Agreements, among other things. The Dallas Mavericks had the opportunity to participate in the bankruptcy case and challenge the Plan, but elected not to do so.[12]

38. Section 13 of the Confirmation Order contains very broad free and clear language. This section provides that "the transfer of the Purchased Assets to the Purchaser under the Asset Purchase Agreement…shall vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets free and clear of all Liens, **claims (as defined in section 101(5) of the Bankruptcy Code, and including, without limitation, successor liability claims)**, encumbrances, obligations, liabilities, demands, guarantees, options, rights, restrictions, contractual commitments, rights of first refusal, or interests of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Released Liens"), including, but not limited to, (i) **those that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Purchased Assets**, or any similar rights . . . The transfer, assumption and assignment, of any of the executory contracts, shall be free and clear of all Released Liens." (emphasis added)

39. However characterized, the alleged "Relocation Event" under the COC Agreements

---

[12] See also Section 10 of the Confirmation Order regarding its binding effect.

(really a forfeiture claim based on the Debtors' prepetition conduct) would clearly fit as a "Released Lien" as defined in the Confirmation Order.  The Confirmation Order transferred the COC Agreements to the Purchaser free and clear of this interest.  If the Dallas Mavericks thought otherwise, they should have said something in 2011.  It is far too late now.

40.     Section 38 of the Confirmation Order also contains a broad plan injunction  This section provides "[A]ll Persons who have held, hold, or may hold Claims against or Equity Interest in any Debtor are permanently enjoined, from and after the Effective Date (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest …"[13]   Section 11.8 of the Plan has identical language.

41.     The Purchaser is a Released Party under section 1.88 of the Plan as a party entitled to exculpation under Section 11.4 of the Plan and a party entitled to a release under sections 11.5 and 11.6 of the Plan.

42.     Any alleged "Relocation Event" under the COC Agreements (which occurred in 2003, eight years before the Confirmation Order) and any related litigation claims arising therefrom are clearly "Claims" under the Plan, and the Mavericks are enjoined from pursuing such claims pursuant to the plain language of the Confirmation Order and the Plan.  Again, they should have raised such issues in 2011 during the bankruptcy case.

43.     Thus, the Mavericks' filing of the Mavericks' Lawsuit asserting claims related to a

---

[13] The proposed confirmation order filed on the petition date, September 15, 2011, [Dkt # 15-3; case No. 11-12935] contained identical free and clear sale language in paragraph 13 and plan injunction language in paragraph 38 as the Confirmation Order that was ultimately entered two months later.  Thus, the Dallas Mavericks were on notice during the entirety of the Bankruptcy Case that this relief was being sought, but took no action.

"Relocation Event" under the COC Agreements violates the Confirmation Order and the Plan, and this Court should order as such.  This Court should also  require the Mavericks to compensate DSE Hockey Club for all costs and expenses incurred related to the Mavericks' violation of the Confirmation Order and the Plan.

## NOTICE

44.     Notice of this Motion will be provided to: (a) the Office of the U.S. Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Mavericks; (d) Jackson Walker, LLP, counsel for the Mavericks; (e) any party that has requested notice under Bankruptcy Rule 2002; and (f) all parties entitled to notice under Local Rule 9013-1(g).  DSE Hockey Club respectfully submits that such notice is sufficient, and no further notice of this Motion is required under the circumstances.

**WHEREFORE**, DSE Hockey Club respectfully requests that the Court enter the Proposed Order granting the relief requested in the Motion and such other relief as the Court deems appropriate under the circumstances.

Dated:  November __, 2025
Wilmington, Delaware

BLANK ROME LLP

By: _____
Stanley B. Tarr (No. 5535)
Lawrence R. Thomas III (No. 6935)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:  (302) 425-6400
Email:  stanley.tarr@blankrome.com
        lorenzo.thomas@blankrome.com

John E. Lucian (*pro hac vice forthcoming*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 569-5500
Email:  john.lucian@blankrome.com

-and-

WINSTEAD PC
Joshua M. Sandler (*pro hac vice forthcoming*)
Phillip L. Lamberson (*pro hac vice forthcoming*)
Cory C. Johnson (*pro hac vice forthcoming*)
Frank O. Carroll III (*pro hac vice forthcoming*)
Annmarie Chiarello (*pro hac vice forthcoming*)
Ben Hamel (*pro hac vice forthcoming*)
John David Janicek (*pro hac vice forthcoming*)
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Email:  jsandler@winstead.com
Email:  plamberson@winstead.com
Email: cjohnson@winstead.com
Email:  achiarello@winstead.com
Email: focarroll@winstead.com
Email: bhamel@winstead.com
Email: jjanicek@winstead.com

**COUNSEL FOR DSE HOCKEY CLUB, L.P.**

**<u>Exhibit A</u>**

**(Proposed Order)**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DS Liquidation L.P., *et al.*,[14] | Case No. 11-12935-PJW |
| Debtors. | Jointly Administered |

## ORDER GRANTING MOTION TO ENFORCE PLAN AND CONFIRMATION ORDER

Upon the motion (the "Motion")[15] of DSE Hockey Club, L.P. ("DSE Hockey Club") for entry of an order (this "Order") enforcing the Plan and Confirmation Order and this Court having found that (i) this Court has jurisdiction to consider the Motion and the relief requested in the Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (iv) venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) notice of the Motion and opportunity for a hearing were adequate and appropriate under the circumstances and no other or further notice need be provided; and this Court having reviewed the Motion and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief

---

[14] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: DS Liquidation, L.P. f/k/a Dallas Stars, L.P. (9450); Dallas Arena, LLC (9999); DS U.S. Liquidation Corp. f/k/a Dallas Stars US Holdings Corp. (0458); and SC Liquidation, LLC f/k/a Stars Centers, LLC (4430) (collectively, the "Debtors").

[15]      Capitalized terms not defined herein shall have the meanings given to such terms in the Plan or Confirmation Order, as applicable.

granted in this Order; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      The Mavericks' claims in the Mavericks' Lawsuit for breach of the Franchise Agreement and the COC Agreements or the occurrence of a "Relocation Event" under the COC Agreements based on the Stars' move to 2601 Avenue of the Stars, Frisco, Texas or the Purchaser continuing to utilize that location are barred by *res judicata* based on the entry of the Confirmation Order.

3.      The Mavericks' filing of the Mavericks' Lawsuit asserting claims related to a "Relocation Event" under the COC Agreements violates paragraph 13 of the Confirmation Order.

4.      The Mavericks' filing of the Mavericks' Lawsuit asserting claims related to a "Relocation Event" under the COC Agreements violates paragraph 38 of the Confirmation Order and paragraph 11.8 of the Plan.

5.      The Mavericks are directed to dismiss the Mavericks' Lawsuit with prejudice within three days after entry of this Order.

6.      The Mavericks are directed to file proof of such dismissal of the Mavericks' Lawsuit with this Court three days after entry of this Order.

7.      Within three days after entry of this Order, the Mavericks will pay all costs and expenses incurred by DSE Hockey Club related to the Mavericks' Lawsuit and the Motion.  To the extent there is a dispute about such costs and expenses, the Court will hear the matter on normal notice to the parties.

8.      This Court retains jurisdiction with respect to all matters arising from or related to the enforcement of this Order.

**Exhibit B**

**(The Confirmation Order)**

**ORIGINAL**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
                                                              :
In re                                                         :   Chapter 11
                                                              :
DALLAS STARS, L.P., et al.¹                                   :   Case No. 11-12935 (PJW)
                                                              :
        Debtors.                                              :   Jointly Administered
                                                              :
------------------------------------------------------------  x   Re: Docket Nos. 14, 15, 16, 122, 140, 141,
                                                                  159, 160, 165, 166 & 167
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
(I) APPROVING THE DEBTORS' (A) DISCLOSURE STATEMENT PURSUANT
TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (B) SOLICITATION
OF VOTES AND VOTING PROCEDURES, AND (C) FORMS OF BALLOTS, AND
(II) CONFIRMING THE DEBTORS' JOINT PREPACKAGED PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dallas Stars, L.P. ("Dallas Stars"), Dallas Arena LLC ("Dallas Arena"), Dallas

Stars U.S. Holdings Corp. ("U.S. Holdings"), and StarCenters LLC ("StarCenters"), as debtors

and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"),

having jointly proposed and filed with the United States Bankruptcy Court for the District of

Delaware (the "Court") the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al.

Under Chapter 11 of the Bankruptcy Code, dated as of September 1, 2011 [Docket No. 14], as

modified by the Modification to Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P.,

et al. Under Chapter 11 of the Bankruptcy Code, dated September 1, 2011 [Docket No. 159]

(the "Prepackaged Plan"), a conformed copy of which is annexed hereto as Exhibit A; and that

certain supplement to the Prepackaged Plan, dated and filed with the Court on October 17, 2011

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification
number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corp. (0485), and
StarCenters LLC (4430).

[Docket No. 122] (as the documents contained therein have been or may be further amended or supplemented, including as supplemented on November 10, 2011 [Docket No. 160], the "Prepackaged Plan Supplement"); the Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.*, Under Chapter 11 of the Bankruptcy Code, dated September 15, 2011 (the "Disclosure Statement") [Docket No. 15]; and ballots for voting on the Prepackaged Plan, in the forms attached as Exhibit A (Classes 2A through 2D) and Exhibit B (Classes 3A through 3D) to the Declaration of Craig E. Johnson of the Garden City Group, Inc. Certifying the Forms of Ballots Used in the Solicitation of Votes on the Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code [Docket No. 167] (the "Johnson Supplemental Declaration"), having been duly transmitted to holders of Claims[2] in compliance with the procedures (the "Solicitation Procedures") set forth in the Declaration of Craig E. Johnson of the Garden City Group, Inc. Certifying the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code, sworn to by Craig E. Johnson of The Garden City Group, Inc. and filed with the Court on September 15, 2011 [Docket No. 16] (the "Voting Certification"); and the Court having entered an order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (b) Approving the Proposed Buyers' Asset Purchase Agreement as a Stalking Horse Asset Purchase Agreement; (c) Approving Bid Protections; (d) Scheduling a Combined Hearing to Consider:  (1) Approval of the Disclosure Statement, (2) Approval of the Solicitation Procedures and Forms of Ballots, (3) Confirmation of the Prepackaged Plan, and (4) Approval of the Sale; (e) Establishing a Deadline to Object to the Disclosure Statement, Sale and the

---

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Prepackaged Plan or the Bidding Procedures and Confirmation Scheduling Order.

2

Prepackaged Plan; (f) Approving the Form and Manner of Notice Thereof; and (g) Granting Any Related Relief (the "Bidding Procedures and Confirmation Scheduling Order") [Docket No. 83], which, among other things, scheduled the hearing to approve the Disclosure Statement for November 23, 2011 at 9:30 a.m., to be immediately followed by a hearing to consider confirmation of the Prepackaged Plan (the "Confirmation Hearing"); and the Confirmation Hearing subsequently having been rescheduled to November 18, 2011 at 9:30 a.m. pursuant to the Notice of Rescheduled Combined Hearing to (a) Approve Disclosure Statement, Prepetition Solicitation Procedures and Sale and (b) Confirm Prepackaged Plan [Docket No. 152]; and due notice of the Confirmation Hearings having been given to holders of Claims against and Equity Interests in the Debtors and other parties in interest in compliance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), the Bidding Procedures and Confirmation Scheduling Order, and the Solicitation Procedures, as established by the affidavits of service, mailing, and/or publication filed with the Court, including (1) Affidavit of Service of Melissa G. Melsher regarding Notice of (A) Commencement of Chapter 11 Cases, (B) Bidding Procedures, (C) Combined Hearing to Approve Disclosure Statement, Prepetition Solicitation Procedures, and Sale and to Confirm Prepackaged Plan, (D) Assumption and Assignment of Certain Executory Contracts, and (E) Establishment of Objection Deadline –and– Summary of Prepackaged Plan of Reorganization [Docket No. 101]; (2) Affidavit of Service of Tal Sapeika regarding Notice of (A) Commencement of Chapter 11 Cases, (B) Bidding Procedures, (C) Combined Hearing to Approve Disclosure Statement, Prepetition Solicitation Procedures, and Sale and to Confirm Prepackaged Plan, (D) Assumption and Assignment of Certain Executory Contracts, and (E) Establishment of Objection Deadline –and– Summary of Prepackaged Plan of Reorganization [Docket No. 139]; and (3) Affidavit of Service of Tal

Sapeika regarding Notice of (A) Commencement of Chapter 11 Cases, (B) Bidding Procedures, (C) Combined Hearing to Approve Disclosure Statement, Prepetition Solicitation Procedures, and Sale and to Confirm Prepackaged Plan, (D) Assumption and Assignment of Certain Executory Contracts, and (E) Establishment of Objection Deadline –and– Summary of Prepackaged Plan of Reorganization [Docket No. 145]; and (4) the Affidavit of Melissa G. Melsher regarding publication in *The Wall Street Journal*, *National Edition* and *The Dallas Morning News* of the Summary and Notice, dated October 6, 2011 [Docket No. 105] (the "Notice Affidavits"), and such notice being sufficient under the circumstances and no further notice being required; and due notice of the Prepackaged Plan Supplement is good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures and the Local Rules and no other or further notice is or shall be required; and based upon and after full consideration of the entire record of the Confirmation Hearings, including (A) the Disclosure Statement, the Prepackaged Plan and the Voting Certification, (B) the Debtors' Memorandum of Law in Support of the Debtors' Request for an Order (I) Approving the Debtors' (A) Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballots, and (II) Approving the Sale and Confirming the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code, dated November 14, 2011 [Docket No. 165] (the "Confirmation Memorandum"), and (C) the Declaration of Robert L. Hutson in Support of Debtors' Request for an Order (I) Approving the Debtors' (A) Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballots, and (II) Approving the Sale and Confirming the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under

4

Chapter 11 of the Bankruptcy Code, dated November 14, 2011 (the "Hutson Supplemental Declaration") [Docket No. 166]; objections, if any, to the approval of the Disclosure Statement or confirmation of the Prepackaged Plan all being withdrawn or overruled; and the Court being familiar with the Disclosure Statement and the Prepackaged Plan and other relevant factors affecting the Debtors' Chapter 11 Cases; and the Court being familiar with, and having taken judicial notice of, the entire record of the Debtors' Chapter 11 Cases; and upon the arguments of counsel and the evidence proffered and adduced at the Confirmation Hearings; and the Court having found and determined that the Disclosure Statement should be approved and the Prepackaged Plan should be confirmed as reflected by the Court's rulings made herein and at the Confirmation Hearings; and after due deliberation and sufficient cause appearing therefor; the Court hereby FINDS, DETERMINES, AND CONCLUDES that:

## FINDINGS OF FACT

A. <u>Findings and Conclusions</u>. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. <u>Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>. The Court has jurisdiction over the Debtors' Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Approval of the Disclosure Statement and confirmation of the Prepackaged Plan are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto. The Debtors are eligible debtors under section 109 of the Bankruptcy Code.

RLF1 5595295v. 1

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

C. **Chapter 11 Petitions.** On September 15, 2011 (the "Commencement Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed pursuant to section 1104 of the Bankruptcy Code. No statutory committee of unsecured creditors has been appointed pursuant to section 1102 of the Bankruptcy Code. Further, in accordance with an order of this Court, the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

D. **Judicial Notice.** The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

E. **Burden of Proof.** The Debtors have the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence. Each Debtor has met such burden.

F. **Adequacy of Disclosure Statement.** The Disclosure Statement (a) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Prepackaged Plan, and the transactions contemplated therein, and (b) is approved in all respects.

6

RLF1 5595295v. 1

G.      Voting. As evidenced by the Voting Certification, votes to accept or reject the Prepackaged Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and applicable nonbankruptcy law.

H.      Solicitation. Prior to the Commencement Date, the Prepackaged Plan, the Disclosure Statement, and the Ballots, and, subsequent to the Commencement Date, notice of the Confirmation Hearings, were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, and the Bidding Procedures and Confirmation Scheduling Order. The forms of the Ballots adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for holders of Classes 2A through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) – the Classes of Claims entitled to vote to accept or reject the Prepackaged Plan. The period during which the Debtors solicited acceptances to the Prepackaged Plan was a reasonable period of time for holders to make an informed decision to accept or reject the Prepackaged Plan. The Debtors were not required to solicit votes from the holders of Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims), as each such class is unimpaired under the Prepackaged Plan and is deemed to accept the Prepackaged Plan. The Debtors also were not required to solicit votes from the holders of Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors), as each such Class receives no recovery under the Prepackaged Plan and is deemed to reject the Prepackaged Plan. As described in and as evidenced by the

Voting Certification and the Notice Affidavits, the transmittal and service of the Prepackaged

Plan, the Disclosure Statement, the Ballots, the notice of the Confirmation Hearings, and the

publication of such notice of the Confirmation Hearings (all of the foregoing, the "Solicitation")

were timely, adequate, and sufficient under the circumstances.  The Solicitation of votes on the

Prepackaged Plan complied with the Solicitation Procedures, was appropriate and satisfactory

based upon the circumstances of these Chapter 11 Cases, was conducted in good faith, and was

in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local

Rules, and any other applicable rules, laws and regulations.  The Debtors (including the Post-

Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative

Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the

NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons,

members, officers, directors, employees, and agents and their respective attorneys, financial

advisors, investment bankers, accountants, and other professionals retained by such persons, the

Post-Effective Date Debtors, and any and all affiliates, members, managers, shareholders,

partners, employees, attorneys, and advisors of the foregoing are entitled to the protection of

section 1125(e) of the Bankruptcy Code.

I.      Notice. As is evidenced by the Voting Certification and the Notice

Affidavits, the transmittal and service of the Prepackaged Plan, the Disclosure Statement, and the

Ballots were adequate and sufficient under the circumstances, and all parties required to be given

notice of the Confirmation Hearings (including the deadline for filing and serving objections to

confirmation of the Prepackaged Plan) have been given due, proper, timely, and adequate notice

in accordance with the Bidding Procedures and Confirmation Scheduling Order and in

compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and

8

applicable nonbankruptcy law and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.

        J.     <u>Prepackaged Plan Supplement</u>.  On October 17, 2011 the Debtors filed the Prepackaged Plan Supplement, which includes, among other things, drafts of Amended Corporate Organization Documents.  On November 11, 2011, the Debtors filed the Second Prepackaged Plan Supplement in Support of the Debtors' Joint Prepackaged Plan of Reorganization [Docket No. 160] (the "<u>Second Plan Supplement</u>") to (a) provide notice, pursuant to section 9.17 of the Asset Purchase Agreement, that 100% of the membership interests in Plano StarCenter, LLC will be treated as an Excluded Asset under the Asset Purchase Agreement and (b) identify Alan M. Jacobs as the Officer of the Post-Effective Date Debtors under sections 1.74 and 6.2(c) of the Prepackaged Plan.

        K.     <u>Modifications of the Prepackaged Plan</u>.  On November 11, 2011, the Debtors filed the Modification to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code [Docket No. 159] to effect a non-material clarification to the definition of "Released Parties" under section 1.88 of the Prepackaged Plan. Modifications made to the Prepackaged Plan since the Solicitation (a) complied in all respects with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and (b) do not require re-solicitation of votes with respect to the Prepackaged Plan.  Adequate and sufficient notice of such modifications has been given, no further notice is or shall be required and such modifications are approved in full, and the votes cast to accept the Prepackaged Plan are deemed to have been cast with respect to the Prepackaged Plan as so modified.

### The Sale Process

        L.     The Court held the hearing to consider the Bidding Procedures and Confirmation Scheduling Order and established (i) the Bid Deadline for any Qualified Bidder (as

RLF1 5595295v. 1

defined in the Bidding Procedures and Confirmation Scheduling Order) wishing to participate in

the Auction to submit a Qualified Bid (as defined in the Bidding Procedures and Confirmation

Scheduling Order) and (ii) the date and time for the Auction. As Dallas Sports & Entertainment,

L.P., DSE Hockey Club L.P., and DSE Hockey Centers L.P. (collectively, the "Stalking Horse")

were determined to be a Qualified Bidder pursuant to the approved Bidding Procedures and

submitted the only Qualified Bid that was received by the Bid Deadline, pursuant to the

approved Bidding Procedures, the Debtors did not hold an Auction and thus the Stalking Horse is

the Successful Bidder.

   M. "Purchaser" as used in this Order shall mean the Stalking Horse, if the

Stalking Horse closes the transaction to acquire the Dallas Stars.

   N. <u>Asset Purchase Agreement</u>. The Asset Purchase Agreement constitutes

the highest or best offer for the Debtors' assets. The Debtors' determination that the Asset

Purchase Agreement is the highest or best offer for the Debtors' assets constitutes a valid and

sound exercise of the Debtors' business judgment. The Asset Purchase Agreement and all

transactions, agreements, and documents related thereto are essential elements of the

Prepackaged Plan and entry into and consummation of the Asset Purchase Agreement is in the

best interest of the Debtors and their estates. The Debtors and the Purchaser have acted in good

faith in connection with the Prepackaged Plan, these Chapter 11 Cases, and the formulation and

confirmation of the Prepackaged Plan. Moreover, the Asset Purchase Agreement was

negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in

good faith, and from arm's length bargaining positions. Except as otherwise disclosed to the

Court, neither the Purchaser, nor any of its affiliates or their respective representatives is an

"insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

RLF1 5595295v. 1

Neither the Debtors, nor the Purchaser, nor any of their respective agents or representatives have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code had the purchase of the Debtors' assets been conducted pursuant to section 363 of the Bankruptcy Code, or other applicable law. Specifically, neither the Purchaser nor any of its representatives have acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders. The terms and conditions of the Asset Purchase Agreement and the transactions contemplated thereby (including, without limitation. the consideration provided in respect thereof) are fair and reasonable and shall not be avoided under the Bankruptcy Code or other applicable law.

O.     Good Faith of the Purchaser. The Purchaser is, in all respects, a good faith purchaser of the Purchased Assets purchased pursuant to the Asset Purchase Agreement and is, therefore, entitled to all of the protections afforded thereby, including the protections of section 363(m) of the Bankruptcy Code to the fullest extent possible. The Purchaser acquired all rights in the Purchased Assets in good faith reliance on the Confirmation Order, including, without limitation, the portions thereof relating to the transfer of the Debtors' assets free and clear of any and all interests, except as set forth in the Asset Purchase Agreement.

P.     Fair Consideration. The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement constitutes reasonably equivalent value or fair consideration under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and the laws of the United States, any state, territory, possession thereof, or the District of Columbia. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code and/or under the laws of the United States, any state, territory, possession thereof, or the District of

11

Columbia. Neither the Debtors nor the Purchaser entered into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent conveyance and fraudulent transfer claims. The Asset Purchase Agreement represents a fair and reasonable offer to purchase the Debtors' assets under the circumstances of these Chapter 11 Cases. Based on the record at the Confirmation Hearing, no other person or entity or group of entities, other than the Purchaser, has offered to purchase the Debtors' assets on terms that would give greater economic value to the Debtors' estates. Approval of the Asset Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, and all other parties in interest.

Q.     <u>Stalking Horse Senior Secured Credit Agreement</u>. The Stalking Horse Senior Secured Credit Agreement and the other Loan Documents (as defined therein) (collectively, the "<u>Stalking Horse Senior Secured Credit Facility</u>") have been negotiated in good faith and on an arms' length basis and each party thereto may rely upon the provisions of this Order in closing the Stalking Horse Senior Secured Credit Facility. The financial accommodations to be extended pursuant to the Stalking Horse Senior Secured Credit Facility are being extended in good faith, for legitimate business reasons, are reasonable, and shall not be subject to recharacterization for any purpose whatsoever, and shall not constitute preferences or fraudulent transfers under the Bankruptcy Code or any other applicable nonbankruptcy law.

<u>**Compliance with the Requirements of Section 1129 of the Bankruptcy Code**</u>

R.     <u>Prepackaged Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016, the Prepackaged Plan is dated and identifies the Debtors as proponents, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

12

(a)     Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  In addition to Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims, which need not be classified, Articles III and IV of the Prepackaged Plan classify thirty three Classes of Claims and Equity Interests.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Prepackaged Plan.  The Prepackaged Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)     Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Articles III, IV and V of the Prepackaged Plan specify that Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims), are unimpaired under the Prepackaged Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)     Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles III, IV and V of the Prepackaged Plan designate Classes 2A through 2D (First Lien Secured Claims), Classes 3A through 3D (Second Lien Secured Claims), Classes 8A through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) as impaired within the meaning of section 1124 of the Bankruptcy Code and specify the treatment of the Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

13

(d)     No Discrimination (11 U.S.C. § 1123(a)(4)).  The Prepackaged Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to or elected a less favorable or different treatment of such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)     Implementation of the Prepackaged Plan (11 U.S.C. § 1123(a)(5)).  The Prepackaged Plan and the various documents and agreements set forth in the Prepackaged Plan Supplement provides adequate and proper means for the implementation of the Prepackaged Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including (i) the continued corporate existence of the Debtors, (ii) the process for designation of the Officer of the Post-Effective Date Debtors, (iii) consummation of the transactions contemplated by the Asset Purchase Agreement (including the assumption by the Debtors of executory contracts and unexpired leases, and assignment of such contracts and leases to the Purchaser) and by the Stalking Horse Senior Secured Credit Agreement, (iv) the cancellation of certain liens, (v) the vesting of the assets of the Debtors' estates in the Post-Effective Date Debtors, (vi) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents related to the foregoing, and (vii) provisions for the dissolution, consolidation, or other termination of legal existence of the Post-Effective Date Debtors.

(f)     Non-Voting Equity Securities / Allocation of Voting Power (11 U.S.C. § 1123(a)(6)).  The Amended Corporate Organizational Documents of each of the Debtors that is a corporation, as set forth in the Prepackaged Plan Supplement, and the corporate organizational documents of any Purchaser that is a corporation (the entity to which properties of the estates are being transferred under the Prepackaged Plan under section 1123(a)(5)(B) of the Bankruptcy

14

Code), include a provision prohibiting the issuance of nonvoting equity securities and provide, as to the several classes of securities possessing voting power, when there are multiple classes, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

        (g)    <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>. Section 6.2(c) of Article VI of the Prepackaged Plan contain provisions with respect to the manner of appointment of the Officer for the Post-Effective Date Debtors that is consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

        (h)    <u>Impairment/Unimpairment of Classes of Claims and Equity Interests (11 U.S.C. § 1123(b)(1))</u>. Pursuant to Article III, IV, and V of the Prepackaged Plan, (a) Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) are unimpaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code, and (b) Classes 2A through 2D (First Lien Secured Claims), Classes 3A through 3D (Second Lien Secured Claims), Classes 8A through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) are impaired.

        (i)    <u>Assumption and Rejection (11 U.S.C. § 1123(b)(2))</u>. Article IX of the Prepackaged Plan addresses the assumption and rejection of executory contracts and unexpired leases, and meets the requirements of section 365(b) of the Bankruptcy Code. There have been

15

no objections to the Debtors' assumption of executory contracts and unexpired leases pursuant to Article IX of the Prepackaged Plan.

(j)     Settlement, Adjustment and Retention of Claims and Interests (11 U.S.C. § 1123(b)(3)(A) and 1123(b)(3)(B)). Section 11.7 of the Prepackaged Plan provides that on the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession. Thus, the Prepackaged Plan complies with sections 1123(b)(3)(A) and 1123(b)(3)(B) of the Bankruptcy Code.

(k)     Sale of Substantially All Assets (11 U.S.C. § 1123(b)(4)). The Prepackaged Plan provides for the Sale on the Effective Date of substantially all of the assets of the Debtors. As a result of the Sale and in accordance with the terms of the Prepackaged Plan, all holders of Allowed Administrative Expense Claims, the CFV Claim and Allowed Assumed General Unsecured Claims against the Debtors will receive payment in full of their allowed claims. In addition, all holders of First Lien Secured Claims and, because each of Classes 3A-3D voted to accept the Prepackaged Plan, all holders of Second Lien Secured Claims will receive distributions from the Sale. Thus, the Prepackaged Plan complies with section 1123(b)(4) of the Bankruptcy Code.

(l)     Unaffected Rights of Holders of Classes of Claims (11 U.S.C. § 1123(b)(5)). The Prepackaged Plan leaves unaffected the rights of holders of Claims in Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A

16

through 7D (Assumed General Unsecured Claims). Thus, the Prepackaged Plan complies with section 1123(b)(5) of the Bankruptcy Code.

(m) <u>Additional Plan Provisions (11 U.S.C. § 1123(b)(6))</u>. The provisions of the Prepackaged Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

(n) <u>Debtors Are Not Individuals (11 U.S.C. § 1123(c))</u>. The Debtors are not individuals, and accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

(o) <u>Cure of Defaults (11 U.S.C. § 1123(d))</u>. Sections 9.1 and 9.2 of the Prepackaged Plan provide that the Purchaser will promptly pay the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtors under the Prepackaged Plan, and provide each contract counterparty an opportunity to object to and be heard by the Court with respect to such proposed cure amount. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption and assignment, Cure shall occur within seven days following the entry of a Final Order of the Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be. Thus, the Prepackaged Plan complies with section 1123(d) of the Bankruptcy Code.

S. <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the applicable provisions of the Bankruptcy Code. Specifically:

17

(a)     Each of the Debtors is an eligible debtor under section 109 of the Bankruptcy Code; and

(b)     The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court, and in transmitting the Prepackaged Plan, the Prepackaged Plan Supplement, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating the votes on the Prepackaged Plan, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126(b), the Bankruptcy Rules, the Local Rules, applicable nonbankruptcy law, the Bidding Procedures and Confirmation Scheduling Order, and all other applicable law.

T.     Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). The Debtors have proposed the Prepackaged Plan (and all related documents, including the Asset Purchase Agreement) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Debtors proposed the Prepackaged Plan with the honest purpose of selling substantially all of the assets of the Debtors and expeditiously distributing value to creditors, and they have thus met their good faith obligations under section 1129(a)(3) of the Bankruptcy Code. The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearings and other proceedings held in these Chapter 11 Cases. The Prepackaged Plan (including the Asset Purchase Agreement, the Stalking Horse Senior Secured Credit Agreement, and all other documents necessary to effectuate the Prepackaged Plan) were negotiated at arms' length among representatives of the Debtors, holders of First Lien Secured Claims, the First Lien Administrative Agent, holders of Second Lien Secured Claims, the Second Lien Administrative Agent, NHL, CFV I LLC, the Purchaser, and their respective professionals. Each of the Debtors,

18

holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second

Lien Secured Claims, the Second Lien Administrative Agent, NHL, CFV I LLC, and the

Purchaser supports the Sale of the Purchased Assets to the Purchaser and confirmation of the

Prepackaged Plan. Further, the Prepackaged Plan's classification, indemnification, exculpation,

release, and injunction provisions have been negotiated in good faith and at arms' length, are

consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy

Code, and are necessary to the proposed reorganization and the implementation of the

Prepackaged Plan.

U.      Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).

Any payment made or to be made by the Debtors for services or for costs and expenses of the

Debtors' professionals in connection with their Chapter 11 Cases, or in connection with the

Prepackaged Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to

the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy

Code.

V.      Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).  The Debtors

have complied with section 1129(a)(5) of the Bankruptcy Code.  The Debtors have identified

Alan M. Jacobs as the individual who will serve as sole officer of the Post-Effective Date

Debtors pursuant to section 6.2(c) of the Prepackaged Plan.

W.      No Rate Changes (11 U.S.C. § 1129(a)(6)).  The Prepackaged Plan does

not provide for rate changes by any of the Post-Effective Date Debtors.  Thus, section 1129(a)(6)

of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

X.      Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).  The Prepackaged Plan

satisfies section 1129(a)(7) of the Bankruptcy Code.  The Debtors entered into the Asset

19

Purchase Agreement after an intensive marketing process, both prepetition and postpetition, that ensured that they received the highest value possible for their assets under the circumstances. In a chapter 7 liquidation, the Debtors would not receive more value for their assets, the chapter 7 stigma could disrupt the Debtors' businesses and affect their value, and there would be substantial costs of liquidation. As such, under the Prepackaged Plan, each holder of a Claim or Equity Interest will receive not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

Y.     Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) are Classes of unimpaired Claims that are conclusively presumed to have accepted the Prepackaged Plan in accordance with section 1126(f) of the Bankruptcy Code. Classes 8A and through 8D (Non-Assumed General Unsecured Claims), and Classes 9A through 9D (Equity Interests in Debtors) are impaired, will not retain property or receive a distribution under the Prepackaged Plan, and are deemed to reject the Prepackaged Plan. Classes 2A through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) have voted to accept the Prepackaged Plan in accordance with sections 1126(b) and (c) of the Bankruptcy Code, without regard to the votes of insiders of the Debtors. Accordingly, the Prepackaged Plan does not comply with section 1129(a)(8) of the Bankruptcy Code.

Z.     Treatment of Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). The treatment of Allowed Administrative Expense Claims pursuant to section 2.1 of the Prepackaged Plan

20

satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code. The treatment of

Priority Non-Tax Claims pursuant to section 4.1 of the Prepackaged Plan satisfies the

requirements of section 1129(a)(9)(B) of the Bankruptcy Code. The treatment of Priority Tax

Claims pursuant to section 2.3 of the Prepackaged Plan satisfies the requirements of section

1129(a)(9)(C) of the Bankruptcy Code.

        AA.    Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). Classes 2A

through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured

Claims) voted to accept the Prepackaged Plan by the requisite majorities, determined without

including any acceptance of the Prepackaged Plan by any insider, thereby satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code.

        BB.    Feasibility (11 U.S.C. § 1129(a)(11)). The information in the Disclosure

Statement, the Hutson Supplemental Declaration, and the evidence proffered or adduced at the

Confirmation Hearing (i) is persuasive and credible, (ii) has not been controverted by other

evidence, and (iii) establishes that the Prepackaged Plan is feasible because, in the context of the

Prepackaged Plan where there will be no ongoing business for the Post-Effective Date Debtors,

the Post-Effective Date Debtors have the ability to satisfy the conditions precedent to the

Effective Date and otherwise have sufficient funds from the Post-Closing Expense Amount to

meet their post-confirmation obligations to pay for the costs of administering and fully

consummating the Prepackaged Plan, thereby satisfying the requirements of section 1129(a)(11)

of the Bankruptcy Code.

        CC.    Payment of Fees (11 U.S.C. § 1129(a)(12)). Notwithstanding anything in

the Prepackaged Plan to the contrary, all fees payable under section 1930 of title 28, United

States Code, as determined by the Bankruptcy Court at a hearing, if necessary, shall be paid for

each quarter (including any fraction thereof) until the Debtors' Chapter 11 Cases are converted, dismissed, or a final decree is entered, whichever occurs first.

DD. <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>. Section 9.4 of the Prepackaged Plan provides that except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan and assigned to the Purchaser under the Asset Purchase Agreement. The Prepackaged Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

EE. <u>No Domestic Support Obligations (11 U.S.C. § 1129(a)(14))</u>. The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

FF. <u>Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15))</u>. The Debtors are not individuals, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

GG. <u>No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16))</u>. The Debtors are each a moneyed, business, or commercial corporation, and accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

RLF1 5595295v. 1

HH.     No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).

Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D

(Equity Interests in Debtors) are deemed to have rejected the Prepackaged Plan. Based upon the

evidence proffered, adduced, and presented by the Debtors at the Confirmation Hearing, the

Prepackaged Plan does not discriminate unfairly against, and is fair and equitable with respect to,

these Classes, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because no

holder of any claim or interest that is junior to such Classes will receive or retain any property

under the Prepackaged Plan on account of such junior claim or interest, and no holder of a Claim

in a Class senior to such Classes is receiving more than 100% recovery on account of its Claim

or such Claim's treatment is a result of a valid subordination agreement under section 510(a) of

the Bankruptcy Code. Moreover, to the extent there are any Non-Assumed General Unsecured

Claims, other than Intercompany Claims and claims with certain affiliates arising out of certain

executory contracts, there is no unfair discrimination, as the unsecured claims that are receiving a

recovery are doing so at the election of the Purchaser based upon the Purchaser's determination

as to which Claims to pay. Thus, the Prepackaged Plan may be confirmed notwithstanding the

deemed rejection of the Prepackaged Plan by these Classes and non-compliance with section

1129(a)(8) of the Bankruptcy Code.

II.     Only One Plan (11 U.S.C. § 1129(c)). The Prepackaged Plan is the only

plan filed in each of these cases, and accordingly, section 1129(c) of the Bankruptcy Code is

inapplicable in these Chapter 11 Cases.

JJ.     Principal Purpose of the Prepackaged Plan (11 U.S.C. § 1129(d)). The

principal purpose of the Prepackaged Plan is not the avoidance of taxes or the avoidance of the

application of section 5 of the United States Securities Act of 1933, as amended and no

23

governmental entity has objected to the confirmation of the Prepackaged Plan on any such grounds. The Prepackaged Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

KK.    Debtors are Not a Small Business (11 U.S.C. § 1129(e)). The Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

LL.    Good Faith Solicitation (11 U.S.C. § 1125(e)). Based on the record before the Court in these Chapter 11 Cases, including evidence presented at the Confirmation Hearings, the Debtors (including the Post-Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Prepackaged Plan and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Prepackaged Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of

acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities under the Prepackaged Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation and release provisions set forth in Article XI of the Prepackaged Plan.

MM. <u>Satisfaction of Confirmation Requirements</u>. Based upon the foregoing, the Prepackaged Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

NN. <u>Implementation</u>. All documents necessary to implement the Prepackaged Plan, including those contained in the Prepackaged Plan Supplement and the Stalking Horse Senior Secured Credit Facility, and all other relevant and necessary documents have been negotiated in good faith and at arms' length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

OO. <u>Injunction, Exculpation, and Releases</u>. The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the injunction, exculpation and releases set forth in Article XI of the Prepackaged Plan. Section 105(a) of the Bankruptcy Code permits issuance of the injunction and approval of the unopposed releases set forth in Article XI of the Prepackaged Plan if, as has been established here based upon the record in these Chapter 11 Cases and the evidence presented at the Confirmation Hearings, such provisions (i) were integral to the agreement among the various parties in interest and are essential to the formulation and implementation of the Prepackaged Plan, as provided in section 1123 of the Bankruptcy Code, (ii) confer substantial benefits on the Debtors' estates, (iii) are fair, equitable and reasonable, and (iv) are in the best interests of the Debtors, their estates, and

25

parties in interest. Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the releases, exculpation, and injunction set forth in the Prepackaged Plan and implemented by this Order are fair, equitable, reasonable, and in the best interests of the Debtors, the Post-Effective Date Debtors and their estates, creditors and equity holders. The releases of non-Debtors under the Prepackaged Plan are fair and are necessary to the proposed reorganization and are supported by fair, sufficient, and adequate consideration provided by each and all of the parties receiving such releases. The record of the Confirmation Hearing and these Chapter 11 Cases is sufficient to support the releases, exculpation, and injunction provided for in Article XI of the Prepackaged Plan. Accordingly, based upon the record of these Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation Hearing, this Court finds that the injunction, exculpation, and releases set forth in Article XI of the Prepackaged Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement the injunction, exculpation and releases would seriously impair the Debtors' ability to confirm the Prepackaged Plan.

PP. _Settlement_. Except as otherwise provided in the Prepackaged Plan and this Order, the Prepackaged Plan represents a settlement among the Debtors and their creditors and equity holders of all Claims, Equity Interests and litigation against the Debtors, pending or threatened, or that was or could have been commenced against the Debtors prior to the date of entry of this Order.

QQ. _Good Faith_. The Debtors, the Purchaser, the holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the NHL, CFV I LLC, and their respective successors, predecessors, control persons, members, affiliates, officers, directors, employees, and agents and

26

their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons will be acting in good faith if they proceed to (i) consummate the Prepackaged Plan and the agreements, settlements, transactions, and transfers contemplated thereby (ii) take the actions authorized or directed by this Order and (iii) execute and consummate the Stalking Horse Senior Secured Credit Facility.

RR. <u>Valuation</u>. Based on the Qualified Bids received as a result of the Bidding Procedures and the Auction, if any, the value of the Debtors is insufficient to support a distribution to holders of Second Lien Secured Claims, Non-Assumed General Unsecured Claims, and Equity Interests in Debtors under absolute priority principles.

SS. <u>Retention of Jurisdiction</u>. The Court may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XII of the Prepackaged Plan and section 1142 of the Bankruptcy Code. For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement, NHL Agreements, and NHL/Lender Cooperation Agreement.

<u>**The Prepackaged Plan Satisfies Confirmation Requirements**</u>

TT. Based upon the foregoing, the Prepackaged Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

<u>**ORDER**</u>

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

1. <u>Findings of Fact and Conclusions of Law</u>. The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule

27

7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

      2.    <u>Notice of the Confirmation Hearings</u>. Notice of the Confirmation Hearings complied with the terms of the Bidding Procedures and Confirmation Scheduling Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

      3.    <u>Solicitation</u>. The solicitation of votes on the Prepackaged Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable nonbankruptcy law.

      4.    <u>Ballots</u>. The forms of Ballots annexed to the Johnson Supplemental Declaration are in compliance with Bankruptcy Rule 3018(c), substantially conform to Official Form Number 14, and are approved in all respects.

      5.    <u>Plan Modifications</u>. Modifications made to the Prepackaged Plan following the solicitation of votes thereon satisfied the requirements of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, there have been no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion, and no further solicitation is required.

      6.    <u>The Disclosure Statement</u>. The Disclosure Statement (i) contains adequate information of a kind generally consistent with the disclosure requirements of applicable nonbankruptcy law, (ii) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors,

28

the Prepackaged Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

7.    Confirmation of the Prepackaged Plan. The Prepackaged Plan and each of their provisions shall be, and hereby are, CONFIRMED under section 1129 of the Bankruptcy Code. The documents contained in the Prepackaged Plan Supplement are authorized and approved. The terms of the Prepackaged Plan, including the Prepackaged Plan Supplement, are incorporated by reference into and are an integral part of this Order.

8.    Objections. All Objections, responses to, and statements and comments, if any, in opposition to, the Prepackaged Plan and/or the Disclosure Statement, respectively, other than those specifically reserved, resolved, or withdrawn in their entirety prior to, or on the record at, the Confirmation Hearings, shall be, and hereby are, overruled in their entirety for the reasons stated on the record.

9.    No Action. Pursuant to section 1142(b) of the Bankruptcy Code, no action of the respective officers, directors, or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Prepackaged Plan and any contract, instrument, or other document to be executed, delivered, adopted or amended in connection with the implementation of the Prepackaged Plan.

10.    Binding Effect. Pursuant to section 1141 and the other applicable provisions of the Bankruptcy Code, on or after entry of this Order and subject to the occurrence of the Effective Date, the provisions of the Prepackaged Plan (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith, including those contained in the Prepackaged Plan Supplement) and this Order shall

29

bind the Debtors, the Post-Effective Date Debtors, all holders of Claims and Equity Interests of the Debtors (irrespective of whether such Claims or Equity Interests are impaired under the Prepackaged Plan or whether the holders of such Claims or Equity Interests accepted or are deemed to have accepted the Prepackaged Plan), each Person receiving, retaining or otherwise acquiring property under the Prepackaged Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any Person making an appearance in the Chapter 11 Cases, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

11.    [RESERVED]

12.    <u>Free and Clear</u>.  Except as otherwise provided in the Prepackaged Plan and as contemplated under the Asset Purchase Agreement, the Debtors, as Post-Effective Date Debtors, shall continue to exist on and after the Effective Date as separate Persons with all of the powers available to such legal entities under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with applicable law and the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan, the property of the Debtors' estates that is not specifically disposed of pursuant to the Prepackaged Plan or purchased by the Purchaser under the Asset Purchase Agreement, if any, shall vest in the Post-Effective Date Debtors on the Effective Date.  Except as otherwise provided in the Prepackaged Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Court.  As of the Effective Date, all property of the Post-Effective Date Debtors not sold to the Purchaser, if any, shall be free and clear of all Claims, encumbrances, charges, and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order;

*provided, however*, that any valid, perfected prepetition liens against the Debtors' assets shall attach to the assets remaining in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority, and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets. Without limiting the generality of the foregoing, the Post-Effective Date Debtors may, without application to or approval by the Court, pay professional fees and expenses incurred by the Post-Effective Date Debtors after the Confirmation Date. Notwithstanding anything to the contrary herein, the Post-Effective Date Debtors shall remain bound by the terms of the confirmed Prepackaged Plan and Confirmation Order.

13. <u>Valid Transfer</u>. On the Effective Date, the Debtors are authorized to enter into the Asset Purchase Agreement and any related agreements and take all actions necessary to effectuate the Asset Purchase Agreement and any related agreements. Prior to the transfer of the Purchased Assets to the Purchaser under the Asset Purchase Agreement on or after the Effective Date, the Debtors are and were the sole and lawful owner of such assets. Except as otherwise provided herein, in the Prepackaged Plan or in the Stalking Horse Senior Secured Credit Facility, as contemplated under the Asset Purchase Agreement and subject to the satisfaction of the conditions precedent to the Effective Date, the transfer of the Purchased Assets to the Purchaser under the Asset Purchase Agreement on or after the Effective Date shall be a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the Bankruptcy Code, and including, without limitation, successor liability claims), encumbrances, obligations, liabilities, demands, guarantees, options, rights, restrictions,

31

contractual commitments, rights of first refusal, or interests of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Released Liens"), including, but not limited to, (i) those that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Purchased Assets, or any similar rights, (ii) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing of the Sale, (iii) those arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal, or charges of any kind or nature, if any, including without limitation any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership, and (iv) those arising in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors, affiliates, or representatives, including, but not limited to, Released Liens arising under any bulk-transfer laws, doctrines of successor liability or similar theories. For the further avoidance of doubt, and without limiting the effect of any of the foregoing, except as otherwise provided in the Prepackaged Plan or as contemplated under the Asset Purchase Agreement, the transfer, assumption and assignment, of any of the executory contracts shall be free and clear of all Released Liens.

14.    Good Faith Purchaser. The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal

of the authorization provided herein shall not affect the validity of the transfer of the Purchased

Assets to the Purchaser, unless such authorization is duly stayed pending such appeal. The

Purchaser is a purchaser in good faith, and is entitled to all of the protections afforded by section

363(m) of the Bankruptcy Code.

15.     No Successor Liability.  Except as otherwise provided herein, in the

Prepackaged Plan, or the Stalking Horse Senior Secured Credit Facility or as contemplated under

the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchaser under the

Asset Purchase Agreement shall not result in the Purchaser having any liability or responsibility

(i) for any Claim against the Debtors or against an insider of the Debtors, (ii) to the Debtors or to

third parties, or (iii) for the satisfaction in any manner, whether at law or in equity, whether by

payment, setoff or otherwise, directly or indirectly, of any Released Liens.  Without limiting the

effect or scope of the foregoing, to the fullest extent permitted by law, except as otherwise

provided in the Prepackaged Plan or as contemplated under the Asset Purchase Agreement, the

transfer of the Purchased Assets from the Debtors to the Purchaser shall not subject the

Purchaser or its affiliates, successors or assigns or their respective properties (including the

Purchased Assets) to any liability for Released Liens against the Debtors in such Purchased

Assets by reason of such transfer under the laws of the United States or any state, territory, or

possession thereof, or the District of Columbia, applicable to such transactions, including,

without limitation, any bulk-transfer laws, successor liability, or similar theories.  For the

avoidance of doubt, and without limiting the effect and/or generality of any of the foregoing,

except as otherwise provided herein, in the Prepackaged Plan or the Stalking Horse Senior

Secured Credit Facility, or as contemplated under the Asset Purchase Agreement, the transfer,

RLFI 5595295v. 1

assumption, and assignment of any of the executory contracts are free and clear of all Released Liens.

      16.    <u>No Liability Findings Needed by Purchaser</u>.  The Purchaser would not have entered into the Asset Purchase Agreement and would not have consummated the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to the Purchaser, and the assumption and assignment or transfer of the executory contracts, was not free and clear of all Released Liens of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Released Liens, in each case except as otherwise provided herein, in the Prepackaged Plan, the Stalking Horse Senior Secured Credit Facility, or as contemplated under the Asset Purchase Agreement.

      17.    <u>Implementation of the Asset Purchase Agreement and Prepackaged Plan</u>. On or (as applicable) prior to the Effective Date, the Debtors and the Post-Effective Date Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Asset Purchase Agreement or the Prepackaged Plan, including those contained in the Prepackaged Plan Supplement, (or necessary or desirable to effect the transactions contemplated by the Asset Purchase Agreement or the Prepackaged Plan) in the name of and on behalf of the Post-Effective Date Debtors, including, without limitation, any and all agreements, documents, and instruments related to the foregoing. Such authorizations and approvals will be effective notwithstanding any requirements under non-bankruptcy law.

      18.    <u>Stalking Horse Senior Secured Credit Facility</u>.  Upon the occurrence of the Effective Date, the First Lien Administrative Agent shall be granted valid, perfected first priority liens on and security interests in all of the Purchased Assets (other than any Purchased Assets

that are specifically excluded from the Collateral (as defined in the Stalking Horse Senior Secured Credit Agreement) pursuant to the terms of the Stalking Horse Senior Secured Credit Facility), for the benefit of the holders of First Lien Secured Claims pursuant to the Stalking Horse Senior Secured Credit Facility and the Purchaser shall be bound by the Stalking Horse Senior Secured Credit Facility in accordance with its terms. Upon the occurrence of the Effective Date, each holder of a First Lien Secured Claim and each holder of a Second Lien Secured Claim shall (i) be bound by the terms of the Stalking Horse Senior Secured Credit Facility and, as applicable, any related Loan Documents (as defined in the Stalking Horse Senior Secured Credit Agreement) and the NHL/Lender Cooperation Agreement whether or not each holder of a First Lien Secured Claim and each holder of a Second Lien Secured Claim executes such documents (ii) shall be deemed to have appointed the First Lien Administrative Agent as the administrative agent under the Stalking Horse Senior Secured Credit Facility pursuant to the terms thereof, and (iii) shall be deemed to have authorized the First Lien Administrative Agent to take such actions as administrative agent under the Stalking Horse Senior Secured Credit Facility as are contemplated thereby, including, without limitation, executing and delivering the NHL/Lender Cooperation Agreement and any supplements or amendments thereto and executing and delivering certain post-closing collateral documents specified in the Stalking Horse Senior Secured Credit Facility.

19.    Compliance with Section 1123(a)(6) of the Bankruptcy Code. The Amended Corporate Organizational Documents of every Debtor and Purchaser that is a corporation comply in all respects with section 1123(a)(6) of the Bankruptcy Code, and are hereby approved. The adoption and filing by the Debtors and the Purchaser of such documents is hereby authorized, ratified, and approved.

RLF1 5595295v. 1

20. <u>Cancellation of Liens</u>. Except as provided herein, in the Stalking Horse Senior Secured Credit Facility and in the Prepackaged Plan, and in accordance with the Asset Purchase Agreement, upon the occurrence of the Effective Date, any Lien encumbering the Purchased Assets prior to the Effective Date shall be deemed released, and the holder of the Claim secured by such Lien shall be authorized and directed to release any Collateral or other property of the Debtors constituting Purchased Assets (including any Cash collateral) held by such holder and to take such actions as may be requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets), to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets); *provided, however*, that such Liens shall be released regardless of whether any such filing or recordings are made; *provided, further*, that any valid, perfected prepetition liens against the Debtors' assets shall attach to the assets remaining in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority, and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets. Following the Effective Date, (i) the First Lien Collateral Agent shall have the right, at its sole discretion at any time prior to dissolution of the Debtors' estates, to accept an in-kind distribution of any non-cash assets remaining in the Debtors' estates and (ii) upon dissolution of the Debtors' estates, the Post-Effective Date Debtors shall distribute any remaining cash in the estates to the First Lien Collateral Agent, in each case to be applied by the First Lien Collateral Agent in accordance with the First Lien Security Agreement. In addition, if any Person or entity that has filed financing statements, mortgages,

36

mechanic's liens, lis pendens, or other documents evidencing Liens encumbering the Purchased Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the Person or entity has with respect to the Purchased Assets, then (a) the Debtors and Post-Effective Date Debtors are authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the Person or entity with respect to the Purchased Assets and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature whatsoever.

21.     Subordination. Except as otherwise expressly provided in the Prepackaged Plan, this Order or a separate order of this Court, the classification and manner of satisfying all Claims and Equity Interests under the Prepackaged Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Except as provided in the Prepackaged Plan or in that certain letter agreement by and among the NHL, the First Lien Administrative Agent, the Second Lien Administrative Agent, Hicks Sports Group, LLC, Hicks Sports Group Holdings LLC, the Dallas Stars, Dallas Arena, HSG Partnership Holdings LLC, Texas Rangers Baseball Partners, Emerald Diamond, L.P., Southwest Sports Television, L.P., Southwest Sports Group Baseball, L.P., Dallas Stars U.S. Holdings Corp. and Starcenter LLC, dated December 19, 2006 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "NHL Letter Agreement"), all subordination rights that a holder of a Claim or Equity Interest may have with respect to any distribution to be made

RLF1 5595295v. 1

under the Prepackaged Plan shall be discharged and terminated and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Except as otherwise provided in the Prepackaged Plan or the NHL Letter Agreement, the distributions under the Prepackaged Plan to the holders of Allowed Claims and Equity Interests will not be subject to payment of a beneficiary of such subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

22. <u>NHL/Lender Cooperation Agreement</u>. If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, each holder of a First Lien Secured Claim (and Second Lien Secured Claim, if applicable) that will receive a distribution under the Prepackaged Plan shall, on account of such claim, be bound by the terms of the Stalking Horse Credit Agreement and pursuant to the terms of such agreement and this Order, the NHL/Lender Cooperation Agreement, whether or not such holder of a First Lien Secured Claim (or Second Lien Secured Claim, if applicable) executes the Stalking Horse Credit Agreement.

23. <u>Compromise of Controversies</u>. In consideration for the distributions and other benefits, including releases, provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved under the Prepackaged Plan, and the entry of this Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

24. <u>Plan Distributions</u>.

(i) On and after the Effective Date, all distributions under the Prepackaged Plan shall be effectuated in accordance with the Prepackaged Plan, including Articles IV and VII thereof.

(ii) If this Court or any other court of competent jurisdiction orders disgorgement of any distribution made by the First Lien Administrative Agent pursuant to section 7.7(b) of the Prepackaged Plan, then (i) each holder of First Lien Secured Claims shall only be required to disgorge its pro rata share of such payments and the holder of First Lien Secured

Claims shall not be jointly and severally liable for such disgorgement, and (ii) the First Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of First Lien Secured Claims and which are no longer in the First Lien Administrative Agent's possession.

(iii)    After the expiration of one year from the Effective Date, all unclaimed property or interests in property distributable under the Prepackaged Plan shall revert automatically to the Purchaser or the Post-Effective Date Debtors, as applicable, and without need for a further Order by the Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Person to such property or interest (including Equity Interest) in such property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(iv)    The provisions of Article VIII of the Prepackaged Plan, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are fair and reasonable and are approved.

25.    Assumption or Rejection of Contracts and Leases.

(i)    General. Pursuant to section 9.1 of the Prepackaged Plan, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Prepackaged Plan, as of the Effective Date, each Debtor shall be deemed to have assumed and assigned to the Purchaser each executory contract and unexpired lease to which it is a party, pursuant to section 365 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) is an Excluded Contract. Such contract and lease assumptions, assumptions and assignments, or rejections are hereby approved under sections 365 and 1123(b) of the Bankruptcy Code as of the Effective Date.

(ii)    Excluded Contracts and Rejected Contracts. On the Effective Date, any executory contracts and unexpired leases that (i) is the subject of a motion to reject

filed by the Debtors on or before the Confirmation Date or (ii) is an Excluded Contract shall be deemed rejected by the Debtors.

(iii)    Objections to Rejection, Assumption, or Assumption and Assignment.  Any party wishing to object to the rejection, assumption, or assumption and assignment of any executory contract or unexpired lease under the Prepackaged Plan was required to follow the instructions described in the Summary and Notice for filing objections to the Prepackaged Plan and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates.  Any counterparty that did not timely and properly object to the rejection, assumption, or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, shall be deemed to have consented to such rejection, assumption, or assumption and assignment.

26.    Cure and Adequate Assurance.  The Purchaser has:  (i) to the extent necessary, cured, or provided adequate assurance of cure of, any default with respect to the executory contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code; and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default with respect to the executory contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.  The Purchaser's contractual obligation to pay the cure amounts listed in the Cure Schedule (as set forth in the Summary and Notice and as may be amended by stipulations approved by the Court), and Purchaser's contractual obligation to perform under the executory contracts after the closing date constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of

40

the Bankruptcy Code. To the extent that any counterparty to an executory contract did not object to its cure amount by the applicable deadline set forth in the Bidding Procedures and Confirmation Scheduling Order, such counterparty is deemed to have consented to such cure amounts and the assignments of its respective executory contracts to the Purchaser.

27.    Rejection Claims. All Claims, if any, arising out of the rejection of executory contracts and unexpired leases by the Debtors shall be classified as Non-Assumed General Unsecured Claims and are not entitled to receive any distributions under the Prepackaged Plan. The Purchaser shall not have any liability or responsibility for any liability of the Debtors arising under or related to the Non-Assumed General Unsecured Claims.

28.    Disputed Claims. On and after the Effective Date, except as otherwise provided herein, all Claims shall be paid in the ordinary course of business of the Purchaser if assumed under the Asset Purchase Agreement. If the Debtors, the Purchaser, or any other party in interest disputes any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of Assumed General Unsecured Claims under the Prepackaged Plan and that the holders of Non-Assumed General Unsecured Claims are not entitled to any recovery under the Prepackaged Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under section 8.1 of the Prepackaged Plan to assert its Claims

41

against the Purchaser, solely to the extent the Claim was assumed by the Purchaser under the Asset Purchase Agreement, or against the Post-Effective Date Debtors solely to the extent the Claim was not assumed by the Purchaser and is entitled to a distribution hereunder, in any forum as though the Debtors' Chapter 11 Cases had not been commenced. Notwithstanding anything to the contrary herein, the Purchaser or any holder of a Disputed Claim shall be entitled to file a motion in the Bankruptcy Court to determine whether any Claim was assumed by the Purchaser under the Asset Purchase Agreement.

29. <u>Conditions to Effective Date</u>. The Prepackaged Plan shall not become effective unless and until the conditions set forth in section 10.1 of the Prepackaged Plan have been satisfied.

30. <u>Professional Compensation</u>. Except as provided in section 2.1 of the Prepackaged Plan, all entities seeking awards by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is ninety days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred (a "<u>Final Fee Application</u>") and (b) be paid in full, in Cash, in such amounts as are Allowed by the Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. Notice of a hearing (the "<u>Final Fee Hearing</u>") on the Final Fee Applications shall be provided in accordance with the Bankruptcy Rules and Local Rules. The Post-Effective Date Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Court approval. The Asset Purchase Agreement shall provide

42

that the portion of Specified Expenses that covers compensation for professional services or reimbursement of expenses incurred by professionals for which Bankruptcy Court approval is required shall be provided by Purchaser to the Post-Effective Date Debtors in Cash pursuant to section 2.2 of the Prepackaged Plan. On the Effective Date, the Post-Effective Date Debtors shall set aside such Cash in a separate, interest-bearing escrow account pending final allowance by the Bankruptcy Court of all professional fee applications.

31.    <u>Objections to Final Fee Applications</u>.  All objections to any Final Fee Applications shall be filed with the Court, together with proof of service thereof, and served upon the applicant and the Notice Parties, so as to be received not later than 4:00 p.m. prevailing Eastern Time on the date that is five Business Days prior to the Final Fee Hearing.

32.    <u>Discharge</u>.  To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, as of the Effective Date, the confirmation of the Prepackaged Plan shall (i) pursuant to section 11.3 of the Prepackaged Plan and except as otherwise provided in the Prepackaged Plan or herein, discharge and release all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estates or properties or interests in property, and (ii) except as provided otherwise in the Prepackaged Plan or herein, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full in exchange for the consideration provided under the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan or herein, all Persons shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or their respective properties or interests in property, any other Claims based upon any

act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

      33.    <u>No Retained Liabilities</u>.  Neither the Debtors nor the Post-Effective Date Debtors shall retain any liability for any Claims arising from liabilities assumed by the Purchaser pursuant to the Asset Purchase Agreement, and all such Claims against the Debtors shall be discharged and forever barred.

      34.    <u>Releases by the Debtors and Stalking Horse</u>.  Except as otherwise specifically provided herein and to the extent permitted by applicable law and approved by the Bankruptcy Court, effective immediately prior to the occurrence of the Effective Date (provided the Effective Date occurs), the releases set forth in section 13.12 of the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) and in the NHL Owner Consent (as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) shall be effective and, except for the right to enforce the Prepackaged Plan, (i) the Debtors and (ii) if the Stalking Horse is the Purchaser, the Purchaser and the Owner Support Parties shall be deemed to forever release, waive and discharge the First Lien Released Parties and the Second Lien Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.  Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge

of (i) any First Lien Released Party or Second Lien Released Party in respect of any contractual obligations of any such First Lien Released Party or Second Lien Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors and assigned to the Purchaser pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court or (ii) any causes of action unknown to the Debtors, the Purchasers, or the Owner Support Parties, respectively, as of the Commencement Date arising out of willful misconduct or gross negligence of any such First Lien Released Party or Second Lien Released Party as determined by a Final Order of the Bankruptcy Court.

35.    Releases by Holders of Claims.

Except as otherwise specifically provided in this Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, other than the right to enforce the Prepackaged Plan, (a) each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan, each Second Lien Administrative Party who opts in to the release contained in Section 11.6 of the Prepackaged Plan, and each holder of a Second Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan shall be deemed to forever release, waive and discharge the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the NHL Released Parties, and the Purchaser Released Parties (if the Stalking Horse is the Purchaser), of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or

RLF1 5595295v. 1

derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise and (b) the NHL shall be deemed to forever release, waive and discharge each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan, each Second Lien Administrative Party who opts in to the release contained in Section 11.6 of the Prepackaged Plan, and each holder of a Second Lien Secured Claim who opts in to the release contained in Section 11.6 of the Prepackaged Plan of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise; *provided, however*, that nothing contained in Section 11.6 of the Prepackaged Plan shall operate as a release, waiver or discharge of the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County, or any claims, causes of action, or rights in connection therewith.

Notwithstanding the foregoing, (i) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party to receive indemnification or reimbursement pursuant to section 9.6 of the First Lien Credit Agreement, (ii) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party or any other holder of a First Lien Secured Claim against GSP Finance LLC, any Second Lien Administrative Party or any other

46

holder of a Second Lien Secured Claim arising out of (a) the filing of, pursuit of or recovery (if any) from the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County or (b) the Intercreditor Agreement, (iii) on an after the Effective Date, the contractual rights and obligations between and among the First Lien Administrative Parties and holders of First Lien Secured Claims under the First Lien Credit Agreement and related loan documents shall survive and continue with respect to any acts, omissions, facts, matters, transactions or occurrences on or after the Effective Date, and (iv) except as set forth in Section 4.3 of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan. Furthermore, notwithstanding the foregoing, such releases, waivers and discharges shall not operate as a release, waiver or discharge of (i) any First Lien Released Party, any Second Lien Released Party, Debtor Released Party, NHL Released Party or Purchaser Released Party in respect of any contractual obligations of any such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan, (ii) any counterclaims or crossclaims against any First Lien Released Party or any Second Lien Released Party by any NHL Released Party arising out of or related to an action against any NHL Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iii) any counterclaims or crossclaims against any NHL Released Party by a First Lien Released Party arising out of or related to an action against such First Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iv) any counterclaims or crossclaims against any NHL Released Party by a Second Lien Released Party arising out of or related to an action against such Second Lien Released Party arising out of or relating to any

claim which is released pursuant to this Prepackaged Plan, or (v) any cause of action by a party granting a release under Section 11.6 of the Prepackaged Plan against a Released Party that is both unknown as of the Commencement Date to the party granting the release under Section 11.6 of the Prepackaged Plan and arises out of or relates to willful misconduct or gross negligence by the Released Party as determined by a Final Order of the Bankruptcy Court.

36.     Release and Exculpation Provisions.  All release and exculpation provisions embodied in the Prepackaged Plan, including but not limited to those contained in sections 11.4, 11.5, and 11.6 of the Prepackaged Plan, are (i) integral parts of the Prepackaged Plan, (ii) fair, equitable and reasonable, (iii) given for valuable consideration and (iv) are in the best interest of the Debtors and all parties in interest, and such provisions are approved and shall be effective and binding on all persons and entities, to the extent provided herein.

37.     Waiver of Avoidance Actions.  To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

38.     Term of Injunctions or Stays.  Except as otherwise specifically provided herein, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or

48

order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to section 11.5 or 11.6 of the Prepackaged Plan; *provided, however,* the First Lien Administrative Agent shall not be enjoined from taking any enforcement action with respect to any Lien against assets that it is entitled to receive under section 11.1 of the Prepackaged Plan. Unless otherwise provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

39. <u>Provisions to Resolve Objections by Governmental Bodies Relating to Certain Injunctions Provided by the Prepackaged Plan</u>.

(a) **Provision to Resolve Informal Objection by the Texas Comptroller of Public Accounts.** Notwithstanding anything in the Prepackaged Plan to the contrary, a Governmental Body (as defined in the Asset Purchase Agreement) may assert (i) any valid, enforceable setoff rights under applicable law to the extent allowed under section 553 of the Bankruptcy Code and (ii) any valid, enforceable recoupment rights under applicable law upon an order of the Bankruptcy Court or agreement of the parties.

(b) **Provision to Resolve Internal Revenue Service Objection.**[3]

Notwithstanding any provision to the contrary in the Prepackaged Plan, the Order confirming the Prepackaged Plan, and any implementing Prepackaged Plan documents, nothing shall: (a) affect the ability of the Internal Revenue Service (the "IRS") to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' estates; (b) affect the rights of the IRS to assert valid setoff and recoupment and such rights are expressly preserved; (c) discharge any claim of the IRS described in 11 U.S.C. § 1141(d)(6); or (d) constitute a waiver by the IRS of its right to assert that the Bankruptcy Court lacks jurisdiction over IRS claims and interests or any matter related to such claims and interests. To the extent the IRS Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, the IRS Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate and method set forth in 26 U.S.C. §§ 6621, 6622. IRS administrative expense claims shall be paid in full on the Effective Date, if any, or as soon as any such claims are determined and any IRS administrative expense claims shall accrue interest and penalties as provided by non-bankruptcy law until paid in full.

---

[3] Objection by the Internal Revenue Service to the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al. Under Chapter 11 of the Bankruptcy Code, filed October 25, 2011 [Docket No. 140].

40. <u>Provision to Resolve General Electric Capital Corporation Objection.</u>[4]
Nothing in the Prepackaged Plan or this Order shall (i) stay or discharge any claims of General Electric Capital Corporation (or its successors in interest) ("<u>GECC</u>") against the Debtors, (ii) stay or enjoin any claim of GECC against any non-debtor third party, including without limitation, non-debtor affiliates and Zurich American Insurance Company ("<u>Zurich</u>"), or (iii) stay or enjoin any action by GECC against Zurich in respect of policy MLP 9384326-00 or the proceeds of such policy; *provided, however*, that the rights reserved in respect of GECC shall not affect, alter or impair the rights of the holders of First Lien Secured Claims (including GECC in its capacity as a holder of a First Lien Secured Claim) or Second Lien Secured Claims to receive the distributions to which they are entitled under the terms of the Prepackaged Plan; *provided further, however*, GECC shall have no right of action against the Post-Closing Expense Amount, or any portion thereof, and shall not be entitled to receive any portion of the Post-Closing Expense Amount on account of any claim against the Debtors reserved in this paragraph (except to the extent GECC is otherwise entitled to such funds in its capacity as holder of a First Lien Secured Claim pursuant to the Prepackaged Plan).

41. <u>Indemnification Obligations of the Debtors and Stalking Horse.</u> Except to the extent assumed by the Purchaser under the Asset Purchase Agreement or pursuant to an assumed contract or as set forth in section 12.2 of the Asset Purchase Agreement, all contribution or indemnification obligations shall be rejected by the Debtors and classified as Non-Assumed General Unsecured Claims. For the avoidance of doubt and in order to clarify but not to limit any contractual indemnification obligation of the Stalking Horse under the Stalking Horse Senior Secured Credit Agreement and related loan documents, the Purchaser shall not indemnify the

---

[4] Objection of General Electric Capital Corporation to Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., *et al.* Under Chapter 11 of the Bankruptcy Code, filed October 24, 2011 [Docket No. 141].

holders of First Lien Secured Claims, the holders of Second Lien Secured Claims, the First Lien

Administrative Parties, or the Second Lien Administrative Parties, or pay for or reimburse losses,

claims, damages, liabilities or related expenses of such parties to the extent arising in connection

with or under or pursuant to (1) the First Lien Credit Agreement or any agreements entered into

pursuant thereto, (2) the Second Lien Credit Agreement or any agreements entered into pursuant

thereto, (3) any agreement with any Hicks Affiliate or any Intercompany Claim, or (4) any

matter arising in connection with or under or pursuant to events occurring prior to the Closing

Date related to any of the matters referred to in clauses (1) through (4) immediately herein

above.

42.     <u>Payment of Statutory Fees</u>.  All fees payable under section 1930, chapter

123, title 28, United States Code shall be paid by a Debtor until such Debtor's chapter 11 case is

closed.

43.     <u>Compliance with Tax Requirements</u>.  In connection with the Prepackaged

Plan and all distributions thereunder, any party issuing any instruments or making any

distribution under the Prepackaged Plan, including any party described in section 7.3 thereof,

shall, to the extent applicable as determined in its sole discretion, comply with all tax

withholding and reporting requirements imposed by any federal, state, local, or foreign taxing

authority, and all distributions under the Prepackaged Plan shall be subject to any such

withholding and reporting requirements.  Each such party shall be authorized to take all actions

necessary or appropriate to comply with such withholding and reporting requirements.  All

persons holding Claims shall be required to provide completed Forms W-8, W-9 and/or any

other forms or information necessary to effect information reporting and the withholding of such

taxes, as determined by the applicable party issuing any instruments or making any distribution

52

under the Prepackaged Plan. Notwithstanding any other provisions of the Prepackaged Plan to the contrary, with respect to any Allowed Claim the payment of which is subject to any withholding tax (i) each holder of such an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distributions, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Prepackaged Plan unless and until such holder has made arrangements satisfactory to the applicable party issuing any instruments or making any distribution under the Prepackaged Plan for the payment and satisfaction of such tax obligations. Any Cash, Senior Promissory Notes, documents, and/or other consideration or property to be distributed pursuant to the Prepackaged Plan shall, pending the receipt of such forms and/or implementation of such arrangements, be treated as an unclaimed distribution pursuant to section 7.7(a) therein. Any party issuing any instruments or making any distribution under the Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has provided the necessary tax forms or information and/or made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

44.     Exemption from Transfer Taxes.   Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or other securities under or in connection with the Prepackaged Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Prepackaged Plan, including the Asset Purchase Agreement and any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any

53

of the transactions contemplated under the Prepackaged Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

45.     <u>Dissolution of Post-Effective Date Debtors</u>.  Upon (i) the adjudication by the Bankruptcy Court of all applications by professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder and (ii) the completion of all other matters necessary to occur in the Chapter 11 Cases, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Upon the closing of the Chapter 11 Cases and the completion of all matters required to be performed by the Post-Effective Date Debtors under the Prepackaged Plan, the Asset Purchase Agreement, and applicable law other than dissolution, the Post-Effective Date Debtors shall be dissolved or otherwise consolidated without the need for further action (*i.e.*, without the need to file a certificate of dissolution or merger with or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of, or consolidate, the Post-Effective Date Debtors); provided, however, that the Post-Effective Date Debtors shall be required to provide notice to the Bankruptcy Court of Dissolution.  In the event the Post-Effective Date Debtors remain in possession of any Cash immediately prior to Dissolution, except as otherwise provided in section 2.2 of the Prepackaged Plan, such Cash shall be distributed to the First Lien Collateral Agent pursuant to sections 6.3 and 11.1 of the Prepackaged Plan.

46.     <u>Change of Name</u>.  Notwithstanding anything contained in their respective organizational documents or applicable state law to the contrary, each of the Debtors is

54

authorized, within five Business Days after the Effective Date, to change its respective name to a name that does not include "Dallas Stars" or "StarCenter" or any confusingly similar variations thereof and any amendment to the organizational documents (including the certificate of organization or certificate of incorporation) to effect such a change is authorized and approved, without partner, member, board, or shareholder approval. Upon any such change with respect to the Debtors, the Debtors shall file with the Court a notice of change of case caption within ten Business Days of the Effective Date, and the change of case caption for these Chapter 11 Cases shall be deemed effective as of the Effective Date.

47. <u>Documents, Mortgages, and Instruments</u>. Each and every federal, state, commonwealth, local, or foreign governmental agency, department, or office is hereby authorized and directed to accept this Order and any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Prepackaged Plan and this Order. This Order shall likewise be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities that may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

48. <u>Reversal/Stay/Modification/Vacatur of Order</u>. Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification or vacatur shall not affect the validity or enforceability of any act, obligation,

indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, Purchasers, or the Post-Effective Date Debtors as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order and the Prepackaged Plan or any amendments or modifications thereto. In accordance with section 1144 of the Bankruptcy Code, any reversal, stay, modification, or vacatur of this Order shall contain such provisions as are necessary to protect the Purchaser as the Purchaser acquired all rights in the Purchased Assets in good faith reliance on this Order.

49. <u>Retention of Jurisdiction</u>. Notwithstanding the entry of this Order or the occurrence of the Effective Date, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court, except as otherwise provided in the Prepackaged Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent as is legally permissible, including, but not limited to, jurisdiction over the matters set forth in Article XII of the Prepackaged Plan. For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement and the NHL Agreements.

50. <u>Modifications</u>. Without need for further order or authorization of the Court, the Debtors, subject to the approval of the NHL, or the Post-Effective Date Debtors are authorized and empowered to make any and all modifications to the Prepackaged Plan, any and all documents included as part of the Prepackaged Plan Supplement, the Asset Purchase Agreement, and any other document that is necessary to effectuate the Prepackaged Plan;

56

*provided* there shall be no Lender Adverse Modification without the consent of the First Lien Administrative Agent acting in its reasonable discretion. Subject to section 1127 of the Bankruptcy Code, holders of Claims that have accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan, as altered, amended, or modified, without further solicitation or notice and hearing being required pursuant to Bankruptcy Rule 3019; *provided* there has been no Lender Adverse Modification without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

51.     <u>Provisions of Prepackaged Plan and Order Nonseverable and Mutually Dependent</u>. The provisions of the Prepackaged Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

52.     <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent the Stalking Horse Senior Secured Credit Agreement or any exhibit to the Prepackaged Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Prepackaged Plan or the Prepackaged Plan Supplement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflict of laws.

53.     <u>Applicable Nonbankruptcy Law</u>. Pursuant to section 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Prepackaged Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

54.     <u>Waiver of Filings</u>. Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with

57

RLF1 5595295v. 1

the Court or the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee), is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

55. <u>Governmental Approvals Not Required</u>. This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Prepackaged Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Prepackaged Plan and the Disclosure Statement.

56. <u>Notice of Order</u>. In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order, substantially in the form annexed hereto as <u>Exhibit B</u>, to all parties who hold a Claim or Equity Interest in these cases and the U.S. Trustee. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

57. <u>Substantial Consummation</u>. On the Effective Date, the Prepackaged Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

58. <u>Waiver of Stay</u>. The stay of this Order provided by any Bankruptcy Rule (including Bankruptcy Rule 3020(e)), whether for fourteen days or otherwise, is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Court.

59. <u>Inconsistency</u>. To the extent of any inconsistency between this Order and the Prepackaged Plan, this Order shall govern.

RLF1 5595295v. 1

60. <u>No Waiver</u>. The failure to specifically include any particular provision of the Prepackaged Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Prepackaged Plan is confirmed in its entirety and incorporated herein by this reference.

Dated: November 18, 2011
      Wilmington, Delaware

THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

59

**Exhibit A**

The Prepackaged Plan

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
                                                              :
In re                                                         :   Chapter 11
                                                              :
DALLAS STARS, L.P., et al.¹                                   :   Case No. 11-12935 (PJW)
                                                              :
        Debtors.                                              :   Jointly Administered
                                                              :
------------------------------------------------------------  x
```

JOINT PREPACKAGED PLAN
OF REORGANIZATION OF DALLAS STARS, L.P., *ET AL.*
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS MODIFIED)

Dallas Stars, L.P., Dallas Arena LLC, Dallas Stars U.S. Holdings Corp., and StarCenters LLC as debtors and debtors in possession, propose the following joint prepackaged chapter 11 plan for the Debtors pursuant to section 1121(a) of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corp. (0485); and StarCenters LLC (4430).

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS AND INTERPRETATION........................................1

A.    Definitions ...............................................................................................1

B.    Rules of Interpretation ..........................................................................13

ARTICLE II      PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS........14

     2.1    Administrative Expense Claims ................................................14

     2.2    Professional Compensation and Reimbursement Claims.........................14

     2.3    Priority Tax Claims .................................................................15

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS......15

ARTICLE IV      TREATMENT OF CLAIMS AND EQUITY INTERESTS..............18

     4.1    Classes 1A through 1D – Priority Non-Tax Claims ..................................18

     4.2    Classes 2A through 2D – First Lien Secured Claims ................................18

     4.3    Classes 3A through 3D – Second Lien Secured Claims............................19

     4.4    Class 4A – CFV Claim.............................................................20

     4.5    Classes 5A through 5D – Secured Tax Claims .......................................21

     4.6    Classes 6A through 6D – Other Secured Claims......................................21

     4.7    Classes 7A through 7D – Assumed General Unsecured Claims..............21

     4.8    Classes 8A through 8D – Non-Assumed General Unsecured Claims......22

     4.9    Classes 9A through 9D – Equity Interests in Debtors..............................22

ARTICLE V      IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION ............................................22

     5.1    Holders of Claims and Equity Interests Entitled to Vote .........................22

     5.2    Holders of Claims and Equity Interests Not Entitled to Vote .................23

     5.3    Nonconsensual Confirmation ...................................................23

ARTICLE VI      MEANS OF IMPLEMENTATION AND POST-EFFECTIVE DATE GOVERNANCE......................................................23

     6.1    Asset Purchase Agreement and Related Documents................................23

     6.2    General Corporate Actions........................................................24

     6.3    Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases .................................................................24

i

**TABLE OF CONTENTS**
(continued)

Page

6.4 Cancellation of Liens.................................................................................25

ARTICLE VII  PROVISIONS GOVERNING DISTRIBUTIONS............................26

7.1 Date of Distributions on Account of Allowed Claims .............................26

7.2 Sources of Cash for the Prepackaged Plan Distribution..........................26

7.3 Disbursing Agent.....................................................................................26

7.4 Rights and Powers of Disbursing Agent .................................................26

7.5 Expenses of the Disbursing Agent .........................................................26

7.6 Record Date for Distribution ..................................................................27

7.7 Delivery of Distributions.........................................................................27

7.8 Manner of Payment Under Prepackaged Plan.........................................28

7.9 Setoffs and Recoupment..........................................................................28

7.10 Distributions After Effective Date...........................................................28

7.11 Allocation of Payments under the Prepackaged Plan..............................28

ARTICLE VIII  PROCEDURES FOR TREATING  CLAIMS UNDER THE
PREPACKAGED PLAN...................................................................28

8.1 Disputed Claims/Process.........................................................................29

8.2 No Postpetition Interest on Claims..........................................................29

ARTICLE IX  TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES.....................................................................29

9.1 Assumption of Contracts and Leases ......................................................29

9.2 Payments Related to Assumption of Contracts and Leases.....................30

9.3 Claims Based on Rejection of Executory Contracts or Unexpired
Leases ......................................................................................................31

9.4 Compensation and Benefit Plans and Treatment of Retirement Plan ......31

9.5 Insurance Policies....................................................................................31

ARTICLE X  CONDITIONS PRECEDENT  TO EFFECTIVE DATE .................32

10.1 Conditions Precedent to Effective Date of Prepackaged Plan.................32

10.2 Effect of Failure of Conditions................................................................32

10.3 Reservation of Rights ..............................................................................33

10.4 Substantial Consummation......................................................................33

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE XI       EFFECT OF CONFIRMATION .......................................................33
    11.1     Vesting of Assets.................................................................................33
    11.2     Binding Effect ....................................................................................34
    11.3     Discharge of the Debtors ...................................................................34
    11.4     Exculpation.........................................................................................34
    11.5     Releases by the Debtors and Stalking Horse ............................35
    11.6     Releases By Holders of Claims ..................................................35
    11.7     Waiver of Avoidance Actions ..............................................37
    11.8     Term of Injunctions or Stays ....................................................37
    11.9     Indemnification Obligations of the Debtors and Stalking Horse .............38
ARTICLE XII      RETENTION OF JURISDICTION ...................................................38
ARTICLE XIII     MISCELLANEOUS.........................................................................39
    13.1     Payment of Statutory Fees.................................................................39
    13.2     Filing of Additional Documents.........................................................40
    13.3     Schedules and Exhibits Incorporated ...............................................40
    13.4     Amendment or Modification of the Prepackaged Plan ...........................40
    13.5     Inconsistency ......................................................................................40
    13.6     Section 1125(e) of the Bankruptcy Code .................................................40
    13.7     Preservation of Rights of Action; Settlement of Litigation Claims .........41
    13.8     Compromise of Controversies...........................................................41
    13.9     Exemption from Certain Transfer Taxes .................................................41
    13.10    Compliance with Tax Requirements .......................................................42
    13.11    Determination of Tax Filings and Taxes .................................................42
    13.12    Severability of Provisions in the Prepackaged Plan ...............................42
    13.13    Governing Law ...................................................................................43
    13.14    Notices................................................................................................43
    13.15    Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment.......................................................................................44

RLF1 5595299V. 1

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.      Definitions**.

The following terms used herein shall have the respective meanings set forth below:

1.1      *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed under and in accordance with, as applicable, sections 330, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to section 503(b) of the Bankruptcy Code, and (d) the Stalking Horse Protection Claim, if any.  Any fees or charges assessed against the Estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section  13.1 (Payment of Statutory Fees) hereof.

1.2      *Affiliate Agreement* means, that certain letter agreement, dated September 1, 2011, by and among the Dallas Stars, Dallas Arena, Plano StarCenter, HSG, HSGH, and Hicks Holdings LLC, as may be amended from time to time.

1.3      *Allowed* means, with reference to any Claim or Equity Interest, (a) any Claim or Equity Interest arising on or before the Effective Date (i) as to which there is no dispute as to allowance or amount, or (ii) as to which any dispute has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Equity Interest as to which the liability of the Debtors (or to the extent assumed by the Purchaser, the Purchaser) and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (c) any Claim or Equity Interest expressly allowed hereunder.

1.4      *Amended Corporate Organizational Documents* means the amended and restated corporate organizational documents to be adopted by each Post-Effective Date Debtor that is a corporation (as such term is defined in the Bankruptcy Code) prior to or on the Effective Date to satisfy the requirements of section 1123(a)(6) of the Bankruptcy Code, which shall be substantially in the form to be filed as part of the Prepackaged Plan Supplement.

1.5      *Asset Purchase Agreement* means that asset purchase agreement between the Debtors and the Purchaser providing for the sale of the Purchased Assets, as amended, restated, amended and restated, or otherwise modified from time to time.  If the Stalking Horse is the Purchaser and there is no Auction, the Stalking Horse Asset Purchase Agreement shall be the Asset Purchase Agreement.

1.6     **Assumed General Unsecured Claim** means a General Unsecured Claim that is being assumed by the Purchaser under the Asset Purchase Agreement.

1.7     **Auction** means the auction for the Purchased Assets that shall occur under the Bidding Procedures and Confirmation Scheduling Order if there is more than one Qualified Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order).

1.8     **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time.

1.9     **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Cases.

1.10    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.11    **Bidding Procedures and Confirmation Scheduling Order** means the order entered by the Bankruptcy Court in the Chapter 11 Cases approving bidding procedures governing the Auction and sale of the Debtors' assets, with such changes as may be required by the Bankruptcy Court that are not materially adverse to the Purchaser or the Debtors, substantially in the form set forth in Exhibit C of the Stalking Horse Asset Purchase Agreement.

1.12    **Business Day** means any day other than a Saturday, Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    **Cash** means legal tender of the United States of America.

1.14    **Cash Collateral Order** means an order or orders of the Bankruptcy Court authorizing the use of cash collateral during the pendency of the Chapter 11 Cases.

1.15    **CFV Claim** means any Claim, including for any post-petition interest, against Dallas Stars arising under or in connection with the CFV Debt Agreement.

1.16    **CFV Debt Agreement** means that certain promissory note, dated January 14, 2011, in the original principal amount of $45,000,000, made by Dallas Stars and payable to CFV I LLC, an affiliate of the NHL, as amended from time to time.

1.17    **CFV Debt Amount** means the net amount owed by Dallas Stars to CFV I LLC, an affiliate of the NHL, pursuant to the CFV Debt Agreement.

1.18    **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and styled *In re Dallas Stars, L.P., et al.*

1.19    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.20     *Class* means any group of substantially similar Claims or Equity Interests classified by the Prepackaged Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.21     *Collateral* means any property or interest in property of the Estates of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

1.22     *Commencement Date* means the date on which the Debtors file their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

1.23     *Committee* means any official committee appointed in the Chapter 11 Cases, if any, as such committee may be reconstituted from time to time.

1.24     *Confirmation Date* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.25     *Confirmation Hearing* means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Prepackaged Plan, as such hearing may be adjourned or continued from time to time.

1.26     *Confirmation Order* means the order or orders of the Bankruptcy Court confirming the Prepackaged Plan, which shall be substantially in the form of Exhibit D to the Asset Purchase Agreement as the same may be amended, supplemented or otherwise modified in accordance with the terms of this Prepackaged Plan; provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

1.27     *Cure* means the payment of Cash by the Debtors or the Purchaser, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease or assume and assign such executory contract or unexpired lease to Purchaser under section 365(a) and/or section 365(f) of the Bankruptcy Code.

1.28     *Dallas Stars* means Dallas Stars, L.P., a Delaware limited partnership.

1.29     *Dallas Arena* means Dallas Arena LLC, a Texas limited liability company.

1.30     *Debtor* means each of Dallas Stars, Dallas Arena, U.S Holdings, and StarCenters in its capacity as a debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.31     *Debtor Released Party* means the Debtors and their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment

bankers, accountants, and other professionals retained by such persons) (but in the case of each of the foregoing, solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.32    ***Determined Hedge Claim*** means, with respect to each holder of a First Lien Secured Claim under a Hedge Agreement (as defined in the First Lien Credit Agreement): (i) the allowed amount of such holder's Claim as stipulated by such holder and the debtors in *In re Rangers Equity Holdings, L.P., et al.*, Case No. 10-43624 (Bankr. N.D. Tex. 2010) on or about December 21, 2010, pursuant to docket entries No. 140, 143, 146, 155 and 159 in such case, *minus* (ii) the aggregate amount of any distributions on account of such Claims received by such holder from the First Lien Administrative Agent or First Lien Collateral Agent following December 21, 2010, *plus* (iii) interest accrued on such Claim following the date of such stipulation, calculated in a manner consistent with the calculation of post-termination interest utilized by the debtors in *In re Rangers Equity Holdings, L.P. et al.* in stipulating to such allowed Claim amounts on or about December 21, 2010.

1.33    ***Disbursing Agent*** means the Officer or any party designated by the Post-Effective Date Debtors, in their sole discretion, to serve as a disbursing agent under Section 7.3 hereof.

1.34    ***Discharge of First Lien Obligations*** shall have the meaning ascribed to such term in the Intercreditor Agreement and shall be determined as of the Effective Date.

1.35    ***Disclosure Statement*** means that certain disclosure statement relating to the Prepackaged Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time.

1.36    ***Disputed Claim*** means any Claim that is not Allowed.

1.37    ***Disputed Equity Interest*** means any Equity Interest that is not an Allowed Equity Interest.

1.38    ***Dissolution*** means the dissolution, consolidation, or other termination of legal existence of the Post-Effective Date Debtors after the Effective Date.

1.39    ***Distribution Record Date*** means the record date for purposes of making distributions under the Prepackaged Plan on account of Allowed Claims, which date shall be three Business Days prior to the Effective Date.

1.40    ***Effective Date*** means the first Business Day on which all the conditions precedent to the Effective Date specified in Section 10.1 hereof shall have been satisfied.

1.41    ***Equity Interest*** means any partnership interest, membership interest, or the interest of any holders of equity securities of any of the Debtors represented by issued and outstanding shares of common or preferred stock or other instruments evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

4

1.42    **Estates** means the estates of the Debtors as created under section 541 of the Bankruptcy Code.

1.43    **Excluded Contract** means (i) the Asset Purchase Agreement and all documents related thereto, (ii) all contracts between the Debtors and any broker or investment banker related to the Asset Purchase Agreement, other than GSP Securities LLC, (iii) except as set forth on Schedule 1.1(a)(i) of the Asset Purchase Agreement, all contracts between the Debtors and any Affiliate of the Debtors or any other Hicks Affiliate (other than contracts to which the only parties that are Affiliates of the Debtors or any other Hicks Affiliate consist of (A) any Debtor and any other Debtor or (B) any Debtor and any Transferred Subsidiary), (iv) the contracts listed on Schedule 1.1(a)(ii) of the Asset Purchase Agreement, and (v) the First Lien Credit Agreement and Second Lien Credit Agreement, and all contracts related thereto.

1.44    **Excluded Liabilities** shall have the meaning given in the Asset Purchase Agreement.

1.45    **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.46    **First Lien Administrative Agent** means JPMorgan Chase Bank, N.A., as administrative and collateral agent to the lenders under the First Lien Credit Agreement.

1.47    **First Lien Administrative Parties** means JPMorgan Securities Inc., as joint lead arranger, joint bookrunner, and co-syndication agent, Barclays Capital Inc., as joint lead arranger, and joint bookrunner, Barclays Bank PLC, as co-syndication agent and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, in each case pursuant to the First Lien Credit Agreement.

1.48    **First Lien Collateral Agent** means JPMorgan Chase Bank, N.A., as collateral agent under the First Lien Security Agreement.

1.49    **First Lien Credit Agreement** means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG as guarantors, the lenders party thereto, the First Lien Administrative

Parties, and the other Persons party thereto from time to time, as amended, restated, amended and restated, or otherwise modified from time to time.

1.50    *First Lien Released Parties* means (i) the holders of First Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) the First Lien Administrative Parties, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.51    *First Lien Secured Claim* means any Claim against a Debtor arising under or in connection with the First Lien Credit Agreement, including, without limitation, all Obligations (as defined in the First Lien Credit Agreement) or any Claim of a Prepetition First Lien Secured Party (as defined in the Cash Collateral Order) arising under the Cash Collateral Order related to the Senior Adequate Protection (as defined in the Cash Collateral Order).

1.52    *First Lien Security Agreement* means that certain Amended and Restated First Lien Pledge and Security Agreement, dated December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG as grantors and JPMorgan Chase Bank, N.A., as Collateral Agent, and the other Persons party thereto from time to time, as amended, restated, amended and restated, or otherwise modified from time to time.

1.53    *General Unsecured Claim* means any Claim against the Debtors that (a) is not an Administrative Expense Claim, Priority Non-Tax Claim, Priority Tax Claim, First Lien Secured Claim, Second Lien Secured Claim, CFV Claim, Secured Tax Lien Claim, Other Secured Lien Claim, or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.54    *Hicks Affiliate* means Thomas O. Hicks, his spouse and children (including adopted and step children), or any trust for the benefit of such persons or any Person (other than the Debtors or any Transferred Subsidiary) controlled by Thomas O. Hicks, his spouse and children (including adopted and step children), or any trust for the benefit of such persons.

1.55    *Hockey Enterprises* means Dallas Stars Hockey Enterprises (2002) Company, a Nova Scotia unlimited liability company.

1.56    *HSG* means HSG Sports Group LLC, a Texas limited liability company.

1.57    *HSGH* means HSG Sports Group Holdings LLC, a Texas limited liability company.

1.58    *Intercompany Claim* means any Claim held by a non-Debtor affiliate of a Debtor against a Debtor; *provided, however,* Intercompany Claim shall not include (i) any Claim held by Center Operating Company, L.P., a Texas limited partnership, Center GP, LLC, a Texas limited liability company, or Transferred Subsidiaries, (ii) any Claim arising out of any contract set forth

6

on Schedule 1.1(a)(i) of the Asset Purchase Agreement, or (iii) any Claim specifically assumed under the Asset Purchase Agreement.

1.59   *Intercreditor Agreement* means that certain Intercreditor Agreement dated as of December 19, 2006 by and among HSG, JPMorgan Chase Bank, N.A. in its capacity as collateral agent for the First Lien Obligations (as defined therein) and GSP Finance LLC, as successor in interest to Barclays Bank PLC, in its capacity as collateral agent for the Second Lien Obligations (as defined therein) (as has been or may be further amended, restated, supplemented or otherwise modified from time to time).

1.60   *Lender Adverse Modifications* means any amendment or waiver of this Prepackaged Plan, the Confirmation Order, or any provision thereof in a manner materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims. For the purposes of this definition of Lender Adverse Modifications, and without limitation thereto, any amendments or waivers of the following provisions or terms shall be deemed "materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims": (i) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with (A) the solicitation of votes on the Prepackaged Plan, (B) the negotiation and consummation of the Prepackaged Plan and related documents, (ii) the releases and exculpation for the benefit of the First Lien Administrative Parties and other holders of First Lien Secured Claims under the Prepackaged Plan and Confirmation Order, and (iii) the provisions of the Prepackaged Plan and Confirmation Order ordering the sale of the Purchased Assets free and clear of all claims, liens, liabilities and interests.  In addition, if the Stalking Horse is the Purchaser, any amendments or waivers of the following provisions or terms shall also be deemed "materially adverse to the First Lien Administrative Parties and other holders of First Lien Secured Claims": (i) the maturity, interest rate or principal amount of the Term Loans (as defined in the Stalking Horse Senior Secured Credit Agreement) (including the terms of any adjustment to the aggregate principal amount of the Term Loans pursuant to Article III of the Stalking Horse Asset Purchase Agreement), (ii) the property comprising the Collateral securing the Obligations (each as defined in the Stalking Horse Senior Secured Credit Agreement), (iii) the validity, priority and perfection of the liens on and security interests in the Collateral (including as provided in the Confirmation Order) granted in favor of the First Lien Administrative Parties and other holders of First Lien Secured Claims, (iv) the identity of the "Loan Parties" and "Owner Support Parties" under the Stalking Horse Senior Secured Credit Agreement, (v) the terms and conditions of the Owner Support Agreement (as defined in the Stalking Horse Senior Secured Credit Agreement), (vi) the Confirmation Order's findings that the First Lien Administrative Parties and other holders of First Lien Secured Claims have acted in good faith in connection with the negotiation and deemed extension of the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement), and (vii) the Confirmation Order's findings that the Senior Secured Loan (as defined in the Stalking Horse Senior Secured Credit Agreement) is not a preference or a fraudulent transfer and that the transactions contemplated by the Stalking Horse Asset Purchase Agreement are not fraudulent transfers.

1.61   *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.62    ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the District of Delaware.

1.63    ***NHL*** means the National Hockey League.

1.64    ***NHL Affiliated Party*** means each of the NHL Entities and each of the NHL Member Clubs (except Dallas Stars, but including future NHL Member Clubs) and each of their respective subsidiaries and other affiliates and each of their respective predecessors, successors and assigns and each of their respective past, present or future, direct or indirect, owners, partners, members, shareholders, directors, officers, agents, trustees, employees and governors.

1.65    ***NHL Agreements*** means the NHL Owner Consent, NHL Guaranty, and Purchaser/NHL Proxy, each as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser.

1.66    ***NHL Entities*** means the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., NHL Enterprises B.V., Intra-Continental Ensurers, Limited, NHL Network US, L.P., NHL Network US, Inc., NHL Network, Inc., 3918939 Canada Inc., 3918921 Canada Inc., CFV I LLC, any entity that may be formed by the NHL Member Clubs generally after the date of the Asset Purchase Agreement, any other entity jointly owned by all or substantially all of the NHL Member Clubs or their respective subsidiaries, and each of their respective affiliates and subsidiaries; *provided* that the "NHL Entities" shall not include the NHL Member Clubs.

1.67    ***NHL Commissioner*** means the person designated as Commissioner of the NHL from time to time or, in the absence of an NHL Commissioner, any person or entity succeeding to the powers and duties of the NHL Commissioner under the NHL Constitution.

1.68    ***NHL Constitution*** means the Constitution of the NHL, as adopted by the NHL Member Clubs, as the same may be amended from time to time, and any and all actions taken thereunder, including all bulletins, guidelines, policies, directives, interpretations, opinions, rulings, and decisions issued by the NHL Commissioner or his or her designee.

1.69    ***NHL/Lender Cooperation Agreement*** means (i) if the Stalking Horse is the Purchaser, the NHL/Lender Cooperation Agreement shall have the meaning given in section 9.9 of the Stalking Horse Asset Purchase Agreement, with such modifications as may be acceptable to the NHL and the First Lien Administrative Agent, or (ii) if the Stalking Horse is not the Purchaser and the Purchaser provides consideration in the form of a secured debt obligation to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if applicable), that letter agreement to be entered into among the NHL, the Purchaser, any of its owner-support parties, any guarantors, pledgors, or similar parties, and the administrative agent with respect to such debt obligation, in form and substance reasonably satisfactory to the NHL and the First Lien Administrative Agent.

1.70    ***NHL Member Clubs*** means the hockey clubs of the NHL.

1.71 **NHL Released Parties** means, the NHL Affiliated Parties and their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of the foregoing, solely in their capacities as such).

1.72 **NHL Rules** shall have the meaning given in the Asset Purchase Agreement.

1.73 **Non-Assumed General Unsecured Claim** means a General Unsecured Claim that is not being assumed by the Purchaser under the Asset Purchase Agreement, including all Intercompany Claims and Excluded Liabilities. [2]

1.74 **Officer** means the Person appointed by the Debtors and identified at or prior to the Confirmation Hearing to be the sole officer of each of the Post-Effective Date Debtors as of the Effective Date to wind up the affairs of the Post-Effective Date Debtors.

1.75 **Other Secured Claim** means a Secured Claim other than a First Lien Secured Claim, a Second Lien Secured Claim, or a Secured Tax Claim.

1.76 **Owner Support Parties** has the meaning ascribed to such term in the Stalking Horse Senior Secured Credit Agreement.

1.77 **Person** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.78 **Plano StarCenter** means Plano StarCenter LLC, a Texas limited liability company.

1.79 **Post-Closing Expense Amount** means the $750,000 in Cash paid by the Purchaser to the Debtors on the Effective Date pursuant to the Asset Purchase Agreement.

1.80 **Post-Effective Date Debtors** means any of the Debtors after the Effective Date.

1.81 **Prepackaged Plan** means this joint prepackaged plan of reorganization, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code, including the exhibits and schedules hereto; provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion.

1.82 **Prepackaged Plan Supplement** means the compilation of documents, including the Amended Corporate Organizational Documents and any exhibits to the Prepackaged Plan not included herewith that the Debtors may file with the Bankruptcy Court on or before the date that

---

[2] Except for Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, the Debtors are not aware of any Non-Assumed General Unsecured Claims.

RLF1 5595299v. 1

is five Business Days prior to the initial deadline scheduled by the Bankruptcy Court to object to the Prepackaged Plan.

1.83    ***Priority Non-Tax Claim*** means any Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.84    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.85    ***Purchased Assets*** means the assets sold under the Asset Purchase Agreement. For the avoidance of doubt, the Purchased Assets shall not include any Claims or causes of action released by the Debtors pursuant to Section 11.5(a) hereof.

1.86    ***Purchaser*** means the Qualified Bidder or Qualified Bidders (as defined in Exhibit 1 to the Bidding Procedures and Confirmation Scheduling Order), which may be the Stalking Horse, selected pursuant to the Bidding Procedures and Confirmation Scheduling Order and approved by the Bankruptcy Court at the Confirmation Hearing that will acquire the Purchased Assets on the Effective Date.

1.87    ***Purchaser Released Parties*** means, solely if the Stalking Horse is the Purchaser: (i) the Purchaser, (ii) the Owner Support Parties, (iii) the Transferred Subsidiaries, and (iv) for each of (i), (ii), and (iii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), (iii), and (iv), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.88    ***Released Parties*** means (i) any party, other than an insurer, being released under section 13.12 of the Stalking Horse Asset Purchase Agreement, or such similar section of the Asset Purchase Agreement if the Stalking Horse is not the Purchaser, (ii) any party entitled to exculpation under Section 11.4 of the Prepackaged Plan, and/or (iii) any party entitled to a release under Sections 11.5 and 11.6 of the Prepackaged Plan.  For the avoidance of doubt, Released Parties shall exclude any Hicks Affiliate.

1.89    ***Second Lien Administrative Agent*** means GSP Finance LLC, as successor-in-interest to Barclays Bank PLC, as administrative and collateral agent to the lenders under the Second Lien Credit Agreement.

1.90    ***Second Lien Administrative Parties*** means JPMorgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, GSP Finance LLC, as successor-in-interest to Barclays Bank PLC, as administrative agent, collateral agent and co-syndication agent to the lenders under the Second Lien Credit Agreement.

1.91    ***Second Lien Credit Agreement*** means that certain Second Lien Credit and Guaranty Agreement, dated December 19, 2006, by and among HSGH, HSG, certain

10

subsidiaries of HSG, as guarantors, the lenders party thereto, the Second Lien Administrative Parties, and the other Persons party thereto from time to time, as amended, restated, amended and restated or otherwise modified from time to time.

1.92   ***Second Lien Expense Reimbursement*** means the fees of the Second Lien Administrative Agent's legal and accounting advisors for reviewing the Prepackaged Plan and Disclosure Statement's terms related to the consideration provided to holders of Second Lien Secured Claims under Section 4.3 of the Prepackaged Plan, up to an amount of $25,000 that is payable to the Second Lien Administrative Agent.

1.93   ***Second Lien Released Parties*** means (i) the holders of Second Lien Secured Claims who opt in to the releases contained in Sections 11.5 and 11.6 of this Prepackaged Plan, (ii) any Second Lien Administrative Party that submits to the Debtors by the deadline for the solicitation of votes on the Prepackaged Plan, in accordance with the notice requirements set forth in Section 13.14 of the Prepackaged Plan, a fully executed copy of the Consent to Release Form by Second Lien Administrative Party, a copy of which is attached hereto as Exhibit A, and (iii) for both (i) and (ii), their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) (but in the case of each of (i), (ii), and (iii), solely in their capacities as such), but in each case excluding any Hicks Affiliate.

1.94   ***Second Lien Secured Claim*** means a Claim against a Debtor arising under or in connection with the Second Lien Credit Agreement, including, without limitation, all Obligations (as defined in the Second Lien Credit Agreement).

1.95   ***Secured Claim*** means, a Claim that is secured by a Lien that is valid, perfected, and enforceable, and not avoidable, upon property in which a Debtor has an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed to by a Debtor or Post-Effective Date Debtor and the holder of such Claim.

1.96   ***Secured Creditor Consideration*** means (i) the consideration provided under the Asset Purchase Agreement to the holders of First Lien Secured Claims and, if the Discharge of First Lien Obligations has occurred, the holders of Second Lien Secured Claims, plus (ii) property distributed to the First Lien Administrative Agent pursuant to Sections 6.3 and 11.1 hereof. If the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement, then the consideration provided to the holders of First Lien Secured Claims shall be (i) the Stalking Horse Senior Secured Obligations, (ii) any Cash payments made under the Stalking Horse Asset Purchase Agreement to the First Lien Administrative Agent for the benefit of the holders of First Lien Secured Claims, and (iii) any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 hereof. If the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, then the consideration provided to each holder of First Lien Secured Claims, and if the Discharge of First Lien Obligations has occurred, to the holders of Second Lien Secured Claims, shall be (i) (a) the aggregate consideration (other than the liabilities assumed under the Asset Purchase Agreement) provided under the Asset Purchase

11

Agreement (which, pursuant to the Bidding Procedures and Confirmation Scheduling Order, shall be of a higher or better value than the consideration provided to holders of First Lien Secured Claims and (if the Discharge of First Lien Obligations has occurred) Second Lien Secured Claims under the Stalking Horse Asset Purchase Agreement), plus (b) any Cash or other property remaining in the Estates following the Effective Date as provided in Sections 6.3 and 11.1 hereof, minus the sum of (x) the aggregate amount of Cash necessary to satisfy the CFV Claim and the Specified Expenses plus (y) the Stalking Horse Asset Protection Claim, if such claim is payable pursuant to the terms of the Stalking Horse Asset Purchase Agreement; *provided*, that, unless otherwise expressly agreed in writing by the First Lien Administrative Agent with the consent of the holders of a majority in amount of the First Lien Secured Claims, the consideration set forth in the Asset Purchase Agreement may be in the form of a debt obligation to the holders of First Lien Secured Claims *only* if the Stalking Horse is the Purchaser and such debt is in the amount and on the terms set forth in the Stalking Horse Senior Secured Credit Agreement.

1.97 ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority and right of payment under section 507(a)(8) of the Bankruptcy Code.

1.98 ***Specified Expenses*** means those unpaid fees and expenses relating to the sale process and the related matters contemplated by the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) as set forth therein, including (i) amounts due to GSP Finance LLC (arising solely in its capacity as sell-side advisor), (ii) all fees and expenses of the NHL, including reimbursement of its legal, accounting and other advisers (including, without limitation, any such fees contemplated by section 7.8 of the Stalking Horse Asset Purchase Agreement), (iii) fees of Debtors' legal and accounting advisors, (iv) the Post-Closing Expense Amount, (v) Second Lien Expense Reimbursement, and (vi) any other expenses related to the sale process and the related matters contemplated by this Agreement (including, without limitation, any antitrust fees and any fees resulting from the filings contemplated under section 9.15 of the Stalking Horse Asset Purchase Agreement).

1.99 ***Stalking Horse*** means, collectively and individually, (i) Dallas Sports & Entertainment, L.P., a Delaware limited partnership, (ii) DSE Hockey Club, L.P., a Delaware limited partnership, (iii) DSE Hockey Centers, L.P., a Delaware limited partnership, and (iv) DSE Plano GP, Inc., a Delaware corporation.

1.100 ***Stalking Horse Asset Purchase Agreement*** means the asset purchase agreement among the Debtors and the Stalking Horse, dated September 15, 2011, as amended, restated, amended and restated, or otherwise modified from time to time.

1.101 ***Stalking Horse Protection Claim*** means the Claim by the Stalking Horse against the Debtors payable under the Bidding Procedures and Confirmation Scheduling Order if the Stalking Horse is not the Successful Bidder.

1.102 ***Stalking Horse Senior Secured Credit Agreement*** means the credit agreement by and among the Stalking Horse, the First Lien Administrative Agent, and the holders of First Lien

Secured Claims, as amended or otherwise modified from time to time, governing the Stalking Horse Senior Secured Obligation, a copy of which is attached as Exhibit J to the Stalking Horse Asset Purchase Agreement.

      1.103  ***Stalking Horse Senior Secured Obligation*** means the obligation to be owed by the Stalking Horse to the holders of First Lien Secured Claims (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) as of the Effective Date pursuant to the Stalking Horse Asset Purchase Agreement, the terms of which shall be set forth in the Stalking Horse Senior Secured Credit Agreement whether or not the holder of a First Lien Secured Claim (and the holders of Second Lien Secured Claims, if each of Classes 3A through 3D votes to accept the Prepackaged Plan) executes the Stalking Horse Senior Secured Credit Agreement, which if the Stalking Horse Asset Purchase Agreement is the Asset Purchase Agreement shall be in the original principal amount of $100,000,000 (as may be adjusted downwards pursuant to the terms of the Stalking Horse Asset Purchase Agreement) in partial satisfaction of the First Lien Secured Claims and, if applicable, Second Lien Secured Claims.

      1.104  ***StarCenters*** means StarCenters LLC, a Texas limited liability company.

      1.105  ***Successful Bidder*** means the Successful Bidder as defined in the Bidding Procedures and Confirmation Scheduling Order or the Back-up Bidder (as defined in the Bidding Procedures and Confirmation Scheduling Order) if the Back-up Bidder is required to and does consummate the purchase of the Purchased Assets.

      1.106  ***Transferred Subsidiaries*** means Hockey Enterprises, and to the extent not excluded under section 9.17 of the Stalking Horse Asset Purchase Agreement or as applicable, the similar provision under the Asset Purchase Agreement, Plano StarCenter.

      1.107  ***U.S. Holdings*** means Dallas Stars U.S. Holdings Corp., a Delaware corporation.

**B.**    **Rules of Interpretation**.

      For purposes of the Prepackaged Plan: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) unless otherwise specified, any reference in the Prepackaged Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Prepackaged Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (5) unless otherwise specified, all references in the Prepackaged Plan to articles or sections are references to the articles or sections of the Prepackaged Plan; (6) unless otherwise specified, all references in the Prepackaged Plan to exhibits are references to exhibits contained or included in

13

the Prepackaged Plan Supplement; (7) the words "herein," "hereof," and "hereto" refer to the Prepackaged Plan in its entirety rather than to a particular portion of the Prepackaged Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Prepackaged Plan, the rights and obligations arising pursuant to the Prepackaged Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to articles of the Prepackaged Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Prepackaged Plan; (10) unless otherwise set forth in the Prepackaged Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form in the Prepackaged Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents filed in the Debtors' Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Debtors' Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Post-Effective Date Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Prepackaged Plan all without further order of the Bankruptcy Court.

In computing any period of time prescribed or allowed by the Prepackaged Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

### PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE, PROFESSIONAL AND TAX CLAIMS

2.1 *Administrative Expense Claims.*

Except as set forth in Section 2.2 of this Prepackaged Plan, to the extent an Allowed Administrative Claim is assumed by the Purchaser under the Asset Purchase Agreement, that Claim shall be paid by the Purchaser in the ordinary course of business as and when due. The Debtors are not aware of any Administrative Claim that will not be assumed and paid by the Purchaser; however, in the event any Allowed Administrative Claim is not assumed and paid by the Purchaser, the Debtors will satisfy such claim from the Post-Closing Expense Amount in the ordinary course of business.

2.2 *Professional Compensation and Reimbursement Claims.*

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, other than professionals retained in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses, shall (a) file,

14

on or before the date that is ninety days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred in the ordinary course of business that are not required to submit applications for compensation for services or reimbursement of expenses in the ordinary course and without the need for Bankruptcy Court approval. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred by professionals after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

The Asset Purchase Agreement shall provide that the portion of Specified Expenses that covers compensation for professional services or reimbursement of expenses incurred by professionals for which Bankruptcy Court approval is required shall be provided by Purchaser to the Post-Effective Date Debtors in Cash. On the Effective Date, the Post-Effective Date Debtors shall set aside such Cash in a separate, interest-bearing escrow account pending final allowance by the Bankruptcy Court of all professional fee applications. To the extent any Cash remains in the escrow account after the payment of all compensation for professional services or reimbursement of expenses incurred by professionals following the entry of Final Orders with respect to all professionals, the Post-Effective Date Debtors shall authorize the release of such Cash from the escrow account to the Purchaser.

2.3 *Priority Tax Claims*.

Under the Asset Purchase Agreement, the Purchaser shall assume all of the Debtors' tax obligations for all taxable periods. With respect to any Priority Tax Claims not paid as of the Effective Date, except to the extent that a holder of an Allowed Priority Tax Claim against the Debtors agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date by the Purchaser; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business, by the Purchaser; or (c) be treated on such other terms and conditions as are acceptable to the Purchaser and the holder of such Claim.

## ARTICLE III

## CLASSIFICATION OF CLAIMS
## AND EQUITY INTERESTS

The following table designates the Classes of Claims against, and Equity Interests in, the Debtors and specifies which of those Classes and Equity Interests are (a) impaired or unimpaired by the Prepackaged Plan, (b) entitled to vote to accept or reject the Prepackaged Plan

15

in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Prepackaged Plan.

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 1A | Dallas Stars | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1B | Dallas Arena | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1C | U.S. Holdings | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 1D | StarCenters | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2A | Dallas Stars | First Lien Secured Claims | Impaired | Yes |
| Class 2B | Dallas Arena | First Lien Secured Claims | Impaired | Yes |
| Class 2C | U.S. Holdings | First Lien Secured Claims | Impaired | Yes |
| Class 2D | StarCenters | First Lien Secured Claims | Impaired | Yes |
| Class 3A | Dallas Stars | Second Lien Secured Claims | Impaired | Yes |
| Class 3B | Dallas Arena | Second Lien Secured Claims | Impaired | Yes |
| Class 3C | U.S. Holdings | Second Lien Secured Claims | Impaired | Yes |
| Class 3D | StarCenters | Second Lien Secured Claims | Impaired | Yes |
| Class 4A | Dallas Stars | CFV Claim | Unimpaired | No (deemed to accept) |

16

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 5A | Dallas Stars | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5B | Dallas Arena | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5C | U.S. Holdings | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 5D | StarCenters | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 6A | Dallas Stars | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6B | Dallas Arena | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6C | U.S. Holdings | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 6D | StarCenters | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 7A | Dallas Stars | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7B | Dallas Arena | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7C | U.S. Holdings | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7D | StarCenters | Assumed General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 8A | Dallas Stars | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8B | Dallas Arena | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |

RLF1 5595299v. 1

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| Class 8C | U.S. Holdings | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 8D | StarCenters | Non-Assumed General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 9A | Dallas Stars | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9B | Dallas Arena | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9C | U.S. Holdings | Equity Interests in Debtors | Impaired | No (deemed to reject) |
| Class 9D | StarCenters | Equity Interests in Debtors | Impaired | No (deemed to reject) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    *Classes 1A through 1D – Priority Non-Tax Claims*.

(a)    Impairment and Voting.  Classes 1A through 1D are unimpaired by the Prepackaged Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Distributions.  Allowed Priority Non-Tax Claims, if any, will be assumed by Purchaser and paid in Cash on the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a different treatment.

4.2    *Classes 2A through 2D – First Lien Secured Claims*.

(a)    Impairment and Voting.  Classes 2A through 2D are impaired by the Prepackaged Plan.  Each holder of a First Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

18

(b)  Distributions.  The First Lien Secured Claims shall be Allowed Claims and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, impairment, objection, or any other challenge under any applicable law or regulation by any person or entity.  On the Effective Date (or, as expressly contemplated by Sections 6.3 and 11.1 hereof, after the Effective Date), each holder of a First Lien Secured Claim shall be issued (on behalf of the Debtors) its pro rata share (in accordance with the First Lien Security Agreement) of the Secured Creditor Consideration up to the full Allowed amount of such Claim, including accrued interest under the First Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of First Lien Secured Claims is in the form of secured debt obligations to the holders of First Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement.  In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.,* Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims.  Notwithstanding anything to the contrary herein or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; *provided, however*, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent hereunder shall be in the form of a secured debt obligation in the original principal amount of $500,000; *provided further, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as provided in Section 4.3 of the Prepackaged Plan, the holders of Second Lien Secured Claims shall neither receive nor retain any distribution hereunder unless and until the Discharge of First Lien Obligations has occurred.

4.3    *Classes 3A through 3D – Second Lien Secured Claims*.

(a)  Impairment and Voting.  Classes 3A through 3D are impaired by the Prepackaged Plan.  Each holder of a Second Lien Secured Claim is entitled to vote to accept or reject the Prepackaged Plan.

(b)  Distributions.  The Second Lien Secured Claims shall be Allowed Claims.  In full satisfaction, settlement, release, and discharge of, and in exchange for, each Second Lien Secured Claim, in the event that the Discharge of First Lien Obligations has occurred, each holder of a Second Lien Secured Claim, on account of its Second Lien Secured Claim, on the Effective Date shall be issued (on behalf of the Debtors) its pro rata share of the

19

RLF1 5595299v. 1

Secured Creditor Consideration remaining after the Discharge of First Lien Obligations (including payment of accrued interest under the First Lien Credit Agreement through the Effective Date), up to the full Allowed amount of the Second Lien Secured Claim, including accrued interest under the Second Lien Credit Agreement through the Effective Date; *provided, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. In the event the Second Lien Secured Claims are entitled to a distribution and the Secured Creditor Consideration under the Asset Purchase Agreement is provided in consideration of different forms (*e.g.*, Stalking Horse Senior Secured Obligations, Cash), the First Lien Administrative Agent, with the consent of the holders of a majority in amount of the First Lien Secured Claims, shall be entitled to choose the form of consideration to be used first to satisfy the First Lien Secured Claims. Other than as set forth herein, on the Effective Date, any Second Lien Secured Claim shall be extinguished and the holders of any Second Lien Secured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Second Lien Secured Claim; *provided, however*, and notwithstanding anything to contrary herein or in the Intercreditor Agreement, on the Effective Date the Second Lien Administrative Agent shall receive the Second Lien Expense Reimbursement.

(c)     Distributions if Classes 3A through 3D Accepts the Prepackaged Plan. Notwithstanding anything to the contrary herein or in the Intercreditor Agreement, if each of Classes 3A through 3D votes to accept the Prepackaged Plan, the Second Lien Administrative Agent shall receive on the Effective Date, $500,000 of the Secured Creditor Consideration that would otherwise have been distributed to holders of First Lien Secured Claims and which consideration shall be distributed pro rata to holders of Second Lien Secured Claims in accordance with the Second Lien Credit Agreement; *provided, however*, that if a portion of the Secured Creditor Consideration is in the form of a secured debt obligation in an original principal amount of at least $500,000, the Secured Creditor Consideration distributed to the Second Lien Administrative Agent hereunder shall be in the form of a secured debt obligation in the original principal amount of $500,000; *provided further, however*, that if all or a portion of the distribution to the holders of Second Lien Secured Claims is in the form of secured debt obligations to the holders of Second Lien Secured Claims payable by the Purchaser, such secured debt obligations shall be subject to that certain NHL/Lender Cooperation Agreement. Except as set forth in this Section 4.3, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan.

4.4     *Class 4A – CFV Claim.*

(a)     Impairment and Voting. Class 4A is unimpaired by the Prepackaged Plan. Each holder of an Allowed CFV Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)  Distributions.  The CFV Claim shall be an Allowed Claim.  On the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the CFV Claim shall be paid in full in Cash by the Purchaser under the Asset Purchase Agreement, as provided therein.

4.5  *Classes 5A through 5D – Secured Tax Claims.*

(a)  Impairment and Voting. Classes 5A through 5D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)  Distributions.  Each holder of an Allowed Secured Tax Claim that is assumed by the Purchaser under the Asset Purchase Agreement shall retain its existing lien, if any, in the Purchased Assets and any rights associated therewith pursuant to applicable non-bankruptcy law, and shall be paid in Cash by the Purchaser when such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business.

4.6  *Classes 6A through 6D – Other Secured Claims.*

(a)  Impairment and Voting.  Classes 6A through 6D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and will be conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)  Distributions.  Allowed Other Secured Claims will be assumed by the Purchaser on the Effective Date under the Asset Purchase Agreement. Each holder of an Allowed Other Secured Claim shall, on the Effective Date, either (i) retain its existing lien in the Purchased Assets and be paid by the Purchaser when such Allowed Other Secured Claim becomes due and owing in the ordinary course of business, or (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

4.7  *Classes 7A through 7D – Assumed General Unsecured Claims.*

(a)  Impairment and Voting.  Classes 7A through 7D are unimpaired by the Prepackaged Plan. Each holder of an Allowed Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to accept the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)  Distributions.  Each holder of an Allowed Assumed General Unsecured Claim will be paid by the Purchaser on the Effective Date or when and as such Allowed Assumed General Unsecured Claim becomes due and owing in the ordinary course of business.

21

4.8    *Classes 8A through 8D – Non-Assumed General Unsecured Claims*.

(a)    <u>Impairment and Voting</u>. Classes 8A through 8D are impaired by the Prepackaged Plan. To the extent there are any claims in Classes 8A through 8D, each holder of an Allowed Non-Assumed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively deemed to reject the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Distributions</u>. On the Effective Date, any Non-Assumed General Unsecured Claim shall be extinguished and the holders of any Non-Assumed General Unsecured Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Non-Assumed General Unsecured Claim. In the event the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests. Except for Intercompany Claims and claims with certain affiliates arising out of certain executory contracts, the Debtors are not aware of any Non-Assumed General Unsecured Claim.

4.9    *Classes 9A through 9D – Equity Interests in Debtors*.

(a)    <u>Impairment and Voting</u>. Classes 9A through 9D are impaired by the Prepackaged Plan. Each holder of an Allowed Equity Interest in Debtors is deemed to reject the Prepackaged Plan.

(b)    <u>Distribution</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Debtors shall be maintained; *provided, however,* the holders of the Allowed Equity Interests in Debtors shall not be entitled to transfer such Allowed Equity Interests in Debtors to any party, and shall not receive or retain any property or interest in property on account of such Allowed Equity Interests in Debtors unless the Auction yields sufficient proceeds such that the Second Lien Secured Claims are entitled to receive payment in full, in which case the Debtors shall file an amended Prepackaged Plan setting forth revised distributions to holders of Non-Assumed General Unsecured Claims, if any, and potentially to holders of Equity Interests.

## ARTICLE V

## IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION

5.1    *Holders of Claims and Equity Interests Entitled to Vote*.

Each of Classes 2A through 2D (First Lien Secured Claims) and Classes 3A through 3D (Second Lien Secured Claims) is entitled to vote to accept or reject this Prepackaged Plan.

RLF1 5595299v. 1

5.2    *Holders of Claims and Equity Interests Not Entitled to Vote.*

Each of Classes 1A through 1D (Priority Non-Tax Claims), Class 4A (CFV Claim), Classes 5A through 5D (Secured Tax Claims), Classes 6A through 6D (Other Secured Claims), and Classes 7A through 7D (Assumed General Unsecured Claims) is unimpaired by the Prepackaged Plan and the holders of Allowed Claims in Classes 1A through 1D, 4A, 5A through 5D, 6A through 6D, and 7A through 7D are conclusively deemed to have accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.

Each of Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) is impaired by the Prepackaged Plan and will receive no distribution under the Prepackaged Plan. The holders of claims in Classes 8A through 8D (Non-Assumed General Unsecured Claims) and Classes 9A through 9D (Equity Interests in Debtors) are conclusively deemed to have rejected the Prepackaged Plan.

5.3    *Nonconsensual Confirmation.*

If any impaired Class of Claims or Interests entitled to vote shall not accept the Prepackaged Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Prepackaged Plan in accordance with Section 13.4 of the Prepackaged Plan or to undertake to have the Bankruptcy Court confirm the Prepackaged Plan under section 1129(b) of the Bankruptcy Code or both.

## ARTICLE VI

## MEANS OF IMPLEMENTATION
## AND POST-EFFECTIVE DATE GOVERNANCE

6.1    *Asset Purchase Agreement and Related Documents.*

(a)    <u>General</u>. On the Effective Date, the transactions contemplated by the Asset Purchase Agreement and any documents in connection therewith, including the Affiliate Agreement, shall be consummated. Except as otherwise explicitly provided herein or in the Asset Purchase Agreement, on the Effective Date, substantially all of the Debtors' property shall be sold and transferred to the Purchaser in accordance with the terms of the Asset Purchase Agreement and the Prepackaged Plan in exchange for the consideration set forth in the Asset Purchase Agreement. Any property comprising the Estates that is not transferred under the Asset Purchase Agreement shall revest in the Post-Effective Date Debtors.

(b)    <u>Amendments</u>. To the extent there are material amendments to the Stalking Horse Asset Purchase Agreement or if the Stalking Horse Asset Purchase Agreement is not the Asset Purchase Agreement, the Debtors shall file the Asset Purchase Agreement (and any related documents) prior to the Confirmation Hearing. After the Confirmation Date, the Debtors are authorized to enter into non-material amendments to the Asset Purchase Agreement or any other documents in accordance with the terms of the Asset Purchase Agreement in

23

furtherance of the transactions contemplated thereby without the need for further notice or Court approval.

### 6.2    *General Corporate Actions.*

(a)    <u>General</u>.  Upon the Effective Date, all actions contemplated by the Prepackaged Plan will be deemed authorized and approved in all respects, including (i) the consummation of the Asset Purchase Agreement and (ii) all other actions contemplated by the Asset Purchase Agreement and the Prepackaged Plan (whether to occur before, on or after the Effective Date).  All matters and transactions provided for in the Asset Purchase Agreement and the Prepackaged Plan concerning the structure of the Debtors or the Post-Effective Date Debtors, and any partnership, membership, or shareholder action required by the Debtors or the Post-Effective Date Debtors in connection with the Asset Purchase Agreement and the Prepackaged Plan will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the Debtors or the Post-Effective Date Debtors.  On or (as applicable) prior to the Effective Date, the general partner or the appropriate officers of each Debtor or Post-Effective Date Debtor, as applicable, shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by the Asset Purchase Agreement and the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated by the Asset Purchase Agreement and the Prepackaged Plan), including the Amended Corporate Organizational Documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan and the Asset Purchase Agreement, in each case in the name of and on behalf of such Debtor or Post-Effective Date Debtor.  Such authorizations and approvals will be effective notwithstanding any requirements under non-bankruptcy law.

(b)    <u>Continued Legal Existence</u>.  Except as otherwise provided in the Prepackaged Plan, each Debtor will continue to exist after the Effective Date as a separate legal entity with all the powers of such entity under applicable law pursuant to the Debtor's corporate organizational document(s), as may be amended, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law, including as set forth herein.

(c)    <u>Officers of the Post-Effective Date Debtor</u>. On the Effective Date, all existing officers of the Debtors shall resign or be deemed to have resigned and the Officer shall be appointed as the sole officer of each of the Post-Effective Date Debtors to wind up the affairs of the Post-Effective Date Debtors.

### 6.3    *Termination of the Post-Effective Date Debtors and Closing of the Chapter 11 Cases.*

Upon (i) the adjudication by the Bankruptcy Court of all applications by professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder and (ii) the completion of all other matters necessary to occur in the Chapter 11

Cases, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Upon the closing of the Chapter 11 Cases and the completion of all matters required to be performed by the Post-Effective Date Debtors under the Prepackaged Plan, the Asset Purchase Agreement, and applicable law other than dissolution, the Post-Effective Date Debtors shall be dissolved or otherwise consolidated without the need for further action (*i.e.*, without the need to file a certificate of dissolution or merger with or take any other action with respect to or receive any approval or any governmental authority that would ordinarily be required under applicable law to dissolve or implement the termination of the legal existence of, or consolidate, the Post-Effective Date Debtors); *provided, however*, that the Post-Effective Date Debtors shall be required to provide notice to the Bankruptcy Court of Dissolution; and *provided further, however*, that notwithstanding the foregoing, the Officer or other authorized person of Dallas Stars shall file a certificate of cancellation of Dallas Stars' certificate of limited partnership with the Secretary of State of the State of Delaware in accordance with the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* and that the Officer shall file a certificate of dissolution of U.S. Holdings with the Secretary of State of the State of Delaware in accordance with the General Corporation Law of the State of Delaware, 8 Del. C. § 101, *et seq.*  In the event the Post-Effective Date Debtors remain in possession of any Cash immediately prior to Dissolution, except as otherwise provided in Section 2.2 hereof, such Cash shall revert to the First Lien Collateral Agent, as contemplated by Section 11.1 hereof; *provided, however*, that if the Discharge of First Lien Obligations has occurred, such Cash shall revert to the Second Lien Administrative Agent, for the benefit of the holders of Second Lien Secured Claims.

### 6.4     *Cancellation of Liens*.

Except as otherwise specifically provided herein and in accordance with the Asset Purchase Agreement, upon the occurrence of the Effective Date, any Lien encumbering the Purchased Assets shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors constituting Purchased Assets (including any Cash collateral) held by such holder and to take such actions as may be requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets), to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Post-Effective Date Debtors or the Purchaser (to the extent the Lien encumbers Purchased Assets); *provided, however*, that such Liens shall be released regardless of whether any such filing or recordings are made.  Any valid, perfected prepetition liens against the Debtors' assets shall remain in force against such assets to the extent such assets remain in the possession of the Post-Effective Date Debtors following the Effective Date and the proceeds thereof with the same force and effect, priority and validity as existed with respect to the Debtors' assets and proceeds thereof prior to the Effective Date, and the Intercreditor Agreement shall continue to be of full force and effect with respect to such assets.  Upon the occurrence of the Effective Date, the Purchaser may file or record a certified copy of this Prepackaged Plan and any order confirming same, as well as any other documents evidencing the release of a Lien, in any state or county office to evidence the release of any Lien encumbering the Purchased Assets prior to the Effective Date.

25

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

7.1     *Date of Distributions on Account of Allowed Claims.*

Except as otherwise specifically provided herein or in the Asset Purchase Agreement, any distributions and deliveries to be made under the Prepackaged Plan shall be made on the Effective Date or as soon as practicable thereafter, *provided* that, any Cash distributions to the holders of (i) CFV Claims, (ii) First Lien Secured Claims (except as expressly contemplated by Sections 6.3 and 11.1 hereof), and (iii) Second Lien Secured Claims (if applicable) shall be made on the Effective Date.  In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

7.2     *Sources of Cash for the Prepackaged Plan Distribution.*

Except as otherwise specifically provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' cash on hand or the Purchaser.

7.3     *Disbursing Agent.*

All distributions under the Prepackaged Plan shall be made by the Purchaser as set forth in the Asset Purchase Agreement, by the Officer as the Disbursing Agent, or by such other Person designated as a Disbursing Agent pursuant to the Prepackaged Plan or by the Post-Effective Date Debtors.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.4     *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Prepackaged Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

7.5     *Expenses of the Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Post-Closing Expense Amount in the ordinary course of business.

### 7.6   *Record Date for Distribution.*

The record date for distributions shall be the Distribution Record Date.

### 7.7   *Delivery of Distributions.*

(a)   <u>Last Known Address</u>.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the Debtors, unless the applicable Debtor has been notified in writing of a change of address.  In the event that any distribution to any holder is returned as undeliverable, the Purchaser or Disbursing Agent, as applicable, shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Purchaser or Disbursing Agent, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Purchaser or Post-Effective Date Debtors, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(b)   <u>Distributions by First Lien Administrative Agent</u>.  The First Lien Administrative Agent shall be the Disbursing Agent for the Allowed First Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed First Lien Secured Claims shall be made by the First Lien Administrative Agent to the holders of such Allowed First Lien Secured Claims.  In connection therewith, the First Lien Administrative Agent shall distribute to each holder of a First Lien Secured Claim under a Hedge Agreement (as defined in the First Lien Credit Agreement) its pro rata share of the Secured Creditor Consideration, with such pro rata share calculated as such holder's Determined Hedge Claim divided by the aggregate amount of all First Lien Secured Claims (which, for the avoidance of doubt, includes the aggregate amount of Determined Hedge Claims).  The First Lien Administrative Agent shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of distributions.  If this Court or any other court of competent jurisdiction orders disgorgement of the payments made by the First Lien Administrative Agent pursuant to this Section, then (i) each holder of a First Lien Secured Claim shall only be required to disgorge its pro rata share of such payments and the holders of First Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the First Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a First Lien Secured Claim and which are no longer in the First Lien Administrative Agent's possession.

(c)   <u>Distributions by the Second Lien Administrative Agent</u>.  The Second Lien Administrative Agent shall be the Disbursing Agent for the Allowed Second Lien Secured Claims.  Distributions under the Prepackaged Plan to holders of such Allowed Second Lien Secured Claims, if any, shall be made by the Second Lien Administrative Agent to the holders of such Allowed Second Lien Secured Claims.  The Second Lien Administrative Agent

27

shall not be required to give any bond, surety, or other security for the performance of its duties with respect to its administration of distributions. If this Court or any other court of competent jurisdiction orders disgorgement of the payments made by the Second Lien Administrative Agent pursuant to this Section, then (i) each holder of a Second Lien Secured Claim shall only be required to disgorge its pro rata share of such payments and the holders of Second Lien Secured Claims shall not be jointly and severally liable for such disgorgement, and (ii) the Second Lien Administrative Agent shall not be liable to return any funds which it has distributed to any other holder of a Second Lien Secured Claim and which are no longer in the Second Lien Administrative Agent's possession.

### 7.8   *Manner of Payment Under Prepackaged Plan.*

At the option of the Purchaser or the Disbursing Agent, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements; *provided* that any Cash payment to be made to the holders of the CFV Claim, the First Lien Administrative Agent (as disbursing agent for the holders of First Lien Secured Claims), or the Second Lien Administrative Agent (as disbursing agent for the holders of Second Lien Secured Claims) shall be made by wire transfer.

### 7.9   *Setoffs and Recoupment.*

Except as otherwise specifically provided for herein (including, without limitation, as provided for in Section 4.2(b) hereof), the Debtors may, but shall not be required to, setoff against or recoup from any Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors of any such claim they may have against such claimant.

### 7.10   *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 7.11   *Allocation of Payments under the Prepackaged Plan.*

In the case of distributions with respect to holders of Claims pursuant to the Prepackaged Plan, such distributions shall, for tax purposes only, be allocable first to the principal amount of any such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim. The aggregate original principal amount of the indebtedness incurred by the Stalking Horse under the Stalking Horse Senior Secured Obligations (if applicable) shall reduce, on a dollar-for-dollar basis, the outstanding amount of the obligations under the First Lien Credit Agreement and, if applicable, the Second Lien Credit Agreement.

### ARTICLE VIII

## PROCEDURES FOR TREATING
## CLAIMS UNDER THE PREPACKAGED PLAN

### 8.1    *Disputed Claims/Process*.

On and after the Effective Date, except as otherwise provided herein, all Claims shall be paid in the ordinary course of business of the Purchaser if assumed under the Asset Purchase Agreement. If the Debtors, the Purchaser or any other party in interest disputes any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of Assumed General Unsecured Claims under this Prepackaged Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this Section 8.1 of the Prepackaged Plan to assert their claims against the Purchaser, solely to the extent the Claim was assumed by the Purchaser under the Asset Purchase Agreement, or against the Post-Effective Date Debtors solely to the extent the Claim was not assumed by the Purchaser and is entitled to a distribution hereunder, in any forum as though the Debtors' Chapter 11 Cases had not been commenced. Notwithstanding anything to the contrary herein, the Purchaser or any holder of a Disputed Claim shall be entitled to file a motion in the Bankruptcy Court to determine whether any Claim was assumed by the Purchaser under the Asset Purchase Agreement. Nothing contained in this Section 8.1 shall affect the allowance of Claims pursuant to Section 4.2 or 4.3 of the Prepackaged Plan.

### 8.2    *No Postpetition Interest on Claims*.

Except as otherwise specifically provided for herein, in the Confirmation Order or in any other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.

## ARTICLE IX

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

### 9.1    *Assumption of Contracts and Leases*.

(a)    General. Except as otherwise specifically provided herein and the Asset Purchase Agreement, as of the Effective Date, the Debtors shall be deemed to have assumed and assigned to the Purchaser each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a

29

motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is an Excluded Contract. All executory contracts and unexpired leases included in subsections (iii) and (iv) of the definition "Excluded Contracts" shall be deemed rejected as of the Effective Date, unless such contract has been previously rejected by the Debtors. Other than certain executory contracts with Affiliates (as such term is defined in the Asset Purchase Agreement), the Debtors are not aware of any executory contracts or unexpired leases that will be rejected by the Debtors on the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions, assumptions and assignments, or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on any schedule.

(b)     Objections to Rejection, Assumption, or Assumption and Assignment. Any party wishing to object to the rejection, assumption, or assumption and assignment of any executory contract or unexpired lease hereunder or the Cure amount payable with respect to any assumed contract or unexpired lease must follow the instructions described in the notice of the Confirmation Hearing for filing objections to the Prepackaged Plan and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates. Any counterparty that does not object to the rejection, assumption, or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Prepackaged Plan, and the Cure amount payable upon assumption, shall be deemed to have consented to such rejection, assumption, or assumption and assignment, and the Cure amount payable upon assumption.

9.2     *Payments Related to Assumption of Contracts and Leases.*

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder are in default shall be satisfied promptly, under section 365(b)(1) of the Bankruptcy Code, by the Purchaser upon assumption and assignment thereof. If there is a

RLF1 5595299v. 1

dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption and assignment, Cure shall occur within seven days following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 9.3    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*.

All Claims arising out of the rejection of executory contracts and unexpired leases shall be Non-Assumed General Unsecured Claims and are not entitled to a distribution hereunder.

### 9.4    *Compensation and Benefit Plans and Treatment of Retirement Plan*.

Except to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and employee benefit plans directly sponsored by the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Prepackaged Plan and assigned to the Purchaser under the Asset Purchase Agreement. Accordingly, the obligations under such plans and programs shall survive confirmation of the Prepackaged Plan, except for (i) executory contracts or benefit plans specifically rejected pursuant to the Prepackaged Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

### 9.5    *Insurance Policies*.

Notwithstanding anything contained in the Prepackaged Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, shall be assumed by the Debtors and assigned to Purchaser and continued in accordance with the terms of the Asset Purchase Agreement. Nothing contained in this Section 9.5 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

RLF1 5595299v. 1

## ARTICLE X

## CONDITIONS PRECEDENT
## TO EFFECTIVE DATE

10.1    *Conditions Precedent to Effective Date of Prepackaged Plan*.

The occurrence of the Effective Date of the Prepackaged Plan is subject to satisfaction of the following conditions precedent:

(a)    <u>Confirmation Order</u>.  The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)    <u>Execution and Delivery of Other Documents</u>.  All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Asset Purchase Agreement and Prepackaged Plan shall have been effectuated, including the documents comprising the Prepackaged Plan Supplement and, in each case, (i) shall have been approved by the Bankruptcy Court and (ii) all conditions to their effectiveness shall have been satisfied or waived pursuant to the terms thereof.

(c)    <u>Regulatory Approvals</u>.  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Prepackaged Plan and that are required by law, regulations, or order.

(d)    <u>NHL Approvals</u>.  The Debtors and the Purchaser (and all Persons and entities related thereto) shall have received all consents and approvals required by NHL to implement the Asset Purchase Agreement and the Prepackaged Plan.

(e)    <u>NHL Consent</u>.  Any amendments to or waivers of this Prepackaged Plan, the Confirmation Order, or any provision thereof in a manner (i) materially adverse to the NHL or any NHL Affiliated Party or (ii) inconsistent with the NHL Rules, has been consented to by the NHL.

(f)    <u>Consents</u>.  All other authorizations, consents, and approvals determined by the Debtors to be necessary to implement the terms of the Asset Purchase Agreement and Prepackaged Plan shall have been obtained.

10.2    *Effect of Failure of Conditions*.

If the conditions specified in Section 10.1 hereof have not been satisfied by the Termination Date (as defined in the Asset Purchase Agreement) or such later date as may be agreed to in writing by the First Lien Administrative Agent (acting on behalf of the holders of First Lien Secured Claims), the NHL, the Debtors, and the Purchaser, then: (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Prepackaged Plan shall be made; (iii) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be

32

restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Prepackaged Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors and the Prepackaged Plan shall be deemed withdrawn.

          10.3    *Reservation of Rights*.

          The Prepackaged Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or action taken by the Debtors with respect to the Prepackaged Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtors or any other party with respect to any Claims or Equity Interests or any other matter.

          10.4    *Substantial Consummation*.

          Substantial consummation of the Prepackaged Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## ARTICLE XI

## EFFECT OF CONFIRMATION

          11.1    *Vesting of Assets*.

          The property of the Estates that is not specifically disposed of pursuant to the Prepackaged Plan or purchased by Purchaser under the Asset Purchase Agreement, if any, shall vest in the Post-Effective Date Debtors on the Effective Date to be distributed in accordance with the terms of the Prepackaged Plan. All property sold, conveyed, or transferred to the Purchaser is and shall be free and clear of all Liens, Claims, and interests of any kind in accordance with section 363(f) of the Bankruptcy Code, except to the extent the Purchaser has assumed such Liens, Claims, or interests under the Asset Purchase Agreement. Thereafter, the Post-Effective Date Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Post-Effective Date Debtors not sold to the Purchaser shall be free and clear of all Claims, encumbrances, charges, and Liens except as specifically provided in the Prepackaged Plan or the Confirmation Order. Following the Effective Date, unless the Discharge of First Lien Obligations has occurred, (i) the First Lien Collateral Agent shall have the right, at its sole discretion at any time prior to, or upon, dissolution of the Debtors' estates, to accept an in-kind distribution of any non-Cash assets remaining in the Debtors' estates and (ii) upon dissolution of the Debtors' estates, the Post-Effective Date Debtors shall distribute any remaining Cash in the Estates to the First Lien Collateral Agent, in each case to be applied by the First Lien Collateral Agent in accordance with the First Lien Security Agreement.

33

### 11.2 Binding Effect.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Prepackaged Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder has accepted the Prepackaged Plan.

### 11.3 Discharge of the Debtors.

Except as otherwise specifically provided herein and to the extent permitted by applicable law and approved by the Bankruptcy Court, the treatment of all Claims against or Equity Interests in the Debtors under the Prepackaged Plan shall be in exchange for and in complete satisfaction, discharge, and release of, all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, from and after the Commencement Date, or against their Estates or properties or interests in property. Except as otherwise provided in the Prepackaged Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged, and released in full in exchange for the consideration provided under the Prepackaged Plan. Except as otherwise provided in the Prepackaged Plan, all Persons shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. For the avoidance of doubt, as of the Effective Date, the Post-Effective Date Debtors shall have no liability with respect to any Assumed General Unsecured Claims or other Claims assumed under the Asset Purchase Agreement.

### 11.4 Exculpation.

*Notwithstanding anything herein to the contrary (but subject to the following proviso), to the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, neither the Debtors, the Post-Effective Date Debtors, the Officer, the Stalking Horse, the Owner Support Parties, the Purchasers, the NHL Affiliated Parties, the Committee, the First Lien Released Parties, the Second Lien Released Parties nor their respective successors, predecessors, control persons, members, officers, affiliates, directors, employees, agents, professionals, and representatives (including any current or former attorneys, financial advisors, investment bankers (specifically including GSP Securities LLC in its capacity as investment banker and financial advisor to the Debtors), accountants, and other professionals retained by such persons), but in each case excluding any Hicks Affiliate, shall have or incur any liability to any holder of a Claim or Equity Interest for any Claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the marketing of the Debtors' assets, the Chapter 11 Cases, the negotiation, pursuit of approval, execution, or performance of the Asset Purchase Agreement, the Stalking Horse Senior Secured Credit Agreement, the Disclosure Statement, the Prepackaged Plan, the Prepackaged Plan Supplement, or any document related to the foregoing, or the solicitation of votes for, or confirmation of, the Prepackaged Plan or the*

34

*funding of the Prepackaged Plan, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan; provided, however, this Exculpation shall not operate as a release, waiver of discharge of any party in respect of any contractual obligations of such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Purchasers pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court.*

      11.5    *Releases by the Debtors and Stalking Horse.*

*Except as otherwise specifically provided herein and to the extent permitted by applicable law and approved by the Bankruptcy Court, effective immediately prior to the occurrence of the Effective Date (provided the Effective Date occurs), the releases set forth in section 13.12 of the Stalking Horse Asset Purchase Agreement (or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) and in the NHL Owner Consent (as defined in the Stalking Horse Asset Purchase Agreement or in the Asset Purchase Agreement if the Stalking Horse is not the Purchaser) shall be effective and, except for the right to enforce the Prepackaged Plan, (i) the Debtors and (ii) if the Stalking Horse is the Purchaser, the Purchaser and the Owner Support Parties shall be deemed to forever release, waive and discharge the First Lien Released Parties and the Second Lien Released Parties of and from any and all Claims, demands, causes of action and the like, relating to the Debtors and/or their affiliates, advisors, officers, directors and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise. Notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any First Lien Released Party or Second Lien Released Party in respect of any contractual obligations of any such First Lien Released Party or Second Lien Released Party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan or assumed by the Debtors and assigned to the Purchaser pursuant to the Prepackaged Plan or a Final Order of the Bankruptcy Court or (ii) any causes of action unknown to the Debtors, the Purchasers, or the Owner Support Parties, respectively, as of the Commencement Date arising out of willful misconduct or gross negligence of any such First Lien Released Party or Second Lien Released Party as determined by a Final Order of the Bankruptcy Court.*

      11.6    *Releases By Holders of Claims.*

*Except as otherwise specifically provided in this Prepackaged Plan and to the extent permitted by applicable law and approved by the Bankruptcy Court, other than the right to enforce the Prepackaged Plan, (a) each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this*

RLF1 5595299v. 1

*Section 11.6 shall be deemed to forever release, waive and discharge the First Lien Released Parties, the Second Lien Released Parties, the Debtor Released Parties, the NHL Released Parties, and the Purchaser Released Parties (if the Stalking Horse is the Purchaser), of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise and (b) the NHL shall be deemed to forever release, waive and discharge each First Lien Administrative Party, each holder of a First Lien Secured Claim who opts in to the release contained in this Section 11.6, each Second Lien Administrative Party who opts in to the release contained in this Section 11.6, and each holder of a Second Lien Secured Claim who opts in to the release contained in this Section 11.6 of and from any and all Claims, demands, causes of action and the like, relating to the Debtors or their affiliates, advisors, officers, directors, and holders of Equity Interests, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise; provided, however, that nothing contained in this Section 11.6 shall operate as a release, waiver or discharge of the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County, or any claims, causes of action, or rights in connection therewith.*

*Notwithstanding the foregoing, (i) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party to receive indemnification or reimbursement pursuant to section 9.6 of the First Lien Credit Agreement, (ii) such release, waiver and discharge shall not operate as a release, waiver or discharge of the rights of any First Lien Administrative Party or any other holder of a First Lien Secured Claim against GSP Finance LLC, any Second Lien Administrative Party or any other holder of a Second Lien Secured Claim arising out of (a) the filing of, pursuit of or recovery (if any) from the matter of GSP Finance LLC v. KPMG LLP, Index No. 650841/2011, commenced on March 29, 2011 in the Supreme Court of the State of New York, New York County or (b) the Intercreditor Agreement, (iii) on an after the Effective Date, the contractual rights and obligations between and among the First Lien Administrative Parties and holders of First Lien Secured Claims under the First Lien Credit Agreement and related loan documents shall survive and continue with respect to any acts, omissions, facts, matters, transactions or occurrences on or after the Effective Date, and (iv) except as set forth in Section 4.3 of the Prepackaged Plan, the Intercreditor Agreement shall remain in full force and effect following the Effective Date and shall not be altered by this Prepackaged Plan. Furthermore, notwithstanding the foregoing, such releases, waivers and discharges shall not operate as a release, waiver or discharge of (i) any First Lien Released Party, any Second Lien Released Party, Debtor Released Party, NHL Released Party or Purchaser Released Party in respect of any contractual obligations of any such party pursuant to the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Prepackaged Plan, (ii) any counterclaims or crossclaims against any First Lien*

36

*Released Party or any Second Lien Released Party by any NHL Released Party arising out of or related to an action against any NHL Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iii) any counterclaims or crossclaims against any NHL Released Party by a First Lien Released Party arising out of or related to an action against such First Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, (iv) any counterclaims or crossclaims against any NHL Released Party by a Second Lien Released Party arising out of or related to an action against such Second Lien Released Party arising out of or relating to any claim which is released pursuant to this Prepackaged Plan, or (v) any cause of action by a party granting a release under this Section 11.6 against a Released Party that is both unknown as of the Commencement Date to the party granting the release under this Section 11.6 and arises out of or relates to willful misconduct or gross negligence by the Released Party as determined by a Final Order of the Bankruptcy Court.*

        11.7    *Waiver of Avoidance Actions*.

        To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

        11.8    *Term of Injunctions or Stays*.

        (a)    Except as otherwise specifically provided herein, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Post-Effective Date Debtor or Released Party, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Post-Effective Date Debtor or Released Party, or against the property or interests in property of any Post-Effective Date Debtor or Released Party with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 11.5 or 11.6 of the Prepackaged Plan (whether in a direct capacity or derivative capacity); *provided, however,* the First Lien Administrative Agent shall not be enjoined from taking any enforcement action with respect to any Lien against assets that it is entitled to receive under Section 11.1 of the Prepackaged Plan.

        (b)    Unless otherwise provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy

Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

11.9   *Indemnification Obligations of the Debtors and Stalking Horse*.

Except to the extent assumed by the Purchaser under the Asset Purchase Agreement or pursuant to an assumed contract or as set forth in section 12.2 of the Asset Purchase Agreement, all contribution or indemnification obligations shall be rejected by the Debtors and classified as Non-Assumed General Unsecured Claims.  For the avoidance of doubt and in order to clarify but not to limit any contractual indemnification obligation of the Stalking Horse under the Stalking Horse Senior Secured Credit Agreement and related loan documents, the Purchaser shall not indemnify the holders of First Lien Secured Claims, the holders of Second Lien Secured Claims, the First Lien Administrative Parties, or the Second Lien Administrative Parties, or pay for or reimburse losses, claims, damages, liabilities or related expenses of such parties to the extent arising in connection with or under or pursuant to (1) the First Lien Credit Agreement or any agreements entered into pursuant thereto, (2) the Second Lien Credit Agreement or any agreements entered into pursuant thereto, (3) any agreement with any Hicks Affiliate or any Intercompany Claim, or (4) any matter arising in connection with or under or pursuant to events occurring prior to the Closing Date related to any of the matters referred to in clauses (1) through (4) immediately herein above.

**ARTICLE XII**

**RETENTION OF JURISDICTION**

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Prepackaged Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)   To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases;

(b)   To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Cases and grant or deny any application involving the Debtors that may be pending on the Effective Date;

(c)   To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Prepackaged Plan;

(d)   To hear and determine any timely objections to the classification of any Claim or Equity Interest, in whole or in part;

(e)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)     To issue such orders in aid of execution of the Prepackaged Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     To consider any amendments to or modifications of the Prepackaged Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)     To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Asset Purchase Agreement, the Prepackaged Plan, the Confirmation Order, the documents comprising the Prepackaged Plan Supplement, or other document governing or relating to any of the foregoing; *provided, however,* that the Bankruptcy Court shall not retain jurisdiction to hear and determine disputes arising under or in connection with the Stalking Horse Senior Secured Credit Agreement, NHL Agreements, and NHL/Lender Cooperation Agreement;

(j)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(k)     To hear any other matter not inconsistent with the Bankruptcy Code;

(l)     To hear and determine all disputes involving the existence, scope, and nature of the discharges granted under Section 11.3 of the Prepackaged Plan;

(m)     To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 11.4 of the Prepackaged Plan;

(n)     To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Prepackaged Plan; and

(o)     To enter a final decree(s) closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS

### 13.1  *Payment of Statutory Fees*.

All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Purchaser on the Effective Date.

RLF1 5595299v. 1

### 13.2   *Filing of Additional Documents*.

The Debtors or the Post-Effective Date Debtors, as applicable, may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Prepackaged Plan.

### 13.3   *Schedules and Exhibits Incorporated*.

All exhibits and schedules to this Prepackaged Plan, including the Prepackaged Plan Supplement, are incorporated into and are a part of the Prepackaged Plan as if fully set forth herein.

### 13.4   *Amendment or Modification of the Prepackaged Plan*.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments, or modifications of the Prepackaged Plan may be proposed in writing by the Debtors at any time prior to or after the Confirmation Date.  Holders of Claims that have accepted the Prepackaged Plan shall be deemed to have accepted the Prepackaged Plan, as altered, amended, or modified, *provided* that there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion, *provided, further,* that such alteration, amendment, or modification may not materially and adversely change the treatment of the Claim of such holder; and *provided, further, however,* that any holders of Claims that were deemed to accept the Prepackaged Plan because such Claims were unimpaired shall continue to be deemed to accept the Prepackaged Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

### 13.5   *Inconsistency*.

In the event of any inconsistency among the Prepackaged Plan, the Disclosure Statement, and any exhibit or schedule to the Disclosure Statement, the provisions of the Prepackaged Plan shall govern.  In the event of any inconsistency between the Prepackaged Plan and the Confirmation Order, the Confirmation Order shall govern.

### 13.6   *Section 1125(e) of the Bankruptcy Code*.

As of the Confirmation Date, the Debtors (including the Post-Effective Date Debtors), the holders of First Lien Secured Claims, the First Lien Administrative Agent, the holders of Second Lien Secured Claims, the Second Lien Administrative Agent, the NHL, CFV I LLC, the Purchaser, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Prepackaged Plan and their participation in the activities described in section 1125 of the

40

Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Prepackaged Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or the offer and issuance of the securities under the Prepackaged Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation and release provisions set forth in Article XI of the Prepackaged Plan.

### 13.7   *Preservation of Rights of Action; Settlement of Litigation Claims*.

Except as otherwise specifically provided herein or in the Asset Purchase Agreement, or in any contract, instrument, release, or other agreement entered into in connection with the Prepackaged Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors or the Purchaser (to the extent transferred to the Purchaser) shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person or entity without the approval of the Bankruptcy Court. The Post-Effective Date Debtors or their successor(s), including the Purchaser, may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Post-Effective Date Debtors or their successor(s), including the Purchaser, that hold such rights.

### 13.8   *Compromise of Controversies*.

In consideration for the distributions and other benefits provided under the Prepackaged Plan, the provisions of the Prepackaged Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Prepackaged Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

### 13.9   *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Prepackaged Plan, including the Asset Purchase Agreement, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Prepackaged Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Prepackaged Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 13.10 *Compliance with Tax Requirements*.

In connection with the Prepackaged Plan and all distributions thereunder, any party issuing any instruments or making any distribution under the Prepackaged Plan, including any party described in Section 7.3 hereof, shall, to the extent applicable as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Prepackaged Plan shall be subject to any such withholding and reporting requirements. Each such party shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims shall be required to provide completed Forms W-8, W-9 and/or any other forms or information necessary to effect information reporting and the withholding of such taxes, as determined by the applicable party issuing any instruments or making any distribution under the Prepackaged Plan. Notwithstanding any other provisions of the Prepackaged Plan to the contrary, with respect to any Allowed Claim the payment of which is subject to any withholding tax (i) each holder of such an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distributions, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Prepackaged Plan unless and until such holder has made arrangements satisfactory to the applicable party issuing any instruments or making any distribution under the Prepackaged Plan for the payment and satisfaction of such tax obligations. Any Cash, Stalking Horse Senior Secured Obligations, documents, and/or other consideration or property to be distributed pursuant to the Prepackaged Plan shall, pending the receipt of such forms and/or implementation of such arrangements, be treated as an unclaimed distribution pursuant to Section 7.7(a) herein. Any party issuing any instruments or making any distribution under the Prepackaged Plan has the right, but not the obligation, to not make a distribution until such holder has provided the necessary tax forms or information and/or made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

### 13.11 *Determination of Tax Filings and Taxes*.

The Post-Effective Date Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 13.12 *Severability of Provisions in the Prepackaged Plan*.

If, prior to Confirmation, any term or provision of the Prepackaged Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, upon consultation with the Purchaser and the NHL, and provided there shall be no Lender Adverse Modifications without the consent of the First Lien Administrative Agent acting in its reasonable discretion, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such

42

holding, alteration, or interpretation, the remainder of the terms and provisions of the Prepackaged Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.13  *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent the Stalking Horse Senior Secured Credit Agreement or any exhibit to the Prepackaged Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Prepackaged Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

### 13.14  *Notices*.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly specifically provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Attention: Martin A. Sosland
> Facsimile: (214) 746-7777
> Email: martin.sosland@weil.com
>
> and
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Ronit J. Berkovich
> Facsimile: (212) 310-8007
> Email: ronit.berkovich@weil.com
>
> with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attention: John H. Knight
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: knight@rlf.com


13.15  *Dissolution of any Statutory Committees and Cessation of Fee and Expense Payment.*

Any Committee appointed in the Chapter 11 Cases shall be dissolved on the Effective Date.  The Post-Effective Date Debtors shall no longer be responsible for paying any fees and expenses incurred by the advisors to any Committee after the Effective Date.

44

Dated: November 17, 2011

Respectfully submitted,

**DALLAS STARS, L.P.**

By:    */s/ Robert Hutson*                
    Name: Robert Hutson
    Title: Chief Financial Officer

**DALLAS ARENA LLC**

By:    */s/ Robert Hutson*                
    Name: Robert Hutson
    Title: Chief Financial Officer

**DALLAS STARS U.S. HOLDINGS CORP.**

By:    */s/ Robert Hutson*                
    Name: Robert Hutson
    Title: Treasurer

**STARCENTERS LLC**

By:    */s/ Robert Hutson*                
    Name: Robert Hutson
    Title: Chief Financial Officer

COUNSEL:


_/s/ Martin A. Sosland_____
John H. Knight
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19081
(302) 651-7700

       and

Martin A. Sosland
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
(214) 746-7700

Ronit J. Berkovich
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000


ATTORNEYS FOR THE DEBTORS

**Exhibit A**

Consent to Release Form by Second Lien Administrative Party

**Return Completed Form To:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Martin A. Sosland
Facsimile: (214) 746-7777
Email: martin.sosland@weil.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ronit J. Berkovich
Facsimile: (212) 310-8007
Email: ronit.berkovich@weil.com

with copies to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attention: John H. Knight
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: knight@rlf.com

I hereby certify that as a duly authorized representative of a Second Lien Administrative Party, as set forth in the Joint Prepackaged Plan of Reorganization of Dallas Stars, L.P., et al. Under Chapter 11 of the Bankruptcy Code (the "Prepackaged Plan"), I hereby elect to be a Second Lien Released Party (as defined in the Prepackaged Plan) by consenting to the releases set forth in Sections 11.5 and 11.6 of the Prepackaged Plan.

Print Name of Second Lien Administrative Party:  _____

Signature:  _____

Title:  _____

If by Authorized Agent, Title of Agent:  _____

Street Address:  _____

City, State and Zip Code:  _____

Telephone Number:  _____

Date Completed:  _____

## **Exhibit B**

Notice of Entry of the Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------   x
                                                               :
In re                                                          :     Chapter 11
                                                               :
DALLAS STARS, L.P., et al.¹                                    :     Case No. 11-12935 (PJW)
                                                               :
       Debtors.                                                :     Jointly Administered
                                                               :
------------------------------------------------------------   x
```

**NOTICE OF (I) ENTRY OF ORDER APPROVING THE DEBTORS'
(A) DISCLOSURE STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(b)
OF THE BANKRUPTCY CODE, (B) SOLICITATION OF VOTES AND VOTING
PROCEDURES, (C) FORMS OF BALLOTS, AND (D) CONFIRMING THE
DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE AND
(II) OCCURRENCE OF EFFECTIVE DATE**

**TO CREDITORS, EQUITY INTEREST HOLDERS, AND OTHER PARTIES IN
INTEREST:**

      PLEASE TAKE NOTICE that an order (the "Order") of the Honorable Peter J.
Walsh, United States Bankruptcy Judge, approving the disclosure statement, solicitation of votes
and voting procedures, and forms of ballots, and confirming the Joint Prepackaged Plan of
Reorganization of Dallas Stars, L.P., et al., Under Chapter 11 of the Bankruptcy Code dated as of
September 1, 2011 (as amended and supplemented, the "Prepackaged Plan"), of Dallas Stars,
L.P. ("Dallas Stars"), Dallas Arena LLC ("Dallas Arena"), Dallas Stars U.S. Holdings Corp.
("U.S. Holdings"), and StarCenters LLC ("StarCenters"), as debtors and debtors in possession
(collectively, the "Debtors"), was entered by the United States Bankruptcy Court for the District
of Delaware (the "Bankruptcy Court") on [November 18, 2011]. Unless otherwise defined in
this notice, capitalized terms used herein shall have the meanings ascribed to them in the
Prepackaged Plan and the Order.

      PLEASE TAKE FURTHER NOTICE that the Order is available for inspection
during regular business hours in the office of the Clerk of the Bankruptcy Court, 824 Market
Street, 3rd Floor, Wilmington, Delaware 19801. The Order is also available on the internet site
of the Debtors' noticing agent, The Garden City Group, at www.dslpinfo.com or by accessing

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification
number, are: Dallas Stars, L.P. (9450); Dallas Arena LLC (9999); Dallas Stars U.S. Holdings Corp. (0485), and
StarCenters LLC (4430).

the Bankruptcy Court's website, at www.deb.uscourts.gov. Please note that a PACER password and login are required to access documents on the Bankruptcy Court's website.

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Prepackaged Plan occurred on [November 18, 2011].

PLEASE TAKE FURTHER NOTICE that the Prepackaged Plan and the provisions thereof are binding on the Debtors, the Post-Effective Date Debtors, any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Prepackaged Plan and whether or not such holder or entity voted to accept the Prepackaged Plan.

Dated: _____, 2011
       Wilmington, Delaware

 

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Zachary I. Shapiro (No. 5103)
Julie A. Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
     – and –

Martin A. Sosland (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Ronit J. Berkovich (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**Exhibit C**

**(The Mavericks' Lawsuit)**